**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**Federal Trade Commission, et al.,**

**Plaintiffs,**

**v.**

**Staples, Inc. and Office Depot, Inc.**

**Defendants.**

---

**Civil Action No. 1:15-cv-02115 (EGS)**

**EXPERT REPORT OF JONATHAN ORSZAG**

**February 29, 2016**

<u>**THIS DOCUMENT CONTAINS CONFIDENTIAL MATERIAL**</u>

CONTAINS CONFIDENTIAL MATERIALS

## I.  QUALIFICATIONS

1.      My name is Jonathan Orszag.  I am a Senior Managing Director and member of

the Executive Committee of Compass Lexecon, LLC, an economic consulting firm.  In private

practice, my services have been retained by a variety of public-sector entities and private-sector

firms ranging from small businesses to Fortune 500 companies.  These engagements have

involved a wide array of matters, from entertainment and telecommunications issues to issues

affecting the manufacturing and retail industries.  I have worked on more than 100 merger-

related antitrust matters, including many consumer product mergers, and I have provided

testimony to the U.S. Congress, U.S. courts, the European Court of First Instance, the Federal

Communications Commission, and other domestic and foreign regulatory bodies on a range of

economic issues, including competition policy, industry structure, and fiscal policy.

2.      Previously, I served as the Assistant to the U.S. Secretary of Commerce and

Director of the Office of Policy and Strategic Planning and as an Economic Policy Advisor on

President Clinton's National Economic Council.  For my work at the White House, I was

presented the Corporation for Enterprise Development's 1999 leadership award for "forging

innovative public policies to expand economic opportunity in America."

3.      In addition to my role at Compass Lexecon, I am a Senior Fellow at the Center for

American Progress.  I received an M.Sc. from Oxford University, which I attended as a Marshall

Scholar.  I graduated *summa cum laude* in economics from Princeton University and was elected

to Phi Beta Kappa.

4.      My full *curriculum vitae*, including a listing of my prior testimony, is included as

Appendix A.  The hourly rate charged by Compass Lexecon for my work on this matter is

$1,050.  I have a financial interest in the overall profitability of Compass Lexecon, but I have no

financial interest in the outcome of this case.

1

CONTAINS CONFIDENTIAL MATERIALS

## II.     BACKGROUND AND SUMMARY OF OPINIONS

5.      Staples, Inc. ("Staples") and Office Depot, Inc. ("Office Depot") are publicly traded firms headquartered in the United States which sell, among other products, business supplies and services.[1]  On February 4, 2015, Staples and Office Depot announced that they had entered into a definitive agreement (the "Transaction") under which Staples will acquire all outstanding shares of Office Depot in exchange for cash and shares of Staples.[2]

6.      On March 30, 2015, the Federal Trade Commission ("FTC") served Staples and Office Depot with a second request for information and documentary materials related to the Transaction.[3]  On December 7, 2015, the FTC issued a complaint (the "Complaint") claiming that the Transaction violates Section 5 of the FTC Act and Section 7 of the Clayton Act, and requested that Staples and Office Depot be required to provide certain relief, including divestitures or reconstitution of assets, or in the alternative, requested a prohibition against the Transaction.[4]  The Complaint alleges that "[b]y eliminating direct competition between Staples and Office Depot, the Merger threatens significant harm to a wide range of large B-to-B [business-to-business] customers."[5]  The Complaint focuses on "the sale and distribution of consumable office supplies," where "consumable" office supplies include "pens, paper clips, notepads, and copy paper," but exclude other similar supplies, such as printer ink and toner.[6]

---

1.      "Staples, Inc. Announces Acquisition of Office Depot, Inc.," Staples, Inc. and Office Depot, Inc. Press Release, February 4, 2015.
2.      *Id.*
3.      Staples, Inc., "Form 8-K," March 30, 2015.
4.      Complaint, In the Matter of Staples, Inc., a corporation, and Office Depot, Inc., a corporation, Docket No. 9367.
5.      *Id.*, at ¶4.
6.      *Id.*, at ¶¶25, 26, & 28.  This definition of "consumable" office supplies seems to differ from that used by the FTC in its prior investigation of the 2013 merger of Office Depot with OfficeMax, which did appear to include ink and toner.  See "Statement of the Federal Trade Commission Concerning the Proposed Merger of Office Depot, Inc. and OfficeMax, Inc.," FTC File No. 131-0104, November 1, 2013 ("'Consumable office supplies' refers to non-durable products that consumers use up, discard, and purchase on a recurrent basis.  Examples included pens, paper, file folders, Post-it notes, and ink and toner cartridges.").

The Complaint also focuses on sales to particular customers: "Large B-to-B customers include, but are not limited to, those that buy $1 million annually of consumable office supplies for their own end-use."[7]

7.      On February 15, 2016, the FTC filed an expert report from Professor Carl Shapiro in support of its claims.[8]  For his analysis, Professor Shapiro adopted the FTC's set of consumable products, referring to them as a "cluster market," but appears to either clarify or expand the set of customers at issue to include smaller purchasers, those that buy between $500,000 and $1 million in these products.[9]  He claims that this set of products and customers constitutes a "proper relevant antitrust market" because "a monopoly provider of consumable office supplies would charge significantly more to large customers than Staples and Office Depot today charge these same customers."[10]  Professor Shapiro then argues that, using a proxy for this alleged market based on the "Fortune 100" set of companies, Staples and Office Depot together currently have a combined market share of 79 percent.[11]  If the Transaction takes place, Professor Shapiro claims that the combined firm will be able to raise prices by approximately six percent.[12]  Professor Shapiro also argues that his conclusions are not reversed by the potential for entry and expansion by competitors, nor by efficiencies gained from the merger, nor by the divestitures which Staples and Office Depot have agreed upon.  Professor Shapiro states that his concerns about the Transaction center on "unilateral effects."[13]  Professor Shapiro does not claim

---

7.      *Id*., at ¶30.
8.      Expert Report of Carl Shapiro, February 15, 2016 ("Shapiro Report").
9.      *Id*., at p. 5 & p. 2 ("I define large customers as commercial customers that purchased at least $500,000 worth of consumable office supplies during 2014 for their own end-use.").  Unless otherwise noted, I use the term "large B-to-B customers" to refer to these customers, without endorsing that threshold as an appropriate one.
10.     *Id*., at p. 12.
11.     *Id*., at p. 15.
12.     *Id*., at p. 40 ("this 6.0% figure can serve as a guide to the magnitude of post-merger price increase that Staples will be able to achieve because it will no longer be facing Office Depot as a competitor.").
13.     *Id*., at p. 3.

CONTAINS CONFIDENTIAL MATERIALS

that, or analyze whether, the Transaction would have anticompetitive coordinated effects; therefore, my analysis focuses on the question of unilateral effects as well.

8.        I was asked by counsel for Staples and Office Depot to review and evaluate, from an economic perspective, the FTC's Complaint and the expert report from Professor Shapiro. Based on my review of the available evidence on the competitive effects of the Transaction, I have reached certain conclusions, which are summarized below, and explained in greater depth in the remainder of the report.

9.        Before doing so, I believe it is conceptually helpful to put in context the magnitude of competitive harm due to the Transaction which Professor Shapiro is alleging.  As noted above, Professor Shapiro concludes that Staples and Office Depot will be able to achieve an approximately six percent increase in prices as a consequence of the Transaction.  Such an alleged six percent price increase is not on all of Staples' and Office Depot's sales, but only on the sales of a modest percentage of Staples' and Office Depot's overall products for a small percentage of Staples' and Office Depot's B-to-B customers.  Professor Shapiro identifies this subset of products and customers as constituting 6.4 percent of all Staples' and Office Depot's sales.[14]  Therefore, the alleged price increase constitutes approximately 0.38 percent of all Staples' and Office Depot's sales, *i.e.*, less than one-half of one percent.[15]

10.        As discussed in the remainder of my report, the evidence shows that Staples and Office Depot are unlikely to increase prices to large business customers due to the Transaction. However, even taking the FTC's and Professor Shapiro's claims about price effects at face value, the alleged competitive harm still would be more than offset by the efficiencies Staples and Office Depot expect from the Transaction and even modest views of the ability of competitors to

---

14.        *Id.*, at p. 7.
15.        0.38 percent = 6.0 percent x 6.4 percent.

CONTAINS CONFIDENTIAL MATERIALS

respond to the Transaction through entry or expansion and the competition that would come from the parties' proposed divestitures.  I demonstrate this quantitatively in section VII of this report.

11.    Based on my analysis, I have reached the following principal conclusions:

- The putative relevant market proposed by the FTC and Professor Shapiro is flawed.

    o First, in the real-world marketplace, customers almost never request bids or purchase products along the lines of the bundle of goods that the FTC and Professor Shapiro assert form a relevant market.  Instead, in almost all cases, a far larger set of goods – including ink and toner and other products – are at issue.

        ▪ Among Staples' 942 bids for large B-to-B contracts in 2014, only 11 (or 1.2 percent) included only the product categories in the FTC's and Professor Shapiro's product market definition.  A sizeable share of the contracts included at least five (and as many as nine) other product categories.

        ▪ Of the 529 large customers who purchased office supplies and paper from Staples in fiscal year 2014, *every single one* also purchased significant amounts from Staples in other product categories.

    o Second, Professor Shapiro has "clustered" office supplies and paper products into a single cluster market, but such an exercise fails Professor Shapiro's own stated test for the validity of such an approach.  Specifically, the products in his candidate market do *not* face similar competitive conditions.

        ▪ Consistent with the ability of large B-to-B customers to purchase or negotiate paper directly (or through an agent) with manufacturers, Professor Shapiro's own calculations of Staples' and Office Depot's margins on paper products are significantly lower than the margins he calculates for other office supplies.  Even within office supplies, these margins vary significantly.  Such evidence is consistent with different competitive conditions.

        ▪ In addition, office supply products are constrained by online/retail prices to different degrees, which means that they face different competitive conditions.

    o Finally, Professor Shapiro includes 1,075 "targeted customers" with more than $500,000 of consumable office supply purchases in his relevant market.  However, he has not conducted any reliable analysis to determine whether such a threshold is appropriate.  More importantly, the evidence presented shows that these large customers are so different from each other in so many

CONTAINS CONFIDENTIAL MATERIALS

different ways that it is inappropriate to aggregate such "targeted customers" together into one market.

- There are no significant barriers to entry or expansion for competing firms. Staples and Office Depot hold no specialized or unique assets as inputs that are not equally available to other competitors. If a combined Staples and Office Depot attempted to raise prices as a consequence of the Transaction, other competitors likely would enter or expand to compete for the combined firm's customers.

- Staples and Office Depot are already being challenged by many different rivals under current market conditions, including W.B. Mason, Amazon, and others. These rivals have demonstrated a ready ability to expand and reposition as necessary to gain market share, so there is no basis to conclude that these firms would not quickly respond to a hypothetical post-Transaction price increase. Such a conclusion is consistent with the FTC's own findings in the Office Depot / OfficeMax merger. Indeed, Professor Shapiro and I appear to agree that there is no evidence that the Office Depot / OfficeMax merger led to higher prices for large corporate customers.

- Another factor constraining the ability of the combined Staples / Office Depot to raise prices is the fact that customers have other competitive alternatives available to them in response to a hypothetical post-Transaction price increase. For example, customers can purchase paper and certain office supplies, either directly or indirectly, from manufacturers. In addition, there is extensive evidence of "leakage" (*i.e.*, purchases outside of a contract from rival firms) at current market prices and any attempt to raise prices post-Transaction would likely lead to an increase in such leakage.

- Consistent with these conclusions, my analysis shows that, contrary to the claims of the FTC and Professor Shapiro, larger customers are better protected from competitive harm than smaller customers. I find that, using Professor Shapiro's own margin calculations, Staples and Office Depot earn substantially *lower* returns and margins on such customers than they do on smaller B-to-B customers. Such lower margins for large B-to-B customers do not appear to be explained by scale economies or other associated factors.

- Professor Shapiro's "best estimate of market shares" focuses on a very small sliver of the overall sales of Staples and Office Depot: just Fortune 100 companies. These customers represented just 1.4 percent of overall Staples and Office Depot sales. For a number of reasons, including those already discussed, Professor Shapiro's market share calculation is incorrect.

  o First, the Fortune 100 does not appear to be representative of the more than 1,000 customers in the alleged relevant market.

  o Second, Professor Shapiro's analysis focuses on 81 of the Fortune 100, but there are a number of reasons why his sample of 81 is not representative of the full Fortune 100.

CONTAINS CONFIDENTIAL MATERIALS

- o Third, Professor Shapiro misattributes to Staples and Office Depot certain purchases by large B-to-B customers, raising questions about the reliability of his share calculations.  In the case of one company ▮▮▮▮▮▮▮▮▮▮ ), the correct market share for Staples and Office Depot should be 37 percent, instead of Professor Shapiro's reported 91 percent.  For another company ▮▮▮▮▮▮ , the correct market share should be 25 percent, instead of Professor Shapiro's reported 74 percent.

- o Fourth, Professor Shapiro does not fully account for "leakage" purchasing from distributors other than Staples and Office Depot.

- o Fifth, Professor Shapiro makes no adjustment for the future competitive significance of rival firms, such as Amazon Business, which are clearly growing.

- o Sixth, Professor Shapiro does not properly analyze the role of "diversity" suppliers, and simply lumps their sales in with Staples and Office Depot.

- o And finally, Professor Shapiro's market shares would be substantially lower if a wider variety of products were included in his relevant market, and he has not demonstrated that a broader relevant market is inappropriate.

- In the end, even if the FTC and Professor Shapiro's claims about the competitive effects of the merger are correct, the potential harms are small (relative to the overall size of the business) and would be felt by large B-to-B customers – some of the largest companies in the world.  On the other hand, the potential merger-specific efficiencies of the proposed Transaction will flow to all customers, including large and small companies *and* retail consumers.  Thus, in balancing the alleged harms against the potential benefits, I note that efforts to block the proposed Transaction seek to protect those best able to protect themselves (read: large companies) at the expense of retail and small B-to-B customers who are the least able to defend themselves and are the most in need of the lower-cost products that this proposed merger can achieve.

12.     In the following sections, I describe in more detail the facts and analyses that lead to these conclusions.  My conclusions are based on my analysis and review of available data and documents produced by the parties and other industry participants (to which my staff and I had complete access); documents; depositions; the economics literature; and interviews of key business executives at Staples and Office Depot.  A list of the materials I have relied upon in forming my opinion is included in Appendix B.  As Professor Shapiro aptly noted, discovery in

this case has been "fast and furious,"[16] and so my opinions may be revised in light of any new evidence that may emerge.  I, therefore, reserve the right to incorporate such evidence into my analysis.  In addition, like Professor Shapiro, due to the schedule, either I, or staff working under my direction, may have made an error.[17]  If such an error is pointed out to me, I will promptly correct that error and file an amendment to this report.

## III.    RELEVANT INDUSTRY BACKGROUND

13.    In this section, I briefly review some of the key facts that informed my conclusions.  I will refer back to these facts in subsequent sections, in which I describe the bases for my conclusions.

### A.  Large B-to-B Customers

14.    As noted previously, Professor Shapiro has raised concerns about the competitive effects of the Transaction on large B-to-B customers, those with more than $500,000 in annual purchases of certain consumable products.  In fiscal year 2014, there were 1,075 of these large customers served by Staples and Office Depot (529 with Staples and 584 with Office Depot).[18] These customers are, of course, only a small share of all Staples' and Office Depot's contract customers.  In fiscal year 2014, Staples and Office Depot each had more than 180,000 B-to-B customers.  Sales of products in the FTC's and Professor Shapiro's proposed relevant market to these 1,075 customers in the alleged relevant market constitute approximately 6.4 percent of total sales (including to retail consumers).  Moreover, in calculating his "best estimate of market shares," Professor Shapiro focuses on an even smaller sliver of the overall sales of Staples and

---

16.    *Id*., at p. 1.
17.    *Id.,* at p. 2.
18.    Thirty-eight customers purchased more than $500,000 in the selected products at both Staples and Office Depot.  Professor Shapiro focused on customers who met this $500,000 threshold as of fiscal year 2014.  *Id*., at p. 2.

CONTAINS CONFIDENTIAL MATERIALS

Office Depot, based on only 81 customers in the "Fortune 100."[19]  These customers represented just 1.4 percent of overall sales.  These figures are presented in Exhibit A.[20]  Simply put, the FTC's and Professor Shapiro's proposed market definition covers a small slice of B-to-B customers and then further narrows the focus on an even smaller slice of those customers to put forward the "best estimate of market shares."[21]

15.     Exhibit B reports the ten largest B-to-B customers for Staples and for Office Depot during fiscal year 2015, focusing on those products selected by the FTC and Professor Shapiro.  Staples' largest customer for these products in that year was ███████, which purchased from Staples $24.5 million worth of the products selected by the FTC and Professor Shapiro, and another $67.1 million in other products.  In other words, ███████ spent 2.7 times more on products outside the proposed relevant market than on products within it.  Office Depot's largest customer for these products in 2015 was ███████, which purchased from Office Depot $18.5 million worth of the products selected by the FTC and Professor Shapiro, and another $10.7 million in other products.

**B.  Products Sold by Staples and Office Depot**

16.     Exhibit C reports the major categories of products sold by Staples and Office Depot to large B-to-B customers for the fiscal years 2010 and 2015.[22]  Across the two

---

19.     *Id.*, at p. 2.
20.     Exhibit A is based on the $500,000 threshold employed by Professor Shapiro.  If a lower threshold of $100,000 were used, then all B-to-B customers would constitute $6,781 million in sales (24.1 percent of total revenue), and $3,212 million in sales of the products in the FTC's and Professor Shapiro's proposed relevant market (11.4 percent of total revenue).
21.     *Id.*, at p. 15.
22.     Staples' fiscal year ends in January.  Office Depot's fiscal year ends in December.  Staples, Inc., "2014 Annual Report, Notice of Annual Meeting and Proxy Statement," at p. 7; Office Depot, Inc., "Form 10-K For the Fiscal Year Ended December 27, 2014."

CONTAINS CONFIDENTIAL MATERIALS

companies, sales of the products selected by the FTC and Professor Shapiro were $1.66 billion in

2015, constituting less than half, 45 percent, of all sales to large B-to-B customers.

17.     Sales to large B-to-B customers of ink and toner, which are not included in the

FTC's and Professor Shapiro's proposed relevant market, were another $786 million in 2015, or

21 percent of all sales.  Sales of other products not included in the FTC's and Professor Shapiro's

alleged relevant market (besides ink and toner) were $1,210 million in 2015, and constituted 33

percent of total sales to large B-to-B customers.  Internally at Staples and Office Depot, these

nontraditional products are sometimes known as "BOSS" (Beyond Office Supply Sales) or

"adjacent" products.  Sales of these other products were only $762 million in 2010, and thus

sales have increased substantially, by more than 58 percent, between 2010 and 2015, reflecting

Staples' and Office Depot's independent business strategies to expand their contract businesses

beyond traditional office supplies.

### C.  Manufacturers of Products Sold by Staples and Office Depot

18.     Staples and Office Depot generally do not manufacture the products they sell.  Of

the products selected by the FTC and Professor Shapiro to be included in their alleged relevant

product market, only 7.3 percent of Staples' fiscal year 2015 sales to large B-to-B customers, and

*zero* percent of Office Depot's fiscal year 2015 sales to large B-to-B customers, were of products

in which the companies themselves had any part in the manufacturing process.[23]  In other words,

for almost all of the products at issue, Staples and Office Depot are merely intermediaries

between manufacturers and wholesalers on the one hand, and large B-to-B customers on the

other hand.

---

23.     Ink pens, pads and memos, binders, and business essentials (such as paper clips and rubber bands) together constitute the majority of products in this category for which Staples plays some role in the manufacturing process. (There are other products that are sold under Staples' label, but for which Staples plays no manufacturing role.)

CONTAINS CONFIDENTIAL MATERIALS

19.     Exhibit D reports the five largest manufacturers of paper and of office supplies sold by Staples and Office Depot (among those products selected by the FTC and Professor Shapiro) in fiscal year 2015.  In office supplies, the manufacturer with the most total sales through Staples and Office Depot was ███████████, with $81.0 million in sales ($47.6 million with Staples, $34.5 million with Office Depot).  In paper, the manufacturer with the most sales through Staples and Office Depot is ███████████.  ███████████ products constitute $29.5 million in total sales between the two companies ($19.8 million with Staples and $9.7 million with Office Depot).

**D.  Process Large B-to-B Customers Use to Purchase Business Supplies**

20.     One way large B-to-B customers can purchase office supplies is through contracts bid out through requests for proposal ("RFPs") or procurement auctions.  Large customers also frequently use less formal processes or may just negotiate directly with their existing distributor for a new contract.  These contracts typically run for multiple years and provide a customer with pricing for certain products.  Contractual prices are sometimes fixed over the term of the agreement, but also often are quoted as equal to, or a discount on, prices charged to retail customers (such as at the companies' online sites, Staples.com and OfficeDepot.com).[24]  A large B-to-B customer may sign a contract with a single supplier covering the entirety of the customer's needs across a broad range of products, but it is also common for customers to "carve out" from contracts certain categories of products and/or certain of the customers' locations.[25] These carve-outs may be formal and apply company-wide, or may simply involve certain parts

---

24.     John T. Lander, Senior Vice President for Field Sales for Office Depot, testified that ███████████
████████████████████████████████████████████████████
████████████████████  Deposition of John Lander, at pp. 171-174.  *See also* the discussion of the relationship between contractual and retail prices in section V.A. below.
25.     See the discussion of carve-outs (with examples) in sections V.C.1 and VI.C.3.

CONTAINS CONFIDENTIAL MATERIALS

of a company purchasing from other suppliers without a formal contractual relationship.

Moreover, with regard to paper and ink and toner products, some large B-to-B customers of

Staples or Office Depot will negotiate directly (or indirectly through Staples or Office Depot)

with the manufacturer and then use Staples or Office Depot to distribute the product to their

business locations.[26]   In such cases, Staples or Office Depot do not set the price of the office

supply product, but rather just set a price for distributing the product.   I discuss direct purchasing

from manufacturers in greater detail in section V.D.1.

21.     In any case, these contracts are non-exclusive, and regularly contain "no

minimum purchase requirement" clauses stating that, if the customer finds a better alternative

after the contract is signed, the customer is not penalized for switching some or all of its office

supply purchasing to that alternative.[27]   As Staples CEO Ronald Sargent put it, "I always say

these contracts, despite the fact you would like them to be kind of enforceable, the reality is they

are not.   There are holes so big you could drive a truck through in terms of if I don't think your

service is good, I could go elsewhere.   If I have a diversity requirement, I can go elsewhere.   If

your prices are too high and you don't match what I can find on Amazon on the web, I can buy

elsewhere.   So its not an ironclad sort of I own this customer."[28]   In fact, these contracts do not

bind customers in any way.   They simply grant the customer the option to buy at the contracted-

for prices during the term of the contract.   There is nothing that prevents the customers from

buying nothing at all from the distributor with which it has negotiated a contract.

22.     As a consequence, contracts are not the only means by which large B-to-B

customers purchase business supplies.   Even after a customer has signed a contract with one

---

26.     *See, e.g*., Deposition of Kieran McCabe (Staples executive), at p. 142 ("[T]he vendor has given the customer a lower cost and that we had to lower our sell price.  I think it's just interesting to me because it notes how some of our customers talk directly to vendors and negotiate cost or vendors talk directly to customers too.").
27.     *See, e.g.*, ODP-OMX-FTC-00581661, ODP-OMX-FTC-07939222.
28.     Investigative Hearing of Ronald Sargent, at p. 132.

CONTAINS CONFIDENTIAL MATERIALS

distributor, purchases from other sellers are nevertheless ubiquitous.  These off-contract purchases are known in the industry as "leakage."  I discuss leakage further in section V.D.2.

### E.  Staples and Office Depot Distribution Infrastructure

23.     Staples and Office Depot distribute products to B-to-B customers through dedicated fulfillment/distribution centers located throughout the country.  Staples has 27 distribution centers, and Office Depot has 30 distribution centers, that distributed products to B-to-B customers during fiscal year 2015.[29]  Exhibit E reports the average distance (weighted by the dollar value of sales) products were shipped by Staples and Office Depot to large B-to-B customers during fiscal year 2015.  The mean distance is 123 miles for Staples, and 149 miles for Office Depot.

24.     In some cases, Staples and Office Depot deliver products directly to a B-to-B customer's various locations, which may be scattered throughout the country.  In other cases, Staples and Office Depot deliver products to only a limited set of a customer's locations, and the customer itself then distributes the products to all of its other locations.  For instance, ███████ ██ has stated that "[g]enerally, Office Depot delivers office supplies for retail stores' internal consumption to ████████ distribution centers, and █████████ delivers those supplies to the retail stores."[30]  Another customer, Foot █████ has indicated that it employed a similar approach up until 2014.[31]

---

29.     I understand Office Depot has 37 total distribution centers, although not all of these are relevant to the products and customers at issue in the FTC's and Professor Shapiro's proposed market definition.
30.     ███████████████, at ¶2.
31.     ███████████████████ at ¶11 ("When Staples was our vendor, it delivered office supplies to ██ ████ distribution centers and ███████ distribution centers delivered to █████████ stores.")  *See also* section V.C.2 for other examples.

