CONFIDENTIAL MATERIAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Federal Trade Commission, et al.,

  Plaintiffs,

v.

Staples, Inc. and Office Depot, Inc.

  Defendants.

Civil Action No. 1:15-cv-02115 (EGS)

# EXPERT REPORT OF CARL SHAPIRO

### February 15, 2016

### <u>THIS DOCUMENT CONTAINS CONFIDENTIAL MATERIAL</u>

PX06100-001

# Table of Contents

**1. Qualifications and Assignment** ........................................................................**1**
   A.   Qualifications........................................................................... 1
   B.   Assignment ............................................................................ 1

**2. Summary of Conclusions**.................................................................................**2**

**3. Relevant Market**............................................................................................**3**
   A.   Consumable Office Supplies................................................. 4
   B.   Large Customers .................................................................. 5
   C.   Geographic Market ............................................................ 11
   D.   Hypothetical Monopolist Test............................................ 11
   E.   Why This Bundle of Items? ............................................... 13

**4. Market Shares** ............................................................................................**14**
   A.   Market Shares Based on Data from Fortune 100 Customers.... 15
   B.   Primary Vendor Relationships............................................ 18
   C.   Market Concentration and HHIs......................................... 19
   D.   Possible Alternative Method of Measuring Market Shares ............ 20

**5. Unilateral Competitive Effects**....................................................................**21**
   A.   Mergers in Bidding Markets: Economic Principles........................ 22
   B.   Head-to-Head Competition between Staples and Office Depot ..................... 23
   C.   Staples Will Face Weaker Competition After the Merger than Before ........................... 31
   D.   Price Effects of the Office Depot/OfficeMax Merger ................... 41

**6. Entry and Expansion** ..................................................................................**42**
   A.   Barriers to Entry and Expansion ....................................... 43
   B.   Amazon Business................................................................ 46

**7. Efficiencies** ................................................................................................**52**

**8. Proposed Divestiture**..................................................................................**53**

CONFIDENTIAL MATERIAL

# 1.  Qualifications and Assignment

## A. *Qualifications*

I am Carl Shapiro, the Transamerica Professor of Business Strategy at the Haas School of Business at the University of California at Berkeley, where I have taught since 1990.  I served as the Director of the Institute of Business and Economic Research at U.C. Berkeley from 1998 to 2008.  I also have served as Co-Editor and then Editor of the *Journal of Economic Perspectives*, a leading economics journal published by the American Economic Association.  My curriculum vitae is attached as Appendix A.

During 2011-12 I had the honor of serving as a Senate-confirmed Member of the President's Council of Economic Advisers.  The CEA, an agency within the Executive Office of the President, is charged with offering the President objective economic advice on the formulation of economic policy.  The Council bases its recommendations and analysis on economic research and empirical evidence, using the best data available to support the President in setting our nation's economic policy.

I am an economist who has been studying antitrust, innovation, and competitive strategy for over thirty years.  My book with Hal Varian, "Information Rules: A Strategic Guide to the Network Economy," has received critical acclaim for its application of economic principles to the information economy and has been widely read by managers and adopted for classroom use.

I have written a number of papers relating to the antitrust analysis of horizontal mergers, including my 1990 paper with Joseph Farrell in the *American Economic Review,* "Horizontal Mergers: An Equilibrium Analysis," and my 2010 paper in the *Antitrust Law Journal*, "The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years."

I have considerable experience with the application of economics for the purpose of enforcing the antitrust laws.  I served during 1995-1996 and again during 2009-2011 as the Deputy Assistant Attorney General for Economics in the Antitrust Division of the U.S. Department of Justice.  I have served on several occasions as an expert witness or consultant to the Antitrust Division or the U.S. Federal Trade Commission.  I have also consulted or served as an expert witness on numerous antitrust matters, including mergers, for private companies in a wide range of industries.  A list of cases in which I have testified during the past four years is attached as Appendix B.

I am being compensated for my work on this case at a rate of $800 per hour.  This compensation is unrelated to the outcome of this matter. My work in this case has been supported by Charles River Associates (CRA), a consulting firm at which I am a Senior Consultant.  I also receive compensation from CRA based on CRA's staff billings on this case.

## B. *Assignment*

I have been asked by the Federal Trade Commission to provide an economic analysis of the likely competitive effects of the proposed acquisition by Staples of Office Depot.

A list of the materials that my staff and I relied upon to prepare this report is provided in Appendix C.  Discovery in this matter has been fast and furious, right up to the time that I am writing this report.  I may amend and update my analysis based on information that becomes

PX06100-003

CONFIDENTIAL MATERIAL

available too late for inclusion in this report.  Due to the compressed schedule, it is possible that my staff or I have missed relevant evidence or made errors.  I will promptly file an amendment to this report if and when I become aware that this report contains any significant errors.

## 2.  Summary of Conclusions

I have analyzed the proposed merger between Staples and Office Depot using the methods normally employed by antitrust economists to evaluate proposed mergers between two competitors.  These methods are described in the Horizontal Merger Guidelines put forward by the U.S. Department of Justice and the Federal Trade Commission.

In this case, the obvious concern is that the merger will substantially lessen competition by eliminating all competition between Staples and Office Depot.  Upon a closer look at how the sale and distribution of office supplies in the United States actually takes place, one learns that large business customers have especially benefitted from head-to-head competition between Staples and Office Depot.  This makes large customers especially vulnerable to harm from the proposed merger, notwithstanding their size.  For this reason, my analysis focuses on large business customers, who can be targeted by Staples for post-merger price increases.  See Section 3 of the Horizontal Merger Guidelines, "Targeted Customers and Price Discrimination."[1]

In Section 3 of this report, I find that the candidate market for the sale and distribution of consumable office supplies, i.e., pens, Post-it notes and the like, as described below, to large customers in the United States is indeed a proper antitrust market within which to analyze the proposed merger between Staples and Office Depot.  I define large customers as commercial customers that purchased at least $500,000 worth of consumable office supplies during 2014 for their own end-use.  I show that this market satisfies the hypothetical monopolist test routinely employed by antitrust economists to identify relevant antitrust markets.  That test is described in Section 4 of the Horizontal Merger Guidelines, "Market Definition."[2]

In Section 4 of this report, I measure market shares in the market for the sale and distribution of consumable office supplies to large customers in the United States.  Here I follow Section 5 of the Horizontal Merger Guidelines, "Market Participants, Market Shares, and Market Concentration."[3]  My best estimate of market shares is based on data received from Fortune 100 firms about their purchasing of consumable office supplies.  Based on this set of buyers, I estimate that Staples and Office Depot have a combined share of at least 79% in the market for the sale and distribution of consumable office supplies to large customers in the United States.  This estimate is corroborated by data on primary vendor relationships with large customers, as provided by the largest firms that distribute consumable office supplies to business customers.  Both sets of data also indicate that Staples and Office Depot are evenly matched today in terms of market shares, but the post-merger Staples will dwarf its remaining rivals.

---

[1] PX08051, U.S. Dep't of Justice and Fed. Trade Comm'n, Horizontal Merger Guidelines, § 3 (Aug. 19, 2010) (hereinafter "Horizontal Merger Guidelines").

[2] PX08051, at § 4 (Horizontal Merger Guidelines).

[3] PX08051, at § 5 (Horizontal Merger Guidelines).

PX06100-004

CONFIDENTIAL MATERIAL

In Section 5 of this report, I turn to the likely effects of the proposed merger on large customers in the United States. Here I focus on the concern that the elimination of competition between Staples and Office Depot will allow Staples to shrink the discounts it offers to its large customers, and in this manner raise prices to these targeted customers. Price increases of this type are called "unilateral effects" to reflect the fact that they result from the *unilateral* post-merger decision by Staples to raise prices. Unilateral effects can be distinguished from "coordinated effects," which arise when a merger diminishes competition by enabling post-merger coordination between the merged entity and is remaining rivals. The analysis of unilateral effects is described in Section 6 of the Horizontal Merger Guidelines, "Unilateral Effects," and especially in Section 6.1, "Pricing of Differentiated Products," and Section 6.2, "Bargaining and Auctions."[4] I find that such price increases are likely since Staples and Office Depot compete vigorously against each other and since their remaining rivals, while numerous, have not been nearly as effective as Staples and Office Depot in serving large customers. I do not believe that the presence of these rivals would stop Staples from profitably charging more to large customers following the merger than Staples and Office Depot would charge if they do not merge. Large customers may also be harmed by a reduction in the quality of service that Staples offers relative to what the parties will offer if they remain independent rivals.

In Section 6 of this report, I consider whether expansion by existing suppliers, or entry by new suppliers, will protect large customers from the harm just described. Here I follow Section 9 in the Horizontal Merger Guidelines, "Entry."[5] While some entry and expansion may occur, it will not be nearly sufficient over the next few years to replace the competition to Staples that Office Depot currently provides.

In Section 7 of this report, I consider whether the proposed merger is likely to generate sufficient merger-specific efficiencies that customers will benefit from the merger. Here I follow Section 10 of the Horizontal Merger Guidelines, "Efficiencies."[6] I explain that efficiencies can "save" an otherwise anti-competitive merger, but only if they are merger-specific, verifiable, and passed-through sufficiently to offset the harm that customers would otherwise experience. I am skeptical that the efficiencies in this case meet those stringent conditions, but I expect to have more to say on this topic once I learn more from Staples and Office Depot about their efficiencies claims.

Finally, in Section 8 of this report, I address the divestiture to Essendant proposed by Staples and Office Depot. Based on my current understanding of that divestiture, it appears wholly inadequate to replace the significant competition to Staples provided today by Office Depot.

## 3.  Relevant Market

The relevant market is the sale and distribution of consumable office supplies to large customers located in the United States. Sections 3.A, 3.B and 3.C describe the contours of this market more

---

[4] PX08051, at §§ 6.1-6.2 (Horizontal Merger Guidelines).

[5] PX08051, at § 9 (Horizontal Merger Guidelines).

[6] PX08051, at § 10 (Horizontal Merger Guidelines).

PX06100-005

CONFIDENTIAL MATERIAL

precisely.  Section 3.D contains my analysis showing that this relevant market is properly defined for the purpose of analyzing the proposed merger between Staples and Office Depot.

Exhibit 1 illustrates how the relevant market in this case fits into the supply chain for consumable office supplies used by large customers.[7]  To understand this supply chain, it is important to recognize that both Staples and Office Depot distribute more than ████ individual items within the category of consumable office supplies and that the average large customer purchases over ████ of these items.  See Exhibit 2.

Starting from the top of the Exhibit 1, the manufacturers are the companies that actually produce the consumable office supplies.  There are many such manufacturers, corresponding to the very large number of individual items that together comprise consumable office supplies.  Many consumable office supplies are manufactured abroad.

Manufacturers sell in part to wholesalers.  Wholesalers serve the function of negotiating prices with many manufacturers, taking delivery of these items at their warehouses, and maintaining inventories for their customers, the distributors.  The two leading wholesalers are Essendant and S.P. Richards.  Wholesalers play an important role for smaller distributors who would find it more costly to negotiate directly with the numerous manufacturers.  Manufacturers also sell directly to the larger distributors, including Staples and Office Depot.

Distributors (sometimes also called vendors) sell in turn to the large customers who are the final users of these office supplies.  Distributors operate warehouses and handle the delivery of office supplies to large customers.  This entails substantial customer service as well as intricate billing and reporting.  Much of the analysis below focuses on the services these distributors provide to their large customers.[8]

## A. Consumable Office Supplies

The relevant market involves the sale and distribution of "consumable office supplies."  This term refers to a bundle of individual items consisting of office supplies that customers use up, discard, and repurchase on a recurrent basis.  This category includes items such as pens, file folders, Post-it notes, binder clips, and paper for copiers and printers.  Consumable office supplies account for roughly ██% of the Business-to-Business ("B2B") revenues at Staples and Office Depot.[9]

Exhibit 3 lists some of the main types of consumable office supplies.  For each category, the exhibit shows the revenues Staples and Office Depot earned from large customers in 2014.  Details on the list of items that are included in "consumable office supplies" are provided in the backup materials associated with this report.

---

[7] The term "large customers" is defined in Section 3.B.  Similar diagrams can be drawn to picture the supply chains for consumable office supplies sold (a) to smaller business customers, and (b) to consumers.

[8] Distributors also sell consumable office supplies to smaller business customers and to consumers through physical stores and online.  The focus of my analysis is on sales made to large customers.

[9] This calculation is based on data from Staples Specification 25 and Office Depot and OfficeMax Specification 26. Staples and Office Depot also sell janitorial and break room products, ink and toner, furniture, and other products and services that are not included in the relevant market.

PX06100-006

CONFIDENTIAL MATERIAL

The category of consumable office supplies includes many individual items that are not substitutes for each other: obviously, a pen is not a substitute for a binder clip. This may seem odd, since the basic idea in defining a relevant market in horizontal merger cases is to include products that are reasonable substitutes for the products sold by the merging firms. Here, the category of "consumable office supplies" consists of a *bundle* of individual items that are *aggregated* for the purpose of measuring market shares and assessing competitive effects. This aggregation is justified because market shares and competitive conditions are likely to be similar for the distribution of pens to large customers and for the distribution of binder clips to large customers. The approach taken here, which is known as a "cluster market," is commonly used by antitrust economists. Another good example of a cluster market involves defining a market for shoes. The market for shoes aggregates shoes of different sizes, despite the fact that consumers clearly do not regard a size-four shoe as a substitute for a size-ten shoe.

The category of consumable office supplies includes paper for copiers and printers. Distributors who supply pens, folders and other core office supplies also supply paper in significant quantities. Because there are specialty paper distributors who do not supply other consumable office supplies, I considered treating paper differently from other consumable office supplies. However, I determined (see below) that the share of paper for copiers and printers distributed to large customers by these specialty paper distributors is small. For this reason, I included paper in the bundle of consumable office supplies.

In contrast, the category of consumable office supplies *excludes* ink and toner cartridges. These items are excluded because the competitive conditions relating to their distribution appear to be significantly different from the distribution of consumable office supplies. More specifically, large customers often purchase ink and toner cartridges as part of a bundle of products and services known as Managed Print Services ("MPS"), which also includes leases and servicing of copiers and printers. Staples has asserted that "Large Customers Are Increasingly Carving Out Ink, Toner and Related Products Through MPS Programs."[10] Copier and printer paper is typically *not* part of the MPS bundle.[11]

The category of consumable office supplies also excludes items that Staples refers to as Beyond Office Supplies ("BOSS"). BOSS includes janitorial and sanitation products, break room products, and technology products such as computers and other business machines. Like ink and toner cartridges, BOSS items are excluded from the relevant market because their distribution is subject to significantly different competitive conditions than is the distribution of consumable office supplies.

### B. Large Customers

The relevant market consists of the sale and distribution of consumable office supplies to "large customers." I define large customers as commercial customers that purchased at least $500,000

---

[10] PX0007, at 038-069 (Presentation to FTC Bureau of Competition and Economics Management, 16 November 2015).

[11] See for example, ███████████████████████████████████████████████████

PX06100-007

CONFIDENTIAL MATERIAL

worth of the consumable office supplies during 2014 for their own end-use.[12]  None of my opinions would change if a somewhat different cutoff were used to define large customers, or if a different time period were used to define the set of large customers.[13]  In particular, my measurement of market shares and my analysis of unilateral effects is not sensitive to the precise set of customers included in the relevant market.

Industry participants recognize that large business customers are distinct from other purchasers of office supplies.[14]  Staples and Office Depot themselves categorize customers based on how much the customer purchases from them.  Customers who purchase more than $1 million in total annually are categorized as "Enterprise" customers.  The definition of "large customers" used here is well aligned with the definition of an "Enterprise" customer used by Staples and Office



[12] A large customer is defined as a non-government customer who purchased at least $500,000 worth of consumable office supplies during 2014 for their own end-use.  Organizations that are classified as government customers include (but are not limited to): federal agencies, state governments, counties, cities, and public schools.  Public universities are not classified as government customers.  Many government entities have distinct preferences from those of large commercial customers as a result of their non-commercial goals.  For instance, at both the state and federal level, some governments have instituted policies directing set asides for small businesses.  See for example PX03063 (                    .) ¶ 8, 11 and Exhibit B (explaining that prior to issuing a                    is required to determine whether to set aside the         process for socially and economically disadvantaged businesses…Small Businesses, and/or Service-Disabled Veteran Owned Small Businesses" and that                    . . . was set aside for only small businesses to submit proposals"); PX02181 (                    ) at 119:2–125:23 (explaining that the                    collects and analyzes data to determine whether the federal government meets goals of utilizing various types of small businesses in federal procurement of office supplies).  Moreover, some state-based government entities have instituted policies directing set asides for state-based businesses.  See for example PX08068 (Virginia Department of Small Business and Supplier Diversity, SWaM Certification) (noting that the purpose of Virginia's Small, Women-owned, and Minority-owned Business (SWaM) certification program is to enhance procurement opportunities for SWaM businesses participating in state-funded projects and that "[i]f you are a non-Virginia based business, you might not be eligible for participation in the Virginia Small, Women- and Minority-owned Business Program").  Some of these government customers recognize the tradeoff between the policy goal of supporting small businesses and buying supplies at the lowest price possible.  See for example PX02180 (                    .) at 165:9–14 (confirming         willingness to award contracts to small businesses under an office supplies contract vehicle even if the small businesses did not submit the lowest-priced bids).  Government customers may also be harmed by the merger of Staples and Office Depot.  The information I have used to identify large customers is provided in the backup materials to this report.

[13] Furthermore, the impact on customers of the proposed merger does not change sharply at the $500,000 boundary used to define large customers.  The proposed merger will likely harm customers below the $500,000 threshold whose needs are similar to those above the threshold; the magnitude and likelihood of such harm can be expected to diminish gradually with customer size, not sharply at the $500,000 threshold.  Whenever one considers a market for targeted customers, one must draw the line somewhere between targeted customers and other customers, even if competitive effects are similar close to both sides of the line.

[14] See for example, PX05183, at 018-019 (                    );                    ); Staples' CEO also regularly tracks sales to Fortune 100 companies.  See PX04129 (                    ); PX04499                    .

CONFIDENTIAL MATERIAL

Depot: ▮% of Staples' large customers, ▮% Office Depot's large customers, and ▮% of OfficeMax's large customers would be classified by them as Enterprise customers.[15]

Sales of consumable office supplies to customers who purchased at least $500,000 in consumable office supplies in the United States from Staples accounted for ▮% of Staples' 2014 U.S. sales revenue, for a total of $▮▮▮▮; the comparable figures for Office Depot are ▮% and $▮▮▮▮.  Combining the two companies gives figures of ▮% and $▮▮▮▮. Sales of consumable office supplies to customers who purchased at least $500,000 of consumable office supplies in the United States from Staples accounted for ▮% of Staples' 2014 U.S. B2B sales revenue; the comparable figure for Office Depot is ▮%.  Combining the two companies gives a figure of ▮%.

As shown below, large customers generally are able to negotiate prices that are significantly *lower* than the prices paid by retail customers.  Furthermore, as just noted, large customers obtain a range of valuable services from distributors, services not provided with retail purchases. Therefore, it might at first seem puzzling that these large customers could be targeted for post-merger price increases.  Indeed, Staples has criticized the FTC's market definition in part because it covers their "Most Powerful Customers."[16]  However, the Horizontal Merger Guidelines (Section 8) correctly address this situation:

> Even buyers that can negotiate favorable terms may be harmed by an increase in market power.  The Agencies examine the choices available to powerful buyers and how those choices likely would change due to the merger.  Normally, a merger that eliminates a supplier whose presence contributed significantly to a buyer's negotiating leverage will harm that buyer.[17]

To the extent that large customers have been able to obtain lower prices by pitting Staples and Office Depot against each other, they can and likely will be harmed by the proposed merger. Fundamentally, large customers will be harmed if the merger, by eliminating competition between Staples and Office Depot, elevates the prices these customers pay for their consumable office supplies, even if large customers will continue to pay less than do retail customers.

Large customers typically procure the substantial majority of their consumable office supplies pursuant to a contract with a primary vendor that the customer enters into after negotiations with one or more vendors.[18]  Large customers commonly issue a Request for Proposal ("RFP")

---

[15] The set of large customers differs from the set of Enterprise customers in part because large customers are identified based on their purchases of consumable office supplies while Enterprise customers are identified based on their spending on a larger collection of items.

[16] PX0008, at 008-009 (Presentation by Respondents, "Staples' Proposed Acquisition of Office Depot," January 4, 2016 Scheduling Conference, FTC Docket No. 9367).

[17] PX08051, at § 8 (Horizontal Merger Guidelines).

[18] See for example, PX03013 (Wilson (Select Medical) Decl.) ¶ 17▮ ▮▮▮▮▮▮ Also, according to purchase information provided from Fortune 100 companies to the FTC, over 30 did not name any supplier for consumable office supplies other than Staples or Office Depot.  Also see Exhibit 8, which is discussed below.

CONFIDENTIAL MATERIAL

specifying their requirements and inviting qualified vendors to submit bids. Distributors respond to these RFPs with customized proposals that can be quite long and detailed. For example, the response by Staples to a 2012 RFP from ███ runs some 75 pages, covering billing and invoicing, global capabilities, account management, reporting, quality and customer satisfaction, customer service support, cost management, technology and e-commerce and implementation, fulfillment and returns, product and inventory, and pricing.[19] Some large customers avoid the formal RFP process by negotiating a contract renewal with their incumbent supplier with the implicit or explicit threat to turn to another supplier if they are not satisfied with the terms and conditions offered by the incumbent.

The contracts between large customers and their primary vendor often specify the prices that will be charged for a customized list of "core" items, along with a specified discount below the manufacturer list price, or online prices, for other items. These contracts may provide for signing bonuses and additional discounts based on actual or anticipated sales volume, with larger volumes leading to deeper discounts.[20] These contracts allow the customer's employees to order consumable office supplies at the negotiated prices.[21]

These contracts typically do not require the customer to purchase its consumable office supplies exclusively through the contract. Purchases not made through the contract with the primary vendor are called "leakage." These purchases are included in the candidate relevant market. Leakage can occur in two basic ways. First, leakage can occur because the customer firm arranges for purchases from vendors other than the primary vendor. These other vendors can be distributors, manufacturers, or wholesalers. Second, leakage can occur when individual customer employees make discretionary retail purchases at brick-and-mortar stores or online.[22] Leakage enters into my analysis below when I measure market shares and when I discuss the unilateral competitive effects of the proposed merger.

---



[19] PX04484 (██████████████████████████████).

[20] See for example, ██████████████████████ PX03009 (Meester (Best Buy) Decl.) ¶ 7; PX05420, at 010–011 ██████████████████████); PX04484, at 069-070 ██████████████████████████); PX05321, at 015, 017 ██████████████).

[21] Large customers typically require their consumable office supply distributor to integrate with the customer's electronic procurement system. The distributor creates a customized online catalog ("punch-out site") which includes only the products and prices specified in the contract and is accessible by the customer's employees at any customer site. Once customer employees select the items they want to order, they are redirected to the e-procurement system, which generates a purchase order containing the desired items and sends it to the distributor for immediate fulfillment. The e-procurement system also provides real-time spend and inventory reporting. See for example, PX03009 (Meester (Best Buy) Decl.) ¶ 13; PX04484, at 045-053 ██████████████████); ██); PX04483, at 034–038 ██████████████████████████); PX05321, at 003-007 (██████████████████████████); PX05323, at 007-008 ████████████████████).

[22] During the course of the FTC's investigation, Staples and Office Depot have also used the term "leakage" to refer to situations in which a customer purchases fewer consumable office supplies than expected, or to franchisees not buying off the franchisor's contract. While I am not ignoring these situations, they do not constitute "leakage" as I use that term.

PX06100-010

CONFIDENTIAL MATERIAL

Large customers place considerable value on various services provided by distributors, including: reliable next-day delivery and desktop delivery;[23] customizable product catalogs and sophisticated information technology;[24] and detailed utilization reporting of the customer's purchases.[25] This is far less true of smaller B2B customers.[26]

Furthermore, many large customers require reliable and speedy delivery to numerous, geographically-distributed locations.[27] Staples and Office Depot recognize and tout their ability to serve large, geographically dispersed customers.[28] Exhibit 4A shows that Staples' large customers individually are far more geographically dispersed than is the average Staples Business-to-Business (B2B) customer. The average Staples B2B customer has shipping locations in ▮ zip codes and ▮ states, whereas the average Staples large customer has shipping locations in ▮ zip codes and ▮ states. The average distance from each shipping location to the center of a polygon formed by all of the customer's location is ▮ miles for all B2B customers and ▮ miles for large customers. Exhibit 4B shows similar results for Office Depot and OfficeMax.

---

[23] See for example, PX03002 (Eubanks-Saunders (Bank of America) Decl.) ¶ 12; ▮ PX03029 (Cervone (McDonald's) Decl.) ¶ 12; PX05320, at 001-005 (▮); PX04481, at 004-006 (▮). See ▮ (▮

[24] See for example, PX03002 (Eubanks-Saunders (Bank of America) Decl.) ¶ 15; PX03009 (Meester (Best Buy) Decl.) ¶ 13▮; PX03012 (Moise (Fifth Third Bank) Decl.) ¶ 5f; PX03022 (O'Neill (AEP) Decl.) ¶ 8; ▮ PX03029 (Cervone (McDonald's) Decl.) ¶ 12d; PX04469, at 004 ▮; PX04475, at 020-021 ▮). ▮. See PX03010 (▮

[25] See for example, PX03002 (Eubanks-Saunders (Bank of America) Decl.) ¶¶ 4, 14▮; ▮; PX03012 (Moise (Fifth Third Bank) Decl.) ¶ 5g; ▮ PX03022 (O'Neill (AEP) Decl.) ¶ 16; ▮; PX03029 (Cervone (McDonald's) Decl.) ¶ 12e; PX04627, at 008-011 ▮); PX04484, at 010 ▮); PX04483, at 034-036

[26] See for example characterization of small customer needs in ▮ ▮).

[27] See for example, PX03002 (Eubanks-Saunders (Bank of America) Decl.) ¶ 13; PX03009 (Meester (Best Buy) Decl.) ¶¶ 4, 12; ▮ PX03012 (Moise (Fifth Third Bank) Decl.) ¶ 5a; ▮; PX03022 (O'Neill (AEP) Decl.) ¶ 8; ▮ PX03029 (Cervone (McDonald's) Decl.) ¶ 12a; PX04469, at 003-004 ▮); PX04484, at 012-013 ▮

[28] ▮ ▮).

Page 9

CONFIDENTIAL MATERIAL

The relevant market in this matter is an example of a market serving "Targeted Customers," as that term is used in Section 3 of the Horizontal Merger Guidelines:

> When examining possible adverse competitive effects from a merger, the Agencies consider whether those effects vary significantly for different customers purchasing the same or similar products. Such differential impacts are possible when sellers can discriminate, e.g., by profitably raising price to certain targeted customers but not to others. […]

> When price discrimination is feasible, adverse competitive effects on targeted customers can arise, even if such effects will not arise for other customers. A price increase for targeted customers may be profitable even if a price increase for all customers would not be profitable because too many other customers would substitute away.[29]

In the case at hand, the "targeted customers" are the large customers, as that term is defined in this subsection. The adverse competitive effect of concern is that the merger will cause prices paid by large customers to rise, even if the merger does not cause prices paid by small businesses and retail consumers to rise.

The key condition that must be satisfied to define a market around targeted customers is that sellers can profitably *price discriminate* by setting different prices to the targeted customers than they charge to other customers. Section 3 of the Horizontal Merger Guidelines states: "For price discrimination to be feasible, two conditions typically must be met: differential pricing and limited arbitrage."[30] Differential pricing requires that suppliers can price differently to targeted customers than to other customers. That condition is met in this matter, since suppliers can identify large customers based on their historical purchase volumes and negotiate distinct prices with them. Indeed, large customers typically pay less than smaller customers or retail customers.[31] Limited arbitrage also applies in this matter, since it is not practical or attractive for a large customer to purchase indirectly from or through smaller customers.[32]

As noted above, sales of consumable office supplies to large customers in the United States accounted for less than ▮% of the combined U.S. sales revenue of Staples and Office Depot in 2014. This fact does not obviate concerns about substantial harm to competition in the distribution of consumable office supplies to large customers: the merging parties sold $▮ ▮ worth of consumable office supplies to large customers in 2014. It is quite common for mergers to raise competitive concerns for some products and/or groups of customers and/or geographies where the merging parties are important direct rivals but not for other products and/or customers and/or geographies where they do not overlap or face stronger competitors.

---

[29] PX08051, at § 3 (Horizontal Merger Guidelines).

[30] PX08051, at § 3 (Horizontal Merger Guidelines).

[31] See ▮▮▮▮▮▮▮▮▮▮

[32] Arbitrage also is not attractive to large customers in this case because large customers typically pay less than smaller business customers or retail customers for their consumable office supplies, and this will remain the case even if Staples significantly raises the price to large customers (but not smaller customers or retail customers) following the merger.

PX06100-012

CONFIDENTIAL MATERIAL

### C. Geographic Market

The relevant geographic market is the United States.  This market is defined based on the location of customers, as explained in Section 4.2.2 of the Horizontal Merger Guidelines.  All sales of consumable office supplies made to large customers located in the United States are included in the relevant market, regardless of the location of the supplier.  For customers who have locations both in the United States and abroad, only purchases bound for U.S. locations are included in the relevant market.

### D. Hypothetical Monopolist Test

This section explains the methodology I have employed to test whether the relevant market just described is indeed a proper relevant market for the purposes of measuring market shares and evaluating the proposed merger between Staples and Office Depot.  My understanding is that antitrust law calls for the relevant market to include all reasonable substitutes for the products sold by the merging firms.  Since at least 1982, antitrust economists working for the Department of Justice, the Federal Trade Commission, and for private parties seeking to merge have been implementing this legal concept using the *hypothetical monopolist test* (HMT).  I have used this test myself many times in merger analysis, on behalf of the government and on behalf of merging parties.  The HMT is described in some detail in Section 4 of the Horizontal Merger Guidelines.

The hypothetical monopolist test starts from a "candidate" collection of products and asks whether that collection of products is broad enough to constitute a proper antitrust market.  The HMT asks whether a hypothetical, profit-maximizing monopolist with complete control over the supply of products in the candidate market to the target customers would impose at least a "small but significant and non-transitory increase in price" ("SSNIP") above prevailing price levels.  The SSNIP is normally taken to be 5% of the prevailing price.  Put simply, the HMT asks whether the complete elimination of competition among suppliers of products in the candidate market would cause prices to target customers to rise by at least 5%.

I have applied the HMT to the candidate market consisting of the sale and distribution of consumable office supplies to large customers in the United States.  For the reasons given below, this candidate market easily satisfies the HMT and thus qualifies as a relevant antitrust market.

The key point regarding the HMT in this case is that the candidate market includes *all* modes by which large customers obtain their consumable office supplies.  The candidate market includes purchases made from the customer's primary vendor, purchases made from other distributors, purchases made directly from manufacturers or from wholesalers, purchases made at retail stores, and online purchases.  By including all modes of distribution in the candidate market to which we apply the HMT, we are effectively starting with the assumption that all of these modes are reasonable substitutes.  For example, we are starting with the assumption that large customers consider purchasing consumable office supplies at retail stores to be a reasonable substitute for purchasing them through their primary vendor, despite the fact that the primary vendor provides a valuable array of services not available with retail purchases, and despite the fact that the retail price is typically well above the primary vendor's price.  In this important sense, the candidate

PX06100-013

CONFIDENTIAL MATERIAL

market is quite broad.  A narrower market, e.g., one that excludes retail and online purchases, might well also satisfy the HMT.[33]

Because the candidate market includes all modes by which large customers obtain their consumable office supplies, the hypothetical monopolist is by definition a monopolist with absolute control over the provision of consumable office supplies to large customers in the United States.  This being the case, the HMT is asking whether current prices for consumable office supplies are at least 5% below the *monopoly* price for those items.

Since the hypothetical monopolist, by definition, controls all sources of supply to large customers, it would *not* have to worry that raising prices would cause large customers to switch to other suppliers of consumable office supplies: by definition, there are none.  Therefore, any real-world price *reductions* that resulted from competition among distributors, including competition between Staples and Office Depot, but also competition from W.B. Mason, HiTouch, and all other smaller distributors, would be reversed by the hypothetical monopolist.

Staples and Office Depot themselves have argued that competition among distributors of office supplies is "fierce," and that Staples lowers prices, increases discounts, and offers other incentives in response to competition from other distributors of office supplies.[34]  Staples has further argued that large customers are especially adept at harnessing the benefits of competition to obtain lower prices.[35]  To the extent these statements are true, they imply that the complete elimination of that competition would lead to a significant price increase to large customers, which in turn implies that the HMT is satisfied.

I emphasize below that many large customers have played Staples and Office Depot off against each other to obtain significant discounts for their consumable office supplies.  There is extensive evidence that competition between Staples and Office Depot has forced them to reduce their prices to win the business of large customers.[36]  This tells us that a *monopoly* provider of consumable office supplies would charge significantly more to large customers than Staples and Office Depot today charge these same customers.  This in turn implies that the candidate market satisfies the HMT and qualifies as a proper relevant antitrust market.[37]

---

[33] In such a narrower market, Staples and Office Depot would have higher market shares, so any concerns that their proposed merger would harm competition that are based on market shares would become more pronounced.

[34] PX0011, at 011-012, 016-017 (Office Depot, Letter from M. Reilly (Simpson Thacher) to FTC Commissioners, December 4, 2015); see also PX04628, at 003-004 (Staples, Answer to Complaint, December 22, 2015); PX0010, at 028-032 (Staples, Presentation to the FTC on Competition for "National" Commercial Customers, July 14, 2015).

[35] PX0010, at 078 (Staples, Presentation to the FTC on Competition for "National" Commercial Customers, July 14, 2015); PX0008, at 009, 020 (Presentation by Respondents, "Staples' Proposed Acquisition of Office Depot," January 4, 2016 Scheduling Conference, FTC Docket No. 9367).

