**Contains Confidential Information – Subject to Protective Order**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, et al.,<br><br>V.<br><br>STAPLES, INC. and OFFICE DEPOT, INC., | Civil Action No. 1:15-cv-02115-EGS |

**Expert Report of Mark E. Zmijewski**

**February 15, 2016**

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    SUMMARY OF OPINIONS AND CONCLUSIONS ...................................... 4

III.   SUMMARY OF QUALIFICATIONS ............................................................. 6

IV.   METHODOLOGY ......................................................................................... 9

    **A.** Assessing Merger Specificity of Efficiencies .................................................. 10

    **B.** Verifying Efficiencies ....................................................................................... 11

V.    OVERVIEW OF THE DEFENDANTS' ALLEGED EFFICIENCIES ........................... 14

    **A.** Overview of Staples' Initial Estimate of the Alleged Efficiencies .................... 15

    **B.** Overview of Staples' Internal Target of Alleged Efficiencies .......................... 19

    **C.** Most of the Alleged Efficiencies Appear to be Related to Sales to Consumers (Retail) Rather than Sales to Commercial Enterprises (B2B) ....................................... 23

VI.   THE DEFENDANTS' EXTRAPOLATIONS OF COST SAVINGS FROM THE OFFICE DEPOT/OFFICEMAX AND STAPLES/CE MERGERS TO THE PROPOSED MERGER ARE NOT RELIABLE ................................................................. 27

    **A.** Overview of Office Depot/OfficeMax Merger ................................................. 28

    **B.** The Defendants Do Not Show the Extent to which, if at All, They Excluded the Cost Savings from Pre-Existing Cost Reduction Plans or from Implementing Non-Proprietary Best Practices When Estimating the Cost Savings from the Office Depot/OfficeMax Merger 32

    **C.** Some of the Estimated Cost Savings from the Office Depot/OfficeMax Merger Used by the Defendants to Estimate Efficiencies from the Proposed Merger Are Not "Grounded on Actual Experience" .................................................................................. 33

    **D.** The Defendants Have Not Provided Sufficient Information to Provide Foundation for, or Allow Me to Understand the Basis of, the Cost Savings from the Office Depot/OfficeMax and Staples/CE Mergers ........................................................................................ 34

VII.  THE DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT THE ALLEGED EFFICIENCIES FOR THE PROPOSED MERGER ARE MERGER-SPECIFIC OR VERIFIABLE ............................................................................................. 35

    **A.** The Defendants Have Failed to Demonstrate That the Alleged Efficiencies for the Proposed Merger are Merger-Specific ............................................................... 36

    **B.** The Defendants Failed to Provide Adequate Substantiation to Verify the Alleged Efficiencies .................................................................................................... 37

Contains Confidential Information –
Subject to Protective Order

**List of Appendices**

Appendix A:        Curriculum Vitae of Mark E. Zmijewski

Appendix B:        Documents Relied Upon

## I.     INTRODUCTION

1.      My name is Mark E. Zmijewski.  I hold the Charles T. Horngren Professorship at The University of Chicago Booth School of Business, where I have been a faculty member since 1984.  I am also a Senior Consultant to Charles River Associates.  I have provided analysis regarding projected merger-related efficiencies since 2003, both on a consulting basis, and as a testifying expert in antitrust litigation.  I have performed such analyses on behalf of both government enforcement agencies ("Agencies") and parties to transactions under review.  I discuss my qualifications in Section III and present my curriculum vitae in Appendix A.

2.      This matter pertains to litigation brought by the Federal Trade Commission ("FTC" or "Plaintiff") regarding the proposed merger ("Proposed Merger") between Staples, Inc. ("Staples") and Office Depot, Inc. ("Office Depot"), collectively ("Defendants").  The FTC has asked me to review and analyze the evidence related to the Proposed Merger available as of the date of this report and to form opinions on certain issues related to both the $1 billion initial estimate of alleged efficiencies ("Initial Estimate of Alleged Efficiencies" or "Initial Estimate"),[1] and the subsequently identified ███████ internal efficiencies target ("Internal Target of Alleged Efficiencies" or "Internal Target")[2] for the United States ("U.S.") only.[3]  More

---

[1] PX04572, at 112 (Response of Staples, Inc. to Request for Additional Information And Documentary Material Issued March 30, 2015 (As Modified), dated August 28, 2015 ("Staples Second Request Narrative Response"); PX06001_native (Staples, SPLS_0008288_native).

[2] PX04572, at 112 (Staples Second Request Narrative Response); PX04155_native (Staples, SPLS2_000027_native, at tab: "Summary").  In the Staples Second Request Narrative Response, Staples stated "Since making its initial projection of at least $1 billion in annual savings (net of investments to provide increased value to consumers), Staples has set an internal cost savings target of ███████." (PX04572, at 112 (Staples Second Request Narrative Response)).

[3] I refer to the Initial Estimate of Alleged Efficiencies and Internal Target of Alleged Efficiencies together as "Alleged Efficiencies."

specifically, I was asked to form opinions as to (1) whether the Alleged Efficiencies could

reasonably be achieved without the Proposed Merger (whether they are "merger-specific") and

(2) whether the Alleged Efficiencies are verifiable.  Because the Defendants do not provide

sufficient information to separate the Alleged Efficiencies for the U.S. only, I analyzed the

Alleged Efficiencies for North America, for which the Defendants provide some limited

information.[4]

3.      In the Staples Second Request Narrative Response, the Defendants disclosed that certain

Alleged Efficiencies were based, in part, on the cost savings experienced from the 2013 merger

between Office Depot and OfficeMax Incorporated ("OfficeMax") ("Office Depot/OfficeMax

Merger")[5] and Staples' 2008 acquisition of Corporate Express N.V. ("Corporate Express")

("Staples/CE Merger").[6]   It is therefore also necessary to review and analyze the evidence

related to the Office Depot/OfficeMax Merger and the Staples/CE Merger in order to form

opinions on certain issues related to the Alleged Efficiencies from the Proposed Merger.  To that

end, I was asked by the FTC to also undertake a similar analysis of the available evidence

regarding each of these transactions.

---

[4] I note that the Initial Estimate does not appear to provide any information to separate the Alleged Efficiencies for the U.S. only, while the Internal Target does provide limited information to separate the Alleged Efficiencies for the U.S. only.  I discuss this breakout in more detail in Section V.B.

[5] The Office Depot/OfficeMax Merger was announced on February 20, 2013 and the effective date of the merger was November 5, 2013.  (PX06018, at 004, 024 (Office Depot, 10-K SEC Filing for the fiscal year ended Dec. 28, 2013)).

[6] PX04572, at 112 (Staples Second Request Narrative Response).  Staples described its merger with Corporate Express as follows: "Staples acquired Corporate Express, a Dutch office supplies wholesaler, in 2008 for an aggregate cash purchase price of $2.8 billion (approximately $4.4 billion, net of cash acquired)." (PX04572, at 123 (Staples Second Request Narrative Response)).

Contains Confidential Information –
Subject to Protective Order                Page 2

4.      I have prepared my expert report to state the opinions I intend to express at trial; to describe the bases for those opinions and the reasons underlying them; to disclose the facts and data I considered in reaching my opinions; and to make all other appropriate disclosures.  I express no legal opinions in this report.  The work that I conducted in this matter has been informed by my education, knowledge, and experience in accounting, economics, and finance.  I have considered and compiled materials as cited herein with the assistance of Charles River Associates ("CRA") personnel working under my direction and supervision.  A listing of the discovery and publicly available materials I have relied upon in the formation of my opinions is contained in Appendix B, as well as the citations in the footnotes to the text and tables presented in this report.  I began my review and analysis of Staples' Alleged Efficiencies in April of 2015.  As I receive additional data, facts or information, I will review, evaluate, and analyze these additional data, facts, or information as they become available.  Given that the Defendants may update their estimates of the Alleged Efficiencies, I will likewise update, modify or supplement my expert report as necessary to reflect any additional data, facts, or information that I receive.[7]

5.      CRA is being compensated for my services provided in this matter at ███ per hour. Various employees of CRA have assisted me in performing services under my direction in

---

[7] For example, in the Staples Second Request Narrative Response, Staples stated it "may consider revising its initial publicly-disclosed $1 billion cost savings estimate subsequent to the completion of integration planning and further validation of higher internal targets."  (PX04572, at 113 (Staples Second Request Narrative Response)).  I understand that Staples has declined to provide a revised estimate from the one submitted on August 28, 2015, until later in this litigation.  (PX04526, at 005-006 (Defendant Staples Objections and Responses to Plaintiffs' First Set of Interrogatories, Response to Interrogatory No. 2, dated January 21, 2016)).  Moreover, I understand that the Defendants have held discussions regarding a possible divestiture.  (PX00007 ("Presentation to FTC Bureau of Competition and Bureau of Economics Management" Re: Proposed Divestiture, dated Nov. 16, 2015)).  To the extent a divestiture of assets decreases the dimensions of the scale of the Defendants that they used as the basis for estimating the Alleged Efficiencies, the estimate of the Alleged Efficiencies would decrease accordingly.  At this time the Defendants have not provided sufficient information regarding the divestiture to evaluate its effect on the Defendants' estimate of the Alleged Efficiencies.

connection with this engagement.  I have a confidential contractual arrangement with CRA under which I ███████████████████████████████████████████████████████ ████████████████████████; however, none of my compensation is contingent in any way on the substance of my opinions or the outcome of this matter.

6.       I summarize my opinions in Section II.  I discuss my qualifications in Section III.  In Section IV, I describe the methodology I used to assess the Alleged Efficiencies.  In Section V, I provide an overview of the Alleged Efficiencies.  In Section VI, I assess the merger specificity and verifiability of the cost savings from the Office Depot/OfficeMax Merger and the Staples/CE Merger, which the Defendants claim provide some of the basis for their estimate of the Alleged Efficiencies.  In Section VII, I assess the merger specificity and verifiability of the Alleged Efficiencies.

## II.       SUMMARY OF OPINIONS AND CONCLUSIONS

7.       While the Defendants provided many documents to the FTC, the information related to the Alleged Efficiencies from the Proposed Merger and the costs savings from the Office Depot/OfficeMax and Staples/CE mergers is limited and insufficient to conduct the necessary analyses of the issues on which I was asked to opine.  I reviewed the information available to me and formed my opinions based on the limited information provided by the Defendants.  In this section, I summarize my overall opinions based on this limited information.  In the remainder of this report, I identify the facts and data I used, and the analyses I conducted, to form the bases for these and other opinions I discuss in the report.  In sum, based on those facts and analyses, I have concluded the following:

a)      The Defendants' extrapolation of cost savings from the Office Depot/OfficeMax Merger and/or Staples/CE Merger to the Proposed Merger is not reliable.

     1.      The Office Depot/OfficeMax cost savings estimates and related information fail to show the extent to which, if at all, the Defendants excluded the cost savings from pre-existing cost reduction plans and from implementing non-proprietary best practices, and thus, the Defendants fail to demonstrate that these cost savings are merger-specific.

     2.      Some of the cost savings from the Office Depot/OfficeMax Merger have not yet been achieved but are forecasts of future cost savings, and thus, the Defendants have not extrapolated from actual experience.

     3.      The Defendants have not provided sufficient information to provide foundation for, or allow me to understand the basis of, the cost savings from the Office Depot/OfficeMax Merger or the Staples/CE Merger.

b)      The Defendants have failed to demonstrate that the Alleged Efficiencies for the Proposed Merger are merger-specific or verifiable.

     1.      The Defendants have failed to demonstrate that the Alleged Efficiencies are unlikely to be accomplished absent the Proposed Merger, and thus, the Defendants fail to demonstrate that the Alleged Efficiencies for the Proposed Merger are merger-specific.

     2.      The Alleged Efficiencies are not verifiable because the Defendants have failed to provide foundation about the inputs and assumptions underpinning the calculation of the Alleged Efficiencies and, in some instances, rely primarily or solely on business judgment.[8]

---

[8] The Defendants have also provided only a partial estimate of the costs necessary to achieve the Alleged Efficiencies and have provided no information to verify even the partial estimate provided.

### III.    SUMMARY OF QUALIFICATIONS

8.      I specialize in the areas of accounting, economics, and finance as they relate to valuation, financial analysis, and security analysis, or more generally, financial economics.  I have been on the faculty of The University of Chicago Booth School of Business since 1984.  I currently hold the Charles T. Horngren Professorship, prior to which I held the Leon Carroll Marshall Professorship.  In addition to my faculty duties, I also held the positions of Deputy Dean, PhD Program faculty director, and the Center for Research in Security Prices faculty director, all at the Booth School of Business.

9.      I earned my BS in 1976, MBA in 1981, and PhD with a major in accounting and minors in economics and finance in 1983, all from the State University of New York at Buffalo.  In addition to The University of Chicago, I have taught at the State University of New York at Buffalo and at York University in Toronto, Canada.  I have taught various courses in accounting (financial accounting, managerial accounting, and advanced accounting/mergers and acquisitions), finance (corporate finance, financial strategy and corporate transactions, financial analysis, and valuation of companies and corporate transactions), and entrepreneurship.  My research focuses on firm valuation and the ways in which various capital market participants use information to value securities.  I have published articles in academic journals in the areas of accounting and financial economics and also co-authored a textbook (with Professor Robert Holthausen of The Wharton School of the University of Pennsylvania) on how to value companies, parts of companies, and the securities issued by companies, titled "Corporate Valuation: Theory, Evidence and Practice."  I have been an Associate Editor of The Accounting Review, and have been on the Editorial Boards of both the Journal of Accounting Research and The Accounting Review.

Contains Confidential Information – Subject to Protective Order

10.     I am a Senior Consultant to Charles River Associates, a consulting firm that provides economic, financial, and management consulting services.  I am also a Senior Advisor to, and a member of, the Investment Committee at Patron Capital Partners (Funds IV and V), a private equity investment company with a focus on real estate related investments.  I was a founding partner of Chicago Partners, LLC, which was acquired by Navigant Consulting.  I am the former managing director of Navigant Economics (a subsidiary of Navigant Consulting) and a former member of the corporate executive committee of Navigant Consulting.

