CONFIDENTIAL MATERIAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **Federal Trade Commission, et al.,** |
| **Plaintiffs,** |
| **v.** |
| **Staples, Inc. and Office Depot, Inc.** |
| **Defendants.** |

**Civil Action No. 1:15-cv-02115 (EGS)**

# REPLY REPORT OF CARL SHAPIRO

# 10 March 2016

## <u>THIS DOCUMENT CONTAINS CONFIDENTIAL MATERIAL</u>

PX06300-001

# Table of Contents

**1.   Summary of Conclusions**.................................................................................1

**2.   Relevant Product Market**...........................................................................3
   A.   Should the Cluster Market Include a Broader Collection of Items?................................... 4
   B.   Should Paper Be Broken Out from Core Office Supplies?............................................... 6
   C.   The $500,000 Threshold for Defining Large Customers................................................ 7
   D.   Staples' and Office Depot's Price/Cost Margins and the HMT ....................................... 7

**3.   Market Shares** ............................................................................................9
   A.   Market Shares Based on Data from Fortune 100 Customers........................................... 11
   B.   Primary Vendor Relationships............................................................................ 12
   C.   Breaking Paper Out from Core Office Supplies ..................................................... 13
   D.   Market Shares Using a $250,000 Threshold.......................................................... 15
   E.   Market Concentration and HHIs ........................................................................ 15

**4.   Unilateral Competitive Effects**...............................................................15
   A.   Unrebutted Bidding Analyses........................................................................... 16
   B.   Updated Fortune 100 RFP Analysis ................................................................... 16
   C.   RFPs That Cover Consumable Office Supplies and Other Products.............................. 17
   D.   Updated Size Gap and the Cost of Goods Sold ..................................................... 17
   E.   Mr. Orszag's "PRISM-Style" Analysis ............................................................... 18
   F.   Post-Contractual Price Reductions by Staples ....................................................... 19
   G.   Online and Retail Prices as a Constraint............................................................. 22
   H.   Magnitude of Harm...................................................................................... 22

**5.   Entry and Expansion** .............................................................................23
   A.   Barriers to Entry and Expansion ...................................................................... 24
   B.   Lack of Financial Analysis of Entry or Expansion ................................................. 25
   C.   Amazon Business.......................................................................................... 25
   D.   Direct Evidence from W.B. Mason and Other Suppliers............................................ 28

**6.   Efficiencies** ..............................................................................................28

**7.   Proposed Divestiture**..............................................................................29

PX06300-002

CONFIDENTIAL MATERIAL

## 1. Summary of Conclusions

I am Carl Shapiro, the Transamerica Professor of Business Strategy at the Haas School of Business at the University of California at Berkeley.  My qualifications are described in the expert report that I filed in this matter on February 15, 2016, "Shapiro Report."

In this reply report I respond to the expert reports submitted on February 29, 2016, on behalf of Staples and Office Depot by Mr. Jonathan Orszag ("Orszag Report"), by Professor Haim Mendelson ("Mendelson Report"), and by Mr. Paul Anderson ("Anderson Report").   The bulk of this reply report responds to the Orszag Report.  I also update the analysis from the Shapiro Report based on information that has become available to me since I submitted that report.  A list of the additional materials that my staff and I relied upon to prepare this report is provided in Appendix A.

My central conclusions in this reply report are the following.  My analysis supporting these conclusions is provided in the following sections.

> Relevant Market (Orszag Report, ¶¶29-57)

- Mr. Orszag has not applied the standard method employed by antitrust economists to define relevant markets, namely the hypothetical monopolist test ("HMT").  Nor has he provided any sound basis for challenging my implementation of the HMT, as described in the Shapiro Report.

- Several of Mr. Orszag's arguments regarding the relevant market are either irrelevant to the application of the HMT or misapply the HMT.

- Mr. Orszag questions whether paper and "core" office supplies can properly be aggregated into a single "cluster" market.  I have looked separately at paper and at core office supplies.  Disaggregating paper from core office supplies would not alter my conclusions.

- Mr. Orszag argues that Staples' and Office Depot's price/cost margins are smaller than shown in the Shapiro Report.  Even if he is correct about this, those lower margins would not alter the outcome of the HMT.[1]

- I fully stand by my opinion that the sale and distribution of consumable office supplies to large customers in the United States satisfies the HMT and forms a relevant market.

> Market Shares (Orszag Report, ¶¶58-170)

- The bulk of what Mr. Orszag labels as his discussion of market shares actually relates to two distinct questions: (1) whether there are significant barriers to entry into the relevant market, and (2) whether expansion by other suppliers would be timely, likely, and sufficient to protect customers from a post-merger price increase by Staples.

---

[1] Mr. Orszag does not claim that the lower margins would alter the outcome of the HMT, but I have considered this question in response to the Orszag Report.

PX06300-003

CONFIDENTIAL MATERIAL

- Mr. Orszag has misinterpreted and misapplied the portion of the Horizontal Merger Guidelines that discusses how to measure market shares.  More specifically, he has misinterpreted what the Horizontal Merger Guidelines say about whether and how to adjust firms' historical market shares to reflect their future competitive significance.  Correctly applying the Horizontal Merger Guidelines, one finds that Staples and Office Depot together account for roughly 80% of the sales in the relevant market, as found in the Shapiro Report.

- Mr. Orszag levels a number of criticisms at the data underlying Exhibit 5B from the Shapiro Report, which estimates that Staples' market share is 47.3% and Office Depot's market share is 31.6%, for a combined share of 79.0%.  While these estimates are admittedly imperfect, they very likely underestimate Staples' and Office Depot's market shares.  Exhibit R1B updates Exhibit 5B from the Shapiro Report.

- The Orszag Report offers no specific criticism of the Primary Vendor Relationship shares reported in Exhibit 7 in the Shapiro Report.  Exhibit R2 updates Exhibit 7 from the Shapiro Report.

- In the end, the Orszag Report does not seriously challenge the conclusion that Staples and Office Depot are far and away the largest firms in the relevant market.  Nor does he seriously challenge the conclusion that their combined market share – as measured by historical sales – is far above the level that triggers a presumption of harm to competition under the Horizontal Merger Guidelines.

➢ Unilateral Competitive Effects

- The Orszag Report is silent on one of the central parts of the Shapiro Report, namely my analysis of how the merger will dramatically diminish bidding competition to serve as the primary distributor of consumable office supplies for large customers.  This is notable since the analysis of data on bidding, wins and losses, and customer switching between suppliers is commonly the centerpiece of how antitrust economists analyze the competitive effects of mergers in markets such as this one where suppliers bid to win the patronage of large customers.

- I read the Orszag Report to concede that historically Staples and Office Depot have competed heavily, head-to-head, and that large customers have obtained substantial price reductions as a result of that competition.  Mr. Orszag greatly downplays this fact and relies heavily on the argument that other suppliers will invest in the capabilities and capacity to replace the loss of Office Depot as a bidder against Staples.  This highlights the absolutely critical role that entry and expansion play in Mr. Orszag's analysis of the merger.

➢ Entry and Expansion

- Mr. Orszag argues at length that entry and expansion in the relevant market are easy and will protect large customers from any post-merger price increase.  He repeatedly makes the argument that a 5% post-merger price increase by Staples would make it profitable for a number of suppliers who currently have tiny shares in the relevant market to make the investments necessary to expand markedly.

PX06300-004

CONFIDENTIAL MATERIAL

- Section 9 in the Horizontal Merger Guidelines states: "The prospect of entry into the relevant market will alleviate concerns about adverse competitive effects only if such entry will deter or counteract any competitive effects of concern so the merger will not substantially harm customers." They state: "The Agencies consider the actual history of entry into the relevant market and give substantial weight to this evidence." Ultimately, they ask "if entry would be timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern." Following this approach, I remain unconvinced that entry will protect customers from harm in this case, for a number of reasons detailed below.

- The actual history of entry into the relevant market does not support Mr. Orszag's assertion that entry into the market is easy. Even Amazon, impressive as they are in other markets, recognizes this to be the case. Furthermore, testimony from the suppliers Mr. Orszag is counting on to expand rapidly and dramatically in response to a small but significant price increase generally indicates that such expansion takes time and faces obstacles. Of course, one cannot rule out that some such expansion would occur in response to a post-merger price increase by Staples, but Mr. Orszag has provided no quantitative analysis showing that such expansion will be (a) profitable for other suppliers, much less (b) sufficient to deter or counteract a post-merger price increase by Staples.

## 2. Relevant Product Market

In the Shapiro Report, I concluded that the relevant market is the sale and distribution of consumable office supplies to large customers located in the United States. For the reasons given below, I fully stand by that conclusion.

Section IV of the Orszag Report (¶¶29-57) is entitled "The FTC and Professor Shapiro Improperly Define the Relative [sic] Product Market."[2] Mr. Orszag states:

> I take no significant issue with Professor Shapiro's discussion of the "hypothetical monopolist test" or his application of the ideas outlined in the FTC's "Horizontal Merger Guidelines." However, market definition is more an empirical than a theoretical matter and that is where Professor Shapiro's discussion – as lucid as it is – falls short.[3]

I find this last criticism peculiar, since my implementation of the hypothetical monopolist test was empirical, and since the whole point of the test is to provide a methodology for evaluating the evidence – not to serve as a substitute for evidence.

As I explain below, Mr. Orszag has effectively abandoned the hypothetical monopolist test. I consider this telling. Furthermore, he offers no evidence that my implementation of the test is faulty in any way. In the end, unmoored from the HMT, he employs a hodge-podge of arguments relating to market definition that do not yield reliable results.

---

[2] Mr. Orszag and I agree that the relevant geographic market is the United States. Orszag Report, ¶29, footnote 33.

[3] Orszag Report, ¶30 (footnotes citing the Shapiro report omitted).

PX06300-005

CONFIDENTIAL MATERIAL

## A.  Should the Cluster Market Include a Broader Collection of Items?

In Section IV.A of his report (¶¶32-42) Mr. Orszag makes a number of assertions about Staples, Office Depot, and their large customers.  He states (¶33) that "Staples and Office Depot are increasingly distributing a wider variety of products beyond office supplies, while other firms that historically distributed other types of products are now also increasingly distributing office supplies."  Exhibit C to the Orszag Report lists several of these other categories of products, including cleaning, breakroom, furniture, and peripherals.  Mr. Orszag shows that the Requests for Proposals ("RFPs") issued by large customers that cover consumable office supplies often include other categories of products as well.  He also shows that large customers who purchase consumable office supplies from Staples and Office Depot often buy products from other categories as well.

I have no reason to doubt any of these assertions, but they in no way imply that the relevant product market is any broader than the one I defined using the hypothetical monopolist test.

To see why, consider, for example, the fact reported in Exhibit C to the Orszag Report that 5% of the total sales made by Staples and Office Depot to large B-to-B customers in 2015 were for furniture, compared with 45% for consumable office supplies.  The HMT asks whether a single firm, completely controlling the distribution of consumable office supplies to large customers, would find it profitable to impose a small but significant, non-transitory increase in price (SSNIP) on those products.  In my report I showed that such a price increase would be profitable, and Mr. Orszag offers no contrary calculations.  Furniture sales did not enter into my calculation, since the hypothetical monopolist would *not* raise the price of furniture.  Under the HMT, the SSNIP is applied only to products in the candidate market, which here does not include furniture.

Mr. Orszag attempts to relate his evidence regarding the sale of other products such as furniture to the hypothetical monopolist test in ¶¶41-42 of his report, but so far as I can tell he errs in this attempt.  Here is what he writes in those two paragraphs (footnotes omitted, emphasis added):

> 41.     The empirical facts described above are relevant to the question I raised about whether it is more appropriate to define the product market in this matter in terms of intermediary services, including bundling and distribution, rather than in terms of a particular set of products, as the FTC and Professor Shapiro propose. The answer to this question depends critically *on whether customers of the bundle of products included in Professor Shapiro's proposed cluster market would seek to defeat a hypothetical price increase by purchasing some of these products separately.  In other words, would customers split up their purchases and buy different parts of the FTC's and Professor Shapiro's alleged bundle separately in response to a putative small, but significant, non-transitory price increase ("SSNIP")?*

> 42.     The answer to this question depends critically on the transaction costs of "breaking" the bundle into separate products. Professor Shapiro has not analyzed this key issue empirically, although as noted above, he stated that large B-to-B customers prefer to deal with one distributor, which, if true, would suggest that they may not break the bundle in response to a SSNIP. In any case, Professor Shapiro has not provided a rigorous economic basis for his proposed relevant market.

Page 4

CONFIDENTIAL MATERIAL

The portion of Mr. Orszag's text in ¶41 that I have highlighted simply does not address the fundamental market definition test. The hypothetical monopolist, *by definition*, controls all sources of supply for the products in the "bundle" (here, all consumable office supplies) so a customer cannot avoid purchasing these items from the hypothetical monopolist by splitting up its purchases. This in turn makes ¶42 in the Orszag Report moot, since it is attempting to answer the question from ¶41 that makes no sense in the context of the HMT.[4]

While Mr. Orszag tries to dismiss the HMT as merely theoretical, the test is well designed and has long been widely used to address a specific, pertinent question: would the complete elimination of competition within the candidate market significantly harm customers? If so, that group of products is worthy of closer study, and market shares within that market are likely to be informative regarding competitive effects. If not, then the group of products is too narrow to use for these purposes.

As always when considering market definition and market shares, it is wise to ask whether the market shares that emerge from the analysis truly inform the analysis of the competitive effects of the merger. This common-sense approach reveals why it would be a major error to include, say, the sale and distribution of furniture in the relevant market. To see why, suppose that large customers spend far more on furniture than they do on consumable office supplies, but as a group they buy relatively little of their furniture from Staples and Office Depot. Suppose also that they buy most of their furniture from firms that specialize in furniture and sell few if any office supplies.[5] In this situation, including furniture in the relevant market would greatly reduce the market shares of Staples and Office Depot. Critically, those lower shares would *not* accurately reflect the competitive significance of Staples and Office Depot in selling consumable office supplies to large customers. Yet this is precisely the approach that Mr. Orszag is advocating. Mr. Orszag would not have made this error had he applied the HMT.

Lastly, Mr. Orszag makes a related argument in ¶40 of his report. There he states that "Staples and Office Depot customers can threaten to switch to competitors for their purchase of ink and toner or BOSS in response to a hypothetical price increase in the FTC's and Professor Shapiro's relevant market." This raises the question of whether such a threat – to refrain from purchasing products *outside* the candidate market – somehow constrains the monopolist's ability to profitably impose a price increase. Clearly this threat would not discipline the hypothetical monopolist in the standard situation where the hypothetical monopolist only controls the products in the candidate market. Even if one assumes that the hypothetical monopolist sells the other products in question, this threat will not constrain the hypothetical monopolist. To the extent that Mr. Orszag is claiming otherwise, his argument is faulty as a matter of economics and has no limiting principle. Under Mr. Orszag's approach, a merger to monopoly would be allowed on the hope that customers could protect themselves from the monopoly power thus created by virtue of the fact that they also purchase other products from the monopolist. In the

---

[4] In ¶40, footnote 49, Mr. Orszag states: "Professor Shapiro overlooks these facts." Not so. He appears not to recognize that these facts are not pertinent for implementing the HMT. In ¶42, Mr. Orszag asserts that "Professor Shapiro has not provided a rigorous economic basis for his proposed relevant market." For the reasons just given, this statement is false and appears to be based on an error by Mr. Orszag.

[5] This is merely an illustrative hypothetical. These are the circumstances under which including furniture in the market would make a significant difference in the resulting market shares – presumably Mr. Orszag's point.

PX06300-007

CONFIDENTIAL MATERIAL

case at hand, this argument effectively assumes that a post-merger Staples would not be able to extract better terms from its large customers for the sale of consumable office supplies despite having considerably more bargaining power over them.[6]

## B. Should Paper Be Broken Out from Core Office Supplies?

In Section IV.B of his report (¶¶43-51) Mr. Orszag goes in the opposite direction and suggests that consumable office supplies is too *broad* a bundle of items.  He states in ¶44:

> As background, Professor Shapiro and I agree about the potential usefulness to economists of aggregating individual products into cluster markets when competitive conditions are similar, even in instances where individual items have little or no substitution with each other from the consumer's perspective. However, we disagree about whether the products in his proposed cluster of office supplies and copy/print paper do face similar competitive conditions.

Mr. Orszag then argues that competitive conditions in the supply of *paper* differ from those for the supply of core office supplies.  He also argues that there are differences in competitive conditions within the category of core office supplies.

There typically are some differences in the competitive conditions for products within a cluster market.  The whole point of a cluster market is to avoid the need to analyze each product separately when doing so is impractical or would not improve the accuracy of the merger review.

Disaggregating a cluster market can be useful and informative, data permitting.  However, simply as a matter of arithmetic, if breaking a cluster market into two sub-groups has any effect on the resulting market shares, it will raise the combined share of the merging firms in one sub-group and lower the combined share in the second sub-group.

I acknowledge that the distribution of paper differs in some respects from the distribution of core office supplies, but as I now explain these differences are relatively minor.  More importantly, breaking paper out from core office supplies would not alter my conclusions regarding the likely competitive effects of the proposed merger.

I have no quarrel with the central point in Exhibits I-1 and I-2 from the Orszag Report: that Staples' and Office Depot's margins on paper are lower than their margins on core office supplies.[7]

---

[6] The claim that customers can protect themselves by threatening not to purchase other products is equally poor as applied to competitive effects.  Any sensible application of bargaining theory would show that customers cannot protect themselves from a supplier's enhanced market power by threatening not to buy other products.  All that is needed to reach this result is the mild assumption that these buyers are already making use of the bargaining tools available to them, including the threat not to buy other products from Staples and Office Depot.  There is no reason to believe that buyers will have a greater ability to engage in such behavior post-merger.  The only change in bargaining positions resulting from the merger is that buyers will *lose* the ability to threaten moving from Staples to Office Depot, or vice versa, to get more competitive prices.  It is this loss of bargaining ability that causes harm here, given the significant constraints that Staples and Office Depot impose on each other.

[7] These exhibits mischaracterize the reported margins as "Professor Shapiro's Margins."  In fact, the margins in Exhibits I-1 and I-2 in the Orszag Report were not calculated using the methods described in Appendix D to the Shapiro Report.  He does not account for customer-level rebates and discounts, delivery expenses, order entry

PX06300-008

CONFIDENTIAL MATERIAL

Below, I look separately at paper and at core office supplies and I report market shares separately for paper and core office supplies.  This disaggregation does not alter my conclusions.

## C. The $500,000 Threshold for Defining Large Customers

In Section IV.C of his report (¶¶52-57), Mr. Orszag raises questions about the $500,000 threshold used to define targeted customers.

In ¶56, Mr. Orszag states that I have inappropriately aggregated heterogeneous customers who "are not subject to similar competitive conditions."  Again, Mr. Orszag has abandoned the HMT, this time as applied to targeted customers.  So far as I can tell, he has mixed up the condition for aggregating products into a *cluster market*, which we agree is based on those products having "similar competitive conditions," and the condition for defining markets around *targeted customers*, which relates primarily to the lack of arbitrage, as described in Section 3 of the Horizontal Merger Guidelines.

Mr. Orszag may well be correct that the *competitive effects* of the proposed merger will vary among large customers – some will face a larger post-merger price increase than others – but that question is properly addressed in the analysis of unilateral competitive effects, notably by looking at the bidding competition to serve large customers.  Nothing Mr. Orszag says here calls into question that a hypothetical monopolist could profitably raise the price of consumable office supplies to large customers.

In ¶57 Mr. Orszag states: "From an economic perspective, the correct place to 'draw the line' is where Staples and Office Depot change their behavior toward customers in a way that potentially renders them vulnerable to market power (i.e., where they become so-called targeted customers)."  This is simply not the correct question if one is following the HMT.  The HMT asks whether the group of customers in question can be profitably targeted for a price increase.  The answer to this question depends primarily on arbitrage, as explained in Section 3 of the HMG, not on whether Staples and Office Depot "change their behavior" towards these customers.  Mr. Orszag's central empirical point in ¶57 is that smaller customers also receive customized offers from Staples and Office Depot.  But that does not in any way imply that larger customers are protected from a post-merger price increase by Staples targeted at them.

In any event, Mr. Orszag's criticism of the $500,000 threshold does not challenge the basic point that large customers will be harmed by this transaction, as many of them have stated.  I report evidence below indicating that the market shares reported in Exhibit 5B in the Shapiro Report are not sensitive to the threshold used to define large customers.

## D. Staples' and Office Depot's Price/Cost Margins and the HMT

I used Staples' and Office Depot's price/cost margins in the Shapiro Report to perform the hypothetical monopolist test.  I now explain that the results of that test are not changed when one includes additional SKU level "vendor holdback" data provided by Staples and the additional cost components identified by Mr. Orszag.