CONTAINS CONFIDENTIAL MATERIALS

### F.  Supply Chain

25.     Exhibit F illustrates the supply chain for business supplies in which Staples and Office Depot participate.  At the top are product manufacturers.  Below the manufacturers are wholesalers, who purchase products from the manufacturers.  The two major wholesalers of business supplies in the U.S. are Essendant, Inc. ("Essendant," formerly known as United Stationers) and S.P. Richards Company ("S.P. Richards").  Staples and Office Depot purchase products for resale both directly from manufacturers and from wholesalers.

26.     Below wholesalers in Exhibit F are intermediaries, such as Staples and Office Depot.  Other firms that also distribute the products in the FTC's and Professor Shapiro's claimed relevant market include major office supply firms such as W.B. Mason Co., Inc.  ("W.B. Mason"), regional and local office supply firms, and firms such as Amazon Business (the B-to-B division of retailing giant Amazon.com, Inc. ("Amazon")) and W.W. Grainger, Inc. ("Grainger"), which sell office supplies along with a wide range of other products.  These various intermediaries purchase products either from manufacturers or from wholesalers, and then resell them to B-to-B customers, who are at the bottom of Exhibit F.

27.     As shown in Exhibit F, B-to-B customers in some cases also bypass distributor intermediaries, such as Staples and Office Depot, to purchase directly from manufacturers.  For instance, as the FTC notes in its Complaint, "[m]any B-to-B customers, particularly large B-to-B customers, buy ink and toner directly from ink and toner manufacturers."[32]  As I discuss in section V.D.1, paper and some other products are also purchased directly from, or through a negotiation indirectly with, manufacturers.  As I also discuss in that section, Professor Shapiro included in his report a diagram ("Exhibit 1") similar to my Exhibit F; however, Professor

---

32.     Complaint, at ¶28.

Shapiro appears to ignore direct purchases from manufacturers.  It would be appropriate for him to add an additional arrow in his diagram (as I do) from manufacturers directly to B-to-B customers, bypassing the intermediaries.

28.     I did not in Exhibit F connect wholesalers directly to B-to-B customers. Nevertheless, wholesalers often deliver products to customers on behalf of distributor intermediaries, including W.B. Mason, Staples, and Office Depot.  Also, under what I understand is an agreed-upon divestiture, many Staples and Office Depot customer contracts will be transferred to, and have office supplies provided by, Essendant (via various other distributors). Therefore, Essendant will play a bigger role as an intermediary between office supply manufacturers and large business customers.

## IV.     THE FTC AND PROFESSOR SHAPIRO IMPROPERLY DEFINE THE RELATIVE PRODUCT MARKET

29.     In order to conclude that Staples and Office Depot have a combined high post-Transaction market share, and thus that the Transaction allegedly threatens competition, the FTC and Professor Shapiro must first define the relevant market over which to calculate market shares.  In this section, I discuss the FTC's and Professor Shapiro's selection of products and customers to include within this market definition, and show that the evidence indicates they improperly defined the market.[33]

30.     The issue here is not a merely theoretical one.  I take no significant issue with Professor Shapiro's discussion of the "hypothetical monopolist test"[34] or his application of the ideas outlined in the FTC's "Horizontal Merger Guidelines."[35]  However, market definition is

---

33.     I agree with the FTC and Professor Shapiro that the relevant geographic market is the United States. Shapiro Report, at p. 11.
34.     *Id*.
35.     *Id*., at p. 2.

15

more an empirical than a theoretical matter and that is where Professor Shapiro's discussion – as lucid as it is – falls short.

31.     First, I examine empirically how the products at issue are sold in the marketplace today.  As discussed in greater detail below, customers almost never request bids for the precise set of goods that the FTC and Professor Shapiro assert form a relevant market.  Instead, in almost all cases, a far larger set of goods – including ink and toner and BOSS products – are at issue.  Given these market realities, I consider whether it would be more accurate to describe the relevant market as the provision of intermediary services in the business supply chain (including bundling and distribution services) for all of the goods typically included in RFPs.  Second, I focus squarely on the "cluster market" of different products defined by the FTC and Professor Shapiro, and examine whether Professor Shapiro's aggregation of office supplies with paper products into a single cluster market fails Professor Shapiro's own stated test: Specifically, I show that the evidence indicates that the products in his candidate relevant market do *not* face similar competitive conditions.  Finally, I discuss Professor Shapiro's selection of certain large customers for his relevant market.

### A.  Should The Relevant Market Be Defined As Intermediary Service Providers for Large B-to-B Customers?

32.     The relevant product market defined by the FTC and Professor Shapiro is based on a view of Staples and Office Depot as sellers of a particular set of goods, which includes office supplies and copy and print paper products, but excludes ink and toner, specialty paper products, and BOSS products.  As I discuss here, Staples and Office Depot may more appropriately be considered as providers of intermediary services including product bundling and distribution.  Indeed, Professor Shapiro's own language suggests this possibility; he refers to

Staples and Office Depot as "distributors" throughout his report.[36]  Thus, in this section, I

consider the empirical basis for this view of Staples and Office Depot, and the implications of

the empirical evidence for how the relevant market in this matter should be defined.

>    *1. Trends in the composition of intermediary services provided by Staples, Office*
>    *Depot, and rival firms*

33.     Staples and Office Depot are increasingly distributing a wider variety of products

beyond office supplies, while other firms that historically distributed other types of products are

now also increasingly distributing office supplies.  As a result, Staples, Office Depot, and these

other firms are increasingly competing as rival providers of intermediary services which

encompass a broader range of products than those Professor Shapiro includes in his relevant

market.

34.     As discussed above and demonstrated in Exhibit C, sales of products outside the

traditional office supplies, paper, and ink and toner categories are a large and rapidly growing

share of Staples' and Office Depot's large B-to-B sales.  These nontraditional products

constituted 33 percent of Staples' and Office Depot's sales to large B-to-B customers in fiscal

year 2015, up from 25 percent in 2010.  Staples and Office Depot executives expect this trend to

continue and accelerate.  For instance:

- Shira Goodman, President of North American Operations at Staples, stated, "…our
  overall company strategy is to grow beyond office supplies because if we are to
  remain relevant and viable in the future, it is in what we call the BOSS categories …
  our reinvention strategy is predicated on us growing our business and beyond office
  supplies because core office supplies, ink, paper toner, Post-It notes, pencils, those
  are declining, dying categories.  For Staples to have a future, we need to be selling
  BOSS categories."[37]

---

36.     *Id.*, at p. 4.
37.     Investigational Hearing of Shira Goodman, at pp. 206 & 212-213.

CONTAINS CONFIDENTIAL MATERIALS

- Neil Ringel, Executive Vice President at Staples, stated, "Over the last three years, you've seen this metamorphosis in our model that I've explained.  We are selling more categories beyond office supplies today than we did one year ago or three years ago."[38]

- John T. Lander, Senior Vice President, North American Field Sales at Office Depot, stated, "…the adjacencies is where we're trying to put all of our focus."[39]

- Stephen R. Calkins, Executive Vice President of Contract Sales at Office Depot, stated, "…we have a specific penetration goal this year to improve our sales in these nontraditional areas, which we would call adjacencies … And certainly it would be within the things that we sell, traditional office supplies, but the goal would be to make them less important than they are to us, given the declines in the industry and the declines with our business in particular.  We want to lean more on other areas."[40]

35.     At the same time that Staples and Office Depot are bundling and distributing a broader range of products, other sellers that historically focused on products outside of office supplies are similarly transforming themselves and adding traditional office supplies to their catalogs.  For instance, in April 2015, retailing giant Amazon launched a new B-to-B sales division known as Amazon Business that sells office supplies and other products, employing the platform and logistics expertise that Amazon.com has developed to sell a wide range of products to businesses and individuals.[41]  The April 2015 launch coincided with a rebranding and substantially expanded product selection.[42]  I discuss Amazon Business further in section V.C.3 below.

36.     As another example, there are several large nationwide firms that traditionally distributed maintenance, repair, and operating ("MRO") products, including Grainger, McMaster-Carr Supply Co. ("McMaster-Carr"), Fastenal Company ("Fastenal"), and MSC Industrial Direct Company, Inc. ("MSC").  As a consequence of their historical role in selling

---

38.     Investigational Hearing of Neil Ringel, at p. 187.
39.     Investigational Hearing of John T. Lander, at p. 65.
40.     Investigational Hearing of Stephen R. Calkins, at pp. 40-41 & 47.
41.     This division was launched in April 2015, but had been in a "beta" testing phase for three years prior to that date.  "Amazon Expands Business-Sales Marketplace After Three Years," *Wall Street Journal*, April 28, 2015.
42.     *Id.*

MRO products to large customers, these firms have efficient nationwide delivery platforms, distribution centers throughout the country, sophisticated ordering and inventory systems, and the ability to offer same-day or next-day delivery.  In recent years, all of these firms have begun offering, in addition to their traditional MRO products, a wide range of traditional office supplies of the type sold by Staples and Office Depot.  I discuss these firms in more detail in section V.C.4 below.  Like Staples, Office Depot, and Amazon, these firms are positioning themselves as broader bundlers and distributors in the B-to-B supply chain.

2. *Large customers nearly always purchase a bundle of products different from those included in the FTC's and Professor Shapiro's cluster market.*

37.     The trends described above are also reflected in how large customers organize their RFPs, and how Staples and Office Depot bid on these RFPs.  In particular, rarely does one observe just the products in the FTC's and Professor Shapiro's claimed relevant product market being supplied by either Staples or Office Depot.  Indeed, large customers typically demand that distributor intermediaries supply a bundle of products that is far broader than the FTC's and Professor Shapiro's claimed relevant market.[43]

38.     Further to this point, Staples and Office Depot provided me with data on the bids they made for large B-to-B contracts, including both bids for contracts they won and bids for contracts they did not win.  Staples' data provide substantial detail on the key (or "core") products included in each bid, and Exhibit G summarizes that information during 2012 – 2014.[44] Staples' bids included a wide range of products, including those products claimed by the FTC and Professor Shapiro to be in the relevant market, but also many other products.  In 2014, for

---

43.     As I discuss elsewhere in this report, there are many ways customers purchase office supplies other than through RFPs.  My discussion of RFPs in this section is meant to be illustrative of the fact that, even in this segment of the market (which Professor Shapiro focuses on), the available evidence is inconsistent with the FTC's and Professor Shapiro's proposed relevant market.

44.     Office Depot's bid data do not include the same level of detail.

CONTAINS CONFIDENTIAL MATERIALS

example, Staples bid on 942 large B-to-B contracts.[45]  Only 11 of these 942 bids (1.2 percent) included no other product categories besides those in the FTC's and Professor Shapiro's product market definition.  In other words, for Staples, only 11 large B-to-B customer contracts that Staples bid on during 2014 were restricted to the precise products in the FTC's and Professor Shapiro's proposed relevant market.  By contrast, 138 of the contracts (or 14.6 percent) included at least five (and as many as nine) other product categories.[46]

39.    Exhibit G also shows that it is common for Staples to bid for RFPs that include less than all of the major product categories in the FTC's and Professor Shapiro's proposed relevant product market.  For instance, in 2014, there were 169 bids by Staples for these large contracts that included office supply products but explicitly excluded paper products.  Among these contracts, only four included no other categories and the other 165 included products that are *excluded* from the FTC's and Professor Shapiro's market definition.  The fact that many RFPs include office supplies but not paper is empirically significant, since as I discuss below, Professor Shapiro's inclusion of only specific products in the bundle he claims constitutes the relevant product market *hinges* on large customers having strong preferences not to split up their purchases of paper and office supplies.[47]

40.    The previous analyses, summarized in Exhibit G, focus on Staples' bids for customer RFPs, and next I turn my analysis to data on actual purchasing.  Consistent with the findings in Exhibit G, the actual purchases that large B-to-B customers make under contracts with Staples and Office Depot are similarly more varied and broader than the FTC's and

---

45.    For purposes of this analysis, large contracts are defined similarly to Professor Shapiro's definition – those with more than $500,000 in total expected purchase volume across all categories of products.

46.    Consistent with the data, Office Depot executive Kim Ghant testified that "very rarely do we see a bid that is only general office supplies."  Investigational Hearing of Kim Ghant, at p. 35.

47.    Shapiro Report, at p. H-4 ("splitting purchase volume among regional vendors would reduce their ability to obtain volume-based discounts.").

CONTAINS CONFIDENTIAL MATERIALS

Professor Shapiro's proposed product market. Exhibit H is organized similarly to Exhibit G, but focuses on actual product sales by Staples to large B-to-B customers during fiscal years 2012 - 2014. I categorized each large customer's purchases as in the prior Exhibit, and counted a customer as making a material amount of purchases in a category if at least $3,000 in purchases during the year were in that category.[48] Exhibit H shows that, of the 529 large customers who purchased office supplies and paper from Staples in fiscal year 2014, *every single one* also purchased significant amounts from Staples in other categories.[49]

### 3. Summary

41.    The empirical facts described above are relevant to the question I raised about whether it is more appropriate to define the product market in this matter in terms of intermediary services, including bundling and distribution, rather than in terms of a particular set of products, as the FTC and Professor Shapiro propose. The answer to this question depends

---

[48]    In other words, my analysis is constructed so as to eliminate the possibility that these findings are driven by customers purchasing very small amounts of products outside the FTC's and Professor Shapiro's relevant product market.

[49]    Professor Shapiro overlooks these facts, but he briefly responds to an anticipated criticism of his proposed product market on this basis. In this discussion, he analogizes his product market to the case of airlines selling flights between a large number of cities, and argues that it is appropriate to select a relevant product market including only certain flights between certain cities. He says this is so, even if the airlines offer a frequent flyer program that provides consumers with benefits based on the total number of flights taken, including those outside the selected routes. *Id.*, at p. 14. Professor Shapiro's analogy is not relevant to the case of Staples and Office Depot. Staples and Office Depot are not, as I have previously noted, manufacturers or wholesalers of particular products that need to be distinguished from other products; instead, they are bundlers and distributors of products. Moreover, airline customers can threaten to switch to competitors for their purchases of all flight routes, including those outside the relevant product market, in response to a price increase in the relevant market. Similarly, Staples and Office Depot customers can threaten to switch to competitors for their purchases of ink and toner or BOSS in response to a hypothetical price increase in the FTC's and Professor Shapiro's relevant market. Finally, Professor Shapiro recognizes in the context of his analogy that the existence of the frequent flyer program would "complicate the measurement of the fares charged on the route" selected for the relevant product market. *Id.* However, Professor Shapiro never addresses this complication for Staples' and Office Depot's prices in the context of the relevant product market he has defined in this matter. Indeed, Professor Shapiro acknowledged in an academic article the potential risks of the hypothetical monopolist test in a context similar to this merger. Specifically, he wrote with a co-author, "[w]hen a pre-merger firm controls important substitutes or complements that are excluded from the candidate market, HM [hypothetical monopolist] market definition risks anomalies. In some cases, these anomalies can be avoided by examining the incentives of a hypothetical cartel comprised of the firms selling the products in the candidate market." Joseph Farrell and Carl Shapiro, "Recapture, Pass-Through, and Market Definition," *Antitrust Law Journal* 76(3):585-604, at p. 587.

CONTAINS CONFIDENTIAL MATERIALS

critically on whether customers of the bundle of products included in Professor Shapiro's

proposed cluster market would seek to defeat a hypothetical price increase by purchasing some

of these products separately.[50]  In other words, would customers split up their purchases and buy

different parts of the FTC's and Professor Shapiro's alleged bundle separately in response to a

putative small, but significant, non-transitory price increase ("SSNIP")?

42.    The answer to this question depends critically on the transaction costs of

"breaking" the bundle into separate products.  Professor Shapiro has not analyzed this key issue

empirically, although as noted above, he stated that large B-to-B customers prefer to deal with

one distributor,[51] which, if true, would suggest that they may not break the bundle in response to

a SSNIP.  In any case, Professor Shapiro has not provided a rigorous economic basis for his

proposed relevant market.[52]

## B. Do Office Supplies and Copy/Print Paper Have Similar Competitive Conditions?

43.    If, in fact, the relevant market is analyzed on the basis of a specific set of

products, as the FTC and Professor Shapiro propose, the key question becomes whether the

particular products included in the FTC's and Professor Shapiro's defined bundle have similar

competitive conditions.  Professor Shapiro asserts this, but provides no rigorous empirical

support to demonstrate that the competitive conditions for *all* office supplies in his bundle and

---

50.    *See* Jonathan B. Baker (2007) "Market Definition: An Analytical Overview," *Antitrust Law Journal* 74(1):129-73, at 158-9 ("… if enough suite buyers would respond to a higher suite price by purchasing instead some components individually, thereby making it unprofitable for a hypothetical suite monopolist to raise price, then the competitive effect of the merger would not be captured by defining a suite market and the transaction should be analyzed in individual component markets only.").

51.    Shapiro Report, at p. H-4.

52.    Even if the relevant market is appropriately based on a particular set of products, as claimed by the FTC and Professor Shapiro, the ability of large B-to-B customers to purchase complementary products from the intermediary service provider and the effect on the pricing of "in-market" products that results from the ability of customers to purchase from other supplies products such as BOSS, should be taken into account in the analysis of competitive effects.  Professor Shapiro appears to ignore this factor in his discussion of competitive effects (see discussion below).

copy/print paper are similar.  As I show in this section, such a conclusion is contradicted by the facts of this matter.

44.     As background, Professor Shapiro and I agree about the potential usefulness to economists of aggregating individual products into cluster markets when competitive conditions are similar, even in instances where individual items have little or no substitution with each other from the consumer's perspective.[53]  However, we disagree about whether the products in his proposed cluster of office supplies and copy/print paper in fact do face similar competitive conditions.

> 1.   *Professor Shapiro provides inadequate empirical support for his claim of similar competitive conditions for products within the relevant market.*

45.     Professor Shapiro appears to reach a conclusion of similar competitive conditions for these products based on very little empirical evidence.  He only asserts that it is "likely" that the various products face similar competitive conditions.  For example, he writes, "market shares and competitive conditions are likely to be similar for the distribution of pens to large customers and for the distribution of binder clips to large customers."[54]  However, Professor Shapiro does not provide a reliable basis of fact from which to draw sound conclusions regarding common competitive conditions across the products in his cluster market.

46.     For instance, Professor Shapiro states that he included copy paper in his relevant market only because many of the same distributors that supply pens and paper clips also distribute paper.[55]  He notes that there are additional competitors who distribute paper, but not pens and paper clips, and he considered excluding paper from the relevant market on that basis,

---

53.     *Id.*, at p. 5 ("The category of consumable office supplies includes many individual items that are not substitutes for each other: obviously, a pen is not a substitute for a binder clip.").
54.     *Id.*
55.     *Id.*

CONTAINS CONFIDENTIAL MATERIALS

but ultimately chose to include paper because he claims these other competitors' shares of sales are small.[56]  Similarly, the FTC and Professor Shapiro state that they considered including ink and toner in the relevant market, but did not do so because they recognize that customers can and do purchase those products from manufacturers and other distributors, such as managed print services.[57]  Finally, Professor Shapiro states that he excluded BOSS products from his relevant market because "their distribution is subject to significantly different competitive conditions than is the distribution of consumable office supplies,"[58] an assertion for which he provides no supporting evidence.

> 2.  *Professor Shapiro overlooks empirical evidence that contradicts his conclusion of similar competitive conditions within his defined cluster of products*

47.  As noted above, the FTC and Professor Shapiro explicitly recognize that many large B-to-B customers purchase ink and toner directly from manufacturers (and other distributors), and on this basis, ink and toner were excluded from the relevant product market. However, later in his report, Professor Shapiro notes that some paper merchants and manufacturers also sell directly to large B-to-B customers, including Georgia Pacific, Domtar Corporation ("Domtar"), Veritiv Corporation ("Veritiv"), and Lindenmeyr Munroe.[59]  ███████ in its declaration in this case, claims to conduct business with more than half of the Fortune 500.[60] In addition, even if some paper manufacturers and vendors do not distribute directly to large B-

---

56.  *Id.*

57.  *Id.  See also* Complaint, at ¶28 ("Many B-to-B customers, particularly large B-to-B customers, buy ink and toner directly from ink and toner manufacturers, or as part of a package of 'managed print services,' in which vendors bundle ink and toner sales with leases of copier and printers, repair services, and/or copy and printer maintenance services.").

58.  Shapiro Report, at p. 5.

59.  *Id.*, at p. G-4.  Since some paper mills sell directly and others do not, it is possible that products produced by different mills face different competitive conditions.  That is an empirical question that Professor Shapiro should have examined.

60.  ████████████████████████████████████, at p. 1.

CONTAINS CONFIDENTIAL MATERIALS

to-B customers, large customers can still negotiate either directly or indirectly through an agent with those manufacturers, while allowing Staples or Office Depot to handle distribution.  These facts indicate that paper products are subject to different competitive conditions than other products in the FTC's and Professor Shapiro's proposed relevant market.

48.     Moreover, if Professor Shapiro is correct that competitive conditions are similar across all of the products in his relevant market, then one would generally expect that Staples and Office Depot should not earn widely disparate margins across these product categories. However, Professor Shapiro's calculated margins for paper and office supplies vary widely.  In Exhibits I-1 and I-2, I examine the accounting margins reported by Staples and Office Depot, which Professor Shapiro used as a basis for his calculations of profit margins across all products,[61] and I break out this calculation for paper and various office supply subcategories during fiscal year 2015.[62]

49.     Exhibits I-1 and I-2 show that Professor Shapiro's margin for paper is ████████ at Office Depot and ██████████ at Staples, while Professor Shapiro's margin for office supplies is ████████ at Office Depot and ████████ at Staples.[63]  These widely varying margins, based on Professor Shapiro's own calculations, suggest that competitive conditions across these product

---

61.     *Id.*, at D-2.  In his calculation of Staples' margins, Professor Shapiro started with the accounting margins I focus on here, which are available in the data provided by Staples at the level of an individual product.  These margins include only certain categories of costs, such as the cost of goods sold and rebates and discounts.  From these margins, Professor Shapiro also subtracted certain other costs, which are provided in a separate dataset that allocates these other costs across customers.  Since Staples does not allocate these other costs at a product-specific level, for this analysis, I focused solely on the accounting margins (without the adjustment for additional costs), which are product-specific.  However, I found that the correlation at the customer level between these accounting margins and the margins Professor Shapiro uses in his analysis is very high, 0.92 (1.00 would be perfect correlation).  Therefore, the results here, which focus on the accounting margins before any allocation of additional costs, are reasonably representative of Professor Shapiro's approach to calculating margins.

62.     I report these calculations for all sales, and for a smaller set of sales, excluding private label products and those products sourced from wholesalers.  My conclusions do not depend on which set of sales one examines.

63.     Exhibits I-1 and I-2 also report separately the same calculations, but excluding sales of "private label" products and products sourced from wholesalers.  This does not change my conclusion that Professor Shapiro's margins on paper products are substantially lower than his margins on office supplies.

categories may not be the same, as Professor Shapiro assumes.  Specifically, the margin measures (on which Professor Shapiro relies) show that margins in paper are far lower than those in office supplies, which may in part reflect the efforts of large customers to bypass distributors, such as Staples and Office Depot, for their paper purchases, as I discuss in more detail in section V.D.1.

50.     The problems with the FTC's and Professor Shapiro's clustering of products does not end with just the combination of paper products and office supplies into a single market. Even within office supplies, Exhibits I-1 and I-2 demonstrate that, based on Professor Shapiro's margins, different products may face significantly different competitive conditions.[64]  For instance, at Staples, Professor Shapiro's estimated margin on personal organizers is ███████, while his margin on Teaching & Education supplies is only ███████.  While margins, and especially the accounting margins Professor Shapiro relies on, do not necessarily define the competitive conditions for each product, Professor Shapiro cannot simply ignore such empirical evidence.  If he is going to claim that these products should be clustered together, it is incumbent on him to justify that conclusion, which would include explaining how his market definition is consistent with the observed variation in margins.

51.     Another reason competitive conditions potentially differ across the products included in the FTC's and Professor Shapiro's alleged relevant market is the differential constraint retail prices provide on the contractual prices paid by large B-to-B customers.  As I discuss in section V.A below, when contract prices exceed retail prices for a particular product, which happens nearly 15 percent of the time (*see* Exhibit K, discussed below), customers have an incentive to purchase more of that product at retail, and available evidence indicates

---

64.     Staples and Office Depot use different categorizations for office supplies, and these are reflected in the differences in office supply categories listed in Exhibits I-1 and I-2.