[36] See for example, ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████ .

[37] The fact that total use of consumable office supplies has declined in recent years does not alter this conclusion. Monopoly power is of concern in all markets, including those experiencing declining demand.  Americans are using less gasoline than in the past (as regulations force our vehicles to become more fuel efficient), but a monopoly

PX06100-014

CONFIDENTIAL MATERIAL

All of this evidence indicates that the sale and distribution of office supplies to large customers in the United States satisfies the hypothetical monopolist test.  Appendix D provides some additional analysis that further supports this conclusion.

### E.  Why This Bundle of Items?

Staples has asserted that "The FTC's Market Definition is Not Consistent with Market Reality," that this "market definition defies common sense," and that it is "an unsustainable gerrymandered definition specifically designed to generate higher market shares."[38]  In support of these sharp assertions, Staples points out that the bundle of individual items included in the relevant market does not include ink and toner cartridges, yet large customers often include these items in the same RFPs that they issue for consumable office supplies.  Staples also asserts that the industry participants do not consistently use the term "consumable office supplies" in the same way that this term is used in the FTC's market definition.

I have considered these objections to the relevant market just described, and in my opinion they lack merit as a matter of economics.  First and foremost, the whole idea of a cluster market is to measure market shares for a collection of individual items *for which competitive conditions are similar*.[39]  This point can be illustrated using my example involving shoes of different sizes.  Extending that example, suppose that Firms A and B, who are proposing to merge, are the only firms that manufacture dress shoes, with each having a 50% share in the production of dress shoes.  Suppose that Firms A and B also make hiking boots, where they compete against Firms C and D, who specialize in making hiking boots and lack the expertise necessary to make dress shoes.  Suppose that Firms A and B each has a 10% share in the production of hiking boots, while Firms C and D each has a 40% share in the production of hiking boots.  A merger between Firms A and B would be merger to monopoly in the market for dress shoes, but would be unlikely to be anti-competitive in the market for hiking boots.  This is true even if the same retailers who buy dress shoes from Firms A and B also buy boots from them.  Looking at the market for dress shoes does not involve "an unsustainable gerrymandered definition specifically designed to generate higher market shares."  Rather, separating out dress shoes from boots, defining a relevant market for dress shoes, and measuring market shares for dress shoes allows for an analysis that more accurately reflects business reality.[40]

---

supplier of gasoline to American motorists would still raise prices substantially above their current levels, and a merger between two major suppliers of gasoline could well be anti-competitive.

[38] PX0008, at 010 (Presentation by Respondents, "Staples' Proposed Acquisition of Office Depot," January 4, 2016 Scheduling Conference, FTC Docket No. 9367).

[39] The alternative in this case to a cluster market would involve literally tens of thousands of markets for the distribution of individual items.  That approach would add immense complexity and shed little if any additional light on the matter.

[40] Of course, it is possible that Firms C and D, who specialize in making boots, might incur the investments necessary to begin making dress shoes after the merger if the merger leads to an anti-competitive increase in the price of dress shoes.  However, that question is properly addressed as part of the analysis of *entry* into the market for dress shoes, not by aggregating the distinct markets for dress shoes and hiking boots.  Combining those two markets would cause errors by yielding misleadingly low market shares for Firm A and B.

PX06100-015

Returning to the case at hand, dress shoes in my example correspond to consumable office supplies, hiking boots correspond to ink and toner cartridges, and suppliers of Managed Print Services ("MPS") correspond to the firms specializing in making hiking boots.[41]  Staples may well be correct that Staples' and Office Depot's market shares in the distribution of ink and toner cartridges are smaller than their shares in the distribution of consumable office supplies, but that merely directs our attention to the area of greater concern, namely the collection of items defined here as "consumable office supplies."  The presence of additional competitors in the distribution of ink and toner cartridges does not obviate competitive concerns in the market for the sale and distribution of consumable office supplies sold to large customers.

Staples also points out that Staples and Office Depot often offer volume discounts to large customers based on the *total* purchases made by the customer, not just the customer's purchases of consumable office supplies.  This fact makes it more difficult to accurately measure the prices that Staples and Office Depot charge to large customers for consumable office supplies, but it does *not* imply that the other items purchased by large customers can properly be aggregated together with consumable office supplies for the purpose of defining the relevant market and measuring market shares.  To see why, suppose that Airlines A and B are the only carriers offering air service between City X and City Y, and assume that other modes of transportation are not reasonable substitutes for air service.  We would certainly be concerned about a merger between Airlines A and B, since this would be a merger to monopoly on the route between City X and City Y.  Now suppose we learn that Airlines A and B have generous frequent flyer programs, so the effective price a carrier charges to a customer depends on how much that customer flies on that carrier on *all* of the carrier's routes.  These frequent flyer programs would complicate the measurement of the fares charged on the route between City X and City Y, but they would *not* imply that the merger should be analyzed using a broader relevant market including all of the routes on which these two carriers fly.  Doing that would lead us to measure far lower market shares for Airlines A and B, which would fail to reflect the loss of competition, indeed the merger to monopoly, on the route between City X and City Y.

Returning to the case at hand, the fact that Staples and Office Depot offer volume discounts to large customers based on those customers' total purchases, including, say, purchases of janitorial and sanitation products, does not imply that these other products belong in the relevant market.[42]

## 4.  Market Shares

This section reports estimated market shares in the relevant market just defined.  My primary estimate of market shares is based on data provided by the Fortune 100 companies.  Corroborating evidence comes from data obtained from a number of the firms that distribute consumable office supplies to large customers.

---

[41] Looking further afield, hiking boots might also correspond to the distribution of janitorial and sanitation products, break room supplies, furniture, or office equipment to large customers.

[42] This same conclusion can also be reached by applying the hypothetical monopolist test.  In my airline example, the presence of frequent flyer programs does not affect the conclusion that there is a relevant market for air service between City X and City Y.

PX06100-016

CONFIDENTIAL MATERIAL

While the data available in this case do not make it possible to measure market shares with absolute precision,[43] the available data lead me to conclude that the combined market share of Staples and Office Depot is at least 79%.  My opinion regarding the likely competitive effects of the proposed merger does not hinge on the precise market shares of Staples and Office Depot.

## A. *Market Shares Based on Data from Fortune 100 Customers*

The FTC has made available to me data from the Fortune 100 companies regarding their purchases of consumable office supplies.  These data are based on responses to Civil Investigative Demands ("CIDs") issued by the FTC.  Appendix E describes these CID responses and explains how they were used to estimate the purchases from the various suppliers of consumable office supplies made by Fortune 100 companies.  As noted in Appendix E, while these data are imperfect, in part because they do not cover all large customers, there is no reason to believe they are biased when it comes to estimating the market shares of Staples and Office Depot.

### 1.  Purchases Reported by Fortune 100 Companies

The first column of numbers in Exhibit 5A reports the total purchases of consumable office supplies by Fortune 100 firms based on the CID responses described in Appendix E.  The remaining columns report purchases of consumable office supplies these firms made from Staples and Office Depot based on data from Staples and Office Depot.  For each Fortune 100 customer listed, Exhibit 5A also reports the share of its consumable office supplies that it purchased from Staples and from Office Depot.  To illustrate, the first Fortune 100 customer listed, ▮▮▮▮▮▮▮, purchased $33.2 million of consumable office supplies in total in 2014, of which it purchased $29 million, or 87%, from Staples.  Staples and Office Depot account for the lion's share of purchases at many of the Fortune 100 companies.  As shown near the bottom of Exhibit 5A, these Fortune 100 customers together report that they purchased 81% of their consumable office supplies from Staples and Office Depot.

### 2.  Best Estimate of Market Shares

Exhibit 5B reports my best estimate of market shares in the market for the distribution of consumable office supplies to large customers in the United States.  Exhibit 5B is derived from the same data used to produce Exhibit 5A.  As shown in Exhibit 5B, Staples has a market share of 47.3% and Office Depot has a market share of 31.6%, for a combined market share of 79%.  These figures very likely *underestimate* the true market shares of Staples and Office Depot in the relevant market, for reasons detailed in in Appendix E.  For example, a portion of the $22.2 million sales reported by ▮▮▮▮ likely represents specialty paper for professional printing

---

[43] The ability of antitrust economists to measure market shares is normally imperfect.  Market shares are often measured by third parties based on surveys of suppliers or customers.  These third parties often have little ability to verify the accuracy of the survey responses.  Furthermore, some suppliers and/or customers may either not be surveyed or may fail to respond to the survey.

PX06100-017

CONFIDENTIAL MATERIAL

(which is not in the relevant market), not copy paper used in an office setting (which is included in the relevant market).[44]

Notably, Exhibit 5B includes not only the *reported* purchases of consumable office supplies by Fortune 100 companies, but also an estimate of unreported "leakage" in the form of discretionary employee purchases. This estimate of unreported purchases of consumable office supplies appears in the final row, which is labeled "Unreported leakage adjustment." Appendix E explains how this adjustment was made.

Several aspects of Exhibit 5B warrant commentary.

First, Staples and Office Depot are each far larger than any other supplier in the relevant market, as measured by purchases made by Fortune 100 customers. Office Depot, which is smaller than Staples in serving Fortune 100 companies, is still roughly six times as large as the next largest supplier. ▮▮▮▮ is a paper merchant that primarily sells a variety of paper, print, and packaging products.[45] If Staples is permitted to acquire Office Depot, the merged entity will then be about fifteen times as large as the next largest supplier.

Second, several companies listed right behind Staples and Office Depot in Exhibit 5B are paper suppliers. Paper alone constitutes a significant share of the total expenditures made by Fortune 100 companies on consumable office supplies. In a narrower cluster market for "core" (general) office supplies excluding paper, the market shares of Staples and Office Depot would be even larger than those shown in Exhibit 5B.

Third, many of the smaller, regional distributors of consumable office supplies are not listed in Exhibit 5B. Some do not serve Fortune 100 customers at all and others are included in the "OTHER-specified suppliers" row, where each has a share less than 0.1%. This reflects the fact that these distributors primarily serve small and medium businesses, and thus do not have meaningful sales to large customers. In part this is due to the fact that many large customers are geographically dispersed and thus prefer to purchase their consumable office supplies from a distributor with broad geographic coverage. In any event, to the extent that smaller, regional distributors sell to large customers, I have included those sales in my market share calculations.

Fourth, I considered whether Exhibit 5B overstates the market shares of Staples and Office Depot because the Fortune 100 companies are *especially* large customers. To test this hypothesis, I measured the market shares of Staples and Office Depot for the top half of the Fortune 100 companies reported in Exhibit 5A and separately for the bottom half. As shown at the bottom on Exhibit 5A, the combined share of Staples and Office Depot is 79% in the top half and 89% in the bottom half. This finding gives me confidence that the market shares for Staples and Office Depot reported in Exhibit 5B are not overstated.

### 3. Treatment of Leakage

While my staff has made every attempt to include all consumable office supply purchases reported by the F100 respondents, the data underlying Exhibits 5A and 5B are inevitably

---

[44] As explained in Appendix E, I included purchases from ▮▮▮▮ made by Fortune 100 companies unless I could positively confirm that these purchases represented specialty paper rather than copy paper.

[45] See PX08069, at 004 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

PX06100-018

CONFIDENTIAL MATERIAL

imperfect in that they do not include every single purchase of consumable office supplies made by Fortune 100 companies. Despite this, for reasons explained in Appendix E, I consider these market share estimates reliable, albeit underestimates of the shares of Staples and Office Depot. Importantly, none of my opinions would change if the market shares of Staples and Office Depot were somewhat lower than those shown in Exhibit 5B.

I have specifically studied whether these data overstate Staples' and Office Depot's market shares because they miss some discretionary retail purchases made by employees. Notably, the CID responses underlying Exhibits 5A and 5B indicate that such retail purchases comprise a very small portion of overall spending on consumable office supplies at Fortune 100 firms.[46]

Furthermore, for the purpose of estimating market shares, I consider it important that large customers have a strong incentive to discourage their employees from purchasing consumable office supplies at brick-and-mortar stores or online because the price they pay under their contracts is usually significantly below the retail price.[47] Exhibit 6A shows that in-store prices are ▮% higher than the contract prices paid by Staples' large customers.[48] Likewise, Exhibit 6B shows that online prices are ▮% higher than the contract prices paid by Staples' large customers. Exhibits 6C and 6D show that in-store prices are ▮% higher than the contract prices paid by Office Depot's large customers and that online prices are ▮% higher than the contract prices paid by Office Depot's large customers. Exhibits 6E and 6F show that in-store prices are ▮% higher than the contract prices paid by OfficeMax's large customers and that online prices are ▮% higher than the contract prices paid by OfficeMax's large customers.[49]

Reflecting the hefty price premiums that large customers pay when purchasing at retail, these customers report (a) that their policies aim to minimize retail purchases, and (b) that they believe that such purchases are a small portion of their overall spending on consumable office supplies.[50] In fact, large customers' RFP documents show that these customers actively seek help from their suppliers to ensure that their employees purchase under contract. For example, the ▮▮▮ RFP asks suppliers responding to the RFP to explain ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[46] See Appendix E for much more detail on this point.

[47] See for example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[48] To calculate this price gap, I used the item-by-item contract prices to compare what the same basket of SKUs would cost if large customers were paying the in-store price instead of their own contract price. I follow the same method to calculate the large-customer discount vis-à-vis online prices.

[49] Further bolstering this point, for many large customers the *marginal* price paid for consumable office supplies is less than the contract price due to volume discounts. So, the extra cost to the customer from purchasing at retail rather than through its contract would be even greater than these reported numbers.

[50] See for example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; PX03012 (Moise (Fifth Third Bank) Decl.) ¶ 9; PX03022 (O'Neill (AEP) Decl.) ¶ 7; PX03029 (Cervone (McDonald's) Decl.) ¶ 7; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; PX03013 (Wilson (Select Medical) Decl.) ¶ 17; PX03002 (Eubanks-Saunders (Bank of America) Decl.) ¶ 16; PX03009 (Meester (Best Buy) Decl.) ¶ 9; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. See ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ¶ 16. Also see ▮▮▮▮▮ detailed requirements for employees to purchase only products that appear in its ▮▮▮▮▮▮▮▮▮▮▮▮▮, from preferred suppliers. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

PX06100-019

████████████████████████████████████████████████ "[51] Likewise, the ████

RFP asks ████████████████████████████████████████████████████████████████

██████████████████████████████████ In 2013, Staples stated that

customers were doing a better job of controlling leakage.[53]

I am aware of assertions by Staples that leakage by large customers is "massive" and "rampant."[54] These assertions are inconsistent with the data from Fortune 100 customers and other evidence available to me regarding large customers' purchasing patterns.

To support its claim to the FTC that "leakage is particularly high for [Staples' and Office Depot's] largest 'national' customers," Office Depot performed an analysis based on an internal data tool known as PRISM ("PRISM Analysis").[55] I await clarification on just how Office Depot performed that analysis and how the underlying data should be interpreted. Based on the description and data provided to me thus far, I do not consider the methodology used in Office Depot's PRISM Analysis to be informative regarding leakage at these customers. I may amend my review if Office Depot provides additional information. See Appendix F for further details.

## B. Primary Vendor Relationships

The FTC also has made available to me sales data obtained from a number of distributors of consumable office supplies who responded to CIDs and voluntary requests issued by the FTC. Appendix G describes these data and provides further details regarding my calculations using the data from these CIDs.

Exhibit 7 reports "primary vendor relationships," which are defined to be supplier/customer pairs involving the sale of at least $500,000 of consumable office supplies in 2014. By definition, all customers involved in a primary vendor relationship are large customers. However, some large customers may have multiple primary vendor relationships, or none. See Appendix G for further details. The sales a supplier makes through its primary vendor relationships, as reported in Exhibit 7, are a good measure of how successful that vendor has been at winning RFPs covering consumable office supplies at large customers.

Purchasing data from Fortune 100 customers indicate that primary vendor relationships are indeed a common procurement practice among large customers. Based on the same data used to calculate the market share in Exhibit 5B, the average share of the customer's purchases that went to the single largest vendor at each customer is 78%. Further, examination of Fortune 100 data indicates that sales to a customer by the largest supplier typically far exceed sales by the next largest one when another supplier is present. Exhibit 8 compares purchases from Staples

---

[51] PX04484, at 046-047 (████████████████████████████████).

[52] PX04475, at 023 (Staples, ████████████████████████████████████████).

[53] PX05408, at 021 (Office Depot, Staples Q2 2013 Earnings Call Transcript, August 21, 2013).

[54] PX0011, at 001-002, 008-009 (Office Depot, Letter from M. Reilly (Simpson Thacher) to FTC Commissioners, December 4, 2015).

[55] PX0011, at 003 (Office Depot, Letter from M. Reilly (Simpson Thacher) to FTC Commissioners, December 4, 2015).

PX06100-020

CONFIDENTIAL MATERIAL

and Office Depot, who are by far the most common primary vendors, to the supplier from which each customer makes the next largest amount of purchases. Of the 81 customers reviewed in Exhibit 8, only 7 report another vendor that captures more than half as much as the volume bought from Staples and Office Depot combined.

I refer to the shares reported in Exhibit 7 as "primary vendor relationship shares." These primary vendor relationship shares are highly informative about competition between Staples and Office Depot in the relevant market and about the likely competitive effects of the proposed merger. Exhibit 7 leaves no doubt that Staples and Office Depot together dominate when it comes to winning RFPs covering consumable office supplies issued by large customers in the United States. Staples and Office Depot are overwhelmingly more successful than any other supplier at winning these RFPs. Staples has a primary vendor relationship with 587 large customers, and Office Depot has a primary vendor relationship with 539 large customers. In sharp contrast, the next two largest firms, ▮▮▮ and ▮▮▮, have primary vendor relationships with 38 and 15 large customers, respectively. ▮▮▮▮ is the only other supplier that has a primary vendor relationship with more than ten large customers, and the vast majority of the other suppliers of consumable office products have primary vendor relationships with no more than two customers.

While I consider the shares reported in Exhibit 7 to be highly informative regarding the competitive significance of different suppliers and regarding competitive effects, my best estimates of market shares are those in Exhibit 5B, not those in Exhibit 7. There are two principal reasons for this: (1) the sales reported in Exhibit 7 do not account for leakage, and (2) certain measurement difficulties arise for large customers who split their spending among two or more vendors, as explained in Appendix G.

### C. Market Concentration and HHIs

Exhibit 5C reports the Herfindahl-Hirschman Index (HHI), which is the sum of the square of the shares of all the firms. Exhibit 5C is based on the market shares shown in Exhibit 5B.

According to Section 5.3 of the Horizontal Merger Guidelines, a market with an HHI of greater than 2500 is considered highly concentrated, and a merger that involves an increase in the HHI of more than 200 points and leads to a highly concentrated market is presumed to be likely to enhance market power.

As shown in Exhibit 5C, the merger between Staples and Office Depot will cause the HHI to go up by 2994, from 3270 to 6265. The market is already highly concentrated, and the increase in the HHI resulting from the merger vastly exceeds the 200 points that triggers a presumption of harm to competition under the Horizontal Merger Guidelines. The same basic point can be seen more easily and more directly simply by observing that Staples has a market share of 47%, Office Depot has a market share of 32%, and their combined market share will be 79%.

The current structure of the relevant market is what industrial organization economists call a "duopoly with a competitive fringe." Staples and Office Depot are the duopolists, and the smaller distributors and other suppliers form the "competitive fringe," a term connoting that these smaller suppliers (unlike the duopolists) lack any significant market power. If Staples is allowed to acquire Office Depot, the new market structure would be that of a dominant firm with a competitive fringe.

Page 19

CONFIDENTIAL MATERIAL

### D. Possible Alternative Method of Measuring Market Shares

In measuring market shares above, I have sought to include as market participants all firms that distribute consumable office supplies to large customers in the United States and to measure the shares of these firms based on their actual sales of consumable office supplies to large customers. In this respect, I am following Sections 5.1 and 5.2 of the Horizontal Merger Guidelines.

For the purpose of measuring market shares, I follow Section 5.2 the Horizontal Merger Guidelines, which states: "The Agencies measure market shares based on the best available indicator of firms' future competitive significance in the relevant market." I strongly agree with this principle. Section 5.2 of the Horizontal Merger Guidelines goes on to state:

> When the Agencies define markets serving targeted customers, these same principles are used to measure market shares, as they apply to those customers. In most contexts, each firm's market share is based on its actual or projected revenues from the targeted customers. However, the Agencies may instead measure market shares based on revenues from a broader group of customers if doing so would more accurately reflect the competitive significance of different suppliers in the relevant market.[56]

Following Section 5.2 of the Horizontal Merger Guidelines, I have considered whether the competitive significance of suppliers in selling consumable office supplies to large customers would be more accurately reflected by measuring market shares based on some broader set of revenues. I have specifically considered using sales of consumable office supplies to a broader group of customers, either all B2B customers in the United States, regardless of their size, or all sales of consumable office supplies in the United States, including retail sales, and using sales to large customers of some broader group of products. I now explain why I do *not* believe such measures would be superior to the one reported above for the purpose of assessing the current and future competitive significance of various suppliers in the relevant market.

There is considerable evidence that large customers have more stringent requirements than do smaller customers. As noted above, large customers typically require customized catalogs and electronic ordering systems, technology interfaces between their procurement software and the supplier's processing and fulfillment systems; regular reporting from the supplier about employee purchasing patterns and spend; and prompt delivery (often next-day) to any of the customer's locations in the continental United States. To meet these needs, distributors serving large customers require access to a distribution network capable of efficiently handling a large volume of orders and promptly servicing all of the customers' locations, as well as a robust, automated invoicing system capable of tracking and reporting customer ordering patterns.

Likewise, there is considerable evidence that the suppliers who have small shares of the sale of consumable office supplies to large customers generally lack some of the capabilities necessary to meet the needs of large customers: this is *why* their shares are so small. Smaller distributors also lack the scale necessary to offer prices that are competitive with Staples and Office Depot

---

[56] PX08051, at § 5.2 (Horizontal Merger Guidelines).

PX06100-022

CONFIDENTIAL MATERIAL

and the geographic reach that many large customers are seeking.[57]  The market shares reported above in Sections 4.A and 4.B usefully reflect the disadvantages faced by smaller, regional distributors, relative to Staples and Office Depot, when competing to serve as the primary vendors for large customers.  These disadvantages are substantial, despite the fact that these smaller distributors have available the services provided by national wholesalers.  I discuss these competitive disadvantages further below.

For all of these reasons, it is likely that a supplier who primarily sells consumable office supplies to smaller customers currently is not as capable as Staples and Office Depot at distributing consumable office supplies to large customers.  The competitive significance of such a supplier in the relevant market would likely be overstated if its market share were calculated based on its sales of consumable office supplies to smaller customers or to retail consumers.  See Appendix H for further details.

Likewise, the competitive significance of a supplier who primarily distributes other products, and who has enjoyed limited success selling consumable office supplies to large customers, would be greatly overstated if its market share were calculated based on its sales of other products such as janitorial and break room supplies.  In addition to the points made above, such suppliers lack the scale as buyers of consumable office supplies needed to obtain input costs comparable to those obtained by Staples and Office Depot.  See Appendix H for further details regarding these suppliers.

In sum, measuring market shares based on sales of consumable office supplies to large customers, as I have done, is superior to measuring market shares based on some broader measure of revenues.

## 5.  Unilateral Competitive Effects

Unilateral competitive effects refers to adverse competitive effects from a merger arising simply because the merger eliminates competition between the two merging parties.  The classic unilateral competitive effect comes in the form of higher prices than would otherwise prevail, but unilateral effects can encompass any change that harms customers, such as reduced product quality or variety, or diminished service.

The use of the word "unilateral" reflects the central idea that the merged entity will act *on its own*, not in coordination with its remaining competitors.  Unilateral *price* effects arise if the merged entity would – acting on its own – charge higher prices than the merging firms would have charged, had the merger not taken place.  Unilateral effects stand in contrast to "coordinated effects," which refers to adverse competitive effects arising from a merger because the merged entity coordinates – i.e., competes less vigorously – with its remaining competitors.[58]

---



[57]

[58] See PX08051, at § 7 (Horizontal Merger Guidelines).

PX06100-023

CONFIDENTIAL MATERIAL

The analysis of unilateral competitive effects in this section assumes that the post-merger competitors to the merged entity are today's competitors to Staples and Office Depot.  The possibility that entry by new firms or expansion by existing market participants will protect customers from unilateral competitive effects is considered below in Section 6.  Likewise, the analysis of unilateral competitive effects in this section does not account for any merger-specific efficiencies.  I address possible merger efficiencies below in Section 7.

## A. Mergers in Bidding Markets: Economic Principles

Section 6.2 of the Horizontal Merger Guidelines explains how to analyze unilateral competitive effects in situations where suppliers compete by bidding for the patronage of individual customers.  This is the predominant form of competition in the market for the distribution of consumable office supplies to large customers in the United States.  My analysis of unilateral effects builds on this "bargaining and auctions" framework.[59]

Section 6.2 of the Horizontal Merger Guidelines further states:

> Anticompetitive unilateral effects in these settings are likely in proportion to the frequency or probability with which, prior to the merger, one of the merging sellers had been the runner-up when the other won the business.  These effects also are likely to be greater, the greater advantage the runner-up merging firm has over other suppliers in meeting customers' needs.[60]

I follow this analytical framework, which is well grounded in the theory of bidding, auctions and procurement.  Following this framework, the magnitude of unilateral competitive effects in the current case depends upon:

- **Extent of Head-to-Head Competition**: the share of large customers for whom Staples and Office Depot are the first- and second-choice suppliers of consumable office supplies;

- **Competitive Advantage**: for those customers, the competitive advantage between the runner-up (Staples or Office Depot) and the next-best supplier.[61]

As noted above, some large customers avoid the formal RFP process and simply negotiate a contract renewal with their incumbent supplier.  In these cases, the incumbent supplier still faces competition, because it is understood that the customer can and will open up its business to other vendors if it is not satisfied with the terms and conditions offered by the incumbent.  As a

---

[59] As noted above, customers are not required to purchase all of their consumable office supplies from the winner of the bidding competition, and indeed there is some "leakage," meaning off-contract purchases.  Customers also sometimes obtain price concessions from suppliers with whom they have contracts by threatening to make off-contract purchases.  Furthermore, customers may renegotiate to renew their contract with their incumbent supplier without opening up their business to a formal bidding process.  As a result, the bargaining and auctions framework used below, while highly informative, does not fit this market perfectly.

[60] PX08051, at § 6.2 (Horizontal Merger Guidelines).

[61] This competitive advantage can come in the form of the next-best supplier having higher costs and/or offering a less attractive proposition for the customer in question, e.g., due to its limited geographic scope or inferior service capabilities.

PX06100-024

general economic principle, when Staples is negotiating a contract renewal with a large customer, Staples will have an incentive to offer lower prices and more favorable terms and conditions, the more attractive is that customer's next-best option.  If Office Depot is this customer's second choice, the merger, by eliminating Office Depot as a rival, may well allow Staples to obtain a higher price from this customer, especially if the remaining choices, e.g., smaller, regional distributors, are significantly less attractive to the customer.  This logic explains why the basic economic framework that I am using applies not only to customers who employ a formal RFP process, but also to customers who negotiate contract renewals with their incumbent supplier and do not issue an RFP or reach the point of negotiating with other vendors.

My analysis here focuses on how Staples and Office Depot and other distributors compete to serve as the primary vendor for large customers.  In reaching my conclusions, I have taken into account the fact that large customers can and do purchase some of their office supplies outside of the contract, so the supplier that wins the RFP may not be the sole supplier of consumable office supplies for that customer.  The key points for my analysis in this respect are (a) that leakage is a small portion of the purchases made by large customers, and (b) that primary vendors and large customers both have an incentive to control leakage.  The primary vendor wants to control leakage to retain as much of the customer's business as possible, and the customer wants to control leakage because many off-contract purchases made by employees involve higher prices than are available under the contract.  Furthermore, by adjusting its signing bonus, bonus clawback provisions, contract prices, and volume discounts, a post-merger Staples, serving as the primary vendor for a large customer, can discourage leakage by raising its average price by more than its marginal price.  This pricing strategy, which does not require any departure from the pricing structure already used by Staples and Office Depot, can significantly harm customers while inducing little or no incremental leakage.

Section B immediately below shows that there is extensive head-to-head competition between Staples and Office Depot.  Section C then presents evidence showing that Staples and Office Depot have a substantial competitive advantage over other suppliers in serving large customers.  Together, the evidence presented in these two sections strongly indicates that large customers are likely to be significantly harmed by the loss of competition between Staples and Office Depot.

## B. Head-to-Head Competition between Staples and Office Depot

Several types of evidence indicate that Staples and Office Depot frequently compete directly against each other to be the primary vendor of consumable office supplies for large customers in the United States.

### 1. Primary Vendor Relationship Shares

The primary vendor relationship shares reported above, in Exhibit 7, provide a strong indication that many large customers in the United States find Staples and Office Depot to be the two most capable and attractive firms to serve their needs regarding the distribution of consumable office supplies.

A common approach taken by economists is to assume that the frequency with which a given firm wins bids is proportional to the frequency with which that firm is a runner-up when it does not win.  This is a reasonable working assumption unless there is evidence indicating that the products offered by some firms are especially close to or distant from those offered by others.

PX06100-025

CONFIDENTIAL MATERIAL

As shown in Exhibit 7, Staples' primary vendor relationship share is 43% and Office Depot's primary vendor relationship share is 45%.  Their combined primary vendor relationship share of 88% is extremely high and strongly suggests that their merger will lead to adverse unilateral competitive effects in the bidding to serve as primary vendor.  Applying the method just described indicates that Office Depot is the runner-up to be the primary vendor for 82% (45/55) of sales made to the large customers who pick Staples as their primary vendor.  Likewise, this method indicates that Staples is the runner-up to be the primary vendor for 75% (43/57) of sales made to the large customers who pick Office Depot as their primary vendor.  In my experience analyzing win-loss data in horizontal mergers, these are overwhelmingly large numbers and strongly indicative of adverse unilateral competitive effects.

### 2. Staples and Office Depot Documents

Staples and Office Depot both recognize that the other is frequently their most important rival in bidding to be the primary vendor of consumable office supplies for large customers.[62]  Here are a few examples of documents that reflect this recognition:



- A July 2013 Staples email states: "███████"[63]  A related email ██████████████████ shows the incumbent at each of the 2013 Fortune 100 companies. ████████ shows that Staples was the incumbent at █ of the Fortune 100 companies and Office Depot and OfficeMax were the incumbents at █.[64]

- A November 2013 Staples presentation (made around the time of the Office Depot-OfficeMax merger) urges the team to: "Act like the dominant player we are in a 2 player OP [Office Products] market."[65]

- A November 19, 2013 ████████████████████████████████████████ ████████████████████████████████████████████ ██████████"[66]

- A November 2013 Office Depot email discussing ████████████ after the Office Depot OfficeMax merger states: "you would think they seriously have to consider us more than ever, since it's us an [sic] Staples now..[.]  The big two."[67]

- A March 2014 Office Depot email discussing strategy with respect to ████████ states:

---

[62] As explained above, the vast majority of large customers would be classified as enterprise customers by Staples and Office Depot.

[63] PX04129, at 001 (████████████████████████████ July 10, 2013).

[64] PX04429 (████████████████████████ July 3, 2013); PX04429_native ████████████ ████████).

[65] PX04042, at 024 ████████████████████ ████████████████████████, November 10, 2013).

[66] PX04304, at 010 (████████████████████████████ November 19, 2013).

[67] PX05311, at 001 (████████████████, November 20, 2013).

PX06100-026

CONFIDENTIAL MATERIAL

At a high level our strategy is to attempt to help ████████ see with the merger they will be moving into our Enterprise team with a full national/international network around their business.  Though we hear they will not consider a renewal proposal we are going to try anyway.  We are having great success with this due to the fact that there are only 2 primary players in the Enterprise space.[68]

- In a May 2014 

"

- An October 2014 Office Depot email discussing a special paper order states:

[T]his is an extremely critical project for a ████████ dollar enterprise customer. They are going out to bid possibly in the next month and we are actively engaged to keep them from going to bid. This project is being closely scrutinized by ████ ████████ management team and this is our opportunity to shine.  Please do not be shy in asking your management team for help in getting responses from distributors – we have to help the customer get the product they need by the 31st. The only other vendor that can do it is Staples, and we obviously can't give this business to them.[70]

- A January 12, 2015 ████████

.

- In an August 2015 Investigational Hearing, ████████

.

These statements are hardly surprising given the primary vendor relationship shares reported above.  I consider them corroborative of my quantitative analysis.

### 3. Evidence from Large Customers

Many large customers confirm that Staples and Office Depot are their top two choices as primary vendors of consumable office supplies.  Some large customers state that Staples and Office



---

[68] PX05250, at 003 (Office Depot, Email chain re ████████, ████████).

[69] PX04625, at 013 (████████).

[70] PX05313, at 007-008 (Office Depot, Email chain re ████████).

[71] PX05039 (████████ January 12, 2015).

[72] PX02002 ████████) at 153-154.

PX06100-027

CONFIDENTIAL MATERIAL

Depot are the only vendors who are qualified to serve this role.[73]  Here are a few illustrative examples.