11.     I have worked as a consultant or expert in litigation matters in U.S. state and federal courts, in the Supreme Court of Victoria in Australia, and in U.S. and international arbitrations. The issues on which I have worked include: business valuation and securities valuation (valuation of corporate transactions, companies, and parts of companies, intangible assets and intellectual property, and securities); securities litigation (10b-5, section 11, section 12, ERISA, Martin Act, effect of disclosures, and insider trading); mergers and acquisitions (appraisals and price disputes, analyzing merger synergies, material adverse changes, corporate transactions, and the process of purchasing and selling companies); solvency and ability to pay (fraudulent conveyance, solvency assessment, and ability to pay government fines); antitrust litigation (analysis of merger efficiencies, failing firm defense, and financial analyses of alleged anticompetitive behavior); commercial and stockholder disputes (measurement of damages, accounting analyses, and economic assessment of transactions); accounting issues (measuring and analyzing revenue, cost structures, profitability, rates of return, interest rates, and other financial metrics and concepts); and creating and evaluating business plans.

12.     Specific to this matter, I have taught and performed various efficiencies-related analyses using standard and well-accepted methods in accounting, economics, and finance.  I have

performed similar analyses that I conduct in this report in my prior merger-related efficiencies work, including analyses that I have conducted for the FTC, the U.S. Department of Justice ("DOJ"), and for merging parties.  I have testified at trial on my analyses related to the Merger Guidelines Efficiencies Criteria in the *United States v. H&R Block, Inc.* litigation, the *United States v. Oracle Corporation* litigation, and the *United States v. First Data Corp.* litigation.[9]

13.     The frameworks and tools I use in my work are generally applicable to all industries, and I have applied my expertise in a broad range of sectors, including airline, auto, financial services, chemical, computer hardware and software, credit card and credit card security, energy, entertainment, for-profit education, health care, insurance, heavy and light manufacturing, pharmaceutical, retail, real estate investment funds, securities companies, technology, telecommunications, transportation, and others.

14.     My curriculum vitae, which is attached to this report in Appendix A, details my qualifications, including my publications and testimonial experience within the last five years. The FTC agreed to compensate me at my usual hourly rate.  Various employees of CRA have assisted me in performing services under my direction in connection with this engagement.  I have a confidential contractual arrangement with CRA under which I ███████████████ ███████████████████████████████████████████████████████████████; however, none of my compensation is contingent in any way on the substance of my opinions or the outcome of this matter.

---

[9] U.S. v. Oracle Corp., 331 F. Supp. 2d 1098 (2004); U.S. v. First Data Corp. and Concord EFS, Inc., No. 03-2169 (D.D.C. 2004); U.S. v. H&R Block, Inc., et al., 833 F. Supp. 2d 36 (D.D.C. 2011).

## IV.    METHODOLOGY

15.    The DOJ and the FTC issued updated *Horizontal Merger Guidelines* on August 19, 2010

("Merger Guidelines").[10]  The Merger Guidelines set forth criteria of whether efficiencies will be

deemed cognizable, stating, "Cognizable efficiencies are merger-specific efficiencies that have

been verified and do not arise from anticompetitive reductions in output or service.  Cognizable

efficiencies are assessed net of costs produced by the merger or incurred in achieving those

efficiencies."[11]  The Merger Guidelines call for analysis of whether alleged or claimed

efficiencies are: (1) merger-specific, (2) verifiable, and (3) not the result of anticompetitive

reductions in output or service (collectively, "Merger Guidelines Efficiencies Criteria").[12]  It is

widely accepted that economists analyze alleged merger efficiencies in merger challenges in

order to assist the trier of fact in assessing whether efficiencies are cognizable using the Merger

Guidelines Efficiencies Criteria,[13] which is what I have done and what I summarize in this

report.

---

[10] PX08051 (U.S. Department of Justice & Federal Trade Commission's *Horizontal Merger Guidelines*, dated Aug. 19, 2010).

[11] PX08051, at 033 (U.S. Department of Justice & Federal Trade Commission's *Horizontal Merger Guidelines*, dated Aug. 19, 2010, § 10).

[12] PX08051, at 033 (U.S. Department of Justice & Federal Trade Commission's *Horizontal Merger Guidelines*, dated Aug. 19, 2010, § 10).  I note that I have not been asked to comment on whether the Alleged Efficiencies are the result of anticompetitive reductions in output or service.

[13] I note that the Merger Guidelines state, "The Commentary on the Horizontal Merger Guidelines issued by the Agencies in 2006 remains a valuable supplement to these Guidelines." (PX08051, at 004, N.1 (U.S. Department of Justice & Federal Trade Commission's *Horizontal Merger Guidelines*, dated Aug. 19, 2010)).

Contains Confidential Information –
Subject to Protective Order

### A.    Assessing Merger Specificity of Efficiencies

16.    The Merger Guidelines define "merger-specific" as "those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects."[14]  As discussed in the Commentary on the Merger Guidelines,[15] an efficiency may be "merger-specific," even if it is technically feasible by other means, for example, because it is not practically feasible or involves substantial transaction costs.[16]  The Merger Guidelines further explain that, "[t]he Agencies will not deem efficiencies to be merger-specific if they could be attained by practical alternatives that mitigate competitive concerns, such as divestiture or licensing.  If a merger affects not whether but only when an efficiency would be achieved, only the timing advantage is a merger-specific efficiency."[17]

17.    The Commentary on the Merger Guidelines further states:

> . . . [T]he parties may believe that they can reduce costs by adopting each other's 'best practices' or by modernizing outdated equipment.  But, in many cases, these efficiencies can be achieved without the proposed merger.  The presence of other firms in the industry unilaterally adopting similar 'best practices' would suggest that such cost savings are not merger-specific.  By contrast, if a 'best practice' is

---

[14] PX08051, at 033 (U.S. Department of Justice & Federal Trade Commission's *Horizontal Merger Guidelines*, dated Aug. 19, 2010, § 10).

[15] PX08053, at 053, 054 (U.S. Department of Justice & Federal Trade Commission's *Commentary on the Horizontal Merger Guidelines*, dated Mar. 2006, § 4 ("Commentary on the Merger Guidelines")).

[16] PX08053, at 053, 054 (U.S. Department of Justice & Federal Trade Commission's *Commentary on the Horizontal Merger Guidelines*, dated Mar. 2006, § 4).

[17] PX08051, at 033, N.13 (U.S. Department of Justice & Federal Trade Commission's *Horizontal Merger Guidelines*, dated Aug. 19, 2010, § 10).

protected by intellectual property rights, then it could be the basis for a merger-specific efficiency claim.[18]

In other words, the best practices portion of efficiencies that could be practically achievable through other means ("non-proprietary") is generally not merger-specific.

18.     Consistent with the Merger Guidelines, the Commentary on the Merger Guidelines, and basic principles in accounting, economics, and finance, I examined the evidence regarding alternatives that may exist for realizing the Alleged Efficiencies absent the Staples and Office Depot Proposed Merger (merger specificity), which I summarize in this report.[19]

### B.      Verifying Efficiencies

19.     The Merger Guidelines state, "efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means."[20]  The Merger Guidelines also state that "it is incumbent upon the merging firms to substantiate efficiency claims so that the Agencies can verify by reasonable means the likelihood and magnitude of each asserted efficiency."[21]  While the Merger Guidelines do not prescribe specific standards, methods, or tests that should be used to verify efficiency claims, the Commentary on the Merger Guidelines

---

[18] PX08053, at 054, 055 (U.S. Department of Justice & Federal Trade Commission's *Commentary on the Horizontal Merger Guidelines*, dated Mar. 2006, § 4).

[19] PX08053, at 053, 054 (U.S. Department of Justice & Federal Trade Commission's *Commentary on the Horizontal Merger Guidelines*, dated Mar. 2006, § 4); PX08051, at 032-34 (U.S. Department of Justice & Federal Trade Commission's *Horizontal Merger Guidelines*, dated Aug. 19, 2010, § 10).

[20] PX08051, at 033 (U.S. Department of Justice & Federal Trade Commission's *Horizontal Merger Guidelines*, dated Aug. 19, 2010, § 10).

[21] PX08051, at 033 (U.S. Department of Justice & Federal Trade Commission's *Horizontal Merger Guidelines*, dated Aug. 19, 2010, § 10).

provides guidance on the documentation the DOJ and FTC look for to substantiate efficiency claims, and the process they use to verify those claims.

20.     The Commentary on the Merger Guidelines states that the assessment of whether efficiency claims are cognizable is facilitated by "documentation that is logical, coherent, and grounded on facts and business experience.  It is in the parties' interest to provide detailed information on the likelihood, magnitude, and timing of claimed efficiencies."[22]  The Commentary on the Merger Guidelines notes that, "The best way to substantiate an efficiency claim is to demonstrate that similar efficiencies were achieved in the recent past from similar actions.  Documentation must be based on appropriate methods and realistic assumptions, and ideally would be grounded on actual experience."[23]  It naturally follows that in order for an extrapolation of the cost savings experienced from a previous merger to form the basis of cognizable efficiencies in a subsequent merger, the cost savings from the previous merger must also be cognizable (verifiable and merger-specific).[24]

21.     The Commentary on the Merger Guidelines also describes the verification process, stating,

> After the parties have presented substantiation for their claimed merger-specific efficiencies, the Agencies attempt to verify those claims.  The verification process usually includes, among other things, an assessment of the parties' analytical methods, including the accuracy of their data collection and measurement, an evaluation of the reasonableness of assumptions in the analysis, and scrutiny into

---

[22] PX08053, at 055 (U.S. Department of Justice & Federal Trade Commission's *Commentary on the Horizontal Merger Guidelines*, dated Mar. 2006, § 4).

[23] PX08053, at 057 (U.S. Department of Justice & Federal Trade Commission's *Commentary on the Horizontal Merger Guidelines*, dated Mar. 2006, § 4).

[24] See PX08051, at 033-34 (U.S. Department of Justice & Federal Trade Commission's *Horizontal Merger Guidelines*, dated Aug. 19, 2010, § 10).

Contains Confidential Information – Subject to Protective Order

how well the parties' conclusions stand up to modifications in any assumptions (i.e., the "robustness" of the parties' analysis).[25]

22.     Consistent with the Merger Guidelines, the Commentary on the Merger Guidelines summarized above, and the basic principles in accounting, economics, and finance, I analyze whether the Defendants have:

    a)    Provided adequate documentation to support and explain each of the Alleged Efficiencies;

    b)    Used standard, widely accepted and reliable principles, methods, and analyses to measure the Alleged Efficiencies and employed them appropriately; and

    c)    Used facts and data (foundation) to support the inputs and assumptions used in these analyses.

23.     I examined the evidence to assess the extent to which the Alleged Efficiencies are verifiable, which I summarize in this report.  The standards that I used are consistent with the Merger Guidelines and the Commentary on the Merger Guidelines.  I have performed similar analyses based on this methodology in my prior work related to verifying merger efficiencies, including analyses that I conducted for the FTC, the DOJ, and for merging parties.  Those analyses and this methodology were the basis of my testimony in the *United States v. H&R Block, Inc.* litigation, the *United States v. Oracle Corporation* litigation, and the *United States v. First Data Corp.* litigation.[26]

---

[25] PX08053, at 056 (U.S. Department of Justice & Federal Trade Commission's *Commentary on the Horizontal Merger Guidelines*, dated Mar. 2006, § 4).

[26] U.S. v. Oracle Corp., 331 F. Supp. 2d 1098 (2004); U.S. v. First Data Corp. and Concord EFS, Inc., No. 03-2169 (D.D.C. 2004); U.S. v. H&R Block, Inc., et al., 833 F. Supp. 2d 36 (D.D.C. 2011).

## V.    OVERVIEW OF THE DEFENDANTS' ALLEGED EFFICIENCIES

24.    On February 4, 2015, Staples announced that it entered into a definitive agreement to

acquire Office Depot.[27]  According to its FY2015 10-K Filing, "As a result of the proposed

acquisition, we expect to generate at least $1 billion of annualized cost synergies by the third full

fiscal year post-closing."[28]  Staples identified five primary efficiency categories:  (1) product

buying, including cost of goods sold ("COGS"); (2) supply chain; (3) marketing; (4) selling,

general & administrative ("SG&A"); (5) and retail.[29]  Staples estimated one-time costs of about

$1 billion to achieve the Alleged Efficiencies.[30]

25.    As of the date of this report, Defendants provided the FTC with two estimates of Alleged

Efficiencies.  On February 26, 2015, the Defendants provided the FTC with an initial publicly-

disclosed $1.0 billion annual estimate of Alleged Efficiencies (Initial Estimate).[31]  Later, on

August 25, 2015, the Defendants provided the FTC with a revised "Internal cost savings target"

---

[27] PX06019, at 003 (Staples, Inc. 10-K SEC Filing for Fiscal Year ended January 31, 2015).

[28] PX06019, at 046 (Staples, Inc. 10-K SEC Filing for Fiscal Year ended January 31, 2015).

[29] PX04572, at 112 (Staples Second Request Narrative Response).  The Product Buying is also referred to as "COGS" in the Staples Synergies Presentation dated May 7, 2015 (PX04153 at 13 (Staples, Synergies Presentation Document, SPLS2_000001)).

[30] In the Staples Second Request Narrative Response, Staples presented a table of "Projected One-time Costs by Year" that total to $1.0 billion over the first three years after the merger, $350 million, $355 million, and $295 million in years one, two, and three, respectively.  (PX04572, at 117 (Staples Second Request Narrative Response)). I am not aware of the foundation or support for the estimate of these costs.  Thus, the costs necessary to achieve the Alleged Efficiencies are not verifiable.

[31] I understand that Staples first disclosed the Initial Estimate to the FTC through its Hart-Scott-Rodino ("HSR") filing with the FTC on February 26, 2015 (PX06001 (Staples Attachment Item 4(d)-14, filed Feb. 26, 2015) ("Staples Attachment Item 4(d)-14")).

of ███████ of Alleged Efficiencies (Internal Target).[32]  I provide an overview of each of these

estimates in this section.[33]

## A. Overview of Staples' Initial Estimate of the Alleged Efficiencies

26.     On August 28, 2015, Staples described the Defendants' Initial Estimate of Alleged

Efficiencies in the Staples Second Request Narrative Response:  "The magnitude of these

merger-specific savings has been initially projected by Staples to be *at least* $1 billion annually,

net of investments to provide increased value to customers, to be achieved within three years of

closing."[34]  Staples also briefly summarized the process used to develop its Initial Estimate of

Alleged Efficiencies: "In developing its savings estimate, Staples employed a top-down approach

due to various limitations regarding access to certain Office Depot data and the short period of

time allowed for diligence."[35]  Staples stated that in developing its Initial Estimate it "plac[ed] a

---

[32] PX04572, at 112 (Staples Second Request Narrative Response); PX06001_native (Staples Attachment Item 4(d)-14, filed Feb. 26, 2015); PX04155_native (Staples, SPLS2_000027_native).  I understand that the Defendants identified the ███████ Internal Target in the Staples Second Request Narrative Response and subsequently provided a spreadsheet to the FTC (attached to a letter to the FTC dated August 25, 2015), which provides some additional information regarding the Internal Target. (PX06029 (Staples, Letter from Megan A. Granger to Amanda Lewis Re: Proposed Merger of Staples, Inc. and Office Depot Inc. (File No. 1510065), dated Aug. 25, 2015). Furthermore, I understand that the Defendants have not publicly disclosed their Internal Target.