---

expenses, or customer service and credit card fee expenses as I did to calculate the margins reported in Appendix D to the Shapiro Report.

PX06300-009

CONFIDENTIAL MATERIAL

Staples included additional customer-SKU level 2014 data on an additional component of the rebates provided by manufacturers to Staples, called "vendor holdbacks" in its rolling production of updated 2015 contract sales data.[8] Mr. Orszag includes these vendor holdback data in his Exhibit I-2 analyses. Below, I incorporate them into my revised estimates.

In Appendix D to the Shapiro Report, I wrote:

> Staples does provide customer level data on "distribution expense" (as distinct from delivery expense). Staples explains that "[d]istribution cost includes overhead warehouse expenses such as rent, salaries, taxes/benefits, supplies, telephone, and depreciation." These costs appear largely not to be incremental to serving any given customer, so I do not include them in my estimate of Staples' margin.[9]

Mr. Orszag asserts that 77% of the "distribution costs" are variable.[10] Mr. Orszag bases this 77% figure on a regression analysis with a single variable relating distribution cost to sales. As I explain in Appendix B, the omission of explanatory variables from his regression may have caused him to overestimate the share of distribution costs that are variable. A Staples internal document estimates that 50% of distribution costs are variable.[11]

Mr. Orszag also includes as variable costs certain expenses associated with the cost of extending customer credit ("A/R" costs).[12]

In the Shapiro Report, I estimated that Staples' margin on sales of consumable office supplies to large customers was ▮.[13] If I incorporate the additional Staples vendor holdback data, A/R costs, and assume that 50% of distribution costs are variable, I estimate that Staples' margin on sales of consumable office supplies to large customers is ▮.[14] Using Mr. Orszag's estimate that 77% of distribution costs are variable, I estimate that Staples' margin on sales of consumable office supplies to large customers would be ▮.[15] Mr. Orszag's calculation of Staples' margins in his Exhibit I-2 includes the vendor holdback component of vendor rebates. However, when he adjusts the Staples margins reported in Shapiro Report Appendix D, he deducts distribution costs

---

[8] Staples Response to Plaintiffs' Third Request for Production of Documents, January 20, 2016, <vr_holdback_rates.sas7bdat> ("Vendor Holdback data").

[9] Shapiro Report, p. D-2 (footnotes referencing the source documents omitted).

[10] Orszag Report, ¶177.

[11] PX04762, at 006 (Staples, Email chain re: Allocations, September 14, 2015).

[12] In a footnote to Orszag Report, ¶177, Mr. Orszag claims that he "excluded as variable costs certain expenses associated with the cost of extending customer credit." The software code included in his backup shows that he included the costs of extending customer credit in his analyses, so I assume that his footnote includes a typographical error.

[13] For further details on the calculation see Shapiro Report, p. D-2.

[14] The software code used to calculate these margins is included in the backup materials accompanying this report.

[15] The software code used to calculate these margins is included in the backup materials accompanying this report.

Page 8

CONFIDENTIAL MATERIAL

and A/R costs but does not include vendor holdbacks.  That is why he estimates a Staples margin of ███ instead of the ███ figure just reported.[16]

In the Shapiro Report I estimated that Office Depot' margin to supply consumable office supplies to large customers is ██%.[17]  Office Depot did not provide data on distribution costs or A/R costs.  If I assume that 50% of distribution cost is variable, then "A/R" cost and the variable portion of distribution cost account for 3% of Staples net sales.  I use this figure to adjust the Office Depot margin and thus estimate that Office Depot's margin to supply consumable office supplies to large customers is ██%.  Using Mr. Orszag's estimate that 77% of distribution costs are variable, I estimate that Office Depot's margin on sales of consumable office supplies to large customers would be ██%.[18]

When Mr. Orszag adjusts the Office Depot margin in Shapiro Report Appendix D, he combines the Office Depot and OfficeMax data despite the data deficiency I explain in Appendix B.  Since the erroneously calculated OfficeMax margin is an underestimate and significantly lower than the Office Depot (and Staples margins), Mr. Orszag estimates an Office Depot margin of ██% instead of the ██% I calculate as my revised estimate above.[19]

Using these revised margin figures would not alter my conclusion that the sale and distribution of consumable office supplies to large customers in the United States is a relevant market.  See Appendix B for these calculations.

## 3.  Market Shares

Section V of the Orszag Report (¶¶58-170) is entitled: "Professor Shapiro Improperly Restricts the Set of Competitive Alternatives Available to Customers, Thereby Overstating Staples' and Office Depot's Market Shares."  Mr. Orszag states in ¶60 that the objective of this section of his report is "to help identify sources of supply that Professor Shapiro does not account for in his calculations."  He further explains in ¶60: "In particular, I discuss the lack of barriers to entry or expansion that rival distributors face in competing with Staples and Office Depot."

I entirely agree with Mr. Orszag that the ability of other suppliers to enter the market and to expand in response to a post-merger price is an important part of the analysis of this merger.[20]  But Mr. Orszag is departing sharply from the HMG by asserting that estimates of the merging firms' market shares must be adjusted downward due to the prospect of entry.  With the exception of Section V.E, all of the material in Section V of the Orszag Report properly belongs in the analysis of competitive effects and the analysis of entry.  I do that below.

---

[16] Orszag Report, ¶177; Orszag Report Backup, February 29, 2016.

[17] For further details on the calculation see Shapiro Report, p. D-2.

[18] The software code used to calculate these margins is included in the backup materials accompanying this report.

[19] Orszag Report, ¶177; Orszag Report Backup, February 29, 2016.

[20] Just to be clear: all sources of supply are included in the relevant market.  My measures of market share include all sources of supply, including Amazon, W.B. Mason, adjacent suppliers and others – based on their actual sales to large customers.

PX06300-011

CONFIDENTIAL MATERIAL

The HMG are quite clear that once a relevant market has been defined, market shares are normally based on historical evidence.  Only when there are reasonably predictable and measurable trends may the Agencies conclude that a firm's historical market share overstates or understates its future competitive significance.  Section 5.2 of the HMG states:

> Market concentration and market share data are normally based on historical evidence. However, recent or ongoing changes in market conditions may indicate that the current market share of a particular firm either understates or overstates the firm's future competitive significance. The Agencies consider reasonably predictable effects of recent or ongoing changes in market conditions when calculating and interpreting market share data. For example, if a new technology that is important to long-term competitive viability is available to other firms in the market, but is not available to a particular firm, the Agencies may conclude that that firm's historical market share overstates its future competitive significance. The Agencies may project historical market shares into the foreseeable future when this can be done reliably.

This is the approach I took in the Shapiro Report.[21]  I estimated the sales of consumable office supplies that various suppliers made to large customers in the United States. I did not observe significant trends that would allow me to "project historical market shares into the foreseeable future" in a reliable manner.  The result was Exhibit 5B in the Shapiro Report, which is based on market shares from 2014.  I readily acknowledge that the data underlying that exhibit are not perfect.  Below I address each and every specific issue raised by Mr. Orszag about those data.

*Mr. Orszag rejects the well-recognized HMG approach to the measurement of market shares in Section V of his report.*  While he offers no alternative measure of market shares, he makes it crystal clear that he believes that market shares should be measured in an entirely different manner that somehow accounts for the ability of other suppliers to enter the market or expand in response to a post-merger price increase by Staples.  In addition to departing sharply from the HMG, Mr. Orszag's approach does not appear to be practical in terms of actually coming up with market shares in this case, or in other cases.  If adopted, his approach would make merger analysis less reliable, and more confusing, by mixing up the exercise of measuring market shares with other major pieces of merger analysis, namely the evaluation of competitive effects and the assessment of barriers to entry into the relevant market.

Mr. Orszag explains his approach this way in ¶60:  "Next, I focus – as the Horizontal Merger Guidelines state – on the 'future competitive significance' of firms in the industry, as opposed to their historic market position." Here he cites the HMG, pp. 16-17, which is the very paragraph that I just quoted.  Mr. Orszag is misreading and misinterpreting that paragraph.  I urge the Court to read this portion of the HMG carefully.  The key passage within that quote is this one:

> However, recent or ongoing changes in market conditions may indicate that the current market share of a particular firm either understates or overstates the firm's future competitive significance. The Agencies consider reasonably predictable effects of recent or ongoing changes in market conditions when calculating and

---

[21] In Section 4.D of the Shapiro Report, I considered and rejected an alternative method of measuring market shares, based on sales to a broader group of customers, following Section 5.2 of the HMG as applied to targeted customers.

PX06300-012

CONFIDENTIAL MATERIAL

> interpreting market share data. … The Agencies may project historical market shares into the foreseeable future when this can be done reliably.

This language is referring to situations in which there are predictable effects and measurable trends in market conditions, such as when a new firm has entered the market and is gaining share rapidly, or when a firm lacking a new-generation product is experiencing declining sales. In those situations, it is entirely appropriate to project historical shares into the future, so long as these projections can be made in a reliable manner.

This is absolutely *not* what Mr. Orszag is advocating. He simply is not talking about measuring historical sales or projected sales in the relevant market. He does not claim that the various suppliers have been winning large customers from Staples and Office Depot. Indeed, the win/loss analysis in the Shapiro Report shows otherwise. With respect to Amazon, a company that he emphasizes, Mr. Orszag has not shown that Amazon Business has won even one bid from a large customer, and he certainly has not demonstrated that its *de minimis* historical share can reliably be projected in a manner that gives Amazon a high future share in the relevant market.[22] Mr. Orszag is talking instead about how various suppliers could make the investments necessary to expand their sales in the relevant market in response to a post-merger price increase by Staples. This is an important question to ask, but it relates to entry, not the measurement of market shares.

Ultimately, Mr. Orszag has not pointed to any changes in market conditions that are nearly large enough to alter the conclusion that (a) Staples and Office Depot together dominate the relevant market, and that (b) all other suppliers are far behind them in their sales of consumable office supplies to large customers in the United States. So far as I can tell, Mr. Orszag is not actually disputing those facts. Instead, he is claiming that these large market shares do not indicate that adverse competitive effects are likely, due to the ease with which other suppliers can expand. I address that question below in my discussion of entry.

### A. Market Shares Based on Data from Fortune 100 Customers

Exhibit R1B reports my best estimate of markets shares for consumable office supplies, based on data from the Fortune 100 customers. Exhibit R1B updates Exhibit 5B from the Shapiro Report to reflect information that has become available to me since I filed that report. As shown in Exhibit R1B, the combined market share of Staples and Office Depot is 79.0%.[23] Exhibit R1A updates Exhibit 5A of the Shapiro Report summarizing procurement responses from each F100 customer.

---

[22] Mr. Orszag does point out that Amazon Business launched recently, in April 2015. I agree it is well worth checking to see if the share attributed to Amazon in Exhibit 5B to the Shapiro Report is too low because that Exhibit relies on 2014 data, but I do not have data from each Fortune 100 company for 2015. In Appendix E, I discuss how using data on 2015 sales by Amazon Business in my analysis of Primary Vendor Relationships results in only a very small change to those shares. I address Amazon Business in greater detail below in my discussion of entry and expansion.

[23] Exhibit R1B incorporates additional information received via subpoena responses, declarations or deposition testimony for ███████████████████████████████████████

CONFIDENTIAL MATERIAL

Section V.E (¶¶153-170) in the Orszag Report asserts that my market share calculations based on data from Fortune 100 customers are "flawed."  Appendix C to this report addresses in detail each of the criticisms that Mr. Orszag levels at those market shares, as reported in Exhibit 5B in the Shapiro Report and updated in Exhibit R1B of this report.  After giving each of his criticisms careful consideration, I stand by the conclusions I reached in the Shapiro Report.

In evaluating Mr. Orszag's criticisms of my market share calculations, it is important to bear in mind that the market shares of Staples and Office Depot, as reported in Exhibit R1B, are far above the level that normally raises serious concerns about adverse competitive effects.  Many of Mr. Orszag's points relating to the measurement of sales in the relevant market are quibbles that do not seriously call into question the presumption that normally applies when the merging firms have such high market shares in a relevant antitrust market.

Furthermore, as explained in the Shapiro Report, in processing the responses from Fortune 100 firms, I have instructed my staff to make a number of assumptions that inflate the market shares of suppliers *other* than Staples and Office Depot.  Mr. Orszag does not dispute that fact, or even mention it in his report.  In part because of this rather glaring omission, he provides no basis for concluding that, *on net*, the market shares I report for Staples and Office Depot are too high rather than too low.

### B. Primary Vendor Relationships

Exhibit 7 in the Shapiro Report provides data on "primary vendor relationships," which are defined to be supplier/customer pairs involving the sale of at least $500,000 of consumable office supplies in 2014.  As reported there, Staples' primary vendor relationship share was 45.1% and Office Depot's share was 42.6%, for a combined share of 87.7%.

Exhibit R2 updates Exhibit 7 from the Shapiro Report to account for information that has become available to me since I filed that report.[24]  The conclusion of my updated analysis of primary vendor relationships remains the same:  Staples and Office Depot are overwhelmingly more successful than any other supplier at winning RFPs covering consumable office supplies issued by large customers in the United States, with a combined primary vendor share of 87.6%.  Staples has a primary vendor relationship with 529 large customers, and Office Depot has a primary vendor relationship with 587 large customers.  In sharp contrast, the next two largest firms,     and     , have primary vendor relationships with 38 and 15 large customers, respectively.  W.B. Mason is the only other supplier that has a primary vendor relationship with more than ten large customers, and the vast majority of the other suppliers of consumable office products have primary vendor relationships with no more than two customers.

The Orszag Report offers no specific criticism of the Primary Vendor Relationship shares reported in Exhibit 7 in the Shapiro Report.  His only reference to these shares occurs in ¶153 of

---

[24] Exhibit R2 includes the last-minute data submissions from     .  It also has an updated sales figure for Amazon, based on the backup calculations to the estimates in the declaration.  See ▮▮▮▮ at 104-105.  The new sales figure reported for Amazon Business tends to ▮▮▮▮▮▮▮▮▮▮▮▮▮.

PX06300-014

CONFIDENTIAL MATERIAL

the Orszag Report, where he begins his criticism of my estimates of market shares based on the Fortune 100 customer data.  Referring to the shares I calculated based on primary vendor relationships, he states that "many of the same criticisms below apply to Professor Shapiro's other approaches."  He offers no more specific criticism of Exhibit 7 in the Shapiro Report.

Mr. Orszag then states in the attached footnote (#250) that "it is unclear how to interpret these alleged market shares."  I provided the following interpretation at p. 19 of the Shapiro Report:

> Exhibit 7 leaves no doubt that Staples and Office Depot together dominate when it comes to winning RFPs covering consumable office supplies issued by large customers in the United States.  Staples and Office Depot are overwhelmingly more successful than any other supplier at winning these RFPs.

## C. Breaking Paper Out from Core Office Supplies

### 1.   Shares Based on Fortune 100 Customers

To address Mr. Orszag's criticism that a cluster market consisting of core consumable office supplies and paper is too broad, I have calculated market shares separately for paper and core office supplies as described below.  In both categories, my best estimate of the combined market share estimates for Staples and Office Depot is well above the level that normally raise serious concerns about anticompetitive effects: over 70% for paper, and over 80% for core office supplies.

Exhibit R3A reports my best estimate of market shares for core office supplies, based on data from the Fortune 100 customers.  Exhibit R3B reports my best estimate of market shares for paper, based on data from the Fortune 100 customers.  A number of Fortune 100 customers did not clearly break out paper from core office supplies in their responses, so I have been required to make a number of assumptions to derive the market shares in these exhibits.  For that reason, I continue to view Exhibit R1B, which shows that Staples and Office Depot have a combined share of 79%, as ultimately more informative than Exhibits R3A and R3B.

Given that F100 customers do not always track paper and core office supplies separately, approximating distinct market shares for each category requires an assumption wherever the underlying data may combine the two.  For example, a customer may report purchases from W.B. Mason as a single amount in a procurement category such as "Office and Admin – Office Supplies" without further detail.  In many cases, it is simply impractical to examine thousands of product line item descriptions to parse between office supply product categories. To handle these cases, Exhibit R3A and Exhibit R3B report shares under two alternate assumptions—each based on data sources that do allow for measuring the split between paper and core office supplies. The first adjustment for product mix I consider is based on the split between the two categories at Staples and Office Depot, where paper accounted for 46% of relevant product purchases from large customers in 2014.  I also consider an alternative adjustment of 33% based on data from office supply distributors other than Staples and Office Depot.  In constructing these shares, all

PX06300-015

CONFIDENTIAL MATERIAL

underlying data specifically tracked as paper is treated as such without adjustment.[25] For core office supplies, Exhibit R3A estimates a combined market share for Staples and Office Depot of 84.0% to 86.7%, depending on the practical assumption made.  The same approach yields market share estimates for paper of between 71.4% and 73.7%, as shown in Exhibit R3B.[26]

Compared to the relevant market share estimate of 79.0% (covering both categories), the somewhat lower paper estimates largely reflect the presence  of paper manufacturers (Georgia Pacific–3.1%, Domtar–1.5%) and paper merchants (Veritiv–10.2%, Lindenmeyr–1.0%).[27]  With regard to Veritiv in particular (for whom I have attributed all sales to paper), as I discussed in the Shapiro Report, these shares overstate their true significance, given that they likely include MRO products outside of the relevant market as well as packing and shipping products apart from paper.[28]  In any case, the difference between shares in each category suggest that post-merger competitive effects may differ somewhat between paper and core office supplies.  Nevertheless, both shares support the same fundamental conclusion reached in the combined cluster market for paper and core office supplies: that Office Depot is far and away the largest competitor currently faced by Staples, and that the combined firm will enjoy a dominant post-merger market share.

## 2.  Primary Vendor Relationship Shares

Exhibit R4A and R4B separate the primary vendor sales in Exhibit R2 into the suppliers' sales of core office supplies and paper, respectively.  Fortunately, the majority of the suppliers shown in Exhibits R4A and R4B reported their sales of core office supplies and paper separately at a customer level.[29]

Exhibit R4A and R4B show that Staples and Office Depot dominate in the primary vendor sales of both core office supplies and paper.  Their combined share is distinctly higher for core office supplies (94%) than for paper (81%), due to the presence of paper manufacturers and paper merchants.  However, the fact that Staples and Office Depot each have far more paper customers and paper sales than the next largest supplier confirms that they are each other's strongest competitor for paper as well as for core office supplies.

---

[25] For these calculations, I also treat *all* sales made by paper manufacturing firms, and "paper merchants" ███, as for paper only. Furthermore, all sales from vendors which include "paper" in their company name ███████████ ) are attributed entirely to paper.

[26] As a matter of arithmetic, the assumption that gives Staples and Office Depot higher shares in core office supplies gives them lower shares in paper, and vice versa.

[27] See Exhibit R3B.

[28] See Shapiro Report, E-10–11.

[29] Some competitors broke out sales of core office supplies and paper at the company level, but not for each customer individually.  In these cases, I use the company level mix as an estimate of the break out for each customer.  Two competitors did not report core office supplies sales separately from paper at any level.  For these competitors, I estimate the product mix using the break outs shown for Staples and Office Depot in Exhibit 3 of the Shapiro Report.

PX06300-016

CONFIDENTIAL MATERIAL

### D. Market Shares Using a $250,000 Threshold

Mr. Orszag criticizes my use of a $500,000 threshold to define large customers.  As I explained in the Shapiro Report, using this cutoff could yield market shares that overstate the competitive significance of Staples and Office Depot in serving these customers, but only if three conditions hold: (a) Staples and Office Depot have significantly lower shares in serving somewhat smaller customers, (b) the revenues from these customers are large relative to the revenues from large customers, and (c) suppliers who primarily serve these somewhat smaller customers, and not large customers, are fully capable of serving large customers as well without the need to make significant investments.

Mr. Orszag does not present evidence that these conditions hold.  Nonetheless, I have checked condition (a) using the data available to me.  I find that the combined primary vendor share of Staples and Office Depot using a somewhat lower threshold – supplier/customer pairs involving the sale of at least $250,000 of consumable office supplies in 2014 – is virtually the same as their combined primary vendor share with large customers: 87.7% using the $250,000 threshold versus 87.6% using the $500,000 threshold.[30]  See Exhibit R5.[31]  This exhibit tells us that the market shares I have calculated would not significantly change if a $250,000 threshold were used instead of a $500,000 threshold.  Using a $500,000 threshold has not caused me to miss or greatly understate the market share of an important competitor to Staples and Office Depot.

### E. Market Concentration and HHIs

Exhibit R6 updates Exhibit 5C from the Shapiro Report, using the updated market shares from Exhibit R1B.  The HHI numbers have gone up slightly.  My conclusions remain the same.

Prior to the merger between Staples and Office, the HHI is 3274.  Their merger would increase the HHI by 3000 to 6274.  As discussed on p. 19 of the Shapiro Report, the post-merger HHI and the change in HHI far surpass the levels at which there is a presumption of likely enhancement of market power under the Horizontal Merger Guidelines.