CONTAINS CONFIDENTIAL MATERIALS

customers in fact do so.[65]  In addition, contract prices are less than five percent below online

retail prices an additional nearly six percent of the time.[66]  Therefore, those products – which in

total amount to more than 20 percent of Staples' and Office Depot's contract sales – obviously

face different competitive conditions, limiting Staples' and Office Depot's ability to raise prices

significantly, than other products for which contract prices are far below retail prices.

Nonetheless, the FTC and Professor Shapiro have aggregated all of these products together,

despite the empirical evidence that their included products face very different competitive

conditions.

### C. Is The Selection of Targeted Customers Purchasing More Than $500,000 in the Selected Products Justified?

52.     As noted previously, Professor Shapiro defines his relevant product market to

include B-to-B customers who purchased more than $500,000 in the selected products during

2014, excluding some (but not all) government entities.[67]  Professor Shapiro recognizes that this

$500,000 line is effectively arbitrary, noting that "[w]henever one considers a market for

targeted customers, one must draw the line somewhere between targeted customers and other

customers, even if competitive effects are similar close to both sides of the line."[68]

---

65.     *See, e.g.*, SPLS_0466603, SPLS_0466624, SPLS_04290805, SPLS_04290819, SPLS_04290871, SPLS_04290893, SPLS_04290907, and SPLS_04291158. ODP-OMX-FTC-02089096-7, ODP-OMX-FTC-06689017, and SPLS_04290841.

66.     We compare the contractual prices Staples and Office Depot set to their own online prices, but to the extent Amazon, Walmart.com, or other online retailers have even lower prices, this could be an additional competitive constraint.

67.     Shapiro Report, at pp. 5-6.  Professor Shapiro excludes federal agencies, state governments, counties, cities, and public schools, but includes public universities and government-sponsored enterprises such as Freddie Mac and Fannie Mae.  *Id.*, at pp. 6 & Exhibit 5A.  Professor Shapiro justifies his exclusions of government entities on the basis that they "have distinct preferences from those of large commercial customers as a result of their non-commercial goals."  *Id.*  Professor Shapiro does not explain why he nevertheless did include public universities in his proposed relevant product market, as these are also non-commercial and have distinct preferences.

68.     *Id.*, at p. 6.

53.     Professor Shapiro ignores relevant facts indicating that many customers with more than $500,000 in annual purchases face significantly different competitive conditions, which would indicate it is inappropriate to aggregate them into the same market for purposes of calculating shares.  For example, Professor Shapiro claims that rival distributor W.B. Mason faces important barriers to geographic expansion beyond its historical base in the northeast.[69]  As I discuss later, I disagree with any assertion that W.B. Mason cannot compete with Staples and Office Depot for national customers.  But even assuming Professor Shapiro were correct about W.B. Mason, many of the large B-to-B customers that Professor Shapiro includes in his relevant market have offices that are concentrated in the states where W.B. Mason has distribution centers.  For example, among Professor Shapiro's collection of Fortune 100 companies, ███ ███████████ ██ ████████████████ all had more than 80 percent of their total fiscal year 2015 office product purchases shipped to a location within 136 miles of a W.B. Mason distribution center (*i.e.*, the average of the mean distances Office Depot and Staples ship products to their customers, *see* Exhibit E).  In addition to these companies, ████████████ █████████████████████████████████████ are all Fortune 100 companies that had more than 60 percent of their total fiscal year 2015 office product purchases shipped to a location within 136 miles of a W.B. Mason distribution center.  Given Professor Shapiro's assertion that W.B. Mason's ability to compete is restricted to only certain regions, these customers presumably have additional competitive options not available to customers with offices in other parts of the country.

54.     Similarly, Professor Shapiro also recognizes that large B-to-B customers may vary in their familiarity with, and willingness to purchase from, other rival distributors such as

---

69.     *Id.*, at p. 43.

CONTAINS CONFIDENTIAL MATERIALS

Amazon or Grainger.  For instance, Professor Shapiro quotes an executive from Grainger stating that, under current market conditions, █████████████████████████████████████ █████████████████████████.[70]  To the extent this is true, the competitive conditions relevant to a large B-to-B customer that does not have a substantial demand for the types of MRO products Grainger provides (say, ██████████████) would be different from the competitive conditions relevant to a customer that does purchase MRO products in large quantities (say, ██████████████).

55.      More generally, Exhibit J reports, for the same Fortune 100 companies that Professor Shapiro analyzes, the share of fiscal year 2015 purchases from Staples and Office Depot constituted by certain product categories, including office supplies, paper, ink and toner, and BOSS products.  There are large differences in the mix of products purchased by different large customers.  For instance, six percent of ██████████ 2015 purchases from Staples and Office Depot were for paper products, but 31 percent of ██████████ 2015 purchases from Staples and Office Depot were for paper products.  Similarly, 13 percent of ██████████ 2015 purchases from Staples and Office Depot were BOSS products, but 63 percent of ██████████ 2015 purchases were BOSS products.[71]

56.      In the end, Professor Shapiro's decision to focus on "targeted customers" with consumable office supply purchases of more than $500,000 suffers from two problems.  First, he inappropriately aggregates across different customers of widely varying sizes, widely varying geographic footprints, widely varying distribution needs, and widely varying product purchases, despite the evidence described above indicating that these customers are not subject to similar

---

70.      *Id*., at p. H-10.
71.      Professor Shapiro claims that all four of these companies purchased 100 percent of their office supplies and paper from Staples and Office Depot.  *Id*., at Exhibit 5A.  Therefore, these differences between companies do not merely reflect customers' different purchases from other distributors.

CONTAINS CONFIDENTIAL MATERIALS

competitive conditions.  Indeed, if the targeted customers face differing competitive conditions, it is inappropriate, according to Professor Shapiro, to aggregate such "targeted customers" in one market for purposes of calculating shares.

57.     Second, Professor Shapiro recognizes that his $500,000 threshold is, to some degree, arbitrary, stating that "one must draw the line somewhere between targeted customers and other customers."[72]  From an economic perspective, the correct place to "draw the line" is where Staples and Office Depot change their behavior toward customers in a way that potentially renders them vulnerable to market power (*i.e.*, where they become so-called targeted customers). Professor Shapiro has not provided any empirical evidence that this is the case at or near the $500,000 line, and testimony from Staples' and Office Depot's executives contradict such an assertion.[73]  I understand that Staples and Office Depot both regularly offer individualized contracts to customers far smaller than Professor Shapiro's $500,000 threshold.  Since Professor Shapiro has not conducted any empirical analysis regarding this issue, it is unclear what sound empirical basis there is for drawing an economically meaningful line at $500,000, instead of some other amount.

## V.     PROFESSOR SHAPIRO IMPROPERLY RESTRICTS THE SET OF COMPETITIVE ALTERNATIVES AVAILABLE TO CUSTOMERS, THEREBY OVERSTATING STAPLES' AND OFFICE DEPOT'S MARKET SHARES.

58.     Having selected a set of products and customers for his relevant product market, Professor Shapiro attempts to calculate Staples' and Office Depot's market shares for those products.  There are many large B-to-B customers in Professor Shapiro's relevant product market, but for his market share analysis, he focuses on a set of 81 firms in the Fortune 100

---

72.     *Id.*, at p. 6.
73.     Deposition of Neil Ringel, at pp. 8-9

CONTAINS CONFIDENTIAL MATERIALS

during 2014 as a proxy.[74]  Professor Shapiro claims that market shares calculated over these 81 firms demonstrate that the combined firm would have a 79 percent share of the relevant market after the Transaction.[75]

59.    As an initial matter, as discussed in the previous section, the relevant market proposed by the FTC and Professor Shapiro is not properly defined, so any calculations of "market shares" of that purported market are improper.  In addition, for the reasons I explain below, the share calculations put forward by Professor Shapiro are unreliable and overstated, even assuming, *arguendo*, it is a properly defined market.

60.    However, before turning to why Professor Shapiro's market share estimates are overstated, I review the various competitive constraints that Staples and Office Depot face today and will face on a going-forward basis in order to help identify the sources of supply that Professor Shapiro does not account for in his calculations.  In particular, I start by discussing the constraint that retail online prices place on many products in the FTC's and Professor Shapiro's relevant product market.  Next, I focus – as the Horizontal Merger Guidelines state – on the "future competitive significance" of firms in the industry, as opposed to their historic market position.[76]  In particular, I discuss the lack of barriers to entry or expansion that rival distributors face in competing with Staples and Office Depot.  I also describe the large number of different firms that are already competing with Staples and Office Depot and who have a ready ability to expand and gain market share in response to a hypothetical post-Transaction price increase.  I also describe other competitive alternatives large customers would have in the case of such a price increase, including purchasing products from manufacturers (either directly or indirectly

---

74.    *Id.*, at p. 15.
75.    *Id.*
76.    Horizontal Merger Guidelines, at pp. 16-17.

CONTAINS CONFIDENTIAL MATERIALS

through an intermediary firm) and purchasing products outside of a contract with a distributor
(*i.e.*, leakage).  Finally, I address additional reasons why Professor Shapiro's market share
calculations overstate the future competitive significance of Staples and Office Depot.

### A.  The FTC Ignores the Competitive Constraint Provided by Online Retail Prices for Many Products.

61.    The online retail channel for office products includes Staples' and Office Depot's
consumer retail websites, Staples.com and OfficeDepot.com, as well as other online retailers that
sell the same or similar products, such as Amazon and Walmart.com.  Professor Shapiro asserts
that online retail prices are, on average, between 44 percent and 45 percent higher than contract
prices paid by Staples' and Office Depot's large customers.[77]  However, these averages across
products mask the fact that, for a significant number of products, prices for large B-to-B
customers are identical (or nearly so) to prices in the retail channel.  In fiscal year 2014, Exhibit
K shows that Staples' contract prices were equal to or higher than the equivalent contemporary
price at Staples.com for 7.3 percent of contract sales; the contract price was less than five percent
below the equivalent contemporaneous price at Staples.com for an additional 2.7 percent of
contract sales.  For Office Depot, the numbers are much higher: Office Depot's contract unit
prices were equal to or higher the equivalent contemporaneous price at OfficeDepot.com for 22.8
percent of contract sales; the contract price was less than five percent below the equivalent
contemporary price at OfficeDepot.com 9.3 percent of the time.  In total, 20.7 percent of Staples'
and Office Depot's combined sales were priced near, at, or above the equivalent online price.
For these products, there is no basis to say that the Transaction could lead to a substantial

---

77.    Shapiro Report, at p. 17.

CONTAINS CONFIDENTIAL MATERIALS

increase in price, since otherwise, B-to-B customers likely would switch to alternative online providers.[78]

62.    Statements by Staples' and Office Depot executives confirm the ability of customers to switch to retail purchasing when retail pricing is more favorable:

- "… [A]gain customers are smart.  If they can buy it for a nickel cheaper with somebody else, and I think pricing today is incredibly transparent, they will do that."[79]

- "We do know and hear feedback from customers that they shop on Amazon … we do know that they ask for price matches shopping at Amazon.  So that type of feedback I do hear."[80]

- "The lower prices of Amazon, especially with Amazon Business now, are available and compete with us in all of your channels."[81]

- "The end user customers shop Amazon, shop other competitors all the time."[82]

- "Everyone has a browser and every one can shop, see prices and choose to buy from whoever they like … Amazon is – when I talk to the sales team there is not a salesperson that doesn't tell me they don't see Amazon prime boxes empty all around their account."[83]

63.    Consistent with the statements of executives, the behavior of Staples' customers shows that they search other websites.  As one customer testified, "[a]ctually, what our associates like to do is go on the OfficeDepot.com site and compare prices.  They do that all the time.  And if they find something on sale in retail and stuff like that, that's when they call and they say, hey, I got a flyer at home, and my pens are 3.25 a box and we're paying 4.28, why is

---

78.    We compare the contractual prices Staples and Office Depot set to their own online prices, but to the extent Amazon, Walmart.com, or other online retailers have even lower prices, even more products could be constrained by online retail prices.
79.    Deposition of Ronald Sargent, at pp. 69-70.
80.    Deposition of Christine Komola, at p. 192.
81.    Deposition of Stephen Hare, at p. 62.
82.    Deposition of Christine Komola, at p. 273.
83.    Deposition of Kieran McCabe, at pp. 63-4.

that? … [I]n most instances … we go back to Office Depot and they honor whatever price -- sale price is in place for that product."[84]

64.     Moreover, evidence from third party website traffic reports, showing where customers are coming from and going to as they search online, is consistent with these facts.  I understand that only authorized users can access the StaplesAdvantage.com website.[85]  For these customers, the third most frequented website either immediately after or immediately prior to visiting StaplesAdvantage.com is Amazon.com.[86]  OfficeDepot.com and WBMason.com are the sixth and seventh most frequented websites both immediately after and immediately prior to visiting StaplesAdvantage.com.

65.     The FTC has previously recognized that prices set in the online retail channel are competitive,[87] and therefore, a competitively set online price constrains many contract prices.  The competitiveness of the retail channel, as recognized by the FTC, presumably is one of the reasons why the FTC did not raise concerns about the impact of the Transaction on retail channel prices.[88]  The FTC has not demonstrated that the same market forces that cause online retail channel prices to be competitive do not also, directly or indirectly, constrain contract prices to large B-to-B customers for a significant number of products in the alleged relevant market.

---

84.     ████████████████, at p. 144.
85.     *See* Deposition of Faisal Masud at pp. 89-92.
86.     *See* Alexa Report on StaplesAdvantage.com, at p. 7.
87.     As the FTC noted in the Office Depot / OfficeMax merger, "[o]nline retailers stock a vast array of office supply products and can deliver them quickly anywhere in the country at nominal cost.  Company documents show that OSS [Office Supply Superstores] are acutely aware of, and feel threatened by, the continued growth of online competitors, most notably Amazon.  OSS have lost, and continue to lose, substantial in-store sales to online competitors. This increased competition from online retailers has caused OSS to respond with new pricing practices and other strategies."  "Statement of the Federal Trade Commission Concerning the Proposed Merger of Office Depot, Inc. and OfficeMax, Inc.," FTC File No. 131-0104, November 1, 2013.
88.     In a June 2015 presentation to the FTC, I also found that retail channel competition was determined by broader competitive forces, and not individual store locations.  "Competitive Effects Analysis of the Proposed Transaction Between Staples and Office Depot," June 12, 2015.

66.     Indeed, Staples' and Office Depot, in some cases, work with customers to ensure that, at worst, the customer receives the online price.  For example, ███████ had become frustrated that its contract prices were sometimes higher than online prices available at Staples.com, and so ███████ negotiated to have a mechanism in place to keep this from happening.[89]  For its "web-matching" customers, Office Depot has a sophisticated price-scraping process by which it identifies and matches prices at a wide variety of competitor sites, including Amazon, Walmart.com, and Target.com on a daily basis.[90]  By overlooking the significant and growing competitive constraint on Staples and Office Depot that retail channel prices impose, Professor Shapiro thereby overstates the relevant competitive significance of Staples and Office Depot.

### B.  There are No Meaningful Barriers to Entry or Expansion in the Business of Bundling and Distributing Supplies to Large B-to-B Customers.

67.     In many industries, particular suppliers may have special intellectual property or other specific capital that cannot be easily replicated by competitors, serving as a barrier to entry. As I discuss below, however, Staples and Office Depot hold no specialized or unique assets as inputs that are not equally available to other competitors.  This means that if a combined Staples and Office Depot attempted to raise prices as a consequence of the Transaction, other competitors likely would enter or expand to compete for the combined firm's customers.  The FTC and Professor Shapiro fail to identify any important barriers to entry that limit competition

---

89.     Deposition of ███████, at 57:4-19 ("… what we found at times is that staples.com would be lower than our negotiated price because of these deals, so we wanted to be able to reduce the noise in the system from our branches calling and saying, 'I can get it cheaper on staples.com today than I can within our catalog.'  Q. So under the current contract with Staples, is there a mechanism for ensuring that you're receiving a discount off of the staples.com pricing?  A. That is part of the responsibility of Staples, to keep up to date.  Q. So does this apply to all products under the contract with Staples?  A. It's whatever supplies would be on staples.com and available to our branches.")
90.     ODP-OMX-FTC-01514443.

CONTAINS CONFIDENTIAL MATERIALS

in bundling and distributing business supplies, and thus they do not show that Staples and Office Depot are in any sense uniquely positioned to raise prices after the Transaction.

1. *Product availability does not form a specialized input that could create a barrier to entry.*

68.     A primary input into the office supply business is, of course, the products themselves.  As noted previously, the vast majority of these products are not produced by Staples or Office Depot, but instead are supplied by third-party manufacturers or wholesalers.[91] Therefore, the ability of rival distributors to expand sales is not limited by their manufacturing capacity.  Moreover, the contracts through which Staples and Office Depot acquire these products from manufacturers are not exclusive, meaning that rival distributors have the ability to source from the same set of manufacturers.  Indeed, manufacturers typically sell their products to a wide variety of intermediaries other than Office Depot and Staples.  For instance, I examined the five top-selling individual office supplies products and the five top-selling individual paper products sold at Staples and Office Depot, respectively, during fiscal year 2015 (based on total sales to large B-to-B customers).  I then investigated the availability of these products from a number of other sellers, including a large national firm (W.B. Mason), a large regional firm (Cardinal Office Products ("Cardinal")), Amazon, and a large firm selling adjacent products (Grainger).  Exhibit L summarizes the results of this research, and demonstrates that almost all of these products are available from other sellers, indicating that other sellers have access to the same manufacturers as do Staples and Office Depot.[92]

---

91.     And, importantly, ████████████████████████████████████████████.  Hence, whatever role Staples plays in the manufacture of certain of its products, the Transaction does not concentrate the manufacturing of office products.

92.     I also looked separately at the 10th, 20th, 30th, 40th, 50th, 60th, 70th, 80th, 90th, and 100th highest-selling products in office supplies and paper for Staples and Office Depot (a total of 40 additional products), and found widespread availability of these at other sellers.  In some cases, SKUs in the data we received from Staples and Office Depot did not correspond with any product currently available on the Staples.com or OfficeDepot.com

CONTAINS CONFIDENTIAL MATERIALS

69.     Even if there were a product sold by Staples and Office Depot that competing intermediary firms were for some reason unable to provide, the vast majority of traditional office supplies are commodity products, easily interchangeable with similar products produced by other manufacturers.[93]  In other words, for most B-to-B customers, there are few or no meaningful differences between different types of pens, notebooks, paper clips, or copy paper.  As a consequence, it would be unlikely that the combined Staples and Office Depot could exclude competition on the basis that competitors cannot access the same products or the capacity to source more products (in the event that Staples and Office Depot attempt to raise prices after the Transaction).

### 2.   *Other key inputs are not specialized and do not create barriers to entry.*

70.     Another important input to the business of intermediating business supplies is delivery services.  Large B-to-B customers often have multiple locations requiring regular delivery of office supplies.  Again, however, Staples and Office Depot do not have any specialized delivery asset or intellectual property that is unavailable to others.  Instead, Staples and Office Depot typically rely on third-party delivery services, such as the U.S. Postal Service, UPS, and Federal Express for delivery.  Competitors, such as Amazon, similarly use these same delivery services. As I discuss below, W.B. Mason and other distributors rely in part on wholesalers like Essendant, which have warehouses throughout the country, to help distribute their products in locations where the distributor does not have its own delivery services.  In

---

websites, and these products were excluded.  Private-label products were also excluded.  Of the remaining 36 additional products, W.B. Mason carries 23, Amazon carries 36, Grainger carries 17, and Cardinal carries 27.
93.      *See, e.g.*, Investigative Hearing of Stephen Hare, at p. 59 ("In many of our cases, you know, we're selling commodity products, and so it's hard to differentiate your business model sometimes beyond price.")  *See also* ██████████, at p. 48 ("All of those factors that we look at when making a purchase decision, especially for a highly commoditized product like office supplies.").  *See also* ███████████████████, at ¶5 ("The products that ████ purchases from Staples are commodity products that are widely available.").

addition, competitors also have access to their own large truck fleets.  For instance, W.B. Mason

has a fleet of approximately ███████, which is larger than Office Depot's fleet.[94]

71.     While in some industries, such as food or drug sales, access to delivery services

may constitute a specialized and scarce input, this is not the case with office supplies, which are

not perishable if transported long distances.[95]  Moreover, unlike food products, office supplies

can also be stored by customers for long and varying periods with virtually no spoilage.  For

these reasons, although some office supply customers may require frequent delivery, there is no

need for office supply distribution centers to be within a given radius of customers in order to

achieve quick and reliable delivery.  As shown in Exhibit E above, Staples and Office Depot

often transport products from their distribution centers far distances (*i.e.*, 100 miles away or

more).  The fact that Staples and Office Depot can gain business, even while delivering many

miles away, demonstrates that there are no unique distribution center locations held by Staples

and Office Depot that give them any special advantage unavailable to competitors.

72.     Another input intermediary firms employ is computer systems used for ordering,

streamlining and tracking sales of thousands of different office products sold to B-to-B

customers.  I understand that Staples has invested substantially in developing such computer

systems.  I understand that Office Depot and other competitors also invest substantially in similar

software.  For instance, Amazon Business, the new B-to-B division of Amazon that launched last

year, obviously has access to a world-class IT infrastructure for ordering and tracking sales, and,

as I discuss in section V.C.3 the company continues to invest in this infrastructure.  More

---

94.     ████████████████████ at p. 270; Office Depot response to the Second Request Specification 17.
95.     *See* Investigational Hearing of Roland C. Smith, at pp. 217-18 ("Office products are incredibly simple to
distribute.  They don't perish.  They're easy to warehouse and put on trucks … [T]here's not a lot of barriers to be
able to kind of get into that business.  You need a representative to knock on a door or make a phone call and talk to
a purchasing agent.  Once that conversation takes place, I don't believe you need a distribution center or a
transportation system because you can pick up the phone and have those products delivered from a wholesaler, if
you choose.").

broadly, as I discuss below in section V.C, many of Staples' and Office Depot's other

competitors, including W.B. Mason and Grainger, similarly provide customers with sophisticated

on-line ordering services covering millions of distinct products.  As an example, ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████,"[96]

   73.  In his report, Professor Shapiro makes various claims to the contrary, alleging that

potential competitors do not currently have the same set of delivery or computer assets as Staples

and Office Depot *at current market prices*.[97]  Professor Shapiro then dismisses these rivals,

implicitly assuming that their *future* competitive significance is unlikely to change from their

*current* competitive significance, even if there is a hypothetical price increase following the

Transaction.  But a hypothetical price increase would sharpen the incentives to invest in

whatever deliver or computer assets are necessary, since there are more profit opportunities for

them to achieve.  If, by investing in whatever delivery or computer assets Professor Shapiro

believes it lacks, a potential rival could gain even a five percentage point increase in market

share, it would be able to obtain millions of dollars in additional profits.  In other words,

Professor Shapiro essentially assumes that whatever additional delivery or computer assets rival

firms allegedly lack would be so costly as to cause these firms to leave profits on the table.  I am

aware of no evidence supporting that claim.

---

96. ████████████████

97.  *See, e.g.*, Shapiro Report, at p. 43 ("Smaller competitors lack the IT capabilities and reputation sought by
large customers … existing suppliers would need to significantly augment their capabilities to provide the range of
services Staples and Office Depot provide to large customers … Regional distributors would need to expand into
new markets while maintaining unified customer service across their network") & 48 ("the current Amazon
Business offering lacks key attributes needed to compete effectively for large customers and [] significant
investment would be required to compete effectively").

CONTAINS CONFIDENTIAL MATERIALS

74.     In sum, neither the FTC nor Professor Shapiro has identified any input or asset (and I am not aware of any input or asset) held by Staples and Office Depot, which is not similarly available to other actual and potential competitors, and which these competitors could not acquire if necessary to expand or reposition themselves in the market.  Put differently, there is no "secret sauce" possessed by Staples and Office Depot that creates a barrier to entry or expansion by competitors.  In the absence of such barriers to entry, any attempt by the combined Staples and Office Depot to raise prices after the Transaction will be stymied by competing firms that enter or expand in order to compete and offer lower prices.

   3.   *Staples' and Office Depot's purchasing from manufacturers does not create a barrier to entry.*

75.     Professor Shapiro argues that Staples and Office Depot have cost advantages over rival distributors due to the fact that they purchase more of their products directly from manufacturers, and purchase less from wholesalers.[98]  Professor Shapiro recognizes that rivals to Staples and Office Depot can also purchase from manufacturers, but he claims that Staples and Office Depot can do so more often because they purchase in larger quantities, consistent with their scale.[99]

76.     On the face of it, there is a key flaw in Professor Shapiro's claim regarding Staples' and Office Depot's cost advantages.  If it were true, this same cost advantage would give Staples and Office Depot the ability to win a massive share of contracts with smaller customers.  The FTC and Professor Shapiro do not claim that Staples and Office Depot have any competitive advantage among smaller customers.  Perhaps Professor Shapiro has some more complicated theory in mind that distinguishes large customers from smaller customers in this

---

98.     *Id.*, at pp. 32-33.
99.     *Id.*

dimension, but he has not articulated it in his report.  More fundamentally, Professor Shapiro has

not provided support for his claim with any sound empirical analysis.  For example, he has not

provided any analysis comparing the actual costs of goods sold by Staples and Office Depot to

the cost of goods sold by their competitors, including W.B. Mason, Amazon, Grainger, and

others.