- In April 2014,

- Prior to the Office Depot OfficeMax merger,

- A ▮▮▮▮▮ declaration explains that:

---

[73] See for example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .
[74] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[75] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[76] ▮▮▮▮▮▮ (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[77] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[78] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[79] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[80] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

PX06100-028

CONFIDENTIAL MATERIAL



- A ▮▮ declaration states:

- A Fifth Third Bank declaration describes its 2013 RFP evaluation as follows:

  Office Depot was FTB's incumbent consumable office supplies vendor at that time. FTB invited Staples, Office Depot, and OfficeMax to participate in the RFP. FTB invited these three vendors because they have the key attributes we need in a consumable office supplies vendor.[83]

  This Fifth Third Bank declaration then provides a detailed description of the seven attributes that Fifth Third Bank needs in a consumable office supplies vendor: broad geographic footprint, attractive pricing, speedy and reliable delivery, customer service, broad product selection and IT capabilities that can interface with its own procurement platform.[84]

Of course, I recognize that suppliers other than Staples and Office Depot sometimes bid to serve as the primary vendor for large customers, and in some cases are the winning bidder. However, the 12% primary vendor share achieved by suppliers other than Staples and Office Depot, as shown in Exhibit 7, supports the conclusion that these other suppliers are at a competitive disadvantage relative to Staples and Office Depot.

---

[81] ▮▮▮▮▮▮▮▮▮▮▮▮▮

[82] ▮▮▮▮▮▮ ▮▮▮▮▮▮

[83] PX03012 (Moise (Fifth Third Bank) Decl.) ¶ 5.

[84] PX03012 (Moise (Fifth Third Bank) Decl.) ¶ 5.

Page 27

PX06100-029

CONFIDENTIAL MATERIAL

Data submitted by Fortune 100 customers regarding their RFPs show substantial head-to-head competition between Staples and Office Depot.[85]  Consistent with customer statements, Staples and Office Depot are the only competitors identified in 63% of these reported RFPs.  As shown in Exhibit 9A, Staples is present as a competitor in all 43 reported opportunities, and Office Depot is present in 38 of them (88.4%).  No other bidder is present in more than 3 of these opportunities (7.0%).  Exhibit 9B shows that Staples won 100% of all the reported RFPs lost by Office Depot, and Office Depot won 91% of all the reported RFPs lost by Staples.[86]

#### 4. Staples and Office Depot Win-Loss Data

Staples and Office Depot each provided win-loss data on formal and non-formal RFPs relating to consumable office supplies.[87]  Both datasets include information on the incumbent and the winning bidder.  Office Depot's data also contain names of other participating bidders.  Based on these data, I am able to measure the extent of head-to-head competition between Staples and Office Depot in responding to sales opportunities at large customers relating to consumable office supplies.  I can measure this head-to-head competition in both directions: (a) the frequency with which Office Depot was a bidder or winner at customers where Staples was the incumbent or bidder; and (b) the frequency with which Staples was a bidder or winner at customers where Office Depot was the incumbent or bidder.  These data show very substantial direct competition between Staples and Office Depot.  Each of the two merging firms competes with the other, and loses to the other, at a level that dwarfs all other competitors.

Exhibit 10 is based on Office Depot's win-loss data.  Looking at the first two columns in Exhibit 10, we see that Staples is mentioned as a competitor in 66.5% of the bids – 833 out of 1253.  The

---

[85] Sixty-two of the Fortune 100 companies provided some response regarding their RFPs.  Of these, 43 provided information on bidders for RFP events in 2012-2015.  I may update my analyses to incorporate any Fortune 100 responses that have become available since my analyses were completed.

[86] My analyses focuses on the most recent bid for each customer's business, excluding bids that did not involve consumable office supplies.  Diversity supplier bids partnered with Staples or Office Depot are treated as being bids from Staples or Office Depot.  See Appendix H for further details on diversity suppliers.

[87] Staples provided data for bid opportunities (a) involving consumable office supplies and toner that were valued at $1M or larger, as well as (b) bid opportunities at 2014 Fortune 100 companies.  My analysis excludes the handful of bids that did not involve consumable office supplies and treats diversity supplier bids partnered with Staples or Office Depot as being bids from Staples or Office Depot.  See Appendix H for further details on diversity suppliers.

In response to Specification 21 of the FTC's second request, Office Depot extracted data going back to 2013 from its Salesforce database and provided a processed version of that data in <Specification 21.xlsx>.  My analysis focuses on the subset of these data involving consumable office supplies.  As a proxy for large customers, I use Office Depot's designations of customers in the Enterprise ($1M+) and Major ($500K-$1M) segments, as well as customers in the Higher-Ed segment with opportunities valued at $500K or more.  I generally assume that any entries with the same customer and a similar set of products that occurred within a 90-day period are references to the same sales opportunity and I exclude such duplicates from my analysis.  However, I make an exception if an entry lists a unique incumbent or winner that conflicts with the other opportunities for the same customer within the 90-day timeframe.  My conclusions would not change if I treated each entry in the data as representing a unique sales opportunity.

PX06100-030

next most frequent bidders are ███████, which appears in 10.5% of the bids, and then ███████████), which appears in 2.6% of the bids. No other bidder appears in more than 0.7% of the bids, i.e., 9 bids out of the 1253 bids reported.

The results are even more striking when one looks at Staples' appearances in Office Depot's win-loss data as a winner or as the incumbent, as shown in the remaining columns of Exhibit 10. These metrics give the best sense of who customers view as Office Depot's strongest competition, because they identify the distributors that customers have actually chosen to provide their consumable office supplies. Staples appears as a winner in 240 of the 1253 bids (19.2%), far more than the next most successful firm, ███████, which appears as the winner in only 18 of the 1253 bids (1.4%). Indeed, all other competitors combined won only 79 of the 1253 bids (6.3%) of the bids, a far smaller percentage than Staples. Likewise, Staples appears as the incumbent in 427 of the 1253 bids (34.1%), far more than the next most successful firm, ███████, which appears as the incumbent in only 28 of the 1253 bids (2.2%).

Exhibit 11 shows similar results using Staples' win-loss data. Office Depot is a winner in 142 of the 393 bids reported (36.1%). Next comes ███████, which is the winner in 20 of the 393 bids (5.1%). No other bidder won more than 4 of the 393 bids reported by Staples and all competitors combined won only 55 of the 393 bids (14.0%) of the bids. A similar pattern can be seen for appearances as an incumbent.

The parties' win-loss data also allow me to examine customer *transitions* between different consumable office supply distributors. Exhibits 12 shows the relationship between the incumbent and the winner for opportunities in the win-loss data, with each row representing an incumbent supplier and each column signifying the ultimate winner. The rows sum to 100%. So, for example, reading across the first row, in reported bidding situations where Office Depot was the incumbent, Office Depot was the winner 84.3% of the time, Staples was the winner 12.3% of the time, and another supplier was the winner 3.4% of the time.[88] Likewise, Exhibit 13 shows that when Office Depot loses a customer, 78.1% of those losses go to Staples and only 21.9% go to another supplier.

Exhibit 14 shows a similar pattern based on win-loss data from Staples. Exhibit 14 reports customer transitions, just like Exhibit 12, and should be read in the same manner. The ██% figure in the middle of Exhibit 14 shows that Staples retains ██% of its customers for whom bidding opportunities are reported.[89] Exhibit 15 shows that when Staples does lose a customer, ██% of those losses go to Office Depot.

---

[88] The ██% reported rate at which Office Depot wins when it is the incumbent is far higher than the ██% reported rate at which Staples wins when it is the incumbent. This asymmetry most likely reflects the fact that Office Depot's sales team is less likely to track Staples customers who retained Staples than it is to track Office Depot customers who retained Office Depot.

[89] ████████████████████████████████████████

See Exhibits 16A.

Page 29

CONFIDENTIAL MATERIAL

### 5.  Large Customers Who Switch Primary Vendors

Large customers do not often switch prime vendors.  Staples reports that its retention rate for Fortune 1000 enterprise customers is ██%.[90]  Office Depot states that "[l]ess than ██ of office depot enterprise customer's [sic] leave for various reasons or annually.  Office Depot retains over ██ of enterprise customers - not including acquisition of new customers."[91]  Exhibits 16A-C show the annual large-customer retention rates for Staples, Office Depot and OfficeMax.[92]  As shown in these exhibits, retention rates are consistently at or above ██% in all years.

Nevertheless, Staples and Office Depot have provided data on ███████████████████ ███████████████████.[93]  Based on these data, I have been able to measure the extent to which large customers who drop Staples as their primary vendor of consumable office supplies switch to Office Depot and vice versa.[94]  Exhibit 17 shows that ██% of Staples' top lost customers switched to Office Depot.  Exhibit 18 shows that ██% of Office Depot's top lost customers switched to Staples.  Exhibit 19 shows that ██% of Staples top ██ customer wins came from Office Depot.  Exhibit 20 shows that ██% of Office Depot's top ██ customer wins came from Staples.  These data show that, of the relatively few large customers lost each year, the vast majority switch between Staples and Office Depot, not other vendors.

### 6.  Staples' ████████████████████

Following the merger between Office Depot and OfficeMax, Staples launched a ████████████ ████████████ to take advantage of the disruption caused by that merger.  Noting that ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ██████████," a Staples email states:



---

[90] PX04625, at 012 (█████████████████████████████████████████████████████████).

[91] PX05422, at 001 (Office Depot, Email chain re: Enterprise account retention rate, July 28, 2014).

[92] I count a customer as lost by a distributor in a given year if its purchases during that year from that distributor are less than 50% of its purchases in the prior year.  Office Depot, in its response to Specification 24 of the Second Request, counted a customer as lost in a given year if its purchases in that year were less than ██% of its purchases during the prior year.  See PX07062, at 054-055 (███████████████████████████████████████████████████). By using a 50% cutoff rather than a ██% cutoff, my approach will count more customers as lost and thus report lower retention rates than under the Office Depot approach.

[93] PX07062, at 052-055 (████████████████████████████████████████); PX04572, at 063-065 (██████████████████████████████████████).

[94] I used Staples and Office Depot transactions data, bidding data and documents to verify the origin and outcome of each customer loss and win in these data.  Wherever I was not able to verify the origin of a win or an outcome of a loss, I assumed that the customer was won from another vendor or lost to another vendor.

[95] PX04351, at 003-004 (███████████████████████████████████████████████).

Page 30

PX06100-032

CONFIDENTIAL MATERIAL



A Staples slide entitled "███████████████████████" lists the early results of the orchestrated attempt by Staples to capitalize on the disruption resulting from the Office Depot/OfficeMax merger.  The year-to-date wins amount is listed as ████████████.[97] ████████████████████████████████████████████████ In May 2015, Staples Vice President of Business Development ████████████████████████████████████████████████  This head-to-head competition continued even as the current merger was being contemplated and reviewed.

### C. Staples Will Face Weaker Competition After the Merger than Before

The adverse unilateral competitive effects in this case arise principally in the form of higher prices that Staples will find it profitable to charge to large customers after the merger, when it no longer faces competition from Office Depot.  As noted above, the Horizontal Merger Guidelines state that anti-competitive unilateral effects "are likely to be greater, the greater advantage the runner-up merging firm has over other suppliers in meeting customers' needs."

Several types of evidence indicate that Staples and Office Depot often have a significant competitive advantage over their far smaller rivals in serving large customers.  This implies that many customers for whom Staples is the runner-up to Office Depot, and vice versa, will be significantly harmed by the proposed merger.  This conclusion is consistently supported by a variety of available evidence.

#### 1. Statements by Staples and Office Depot

As Staples and Office Depot emphasize when they are competing to win the business of large customers, they have significant advantages over smaller regional suppliers based on sophisticated information technology systems, lower costs of goods sold, and the reliability and cost savings associated with having their own national distribution networks.  Here are two examples of Staples making such assertions in response to customer RFPs.[100]

---



[96] PX04348 at 004 (████████████████████████████ March 28, 2014).

[97] PX04338, at 007 (████████████████████████ September. 7, 2014).

[98] PX04394, at 042 ████████████████████████ October 13, 2014).

[99] PX04432, at 003 (████████████████████ May 27, 2015).

[100] Similar statements are also included in PX04642 (████████████████████, ████████); PX04627, at 032-34 (████████████████████).

PX06100-033

CONFIDENTIAL MATERIAL



---

101 PX04484, at 038, 043–45, 052-53 (████████████████████).

102 PX04641, at 051 (████████████████████████████████).

PX06100-034



Staples reports that ███% of its purchases were directly from the manufacturer, and Office Depot reports that ███% of it purchases were directly from the manufacturer.[104]  In contrast, ████████ ████████ explains that:

██████████ purchases less than ███% of its products directly from the manufacturer; the rest are purchased from a wholesaler.[106]  Likewise, ████████ aims to source ███% of its product directly from manufacturers and the rest from wholesalers.[107]  ████████ sources ███% of its product directly from manufacturers.[108]

### 2. Statements by Competitors

Smaller competitors state unequivocally that they are at a significant disadvantage regarding their cost of goods sold (COGS) relative to Staples and Office Depot.

---

[103] PX04641 at 023-024 ████████████████████████████████████).

[104] PX05424, at 004 (Letter from A. Lacy (Simpson Thacher) to K. Cerilli (FTC), February 2, 2016); PX04629, at 005 (████████████████████████████).

[105] ████████████████████████

[106] ████████████████████████

[107] ██████████████████████

[108] ██████████████████████████

[109] ████████████████████████

PX06100-035

CONFIDENTIAL MATERIAL



████████████████ states:

Likewise, ████████ states:

Although small distributors can join purchasing consortia, these purchasing consortia are unable to overcome this gap in scale and cost. █████████████████ states:

███████████ echoes this theme and adds that the gap in purchasing costs also applies to purchases from wholesalers:

[110] ████████████

[111] ██████████████

[112] ███████████████

PX06100-036

CONFIDENTIAL MATERIAL

Compared to Staples and Office Depot, independent dealers are at a disadvantage in terms of buying power with domestic and foreign manufacturers.



Smaller distributors also state that they do not have the financial resources to be able to offer large customers ████████████████████████████████████████████. ████████████        Smaller distributors also state that they lack the financial and technical resources to acquire the IT capabilities required by many large customers.[116]

Competitors state that these disadvantages make it difficult for them to compete effectively against Staples and Office Depot on price and service to win the business of large customers.



113 ████████████████████████████

114 ████████████████████████

115 ███████████████████████████████████████████████
███████████████████████████████████████████

116 ███████████████████████████████████████████
████████████████████        12(b)

PX06100-037

CONFIDENTIAL MATERIAL



████████████████ states:

████████ echoes these views:

████████████████████████ asserts that consortia cannot overcome these disadvantages:

████████████ provides more detail on the limitations of consortia:

Page 36

CONFIDENTIAL MATERIAL



### 3. Statements by Customers

Customers recognize the impact and significance of the COGS gap, as well as the other disadvantages of relying on regional distributors and consortia.

Ms. Eubank-Sanders of Bank of America ("BofA") explains:

> Two other factors that affect our office supplies pricing are the volume of spend that our vendor has with manufacturers and BofA's volume of spend with our vendor. Based on my extensive interactions with vendors, my understanding is that they usually realize cost savings as they purchase more product from manufacturers and move more volume through their distribution infrastructure. Likewise, we realize cost savings the more we spend with our vendor.  In fact, BofA's contract with Staples ███████████████████████████████. If we used more office supplies vendors than we currently do, we would lose some or most of these ██████████████████████[123]

Mr. Cervone of McDonalds points out that

> McDonald's is likely to pay higher per-unit prices on office supplies if we split our purchasing volume across multiple vendors.  I also would be concerned that McDonald's would pay higher prices because smaller regional vendors generally have less purchasing power and consequently have higher costs than Staples and Office Depot in purchasing goods from manufacturers.[124]

 states:

---

[122] ████████ (██████████████████

[123] PX03002 (Eubanks-Saunders (Bank of America) Decl.) ¶ 10.

[124] PX03029 (Cervone (McDonald's) Decl.) ¶ 14.

Page 37

CONFIDENTIAL MATERIAL



According to Mr. Moise of Fifth Third Bank:

> Larger consumable office supplies vendors have higher sales volumes, which means they can buy in large quantities from manufacturers.  I believe large purchase volumes enable them to obtain lower prices from manufacturers.  We expect that larger vendors will pass their lower costs onto us when facing meaningful competition from other larger vendors.  By inviting several larger consumable office supplies vendors to bid on FTB's business and by selecting the vendor that offers the best value, FTB can ensure lower procurement costs.[126]

> …W.B. Mason lacks the purchasing power and financial resources of Staples or Office Depot due to its smaller size, and I am therefore concerned about its ability to compete on price, including upfront incentives, with Staples and Office Depot. I am skeptical that any regional office supplies vendor can compete effectively with Staples or Office Depot by partnering with a third-party wholesaler or courier to offer national coverage. If the combined Staples/Office Depot raised prices 5 to 10 percent after the merger, I believe FTB would be forced to accept the price increase and remain with Staples/Office Depot rather than move to such an arrangement.[127]



### 4.  Industry Consultant View

█████████████████████ which provides consulting services regarding procurement, explains why █████ does not consider regional distributors of consumable office supplies to be an attractive alternative for most large customers with whom they consult.



---

[125] ████████ ████████████████████

[126] PX03012 (Moise (Fifth Third Bank) Decl.) ¶ 5(b).

[127] PX03012 (Moise (Fifth Third Bank) Decl.) ¶ 10.

[128] █████ (███████████████████████

PX06100-040

CONFIDENTIAL MATERIAL



### 5. Size Gap and the Cost of Goods Sold

Exhibit 21 shows sales of consumable office supplies in *all* channels by supplier. Assuming that the cost of goods sold is driven by total purchases, this is the best measure of scale for the purpose of assessing COGS differences across suppliers.

As shown in Exhibit 21, Staples sold ████████ worth of consumable office supplies across all channels (online, in-store, and B2B), and so did Office Depot, for a combined total of ████████. In contrast, the next largest supplier, ████████, sold ████████ worth of consumable office supplies. If Staples is permitted to acquire Office Depot, the merged firm will be ██ times as large as ████████, as measured by total sales of consumable office supplies.

To the extent that scale economies are driven by sales to large customers, Exhibits 5B and 7 show that there will be a huge gap in size between Staples and the next largest firm, ████████ ████████ if Staples acquires Office Depot. The merged firm's sales of consumable office supplies to large customers will be nearly ████████ times as large as those of ████████. In contrast, Staples and Office Depot are quite evenly matched today, both in terms of overall scale and in that they both own and operate national distribution networks.

### 6. COGS Gap Between Office Depot and ████████



Office Depot documents show that it expects to achieve an approximately ████ "end-state" savings in COGS as a result of its acquisition of OfficeMax.[130] That acquisition roughly doubled the size of Office Depot. If we assume that this expectation is achieved, we can use this figure to estimate the magnitude of the economies of scale associated with volume purchasing. More specifically, for the purpose of this calculation, let us assume that a doubling of size leads to a ████ decline in COGS.

---

[129] ████████ (████████████████

[130] 
████████████████████████████████████████████████████ .

PX06100-041

CONFIDENTIAL MATERIAL

In 2014, Office Depot had net revenues of $12.5 billion; ██████████ had revenue of ██████ ████ in fiscal year 2015.[131]  If every doubling of size leads to a ████ decline in COGS, then extrapolation implies that ████████████████████████████ than those of Office Depot. This method likely underestimates the true COGS gap, since Office Depot and OfficeMax both purchase more of their consumable office supplies directly from manufacturers than does ████████████████████████████████████████████████████████ Still, this ████ figure can serve as a guide to the magnitude of post-merger price increase that Staples will be able to achieve because it will no longer be facing Office Depot as a competitor.[132]

### 7.  Statements by Staples and Office Depot Salespeople

Staples and Office Depot salespeople have in some cases attempted to make sales based on the argument that prices will be higher after the merger due to the resulting loss of competition.

In February 2015, ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████ .

In an effort to convince ██████ to consider switching from Staples in ██████████, an Office Depot salesperson told ████ :

> [P]lease keep in mind that Office Depot and Staples are operating as two separate organizations at this point.  We have no way of knowing if, or when the merger will actually happen, but let's assume it does go through the end of 2015.  *Then what will remove your ability to evaluate your program with two competitors. There will be only one [...].*  (emphasis in the original)

> Allow me to provide you with an analysis, so that you can benchmark your current program while you still have the ability to negotiate with two suppliers.  It may be of value for ██████ to evaluate now.[134]

---

[131] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████ .

[132] Bargaining and auction theory predicts that the post-merger price increase at a given customer will depend on the total gap between Office Depot and the next strongest competitor for that customer.  That gap can be far larger than the COGS gap due to other disadvantages ████████████████████████████████████ ████████ .

[133] PX07175, at 001 ( ████████████████████████████ )

[134] PX05249, at 001 ( ██████████████████████████████████ ).

PX06100-042

CONFIDENTIAL MATERIAL

In an April 2015 email regarding Office Depot's proposed response to ████ ' RFP, Office Depot's Global Account Manager states:

> In return for a three year agreement, Office Depot offers ████ a ████ signing bonus.  This will be made in two payments, ████ at the contract signing and ████ on the first anniversary date…

> Here are a few things for you to consider in evaluating this offer:

> • TIMING- This offer is time sensitive.  If and when the purchase of Office Depot is approved, Staples will have no reason to make this offer.[135]

In November 2015, █████████████████████████



### 8.  Summary

The large gap in scale and service capabilities that will exist between Staples and all other suppliers in the market, together with the fact that Staples and Office Depot today are evenly matched, strongly supports the conclusion that the proposed merger will have significant adverse competitive effects on large customers.  This conclusion is further supported by a variety of evidence from competitors, customers, and from Staples and Office Depot themselves.

## D. Price Effects of the Office Depot/OfficeMax Merger

Recent mergers in the same industry can provide valuable evidence regarding the likely impact of a proposed merger.  Naturally, I have looked to see if one can discern any competitive effects from Office Depot's 2013 acquisition of OfficeMax.  The acquisition was completed in November 2013.  However, the integration process was still on-going as of ████ when discussions regarding the current merger began.[137]  Moreover, large-customer contracts often have a duration of three years.[138]  The all-channel data that Staples and Office Depot provided in response to the FTC's Second Request only extend through the first quarter of

---



[135] PX05236, at 001 (██████████████████████████████████ ).

[136] PX04567, at 002 (████████████████████████ ).

[137] PX08062, at 001, 004-005 (Office Depot, 10-K, December 27, 2014); PX02012 (████████████ ) at 302 (noting that merger discussions between Staples and Office Depot commenced at least as early as ████ ).

[138] PX03010 █████████████

PX06100-043

CONFIDENTIAL MATERIAL

2015.[139]  So I lack sufficient post-merger and post-integration data to conduct a complete analysis.[140]  Nonetheless, so far as I have been able to determine, the ongoing, substantial competition from Staples has prevented Office Depot from significantly raising prices to large customers following its acquisition of OfficeMax.

While I was not involved in the review of the Office Depot OfficeMax merger, this may well have been the outcome that would have been predicted using the methodology I have employed here to analyze the proposed merger between Staples and Office Depot.[141]  As noted above, the unilateral competitive effects of a merger in this market are driven by (a) the extent of head-to-head competition between the merging parties, and (b) the competitive advantage between the runner-up merging party and the next-best supplier.

Regarding (a), the evidence I have seen does not show that Office Depot and OfficeMax were especially close head-to-head competitors.  In a presentation to the FTC in September 2013, Office Depot included its own analysis of win-loss data to make the case that Staples was a closer competitor both to Office Depot and to OfficeMax than these two firms were to each other for large contract customers.[142]  Exhibits 22A-C simply replicate the results provided in that presentation.  Exhibit 22A shows that ██% of OfficeMax's enterprise customer losses went to Staples.  Exhibit 22B shows that ██% of Office Depot's enterprise customer losses went to Staples.  Exhibit 22C shows that Staples was the runner-up to Office Depot in ██% of the bids involving enterprise customers.[143]

Regarding (b), there is no reason to believe that Staples was then or is now at any competitive disadvantage relative to Office Depot and OfficeMax in the distribution of consumable office supplies to large customers in the United States.

## 6.  Entry and Expansion

I have considered whether entry by new firms into the relevant market, or expansion by existing market participants, will protect large customers from the anti-competitive effects that would otherwise result from the elimination of competition between Staples and Office Depot.  More specifically, I have followed Section 9 of the Horizontal Merger Guidelines, which states:

---

[139] After several delays, the parties have recently provided Q2–Q4 2015 contract channel sales data, but not the retail and online sales data useful for such an analysis.  Given the size and complexity of the contract channel data, I have not been able to incorporate it into my analysis for this report.

[140] Of course, even with excellent data, identifying the effects of a merger can be very difficult since one never observes the alternative world in which the merger did not take place.

[141] My discussion here only relates to unilateral effects, since that is the concern with the current merger.  Coordinated effects could logically have been a substantial concern in the review of the Office Depot/OfficeMax merger.  The FTC's closing statement regarding the Office Depot OfficeMax merger  indicates that the FTC considered coordinated effects but found that post-merger coordination would be difficult.  PX08064, at 002 n.4 (FTC, 2013 FTC Office Depot/OfficeMax Closing Statement, November 1, 2013).

[142] PX0001, at 018, 021, 040 (Office Depot OfficeMax Presentation to FTC on Competition for Contract Sales to Large and National Customers September 13, 2013).

[143] Moreover, the presentation and Exhibits 22A-C show that for a broad group of customers, Staples was the leading competitor and runner-up to Office Depot and to OfficeMax individually.

PX06100-044

CONFIDENTIAL MATERIAL

> A merger is not likely to enhance market power if entry into the market is so easy that the merged firm and its remaining rivals in the market, either unilaterally or collectively, could not profitably raise price or otherwise reduce competition compared to the level that would prevail in the absence of the merger. Entry is that easy if entry would be timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern.

In the current case, the "sufficiency" requirement is especially important due to the fact that the firm being eliminated from the market as an independent competitor, Office Depot, has such a large market share in the relevant market. In Section 9.3 on Sufficiency, the Horizontal Merger Guidelines state: "Entry by a single firm that will replicate at least the scale and strength of one of the merging firms is sufficient. Entry by one or more firms operating at a smaller scale may be sufficient if such firms are not at a significant competitive disadvantage."[144]

For the reasons given below, entry in this case would not be sufficient, in large part due to the significant and durable competitive disadvantages faced by smaller market participants, which were noted above. Appendix H addresses in more detail the expansion and entry arguments made by Staples and Office Depot, with reference to several categories of potential competitors that they identify.

## A. Barriers to Entry and Expansion

While some expansion by existing suppliers may take place over time after the merger in response to a post-merger price increase by Staples, and some new suppliers may enter the market, these supply-side responses do not appear likely to be sufficient to protect large customers from the very substantial loss of Office Depot as a counter-weight to Staples.

Smaller competitors lack the IT capabilities and reputation sought by large customers. In order to protect large customers from a post-merger price increase, existing suppliers would need to significantly augment their capabilities to provide the range of services Staples and Office Depot provide to large customers. For example, manufacturers would need to significantly augment, and in most cases create, a distribution system serving end customers rather than resellers. Regional distributors would need to expand into new markets while maintaining unified customer service across their network. In recent years no regional supplier has built its own national distribution network, and there has been no entry at a scale remotely approaching that of Staples or Office Depot. I have seen no evidence that entry on that scale would be likely in response to a small but significant post-merger price increase by Staples.

███████████████████ identifies some of the significant barriers to entry and expansion in the distribution of consumable office supplies to large customers in the United States:



---

[144] PX08051, at § 9.3 (Horizontal Merger Guidelines).

PX06100-045

CONFIDENTIAL MATERIAL



states that geographic expansion is risky and takes time:

also states that geographic expansion is difficult and takes time:

PX06100-046

CONFIDENTIAL MATERIAL

█████████████████████████████████████

████████████████ and ████████████████ both indicate that serving large customers requires greater IT capabilities than does serving smaller customers:

████████ states:

Likewise, ████████████████ states:

████████████████ and ████████████████, a large customer, both indicate that large customers are reluctant to pick a vendor that lacks a track record with similar customers. This constitutes an additional obstacle to entry and expansion:



---

149 ████████
150 ████████
151 ████████
152 ████████

Page 45

PX06100-047

CONFIDENTIAL MATERIAL



The very high rates at which Staples and Office Depot retain their existing large customers make entry by new suppliers and expansion by existing suppliers much more difficult. As shown above in Exhibits 16A-C, Staples and Office Depot each retains well over ▮% of its large customers from one year to the next. As a general economic principle, entry and expansion is more difficult if customers incur significant switching costs when switching suppliers. In the current case, entrants and smaller distributors would find it very difficult to capture enough large customers to achieve the scale economies already enjoyed by Staples and Office Depot.

Entry into the relevant market also is made more difficult because of competition from Amazon and others to sell consumable office supplies to consumers through the *retail* channel. Competition in the retail channel makes it harder for a new entrant other than Amazon to achieve overall scale, which affects costs due to the scale economies of operating a distribution network and due to the ability of larger distributors to negotiate lower prices from manufacturers and wholesalers.

### B. Amazon Business

I have considered whether Amazon is likely to significantly expand its presence in the relevant market in response to a 5% to 10% post-merger price increase by Staples. Such expansion would require Amazon to gain the capability to provide the level of service necessary to be the prime vendor for large customers and thus to participate effectively in RFPs for large customers.



Staples also claims that third-party surveys and Amazon itself have suggested that Amazon already has substantial market share with Staples' and Office Depot's customers. However, the third-party survey that Staples refers to in support of this statement is not confined to large customers.[156] Staples further states:

> Moreover, Amazon continues to expand into the office supply business-to-business space with the recent unveiling of its new business model, Amazon

---

[153] ▮▮▮▮▮▮▮ ¶ 17.

[154] ▮▮▮▮ (▮▮▮▮▮.) ¶ 9.

[155] PX0011, at 014 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮).

[156] PX04651, at 020 (Martin Wilde Assoc. Ltd. & Office Products Int'l Ltd., *Swimming with Piranha*, September 2014) (indicating that 81 percent of the companies surveyed regarding their office supplies purchases employed fewer than 300 employees).

PX06100-048

CONFIDENTIAL MATERIAL

Business.  Amazon Business offers a wider selection of office products SKUs than Staples Advantage and Office Depot combined.  Amazon Business' product range, low prices, and unrivaled nationwide distribution capability make it a formidable and highly disruptive competitor in this business. [157]

The evidence I have seen does not support assertions that Amazon is currently a significant competitor in the relevant market or soon will be one.  While Amazon is a natural candidate for possible expansion, given their strong presence in the retail channel and very impressive retail distribution capabilities, the evidence indicates that Amazon has a tiny presence in the relevant market and no current plans to significantly expand its presence in the relevant market.  Amazon is well placed to supply small and medium-sized businesses, who want a more consumer-like experience, and to handle spot purchases by larger businesses, but their existing marketplace business model poses significant challenges for them to become the primary vendor of consumable office supplies for large businesses.  Amazon recognizes this.  Whether Amazon will become a meaningful competitor for large businesses, and if so when, is uncertain.

### 1.  Amazon's Presence in Win-Loss and Market Share Data

First, we can see what Amazon has actually achieved to date as a competitor in the relevant market.  Staples and Office Depot win-loss data and Fortune 100 RFP data show that Amazon has not become a meaningful competitor in the relevant market.  Exhibit 9A, which reports RFP information collected from Fortune 100 customers, shows that Amazon appeared ███████████ ████████  Exhibit 10, which indicates who Office Depot bid against for large customers, shows Amazon appeared as an alternative to Office Depot ████████ out of more than ████████ ████████████████████.  Exhibit 11, which reports similar head-to-head bidding events for Staples, finds Amazon appearing as an option at ███████████████, and ██████ ███████.  These findings are consistent with the ████████████████████ shown in Exhibit 5B.

### 2.  Amazon Statements

Next, we can look at Amazon's own plans.  Amazon Business has projected sales of consumable office supplies totaling only ████████████, $███████████, and ██████████████. [158]  Moreover, the vast majority of these current and projected sales are not to large customers. ██. ████████████████ states:

█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████

---

[157] PX0012 at 005-006 (Letter from Steven Bernstein (Weil Gotshal) to Stelios Xenakis, August 3, 2015).

[158] ██████████████████████████

PX06100-049

CONFIDENTIAL MATERIAL



As a result, as ▮▮▮▮▮▮▮▮ of Amazon explains in his deposition, ▮▮▮▮▮▮▮▮

PX06100-050

CONFIDENTIAL MATERIAL



Currently, Amazon Business is simply not set up in a way that allows for ▮▮▮▮▮▮ ▮▮▮▮▮▮ that is the norm in contract-based sales of consumable office supplies to large customers.  For example, ▮▮▮▮▮▮

PX06100-051

CONFIDENTIAL MATERIAL



Each of these characteristics helps explain why Amazon does not consider itself to be in a position to serve as a primary vendor for consumable office supplies to large customers.

- Not planned:

- Beginning stages:

- Unfunded:

PX06100-052



### 3. Customer Statements

I am aware that some large customers have stated they are willing to consider Amazon Business as an alternative should Staples and Office Depot merge.[171]  In my experience, customers often indicate that they will "consider" various options.  Why not?  But the better test of a supplier's competitive significance is how often customers actually choose that supplier.

Moreover, statements from several large customers echo those made by Amazon Business regarding the services Amazon Business does, and does not, offer:



Ms. Eubanks-Saunders of Bank of America states:

> Based on my assessment of Amazon's current capabilities, I also do not consider Amazon to be a viable substitute to Staples and Office Depot.  Amazon is not set up to service business customers such as BofA. For example, I have not seen any indications that Amazon can create the online custom catalog that we value so highly, or that Amazon is willing to give customer-specific discounted prices,

---

[170]

[171] See, for example:

[172]

[173]

PX06100-053

rather than its list prices to all buyers.  Amazon also does not appear equipped to provide next-day desktop delivery to all BofA locations.[174]

While it is of course *possible* that Amazon may expand its capability to serve as the primary supplier for large customers at some point in the future, that prospect simply does not appear likely in the near future as a factual matter.  Possible expansion by Amazon is neither so likely nor so imminent that it can be relied on to replace Office Depot as a competitive check on Staples.

## 7. Efficiencies

An otherwise anti-competitive merger can generate sufficient efficiencies to benefit customers.  There are three essential requirements for this to occur, as explained in Section 10 of the Horizontal Merger Guidelines:

**1. Merger-Specific**: "The Agencies credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects.  These are termed merger-specific efficiencies."