[33] I note that, in late 2014, Office Depot estimated efficiencies from the Proposed Merger at ███████ ███████ to inform its Board of Directors with respect to the company's strategic alternatives.  (PX08018, at 042 (Office Depot Attachment Item 4(d)-4, Discussion Materials: Project Aristotle – Potential Transaction, dated Dec. 4, 2014)).  Mr. Stephen Hare, CFO of Office Depot ("Mr. Hare") described this estimate as "some way to benchmark a sanity check on what the state of the possible would be," based on Office Depot's experience with the Office Depot/OfficeMax Merger.  (PX02010 (Hare (ODP) IH Tr.) at [121:8-14]).  To my knowledge, Office Depot has not provided sufficient information to verify this estimate, or to assess the merger specificity of the claimed cost savings.

[34] PX04572, at 111 (Staples Second Request Narrative Response).  Staples also noted that "Staples' management and financial advisors developed this initial estimate in the ordinary course of business to inform the Staples Board of Directors as to whether to proceed with the transaction."  (PX04572, at 111 (Staples Second Request Narrative Response)).

[35] PX04572, at 112 (Staples Second Request Narrative Response).  Based on my experience, a top-down approach for measuring cost savings typically applies a cost savings percentage to the corresponding top-line item on an

heavy emphasis on the savings levels achieved from the 2008 acquisition of Corporate

Express."[36]  In Table 1, I reproduce the summary of the Defendants' Initial Estimate of Alleged

Efficiencies as presented in the Staples Second Request Narrative Response.  As shown in the

table, the $1 billion estimate includes an "International" cost savings of $75 million, which I was

not asked to evaluate, and an Allowance for Complexity of $115 million.

### Table 1: Summary of Initial Estimate of Alleged Efficiencies

| Cost Category | Projected Cumulative Savings by Year ($ in millions) | | |
|---|---|---|---|
| | Year 1 | Year 2 | Year 3 |
| Product Buying | $116 | $290 | $290 |
| Supply Chain | 6 | 31 | 125 |
| Marketing | 96 | 175 | 175 |
| SG&A | 123 | 315 | 350 |
| Retail | 16 | 56 | 100 |
| Total North America | $357 | $867 | $1,040 |
| International | 4 | 30 | 75 |
| Allowance for Complexity | (60) | (80) | (115) |
| Total Projected Savings | $301 | $817 | $1,000 |
| One Time Costs by Year | $350 | $355 | $295 |

Source: PX04572, at 112 (Staples Second Request Narrative Response).

27.    In order to review the Initial Estimate of Alleged Efficiencies, I relied primarily upon the

Staples Second Request Narrative Response and Staples Attachment Item 4(d)-14.[37]  Staples

---

income statement, while, in a bottom-up approach, management within each part of the company (e.g., division, department) analyzes detailed cost categories that comprise each top-line item on the income statements.

[36] PX04572, at 112 (Staples Second Request Narrative Response).

[37] PX04572 (Staples Second Request Narrative Response); PX06001 (Staples Attachment Item 4(d)-14, filed Feb. 26, 2015).

Contains Confidential Information – Subject to Protective Order                   Page 16

Attachment Item 4(d)-14 provides certain detail for the calculation of some of the Alleged Efficiencies in the Initial Estimate.[38]  I also relied upon a spreadsheet file that, to the best of my knowledge, was used by the Defendants to create Staples Attachment Item 4(d)-14 ("Initial Estimate Spreadsheet").[39]

28.      In Table 2, I reproduce the summary of the Defendants' Initial Estimate of the Alleged Efficiencies as presented in the Staples Attachment Item 4(d)-14 and the Initial Estimate Spreadsheet.

Table 2: Summary of Initial Estimate of Alleged Efficiencies

| ($ in millions) | | | | | Laura/ Official View | |
| --- | --- | --- | --- | --- | --- | --- |
| Retail | | | | | $100 | |
| Supply Chain | | | | | 125 | |
| Buying | | | | | 290 | |
| Marketing | | | | | 175 | |
| SG&A | | | | | 350 | |
| Total North America | | | | 0 | $1,040 | |
| International | | | | | 75 | |
| Allowance for Complexity | | | | | (115) | |
| **Total** | | | | | **$1,000** | |

Sources: PX06001, at 001 (Staples Attachment Item 4(d)-14, filed Feb 26, 2015); PX06001_native, at "Summary" tab (Staples, SPLS_0008288 xlsx)

---

[38] PX06001 (Staples Attachment Item 4(d)-14, filed Feb. 26, 2015).

[39] PX06001_native (Staples, SPLS_0008288_native).  *See also* PX06029 (Letter from Megan A. Granger to Amanda Lewis Re: Proposed Merger of Staples, Inc. and Office Depot, Inc., dated Aug. 25, 2015).

29.     As shown in the table above, the summary of the Initial Estimate as presented in the

Staples Attachment Item 4(d)-14 has two columns labeled ███████████████ and

████████████[40]  The first column █████████████, has three sub-

columns titled █████████████ and ███████████████ and ██████[41]

The second column █████████████ also has three sub-columns titled ██████[42]

"Laura/Official View,"[43] and █████████[44]  As shown in the table, the line items for the

"Laura/Official View" estimate of the Alleged Efficiencies sum to $1.0 billion.[45]  I have

confirmed that each of the individual line item efficiencies in the "Laura/Official View" matches

the amount of the corresponding efficiency category listed in the Staples Second Request

Narrative Response as presented above in Table 1.[46]  Thus, based on this comparison, I assume



---

[40] PX06001, at 002 (Staples Attachment Item 4(d)-14).

[41] PX06001, at 002 (Staples Attachment Item 4(d)-14).

[42] I assume that the column titled "Jeff" refers to the estimates prepared by Mr. Jeff Brown of Staples.  Ms. Christine Komola, EVP and CFO of Staples ("Ms. Komola"), referred to Mr. Brown and his work tracking synergies for previous Staples transactions as well as the Proposed Merger. (PX02005 (Komola (Staples) IH Tr.) at [67:12-18; 267:7-17]).

[43] I assume that "Laura" refers to Ms. Laura Granahan, VP Financial Planning & Analysis ("Ms. Granahan") (PX04572, at 117 (Staples Second Request Narrative Response)).  In her investigational hearing testimony, Ms. Komola explained that, in regards to the synergy plan work, "[w]e've been primarily working with my corporate FP&A Department, Laura Granahan." (PX02005 (Komola (Staples) IH Tr.) at [69:14-17]).

[44] PX06001, at 002 (Staples Attachment Item 4(d)-14, filed Feb. 26, 2015).

[45] PX06001, at 002 (Staples Attachment Item 4(d)-14, filed Feb. 26, 2015).

[46] PX04572, at 112 (Staples Second Request Narrative Response); PX06001, at 002 (Staples Attachment Item 4(d)-14, filed Feb. 26, 2015).  I note that the values in the "Laura/Official View" column correspond with the "Year 3" "Projected Cumulative Savings by Year" in the Staples Second Request Narrative Response.

that the estimates in the "Laura/Official View" provide the calculations of the Initial Estimate of the Alleged Efficiencies presented by Staples in its Second Request Narrative Response.[47]

### B.      Overview of Staples' Internal Target of Alleged Efficiencies

30.     Staples later disclosed that, "[s]ince making its initial projection of at least $1 billion in annual savings (net of investments to provide increased value to consumers), Staples has set an internal cost savings target of ███████."[48]  Staples summarized the process used to develop its Internal Target stating, "[t]his target is principally informed by the magnitude of savings realized by Office Depot through the recent integration of OfficeMax as well as Office Depot's outlook regarding the realization of additional savings as integration is completed."[49]  Staples indicated, however, that it does not have all the details underpinning the cost savings estimates from the Office Depot/OfficeMax Merger.[50]

31.     To identify and review the types and the amounts of the Alleged Efficiencies in the Internal Target, and to understand the calculations underlying each estimate, I relied upon the various documents the Defendants provided to the FTC to substantiate the Alleged Efficiencies. In particular, I reviewed the Staples Second Request Narrative Response and two additional documents.  The first is a Staples presentation titled "Synergies,"[51] which I understand was

---

[47] PX04572, at 112 (Staples Second Request Narrative Response).

[48] PX04572, at 112 (Staples Second Request Narrative Response).

[49] PX04572, at 112 (Staples Second Request Narrative Response).

[50] *See, e.g.*, PX02005 (Komola (Staples) IH Tr.) at [231:11-19].

[51] PX04153 (Staples, Synergies Presentation Document, SPLS2_000001).

prepared by Ms. Christine Komola, EVP and CFO of Staples,[52] and Ms. Laura Granahan, Staples' VP of Financial Planning & Analysis,[53] ("Staples Synergies Presentation").[54]  The second is a spreadsheet that contains calculations underpinning the Internal Target ("Staples Internal Target Spreadsheet").[55]

32.     In Table 3, I present a summary of each category of the Alleged Efficiencies in the Internal Target by geographic region.  As shown in the first column of the table, ███████ of the ████████ of the Defendants' Alleged Efficiencies are attributed to North America.[56]  The remaining ██████████ is related to cost savings in Europe and Australia/New Zealand, which I have not been asked to examine.

---

[52] PX04572, at 117 (Staples Second Request Narrative Response); PX02005 (Komola (Staples) IH Tr.) at [12:19-20].

[53] PX02005 (Komola (Staples) IH Tr.) at [69:14-17].

[54] PX04153 (Staples, Synergies Presentation Document, SPLS2_000001).  Ms. Komola's investigational hearing testimony confirms that this presentation was dated May 7, 2015. (PX02005 (Komola (Staples) IH Tr.) at [207:6-20]).

[55] PX04155_native (Staples, SPLS2_000027_native).  In her investigational hearing testimony, Ms. Komola identified this spreadsheet as the synergy model prepared by Ms. Granahan and her team that is the backup for Staples' Internal Target of Alleged Efficiencies.  (PX02005 (Komola (Staples) IH Tr.) at [233:3 – 234:9]).  In addition, I understand that the Defendants provided and identified this spreadsheet to the FTC (attached to a letter to the FTC dated August 25, 2015) which provides some additional information regarding the Internal Target (PX06029 (Staples, Letter from Megan A. Granger to Amanda Lewis Re: Proposed Merger of Staples, Inc. and Office Depot Inc. (File No. 1510065), dated Aug. 25, 2015)).

[56] The Initial Estimate and Internal Target each have somewhat different cost categories in their respective high-level estimates of the Alleged Efficiencies.  The Initial Estimate presents one category of SG&A Alleged Efficiencies, although detail in the Initial Estimate Spreadsheet allows one to break out the General & Administrative ("G&A") efficiencies from the Sales Force efficiencies.  I note that the SG&A Alleged Efficiency in the Initial Estimate Spreadsheet is composed of G&A efficiencies and Sales Force efficiencies.  One component of the Sales Force efficiency is titled "Customer Service."  (PX06001_native (Staples, SPLS_0008288_native, at tabs "Summary," "1a. SG&A G&A," and "1b. Sales Force.")).  The Internal Target presents a G&A category, a Sales Force category, and a Customer Service category.  (PX04155_native (Staples, SPLS2_000027_native, at tab "Summary")).

Contains Confidential Information –
Subject to Protective Order

Table 3: Summary of Internal Target of Alleged Efficiencies

| $ millions | Initial Target | | | |
|---|---|---|---|---|
| **Area** | **North America** | **Europe** | **AUS/NZ** | **Total** |
| Product Buying | | | | |
| Logistics | | | | |
| Marketing | | | | |
| Retail Ops / Real Estate | | | | |
| Sales Force | | | | |
| Customer Service | | | | |
| General & Administrative | | | | |
| **Total** | | | | |

Source: PX04155_native (Staples, SPLS_000027_native, at tab "Summary").

33.     In Table 4, I present a summary of the Internal Target that provides a more detailed identification of cost categories within the General & Administrative ("G&A") Alleged Efficiency.[57]

---

[57] *See* PX04155_native (Staples, SPLS2_000027_native, at tab "Laura Sheet").

Contains Confidential Information –
Subject to Protective Order                Page 21

Table 4: Internal Target of North American Alleged Efficiencies with
Additional Detail of G&A Cost Categories

*($ in millions)*

| Cost Saving Category | North America |
|---|---|
| Product Buying | ▮ |
| Logistics | ▮ |
| Marketing | ▮ |
| Retail Ops / Real Estate | ▮ |
| Sales Force | ▮ |
| Customer Service | ▮ |
| General & Administrative | ▮ |
|    IT | ▮ |
|    Executive | |
|    Marketing | ▮ |
|    Business Unit Functions | |
|    Merchandising | |
|    Supply Chain | |
|    HR | |
|    Benefits | |
|    Finance - Shared Services | |
|    Legal | |
|    All Other | |
|    Bonus | |
| **Total** | ▮ |

Source: PX04155_native (Staples, SPLS_000027_native, at
tab "Laura Sheet").

34.     An earlier version of the North American Internal Target of Alleged Efficiencies dated

April 12, 2015 was ▮▮▮▮ lower than the current estimate.[58]  Thus, the Defendants

increased their North American Alleged Efficiencies from around ▮▮▮▮ on February 26,

---

[58] PX06002_native (Staples, SPLS_1134519_native, at tab "Laura Sheet").  In this file, the estimate of North
American Alleged Efficiencies dated April 12, 2015 is ▮▮▮▮ compared to the ▮▮▮▮ Internal
Target of Alleged Efficiencies.  This estimate was attached to an email from Ms. Granahan to Ms. Komola dated
April 12, 2015 (PX06002, at 001 (Staples, Email, Subject: "bernie and total synergies," Apr. 12, 2015,
SPLS_1134518)).