## 4.  Unilateral Competitive Effects

Mr. Orszag says little or nothing about my analysis of the unilateral competitive effects of the proposed merger.  No section of his report addresses unilateral competitive effects as such.

---

[30] The data provided by ████████████████████████████████████████████ limit the extent to which sales to customers at a $250K threshold can be counted, so the exhibit understates their significance to some degree.  On the other hand, customer accounts in the Office Depot and Staples data were not aggregated to the $250,000 level, so they may have additional customers that meet the lower threshold and are not being captured in the exhibit.

[31] This exhibit uses the same methodology as described in Appendix G of the Shapiro Report, except that it cuts the sales threshold in half.  Consistent with the previous analysis, the exhibit excludes government entities.

PX06300-017

CONFIDENTIAL MATERIAL

## A.  Unrebutted Bidding Analyses

So far as I can determine, Mr. Orszag is not disputing that Staples and Office Depot dominate the bidding competition for RFPs covering consumable office supplies that are issued by large customers.  He also is not disputing that Staples and Office Depot regularly engage in head-to-head competition to win those bids.  Nor does he dispute that all other vendors are far behind Staples and Office Depot as measured by their success at actually winning these bids.

The analysis of bidding data provided by Staples and Office Depot is a centerpiece of the Shapiro Report.  This analysis stands unrebutted by Mr. Orszag.

Antitrust economists commonly perform this type of bidding analysis to evaluate proposed horizontal mergers.  Office Depot and Office Max presented this type of bidding analysis to the FTC as part of their efforts to convince the FTC not to challenge their merger.[32]

The lack of any criticism by Mr. Orszag of my bidding analysis highlights the extent to which he is relying on entry and expansion to reach his conclusion that the proposed merger will not substantially lessen competition.

## B.  Updated Fortune 100 RFP Analysis

In the Shapiro report, I analyzed data submitted by Fortune 100 companies regarding their RFPs involving consumable office supplies.  Exhibit 9A to the Shapiro Report shows that Staples and Office Depot dominate these bidding events: Staples was present as a competitor in all 43 reported opportunities, Office Depot was present in 38 of them, and no other bidder was present in more than three of these opportunities.  Exhibit 9B to the Shapiro Report shows that Staples won 100% of the reported RFPs lost by Office Depot, and Office Depot won 91% of the reported RFPs lost by Staples.

Exhibits R7A and R7B update that analysis based on additional evidence that has become available to me.[33]  The updated analysis confirms my previous conclusion that Staples and Office Depot are very substantial head-to-head competitors in the relevant market.

Consistent with customer statements, Staples and Office Depot remain the only competitors identified in 62% of these reported RFPs.  As shown in Exhibit R7A, Staples is present as a competitor in all 52 reported opportunities, and Office Depot is present in 47 of them (90.4%).  The next most frequent bidder is W.B. Mason, with only four appearances (7.7%).  Exhibit R7B shows the same fraction of losses captured by the merging parties as in my prior analysis:

---

[32] See PX0001, "Office Depot and Office Max, Presentation to the FTC: Competition for Contract Sales to Large and 'National' Customers," September 13, 2013, especially p. 40 which shows that Staples was the runner-up to Office Depot for 68% of the 41 bidding opportunities worth more than $1 million, with OfficeMax the runner-up in 21% of these opportunities.  This same slide shows that Staples was the runner-up to Office Depot for 63% of the 114 bidding opportunities worth more than $150,000, with OfficeMax the runner-up in 15% of these opportunities. My understanding is that Mr. Orszag contributed to this presentation.

[33] With this additional information, 74 of the Fortune 100 companies have provided some response regarding RFPs or informal bidding events.  Of these, 52 provided information on bidders for events involving consumable office supplies during 2012-2015 that met the criteria used for inclusion in this analysis, namely that the customer either issued an RFP or conducted a bidding process in which they solicited quotes from at least two suppliers.

PX06300-018

Staples won 100% of all the reported RFPs lost by Office Depot, and Office Depot won 91% of all the reported RFPs lost by Staples.[34]

## C.  RFPs That Cover Consumable Office Supplies and Other Products

Mr. Orszag uses Staples data in his Exhibit G to argue that "Staples' bids included a wide range of products, including those products claimed by the FTC and Professor Shapiro to be in the relevant market, but also many other products."[35]

In my analyses of the Staples and Office Depot win-loss data, I considered all opportunities that included consumable office supplies.  Many of these also covered other products as well.  I did not exclude any bidders from these analyses, despite the fact that a large majority of opportunities included non-relevant products[36] and bidders responding to broad RFPs do not always bid on the consumable office supplies portion of the business.[37]

Exhibits R8A and R8B list the descriptions of products covered by the opportunities included in my Office Depot and Staples win-loss analyses, respectively.  These exhibits confirm the wide variety of non-relevant products that appear in opportunities for consumable office supplies.  To the extent that any of the bidders included in my win-loss analyses were not actually bidding on consumable office supplies, the results of my bidding analysis tend to *underestimate* the extent of head-to-head competition between Staples and Office Depot in the relevant market.

## D.  Updated Size Gap and the Cost of Goods Sold

In Section 5.C.5 and Exhibit 21 in the Shapiro Report, I presented analysis showing that the post-merger Staples would be far larger than W.B. Mason and other regional suppliers, as measured by sales of consumable office supplies in all channels.  Assuming that the cost of goods sold is driven by total purchases, this is the best measure of scale for the purpose of assessing COGS differences across suppliers.

Exhibit R9 updates the all-channel U.S. sales of consumable office supplies from Exhibit 21 of the Shapiro Report to account for new information that has become available to me.  The only changes are (i) the addition of one new supplier – ███ – to the chart and (ii) a slight increase in the sales of another – ███████████ – based on data provided in its subpoena response.

---

[34] My analyses focuses on the most recent bid for each customer's business, excluding bids that did not involve consumable office supplies.  Diversity supplier bids partnered with Staples or Office Depot are treated as being bids from Staples or Office Depot.  See Appendix H of the Shapiro Report for further details on diversity suppliers.

[35] Orszag Report, ¶ 38.

[36] Of the 393 opportunities included in my analysis of the Staples win-loss data, 94% included non-relevant products in addition to consumable office supplies.  Of the 1253 opportunities included in my analysis of the Office Depot win-loss data, at least 62% included non-relevant products in addition to consumable office supplies.  This 62% does not include opportunities with the generic "Standard Product Mix" description, where there is no information on any specific non-relevant products.

[37] For example, in  for office supplies, toner, paper, IT peripherals, and AV, two bidders of the eight bidders – ███████████ – submitted responses that excluded office supplies and paper.  See ███████, at 004, 007 (███████████████████████████████).

PX06300-019

CONFIDENTIAL MATERIAL

Neither of these updates affects the conclusions I reached in the Shapiro Report.  Exhibit R9 shows that Staples and Office Depot are each individually more than ▮ times the size of the next largest supplier, and the merged firm would be more than ▮ times as large.

### E.  Mr. Orszag's "PRISM-Style" Analysis

Mr. Orszag claims that "a significant share of purchases by large B-to-B customers takes place as leakage, even after the customer has signed a long-term contract."[38]  His results relating to leakage are presented in his Exhibit P: "PRISM-Style Declining Sales Report for Staples and Office Depot."[39]  So far as I am aware, Mr. Orszag's PRISM-Style analysis is the only quantification of off-contract purchases suggesting that these purchases comprise a significant share of the total purchases of consumable office supplies by large customers.

Mr. Orszag has made major errors in his PRISM-Style analysis.  These errors invalidate his conclusions regarding leakage and its effect on prices in the relevant market.  Appendix D describes these errors in some detail.  Here I summarize the main problems with his analysis.

The fundamental problem is that Mr.  Orszag measures "leakage" based on all situations in which a customer's purchases delivered to a specific zip code significantly decline.  Mr. Orszag has not attempted to identify the reasons *why* shipments to a given zip code decline (or increase) from one year to the next.[40]  As a result of this omission,  Mr. Orszag's measure of "leakage" is emphatically not a measure of off-contract purchases that might discipline the price charged by the primary vendor.

Most dramatically, Mr. Orszag counts as "leakage" a number of situations in which a large customer's purchases at Office Depot declined sharply because the customer *switched to Staples*.  These are certainly *not* examples of leakage that could possibly constrain Staples' pricing after the merger!  To the contrary, these situations illustrate why the proposed merger will reduce competition and harm large customers.  Here are several such situations:



- ▮▮▮▮▮▮▮▮▮▮: Mr. Orszag reports a sales decline of ▮ %[41] for ▮▮▮▮▮▮▮▮  However, Mr. Orszag fails to note that ▮▮▮▮▮▮▮ switched to being backed by Staples in ▮▮▮▮▮▮ and ended its relationship with Office Depot on ▮▮▮ ▮▮▮

---

[38] Orszag Report, ¶144.

[39] Exhibit P, Orszag Report.

[40] As discussed in Appendix D, the data used by Mr. Orszag do not allow him to identify delivery zip codes.  The addresses in the data he used are the "customer's primary addresses."

[41] For the zip codes in which his calculations show a 50 percent or greater decline in sales.

[42] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

PX06300-020

- ████████: Mr. Orszag reports a sales decline of ████████████. He does not point out that ████████ signed a new master purchase agreement with Staples on ████████.[44]

- ████████: Mr. Orszag reports a sales decline of ████[45] for ████████. He does not seem to be aware that ████████ signed new contracts with Staples to starting ████████████████ ████.

- ████████: Mr. Orszag reports a sales decline of ████████████. He does not note that ████████ switched to Staples effective ████████.

- ████ Mr. Orszag reports a sales decline of ████████. ████ signed amendments to a contract with Staples in ████████████ to award Office Supply and Paper sales to Staples.[5]

Appendix D provides several other reasons why Mr. Orszag's PRISM-Style analysis does not support the conclusions he draws from it. In the case of ████████ Mr. Orszag made an error in tracking the customer's account number. Correcting this error causes his measure of potential leakage to decline from 61.2% to 0.5%. In the cases of ████████████████, the decline in purchases observed by Mr. Orszag can be largely, if not entirely, explained by a decline in the customer's operations, as reflected by large layoffs or the sale of part of the company's operations to another company. These declines simply do not reflect "leakage."

In fact, as shown in detail in Exhibit RC-2 (updating Exhibit E-1 of the Shapiro Report), there is considerable evidence that discretionary leakage is quite small as a share of the purchases of consumable office supplies made by large customers.

## F. Post-Contractual Price Reductions by Staples

Further to the issue of leakage, Mr. Orszag states:

> Not only is leakage ubiquitous, but available evidence indicates that the threat of leakage frequently causes Staples and Office Depot to make post-contract

---

[43] For the zip codes in which his calculations show a 50 percent or greater decline in sales.

[44] ████████████████████████████████████

[45] For the zip codes in which his calculations show a 50 percent or greater decline in sales.

[46] ████████████████████████████████████

[47] For the zip codes in which his calculations show a 50 percent or greater decline in sales.

[48] ████████████████████████████

[49] For the zip codes in which his calculations show a 50 percent or greater decline in sales.

[50] ████████████████████

PX06300-021

CONFIDENTIAL MATERIAL

adjustments in prices in order to minimize customers' incentives to purchase outside of the contract.[51]

This evidence on post-contract price adjustments further demonstrates that the threat of leakage would likely constrain pricing for a combined Staples and Office Depot…[52]

I have reviewed Mr. Orszag's analysis underlying these statements. For the reasons given below, the underlying data used by Mr. Orszag do not support his claims.

### 1. Price Reductions Not Necessarily "Permanent" for "Duration of Contract"/ Price Increases Not Considered

Mr. Orszag states that "Staples lowered prices for the duration of the contract more than 10,000 times during fiscal year 2014. These permanent price reductions occurred on products representing 7.7 percent of total sales by large B-to-B customers in fiscal year 2014…"[53]

Mr. Orszag used 117 Excel files in what he claims are analyses of "permanent price reductions" for the "duration of the contract."[54] [55] He claims that his calculations are based on "'price change reports' cited in 'Defendant Staples' Objections and Responses to Plaintiffs' First Set of Interrogatories,' January 21, 2016."[56] However Staples' counsel was only able to confirm that 71 of the 117 files had been previously produced to the FTC.[57]

Moreover, the "price change reports" included in Orszag's analyses (and Defendant Staples' Objections and Responses to Plaintiffs' First Set of Interrogatories) were not accompanied by a data dictionary. So it is not possible to determine whether the changes in question were in fact "permanent" or "for the duration of the contract." Indeed, in some cases these data show both price decreases and price increases applying to the same SKU, for the same customer. Mr. Orszag does not determine which of these changes are "permanent" and "for the duration of the contract." He does not appear to consider the possibility that some decreases may be offset by increases, since he only examines records with decreases. For example, the comment field associated with a ████████████████████████████: "[a]djusted paper price back to

---

[51] Orszag Report, ¶150.

[52] Orszag Report, ¶152.

[53] Orszag Report, ¶151.

[54] Orszag Report, ¶151; Supplemental Backup to Orszag Report, 3-2-16. The Excel files and the programs used to process them for further analyses were not included in the Orszag Report Backup produced on February 29, 2016. They were only made available to me on March 2, 2016 after the FTC inquired about them.

[55] Mr. Orszag also analyzes "temporary price reductions." His analysis relies upon 12 Access datasets. These Access datasets and the programs used to process them for further analyses were not included in the Orszag Report Backup produced on February 29, 2016. They were only made available to me on March 2, 2016 after the FTC inquired about them. Defendant Staples' Objections and Responses to Plaintiffs' First Set of Interrogatories, January 21, 2016 did not include any Access datasets. At this time, counsel for Staples have been unable to confirm whether any of the 12 Access datasets used in this analyses have been previously produced to the FTC.

[56] Orszag Report, ¶151 and footnote 248.

[57] PX04757, (Email from Jonathan E. Cheng (Weil, Gotshal & Manges LLP) to FTC, March 7, 2016, including attachment <Orszag Report Paragraph 151.pdf>).

PX06300-022

CONFIDENTIAL MATERIAL

pre-blast level, we had agreed with the customer to hold the price increase until ▮▮▮▮ Paper price increase will be implemented on ▮▮▮▮."[58] Here, Mr. Orszag counts a temporary reprieve from a price increase as a "permanent price reduction" for the "duration of the contract."

### 2.   Mr. Orszag Does Not Restrict His Analysis to Price Changes Made Due to "Threat of Leakage"

Comment fields accompanying the data used by Mr. Orszag show that these price changes occur for a variety of reasons, including when the customer is overcharged due to data entry errors. For example, a ▮▮▮▮ record states "Decrease price to match contract terms.  Priced incorrectly after new contract put into place."[59] Likewise, a ▮▮▮▮ price was lowered in ▮▮▮▮ because "[i]ncorrect price was loaded in ▮▮▮▮."   Mr. Orszag does not remove these price changes from his analyses or otherwise isolate the price changes that were made due to the "threat of leakage."

### 3.   Mr. Orszag's 7.7% Figure Does Not Show the *Magnitude* of Price Reductions

Mr. Orszag summarizes his analyses as follows:

> These permanent price reductions occurred on products representing 7.7 percent of total sales by large B-to-B customers in fiscal year 2014 (among the products in the FTC's and Professor Shapiro's alleged relevant market).[61]

Even holding aside the problems already identified, it is important to recognize that this 7.7% figure is *not* a measure of the *magnitude* of the price decreases provided to large customers.[62] Mr. Orszag does not measure that magnitude.

Just to be clear, let me illustrate by way of an example what Mr. Orszag does and does not measure.  Suppose that a household buys $100 worth of groceries, and spends $7.70, i.e., 7.7% of the total, on milk.  Now assume that the supermarket reduces the price of milk by 10%.  This saves the household 10% on its $7.70 milk purchases, or 77¢.  This represents a decrease in the overall price of groceries of 77¢ out of $100, which is a bit less than 1%, namely 0.77%.  What Mr. Orszag reports is the equivalent of what the household spends on milk as a percentage of its total grocery bill, 7.7%, not the price reduction on milk as a percentage of the total grocery bill.

### 4.   Summary

Reading this section of the Orszag Report, one might be left with the impression that price reductions by Staples on consumable office supplies sold to large customers in response to post-contractual "leakage" have been significant as a share of what these customers spend on consumable office supplies.  That is not what the underlying data show.

---

[58] See Supplemental Backup to Orszag Report, 3-2-16, <DEP_002_1_00043918.xlsx>.

[59] See Supplemental Backup to Orszag Report, 3-2-16, <DEP_002_1_00036603.xlsx>.

[60] See Supplemental Backup to Orszag Report, 3-2-16, <DEP_002_1_00026713.xlsx>.

[61] Orszag Report, ¶151.

[62] Mr. Orszag counts a product in the 7.7% figure no matter how small the price decrease on that product was.

PX06300-023

CONFIDENTIAL MATERIAL

## G. Online and Retail Prices as a Constraint

In the Shapiro Report, I argued that large customers would not defeat a post-merger price increase by Staples by shifting a significant share of their purchases from their primary vendor to the online and retail channels. I supported this claim by showing that online and retail prices for consumable office supplies are far above the prices paid by large customers to their primary vendors. Exhibits 6A to 6F in the Shapiro Report show that online and in-stores prices average 31% to 46% higher than the prices paid by large customers (depending on whether one looks at online or retail and on whether one looks at data from Staples, Office Depot, or OfficeMax).

Mr. Orszag does not challenge these results. Nor does he provide any evidence that online and retail prices constrain the bids made during the RFP process. But he does point out in ¶51 of the Orszag Report and in his Exhibit K that the gap between contract prices and online prices varies across individual items. This variation does not alter the fact that a post-merger Staples could very significantly raise the price of many individual items, and the average price of all items, without making it attractive for large customers to shift their purchases to retail stores on online.

Exhibits R10 and R11 illustrate this point further. Exhibit R10 shows how much more each of Office Depot's large customers would pay if that customer purchased its consumable office supplies online rather than from Office Depot. On average, these customers would pay 45% more by purchasing online rather than according to their contract with Office Depot. This premium varies considerably among Office Depot's large customers. For example, the tallest bar in Exhibit R10 shows that about 14% of these customers would pay between 35% and 40% more by purchasing online. Notably, every single customer would pay at least 5% more by purchasing online than under its contract with Office Depot. Exhibit R11 performs the same analysis for OfficeMax. For OfficeMax customers, the average premium is 38%, and almost all customers [382 out of 398] would pay at least 5% more purchasing online than through their contract.

There are two additional reasons why it is unattractive for large customers to shift many of their purchases of consumable office supplies from their primary vendor to retail stores or online. First, contract sales offer a number of valuable services, including customizable product catalogs and detailed utilization reporting. Second, moving purchases off-contract may cause the customer to lose some or all of their volume discounts, a factor that is not accounted for by Mr. Orszag in his Exhibit K. In the language of economics, for a customer who is receiving a volume discount, the "marginal price" paid by the customer for buying a product under its contract is less than the contract price used by Mr. Orszag.

## H. Magnitude of Harm

In the Shapiro Report (p. 40), I estimated that W.B. Mason's COGS are ▮▮▮▮ higher than those of Office Depot and stated that "▮▮▮▮▮ figure can serve as a guide to the magnitude of post-merger price increase that Staples will be able to achieve because it will no longer be facing Office Depot as a competitor." In the attached footnote, I added: "Bargaining and auction theory predicts that the post-merger price increase at a given customer will depend on the total gap between Office Depot and the next strongest competitor for that customer. *That gap can be far larger than the COGS gap due to other disadvantages faced by W.B. Mason and other regional distributors, including their lack of national coverage*." (emphasis added)

PX06300-024

CONFIDENTIAL MATERIAL

Mr. Orszag has taken my ███ figure and treated it as an upper bound for the magnitude of a post-merger price increase by Staples, despite my express statement that the post-merger price increase "can be far larger than the COGS gap."  This is unjustified and misleading.

The source of the COGS gap underlying my ███ figure was illustrated above in Exhibit R9, which updates Exhibit 21 in the Shapiro Report.  Exhibit R9 shows the enormity of the gap in all-channel sales of consumable office supplies between Staples and Office Depot, on the one hand, and their other rivals, and the enormity of the gap between Staples and its rivals that will result if Staples is permitted to acquire Office Depot.

## 5.  Entry and Expansion

In the Shapiro Report, I concluded that entry and expansion would not be sufficient to protect large customers from the loss of competition resulting from the merger between Staples and Office Depot.  Section 6.A in the Shapiro Report discusses barriers to entry and expansion, and Section 6.B discusses Amazon Business in particular.  Appendix H to the Shapiro Report provided additional details relating to entry and expansion.