77.     In addition, Professor Shapiro's claim that Staples and Office Depot will be able

to maintain competitive advantages over rivals due to scale is flawed in other ways.  For

instance, it ignores the fact that manufacturers have incentives to keep prices low.  This is

because manufacturers would be harmed by any post-Transaction price increase, since it would

reduce sales of their products without benefitting them.  Manufacturers generally prefer to have

their products sold to final users at the lowest cost possible.[100]  Therefore, they would be

incentivized to reduce any scale-related barriers to distributors' ability to purchase direct from

them, which might otherwise limit rival distributors' ability to compete on price.[101]

78.     Consistent with this standard economic theory, I understand that even Staples and

Office Depot, at their current scale, will frequently seek (and receive) lower costs from

manufacturers in cases where they need to offer a customer lower prices to defeat a rival

---

[100].     Dennis W. Carlton and Jeffrey M. Perloff (2005) *Modern Industrial Organization*, fourth edition, Pearson Addison Wesley, at p. 417 ("The manufacturer does not want its distributor to restrict output further – or, equivalently, to increase its price, p1, above the wholesale price, p2 – because profits from the distributor's markup go to the distributor, not the manufacturer.  The manufacturer wants as efficient a distribution system as possible (that is, with the smallest distributor's markup).").

[101].     Consistent with this claim, contracts between major manufacturers, on the one hand, and Staples and Office Depot, on the other, often contain rebate incentives that give Staples and Office Depot lower cost of goods sold if they sell greater quantities of the manufacturers' products.  For instance, Staples' contract with ███████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ These contract provisions are designed to align the interests of intermediaries such as Staples and Office Depot with those of manufacturers.  Accordingly, the contracts incentivize Staples and Office Depot to keep the intermediation component of prices to customers low in order to maximize sales and reduce the full cost of goods sold.  There is no reason to believe that similar contract incentives would not be negotiated by manufacturers with the combined Staples and Office Depot after the Transaction.

distributor's bid.  There is no reason why manufacturers would not be equally willing to do the same for rival competitors if lower costs were needed in order to defeat a post-Transaction price increase by Staples and Office Depot.

### 4. The experience of managed print services illustrates the lack of entry barriers

79.    Market evolution in the supply of ink and toner to large B-to-B customers presents a case study in the lack of barriers to entry among intermediary services in the business supply chain, as well as the generally dynamic marketplace in which Staples and Office Depot compete.   As I have previously noted, while distributors such as Staples and Office Depot traditionally sold, and continue to sell, ink and toner along with other office supplies, today many large B-to-B customers have the additional option of purchasing ink and toner through market resellers known as "managed print services."[102]  Staples' and Office Depot's sales of ink and toner products constituted 26 percent of their total sales to large B-to-B customers in 2010, but only 21 percent in 2015, as shown in Exhibit C.

80.    Managed print services jointly serve a customer's printing equipment, ink, toner, and printer service needs.  Thereby, even if (for instance) a manufacturer or distributor did not find it economical to sell ink and toner alone directly to customers, the combination of ink with toner, printers, and service may be economical.  In fact, many of the major ink and toner manufacturers operate managed print services, as do other business supplies sellers, including Staples.[103]  A 2015 survey found that 51 percent of large organizations with over 1,000 employees either already use or plan to use managed print services in the next year.[104]  Staples and Office Depot believe that many large B-to-B customers, including ████████████

---

102.    Professor Shapiro discusses managed print services briefly in Shapiro Report, at p. 5.
103.    http://www.staplesadvantage.com/learn/expert-services/managed-print-services/managed-print-services.html [accessed January 26, 2016].
104.    Quocirca, "Managed Print Services Landscape," July 2015, at pp. 4-5.

████████████████████████████████████████████████████████

████████████████████████████████████████████████ source from

managed print services.

81.     The growth of managed print services, and their widespread adoption, reflects the

lack of barriers to entry in intermediating the office product supply chain.  There is no reason

why a similar marketplace response could not take place with respect to other office products

(*e.g.*, the managed print service providers including copy/print paper as part of the bundle of

products that they distribute),[105] and such a marketplace response would be even more likely in

the case the FTC is concerned about, in which the combined Staples and Office Depot attempt to

raise prices after the Transaction.  Such an outcome would further incentivize rivals to develop

new business models such as managed print services in order to earn the higher available

margins.

### C. There Are Already Many Rival Firms with a Ready Ability to Expand and Reposition to Gain Market Share in Response to A Hypothetical Post-Transaction Price Increase

82.     As I demonstrate below, Staples and Office Depot are already being challenged

by many different rivals under current market conditions.  These rivals have demonstrated a

ready ability to expand and reposition as necessary to gain market share, so there is no basis for

Professor Shapiro's assumption that competition is effectively frozen at 2014 levels and would

not quickly respond to a hypothetical post-Transaction price increase by Staples and Office

Depot.

---

105.    In fact, managed print services have, in the past, offered to include paper in the bundle of products that they
provide.  *See* ███████████████████████, at ¶8.

43

CONTAINS CONFIDENTIAL MATERIALS

83.     Consistent with this conclusion, in November 2013, the FTC approved the Office

Depot / OfficeMax merger on the basis that there were at that time many actual and potential

alternatives available to customers.  In particular, the FTC stated:[106]

- "[N]on-OSS [Office Supply Superstore] competitors take business from the parties in a substantial number of contracting opportunities."

- The merging parties face "strong competition" from "a host of non-OSS competitors, such as W.B. Mason Co., Inc."

- "Non-OSS competitors are growing in number and strength and have demonstrated the ability to win large multi-regional and national customer contracts."

- "[R]egional office supply competitors have developed and utilized various strategies to compete successfully for large national accounts, including working with office supply wholesalers and joining cooperatives of independent office supply dealers to create a distribution network capable of meeting the needs of large multi-regional and national customers."

- "[P]otential competitors in adjacent product categories, such as janitorial and industrial products, have existing contractual relationships with large office supply customers and can leverage those relationships to enter the office supply distribution market."

- "… large customers use a variety of tools to ensure that they receive competitive pricing such as ordering certain products (like ink and toner) directly from manufacturers and sourcing (or threatening to source) certain categories of office supply products from multiple firms."

84.     The evidence discussed below indicates that the FTC was correct in this

November 2013 view.  The FTC has not explained why its views about competition appear to

have changed between November 2013 and the present, nor has Professor Shapiro explained why

his views appear to conflict with the FTC's view in November 2013.  If anything, the

competitive alternatives the FTC mentioned are stronger and more dynamic today than they were

in November 2013.

---

106.     "Statement of the Federal Trade Commission Concerning the Proposed Merger of Office Depot, Inc. and OfficeMax, Inc.," FTC File No. 131-0104, November 1, 2013.

CONTAINS CONFIDENTIAL MATERIALS

### 1.  Other national office supply competitors.

85.     As noted above the FTC recognized in November 2013 that Staples and Office Depot face "strong competition" from "a host" of independent suppliers, and specifically named one of them, W.B. Mason.  Indeed, evidence indicates that there are a number of independent national suppliers who compete for, and have won, contracts to supply large B-to-B accounts. For instance, in 2013, ███████████████████████████████████ requested bids for an expected $2.5 million annual office products contract requiring delivery to more than 40 locations nationwide.[107]  Staples bid on the contract, but lost to rival distributor MyOfficeProducts.[108]  I understand that Staples and Office Depot believe that MyOfficeProducts and other competitors also serve a number of other large nationwide customers, including

███████████████████████████████████████████████████████

████████████████████████████████  and many others.

86.     Because the FTC specifically mentioned W.B. Mason in 2013, and because Professor Shapiro also discusses W.B. Mason at some length in his report in this matter, I performed an in-depth study of that firm as an example.  Despite the 2013 statements to the contrary, the FTC now claims that firms such as W.B. Mason do not provide effective competition for Staples and Office Depot because they "have higher costs and thus higher prices, limited geographic footprints, and/or logistical and coordination challenges for large B-to-B customers."[109]  Professor Shapiro echoes these claims in his report as well.[110]  I therefore examined W.B. Mason on the three dimensions which, according to the FTC, cause it to be an inferior competitor.

---

107.    SPLS_SFDC_0001762648.
108.    ████████████████████████████████████████████, at ¶5.
109.    Complaint, at ¶12.
110.    Shapiro Report, at pp. H-3 through H-7.

87.     W.B. Mason describes itself as "the largest privately owned office products dealer in the United States,"[111] and claims ███████ in 2014 sales, including ███████ in consumables sales,[112] and employs 3,500 employees.[113]   W.B. Mason has ███ B-to-B customers, more than either Staples or Office Depot had in 2015.[114]   W.B. Mason's B-to-B customers include ██ customers that spend more than $1 million annually.[115]   Professor Shapiro recognizes that W.B. Mason has historically been a frequent bidder in RFPs for large B-to-B customers, participating in 10.5 percent of the RFPs Office Depot bid for, and 7.6 percent of the RFPs Staples bid for.[116]   Indeed, there are numerous examples of W.B. Mason actually beating out Staples and Office Depot for significant national customers (including customers that fall within his relevant market).[117]   These facts demonstrate that W.B. Mason is capable of competing for and winning large B-to-B contracts, and hence, there is no reason why it could not expand to increase its market share if Staples and Office Depot attempted to raise prices after the Transaction.

### a.  Claim that W.B. Mason's prices are uncompetitive

88.     Regarding the FTC's and Professor Shapiro's claims that W.B. Mason has higher prices to B-to-B customers, I have not seen any empirical analysis of this claim.  Nonetheless, W.B. Mason itself naturally disagrees, stating publicly that it "provides a huge selection of

---

111.    http://www.wbmason.com/AboutUs/index.html [accessed January 25, 2016].
112.    ███████████████████████████████████████████ at -001.
113.    "W.B. Mason lays off 15 employees in city," *The Enterprise* [Brockton, Mass.], December 22, 2015.
114.    ███████████ at -002.
116.    Shapiro Report, at Exhibits 10 & 11.
117.    *See, e.g.,* ███████████████ at p. 152 (discussing W.B. Mason beating Office Depot (the incumbent), Staples, and Office Max to serve ██████████ *id.,* at pp. 175-178 (discussing W.B. Mason beating Staples and Office Max first for the ███████████████████

products for the workplace at competitive prices."[118]  Other evidence is consistent with the

conclusion that W.B. Mason already prices competitively with Staples and Office Depot.  First,

Internal Staples business documents in 2014 stated, "WB Mason continues to aggressively

pursue [Staples] accounts."[119]  In addition, Staples and Office Depot have each, in many cases,

faced pressure to lower their prices to large B-to-B customers due to competitive pricing from

W.B. Mason.  For instance, in 2014, ████████████████  requested bids for a $3 million

office products order.[120]  Staples and Office Depot both lost the account to W.B. Mason, with

███████████  notifying Office Depot that they "were not competitive" with W.B. Mason's

prices.[121]  Also in April 2015, Staples lost a bid for ██████████████████████

indicating that "Mason went super low" on prices.[122]  Similarly, W.B. Mason beat out, among

others, Staples and Office Depot for the ████████  account.  According to W.B. Mason's

CEO, █████████  told W.B. Mason that its prices were competitive with those offered by the

competitors it beat out.[123]  To be sure, these are not isolated incidents.   As Mr. Meehan of W.B.

Mason put it, ██████████████████████████████████████ ████████

████████████████████████████████████████████████████

████████████████████████████████████████████[125].

---

118.     "Keurig Green Mountain, Inc. and W.B. Mason Bring Magic to Keurig Brewers with SHAZAM Coffee,"
*Business Wire*, October 6, 2014.
119.     SPLS_0466573.
120.     SPLS_SFDC_0001627830.
121.     ODP-OMX-FTC-02904289.
122.     SPLS_0466574.  Similarly, *see also* SPLS_0466549 (internal Staples email stating ███████████
████████████████████████████████) and SPLS_0466613, at 615 (internal
Staples email stating ██████████                              ████████████████
123.     *See, e.g.,* ████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████
124.     *Id.*, at p. 40.
125.     *Id.*, at pp. 43-46.

### b. Claim that W.B. Mason's geography is limited.

89.     Regarding the FTC's and Professor Shapiro's claims about W.B. Mason's allegedly limited geographic footprint, again, W.B. Mason itself disagrees, stating publicly that it has "over 40 locations," as well as "warehouses across the United States which allow us to service customers in all 50 states."[126]  W.B. Mason even refers to itself as a ██████ ██████████ with a ██████████████████████████████████ [128]  W.B. Mason has also stated that its relationship with wholesaler Essendant gives it a national reach: ██████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████ These claims are not just that – they are corroborated by ████████████████████████████████████████████ ██████████████████████ ████ .[130]

90.     Moreover, W.B. Mason is rapidly expanding its geographic footprint.  W.B. Mason has recently expanded its locations into Illinois and California,[131] and in 2015 alone, made 13 business acquisitions, with a net gain of 300 employees and a double-digit percentage increase in sales.[132]  W.B. Mason specifically plans to expand into all 50 states.[133]

---

126.    http://www.wbmason.com/AboutUs/locations.html [accessed January 20, 2016].
127.    ██████████████████████████████████
130 .   FTC-PROD-0056380
131.    "W.B. Mason and Ryder: A customized fleet for phenomenal growth," Ryder, 2015, at p. 2.
132.    "W.B. Mason lays off 15 employees in city," *The Enterprise* [Brockton, Mass.], December 22, 2015.
133.    "How W.B. Mason Grew by Narrowing its Focus," *INC*, July 14, 2015.

CONTAINS CONFIDENTIAL MATERIALS

91.     As discussed above, W.B. Mason's current set of distribution centers is already sufficient that many Fortune 100 firms, including ████████████████ ██ ████████████ ████████ all had more than 80 percent of their total fiscal year 2015 office product purchases shipped to a location within 136 miles of a W.B. Mason distribution center (*i.e.*, the average of the mean distances Office Depot and Staples ship products to their customers, *see* Exhibit E).  In addition to these companies, ██████████████████████████████████ ██████████████████ are all Fortune 100 companies that had more than 60 percent of their total fiscal year 2015 office product purchases shipped to a location within 136 miles of a W.B. Mason distribution center.  For yet other customers, the additional cost of shipping further will likely often be less than six percent of the purchase price, and hence, W.B. Mason will be better able to compete with a combined Staples and Office Depot that attempted to raise prices by six percent, as Professor Shapiro claims.

92.     That W.B. Mason can serve prominent customers on a national scale is further supported by ██████████████████   These data show that today W.B. Mason is serving as the primary supplier of office products to a number of large national firms, and is serving their locations throughout the country.  These include, among others, ████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████[34]  In fact, for some customers, W.B. Mason is even selling more outside of its primary 13-state footprint than it is inside that footprint.[135]

---

134.     FTC-PROD-0056380;  Professor Shapiro also cites what he characterizes as "an internal memo" from Staples that allegedly claims W.B. Mason to be a smaller, regional distributor lacking the ability to serve large customers.  Shapiro Report, at p. H-4.  A closer look at this document reveals that it is not a revelation of Staples' internal views at all, but in fact what the author calls a "script" for use in convincing customers to switch their business to Staples.  SPLS_1108311.  In other words, this document reflects Staples' marketing pitch to customers,

### c. Claim that W.B. Mason faces logistical challenges

93.     Finally, regarding the FTC's and Professor Shapiro's claims about W.B. Mason's alleged "logistical and coordination challenges for large B-to-B customers," ███████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

████████ which W.B. Mason presumably is able to offer.[136] ████████████████

████████████████████████████████████████████████████████

████████████████████[137] W.B. Mason publicly brags that they are able to offer high levels of service, including the same customized services that the FTC claims large B-to-B customers demand. W.B. Mason stated that "[m]any larger corporations require a more customized ordering solution and we are happy to cater to the way YOU do business,"[138] and "[c]ustomer's [sic] that still wish to order transactionally can do so but they are always offered that full customer intimate experience – dealing with people they know rather than just a website."[139] W.B. Mason also offers free same-day and next-day delivery,[140] consistent with the FTC's claim that next-day delivery is a requirement to compete for large B-to-B customers. By contrast,

---

and it naturally attempts to downplay competitors such as W.B. Mason. The very fact that Staples felt it was necessary to mention W.B. Mason to customers indicates Staples' recognition that W.B. Mason was a serious competitor for these customers.
135.    FTC-PROD-0056380 (for example, sales to ████████████ are higher outside of "Masonville" than inside). *See* ███ at -002.
136.    ███████████████ at -002.
137.    █████████████████████████████████████████████████████

138.    http://www.wbmason.com/AboutUs/corporate-solutions.html [accessed January 20, 2016].
139.    "WB Mason Momentum Unstoppable," *Proficiency Post*, October 19, 2015.
140.    W.B. Mason and Ryder: A customized fleet for phenomenal growth," Ryder, 2015, at p. 5 ("W.B. Mason makes a crucial guarantee that often crushes its competition: free same day and next day delivery.").

CONTAINS CONFIDENTIAL MATERIALS

███████████████████████████████████████████.[141]  As noted previously, W.B. Mason's truck

fleet is larger than Office Depot's.

94.      W.B. Mason's IT infrastructure also has the features that the FTC claims are

necessary to compete effectively for large B-to-B customers.  W.B. Mason offers ██████████

███████████████ ████████████████████████████████████████████████ ████

██████████ ████████████████████  Put differently, there is nothing that Staples and Office

Depot offer their large customers that W.B. Mason cannot currently also offer.

95.      These conclusions are supported by the available evidence, which only reinforce

that W.B. Mason's claims are not simply aspirational.  "W.B. Mason has the enviable industry

record of making deliveries on time more than 99 percent of the time.  This success is

particularly impressive as 35 percent of its deliveries are same day and over 99 percent of its

deliveries are same or next day.  The company's customer satisfaction and retention rates are

some of the highest in the office products industry."[146]  These conclusions are further supported

by W.B. Mason's ███████████████████████████████████████████████████████

████████████████████████████████████████████[147]

96.      In sum, I see no reliable basis to conclude that W.B. Mason's ability to compete

with Staples and Office Depot is limited by an allegedly uncompetitive cost structure, limited

geographic footprint, or logistics challenges, as the FTC and Professor Shapiro assert.  This view

is reinforced by the evidence of the customers that W.B. Mason currently is able to serve

successfully, the rate of W.B. Mason's past expansion, its potential for future expansion, and the

---

141.    Investigative Hearing of Steven Calkins, at p. 122.
142.    ████████████████████████████████████
143.    *Id.*
144.    *Id.*, at pp. 225-26.
145.    *Id.*, at p. 220.
146.    W.B. Mason and Ryder: A customized fleet for phenomenal growth," Ryder, 2015, at p. 5.
147.    ████████████████████████████████████████████████

incentives it would have to expand even faster if market prices were to rise as Professor Shapiro alleges will happen as a consequence of the Transaction.

97.     As noted above, W.B. Mason is only one of a number of office product sellers which successfully bid for and win contracts with large national B-to-B customers.  Overall, the evidence indicates that national office supply sellers such as W.B. Mason and others currently provide competition for Staples and Office Depot, and are sufficiently dynamic to expand in response to any hypothetical post-Transaction price increase.

## 2. *Regional office supply competitor*s

98.     There are many other office supply competitors which may not directly have the same national reach as Staples, Office Depot, or others such as W.B. Mason.  However, these regional competitors nevertheless already compete to supply large B-to-B customers, and would be incentivized to do so to an even greater degree if a combined Staples and Office Depot attempted to raise prices.

99.     One way regional competitors constrain pricing by national firms like Staples and Office Depot is when large customers "carve out" from a contract with a national firm the customer's offices in a certain region or regions and allow those offices to be serviced by a regional competitor.  The threat to do so can force a national supplier, like Staples and Office Depot, to keep prices low, in order to avoid losing a substantial share of a customer's sales. Professor Shapiro claims that customers generally prefer to purchase from a single distributor.[148] Even if so, however, this preference is not universal, and it obviously does not mean that, if Staples and Office Depot attempted to raise prices after the Transaction, customers would not be

---

148.     Shapiro Report, at p. H-4.

CONTAINS CONFIDENTIAL MATERIALS

willing to carve out certain regional offices in order to avoid the price increase.[149]  For instance,

██████████████████████████████████████████████████████████████

█████████████████████████████[150]

100.    An additional means by which regional competitors obtain contracts with large B-to-B customers is through the use of office supply wholesalers and cooperatives of dealers. Indeed, as noted above, in November 2013, the FTC recognized that Office Depot and Staples faced additional competition from the operations of these wholesalers and cooperatives.[151]  As I discuss below, available evidence indicates that the FTC's previous analysis was correct. However, in its Complaint regarding the current Transaction, the FTC appears to have changed course and now claims that wholesalers are "not meaningful alternatives" because they "generally sell only for resale, not to businesses for their own use" and because "wholesaler-vendor partnerships cannot provide the level of pricing or service that office supplies vendors like Respondents provide."[152]

101.    As noted previously, the largest wholesalers of business supplies in the United States today are Essendant and S.P. Richards, and Staples and Office Depot themselves rely on these wholesalers in sourcing products sold to large B-to-B customers.[153]  W.B. Mason also relies on Essendant.[154]  Essendant, with 77 distribution centers throughout the United States, stocks more than 160,000 products, including 23,000 traditional office supplies products, and can

---

149.    Moreover, it is unclear whether such a preference would be sufficiently observable by Staples and Office Depot that they could price discriminate on that basis.  If not, then the preference of only some customers willing to consider regional suppliers can have a constraining effect on prices for all customers.

150.    ████████████████████████████████████████████████████████████████

151.    "Statement of the Federal Trade Commission Concerning the Proposed Merger of Office Depot, Inc. and OfficeMax, Inc.," FTC File No. 131-0104, November 1, 2013.

152.    Complaint, at ¶55.  See also Shapiro Report, at pp. 32-33.

153.    Professor Shapiro recognizes this fact.  Shapiro Report, at p. 33.

154.    United Stationers, Inc. "Form 10-K for the Year Ended December 31, 2014," at p. 2.

CONTAINS CONFIDENTIAL MATERIALS

provide overnight delivery to 90 percent of the country.[155]  S.P. Richards has over 40 distribution centers in the United States, and also offers next-day delivery for most of its products.[156]  S.P. Richards states prominently that "[w]hen you partner with us, your reach is nationwide."[157]  Notably, both Essendant and S.P. Richards have more distribution centers serving contract customers than does either Staples or Office Depot.

102.    The evidence indicates that Staples already views these wholesalers as competitors, even at today's price levels.  For instance, one 2011 internal strategy document says, "United [Essendant] and SP Richards have been aggressively pursuing new avenues to grow their business and are crossing the line between a traditional wholesaler and a competitor."[158]  Another strategy document from 2013 analyzes Staples' relationship with Essendant, noting that Essendant provides "sole support for many Independent Dealers that directly compete with Staples," and that their "[p]latform now has the capability to support National Account acquisition with multiple regional independents."[159]  By the same token, Essendant views Staples as a competitor as well.  ███████████████████████

███████████████████████████████████████████

███████████████████████████████[160]

103.    Moreover, Staples and Office Depot have recently agreed to sell to Essendant the contracts of many large B-to-B customers currently being supplied by "diversity" suppliers, creating additional direct competition for the combined firm.[161]  Professor Shapiro characterizes

---

155.    *Id.*, at p. 1.
156.    http://www.sprichards.com/who-we-are/operations/ [accessed January 26, 2015].
157.    *Id.*
158.    Staples Wholesaler Negotiation Status (July 21, 2011), at p. 3.
159.    United Stationers Info, Staples Wholesaler & Non-Stock Group, (Jan 2013), slide 14.  *See also* ███████ ███████████████ (indicating use of Essendant and S.P. Richards to distribute products to customers located outside of the range of the declarant's distribution centers).  *See also* ██████ ███ indicating use of wholesalers, among others, to distribute products to customers outside their distribution area).
160.    ████████████████████████
161.    "Staples Agrees to Sell Some Contracts to Essendant," *Wall Street Journal*, February 16, 2016.

CONTAINS CONFIDENTIAL MATERIALS

the divestiture as "woefully inadequate," but appears to recognize that it strengthens the competitive position of distributors that depend on Essendant, although not sufficiently as to fully replace Office Depot.[162]  Even if Professor Shapiro is correct that diversity suppliers cannot alone constrain a combined Staples and Office Depot, the divestiture nevertheless undoubtedly adds to the competitive constraints Staples and Office Depot will face after the Transaction.