**2. Verifiable:** "Efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means. … Cognizable efficiencies are merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service."

**3. Benefit Customers**: "The Agencies will not challenge a merger if cognizable efficiencies are of a character and magnitude such that the merger is not likely to be anticompetitive in any relevant market.  To make the requisite determination, the Agencies consider whether cognizable efficiencies likely would be sufficient to reverse the merger's potential to harm customers in the relevant market, e.g., by preventing price increases in the relevant market."  [footnotes omitted]

Section 10 in the Horizontal Merger Guidelines also states: "In the Agencies' experience, efficiencies are most likely to make a difference in merger analysis when the likely adverse competitive effects, absent the efficiencies, are not great.  Efficiencies almost never justify a merger to monopoly or near-monopoly."

Economists generally focus on efficiencies that lower the merged firm's *incremental* cost of serving customers, because other types of cost savings are unlikely to be passed through to customers.  This principle is reflected in Section 10 of the Horizontal Merger Guidelines, which states: "In a unilateral effects context, incremental cost reductions may reduce or reverse any increases in the merged firm's incentive to elevate price."  The incremental cost in this case is the extra cost that Staples or Office Depot incurs as a result of serving the customer.

I have reviewed the submissions made by Staples and Office Depot to the FTC regarding merger efficiencies.[175]  I am aware that Staples initially claimed that the merger would allow it to reduce

---

[174] PX03002 (Eubanks-Saunders (Bank of America) Decl.) ¶ 30.

PX06100-054

costs by at least ███████ per year within ████████ of closing the deal, and that Staples subsequently indicated that it is internally targeting savings of ████████ per year by FY20██.[176]

At this point, I lack sufficient information to evaluate whether the efficiencies identified by Staples and Office Depot meet the three conditions listed above.  Some cost categories (e.g., ████████████) appear not to represent savings in the incremental cost of serving large customers in the United States.  Other categories (e.g., ████████████████) may reflect reductions in output or service and thus are not cognizable.  The category most likely to represent savings in the incremental cost of serving large customers in the United States is ██████████, where Staples has projected savings of ████ million to ████ million per year by FY20██.  These figures represent ████% to ████ of Staples' and Office Depot's forecasted combined purchases of ████████ for 2015.[177]

My analysis of unilateral competitive effects causes me to be skeptical that any merger-specific efficiencies that are likely to arise would in fact be passed through to large customers to any meaningful degree.  The economic incentive for Staples to pass through some of these efficiencies would be to sell more consumable office supplies.  In principle, this could occur either (a) because lower prices by Staples cause Staples to win additional business from its remaining rivals, or (b) because lower prices by Staples cause Staples customers to actually use more consumable office supplies.  The magnitude of (a) is limited given the very large market share that Staples will have after the merger, and the magnitude of (b) also appears limited given the lack of evidence that the price elasticity of demand for consumable office supplies by large customers is high.  Furthermore, Staples could lower the marginal price to large customers without lowering the average price.

I may be able to provide additional analysis on these points after further discovery if additional information provided by Staples and Office Depot allows me to learn more about the nature and magnitude of the merger efficiencies asserted by Staples and Office Depot.

## 8. Proposed Divestiture

Staples and Office Depot have proposed certain divestitures as a "fix" to their proposed merger.  More specifically, Staples and Office Depot have proposed assigning to Essendant contracts that



[175] See PX04572, at 111-118 ██████████████████████████ ; PX06017, at 006-007 ( ████████████████████ ); PX04155_native ( ████████████████ ).

[176] See PX04572, at 111-118 ( ██████████████████████████ ; PX06017, at 006-007 ████████████████ ); PX04155_native ████████████████ ).

[177] PX04572, at 113 ██████████████ ); PX04155_native ████████████ ).

[178] PX04572, at 113 ██████████████ ; PX04155_native ████████████ ).

PX06100-055

CONFIDENTIAL MATERIAL

account for ▮▮▮ million in revenue, of which at least ▮▮▮ million must be from contracts with Tier 1 (diversity) vendors.[179]  My understanding is that Staples and Essendant have not yet entered into a transition services agreement and it is unclear whether they plan to do so before the closing of the Staples/Office Depot merger.  This transition services agreement is necessary because Essendant lacks the capability to provide the services to Tier 1 vendors and customers needed to fulfill the divested contracts.[180]



I have considered whether the proposed divestiture would reliably replace the loss of competition that would otherwise be caused by the merger between Staples and Office Depot.  Based on what I know at this time about the proposed divestiture, it seems woefully inadequate in this respect.  Critically, the divestiture does not involve an ongoing business of proven viability, or even the key assets necessary for Essendant to be an effective competitor in distributing consumable office supplies to large customers.

The proposed divestiture would make Essendant a vassal that is heavily reliant on Staples to adequately service the large customers served under the divested Tier 1 contracts.  The proposed divestiture clearly would *not* transform Essendant, which currently is not even a participant in the relevant market, into a strong, independent rival to Staples, much less a rival with the scale and capabilities currently enjoyed by Office Depot.  Nor will the proposed divestiture strengthen smaller distributors sufficiently to replace the competition from Office Depot that will be lost.

 I may have more to say later about the proposed divestiture if Staples and Office Depot provide further information about how the divestiture and the related transition services agreement are intended to work and why they believe their "fix" will preserve competition in the relevant market.



PX06100-056

CONFIDENTIAL MATERIAL

_Carl Shapiro_                _February 15, 2016_

Carl Shapiro                 Date

PX06100-057

**Exhibit 1**

**Consumable Office Supplies**
***B2B Contract Channel***



CONFIDENTIAL MATERIAL

PX06100-058

**Exhibit 2**

## Average Number of SKUs Purchased by Large Customers
### FY 2014

| Product Category | Staples | Office Depot | OfficeMax |
|---|---|---|---|
| Consumable Office Supplies | ▮ | ▮ | ▮ |
| All Products | ▮ | ▮ | ▮ |

*Notes:*

[1]

**Exhibit 3**

**Staples and Office Depot Consumable Office Supplies: Revenue by Category**

*Large Customers, FY 2014*

| Category | Staples | | Office Depot | |
|----------|---------|--|--------------|--|
| | Revenue ($ Million) | % of Consumables | Revenue ($ Million) | % of Consumables |
| PAPER | ▮ | ▮ | ▮ | ▮ |
| GENERAL SUPPLIES | ▮ | ▮% | ▮ | ▮ |
| WRITING | ▮ | ▮ | ▮ | ▮ |
| PRESENTATION | ▮ | ▮ | ▮ | ▮ |
| FILING | ▮ | ▮ | ▮ | ▮ |
| SHIPPING/MAILING | ▮ | ▮ | ▮ | ▮ |
| BINDERS | ▮ | ▮ | ▮ | ▮ |
| FORMS/DATED GOODS | ▮ | ▮ | ▮ | ▮ |
| LABELS/TAGS | ▮ | ▮% | ▮ | ▮ |
| STORAGE | ▮ | ▮% | ▮ | ▮ |
| EDUCATION | ▮ | ▮% | ▮ | ▮ |
| *TOTAL* | ▮▮▮ | *100%* | ▮▮▮ | *100%* |

*Notes:*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮

CONFIDENTIAL MATERIAL

PX06100-060

**Exhibit 3**



*Sources:*

PX06100-061

**Exhibit 4A**

**Dispersion of Locations: Staples Customers**

*FY 2014*

| Customer Group | Average Counts | | Average Distance to Center (Miles) |
|---|---|---|---|
| | Zip Codes | States | |
| All Business-to-Business Customers | ■ | ■ | ■ |
| Large Business-to-Business Customers | ■ | ■ | ■ |

*Notes:*

[1] ████████████████████████████████
████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████
███████████████████████████
████████████████████████████████████████
███████████████████████████████████████
██████████
███████████████████████████████████████
████████████████████████████
███████████████████████████
█████████████████
██████████████████
█████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████
███████████████████
████████████████████████████████████████
██████████████████████████████████████████████
█████████
████████████████████████
██████████████████████████████████████████████

CONFIDENTIAL MATERIAL

PX06100-062

**Exhibit 4A**



**Exhibit 4B**

## Dispersion of Locations: Office Depot and OfficeMax Customers

*FY 2014*

| Vendor | Customer Group | Average Counts | | Average Distance to Center (Miles) |
| --- | --- | --- | --- | --- |
| | | Zip Codes | States | |
| Office Depot | All Business-to-Business Customers | ■ | ■ | ■ |
| | Large Business-to-Business Customers | ■ | ■ | ■ |
| OfficeMax | All Business-to-Business Customers | ■ | ■ | ■ |
| | Large Business-to-Business Customers | ■ | ■ | ■ |



[1]

**Exhibit 4B**



MATERIAL

**Exhibit 5A**

## Staples and Office Depot Shares of Consumable Office Supplies Purchases
*Fortune 100 CID Responses, 2014*

| Customer | Total Purchases | Staples | | Office Depot | | Staples & Office Depot | |
|---|---|---|---|---|---|---|---|
| | | $ Purchases | % Share | $ Purchases | % Share | $ Purchases | % Share |
| | 33,208,483 | 28,960,621 | 87% | 13,718 | 0% | 28,974,338 | 87% |
| | 29,697,455 | 8,111,568 | 27% | 6,176,317 | 21% | 14,287,885 | 48% |
| | 21,347,164 | 21,334,333 | 100% | 12,830 | 0% | 21,347,164 | 100% |
| | 21,232,578 | 1,034 | 0% | 18,053,298 | 85% | 18,054,331 | 85% |
| | 15,523,359 | 23,420 | 0% | 15,499,939 | 100% | 15,523,359 | 100% |
| | 15,204,504 | 13,837,593 | 91% | 23,387 | 0% | 13,860,981 | 91% |
| | 12,680,012 | 71 | 0% | 12,679,941 | 100% | 12,680,012 | 100% |
| | 10,990,757 | 70 | 0% | 9,891,681 | 90% | 9,891,751 | 90% |
| | 10,586,647 | 9,818,140 | 93% | 651,782 | 6% | 10,469,922 | 99% |
| | 10,500,061 | 3,599,373 | 34% | 7,734 | 0% | 3,607,107 | 34% |
| | 10,374,535 | 9,587,819 | 92% | 208,639 | 2% | 9,796,458 | 94% |
| | 10,161,607 | 3,962 | 0% | 28,688 | 0% | 32,650 | 0% |
| | 8,601,929 | 119,399 | 1% | 8,318,065 | 97% | 8,437,465 | 98% |
| | 8,403,405 | 5,828,013 | 69% | 1,740,407 | 21% | 7,568,419 | 90% |
| | 8,187,286 | 8,174,079 | 100% | 13,207 | 0% | 8,187,286 | 100% |
| | 8,052,504 | 2,365,522 | 29% | 5,306,919 | 66% | 7,672,441 | 95% |
| | 7,177,838 | 709,144 | 10% | 3,111,888 | 43% | 3,821,033 | 53% |
| | 7,123,072 | 28,427 | 0% | 3,904,292 | 55% | 3,932,719 | 55% |
| | 6,459,928 | 5,880,002 | 91% | 1,455 | 0% | 5,881,458 | 91% |
| | 6,373,203 | 47,929 | 1% | 2,059,016 | 32% | 2,106,945 | 33% |
| | 6,284,727 | 4,972,648 | 79% | 262,079 | 4% | 5,234,727 | 83% |
| | 6,133,098 | 5,425,902 | 88% | 461,871 | 8% | 5,887,774 | 96% |
| | 5,942,647 | 2,565,276 | 43% | 55,721 | 1% | 2,620,998 | 44% |
| | 5,251,204 | 5,194,029 | 99% | 12,815 | 0% | 5,206,843 | 99% |
| | 4,991,933 | 4,422,853 | 89% | 116,570 | 2% | 4,539,423 | 91% |
| | 4,488,953 | - | 0% | 4,040,058 | 90% | 4,040,058 | 90% |
| | 4,421,490 | 2,385,544 | 54% | 2,035,946 | 46% | 4,421,490 | 100% |
| | 4,165,236 | 4,040,109 | 97% | 125,127 | 3% | 4,165,236 | 100% |
| | 4,094,776 | 2,977,847 | 73% | 32,929 | 1% | 3,010,776 | 74% |
| | 4,014,416 | 4,887 | 0% | 4,009,529 | 100% | 4,014,416 | 100% |
| | 3,984,803 | 1,691 | 0% | 3,969,717 | 100% | 3,971,408 | 100% |
| | 3,885,755 | 2,414,850 | 62% | 2,769 | 0% | 2,417,619 | 62% |
| | 3,787,637 | 566,077 | 15% | 1,197 | 0% | 567,274 | 15% |
| | 3,745,051 | 3,242 | 0% | 3,741,809 | 100% | 3,745,051 | 100% |
| | 3,704,657 | 111,207 | 3% | 2,730,839 | 74% | 2,842,046 | 77% |
| | 3,404,809 | 40,751 | 1% | 3,364,058 | 99% | 3,404,809 | 100% |
| | 3,401,491 | 3,394,641 | 100% | 6,850 | 0% | 3,401,491 | 100% |
| | 3,397,974 | 662,270 | 19% | 1,374,696 | 40% | 2,036,966 | 60% |
| | 3,339,049 | 2,125,217 | 64% | 7,717 | 0% | 2,132,934 | 64% |

CONFIDENTIAL MATERIAL

**Exhibit 5A**

| Customer | Total Purchases | Staples | | Office Depot | | Staples & Office Depot | |
|---|---|---|---|---|---|---|---|
| | | $ Purchases | % Share | $ Purchases | % Share | $ Purchases | % Share |
| | 3,269,213 | 2,456,707 | 75% | 52,407 | 2% | 2,509,114 | 77% |
| | 3,259,704 | - | 0% | 2,323,039 | 71% | 2,323,039 | 71% |
| | 3,246,665 | 336 | 0% | 2,871,785 | 88% | 2,872,122 | 88% |
| | 3,214,907 | 2,571,925 | 80% | 78,275 | 2% | 2,650,201 | 82% |
| | 3,060,271 | 30,262 | 1% | 2,907,257 | 95% | 2,937,519 | 96% |
| | 2,841,975 | 2,443,485 | 86% | 96,084 | 3% | 2,539,568 | 89% |
| | 2,579,379 | 2,480,159 | 96% | 99,219 | 4% | 2,579,379 | 100% |
| | 2,544,683 | 2,493,543 | 98% | 50,701 | 2% | 2,544,245 | 100% |
| | 2,516,367 | 2,515,644 | 100% | 723 | 0% | 2,516,367 | 100% |
| | 2,464,698 | 2,455,302 | 100% | 1,698 | 0% | 2,457,000 | 100% |
| | 2,456,950 | 1,834,136 | 75% | 325,067 | 13% | 2,159,204 | 88% |
| | 2,317,204 | 2,201,344 | 95% | 4,050 | 0% | 2,205,393 | 95% |
| | 2,267,470 | 2,138,532 | 94% | 91,891 | 4% | 2,230,422 | 98% |
| | 2,169,965 | 2,155,914 | 99% | 14,051 | 1% | 2,169,965 | 100% |
| | 2,156,250 | 918 | 0% | 2,079,474 | 96% | 2,080,392 | 96% |
| | 2,151,340 | 1,965,160 | 91% | 4,886 | 0% | 1,970,046 | 92% |
| | 2,147,641 | 1,609,707 | 75% | 103,683 | 5% | 1,713,389 | 80% |
| | 2,046,349 | 1,760,877 | 86% | 239,759 | 12% | 2,000,636 | 98% |
| | 1,984,626 | 14,085 | 1% | 1,970,541 | 99% | 1,984,626 | 100% |
| | 1,953,016 | 778,116 | 40% | - | 0% | 778,116 | 40% |
| | 1,860,697 | 950,196 | 51% | 358,628 | 19% | 1,308,824 | 70% |
| | 1,764,496 | 8,540 | 0% | 1,711,562 | 97% | 1,720,101 | 97% |
| | 1,747,441 | 825,628 | 47% | 281,912 | 16% | 1,107,540 | 63% |
| | 1,681,230 | 14,391 | 1% | 1,475,009 | 88% | 1,489,400 | 89% |
| | 1,660,489 | 1,659,336 | 100% | 1,153 | 0% | 1,660,489 | 100% |
| | 1,651,618 | 1,651,618 | 100% | - | 0% | 1,651,618 | 100% |
| | 1,457,185 | 1,207,220 | 83% | 249,965 | 17% | 1,457,185 | 100% |
| | 1,142,125 | 856,593 | 75% | 55,253 | 5% | 911,847 | 80% |
| | 1,119,218 | 596,223 | 53% | 25,655 | 2% | 621,878 | 56% |
| | 1,110,408 | 1,095,503 | 99% | 2,655 | 0% | 1,098,158 | 99% |
| | 1,106,684 | 972,671 | 88% | 225 | 0% | 972,896 | 88% |
| | 1,053,974 | 983,130 | 93% | 70,844 | 7% | 1,053,974 | 100% |
| | 995,270 | 16,016 | 2% | 979,254 | 98% | 995,270 | 100% |
| | 959,883 | 53 | 0% | 959,829 | 100% | 959,883 | 100% |
| | 852,429 | 500,929 | 59% | 351,500 | 41% | 852,429 | 100% |
| | 837,749 | 695 | 0% | 651,866 | 78% | 652,561 | 78% |
| | 751,706 | - | 0% | 751,706 | 100% | 751,706 | 100% |

CONFIDENTIAL MATERIAL

**Exhibit 5A**

| Customer | Total Purchases | Staples | | Office Depot | | Staples & Office Depot | |
|---|---|---|---|---|---|---|---|
| | | $ Purchases | % Share | $ Purchases | % Share | $ Purchases | % Share |
| | 679,633 | - | 0% | 467,133 | 69% | 467,133 | 69% |
| | 526,093 | 420,835 | 80% | 2,855 | 1% | 423,690 | 81% |
| | 347,479 | 46,008 | 13% | - | 0% | 46,008 | 13% |
| | 342,703 | 280 | 0% | 342,423 | 100% | 342,703 | 100% |
| | 187,887 | 107,436 | 57% | 80,451 | 43% | 187,887 | 100% |
| **Total - All Included CIDs** | **418,811,102** | **203,559,015** | **49%** | **136,189,973** | **33%** | **339,748,987** | **81%** |
| **Total - Top 40 Ranked by Total Spend** | **347,595,245** | **162,196,269** | **47%** | **114,107,908** | **33%** | **276,304,178** | **79%** |
| **Total - Bottom 41 Ranked by Total Spend** | **71,215,856** | **41,362,745** | **58%** | **22,082,064** | **31%** | **63,444,810** | **89%** |

CONFIDENTIAL MATERIAL

PX06100-068

**Exhibit 5A**



CONFIDENTIAL MATERIAL

PX06100-069

**Exhibit 5B**

## Market Shares by Supplier

*Fortune 100 Customers, 2014*

| Supplier Name | Count of F100 | $ Purchases | % Share |
|---|---|---|---|
| STAPLES | 77 | $203,559,015 | 47.3% |
| OFFICE DEPOT | 78 | $136,189,973 | 31.6% |
| VERITIV-UNISOURCE-XPEDX | 15 | $22,200,211 | 5.2% |
| GEORGIA PACIFIC | 1 | $6,740,000 | 1.6% |
| DOMTAR | 8 | $3,361,399 | 0.8% |
| LINDENMEYR | 5 | $2,100,821 | 0.5% |
| NELMAR | 3 | $1,660,233 | 0.4% |
| ULINE | 16 | $1,489,229 | 0.3% |
| RUNCO | 1 | $1,475,537 | 0.3% |
| GRAINGER | 13 | $1,285,796 | 0.3% |
| XEROX | 1 | $1,050,000 | 0.2% |
| COIN-TAINER | 1 | $1,011,186 | 0.2% |
| AMAZON | 5 | $958,497 | 0.2% |
| ARCTIC OFFICE | 4 | $847,794 | 0.2% |
| WHITLOCK BUSINESS SYSTEMS | 1 | $787,265 | 0.2% |
| TAYLOR CORPORATION | 1 | $760,082 | 0.2% |
| W.B. MASON | 11 | $629,423 | 0.1% |
| GESTION DACHATS RAM | 1 | $620,674 | 0.1% |
| INDUSTRIES FOR THE BLIND | 1 | $536,176 | 0.1% |
| OFFICE ESSENTIALS | 1 | $499,786 | 0.1% |
| RR DONNELLEY | 5 | $477,238 | 0.1% |
| MILLER OFFICE | 4 | $388,768 | 0.1% |
| FACSIMILE PAPER CONNECTION | 2 | $329,422 | 0.1% |
| INTERNATIONAL PAPER | 5 | $270,400 | 0.1% |
| MARKET POINT | 1 | $256,909 | 0.1% |
| OTHER - specified suppliers | | $18,764,752 | 4.4% |
| OTHER - supplier not specified | | $10,560,514 | 2.5% |
| Unreported leakage adjustment | | $11,493,751 | 2.7% |
| **Total** | | **$430,304,853** | **100.0%** |
| **Staples and Office Depot** | | **$339,748,987** | **79.0%** |

CONFIDENTIAL MATERIAL

PX06100-070

**Exhibit 5B**

*Notes:*



**Exhibit 5B**



CONFIDENTIAL MATERIAL

PX06100-072

**Exhibit 5C**

## Market Concentration Measures

*Fortune 100 Customers, 2014*

| Measure | Value |
| --- | --- |
| **Pre-Merger:** | |
| Staples Share | 47% |
| Office Depot Share | 32% |
| HHI | 3,270 |
| | |
| **Post-Merger:** | |
| Staples & Office Depot Share | 79% |
| HHI | 6,265 |
| **Increase in HHI** | **2,994** |

*Notes:*

[1] 

CONFIDENTIAL MATERIAL

**Exhibit 5C**



CONFIDENTIAL MATERIAL

PX06100-074

**Exhibit 6A**

## In-Store Price Premium Relative to
## Large-Customer Contract Prices

*Staples, FY 2014*



| Metric | |
|---|---|
| Actual B2B Spending | ▬ |
| Spending if Purchased In-Store | ▬ |
| *In-Store Price Premium* | ▪ |

CONFIDENTIAL MATERIAL

PX06100-075

**Exhibit 6A**



CONFIDENTIAL MATERIAL

PX06100-076

**Exhibit 6B**

## Online Price Premium Relative to
## Large-Customer Contract Prices

*Staples, FY 2014*



| Metric | |
| --- | --- |
| Actual B2B Spending | |
| Spending if Purchased Online | |
| *Online Price Premium* | |

*Notes:*

CONFIDENTIAL MATERIAL

PX06100-077

**Exhibit 6B**



CONFIDENTIAL MATERIAL

PX06100-078

**Exhibit 6C**

## In-Store Price Premium Relative to
## Large-Customer Contract Prices

*Office Depot, FY 2014*

| Metric | |
|--------|--|
| Actual B2B Spending | ▬▬ |
| Spending if Purchased In-Store | ▬▬ |
| *In-Store Price Premium* | ▪ |

*Notes:*



CONFIDENTIAL MATERIAL

**Exhibit 6C**

*Sources:*

[a] 

CONFIDENTIAL MATERIAL

PX06100-080

**Exhibit 6D**

## Online Price Premium Relative to
## Large-Customer Contract Prices

*Office Depot, FY 2014*



| Metric | |
|---|---|
| Actual B2B Spending | ▬▬ |
| Spending if Purchased Online | ▬▬ |
| *Online Price Premium* | ▪ |

*Notes:*

[1]

CONFIDENTIAL MATERIAL

PX06100-081

**Exhibit 6D**



CONFIDENTIAL MATERIAL

PX06100-082

**Exhibit 6E**

## In-Store Price Premium Relative to
## Large-Customer Contract Prices

*OfficeMax, FY 2014*



| Metric | |
|--------|--|
| Actual B2B Spending | ▬▬ |
| Spending if Purchased In-Store | ▬▬ |
| *In-Store Price Premium* | ▬ |

*Notes:*

[1]

CONFIDENTIAL MATERIAL

**Exhibit 6E**

*Sources:*

[a] 

CONFIDENTIAL MATERIAL

PX06100-084

**Exhibit 6F**

## Online Price Premium Relative to
## Large-Customer Contract Prices

*OfficeMax, FY 2014*



| Metric | |
| --- | --- |
| Actual B2B Spending | ▬▬ |
| Spending if Purchased Online | ▬▬ |
| *Online Price Premium* | ▬ |

*Notes:*

[1]

CONFIDENTIAL MATERIAL

**Exhibit 6F**

*Sources:*



**Exhibit 7**

## Primary Vendor Relationships
*Consumable Office Supplies, 2014*

| Supplier | Sales | Customer Count | Shares |
|---|---|---|---|
| Office Depot | $924,256,982 | 587 | 45.1% |
| Staples | $873,219,854 | 529 | 42.6% |
| | $77,274,000 | 38 | 3.8% |
| | $65,557,363 | 15 | 3.2% |
| | $19,081,752 | 19 | 0.9% |
| | $15,024,355 | 10 | 0.7% |
| | $12,200,000 | 2 | 0.6% |
| | $10,371,447 | 5 | 0.5% |
| | $9,843,000 | 2 | 0.5% |
| | $7,345,863 | 2 | 0.4% |
| | $7,150,000 | 3 | 0.3% |
| | $6,213,871 | 5 | 0.3% |
| | $4,050,000 | 7 | 0.2% |
| | $2,210,615 | 4 | 0.1% |
| | $1,994,727 | 2 | 0.1% |
| | $1,794,816 | 2 | 0.1% |
| | $1,570,311 | 2 | 0.1% |
| | $1,357,722 | 1 | 0.1% |
| | $1,313,327 | 2 | 0.1% |
| | $1,071,715 | 1 | 0.1% |
| | $1,060,067 | 2 | 0.1% |
| | $1,037,654 | 2 | 0.1% |
| | $1,017,628 | 1 | 0.0% |
| | $672,164 | 1 | 0.0% |
| | $592,464 | 1 | 0.0% |
| | $568,265 | 1 | 0.0% |
| | $568,181 | 1 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| Staples + Office Depot | $1,797,476,836 | | **87.7%** |
| *Total* | *$2,048,418,144* | | *100.0%* |

CONFIDENTIAL MATERIAL

PX06100-087

**Exhibit 7**



CONFIDENTIAL MATERIAL

PX06100-088

**Exhibit 8**

## Purchases from  Staples + Office Depot vs. Purchases from Largest Other Named Supplier
*Fortune 100 Customers Included in Market Shares, 2014*

| Customer | Staples & Office Depot Purchases | Largest Other Supplier Purchases | Largest Other Named Supplier | Ratio (Other $) / (ST,OD $) |
|---|---|---|---|---|
| *Staples and Office Depot are the __ONLY__ Named Suppliers* | | | | |
| | $2,937,519 | | | 0.00 |
| | $2,650,201 | | | 0.00 |
| | $1,098,158 | | | 0.00 |
| | $1,660,489 | | | 0.00 |
| | $1,651,618 | | | 0.00 |
| | $4,040,058 | | | 0.00 |
| | $15,523,359 | | | 0.00 |
| | $3,745,051 | | | 0.00 |
| | $2,516,367 | | | 0.00 |
| | $3,401,491 | | | 0.00 |
| | $1,720,101 | | | 0.00 |
| | $2,579,379 | | | 0.00 |
| | $852,429 | | | 0.00 |
| | $2,205,393 | | | 0.00 |
| | $911,847 | | | 0.00 |
| | $4,421,490 | | | 0.00 |
| | $4,165,236 | | | 0.00 |
| | $3,404,809 | | | 0.00 |
| | $21,347,164 | | | 0.00 |
| | $2,169,965 | | | 0.00 |
| | $342,703 | | | 0.00 |
| | $4,014,416 | | | 0.00 |
| | $12,680,012 | | | 0.00 |
| | $8,187,286 | | | 0.00 |
| | $1,053,974 | | | 0.00 |
| | $1,970,046 | | | 0.00 |
| | $751,706 | | | 0.00 |
| | $4,539,423 | | | 0.00 |
| | $1,457,185 | | | 0.00 |
| | $995,270 | | | 0.00 |
| | $1,984,626 | | | 0.00 |
| | $959,883 | | | 0.00 |

CONFIDENTIAL MATERIAL

## Exhibit 8

| Customer | Staples & Office Depot Purchases | Largest Other Supplier Purchases | Largest Other Named Supplier | Ratio (Other $) / (ST,OD $) |
|---|---|---|---|---|
| ███████████████ | $9,891,751 | | | 0.00 |
| | $8,437,465 | | | 0.00 |
| | $187,887 | | | 0.00 |
| **Total—Staples and Office Depot are the ONLY Named Suppliers** | **$140,455,756** | **$0** | | **0.00** |

*Staples or Office Depot is the <u>Largest</u> Named Supplier*

| | | | | |
|---|---|---|---|---|
| | $2,544,245 | $438 | ALPHA OFFICE SUPPLIES | 0.00 |
| | $9,796,458 | $11,474 | ALBERT'S OFFICE SUPPLY CO INC | 0.00 |
| | $2,457,000 | $7,699 | CBRE | 0.00 |
| | $3,971,408 | $13,394 | VERITIV-UNISOURCE-XPEDX | 0.00 |
| | $18,054,331 | $97,547 | BARRINGTON GROUP LTD | 0.01 |
| | $2,539,568 | $14,279 | PAPER CORPORATION | 0.01 |
| | $10,469,922 | $80,366 | FEDEX | 0.01 |
| | $5,206,843 | $44,201 | COLAMCO | 0.01 |
| | $2,000,636 | $18,931 | GUERNSEY OFFICE PRODUCTS INC | 0.01 |
| | $5,887,774 | $61,331 | GUY BROWN | 0.01 |
| | $2,230,422 | $25,677 | EMPIRE OFFICE INC | 0.01 |
| | $972,896 | $18,679 | JONES LANG LASALLE AMERICAS INC | 0.02 |
| | $2,080,392 | $53,761 | MAXWELL PAPER PRODUCTS CO INC | 0.03 |
| | $28,974,338 | $760,082 | TAYLOR CORPORATION | 0.03 |
| | $7,672,441 | $220,655 | ULINE | 0.03 |
| | $2,509,114 | $85,817 | NEOPOST USA INC | 0.03 |
| | $5,881,458 | $212,436 | KRENGEL - AMERICAN MARKING SYSTEMS | 0.04 |
| | $7,568,419 | $322,543 | FACSIMILE PAPER CONNECTION | 0.04 |
| | $2,159,204 | $111,789 | BRUCKNER SUPPLY | 0.05 |
| | $2,132,934 | $115,269 | AMAZON | 0.05 |
| | $2,417,619 | $153,485 | AHLSTROM NONWOVENS LLC | 0.06 |
| | $2,872,122 | $217,373 | INTERNATIONAL PAPER | 0.08 |
| | $2,842,046 | $228,080 | GRAINGER | 0.08 |
| | $1,308,824 | $106,833 | DNOW | 0.08 |
| | $13,860,981 | $1,168,794 | NELMAR | 0.08 |
| | $1,489,400 | $161,111 | SOUTHERN OFFICE SUPPLY | 0.11 |
| | $1,713,389 | $192,573 | MILLER OFFICE | 0.11 |
| | $423,690 | $55,578 | LINDENMEYR | 0.13 |
| | $467,133 | $61,952 | FRANK PARSONS INC | 0.13 |
| | $3,821,033 | $620,674 | GESTION DACHATS RAM | 0.16 |
| | $5,234,727 | $1,050,000 | XEROX | 0.20 |
| | $567,274 | $127,636 | A&B BUSINESS | 0.22 |
| | $621,878 | $147,810 | CANON | 0.24 |
| | $2,036,966 | $499,786 | OFFICE ESSENTIALS | 0.25 |

CONFIDENTIAL MATERIAL

## Exhibit 8

| Customer | Staples & Office Depot Purchases | Largest Other Supplier Purchases | Largest Other Named Supplier | Ratio (Other $) / (ST,OD $) |
|---|---|---|---|---|
| | $3,010,776 | $843,071 | LINDENMEYR | 0.28 |
| | $652,561 | $185,188 | VERITIV-UNISOURCE-XPEDX | 0.28 |
| | $2,323,039 | $787,265 | WHITLOCK BUSINESS SYSTEMS | 0.34 |
| | $2,106,945 | $792,856 | AMAZON | 0.38 |
| | $1,107,540 | $505,876 | ARCTIC OFFICE | 0.46 |
| | $2,620,998 | $1,475,537 | RUNCO | 0.56 |
| | $3,932,719 | $3,190,353 | DOMTAR | 0.81 |
| **Total—Staples or Office Depot is the Largest Named Supplier** | **$180,541,466** | **$14,848,201** | | **0.08** |
| *Another Supplier is the Largest Named Supplier* | | | | |
| | $14,287,885 | $14,601,408 | VERITIV-UNISOURCE-XPEDX | 1.02 |
| | $46,008 | $61,218 | INNERWORKINGS | 1.33 |
| | $778,116 | $1,174,900 | LINDENMEYR | 1.51 |
| | $3,607,107 | $6,670,469 | VERITIV-UNISOURCE-XPEDX | 1.85 |
| | $32,650 | $6,740,000 | GEORGIA PACIFIC | 206.43 |
| **Total—Another Supplier is the Largest Named Supplier** | **$18,751,765** | **$29,247,995** | | **1.56** |

CONFIDENTIAL MATERIAL

**Exhibit 8**

*Notes:*

[1] 

CONFIDENTIAL MATERIAL

PX06100-092

**Exhibit 9A**

**Bidder Appearances: Consumable Office Supplies Opportunties**

*Fortune 100 Customers, 2012-2015 (N = 43)*

| Competitor | Total Appearances | | Appearances as Incumbent | | Appearances as Winner | |
|---|---|---|---|---|---|---|
| | Count | Share of Bids | Count | Share of Bids | Count | Share of Bids |
| STAPLES | 43 | 100.0% | 21 | 48.8% | 24 | 55.8% |
| OFFICE DEPOT | 38 | 88.4% | 18 | 41.9% | 16 | 37.2% |
| WB MASON | 3 | 7.0% | 0 | 0.0% | 0 | 0.0% |
| CDW | 2 | 4.7% | 1 | 2.3% | 0 | 0.0% |
| INNOVATIVE OFFICE SOLUTIONS | 2 | 4.7% | 1 | 2.3% | 0 | 0.0% |
| PROMOADVANTAGE MARKETING GROUP | 1 | 2.3% | 1 | 2.3% | 0 | 0.0% |
| S&T OFFICE | 1 | 2.3% | 1 | 2.3% | 0 | 0.0% |
| TRENDEX | 1 | 2.3% | 1 | 2.3% | 0 | 0.0% |
| VISIONS | 1 | 2.3% | 1 | 2.3% | 0 | 0.0% |
| XEROX | 1 | 2.3% | 1 | 2.3% | 0 | 0.0% |
| RUNCO | 1 | 2.3% | 0 | 0.0% | 1 | 2.3% |
| ABI | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| AMAZON | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| APD | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| ATTRONICA | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| BUSINESS CARDS ACROSS AMERICA | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| CELLMARK | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| CORPORATE UNITED | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| ESSENDANT | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| FASTENAL | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| GLOBAL OFFICE SERVICES | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| GRAINGER | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| GREEN CASTLE | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| HAGEMEYER | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| IMPERIAL SUPPLIES | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| INSIGHT | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| LIGHTHOUSE FOR THE BLIND | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| MAGID | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| MEMPHIS | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| MISTER PAPER | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| MOTION INDUSTRIES | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| MSC INDUSTRIAL | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| NETWORK SERVICES | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| ODORZONE | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| ORGATEX | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| PROFTECH | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| S&L OFFICE SUPPLIES | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| SEALED AIR | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| SHI | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| SIGMA SUPPLY | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |

CONFIDENTIAL MATERIAL

**Exhibit 9A**

| Competitor | Total Appearances | | Appearances as Incumbent | | Appearances as Winner | |
|---|---|---|---|---|---|---|
| | Count | Share of Bids | Count | Share of Bids | Count | Share of Bids |
| STANDARD REGISTER | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| TRIMEGA | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| TSRC | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| VICTOR LUNDEEN | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |
| XPEDX | 1 | 2.3% | 0 | 0.0% | 0 | 0.0% |

*Notes*

[1] This analysis considers bids for the most recent bidding opportunity that included consumable office supplies at each Fortune 100 company.  There are 43 such bidding events during 2012-2015 with sufficient information to identify bidders.