Contains Confidential Information –
Subject to Protective Order

2015,[59] to ██████ on April 12, 2015,[60] to ██████ currently.[61]  The Defendants

partitioned the ██████ Internal Target of North American Alleged Efficiencies by business

segment and country (Canada and the United States).[62]  The North American Internal Target of

Alleged Efficiencies includes efficiencies related to Canada and consequently the North

American Alleged Efficiency estimate of ██████ overstates the efficiencies related to the

U.S.  Based on the analysis I present in the next section (see Table 5), it appears, based on the

Internal Target Spreadsheet, that, of the ██████ of North American Alleged Efficiencies,

██████ are related to Canada ██████ related to the Canada S&O business unit and ██████

██████ related to the Canada Contract business unit).[63]

### C.    Most of the Alleged Efficiencies Appear to be Related to Sales to Consumers (Retail) Rather than Sales to Commercial Enterprises (B2B)

35.    The Defendants provided limited information to partition what part of the Alleged

Efficiencies are related to the Defendants' sales to commercial enterprises/businesses ("B2B")

---

[59] The Initial Estimate of Alleged Efficiencies of $1 billion includes ██████ attributable to international operations, which leaves ██████ of U.S. cost savings, assuming the entire allowance for complexity was applied to the U.S., which is unclear based on the evidence provided by the Defendants.  (PX06001_native (Staples Attachment Item 4(d)-14, filed Feb. 26, 2015)).

[60] PX06002_native (Staples, SPLS_1134519_native, at tab "Laura Sheet").

[61] PX04155_native (Staples, SPLS2_000027_native, at tab "Summary").  To the best of my knowledge, the Defendants did not provide an explanation for the increase of ██████.

[62] The Defendants provided limited information to partition the part of the Alleged Efficiencies related to the U.S. To the best of my knowledge, the Defendants provided no geographic region-based partition for the Initial Estimate, other than to attribute $75 million of efficiencies to an "International" category, as I show in Table 1.  The Staples Internal Target Spreadsheet provides information that appears to partition the Alleged Efficiencies by three geographic regions, which I summarize in Table 3.

[63] *See, e.g.,* PX04155_native (Staples, SPLS_000027_native, at tabs "SPLS_ODP Synergies by SBU" and "G&A from Matt_updated_6.16").

and what part are related to the Defendants' sales to consumers ("Retail").[64]  To the best of my

knowledge, the Defendants have not provided sufficiently detailed information to identify what

part of the Initial Estimate is related to the Defendants' sales to commercial

enterprises/businesses (B2B).  The Staples Internal Target Spreadsheet, however, provides

information that appears to partition the North America Alleged Efficiencies by the Defendants'

Retail and B2B businesses.

36.     I summarize this information in Table 5.[65]  The table presents three columns for Retail –

"US Stores," "US Online," and "CA S&O [Canada Stores & Online]."  The total North

American Alleged Efficiencies for Retail are ███████████.  The three columns for B2B are

---

[64] I understand that the delivery business segment represents the Defendants' sales to commercial enterprises/businesses or B2B and that the stores and online business segment represents the Defendants' sales to consumers or Retail. In her investigational hearing testimony, Ms. Komola explained that "US Delivery" referred to the "B2B part of the business." (PX02005 (Komola (Staples) IH Tr.) at [242: 4-7]).  Ms. Komola also explained that the term "Contract" also refers to the B2B business. (PX02005 (Komola (Staples) IH Tr.) at [17:4-8]).

[65] In a tab in SPLS_000027.xlsx titled "SPLS_ODP Synergies by SBU" the end-state North American synergies are divided into six business units.  (PX04155_native (Staples, SPLS2_000027_native, at tab "SPLS_ODP Synergies by SBU")).  Based on Ms. Komola's investigational hearing testimony, which explains that " S&O" refers to "store and online," I classify the US Stores, US Online, and CA (Canada) S&O business units as Retail cost savings. Ms. Komola also testified that "the marketing that's in there, the ███████████ applies to both [stores and online].  We do marketing kind of to the online business and the retail business together."  Ms. Komola was then asked whether the ███████████ marketing efficiency includes marketing expenses related to B2B. Ms. Komola testified "No.  You can see the B2B marketing is the ███████████." (PX02005 (Komola (Staples) IH Tr.) at [270: 2-14]).  Based on Ms. Komola's investigational hearing testimony, I classify the other three business units, US Contract, CA Contract, and Quill, as B2B cost savings. Ms. Komola testified that the term "Contract" also refers to the B2B business and that "US Delivery" referred to the "B2B part of the business."  (PX02005 (Komola (Staples) IH Tr.) at [17: 4-8; 242:4-7]).  "Quill.com is an internet and catalog business with a targeted approach to serving the needs of small and mid-sized businesses in the United States." (PX06019, at 05 (Staples, Inc. 10-K SEC Filing for Fiscal Year ended January 31, 2015)); PX02005 (Komola (Staples) IH Tr.) at [17: 4-8]).

The tab "SPLS_ODP Synergies by SBU" only partitions total G&A cost savings by business unit; it does not partition each cost component of G&A (IT, HR, Finance, etc.).  (PX04155_native (Staples, SPLS2_000027_native, at tab "SPLS_ODP Synergies by SBU")).  However, another tab ("G&A from Matt_updated_6.16") within the Staples Internal Target Spreadsheet provides a percentage allocation for each of the components of G&A within each of the six business units.  (PX04155_native (Staples, SPLS2_000027_native, at tab "G&A from Matt_updated_6.16")).  I use these percentages to calculate the cost savings attributable to each of the six business units.

"US Contract," "CA [Canada] Contract," and "Quill."  The total North American Alleged

Efficiencies for B2B are ████████████.  As I show in the table, based on the business unit

allocations provided in the Internal Target Spreadsheet, of the ████████████ of North American

Alleged Efficiencies savings, ████████████████████ is attributable to the Retail business and

████████████████████ is attributable to the B2B business.

Table 5: Estimate of Defendants' Internal Target of Alleged Efficiencies for the Retail and B2B Businesses

| Alleged Efficiencies: | Total |
|---|---|
| Internal Target: | █ |
|    Retail | █ |
|    B2B | █ |

| ($ in millions) | Internal Target[1] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Retail | | | | B2B | | | | |
| Cost Saving Category | US Stores | US Online[2] | CA S&O[3] | Total Retail | US Contract[4] | CA Contract[4] | Quill[5] | Total B2B | Total |
| Product Buying | █ | | | | █ | █ | | | █ |
| Supply Chain/Logistics | █ | █ | | | █ | | | | █ |
| Marketing | █ | █ | | | █ | | | | █ |
| Retail Ops / Real Estate | █ | | | | | | | | █ |
| Sales Force | | | | | █ | | | | █ |
| Customer Service | █ | █ | | | █ | | | | █ |
| General & Administrative[6] | █ | █ | █ | █ | █ | █ | █ | █ | █ |
|   NA Merchandising | | | | | | | | █ | |
|   NA Marketing | | | | | | | | █ | |
|   NA Human Resources | | | | | | | | █ | |
|   NA Finance | | | | | | | | █ | |
|   Supply Chain | | | | | | | | █ | |
|   Executive | | | | | | | | █ | |
|   NA IT | | | | | | | | █ | |
|   Legal | | | | | | | | █ | |
|   Bonus | | | | | | | | █ | |
|   Benefits | | | | | | | | █ | |
|   Business Unit Functions | █ | | | | | | | █ | |
|   Other | █ | | | | | | | █ | |
| Total | █ | █ | █ | █ | █ | █ | █ | █ | █ |

Notes:

[1] Based on estimates in PX04155_native (Staples, SPLS2_000027_native, at tabs "SPLS_ODP Synergies by SBU," "G&A from Matt_updated_6.16," and "Laura Sheet").

[2] I assume that the US Online business unit applies to Staples' Retail business based on Ms. Komola's investigational hearing testimony. Specifically, Ms. Komola testified that "the marketing that's in there, the ████████ applies to both [stores and online]. We do marketing kind of to the online business and the retail business together." Ms. Komola was then asked whether the ████████ marketing efficiency includes marketing expenses related to B2B. Ms. Komola testified "No. You can see the B2B marketing is the ████████." (PX02005 (Komola (Staples) IH Tr.) at [270:2-14]).

[3] In her investigational hearing testimony, Ms. Komola explains that "S&O" refers to "store and online." (PX02005 (Komola (Staples) IH Tr.) at [270: 2-5]).

[4] In her investigational hearing testimony, Ms. Komola explained that the term "Contract" refers to the B2B business. (PX02005 (Komola (Staples) IH Tr.) at [17:4-8]).

[5] "Quill.com is an internet and catalog business with a targeted approach to serving the needs of small and mid-sized businesses in the United States." (PX06019, at 005 (Staples, Inc. 10-K SEC Filing for Fiscal Year ended January 31, 2015). In her investigational hearing testimony, Ms. Komola says that Quill is "all B2B." (Komola (Staples) IH Tr.) at [75:23-24]).

[6] The break-out by business unit within the General & Administrative cost category is calculated by applying the allocation percentages as presented in tab "G&A from Matt_updated_6.16" in SPLS2_000027_native to each of the corresponding underlying G&A efficiency estimates presented in tab "Laura Sheet." (PX04155_native (Staples, SPLS2_000027_native, at tabs "G&A from Matt_updated_6.16," and "Laura Sheet").

Sources: PX04155_native (Staples, SPLS2_000027_native, at tabs "SPLS_ODP Synergies by SBU," "G&A from Matt_updated_6.16," and "Laura Sheet"); PX02005 (Komola (Staples) IH Tr.) at 17, 75, 270; PX06019, at 005 (Staples, Inc. 10-K SEC Filing for Fiscal Year ended January 31, 2015).

## VI.    THE DEFENDANTS' EXTRAPOLATIONS OF COST SAVINGS FROM THE OFFICE DEPOT/OFFICEMAX AND STAPLES/CE MERGERS TO THE PROPOSED MERGER ARE NOT RELIABLE

37.    Staples states that the Internal Target was ". . . informed by the magnitude of savings realized by Office Depot through the recent integration of OfficeMax as well as Office Depot's outlook regarding the realization of additional savings as integration is completed."[66]  Staples further explains that it "plac[ed] a heavy emphasis on the savings levels achieved from the 2008 acquisition of Corporate Express."[67]  Although the Defendants have not provided the details as to how they were "informed" by the Office Depot/OfficeMax Merger and the Staples/CE Merger, the Defendants appear to have applied various estimated rates of savings from these prior mergers to the Staples and Office Depot pro forma financial statements for FY2015 in order to estimate the Alleged Efficiencies.[68]  As I explain in more detail in this section, such an extrapolation is unreliable for the following reasons:

  a)    The Office Depot/OfficeMax cost savings estimates and related information fail to show the extent to which, if at all, the Defendants excluded the cost savings from pre-existing cost reduction plans and from implementing non-proprietary best practices, and thus, the Defendants fail to demonstrate that these cost savings are merger-specific.

---

[66] PX04572, at 112 (Staples Second Request Narrative Response).

[67] PX04572, at 112 (Staples Second Request Narrative Response).

[68] PX04153 at 013-018 (Staples, Synergies Presentation Document, SPLS2_000001).  See also, for example, SPLS2_000027_native.  In tab "Logistics_USDelivery" of SPLS2_000027_native, pro forma sales for Staples and Office Depot for 2015 are forecasted (cell N32).  Staples' management estimates logistics efficiencies equal to ▮ basis points of 2015 pro forma sales to be realized incrementally over the period of 2016 – 2018 (cells S34 and Q:S42). (PX04155_native (Staples, SPLS2_000027_native, at tab: "Logistics_USDelivery")).

b)      Some of the cost savings from the Office Depot/OfficeMax Merger have not been achieved but are forecasts of future cost savings, and thus, the Defendants have not extrapolated from actual experience.[69]

c)      The Defendants have not provided sufficient information to provide foundation for, or allow me to understand the basis of, the cost savings from the Office Depot/OfficeMax Merger or the Staples/CE Merger.

## A.    Overview of Office Depot/OfficeMax Merger

38.    In a letter from Office Depot to the FTC, dated December 1, 2015 ("December 2015 Letter to Commissioners"),[70] Office Depot provided examples of presentations that summarized the cost savings from the Office Depot/OfficeMax Merger, which included the April 2015 Board of Directors Meeting Integration Update ("April 2015 Integration Update") and the July 13, 2015 Integration Executive Steering Committee presentation ("July 2015 Integration Presentation").[71] Office Depot also provided the FTC with a number of Office Depot/OfficeMax Merger integration summary presentations.[72] These reports present top-line summaries of Office Depot's internally-reported achieved and fore casted cost savings by functional area (COGS, Merchandising, Supply Chain, Marketing, IT, Finance, etc.).[73] Some of these reports also

---

[69] PX04572, at 112 (Staples Second Request Narrative Response).

[70] PX06017 (Office Depot, Letter to FTC Commissioners Re: Efficiencies Resulting from Staples' Acquisition of Office Depot, dated Dec. 1, 2015).

[71] PX05195, at 009-010 (Office Depot, Board of Directors Meeting Integration Update, dated Apr. 2015, ODP-OMX-FTC-01716710); PX06004 at 085-086 (Office Depot, Integration Executive Steering Committee Presentation, dated July 13, 2015, ODP-OMX-FTC-02469873).

[72] *See, e.g.*, PX05086 (Office Depot, Executive Steering Committee, dated Dec. 18, 2013, ODP-OMX-FTC-01206654); PX05093 (Office Depot, Integration Executive Steering Committee Presentation, dated Apr. 14, 2014, ODP-OMX-FTC-01133150); PX05089 (Office Depot, Integration Executive Steering Committee Presentation, dated May 19, 2014, ODP-OMX-FTC-01213544); PX05117 (Office Depot, Integration Update, dated Oct. 2014, ODP-OMX-FTC-01288591).

[73] *See, e.g.,* PX05195, at 010 (Office Depot, Board of Directors Meeting Integration Update, dated Apr. 2015, ODP-OMX-FTC-01716710).

Contains Confidential Information – Subject to Protective Order      

provide an additional level of detail underlying some of the functional areas.[74]  In Table 6, I

reproduce the cost savings summary in the July 2015 report,[75] which is the latest cost savings

summary provided by the Defendants that is dated prior to the date they submitted the Staples

Second Request Narrative Response in August 2015 and which the Defendants also refer to in

their December 2015 Letter to Commissioners.[76]  As shown in this table, this summary contains

historical information for 2014 and part of 2015 and projections for the rest of 2015 through

2017.[77]

---

[74] *See, e.g.,* PX05195, at 030-042 (Office Depot, Board of Directors Meeting Integration Update, dated Apr. 2015, ODP-OMX-FTC-01716710).