Mr. Orszag's opinion that the proposed merger between Staples and Office Depot will not harm large customers rests very heavily on his view that (1) there are no barriers to entry into the distribution of consumable office supplies to large customers, and that (2) any attempt by Staples to raise prices after the merger will be met rapidly by entry sufficient to reverse that price increase.  In this section, I address whether the evidence supports Mr. Orszag's rosy view.

Section 9 in the Horizontal Merger Guidelines states (emphasis added):

> A merger is not likely to enhance market power if entry into the market is so easy that the merged firm and its remaining rivals in the market, either unilaterally or collectively, could not profitably raise price or otherwise reduce competition compared to the level that would prevail in the absence of the merger. Entry is that easy if entry would be *timely, likely, and sufficient* in its magnitude, character, and scope to deter or counteract the competitive effects of concern.

While Mr. Orszag does not use the words "timely, likely, and sufficient" to evaluate entry, based on my reading of this report, I believe that he accepts this approach in principle.

My views on entry and expansion differ considerably from those of Mr. Orszag.  I do not believe that entry by new suppliers, or expansion by existing market participants, would be timely, likely, and sufficient to deter or counteract a post-merger price increase by Staples.  I stand by this statement from the Shapiro Report: "In the current case, the 'sufficiency' requirement is especially important due to the fact that the firm being eliminated from the market as an independent competitor, Office Depot, has such a large market share in the relevant market."[63]

My conclusions regarding entry differ from those of Mr. Orszag for three distinct reasons:

- We differ in how we evaluate the presence or absence of barriers to entry;

---

[63] Shapiro Report, p. 43.

PX06300-025

CONFIDENTIAL MATERIAL

- We differ regarding the evidence we consider adequate to establish that entry would be timely, likely, and sufficient; and

- We differ in how we read the record regarding Amazon Business and other suppliers.

I now address these points in turn.

## A. Barriers to Entry and Expansion

In Section V.B of his report, ¶¶67-81, Mr. Orszag asserts that there are no meaningful barriers to entry or expansion in the distribution of consumable office supplies to large customers. In reaching this conclusion, he adopts a very narrow definition of what constitutes a barrier to entry.

My analysis of entry and expansion asks whether entry and expansion will be timely, likely, and sufficient to protect customers from the loss of competition caused by the merger. Ultimately, this is an empirical and practical question: would enough other suppliers make the investments necessary to enter and/or expand in response to a small post-merger price increase by Staples so as to replace the lost competition from Office Depot? Under my approach, anything that would make such investments risky and unprofitable is pertinent to this real-world analysis and can reasonably be labeled as a barrier to entry.

In the Shapiro Report, I identified several significant entry barriers, including the COGS cost disadvantage that smaller firms would face in competing against Staples, the need to invest in information technology to serve the needs of large customers, the strong tendency of large customers to stick with their incumbent supplier, and the cost and risk of building out a distribution system in large parts of the country. The testimony from many suppliers, who are best placed to understand the costs and risks associated with entry and expansion, confirms that these are indeed very real and significant obstacles to entry and expansion.

Mr. Orszag takes a sharply different approach. He has a far narrower view of what constitutes a barrier to entry or expansion. More specifically, he only sees barriers to entry or expansion if entry and expansion require key assets that are *unavailable*.

- Section V.B.1 in the Orszag Report presents evidence that distributors other than Staples sell some of the same popular items that Staples sells and thus (¶68) "that other sellers have access to the same manufacturers as do Staples and Office Depot." But this section does not address the COGS disadvantage faced by Staples' far smaller rivals.

- Section V.B.2 asserts that other key inputs are generally available. But this section also does not address the cost disadvantages faced by Staples' far smaller rivals. Nor does Mr. Orszag discuss the magnitude of investment required to compete effectively with Staples, or the risks associated with building the necessary IT systems or distribution infrastructure.

- In Section V.B.2 Mr. Orszag writes:

    In sum, neither the FTC nor Professor Shapiro has identified any input or asset (and I am not aware of any input or asset) held by Staples and Office Depot, *which is not similarly available* to other actual and potential competitors, and which these competitors *could not acquire if necessary* to expand or reposition themselves in the market. Put differently, there is no "secret sauce" possessed by

PX06300-026

CONFIDENTIAL MATERIAL

> Staples and Office Depot that creates a barrier to entry or expansion by
> competitors. In the absence of such barriers to entry, any attempt by the combined
> Staples and Office Depot to raise prices after the Transaction will be stymied by
> competing firms that enter or expand in order to compete and offer lower prices.[64]

Mr. Orszag's narrow definition of "barrier to entry" is not well suited to answering the question of whether entry will be timely, likely, and sufficient to protect customers from the loss of competition caused by the merger. Under Mr. Orszag's approach, a merger to monopoly would be perfectly acceptable so long as other suppliers could acquire the assets necessary to compete, without asking whether such investments would be profitable and likely to be made in a timely fashion leading to competitors strong enough to prevent a price increase. Under this view of the world, the stock market value of most firms would be little more than what they paid to acquire assets: goodwill and other intangible assets would be of little or no value. That is not the real world, and the participants in this industry know it.

## B. *Lack of Financial Analysis of Entry or Expansion*

Mr. Orszag has provided no financial analysis in support of his assertion that many suppliers would enter or expand in response to a small post-merger price increase by Staples.

Mr. Orszag states: "But a hypothetical price increase would sharpen the incentives to invest in whatever deliver [sic] or computer assets are necessary, since there are more profit opportunities for them to achieve. If, by investing in whatever delivery or computer assets Professor Shapiro believes it lacks, a potential rival could gain even a five percentage point increase in market share, it would be able to obtain millions of dollars in additional profits."[65]

So far as I am able to ascertain, this assertion is entirely lacking in empirical support. Nowhere does Mr. Orszag discuss the magnitude of investment required, the time needed to put in place the necessary capabilities, how the entrant would overcome customer switching costs or other obstacles, or how Staples would respond to such entry or expansion.

## C. *Amazon Business*

Section 6.B in the Shapiro Report, pp. 46-52, is devoted to Amazon Business. The first paragraph in this section states:

> I have considered whether Amazon is likely to significantly expand its presence in
> the relevant market in response to a 5% to 10% post-merger price increase by
> Staples. Such expansion would require Amazon to gain the capability to provide
> the level of service necessary to be the prime vendor for large customers and thus
> to participate effectively in RFPs for large customers.

In the Shapiro Report, I observed that the win-loss data from Staples and Office Depot, and the data from RFPs issued by Fortune 100 companies, both showed that Amazon Business was not yet a meaningful competitor in the relevant market.

---

[64] Orszag Report, ¶74, emphasis added.

[65] Orszag Report, ¶73.

PX06300-027

CONFIDENTIAL MATERIAL

Of course, I recognize that Amazon is a very impressive company. I also was well aware that Amazon Business launched quite recently, in 2015. I therefore looked closely at the statements made by Amazon itself regarding the current capabilities of Amazon Business and its plans to make the investments necessary to serve large customers. I concluded that it was unlikely that Amazon Business would replace Office Depot as a strong competitor to Staples in the relevant market in the foreseeable future, by which I mean the next two to three years.

### 1. Orszag Report

Mr. Orszag discusses Amazon Business at some length in Section V.C.3 of his report. As with market definition and market shares, again Mr. Orszag is asking rather different questions than I am asking, and getting very different answers than I get. For example, he reports his understanding that "Amazon Business had forecasted sales of ████████ by 2020 at *current market prices*."[66]

However, the record shows that this estimate is not about sales in the relevant market, but rather sales of all products to all B2B customers, and has since been walked back by Amazon.[67] A more recent document shows an estimated ████████ in sales of consumable office supplies in 2017.[68] I have looked at the investments Amazon would need to make to win RFPs for consumable office supplies from large customers, whether and when Amazon is currently planning to make those investments, and whether and when it would be likely to make those investments in response to a 5% to 10% post-merger price increase by Staples. In the end, I believe that Mr. Orszag and I reach different conclusions largely because we apply different standards to what constitutes "timely, likely, and sufficient" entry, not because we have different views about Amazon's capabilities or the current, very limited role of Amazon Business in the relevant market.

### 2. Mendelson Report

I also have reviewed the expert report submitted by Professor Haim Mendelson, which is devoted entirely to Amazon Business. Professor Mendelson states in ¶9 of his report:

> I was asked by counsel to analyze whether Amazon Business presents a meaningful competitive constraint on a combined Staples/Office Depot.

The Mendelson Report presents no evidence showing that Amazon Business has been a meaningful constraint to Staples and Office Depot for any of the large customers at issue here. My analysis of unilateral competitive effects clearly establishes that Amazon Business in fact has *not* been a meaningful competitive constraint on Staples and Office Depot in their bidding to become the primary vendor of consumable office supplies for large customers. Testimony from

---

[66] Orszag Report ¶115, emphasis in original.



PX06300-028

CONFIDENTIAL MATERIAL

Amazon and from large customers confirms that conclusion. Nothing in the Mendelson Report challenges that analysis.

Taken at face value, I tend to agree with each of the summary opinions that Professor Mendelson expresses in ¶¶11-14. Yes, "digitization has revolutionized the American marketplace and altered the competitive landscape across industries." (¶11) Yes, Amazon has a "storied history of outperforming competitors on price, selection, and convenience." (¶12) Yes, I agree that "no company is better positioned to bring the 'Amazon experience' to Business to Business (B2B) than Amazon itself," (¶13) although this borders on tautology. Yes indeed, "Amazon is currently a competitor to Staples and Office Depot in selling office products, including office supplies and paper, to businesses of all sizes." (¶14) I counted Amazon as a market participant in my report.

But all of these opinions are detached from the analysis of entry that economists normally do in merger cases. Professor Mendelson simply does not address the crucial "timely, likely, and sufficient" aspects of entry analysis. Furthermore, I must note that virtually none of the evidence he cites actually involves sales made by Amazon Business *in the relevant market in this case*.

Section VI of the Mendelson Report (¶¶74-95) is entitled "Professor Shapiro Incorrectly Dismisses Amazon Business as a Competitive Threat to Staples and Office Depot." I now respond to Professor Mendelson's assertion that my entry analysis is "incorrect."

- Professor Mendelson criticizes me (¶74) for using bid data for 2012-2015 to evaluate the competitive significant of Amazon Business in the relevant market. He points out that Amazon Business only launched in April 2015 and states that "Amazon does not need to win bids in order to compete for large B2B customers and constrain Staples' and Office Depot's (and others') pricing."

  I certainly did not rely on bid data alone to reach my conclusions about Amazon Business. The whole point of an entry and expansion analysis is to look beyond historical sales to assess what would happen in response to a post-merger price increase. Some of the best evidence comes from would-be entrants themselves. On pp. 47-50 in the Shapiro Report I quote Mr. Wilson from Amazon extensively.

  

- Professor Mendelson quotes the dubious ███████ figure noted above for ███ . (¶75)

- Professor Mendelson argues (¶¶76-82) that Amazon Business is growing, that Amazon Business will inherit some of Amazon's general capabilities, and that Amazon Business currently is a "viable and legitimate alternative for companies." Perhaps, but this is simply not the type of focused, detailed analysis of entry or expansion in the relevant market that one expects to see in a merger case. I certainly do not agree that these general observations show that my analysis is "incorrect."

PX06300-029

CONFIDENTIAL MATERIAL

- Professor Mendelson next (¶83) quotes the following statement from the Shapiro Report: "Whether Amazon will become a meaningful competitor for large businesses, and if so when, is uncertain." He follows this immediately (¶84) with the following sentence: "As discussed above, that large customers have not yet selected Amazon Business as their primary vendor is of no moment." Well, this fact is of considerable moment to the large customers themselves, to me, and I would hope to the Court as well.

### D. Direct Evidence from W.B. Mason and Other Suppliers

There is considerable evidence from the suppliers themselves that they would face significant obstacles to expanding and that they have no plans to do so in the foreseeable future, even if Staples were to raise prices by 5% following its acquisition of Office Depot.

Mr. Orszag's confidence that entry and expansion will occur in response to a post-merger price increase by Staples stands in sharp contrast to this evidence. See Appendix E for the details on regional suppliers, cooperatives, adjacents, and manufacturers.

Because Mr. Orszag uses W.B. Mason as his lead example of a firm he believes would expand in response to a post-merger price increase by Staples,[69] I highlight here the key points regarding W.B. Mason that are discussed in Appendix E.



## 6. Efficiencies

In the Shapiro Report I stated:

> An otherwise anti-competitive merger can generate sufficient efficiencies to benefit customers. There are three essential requirements for this to occur, as explained in Section 10 of the Horizontal Merger Guidelines:
>
> **1. Merger-Specific**: "The Agencies credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects. These are termed merger-specific efficiencies."

---

[69] Orszag Report, ¶ 86.

[70] Orszag Report, ¶ 85.

PX06300-030

CONFIDENTIAL MATERIAL

**2. Verifiable:** "Efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means. … Cognizable efficiencies are merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service."

**3. Benefit Customers**: "The Agencies will not challenge a merger if cognizable efficiencies are of a character and magnitude such that the merger is not likely to be anticompetitive in any relevant market.  To make the requisite determination, the Agencies consider whether cognizable efficiencies likely would be sufficient to reverse the merger's potential to harm customers in the relevant market, e.g., by preventing price increases in the relevant market."  [footnotes omitted]

I have now reviewed the Expert Report of Mr. Paul Anderson.  I understand that Professor Mark Zmijewski does not believe that Staples and Office Depot have verified their efficiency claims or established that they are merger-specific.  I offer no opinion on those issues.

To the extent that the efficiency claims put forward by Staples and Office Depot are found to be verified and merger-specific, I remain skeptical that they would be passed through to large customers to any meaningful degree.  The basis for my skepticism is explained in the Shapiro Report at p. 53.  The Orszag Report has not given me any reason to become less skeptical about pass-through to large customers.

The substantial majority of the efficiency claims put forward by Staples and Office Depot are outside the relevant market.  Mr. Orszag suggests that these claimed out-of-market efficiencies should be counted because they are "inextricably linked" to the relevant market.[71]  As far as I can determine, however, neither Mr. Anderson nor Mr. Orszag has provided analysis showing that the out-of-market efficiencies claimed by Staples and Office Depot are "inextricably linked" to the relevant market.  I offer no opinion on that issue.

## 7.  Proposed Divestiture

In Section 8 of the Shapiro Report I discuss the divestitures that Staples and Office Depot have proposed to "fix" their proposed merger.  At the time I filed that report, I had access to a Draft Asset Purchase Agreement between Staples and Essendant dated February 2, 2016.

I now have access to the Asset Purchase Agreement executed between Staples and Essendant on February 16, 2016.[72]  There remains considerable uncertainty about the scope of contracts that cannot be transferred without customer consent, [73] and about Essendant's ability to fulfill those

---

[71] Orszag Report, ¶¶ 217-21.

[72] PX07302 (Staples, Asset Purchase Agreement between Staples, Inc. and Essendant Co., February 16, 2016) (hereinafter "APA").

[73]

PX06300-031

CONFIDENTIAL MATERIAL

contracts without extensive and ongoing support for years from Staples.[74] I also understand that Staples and Essendant have not yet signed a transition services agreement.[75]

Overall, the new information available to me about the proposed divestiture does not alter my conclusion that proposed "fix" is inadequate to restore the competition that will be lost if Staples is permitted to acquire Office Depot.

---

[74] PX02162 (Komola (Staples) Draft Dep. Tr.) at 122, 127-31, 153-58, 166.

[75] PX07302 (APA) at 030-031; PX02162 (Komola (Staples) Draft Dep. Tr.) at 183-84, 186.

PX06300-032

_Carl Shapiro_                    _March 10, 2016_

Carl Shapiro                      Date

PX06300-033

**Exhibit R1A**

## Staples and Office Depot Shares of Consumable Office Supplies Purchases

*Fortune 100 CID Responses, 2014*

| Customer | Total Purchases | Staples | | Office Depot | | Staples & Office Depot | |
|---|---|---|---|---|---|---|---|
| | | $ Purchases | % Share | $ Purchases | % Share | $ Purchases | % Share |
| | 33,208,483 | 28,960,621 | 87% | 13,718 | 0% | 28,974,338 | 87% |
| | 29,697,455 | 8,111,568 | 27% | 6,176,317 | 21% | 14,287,885 | 48% |
| | 21,347,164 | 21,334,333 | 100% | 12,830 | 0% | 21,347,164 | 100% |
| | 21,232,578 | 1,034 | 0% | 18,053,298 | 85% | 18,054,331 | 85% |
| | 15,523,359 | 23,420 | 0% | 15,499,939 | 100% | 15,523,359 | 100% |
| | 15,204,504 | 13,837,593 | 91% | 23,387 | 0% | 13,860,981 | 91% |
| | 12,680,012 | 71 | 0% | 12,679,941 | 100% | 12,680,012 | 100% |
| | 11,661,607 | 3,962 | 0% | 28,688 | 0% | 32,650 | 0% |
| | 10,586,647 | 9,818,140 | 93% | 651,782 | 6% | 10,469,922 | 99% |
| | 10,500,061 | 3,599,373 | 34% | 7,734 | 0% | 3,607,107 | 34% |
| | 10,412,296 | 70 | 0% | 9,891,681 | 95% | 9,891,751 | 95% |
| | 10,374,535 | 9,587,819 | 92% | 208,639 | 2% | 9,796,458 | 94% |
| | 8,601,929 | 119,399 | 1% | 8,318,065 | 97% | 8,437,465 | 98% |
| | 8,403,405 | 5,828,013 | 69% | 1,740,407 | 21% | 7,568,419 | 90% |
| | 8,187,286 | 8,174,079 | 100% | 13,207 | 0% | 8,187,286 | 100% |
| | 8,052,504 | 2,365,522 | 29% | 5,306,919 | 66% | 7,672,441 | 95% |
| | 7,177,838 | 709,144 | 10% | 3,111,888 | 43% | 3,821,033 | 53% |
| | 7,123,072 | 28,427 | 0% | 3,904,292 | 55% | 3,932,719 | 55% |
| | 6,459,928 | 5,880,002 | 91% | 1,455 | 0% | 5,881,458 | 91% |
| | 6,373,203 | 47,929 | 1% | 2,059,016 | 32% | 2,106,945 | 33% |
| | 6,284,727 | 4,972,648 | 79% | 262,079 | 4% | 5,234,727 | 83% |
| | 6,133,098 | 5,425,902 | 88% | 461,871 | 8% | 5,887,774 | 96% |
| | 5,942,647 | 2,565,276 | 43% | 55,721 | 1% | 2,620,998 | 44% |
| | 5,251,204 | 5,194,029 | 99% | 12,815 | 0% | 5,206,843 | 99% |
| | 5,084,100 | 4,040,360 | 79% | 125,205 | 2% | 4,165,565 | 82% |
| | 4,991,933 | 4,422,853 | 89% | 116,570 | 2% | 4,539,423 | 91% |
| | 4,704,830 | 151,010 | 3% | 4,327,058 | 92% | 4,478,068 | 95% |
| | 4,421,490 | 2,385,544 | 54% | 2,035,946 | 46% | 4,421,490 | 100% |
| | 4,094,776 | 2,977,847 | 73% | 32,929 | 1% | 3,010,776 | 74% |
| | 4,014,416 | 4,887 | 0% | 4,009,529 | 100% | 4,014,416 | 100% |
| | 3,984,803 | 1,691 | 0% | 3,969,717 | 100% | 3,971,408 | 100% |
| | 3,885,755 | 2,414,850 | 62% | 2,769 | 0% | 2,417,619 | 62% |
| | 3,787,637 | 566,077 | 15% | 1,197 | 0% | 567,274 | 15% |
| | 3,745,051 | 3,242 | 0% | 3,741,809 | 100% | 3,745,051 | 100% |
| | 3,704,657 | 111,207 | 3% | 2,730,839 | 74% | 2,842,046 | 77% |
| | 3,404,809 | 40,751 | 1% | 3,364,058 | 99% | 3,404,809 | 100% |
| | 3,401,491 | 3,394,641 | 100% | 6,850 | 0% | 3,401,491 | 100% |
| | 3,397,974 | 662,270 | 19% | 1,374,696 | 40% | 2,036,966 | 60% |
| | 3,339,049 | 2,125,217 | 64% | 7,717 | 0% | 2,132,934 | 64% |