104.    An additional way in which regional competitors can already compete for large B-to-B customers is by joining a cooperative of other regional suppliers.  One such cooperative, Independent Stationers, promotes itself directly to "national accounts customers," offering "great pricing."[163]  Another cooperative, American Office Products Distributors, Inc. ("AOPD") states that it "gives the independent dealer the power to compete for regional and national contract customers and participate in corporate bids,"[164] and in fact currently serves 355 nationwide contracts.[165]  AOPD's Executive Director has publicly stated that "[w]e want to elevate the AOPD brand as a serious alternative to Staples."[166]

105.    Overlooking this evidence, Professor Shapiro asserts that consortia "have had very limited success serving large customers" to date,[167] but this misses the point; what is relevant is the future competitive significance of these consortia if Staples and Office Depot attempt to raise prices after the Transaction.  Professor Shapiro also asserts that a small post-Transaction price increase "would not cause large customers to switch in significant numbers to using consortia," but this claim again assumes that consortia will not reposition themselves or

---

162.    Shapiro Report, at p. 54 ("Nor will the proposed divestiture strengthen smaller distributors sufficiently to replace the competition from Office Depot that will be lost.").
163.    http://www.independentstationers.coop/ [accessed January 26, 2016].
164.    http://www.aopd.com/about_us.php?page=18 [accessed January 26, 2016].
165.    "Accelerating Contract Commitment: AOPD '16 Leader's New Vision & Brand Plans," *Proficiency Post*, March 11, 2015.
166.    *Id.*
167.    Shapiro Report, at p. H-9.

invest in the assets necessary to win more market share among large customers.  As I have

discussed previously, the amount of potential additional profits to be earned by a consortia from

even a small increase in market share after a post-Transaction price increase is sufficiently large

to appear to incentivize whatever repositioning and investment would be necessary to gain that

market share.

106.    Yet another way in which regional competitors compete for large B-to-B

customers is by making use of the customer's own internal distribution network.  As I have noted

previously, many large B-to-B customers have logistically sophisticated supply chains to move

the products they sell from centralized distribution centers to individual store locations, and this

same infrastructure is often used to transport office supplies as well.  In this way, a regional

competitor may deliver office supply products to a small number of centralized distribution

centers, and the B-to-B customer then distributes the office supplies throughout its locations

across the country. █████████████████████████████ are examples of

national B-to-B customers that currently, or in the recent past, used internal distribution to

provide office supplies to their many locations throughout the country.[168]  Professor Shapiro does

not consider this means by which regional competitors can gain the business of many large

customers.

107.    All of these options available to regional competitors demonstrate that, contrary to

the impression provided by the FTC and Professor Shapiro, competition for large national B-to-B

customers is not restricted to suppliers that own many distribution centers throughout the

---

168.    █████████████████████████████████████████████████

CONTAINS CONFIDENTIAL MATERIALS

country.  The resources needed to supply national accounts are much more broadly available and by no means constitute a specialized asset held only by Staples and Office Depot.  These regional suppliers already compete to a large degree with Staples and Office Depot today, and would be able to expand and/or reposition themselves in response to any hypothetical price increase after the Transaction.

### 3.  Amazon Business

108.     I have already discussed in some detail the April 2015 launch of Amazon Business, the B-to-B supply division of retailing giant Amazon.  Although Amazon Business is a newly expanded competitor, it is obviously backed by tremendous logistics expertise and consumer familiarity with the Amazon name.  As Professor Shapiro recognizes, Amazon has "strong presence in the retail channel and very impressive retail distribution capabilities."[169] Consequently, it will provide an important source of additional competition for the combined Staples and Office Depot.

109.     Amazon Business advertises that it offers hundreds of millions of products, including office supply goods.[170]  Like Staples and Office Depot, Amazon Business offers the key features that the FTC claims large B-to-B customers demand, including discounts off retail prices for business customers, corporate lines of credit, and enhanced order reporting for tracking procurement.[171]  Amazon Business also offers integration with online purchasing systems

---

169.     Shapiro Report, at p. 47.
170.     http://www.amazon.com/business [accessed January 20, 2016].  *See also* ███████████████████████████████████████Press Release: Amazon Business Ignites More B2B Customers for Sellers dated April 28, 2015).
171.     http://www.amazon.com/business [accessed January 20, 2016].  *See also* ███████████████████████████████████████(Press Release: Introducing Amazon Business: Everything You Love About Amazon For Your Business dated April 28, 2015).

CONTAINS CONFIDENTIAL MATERIALS

common in B-to-B environments ("punchout").[172]   Amazon also owns a network of 72

fulfillment centers across 28 states, more than either Staples or Office Depot, and thus has

nationwide distribution capabilities the FTC also claims large B-to-B customers demand.[173]

110.   Company executives have stated that Amazon Business's entry reflects important

new competition for B-to-B sales with the potential to grow quickly.[174]   For instance, Office

Depot executive John T. Lander testified that "[a]s early as last week ▮▮▮▮ said we're going to

look at Amazon Business, as well … in our Salesforce everybody has anxiety about Amazon

Business and so when you hear stuff like this, it sends shock waves.  Because here they

come."[175]   Office Depot executive Juliet Johansson referred to Amazon as "the 800 pound gorilla

that I worry about quite a bit."[176]   Staples executive Faisal Masud testified that "we live in an

Amazon world, and … we just need to have a chance to breathe in it".[177]   Staples executive Shira

Goodman testified that Amazon "is our single largest competitor, our most formidable

competitor going forward[.]"[178]

111.   Amazon Business has launched with several advantages over other new entrants,

including the fact that many B-to-B customers were already familiar with Amazon either through

Amazon.com or the "beta" phase of Amazon Business (known as AmazonSupply.com).  B-to-B

customers, including Fortune 100 companies, were already making business purchases on

---

172.   http://www.amazon.com/gp/aw/help/id=201722990 [accessed January 21, 2016].  *See also* ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ (Press Release: Introducing Amazon Business:
Everything You Love About Amazon For Your Business dated April 28, 2015).
173.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Amazon Distribution
Network Strategy / MWVPL International website [accessed January 28, 2016]).
174.   Industry commentary is also consistent with this conclusion.  *See, e.g.*, procurement industry publication
*Spend Matters,* which stated, "[d]uring the coming 12-36 months, we are going to see greater disintermediation and
change in B2B commerce than the past few decades combined.  Buckle your seatbelt (especially if you're an
incumbent distributor like Grainger or Staples)."  "Amazon Takes Stage with Oracle, Enters B2B Market – So
What?" *Spend Matters,* February 3, 2015.
175.   Deposition of John Lander, at pp. 169-72.
176.   Deposition of Juliet Johansson, at p. 158.
177.   Deposition of Faisal Masud, at p. 35.
178.   Deposition of Shira Goodman, at p. 137.

Amazon.[179]   In 2014 alone, Amazon estimated that there was ██████████████████

██████████████████.[180]   Such purchasing by businesses on Amazon before

Amazon Business launched is consistent with survey data showing that businesses (or their

employees) have already used the Amazon site frequently.   One June 2013 survey of corporate

buyers with annual budgets in excess of $100,000 found that "45 percent of respondents have

used Amazon Supply to make a purchase in the last year, and 25 percent of respondents who

have used Amazon Supply purchase from there frequently."[181]   Another 2014 survey indicated

that "[i]n terms of core OP [office products] purchasing (i.e., traditional stationary products,

office paper, computer & printer supplies and office furniture), as many as 60% of the

respondents reported that their companies had purchased OP from Amazon in the last 12

months."[182]   Nearly half, 46% of respondents to the survey could either "definitely" or

"probably" envision buying all of their office products from Amazon.[183]

---

179. ████████████████████████████
180. ██████████████████████████████████████████

181.     "Study Finds Nearly Half of B2B Buyers Have Used Amazon Supply to Make a Company Purchase,"
Acquity Group Press Release, June 18, 2013.
182.     Martin Wilde Associates Ltd & Office products International Ltd., *Swimming with Piranha*, at Vol. 1,
September 2014, at p. 1.
183.     *Id.*, at p. 2.  Professor Shapiro criticizes this survey on the basis that respondents included some smaller
customers.  Shapiro Report, at p. 46.  However, this does not change the relevance of the survey's key finding, that
"the use of Amazon was found to be widespread across all sizes of business."  I also note that a more recent survey
by the same publication has a higher percentage of survey respondents from large customers (21% from companies
with more than 300 employees and 19% from companies with more than 1,000 employees), and the findings are
consistent.  *See* Martin Wilde Associates Ltd & Office products International Ltd., *The Spider Report: How And
Why Business Products Are Bought On The Web Us Report*, January 2016, § 1.1 (11) ("The most widely-used online
suppliers of each of the three core OP categories purchased by respondents were Staples.com in first place,
Amazon.com in second, followed by OfficeDepot.com. However, Amazon.com was the most widely-used online
supplier for all the other three product categories covered by this survey, with Staples.com being in second place for
office furniture (followed by OfficeDepot.com) and cleaning/janitorial products.").  Other survey data is similarly
consistent.  *See, e.g.,* Forrester, Insights Into The Behavior Of The Modern B2B Buyer, 3rd Annual Survey, by
Andy Hoar, December 15, 2015, ████████████████████████████████████████

CONTAINS CONFIDENTIAL MATERIALS

112.    These survey findings are consistent with what I understand to be the experience of Staples and Office Depot.  There are many internal emails and strategy documents from both companies that describe B-to-B customers using Amazon as a benchmark to request lower prices from Staples or Office Depot,[184] or purchasing office supplies from Amazon even though they have an existing contract with Staples or Office Depot.[185]

113.    Consistent with the deposition testimony cited above, Staples and Office Depot appear to have recognized the launch of Amazon Business as a serious competitive threat.  For instance, Staples' Chief Digital Officer, Faisal Masud, commented in an email that Amazon Business "is a huge threat considering the fact they have 2MM prime products and we have 36k + they beat our prices and service levels."[186]  Additionally, in an April 30, 2015 internal e-mail, Faisal Masud stated that "Jeff [Bezos] isn't thinking about 2016.  He's already planning the death of Staples.  Like he did for Circuit City, BestBuy, Sears, Radio Shack and many more."[187] An internal Staples strategy document from May 2015 states, "Amazon already has a meaningful presence with business customers and strong momentum for the future."[188]  Office Depot's Chairman and CEO, Roland Smith, stated, ███████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████"[189] Amazon Business has also begun competing directly for RFPs.[190]

---

184.    *See, e.g.*, SPLS_0466603, SPLS_0466624, SPLS_04290805, SPLS_04290819, SPLS_04290871, SPLS_04290893, SPLS_04290907, and SPLS_04291158.
185.    *See, e.g.*, ODP-OMX-FTC-02089096-7, ODP-OMX-FTC-06689017, and SPLS_04290841.
186.    SPLS_2078955.
187.    SPLS_2967031.  Even before the launch of Amazon Business, Staples executives were concerned about Amazon expanding its presence into the B-to-B space.  In a May 14, 2014 internal e-mail, Shira Goodman, Staples' North American Commercial President, stated that Amazon's expansion into meant that it was time for Staples "to deepen the moat around our business."  SPLS_0920120.
188.    Staples, NAC Q2 2015 Strategy Session, at 16 (May 21, 2015).
189.    Investigational Hearing of Roland Smith, at pp. 191 & 215.
190.    Investigational Hearing of John Lander, August 21, 2015, at p. 186 ("We're starting to see them in RFPs.").
*See also* ████████████████████████████████████████████████████████████████

CONTAINS CONFIDENTIAL MATERIALS

114.    In his report, Professor Shapiro admits that Amazon Business "is a natural candidate for possible expansion," but concludes that Amazon nevertheless does not currently provide sufficient competition to constrain the pricing of a combined Staples and Office Depot.[191]  Professor Shapiro's apparent prime rationale for this conclusion is that Amazon represents only a modest share of the alleged relevant market in his various analyses of win-loss data and the purchases of Fortune 100 customers.[192]  This is wholly unsurprising, since Professor Shapiro's analyses primarily cover periods prior to the launch of Amazon Business in April 2015.  His analysis of purchasing in the Fortune 100, for instance, covers the year 2014.[193]  That Amazon held a small share of those purchases in 2014 has no bearing on the *future competitive significance* of Amazon, since it had not even fully launched its B-to-B sales channel at that time.

115.    Professor Shapiro also argues that Amazon Business cannot be an effective competitor for Staples and Office Depot because it has a different business model than those firms and a platform that differs from theirs in certain aspects.[194]  I agree with Professor Shapiro that Amazon's business model is different in certain ways from that of Staples and Office Depot.  But one might have said the same thing about Amazon in 1995 with respect to traditional bookstores.  A different business model does not mean that a firm cannot compete; in fact, it may mean that the firm is poised to disrupt incumbent firms and grow quickly.  Professor Shapiro does not demonstrate that Amazon's business model is inferior, and I would be surprised if

---

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

191.    Shapiro Report, at p. 47.
192.    *Id.*
193.    *Id.*, at Exhibit 5D.  *See also* Section V.D.2.
194.    *Id.*, at p. 47 ("[Amazon's] existing marketplace business model poses significant challenges for them to become the primary vendor of consumable office supplies for large businesses.").

anyone familiar with the history of Amazon would make such a claim.  No one can doubt that

Amazon is a dynamic competitor with the ability to expand quickly when the opportunity arises.

I understand that Amazon Business ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████.[197]

116.    Professor Shapiro also asserts that, while Amazon is planning significant

investments to improve its competitiveness, certain key investments necessary to compete are

currently unplanned or unfunded, ████████████████████████████████████

████████████.[198]  None of this is inconsistent with a growing business making

various choices on which areas to invest in or not and re-assessing those decisions over time.

For example, I understand that Amazon Business released 30 new products and features in 2015

and, ████████████████████████████████████████████████████████

██████████ ██.[199]  I also understand that Amazon Business is actively working to address some

of the apparent limitations identified by Professor Shapiro, ██████████████████.[200]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



195.    *See* ███

196.    ██████

198.    Shapiro Report, at p. 50.
199.    ██████
200.    ██████████████████

CONTAINS CONFIDENTIAL MATERIALS

██████████████████████████████████████   ██████████████████

██████████████████████████████████ It simply would not make any sense

for Amazon Business to be actively growing at such a rate and continuing to make a variety of

investments, and yet at the same time failing to invest in the key business elements necessary to

compete.

117.    Professor Shapiro does not appear to acknowledge or account for the rapid

success Amazon Business has achieved to date.  For example, Amazon publicly reported to

investors that, "[e]ight months after launch, Amazon Business serves over 200,000 businesses

including both small businesses and Fortune 500 companies," and Mr. Wilson testified that this

includes large customers such as ████████████████████████.[202]  Similarly, I

have seen Amazon documents indicating a ███████████████████████████████

██████████████████████████[203] and that ████████████████████████

████████████████████████████████████████████████████

████[204]  In any case, Professor Shapiro provides no reason to believe that Amazon could not

change plans to make the additional investments allegedly necessary to become successful.  As I

have previously discussed, the additional profits available to a competitor for gaining even a

modest increase in market share after a hypothetical post-Transaction price increase by Staples

and Office Depot are sufficiently large to incentivize substantial investment by competitors.

118.    Amazon Business therefore provides another source of competition to Staples and

Office Depot.  Moreover, the launch of Amazon Business at the end of April 2015 also

---

201.    *Id.*, at p. 86.

202.    ████████████████████████████

203.    ███████████████████████████████████████
        ██████████████████████████████

204.    ████████████████████████████████████████████
        ██████████████████████

CONTAINS CONFIDENTIAL MATERIALS

demonstrates that, even relative to November 2013, when the FTC concluded that Office Depot and OfficeMax faced substantial competition from alternative suppliers of office supply products, the level of competition Staples and Office Depot now face appears to be even more intense.  Amazon obviously has the ability to continue to compete effectively and expand or reposition itself as necessary, in order to compete with a combined Staples and Office Depot, particularly if the combined firm attempts to raise prices, as the FTC fears.

119.    This competitive effect from Amazon Business is, of course, in addition to the competitive constraint I discussed previously that Amazon provides through the retail channel. Amazon and other firms compete for retail customers with Staples and Office Depot, and these retail prices constrain in a significant number of cases the contract prices set for large B-to-B customers.

120.    Finally, to the extent that Professor Shapiro is correct and that Amazon Business is not an effective competitor in the near future, an important fact is that some large B-to-B customers have contracts with Staples or Office Depot that expire two or more years from now.[205]  These customers are protected in the intervening period.  And, assuming Professor Shapiro is correct, Amazon would have two or more years to accelerate their plans (if the merged firm tried to raise prices) and could then compete effectively for these large B-to-B customers. And I understand that a number of large corporate customers have said that they will consider Amazon Business in the future.[206]  In other words, there is little question that Amazon has the

---

205.    *See, e.g.,* ████████████████████████████, January 26, 2016, at ¶ 5; ████████████████, January 26, 2016, at ¶ 3; ████████████████████████████████████ February 11, 2016, at ¶ 10.
206.    *See, e.g.,* ████████████████████████ January 29, 2016, at ¶ 10 ("If Office Depot raised its prices after merging with Staples, █████ could conduct an RFP inviting other companies, such as Amazon, we expect could meet our office supplier needs, including providing dedicated customer service, a broad assortment of office products, eProcurement capability, and competitive pricing, although █████ has not conducted an investigation at this time."); ████████████████████ February 1, 2016, at ¶ 16 ("Based on my personal experience in the industry and as a procurement professional, Amazon Business has the potential to be a viable competitor in this market and to change the competitive landscape.  I will be watching Amazon Business's development closely and anticipate that I will evaluate the use of their services in the near term.").

CONTAINS CONFIDENTIAL MATERIALS

ultimate ability to compete for large B-to-B customers given the time to do so, and any attempt by the combined Staples / Office Depot to raise prices after the Transaction would provide Amazon Business with additional incentives to compete and win large B-to-B customer business.

### 4. Adjacent competitors

121.    As noted above, in November 2013, the FTC recognized that Staples and Office Depot face competition from "potential competitors in adjacent product categories, such as janitorial and industrial products, [which] have existing contractual relationships with large office supply customers and can leverage those relationships to enter the office supply distribution market."[207]  As with independent office supply competitors like W.B Mason, the FTC now claims that these other competitors cannot effectively constrain Staples' post-Transaction pricing.[208]  However, the available evidence is more consistent with the FTC's earlier view than the recently adopted view.

122.    I have already noted above the case of MRO firms like Grainger, McMaster-Carr, Fastenal, and MSC, which are increasingly offering office supplies in addition to their traditional products.  As described below, these firms have efficient nationwide delivery platforms, distribution centers throughout the country, sophisticated ordering and inventory systems, and the ability to offer same-day or next-day delivery.  In short, these firms currently offer all of the services that the FTC and Professor Shapiro assert are critical.  If a combined Staples and Office Depot attempted to raise prices after the Transaction, these firms would therefore be well-positioned to expand and reposition in order to compete even more directly with the combined firm for large B-to-B customers.

---

207.    "Statement of the Federal Trade Commission Concerning the Proposed Merger of Office Depot, Inc. and OfficeMax, Inc.," FTC File No. 131-0104, November 1, 2013.
208.    Complaint, at ¶57.

123.     Grainger, which had 2014 sales of $10 billion, is the largest MRO supplier in North America.[209]  It serves 1.2 million customers in the U.S., with 106,000 daily transactions, and approximately 75 percent of their sales are to large customers.[210]  It operates in all 50 states with a network of 19 distribution centers, 377 branches, and 51 contact centers, all of which allows them to offer same-day and next-day shipping.[211]  Grainger utilizes punchout systems that communicate directly with customers' electronic purchasing platforms.[212]  Grainger offers thousands of office supply products,[213] and has demonstrated an ability and willingness to increase the size of its product offerings substantially.  Grainger's U.S. catalog has increased more than seven-fold from 82,000 product offerings in 2005 to more than 592,000 products in the 2015 catalog.[214]

124.     Staples clearly views Grainger as a current and growing competitor.  One internal Staples strategy document states: "We are competing more and more with Grainger – a formidable company who is ahead of us in reinvention and does not have the pressure of secular decline."[215]  Another strategy document notes that Grainger has "[s]ignificant overlap with Staples," and recommends that "Staples should closely monitor Grainger's assortment expansion strategy, Potential direct threat as they expand into core office supplies."[216] Shira Goodman, Staples' president for North American operations, stated in a 2014 email that Grainger is "emerging as a major competitor for sa [Staples Advantage]."[217]

---

209.     W.W. Grainger, Inc., "2014 Annual Report," at p. 0.
210.     W.W. Grainger, Inc., "Form 10-K," at p. K-3.
211.     *Id.*, at p. K-4.
212.     *Id.*
213.     https://www.grainger.com/category/office-supplies/ecatalog/N-jkv [accessed January 28, 2016].
214.     W.W. Grainger, Inc., "2015 Fact Book," at p. 7.
215.     SPLS_0438516.
216.     SPLS_0427272, at slide 64.
217.     SPLS_0466598.  *See also* Deposition of Shira Goodman, at p. 104 ("If you think about what customers really want from us is to get a product at a good price, delivered to them when they want it.  We can do that. Grainger also has the capability to do that; and whether they are stocking it in their warehouses or relying a little bit on Essendant or SP [Richards], which we do as well, they also have the ways to get it to the customer and they have

CONTAINS CONFIDENTIAL MATERIALS

125.     Another competitor is MSC, which is a competing MRO dealer that touts "customers in all 50 states," and a network of 11 North American customer fulfillment centers, as well as 97 branch offices.[218]  Like Grainger, MSC offers same-day and next-day shipping, sophisticated search and transaction capabilities, and interfacing with customer purchasing portals.[219]  Its website lists 2,324 products in the "office supplies" category, as well as hundreds more products in office equipment, office furniture, packaging and shipping, and breakroom supplies.[220]  Fastenal, another MRO competitor, serves B-to-B customers through 11 distribution centers throughout the U.S. and 2,637 store locations.[221]  Its website touts 4,171 office products and office furniture,[222] and can be customized for a particular customer.[223]  McMaster-Carr, another MRO competitor, offers more than 555,000 products, including a wide range of office supplies.[224]

126.     In his report, Professor Shapiro admits that "the relationships Grainger and Fastenal have with large customers allows [sic] them to overcome one of the obstacles to expansion."[225]  However, he nevertheless asserts that adjacent distributors cannot meaningfully constrain pricing of a combined Staples and Office Depot.  In support of this assertion, he chiefly points to statements by executives at Grainger and Fastenal indicating that they view further

---

the relationships with the customer.  They have a sales force.  They have a website.  You know, they are a great brand.  They have a great reputation.  Their customers love them.").
218.    MSC Industrial Direct Co., Inc., "Form 10-K," at p. 1.
219.    *Id*., at pp. 1-2.
220.    http://www.mscdirect.com/browse/Shipping-Office-Supplies?navid=12104088 [accessed January 28, 2016].
221.    Fastenal Company, "2014 Annual Report," at p. 3.
222.    https://www.fastenal.com/products/office-products-furniture?intcmp=hpcat-office_products_and_furniture&r=~|category1l:%22609525%20Office%20Products%209and%20Furniture%22|~ [accessed January 28, 2016].
223.    ████████████████████████
224.    http://www.mcmaster.com/#office-supplies-signs/=10vsjdf [accessed January 28, 2016]
225.    Shapiro Report, at p. H-10.

CONTAINS CONFIDENTIAL MATERIALS

expansion into office supplies as unattractive because the margins on these products are low,

relative to more traditional MRO products.[226]

127.   These executives' statements actually prove the opposite of what Professor

Shapiro concludes from them.  In particular, the statements indicate that the factor currently

keeping adjacent suppliers from expanding to compete with Staples and Office Depot is the low

margins on office supplies, not any inherent barrier to entry, such as a specialized asset that only

Staples and Office Depot have.  This is consistent with my earlier discussion of barriers to entry,

which came to precisely this conclusion.  If margins on office supplies were higher, these

statements imply that adjacent suppliers would have an incremental incentive to reposition and

expand to increase their competition with Staples and Office Depot.  But higher margins are

exactly what Professor Shapiro believes the Transaction will allow, as he claims Staples and

Office Depot will implement a post-Transaction price increase.

128.   In sum, these adjacent firms have sophisticated nationwide logistics networks in

place and they already compete to a large degree with Staples and Office Depot in selling office

supplies.  They clearly have the capacity and the willingness to accelerate their expansion and

repositioning in response to a hypothetical price increase by a combined Staples and Office

Depot.  Just as Staples and Office Depot have lost ink and toner sales over time to managed print

services, there is nothing stopping adjacent firms from attempting to take Staples' and Office

Depot's sales in other product categories.

---

226.   *Id*., at p. H-11.