[2] Total appearances count all bidders, including the incumbent and winner.

[3] Office Depot includes all references to OfficeMax.

[4] Excludes bids for regions outside of the U.S.

[5] Bids by Staples or Office Depot that include partnerships with diversity suppliers are attributed to Staples or Office Depot, respectively.

[6] Suppliers with common ownership are counted as a single entity (e.g., Staples and Quill).

*Sources*

[a] Customer CID Responses, Subpoena Responses, and Declarations.

[b] Office Depot Specification 26 Diversity Supplier Data,
    <OD OM Tier 1 Account Numbers and Tier 1 Partners xlsx>,
    <ODP-OMX Tier 1 Admin Fee Rates - 2015 xls>.

[c] Staples Specification 25 Diversity Supplier Data, <SPLS_4286101_with account numbers.xlsx>.

CONFIDENTIAL MATERIAL

**Exhibit 9B**

## Office Depot and Staples Losses to Competitors
## Fortune 100 Bid Data
*Consumable Office Supplies Opportunities, 2012-2015*

| Incumbent | Winner | Number of Bids | Share of Incumbent Losses |
|---|---|---|---|
| Office Depot | Staples | 6 | **100%** |
| | Other Suppliers | 0 | 0% |
| Staples | Office Depot | 5 | **91%** |
| | Other Suppliers | 1 | 9% |

*Notes:*

[1]   This analysis considers bids for the most recent bidding opportunity that included consumable office supplies at each Fortune 100 company.  There are 43 such bidding events during 2012-2015 with sufficient information to identify bidders.

[2]   Excludes bids for regions outside of the U.S. and bids for which the winner is unknown.

[3]   Office Depot includes all references to OfficeMax.

[4]   Losses consist of opportunities in which Office Depot or Staples appeared as an incumbent and lost some or all of the business to a competitor.

[5]   When there are multiple incumbents or winners, each supplier is allocated an equal proportion of the incumbency or win.  For example, an opportunity with incumbent "Office Depot, W.B. Mason" and winner "Staples" would count as half of a loss each for Office Depot and W.B. Mason.

[6]   Bids by Staples or Office Depot that include partnerships with diversity suppliers are attributed to Staples or Office Depot, respectively.

[7]   Suppliers with common ownership are counted as a single entity (e.g., Staples and Quill).

*Sources:*

[a]   Customer CID Responses, Subpoena Responses, and Declarations.

[b]   Office Depot Specification 26 Diversity Supplier Data,
        <OD OM Tier 1 Account Numbers and Tier 1 Partners xlsx>,
        <ODP-OMX Tier 1 Admin Fee Rates - 2015.xls>.

[c]   Staples Specification 25 Diversity Supplier Data, <SPLS_4286101_with account numbers xlsx>.

CONFIDENTIAL MATERIAL

**Exhibit 10**

## Competitor Appearances in the Office Depot Bid Data

*Consumable Office Supplies Opportunities with Enterprise, Major, and Large Higher-Education Customers, 2013-2015 (N = 1253)*

| Competitor | Total Appearances | | Appearances as Incumbent | | Appearances as Winner | |
|---|---|---|---|---|---|---|
| | Count | Share of Bids | Count | Share of Bids | Count | Share of Bids |
| STAPLES | 833 | 66.5% | 427 | 34.1% | 240 | 19.2% |
| | 132 | 10.5% | 28 | 2.2% | 18 | 1.4% |
| | 33 | 2.6% | 20 | 1.6% | 11 | 0.9% |
| | 9 | 0.7% | 6 | 0.5% | 2 | 0.2% |
| | 7 | 0.6% | 2 | 0.2% | 0 | 0.0% |
| | 6 | 0.5% | 0 | 0.0% | 0 | 0.0% |
| | 5 | 0.4% | 5 | 0.4% | 3 | 0.2% |
| | 5 | 0.4% | 4 | 0.3% | 0 | 0.0% |
| | 5 | 0.4% | 3 | 0.2% | 2 | 0.2% |
| | 5 | 0.4% | 2 | 0.2% | 2 | 0.2% |
| | 5 | 0.4% | 1 | 0.1% | 3 | 0.2% |
| | 5 | 0.4% | 1 | 0.1% | 1 | 0.1% |
| | 4 | 0.3% | 1 | 0.1% | 0 | 0.0% |
| | 4 | 0.3% | 0 | 0.0% | 0 | 0.0% |
| | 3 | 0.2% | 2 | 0.2% | 2 | 0.2% |
| | 3 | 0.2% | 2 | 0.2% | 2 | 0.2% |
| | 3 | 0.2% | 2 | 0.2% | 1 | 0.1% |
| | 3 | 0.2% | 2 | 0.2% | 1 | 0.1% |
| | 3 | 0.2% | 2 | 0.2% | 0 | 0.0% |
| | 3 | 0.2% | 1 | 0.1% | 1 | 0.1% |
| | 3 | 0.2% | 1 | 0.1% | 0 | 0.0% |
| | 3 | 0.2% | 1 | 0.1% | 0 | 0.0% |
| | 3 | 0.2% | 0 | 0.0% | 3 | 0.2% |
| | 3 | 0.2% | 0 | 0.0% | 1 | 0.1% |
| | 3 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| | 3 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| | 3 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| | 3 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| | 3 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| | 2 | 0.2% | 2 | 0.2% | 2 | 0.2% |
| | 2 | 0.2% | 2 | 0.2% | 0 | 0.0% |
| | 2 | 0.2% | 2 | 0.2% | 0 | 0.0% |
| | 2 | 0.2% | 2 | 0.2% | 0 | 0.0% |
| | 2 | 0.2% | 1 | 0.1% | 2 | 0.2% |
| | 2 | 0.2% | 1 | 0.1% | 1 | 0.1% |
| | 2 | 0.2% | 1 | 0.1% | 0 | 0.0% |
| | 2 | 0.2% | 1 | 0.1% | 0 | 0.0% |
| | 2 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| | 2 | 0.2% | 0 | 0.0% | 0 | 0.0% |

CONFIDENTIAL MATERIAL

**Exhibit 10**

| Competitor | Total Appearances | | Appearances as Incumbent | | Appearances as Winner | |
|---|---|---|---|---|---|---|
| | Count | Share of Bids | Count | Share of Bids | Count | Share of Bids |
| | 2 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| | 2 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| | 2 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 1 | 0.1% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |

CONFIDENTIAL MATERIAL

**Exhibit 10**

| Competitor | Total Appearances | | Appearances as Incumbent | | Appearances as Winner | |
|---|---|---|---|---|---|---|
| | Count | Share of Bids | Count | Share of Bids | Count | Share of Bids |
| ████████████████ | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 1 | 0.1% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 1 | 0.1% |
| | 1 | 0.1% | 0 | 0.0% | 1 | 0.1% |
| | 1 | 0.1% | 0 | 0.0% | 1 | 0.1% |
| | 1 | 0.1% | 0 | 0.0% | 1 | 0.1% |
| | 1 | 0.1% | 0 | 0.0% | 1 | 0.1% |
| | 1 | 0.1% | 0 | 0.0% | 1 | 0.1% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |

CONFIDENTIAL MATERIAL

**Exhibit 10**

| Competitor | Total Appearances | | Appearances as Incumbent | | Appearances as Winner | |
|---|---|---|---|---|---|---|
| | Count | Share of Bids | Count | Share of Bids | Count | Share of Bids |
| ▮▮▮▮▮▮ | 1 | 0.1% | 0 | 0.0% | 0 | 0.0% |

*Notes*

[1] This analysis considers customers who are ever classifed by Office Depot in the "Enterprise $1M+" or "Major $500K-$1M" segments, or who are ever classified by Office Depot in the "Higher-Ed" segment with a bid value of at least $500K.

[2] Consumable office supplies opportunities are defined as those including office supplies, instructional supplies, art supplies, paper, labels, calendars, packaging materials, or a "Standard Product Mix."

[3] Only named competitors are included.  References to ambiguous entities, such as "Others" or "Local Vendor," are not counted.

[4] Total appearances count competitor mentions in either the "incumbent," "winner," or "other_bidders" fields.

[5] The frequencies consider bid opportunities after removing likely duplicates.  Duplicates are identified where opportunities share the same customer, have similar product descriptions, incumbents, and winners, and occur within 90 days of each other.

[6] Excludes opportunities outside of the U.S., opportunities that Office Depot classifies as duplicate or cancelled, and opportunities in which Office Depot did not place a bid.

[7] Bids by Staples or Office Depot that include partnerships with diversity suppliers are attributed to Staples or Office Depot, respectively.

[8] Suppliers with common ownership are counted as a single entity (e.g., Staples and Quill).



**Exhibit 11**

## Competitor Appearances in the Staples Bid Data

*Consumable Office Supplies Opportunities, 2012-2014 (N = 393)*

| Competitor | Total Appearances | | Appearances as Incumbent | | Appearances as Winner | |
|---|---|---|---|---|---|---|
| | Count | Share of Bids | Count | Share of Bids | Count | Share of Bids |
| OFFICE DEPOT | 214 | 54.5% | 180 | 45.8% | 142 | 36.1% |
| | 30 | 7.6% | 24 | 6.1% | 20 | 5.1% |
| | 4 | 1.0% | 4 | 1.0% | 4 | 1.0% |
| | 4 | 1.0% | 3 | 0.8% | 2 | 0.5% |
| | 3 | 0.8% | 3 | 0.8% | 3 | 0.8% |
| | 3 | 0.8% | 2 | 0.5% | 2 | 0.5% |
| | 3 | 0.8% | 1 | 0.3% | 2 | 0.5% |
| | 2 | 0.5% | 2 | 0.5% | 2 | 0.5% |
| | 2 | 0.5% | 2 | 0.5% | 1 | 0.3% |
| | 2 | 0.5% | 0 | 0.0% | 2 | 0.5% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 1 | 0.3% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |

CONFIDENTIAL MATERIAL

**Exhibit 11**

| Competitor | Total Appearances | | Appearances as Incumbent | | Appearances as Winner | |
|---|---|---|---|---|---|---|
| | Count | Share of Bids | Count | Share of Bids | Count | Share of Bids |
|  | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 1 | 0.3% | 0 | 0.0% |
| | 1 | 0.3% | 0 | 0.0% | 1 | 0.3% |
| | 1 | 0.3% | 0 | 0.0% | 1 | 0.3% |

*Notes*

[1]  Tablulations are based on 393 opportunities from the Staples bid data involving consumable office supplies in 2012-2014.

[2]  Excludes opportunities outside of the U.S., opportunities that Staples classifies as duplicate or cancelled, and opportunities in which Staples did not place a bid.

[3]  Only named competitors are included.  References to ambiguous entities, such as "Other Vendor" or "Unknown," are not counted.

[4]  Office Depot includes all references to OfficeMax.

[5]  Bids by Staples or Office Depot that include partnerships with diversity suppliers are attributed to Staples or Office Depot, respectively.

[6]  Suppliers with common ownership are counted as a single entity (e.g., Staples and Quill).

CONFIDENTIAL MATERIAL

**Exhibit 12**

## Transitions from Incumbent to Winner in the Office Depot Bid Data

*Consumable Office Supplies Opportunities with Enterprise, Major, and Large Higher-Education Customers, 2013-2015*

| Incumbent | Number of Opportunities | Winner | | |
|---|---|---|---|---|
| | | Office Depot | Staples | Other Suppliers |
| Office Depot | 499 | **84.3%** | 12.3% | 3.4% |
| Staples | 315 | 47.0% | **49.2%** | 3.8% |
| Other Suppliers | 135 | 47.0% | 9.5% | **43.5%** |

*Notes:*

[1]  This analysis considers customers who are ever classifed by Office Depot in the "Enterprise $1M+" or "Major $500K-$1M" segments, or who are ever classified by Office Depot in the "Higher-Ed" segment with a bid value of at least $500K.

[2]  Consumable office supplies opportunities are defined as those including office supplies, instructional supplies, art supplies, paper, labels, calendars, packaging materials, or a "Standard Product Mix."

[3]  <Specification 21 xlsx> distinguishes Office Depot from OfficeMax, both before and after their merger.  This calculation treats Office Depot and OfficeMax as a single entity.

[4]  When the data list multiple incumbents or winners, each supplier is allocated an equal proportion of the incumbency or win.  For example, an opportunity with incumbent "Office Depot, W.B. Mason" and winner "Staples" would count as half of a loss each for Office Depot and W.B. Mason.

[5]  References to ambiguous entities, such as "Others" or "Various," are assumed to be other (third party) suppliers, even when the data do not rule out Staples or Office Depot.  They are counted as a single "Other" supplier.

[6]  Opportunities are counted after removing likely duplicates.  Duplicates are identified where opportunities share the same customer, have similar product descriptions, incumbents, and winners, and occur within 90 days of each other.

[7]  Excludes opportunities outside of the U.S., opportunities that Office Depot classifies as duplicate or cancelled, opportunities in which Office Depot did not place a bid, and opportunities in which the incumbent or winner is unknown or missing.

[8]  Bids by Staples or Office Depot that include partnerships with diversity suppliers are attributed to Staples or Office Depot, respectively.

[9]  Suppliers with common ownership are counted as a single entity (e.g., Staples and Quill).



CONFIDENTIAL MATERIAL

**Exhibit 13**

## Office Depot Losses to Staples and Other Suppliers
## Office Depot Bid Data

*Consumable Office Supplies Opportunities with Enterprise, Major, and Large Higher-Education Customers, 2013-2015*

| Winner | Number of Office Depot Losses | Share of Office Depot Losses |
|---|:---:|:---:|
| Staples | 61 | **78.1%** |
| Other Suppliers | 17 | 21.9% |
| *Total* | *78* | *100.0%* |

*Notes:*

[1] This analysis considers customers who are ever classifed by Office Depot in the "Enterprise $1M+" or "Major $500K-$1M" segments, or who are ever classified by Office Depot in the "Higher-Ed" segment with a bid value of at least $500K.

[2] Consumable office supplies opportunities are defined as those including office supplies, instructional supplies, art supplies, paper, labels, calendars, packaging materials, or a "Standard Product Mix."

[3] <Specification 21.xlsx> distinguishes Office Depot from OfficeMax, both before and after their merger.  This calculation treats Office Depot and OfficeMax as a single entity.

[4] Losses consist of opportunities in which Office Depot or OfficeMax appeared as an incumbent and lost some or all of the business to a competitor.

[5] When the data list multiple incumbents or winners, each supplier is allocated an equal proportion of the incumbency or win.  For example, an opportunity with incumbent "Office Depot, W.B. Mason" and winner "Staples" would count as half of a loss each for Office Depot and W.B. Mason.

[6] References to ambiguous entities, such as "Others" or "Various," are assumed to be other (third party) suppliers, even when the data do not rule out Staples or Office Depot.  They are counted as a single "Other" supplier.

[7] Opportunities are counted after removing likely duplicates.  Duplicates are identified where opportunities share the same customer, have similar product descriptions, incumbents, and winners, and occur within 90 days of each other.

[8] Excludes opportunities outside of the U.S., opportunities that Office Depot classifies as duplicate or cancelled, opportunities in which Office Depot did not place a bid, and opportunities in which the winner is unknown or missing.

[9] Bids by Staples or Office Depot that include partnerships with diversity suppliers are attributed to Staples or Office Depot, respectively.

[10] Suppliers with common ownership are counted as a single entity (e.g., Staples and Quill).

CONFIDENTIAL MATERIAL

**Exhibit 13**



CONFIDENTIAL MATERIAL

## Exhibit 14

## Transitions from Incumbent to Winner in the Staples Bid Data

*Consumable Office Supplies Opportunities, 2012-2014*

| Incumbent | Number of Opportunities | Winner | | |
|---|---|---|---|---|
| | | Office Depot | Staples | Other Suppliers |
| Office Depot | 153 | **64.5%** | 33.5% | 2.0% |
| Staples | 116 | 24.5% | **69.9%** | 5.6% |
| Other Suppliers | 69 | 12.1% | 30.5% | **57.3%** |

*Notes:*

[1]   This analysis is restricted to opportunities involving consumable office supplies.

[2]   When the data list multiple incumbents or winners, each supplier is allocated an equal proportion of the incumbency or win.  For example, an opportunity with incumbent "Office Depot, W.B. Mason" and winner "Staples" would count as half of a loss each for Office Depot and W.B. Mason.

[3]   Office Depot includes all references to OfficeMax.

[4]   References to ambiguous entities, such as "Others" or "Various," are assumed to be other (third party) suppliers, even when the data do not rule out Staples or Office Depot.  They are counted as a single "Other" supplier.

[5]   Excludes opportunities outside of the U.S., opportunities that Staples classifies as duplicate or cancelled, opportunities in which Staples did not place a bid, and opportunities in which the incumbent or winner is unknown or missing.

[6]   Bids by Staples or Office Depot that include partnerships with diversity suppliers are attributed to Staples or Office Depot, respectively.

[7]   Suppliers with common ownership are counted as a single entity (e.g., Staples and Quill).



CONFIDENTIAL MATERIAL

## Exhibit 15

### Staples Losses to Office Depot and Other Suppliers
### Staples Bid Data

*Consumable Office Supplies Opportunities, 2012-2014*

| Winner | Number of Staples Losses | Share of Staples Losses |
|--------|--------------------------|-------------------------|
| Office Depot | 28 | **81.3%** |
| Other Suppliers | 7 | 18.7% |
| *Total* | *35* | *100.0%* |

*Notes:*

[1]  This analysis is restricted to opportunities involving consumable office supplies.

[2]  Office Depot includes all references to OfficeMax.

[3]  Losses consist of opportunities in which Staples appeared as an incumbent and lost some or all of the business to a competitor.

[4]  When the data list multiple incumbents or winners, each supplier is allocated an equal proportion of the incumbency or win.  For example, an opportunity with incumbent "Office Depot, W.B. Mason" and winner "Staples" would count as half of a loss each for Office Depot and W.B. Mason.

[5]  References to ambiguous entities, such as "Others" or "Various," are assumed to be other (third party) suppliers, even when the data do not rule out Staples or Office Depot.  They are counted as a single "Other" supplier.

[6]  Excludes opportunities outside of the U.S., opportunities that Staples classifies as duplicate or cancelled, opportunities in which Staples did not place a bid, and opportunities in which the incumbent or winner is unknown or missing.

[7]  Bids by Staples or Office Depot that include partnerships with diversity suppliers are attributed to Staples or Office Depot, respectively.

[8]  Suppliers with common ownership are counted as a single entity (e.g., Staples and Quill).



CONFIDENTIAL MATERIAL

**Exhibit 16A**

## Staples' Retention Rates for Large Customers

*50% Retention Cutoff, FY 2011-2014*

| Customer Count | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
|---|---|---|---|---|---|
| Large-Customer Count | ■ | ■ | ■ | ■ | |
| Retained-Customer Count | | ■ | ■ | ■ | ■ |
| *Retention Rate* | | ■ | ■ | ■ | ■ |

*Notes:*

[1] ████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
████████████████████████████
██████████████████████████████
██████████████████████
██████████████████████████████████
██████████████████████████████████
████████
████████████████████████
██████████████████████████████████
████████████████████████████████
████████████████████████████████████
██████████████████

████
██████████████████████
████████████████████████
██████████████████████████████

CONFIDENTIAL MATERIAL

**Exhibit 16B**

## Office Depot's Retention Rates for Large Customers

*50% Retention Cutoff, FY 2011-2014*

| Customer Count | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
|---|---|---|---|---|---|
| Large-Customer Count | ■ | ■ | ■ | ■ | |
| Retained-Customer Count | | ■ | ■ | ■ | ■ |
| *Retention Rate* | | ■ | ■ | ■ | ■ |

*Notes:*

[1]



**Exhibit 16C**

## OfficeMax's Retention Rates for Large Customers

*50% Retention Cutoff, FY 2011-2014*

| Customer Count | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
|---|---|---|---|---|---|
| Large-Customer Count | ■ | ■ | ■ | ■ | |
| Retained-Customer Count | | ■ | ■ | ■ | ■ |
| *Retention Rate* | | ■ | ■ | ■ | ■ |

*Notes:*



**Exhibit 17**

**Winning Suppliers: Staples' Top Losses**

| Winning Supplier | Customer Count | Percent |
|---|---|---|
| Office Depot-OfficeMax | 40 | 80% |
| Others | 10 | 20% |

*Notes:*

[1] Outcomes of Staples losses were identified based on (a) win-loss data produced by Staples, Office Depot and OfficeMax, (b) internal Staples, Office Depot and OfficeMax documents, and (c) analysis of revenue reported in Staples Specification 25, OfficeMax Specification 26, and Office Depot Specification 26.

[2] "Others" refers to suppliers other than Staples, Office Depot and OfficeMax.



CONFIDENTIAL MATERIAL

**Exhibit 18**

**Winning Suppliers: Office Depot-OfficeMax Top Losses**

| Winner | Customer Count | Percent |
|--------|----------------|---------|
| Staples | 34 | 72% |
| Others | 13 | 28% |

*Notes:*

[1] Outcomes of Office Depot-OfficeMax losses were identified based on (a) win-loss data produced by Staples, Office Depot and OfficeMax, (b) internal Staples, Office Depot and OfficeMax documents, and (c) analysis of revenue reported in Staples Specification 25, OfficeMax Specification 26, and Office Depot Specification 26.

[2] "Others" refers to suppliers other than Staples, Office Depot and OfficeMax.

[3] ▮▮▮▮▮ switched from Office Depot to OfficeMax and ▮▮▮ switched from OfficeMax to Office Depot. These 2 customers are excluded from this analysis.

[4] According to Office Depot Specification 24 response, Office Depot lost two account ids associated with ▮▮▮▮▮▮. In this analysis, we have counted these two account ids as a single loss.



CONFIDENTIAL MATERIAL

**Exhibit 19**

**Incumbent Suppliers: Staples' Top Wins**

| Incumbent Supplier | Customer Count | Percent |
|---|---|---|
| Office Dept-OfficeMax | 39 | 80% |
| Others | 10 | 20% |

*Notes:*

[1] Incumbent suppliers of Staples wins were identified based on (a) win-loss data produced by Staples, Office Depot and OfficeMax, (b) internal Staples, Office Depot and OfficeMax documents, and (c) analysis of revenue reported in Staples Specification 25, OfficeMax Specification 26, and Office Depot Specification 26.

[2] "Others" refers to suppliers other than Staples, Office Depot and OfficeMax.

[3] According to Staples Specification 22 response, Staples won opportunities involving two account ids associated with ██████ In this analysis, we have counted these two account ids as a single win.



CONFIDENTIAL MATERIAL

**Exhibit 20**

**Incumbent Suppliers: Office Depot-OfficeMax Top Wins**

| Incumbent Supplier | Customer Count | Percent |
|:---:|:---:|:---:|
| Staples | 36 | 77% |
| Others | 11 | 23% |

*Notes:*

[1]  Incumbent suppliers of Office Depot-OfficeMax wins were identified based on (a) win-loss data produced by Staples, Office Depot and OfficeMax, (b) internal Staples, Office Depot and OfficeMax documents, and (c) analysis of revenue reported in Staples Specification 25, OfficeMax Specification 26, and Office Depot Specification 26.

[2]  "Others" refers to suppliers other than Staples, Office Depot and OfficeMax.

[3]  Three out of the fifty wins were switches beteween Office Depot and OfficeMax.  These three wins are excluded from this analysis.  The three wins are ███████ (switch from Office Depot to OfficeMax) ██████ (switch from Office Depot to OfficeMax) and █████████████ (switch from OfficeMax to Office Depot).



CONFIDENTIAL MATERIAL

**Exhibit 21**

All-Channel U.S. Sales of Consumable Office Supplies, 2014
*(Millions of Dollars)*



*Notes:* See Appendix G for detailed notes.

*Sources:* Supplier responses, as detailed in Appendix G.

CONFIDENTIAL MATERIAL

**Exhibit 22A**

## OfficeMax Losses Prior to Merger with Office Depot

*Opportunities for >$150K and >$1M B2B Accounts, 2008-2013*

| Winner | Share from OMX Hunters Data | |
|---|---|---|
| | >$150K (n=273) | >$1M (n=65) |
| Staples | 61% | 72% |
| Office Depot | 16% | 11% |
| Other Suppliers | 23% | 17% |



CONFIDENTIAL MATERIAL

**Exhibit 22B**

**Office Depot Losses Prior to Merger with OfficeMax**

*Opportunities for >$150K and >$1M B2B Accounts, 2007-2013*

| Winner | Share from ODP Bid History Data | | Share from ODP Win/Loss/Renew Data | |
|---|---|---|---|---|
| | >$150K (n=37) | >$1M (n=9) | >$150K (n=375) | >$1M (n=109) |
| Staples | 39% | 44% | 56% | 55% |
| OfficeMax | 19% | 33% | 25% | 28% |
| Other Suppliers | 42% | 22% | 20% | 17% |

*Notes:*

███████████████████████████████

███████████████████████████████

████████████████████

████████████████████████████

██████

██████

█████████████████████████████████████

████████████████████

CONFIDENTIAL MATERIAL

PX06100-116

**Exhibit 22C**

## Runner-Ups for Office Depot Wins Prior to Merger with OfficeMax

*Opportunities for >$150K and >$1M B2B Accounts, 2012*

| Runner-Ups | Share from ODP Bid History Data | |
| --- | --- | --- |
| | >$150K (n=114) | >$1M (n=41) |
| Staples | 63% | 68% |
| OfficeMax | 15% | 21% |
| Other Suppliers | 22% | 11% |

*Notes:*

███████████████████████████████████

███████████████████████████████

████████████████████████

███

████████████████████████████████████████

██████████████

CONFIDENTIAL MATERIAL

**Exhibit E-1**

## Fortune 100 Customer Discretionary Leakage: Source Materials

| Customer | Estimate | Source | Citation |
|---|---|---|---|
|  | "Immaterial" | | Email from ▮▮▮▮▮ to FTC, January 20, 2016 |
| | 10% | | Email from ▮▮▮▮▮ to FTC, November 5, 2015 |
| | 1.1% | | Email from ▮▮▮ to Gabriel Rottman (Simpson Thatcher & Bartlett LLP), January 14, 2016; |

CONFIDENTIAL MATERIAL

**Exhibit E-1**

| Customer | Estimate | Source | Citation |
|---|---|---|---|
| ▮▮▮▮ | 0.7% |  | ▮▮▮▮ Decl. ¶16 |
| ▮▮ | 10% | | ▮▮▮▮ Decl. ¶9 |
| ▮▮ | "De minimis" | | Letter from ▮▮▮▮ ▮▮▮▮ to FTC, October 27, 2015, p. 2, note 1; ▮▮▮▮_00000553 xlsx |
| ▮▮ | "De minimis" | | Email from ▮▮▮▮ to FTC, October 30, 2015 |
| ▮▮ | "De minimis" | | Email from ▮▮▮▮ ▮▮▮▮ to FTC, January 15, 2016 |
| ▮▮ | "[Q]uite limited...by exception" | | Email ▮▮▮▮ ▮▮▮▮ September 25, 2015 |

CONFIDENTIAL MATERIAL

## Exhibit E-1

| Customer | Estimate | Source | Citation |
|---|---|---|---|
|  | 1% | | Email from ▇▇▇▇ ▇▇ to FTC, October 31, 2015 |
| | <3% | | Email from ▇▇▇▇ ▇▇▇▇ to FTC, September 22, 2015 |
| | "De minimis" | | Email from ▇▇▇▇ to FTC, October 8, 2015 |
| | "De minimis" | | Email from ▇▇▇▇ ▇▇▇▇ to FTC, September 23, 2015 |
| | 3.3% | | Email from ▇▇▇ to FTC, October 12, 2015 |
| | <5% | | Letter from ▇▇▇▇ ▇▇▇▇ ▇▇▇▇ to FTC, September 4, 2015, p. 3 |

CONFIDENTIAL MATERIAL

## Exhibit E-1



| Customer | Estimate | Source | Citation |
|---|---|---|---|
| ███████ | <5% | ████████████████████████████ | Email from ███████ ███████ to FTC, November 23, 2015 |
| ███████ | "De minimis" | ████████████████████████████ | Email from ███████ ███████) to FTC, October 23, 2015 |
| ███████ | 1.1% | ████████████████████████████ | Letter from ███████ ███████ to FTC, August 21, 2015, pp. 2-3; ██████████ ████████████ ██████████████ ████████████ ████████████ ██████████ |
| ███████ | "De minimis" | ████████████████████████████ | Email from ███████ ███████ to FTC, January 17, 2016 |

CONFIDENTIAL MATERIAL

**Exhibit E-1**



| Customer | Estimate | Source | Citation |
|---|---|---|---|
| ████ | "De minimis" | | Email from ████ ████ to FTC, September 22, 2015 |
| ████ | 10% | | Letter from ████ to FTC, September 18, 2015, p. 1 |
| ███ | 11% | | ████ |
| ██ | "Not material" | | Email from ████ ████ to FTC, November 13, 2015 |
| ████ | "De minimis" | | Email from ████ ████) to FTC, January 13, 2016 |

CONFIDENTIAL MATERIAL

**Exhibit E-1**

| Customer | Estimate | Source | Citation |
|---|---|---|---|
| ▬▬ | <3% |  | Email from ▬▬ to FTC, November 4, 2015 |
| ▬▬ | <10% | | ▬▬ Decl. ¶5 |

CONFIDENTIAL MATERIAL

PX06100-123

**Exhibit E-2**

**Fortune 100 Customer Discretionary Leakage: Summary**

| Customer | Estimate |
|---|---|
| | "Immaterial" |
| | 10% |
| | 1.1% |
| | 0.7% |
| | 10% |
| | "De minimis" |
| | "De minimis" |
| | "De minimis" |
| | "[Q]uite limited...by exception" |
| | 1% |
| | <3% |
| | "De minimis" |
| | "De minimis" |
| | 3.3% |
| | <5% |
| | <5% |
| | "De minimis" |
| | 1.1% |
| | "De minimis" |
| | "De minimis" |
| | 10% |
| | 11% |
| | "Not material" |
| | "De minimis" |
| | <3% |
| | <10% |

*Sources:*

[a]  See Exhibit E-1 for a detailed list of sources.

CONFIDENTIAL MATERIAL

PX06100-124

**Exhibit E-3**

**Fortune 100 Customers with Insufficient or Unreliable Responses**
*2014*

| Customer | Purchases from Staples & Office Depot |
|---|---|
| | $8,097,555 |
| | $7,107,940 |
| | $5,036,345 |
| | $4,071,583 |
| | $3,819,645 |
| | $3,514,480 |
| | $2,772,447 |
| | $2,320,590 |
| | $1,867,901 |
| | $1,756,689 |
| | $1,453,456 |
| | $1,277,653 |
| | $1,158,978 |
| | $1,141,995 |
| | $527,149 |
| | $517,134 |
| | $425,473 |
| | $202,589 |
| | $11,414 |
| **Average** | **$2,477,948** |
| **Median** | **$1,756,689** |

*Notes:*

[1]

CONFIDENTIAL MATERIAL

**Exhibit E-3**



CONFIDENTIAL MATERIAL

**Exhibit F-1**

**"Leakage" Examples From Office Depot's PRISM Analysis**

| Account Name | Office Depot 2015 Revenue | Office Depot 2014 Revenue | Total Sites | Not Buying in 2015 | Down 50% in 2015 | Newly Buying in 2015 | Up 100% in 2015 | Office Depot Leakage Method | Net Leakage Method | Aggregate Leakage Method |
|---|---|---|---|---|---|---|---|---|---|---|
| ███████ | $9,714,851 | $8,386,527 | 1,144 | 71 | 168 | 309 | 182 | -20.9% | 22.0% | 15.8% |
| ███████ | $5,581,025 | $5,364,429 | 374 | 67 | 31 | 80 | 29 | -26.2% | 2.9% | 4.0% |

*Notes*

[1] Total Sites is the number of sites with any spend in either 2014 or 2015, as Office Depot defined it in their December 4th Letter to FTC Commissioners.