[75] PX06004 at 085-086 (Office Depot, Integration Executive Steering Committee Presentation, dated July 13, 2015, ODP-OMX-FTC-02469873).

[76] *See* PX06017, at 003 (Office Depot, Letter to FTC Commissioners Re: Efficiencies Resulting from Staples' Acquisition of Office Depot, dated Dec. 1, 2015); PX04572 (Staples Second Request Narrative Response).

[77] PX06004 at 085-086 (Office Depot, Integration Executive Steering Committee Presentation, dated July 13, 2015, ODP-OMX-FTC-02469873).

Contains Confidential Information –
Subject to Protective Order

### Table 6: Office Depot/OfficeMax Synergies by Year
#### As Presented in the July 13, 2015 Integration Committee Meeting Presentation

*( $ in millions)*

| Category | 2014 Synergies | 2015 Synergies | 2016 Synergies | End-State Synergies |
|---|---|---|---|---|
| COGS - US | | | | |
| COGS - Canada | | | | |
| Merchandising | | | | |
| Supply Chain | | | | |
| Marketing | | | | |
| B2B | | | | |
| Canada | | | | |
| IT | | | | |
| Finance | | | | |
| Retail Ops | | | | |
| Executive | | | | |
| HR & Comms | | | | |
| E-Commerce | | | | |
| Legal | | | | |
| Real Estate | | | | |
| Headquarters | | | | |
| **Sub-Total** | | | | |
| *less: Judgmental Indirect Synergies* | | | | |
| Net Synergies before Closures | | | | |
| Store Closures | | | | |
| **Total** | | | | |

Source: PX06004, at 085-086 (Office Depot, Integration Executive Steering Committee Presentation, dated July 13, 2015, ODP-OMX-FTC-02469873).

39.    COGS is the largest category of cost savings.  In an Office Depot/OfficeMax presentation titled "COGS Synergy update: Steering Committee Discussion" dated December 18, 2013,[78]

---

[78] PX06013 (Office Depot, COGS Synergy Update: Steering Committee Discussion, dated Dec. 18, 2013 (ODP-OMX-FTC-06236555)).

Office Depot presented COGS synergy estimates by product category.   In Table 7, I reproduce the COGS synergy estimates by product category for the Office Depot/OfficeMax Merger.[79]

## Table 7: Estimated COGS Synergies in Office Depot/OfficeMax Merger By Product Category



| Category | Run-Rate Synergies ($ in millions) | % of Total |
|---|---|---|
| | | 27.2% |
| | | 9.3% |
| | | 7.6% |
| | | 7.4% |
| | | 7.3% |
| | | 4.4% |
| | | 4.0% |
| | | 3.5% |
| | | 3.4% |
| | | 2.9% |
| | | 2.9% |
| | | 2.9% |
| | | 2.7% |
| | | 2.6% |
| | | 2.5% |
| | | 2.4% |
| | | 2.4% |
| | | 1.9% |
| | | 1.4% |
| | | 1.3% |
| Total Run-Rate Synergies | | 100.0% |

Sources: PX06013, at 018 (Office Depot/OfficeMax, COGS Synergy Update: Steering Committee Discussion, dated Dec. 18, 2013, ODP-OMX-FTC-06236556); CRA Analysis ("% of Total" calculation).

---

[79] PX06013, at 018 (Office Depot, COGS Synergy Update: Steering Committee Discussion, dated Dec. 18, 2013 (ODP-OMX-FTC-06236555)).

Contains Confidential Information – Subject to Protective Order

**B.    The Defendants Do Not Show the Extent to which, if at All, They Excluded the Cost Savings from Pre-Existing Cost Reduction Plans or from Implementing Non-Proprietary Best Practices When Estimating the Cost Savings from the Office Depot/OfficeMax Merger**

40.    Cost savings that result or could have resulted from pre-existing cost reduction plans are by nature generally not merger-specific.  To the best of my knowledge, the Defendants have not provided information about how cost savings from pre-existing cost reduction plans that Office Depot and OfficeMax planned to achieve on a stand-alone basis were excluded, if at all, from the estimate of savings from the Office Depot/OfficeMax Merger.  For example, in Office Depot's third quarter 2012 earnings call, in the year prior to its merger with OfficeMax, Mr. Neil Austrian, the CEO of Office Depot ("Mr. Austrian") stated, "Looking forward, we expect to deliver approximately $300 million in additional initiative benefits over the next 3 years."[80] There is no indication that Office Depot excluded these savings from its current estimate of savings from the Office Depot/OfficeMax Merger.  Naturally, to the extent the Office Depot/OfficeMax Merger cost savings estimates include cost savings that could be achieved independent of that merger, an extrapolation of the Office Depot/OfficeMax Merger cost savings estimates to the Proposed Merger would overstate the Alleged Efficiencies for the Proposed Merger.

41.    Office Depot stated that it identified and implemented best practices after the Office Depot/OfficeMax Merger, which it included as cost savings from the merger.  For example, in the Response of Office Depot, Inc. to Request for Additional Information and Documentary

---

[80] Office Depot, Q3 2012 Earnings Call Tr., Nov. 6, 2012.

Contains Confidential Information – Subject to Protective Order

Material dated August 28, 2015 ("Office Depot Narrative Response"),[81] Office Depot stated that

its cost savings "were achieved through, among other things, (i) application of best practices in

supply chain network optimization and inventory management."[82]  As I explained in Section IV,

non-proprietary best practices are generally not merger-specific.[83]

       **C.**       **Some of the Estimated Cost Savings from the Office Depot/OfficeMax Merger Used by the Defendants to Estimate Efficiencies from the Proposed Merger Are Not "Grounded on Actual Experience"**

42.      The Commentary on the Merger Guidelines states that, "Documentation must be based

on appropriate methods and realistic assumptions, and ideally would be grounded on actual

experience."[84]  I interpret "grounded on actual experience"[85] to mean historical experience

based on facts, rather than on projections associated with a partially-integrated merger.  Staples

submitted the Staples Second Request Narrative Response in August 2015.  The latest of the cost

saving reports provided by the Defendants prior to the submission of the Staples Second Request

Narrative Response is dated July 2015.[86]  This report confirms that Office Depot has yet to

---

[81] PX05394 (Response of Office Depot to Request for Additional Information and Documentary Material, dated Aug. 28, 2015 ("Office Depot Narrative Response")).

[82] PX05394, at 128 (Office Depot Narrative Response).

[83] *See also* PX08053, at 054-55 (U.S. Department of Justice & Federal Trade Commission's *Commentary on the Horizontal Merger Guidelines,* dated Mar. 2006).

[84] PX08053, at 057 (U.S. Department of Justice & Federal Trade Commission's *Commentary on the Horizontal Merger Guidelines,* dated Mar. 2006).

[85] PX08053, at 057 (U.S. Department of Justice & Federal Trade Commission's *Commentary on the Horizontal Merger Guidelines,* dated Mar. 2006).

[86] Office Depot submitted additional cost savings reports such as the September 23, 2015 Integration Executive Steering Committee Presentation and the August 31, 2015 Integration Executive Steering Committee Presentation, however these reports are dated after the date of the submission of the Staples Second Request Narrative Response on August 28, 2015.  (*See* PX06020 (Office Depot, Integration Executive Steering Committee Presentation, dated

achieve all of the claimed cost savings from the Office Depot/OfficeMax Merger.[87]  Therefore,

any estimates of cost savings from the Office Depot/OfficeMax Merger that include additional

cost savings from July 2015 through the end of 2017 are, in part, based on projections rather than

actual experience.  In addition, the Defendants have not provided the backup information

regarding the calculation of the cost savings from the Office Depot/OfficeMax Merger, so it is

possible that even the historical cost savings include projections that are not grounded in actual

experience.

> **D.  The Defendants Have Not Provided Sufficient Information to Provide Foundation for, or Allow Me to Understand the Basis of, the Cost Savings from the Office Depot/OfficeMax and Staples/CE Mergers**

43.    While the Defendants provided top-level board of director and other high-level reports

about the cost savings from the Office Depot/OfficeMax Merger,[88] to my knowledge, the

Defendants have not provided sufficient information to provide foundation for, or allow me to

understand the basis of, both the historical and projected cost savings from the Office

Depot/OfficeMax Merger.  Because the Defendants have not provided this information, I cannot

verify the estimated cost savings from the Office Depot/OfficeMax Merger.

44.    Staples stated that it also relied upon the cost savings from the Staples/CE Merger to

develop its Initial Estimate: "In developing its savings estimate, Staples employed a top-down

---

Sep. 23, 2015, ODP-OMX-FTC-07853790); PX05439 (Office Depot, Integration Executive Steering Committee Presentation, dated Aug. 31, 2015, ODP-OMX-FTC-07853618)).

[87] PX06004 at 085-086 (Office Depot, Integration Executive Steering Committee Presentation, dated July 13, 2015, ODP-OMX-FTC-02469873).

[88] PX06017, at 002 (Office Depot, Letter to FTC Commissioners Re: Efficiencies Resulting from Staples' Acquisition of Office Depot, dated Dec. 1, 2015).

Contains Confidential Information – Subject to Protective Order

approach due to various limitations regarding access to certain Office Depot data and the short period of time allowed for diligence,"[89] and "plac[ed] a heavy emphasis on the savings levels achieved from the 2008 acquisition of Corporate Express."[90]  However, the Defendants appear to have provided even less information about the Staples/CE Merger than was provided with respect to the Office Depot/OfficeMax Merger.  The Defendants have not provided sufficient information to provide foundation for, or allow me to understand the basis of, or assess the merger specificity of the cost savings from the Staples/CE Merger.  As a result I am unable to assess whether or not the cost savings from the Staples/CE Merger are merger-specific or whether or not these cost savings are grounded in actual experience, and I cannot verify these cost savings.  Thus, the cost savings from the Staples/CE Merger cannot be reliably extrapolated to the Proposed Merger.

## VII.   THE DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT THE ALLEGED EFFICIENCIES FOR THE PROPOSED MERGER ARE MERGER-SPECIFIC OR VERIFIABLE

45.      In this section, I review the evidence provided by the Defendants and assess the merger specificity and verifiability of the Alleged Efficiencies.  As I explain in the remainder of this section, the Defendants have failed to demonstrate that the Alleged Efficiencies for the Proposed Merger are merger-specific or verifiable.

---

[89] PX04572, at 112 (Staples' Second Request Narrative Response).

[90] PX04572, at 112 (Staples' Second Request Narrative Response).

**A.      The Defendants Have Failed to Demonstrate That the Alleged Efficiencies for the Proposed Merger are Merger-Specific**

46.      I have concluded that, in several important respects, the Defendants have failed to demonstrate that the Alleged Efficiencies are merger-specific – that is, they have failed to demonstrate that they are likely to be accomplished with the Proposed Merger and unlikely to be accomplished in the absence of the Proposed Merger.  The Defendants classify the Alleged Efficiencies into five broad cost categories– Product Buying, Supply Chain, Marketing, Retail, and SG&A.[91]  Each category of Alleged Efficiencies appears to include cost savings that could be achieved without the Proposed Merger, and thus, the Defendants failed to demonstrate that the Alleged Efficiencies are merger-specific.

47.      The Defendants disclosed that at least some of the Alleged Efficiencies are the result of best practices and learnings.  For example, in its Q1 2015 Earnings Q&A preparation, Staples scripted an answer to the question "Can you break these [efficiencies from the Proposed Merger] out by key buckets?"[92]  The answer to this question was that some of the Alleged Efficiencies would come from "sharing best practices."[93]  The Defendants make no claim that these best practices are in some way proprietary such that they could not be accomplished without the Proposed Merger.  Examples of where the Defendants appear to be including cost savings that are not merger-specific include:

---

[91] PX04572, at 112 (Staples Second Request Narrative Response).  I note that the Defendants provide slightly different broad cost categories for the Internal Target, including: Product Buying, Logistics, Marketing, Retail Ops/Real Estate, Sales Force, Customer Service, and G&A (PX04155_native (Staples, SPLS2_000027.xlsx, at tab: "Summary").

[92] PX04461 at 017 (Staples, Q1 2015 Earnings Call, dated May 18, 2015, SPLS_4185757).

[93] PX04461 at 017 (Staples, Q1 2015 Earnings Call, dated May 18, 2015, SPLS_4185757).

a)   Product-Buying: "Goal is to get savings in line with ODP / OMX synergies with some upside assuming FTF [Fund the Future] learnings/other best practices can be transferred."[94]

b)   Supply Chain: "We have a unique opportunity to standardize practices across a larger organization [through] labor management practices, wage structure by market, productivity improvements."[95]

c)   Retail Operations: "Targeting ███ of savings from store closures, regional overhead, indirect spend and other best practices."[96]

### B.   The Defendants Failed to Provide Adequate Substantiation to Verify the Alleged Efficiencies

48.   I have concluded that at least some of the assumptions underpinning each of the five broad cost categories of the Alleged Efficiencies are unfounded due to lack of analysis, foundation, or documentation necessary to substantiate the Alleged Efficiency, and thus, the related Alleged Efficiency cannot be verified.  In addition, some assumptions are not based on facts or analyses but based solely or primarily on management (or personal business) judgment that has no analytical underpinnings or factual foundation, and cannot be verified.  Although the calculations in the Initial Estimate and Internal Target of the various Alleged Efficiencies differ, each relies on at least one, and many times multiple, unfounded assumptions.  Examples where the Defendants appear to have calculated efficiencies on the basis of unfounded assumptions include:

---

[94] PX04441 at 019 (Staples, Synergy Discussion, dated May 7-8, 2015, SPLS_0006000).  In her investigational hearing testimony, Ms. Komola described Staples' cost-cutting Fund the Future initiative: "A couple of years ago, as part of our reinvention strategy, we developed a program to take costs out of our business and be able to reinvest that into areas that we wanted to grow our business." (PX02005 (Komola (Staples) IH Tr.) at [52:2-9]).  The Staples Synergies Presentation additionally notes that the target rationale for the COGS synergy target was to "add additional insight from our Fund the Future learnings." (PX04153 at 013 (Staples, Synergies Presentation Document, dated May 7, 2015, SPLS2_000001-26)).

[95] PX04153 at 014 (Staples, Synergies Presentation Document, SPLS2_000001-26).

[96] PX04153 at 016 (Staples, Synergies Presentation Document, SPLS2_000001-26).