CONFIDENTIAL MATERIAL

PX06300-034

**Exhibit R1A**

| Customer | Total Purchases | Staples | | Office Depot | | Staples & Office Depot | |
|---|---|---|---|---|---|---|---|
| | | $ Purchases | % Share | $ Purchases | % Share | $ Purchases | % Share |
| | 3,269,213 | 2,456,707 | 75% | 52,407 | 2% | 2,509,114 | 77% |
| | 3,259,704 | - | 0% | 2,323,039 | 71% | 2,323,039 | 71% |
| | 3,246,665 | 336 | 0% | 2,871,785 | 88% | 2,872,122 | 88% |
| | 3,214,907 | 2,571,925 | 80% | 78,275 | 2% | 2,650,201 | 82% |
| | 3,060,271 | 30,262 | 1% | 2,907,257 | 95% | 2,937,519 | 96% |
| | 2,841,975 | 2,443,485 | 86% | 96,084 | 3% | 2,539,568 | 89% |
| | 2,579,379 | 2,480,159 | 96% | 99,219 | 4% | 2,579,379 | 100% |
| | 2,544,683 | 2,493,543 | 98% | 50,701 | 2% | 2,544,245 | 100% |
| | 2,516,367 | 2,515,644 | 100% | 723 | 0% | 2,516,367 | 100% |
| | 2,464,698 | 2,455,302 | 100% | 1,698 | 0% | 2,457,000 | 100% |
| | 2,456,950 | 1,834,136 | 75% | 325,067 | 13% | 2,159,204 | 88% |
| | 2,317,204 | 2,201,344 | 95% | 4,050 | 0% | 2,205,393 | 95% |
| | 2,267,470 | 2,138,532 | 94% | 91,891 | 4% | 2,230,422 | 98% |
| | 2,169,965 | 2,155,914 | 99% | 14,051 | 1% | 2,169,965 | 100% |
| | 2,156,250 | 918 | 0% | 2,079,474 | 96% | 2,080,392 | 96% |
| | 2,151,340 | 1,965,160 | 91% | 4,886 | 0% | 1,970,046 | 92% |
| | 2,147,641 | 1,609,707 | 75% | 103,683 | 5% | 1,713,389 | 80% |
| | 2,046,349 | 1,760,877 | 86% | 239,759 | 12% | 2,000,636 | 98% |
| | 1,984,626 | 14,085 | 1% | 1,970,541 | 99% | 1,984,626 | 100% |
| | 1,953,016 | 778,116 | 40% | - | 0% | 778,116 | 40% |
| | 1,860,697 | 950,196 | 51% | 358,628 | 19% | 1,308,824 | 70% |
| | 1,764,496 | 8,540 | 0% | 1,711,562 | 97% | 1,720,101 | 97% |
| | 1,747,441 | 825,628 | 47% | 281,912 | 16% | 1,107,540 | 63% |
| | 1,704,325 | 14,391 | 1% | 1,475,009 | 87% | 1,489,400 | 87% |
| | 1,663,770 | 1,659,336 | 100% | 1,153 | 0% | 1,660,489 | 100% |
| | 1,651,618 | 1,651,618 | 100% | - | 0% | 1,651,618 | 100% |
| | 1,457,185 | 1,207,220 | 83% | 249,965 | 17% | 1,457,185 | 100% |
| | 1,142,125 | 856,593 | 75% | 55,253 | 5% | 911,847 | 80% |
| | 1,119,218 | 596,223 | 53% | 25,655 | 2% | 621,878 | 56% |
| | 1,110,408 | 1,095,503 | 99% | 2,655 | 0% | 1,098,158 | 99% |
| | 1,106,684 | 972,671 | 88% | 225 | 0% | 972,896 | 88% |
| | 1,053,974 | 983,130 | 93% | 70,844 | 7% | 1,053,974 | 100% |
| | 995,270 | 16,016 | 2% | 979,254 | 98% | 995,270 | 100% |
| | 959,883 | 53 | 0% | 959,829 | 100% | 959,883 | 100% |
| | 910,981 | 695 | 0% | 651,866 | 72% | 652,561 | 72% |
| | 852,429 | 500,929 | 59% | 351,500 | 41% | 852,429 | 100% |
| | 815,288 | 382 | 0% | 751,706 | 92% | 752,088 | 92% |

CONFIDENTIAL MATERIAL

**Exhibit R1A**

| Customer | Total Purchases | Staples | | Office Depot | | Staples & Office Depot | |
|---|---|---|---|---|---|---|---|
| | | $ Purchases | % Share | $ Purchases | % Share | $ Purchases | % Share |
| | 679,633 | - | 0% | 467,133 | 69% | 467,133 | 69% |
| | 526,093 | 420,835 | 80% | 2,855 | 1% | 423,690 | 81% |
| | 347,479 | 46,008 | 13% | - | 0% | 46,008 | 13% |
| | 342,703 | 280 | 0% | 342,423 | 100% | 342,703 | 100% |
| | 187,887 | 107,436 | 57% | 80,451 | 43% | 187,887 | 100% |
| **Total - All Included CIDs** | **421,030,572** | **203,710,658** | **48%** | **136,477,051** | **32%** | **340,187,709** | **81%** |
| **Total - Top 40 Ranked by Total Spend** | **349,651,525** | **162,347,531** | **46%** | **114,394,986** | **33%** | **276,742,517** | **79%** |
| **Total - Bottom 41 Ranked by Total Spend** | **71,379,047** | **41,363,127** | **58%** | **22,082,064** | **31%** | **63,445,192** | **89%** |

CONFIDENTIAL MATERIAL

PX06300-036



CONFIDENTIAL MATERIAL

**Exhibit R1B**

# Market Shares by Supplier

*Fortune 100 Customers, 2014*

| Supplier Name | Count of F100 | $ Purchases | % Share |
|---|---|---|---|
| STAPLES | 79 | $203,710,658 | 47.3% |
| OFFICE DEPOT | 78 | $136,477,051 | 31.7% |
| VERITIV-UNISOURCE-XPEDX | 17 | $22,223,259 | 5.2% |
| GEORGIA PACIFIC | 1 | $6,740,000 | 1.6% |
| DOMTAR | 8 | $3,361,399 | 0.8% |
| LINDENMEYR | 7 | $2,136,581 | 0.5% |
| AMERICAN PRODUCT DISTRIBUTORS | 1 | $1,660,756 | 0.4% |
| NELMAR | 3 | $1,660,233 | 0.4% |
| ULINE | 21 | $1,596,850 | 0.4% |
| RUNCO | 1 | $1,475,537 | 0.3% |
| GRAINGER | 18 | $1,337,880 | 0.3% |
| AMAZON | 8 | $1,131,860 | 0.3% |
| XEROX | 2 | $1,098,208 | 0.3% |
| COIN-TAINER | 1 | $1,011,186 | 0.2% |
| ARCTIC OFFICE | 4 | $847,794 | 0.2% |
| WHITLOCK BUSINESS SYSTEMS | 1 | $787,265 | 0.2% |
| TAYLOR CORPORATION | 1 | $760,082 | 0.2% |
| W.B. MASON | 12 | $749,105 | 0.2% |
| GESTION DACHATS RAM | 1 | $620,674 | 0.1% |
| MILLER OFFICE | 5 | $542,165 | 0.1% |
| INDUSTRIES FOR THE BLIND | 1 | $536,176 | 0.1% |
| OFFICE ESSENTIALS | 1 | $499,786 | 0.1% |
| RR DONNELLEY | 6 | $478,834 | 0.1% |
| FACSIMILE PAPER CONNECTION | 2 | $329,422 | 0.1% |
| INTERNATIONAL PAPER | 5 | $270,400 | 0.1% |
| OTHER - specified suppliers | | $19,273,112 | 4.5% |
| OTHER - supplier not specified | | $9,714,296 | 2.3% |
| Unreported leakage adjustment | | $9,519,097 | 2.2% |
| **Total** | | **$430,549,669** | **100.0%** |
| **Staples and Office Depot** | | **$340,187,709** | **79.0%** |

CONFIDENTIAL MATERIAL

**Exhibit R1B**



CONFIDENTIAL MATERIAL

PX06300-039

**Exhibit R1B**



CONFIDENTIAL MATERIAL

PX06300-040

**Exhibit R2**

## Primary Vendor Relationships

*Consumable Office Supplies, 2014*

| Supplier | Sales | Customer Count | Shares |
|---|---|---|---|
| Office Depot | $924,256,982 | 587 | 45.1% |
| Staples | $873,219,854 | 529 | 42.6% |
| | $77,274,000 | 38 | 3.8% |
| | $65,557,363 | 15 | 3.2% |
| | $19,081,752 | 19 | 0.9% |
| | $15,024,355 | 10 | 0.7% |
| | $12,200,000 | 2 | 0.6% |
| | $10,371,447 | 5 | 0.5% |
| | $9,843,000 | 2 | 0.5% |
| | $7,345,863 | 2 | 0.4% |
| | $7,150,000 | 3 | 0.3% |
| | $6,213,871 | 5 | 0.3% |
| | $4,050,000 | 7 | 0.2% |
| | $2,210,615 | 4 | 0.1% |
| | $1,994,727 | 2 | 0.1% |
| | $1,794,816 | 2 | 0.1% |
| | $1,570,311 | 2 | 0.1% |
| | $1,440,025 | 2 | 0.1% |
| | $1,423,862 | | 0.1% |
| | $1,357,722 | 1 | 0.1% |
| | $1,313,327 | 2 | 0.1% |
| | $1,071,715 | 1 | 0.1% |
| | $1,060,067 | 2 | 0.1% |
| | $1,037,654 | 2 | 0.1% |
| | $1,017,628 | 1 | 0.0% |
| | $672,164 | 1 | 0.0% |
| | $592,464 | 1 | 0.0% |
| | $568,265 | 1 | 0.0% |
| | $568,181 | 1 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| Staples + Office Depot | $1,797,476,836 | | 87.6% |
| *Total* | *$2,051,282,031* | | *100.0%* |

CONFIDENTIAL MATERIAL

PX06300-041

**Exhibit R2**



CONFIDENTIAL MATERIAL

PX06300-042

**Exhibit R3A**

## Core Market Shares by Supplier

*Fortune 100 Customers, 2014*

| Supplier Name | Count of F100 | Paper Adj.=46% | | Paper Adj.=33% | |
|---|---|---|---|---|---|
| | | $ Purchases | % Share | $ Purchases | % Share |
| STAPLES | 78 | $103,374,565 | 48.4% | $103,519,524 | 46.9% |
| OFFICE DEPOT | 78 | $81,814,717 | 38.3% | $81,955,204 | 37.1% |
| OTHER - specified suppliers | | $18,043,210 | 8.4% | $22,385,484 | 10.1% |
| OTHER - supplier not specified | | $5,192,843 | 2.4% | $6,442,971 | 2.9% |
| Unreported leakage adjustment | | $5,140,312 | 2.4% | $6,377,795 | 2.9% |
| **Total** | | **$213,565,647** | **100.0%** | **$220,680,979** | **100.0%** |
| **Staples and Office Depot** | | **$185,189,282** | **86.7%** | **$185,474,728** | **84.0%** |



**Exhibit R3A**



CONFIDENTIAL MATERIAL

PX06300-044

**Exhibit R3A**

CONFIDENTIAL MATERIAL

PX06300-045

**Exhibit R3B**

## Paper Market Shares by Supplier

*Fortune 100 Customers, 2014*

| Supplier Name | Count of F100 | Paper Adj.=46% | | Paper Adj.=33% | |
|---|---|---|---|---|---|
| | | $ Purchases | % Share | $ Purchases | % Share |
| STAPLES | 75 | $100,336,093 | 46.2% | $100,191,134 | 47.7% |
| OFFICE DEPOT | 77 | $54,662,333 | 25.2% | $54,521,846 | 26.0% |
| VERITIV-UNISOURCE-XPEDX | 17 | $22,196,369 | 10.2% | $22,189,896 | 10.6% |
| GEORGIA PACIFIC | 1 | $6,740,000 | 3.1% | $6,740,000 | 3.2% |
| DOMTAR | 8 | $3,361,399 | 1.5% | $3,361,399 | 1.6% |
| LINDENMEYR | 7 | $2,123,589 | 1.0% | $2,120,461 | 1.0% |
| OTHER - specified suppliers | | $18,664,001 | 8.6% | $14,331,327 | 6.8% |
| OTHER - supplier not specified | | $4,521,454 | 2.1% | $3,271,325 | 1.6% |
| Unreported leakage adjustment | | $4,378,785 | 2.0% | $3,141,302 | 1.5% |
| **Total** | | **$216,984,022** | **100.0%** | **$209,868,690** | **100.0%** |
| **Staples and Office Depot** | | **$154,998,426** | **71.4%** | **$154,712,980** | **73.7%** |



CONFIDENTIAL MATERIAL

PX06300-046

**Exhibit R3B**



CONFIDENTIAL MATERIAL

PX06300-047

**Exhibit R3B**



CONFIDENTIAL MATERIAL

PX06300-048

**Exhibit R4A**

## Primary Vendor Relationships

*Consumable Office Supplies Excluding Paper, 2014*

| Supplier | Sales | Customer Count | Shares |
|---|---|---|---|
| Office Depot | $529,474,227 | 581 | 50.8% |
| Staples | $449,529,140 | 529 | 43.2% |
| | $10,574,279 | 19 | 1.0% |
| | $9,755,109 | 5 | 0.9% |
| | $7,563,799 | 10 | 0.7% |
| | $6,639,733 | 2 | 0.6% |
| | $5,386,967 | 2 | 0.5% |
| | $4,805,117 | 5 | 0.5% |
| | $3,820,755 | 7 | 0.4% |
| | $1,559,105 | 2 | 0.1% |
| | $1,376,347 | 4 | 0.1% |
| | $1,257,205 | | 0.1% |
| | $1,175,301 | 1 | 0.1% |
| | $1,162,176 | 2 | 0.1% |
| | $1,013,275 | 2 | 0.1% |
| | $952,138 | 2 | 0.1% |
| | $880,107 | 2 | 0.1% |
| | $791,318 | 2 | 0.1% |
| | $672,164 | 1 | 0.1% |
| | $638,899 | 2 | 0.1% |
| | $583,271 | 1 | 0.1% |
| | $580,499 | 1 | 0.1% |
| | $446,704 | 1 | 0.0% |
| | $422,157 | 1 | 0.0% |
| | $351,220 | 1 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| Staples + Office Depot | $979,003,366 | | **94.0%** |
| *Total* | *$1,041,411,011* | | *100.0%* |

CONFIDENTIAL MATERIAL

PX06300-049

**Exhibit R4A**



CONFIDENTIAL MATERIAL

**Exhibit R4B**

## Primary Vendor Relationships

*Paper, 2014*

| Supplier | Sales | Customer Count | Shares |
|---|---|---|---|
| Staples | $423,690,714 | 529 | 42.0% |
| Office Depot | $394,782,756 | 587 | 39.1% |
| | $77,274,000 | 38 | 7.7% |
| | $65,557,363 | 15 | 6.5% |
| | $9,843,000 | 2 | 1.0% |
| | $8,507,473 | 19 | 0.8% |
| | $7,460,556 | 10 | 0.7% |
| | $7,150,000 | 3 | 0.7% |
| | $5,560,267 | 2 | 0.6% |
| | $1,958,897 | 2 | 0.2% |
| | $1,408,753 | 5 | 0.1% |
| | $981,452 | 2 | 0.1% |
| | $834,268 | 4 | 0.1% |
| | $690,204 | 2 | 0.1% |
| | $616,338 | 5 | 0.1% |
| | $488,445 | 1 | 0.0% |
| | $487,887 | 2 | 0.0% |
| | $437,129 | 1 | 0.0% |
| | $398,754 | 2 | 0.0% |
| | $268,749 | 2 | 0.0% |
| | $235,711 | 2 | 0.0% |
| | $229,245 | 7 | 0.0% |
| | $216,961 | 1 | 0.0% |
| | $182,421 | 1 | 0.0% |
| | $170,307 | 1 | 0.0% |
| | $166,657 | | 0.0% |
| | $151,152 | 2 | 0.0% |
| | $121,561 | 1 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| Staples + Office Depot | $818,473,470 | | 81.0% |
| *Total* | *$1,009,871,020* | | *100.0%* |

CONFIDENTIAL MATERIAL

PX06300-051

**Exhibit R4B**

*Notes:*



CONFIDENTIAL MATERIAL

PX06300-052

**Exhibit R5**

## Primary Vendor Relationships

*Consumable Office Supplies ($250K Threshold), 2014*

| Supplier | Sales | Customer Count | Shares |
|---|---|---|---|
| Office Depot | $1,117,990,930 | 1144 | 45.1% |
| Staples | $1,055,215,815 | 1057 | 42.6% |
| | $77,274,000 | 38 | 3.1% |
| | $67,939,105 | 23 | 2.7% |
| | $33,882,392 | 62 | 1.4% |
| | $18,157,432 | 20 | 0.7% |
| | $12,200,000 | 2 | 0.5% |
| | $12,026,157 | 10 | 0.5% |
| | $10,800,000 | 34 | 0.4% |
| | $9,843,000 | 2 | 0.4% |
| | $7,823,543 | 10 | 0.3% |
| | $7,345,863 | 2 | 0.3% |
| | $7,150,000 | 3 | 0.3% |
| | $5,526,644 | 13 | 0.2% |
| | $3,783,163 | 8 | 0.2% |
| | $3,039,913 | 8 | 0.1% |
| | $2,791,572 | 7 | 0.1% |
| | $2,674,093 | 5 | 0.1% |
| | $2,537,040 | 4 | 0.1% |
| | $2,522,968 | 7 | 0.1% |
| | $2,203,645 | 4 | 0.1% |
| | $2,170,641 | 5 | 0.1% |
| | $2,040,207 | 3 | 0.1% |
| | $1,994,727 | 2 | 0.1% |
| | $1,877,732 | 5 | 0.1% |
| | $1,423,862 | | 0.1% |
| | $1,120,019 | 3 | 0.0% |
| | $1,060,067 | 2 | 0.0% |
| | $752,000 | 2 | 0.0% |
| | $592,464 | 1 | 0.0% |
| | $530,636 | 2 | 0.0% |
| | $361,159 | 1 | 0.0% |
| | $347,048 | 1 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| | $0 | 0 | 0.0% |
| Staples + Office Depot | $2,173,206,745 | | **87.7%** |
| *Total* | *$2,476,997,835* | | *100.0%* |

**Exhibit R5**

*Notes:*



CONFIDENTIAL MATERIAL

PX06300-054

**Exhibit R6**

# Market Concentration Measures

*Fortune 100 Customers, 2014*

| Measure | Value |
|---|---|
| **Pre-Merger:** | |
| Staples Share | 47% |
| Office Depot Share | 32% |
| HHI | 3,274 |
| | |
| **Post-Merger:** | |
| Staples & Office Depot Share | 79% |
| HHI | 6,274 |
| **Increase in HHI** | **3,000** |

*Notes:*

[1] 

PX06300-055

**Exhibit R6**



CONFIDENTIAL MATERIAL

**Exhibit R7A**

## Bidder Appearances: Consumable Office Supplies Opportuntities

*Fortune 100 Customers, 2012-2015 (N = 52)*

| Competitor | Total Appearances | | Appearances as Incumbent | | Appearances as Winner | |
|---|---|---|---|---|---|---|
| | Count | Share of Bids | Count | Share of Bids | Count | Share of Bids |
| STAPLES | 52 | 100.0% | 25 | 48.1% | 30 | 57.7% |
| OFFICE DEPOT | 47 | 90.4% | 23 | 44.2% | 20 | 38.5% |
| WB MASON | 4 | 7.7% | 0 | 0.0% | 0 | 0.0% |
| INNOVATIVE OFFICE SOLUTIONS | 3 | 5.8% | 1 | 1.9% | 0 | 0.0% |
| XPEDX | 2 | 3.8% | 1 | 1.9% | 1 | 1.9% |
| AMERICAN PRODUCT DISTRIBUTORS | 2 | 3.8% | 0 | 0.0% | 0 | 0.0% |
| FASTENAL | 2 | 3.8% | 0 | 0.0% | 0 | 0.0% |
| CDW | 1 | 1.9% | 1 | 1.9% | 0 | 0.0% |
| PROMOADVANTAGE MARKETING GROUP | 1 | 1.9% | 1 | 1.9% | 0 | 0.0% |
| TRENDEX | 1 | 1.9% | 1 | 1.9% | 0 | 0.0% |
| VISIONS | 1 | 1.9% | 1 | 1.9% | 0 | 0.0% |
| XEROX | 1 | 1.9% | 1 | 1.9% | 0 | 0.0% |
| RUNCO | 1 | 1.9% | 0 | 0.0% | 1 | 1.9% |
| ABI | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| AMAZON | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| BUSINESS CARDS ACROSS AMERICA | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| CELLMARK | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| CORPORATE UNITED | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| CP OFFICE SUPPLIES | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| ESSENDANT | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| GLOBAL OFFICE SERVICES | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| GREEN CASTLE | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| HAGEMEYER | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| IMPACTOFFICE | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| IMPERIAL SUPPLIES | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| INSIGHT | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| LIGHTHOUSE FOR THE BLIND | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| MAGID | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| MEMPHIS | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| MIDWEST OFFICE | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| MISTER PAPER | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| MOTION INDUSTRIES | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| MSC INDUSTRIAL | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| NETWORK SERVICES | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| ODORZONE | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| ORGATEX | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| PROFTECH | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| S&L OFFICE SUPPLIES | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| SEALED AIR | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| SHI | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |

PX06300-057

**Exhibit R7A**

| Competitor | Total Appearances | | Appearances as Incumbent | | Appearances as Winner | |
|---|---|---|---|---|---|---|
| | Count | Share of Bids | Count | Share of Bids | Count | Share of Bids |
| SIGMA SUPPLY | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| STRIGLOS | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| TRIMEGA | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| TSRC | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |
| VICTOR LUNDEEN | 1 | 1.9% | 0 | 0.0% | 0 | 0.0% |

*Notes:*

[1] This analysis considers bids for the most recent bidding opportunity that included consumable office supplies at each Fortune 100 company.  There are 52 such bidding events during 2012-2015 with sufficient information to identify bidders.