CONTAINS CONFIDENTIAL MATERIALS

### D. Customers Have Other Competitive Alternatives Available to Them in Response to A Hypothetical Post-Transaction Price Increase

   *1. Customers can purchase directly from manufacturers, either alone or in concert with an intermediary.*

129.    As noted above, at the time of the Office Depot / OfficeMax merger in November 2013, the FTC recognized that large customers could "use a variety of tools to ensure that they receive competitive pricing such as ordering certain products (like ink and toner) directly from manufacturers."[227]  In its Complaint challenging the Transaction, the FTC correctly recognized direct purchases from manufacturers as a competitive constraint on Staples, but only in the case of ink and toner.[228]  For other consumable office products, the FTC now avers that direct purchasing would involve negotiating with too many different manufacturers to be practical, and that manufacturers do not sell in quantities small enough for use by even large B-to-B customers.[229]  Consistent with the FTC's revised opinion, in Professor Shapiro's diagram of the business supply chain, in which arrows represent the flow of goods, he neglects to even include an arrow directly linking manufacturers and customers.[230]

130.    In fact, however, available evidence indicates that direct purchasing is a feasible alternative for large B-to-B customers in categories other than ink and toner.  I understand that Staples and Office Depot believe, based on market surveillance, that a number of large B-to-B customers purchase copy paper directly from manufacturers, including ██████████████████  ███████████████  In addition, Staples and Office Depot believe that some Fortune 100 customers, such as ███████████ and ██████████, purchase specialty papers from paper manufacturers.  Given that these customers already have a relationship with the paper

---

227.    "Statement of the Federal Trade Commission Concerning the Proposed Merger of Office Depot, Inc. and OfficeMax, Inc.," FTC File No. 131-0104, November 1, 2013.
228.    Complaint, at ¶28.
229.    *Id.*, at ¶56.
230.    Shapiro Report, at Exhibit 1.

manufacturer, Professor Shapiro has not explained the barriers to the same two parties

negotiating for the distribution of copy/print paper if the merging parties attempted to raise paper

prices after the Transaction.

131.    Large customers confirm that purchasing direct from manufacturers is a feasible

alternative.  For instance, ███████ declaration in this matter indicates that "[e]ach time ██████

███ has solicited proposals for office products, it has found several manufacturers and

wholesalers willing and able to compete for its business."[231]  Similarly, a ████████████

executive testified, "[y]ou can buy from manufacturers.  That's correct as well."[232]

132.    Importantly, direct purchases can take different forms and, contrary to Professor

Shapiro's claims,[233] do not necessarily require the manufacturer itself to have a distribution

infrastructure in place.  In some cases, large B-to-B customers contract directly with a paper

manufacturer or merchant, such as Domtar or Veritiv, which Professor Shapiro recognizes have

their own sales departments.[234]  In fact, one paper manufacturer, ████████████, has stated

in this matter that it sees Staples and Office Depot as direct competitors for large customers.[235]

133.    In other cases, large B-to-B customers, as mentioned previously, negotiate the

price and terms with the paper manufacturer and then use a distributor to deliver the paper.  Such

negotiations may be entirely between the customer and the manufacturer, or the distributor may

negotiate on behalf of the customer.  And, in still other cases, large customers will purchase and

take delivery of bulk products directly from the paper manufacturer, and then purchase smaller

---

231.    ████████████████████, at p. 2.
232.    ████████████████ at p. 64.  *See also* Investigative Hearing of Stephen Calkins, at pp. 114-115
("So, for example, I'll mention paper, the largest paper companies in our space is a company called Veritiv, and
they're a nine-billion-dollar business, and they sell more printing paper than – than, I think, just about anybody.
Those – that would be a company that we would compete with respect to paper on a nationwide basis.  We have
recently lost our paper business for ██████ which is a huge company, to █████████.
233.    Shapiro Report, at p. H-12.
234.    *Id.*, at p. 19.
235.    ████████████████████████████ at p. 1.

amounts of additional paper as needed (*e.g.*, single cases of paper for a particular office).[236]

Finally, in still other cases, large customers will use the pricing of Staples or Office Depot, but

then require that any price increases be documented by a formal letter or other communication

from the paper vendor that the manufacturer has increased its price to the distributor.  The FTC

and Professor Shapiro ignore all of these real-world means by which paper and other products

can be purchased direct from manufacturers.

134.    Other products besides paper can also be purchased directly from manufacturers.

For instance, I understand that ███████████████████████████ a large B-to-B

customer that is currently contracted to Office Depot, communicates directly with Sanford on the

prices of certain products.[237]  Sanford's products include branded pens, markers and many other

products, which could also be sold directly to B-to-B customers.[238]  As I discuss below, another

major office supplies manufacturer, Avery, also sells products directly to customers.

135.    In order to study direct purchasing in more detail, I undertook two case studies.

First, I examined data from paper manufacturer ████████ which was produced in this matter.

████████ data include information on sales to its customers in the Fortune 1,000.  The data

identify the customer name, the total sales revenue, tons shipped, and units shipped to that

customer, by product type.  The results of my analysis are summarized in Exhibit M.  In

particular, I identified any Fortune 1000 firms that purchased paper directly from ████████ and

which also purchased more than $500,000 in the FTC's and Professor Shapiro's proposed

relevant market from Staples or Office Depot during fiscal year 2015.  There are 46 such firms

that purchased copy/print paper, and 66 such firms that purchased any kind of paper directly

---

236.    *See, e.g.*, ████████████████████████████████████., at p. 2 ("Each year ████████ purchases
approximately $7 million in paper for its own internal use, with most of these purchases made from Georgia Pacific
in full truck load deliveries.").
237.    ODP-OMX-FTC-05085056.
238.    http://www.sanfordb2b.com/US/Pages/AboutUs.aspx [accessed February 6, 2016].

CONTAINS CONFIDENTIAL MATERIALS

from ▓▓▓▓▓  Among the Fortune 100, there are 29 firms that purchased any kind of paper

directly from ▓▓▓▓▓  Thus, 29 percent of the firms Professor Shapiro identified as

representative of the market for the purposes of calculating market shares already have a direct

purchasing relationship with just one paper manufacturer (and of course other customers may

purchase directly from different manufacturers or merchants).  Yet Professor Shapiro asserts that

manufacturers would be unable to serve as a future competitive constraint, even for paper.

136.    As a second case study, I analyzed direct-to-customer sales by ▓▓▓▓▓ a

manufacturer of labels, pens, binders, and other office supplies.  In 2015, ▓▓▓▓▓ sold more than

$1.8 million worth of products directly to 39 customers for end-use.

137.    These case studies also demonstrate that, contrary to the claims of the FTC and

Professor Shapiro, customers do not need to purchase very large amounts and be able to store

excess products in order to take advantage of the buying direct from a manufacturer.  In

particular, we observe in Exhibit M annual direct purchases from ▓▓▓▓▓ by Fortune 100

customers in 2015 as low as $183, and the tenth percentile of purchases by Fortune 100 firms is

only $276 (in other words, ten percent of Fortune 100 customers that purchased directly from

▓▓▓▓▓ purchased less than $276 worth of product).[239]  The median annual direct purchase from

▓▓▓▓▓ among Fortune 100 customers is $34,813, which is still a relatively small amount for

large B-to-B customers.  Similarly, the median annual purchase among customers who bought

directly from ▓▓▓▓▓ was approximately $4,783 in 2015.

138.    These facts demonstrate that manufacturers already sell directly to many

customers.  But more importantly from an economic perspective is whether these and other

---

239.    I understand that counsel in this matter asked ▓▓▓▓▓ "For end-users that purchase a relatively small
amount of cut-sheet paper from ▓▓▓▓▓ (i.e., less than $50,000), are there special circumstances for why these
purchases are made, or is ▓▓▓▓▓ able and willing to accommodate even smaller purchases from customers that
prefer to purchase direct," and that ▓▓▓▓▓ replied, ▓▓▓▓▓▓▓▓▓▓ can accommodate smaller
purchases from customers which choose to purchase direct."  FTC-PROD-0177225 & 244.

CONTAINS CONFIDENTIAL MATERIALS

manufacturers could expand their sales of products directly to large B-to-B customers in response to a hypothetical post-Transaction price increase by Staples and Office Depot.[240]

139.    To address that question, I investigated the FTC's claim that large B-to-B customers would have to purchase from too many different manufacturers for this alternative to be practical.  Of course, a customer would not need to threaten to purchase *all* of its purchases from a manufacturer in order to put competitive pressure on a combined Staples and Office Depot.  A credible threat to purchase a material share of a customer's office supplies directly from manufacturers would be sufficient, since for large B-to-B customers, even a relatively modest shift in total office supply purchases still constitutes a substantial potential loss for Staples.  A credible threat to purchase a product or a small number of products directly from a manufacturer can also potentially discipline prices on other products that the customer uses.

140.    To analyze this question, I identified, for each large B-to-B customer, the product vendor that constituted the largest share of their total purchases (among products in the FTC's proposed product market).  As shown in Exhibit N, on average across all large B-to-B customers, this largest vendor constituted 37 percent of all purchases.  I then performed the same analysis for the two vendors constituting the largest share of each customer's total purchases, three vendors, and so on.  For instance, the largest five vendors constitute, on average, 65 percent of a large B-to-B customer's purchases.  Contrary to the claims of the FTC, this Exhibit demonstrates that, in the vast majority of cases, a customer would need to be able to purchase directly from five or fewer vendors in order to credibly threaten to fulfill a large share of their needs.  Given that, as I discuss in section VI.C below, most large B-to-B customers have dedicated

---

240.    Because I have already addressed similar issues elsewhere in this report, I do not here address Professor Shapiro's claims that manufacturers do not have sufficient distribution or customer service facilities to sell directly to customers, and that many customers lack the purchasing scale necessary to obtain low prices from manufacturers.

procurement employees and divisions, identifying and negotiating with five to eight manufacturers seems feasible.

141.    Focusing on paper alone, large B-to-B customers commonly source all, or virtually all, of their paper from just one manufacturer.  As reported in Exhibit N, the largest vendor constitutes, on average, 83 percent of all paper sales for large B-to-B customers.  Again, contrary to the FTC's claims, it would be practical for a large B-to-B customer to consider sourcing most or all of its paper needs direct from a manufacturer in the event of a price increase from a combined Staples and Office Depot.

142.    I also separately considered the FTC's claim that manufacturers do not sell their products in quantities small enough for customers to conveniently purchase directly from manufacturers.  As noted above, many large B-to-B customers already purchase paper directly from manufacturers, so at least in the case of paper, it appears that ███████ is capable of selling, and often does sell, in quite small quantities.  More generally, Exhibit O shows that the smallest purchase from the five largest vendors for a large B-to-B customer was $41,229 for the median Office Depot customer, and $48,883 for the median Staples customer.  There is no basis to conclude that manufacturers would not find it profitable to sell their products in such large quantities.  Contrary to the claims of the FTC, these analyses demonstrate that manufacturers likely would be willing to directly negotiate sales to large B-to-B customers in most cases, particularly in response to a price increase by the combined Staples and Office Depot.

## 2.   *Leakage constrains the post-Transaction prices of Staples and Office Depot*

143.    Most of the claims made by the FTC and Professor Shapiro as to why competitive alternatives should be dismissed focus on reasons large B-to-B customers might not find the alternatives fully satisfactory for long-term contractual relationships.  The evidence I have

74

described above indicates that these firms are in fact already effective competitors, and that they are capable and sufficiently dynamic to expand and reposition to be even more competitive if the combined Staples and Office Depot attempted to raise prices.  However, even if the FTC and Professor Shapiro are correct that these firms cannot provide all of the amenities that large B-to-B customers prefer in long-term contracts, this does not establish that these firms would not constrain the combined Staples' and Office Depot's ability to raise prices.

144.    As I discuss below, a significant share of purchases by large B-to-B customers takes place as leakage, even after the customer has signed a long-term contract.  If a combined Staples and Office Depot attempted to raise contract prices after the Transaction, B-to-B customers could increase the share of purchases they make through leakage outside of their contracts, thereby avoiding the attempted price increase.

145.    Leakage appears to be ubiquitous among large B-to-B customers at current market prices.  Staples and Office Depot have identified, for many of their large B-to-B customers, contemporaneous internal documents, including communications with sales representatives, indicating their beliefs about substantial leakage.  Relevant quotes from these documents are included in Appendix C.

146.    Also, Office Depot uses a system called PRISM in the ordinary course of business which identifies *potential* leakage (among other things) for contract customers.  PRISM does this by identifying individual contract customer locations in which Office Depot sales have declined, relative to an earlier period.  These potential cases of leakage are identified to Office Depot's sales representatives as sales leads (or "plays"), which reflects the fact that Office Depot considers PRISM's analysis to be a useful business tool for identifying lost sales opportunities.  Indeed, Office Depot executives state that PRISM is a key part of their sales efforts, and a

reasonable approach to the business problem of leakage.[241]  Appendix D includes a series of

screen shots of the PRISM system that Office Depot sales representatives see, illustrating its use.

147.    I used the transactional data provided by Staples and Office Depot to examine

potential leakage in conceptually the same way the PRISM system does in the ordinary course of

business for Office Depot.[242]  In particular, for each of the 75 Fortune 100 companies with at

least $10,000 in fiscal year 2014 sales at Staples and Office Depot, I calculated the number of

individual zip codes receiving shipments at that company in 2014 (focusing on the products in

the FTC's and Professor Shapiro's relevant product market).  I then calculated which of these zip

codes experienced 50 percent or greater declines in sales in 2015, relative to 2014.  Exhibit P

summarizes the results.  Sixty-one out of the 75 customers had at least one zip code experiencing

a 50 percent or greater decline in sales.  In many cases, a substantial number of zip codes for a

company experienced reductions of 50 percent or more in revenue.

148.    Professor Shapiro is critical of this type of analysis, as performed by PRISM, in

his report.  In particular, he provides theories as to why the declines in sales recorded in the

PRISM system could reflect other factors besides leakage, such as closures of particular

customer locations and changing demand for office supplies.[243]  Of course, Professor Shapiro is

correct at a theoretical level that not every decline in purchasing for a customer is necessarily

leakage.  What is important, though, is that Office Depot invested a significant sum of money – I

understand ███████████████████████████████████████████████████ – on

the PRISM system, and has found it to be helpful in identifying sales opportunities related to

---

241.    Deposition of Gillian Klein, at pp. 28-32, 34, & 124-27.
242.    PRISM identifies leakage in several ways, but the analysis below is most similar to the "declining customer" play in the PRISM system.
243.    Shapiro Report, at pp. F-1 through F-3.  Professor Shapiro also criticizes PRISM for not focusing on the products in his proposed relevant market and for not taking into account the fact that some customer sites are larger than others.  *Id.*  My analysis focuses only on the FTC's and Professor Shapiro's selected products, and includes measure of revenue, which weight larger customer sites proportionally.

leakage.[244]  The very fact that Office Depot regularly uses the PRISM system in the ordinary

course of business to identify cases of potential leakage, and directs its sales representatives to

call customers in response, is a relevant factor in the competitive effects analysis.  More broadly,

if leakage were irrelevant to the business, why would Office Depot invest such large resources in

trying to minimize it?  Professor Shapiro does not answer this question.  It would, of course, be

an irrational waste of money and time if leakage were irrelevant.[245]

149.    Even if Professor Shapiro is correct and *half* of the leakage a PRISM-like analysis

identifies actually reflects other events, it is still the case that leakage is ubiquitous among large

B-to-B customers.  If leakage is ubiquitous under current market conditions, it follows that

customers will have the ability and willingness to increase leakage if, as the FTC fears, Staples

and Office Depot attempt to increase prices after the Transaction.  Leakage therefore serves as

yet another competitive alternative available to customers that serves as a constraint on post-

Transaction pricing.

150.    Not only is leakage ubiquitous, but available evidence indicates that the threat of

leakage frequently causes Staples and Office Depot to make post-contract adjustments in prices

in order to minimize customers' incentives to purchase outside of the contract.  As Stephen R.

Calkins, Executive Vice President of Contract Sales at Office Depot, stated, "We also have had a

number of examples where we've had to approach large national customers where we know that

there is significant leakage in certain parts of the country in certain offices and we'd have – we'd

---

244.    Deposition of Stephen Hare, at pp. 70-71 ("[Prism] shows the volumes by category, and then it also shows – and we use it also for significant changes.  If we see a customer who's been buying ink from us, and all of a sudden they stop buying ink from us, or they're buying paper from us for six months in a row at a certain level and then all of a sudden it goes to zero or it goes cut in half, it's a way to prompt us to call the customer and say it appears you're doing something very different.  It's not usage decline.  It's clearly a damn particular change in the volume that would indicate that they're buying outside of our master contract that was negotiated at the corporate level.").  *See also* ODP-OMX-7967464, at slides 4-15.
245.    Professor Shapiro also appears to argue that the fact that other company sites may have increased sales between 2014 and 2015 should weigh against any measure of leakage.  *Id.*, at p. F-3.  But this would mean that no growing customer could ever have leakage.

CONTAINS CONFIDENTIAL MATERIALS

have to go back and renegotiate the deal to try and encourage more participation under the program."[246]  In response to the question, "How frequently have you had to renegotiate an agreement due to leakage?" Calkins responded, "Countless times."[247]

151.    Staples provided me with data on the reductions in contractual prices they made for large B-to-B customers on the products in the FTC's and Professor Shapiro's alleged relevant market, after signing agreements with customers.  These data indicate that Staples lowered prices for the duration of the contract more than 10,000 times during fiscal year 2014.  These permanent price reductions occurred on products representing 7.7 percent of total sales by large B-to-B customers in fiscal year 2014 (among the products in the FTC's and Professor Shapiro's alleged relevant market).[248]  In addition, Staples made an additional 78,710 temporary price reductions during fiscal year 2014.

152.    This evidence on post-contract price adjustments further demonstrates that the threat of leakage would likely constrain pricing for a combined Staples and Office Depot, even under the assumption that the FTC and Professor Shapiro are correct in claiming that other firms are not be able to effectively compete with the combined firm for long-term contracts.

### E.  Professor Shapiro's Market Share Calculations Are Flawed in Other Ways

153.    Professor Shapiro attempts to calculate Staples' and Office Depot's market shares in several ways, but states that his "best estimate" of market shares is based on the purchases of office supplies and paper reported by 81 companies in the Fortune 100.[249]  As an initial matter, a

---

246.    Investigational Hearing of Steven Calkins, at p. 206.

247.    *Id. See also* Deposition of Thomas Heisroth, at pp. 94-95 ("We lower 4,000 prices a day on our customers in response to a variety of things.  Matching is one of them, and it's quite often matching Amazon's price … they see the price on Amazon and they call their – somehow it gets back to the sales rep or to someone on our customer service team, and we agree to match the Amazon price.").

248.    These calculations are based on the "price change reports" cited in "Defendant Staples' Objections and Responses to Plaintiffs' First Set of Interrogatories," January 21, 2016, at pp. 14-31.

249.    Shapiro Report, at p. 15.

"market share" must be of a properly defined relevant market.  For the reasons delineated above,

Professor Shapiro's relevant market does not meet this threshold issue and thus, his purported

calculation is not a true measure of "market" share.   But, even if it were a measure of market

share, I describe below several ways in which his "best estimate" is flawed.  I should note that

Professor Shapiro puts forward other purported measures of market share, including one based

on "primary vendor" relationships, that he states are inferior to his preferred approach.

However, many of the same criticisms below apply to Professor Shapiro's other approaches.[250]

*1.   Professor Shapiro's attempt to use the Fortune 100 as a proxy is flawed.*

154.    As noted above, Professor Shapiro uses 81 Fortune 100 firms as a proxy for all

1,085 of the large B-to-B customers in his relevant market.  Notably, three of the Fortune 100

firms analyzed by Professor Shapiro are not even in his relevant market, since he calculates that

they spent less than $500,000 annually on office supplies.[251]

155.    Professor Shapiro attempts to defend his use of the Fortune 100 proxy as

representative of all the firms in his relevant market (most of which are substantially smaller than

the firms in the Fortune 100) by dividing the 81 firms in question into two groups, one including

the largest 40 firms, and the other including the remaining 41 Fortune 100 firms.[252]  He claims

that Staples and Office Depot have similar market shares in each group.[253]  Such evidence is, at

best, of limited value in demonstrating that market shares are similar for the other 988 customers

in his product market, which are generally much smaller than any of the firms in the Fortune

---

250.    Neither the FTC nor Professor Shapiro appears to argue that primary vendor relationships constitute a
relevant market, so it is unclear how to interpret these alleged market shares.  Moreover, as Professor Shapiro states,
his analysis of primary vendor relationships does not account for leakage, and involves "measurement difficulties"
for customers who split their spending among vendors.  *Id.*, at p. 19.
251.    *Id.*, at Exhibit 5A (showing ███████████████████████████████████ with
less than $500,000 in total purchases).
252.    *Id.*, at Exhibit 5A.
253.    *Id.*, at p. 16.

CONTAINS CONFIDENTIAL MATERIALS

100.  In fact, Professor Shapiro himself asserts that "the magnitude and likelihood of [alleged] harm [due to the Transaction] can be expected to diminish gradually with customer size."[254]  If so, then the competitive alternatives available to much smaller firms would be quite different than those available to the Fortune 100 firms (even the smaller Fortune 100 firms), and consequently, Professor Shapiro's market share calculations would likely overstate the shares relevant for smaller firms.

> 2. *Professor Shapiro's selected subset of the Fortune 100 firms is biased toward higher market shares.*

156.  Even assuming that the Fortune 100 was a reasonable proxy for the set of firms in Professor Shapiro's product market, he excludes 19 of the Fortune 100 firms (leaving only 81 firms) from his market share calculation, apparently because these 19 did not provide data (or did not provide sufficiently detailed data) for Professor Shapiro's use.[255]  These excluded customers include those to whom Staples and Office Depot sell little or no product, such as ▮▮▮▮.[256] Since there is only one customer among the 81 included in Professor Shapiro's analysis that does not purchase from Staples or Office Depot (▮▮▮▮,[257] and there is at least one customer among the 19 excluded from Professor Shapiro's analysis where this is true, this fact suggests that a market share calculated on only the 81 firms Professor Shapiro analyzes likely overstate the true market share for the entire Fortune 100.

157.  Professor Shapiro also excludes ▮▮▮▮▮▮▮▮▮▮ from his calculation of share.  The inclusion of ▮▮▮ would likely lower those shares since ▮▮▮ has stated that many purchases at that company are made on a decentralized basis through company

---

254.  *Id.*, at p. 6.  Presumably, Professor Shapiro meant "increase gradually," not "diminish gradually."
255.  *Id.*, at Exhibit 5A (indicating 81 customers).
256.  *Id.*, at p. E-13 through E-15.
257.  *Id.*, at Exhibit 5A

CONTAINS CONFIDENTIAL MATERIALS

procurement cards.[258]  It is likely that the Fortune 100 companies with more centralized purchasing and reporting are the same companies best able to produce data for this proceeding. That means that these centralized purchasing firms are also presumably less likely to carve out particular offices or products to smaller suppliers.[259]

158.   For these reasons, it is unlikely that Professor Shapiro's sample of 81 customers is representative of the Fortune 100 (which, as noted in the previous section, is itself unlikely to be representative of all large B-to-B customers in the FTC's and Professor Shapiro's alleged relevant market).

### 3. Professor Shapiro makes errors in dealing with customer direct purchases from product manufacturers, which inflate his market share calculations.

159.   As I have previously noted, when large B-to-B customers purchase products directly from manufacturers, they sometimes do so in a three-way negotiation in which the manufacturer and the customer negotiate a price, but a distributor such as Staples or Office Depot actually bundles and distributes the product.  In this case, since the pricing power was on the part of the manufacturer, not the distributor, the sale should properly be attributed to the manufacturer, since it reflects the manufacturer's competitive significance.

160.   However, it is unclear whether Professor Shapiro has properly accounted for purchasing from manufacturers.  For instance, he improperly assigned purchases from a manufacturer to Staples in the case of ███████████, one of the 81 Fortune 100 companies on which his share calculations are based.  In particular, Professor Shapiro claims that ████████ ██████ spent a total of $15.2 million on products in the alleged relevant market, of which $13.9

---

258.   *Id.*, at p. E-13.
259.   *See* Investigational Hearing of Stephen R. Calkins, at p. 204 ("… as the customers more decentralize in how it operates, there's greater opportunity for customers to buy off of the written agreement that their procurement lead has negotiated and instead by from other resellers, and those are very common traits among customers.").

CONTAINS CONFIDENTIAL MATERIALS

million, or 91 percent, was with Staples and Office Depot.  However, elsewhere in Professor Shapiro's report, he quotes a ████████████ source indicating approximately $8.2 million in purchases of copy paper for which █████████████ negotiated the price with ███████ although Staples performed the delivery.[260]  If the apparent error of attributing these purchases to Staples is corrected, then Staples' and Office Depot's combined share of ███████████████ in the alleged product market declines from 91 percent to 37 percent.

161.    In addition, Professor Shapiro makes what appear to be other errors in his calculations of market shares, including incorrectly identifying office supplies as specialty products outside of his proposed relevant market.  For instance, Professor Shapiro claims that ███████ spent a total of $4.1 million on products in the alleged relevant market, of which $3.0 million, or 74 percent, was with Staples and Office Depot.  Data produced in this matter from ███████ indicate purchases from █████████████████████████████████████████ ███████ and others of more than $8.9 million.  Professor Shapiro appears to ignore purchases of office supplies from these suppliers in his share calculations.  If these apparent errors are corrected, then Staples' and Office Depot's combined share of ████████ in the alleged product market declines from 74 percent to 25 percent.