[2] Total Sites, and thus Office Depot Leakage Method result, for ████████ does not match Office Depot's results in Appendix 1 of the December 4th Letter to FTC Commissioners.  Office Depot reported 387 ████████ sites in Appendix 1, but there are only 374 observations in the PRISM Data produced by Office Depot.

[3] Not Buying in 2015 represents sites with $0 spend in 2015, as Office Depot defined it in their December 4th Letter to FTC Commissioners.

[4] Down 50% in 2015 represents sites with year-over-year reductions in spend of 50% or greater in 2015, as Office Depot defined it in their December 4th Letter to FTC Commissioners.

[5] Newly Buying in 2015 represents sites with non-zero spend in 2015 and $0 of spend in 2014.

[6] Up 100% in 2015 represents sites with year-over-year increases in spend of 100% or greater in 2015.

[7] Office Depot Leakage Method is the proportion of Total Sites that were either Not Buying in 2015 or Down 50% in 2015.  (-Not Buying in 2015 - Down 50% in 2015) / Total Sites.

[8] Net Leakage Method calculates the net change in Newly Buying in 2015 and Up 100% in 2015 minus Not Buying in 2015 and Down 50% in 2015 as a proportion of all sites.  (Not Buying in 2015 + Down 50% in 2015 - Newly Buying in 2015 - Up 100% in 2015) / Total Sites.

[9] Aggregate Leakage Method is the change in total spend from 2014 to 2015.  (2015 Revenue - 2014 Revenue) / 2014 Revenue.

*Sources*

[a] Office Depot PRISM Data, <Office Depot Prism Data xlsx>.

[b] Letter from Matthew Reilly and Jeffrey Perry to FTC Commissioners, December 4, 2015, Appendix 1.

CONFIDENTIAL MATERIAL

# Appendix A

# CARL SHAPIRO

# Curriculum Vitae

Haas School of Business
University of California
Berkeley, CA 94720

510-642-5905

E-Mail: cshapiro@berkeley.edu
Home Page: http://faculty.haas.berkeley.edu/shapiro

## Professional Positions

**Transamerica Professor of Business Strategy**
Haas School of Business
University of California at Berkeley, 1994 - present

**Professor of Business and Economics**
Haas School of Business and Department of Economics
University of California at Berkeley, 1990 - present

**Member of the President's Council of Economic Advisers**
Executive Office of the President, The White House, 2011-12

**Deputy Assistant Attorney General for Economics**
Antitrust Division, U.S. Department of Justice, 2009 - 2011

**Director of the Institute of Business and Economic Research**
University of California at Berkeley, 1998 - 2008

**Deputy Assistant Attorney General for Economics**
Antitrust Division, U.S. Department of Justice, 1995 - 1996

**Chair, Economic Analysis and Policy Group**
Haas School of Business
University of California at Berkeley, 1991 - 1993

**Professor of Economics and Public Affairs**
Woodrow Wilson School of Public and International Affairs and
Department of Economics, Princeton University, 1987 - 1990

PX06100-128

**Research Fellow**
> Center for Advanced Study in the Behavioral Sciences
> Stanford University, 1989 - 1990

**Visiting Scholar**
> Stanford Law School, Stanford University, 1989 - 1990

**Assistant Professor of Economics and Public Affairs**
> Woodrow Wilson School of Public and International Affairs and
> Department of Economics, Princeton University, 1980 - 1987

**Visiting Fellow**
> Institute for International Economic Studies, University of Stockholm, 1986

**Visiting Assistant Professor of Economics and Public Policy**
> Graduate School of Business, Stanford University, 1982 - 1983.

**Economist**
> Bureau of Economics, Federal Trade Commission, Summer 1980

# Education

Ph.D.   Economics, M.I.T., 1981

M.A.   Mathematics, University of California at Berkeley, 1977

B.S.   Economics, M.I.T., 1976

B.S.   Mathematics, M.I.T., 1976

# Publications

Patent Assertions: Are We Any Closer to Aligning Rewards to Contribution?, with Fiona Scott
> Morton, *Innovation Policy and the Economy*, National Bureau of Economic Research,
> forthcoming, 2015.

The Actavis Inference: Theory and Practice, with Aaron Edlin, Scott Hemphill, and Herbert
> Hovenkamp, *Rutgers University Law Review*, 2015.

Jean Tirole's Nobel Prize in Economics: The Rigorous Foundations of Post-Chicago Antitrust
> Economics, with Steven Salop, *Antitrust*, 2015.

Actavis and Error Costs: A Reply to Critics, with Aaron Edlin, Scott Hemphill, and Herbert
> Hovenkamp, *Antitrust Source*, 2014.

Strategic Patent Acquisitions, with Fiona Scott Morton, *Antitrust Law Journal*, 2014.

A Simple Approach to Setting Reasonable Royalties for Standard-Essential Patents, with Mark
> Lemley, *Berkeley Technology Law Journal,* 2013.

Activating *Actavis*, with Aaron Edlin, Scott Hemphill, and Herbert Hovenkamp, *Antitrust,* 2013.

PX06100-129

Competition and Innovation: Did Arrow Hit the Bull's Eye?, in *The Rate & Direction of Inventive Activity Revisited,* Josh Lerner and Scott Stern, eds., National Bureau of Economic Research, University of Chicago Press, 2012.

The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years, *Antitrust Law Journal*, 2010.

Injunctions, Hold-Up, and Patent Royalties, *American Law and Economics Review*, 2010.

The Year in Review: Economics at the Antitrust Division: 2009-2010, with Ken Heyer, *Review of Industrial Organization,* 2010.

Recapture, Pass-Through, and Market Definition, with Joseph Farrell, *Antitrust Law Journal*, 2010.

Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition, with Joseph Farrell, *BE Journal of Theoretical Economics: Policies and Perspectives*, 2010.

> Upward Pricing Pressure in Horizontal Merger Analysis: Reply to Epstein and Rubinfeld, *BE Journal of Theoretical Economics: Policies and Perspectives*, 2010.

> Upward Pricing Pressure and Critical Loss Analysis, with Joseph Farrell, *Global Competition Review*, 2010.

Competition Policy in Distressed Industries, in *Competition as Public Policy,* American Bar Association, 2010.

The Year in Review: Economics at the Antitrust Division: 2008-2009, with Ken Heyer, *Review of Industrial Organization,* 2010.

A Tribute to Oliver Williamson: Antitrust Economics, *California Management Review,* 2010.

Updating the Merger Guidelines: Issues for the Upcoming Workshops, Antitrust Division, U.S. Department of Justice, November 2009.

Microsoft: Remedial Failure, *Antitrust Law Journal,* 2009.

How Strong Are Weak Patents? with Joseph Farrell, *American Economic Review,* 2008.

Detecting and Reversing the Decline in Horizontal Merger Enforcement, with Jonathan Baker, *Antitrust*, Summer 2008.

Reinvigorating Horizontal Merger Enforcement, with Jonathan Baker, in *Where the Chicago School Overshot the Mark: The Effect of Conservative Economic Analysis on Antitrust,* Robert Pitofsky, ed., Oxford University Press, 2008.

Merger to Monopoly to Serve a Single Buyer: Comment, with Jonathan Baker and Joseph Farrell, *Antitrust Law Journal,* 2008.

Improving Critical Loss, with Joseph Farrell, *Antitrust Source,* February 2008.

Patent Reform: Aligning Reward and Contribution, *Innovation Policy and the Economy,* Adam Jaffe, Josh Lerner, and Scott Stern, eds., National Bureau of Economic Research, vol. 8, pp. 111-156, 2007.

Standard Setting, Patents and Hold-Up, with Joseph Farrell, John Hayes and Theresa Sullivan, *Antitrust Law Journal*, 74, 2007.

PX06100-130

Antitrust, with Louis Kaplow, in *Handbook of Law and Economics, Volume 2,* A. Mitchell Polinsky & Steven Shavell, eds., Elsevier, pp. 1073-1225, 2007.

Patent Hold-Up and Royalty Stacking, with Mark A. Lemley, *Texas Law Review*, vol. 85, no. 7, pp. 1991-2049, June 2007.

> Patent Hold-Up and Royalty Stacking: Reply, with Mark A. Lemley, *Texas Law Review*, vol. 85, no. 7, pp. 2163-2173, June 2007.

Market Definition in Crude Oil: Estimating the Effects of the BP/ARCO Merger, with John Hayes and Robert Town, *Antitrust Bulletin*, Summer 2007.

Prior User Rights, *American Economic Review Papers & Proceedings,* May 2006.

Probabilistic Patents, with Mark A. Lemley, *Journal of Economic Perspectives*, Spring 2005.

Patent System Reform: Economic Analysis and Critique, *Berkeley Technology Law Journal,* vol. 19, no. 3, pp. 1017-1047, 2004.

*The Economics of Information Technology,* with Hal R. Varian and Joseph Farrell, Cambridge University Press, 2004.

Further Thoughts on Critical Loss, with Michael L. Katz, *Antitrust Source,* March 2004.

Antitrust Limits to Patent Settlements, *Rand Journal of Economics,* vol. 34, no. 2, pp. 391-411, Summer 2003.

Antitrust Analysis of Patent Settlements Between Rivals, *Antitrust Magazine,* pp. 70-77, Summer 2003.

Critical Loss: Let's Tell the Whole Story, with Michael L. Katz, *Antitrust Magazine, pp. 49-56,* Spring 2003.

The FTC's Challenge to Intel's Licensing Practices, in *The Antitrust Revolution: Economics, Competition, and Policy, 4th Edition,* John E. Kwoka, Jr. and Lawrence J. White, eds., Oxford University Press, 2003.

The British Petroleum/ARCO Merger: Alaskan Crude Oil, with Jeremy Bulow, in *The Antitrust Revolution: Economics, Competition, and Policy, 4th Edition,* John E. Kwoka, Jr. and Lawrence J. White, eds., Oxford University Press, 2003.

Antitrust Policy in the Clinton Administration, with Robert E. Litan, in *American Economic Policy in the 1990s,* Jeffrey Frankel and Peter Orszag, eds., Center for Business and Government, John F. Kennedy School of Government, Harvard University, 2002.

Trans-Atlantic Divergence in *GE/Honeywell:* Causes and Lessons, with Donna E. Patterson, *Antitrust Magazine,* Fall 2001.

Scale Economies and Synergies in Horizontal Merger Analysis, with Joseph Farrell, *Antitrust Law Journal*, vol. 68, no. 3, 2001.

Navigating the Patent Thicket: Cross Licenses, Patent Pools and Standard Setting, in *Innovation Policy and the Economy*, Adam Jaffe, Joshua Lerner, and Scott Stern, eds., National Bureau of Economic Research, vol. 1, pp. 1190-150, 2000.

PX06100-131

Setting Compatibility Standards: Cooperation or Collusion?, in *Expanding the Bounds of Intellectual Property*, Rochelle Dreyfuss, Diane Zimmerman, and Harry First, eds., 2001, Oxford University Press.

Simulating Partial Asset Divestitures to 'Fix' Mergers, with Jith Jayaratne, *International Journal of the Economics of Business*, 2000.

Competition Policy: A Century of Economic and Legal Thinking, with William Kovacic, *Journal of Economic Perspectives*, Winter 2000.

Competition Policy in the Information Economy, in *Competition Policy Analysis*, Einar Hope, ed., 2000, Routledge Studies in the Modern World Economy.

*Information Rules:  A Strategic Guide to the Network Economy*, with Hal R. Varian, Harvard Business School Press, 1999.

Exclusivity in Network Industries, *George Mason Law Review*, Spring 1999.

The Art of Standards Wars, with Hal R. Varian, *California Management Review*, Winter 1999.

Antitrust in Software Markets, with Michael L. Katz, in *Competition, Innovation and the Microsoft Monopoly: Antitrust in the Digital Marketplace*, Jeffrey A. Eisenbach and Thomas M. Lenard, eds., 1999, Kluwer Academic Publishers.

Versioning: The Smart Way to Sell Information, with Hal R. Varian, *Harvard Business Review*, November-December 1998.

Unilateral Refusals to License Intellectual Property and International Competition Policy, with Richard J. Gilbert, in *Competition and Trade Policies*, Einar Hope and Per Maeleng, eds., 1998, Routledge.

Antitrust Issues in the Licensing of Intellectual Property: The Nine No-No's Meet the Nineties, with Richard J. Gilbert, *Brookings Papers on Economics: Microeconomics*, 1997.

Crown-Jewel Provisions in Merger Consent Decrees, with Michael Sohn, *Antitrust Magazine*, 1997.

Privacy, Self-Regulation, and Antitrust, with Joseph Kattan, in *Privacy and Self-Regulation in the Information Age*, National Telecommunications and Information Administration, U.S. Department of Commerce, 1997.

Antitrust Policy: Towards a Post-Chicago Synthesis, *Jobs & Capital*, Winter 1997.

An Economic Analysis of Unilateral Refusals to License Intellectual Property, with Richard J. Gilbert, *Proceedings of the National Academy of Sciences*, November 12, 1996.

Re-Examining Dominance and Unlawful Exclusion Rules, *Antitrust Conference Report,* The Conference Board, 1996.

Antitrust in Network Industries,  Antitrust Division, U.S. Department of Justice, March 1996.

Mergers with Differentiated Products, *Antitrust*, Spring 1996.  See also http://www.usdoj.gov/atr/public/speeches/shapiro.spc.htm.

Aftermarkets and Consumer Welfare: Making Sense of *Kodak*, *Antitrust Law Journal*, Spring 1995.

PX06100-132

Systems Competition and Network Effects, with Michael L. Katz, *Journal of Economic Perspectives*, Spring 1994.

Systems Competition and Aftermarkets: An Economic Analysis of *Kodak*, with David J. Teece, *Antitrust Bulletin*, Spring 1994.

The Dynamics of Bandwagons, with Joseph Farrell, in *Problems of Coordination in Economic Activity*, James W. Friedman, ed., Kluwer Press, 1993.

Standard Setting in High Definition Television, with Joseph Farrell, *Brookings Papers on Economic Activity: Microeconomics*, 1992.

Product Introduction with Network Externalities, with Michael L. Katz, *Journal of Industrial Economics*, March 1992.

Horizontal Mergers: Reply, with Joseph Farrell, *American Economic Review*, September 1991.

Introduction to Liability Symposium, *Journal of Economic Perspectives*, Summer 1991.

Economic Rationales for the Scope of Privatization, with Robert D. Willig, in *The Political Economy of Public Sector Reform and Privatization*, Ezra N. Suleiman and John Waterbury, eds., Westview Press, San Francisco, CA, 1990.

On the Antitrust Treatment of Production Joint Ventures, with Robert D. Willig, *Journal of Economic Perspectives*, Summer 1990.

Asset Ownership and Market Structure in Oligopoly, with Joseph Farrell, *Rand Journal of Economics*, Summer 1990.

Optimal Patent Length and Breadth, with Richard Gilbert, *Rand Journal of Economics*, Spring 1990.

Horizontal Mergers: An Equilibrium Analysis, with Joseph Farrell, *American Economic Review*, March 1990.

Theories of Oligopoly Behavior, in *The Handbook of Industrial Organization*, R. Schmalensee and R.D. Willig (eds.), 1989.

Market Power and Mergers in Durable Goods Industries: Comment, *Journal of Law and Economics*, 1989

The Theory of Business Strategy, *Rand Journal of Economics*, Spring 1989.

Optimal Contracts with Lock-In, with Joseph Farrell, *American Economic Review*, March 1989.

Dynamic Competition with Switching Costs, with Joseph Farrell, *Rand Journal of Economics*, Spring 1988.

Counterfeit-Product Trade, with Gene. M. Grossman, *American Economic Review*, March 1988.

Foreign Counterfeiting of Status Goods, with Gene. M. Grossman, *Quarterly Journal of Economics*, February 1988.

Dynamic R&D Competition, with Gene M. Grossman, *Economic Journal*, June 1987.

R&D Rivalry with Licensing or Imitation, with Michael L. Katz, *American Economic Review*, June 1987.

PX06100-133

Optimal Dynamic R&D Programs, with Gene M. Grossman, *Rand Journal of Economics*, Winter 1986.

Product Compatibility Choice in a Market with Technological Progress, with Michael L. Katz, *Oxford Economic Papers*, Special Issue on the New Industrial Economics, November 1986.

Investment, Moral Hazard, and Occupational Licensing, *Review of Economic Studies*, October 1986.

How to License Intangible Property, with Michael L. Katz, *Quarterly Journal of Economics*, August 1986.

Research Joint Ventures: An Antitrust Analysis, with Gene M. Grossman, *Journal of Law Economics and Organization*, Fall 1986.

Consumer Shopping Behavior in the Retail Coffee Market, with Michael L. Katz, in *Empirical Approaches to Consumer Protection*, Pauline M. Ippolito and David T. Scheffman, eds., Federal Trade Commission, 1986.

Technology Adoption in the Presence of Network Externalities, with Michael L. Katz, *Journal of Political Economy*, August 1986.

Entry Dynamics with Mixed Strategies, with Avinash K. Dixit, in *The Economics of Strategic Planning*, L.G. Thomas, ed., Lexington Press, 1986.

Exchange of Cost Information in Oligopoly, *Review of Economic Studies*, July 1986.

InterLATA Capacity Growth and Market Competition, with Robert D. Willig, in *Telecommunications and Equity: Policy Research Issues*, Proceedings of the Thirteenth Annual Telecommunications Policy Research Conference, James Miller, ed., North Holland, 1986.

Can Unemployment be Involuntary? Reply, with Joseph E. Stiglitz, *American Economic Review*, December 1985.

On the Licensing of Innovations, with Michael L. Katz, *Rand Journal of Economics*, Winter 1985.

Normative Issues Raised by International Trade in Technology Services, with Gene M. Grossman, in *Trade and Investment in Service: Canada/U.S. Perspectives*, R.M. Stern (ed.), Ontario Economic Council, 1985.

Equilibrium Unemployment as a Worker Discipline Device: Reply, with Joseph E. Stiglitz, *American Economic Review*, September 1985.

Advances in Supervision Technology and Economic Welfare: A General Equilibrium Analysis, with Janusz Ordover, *Journal of Public Economics*, December 1984.

The General Motors-Toyota Joint Venture: An Economic Assessment, with Janusz A. Ordover, *Wayne Law Journal*, Summer 1985.

Network Externalities, Competition, and Compatibility, with Michael L. Katz, *American Economic Review*, June 1985.

PX06100-134

Patent  Licensing and R&D Rivalry, *American Economic Review Papers and Proceedings*, May 1985.

Equilibrium Unemployment as a Worker Discipline Device, with Joseph E. Stiglitz,  *American Economic Review*, June 1984.

Informative Advertising with Differentiated Products, with Gene M. Grossman, *Review of Economic Studies*, January 1984.

Premiums for High Quality Products as Returns to Reputation, *Quarterly Journal of Economics*, November 1983.

Consumer Protection in the United States, *Zeitscrift für die gesamte Staatswissenschaft*, *Journal of Institutional and Theoretical Economics*, October 1983.

A Theory of Factor Mobility, with Gene M. Grossman, *Journal of Political Economy*, October 1982.

Optimal Pricing of Experience Goods, *Bell Journal of Economics*, Autumn 1983.

Consumer Information, Product Quality, and Seller Reputation, *Bell Journal of Economics*, Spring 1982.

Advertising and Welfare: Comment, *Bell Journal of Economics*, Autumn 1980.

## Working Papers, Research Memoranda, Work in Progress

Unilateral Effects Analysis After *Oracle*,  Roundtable Discussion (multiple participants), *Antitrust Magazine,* Spring 2005.

The Role of Innovation in Competitive Analysis, Chair's Showcase Program (multiple participants), *Antitrust Source,* July 2005.

Linux Adoption in the Public Sector: An Economic Analysis, 2003, with Hal R. Varian.

Competition Policy and Innovation, Prepared for the Directorate for Science, Technology, and Industry, OECD, STI Working Paper No. 2002/11, April 2002, www.oecd.org/sti.

U.S. Government Information Policy, with Hal R. Varian, prepared for the Office of the Assistant Secretary of Defense (Command, Control, Communications and Intelligence), U.S. Department of Defense, August 1997.

*Economic Models of Counterfeiting*, with Gene M. Grossman, Report to the U.S. Department of Labor, International Labor Affairs Bureau, January 1988.

## Book Reviews

Review of *Bandwagon Effects in High-Technology Industries* by Jeffrey H. Rohlfs, in the Journal of Economics, 2003.

Review of *Will E-Commerce Erode Liberty? Review of Code and Other Laws of Cyberspace*, by Lawrence Lessig, in the Harvard Business Review, May/June 2000.

PX06100-135

Review of *Sunk Costs and Market Structure: Price Competition, Advertising, and the Evolution of Concentration*, by John Sutton, in the Journal of Economic Literature, 1993.

Review of *Controlling Industrial Pollution: The Economics and Politics of Clean Air*, by Robert W. Crandall, in the Journal of Economic Literature, June 1984, pp. 625-627.

## Other Professional Activities

Member, Long Range Planning Committee, Antitrust Sectionm, American Bar Association, 2015-2016.

Member, Foreign Investment, Sectoral Review, and Trade Policy Task Force, Antitrust Section, American Bar Association, 2013- 2015.

Member, Academic Research Council, Housing Finance Center, Urban Institute, 2013 - present

Member, Budget and Interdepartmental Relations Committee, Berkeley Division of the Academic Senate, University of California, 2004-2007.

Member, University of California, Committee on Academic Personnel, 2006-2008.

Member, Economic Evidence Task Force, Antitrust Section, American Bar Association, 2005-2006.

Member, Program Committee, American Economic Association Annual Meetings, 2006.

Member, Market Surveillance Committee, California Independent System Operator, 1997-2000, see http://www.caiso.com/.

Member, Advisory Board, *Journal of Economic Perspectives*, 1999-2002.

Member, Advisory Board, *Antitrust and Regulation Abstracts*, 1998-2002.

Member, Advisory Board, *Journal of Network Industries*, 1999-2001.

Vice-Chair, Economics Committee, Antitrust Section, American Bar Association, 1995 - 1998.

Editor, *Journal of Economic Perspectives*, 1993 - 1995.

President, Industrial Organization Society, 1995 - 1996.

Member, Defense Science Board Task Force on Antitrust Aspects of Defense Industry Consolidation, U.S. Department of Defense, 1993 - 1994.

Co-Editor, *Journal of Economic Perspectives*, 1986 - 1993.

Associate Editor, *Quarterly Journal of Economics*, 1984 - 1987.

Associate Editor *Rand Journal of Economics*, 1984 - 1986.

Director, John M. Olin Program for the Study of Economic Organization and Public Policy, Princeton University, 1988 - 1989

Associate Director, John M. Olin Program for the Study of Economic Organization and Public Policy, Princeton University, 1987 - 1988.

PX06100-136

## Honors, Fellowships, and Research Grants

Susan Bies Lecture on Economics and Public Policy, Northwestern University, 2015.

Distinguished Fellow, Industrial Organization Society, 2013.

National Science Foundation Graduate Research Fellowship Program, 60th Anniversary Awardee (one of 60 Awardees selected from over 45,000 Fellows)

Runner-Up, Teaching Prize, MBA Program, Haas School of Business, U.C. Berkeley, 1999-2000.

National Science Foundation Research Grant #SES-9209509, Technology Transitions with Network Externalities, 1992-1994, (with Joseph Farrell).

National Science Foundation Research Grant #SES-8821529, The Evolution of Network Industries, 1989-1991, (with Joseph Farrell).

Center for Advanced Study in the Behavioral Sciences, Stanford California, Research Fellowship, 1989-1990.

National Science Foundation Research Grant #SES-8606336, Issues of Industrial Organization in International Trade, 1986-1988, (with Gene M. Grossman).

Alfred P. Sloan Foundation Research Fellowship, 1985-1987.

National Science Foundation Research Grant #SES-8408622, Technological Competition and International Trade, 1984-1986, (with Gene M. Grossman).

National Science Foundation Research Grant #SES-8207337, Signals of Product Quality, 1982-1984.

National Science Foundation Graduate Fellowship, 1977-1980.

University of California Fellowship, 1976-1977.

Phi Beta Kappa and Sigma Xi, M.I.T., 1976.

## Affiliations

American Economic Association

American Bar Association

## Consulting Activities

Senior Consultant, Charles River Associates, 1998 – 2009 and 2012 – present

Principal and Co-Founder, The Tilden Group, LLC, 1996 - 1998.

Extensive experience working with private parties and government agencies on matters involving antitrust, regulation, and intellectual property.

PX06100-137

# Appendix B

# Testimony of Carl Shapiro During the Past 4 Years

1. Intellectual Ventures I LLC et al. v. Altera Corporation et al.

   Civil Action No. 10-1065-LPS
   District of Delaware

   Testified in deposition on behalf of Altera Corporation and Xilinx, Inc., 2013

2. United States of America v. Bazaarvoice Inc.

   Case No. 13-cv-00133-WHO
   Northern District of California

   Testified in deposition and at trial on behalf of the United States of America, 2013.

3. Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings (Web IV)

   Case No. 14-CRB-0001-WR (2016-2020)
   United States Copyright Royalty Judges, The Library of Congress, Washington, D.C.

   Testified in deposition and at trial on behalf of Pandora Media, Inc., 2015.

PX06100-138

CONFIDENTIAL MATERIAL

# Appendix C: Materials Relied Upon

## Staples HSR Filing and Documents Produced in Response to Second Request and Requests for Production

| PX No. | Bates No. |
|---|---|
|  | SPLS_0000035 |
|  | SPLS_0008288 |
| PX04042 | SPLS_0511740 |
| PX04032 | SPLS_0514084 |
| PX04458 | SPLS_0531117 |
| PX04064 | SPLS_0552184 |
| PX04639 | SPLS_0557522 |
| PX04083 | SPLS_0586812 |
| PX04359 | SPLS_0631205 |
| PX04246 | SPLS_0834098 |
|  | SPLS_0861241 |
|  | SPLS_0864033 |
|  | SPLS_0885531 |
| PX04429 | SPLS_0886467 |
| PX04499 | SPLS_0886469 |
| PX04129 | SPLS_0886946 |
|  | SPLS_0888738 |
| PX04304 | SPLS_0900517 |
|  | SPLS_0996419 |
|  | SPLS_0999949 |
|  | SPLS_1000312 |
|  | SPLS_1021080 xlsx |
|  | SPLS_1102139 xlsx |
| PX04635 | SPLS_1108311 |
| PX04465 | SPLS_1137875 |

PX06100-139

CONFIDENTIAL MATERIAL

**Staples HSR Filing and Documents Produced in Response to Second Request and Requests for Production**

| PX No. | Bates No. |
|---|---|
| PX04394 | SPLS_1205249 |
| PX04383 | SPLS_1480094 |
| PX04348 | SPLS_1789970 |
| PX04351 | SPLS_1894394 |
| PX04338 | SPLS_1901725 |
|  | SPLS_2350983 |
| PX04456 | SPLS_2455680 |
|  | SPLS_2460627 |
|  | SPLS_2671526 |
|  | SPLS_4063878 |
| PX04432 | SPLS_4125647 |
| PX04634 | SPLS_4286101_with account numbers.xlsx |
| PX04567 | SPLS_4882333 |
|  | SPLS_SFDC_0000547269 |
| PX04475 | SPLS_SFDC_0002315236 |
| PX04481 | SPLS_SFDC_0002577063 |
| PX04653 | SPLS_SFDC_0002596510 |
| PX04472 | SPLS_SFDC_0002640812 |
| PX04483 | SPLS_SFDC_0002723996 |
| PX04641 | SPLS_SFDC_0002758035 |
| PX04484 | SPLS_SFDC_0002804219 |
| PX04625 | SPLS_SFDC_0002826989 |
| PX04627 | SPLS_SFDC_0002850496 |
| PX04652 | SPLS_SFDC_0002883508 |
| PX04469 | SPLS_SFDC_0002923714 |
| PX04642 | SPLS_SFDC_0003013874 |
| PX04153 | SPLS2_000001 |
| PX04155 | SPLS2_000027 |
| PX04637 | SPLS_4286109 |

PX06100-140

CONFIDENTIAL MATERIAL

## Office Depot HSR Filing and Documents Produced in Response to Second Request and Requests for Production

| PX No. | Bates No. |
| --- | --- |
| PX05420 | ODP-OMX-FTC-00537652 |
| | ODP-OMX-FTC-00539248 xlsx |
| PX05320 | ODP-OMX-FTC-00567389 |
| PX05321 | ODP-OMX-FTC-00748581 |
| PX05279 | ODP-OMX-FTC-00785219 |
| PX05039 | ODP-OMX-FTC-01047638 |
| | ODP-OMX-FTC-01050037 xlsx |
| PX05155 | ODP-OMX-FTC-01074197 |
| | ODP-OMX-FTC-01080276 |
| PX05423 | ODP-OMX-FTC-01143572 |
| | ODP-OMX-FTC-01165840 xlsx |
| | ODP-OMX-FTC-01173357 xlsx |
| PX05323 | ODP-OMX-FTC-01256557 |
| PX05431 | ODP-OMX-FTC-01343630 |
| | ODP-OMX-FTC-01349623 xls |
| | ODP-OMX-FTC-01352095 xlsx |
| | ODP-OMX-FTC-01365135 xlsx |
| | ODP-OMX-FTC-01409265 xlsx |
| | ODP-OMX-FTC-01421358 |
| | ODP-OMX-FTC-01458150 |
| PX05183 | ODP-OMX-FTC-01537816 |
| | ODP-OMX-FTC-01584494 xls |
| | ODP-OMX-FTC-01804392 |
| PX05250 | ODP-OMX-FTC-01839654 |
| PX05234 | ODP-OMX-FTC-01842675 |
| PX05316 | ODP-OMX-FTC-01956851 |
| PX05236 | ODP-OMX-FTC-02083011 |
| PX05432 | ODP-OMX-FTC-02090839 |
| | ODP-OMX-FTC-02469875 |
| | ODP-OMX-FTC-02852476 |

PX06100-141

CONFIDENTIAL MATERIAL

**Office Depot HSR Filing and Documents Produced in Response to Second Request and Requests for Production**

| PX No. | Bates No. |
| --- | --- |
| PX05408 | ODP-OMX-FTC-03064793 |
| PX05425 | ODP-OMX-FTC-03109430 |
| PX05311 | ODP-OMX-FTC-04237752 |
| PX05285 | ODP-OMX-FTC-05497934 |
|  | ODP-OMX-FTC-05983199 xlsx |
| PX05422 | ODP-OMX-FTC-06321088 |
| PX05249 | ODP-OMX-FTC-06738529 |
| PX05313 | ODP-OMX-FTC-06939702 |
| PX05421 | ODP-OMX-FTC-07132847 |
| PX05438 | ODP-OMX-FTC-2-0010475 |
|  | OMX0000754536 xls |
|  | OMX0001958414 |

PX06100-142

CONFIDENTIAL MATERIAL

## Staples Second Request Responses and Other Submissions to the FTC

| PX No. | Document Description |
|---|---|
| | Staples Partial Narrative Response to Second Request, June 25, 2015 |
| PX04633 | Staples Partial Narrative Response to Second Request, July 27, 2015 |
| | Staples Partial Narrative Response to Second Request, July 27, 2015 |
| PX04572 | Staples Narrative Response to Second Request, August 28, 2015 |
| | Staples Specification 6 Response |
| | Staples Specification 7 Response |
| | Staples Specification 8 Response |
| | Staples Specification 16 Response |
| | Staples Specification 20 Response |
| | Staples Specification 21 Response |
| | Staples Specification 22 Response |
| | Staples Specification 23 Response |
| | Staples Specification 25 Response |
| | Staples Presentation to FTC regarding Retail Pricing, June 12, 2015 |
| | Compass Lexicon, Presentation to FTC on Competitive Effects Analysis, June 12, 2015 |
| PX0010 | Staples Presentation to FTC on Competition for "National" Commercial Customers, July 14, 2015 |
| | Staples Presentation to FTC regarding Proposed Divestiture, October 5, 2015 |
| PX0007 | Staples Presentation to FTC Bureau of Competition and Bureau of Economics Management, November 16, 2015 |
| PX0012 | Staples Letter to FTC regarding Sysco/US Foods, August 3, 2015 |
| | Staples Letter to FTC regarding Amazon, September 10, 2015 |
| | Staples Non-Binding Term Sheet, September 29, 2015 |
| | Staples Letter to FTC regarding retail stores, October 26, 2015 |
| PX04638 | Staples Submission regarding win/loss compilation, October 30, 2015 |
| | Staples Submission regarding Proposed Divestiture, November 2, 2015 |
| | Staples Submission regarding Proposed Divestiture, November 4, 2015 |
| | Staples Letter to FTC regarding "A Conversation with Amazon Business," November 12, 2014 |
| | Staples Letter to FTC regarding data, September 15, 2015 |
| | Staples Letter to FTC regarding data, September. 22, 2015 |
| | Staples Email to FTC regarding data, September 24, 2015 |
| PX06025 | Staples Email to FTC regarding data, October 7, 2015 |
| | Staples Email to FTC regarding data, October 8, 2015 |