Contains Confidential Information – Subject to Protective Order

a)  Retail Operations/Real Estate: Staples bases its estimate of efficiencies from store closures on the unfounded assumption that it will close ███████.[97]

b)  Product Buying: Staples' assumption that it will be able to obtain cost reductions from specific vendors post-merger is speculative.[98]

c)  Supply Chain: Staples applied primarily "business judgment" to estimate cost savings in this category.[99]

49.     The Defendants have also not provided sufficient documentation or foundation as to how they were ". . . informed by the magnitude of savings realized by Office Depot through the recent integration of OfficeMax as well as Office Depot's outlook regarding the realization of additional savings as integration is completed."[100]  As I discuss earlier in the report, the Defendants have provided little, if any, foundation to demonstrate that the cost savings estimates from the Office Depot/OfficeMax Merger can be reliably extrapolated to the Proposed Merger.

---

[97] PX02005 (Komola (Staples) IH Tr.) at [246: 5-15].  Regarding the assumed ███ store closures, Ms. Komola testified that the most recent estimate of store closures "was really just kind of picking some variable numbers so we didn't have a specific number to go after . . . .  So we just – as we look at our network at a high level, assuming we'll probably close ███████." (PX02005 (Komola (Staples) IH Tr.) at [246: 5-15]).

[98] For example ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ X06022, at 005 (Staples, Inc., "Defendant Staples' Objections and Responses to Plaintiffs' Second Set of Interrogatories," dated Jan. 29, 2016)).

[99] PX02005 (Komola (Staples) IH Tr.) at [256:17-22].  In her investigational hearing testimony, Ms. Komola was asked about ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (PX02005 (Komola (Staples) IH Tr.) at [256:3-22]).

[100] PX04572, at 112 (Staples Second Request Narrative Response).

Contains Confidential Information –
Subject to Protective Order                    Page 38

Staples indicated that it does not have all the details underpinning the cost savings estimates from the Office Depot/OfficeMax Merger.[101] Moreover, the Proposed Merger appears to be more complex than the Office Depot/OfficeMax Merger,[102] and the Defendants also acknowledge that Staples and Office Depot have engaged in little, if any, pre-merger joint integration planning.[103]

50.     In sum, after analyzing the Defendants' Alleged Efficiencies in this matter, I have concluded that none of the five cost categories in either the Defendants' Initial Estimate or their Internal Target of the Alleged Efficiencies has been verified, and thus, for these and the additional reasons I have discussed in this report, neither the overall Initial Estimate or the overall Internal Target of the Defendants' Alleged Efficiencies is verifiable.

Submitted By:

*Mark E. Zmijewski*

Mark E. Zmijewski

February 15, 2016

---

[101] *See, e.g.*, PX02005 (Komola (Staples) IH Tr.) at [231:11-19].

[102] PX02010 (Hare (Office Depot) IH Tr.) at [306:18-24].

[103] PX02010 (Hare (Office Depot) IH Tr.) at [124:21-24]; PX02005 (Komola (Staples) IH Tr.) at [195:5-7].

Contains Confidential Information –
Subject to Protective Order

Appendix A



# Mark E. Zmijewski (Zme – yev' -ski) Bio

Professor Zmijewski specializes in the areas of accounting, economics, and finance as they relate to valuation, financial analysis, and security analysis, or more generally, financial economics. He has been on the faculty of The University of Chicago Booth School of Business since 1984. He currently holds the Charles T. Horngren Professorship, prior to which he held the Leon Carroll Marshall Professorship. In addition to his faculty duties, Professor Zmijewski also held the positions of Deputy Dean, PhD Program faculty director, and the Center for Research in Security Prices faculty director, all at the Booth School of Business.

Professor Zmijewski earned his BS in 1976, MBA in 1981, and PhD with a major in accounting and minors in economics and finance in 1983, all from the State University of New York at Buffalo. In addition to The University of Chicago, he has taught at the State University of New York at Buffalo and at York University in Toronto, Canada. He has taught various courses in accounting (financial accounting, managerial accounting, and advanced accounting/mergers and acquisitions), finance (corporate finance, financial strategy and corporate transactions, financial analysis, and valuation of companies and corporate transactions), and entrepreneurship. Professor Zmijewski's research focuses on firm valuation and the ways in which various capital market participants use information to value securities. He has published articles in academic journals in the areas of accounting and financial economics and also co-authored a textbook (with Professor Robert Holthausen of The Wharton School of the University of Pennsylvania) on how to value companies, parts of companies, and the securities issued by companies, titled "Corporate Valuation: Theory, Evidence and Practice." He has been an Associate Editor of The Accounting Review, and has been on the Editorial Boards of both the Journal of Accounting Research and The Accounting Review.

Professor Zmijewski is a Senior Consultant to Charles River Associates, a consulting firm that provides economic, financial, and management consulting services. He is also a Senior Advisor to, and a member of, the Investment Committee at Patron Capital Partners (Funds IV and V), a private equity investment company with a focus on real estate related investments. Professor Zmijewski was a founding partner of Chicago Partners, LLC, which was acquired by Navigant Consulting. He is the former managing director of Navigant Economics (a subsidiary of Navigant Consulting) and a former member of the corporate executive committee of Navigant Consulting.

Professor Zmijewski has worked as a consultant or expert in litigation matters in US state and federal courts, in the Supreme Court of Victoria in Australia, and in US and international arbitrations. The issues on which he has worked include: business valuation and securities valuation (valuation of corporate transactions, companies, and parts of companies, intangible assets and intellectual property, and securities); securities litigation (10b-5, section 11, section 12, ERISA, Martin Act, effect of disclosures, and insider trading); mergers and acquisitions (appraisals and price disputes, analyzing merger synergies, material adverse changes, corporate transactions, and the process of purchasing and selling companies); solvency and ability to pay (fraudulent conveyance, solvency assessment, and ability to pay government fines); antitrust litigation (analysis of merger efficiencies, failing firm defense, and financial analyses of alleged anticompetitive behavior); commercial and stockholder disputes (measurement of damages, accounting analyses, and economic assessment of transactions); accounting issues (measuring and analyzing revenue, cost structures, profitability, rates of return, interest rates, and other financial metrics and concepts); and creating and evaluating business plans.

The frameworks and tools he uses in his work are generally applicable to all industries, and he has applied his expertise in a broad range of sectors, including airline, auto, financial services, chemical, computer hardware and software, credit card and credit card security, energy, entertainment, for-profit education, health care, insurance, heavy and light manufacturing, pharmaceutical, retail, real estate investment funds, securities companies, technology, telecommunications, transportation, and others.

Contains Confidential Information – Subject to Protective Order

Appendix A



## Mark E. Zmijewski
## (Zme-yev'-ski)
### Senior Consultant

PhD, Accounting
State University of New York
at Buffalo

MBA, Accounting
State University of New York
at Buffalo

BA, Accounting
State University of New York
at Buffalo

## Academic employment

| | |
|---|---|
| 1984–Present | The University of Chicago Booth School of Business |
| | *Charles T. Horngren Professor of Accounting* (2015–Present) |
| | *Leon Carroll Marshall Professor of Accounting* (1999–2015) |
| | *Deputy Dean* (1996–2011) |
| | *Professor of Accounting* (1992–1999) |
| | *Associate Dean for PhD Studies* (1995–1996) |
| | *Executive Director, Center for Research in Securities Prices* (CRSP) (1992–1998) |
| | *Associate Professor of Accounting* (1988–1992) |
| | *Assistant Professor of Accounting* (1984–1988) |
| 1980–1984 | *Assistant Professor of Accounting*, State University of New York at Buffalo |
| 1979–1982 | *Course Director*, York University, Toronto Canada |
| 1977–1980 | *Teaching Assistant*, State University of New York at Buffalo |

## Honors and awards

Business Information Professional of the Year—Education, Beta Alpha Psi, 2007.

Hillel J. Einhorn Excellence in Teaching Award, The Executive MBA Program, The University of Chicago Graduate School of Business, 1999.

Emory Williams Award for Excellence in Teaching, The University of Chicago, 1988

Competitive Manuscript Award, American Accounting Association, 1984.

Beta Alpha Psi, Honorary Accounting Society, 1981.

Beta Gamma Sigma, Honorary Business Society, 1980.

Contains Confidential Information –
Subject to Protective Order

Appendix A

## Grants

Research Grant, SEC and Financial Reporting Institute, 1985.

University Fellowship, State University of New York at Buffalo, 1979.

Graduate Fellowship, State University of New York at Buffalo, 1976–1978.

## Publications

*Corporate Valuation: Theory, Evidence and Practice* (textbook). With Robert W. Holthausen, Cambridge Business Publishers, LLC, 2014, 1st Edition.

"Valuation with Market Multiples: How to Avoid Pitfalls When Identifying and Using Comparable Companies." With R. Holthausen. *Journal of Applied Corporate Finance*, Summer 2012.

"Pitfalls in Levering and Unlevering Beta and Cost of Capital Estimates in DCF Valuations." With R. Holthausen. *Journal of Applied Corporate Finance*, Summer 2012.

"Accounting and Disclosure Issues in Structured Finance." With Keith Bockus and W. Dana Northcut. In *Corporate Aftershock: The Public Policy Lessons from the Collapse of Enron and Other Major Corporations*, C.L. Culp and W.A. Niskanen, eds., Wiley, 2003.

"Discovery and the Financial Analyst." With Roger Hickey. *Litigation Services Handbook*, January 1995.

"How Useful Are *Wall Street Week* Stock Recommendations?" With P. Griffin and J. Jones. *Journal of Financial Statement Analysis*, Fall 1995.

"Contemporaneous Announcements of Dividends and Earnings." With R. Leftwich. *Journal of Accounting, Auditing, and Finance*, Autumn 1994.

"The Relative Informativeness of Accounting Disclosures in Different Countries." With A. Alford, J. Jones, and R. Leftwich. *Journal of Accounting Research*, Supplement, 1993.

"Extensions and Violations of the Statutory SEC Form 10-K Filing Requirements." With A. Alford and J. Jones. *Journal of Accounting and Economics*, 1993.

"SEC Form 10-K/10-Q Reports and Annual Reports to Shareholders: Reporting Lags and Squared Market Model Prediction Errors." With P. Easton. *Journal of Accounting Research*, Winter 1993.

*The Phish Corporation: A Practice Case in Managerial Accounting*, With R. Derstine, R. Huefner, and S. Gunn. McGraw-Hill, 1991.

"Cross-Sectional Variation in the Stock Market Response to the Announcement of Accounting Earnings." With P. Easton. *Journal of Accounting and Economics*, 1989.

"An Evaluation of Alternative Proxies for the Market's Expectation of Earnings." With L. Brown, P. Griffin, and R.L. Hagerman. *Journal of Accounting and Economics*, 1987.

Appendix A

"Predictive Value of Accounting Information." With P. Griffin. In *Usefulness to Investors and Creditors of Information Provided by Financial Reporting*, 2nd Edition, P. Griffin, ed. Financial Accounting Standards Board, 1987.

"Security Analyst Superiority Relative to Univariate Time-Series Models in Forecasting Quarterly Earnings." With L. Brown, P. Griffin, and R. Hagerman. *Journal of Accounting and Economics*, 1987.

"The Effect of Labor Strikes on Security Analysts' Forecast Superiority and on the Association between Risk-Adjusted Stock Returns and Unexpected Earnings." With L. Brown. *Contemporary Accounting Research*, 1987.

"Estimating Models with Binary Dependent Variables: Some Theoretical and Empirical Observations." With G. Gessner, W. Kamakura, and N. Malhotra. *Journal of Business Research*, 1987.

"Methodological Issues Related to the Estimation of Financial Distress Prediction Models." *Journal of Accounting Research*, 1984.

"The Association Between the Magnitude of Quarterly Earnings Forecast Errors and Risk-Adjusted Stock Returns." With R.L. Hagerman and P. Shah. *Journal of Accounting Research*, 1984.

"An Income Strategy Approach to the Positive Theory of Accounting Policy Setting/Choice." With R.L. Hagerman. *Journal of Accounting and Economics*, 1981. Reprinted in *The Economics of Accounting Policy Choice*, Ray Ball and Clifford Smith, Jr., eds. McGraw-Hill, 1992.

"A Test of Accounting Bias and Market Structure: Some Additional Evidence." With R.L. Hagerman. *Review of Business and Economic Research*, 1981.

"Some Economic Determinants of Accounting Policy Choice." With R.L. Hagerman. *Journal of Accounting and Economics*, 1979.

"Predictive Value of Accounting Information." With P. Griffin. In *Usefulness to Investors and Creditors of Information Provided by Financial Reporting*, 2nd Edition, P. Griffin, ed. Financial Accounting Standards Board, 1987.

Comments on "Earnings Forecasting Research: Its Implications for Capital Markets Research." *International Journal of Forecasting.*

## Dissertation committees

Sandip Madan, The University of Chicago, 1999, Member

Keith Bockus, The University of Chicago, 1998, Co-Chairperson

Beverly Walther, The University of Chicago, 1995, Member

Howard Bunsis, The University of Chicago, 1993, Co-Chairperson

Phillip Berger, The University of Chicago, 1992, Member

Stuart Essig, The University of Chicago, 1991, Member

Contains Confidential Information –
Subject to Protective Order

Appendix A

Mark E. Zmijewski (Zme-yev'-ski)

Sherri Jarrell, The University of Chicago, 1991, Member

Andrew Alford, The University of Chicago, 1990, Chairperson

Mark Lang, The University of Chicago, 1990, Member

Laureen Maines, The University of Chicago, 1990, Member

Walter Teets, The University of Chicago, 1988, Member

Siew Teoh, The University of Chicago, 1988, Member

Kirsten Ely, The University of Chicago, 1988, Member

M. Daniel Beneish, The University of Chicago, 1987, Member

Pat O'Brien, The University of Chicago, 1986, Member

W. Forbes Cavanagh, State University of New York at Buffalo, 1985, Member

## University activities

Accounting Advisory Counsel, State University of New York at Buffalo, 1993–1995.

Faculty Facilitator, Leadership, Education, and Development (LEAD) Program, The University of Chicago, Graduate School of Business, 1989, 1991.

Dean's Advisory Committee on MBA Students and Curriculum, The University of Chicago, 1988.

Executive Director, Management Development Council, State University of New York at Buffalo, 1981–1984.

Advisor, Center for Management Development, State University of New York at Buffalo, 1979–1980.

## Editorial service and boards

Associate Editor, *The Accounting Review*, 1993–1997.