[2] Total appearances count all bidders, including the incumbent and winner.

[3] Office Depot includes all references to OfficeMax.

[4] Excludes bids for regions outside of the U.S. and unnamed suppliers.

[5] Bids by Staples or Office Depot that include partnerships with diversity suppliers are attributed to Staples or Office Depot, respectively.

[6] Suppliers with common ownership are counted as a single entity (e.g., Staples and Quill).

*Sources:*

[a] Customer CID Responses, Subpoena Responses, and Declarations.

[b] Office Depot Specification 26 Diversity Supplier Data,
      <OD OM Tier 1 Account Numbers and Tier 1 Partners xlsx>,
      <ODP-OMX Tier 1 Admin Fee Rates - 2015 xls>.

[c] Staples Specification 25 Diversity Supplier Data, <SPLS_4286101_with account numbers.xlsx>.

CONFIDENTIAL MATERIAL

**Exhibit R7B**

# Office Depot and Staples Losses to Competitors
# Fortune 100 Bid Data

### Consumable Office Supplies Opportunities, 2012-2015

| Incumbent | Winner | Number of Bids | Share of Incumbent Losses |
|---|---|---|---|
| Office Depot | Staples | 7 | **100%** |
| | Other Suppliers | 0 | 0% |
| Staples | Office Depot | 5 | **91%** |
| | Other Suppliers | 1 | 9% |

*Notes:*

[1] This analysis considers bids for the most recent bidding opportunity that included consumable office supplies at each Fortune 100 company.  There are 52 such bidding events during 2012-2015 with sufficient information to identify bidders.

[2] Excludes bids for regions outside of the U.S. and bids for which the winner is unknown.

[3] Office Depot includes all references to OfficeMax.

[4] Losses consist of opportunities in which Office Depot or Staples appeared as an incumbent and lost some or all of the business to a competitor.

[5] When there are multiple incumbents or winners, each supplier is allocated an equal proportion of the incumbency or win.  For example, an opportunity with incumbent "Office Depot, W.B. Mason" and winner "Staples" would count as half of a loss each for Office Depot and W.B. Mason.

[6] Bids by Staples or Office Depot that include partnerships with diversity suppliers are attributed to Staples or Office Depot, respectively.

[7] Suppliers with common ownership are counted as a single entity (e.g., Staples and Quill).

*Sources:*

[a] Customer CID Responses, Subpoena Responses, and Declarations.

[b] Office Depot Specification 26 Diversity Supplier Data,
    <OD OM Tier 1 Account Numbers and Tier 1 Partners.xlsx>,
    <ODP-OMX Tier 1 Admin Fee Rates - 2015.xls>.

[c] Staples Specification 25 Diversity Supplier Data, <SPLS_4286101_with account numbers.xlsx>.

CONFIDENTIAL MATERIAL                    PX06300-059

**Exhibit R8A**

## Product Descriptions in the Office Depot Bid Data

*Consumable Office Supplies Opportunities with Enterprise, Major, and Large Higher-Education Customers, 2013-2015 (N = 1253)*

| Description of Products Included | Number of Opportunities | Share of Opportunities |
|---|---|---|
| ███████ | █ | █ |

CONFIDENTIAL MATERIAL

PX06300-060

**Exhibit R8A**

| Description of Products Included | Number of Opportunities | Share of Opportunities |
|---|---|---|
| ██████████████ | █ | █ |
| ██████████████████████████ | █ | █ |
| ███████████████ | █ | █ |
| █████████ | █ | █ |
| ███████████████████ | █ | █ |
| ████████████████████ | █ | █ |
| ███████████ | █ | █ |
| █████████████ | █ | █ |
| █████████████████ | █ | █ |
| ██████████████████ | █ | █ |
| ███ | █ | █ |

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

CONFIDENTIAL MATERIAL

**Exhibit R8B**

## Product Descriptions in the Staples Bid Data
*Consumable Office Supplies Opportunities, 2012-2014 (N = 393)*



| Description of Products Included | Number of Opportunities | Share of Opportunities |
| --- | --- | --- |

PX06300-062

**Exhibit R8B**

| Description of Products Included | Number of Opportunities | Share of Opportunities |
| --- | --- | --- |



*Notes:*

PX06300-063

**Exhibit R9**

## All-Channel U.S. Sales of Consumable Office Supplies, 2014
### *(Millions of Dollars)*



Millions of Dollars

*Notes:* See Shapiro Report Appendix G for detailed notes.

*Sources:* Supplier responses, as detailed in Shapiro Report Appendix G.

CONFIDENTIAL MATERIAL

**Exhibit R10**



## Online Price Premiums for Large Customers
### *Office Depot, FY 2014*

*Sources:* See sources from Exhibit 6D of Feb 2016 Shapiro Report.

CONFIDENTIAL MATERIAL

PX06300-065

**Exhibit R11**



Sources: See sources from Exhibit 6F of Feb 2016 Shapiro Report.

PX06300-066

**Exhibit RC-1**

## Fortune 100 Customers with Formal RFPs or Bidding Events

*Limited to Customers Not Included in Fortune 100 Market Share Calculation*

| Customer | Year(s) of RFP/ Bidding Event | Sources |
|---|---|---|
| ███████████ | ███ | ████████████ |
| ██████████████ | ███ | ████████████████████ |
| ████████████ | █████ | ██████████████████████████ |
| ████ | ███ | █████████████████ |
| █████ | ███ | █████████████████ |
| ████████████ | ███ | ██████████████████████████ |
| ██████████ | ███ | ████████████████████████ |
| ██████████ | ███ | ███████████████████████ |
| ██████ | ███ | ████████████████████████ |
| █████████████ | ███ | ██████████████ |
| ████ | ███ | ████████████████ |
| ██████████████ | ███ | ████████████████████████ |

*Notes:*

█████████████████████████████████████████

██████████

PX06300-067

**Exhibit RC-2**

## Fortune 100 Customer Discretionary Leakage: Source Materials



CONFIDENTIAL MATERIAL

**Exhibit RC-2**

| Customer | Estimate | Source | Citation |
|---|---|---|---|



CONFIDENTIAL MATERIAL

PX06300-069

**Exhibit RC-2**



| Customer | Estimate | Source | Citation |
|---|---|---|---|
| ▬▬▬ | "[Q]uite limited...by exception" | | |
| ▬▬ | 1% | | |
| ▬ | <3% | | |
| ▬▬▬ | "De minimis" | | |
| ▬ | "De minimis" | | |
| ▬ | 3.3% | | |

PX06300-070

**Exhibit RC-2**

| Customer | Estimate | Source | Citation |
|---|---|---|---|



CONFIDENTIAL MATERIAL

PX06300-071

**Exhibit RC-2**



| Customer | Estimate | Source | Citation |
|---|---|---|---|
| | "De minimis" | | |
| | "De minimis" | | |
| | 10% | | |
| | 11% | | |
| | "Not material" | | |

MATERIAL

PX06300-072

**Exhibit RC-2**

| Customer | Estimate | Source | Citation |
|---|---|---|---|



| | "De minimis" | | |
| | <3% | | |

MATERIAL

PX06300-073

**Exhibit RC-2**

| Customer | Estimate | Source | Citation |
|---|---|---|---|
| ▬▬▬ | <5% | | |

███████████ MATERIAL

**Exhibit RC-3**

## Fortune 100 Customer Discretionary Leakage: Summary

| Customer | Estimate |
|---|---|
| | "Immaterial" |
| | 10% |
| | 1.1% |
| | 0.7% |
| | 4.8% |
| | "De minimis" |
| | "De minimis" |
| | "De minimis" |
| | "[Q]uite limited...by exception" |
| | 1% |
| | <3% |
| | "De minimis" |
| | "De minimis" |
| | 3.3% |
| | <5% |
| | <5% |
| | "De minimis" |
| | 1.1% |
| | "De minimis" |
| | "De minimis" |
| | 10% |
| | 11% |
| | "Not material" |
| | "De minimis" |
| | <3% |
| | <5% |

*Sources:*

[a]  See Exhibit RC-2 for a detailed list of sources.

CONFIDENTIAL MATERIAL

PX06300-075

**Exhibit RE-1**

## Office Depot Losses to Staples, W.B. Mason, and Other Suppliers

## Office Depot Bid Data

*Consumable Office Supplies Opportunities with Enterprise, Major, and Large Higher-Education Customers, 2013-2015*

| Winner | Number of Office Depot Losses | Share of Office Depot Losses |
|---|---|---|
| Staples | 61 | **78.1%** |
| W.B. Mason | 5 | 6.2% |
| Other Suppliers | 12 | 15.7% |
| *Total* | *78* | *100.0%* |

*Notes:*

[1]



CONFIDENTIAL MATERIAL

**Exhibit RE-1**



CONFIDENTIAL MATERIAL

PX06300-077

**Exhibit RE-2**

## Staples Losses to Office Depot, W.B. Mason, and Other Suppliers

## Staples Bid Data

*Consumable Office Supplies Opportunities, 2012-2014*

| Winner | Number of Staples Losses | Share of Staples Losses |
|---|---|---|
| Office Depot | 28 | **81.3%** |
| W.B. Mason | 5 | 12.9% |
| Other Suppliers | 2 | 5.7% |
| *Total* | *35* | *100.0%* |



CONFIDENTIAL MATERIAL

PX06300-078

**Exhibit RE-3**

## Market Shares for Largest Vendors to Staples and Office Depot

*Fortune 100 Customers, 2014*

| Vendor | $ Sales | % Share |
|---|---|---|
| GP OPERATIONS HOLDINGS (GEORGIA-PACIFIC) | $6,740,000 | 1.57% |
| DOMTAR INC | $3,361,399 | 0.78% |
| INTERNATIONAL PAPER | $270,400 | 0.06% |
| AVERY DENNISON | $147,866 | 0.03% |
| ACCO BRANDS | $31,474 | < 0.01% |
| NEENAH PAPER INC | $34 | < 0.01% |
| 3M CORPORATION | - | - |
| BIC CORPORATION | - | - |
| SANFORD CORP | - | - |
| SOUTHCOAST PAPER | - | - |
| SOUTHCOAST SOLUTIONS LLC | - | - |
| TST IMPRESO, INC | - | - |
| *Total* | *$10,551,174* | *2.44%* |



PX06300-079

**Exhibit RE-3**



CONFIDENTIAL MATERIAL

PX06300-080

# Appendix A: Additional Materials Relied Upon

## Staples Documents

| PX No. | Bates No. |
|---|---|
| PX07302 | Asset Purchase Agreement between Staples, Inc. and Essendant Co., February 16, 2016 |
| PX04757 | Email from Staples to FTC re: FTC v. Staples/Office Depot -- Questions Regarding Orszag Report Production with attachment, dated March 7, 2016 |
| PX04633 | Partial Response of Staples, Inc. to Request for Additional Information and Documentary Material Issued March 30, 2015 (As Modified), dated July 27, 2015 |
| PX07305 | Schedule A to the APA |
| PX04761 | SPLS_1816317 |
| PX04456 | SPLS_2455680 |
| PX04456 | SPLS_2455680 |
| PX04634_native | SPLS_4286101 |
| PX04762 | SPLS_4433165 |
| PX04769 | SPLS_4839016 (PI-Staples-002).xlsx, at tab "Summary by Criteria" |
| PX0010 | Staples Presentation to the FTC re Staples' Proposed Acquisition of Office Depot, dated July 14, 2015 |
| PX0007 | Staples Presentation to the FTC re Staples' Proposed Acquisition of Office Depot, dated November 16, 2015 |

PX06300-081

CONFIDENTIAL MATERIAL

# Office Depot Documents

| PX No. | Bates No. |
|---|---|
| PX05335 | ODP-OMX-FTC-01165794 |
| PX05336 | ODP-OMX-FTC-05973898 |
| PX05499 | ODP-OMX-FTC-05978893 |
| PX05434_native | Office Depot Spreadsheet re ODP Tier 1 Vendor - Admin Fee Payment Rate |
| PX05394 | Response of Office Depot, Inc. To Request for Additional Information and Documentary Material Issued March 30, 2015 (Narrative Response to FTC Second Request), dated August 28, 2015 |
| PX05430 | Partial Response of Office Depot, Inc. to Request for Additional Information and Documentary Material Issued March 30, 2015 (As Modified), dated July 27, 2015 |
| PX05390 | ODP-OMX-FTC-02470457 |
| PX05586 | ODP-OMX-FTC-01064818 |
| PX05547 | ODP-OMX-FTC-07612028 |
| PX05582 | ODP-OMX-FTC-07639317 |
| PX0001 | Presentation to the FTC: Competition for Contract Sales to Large and 'National' Customers," September 13, 2013 |

PX06300-082

CONFIDENTIAL MATERIAL

## Staples Investigational Hearing and Deposition
## Transcripts (Including Exhibits)

| PX No. | Witness |
| --- | --- |
| PX02127 | Deposition Transcript of Christine Komola (SPLS) |
| PX02146 | Deposition Transcript of Laura Granahan (SPLS) |
| PX02147 | Deposition Transcript of Ronald Sargent (SPLS) |
| PX02153 | Deposition Transcript of Jay Mutschler (SPLS) |
| PX02162 | Deposition Transcript of Christina Komola (SPLS) |

PX06300-083

CONFIDENTIAL MATERIAL

## Office Depot Investigational Hearing and Deposition Transcripts
## (Including Exhibits)

| PX No. | Witness |
| --- | --- |
| PX02156 | Deposition Transcript of James Bernatek (ODP) |
| PX02157 | Deposition Transcript of Gillian Klein (ODP) |

PX06300-084

CONFIDENTIAL MATERIAL

**Third Party Documents**

| Third Party | Description | PX No. / Bates No. |
|---|---|---|


PX06300-085

CONFIDENTIAL MATERIAL

**Third Party Documents**

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06300-086

CONFIDENTIAL MATERIAL

**Third Party Documents**

| Third Party | Description | PX No. / Bates No. |
|---|---|---|



PX06300-087

CONFIDENTIAL MATERIAL

**Third Party Documents**



| Third Party | Description | PX No. / Bates No. |
|---|---|---|

PX06300-088

CONFIDENTIAL MATERIAL

**Third Party Documents**



PX06300-089

CONFIDENTIAL MATERIAL

## Third Party Deposition Transcripts
## (Including Exhibits)



| PX No. / Bates No. | Witness |
|---|---|

PX06300-090

CONFIDENTIAL MATERIAL

## Third Party Declarations

| PX No. / Bates No. | Third Party | Date |
|---|---|---|



PX06300-091

## Miscellaneous Materials

| PX No. / Bates No. | Description |
|---|---|



PX06300-092

CONFIDENTIAL MATERIAL

# Appendix B

# Hypothetical Monopolist Test

In Appendix D to the Shapiro Report I used Staples' and Office Depot's price/cost margins to perform the hypothetical monopolist test (HMT).  I now explain that the results of the HMT are not changed if one includes the additional cost components identified by Mr. Orszag.

## Staples' and Office Depot's Price/Cost Margins

### *Distribution Costs*

Staples provided customer-level data on "distribution expense."[1]  Staples explains that ████████████████████████████████████████████████████████ ██████████████████████████████████."  Staples did not produce data that would allow me to identify the individual components of distribution cost or break out the variable portion of distribution costs.  Since most of the components of distribution costs appeared not to be incremental to serving any given customer, I did not include them in the estimate of Staples' margin used in the Shapiro Report.[3]

Mr. Orzag estimates that 77% of distribution costs are variable.[4]  In order to estimate the portion of distribution costs that were variable, Mr. Orzag regresses total quarterly distribution cost on total quarterly sales.  However, this exercise establishes nothing more than the obvious conclusion that *total* distribution costs (combining fixed and variable elements) and total sales are correlated.  In effect Mr. Orzag assumes that all the variation in distribution cost can be explained by the variation in quarterly sales.  However, some of the variation in the individual components of distribution cost may be explained by other variables such as location, employee years of education, tax rates in the area, etc.  The omission of these explanatory variables from his regression may have caused him to overestimate the share of distribution costs that are variable.[5]  A Staples internal document estimates that only 50% of distribution costs are variable.[6]  This is substantially lower than the 77% estimated by Mr. Orszag.  I provide revised

---

[1] Customer-level data in Staples Specification 25 file <staples_advantage_spec_25.sas7bdat>.

[2] PX04633, at 057 (Staples Second Request Partial Narrative Response, July 27, 2015).

[3] For example, Christine Komola (Staples CFO) acknowledges that depreciation is a fixed cost.  PX02005 (Komola (Staples) IH Tr.) at 49.  Rent and property taxes are also considered fixed costs.  See Lawrence Revsine, Daniel Collins, Bruce Johnson, and Fred Mittelstaedt, Financial reporting and Analysis, Prentice Hall, 2012, p. 485.  Some components of compensation—e.g. commissions—may vary with sales, but salaries may not.

[4] Orszag Report, ¶177.

[5] Economists refer to the consequences of the omission of relevant explanatory variables as "omitted variable bias." See Damodar Gujarati, Essentials of Econometrics, Irwin/McGraw-Hill, 1999, pp. 407-408.

[6] PX04762, at 006 (Staples, Email chain re: Allocations, September 14, 2015).

PX06300-093

CONFIDENTIAL MATERIAL

estimates of margins below using both the 50% estimate from the Staples document and the 77% estimate from Mr. Orszag.

### Cost of Extending Customer Credit

Staples also provided customer-level data on "A/R" cost, the cost of extending customer credit.[7] Mr. Orzag also includes this component of cost in his measure of margins. I include these costs in my revised margin estimates below.

### SKU Level Vendor Holdbacks

As explained in Appendix D to the Shapiro Report, manufacturers often provide significant rebates to distributors. Staples provided customer-SKU level data on deviated cost and margin add components of these vendor rebates, and I incorporated these data into the margin estimates in the Shapiro Report.[8] Staples also included customer-SKU level data on yet another component of vendor rebates, called "vendor holdbacks" along with its rolling production of updated 2015 contract sales data.[9] Given the pace of discovery I did not realize that the production also included customer-SKU level vendor holdback data for 2014, and therefore did not include them in the estimate of Staples' margin in the Shapiro Report. I include these vendor rebates in my revised margin estimates below.

### Revised Margin Calculations

In the Shapiro Report, I estimated that Staples' margin on sales of consumable office supplies to large customers was ███.[10] Once I incorporate vendor holdbacks, this margin increases to ███. If I further adjust the margins to incorporate A_R costs and assume per Staples' own internal calculation that 50% of distribution costs are variable, I estimate that Staples' margin is ███. If instead, I assume as Mr. Orszag did that 77% of distribution costs are variable, then Staples' margin on sales of consumable office supplies to large customers is ███.[11]

Mr. Orszag's calculation of Staples' margins in his Exhibit I-2 includes the vendor holdback component of vendor rebates. However, when he adjusts the Staples margins reported in Shapiro Report Appendix D, he deducts distribution costs and A_R costs but does not include vendor

---

[7] Customer-level data in Staples Specification 25 file <staples_advantage_spec_25.sas7bdat>; PX04633, at 049 (Staples Second Request Partial Narrative Response, July 27, 2015).

[8] Shapiro Report, p. D-1. Customer-SKU level data in Staples Specification 25 file < staples_spec_25.sas7bdat>; Staples Response to Plaintiffs' Third Request for Production of Documents, January 26, 2016, file <spls_spec_25_mar_add_13q3_15q1.sas7bdat> ("Mar Add data").

[9] Staples Response to Plaintiffs' Third Request for Production of Documents, January 20, 2016, <vr_holdback_rates.sas7bdat> ("Vendor Holdback data").

[10] For further details on the calculation see Shapiro Report, p. D-2.

[11] The software code used to calculate these margins is included in the backup materials accompanying this report.