162.    Given the time constraints, I have not performed a comprehensive search for other cases like these, but these examples raise serious questions about the reliability of Professor Shapiro's market share calculations.

---

260.    Shapiro Report, at p. H-15.

CONTAINS CONFIDENTIAL MATERIALS

### 4. *Professor Shapiro does not account for all potential consumable office supply leakage within Fortune 100 companies*

163.     Professor Shapiro makes an adjustment to his market share calculations based on the results of an analysis he performed, which he claims demonstrates that leakage "do[es] not comprise a significant portion of spending on consumable office supplies."[261]  Specifically, he reviewed 26 declarations filed by customers in this matter in which the declarant provided an estimate of the magnitude of leakage for their firm.  Professor Shapiro calculates that the average claimed leakage across these 26 declarant statements is no more than 3.7 percent of total purchases.[262]

164.     Professor Shapiro takes these declarants at face value, even though most or all of them are written by procurement personnel at the customer firms.  The problem is that companies have difficulty accurately identifying and measuring leakage.[263]  Given the difficulty of identifying leakage, Professor Shapiro has not conducted any empirical analysis or presented any evidence to support a conclusion that the declarants had fully accounted for leakage.  And, even if these declarants did accurately measure leakage, Professor Shapiro makes no adjustment for the fact that the 26 declarants who specify a particular leakage amount are most likely

---

261.     *Id.*, at p. E-11.
262.     *Id.*, at E-12.
263.     *See, e.g.,*

CONTAINS CONFIDENTIAL MATERIALS

selected from among those customers that have the smallest amount of leakage or the best methodology to track it.  Declarants with larger leakage or a lesser ability to track leakage either are more likely to support the merger because they know if the merged firm tried to raise prices, they could utilize increased leakage to defeat an attempted price increase, or are simply far less likely to be willing to mention their inability to measure leakage.

### 5.   *Professor Shapiro makes no adjustment for the "future competitive significance" of competitors*

165.    The Horizontal Merger Guidelines state that "recent or ongoing changes in market conditions may indicate that the current market share of a particular firm either understates or overstates the firm's future competitive significance. The Agencies consider reasonably predictable effects of recent or ongoing changes in market conditions when calculating and interpreting market share data."[264]  Despite evidence that competitors of Staples and Office Depot, such as W.B. Mason and Amazon Business, are expanding and repositioning, Professor Shapiro makes no adjustment to his market share calculation to account for such changes, even though such an adjustment would appear to be appropriate in this case.

### 6.   *Professor Shapiro improperly allocates to Staples and Office Depot all of the sales attributable to diversity suppliers.*

166.    Professor Shapiro's market share calculations count sales by diversity suppliers, which I have discussed previously, as sales of Staples and Office Depot.  These firms are resellers of office products, which, in many ways, compete with Staples and Office Depot, although not in the same way that other distributors do, since diversity suppliers often rely on

---

264.    Horizontal Merger Guidelines, at p. 16.

Staples or Office Depot to provide certain support for their customers.[265]  Thirty-two of the 81

Fortune 100 firms that Professor Shapiro analyzes for his market share calculations made

purchases from diversity suppliers.[266]  But, instead of analyzing the relationship between Staples

and Office Depot on the one hand, and the diversity sellers on the other hand, Professor Shapiro

simply treated diversity sellers as though they were always wholly owned subsidiaries of Staples

and Office Depot.  Professor Shapiro provides no support for this assumption, and consequently

likely overstates Staples' and Office Depot's market shares.

167.    The economics literature and antitrust practice show that Professor Shapiro should

have either analyzed the relationship between diversity suppliers and Staples and Office Depot,

respectively, or he should have presented market share calculations treating the diversity

suppliers as separate competitors (in addition to the ones that he has presented).  Both

calculations can be informative of different aspects of the market and may be relevant to evaluate

the competitive impact of the proposed merger.[267]

> 7.  *Market shares in an alternative market definition based on the provision of*
>      *intermediary services would be much lower than Professor Shapiro estimates*

168.    As I discussed in the previous section, an alternative approach to market

definition that may be more appropriate is to consider Staples and Office Depot as participating

in the broader market for intermediary services in the business supply chain.  Given time

---

265.    *See, e.g.*, Deposition of Ronald Sargent, at p. 56 ("Q. Who pays Staples under a tier one Staples relationship? A. My understanding is that the tier one vendor owns the customer, books the sale, pays us to provide the back-end service.").

266.    SPLS_0968905 indicates 22 Fortune 100 companies that are included in Professor Shapiro's Exhibit 5A. In addition, ODP-OMX-FTC-07919948 and ODP-OMX-FTC-01804088 indicate another six of these Fortune 100 companies, and SPLS_4285928 lists four more.

267.    *See* Stanley M. Besen, et al. (2013) "An Economic Analysis of the AT&T-T-Mobile USA Wireless Merger," *Journal of Competition Law and Economics* 9(1):23-47, at 30-31 (In the context of wireless phone markets, concluding that "[w]hether resellers should be counted as independent firms depends on, among other things, the nature of the contractual relationship between the resellers and the underlying carriers.").

CONTAINS CONFIDENTIAL MATERIALS

constraints, I have not attempted to measure fully market shares under this alternative definition; however, it is clear that Staples and Office Depot's shares of that market would be much lower than the shares calculated by Professor Shapiro.  If the market is defined to encompass intermediary services more broadly, a much wider range of products sold by Amazon, Grainger, and many others would be included in the relevant market.

169.    As an illustration, I analyzed market shares for four large B-to-B customers, including a broader range of product categories distributed by intermediary firms like Staples and Office Depot.  In particular, besides the products in the FTC's and Professor Shapiro's proposed relevant market, I also included ink and toner, janitorial supplies, furniture, technology, breakroom products, and print and document services.[268]

- █████       Professor Shapiro's calculated 95 percent market share falls to 76 percent.

- ██████       Professor Shapiro's calculated 91 percent market share falls to 52 percent.

- ███████       Professor Shapiro's calculated 89 percent market share falls to 16 percent.

- █████   Professor Shapiro's calculated 77 percent falls to three percent.

170.    These dramatic reductions in market share, relative to what Professor Shapiro calculated, demonstrate that it is far from clear that any presumption of competitive harm would attach to the Transaction under this approach to market definition, even putting aside the many other reasons described above why current market shares are a poor guide to measure the competitive effects of the proposed Transaction.  As I discussed in section IV above, Professor Shapiro has not shown that his selected set of products, and not this broader range of products, is the appropriate relevant market.

---

268.    These share calculations are based on data produced by the customers in response to the FTC's discovery requests.  In order to facilitate comparisons with Professor Shapiro's shares, I included in Staples' and Office Depot's shares spending at diversity vendors or subsidiaries.  These shares would be lower if these diversity vendors were separated from Staples and Office Depot.

CONTAINS CONFIDENTIAL MATERIALS

## VI.   PROFESSOR SHAPIRO MAKES SEVERAL OTHER MISTAKES THAT BIAS HIM TOWARD CONCLUDING THAT THE TRANSACTION IS LIKELY TO LEAD TO A PRICE INCREASE

171.   Professor Shapiro's report includes a number of assumptions and conclusions which may not be formulaically linked to his conclusions regarding the relevant product market and market shares, but nevertheless clearly played a role in forming his view of the Transaction. Moreover, regardless of Professor Shapiro's views, these issues are clearly important in determining the likely competitive effects of the Transaction.  I address three such issues in this section: (a) the profit margins earned by Staples and Office Depot; (b) the recent Office Depot / OfficeMax merger; and (c) the differential competitive effect of the Transaction on larger customers.

172.   Contrary to Professor Shapiro's conclusions on these issues, I find that (a) Staples' and Office Depot's profit margins are low, consistent with widespread and vigorous competition; (b) the Office Depot / OfficeMax merger did not lead to price increases, inconsistent with his general view of the market structure; and (c) larger customers are more, not less, protected from attempts by distributors to raise prices.

### A.   Staples' and Office Depot's Profit Margins are Low

173.   If Staples and Office Depot were the only effective competitors in the FTC's and Professor Shapiro's relevant market, one would expect, *ceteris paribus*, Staples and Office Depot to earn relatively high margins on large B-to-B customers, consistent with their status as alleged duopolists for those customers.  Professor Shapiro states that he calculated average profit margins of ███████ for Staples, and ███████ for Office Depot.[269]  Professor Shapiro's margin calculations are overstated, as a more appropriate calculation indicates that Staples and

---

269.   Shapiro Report, at p. D-2.

Office Depot actually earn substantially lower margins, consistent with robust levels of competition from other intermediary rivals.

174.     The profit margin of interest is the "variable" margin, that is, the degree to which a firm's revenues exceed its variable costs.  Variable costs are those for which additional expenses must be made if sales increase (or, equivalently, costs which are avoidable if sales decrease).  A key question in determining a firm's margin is therefore: Which of the firm's costs are variable, and which are fixed?  Professor Shapiro states that he assumed the following types of costs were variable: customer rebates, discounts, delivery expenses, order entry and certain other customer service costs, and credit card fees.[270]  He states that he assumed other costs were fixed, including what are termed "distribution expenses," including a subset of "rent, salaries, taxes/benefits, supplies, telephone, and depreciation."[271]

175.     Professor Shapiro did not report any analysis he performed to conclude that these categories of costs are fixed.  One can certainly imagine reasons why many of the costs Professor Shapiro categorizes as fixed may in fact be variable.  For instance, if Staples wins a new RFP for a large customer, they may hire additional employees to serve as dedicated customer service representatives for that customer, and may rent additional office and warehouse space in order to service that customer.  These additional rent and salaries costs would then be variable.

176.     A standard approach economists use in cases where intuition alone cannot determine the fixed or variable nature of a cost is to statistically examine how that cost historically varied with sales.[272]  Exhibit Q is a scatterplot of the costs for Staples which

---

270.     *Id*.
271.     *Id*.
272.     *See* Mark A. Allen, Robert E. Hall, and Victoria A. Lazear (2011) "Reference Guide on Estimation of Economic Damages," in Federal Judicial Center and National Research Council (2011) *Reference Manual on Scientific Evidence, Third Edition*, National Academies Press, at p. 450 ("An alternative approach uses regression analysis or some other statistical method to determine how costs vary with sales as a general matter within the firm or across similar firms.").

CONTAINS CONFIDENTIAL MATERIALS

Professor Shapiro assumed were fixed, against Staples' sales to large B-to-B customers in the alleged relevant market.  The data in Exhibit Q are quarterly between Q1-2012 and Q3-2015.[273] Far from being fixed, Exhibit Q shows that these costs actually vary substantially and consistently with Staples' sales.  When sales are higher, the costs Professor Shapiro assumes to be fixed are also higher.

177.    I have also plotted in Exhibit Q a best-fit line to these data, and this line fits the data fairly closely ($R^2$ of 0.91).  Based on this line, the share of these costs that are variable is 77.1 percent,[274] whereas Professor Shapiro assumes they are entirely fixed.  Based on this analysis, I adjusted Professor Shapiro's margin calculation to include 77.1 percent of these costs as variable (instead of zero percent, as Professor Shapiro does).[275]  This lowers Staples' profit margin from the ▮▮▮▮▮ that Professor Shapiro calculates down to ▮▮▮▮▮.[276]

178.    With respect to Office Depot, Professor Shapiro excludes OfficeMax's customers from his calculation, despite the fact that OfficeMax was a part of Office Depot during the 2014 period Professor Shapiro analyzes.  If OfficeMax is grouped with Office Depot, as it should have been, then Professor Shapiro's calculated margin falls from ▮▮▮▮▮▮▮▮.  In addition, if I also include 77.1 percent for the costs Professor Shapiro assumes are fixed, as I did for Staples above, Office Depot's margin falls to only ▮▮▮▮▮.

179.    In these margin figures, I continue to assume that many other large cost categories (other than the "distribution" costs) are fixed.  I have not analyzed whether such an assumption is

273.    Professor Shapiro focuses on Staples' cost data, because Office Depot's data do not provide the same level of detail.  Shapiro Report, at p. D-2.  For this reason, I also focus on Staples' data.
274.    The intercept identified by the best-fit line, is an estimate of fixed costs each quarter.  This amount is $10.9 million.  The average quarterly total cost (among the cost categories Professor Shapiro assumes are fixed) is $47.8 million.  Hence, $10.9 million / $47.8 million, or 22.9 percent, is an estimate of the share of these costs that are fixed, and the remaining 77.1 percent are variable.
275.    I also excluded as variable costs certain expenses associated with the cost of extending customer credit.
276.    Such an approach to calculating margins is appropriate (subject to the caveats discussed below) on average across customers and across products, but is only a rough approximation for any particular customer or particular product.

CONTAINS CONFIDENTIAL MATERIALS

warranted; hence, these margin figures may be overstated for that reason.  Moreover, by necessity, I estimated the variability of Staples' costs on a quarterly basis in Exhibit Q, and this may also cause these margins to be overstated.  As a general matter, the question of which costs are variable and which are fixed depends on the time period selected, since many categories of costs are fixed over short periods of time, but variable over longer periods.[277]  For instance, if production ramps up quickly over a period of a week, most of a firm's costs will be fixed due to contracts that cannot be renegotiated in such a short time and the simple fact that hiring new employees or purchasing additional capital goods takes time.  Over a sufficiently long period, however, all or almost all costs are variable: All contracts can be renegotiated, and more (or different) employees and capital goods can be hired or purchased, respectively, given enough time.

180.     Professor Shapiro's key claims in this case relate to the alleged market power held by Staples and Office Depot in bidding for RFPs for large B-to-B customers.  As Professor Shapiro recognizes, the contracts that Staples and Office Depot sign in these RFPs are often three years or longer.[278]  Therefore, the appropriate perspective on margins asks which costs are variable over the term of a three-year contract.

181.     It is a fundamental principle in economics that, over a longer period, fewer costs are fixed.[279]  Over a three-year period, many of Staples' costs that may be fixed on a quarterly basis will be variable. Therefore, if these variable costs were properly accounted for, estimated

---

277.     *See* Mark A. Allen, Robert E. Hall, and Victoria A. Lazear (2011) "Reference Guide on Estimation of Economic Damages," in Federal Judicial Center and National Research Council (2011) *Reference Manual on Scientific Evidence, Third Edition*, National Academies Press, at p. 450 ("… costs that are fixed in the short run may be variable in the longer run.").
278.     Shapiro Report, at p. 41.
279.     Mark A. Allen, Robert E. Hall, and Victoria A. Lazear (2011) "Reference Guide on Estimation of Economic Damages," in Federal Judicial Center and National Research Council, *Reference Manual on Scientific Evidence, Third* Edition, National Academies Press, pp. 425-502, at 450 ("The costs that can be avoided if sales fall abruptly are smaller in the short run than in the long run").

margins for Staples and Office Depot may be reduced even below the ▇▇▇▇▇▇▇▇ ▇▇▇▇ rates I calculated above on a quarterly basis.

182.     In any case, it is clear that Professor Shapiro has overstated the margins that Staples and Office Depot earn, leading him to improperly conclude that Staples and Office Depot face less competition from rivals than they actually do.  Instead, the low margins that Staples and Office Depot earn are indicative of the robust competition they face.

### B.   No Evidence That The Merger between Office Depot and OfficeMax Resulted In Higher Prices for Large Corporate Customers

183.     Professor Shapiro asserts that the Transaction will cause the Herfindahl-Hirschman Index ("HHI"), a common measure of industry concentration, to rise by 2,994 points.[280]  He notes that the market was already "highly concentrated," with an HHI of 3,270, and that "the increase in the HHI resulting from the merger vastly exceeds the 200 points that triggers a presumption of harm to competition under the Horizontal Merger Guidelines."[281]

184.     Professor Shapiro also states – and I agree – that "[r]ecent mergers in the same industry can provide valuable evidence regarding the likely impact of a proposed merger."[282]  I therefore examined the Office Depot / OfficeMax merger, which took place in November 2013.[283]  On February 20, 2013, Office Depot and OfficeMax jointly announced the signing of an all-stock merger agreement between the two firms, and Office Depot's CEO stated that the combination would "enhance our ability to serve customers around the world, offer new opportunities for our employees, make us a more attractive partner to our vendors, and increase

---

280.     Shapiro Report, at p. 19.
281.     *Id*.
282.     *Id*., at p. 41.
283.     For full disclosure, I advised Office Max and Office Depot on the merger and presented extensive econometric analyses to the FTC about the lack of anticompetitive effects from that merger.

stockholder value."[284]  Shareholders of the two companies voted to approve the merger on July

10, 2013,[285] and the FTC cleared the merger on November 1, 2013.[286]  The merger was

completed on November 5, 2013.[287]

186.    Based on Professor Shapiro's calculations, the HHI for contract customers prior to

the merger would have been 2,800, which also classifies as "highly concentrated" according to

the Horizontal Merger Guidelines.[288]  Professor Shapiro's calculations also imply that the merger

increased HHI by 470 points, which is also more than the 200 that "triggers a presumption of

harm to competition," as Professor Shapiro put it.

186.    Applying the view the FTC has expressed in the current Staples / Office Depot

matter to the earlier Office Depot / OfficeMax merger, the FTC presumably would have

concluded that Staples, Office Depot, and OfficeMax did not have effective competitors for large

B-to-B customers among the products in the FTC's proposed market definition.  If this view

were true, then the Office Depot / OfficeMax merger was essentially a "three-to-two"

combination that eliminated one of the major competitors in the FTC's relevant product market.

It would be expected that margins in the industry would have risen, as the remaining two

competitors (Office Depot and Staples) faced less risk of being undercut by OfficeMax for large

B-to-B customer contracts.

---

284.    "OfficeMax and Office Depot Announce Merger of Equals to Create $18 Billion Global Office Solutions Company," OfficeMax Incorporated and Office Depot, Inc. Press Release, February 20, 2013.
285.    "Office Depot and OfficeMax Stockholders Approve Merger of Equals," Office Depot, Inc. and OfficeMax Incorporated Press Release, July 10, 2013.
286.    "Trade Commission Clears Office Depot, OfficeMax Merger; U.S. Agency Decides Deal Between Office Supply Stores Won't Harm Competition," *Wall Street Journal*, November 1, 2013.
287.    "Office Depot and OfficeMax Complete Merger," Office Depot, Inc. and OfficeMax Incorporated Press Release, November 5, 2013.
288.    Horizontal Merger Guidelines, at p. 19.  These calculations are based on Professor Shapiro's 2014 alleged market share for Office Depot.  Shapiro Report, at Exhibit 5A.  I took this share and then divided it into Office Depot and OfficeMax based on Office Depot's and OfficeMax's 2014 sales from the transaction sales data for the Fortune 100.

CONTAINS CONFIDENTIAL MATERIALS

187.     Obviously, a "three-to-two" merger could have quantitatively different competitive effects than a "two-to-one" merger, as the FTC and Professor Shapiro essentially assume the Transaction reflects.  However, according to economic theory, only in special circumstances would a three-to-two merger be expected to have no competitive effect on the margins of the remaining firms, such as in the case of pure price competition (also known as "Bertrand" competition) between sellers of undifferentiated products.[289]  I am not aware of any evidence that in 2013 the FTC viewed competition in the industry in such a manner and a wide variety of empirical evidence in this case suggests that the real-world market is not characterized by the specifics of that form of theoretical competitive interaction.  Instead, as discussed previously, the FTC appears to have concluded that the Office Depot / OfficeMax merger would not harm consumers because of the wide range of competitive alternatives available to consumers – a view I share.  In other words, the Office Depot / OfficeMax merger was not really "three-to-two," and by extension, the Staples / Office Depot Transaction is not really "two-to-one."

188.     Just like Professor Shapiro, I have found no evidence that Office Depot has been able to raise prices significantly to large customers following its acquisition of OfficeMax.[290]  Given that we do not appear to disagree regarding this conclusion, there is no need to elaborate further on it.

---

289.     Dennis W. Carlton and Jeffrey M. Perloff (2005) *Modern Industrial Organization*, fourth edition, Pearson Addison Wesley, at pp. 171-174.
290.     Shapiro Report, at p. 42.

CONTAINS CONFIDENTIAL MATERIALS

### C. Large B-to-B Customers Are Particularly Able to Constrain a Combined Staples and Office Depot

189.   As noted previously, the FTC has focused its concerns regarding competitive harm on large B-to-B customers.[291]   The FTC's complaint does not argue that smaller B-to-B customers or retail customers will be harmed by the Transaction.[292]   Professor Shapiro appears to recognize the non-intuitive nature of the FTC's claim that large, powerful firms like Bank of America, Walmart, and ExxonMobil are unable to protect themselves on the pricing of office supplies, and hence, he attempts to explain that "[t]o the extent that large customers have been able to obtain lower prices by pitting Staples and Office Depot against each other, they can and likely will be harmed by the proposed merger."[293]

190.   Professor Shapiro does not explain why large customers are able to pit Staples and Office Depot against each other, but smaller and medium-sized customers (say, those with purchases less than $500,000) are not equally able to pit Staples and Office Depot against each other.   In fact, the available economic evidence indicates that, contrary to the FTC's and Professor Shapiro's theories, large B-to-B customers are, if anything, *better* protected from any attempt by a combined Staples and Office Depot to raise prices a result of the Transaction.

*1.  Large B-to-B customers are a natural target for Staples' competitors.*

191.   Large B-to-B customers are natural targets for any repositioning or strategic action by the various competitive rivals I have discussed previously.   As indicated in my earlier discussion, several of these alternatives are even now undergoing substantial repositioning and expansion in the market, including W.B. Mason, which has been expanding vigorously, and

---

291.    Complaint, ¶30.
292.    In its 2013 decision regarding the Office Depot / OfficeMax merger, the FTC stated that "there are dozens, if not hundreds, of office suppliers that compete effectively to serve small and medium-sized businesses." "Statement of the Federal Trade Commission Concerning the Proposed Merger of Office Depot, Inc. and OfficeMax, Inc.," FTC File No. 131-0104, November 1, 2013.
293.    Shapiro Report, at p. 7.

CONTAINS CONFIDENTIAL MATERIALS

Amazon Business, which expanded its B-to-B platform and is expected by market participants to grow quickly.  Repositioning and changes in strategy are a normal and common response by firms to changing market conditions, and there would likely be the same sort of repositioning and expansion in response to a hypothetical post-Transaction price increase.

192.    The evidence indicates that the incentive and ability to target the largest customers in any such repositioning by competitors would be strong.  There are certain fixed costs involved in changing a firm's strategy, including the (opportunity) cost of management time spent focusing on the repositioning, as well as the costs of marketing to, and initiating sales with, new customers.  As a consequence, the cost of repositioning to gain a particular volume of business is usually lower if that volume is concentrated among a few customers instead of spread across many smaller B-to-B customers.  For this reason, economic theory indicates that firms will likely reposition to appeal to the largest customers first, before considering whether there is a way to appeal to smaller customers.

193.    Exhibit B, which I discussed earlier, reports the largest B-to-B customers served by Staples and Office Depot during the past year, according to their total office supply purchases.  For instance, ██████████ purchased more than $24 million worth of office supplies in 2015 from Staples.  The potential for firms like W.B. Mason, Amazon, Grainger, or others competitors to acquire a contract of that size would provide an incentive to them to reposition to serve ██████████ or other large customers if the combined Staples and Office Depot raised prices and thereby created the opportunity for a competitor to undercut its prices.

### 2.  *Large B-to-B customers have the best ability and strongest incentives to search for alternatives in the face of a price increase*

194.    As a basic principle of economics, consumers would be more likely to seek substitutes in response to a price increase for products that make up a larger share of their total

CONTAINS CONFIDENTIAL MATERIALS

purchases, all else equal.  As one textbook explains, "[w]hen a good takes up a large part of your budget, a rise in price has a large impact on how much income you will have left to buy other things."[294]  This is because searching for alternatives involves fixed costs of research and sampling.  If the total purchases of a good are large, the return to finding a lower-priced alternative will be great enough to cover the costs of searching.  As noted below, large B-to-B customers typically have dedicated procurement personnel and resources that can be devoted to searching for lower-price alternatives.

195.    For large B-to-B customers that buy substantial amounts of office supplies, the benefit of even a small improvement in price for a product will tend to be substantial, and therefore, searching for such price improvements is worthwhile.  By contrast, a smaller customer may not purchase enough of a particular product to make the total savings from a potential reduction in price large enough to warrant the effort.  This therefore provides an additional reason why, in the face of a hypothetical price increase from a combined Staples and Office Depot, large B-to-B customers are even more protected from competitive harm, relative to other B-to-B customers.  Large customers would have stronger incentives to investigate and test alternative means of obtaining office supplies.