PX06100-143

CONFIDENTIAL MATERIAL

## Staples Second Request Responses and Other Submissions to the FTC

| PX No. | Document Description |
|---|---|
| | Staples Submission on Leakage, November 14, 2015 |
| | Staples Submission, SPLS AMH_Assignments_DETAILS |
| | Staples Submission, AMH Account List |
| | Staples Submission, List of Divested Customers, SPLS ODP Tier I Diversity Accounts xlsx |
| | Staples Submission, Divestiture Information, SPLS_04290791 |
| | Timing Agreement Letter, October 22, 2015 |
| | Staples 4(d)-14 |
| PX07024 | Staples and Essendant, Asset Purchase Agreement Draft, February 2, 2016 |
| PX04628 | Staples Answer to Complaint (ECF 49), December 22, 2015 |
| PX04629 | Staples' Objections and Partial Responses To Plaintiffs' Third Set Of Interrogatories |
| | Staples' Responses to Specification 3 of Plantiffs' Third Request for Production |

PX06100-144

CONFIDENTIAL MATERIAL

## Office Depot Second Request Responses and Other Submissions to the FTC

| PX No. | Document Description |
| --- | --- |
|  | Office Depot Partial Narrative Response to Second Request, June 25, 2015 |
| PX05430 | Office Depot Partial Narrative Response to Second Request, July 27, 2015 |
| PX05394 | Office Depot Narrative Response to Second Request, August 28, 2015 |
|  | Office Depot Specification 6 Response |
|  | Office Depot Specification 7 Response |
|  | Office Depot Specification 8 Response |
|  | Office Depot Specification 16 Response |
|  | Office Depot Specification 21 Response |
|  | Office Depot Specification 23 Response |
|  | Office Depot Specification 24 Response |
|  | Office Depot Specification 26 Response |
|  | Office Depot Specification 28 Response |
| PX0001 | Office Depot/Office Max, Presentation to FTC on Competition for Contract Sales to Large and "National" Customers, September 13, 2013 |
| PX0002 | Office Depot, Presentation to FTC regarding Retail Pricing, July 10, 2013 |
|  | Office Max, Presentation to FTC regarding Retail Pricing, July 10, 2013 |
| PX0003 | Office Depot/Office Max, Presentation to FTC on Economic Analysis of the Competitive Retail Effects of the Proposed Transaction, August 10, 2013 |
|  | Office Depot Presentation to FTC regarding Retail Pricing, June 12, 2015 |
| PX06017 | Office Depot Letter to FTC re Efficiencies Resulting from Staples' Acquisition of Office Depot, December 1, 2015 |
| PX0011 | Office Depot Letter to FTC regarding Proposed Acquisition, December 4, 2015 |
|  | Office Depot Submission, Tier 1 Fortune 100 & 500 Customers Excel, November 2, 2015 |
| PX05434 | Office Depot Submission, ODP-OMX Tier 1 Admin Fee Rates - 2015, November 4, 2015 |
|  | Office Depot Submission, Office Depot F100 Tier 1 Shipping Locations Summary, November 5, 2015 |
|  | Office Depot Submission, pec26_Spec8_mismatch_with_Spec8Info, November 4, 2015 |
|  | Office Depot Submission, OD OM Tier 1 Account Numbers and Tier 1 Partners xlsx |
|  | Office Depot Submission on Leakage, November 14, 2015 |
|  | Office Depot 4(d)-11 |
|  | Office Depot Answer to Complaint (ECF 50), December 22, 2015 |
|  | Office Depot's Responses to Specifications 19 and 20 of Plaintiffs' First Requests for Production |
|  | Office Depot's Responses to Specifications 1 and 2 of Plaintiffs' Second Requests for Production |
| PX05424 | Office Depot Letter to FTC re Plaintiff FTC's Third Set of Interrogatories to Defendant Office Depot, February 2, 2016 |

PX06100-145

CONFIDENTIAL MATERIAL

## Office Depot Second Request Responses and Other Submissions to the FTC

| PX No. | Document Description |
| --- | --- |
| PX0014 | Office Depot Letter to FTC regarding PRISM data, January 25, 2016 |
| PX0013 | Office Depot Letter to FTC re IMG, February 1, 2016 |

PX06100-146

CONFIDENTIAL MATERIAL

## Staples Investigational Hearing and Deposition

| PX No. | Witness |
| --- | --- |
| PX02001 | Investigational Hearing Transcript of Shira Goodman (SPLS) |
| PX02003 | Investigational Hearing Transcript of Neil Ringel (SPLS) |
| PX02004 | Investigational Hearing Transcript of Kieran McCabe (SPLS) |
| PX02005 | Investigational Hearing Transcript of Christine Komola (SPLS) |
| PX02011 | Investigational Hearing Transcript of Thomas Heisroth (SPLS) |
| PX02012 | Investigational Hearing Transcript of Ronald Sargent (SPLS) |
| PX02100 | Deposition Transcript of Thomas Heisroth (SPLS) |
| PX02110 | Deposition Transcript of Shira Goodman (SPLS) |
| PX02116 | Deposition Transcript of Neil Ringel (SPLS) |
| PX02120 | Deposition Transcript of Kieran McCabe (SPLS) |
| PX02134 | Deposition Transcript of Joseph Doody (SPLS) |
| PX02135 | Deposition Transcript of Faisal Masud (SPLS) |
|  | Deposition Transcript of Christine Komola (SPLS) (Rough Copy) |
|  | Deposition Transcript of Laura Granahan (SPLS) (Rough Copy) |
|  | Deposition Transcript of Ronald Sargent (SPLS) (Rough Copy) |

PX06100-147

CONFIDENTIAL MATERIAL

## Office Depot Investigational Hearing and Deposition Transcripts

| PX No. | Witness |
| --- | --- |
| PX02002 | Investigational Hearing Transcript of Steve Calkins (ODP) |
| PX02006 | Investigational Hearing Transcript of Deborah O'Connor (ODP) |
| PX02007 | Investigational Hearing Transcript of John Lander (ODP) |
| PX02008 | Investigational Hearing Transcript of Kim Ghant (ODP) |
| PX02009 | Investigational Hearing Transcript of Roland Smith (ODP) |
| PX02010 | Investigational Hearing Transcript of Stephen Hare (ODP) |
| PX02109 | Deposition Transcript of Steve Calkins (ODP) |
| PX02111 | Deposition Transcript of Christopher Edler (ODP) |
| PX02128 | Deposition Transcript of Juliet Johansson (ODP) |
| PX02129 | Deposition Transcript of John Lander (ODP) |
| PX02148 | Deposition Transcript of Stephen Hare (ODP) |
| PX02149 | Deposition Transcript of Roland Smith (ODP) |

PX06100-148

CONFIDENTIAL MATERIAL

## Third Party Deposition Transcripts



| PX No. / Bates No. | Witness |
| --- | --- |
| PX02101 | |

PX06100-149

CONFIDENTIAL MATERIAL

**Third Party Documents**

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-150

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-151

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-152

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-153

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-155

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-156

CONFIDENTIAL MATERIAL

**Third Party Documents**

| Third Party | Description | PX No. / Bates No. |
| --- | --- | --- |



PX06100-157

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-158

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-159

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
| --- | --- | --- |



PX06100-160

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-161

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-162

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-163

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-164

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-165

CONFIDENTIAL MATERIAL

## Third Party Documents



| Third Party | Description | PX No. / Bates No. |
|---|---|---|

PX06100-166

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-167

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-168

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-169

CONFIDENTIAL MATERIAL

# Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-170

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-171

CONFIDENTIAL MATERIAL

# Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-172

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-173

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-174

CONFIDENTIAL MATERIAL

# Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



JCI-059 - CONFIDENTIAL - Insight.XLSX    PX07245

PX06100-175

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-176

CONFIDENTIAL MATERIAL

**Third Party Documents**

| Third Party | Description | PX No. / Bates No. |
| --- | --- | --- |



PX06100-177

CONFIDENTIAL MATERIAL

**Third Party Documents**

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-178

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-179

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
| --- | --- | --- |



PX06100-180

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-181

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-182

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-183

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-184

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-185

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-186

CONFIDENTIAL MATERIAL

## Third Party Documents

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06100-187

CONFIDENTIAL MATERIAL

## Essendant Materials



PX06100-188

CONFIDENTIAL MATERIAL

**Third Party Declarations**

| PX No. / Bates No. | Third Party | Date |
|---|---|---|



PX06100-189

CONFIDENTIAL MATERIAL

## Third Party Declarations

| PX No. / Bates No. | Third Party | Date |
|---|---|---|



PX06100-190

CONFIDENTIAL MATERIAL

## Third Party Declarations

| PX No. / Bates No. | Third Party | Date |
|---|---|---|



PX06100-191

CONFIDENTIAL MATERIAL

## Third Party Declarations

| PX No. / Bates No. | Third Party | Date |
| --- | --- | --- |



PX06100-192

CONFIDENTIAL MATERIAL

## Third Party Declarations

| PX No. / Bates No. | Third Party | Date |
|---|---|---|
| ███████ | █████████████████ | ███ |
| ███████ | ██████████████████ | ███ |
| ███████ | ████████████████ | ███ |
| ███████ | ███████████████ | ███ |
| ███████ | ████████████████████ | ███ |
| ███████ | █████████████ | ███ |
| ███████ | ████████████ | ███ |
| ████ | ██████████████ | ███ |

PX06100-193

CONFIDENTIAL MATERIAL

## Miscellaneous Materials

| PX No. / Bates No. | Description |
|---|---|



PX06100-194

CONFIDENTIAL MATERIAL

# Appendix D: Hypothetical Monopolist Test

Economists have developed a method for implementing the hypothetical monopolist test (HMT) for a candidate relevant market based on two variables: (1) the percentage margin between price and incremental cost, $M = \frac{P-C}{P}$, where $P$ is the prevailing price and $C$ is the incremental cost, and (2) the "recapture rate," $R$, which is defined as the share of the sales lost by one supplier, when it alone raises its price, that are "recaptured" by other suppliers in the candidate market. This method relies on the economist's normal assumption that each firm sets its price to maximize profits.[1] According to this method, the HMT is satisfied if $R > \frac{2S}{M+2S}$, where S is the size of the SSSNIP. The HMT is more likely to be satisfied, other things equal, the larger is the recapture rate and the larger is the price/cost margin.

## Margins

To estimate margins on sales of consumable office supplies to large customers, I use available data on revenues, customer discounts, rebates provided by manufacturers to distributors, and available data on other variable costs. Manufacturers often provide significant rebates to distributors. These rebates effectively increase the margin the distributor earns.

Staples provided customer-SKU specific data on adjusted gross sales (sales adjusted for returns, debits and credits), cost of goods sold, "deviated income" and so-called "margin add."[2] Some manufacturer rebates are captured in the "deviated income" field in the data.[3] The remaining and significant portion of these rebates are captured in the "margin add" field in the data. Staples also provided customer-level data on lump sum rebates (sign-on "conversion" rebates amortized over the life of the contract and volume rebates), an accounts receivable discount ("A/R discount") for early payment, and delivery expenses attributable to all the products purchased by

---

[1] This method is described in Michael Katz and Carl Shapiro, "Critical Loss: Let's Tell the Whole Story," *Antitrust*, Spring 2003, Daniel O'Brien and Abraham Wickelgren, "A Critical Analysis of Critical Loss Analysis," *Antitrust Law Journal,* 2003, and Joseph Farrell and Carl Shapiro, "Improving Critical Loss Analysis," *The Antitrust Source*, 2008. The formula in the text, which is from Proposition 1A in Farrell and Shapiro (2009), applies in a symmetric situation when demand is linear in price for small changes from the pre-merger price. Farrell and Shapiro (2009) also explain how to handle relaxations in these assumptions. My conclusion regarding the relevant market does not rely on the assumptions of symmetry or linearity. Two litigated mergers where this formula has been used and accepted include United States v. H&R Block, Inc., 789 F. Supp. 2d 74 (D.D.C. 2011); United States v. Bazaarvoice, Inc., No. 13-cv-00133-WHO, 2013 WL 792643 (N.D. Cal. Mar. 4, 2013).

[2] Customer-SKU level data in Staples Specification 25 file < staples_spec_25.sas7bdat>; Staples Response to Plaintiffs' Third Request for Production of Documents, January 26, 2015, file <spls_spec_25_mar_add_13q3_15q1.sas7bdat> ("Mar Add data").

PX06100-195

CONFIDENTIAL MATERIAL

the customer (including products other than consumable office supplies).[4]  I allocate these customer-level rebates, discounts and delivery expenses to the customer's consumable office supply purchases based on the share of the customer's purchases of all products comprised by consumable office supplies.  Based on these data, I estimate that Staples' margin to supply consumable office supplies to large customers is ███ .[5]

Staples also provides customer-level data on order entry, customer service and credit card fee expenses.[6]  If the calculation reported above is adjusted to incorporate these additional and potentially variable costs, then my estimate of Staples margin becomes ███  Staples does provide customer level data on "distribution expense" (as distinct from delivery expense).[7] Staples explains that ████████████████████████████████████████ ████████████████████ These costs appear largely not to be incremental to serving any given customer, so I do not include them in my estimate of Staples' margin.

Office Depot data included a different set of fields in its customer-SKU level data: net sales, which Office Depot describes as "████████████████████"[9]; and ██████ (████) which Office Depot describes a ████████████████████ ████████████ as well as several other miscellaneous vendor income categories."[10] Based on these descriptions, I treat the ████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[4] ████████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ .

PX06100-196

## Recapture Rate

Using a margin of ██%, the HMT using a 5% SSNIP is satisfied if the recapture rate is at least ████ which equals ██%.  Using a margin of █████ the HMT using a 5% SSNIP is satisfied if the recapture rate is at least ██████ equals ██.[12]

The evidence in this case clearly indicates that the actual recapture rate is far greater than ████, and may well be █████████  To see why, consider what would happen if Staples were to raise its price to large customers by 5%.  Under the economist's normal assumption that Staples is currently setting its prices to maximize its profits, we would expect Staples to lose some business in response to this price increase.  The recapture rate measures the proportion of this business that would be lost to other distributors of consumable office supplies; the balance would reflect reduced purchases of office supplies by large customers.  The evidence from Staples, Office Depot and their competitors consistently indicates concern about losing sales to other distributors, *not* concerns that a higher price will cause large customers to reduce their overall use of consumable office supplies in a meaningful way.  Indeed, Staples and Office Depot routinely engage in bidding competition to win the business of large customers, and this competition frequently results in customers obtaining price concessions from Staples and Office that are at least five percent.[13]



PX06100-197

CONFIDENTIAL MATERIAL

# Appendix E: Fortune 100 Company Data Processing

This appendix describes the methods used to process office supplies purchase data received from Fortune 100 ("F100") companies in response to Civil Investigative Demands issued by the Federal Trade Commission or Subpoenas for similar information issued by Defendants ("CID responses").[1]  To the extent that F100 companies submitted Declarations with similar information on relevant purchases, those documents were also considered and incorporated into the data analysis described here.  CID responses include both initial as well as subsequent clarifying submissions from the set of F100 customers.  In addition to this appendix, supporting materials, including data and written correspondence, as well as programs created to process and aggregate the data, are provided in the supporting production to this report.

Purchase and vendor selection information requested by the FTC includes a broad range of product categories supplied by the merging parties from all sources.  In addition to consumable office supplies, CID product categories include purchases outside the relevant market analyzed in this report.  For example, data requested and produced by the F100 include cleaning and janitorial supplies, breakroom supplies, ink and toner, and durable office equipment such as printers, computers, and  furniture.[2]  As a result, submissions were reviewed and filtered to identify reported purchases that are likely to reflect consumable office supplies.

For each F100 response, the goal of data processing is to identify the F100 company's purchases of consumable office supplies in the United States from suppliers other than Staples and Office Depot.  Purchases by F100 companies of consumable office supplies in the United States from Staples and Office Depot are measured using Staples' and Office Depot's own transaction data for "B2B" customers.[3]  The time horizon for F100 data collection or estimation is 2014.

---

[1] CIDs were issued to F100 companies in two forms. If the F100 company was identified by Staples or Office Depot as one of their largest customers, the company was issued a CID which requested information on purchases of office products, company locations served, the process and history of selecting vendors, and several other topics. See, for example, PX06033 (Civil Investigative Demand Issued to ███████████ Corporation, FTC File No. 151-0065). If the F100 company was not identified as a member of this group by the merging parties, it was issued a CID covering only the first three specifications involving purchase information, locations and relevant vendor selection. See, for example, PX06034 (Civil Investigative Demand Issued to ████ Inc., FTC File No. 151-0065).  Data and Declarations provided by F100 companies in response to Defendant Subpoenas were also reviewed and considered in the same manner as FTC CID responses.

[2] These submissions were responsive to the full set of requests set forth in F100 customer CIDs, which pertained to relevant products as defined therein: "The terms "relevant product" and "relevant products," as used herein, refer to any products or services—individually and in all combinations—that are office supplies, office equipment, office support services, office furniture, break room supplies, cleaning and janitorial supplies, copy and print services, or managed print services. The terms include, without limitation, pens, pencils, paper clips, staples, folders, binders, paper, ink and toner, and technology products (e.g., computers, smart phones, and tablets).  The terms are limited to products and services that the Company procured for its own use and not for resale."  PX06034, at 006 (Civil Investigative Demand Issued to ████ Inc., FTC File No. 151-0065, August 14, 2015).

[3] Purchases of relevant products by F100 customers from the merging parties via B2B channels are identified in the data provided in response to the FTC's Second Request for Information at Specification 25 (Staples) and Specification 26 (Office Depot).  Purchases made by F100 via Staples and Office Depot *retail* channels (e.g. online or in-store) are also included only if specifically identified as such in the F100 CID respondents' data.

PX06100-198

CONFIDENTIAL MATERIAL

F100 companies employ a variety of methods to track procurement. As the F100 CID survey responses show, there are numerous systems of tracking and categorization, both in terms of classification (e.g., purchases may be organized by type of product or service procured, by company business unit, or by vendor type) and level of aggregation (procurement information for each vendor may be maintained at the product-line-item level of detail). As a result, not all F100 responses include sufficient information to arrive at a reliable source of data for estimating both the magnitude of relevant product purchases and how those purchases break down between Staples, Office Depot and other significant suppliers. Therefore, processing responses from the F100 can be thought of as a two-step procedure involving (1) determining whether the response provides reliable information for measuring purchases of consumable office supplies in the United States, and (2) filtering the data provided to estimate the share of relevant product purchases made from Staples, Office Depot, and other vendors.

## 1. Transactions Data from Staples and Office Depot

For F100 company purchases of consumable office supplies from Staples and Office Depot, the most reliable source of data available to me are the transactions data from Staples and Office Depot themselves.[4] The B2B transaction data from Staples and Office Depot are consistent across F100 customers and include a level of product detail unparalleled by nearly all datasets provided in response to F100 CIDs.[5] For example, if an F100 company tracks spend only at the vendor level, the reported purchase value from Staples may include purchases of laptops and office furniture (outside of the relevant market) as well as purchases of consumable office supplies.[6] Reliance on such a CID response would artificially inflate the significance of Staples in providing consumable office supplies. In cases where a diversity (or "Tier 1") partner is identified in the F100 response, Staples and Office Depot transactions data are used to determine whether the customer is serviced via Staples or Office Depot.[7]

### A. Retail Purchases from Staples and Office Depot

The methodology described above for identifying relevant purchases from Staples and Office Depot includes only those transactions with F100 customers that occur via their B2B sales channel. Online and in-store spending by F100 customers at Staples or Office Depot that is not



[4] See notes to Exhibit 3 for detail regarding identification of consumable office supply sales by Staples and Office Depot based on 2014 transaction data provided to the FTC. For the purpose of identifying sales to F100 customers, Staples and Office Depot customer accounts are aggregated to the parent company level where possible. Aggregation of F100 customer accounts does not purport to reflect the precise ownership structure of each company, particularly in cases where the company may be affiliated with independent or company-owned franchises or dealerships. In these cases, the data aggregation is matched to the CID response. For instance, ▓ did not consider all affiliated ▓ r dealerships in its CID response, so ▓ 's purchases from Office Depot or Staples are calculated exclusive of dealership accounts.

[5] Of course, these data have their own imperfections, e.g., when it comes to aggregating account numbers to measure sales to a large customer with multiple account numbers.

[6] See for example, ▓▓▓▓▓▓▓▓ Historical Spend 2012-2015 for Office Supplies.xlsx.

[7] ▓▓▓▓▓▓▓▓▓▓▓ s are also confirmed via data files provided to the FTC by Staples and Office Depot, and listed in Exhibit 5A.

PX06100-199

captured in a contract account is not included in these values. Such retail purchases are only included in the volume attributed to the merging parties in the rare cases where the F100 company's CID response explicitly identifies them as such.[8] To the extent that such purchases occur via the retail channel rather than contract channel, this method underestimates the market shares of Staples and Office Depot.

### B. Allocation to "Other" Suppliers Based on Purchases from Staples and Office Depot

A small subset of F100 respondents characterized their purchases from sources other than the merging parties only *relative* to either (a) their overall spending or (b) their purchases from Staples and Office Depot. For example,



In these cases, consistent with the F100 response, the value of purchases from other sources are estimated relative to purchases of consumable office supplies from Staples and Office Depot.[10] In cases like ████████ where the F100 CID response provides a range, I use the value within that range yielding the lowest market share for the merging parties. This method will tend to cause me to underestimate the market shares of Staples and Office Depot.

## 2. Purchases from Suppliers Other than Staples and Office Depot

Due to the broad list of product categories requested in the FTC CIDs issued to F100 customers, data processing to identify sources of supply outside of the merging parties primarily involves (1) filtering information provided to remove product categories outside of the relevant market, and (2) identifying vendors that do not offer, or rarely offer, consumable office supplies. My approach here has been to eliminate purchases from other suppliers I can *confirm* are outside the relevant market. In many cases, this causes me to include purchases made from other suppliers that may well be outside the relevant market, because I cannot confirm that fact. As a result, my method over-estimates F100 purchases from suppliers other than Staples and Office Depot.

My method causes me to significantly *underestimate* the market shares of Staples and Office Depot. For example, if an F100 customer response reports purchases associated with the vendor name "WB MASON" in a general ledger category "OFFICE SUPPLIES AND EQUIPMENT," the entire purchase value is attributed to W.B. Mason's sales of consumable office supplies.

---

[8] For example,



[9] ████████████████ 5.

[10] In cases where the relative values reported in the F100 response include products outside the relevant market (e.g., toner), this method assumes the same share or relative value applies to consumable office supply purchases. Using the ████████████████████████

CONFIDENTIAL MATERIAL

However, those purchases may well include purchases of products other than consumable office supplies, such as office furniture or technology products.  Moreover, in cases where the F100 customer CID response confirms that its purchases from a vendor includes products outside the relevant market but does not offer more detailed breakdown, I still attribute all of these purchases to that vendor's sales of consumable office supplies.  This causes me to under-estimate the market shares of Staples and Office Depot, perhaps significantly, because a more stringent filter is applied to purchases from Office Depot and Staples.  For the merging parties, purchases outside of consumable office supplies are eliminated using the product-level detail available in their own sales data.

### A. Procurement Categories Outside the Relevant Product Market

The primary method used for filtering F100 customer data responses is to rely on the data categorizations that the companies themselves provide.  These are often general ledger account names or other procurement tracking categories used to classify employee expenses, which vary from firm to firm.  The list below provides examples of the types of procurement categories that I have treated as outside the relevant product market:

- Office furniture
- Office equipment
- Software
- Technology hardware
- Janitorial  or cleaning supplies
- Building maintenance
- Food or catering services
- Commercial printing services

Customers may consider only certain paper products for office use.  For instance, customers may differentiate between specialty paper, or paper packaged in large quantities and used in high speed commercial printing (e.g. for bills, statements or direct mail materials) and copy paper for day-to-day office use.  I rely on CID responses to make these distinctions.  For example, ▮▮▮▮▮▮ ▮▮▮▮▮▮ explained that certain paper purchases are unrelated to consumable office supplies:



---

11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

PX06100-201

CONFIDENTIAL MATERIAL

Similarly,



I have also considered sales data from paper manufacturers that may sell directly to F100 customers, including ▮▮▮▮▮▮▮▮▮▮▮▮ . Certain customers that appear in those datasets do not report purchases from paper manufacturers in their CID and subpoena responses regarding office supplies. However, as an example, ▮▮▮▮▮▮ sales data include sales of large unprocessed paper rolls typically used in high speed commercial print equipment. Also, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ whether purchases were for end use or resale, or uses outside of office supply. My reliance on the F100 customer CID responses to capture relevant purchases is

PX06100-202

CONFIDENTIAL MATERIAL



### 1.  Procurement Classification Example: ████████

████████ data responding to the FTC's CID is categorized by a field *Relevant Products,* with further detail regarding product descriptions provided in the field *PO Item Text/Material Description.*  The set of categories that appear in the *Relevant Products* field roughly corresponds to those listed in the CID request.[16]  Based upon these category names and inspection of the more detailed *PO Item Text/Material Description,* purchase data from all categories apart from "Office Supplies" and "Other" are filtered out.  Further inspection of these ████████ categories by vendor is described in the next sub-section.

### 2.  Procurement Classification Example: ████████

████████ provided data categorized by their general account ledger, as described in this table.[17]

| Account Name | Description/Usage |
| --- | --- |
| Office Supplies and Printing | Basic office supplies (paper, pens, etc.) |
| Equipment < $5000 | Equipment & furniture purchases that fall below the capitalization threshold of $5,000, ████████ |
| Laptops | Employee laptop and workstation expenses |
| Workstations | Workstation expenses |
| Monitors | Computer monitors |
| Computer software and supplies | General computer software services and supplies (e.g., USB sticks, VGA cables).  Licenses ████████ are not booked here |
| Telephone | Office telephones, long distance, and cell phone reimbursement (business related) expenses |
| Telephone- Mobile | Cell phone reimbursement (business related) expenses |
| Janitorial Services | Facility- janitorial related services contracted with outside companies |

Based on the account names  and descriptions provided by ████████ the response data provided in this file is filtered to include purchases categorized within "Office Supplies and Printing." This is the only category consistent with the relevant product market for consumable office supplies. As

PX06100-203

with the ███████ example, the ██████ purchase data found within this category includes not only consumable office supplies but also purchases of products and services clearly outside of the relevant market. Further inspection of this ██████ category by vendor is described below.

## B. Vendors Selling Products Outside the Relevant Market

The next principal method for filtering data to approximate consumable office supply purchase values involves review of the vendors listed to confirm whether they plausibly are providing products in the relevant market. The precise manner in which this review and filter occurs depends on the level of detail provided in the response data. For instance, if the response includes product or purchase order level detail, those data are available to review the types of purchases made from each vendor. Alternatively, if no product detail is available, outside research and common sense is required to identify "irrelevant" vendors.[18]

Unless the CID response data links the following types of vendors to the provision of consumable office supplies, these types of vendors are considered to provide products outside the relevant market:[19]

- Commercial print vendors

- Office furniture vendors

- Suppliers of customized products, e.g. marketing materials

- Vendors for production materials, e.g. inputs to a company's production line[20]

- Print equipment, ink and toner original equipment manufacturers ("OEMs"), unless indicated in the response as a vendor for paper or core office supplies[21]

---

[18] For example, a vendor with the word "coffee" or "furniture" in its company name is presumed to provide products outside consumable office supplies. On the other hand, a vendor with the word "printer" in its company name requires further follow-up to determine whether it is, for instance, a commercial or custom print service provider.

[19] The list provided here is illustrative rather than exhaustive.

[20] For example, ████████████████████████████████



[21]

CONFIDENTIAL MATERIAL

- Technology product OEMs, distributors and resellers[22]
- Food and beverage vendors

### 1. Practical Limitations to Vendor Filters

There are several practical limitations to the approach described above. Despite these limitations, my approach generates reliable estimates of the market shares of Staples and Office Depot. Importantly, where these limitations are reached, I have adopted an approach that tends to overstate the competitive significance of alternatives to Staples and Office Depot for consumable office supplies. Therefore, my estimates of the market shares of Staples and Office Depot may more precisely be considered lower bounds.

First and foremost among practical limitations is the fact that the best available data for several F100 respondents includes a long list of vendors (reaching into the thousands in some cases), many of which are clearly irrelevant for the purposes of capturing consumable office supply purchases.[23] These data entries are typically tiny at the level of any single vendor but can become significant in the aggregate. However, line-item review is simply impractical given both the timing of this merger review and the likely minimal insights to be gained by such an exercise. Therefore, in these cases, I instructed my staff to focus their efforts on the largest vendors.[24]

The remaining unfiltered purchases in the "tail" of purchase data are assumed to reflect consumable office supplies. This assumption again causes me to overestimate the market shares of vendors other than Staples and Office Depot. For example, ███████████ initially submitted purchase data to the FTC with over ███ unique vendor names listed within procurement categories labeled as "Office Supplies." Only the top ██ vendors other than Staples and Office Depot were reviewed in more detail by ███████ to determine whether they provided consumable office supplies ███████████. While those ██ vendors cover more than ██ of the reported purchases in that category, this approach still leaves ██████████ in purchases in the long "tail" of unfiltered vendors. For the purposes of calculating market shares, this value is assumed to represent purchases of consumable office supplies by ██████████ from vendors other than Staples and Office Depot. This ██████████ figure includes, for example, purchases from ████████████ and ██████████████" No doubt many of these purchases are not, in fact, consumable office supplies, so my method again underestimates the market shares of Staples and Office Depot.



PX06100-205

CONFIDENTIAL MATERIAL

Another practical limitation to vendor filtering is that purchase values at a given vendor often cannot be parsed between relevant and non-relevant products.  Continuing with the example of ███████, W.B. Mason appears as a vendor whose sales were marked as *including* consumable office supplies.  W.B. Mason sells products outside of the relevant market, including ink and toner, but the entire value reported by ███████ is counted towards W.B. Mason's sales of consumable office supplies.  As explained above, a more stringent filter is applied to purchases from Staples and Office Depot.  The result is that my methods systematically overestimate the market shares of vendors other than Staples and Office Depot.

### 2. Vendor Classification Example: ███████

Continuing with the ███████ example used above, after identifying relevant procurement categories ("Office Supplies" and "Other"), the remaining data is filtered by examining the types of products purchased from each significant vendor.  For this F100 dataset, purchase-order item descriptions are available to inform the review.  For example, purchases from vendors ████████████████████████████████████████████ are identified as irrelevant based on descriptions that include soccer equipment and trailer rentals.

### 3. Vendor Classification Example: ███████

After filtering ███████ CID response data to the procurement category most closely aligned with relevant products ("Office Supplies and Printing"), the data retain several thousand unique vendor names.  Review of the vendors listed indicates that, apart from ███████ primary vendor for consumable office supplies (Office Depot), the vast majority of vendors in the long tail of reported vendors are irrelevant, plus ███████ in reported purchases do not list a vendor.

Rather than discard ███████ procurement data, filtering to a dataset more reliable for estimating market shares proceeds by reviewing the largest ████ vendor names, which account for ████ ████████████████████████████████  Vendors are only filtered from the analysis if they are ruled out as providers of products within the relevant market.  For example, ████████████████████████████████, despite the fact that consumable office supplies comprise only ████████████ total sales.   Likewise, ████████████████ ████████████████████████████, though it is nearly certain this overstates the value of purchases in the relevant market.  Some of the vendors not included are ████████████████ ████████████████████████████████████████████████████ ████████████ Further detail is available in the production materials that accompany this report.

### 4. Examples of Vendor Shares Overestimated Due to Practical Limitations

As described above, practical limitations to reviewing many thousands of purchases by F100 customers often means that certain sales may be included even if they are likely to include products outside of the relevant market.  The suppliers below are examples of cases where this limitation leads to an overstatement of the market shares of suppliers other than Staples and Office Depot in the relevant market.

PX06100-206

CONFIDENTIAL MATERIAL



Page E-10

CONFIDENTIAL MATERIAL



*, etc.*

### 3. Adjustment for Unreported Purchases

Responses from F100 customers to CIDs from the FTC and subpoenas from Office Depot and Staples include useful information regarding the magnitude of *unreported* spend.  As described in the main body of this report, "leakage" from a contractual relationship between a supplier and an F100 customer includes unreported (and in many cases untracked) "off-contract" purchases made at the discretion of individual employees.  These may occur outside of procurement systems maintained by a customer, making them difficult for F100 customers to track.

### *A. Estimates of Discretionary "Leakage"*

A careful study of responses from F100 customers regarding the actual or estimated magnitude of discretionary leakage indicates that such purchases do not comprise a significant portion of spending on consumable office supplies.  This is consistent with (a) customer statements regarding their desire to consolidate and control spending where possible, and (b) the significantly higher prices that large customers pay when purchasing at retail and online locations relative to their contract prices.  Exhibit E-2 summarizes responses from F100 customers regarding the magnitude of such purchases.  Exhibit E-1 provides more detail regarding each response summarized in Exhibit E-2.[33]

In some cases, the F100 respondent was able to provide a specific numerical estimate:



Most respondents indicate only a range or maximum value for untracked spending, with many describing such purchases as "one off" or "by exception" only.  For example, ▮ reports:



CONFIDENTIAL MATERIAL



Similarly, ███████████████

Assuming that responses equivalent to "de minimis" or immaterial indicate that no more than 1% of total purchases come from discretionary unreported purchases, the weighted average value of the 26 estimates in Exhibit E-2 is no more than 3.7%. Note that in calculating this value, whenever a range is reported (e.g. <5%), I use the highest value consistent with the range (e.g. 5%). This causes me to overestimate the extent of leakage and thus under-estimate the market shares of Staples and Office Depot.

### B. Applying Adjustments for Unreported Leakage to F100 Market Shares

The market shares reported in Exhibit 5B reflect adjustments for unreported purchases based on the responses summarized in Exhibit E-2. Specifically, for each customer where a specific estimate is not available from the respondent, I assume that unreported purchases match the average value of 3.7% described above. I do not adjust these values further to reflect the high likelihood that some or many untracked purchases made from retail and online sources come from Office Depot and Staples themselves. To the extent that this occurs, my adjustment causes me to understate the market shares of Staples and Office Depot.