Editorial Board, *Journal of Accounting Research*, 1988–1993.

Editorial Board, *The Accounting Review*, 1985–1987.

## Ad hoc referee

*Journal of Accounting, Auditing, and Finance*

*The Accounting Review*

*Contemporary Accounting Research*

*The Financial Review*

*Journal of Accounting and Economics*

Contains Confidential Information –
Subject to Protective Order

Appendix A                          **Mark E. Zmijewski (Zme-yev'-ski)**

*Journal of Accounting Research*

*Journal of Banking and Finance*

*Journal of Business*

*Journal of Forecasting*

*International Journal of Forecasting*

*Management Science*

## Professional organizations

American Accounting Association

The American Finance Association

Contains Confidential Information –
Subject to Protective Order

6

## Recent testimony

*Pankaj Oswal v. Carson & Others; Radhika Oswal v. Australia and New Zealand Banking Group & Others.* Before the Supreme Court of Victoria, Proceedings No. SCI 2012 1995 and No. SCI 2011 4653. Expert report filed November 13, 2015.

In Re *Groupon, Inc. Securities Litigation.* In the United States District Court for the Northern District of Illinois, Eastern Division, 12-CV-2450. Report filed September 8, 2015. Deposition testimony November 5, 2015.

*Avisep, S.A. de C.V., and Bevisep, S.A. de C.V., Claimants, v. The Sherwin-Williams Company, and Sherwin-Williams (Caribbean) N.V., Respondents.* In the International Court of Arbitration, International Chamber of Commerce, No. 20169/RD. Report filed August 31, 2015.

*Exelon Corporation, as successor by merger to Unicom Corporation and Subsidiaries, et al., Petitioner, v. Commissioner of Internal Revenue Service, Respondent.* In the United States Tax Court, Docket Nos. 29183-13 and 29184-13. Report filed April 24, 2015. Rebuttal report filed June 12, 2015. Trial testimony August 20, 2015.

*Ahmed D. Hussein, Plaintiff, v. Sheldon Razin et al., Defendants.* In the Superior Court of the State of California For the County of Orange, Case No. 30-2013-00679600-CU-NP-CJC. Report filed May 7, 2015. Rebuttal report filed May 28, 2015. Deposition testimony June 10, 2015.

*Lavastone Capital LLC, Plaintiff, v. Coventry First LLC, LST I LLC, LST II LLC, LST Holdings Ltd., Montgomery Capital, Inc., Alan Buerger, Reid Buerger, Constance Buerger, and Krista Lake, Defendants.* In the United States District Court for the Southern District of New York, Case No. 14-CF-7139 (JSR)(DCF). Report filed April 20, 2015. Deposition testimony April 29, 2015. Trial testimony October 23, 2015.

*Dr. Robert Corwin, as trustee for the Beatrice Corwin Living Irrevocable Trust, on behalf of all those similarly situated, Plaintiff, v. British American Tobacco, PLC, et al., Defendants.* In the General Court of Justice of the State of North Carolina, Guilford County, Superior Court Division, Case No. 14 CVS 8130. Affidavit filed January 12, 2015.

*Herbert Chen and Derek Sheeler, individually and on behalf of all others similarly situated, Plaintiffs, v. Robert Howard-Anderson, et al., Defendants.* In the Court of Chancery of the State of Delaware, Case C.A. No. 5878-VCL. Report filed October 17, 2014. Rebuttal report filed November 18, 2014. Deposition testimony December 9, 2014.

*The People of the State of New York by Eric T. Schneiderman, Attorney General of the State of New York , Plaintiff, v. Maurice R. Greenberg and Howard I. Smith, Defendants.* In the Supreme Court of the State of New York, County of New York, Case No. 401720/05. Report filed July 28, 2014. Rebuttal report filed November 21, 2014. Deposition testimony December 3, 2014.

Contains Confidential Information –
Subject to Protective Order

Case 1:15-cv-02115-EGS   Document 280-37   Filed 03/20/16   Page 50 of 58
Appendix A
Mark E. Zmijewski (Zme-yev'-ski)

Charles River Associates                                                                                    Page 7

*Enteris Biopharma, Inc. as Successor-In-Interest to Unigene Laboratories, Inc. v. Stealth Peptides Inc. and Stealth Peptides International, Inc.* Before the American Arbitration Association (AAA), Case No. 50 122 T 00787 13. Report filed July 18, 2014. Arbitration testimony October 23-24, 2014.

*Jefferies Group, Inc. Shareholders Litigation.* In the Court of Chancery of the State of Delaware, Case C.A. No. 8059-CS. Report filed August 15, 2014. Rebuttal report filed September 12, 2014. Deposition testimony October 1, 2014.

*Merlin Partners LP et al., Petitioners v. Autoinfo, Inc., Respondent.* In the Court of Chancery of the State of Delaware, Case C.A. No. 8509-VCN. Report filed June 25, 2014. Rebuttal report filed July 16, 2014. Deposition testimony August 1, 2014. Trial testimony September 19, 2014.

*Vincent A. Beacom v. Oracle America, Inc.* Before the United States District Court, District of Minnesota, Case No. 13-cv-00985-DWF-FLN. Report filed August 8, 2014.

*M/s. Islamic Finance Company (PJSC) v. M/s. Beit Al Batteerjee Medical Company Ltd. et al.* Before the Dubai International Arbitration Centre (DIAC), Case No. 204/2011. Report filed February 13, 2014. Rebuttal report filed February 20, 2014.

*Puda Coal Securities Inc. et al. Litigation.* In the United States District Court for the Southern District of New York, Case No. 1:11-CV-2598 (KBF). Report filed January 22, 2014. Deposition testimony January 31, 2014.

*United States of America et al., Plaintiffs v. US Airways Group, Inc. and AMR Corporation, Defendants.* In the United States District Court for the District of Columbia, Case No. 1:13-cv-01236-CKK. Report filed October 25, 2013.

*United States of America et al., Plaintiffs v. American Express Co. et al., Defendants.* In the United States District Court for the Eastern District of New York, Case No. 10-CV-4496 (NGG) (RER). Sur-Rebuttal report filed July 3, 2013. Deposition testimony August 7-8, 2013.

*Ramona Two Shields and Mary Louise Defender Wilson v. The United States of America.* In the United States Court of Federal Claims, Case No. 1:13-cv-00090-LB. Affidavit and preliminary report filed June 3, 2013.

*Thurman Ross, Plaintiff v. Career Education Corporation, Gary E. McCullough, and Michael J. Graham, Defendants.* In the United States District Court for the Northern District of Illinois, Case No. 12 C 276. Report filed March 15, 2013.

*Christine A. E. Bagley, Petitioner/Counter-Respondent v. Thomas S. Bagley, Respondent/Counter-Petitioner.* In the Circuit Court of Cook County, Illinois County Department, Domestic Relations Division, Case No. 10 D 12002. Report filed November, 5, 2012. Reply report filed November 26, 2012. Deposition testimony December 13, 2012.

Contains Confidential Information –
Subject to Protective Order

Appendix A

Mark E. Zmijewski (Zme-yev'-ski)

Charles River Associates                                                    Page 8

*Pathway Investment Pty Ltd (ACN 072 420065) and Doystoy Pty Ltd (ACN 130 593 609) v. National Australia Bank Limited (ACN 004 044 937.)* Before the Supreme Court of Victoria at Melbourne Commercial and Equity Division Commercial Court. Expert report filed August 19, 2012.

*Coventry Real Estate Advisors, et al. v. DDR Corp. f/k/a Developers Diversified Realty Corporation, et al.* In the Supreme Court of the State of New York, County of New York, Case No. 115559/09. Report filed April 5, 2012. Deposition testimony September 21, 2012.

*Securities and Exchange Commission v. Kimon P. Daifotis and Randall Merk.* In the United States District for the Court Northern District of California, San Francisco Division, Case No. 11cv0137 WHA. Report filed March 30, 2012. Reply report filed April 20, 2012. Deposition testimony April 30, 2012.

*UnionBanCal Corporation and Subsidiaries v. United States of America.* In the United States Court of Federal Claims, Case No. 06-587T. Report filed January 9, 2009. Rebuttal report filed February 6, 2009. Deposition testimony March 17, 2009. Trial testimony March 16, 2012.

In Re *Evergreen Ultra Short Opportunities Fund Securities Litigation.* In the United States District Court for the District of Massachusetts, No. 1:08-CV-11064-NMG. Report filed December 5, 2011. Deposition testimony January 5, 2012.

Contains Confidential Information –
Subject to Protective Order

9

# Appendix B

# Documents Relied Upon

**Commission and Court Documents**

- "Office Depot, Inc." William Kearney to Premerger Notification Office and Director of Operations and Merger Enforcement." Letter. February 26, 2015.
- "Proposed Acquisition by Staples, Inc. of All of the Outstanding Voting Securities of Office Depot, Inc." Vadim M. Brusser to Stelios Xenakis." Letter. February 26, 2015.
- "Staples, Inc./Office Depot, Inc." Andrew Bernstein to Stelios Xenakis, Esq." Letter. February 26, 2015.
- Elisa D. Garcia C., "Section 803.5 Affidavit before the Federal Trade Commission and the United States Department of Justice," February 26, 2015
- Federal Trade Commission, "Complaint for Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act," December 7, 2015
- Michael T. Williams, "Declaration Pursuant to 16 C.F.R. Section 803.5(b) Concerning the Notification and Report for of Staples, Inc.," February 26, 2015
- Office Depot, Inc., 16 C.F.R. Part 803 – Appendix: Notification and Report Form for Certain Mergers and Acquisitions, February 26, 2015, and associated attachments:
  - Office Depot, Inc. Attachment Item 3(b): Agreement and Plan of Merger by and among Office Depot, Inc., Staples, Inc. and Staples AMS Inc., February 4, 2015
  - PX08015 (Office Depot, Inc. Attachment Item 4(d)-1, Discussion Materials Project Aristotle Presentation; prepared by Peter J Solomon Company; dated August 1, 2014)
  - PX08016 (Office Depot, Inc. Attachment Item 4(d)-2: Discussion Materials Project Aristotle Presentation; prepared by Peter J Solomon Company; dated August 1, 2014
  - PX08017 (Office Depot, Inc. Attachment Item 4(d)-3, Discussion Materials Project Aristotle Potential Transaction Presentation; prepared by Peter J Solomon Company; dated October 2014)
  - PX08018 (Office Depot Attachment Item 4(d)-4, Discussion Materials: Project Aristotle – Potential Transaction, dated Dec. 4, 2014)
  - PX08019 (Office Depot, Inc. Attachment Item 4(d)-5, Board Discussion Materials Project Aristotle Presentation; prepared by Peter J Solomon Company; dated January 31 , 2015 (Redacted Version))
  - PX08020 (Office Depot, Inc. Attachment Item 4(d)-6, Fairness Opinion Materials Project Aristotle Presentation; prepared by Peter J Solomon Company; dated February 3, 2015)
  - PX08021 (Office Depot, Inc. Attachment Item 4(d)-7, Discussion Materials Project Aristotle Presentation; prepared by Peter J Solomon Company; dated January 9, 2015 (Redacted Version))
  - PX08022 (Office Depot, Inc. Attachment Item 4(d)-8, Project Aristotle Discussion Materials Presentation; prepared by UBS; dated October 2014)
  - PX08023 (Office Depot, Inc. Attachment Item 4(d)-9, Project Aristotle Initial Executive Meeting Potential Questions and Answers; prepared by Michael Steele, Vice President, Investor Relations and James Hoganson, Sr. Director Investor Relations; dated November 11, 2014 (Redacted Version))
  - PX08024 (Office Depot, Inc. Attachment Item 4(d)-10, Omega G and A Payroll Synergy Report; prepared by Chad Browder, Director, FP&A and Strategy; dated January 28, 2015)
  - PX08025 (Office Depot, Inc. Attachment Item 4(d)-11, Illustrative Sigma/Omega Synergy Analysis; prepared under the direction of Stephen Hare, Chief Financial Officer; dated November 21, 2015)

Contains Confidential Information
Subject to Protective Order

# Appendix B

- o PX08026 (Office Depot, Inc. Attachment Item 4(d)-12, G&A Synergy Assumptions Report; prepared by Staples, Inc.; dated January 26, 2015)
- o PX08027 (Office Depot, Inc. Attachment Item 4(d)-13, Project Geometry Presentation; prepared by Bank of America Merrill Lynch; dated May 30, 2014)
- Office Depot, Inc., "Defendant's Objections and Responses to Plaintiff Federal Trade Commission's First Set of Interrogatories to Defendant Office Depot," January 21, 2016
- Office Depot, Inc., "Defendant's Objections and Responses to Plaintiff Federal Trade Commission's Second Set of Interrogatories to Defendant Office Depot," January 29, 2016
- PX0007 (Presentation to FTC Re: Proposed Divestiture, dated Nov. 16, 2015)
- PX04526 (Defendant Staples' Objections and Responses to Plaintiffs' First Set of Interrogatories, dated January 21, 2016)
- PX04572 (Response of Staples, Inc. to Request for Additional Information And Documentary Material Issued March 30, 2015 (As Modified), "Staples, Inc.," dated August 28, 2015)
- PX05394 (Response of Office Depot to Request for Additional Information and Documentary Material, dated Aug. 28, 2015)
- PX06017 (Office Depot, Letter to FTC Commissioners Re: Efficiencies Resulting from Staples' Acquisition of Office Depot, dated Dec. 1, 2015)
- PX06022 (Defendant Staples' Objections and Responses to Plaintiffs' Second Set of Interrogatories, dated Jan. 29, 2016)
- PX06029 (Staples, Letter from Megan A. Granger to Amanda Lewis Re: Proposed Merger of Staples, Inc. and Office Depot Inc. (File No. 1510065), dated Aug. 25, 2015)
- PX08051 (U.S. Department of Justice & Federal Trade Commission's Horizontal Merger Guidelines, dated Aug. 19, 2010)
- PX08053 (U.S. Department of Justice & Federal Trade Commission's Commentary on the Horizontal Merger Guidelines, dated Mar. 2006)
- Staples, Inc., 16 C.F.R. Part 803 – Appendix: Notification and Report Form for Certain Mergers and Acquisitions, February 26, 2015, and associated attachments:
  - o Staples, Inc. Attachment Item 3(b): Agreement and Plan of Merger by and among Office Depot, Inc., Staples, Inc. and Staples AMS Inc., February 4, 2015
  - o Staples, Inc. Attachment Item 4(c)-1: Email discussion between Christine T. Komola, Chief Financial Officer, and Bernie Schachter, SVP Real Estate, Staples, Inc. dated December 16, 2014, with attachment
  - o PX08000 (Staples, Inc. Attachment Item 4(d)-1, project Warrior, prepared by Christine T. Komola, Chief Financial Officer, Staples, Inc., and Michael T. Williams, Executive Vice President, General Counsel, and Secretary, Staples, Inc., dated September 5, 2014)
  - o PX08001 (Staples, Inc. Attachment Item 4(d)-2, preliminary Discussion materials, prepared by Barclays Capital Inc., dated September 10, 2014)
  - o PX08002 (Staples, Inc. Attachment Item 4(d)-3, Project Warrior Follow up, prepared by or at the direction of Christine T. Komola, Chief Financial Officer, Staples, Inc., dated September 12, 2014)
  - o PX08003 (Staples, Inc. Attachment Item 4(d)-4, Project Warrior Discussion Materials, prepared by Barclays Capital Inc., dated October 31, 2014)
  - o PX08004 (Staples, Inc. Attachment Item 4(d)-5, Illustrative Sigma / Omega Synergy Analysis, prepared by Office Depot, Inc., dated November 21 , 2014)
  - o PX08005 (Staples, Inc. Attachment Item 4(d)-6, Project Warrior Follow Up Board of Directors Meeting, prepared by or at the direction of Christine T. Kamala, Chief Financial Officer, Staples, Inc., dated December 2, 2014)
  - o PX08006 (Staples, Inc. Attachment Item 4(d)-7, Letter from Jeffrey C. Smith, Managing Member, Starboard Value LP, to Ronald Sargent, Chief Executive Officer, Staples, Inc., and Staples Board of Directors, dated January 20, 2015)