PX06300-094

CONFIDENTIAL MATERIAL

holdbacks. That is why he estimates a Staples margin of ████ instead of the ████ I calculate the revised estimate above.[12]

In the Shapiro Report I estimated that Office Depot' margin to supply consumable office supplies to large customers is ████.[13] Office Depot did not provide data on distribution costs or A/R costs. If I assume that 50% of distribution cost is variable, then "A/R" cost and the variable portion of distribution cost account for 3% of Staples net sales. I use this figure to adjust the Office Depot margin and thus estimate that Office Depot's margin to supply consumable office supplies to large customers is ████ If instead, I assume as Mr. Orszag did that 77% of distribution cost is variable, then I estimate that Office Depot's margin on sales of consumable office supplies to large customers is ████%.[14]



OfficeMax provided customer-SKU level data on ████ ████ Based on these descriptions, I ████ ████ However, unlike Office Depot, OfficeMax only provided customer-SKU level data for gross sales and not net sales.[16] A margin calculated by dividing (net sales minus costs plus rebates) by gross sales instead of net sales would underestimate the true gross margin and not be comparable to the margins calculated for Staples and Office Depot.[17] Given this data deficiency, for the purposes of this calculation I assume that Office Depot margins are representative of the combined Office Depot-OfficeMax entity.

When Mr. Orszag adjusts the Office Depot margin in Shapiro Report Appendix D, he combines the Office Depot and OfficeMax data despite the data deficiency I note above. Since the erroneously calculated OfficeMax margin is an underestimate and thus significantly lower than the Office Depot (and Staples margins), Mr. Orszag estimates an Office Depot margin of ████ instead of the ████ I calculate as my revised estimate above.[18]

---

[12] Orszag Report, ¶177; Orszag Report Backup, February 29, 2016.

[13] For further details on the calculation see Shapiro Report, p. D-2.

[14] The software code used to calculate these margins is included in the backup materials accompanying this report.

[15] PX0013, at 001 (Letter from P. Miller (Simpson Thacher) to FTC, February 1, 2016); see also PX05394, at 087-088 (Office Depot Second Request Narrative Response, August 28, 2015).

[17] If I did ignore this significant data deficiency, and were to use the gross sales figure as the denominator of the OfficeMax calculation, I would get the erroneous result that OfficeMax's margins ████

[18] Orszag Report, ¶177; Orszag Report Backup, February 29, 2016.

PX06300-095

CONFIDENTIAL MATERIAL

## Updating The Hypothetical Monopolist Test

Using a margin of ██%, the HMT using a 5% SSNIP is satisfied if the recapture rate is at least ██, which equals ██%.[19]  Using a margin of ██%, the HMT using a 5% SSNIP is satisfied if the recapture rate is at least ██ which equals ██%.  Using a margin of ████, the HMT using a 5% SSNIP is satisfied if the recapture rate is at least ██, which equals ██%.

As I explained in Appendix D to the Shapiro Report, the evidence in this case clearly indicates that the actual recapture rate is far greater than ██%, and may well be close to 100%.[20]  So using these revised margin figures would not alter my conclusion that the sale and distribution of consumable office supplies to large customers in the United States is a relevant market.   Mr. Orszag does not argue otherwise.

---

[19] If one uses a larger SSNIP, the threshold recapture rate needed to satisfy the HMT goes up.  Using a margin of ██, the HMT is satisfied using a 10% SSNIP if the recapture rate is at ██████

[20] Shapiro Report, p. D-3.

PX06300-096

CONFIDENTIAL MATERIAL

# Appendix C

# Market Shares Based on Fortune 100 Customer Responses

Mr. Orszag criticizes the calculation of market shares in Exhibit 5B in the Shapiro Report based on purchases of consumable office supplies by Fortune 100 ("F100") customers.

Mr. Orszag specifically raises these measurement issues: (1) whether the purchases of consumable office supplies made by the F100 are a good proxy for the purchases made by all large customers; (2) whether the inclusion of data from all one hundred F100 customers is required to form a reliable measure; (3) whether relevant purchases in the underlying data are correctly identified; (4) whether I have properly accounted for untracked discretionary leakage; and (5) whether I have improperly assigned to Staples and Office Depot sales made by their diversity partners.

Mr. Orszag has not offered any alternative measure of the market shares of the merging parties in the market for the sale and distribution of consumable office suppliers to large customers in the United States, or in any other relevant market, for that matter.  Nor has he measured the magnitude of the claimed bias embedded in my measure of market shares.

I have carefully considered all of Mr. Orszag's critiques.  None merits a change in my approach or conclusion that Staples and Office Depot together dominate the market for the sale and distribution of consumable office suppliers to large customers in the United States.  Furthermore, Mr. Orszag's claim that I have made errors in the processing of raw data to identify relevant purchases is incorrect.

## 1.  Fortune 100 Customers as a Proxy for All Large Customers

Mr. Orszag is concerned that F100 customers may not be representative of all large customers for consumable office supplies, and of customers on the smaller end of the spectrum in particular.[1]  I agree that the Fortune 100 customers are not a perfect proxy, but data of this sort are never perfect.  I explicitly addressed this issue in the Shapiro Report.  I stand by my opinion that the Fortune 100 customer data are reliable and highly informative regarding market shares among all large customers and regarding the competitive significance of the various suppliers in the relevant market.  I note in this regard that Mr. Orszag has not offered any specific evidence that looking at a broader collection of large customers than the F100 would lead to significantly lower market shares for Staples and Office Depot.

Market share measures should not be considered in isolation.  I consider market share measures to be reliable when they comport with other available evidence, as my F100 calculations do.  First, as I noted in the Shapiro Report, analyses of primary vendor relationships also indicate dominant shares for Staples and Office Depot of a similar or greater magnitude.  Notably, shares based on primary vendor relationships are not limited to the F100, and extend to the broader group of large customers to which Mr. Orszag's criticism applies.  I have updated my primary

---

[1] Orszag Report ¶ 155.

PX06300-097

CONFIDENTIAL MATERIAL

vendor relationship share estimates to reflect additional data produced since my last report, and they appear in Exhibit R2. As shown in that exhibit, the combined share of Staples and Office Depot is 87.6%. This observation is consistent with the dominant position I find when examining purchases by F100 customers. Moreover, to evaluate whether inclusion of more large customers would lead to a change in this result, I have since performed a sensitivity check, which includes primary vendor relationships down to a $250,000 annual consumable office supplies sales threshold. This method will include customers who purchase fewer consumable office supplies as well as large customers who may split purchases between providers. The results of this sensitivity check are reported in Exhibit R5, which estimates the combined share of Staples and Office Depot as 87.7%. This further corroborates my best estimates of market shares, which are based on purchases of consumable office supplies by the F100 customers.

Furthermore, as I explained in the Shapiro Report, among the F100 customers for which I have reliable data, the shares of Staples and Office Depot do not drop off with customer size. I have updated F100 market share tables to reflect data received since my last report. The updates are reflected in Exhibits R1A and R1B. Among the top half of the F100 customers (ranked by total purchases of consumable office supplies), the combined share of Staples and Office Depot is 79%; among the bottom half, their combined share is 89%. Mr. Orszag asserts that this finding is "at best, of limited value."[2] I disagree and note that Mr. Orszag has not offered an alternative and has not provided any data supporting this criticism of my work.

Furthermore, Mr. Orszag appears to have disregarded substantial evidence consistent with my F100 market share measures based on data covering customer bidding events. In the Shapiro Report, I explained that customer bidding events are an important source of information regarding head-to-head competition and the effects that are likely to follow when that head-to-head competition is eliminated by a merger. Bidding events reveal direct information about how firms compete; in this respect, they complement market shares and in some respects are superior.

In this case, if Grainger were a significant competitor in the relevant market, I would expect to see them appear as a bidder for, and winner of, the patronage of large customers in a substantial share of bidding events relating to large customers. In the Shapiro Report, I examined bidding events from three perspectives: (1) Office Depot win-loss data (Exhibit 10 of the Shapiro Report), (2) Staples win-loss data (Exhibit 11 of the Shapiro Report), and (3) F100 customer-reported bid data (Exhibit 9A of the Shapiro Report, updated in Exhibit R7A). In all cases, the infrequency of bids and wins by suppliers other than the merging parties is consistent with the dominant combined share for Staples and Office Depot found in the F100 market share measures. These bid data provide valuable information that corroborates the market shares I have estimated using the F100 customers. Mr. Orszag does not mention these corroborating data in his criticism of my market share estimates.

## 2. The 81 Fortune 100 Firms Used to Calculate Market Shares

Due to practical limitations, I was not able to obtain sufficient data from all of the F100 companies. My estimates of market shares are based on the responses from the 81 Fortune 100 companies from whom I had reliable and usable data.

---

[2] Orszag Report, ¶155.

PX06300-098

CONFIDENTIAL MATERIAL

Mr. Orszag asserts that, because I am able to include responses from only 81 of the F100, the market shares "likely overstate the true market share [of a merged Staples and Office Depot] for the entire Fortune 100."[3]  He supports this assertion with two claims.  First he claims that the exclusion of one of only two firms in the entire F100 that make little or no purchases from Staples or Office Depot ███████████████████████████) tilts the market share estimate upward.  Second, he claims that the 19 F100 companies that are not included are less likely to have centralized purchasing and reporting, and thus would be more likely to "carve out" purchases to vendors other than Staples and Office Depot.  If these perceived "decentralized" customers were included, Mr. Orszag reasons share estimates would be lower.  For the reasons given below, the available evidence does not support either of these claims.



<hr />

[3] Orszag Report, ¶ 156.

[4] Mr. Orszag does not mention that the excluded group also includes several F100 customers of Staples and Office Depot who describe the merging parties as either their largest or primary suppliers. ████████████████████████
██████████  I discuss these and others in more detail below.
█████████████████████████████████████████████
█████████████████████████████

PX06300-099

CONFIDENTIAL MATERIAL



### *Decentralized Purchasing*

Next, Mr. Orszag argues that "[i]t is likely that the Fortune 100 companies with more centralized purchasing and reporting are the same companies best able to produce data for this proceeding."[7]



Other than the example of ███, which I turn to below, Mr. Orszag does not provide a basis for his assertion that the two subsets of F100 customers (the 81 included in share estimates vs. the remaining 19) have different (centralized vs. de-centralized) procurement practices.  It is possible that he has misunderstood either the number of F100 companies that indeed produced purchase data, or the reasons why certain F100 responses were not amenable to ascertaining purchases of products in the relevant market.

With regard to the number of customers unable (or unwilling) to produce data, as of the date of this reply report only three of the F100 were unable to produce purchasing data: ████████ ████████████████████████ The preceding section of this report addresses whether the lack of data from ███████████ an upward bias in market share estimates.  Of the other two customers, as I showed in Exhibit E-3 of the Shapiro Report, both purchase a substantial volume of consumable office supplies from Staples and Office Depot.  As shown in that exhibit, in 2014 ██████ purchased in excess of ████ million from Staples and Office Depot, and ███ ████████████ million.[9]  Furthermore, while ████ ████████ did not submit purchasing



---

[7] Orszag Repot, ¶ 157.

PX06300-100

CONFIDENTIAL MATERIAL

data, they did submit a declaration describing their purchasing practices—which amount to centralized purchasing from Staples.  In that declaration, ███████████ █ ████████



Next, as I explained in my Appendix E to the Shapiro Report, while the remaining 16 companies *did* produce procurement data, the data were maintained by those customers in a manner that simply made it impossible or impractical to separate consumable office supply purchases from other procurement (such as laptop computers, industrial supplies or furniture), or to identify vendors for relevant products.  So far as I can tell, Mr. Orszag has not explained why this feature of a data submission indicates that a customer is more or less likely to be a "centralized purchasing firm."

One useful indicator of whether a customer is likely to purchase office supplies on a centralized basis is whether the company selects office supply vendors via a call for bids or formal RFP process.  These selection processes occur at the company level, as opposed to day-to-day decisions made by individual employees that are more likely to predominate when a company itself has not directed employees to a selected vendor.  In fact, based on the submissions of the 19 customers at issue, selection at a company level by bid solicitation or formal RFP appears to be common practice among this set.  As Exhibit RC-1 shows, at least twelve of these 19 customers made use of a bidding event or RFP to select vendors for consumable office supplies.  As noted above, many of these customers describe Staples and Office Depot as their largest or primary vendor of office supplies (█████████████████████████████████████ ██████████████).[11]  Furthermore, most of the seven remaining customers that do not appear in Exhibit RC-1 either purchased in excess of $1 million worth of consumable office supplies from Staples and Office Depot, or indicated in their submissions that the share of procurement captured by the merging parties is likely to be high.  For example ████████ purchased over ███████████ in consumable office supplies from Staples and Office Depot in 2014, and as of December 2015 was negotiating a three-year renewal contract with Office

─────────────────

CONFIDENTIAL MATERIAL

Depot.[12]  Furthermore, as I pointed out in the Shapiro Report, ████████ description of the data it submitted appears to align with Mr. Orszag's description of a centralized purchasing firm:

Likewise, while the data submission for ████████████████ as unfortunately incomplete for the purposes of calculating market shares, its submission to the FTC explained that the company "████████████████████████████████████████████████████[14]

Drawing on this information, I see no reason to believe that an inability to produce data sufficient for the purpose of segregating purchases of consumable office supplies indicates either that (1) the customer is likely to make purchasing decisions on a decentralized basis, or (2) that the inclusion of these firms would lead to a meaningfully lower estimate of the market shares for Staples and Office Depot.

For this statement Mr. Orszag cites to the Shapiro Report, ████████████████████████ ████████[16]  So far as I can tell, nowhere in that submission does █████ state that purchasing through company procurement cards amounts to "decentralized" purchasing.  As I explained in the Shapiro Report, the reason these particular procurement card purchases were problematic was because ███████████████████████████████████████████████████████████████.

---

████████████████████████████████

████████████████████████████████████████

████████████████████████████

[15] Orszag Report, ¶ 157.

████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

PX06300-102

CONFIDENTIAL MATERIAL

### 3.  Alleged Errors in the Fortune 100 Market Share Calculation

Mr. Orszag claims to have found errors in my calculations relating to F100 ███████████████ ████████████████.[18]  In both cases, what Mr. Orszag calls "apparent errors" are not in fact errors.

In the case of ██████████████, it seems that Mr. Orszag is either unaware of the testimony from █████████████ describing the purchases in question, or improperly dismisses the role that Staples performs as a reseller and distributor of paper products.

In the case of ████████, examination of the underlying data for the purchases in question clearly reveals them to cover products and services outside of the relevant market.

████████████████████

Mr. Orszag claims that "when large B-to-B customers purchase products directly from manufacturers, they sometimes do so in a three-way negotiation in which the manufacturer and the customer negotiate a price, …[and] the sale should properly be attributed to the manufacturer, since it reflects the manufacturer's competitive significance."[19]  He then concludes that because the price ████████████ pays Staples for Staples-branded paper is influenced by a combination of ████████████ relationship with ████████ (the paper manufacturer) as well as with Staples (the reseller), those sales should not be attributed to Staples' market share.

Here is ████████████████ own description of the transaction in question:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████.

Note that ████ ██████████████████████████████████."   This tells me that Staples is indeed providing the distribution services for the paper in question.  That is the essence of what distributors do, regardless of whether the manufacturer agrees to offer a discount for a particular customer.  I

---

[18] Orszag Report, ¶¶ 159-161.

[19] Orszag Report, ¶ 159.

[20] ████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

PX06300-103

CONFIDENTIAL MATERIAL

vigorously dispute any assertion that this method of treating ██████████ paper purchases is an error.

PX06300-104

CONFIDENTIAL MATERIAL

Furthermore, the testimony of ███████████████████████ belies Mr. Orszag's contention that the "competitive significance" of the arrangement between the bank and Staples points instead to ████████ She explains:

██████████████████████████████████████████
███

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

In addition, ████████████ directly addresses whether ████████████ views Staples' role as a reseller rather than manufacturer to be of significance:

██████████████████████████████████████████
███████████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████

In sum, a careful review of testimony and data submitted in this case supports the market share calculation for ████████████ as originally reported.

███████

Regarding ████████, Mr. Orszag states: "Professor Shapiro appears to ignore purchases of office supplies from ████████████████████████████████████] in his share calculations."    This statement is false.

---

█ ██████████████████████████████████
█ ████████████████████████████████████
[27] Orszag Report, ¶ 161.

PX06300-105

CONFIDENTIAL MATERIAL

A careful review of the underlying data provided by ███████ shows that the purchases identified by Mr. Orszag involve products and services outside of the relevant market.  The purchases by ████ █████ that Mr. Orszag has identified involv ████████ ███████████ I now address these purchases in detail, vendor by vendor.

### ████ **Purchases from** ██████████

As a starting point, it useful to understand what types of products and services ████████████ typically offers. ███████████████████



PX06300-106

CONFIDENTIAL MATERIAL



from

PX06300-107

CONFIDENTIAL MATERIAL



**Purchases from**

In conclusion, a careful review of data submitted in this case, as well as other readily available sources of information, supports the market share calculation for ████ as originally reported.

## 4. Discretionary Leakage

The Shapiro Report addressed the fact that large customers may have difficulty tracking procurement of consumable office supplies from all conceivable sources – including employees who may make discretionary purchases of office supplies outside the bounds of a company's selected vendor.[33]  On this point, Mr. Orszag and I are in agreement.  However, Mr. Orszag asserts that the data I relied on underestimate the likely magnitude of *unreported* discretionary leakage.  Underlying his claim is an assertion that my estimate was calculated based on review of "26 declarations filed by customers in this matter in which the declarant provided an estimate of the magnitude of leakage for their firm."[34]  He further states that declarants with "larger leakage

---

[33] See, Shapiro Report, at pp. E-11–12.

[34] Orszag Report, ¶ 163.

PX06300-108

CONFIDENTIAL MATERIAL

or a lesser ability to track leakage … are simply far less likely to be willing to mention their inability to measure leakage."[35]  So far as I am aware, this statement is sheer speculation.

Regarding the implication of bias, Mr. Orszag may not be aware of the method I instructed my staff to use in collecting information relevant for estimating discretionary leakage.  His claim that the underlying data come from a limited review of "26 declarations" is false.  Exhibit E-1 in the Shapiro Report explains that the information used to estimate unreported leakage included all relevant estimates provided by F100 customers.  In some cases, the estimate came in response to a CID issued by the FTC or a follow-up response to clarify that submission.  In a handful of cases, the estimate came from a declaration filed in this matter.  To the extent that estimates provided by F100 customers were filtered in any way, it would have been merely to separate estimates related to discretionary employee leakage from usages of the word "leakage," such as spending at vendors other than Staples or Office Depot, that is decided at the firm level.  As explained in the Shapiro Report, the latter type of spending is already accounted for in the procurement data submissions from F100 customers.

I have updated my estimate of unreported leakage to 3.0% to reflect newly available information.[36]  See Exhibits RC-2 and RC-3.

## 5.  Diversity Supplier Partnerships

Mr. Orszag's criticism of my treatment of diversity suppliers is twofold.

First, Mr. Orszag makes the general claim that I have not considered "future competitive significance" of certain suppliers, including diversity suppliers.  I discuss this general claim elsewhere in this report, as part of my evaluation of post-merger entry and expansion.  My focus here is on practical issues that pertain to the measurement of market shares.

Second, Mr. Orszag asserts that I should have decreased the market shares attributed to Staples and Office Depot wherever they were assisted in servicing a customer by a diversity supplier.  In ¶166 of his report, Mr. Orszag states:

> But, instead of analyzing the relationship between Staples and Office Depot on the one hand, and the diversity sellers on the other hand, Professor Shapiro simply treated diversity sellers as though they were always wholly owned subsidiaries of Staples and Office Depot.  Professor Shapiro provides no support for this assumption, and consequently likely overstates Staples' and Office Depot's market shares.

In my initial report, I did in fact address these issues in Appendix H.  I drew on several sources that support my assignment of market shares. Here is the relevant passage, quoted without alteration:

******

---

[35] Orszag Report, ¶ 164.

[36] After filing the Shapiro Report, deposition testimony and data regarding discretionary leakage estimates from Walgreens and Best Buy were made available to me. I have therefore updated my data collection of relevant discretionary leakage estimates, and report the revised tables in this report at Exhibits RC-2 and RC-3. The new information yields a revised "unreported leakage" adjustment factor of 3.0%.