### 3. *Large B-to-B customers are the most sophisticated buyers and they use contracts with many options to constrain pricing.*

196.    Large B-to-B customers typically have dedicated personnel experienced in procurement to negotiate their contracts and to monitor suppliers to be sure that they continue to receive the best available prices and terms.  For instance,

---

294.    Robert E. Hall and Marc Lieberman, *Economics: Principles and Applications*, 4e, Thomon South-Western, 2008, at p. 104.

CONTAINS CONFIDENTIAL MATERIALS

- ██████████████████████████████, who manages the team responsible for purchasing office supplies, states that their recent RFP "took 8 months from beginning to end and involved 30 employees."[295]

- ████████████████████ Senior Director of Procurement, Fulfillment and Sustainability, states that, for a recent RFP, "around 5 – 6 ████████ employees spent one and a half years."[296]

- ████████████████████, Director of Strategic Sourcing, states that her responsibilities include "negotiating and managing contracts – such as office supply contracts – on behalf of ████████████ and that she has a "team … responsible for managing out office supplies vendor, Staples, on a daily basis."[297]

- ██████████████████, Assistant Vice President for Real Estate & Facilities Management, indicates duties that include "overseeing and approving the work of our corporate purchasing team.  The corporate purchasing team monitors ████████ office supply needs, manages ██████████ office supplies vendor selection process, and negotiates a contract with the selected office supplies vendor."[298]

197.    In addition, I understand that many large B-to-B customers rely on third-party consultants who specialize in procurement and finding the lowest prices.[299]  Other large B-to-B customers are themselves procurement organizations, such as group purchasing organizations. The negotiation of low prices is the key purpose of these organizations, and all of their staff and resources are directed to that purpose.

198.    As I have noted previously, the contracts Staples and Office Depot sign with large B-to-B customers typically cover a wide range of business supply products, including the specific products the FTC and Professor Shapiro has included in its proposed relevant product market, but also a wide range of other products.  Therefore, what impacts customers welfare depends on the pricing and terms on the total combined set of products being purchased under a

---

295. ████████████████████████████

296. ████████████████████████

297. ████████████████████

299.    *See, e.g.,* ████████████████████████████████████ at pp. 33-39 (stating that ████ has had a long-standing relationship with procurement consultant EJ Advisory Services). *See also* ████████████ ██████████████████████████, at pp. 57-59 (describing using a consultant to help with procurement strategy).

contract, not merely the pricing associated with the narrow and artificial subset of products the FTC and Professor Shapiro consider to be in the relevant market.

199.    As a consequence of these facts, large B-to-B customers have an additional lever with which to constrain any attempt to increase prices on specific classes of products. Specifically, suppose that, as the FTC fears, the combined Staples and Office Depot attempts to raise prices on certain products after the Transaction.  The combined firm cannot, however, raise prices on other products outside the relevant market.  A large B-to-B customer can threaten to switch its purchases of these other unaffected products to a different supplier unless the combined Staples and Office Depot improves the pricing or the terms of its contract – either with respect to the products in the FTC's and Professor Shapiro's product market definition or with respect to other products.  In any case, large and sophisticated B-to-B customers may in this way be able to obtain more competitive value from their contracts, constraining or offsetting any attempt by the combined firm to raise prices on the set of products in the FTC's and Professor Shapiro's relevant market definition.

200.    Company executives confirm that office supply prices are constrained by customers' ability to switch suppliers for other non-office-supply products.  For instance, Neil Ringel, Staples Executive Vice President, stated that, "[w]e may be in a process with a customer where the net profitability on the office products deal is subadvantageous for us, but we know we're a week, a month, six months away from picking up $2 million in BO$$ category sales. We may decide the totality of the customer profitability trumps that particular category in that particular instance."[300]  Similarly, Roland Smith, Chairman and CEO of Office Depot, testified that "If the customer decides that they don't need to buy ink, paper, and toner from us because

---

300.    Investigational Hearing of Neil Ringel, at pp. 186-88.

we're not pricing it correctly and they go somewhere else, they're just as likely now to go

somewhere else for the remainder of the products."[301]

201.    In fact, customer threats to switch away from Staples and Office Depot on non-

office-supply products are in fact very common among large B-to-B customers today.  These

customers regularly threaten to carve out, and often do carve out, from their contracts with

Staples and Office Depot certain categories of products that they wish to procure from another

source.  For instance, one of the declarants in this matter, ▮▮▮▮▮▮▮, has indicated that it

carves out from a $1.5 million contract with OfficeMax (now administered by Office Depot)

approximately $200,000 worth of cleaning supplies.[302]  Customers' ability to undertake such

carve-outs provides an important competitive threat to make the overall value provided by the

contract competitive to customers.

202.    More generally, large B-to-B customers typically negotiate office supply contract

terms in other sophisticated ways that substantially restrict the ability of firms like Staples and

Office Depot to exert market power over them, and these options would still be available to

customers after the Transaction.  For instance, large B-to-B customers routinely reserve the right

to award additional contracts for certain product categories;[303] purchase from other distributors,

retailers, or online sellers;[304] break-up their contracts on a regional basis;[305] and terminate

---

301.    Investigational Hearing of Roland Smith, at p. 190.
302.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ¶4.  *See also* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, a part of ▮▮▮▮▮▮▮▮
production in response to the FTC's second request, indicating $205,602 in payments to "World Class Business
Products" for "Misc. Cleaning/Janitorial Supplies."  See *also* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, at pp. 97-98 (indicating
that ▮▮▮▮ prefers to purchase technology products from technology companies such as CDW over Office
Depot because of their "expertise in this area" and "relationships with manufacturers.").
303.    *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, at pp. 103-108 (describing Staples contract excluding certain
products).  *See also* ▮▮▮▮▮▮▮▮▮▮▮▮ at pp. 92-93 (describing moving janitorial product purchases away
from Office Depot).
304.    *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮, at pp. 252-55 (describing how ▮▮▮▮▮ has the right to purchase
paper from other vendors as long as OfficeMax has opportunity to match pricing).  *See* also
▮▮▮ at p. 94 (describing buying from multiple vendors).  *See also* ▮▮▮▮▮▮▮▮▮▮, at pp. 179-80
(describing nonexclusive contract between ▮▮▮ and Office Depot).
305.    *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮, at pp. 45-46.

contracts on short notice if pricing or terms become uncompetitive.[306]  Like carve-outs, all of these contract terms generate competitive pressure, and there is no reason to believe that these contractual strategies would be unavailable to large B-to-B customers after the Transaction.

> #### 4. Consistent with these facts, Staples' and Office Depot's margins are lower, not higher, for large B-to-B customers.

203.    The FTC and Professor Shapiro have claimed that large B-to-B customers are the most likely to be harmed by the transaction because they allegedly have only two real options for office supplies, Staples and Office Depot.  By contrast, the FTC and Professor Shapiro claim that smaller customers are not as demanding in their procurement needs, and therefore are not included in their market definition, presumably because their less demanding requirements provide them other options besides Staples and Office Depot.  If the FTC and Professor Shapiro are correct, then Staples and Office Depot should be earning *higher* returns on large B-to-B customers, relative to smaller B-to-B customers, as large customers have no other good alternatives under the FTC's and Professor Shapiro's theory.  By contrast, the evidence I summarized above, indicating that larger customers are better protected from competitive harm, implies that large B-to-B customers should get better net pricing, with Staples and Office Depot earning *lower* returns and margins on these smaller B-to-B customers.[307]

---

306.    *See, e.g.*, ████████████████████, at pp. 251-52 ████████████████████████████████████████ *. See also*  PX03028-001, at ¶ 2 (████████████████████████████████████████████

307.    Lower margins for large customers are consistent with testimony from executives in this matter.  *See, e.g.*, Investigative Hearing of Christine T. Komola, at p. 81 ("The very large customers have – typically those – the large, large customers have procurement groups, which are extremely aggressive at narrowing and negotiating price.  They are also very aggressive about picking the products that they want, and they can – they have vendors go against each other and play off each other.  They have a pretty robust RFP process, from what I understand. So they can really nickel and dime you very aggressively … The low margins are driven by they price match – they price shop individual items.  They price match with other competition, yes.  They do – they can pick and choose which product lines they want to do with us.  So they might – they can play off that margin capability – that margin problem with us.  So yes, it's all of that.").  *See also* Investigative Hearing of Ronald Sargent, at p. 114-15 ("I would argue our

CONTAINS CONFIDENTIAL MATERIALS

204.    Therefore, I examine the margins Professor Shapiro claims that Staples earned on the large B-to-B customers in his market, and then compare these margins to the equivalent ones for smaller customers.  Such an exercise shows that Professor Shapiro's own margin calculations imply that larger customers pay not only lower prices, but that (inconsistent with the FTC's claims) the merging parties also earn lower returns on these customers.

205.    For this exercise, I examine large and small B-to-B customers, and use the same accounting measure of margin that Professor Shapiro presents.  In Exhibit R, I report Professor Shapiro's margin for B-to-B customers of different sizes (in terms of annual purchases of supplies).  I report the average margins for these products when sold to B-to-B customers of varying sizes.  As indicated in Exhibit R, Staples and Office Depot earn far lower margins on large B-to-B customers based on Professor Shapiro's calculations.

206.    Such a finding is inconsistent with the FTC's and Professor Shapiro's theory that larger customers have fewer alternatives to Staples and Office Depot, as the far lower prices paid by large B-to-B customers are apparently not accounted for by scale economies, as indicated by these results for Professor Shapiro's margins.  To put these differences in perspective, Professor Shapiro's own calculated margins indicate that Staples' B-to-B customers with between $1 million and $5 million in total sales, pay more than five times the margins of customers with over $10 million worth of purchases, on average ▮ percent versus ▮ percent).  Furthermore, Staples' B-to-B customers outside of Professor Shapiro's market, those with annual purchases of between $0.25 million and $0.5 million pay margins of ▮ percent, on average, or more than *seven* times as large as the margins paid by the largest B-to-B customers.  It is difficult to explain such large differences due to any scale economies associated with serving large B-to-B

---

largest customers are pretty sophisticated buyers. In many cases they have procurement functions.  They probably have the lowest margin rate of any of our customers.").

CONTAINS CONFIDENTIAL MATERIALS

customers.  A much more plausible explanation is that the better pricing offered large B-to-B customers comes from their leverage in negotiations with Staples and Office Depot.  Lower profitability and strong customer leverage are not consistent with the FTC's and Professor Shapiro's theory of harm, centered on large B-to-B customers being the most vulnerable to post-Transaction price increases.

207.    In order to further examine this question of Professor Shapiro's margins, I also performed a regression analysis using these data on a product-by-product basis.  The details of the model are reported in Appendix E, but to summarize briefly, I estimated a statistical relationship between the margin earned on a particular product sold to a particular customer in a particular quarter, as suggested by Professor Shapiro's margin calculation, and that customer's status as "large" (as defined by Professor Shapiro).  The regression thus estimates the amount by which Professor Shapiro's margins differ for large B-to-B customers and other customers, across various products.  In order to account for trends over time in Professor Shapiro's margins, I only compared large customers with other customers within the same quarter, never across quarters.[308] I also only compared large customers to other customers for the same product, in order to control for the fact that larger customers may purchase a different mix of products than do smaller customers.

208.    The regression analysis indicates that margins for Staples Office Depot are between five and six percent *lower* on sales to large B-to-B customers than on other B-to-B customers for the same product in the same quarter of sales.[309]  These findings corroborate the

---

308.    In econometric terms, I included quarter-year "fixed effects" as controls.

309.    As described in Appendix E, I also broke out the "large" customer category into three separate subcategories: $0.5 million to $1 million, $1 million to $3 million, and greater than $3 million in consumables sales during the same fiscal year.  I find that Professor Shapiro's margins for all three groups are lower than they are for smaller customers, and that his margins are the lowest for the largest customers with greater than $3 million in purchases.

earlier ones.  Staples and Office Depot earn less on large customers, which appears inconsistent with the FTC's and Professor Shapiro's theory that larger customers have fewer alternatives to Staples and Office Depot, and therefore would be harmed by the Transaction.

209.    As I have previously noted, Professor Shapiro does recognize that large customers are able to obtain lower prices than smaller customers.[310]  Although he suggests this fact may result from some ability of large customers to pit Staples and Office Depot against each other, he does not explain why other firms are not also able to pit office supply distributors against each other.  That is, why do smaller B-to-B customers appear to be so much more profitable for Staples and Office Depot in a way that does not appear to be explained by scale economies associated with large customers?  And why do these smaller customers not use the extra competitive alternatives available to them to get better pricing?   Also, the FTC's and Professor Shapiro's theory of harm does not explain why large customers will not be able to pit other distributors against each other after the Transaction, such as Staples and W.B. Mason, or Staples and Amazon, or Staples and any other rival (or combination of rivals or competitive alternatives).

## VII.    CONCLUSION: PROFESSOR SHAPIRO'S ALLEGED 0.38 PERCENT PRICE INCREASE IS VASTLY OVERSTATED

210.    Professor Shapiro asserts that the Transaction will allow a combined Staples and Office Depot to raise prices by approximately six percent on a set of customers and products that constitutes, in total, 6.4 percent of their total sales.[311]  In other words, the overall price increase claimed by Professor Shapiro is only 0.38 percent of total sales.[312]  Throughout this report, I

---

310.    Shapiro Report, at p. 7.
311.    *Id.*, at pp. 7 & 40.
312.    0.38 = 6 percent x 6.4 percent.

CONTAINS CONFIDENTIAL MATERIALS

have described the economic theory and available evidence that indicates that even this claimed 0.38 percent price increase is substantially overstated.  Some of these overstatements cannot be strictly quantified, but it is possible to give a rough measure of the amount of overstatement in other cases.

211.    First, as I discussed at length, large B-to-B customers have the ability to buy many products directly from manufacturers – or negotiate directly or indirectly with the manufacturer regarding the price of the product and then use a third party to distribute the product.  This practice is already common among large B-to-B customers for paper purchases, as well as purchases of certain office supplies from manufacturers such as Avery and Sanford.  As I have discussed, if Staples and Office Depot attempted to raise prices after the Transaction, other manufacturers would likely be incentivized to increase their direct-to-consumer relationships.  But even putting aside this effect, merely eliminating paper from the FTC's and Professor Shapiro's product market further reduces the size of the alleged price increase claimed by Professor Shapiro from 0.38 percent down to 0.21 percent.  Excluding Sanford and Avery products as well further reduces the alleged price increase to 0.19 percent.

212.    Next, as I have discussed, Professor Shapiro dismisses the pricing constraint created by entry and expansion of competitors, claiming it will not be sufficient "over the next few years to replace the competition to Staples that Office Depot currently provides."[313]  However, many of Staples' and Office Depot's customers are only in the first year of a contract that has a term of three years or more.  Thus, Professor Shapiro has not explained how these customers will be harmed by the Transaction in the next two or more years.  Moreover, Professor Shapiro appears to implicitly admit that entry and expansion may mitigate or eliminate

---

313.    Shapiro Report, at p. 3.

CONTAINS CONFIDENTIAL MATERIALS

any competitive harm due to the Transaction in the future.  If approximately one-third of Staples'

and Office Depot's customers are in this situation and significant entry or repositioning occurs in

the next two to three years, then the effective price increase alleged by Professor Shapiro

declines from 0.19 percent to 0.13 percent.

213.   Next, I showed in Exhibit K that a substantive percent of products are constrained

not by competition between intermediaries, but by online retail prices.  Since the proposed

merger is not going to change that constraint, it would be appropriate to adjust the size of the

market that is potentially at risk of a price increase, according to Professor Shapiro's analysis.

Accounting for all these adjustments, instead of 6.4 percent of total sales, his putative price

increase would be multiplied by 1.7 percent of total sales, thereby reducing the overall alleged

harm to 0.10 percent.

214.   My conclusion, based on all the evidence in this report, is that there is likely to be

no price increase at all to large B-to-B customers for the products in the FTC's and Professor

Shapiro's relevant market.  The competitive options available to customers for avoiding the

effect of a hypothetical post-Transaction price increase are numerous and powerful, including,

among other factors, buying from manufacturers, entry and expansion by rival competitors,

leakage, internally distributing their own office products, and threatening to switch distributors

for products outside the proposed relevant product market.

215.   However, even if the Transaction did lead to a 0.1 percent price increase overall,

it is still the case that even a very modest view of efficiencies from the Transaction would be

sufficient to make the overall effect of the Transaction pro-competitive.  I understand that other

experts have presented analyses showing that there are substantial efficiencies associated with

the Transaction.  I have not reviewed those analyses and do not have an opinion about how large

the efficiencies are.  In order to illustrate my point, however, suppose that merger-specific,

CONTAINS CONFIDENTIAL MATERIALS

marginal cost efficiencies are only *one* percent of total revenue.[314]  Even in this case, a pass-through rate of 15 percent, as has been used in this industry in the past, would suggest that, on balance, consumers are better off from the proposed merger.[315]  If, however, the market is not as competitive as I have shown in this report (and more like the arguments put forward in Professor Shapiro's report), Professor Shapiro has previously stated that one would generally expect the firm-specific pass-through rate to be higher,[316] but that would just mean that the merger is even more likely to generate benefits for consumers, on balance.[317]

216.    In the end, the determination of the likely competitive effects of a merger or acquisition generally focuses on consumer welfare.[318]  This traditionally requires an evaluation of whether consumers are likely to be worse off as a result of the transaction, which involves assessing whether prices in a relevant market are likely to increase, taking into consideration whether efficiencies related to that market are enough to offset upward pricing pressure in that market as a result of the proposed transaction.  From this narrow perspective, the relevant

---

314.    I note here that Professor Shapiro's six percent price increase estimate is based, in part, on an assumption that the Office Depot / Office Max produced efficiencies of      percent in terms of lower costs of goods sold.  *Id.*, at pp. 39-40.

315.    1.0 percent x 15 percent = 0.15 percent in consumer gains from efficiencies is greater than 0.10 percent in consumer losses due to the FTC's and Professor Shapiro's claims of hypothetical consumer harm.  A pass-through rate of 15 percent for Staples was estimated in Orley Ashenfelter, David Ashmore, Jonathan B. Baker, and Signe-Mary McKernan (1998) "Identifying the Firm-Specific Cost Pass-Through Rate."  *See also* Joseph Farrell, John Hayes, Carl Shapiro, and Theresa Sullivan (2007) "Standard setting, patents, and hold-up," *Antitrust Law Review* 74(3):603-670, at p. 644 ("Even if the firm's marginal or incremental costs, and not just its fixed costs, rise, this pass-through rate will often be small if the firm has little market power.").

316.    *See* Joseph Farrell, John Hayes, Carl Shapiro, and Theresa Sullivan (2007) "Standard setting, patents, and hold-up," *Antitrust Law Review* 74(3):603-670, at p. 644 ("If the firm has significant market power, its pass-through rate may be substantial…").

317.    As another illustrative example, even if Professor Shapiro is correct and the price effect is 0.38 percent of overall revenue, the merger benefits consumers as long as marginal cost, merger-specific efficiencies are greater than 0.76 percent of revenue and the firm-specific pass-through rate is 50 percent or greater.

318.    *See, e.g.*, Federal Trade Commission and U.S. Department of Justice (2006) "Commentary on Merger Guidelines," at 49 ("Efficiencies in the form of quality improvements also may be sufficient to offset anticompetitive price increases following a merger. Because a quality improvement involves a change in product attributes, a simple comparison of pre- and post-merger prices could be misleading. A careful analysis of the effects of changes in product attributes and prices on consumer welfare is likely to be necessary.").  *See also, e.g.*, Horizontal Merger Guidelines, atp.  2 ("Regardless of how enhanced market power likely would be manifested, the Agencies normally evaluate mergers based on their impact on customers.").

efficiencies would be those that lower costs in the relevant market.  However, such a narrow

consideration of efficiencies is inappropriate for the evaluation of this particular case, given the

way in which office supplies are purchased by distributors *and* large B-to-B customers.

217.    First, procurement and distribution efficiencies should be counted because, in the

vernacular of the Merger Guidelines, they are "so inextricably linked … that a partial divestiture

or other remedy could not feasibly eliminate the anticompetitive effect in the relevant market

without sacrificing the efficiencies in the other market(s)."[319]

218.    Second, as explained in the remainder of this subsection, given that large B-to-B

customers also purchase non-consumable office supplies in bundles with office supplies, the

efficiencies related to those other products are "inextricably linked" for such consumers and thus

should also be counted. When such transactional complementarities exist, the proper evaluation

of efficiencies must consider how efficiencies that directly affect, for example, janitorial

services, will affect consumers of paper products.[320]

219.    To illustrate how demand-side complementarities can impact the flow of

efficiencies realized by large B-to-B customers, consider the following simple example.  There

are two products – paper and janitorial services.  A large B-to-B customer purchases both

products in equal amounts from Staples today.  Assume, *arguendo*, that a merger occurs which

---

[319].    Horizontal Merger Guidelines, at n. 14.

[320].    I note that many economists and policymakers believe a consumer welfare standard that balances the likely consumer harms and efficiencies across all merger-implicated products is most appropriate.  For example, former FTC Commissioner Josh Wright notes that "there is no economic reason to exclude benefits the agency considers cognizable and otherwise satisfy the requirements of the 2010 Merger Guidelines simply because the consumers reaping those benefits fall outside arbitrarily drawn markets.  We have no reason to favor one set of consumers over another as an agency and no basis in economics to do so."  "Interview with FTC Commissioner Joshua D. Wright," *The Antitrust Source*, August 2014 Volume 13 Issue 6.  *See also, e.g.,* Jan M. Rybnicek and Joshua D. Wright, "Outside In or Inside Out?: Counting Merger Efficiencies Inside and Out of the Relevant Market," at 18 ("The claim is that incorporating out-of-market efficiencies into merger analysis amounts to competition agencies and courts arbitrarily picking one group of customers over another"); Marc Ivaldi and Aleksandra Khimich (2014) "Towards Guidelines for Efficiency Analysis in Mergers and Antitrust Cases," Report to the Regional Competition Center for Latin America, at 25 ("Under a general consumer welfare standard, efficiencies that arise outside of the relevant market should be appreciated as much as those arising within it.")

results in upward pricing pressure (net of efficiencies directly attributable to paper products) of $5 for paper products, but that there are efficiencies attributable to janitorial services that are high enough that the price of janitorial services falls by $6. Under this scenario, the large B-to-B customer experiences a net benefit of $1. Since there is no partial divesture that can achieve the benefits of the proposed merger without the putative harms, it should be clear that the customer is net better off from the proposed merger and it should be allowed.

220.    Similar, but more general, effects of complementarity among goods offered by multi-product firms on the pass-through of merger efficiencies have been contemplated by the academic literature. For example, Jaffe and Weyl (2013) show that in a multi-product setting the net upward pricing pressure on one firm's product is a function of diversion ratios from that product to *all* of the products of its merger partner (multiplied by the expected *post-merger* margins of those products).[321]  In other words, this model shows that, in the presence of complementarities, the upward price pressure associated with office supplies is inextricably linked with the merger-specific variable cost efficiencies of BOSS products. The reason is simple: BOSS variable cost efficiencies alter the post-merger margins of BOSS products, which then directly changes the pricing incentives associated with consumable office supplies.

221.    In sum, the evaluation of the competitive effects of the Transaction should consider all inextricably linked merger-specific efficiencies, including those efficiencies not solely related to consumable office supplies.

222.    I end with a simple statement about economic equity, a topic which too often gets shortchanged in the economics literature. The potential harm alleged by the FTC would be felt

---

321.    Sonia Jaffe and E. Glen Weyl (2013) "The first-order approach to merger analysis," *American Economic Journal: Microeconomics* 5(4):188-218, at § VI.A. *See also* Joseph Farrell and Carl Shapiro (2010) "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition," *The B.E. Journal of Theoretical Economics* 10(1):1-39, at 31-32 (provides a less rigorous explanation of the same notion).

CONTAINS CONFIDENTIAL MATERIALS

by large B-to-B customers – some of the largest companies in the world, such as Wells Fargo (a bank); HCA (a hospital conglomerate); AT&T (a telecommunications company); Pfizer (a pharmaceutical company); and ExxonMobil (an energy company).  On the other hand, the potential benefits of the proposed Transaction will flow to all customers, including large and small companies *and* retail consumers.  I find it surprising that the FTC is seeking to block a merger that unquestionably will benefit retail consumers to try to defend some of the largest and richest corporations in the world.  The effort is particularly problematic since attempts to block the Transaction actually protect those best able to protect themselves (read: large companies) at the expense of retail customers who are least able to defend themselves and are most in need of the lower-cost products that this proposed merger can achieve.[322]

---

322.    Two leading antitrust scholars have argued that the equity considerations laid out in this paragraph should be explicitly taken into account in evaluating mergers. See Jonathan B. Baker and Steven C. Salop (2015) "Antitrust, Competition Policy, and Inequality," *Georgetown Law Journal Online*, 104(1):1-28.

CONTAINS CONFIDENTIAL MATERIALS

_____        February 29, 2016
Jonathan Orszag                                          Date
                                                                  _____