## 4. Insufficient or Unreliable F100 Responses

Not all F100 companies provided data that was both sufficiently complete and detailed enough to reasonably segregate purchases of consumable office supplies from purchases of other items. I have excluded these responses from my analysis because I do not consider them reliable for the purpose of estimating market shares in relevant market. The primary reasons why certain F100 responses are considered insufficient or unreliable are these:

1. The F100 company does not track procurement of office supplies and did not provide a response, even of aggregate purchases of office supplies across all vendors.

---



CONFIDENTIAL MATERIAL

2. The response excludes a significant portion of the F100 company, such as a major subsidiary or division.

3. A significant portion of the value reported cannot be filtered to a reasonable approximation of consumable office supply purchases.  For instance, responses where the only level of procurement detail provided combines purchases of consumable office supplies with purchases of information technology or production inputs are considered inadequate.

4. Response data is not available for 2014 or a reasonably proxy (e.g. 2015 or an overlapping fiscal year period).

The following 19 F100 companies are not included in the data constructed to estimate market shares:



PX06100-210

CONFIDENTIAL MATERIAL

7.



PX06100-211

CONFIDENTIAL MATERIAL



Page E-15

CONFIDENTIAL MATERIAL



---

PX06100-213

CONFIDENTIAL MATERIAL

# Appendix F: Office Depot's PRISM Analysis

 So far as I can determine, the approach taken by Office Depot to identify leakage counts as "leakage" all situations in which a customer's purchases delivered to a specific location significantly decline without properly considering common reasons *apart from leakage* why a customer's purchases at a given site might move down (or up) from one year to the next.[1] Furthermore, the data provided by Office Depot in support of the PRISM analysis also appear to suffer from anomalies which suggest that something is amiss regarding what Office Depot claims these data represent.[2]  To date, Office Depot has not presented materials that explicitly link the underlying data to the PRISM analysis  presented to the FTC.  I may amend my review if such information and materials become available.

## Declines are Not Necessarily Leakage

For the purpose of measuring market shares at Fortune 100 customers or assessing competitive effects, leakage should measure purchases of consumable office supplies involving a vendor other than the customers' primary or preferred vendor.  In some cases, when shipments to a given site decline sharply from one year to the next, leakage may indeed be the reason. However, such year-over-year declines in sales can result from a variety of causes besides leakage.  Possible causes include customer downsizing, closed locations, lumpy purchasing patterns, or simply moving to double-sided printing.  Moreover, the method used by Office Depot includes declines in sales of products outside the relevant market, such as furniture orders, but does not separately identify which products' sales declined.

---

[1] The PRISM analysis purports to identify leakage at Office Depot's large customers as well as customers that belong to the Fortune 100 by comparing sales from one year to the next.  Large customers typically have many delivery sites, and the analysis proceeds by sorting locations for each customer according to whether they show a recent large decline in sales or not.  Specifically, a site at a customer is flagged as a declining site if purchases in 2015 declined by at least 50% relative to those in 2014.  Sites that stopped buying altogether in 2015 are marked as "Not Buying."  For each customer, "leakage" is defined as the proportion of  sites "Not Buying" or "Down 50%."

[2] For example, the letter from Office Depot accompanying the underlying data states: "In no instances is this data less extensive than that used to generate the figures referenced in the [December 4[th], 2015] presentation and letter." However, for many of the customers described in the original analysis presented to the FTC, the underlying data provided subsequently contain fewer rows of data than the total number of customer sites reported for that customer in the original analysis.  There are several other non-trivial inconsistencies between the underlying data and the PRISM analysis presented to the FTC on December 4, 2015.  See PX0011, at 019-022 (Letter from M. Reilly (Simpson Thacher) to FTC Commissioners, December 4, 2015), PX0014, at 001 (Letter from Preston Miller (Simpson Thacher) to FTC, January 25, 2016), and accompanying data file "Office Depot Prism Data.xlsx."

PX06100-214

CONFIDENTIAL MATERIAL



## Gross Declines are Counted Rather Than Net Declines

The PRISM leakage analysis accounts for declines in sales, but does not consider that sales may increase at other customer sites. For example, if the customer intends to shut down one location and move to or scale-up another, the method described above will count the closing location as leakage, while not accounting for the fact that the sales have shifted to another site.

## The Leakage Measure Used Ignores Location Size

The PRISM leakage analysis does not account for the fact that some sites are larger than others. The methodology used typically leads to an inflated measure of leakage that largely reflects changes at small sites, which have more volatile purchasing patterns.

To illustrate, consider a company with a headquarters that consistently purchases $1 million per year, and a satellite office that reduced its purchasing from $1000 to $500. The PRISM analysis would measure leakage at this customer at 50%, since purchases at one of the two sites dropped by at least 50%. However, the actual decline in purchasing in this example is trivial, only 0.05%.

## Examples of Flaws

To see how these methodological flaws affect the leakage estimates coming out of the PRISM analysis, consider the examples of ███████████████ provided in Exhibit F-1.[4]

---

[3] See PX04639_native (Staples, Spls_0557572.xlsx. at tab "MidAtlantic").

[4] I do not have access to the underlying materials or data used to create the PRISM leakage estimates presented to the FTC. See PX0011, at 019-022 (Letter from M. Reilly (Simpson Thacher) to FTC Commissioners, December 4, 2015). Nevertheless, I have been able to closely replicate this analysis for these customers.

PX06100-215

CONFIDENTIAL MATERIAL



PX06100-216

CONFIDENTIAL MATERIAL

# Appendix G: Competitor Data Compilation and Processing

This appendix describes the competitor data underlying my calculation of (a) primary vendor relationships in Exhibit 7, and (b) all-channel U.S. sales of consumable office supplies in Exhibit 21.

## Criteria for Competitor Data Requests

The FTC requested information from third-party distributors of consumable office supplies who were identified as the strongest potential competitors to Staples and Office Depot. Several sources informed the selection of the companies surveyed, including: (1) a "representative list of the independents and the market" created by Office Depot; (2) data from the two major wholesalers of office supplies; and (3) win-loss data provided by Staples and Office Depot.

### *Office Depot's List of Distributors*

I rely in part on an Office Depot 2014 market assessment to identify primary vendors of consumable office supplies for large customers.[1]  The email states:



The attached file includes a list of 288 distributors together with an estimate of their total annual sales. The file shows that 273 of these 288 dealers have estimated revenues of less than ▮▮▮▮▮ per year. The FTC issued Civil Investigative Demands (CIDs) to distributors with at least ▮▮▮▮▮ in estimated revenue.[3]

Consistent with Office Depot's own characterization of these distributors as "tiny," Exhibit 7 shows that a number of the surveyed distributors did not report any customers who purchased at least $500,000 in consumable office supplies from that distributor, and only a handful had more than five such customers. I therefore consider it highly unlikely that the *unsurveyed* distributors in this list with estimated revenues of less than ▮▮▮▮▮, have many such customers, especially relative to the ▮▮ relationships reported by Staples and the ▮▮ relationships reported by Office Depot.[4]  Moreover, Staples' own documents make it clear that small distributors are

---

[1] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[3] Retailers and companies known to have been acquired by the parties or another listed competitor were excluded from the FTC's survey.

[4] The ▮▮ Office Depot relationships reflects the sum of the number of primary vendor relationships calculated using the Office Depot transaction data and the number of primary vendor relationships calculated using the OfficeMax transaction data. In this calculation a customer who purchased at least $500,000 worth of consumable office supplies from Office Depot and OfficeMax separately would be counted twice. However, this calculation does not

PX06100-217

CONFIDENTIAL MATERIAL

unlikely to be primary vendors to large customers.[5]  A Staples leadership summit presentation describing the post-Office Depot-OfficeMax merger competitive landscape states: "The merger is complete[.]  Opportunity we've worked so hard for[.]  There are only two real choices for major customers.  Us or Them."[6]

### *Other Sources of Information Identifying Potential Competitors*

My staff consulted a variety of other sources to pinpoint distributors who would be most likely to serve as primary vendors for large customers.  The FTC obtained information from the industry's

Additionally, the two largest wholesalers of consumable office supplies, Essendant and S.P. Richards, provided lists of their top ▮ customers in 2014.[7]  Essendant's list did

The FTC surveyed office supply distributors with at least ▮▮▮ in purchases in 2014 from either Essendant or S.P. Richards.[10]

Win-loss data from Staples and Office Depot can also shed light on companies who potentially serve as primary vendors for large customers.[11]  As Exhibits 10 and 11 show, the majority of competitors in the Staples and Office Depot bid data appeared in fewer than two bidding opportunities.  Based on bid information at the time of the survey, the FTC also requested data from companies that were mentioned more than two times as incumbents or winners.



PX06100-218

CONFIDENTIAL MATERIAL

## Requested Information and Competitor Responses

The FTC surveyed 39 potential competitors and received responses from 35 companies.[12]  The detail and scope of the 35 replies vary, but all provided enough information to estimate the number of large customers for whom they serve as a primary vendor, based on their original responses and their answers to follow-up questions.  Most respondents provided summary sales data, but some provided revenue information only as part of a declaration or other written response.[13]

The surveyed distributors were asked to provide at least two types of sales data.[14]  First, the FTC requested sales by customer, product category, and calendar year for each customer with at least $100,000 in annual purchases in any year from 2012 to the present.  Second, the FTC requested total sales to all customers,[15] broken out by year and product category, from 2012 to the present.  Many CIDs were issued during 2015, so companies often provided partial year 2015 sales.

Respondents generally produced calendar year sales, but data from at least four companies did not line up with the calendar year.[16]  For Exhibits 7 and 21, I use calendar year 2014 sales or the closest approximation provided by each company.[17]

## Sales of Consumable Office Supplies

Each respondent has its own record-keeping system.  Different suppliers may group their sales into buckets using somewhat different definitions of product categories.  Based on the category names and any additional descriptions provided by the respondents, I measured sales of consumable office supplies using those categories primarily associated with the sales of



PX06100-219

CONFIDENTIAL MATERIAL

consumable office products (such as general office supplies and school supplies) and copy paper.[18]  I excluded categories whose products fall primarily outside of the relevant market, such as janitorial and sanitation products, breakroom, ink and toner, technology, custom print, and furniture.

When respondents did not provide enough information to separately identify sales of consumable office supplies, I made assumptions that tend to overestimate these competitors' relevant sales.

- When competitors group non-relevant products into the main categories that report sales of consumable office supplies and do not provide an estimated breakout, I attribute all sales in these mixed groups to consumable office supplies ███████████████████████ ███████████████████████████████████████████████████████████████

- Sales for which the product category was unknown or sufficiently unclear were also assumed to contain only consumable office supplies. ████████████████████ ███████████████████████

- When available, I included sales of both continuous forms and cut sheet paper, which includes copy paper,[19] reported by the paper manufacturers.[20]  This may overestimate sales of consumable office supplies to the extent that the purchases of non-copy paper are being used by customers for commercial applications.[21]

- When customer-level discounts were reported as a separate category, I did not attribute those discounts to sales of consumable office products.



PX06100-220

CONFIDENTIAL MATERIAL

- Some respondents did not provide any product category detail on some or all of their customers.  In such cases, I attributed *all* of such sales to consumable office supplies.  This approach is likely to greatly overstate their sales in the relevant market.[22]

## Calculation of Primary Vendor Revenues in Exhibit 7

Exhibit 7 shows revenues that distributors receive as an end customer's primary vendor (i.e., when providing that customer with at least $500,000 in consumable office supplies) in 2014.[23]  These data reflect the ability of competitors to establish high-volume relationships with large customers.

### *Customer Definitions*

Data received from respondents typically specify sales at the account level.  Because a single customer can have more than one account number with a particular distributor, my staff attempted to aggregate sales to the customer level based on customer names and any other useful information for identifying accounts associated with the same customer, such as tax identification numbers.[24]

The three consortia could not always provide customer information.  [                    ] could only identify sales to GPOs and could not provide detail on the GPO members doing the purchasing.  [                    ] could only identify the member customer for four of its eleven GPO accounts.  Whenever sales to a GPO's members were not available, I counted all sales through the GPO as sales to a single customer.  Moreover, the membership of these consortia overlaps with the surveyed distributors, meaning that sales reported by these consortia



PX06100-221

CONFIDENTIAL MATERIAL

may double count sales already included in the revenues of other entities in Exhibits 7 and 21. For these two reasons, sales through the consortia represent an upper bound on their actual presence in the market.

The revenues in Exhibit 7 represent primary vendor sales to large end-user customers.[26] However, when the respondent did not provide enough information to identify resellers, I tend to overestimate sales by counting those potential resellers in the figures in Exhibit 7. These revenues exclude test accounts, internal accounts, and retail accounts identified by the respondents.[27]

### *Primary Vendor Relationships Do Not Capture Split Spend*

The primary vendor sales in Exhibit 7 do not comprise all sales to large customers because they do not measure two sources of split spend.

First, the FTC requested sales by account/customer only for those customers with over $100,000 in annual purchases, in order to minimize the reporting burden of respondents.[28] This threshold applies to total sales over all product categories and, therefore, sales of consumable office supplies of the excluded accounts could be much lower than $100,000. To the extent that a large customer splits off a portion of its spend into one of these unreported accounts, that portion is not included in my measure of primary vendor sales.

Second, the primary vendor relationship revenues do not attempt to report spending that a large customer splits among different distributors of office supplies. If a large customer splits its spend across distributors in portions of less than $500,000, those smaller portions of spend would not appear in Exhibit 7. A customer could also have a primary vendor relationship with multiple distributors, if it spent more than $500,000 with each distributor. Measurement issues arise in attempting to match customer names across the 35 competitor responses and the three transaction datasets from the parties. Therefore, primary vendor relationship revenues should be interpreted as measuring a distributor's ability to build high-volume relationships with large customers, rather than as a representation of the market as a whole. Nonetheless, I consider the primary vendor relationship revenues reported in Exhibit 7 to be highly informative regarding the competitive significance of distributors in the relevant market.



PX06100-222

CONFIDENTIAL MATERIAL

## Calculation of All-Channel Sales of Consumable Office Supplies

The sales reported in Exhibit 21 represent sales of consumable office supplies through *all* channels and to *all* customers. This universe encompasses some sales that are not in the relevant market, including in-store sales, online sales, and sales to B2B customers who are not large customers.[29]

Exhibit 21 does not include ███████████████████████████████████████ █████████████████████████ Exhibit 21 also excludes the paper manufacturers ███████████████████████████████████████████████ ███████████████ Their data did not allow me to remove sales to resellers as would be necessary to avoid double counting. Lastly, the large wholesalers do not appear in Exhibit 21 ██████████████

Like the customer-level data, some respondents did not provide sufficient detail to separate their sales of consumable office supplies from sales of BOSS products. As described in Section 3, I overestimate sales in these cases by assuming all sales in 2014 were sales of consumable office supplies. Despite these overestimates, the combined scale of the parties is more than 15 times greater than the next largest distributor, W.B. Mason.



PX06100-223

CONFIDENTIAL MATERIAL

# Appendix H: Expansion and Entry

Staples and Office Depot have argued that a variety of suppliers compete effectively against Staples and Office Depot to distribute consumable office supplies to large customers.

In the framework of the Horizontal Merger Guidelines, I understand Staples and Office Depot to be arguing either (a) that the market shares of these suppliers measured based on sales of consumable office supplies to large customers understate their current and future competitive significance, or (b) that these firms can easily expand and will do so if Staples attempts to raise prices to large customers. Ultimately, Staples and Office Depot are arguing that post-merger competition from these other suppliers will be sufficient to protect large customers from adverse unilateral effects associated with the proposed merger between Staples and Office Depot. I now address these arguments, as I understand them, in greater detail. I may amend this analysis after I see any expert reports submitted by economists retained by Staples and Office Depot.

Here are several examples of assertions made by Staples and Office Depot regarding entry and expansion:

> Staples and Office Depot face competition for "national" customers from numerous significant competitors with nationwide footprints. These competitors include, but are not limited to, W.B. Mason, HiTouch Business Services (MyOfficeProducts), Innovative Office Solutions, other independent dealers supported by wholesalers, diversity suppliers utilizing wholesalers, consortiums of independent dealers, Grainger and other competitors from adjacent businesses, Amazon Business, and manufacturers who sell their products directly to customers (including through programs such as managed print service ("MPS") programs). These competitors all provide office products to customers who desire delivery in multiple locations across the country. In fact, Staples and Office Depot are aware of at least 18 other competitors that have recently won contracts to distribute traditional office products to "national" customers, including to ███████████████████████████, and other customers with hundreds of nationwide ship-to locations. The parties are also aware of at least 10 manufacturers that have recently won contracts to provide their products directly to "national" customers.[1]

> Regional Suppliers of Commercial Office Products Are Effective Competitors for "National" Customers.[2]

---

[1] PX0012, at 002 (Letter from Steven Bernstein (Weil Gotshal & Manges) to Stelios Xenakis (FTC), August 3, 2015). In this letter, the term "'national' customers" is defined to mean "large customers (over $1 million/year) who desire multi-regional delivery."

[2] PX0012, at 003 (Letter from Steven Bernstein (Weil Gotshal & Manges) to Stelios Xenakis (FTC), August 3, 2015).

PX06100-224

CONFIDENTIAL MATERIAL

> In fact, significant new competitive entry and expansion has taken place in the commercial office supply business in recent years. For example, as noted in the FTC Closing Statement, competitors in adjacent businesses such as suppliers of Maintenance, Repair, and Operations ("MRO") products (*e.g.*, Grainger and Fastenal) continue to enter and expand into the supply of office products.[3]

In the main body of my report, I discuss the barriers to entry into the relevant market and address the evidence regarding actual entry into the relevant market in recent years. Clearly, no recent entrant into the relevant market has been nearly as successful as Staples and Office Depot or approached their scale. Here I discuss each of the categories of actual and potential competitors identified by Staples and Office Depot.

## Diversity Suppliers

Some large customers have diversity goals regarding their suppliers, i.e., the goal of incorporating businesses owned by under-represented minorities, women, and veterans into their supply chain. Plus, a large corporation with federal contracts may need to satisfy government mandates regarding the diversity of their supply chain.[4] Some of these large customers ask their consumable office supply distributors to help them satisfy a portion or all of their internal supplier diversity goals.[5] In some such cases, the customer has a direct contract with Staples and Office Depot. In other cases, the customer has a three-way contract with either Staples or Office Depot and with the diversity supplier.[6]

The critical point from the perspective of *competition* is that diversity suppliers cannot independently provide the pricing and service levels required by large customers.[7] When working with diversity suppliers, Staples and Office Depot typically determine the prices and prepare the bid for the customer.[8] Once a bid has been won, Staples and Office Depot remain in close contact with the customer and perform many of the functions provided by a distributor of consumable office supplies. Customers place their orders through Staples' and Office Depot's procurement interfaces or e-commerce websites. Staples and Office Depot process the orders, pick and pack the merchandise from their warehouses, and deliver the items ordered by the



PX06100-225

CONFIDENTIAL MATERIAL

customer.[9]   Typically, the diversity supplier bills the customer for the products sold, receives payment, and remits the entire payment amount (minus sales tax) to Staples or Office Depot.[10] Staples and Office Depot pay the diversity supplier a small fee, usually a percentage of sales.[11]

Staples has claimed that "[d]iversity suppliers are significant competitors to Staples and Office Depot for "'national'" customers."[12]   As an antitrust economist, this assertion makes no economic sense to me.  Regardless of the social goals served by diversity suppliers, they typically are not *independent competitors* who have the capability to apply competitive pressure on either Staples or Office Depot to serve large customers.[13]  Rather, they are valued partners who, together with a company that owns and operates a distribution business, can meet the needs of large customers.[14]

In my calculation of market shares, I have attributed the sales made by diversity suppliers to the distributor that actually performs the distribution services and ultimately accrues the bulk of the revenues.  This approach properly reflects the inability of diversity suppliers to compete *on their own* to distribute consumable office supplies to large customers.

## Regional Suppliers

Staples and Office Depot assert that "[r]egional [s]uppliers of [c]ommercial [o]ffice [p]roducts [a]re [e]ffective [c]ompetitors for '[n]ational' [c]ustomers," with the backing of the two large wholesalers, Essendant and S.P. Richards.[15]  They also state:

> Additionally, there has also been rapid expansion by W.B. Mason and other
> independent dealers through organic growth, acquisitions, and by working with
> wholesalers and joining consortiums.  W.B. Mason alone has been growing at
> approximately ▮▮▮▮▮ annually, and is expected to reach ▮▮▮▮▮ in annual
> sales in 2015.  Since 2014, Mason has completed more than a dozen acquisitions



PX06100-226

CONFIDENTIAL MATERIAL

of office supply distributors and has further enhanced its already national service capabilities.[16]

However, this view stands in contrast to what Staples said in an internal memo regarding the merger between Office Depot and OfficeMax:



Regional suppliers certainly have won the business of some large customers, but the market shares they have been able to achieve are tiny, as shown in Exhibit 5B and Exhibit 7.  In my analysis, all regional distributors who sell to large customers, including W.B. Mason and HiTouch, are counted as participants in the market for the distribution of consumable office supplies to large customers in the United States.  The significance of these firms as suppliers is reflected in their market shares.  Some regional distributors who do not appear in Exhibit 5B *do* appear in Exhibit 7 below, meaning that they serve as the primary vendor for some large customers but not for any Fortune 100 customers.  Still, Exhibit 7 shows that these regional suppliers have had extremely limited success at winning RFPs at large customers.  The bidding evidence described in the main body of my report confirms this observation.

Customers who view regional suppliers as a distant or unviable primary vendor alternative to Staples or Office Depot point to their smaller distribution footprints and limited out-of-region capabilities.  For customers that require multi-regional distribution, filling their needs via regional vendors would require a patchwork of different supply relationships.  Furthermore, customers explain that splitting purchases among regional vendors would reduce their ability to obtain volume-based discounts.

For example, ████████████████████████████████████████ explain that splitting purchase volume among regional suppliers results in higher overall prices:

---

[16] PX0012, at 006 (Letter from Steven Bernstein (Weil Gotshal & Manges) to Stelios Xenakis (FTC), August 3, 2015).



PX06100-227

CONFIDENTIAL MATERIAL



████████████ describes why a national procurement strategy is important to keep their costs low and ensure consistent service quality:

Further, ████████████████ finds that the "national service capabilities" of W. B. Mason touted by Staples and Office Depot in the reference above fall well short of the mark:

Regarding W.B. Mason, Staples claims that W.B. Mason is a "[p]articularly [a]ggressive and [l]ow-[p]riced [c]ompetitor."[22]  While W.B. Mason does not ████████████████████ ████████████████████████████████████  However, W.B. Mason's success in this respect appears to be very limited relative to either Staples or Office Depot.  As shown in Exhibit 7, W.B. Mason has only ██ customers who purchase over ████████ per year in consumable office supplies, compared with over ████ customers for each of Staples and Office Depot.  Therefore, by both measures of their

PX06100-228

CONFIDENTIAL MATERIAL

competitive significance as well as their own account, W.B. Mason is far smaller than both Staples and Office Depot.[24]

W.B. Mason faces obstacles to expansion that would remain even if Staples were to raise price by 5% or 10% following its acquisition of Office Depot.  W.B. Mason stresses that it is many years and many geographical regions away from matching the national footprint currently offered by Staples and by Office Depot:

> WBM sometimes expands by acquiring office supplies vendors in new markets, but this requires large amounts of capital, and desirable acquisition targets do not exist in every market. Even by combining organic expansion with expansion by acquisition, WBM could not expand into enough markets to create the kind of national footprint that Staples and Office Depot already have in less than ██████. ██████. I do not see any other office supplies vendor being in a position to do so, either.[25]

W.B. Mason also has found via recent experience that expansion into new regional markets by "organic" growth (rather than by acquisition) is also slow and risky:

> "Organic" expansion into a new market is risky and expensive: It is difficult to win customers in a new geographic area without having an operational distribution center up and running.  So a vendor must take a gamble and invest ██████ dollars to acquire or build and stock a new distribution center, in the hopes that it will be able to attract enough customers to eventually make the operation profitable.  Even when this gamble pays off, it generally takes ██████ before a new market is profitable.[26]

Similarly, HiTouch, explains that it primarily serves customers that are within ██████

██████████████████████████████

██████████

██████████

────────────────

██████████████████████

██████

██████

██████

██████

██████

PX06100-229

CONFIDENTIAL MATERIAL



In sum, regional suppliers are far smaller than Staples and Office Depot and face significant obstacles to expansion.

## Consortia

Staples and Office Depot assert that "regional competitors effectively compete for 'national' customers by joining cooperatives of independent office supply dealers."[31]  However, these suppliers do not appear at all in the purchases reported by Fortune 100 customers.  Furthermore, Mr. Meehan of W.B. Mason states: "We rarely see consortia included in RFPs for large B2B accounts, they rarely win bids, and we do not view them as serious competitors for large B2B business."[32]

PX06100-230

CONFIDENTIAL MATERIAL



Several large customers confirm that they do not find consortia of regional suppliers to be effective competitors to Staples or Office Depot.



CONFIDENTIAL MATERIAL



This evidence strongly suggests that a post-merger price increase by Staples on the order of 5% to 10% would not cause large customers to switch in significant numbers to using consortia. The recent attempts and failures for both ███████████████████████ described above indicate that consortia face significant obstacles to success with large customers. Nor is ███████ within striking distance of Staples and Office Depot with respect to large customers: ████ ████████████████████████████████ Furthermore, as noted above, W.B. Mason and ███████ view consortia as "either not viable or…significantly less-effective competitors."

In sum, consortia of regional suppliers have had very limited success serving large customers, and there is no reason to expect that to change after the merger of Staples and Office Depot, even if Staples raises prices to large customers by 5% to 10%.

## Adjacents: Grainger and Fastenal

Staples and Office Depot have asserted that "Grainger, Fastenal… have expanded into the supply of office products, including traditional office products to "'national'" customers."[45] They also



PX06100-232

CONFIDENTIAL MATERIAL

assert that "Grainger targets national office product accounts," and that they see a "growing threat from Grainger and Fastenal for large office product accounts."[46]  They also state:

> These suppliers are well positioned to capitalize on their highly efficient and comprehensive national delivery platforms, existing close relationships with the largest multi-regional and "national" customers, ongoing product deliveries to these customers on a regular basis, extensive and growing range of office products, leading positions in adjacent categories, large sales forces, and sophisticated ordering and inventory systems that are already integrated into their customers' procurement systems. It strains credulity to suggest that these suppliers – who *already* are delivering office products to these same customers – could not expand sales of traditional office supplies."[47]

While I agree that the relationships Grainger and Fastenal have with large customers allows them to overcome one of the obstacles to expansion, they will continue to face significant obstacles after the merger of Staples and Office Depot.

As a starting point, my measurement of market shares based on purchases of consumable office supplies by Fortune 100 customers very likely *overstates* the current shares of Grainger and Fastenal because I have  included their sales to Fortune 100 companies unless the information provided by the Fortune 100 company clearly indicates that sales made by Grainger and Fastenal involve products *other* than consumable office supplies, such as janitorial and sanitation products.



Grainger primarily distributes maintenance, repair and operations (MRO) products, such as lighting, safety, hand and power tools, material handling equipment, pumps and plumbing supplies, and cleaning and maintenance products.[48]

---

[46] PX0010, at 052-053, 057 (Staples, Presentation to the FTC on Competition for National Commercial Customers, July 14, 2015).

[47] PX0012, at 005 (Letter from Steven Bernstein (Weil Gotshal & Manges) to FTC, August 3, 2015) (emphasis in original).



PX06100-233

CONFIDENTIAL MATERIAL



Fastenal primarily distributes industrial and construction supplies, such as fasteners (e.g., nuts, bolts, washers, etc.), metalworking and cutting tools, lifting and rigging equipment, and welding equipment.[52]



These statements support the view that expansion by Grainger and Fastenal in response to a small but significant price increase by Staples is unlikely.  Furthermore, given Office Depot's large market share, plausible expansion by Grainger and Fastenal is unlikely to be sufficient to replace the competition lost from the merger.

## Manufacturers

Staples and Office Depot have asserted that they "compete not only against other distributors, but also against manufacturers seeking to disintermediate distributors by selling direct to customers."[56]  They further claim that the direct purchasing alternative "allows customers to



PX06100-234

discipline any supplier by threatening to convert additional products to direct purchases from manufacturers."[57]  They also state:

> Moreover, manufacturers are increasingly offering services, such as MPS, where the manufacturer assumes responsibility for a portion of the office (e.g., printing and copying), including all of the supply needs (e.g., ink/toner, paper, etc.) The products offered by manufacturers through these direct sourcing arrangements are direct substitutes for the products offered by Staples and Office Depot (and in many instances are the *exact same* products) and this competition directly impacts Staples' and Office Depot's prices.[58]

However, for most manufacturers, even a large customer does not have sufficient volume to be served efficiently (paper is an exception, as discussed below).  Large customers also understand that manufacturers are rarely willing to offer the distribution or customer service that they receive from Staples and Office Depot.  When a large customer purchases core office supplies directly from the manufacturer, the customer typically must bear the added expense of providing its own mode of distribution.  If it sources from multiple manufacturers, the customer foregoes the benefit of supplies from different origins funneled into a combined single delivery. In addition, the customer also typically lacks the purchasing scale of Staples and Office Depot, meaning it cannot achieve comparable volume-based discounts.

Large customers explain why purchasing directly from manufacturers is typically unattractive.



---

[57] PX0010, at 059 (Staples, Presentation to the FTC on Competition for National Commercial Customers, July 14, 2015).

[58] PX0012, at 005 (Letter from Steven Bernstein (Weil Gotshal & Manges) to Stelios Xenakis (FTC), August 3, 2015) (emphasis in original).

[59]

PX06100-235

CONFIDENTIAL MATERIAL



PX06100-236

CONFIDENTIAL MATERIAL

## Paper Manufacturers

Staples and Office Depot stress that "[d]irect sourcing is available for all categories of office products but is most common in ink/toner and paper, the largest components of commercial office products sales."[64]

I have measured the presence of paper manufacturers in the relevant market in Exhibit 5B based on their sales to Fortune 100 customers.  The #4 and #5 suppliers listed are paper manufacturers, but their shares are very small compared with Staples and Office Depot: ███████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

Three of the four major U.S. paper manufacturers do not make direct sales at all or only do so by the truckload, so they would need to add a set of capabilities to expand to serve the needs of large customers.  These companies typically do not compete for direct sales to customers who are unwilling to keep large quantities of paper in inventory or handle distribution to individual office locations after taking delivery in bulk.  The fourth major U.S. paper manufacturer, ███████ has a relatively small volume of direct sales.

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████

Sales to end users reported by the paper manufacturer ███████████ are consistent with ███████ assertion that such arrangements between customers and paper manufacturers are rare. Between 2012 and 2015, ███████████ shipped copy paper to only ███ end users: ███████ ██████████████████████████████████. Moreover, in 2015 just two customers, █████████████, accounted for over ██████ these direct sales.[67] ██████████ ████ ██:

---

[64] PX0010, at 059 (Staples, Presentation to the FTC on Competition for National Commercial Customers, July 14, 2015).

[65] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

█ ████████████████████████████████

█ ████████████████████████████████████████████

PX06100-237

CONFIDENTIAL MATERIAL



My understanding is that ███████ is the only major paper manufacturer with a direct sales function, and that function is limited.[69]  As one example, ████████████████████ writes:

Paper manufacturers face significant barriers to expansion in the relevant market.  The rarity with which they serve large customers directly suggests that a post-merger price increase on the order of 5% to 10% by Staples would not cause them to quickly re-invent their distribution model in order to become a more meaningful competitive check.  Even if paper manufacturers

CONFIDENTIAL MATERIAL

were to significantly expand their sales to large customers, they would remain far smaller in the relevant market than Office Depot is today.

## Paper Merchants

In describing paper purchases directly from manufacturers, Staples and Office Depot state that "customers often turn to paper distributors or 'converters' that distribute paper on behalf of manufacturers (e.g., ███████████████, etc.)."[73]

███████ appears as the #3 firm in Exhibit 5B, with a market share of of ████. This share is far less than Office Depot's share of ██████, but far greater than the market share of the #4 firm, ████████████, which is ████. However, my estimate of ███████ market share is almost certainly too high, since ████ also has substantial sales to Fortune 100 customers of products other than consumable office supplies. ██████ reports sales of ████████ in 2014 in the facilities solutions segment alone, which lies outside of the relevant market. These are sales of products that include "break room/food service supplies, industrial cleaning chemicals, disposal systems, janitorial supplies and equipment, floor care supplies and equipment, hand and skin care, restroom supplies and equipment and safety supplies and personal protection."[74] As I explain in Appendix E, I am often unable to separate purchases from ████████ representing products in the relevant market from those representing products outside the relevant market. In such cases, I have included the entire value, which overstates ████████ revenues in the relevant market.[75] To the extent that my method includes products outside the relevant market, the share for ██████ reported in Exhibit 5B is overstated.

███████████ market share, as shown in Exhibit 5B, is only ████. Additional evidence regarding ████████████ paper sales to large customers is consistent with their low market share ███████ at the Fortune 100 customers. Among the expanded group of the Fortune 250 customers, ████████████ sales of copy paper to end users other than Staples and Office Depot is less than ████████. To put this in perspective, even if one were to attribute the entire value from this expanded customer base to ████████████████████, ███████████ market share in Exhibit 5B would still not exceed ████. Furthermore, the fact that more than ███████ copy paper sales among the Fortune 250 are made to resellers indicates that ████████ has a limited track record servicing large end users.[77]

Even if ████████████████ were to significantly expand their sales to large customers, they would remain far smaller than Office Depot is today in the relevant market.

---

[73] PX0010 at 059 (Staples, Presentation to the FTC on Competition for National Commercial Customers, July 14, 2015).



PX06100-239