Contains Confidential Information
Subject to Protective Order

# Appendix B

- o PX08007 (Staples, Inc. Attachment Item 4(d)-8, Synergies Due Diligence, prepared by or at the direction of Christine T. Kamala, Chief Financial Officer, Staples, Inc., dated January 25, 2015)
- o PX08008 (Staples, Inc. Attachment Item 4(d)-9, Email discussion between Christine T. Kamala, Chief Financial Officer, Laura Granahan, VP Financial Planning and Analysis, Jeffrey Brown, Director of Corporate Finance, and Silvana Pencheva, Manager of Financial Planning and Analysis, Staples, Inc., dated January 25, 2015)
- o PX08009 (Staples, Inc. Attachment Item 4(d)-10, Synergy Analysis, prepared by or at the direction of Christine T. Komola, Chief Financial Officer, Staples, Inc., dated January 26, 2015)
- o PX08010 (Staples, Inc. Attachment Item 4(d)-11, Next Steps, prepared by or at the direction of Christine T. Komola, Chief Financial Officer, Staples, Inc., dated January 27, 2015)
- o PX08011 (Staples, Inc. Attachment Item 4(d)-12, Project Warrior Overview Finance Committee, prepared by or at the direction of Christine T. Komola, Chief Financial Officer, Staples, Inc., dated January 29, 2015)
- o PX08012 (Staples, Inc. Attachment Item 4(d)-13, Email from Christopher Powers, Vice President, Investor Relations, Staples, Inc. to Christine T. Komola, Chief Financial Officer, Laura Granahan, VP Financial Planning and Analysis, Jeffrey Brown, Director of Corporate Finance, Staples, Inc. , dated January 29, 2015)
- o PX08013 (Staples, Inc. Attachment Item 4(d)-14, Synergy Tracking, prepared by or at the direction of Christine T. Komola, Chief Financial Officer, Staples, Inc., dated February, 2015)
- o PX08014 (Staples, Inc. Attachment Item 4(d)-15, Project Warrior (Fairness Presentation), prepared by Barclays Capital Inc., dated February 2, 2015)
- Weil, Gotshal & Manges and Simpson Thacher & Bartlett, "Staples' Proposed Acquisition of Office Depot: Presentation to the US Federal Trade Commission Regarding Divestiture to Essendent," October 5, 2015

**<u>Depositions and Testimony</u>**
- Deposition Testimony of Christine Komola in the Matter of Staples, Inc., et al., dated February 11, 2016 (Draft Copy)
- Deposition Testimony of Harry Dochelli in the Matter of Staples, Inc., et al., dated February 3, 2016
- Deposition Testimony of Joe Doody in the Matter of Staples, Inc., et al., dated February 9, 2016
- Deposition Testimony of Julliet Johansson in the Matter of Staples, Inc., et al., dated February 5, 2016
- Deposition Testimony of Laura Granahan in the Matter of Staples, Inc., et al., dated February 9, 2016 (Draft Copy)
- Deposition Testimony of Stephen Hare in the Matter of Staples, Inc., et al., dated February 12, 2016 (Draft Copy)
- Investigational Hearing Testimony of Deborah A. O'Connor in the Matter of Office Depot and Staples dated August 28, 2015
- Investigational Hearing Testimony of Roland Smith in the Matter of Office Depot and Staples dated August 7, 2015
- PX02005 (Komola (Staples) IH Tr.)
- PX02010 (Hare (Office Depot) IH Tr.)

Contains Confidential Information
Subject to Protective Order

# Appendix B

**Bates-Stamped Documents**
- ODP-OMX-FTC-0000001
- ODP-OMX-FTC-0000002
- ODP-OMX-FTC-0000014
- ODP-OMX-FTC-0000027
- ODP-OMX-FTC-0000032
- ODP-OMX-FTC-0000037
- ODP-OMX-FTC-0000043
- ODP-OMX-FTC-0000044
- ODP-OMX-FTC-00147424
- ODP-OMX-FTC-01204096
- ODP-OMX-FTC-01288886
- ODP-OMX-FTC-01304788
- ODP-OMX-FTC-01312734
- ODP-OMX-FTC-01317258
- ODP-OMX-FTC-01716893
- ODP-OMX-FTC-01736753
- ODP-OMX-FTC-02525398
- ODP-OMX-FTC-03279824
- ODP-OMX-FTC-04975872
- ODP-OMX-FTC-05056462
- ODP-OMX-FTC-05295810
- ODP-OMX-FTC-07828789
- ODP-OMX-FTC-07829389
- ODP-OMX-FTC-07829390
- ODP-OMX-FTC-07829885
- ODP-OMX-FTC-07829886
- ODP-OMX-FTC-07831026
- ODP-OMX-FTC-07831027
- ODP-OMX-FTC-07842170
- ODP-OMX-FTC-07842172
- ODP-OMX-FTC-07842173
- ODP-OMX-FTC-07842265
- ODP-OMX-FTC-07842266
- ODP-OMX-FTC-07852773
- ODP-OMX-FTC-07852774
- ODP-OMX-FTC-07852823
- ODP-OMX-FTC-07852824
- ODP-OMX-FTC-07852825
- ODP-OMX-FTC-07852874
- ODP-OMX-FTC-07853189
- ODP-OMX-FTC-07853191
- ODP-OMX-FTC-07853292
- ODP-OMX-FTC-07853294
- ODP-OMX-FTC-07853395
- ODP-OMX-FTC-07853397
- ODP-OMX-FTC-07853618
- ODP-OMX-FTC-07853619

Contains Confidential Information
Subject to Protective Order

# Appendix B

- ODP-OMX-FTC-07853720
- ODP-OMX-FTC-07853790
- ODP-OMX-FTC-07853840
- ODP-OMX-FTC-07853843
- ODP-OMX-FTC-07853845
- ODP-OMX-FTC-07854118
- ODP-OMX-FTC-07854119
- ODP-OMX-FTC-07854431
- ODP-OMX-FTC-07854432
- PX04007 (SPLS_0398310)
- PX04143 (SPLS_0220960)
- PX04149 (SPLS_0407279)
- PX04153 (Staples, Synergies Presentation Document, SPLS2_000001-26)
- PX04155_native (Staples, SPLS2_000027_native)
- PX04186  (SPLS_1035488)
- PX04189 (SPLS_1142772)
- PX04290 (SPLS_0088899)
- PX04441 (Staples, Synergy Discussion, dated May 7-8, 2015, SPLS_0006000-01)
- PX05086 (Office Depot, Email with attachment, Executive Steering Committee, dated Dec. 17, 2013, ODP-OMX-FTC-01206654)
- PX05088 (ODP-OMX-FTC-01213409)
- PX05089 (Office Depot, Integration Executive Steering Committee Presentation, dated May 19, 2014, ODP-OMX-FTC-01213544)
- PX05093 (Office Depot, Email with attachment, Integration Executive Steering Committee Presentation, dated April 11, 2014, ODP-OMX-FTC-01133150)
- PX05106 (ODP-OMX-FTC-01206655)
- PX05116 (ODP-OMX-FTC-01288180)
- PX05117 (Office Depot, Integration Update, dated Oct. 2014, ODP-OMX-FTC-01288591)
- PX05121 (ODP-OMX-FTC-01294996)
- PX05124 (OD-FTC-0552483)
- PX05195 (Office Depot, Board of Directors Meeting Integration Update, dated Apr. 2015, ODP-OMX-FTC-01716710)
- PX05439 (Office Depot, Integration Executive Steering Committee Presentation, dated Aug. 31, 2015, ODP-OMX-FTC-07853720)
- PX06001 (Staples, SPLS_0008288)
- PX06001_native (Staples, SPLS_0008288_native)
- PX06002 (Staples, Email, Subject: "bernie and total synergies," Apr. 12, 2015, SPLS_1134518)
- PX06002_native (Staples, SPLS_1134519_native)
- PX06004 (Office Depot, Email with attachment, Integration Executive Steering Committee Presentation, dated July 13, 2015, ODP-OMX-FTC-02469873)
- PX06013 (Office Depot, COGS Synergy Update: Steering Committee Discussion, dated Dec. 18, 2013, ODP-OMX-FTC-06236556)
- PX06020 (Office Depot, Integration Executive Steering Committee presentation, dated Sep. 23, 2015, ODP-OMX-FTC-07853791)
- PX06021 (Office Depot, Integration Executive Steering Committee presentation, dated Dec. 14, 2015, ODP-OMX-FTC-07828790)
- SPLS_0000001
- SPLS_0000010

Contains Confidential Information
Subject to Protective Order

# Appendix B

- SPLS_0000020
- SPLS_0000025
- SPLS_0000033
- SPLS_0000034
- SPLS_0000035
- SPLS_0046706
- SPLS_0130431
- SPLS_0217692
- SPLS_0407059
- SPLS_0407248
- SPLS_0442685
- SPLS_1134036
- SPLS_1134454
- SPLS_1134467
- SPLS_1134518
- SPLS_1135656
- SPLS_1135719
- SPLS_1135745
- SPLS_1135746
- SPLS_1136658
- SPLS_1136901
- SPLS_3114953
- SPLS_3207057
- SPLS_4039734
- SPLS_4185758
- SPLS_4291429
- SPLS_4351156
- SPLS_4792152
- SPLS_4792170
- SPLS_4792404
- SPLS_4817685
- SPLS_4844541
- SPLS_4901225
- SPLS_4914035
- SPLS_5038759
- SPLS_5039097

**SEC Filings**
- Office Depot, Inc. 10-K SEC Filing for the fiscal year ended December 25, 2010
- Office Depot, Inc. 10-K SEC Filing for the fiscal year ended December 31, 2011
- Office Depot, Inc. 10-K SEC Filing for the fiscal year ended December 29, 2012
- Office Depot, Inc. 10-K SEC Filing for the fiscal year ended December 27, 2014
- OfficeMax Incorporated 10-K SEC Filing for the fiscal year ended December 25, 2010
- OfficeMax Incorporated 10-K SEC Filing for the fiscal year ended December 31, 2011
- OfficeMax Incorporated 10-K SEC Filing for the fiscal year ended December 29, 2012
- OfficeMax Incorporated 8-K SEC Filing dated February 20, 2013
- PX06018 (Office Depot, 10-K SEC Filing for the fiscal year ended Dec. 28, 2013)
- PX06019 (Staples, Inc. 10-K SEC Filing for Fiscal Year ended January 31, 2015)

Contains Confidential Information
Subject to Protective Order

6

# Appendix B

- Staples, Inc. 10-K SEC Filing for the fiscal year ended February 2, 2013
- Staples, Inc. 10-K SEC Filing for the fiscal year ended February 1, 2014
- Staples, Inc. 10-K SEC Filing for the fiscal year ended January 29, 2011
- Staples, Inc. 10-K SEC Filing for the fiscal year ended January 28, 2012
- Staples, Inc. 10-K SEC Filing for the fiscal year ended January 30, 2010
- Staples, Inc. 8-K Filings dated February 4, 2015

**Analyst Calls**
- OfficeMax Incorporated, Q4 2011 Earnings Call, February 23, 2012
- Office Depot, Inc., Q4 2011 Earnings Call, February 28, 2012
- Office Depot, Inc., Q1 2012 Earnings Call, May 1, 2012
- OfficeMax Incorporated, Q1 2012 Earnings Call, May 8, 2012
- OfficeMax Incorporated, Q2 2012 Earnings Call, August 2, 2012
- Office Depot, Inc., Q2 2012 Earnings Call, August 7, 2012
- OfficeMax Incorporated, Q3 2012 Earnings Call, November 6, 2012
- Office Depot, Inc., Q3 2012 Earnings Call, November 6, 2012
- Office Depot, Inc., Q4 2013 Earnings Call, February 25, 2014
- Staples, Inc., Q4 2014 Earnings Call, March 6, 2014
- Office Depot, Inc., Q1 2014 Earnings Call, May 6, 2014
- Office Depot, Inc., Q2 2014 Earnings Call, August 5, 2014
- Staples, Inc., Q2 2015 Earnings Call, August 20, 2014
- Office Depot, Inc., Q3 2014 Earnings Call, November 4, 2014
- Staples, Inc., Q3 2015 Earnings Call, November 19, 2014
- Office Depot, Inc., M&A Call, February 4, 2015
- Staples, Inc., Q4 2015 Earnings Call, March 6, 2015
- PX04461 (Staples, Q1 2015 Earnings Call, dated May 18, 2015, SPLS_41857-76)
- Staples, Inc., Q1 2016 Earnings Call, May 20, 2015
- Staples, Inc., Q2 2016 Earnings Call, August 19, 2015
- Staples, Inc., Q3 2016 Earnings Call, November 18, 2015
- Office Depot, Inc., Company Conference Presentation, September 3, 2014

Contains Confidential Information
Subject to Protective Order