PX06300-109

CONFIDENTIAL MATERIAL

Some large customers have diversity goals regarding their suppliers, i.e., the goal of incorporating businesses owned by under-represented minorities, women, and veterans into their supply chain.  Plus, a large corporation with federal contracts may need to satisfy government mandates regarding the diversity of their supply chain.[37]  Some of these large customers ask their consumable office supply distributors to help them satisfy a portion or all of their internal supplier diversity goals.[38]  In some such cases, the customer has a direct contract with Staples and Office Depot.  In other cases, the customer has a three-way contract with either Staples or Office Depot and with the diversity supplier.[39]

The critical point from the perspective of *competition* is that diversity suppliers cannot independently provide the pricing and service levels required by large customers.[40]  When working with diversity suppliers, Staples and Office Depot typically determine the prices and prepare the bid for the customer.[41]  Once a bid has been won, Staples and Office Depot remain in close contact with the customer and perform many of the functions provided by a distributor of consumable office supplies.  Customers place their orders through Staples' and Office Depot's procurement interfaces or e-commerce websites.  Staples and Office Depot process the orders, pick and pack the merchandise from their warehouses, and deliver the items ordered by the customer.[42]  Typically, the diversity supplier bills the customer for the products sold, receives payment, and remits the entire payment amount (minus sales tax) to Staples or Office Depot.[43]  Staples and Office Depot pay the diversity supplier a small fee, usually a percentage of sales.[44]

Staples has claimed that "[d]iversity suppliers are significant competitors to Staples and Office Depot for '"national"' customers."[45]  As an antitrust



PX06300-110

CONFIDENTIAL MATERIAL

economist, this assertion makes no economic sense to me. Regardless of the social goals served by diversity suppliers, they typically are not *independent competitors* who have the capability to apply competitive pressure on either Staples or Office Depot to serve large customers.[46] Rather, they are valued partners who, together with a company that owns and operates a distribution business, can meet the needs of large customers.[47]

In my calculation of market shares, I have attributed the sales made by diversity suppliers to the distributor that actually performs the distribution services and ultimately accrues the bulk of the revenues. This approach properly reflects the inability of diversity suppliers to compete *on their own* to distribute consumable office supplies to large customers.

******

As I state above, evidence from Staples and Office Depot indicates that fees paid to diversity suppliers are small. Despite persistent questioning from my staff and the FTC, I understand that the parties have not produced data that measures these fees for each account in the transactions data made available to me.[48] In addition, an internal analysis from Staples titled "Diversity Sales Fiscal Year 2014 – Breakdown by Criteria" appears to list "Diversity Fees" next to adjusted gross sales, and comparing the former to the latter yields a proportion of ▮▮.[49] To check whether this estimate might differ for large customers, I also calculated the average diversity "bank fee" rates for F100 accounts identified in another Staples document, yielding a similar ▮ estimate. The same document included the following explanation: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[50]

In response to the Orszag Report, I have checked that my treatment of diversity suppliers is accurate and correct as a matter of antitrust economics. My approach is supported by Staples' own documents as well as by declarations from diversity suppliers themselves.[51] As a further



PX06300-111

CONFIDENTIAL MATERIAL

check, I specifically looked for cases among the F100 procurement submissions in which a diversity supplier served a customer entirely independently.  I have found only one F100 customer ████████ ) that reported such an arrangement with the diversity supplier ████ and that is reflected in their market share.  As I stated in the Shapiro Report, my treatment of diversity suppliers reflects the inability of diversity suppliers to serve on their own as a meaningful competitive restraint on Staples and Office Depot.



PX06300-112

CONFIDENTIAL MATERIAL

# Appendix D

# Evaluation of Mr. Orszag's "PRISM-Style" Analysis

Mr. Orszag claims that a "significant share of purchases by large B-to-B customers takes place as leakage, even after the customer has signed a long-term contract."[1]  The approach taken by Mr. Orszag appears to define as "leakage" all situations in which a customer's purchases delivered to a specific zip code significantly decline without properly considering common reasons *apart from leakage* why a customer's purchases in a given zip code might move down (or up) from one year to the next.[2]  His results are presented in Orszag Exhibit P: "PRISM-Style Declining Sales Report for Staples and Office Depot."[3]

## Mr. Orszag's Metric: Not Ordinary-Course-of-Business Leakage Definition

Office Depot implemented Lattice Engines' Sales Prism tool to promote sales, encourage adjacent product purchases, and increase margins, not principally to track leakage within large B2B customer accounts.[4]  Mr. Orszag states that he

> used the transactional data provided by Staples and Office Depot to examine *potential leakage in conceptually the same way the PRISM system does in the ordinary course of business for Office Depot* [emphasis added].[5]

However, it is my understanding that Office Depot's Gillian Klein has confirmed that the "Prism Leakage" metrics included in the letters and presentation to the FTC were created not in the ordinary course of business, but at the direction of counsel for the purpose of seeking FTC clearance for the merger and for litigation in this matter.[6]  Moreover, as I show below, when sales declines are observed, Office Depot sales people identify various causes for those sales declines other than leakage.

---

[1] Orszag Report, ¶144.

[2] As I discuss below, the data used by Mr. Orszag does not allow him to identify delivery zip codes.  The addresses in the data he used are the "customer's primary addresses."

[3] Exhibit P, Orszag Report.

[4] PX05335, at 002 (Email from Schultz (Office Depot) to Calkins (Office Depot), December 14, 2012); PX05336, at 002 (Email from Calkins (Office Depot) to Schmidt (Office Depot), June 16, 2015); PX05499, at 016 (Email from Blackmon (Office Depot) to Calkins (Office Depot), July 17, 2015); PX02007 (Lander (ODP) IH. Tr.) at 71-72; PX02008 (Ghant (ODP) IH. Tr.) at 73; PX02157 (Klein (ODP) Dep. Tr.) at 14-15.

[5] Orszag Report, ¶147.

[6] See PX0007, at 086-087, (Staples Presentation to FTC Bureau of Competition and Bureau of Economics Management, November 16, 2015); PX0011, at 019-022 (Letter from M. Reilly (Simpson Thacher) to FTC Commissioners, December 4, 2015), PX0014, at 001 (Letter from Preston Miller (Simpson Thacher) to FTC, January 25, 2016), and accompanying data file "Office Depot Prism Data.xlsx."  PX02157 (Klein (ODP) Dep. Tr.) at 62-63, 79-80, 133-135.

PX06300-113

CONFIDENTIAL MATERIAL

## Many Sales Declines Counted by Mr. Orszag Were Not Due to Leakage

Mr. Orszag explains his calculation as follows:

> [F]or each of the 75 Fortune 100 companies with at least $10,000 in fiscal year 2014 sales at Staples and Office Depot, I calculated the number of individual zip codes receiving shipments at that company in 2014 (focusing on the products in the FTC's and Professor Shapiro's relevant product market).  I then calculated which of these zip codes experienced 50 percent or greater declines in sales in 2015, relative to 2014. Exhibit P summarizes the results.[7]

Summarizing his results he states that

> Sixty-one out of the 75 customers had at least one zip code experiencing a 50 percent or greater decline in sales. In many cases, a substantial number of zip codes for a company experienced reductions of 50 percent or more in revenue."[8]

For the zip codes in which his calculations show a 50 percent or greater decline in sales, he also reports the percentage sales decline (see right most column in Exhibit P).  He seems to be basing his claims of "significant" "leakage" on this metric in Exhibit P.

Mr. Orszag suggests that in the Shapiro Report I have only provided "theories as to why the declines in sales...could reflect other factors besides leakage, such as closures of particular customer locations and changing demand for office supplies."[9]  In fact, taking a closer look at the sales data itself, and Office Depot's and Staples' own ordinary-course documents, reveals compelling *evidence* that the "significant" "leakage" he claims to have identified was either low to begin with or caused by several other factors.  I provide some examples below.

### For the Majority of Customers in Exhibit P, Potential Leakage is Low Even Using Mr. Orszag's Measure

For 39 of the 75 Fortune 100 in Exhibit P, Mr. Orszag identified "potential leakage" of less than 4%.

### Staples is The Majority Supplier

Mr. Orszag's Exhibit P reports "potential leakage" at Office Depot.  Staples supplies more than 50% of the customers' consumable office supply needs for 30 of the 75 Fortune 100 companies in Exhibit P.  Consistent with other evidence, most of the sales lost by Office Depot these customers were likely gained by Office Depot.

---

[7] Orszag Report, ¶147.

[8] Orszag Report, ¶147.

[9] Orszag Report, ¶148.

PX06300-114

CONFIDENTIAL MATERIAL

### *Customers Who Switched from Office Depot to Staples*

Mr. Orszag also does not mention clear evidence of sales declines that occurred when the customer switched from Office Depot to Staples. Several example of this are described in Section 4.D of this report.

### *Customer Account Changes and Business Declines*



---

[10] For the zip codes in which his calculations show a 50 percent or greater decline in sales.

[11] ██████████████████████████ .

[12] For the zip codes in which his calculations show a 50 percent or greater decline in sales.

[14] For the zip codes in which his calculations show a 50 percent or greater decline in sales.

[16] For the zip codes in which his calculations show a 50 percent or greater decline in sales.

PX06300-115

CONFIDENTIAL MATERIAL

## Mr. Orszag Mischaracterizes the Data Used in Exhibit P

Mr. Orszag also mischaracterizes the data included in his analyses.  The text of the report states that he selected the Fortune 100 customers included in his analyses based on both Staples and Office Depot sales.[18]  The title of Exhibit P may suggest that he analyzed Fortune 100 customer purchases from both Staples and Office Depot.[19]  In reality, his Exhibit P analysis only relies on sales data from Office Depot's Specification 26 response.

Moreover, Mr. Orszag did not calculate the "number of individual zip codes receiving shipments"[20] as he described, because the data used in his analysis do not allow for such a calculation.  Customer addresses in Office Depot's Specification 26 represent "the customer's primary address," which may or may not correspond to the zip codes receiving shipments.[21]  Mr. Orszag could have used Office Depot's Specification 16 response, which shows sales at the level of "the delivery address of the shipments."[22] ███████████, for example, he includes 9 zip codes that appear in the 2014 Office Depot Specification 26 data.[23]  In the 2014 Specification 16 data he would have found 341 delivery zip codes ███████████

---

[18] Orszag Report, ¶147.

[19] Exhibit P, Orszag Report.

[20] Orszag Report, ¶147.

[21] PX05430, at 057-059 (Office Depot, Partial Narrative Response to Second Request, July 27, 2015).

[22] PX05430, at 029-031 (Office Depot, Partial Narrative Response to Second Request, July 27, 2015).

[23] Mr. Orszag restricts his analyses to customer zip codes with sales in all quarters of 2014.

PX06300-116

CONFIDENTIAL MATERIAL

# Appendix E

# Entry and Expansion: Direct Evidence from Suppliers

As explained in Section 5 of this report, my opinion on entry and expansion differs considerably from that of Mr. Orszag.  I do not believe that entry by new suppliers, or expansion by existing market participants, would be timely, likely, and sufficient to deter or counteract a post-merger price increase by Staples.  This appendix details additional support for my opinion, on top of that already provided in Section 6 and Appendix H of the Shapiro Report, and responds to some specific critiques from Mr. Orszag.

## W.B. Mason

Mr. Orszag uses W.B. Mason as his leading example of firms that "have demonstrated a ready ability to expand and reposition as necessary to gain market share."[1]  While W.B. Mason and other firms are of course not frozen in place,

### *Competition for Large Customers*

Mr. Orszag argues that "W.B. Mason is capable of competing for and winning large B-to-B contracts[.]"[2]  Taken at face value, this statement is literally correct, but it does not address the "sufficiency" prong of entry analysis.

---

[1] Orszag Report, ¶ 82.

[2] Orszag Report, ¶ 87.

PX06300-117

CONFIDENTIAL MATERIAL

### *Geographic Footprint*

According to Mr. Orszag, "W.B. Mason can serve prominent customers on a national scale[.]"[3] As support for this claim, he lists the number of states in which W.B. Mason recorded sales to seven particular customers: ██████████████████████████████████████████████ While these customers do receive shipments outside of W.B. Mason's main thirteen-state territory, which it refers to as "Masonville,"[4] the ████████████ of W.B. Mason's sales of consumable office supplies to these customers – ████████████ delivered inside of Masonville.

Moreover, only four of these seven are large customers: ████████████████████ Of W.B. Mason's sales of consumable office supplies to all of its large customers in ██████████ were delivered inside of Masonville.[6] All but a single large customer – ████████████████ – had the majority of their sales located inside of Masonville in 2014. The median number of states in which a large customer of W.B. Mason received deliveries of consumable office supplies ████████████████.[7] This corroborates the testimony of W.B. Mason's CEO, who explains:



### *Potential for Expansion*

As I explained in my original submission, sales of consumable office supplies in all channels is the best measure of scale for the purpose of assessing COGS differences across suppliers.[10]

---

[3] Orszag Report, ¶ 92.



[7] For the purposes of this calculation, Washington, DC is counted as a state.

[10] Shapiro Report, p. 39.

PX06300-118

CONFIDENTIAL MATERIAL



PX06300-119

CONFIDENTIAL MATERIAL



## Amazon Business

As I discussed in Section 5.C.1, I believe it is unlikely that Amazon Business would replace Office Depot as a strong competitor to Staples in the relevant market over the next few years. Here, I address a few more detailed critiques presented by Mr. Orszag and Professor Mendelson regarding Amazon Business.



PX06300-120

CONFIDENTIAL MATERIAL



PX06300-121

CONFIDENTIAL MATERIAL



## Regional Suppliers and Cooperatives

Mr. Orszag believes that large customers would shift a substantial share of their purchases to regional suppliers, wholesalers and cooperatives in response to a post-merger price increase by Staples. Mr. Orszag predicts this response despite the fact that these sources of supply account for only a very modest share of the relevant market.

In his report, Mr. Orszag points out at ¶¶ 98-99 that regional suppliers (other than W.B. Mason) currently competing for large customers "would be incentivized to do so to an even greater degree if a combined Staples and Office attempted to raise prices." He does not dispute my finding that regional vendors rarely serve as primary vendors to large customers, and points out only that large customers sometimes "carve out" some procurement for regional suppliers.[44] He and I are in agreement on this point, though he is silent on the magnitude of these "carve outs." As I explained in the Shapiro Report, by all metrics of current competitive significance for large customers (Fortune 100 shares, primary vendor relationships, and head-to-head bidding data), regional suppliers amount to a small fringe. In pointing to changed incentives post-merger, Mr.

---



PX06300-122

CONFIDENTIAL MATERIAL

Orszag is predicting a dramatic turn of events for regional suppliers. But he offers no analysis that suggests these alternatives are expanding or would attract sufficient business to make it profitable to expand following a post-merger price increase.

Acknowledging the lack of a national distribution network as an obvious disadvantage for regional suppliers, Mr. Orszag turns to cooperatives and wholesalers as possible solutions[45]. As I explained in the Shapiro Report, cooperatives of regional dealers have tried but generally failed to gain large commercial customers.[46] In reply, at ¶ 104 of his report Mr. Orszag curates some public statements from cooperatives ███████████████████ that he is concerned that I overlooked. Below I present the statements from these cooperatives chosen by Mr. Orszag alongside their own declarations, which speak for themselves:



Turning to wholesalers, Mr. Orszag correctly states that a regional supplier can conceivably extend its reach by relying on a wholesaler to distribute products instead. However, he does not address the attractiveness this option holds for suppliers wishing to compete with Staples and Office Depot to serve large customers outside of their region. As I explained in the Shapiro Report, fees for wholesale distribution services add to the cost disadvantage faced by regional suppliers in comparison with Staples and Office Depot.[49]



---

[45] See Orszag Report, ¶¶ 101-102.

[46] Shapiro Report, H-7–8.

[49] Shapiro Report, pp. 38–39.

PX06300-123

CONFIDENTIAL MATERIAL

## Adjacents

At ¶¶ 121-128 of his report, Mr. Orszag turns his attention to "adjacents," i.e., companies whose primary business involves resale of maintenance, repair, and operations products.  I addressed adjacents in the Shapiro Report.  Mr. Orszag's argument that these options will protect large customers from a post-merger price increase by Staples is similar to his argument relating to regional suppliers: while these sources of supply have a very small market share today, that would change markedly if Staples attempts to raise prices following the merger.

For the adjacent suppliers that Mr. Orszag mentions – ███████████████████████████ ██████ he does not claim that any has a meaningful share of the current relevant product market (e.g. >1%), and indeed they do not.  Instead, he proposes that they "clearly have the capacity and willingness to accelerate their expansion and repositioning … [and] there is nothing stopping adjacent firms from attempting to take Staples' and Office Depot's sales[.]"[51]

I do not dispute that Staples is watchful of potential rivals as the internal documents Mr. Orszag cites at ¶ 124 indicate with respect to Grainger.  But given their current position, even aggressive assumptions regarding their rate of expansion do not lead to a conclusion that such entry would come close to satisfying the "sufficiency" prong of merger analysis. ████████████████



To evaluate whether expansion by adjacent firms should be characterized as timely, likely and sufficient, I consider these two facts particularly salient: ██████████████████████████████ █████████████████████████████████████████████ hile I raised both of these points in the Shapiro Report, it is useful to view Mr. Orszag's opinions alongside the statements made by ██████████████████ :

- ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[51] Orszag Report, ¶ 128.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████

PX06300-124

CONFIDENTIAL MATERIAL



In sum, my views on whether expansion by adjacent suppliers will be timely, likely and sufficient to combat harm from the proposed merger are consistent with those of these market participants and corroborated by other evidence.

## Manufacturers

Mr. Orszag (at ¶¶ 139-140) takes issue with customer testimony explaining that they would find it impractical to negotiate purchases directly with several manufacturers and coordinate delivery.[57]  Rather, he views direct purchasing from manufacturers as a *potentially* powerful alternative to Staples and Office Depot:

> A credible threat to purchase a material share of a customer's office supplies directly from manufacturers would be sufficient [to put competitive pressure on a combined Staples and Office Depot], since for large B-to-B customers, even a relatively modest shift in total office supply purchases still constitutes a substantial potential loss for Staples.[58]

I agree with Mr. Orszag that the threat to move business is worthless if it amounts to cheap talk. He therefore presumably believes that such a threat is *already* credible, or would become credible post-merger.  Mr. Orszag also presents an analysis that shows that, on average, customers could move ▮▮ of their business by dealing directly with the five largest ultimate



PX06300-125

CONFIDENTIAL MATERIAL

manufacturers, rather than buying through Staples and Office Depot, and adds that "identifying and negotiating with five to eight manufacturers seems feasible."[59]

To evaluate this claim, Mr. Orszag does not offer evidence regarding the frequency with which customers *today* procure office supplies directly from manufacturers. Such evidence is highly relevant for evaluating whether such a threat would become credible in response to a post-merger price increase by Staples. To this end, Exhibit RE-3 reports whether large customers indeed currently purchase office supplies directly from manufacturers, drawing on procurement responses from Fortune 100 customers. Manufacturers are listed in this table if they are among the top five vendors to Office Depot or Staples for either core office supplies or paper (as identified by Mr. Orszag in his report, at Exhibit D). Of this list of 12 manufacturers, 6 were not reported by F100 customers in purchase data for relevant products. Of the remainder, only one (paper manufacturer Georgia Pacific) has a share greater than 1%. The runner up, Domtar, which Mr. Orszag highlights as a case study of direct-from-manufacturer purchasing, falls short of a 1% share. The next highest, though it fails to reach *one-tenth* of a 1% share (and yet has more sales than the remaining three manufacturers combined), is International Paper, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

For core office supply products, consistent with customer declarations and the head-to-head bidding data maintained by Staples and Office Depot, there is little doubt that direct purchasing is rare. I am not aware of any manufacturer of core office supplies that would be likely to serve as a credible threat for a significant volume of core office supplies, let alone the five or six manufacturers that Mr. Orszag suggests a customer might assemble to combat a post-merger price increase by Staples.

For paper, the infrequency with which customers actually purchase directly from manufacturers undermines the value of the threat Mr. Orszag envisions. Taking the largest paper manufacturers in turn (



---

[59] Orszag Report, ¶ 140.

PX06300-126

CONFIDENTIAL MATERIAL



Regarding the expansion that would have to occur post-merger to replace the competition lost due to the merger between Staples and Office Depot, consider the current position of Office Depot relative to the *combined* share of the top manufacturers listed in Exhibit RE-3. F100 shares indicate that these manufacturers would have to expand over ten-fold in aggregate to achieve Office Depot's current market share.[65]

### *Mr. Orszag's* ▊ *Case Study*

To support his claim that purchasing office supplies (other than paper) directly from manufacturers will protect large customers from a post-merger price increase by Staples, Mr. Orszag points to his case study ▊▊▊.[66] He claims that ▊▊ already sells directly to end customers, and could expand this effort following the merger:



> As a second case study, I analyzed direct-to-customer sales by ▊▊, a manufacturer of ▊▊▊▊▊▊▊▊▊▊. In 2015, ▊▊▊▊

To begin with, at least ▊▊▊ of the ▊▊▊▊ of sales identified by Mr. Orszag result from a data error: Mr. Orszag misidentified office supply *resellers and distributors* as end-use



PX06300-127

CONFIDENTIAL MATERIAL



In the end, the ▮▮▮▮ example simply does not demonstrate that large customers would find it attractive to make significant purchases of consumable office supplies directly from manufacturers, even in response to a post-merger price increase by Staples.



PX06300-128