**REDACTED PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al., | |
| Plaintiffs, | Civil Action No. 1:15-cv-02115 |
| v. | |
| STAPLES, INC. and OFFICE DEPOT, INC., | (Judge Emmet G. Sullivan) |
| Defendants. | **FILED UNDER SEAL** |

**<u>DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

I.    APPLICABLE LEGAL STANDARDS ............................................................. 8

    A.    PLAINTIFFS' HEAVY BURDEN .................................................... 8

    B.    PLAINTIFFS MUST DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS .................................................................................. 10

II.   PLAINTIFFS CANNOT ESTABLISH A RELEVANT MARKET ............... 12

III.  COMPETITIVE EFFECTS ............................................................................. 16

IV.   THE COURT CAN CONSIDER PROPOSED REMEDIES ......................... 20

V.    THE PARTIES AND THE MERGER ............................................................. 21

VI.   PROCEDURAL HISTORY .............................................................................. 22

VII.  INDUSTRY BACKGROUND ......................................................................... 23

    A.    THE B2B OFFICE PRODUCTS MARKET ................................... 23

    B.    CHARACTERISTICS OF LARGE B2B CUSTOMERS ................ 27

    C.    LARGE B2B CUSTOMERS USE MANY TOOLS TO PURCHASE OFFICE PRODUCTS AT LOW PRICES AND WITH NECESSARY SERVICES ............................. 30

VIII. THE FTC HAS NOT DEFINED A RELEVANT PRODUCT MARKET ...... 34

    A.    CUSTOMERS' AND COMPETITORS' DOCUMENTS AND TESTIMONY OVERWHELMINGLY SHOW THAT INDUSTRY PARTICIPANTS DO NOT RECOGNIZE PLAINTIFFS' ALLEGED PRODUCT MARKET ......................................... 34

        1.    Plaintiffs Identify An Arbitrary Assortment Of Products ........................ 35

        2.    Large Customers' Actual Purchases Contradict Plaintiffs' Alleged Relevant Market ........................................................................... 38

    B.    PLAINTIFFS' CURRENT DEFINITION OF "CONSUMABLE OFFICE SUPPLIES" IS INCONSISTENT WITH THE FTC'S PAST POSITIONS AND ITS OWN PURCHASING EXPERIENCE ........................................................ 41

    C.    PROFESSOR SHAPIRO'S TESTIMONY CANNOT SALVAGE PLAINTIFFS' CASE ........... 44

        1.    Professor Shapiro's Conclusions Rely On a Fatally Flawed Definition of the Relevant Market ............................................... 44

IX.   THE MERGER WILL NOT RESULT IN ANTICOMPETITIVE EFFECTS ................ 48

    A.    THE ENTRY AND RAPID EXPANSION OF AMAZON BUSINESS AS A DISRUPTIVE COMPETITOR HAS FUNDAMENTALLY CHANGED THE NATURE OF COMPETITION IN THE B2B OFFICE PRODUCTS MARKET .................................. 48

1.    Amazon Business Is Rapidly Expanding Its Capabilities and Targeting Large Customers ..................................................... 53

2.    Large Customers Are Considering Amazon Business Now and Will Increasingly Look To Amazon Business In the Future ................... 57

3.    Defendants Perceive Amazon Business As an Existential Competitive Threat ..................................................................... 59

B.    SUBSTANTIAL EVIDENCE CONFIRMS THAT COMPETITION EXISTS NOW AND WILL EXIST IN THE FUTURE FOR B2B SALES OF OFFICE PRODUCTS .................... 62

1.    Large National Customers Can and Do Choose Suppliers Other Than Staples and Office Depot for Their Office Products ...................... 63

2.    Alternative Suppliers Already Can Provide National Coverage to Customers .................................................................... 64

3.    Alternative Suppliers Can Provide the Features That Large B2B Customers Allegedly Require ..................................................... 67

4.    Independent Office Supply Vendors Are Growing and Expanding Their Coverage and Capabilities ............................................. 68

5.    Wholesalers Such As Essendant and S.P. Richards Partner with Office Supply Vendors to Expand Their Footprints ................................. 70

C.    DEFENDANTS WOULD LOSE CUSTOMERS OF OFFICE SUPPLIES AND PAPER AND OF ADJACENT "BEYOND OFFICE SUPPLIES" PRODUCTS IF THEY ATTEMPT TO RAISE PRICES ......................................................... 71

D.    COMPETING SUPPLIERS ARE POSITIONED TO GAIN MARKET SHARE IF A POST-MERGER STAPLES ATTEMPTED TO RAISE PRICES ......................... 73

X.    THE EVIDENCE SHOWS THAT PLAINTIFFS IMPROPERLY BEGAN WITH A PRESUMPTION THAT THE MERGER WAS ANTICOMPETITIVE AND WORKED BACKWARD TO FIND EVIDENCE SUPPORTING THEIR CONCLUSION .................................................................. 77

A.    SOME OF THE "CONCERNED" CUSTOMERS HAVE EXPLICITLY IDENTIFIED BIAS AGAINST THE MERGER AND THE DEFENDANTS ........................... 80

B.    SOME OF THE "CONCERNED" CUSTOMERS HAVE UNIQUE AND/OR IRRELEVANT CONCERNS THAT DO NOT RELATE TO THE COMPETITIVENESS OF THE ALLEGED RELEVANT MARKET ................................................ 81

C.    FTC WITNESSES ASSERTING THAT ONLY STAPLES AND OFFICE DEPOT COULD SERVE THEM HAVE DONE NOTHING TO INVESTIGATE ALTERNATIVE SUPPLIERS .................................................................. 82

XI.    THE B2B OFFICE PRODUCTS MARKET IS AND WILL REMAIN COMPETITIVE POST-MERGER ..................................................... 84

A.    MANY VENDORS COMPETE TO SELL OFFICE SUPPLIES TO LARGE B2B CUSTOMERS .................................................................. 84

B.    INDEPENDENT VENDORS WORKING WITH WHOLESALERS COMPETE FOR LARGE B2B CUSTOMERS .................................................................. 85

C.    MANUFACTURERS OF OFFICE SUPPLIES SELL DIRECTLY TO NATIONAL CUSTOMERS ............................................................................................ 86

D.    THE COMMODITIZED NATURE OF OFFICE SUPPLIES ALLOWS LARGE B2B CUSTOMERS TO CONTINUOUSLY SEEK OUT BETTER TERMS ................. 87

E.    THE CHARACTERISTICS OF THE ALLEGED RELEVANT MARKET DIFFER SUBSTANTIALLY FROM THOSE IN SYSCO ............................................ 90

F.    THE COURT HAS REVIEWED PROPOSED REMEDIES THAT WOULD ELIMINATE ANY POTENTIAL ANTICOMPETITIVE EFFECTS ..................... 92

XII.   THE MERGER WILL CREATE ENORMOUS VERIFIABLE EFFICIENCES THAT WILL BE PASSED ON TO CUSTOMERS ........................................... 94

A.    CALCULATION AND METHODOLOGY .................................... 94

B.    MERGER-SPECIFIC, VARIABLE COST SAVINGS ..................................... 96

C.    EFFICIENCIES WILL PASS ON TO CUSTOMERS ...................................... 97

XIII.  THE EQUITIES WEIGH IN FAVOR OF THE PROPOSED MERGER ....................... 98

XIV.   DISPOSITION ................................................................................. 99

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................................................9, 13, 19

*Cargill v. Monfort of Colorado*,
1986 WL 727374 (March 28, 1986) ......................................................................19

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)................................................................................................13

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972)................................................................................................20

*FTC v. Arch Coal, Inc.*,
329 F. Supp. 2d 109 (D.D.C. 2004) ........................................................... *passim*

*FTC v. Arch Coal, Inc.*,
No. 04-0534 (D.D.C. July 7, 2004)........................................................................21

*FTC v. Butterworth Health Corp.*,
946 F. Supp. 1285 (W.D. Mich. 1996) *aff'd sub nom. Fed. Trade Comm'n v. Butterworth Health Corp.*, 121 F.3d 708 (6th Cir. 1997) .......................................................... 21

*FTC v. Cardinal Health*,
12 F. Supp. 2d 34 (D.D.C. 1998) ..................................................................9, 13, 17

*FTC v. CCC Holdings*,
605 F. Supp. 2d 26 (D.D.C. 2009) ........................................................................12

*FTC v. Exxon Corp.*,
636 F.2d 1336 (D.C. Cir. 1980) ..............................................................................8

*FTC v. Foster*,
No. 07-352, 2007 WL 1793441 (D.N.M. May 29, 2007)...............................8, 9, 12

*FTC v. Freeman Hosp.*,
69 F.3d 260 (8th Cir. 1995) ...................................................................................12

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ...............................................................................11

*FTC v. Lab. Corp. of Am.*,
No. 10-1873, 2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) ...................................................12

*FTC v. Occidental Petroleum Corp.*,
No. 86-900, 1986 WL 952 (D.D.C. Apr. 29, 1986)............................................................8, 10

*FTC v. Pharmtech Research, Inc.*,
576 F. Supp. 294 (D.D.C. 1983) ...............................................................................................9

*FTC v. ProMedica Health Sys.*,
No. 3:11 CV 47, 2011 U.S. Dist. LEXIS 33434 (N.D. Ohio Mar. 29, 2011)..........................11

*FTC v. Staples*,
970 F. Supp. ........................................................................................................................15, 42

*FTC v. Swedish Match*,
131 F. Supp. 2d 151 (D.D.C. 2000) .......................................................................................9, 12

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1, 26 (D.D.C. 2015) ...............................................................14,  90, 91, 92

*FTC v. Weyerhaeuser*,
665 F.2d 1072 (D.C. Cir. 1981) ..........................................................................................9, 10, 20

*Hospital Corp. of Am. v. FTC*,
807 F.2d 1381 (7th Cir 1986) ...................................................................................................19

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989) ..................................................................................................18

*Mo. Portland Cement Co. v. Cargill, Inc.*,
498 F.2d 851 (2d Cir. 1974).........................................................................................................8

*PepsiCo, Inc. v. Coca-Cola Co.*,
114 F. Supp. 2d 243 (S.D.N.Y. 2000).............................................................................13, 14, 15, 16

*In the Matter of Polypore International, Inc.*,
(2008) .........................................................................................................................................18

*In re R.R Donnelley & Sons Co.*,
120 FTC 36 (1995).......................................................................................................................17

*R.R. Donnelley & Sons Co.*,
1990–2 Trade Cases (CCH) ¶ 69,239 (D.D.C.1990) ............................................................18

*Roberson v. Giuliani*,
346 F.3d 75 (2d Cir. 2003)........................................................................................................21

*Sullivan v. Murphy*,
    478 F.2d 938 (D.C. Cir. 1973) ..................................................................................20

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
    691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd sub nom Haagen-Dazs v. Double Rainbow
    Gourmet Ice Creams, Inc.*, 895 F. 2d 1417 (9th Cir. 1990)......................................14

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ..................................................................................15

*U.S. v. Cont'l Can Co.*,
    378 U.S. 441 (1964)...................................................................................................16

*United States v. Archer-Daniels-Midland Co.*,
    866 F.2d 242 (8th Cir. 1988) ....................................................................................10

*United States v. Baker Hughes, Inc.*,
    908 F.2d 981 (D.C. Cir.1990)........................................................................10, 11, 19

*United States v. Baroid Corp.*,
    346 F. Supp. 2d 138 (D.D.C. 2004) ..........................................................................21

*United States v. Falstaff Brewing Corp.*,
    410 U.S. 526 (1973)...................................................................................................18

*United States v. Gen. Dynamics, Corp.*,
    415 U.S. 486 (1974)...................................................................................................11

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)...............................................................................................13, 35

*United States v. H&R Block*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ............................................................................91

*United States v. Latney's Funeral Home, Inc.*,
    41 F. Supp. 3d 24, 36 (D.D.C. 2014) ........................................................................20

*United States v. Marine Bancorp, Inc.*,
    418 U.S. 602 (1974)...............................................................................................12, 18

*United States v. Oracle*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ........................................................... *passim*

*United States v. SunGard Data Sys., Inc.*,
    172 F. Supp. 2d 172 (D.D.C. 2001)................................................................. *passim*

*W. Parcel Express v. United Parcel Serv. of Am., Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998), *aff'd* 190 F.3d 974 (9th Cir. 1999) ...........14

*Westman Comm'n Co. v. Hobart Int'l Inc.*,
796 F.2d 1216 (10th Cir. 1986) ........................................................................................14, 15

**Statutes**

15 U.S.C. § 45(c) ........................................................................................................8

15 U.S.C. § 53(b) ....................................................................................................1, 9

Antitrust Law § 325b ..................................................................................................10

Clayton Act. ............................................................................................................12

Section 7 of the Clayton Act ................................................................................9, 10, 12

Section 13(b) of the FTC Act ................................................................................ *passim*

FTC Administrative Law ..............................................................................................22

SMARTER Act of 2015 ..............................................................................................10

**Other Authorities**

FTC 2013 Closing Statement ........................................................................................ 20

Horizontal Merger Guidelines (2010) ....................................................................... *passim*

## PRELIMINARY STATEMENT

1.      Plaintiffs ask this Court to block a merger that indisputably will benefit *all* retail customers, and more than 99% of business customers, of office supplies in the United States. No unconsummated merger has ever survived the issuance of a preliminary injunction, and the result will be no different in this case. If this Court grants Plaintiffs' motion, the merger of Staples and Office Depot simply will not occur, and hundreds of thousands of business customers and millions of individuals will never receive those benefits.

2.      Under Section 13(b) of the FTC Act, this Court alone – with no deference to the Commission – may issue an injunction only if it determines that doing so is "in the public interest," after "weighing the equities and considering the Commission's likelihood of ultimate success." 15 U.S.C. § 53(b). The equities to be considered by this Court are not limited to the interests of the small fraction of Defendants' business customers on which Plaintiffs' have elected to focus, but instead include the interests of all of Defendants' customers, including businesses of all shapes and sizes and moms and dads buying school supplies. And to justify such extraordinary and drastic relief, Plaintiffs must prove a likelihood of success on the merits by showing a reasonable probability that the proposed transaction would substantially lessen competition in the future.

3.      After a year-long, one-sided investigation, accompanied by the sweeping compulsory process powers of the FTC, followed by discovery ordered by this Court, the FTC obtained the production of millions of documents, extensive written discovery, and more than 70 depositions and "investigational hearings," culminating in ten days of live testimony from ten government witnesses. And, despite this, Plaintiffs have failed in every respect to show any harm to competition, let alone meet the high burden required to warrant the extraordinary relief of

blocking this merger.

4.      Plaintiffs' case relied entirely upon a gerrymandered and artificially narrow product market limited to *some*, but not all, "consumable office supplies" sold to only the most powerful companies in the world. Compounding their error, Plaintiffs' market share calculation credits only *some* of Defendants' competitors, as Plaintiffs did not even attempt to obtain sales data from key ink and toner suppliers or from the "elephant in the room," Amazon. Plaintiffs had tunnel vision every step of the way, assuming the conclusion without a thorough and unbiased investigation. Because of this failure, Plaintiffs have presented this Court with a distorted picture, untethered from the actual marketplace realities detailed by Plaintiffs' own witnesses.

5.      ***First, the "market" defined by Plaintiffs is a fiction that does not exist outside the courtroom and does not withstand scrutiny.*** The Commission has *never* won a case under Section 13(b) of the FTC Act without the benefit of a presumption of illegality resulting from undue concentration levels in a properly defined relevant market. Faced with this reality and the prospect that the math would not work for them using the market definition they have repeatedly used to analyze this same industry, Plaintiffs ignored evidence that did not support their theory and sliced and diced the market in an attempt to achieve high concentration levels. The market they would ultimately present to this Court bears no resemblance to ***any*** evidence in this case or the "consumable office supplies" market the FTC has used time and again: the new relevant market would include traditional office supplies and paper – but ***not*** ink and toner or any other consumable office product sold pursuant to the same contracts to the very same customers.

6.      This made-for-litigation "market" was emphatically contradicted by *every* one of Plaintiffs' fact witnesses as unhinged from business realities. Tellingly, in 2013, the FTC publicly concluded that ink and toner were part of the "consumable office supplies" market when

evaluating the same industry in its investigation of the Office Depot/OfficeMax merger.

Plaintiffs failed to offer any credible explanation for this dramatic change in course. It certainly

was not based on any meaningful, independent expert analysis. After considerable questioning

by both defense counsel and the Court, Plaintiffs' expert economist (Professor Carl Shapiro)

ultimately conceded that it was FTC staff, and not Professor Shapiro, that made the decision to

exclude ink and toner from the proposed market. Stunningly, he admitted that no data was ever

obtained from Managed Print Services ("MPS") providers and that he had done no empirical

analysis to justify a conclusion that competitive conditions for ink and toner had materially

changed in the last two years. Professor Shapiro simply accepted the FTC's new product market

definition, never even bothering to meaningfully examine whether FTC staff got it right. Having

failed to satisfy their burden to properly define an appropriate relevant market, Plaintiffs' relief

should be denied for this threshold reason alone.

     7.     ***Second, Plaintiffs improperly narrowed their lens to focus only on a small***

***fraction of customers to eliminate competitive alternatives from their story.*** Throughout the

course of this litigation, the alleged group of "at risk" customers has been a moving target.

Conceding that the merger will not harm ordinary consumers and the vast majority of business

customers, Plaintiffs have struggled to articulate a consistent group of customers that they allege

will be at the mercy of the combined firm. Their Complaint alleged a market of those customers

purchasing at least $1 million of "consumable office supplies" (excluding ink and toner) per year

(Compl. ¶ 41). A few months later, this threshold was lowered to those customers purchasing at

least $500,000 of "consumable office supplies" (excluding ink and toner) annually. PI Br. at 15.

Amazingly, Plaintiffs later implied (inaccurately) that they could even show harm if the

threshold were lowered to those customers that purchase more than $250,000 of "consumable

office supplies" (excluding ink and toner) per year, despite having neither alleged nor attempted to prove any such harm. PI Reply Br. at 9 (citing PX06300 (Shapiro Reply Rpt). at 7, 15, Ex. R5). Putting aside that Plaintiffs have no justification for these myriad figures, regardless of where Plaintiffs draw their "magic" line, they have chosen to limit their "market" of purportedly vulnerable customers to the largest, richest, most sophisticated, and most powerful 1% of companies in America. These companies indisputably pay the lowest prices for office products, and have numerous and effective tools for securing the lowest prices—including the acknowledged ability and willingness to use those resources to seek alternative suppliers in the event of a post-merger price increase.

8.      *Third, Professor Shapiro's findings are based upon a market share "analysis" that does not even accurately reflect Plaintiffs' unrealistic market.* The crux of Dr. Shapiro's analysis – the market shares he calculated from a subset of Fortune 100 companies – is seriously flawed. Professor Shapiro bases his market share calculations on stale 2014 data, which does not reflect the significant changes in the marketplace over the last two years, including the continued rapid growth of W.B. Mason and, critically, the launch of Amazon Business. Tr. at 2496:14-19. Moreover, the sample on which he bases his conclusions is irredeemably biased and unreliable. Rather than look across all of the asserted "large" customers that fall within the FTC's proposed relevant market (or even an unbiased sample of those customers), his sole market share analysis is based entirely on the purchasing behavior of 81 of the Fortune 100. Tr. 2474:8-16. Even within the Fortune 100, his shares conveniently overlook 19 other Fortune 100 companies that frequently purchase from a broad array of suppliers, further enhancing the bias in his results. But most troublingly, Professor Shapiro ignores the overwhelming majority of the approximately 1,200 companies that fall within the FTC's asserted relevant market, despite his admission that

smaller customers have more options than larger ones. By his own logic, his sample of 81 of the largest companies in the world simply cannot be representative of the entire relevant market alleged by the FTC, let alone the hundreds of thousands of business customers served by Staples, Office Depot, and their competitors.

9.      Professor Shapiro made a number of other material errors in calculating market shares – including: (1) failing to account for the role that Tier 1 diversity suppliers play in serving large customers; (2) failing to account for the role that large paper manufacturers play when they do everything except actually deliver the paper to the customer; (3) arbitrarily excluding federal and state government agencies that otherwise meet the $500,000 threshold and, by his own admission, frequently use suppliers other than Staples and Office Depot; (4) failing to use a complete reliable measure of off-contract spend, known in the industry at "leakage"; and (5) failing to properly credit Essendant and its dealer partners for the role that they would play as a result of the proposed divestiture. These omissions further biased and artificially inflated the market shares calculated by Professor Shapiro in Plaintiffs' transparent effort to obtain a legal presumption against this deal. Thus, Plaintiffs also failed to meet their burden of showing undue concentration, even in their gerrymandered market.

10.      **_Finally, Plaintiffs' own witnesses, including the rapidly expanding Amazon Business, overwhelmingly rebut any weak presumption that Plaintiffs seek._** Putting even these failings aside, however, any presumption sought by Plaintiffs would be extremely weak and has been thoroughly rebutted by the testimony elicited during Plaintiffs' case-in-chief. Indeed, the FTC unsuccessfully urged key witnesses to testify regarding their alleged inability to compete with a merged Staples/Office Depot. The witnesses rejected those "high priority" assertions from the FTC and instead confirmed the existence of strong competition, including by the looming

market disruptor, Amazon Business. After significant motion practice, Amazon Business

provided extensive testimony and ordinary-course internal documents regarding its current and

future abilities to sell office products to large B2B customers as well as its steady

implementation of new features targeted specifically at the needs of large customers. The

undisputed evidence shows that Amazon Business is rapidly expanding to compete on an equal

footing with a combined Staples/Office Depot within the next two to three years, the time frame

that Plaintiffs' expert admitted and case law confirms is the relevant period for this Court to

consider.

11.     When the FTC analyzed this very same industry in 2013, it reached precisely the

opposite conclusions from those it is now urging the Court to adopt. The FTC publicly stated, in

approving the Office Depot/OfficeMax merger, that the parties would "continue to face strong

competition" for "large customers" from a "host of non-OSS [i.e., non-Staples and Office Depot]

competitors, such as W.B. Mason," which the FTC acknowledged "are growing in number and

strength and have demonstrated the ability to win large multi-regional and national customer

contracts." Since that time, it is undeniable that the competition from W.B. Mason, Amazon, and

others has grown even stronger. Moreover, Plaintiffs' witnesses uniformly acknowledged that

office supply prices have not increased—but rather have *decreased*—in the wake of that merger.

Yet Plaintiffs would have this Court believe that the FTC's outside-of-litigation analysis in 2013

was wrong, and that its made-for-litigation allegations in 2016 are right. The evidence confirms

that the opposite is true.

12.     Despite investigating this proposed merger for more than a year, using the federal

and state government enforcement powers, Plaintiffs have woefully failed to meet their burden.

If Plaintiffs can obtain a preliminary injunction under the facts in this case—where the evidence

6

presented by all of Plaintiffs' own witnesses contradicts Plaintiffs' alleged relevant market, where declarations drafted by Plaintiffs fail to support Plaintiffs' alleged relevant market (after serious and significant revision by witnesses to reflect reality), where rapidly intensifying competition post-merger will continue to constrain Staples, and where the vast majority of customers will *benefit* from the transaction—then it is hard to imagine any Section 13(b) case where Plaintiffs could fail to obtain an injunction.

13.     Although Plaintiffs are not entitled to any relief from this Court, Defendants have committed to allowing the very customers Plaintiffs are suing over to extend their contracts through 2019, if they choose to do so. Professor Shapiro readily admitted that this would significantly reduce any claimed harm, and it will unquestionably bridge any alleged gap until Amazon Business is clobbering its B2B competition. In addition, Defendants have entered into a proposed divestiture agreement with Essendant, the industry's leading wholesaler, under which Defendants would transfer $550 million in business and related assets and employees to Essendant so it can be an even stronger distributor to support Tier 1 and other independent dealers servicing large business customers, should the Court conclude such a remedy is necessary. By any measure, the merging parties have gone out of their way to address the claimed concerns by Plaintiffs and pacify the very few customers that have complained here.

14.     For all of these reasons, Plaintiffs' motion for a preliminary injunction should be denied so that the proposed merger may proceed, cost savings can be passed on to consumers, substantial efficiencies can be realized and passed on to consumers, and a combined Staples/Office Depot can better compete in a rapidly evolving marketplace.

**CONCLUSIONS OF LAW**

## I.   APPLICABLE LEGAL STANDARDS

### A.   PLAINTIFFS' HEAVY BURDEN

15.     "The issuance of a preliminary injunction prior to a full trial on the merits is an extraordinary and drastic remedy" because it "may prevent the transaction from ever being consummated." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) (quotation marks omitted); *see also Mo. Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 870 (2d Cir. 1974) (injunction likely "spell[s] the doom of an agreed merger").

16.     Despite the FTC's assertions to the contrary, a "full review of the merits" is a year-long process before an administrative law judge, followed by an "appeal" to the very same Commissioners who brought this lawsuit. Only after these lengthy administrative proceedings are concluded is a review of the merits by the Court of Appeals available. 15 U.S.C. § 45(c). The total administrative review process, including appeal, takes anywhere from 2 to 4 years and no unconsummated merger has ever survived the issuance of a preliminary injunction.

17.     Indeed, Staples and Office Depot have publicly stated to this Court and elsewhere that, rather than endure the administrative proceedings, the proposed transaction will be terminated if preliminarily enjoined. *See*, *e.g.*, Tr. at 3034:18-22. If that occurs, the unrebutted and significant benefits the proposed transaction would bring to ***all*** individual consumers and more than 99% of B2B customers will never be achieved.

18.     "Given the stakes," the FTC bears a heavy burden when it requests preliminary injunctive relief from a federal court. *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004); *FTC v. Foster*, No. 07-352, 2007 WL 1793441 at *51 (D.N.M. May 29, 2007); *FTC v. Occidental Petroleum Corp.*, No. 86-900, 1986 WL 952, at *13 (D.D.C. Apr. 29, 1986).

8

19.     Under Section 13(b) of the FTC Act, the Court is to determine whether an injunction is "in the public interest," after "weighing the equities and considering the Commission's likelihood of ultimate success." 15 U.S.C. § 53(b). In this context, the public interest is the benefit of the proposed merger to all consumers – not just those mega-companies the FTC has sued to protect. *See*, *e.g.*, *FTC v. Pharmtech Research, Inc.*, 576 F. Supp. 294, 299 (D.D.C. 1983) (citing *FTC v. Weyerhaeuser*, 665 F.2d 1072, 1082 (D.C. Cir. 1981)) ("In the context of a merger proceeding … public equities include beneficial economic effects and procompetitive advantages for consumers.").

20.     "Absent a likelihood of success on the merits, equities alone will not justify an injunction." *Arch Coal,* 329 F. Supp. 2d at 116. To prove a likelihood of success on the merits under Section 7 of the Clayton Act, the FTC "must show a reasonable probability that the proposed transaction would substantially lessen competition in the future." *FTC v. Cardinal Health*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998) (quotation marks omitted). The Supreme Court has explained that to satisfy this standard the FTC must show that "there is a *reasonable probability* that the merger will substantially lessen competition." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (emphasis added); *see also FTC v. Swedish Match*, 131 F. Supp. 2d 151, 156 (D.D.C. 2000).

21.     In evaluating the FTC's Complaint, the Court must "exercise independent judgment" – it cannot simply defer to the FTC. *Weyerhaeuser*, 665 F.2d at 1082; *Foster*, 2007 WL 1793441, at *51 ("If Congress did not want federal courts to play some meaningful role in the injunction process, it could have given injunction power directly to the FTC.").

22.     Some courts have characterized the FTC's burden under Section 13(b) as being lower than that under a traditional preliminary injunction standard, but this is only because the

FTC is not required to show irreparable harm. *See FTC v. Weyerhaeuser, Co.*, 665 F.2d at 1082;

*see also* Areeda *et al.*, Antitrust Law § 325b ("When the FTC brings suit, it is sometimes said

that irreparable harm is presumed, but probable success on the merits must still be proven."). The

FTC itself recognizes that it does ***not*** have a lower standard in proving its likelihood of success

on the merits. *See* Exhibit A, Global Competition Review, An Interview with Deborah Feinstein

(Feb. 11, 2015) ("[I]n practice the judges view the standards the same way…. I just don't see the

evidence in practice of any meaningful difference between the way courts approach our cases or

the antitrust division's merger challenges."). Indeed, the Chairwoman of the Commission, Edith

Ramirez, recently testified before the United States Senate regarding pending legislation

designed to eliminate the FTC's ability to pursue administrative adjudication to challenge a

proposed transaction when it seeks a preliminary injunction in federal court. In a written

statement on behalf of the Commission, Chairwoman Ramirez explicitly recognized that "while

the preliminary injunction standard prescribed for the FTC under Section 13(b) of the FTC Act is

worded differently than the one that applies to DOJ, the FTC, like DOJ, is ***required to make a***

***robust evidentiary and legal showing that the transaction would likely be anticompetitive in***

***order to obtain a preliminary injunction***." Exhibit B, FTC Statement, U.S. Senate Judiciary

Committee, S. 2102, The "SMARTER Act of 2015" October 7, 2015 (emphasis added).

### B.    PLAINTIFFS MUST DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

23.    "The objective of Section 7 of the Clayton Act is to prohibit only those

acquisitions that may allow the combined entities to exercise market power by raising prices and

restricting the availability of a product or service to customers." *Occidental Petroleum*, 1986 WL

952, at *13; *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988).

24.    To establish a likelihood of ultimate success on the merits, the FTC must

demonstrate undue concentration in a properly defined relevant market. *Baker Hughes*, 908 F.2d

at 982; *Arch Coal*, 329 F. Supp. 2d at 117. Only after the FTC properly defines a relevant market and then establishes undue concentration in that market, is it entitled to a presumption that anticompetitive effects from the merger are probable. *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001). "[A] failure of proof in any respect will mean the transaction should not be enjoined." *Arch Coal*, 329 F. Supp. 2d at 116. Indeed, no court has ever issued a preliminary injunction under Section 13(b) where the FTC has failed to establish a presumption of illegality.

25.     Further, regardless of concentration levels, any presumption established can be rebutted by establishing that anticompetitive effects are unlikely. *See United States v. Gen. Dynamics, Corp.*, 415 U.S. 486, 498 (1974); *see also Arch Coal*, 329 F. Supp. 2d at 130 ("[T]his Circuit has cautioned against relying too heavily on a statistical case of market concentration alone, and that instead a broad analysis of the market to determine any effects on competition is required."). And where Plaintiffs' prima facie case is weak, it "requires less of a rebuttal showing by defendants." *Arch Coal*, 329 F. Supp. 2d at 158; *accord*, *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir.1990); *FTC v. ProMedica Health Sys.*, No. 3:11 CV 47, 2011 U.S. Dist. LEXIS 33434, at *157 (N.D. Ohio Mar. 29, 2011) (less of a showing required to rebut the "less-than-compelling" prima facie case).

26.     Establishing that anticompetitive effects are unlikely can be accomplished in myriad ways. *See*, *e.g.*, *id.* at 158 (unilateral price increase unlikely); *Arch Coal*, 329 F. Supp. 2d at 157-59 (D.C. Cir. 2004) (divestiture remedying alleged harm); *Baker Hughes*, 908 F.2d at 984 (entry and repositioning of competitors); *id.* at 986-87 (sophisticated customers); *Heinz*, 246 F.3d at 720 (procompetitive efficiencies). Critically, defendants also can "rebut the presumption by producing evidence that market-share statistics produce an inaccurate account of the merger's probable effects on competition in the relevant market." *Arch Coal*, 329 F. Supp. 2d at 116.

27.     Entry or expansion can also be the basis for a rejection of claims of probable anticompetitive effects. Where "non-merging firms [are] able to reposition their products to offer close substitutes for the products offered by the merging firms," the likelihood of competitive harm is diminished. [DX02576] Horizontal Merger Guidelines (2010) ("HMG") § 6.1; *see also FTC v. CCC Holdings*, 605 F. Supp. 2d 26, 57 (D.D.C. 2009) ("The ability and willingness of current competitors to expand their foothold in the market and/or reposition greatly reduces the anticompetitive effects of a merger, and is essentially equivalent to new entry.").

## II.     PLAINTIFFS CANNOT ESTABLISH A RELEVANT MARKET

28.     "Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act." *United States v. Marine Bancorp, Inc.*, 418 U.S. 602, 618 (1974) (" ) (quotation marks omitted); *Swedish Match*, 131 F. Supp. 2d at 156.

29.     "Not only is the proper definition of the relevant product market the first step in this case, it is also the key to the ultimate resolution of this type of case, since the scope of the market will necessarily impact any analysis of the anticompetitive effects of the transaction." *United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 181 (D.D.C. 2001). *See also Arch Coal*, 329 F. Supp. 2d at 119 (relevant product market necessary to identify area of trade with alleged anticompetitive effects). Without a well-defined product market, "an examination of a transaction's competitive effects is without context or meaning." *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995).

30.     Thus, "[t]he failure to properly define a relevant market may lead to the dismissal of a Section 7 claim." *FTC v. Lab. Corp. of Am.*, No. 10-1873, 2011 WL 3100372 at *17 (C.D. Cal. Feb. 22, 2011); *Foster*, 2007 WL 1793441 at *56.

31.     A product market must be defined through a *rigorous* exploration of demand, *i.e.*, "the reasonable interchangeability of use" of and the "cross-elasticity of demand" between defendants' products and competing products. *Brown Shoe*, 370 U.S. at 325. The key question is whether a hypothetical monopolist in the alleged market profitably could impose a small but significant and non-transitory increase in price ("SSNIP"). *See*, *e.g.*, *Oracle*, 331 F. Supp. 2d at 1111-12; *Arch Coal*, 329 F. Supp. 2d at 120; *accord* [DX02576] HMG § 4.1.1.

32.     A well-defined product market "***must correspond to the commercial realities of the industry*** and be economically significant" and should "recognize competition, where, in fact competition exists." *Brown Shoe*, 370 U.S. at 326, 336-37 (quotation marks and footnote omitted) (emphasis added); *see also Cardinal Health*, 12 F. Supp. 2d at 46 (same); *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000) (rejecting PepsiCo's contention "that a bundle of product (fountain syrup) and services (system distribution) utilized by certain customers comprises a separate market"). "[A]ntitrust theory and speculation cannot trump facts, and even Section 13(b) cases must be resolved on the basis of the record evidence relating to the market and its probable future." *Arch Coal*, 329 F. Supp. 2d at 117. Relying on "formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 482 (1992).

33.     As the Supreme Court explained, where, as here, the government claims that the relevant market is a "cluster market," that market must "***reflect[] commercial realities***." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966). Courts combine a "number of different products or services where that combination reflects commercial realities…Thus, what is relevant for consideration here is not any particular . . . item sold or delivered by Defendants, but the full panoply of products and services offered by them that customers recognize" as the

13

market. *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 26 (D.D.C. 2015).

34.     Further, "[c]ourts should be guided by the commercial realities facing the

[relevant consumer], not only by the method of product distribution." *PepsiCo*, 114 F. Supp. 2d

at 251. "[A]ny definition of a line of commerce which ignores the buyers and focuses on what

the sellers do, or theoretically can do, is not meaningful." *Westman Comm'n Co. v. Hobart Int'l*

*Inc.*, 796 F.2d 1216, 1220-21 (10th Cir. 1986) (quoting *United States v. Bethlehem Steel Corp.*,

168 F. Supp. 576, 592 (S.D.N.Y. 1958).

35.     Courts reject product markets where the record shows "a spectrum of consumer

choices, and active competition for those choices." *W. Parcel Express v. United Parcel Serv. of*

*Am., Inc.*, 65 F. Supp. 2d 1052, 1059-60 (N.D. Cal. 1998), *aff'd* 190 F.3d 974 (9th Cir. 1999).

*See also In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D.

Cal. 1988), *aff'd sub nom Haagen-Dazs v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F. 2d

1417 (9th Cir. 1990). "[T]o the extent that clear breaks are difficult to identify, attempts to create

defensible market boundaries are likely to be based on relatively vague product characteristics.

Product characteristics that are too vague do not meet section 7's requirement that the relevant

market be "well-defined." *Oracle* 331 F. Supp. 2d at 1120-21 (citing *FTC v. Tenet Healthcare*,

186 F.3d 1045, 1052 (8th Cir. 1999)).

36.     Similarly, a merger cannot be enjoined on the basis of harm to a large group of

customers when Plaintiffs fail to present a sufficiently representative set of customers and the

customers in question are highly heterogeneous. *See*, *e.g.*, *SunGard*, 172 F. Supp. 2d at 191-92

("Instead of fine-tuning its presentation to account for significant differences among defendants'

customers, the government lumped all customers together. As a result, this Court is unable to

determine with any degree of certainty whether those [50] companies that claim they would not

switch in response to a SSNIP are representative of [7,500 alleged market] customers . . . .")
Courts have recognized that "[d]rawing generalized conclusions about an extremely
heterogeneous customer market based upon testimony from a small sample is not only
unreliable, it is nearly impossible." *Oracle*, 331 F. Supp. 2d at 1167 (citing *Sungard Data Sys.*,
172 F. Supp. 2d at 182–83).

37.     In addition, product markets predicated on a "one-stop-shopping" distribution
theory are frequently rejected – *i.e.*, courts have found that a combination of other distributors
may be a substitute for one-stop shopping where customers seek a combination of goods. "The
fact that a distributor is able to satisfy all of a customer's needs at one location does not mean
that it is free from competition from other types of distributors." *Westmann*, 796 F.2d at 1221.
This Court addressed precisely this issue in *SunGard*, observing that "many combinations of
[products] may be a substitute for" the product in question, and distinguishing "most antitrust
cases, in which the product at issue is a discrete item." 172 F. Supp. 2d at 190, n.20.

38.     The relevant question is whether customers would divert enough of their demand
to competitors in other channels that a SSNIP would be unprofitable. Whether a substitute
channel is a comprehensive substitute is irrelevant. Similarly, where customers simultaneously
allocate demand among many distribution channels to varying degrees, the proper analysis
focuses on how much demand would be switched to alternate distribution channels from the
channel at issue. *See*, *e.g.*, *Staples*, 970 F. Supp. at 1070, 1073-74, 1077-81 (comparing sales of
office supplies by superstores with all "other sellers of office supplies"); *Thurman Indus., Inc. v.
Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989) (rejecting the proposed market
because "other retailers" of functionally interchangeable home-improvement goods could lure
consumers away from home center stores); *PepsiCo*, 114 F. Supp. 2d at 249-50 (rejecting

proposed market of fountain syrup delivered by independent foodservice distributors because "the evidence does not show that the preference for independent foodservice distributors is so strong so as to eliminate delivery through other means as an acceptable alternative").

39.     A relevant product market defines the product boundaries within which competition meaningfully exists. *U.S. v. Cont'l Can Co.,* 378 U.S. 441, 449 (1964). "[T]o find that a 'cluster' of goods or services defines the relevant market, the evidence must show that the particular cluster or package of goods is the 'object of consumer demand.'" *PepsiCo*, 114 F. Supp. 2d at 251, *judgment aff'd*, 315 F.3d 101 (2d Cir. 2002).

40.     Further, the Horizontal Merger Guidelines, on which Plaintiffs heavily rely, state that where pricing of one group of products affects pricing of other products such that "the merging firms sell products outside the candidate market that significantly affect their pricing incentives for products in the candidate market," then it is appropriate to consider the effects of sales of all products that affect prices in the relevant market. [DX02576] HMG §4.1.1, n. 4. The HMG make clear that these considerations are "guided by the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects." *Id.* at 10.

## III.     COMPETITIVE EFFECTS

41.     Plaintiffs do not allege anticompetitive harm to ***all*** customers. Rather, they have opted to pursue a claim to "protect" ***only a fraction*** of customers in the market, a handful of mega-companies, to which they allege the combined firm will have the power to increase prices. Compl. ¶¶ 36-45.

42.     To prove targeted price discrimination, Plaintiffs must show that a hypothetical monopolist can reliably identify consumers targeted customers, can actually charge higher prices

to those customers with inelastic demand (i.e., customers that would not switch to another product in the event of a significant price increase), and that these customers cannot defeat the price increase through arbitrage. *In re R.R Donnelley & Sons Co.*, 120 FTC 36, 51 (1995).

43.     To demonstrate unilateral anticompetitive effects, Plaintiffs must show that the Defendants compete in a differentiated market, that the Defendants' products or services are the top two choices for a substantial share of customers, and that other firms do not offer close substitutes and will not be able to in the future. *Oracle*, 331 F. Supp. 2d at 1117-18.

44.     Moreover, as this Court has recognized, and Plaintiffs' expert admitted, the relevant time frame for the analysis of anticompetitive effects is how the market will be affected over "the next three years or so." *See* Tr. at 2661:18-22; 2935:17-25; *see also* [DX02576] HMG § 9 (ease of entry must be "*timely, likely,* and *sufficient* in its magnitude, character, and scope to deter or counteract the competitive effects of concern.") (emphasis added); *Arch Coal*, 329 F. Supp. 2d at 147-150 (determining that "fringe" competitors' production capacity would be "more than sufficient to absorb any increase in demand … over the next three years").

45.     FTC enforcement officials recognize the prospective nature of merger analysis, publicly acknowledging that it "look[s] at such evidence as the circumstances that led to past entry, whether conditions are conducive to entry, and what the most likely entrants say they would do in the face of a changed market environment." Exhibit C, Deborah L. Feinstein, Director, Bureau of Competition, Federal Trade Commission, *The Forward-Looking Nature of Merger Analysis*, 2014 WL 585466, at *6 (January 1, 2014).

46.     In addition to ease of entry or expansion, the existence of powerful buyers and likely efficiencies resulting from a proposed merger are considered when evaluating the likely effects of a transaction. [DX02576] HMG § 8; *Cardinal Health, Inc.*, 12 F. Supp. 2d at 58; *see*

*also R.R. Donnelley & Sons Co.,* 1990–2 Trade Cases (CCH) ¶ 69,239 at 64,855 (D.D.C.1990)

("Well-established precedent and the ... *Merger Guidelines* recognize that the sophistication and

bargaining power of buyers play a significant role in assessing the effects of a proposed

transaction.").

47.     The Supreme Court has held that the presence of a new or expanding competitor,

particularly a large, well-financed competitor, constrains the current firms' pricing and behavior,

even before the new or expanding competitor actually enters the market or reaches its full market

potential. As the Supreme Court has observed:

> The existence of an aggressive, well equipped and well financed corporation
> engaged in the same or related lines of commerce waiting anxiously to enter an
> oligopolistic market [is] a substantial incentive to competition which cannot be
> underestimated.' From the perspective of the firms already in the market, the
> possibility of entry by such a lingering firm may be an important consideration in
> their pricing and marketing decisions.

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 559-60 (1973) (citation omitted); *see also*

*United States* v. *Marine Bancorporation, Inc.*, 418 U.S. 602 (1974).

48.     The FTC itself has acknowledged the strong competitive constraint a potential

entrant can impose on the market, even challenging transactions alleged to diminish the

competitive constraint posed by a perceived new entrant. *See In the Matter of Polypore*

*International, Inc.*, (2008) Complaint at ¶28 ("Alternatively, customers, competitors, and other

industry participants in automotive separators perceived Microporous to be a uniquely positioned

potential entrant that had a tempering, procompetitive effect in the automotive separator

market.").

49.     The risk of anticompetitive effects is lower where, as here, "strong companies

with concrete plans to expand" are ***already present*** in the relevant market. *Arch Coal*, 329 F.

Supp. 2d at 149; *see also Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1415

(7th Cir. 1989) ("If such barriers to increasing output are low for existing competitors, barriers to entry would likely be low for market entrants."). Courts have noted that "[i]n the absence of significant barriers, a company probably cannot maintain supracompetitive pricing for any length of time." *United States v. Baker Hughes Inc.*, 908 F.2d at 987.

50.     The Supreme Court has repeatedly made clear: "[i]t is competition, not competitors, which the [Clayton] Act protects." *Brown Shoe*, 370 U.S. at 344. *See also Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir 1986) ("the economic concept of competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide the contemporary application of the antitrust laws" ). Accordingly, the FTC views competitors' objections to mergers with great skepticism in the ordinary course:

> "Competitors' challenges to acquisitions should be viewed with great skepticism. Competitors stand to benefit from, and have no incentive to challenge, acquisitions that may lead to supracompetitive pricing. On the other hand, competitors have a substantial incentive to challenge acquisitions that will make their rivals more efficient, make their industry more competitive, and reduce the prices they can charge their customers."

*See* FTC Amicus Br., *Cargill v. Monfort of Colorado*, 1986 WL 727374, at *9 (March 28, 1986).

51.     The Court can give no meaningful weight to blanket statements from customers that vendors other than Defendants cannot meet their needs, when those very customers have not actually investigated those vendors' capabilities. *See United States v. Oracle*, 331 F. Supp. 2d 1098, 1131 (N.D. Cal. 2004) (noting that customer witnesses' speculation regarding the lack of available alternatives was not supported by any serious analysis that they performed or any evidence that they presented). This is particularly true when witnesses testify under oath that they had not fully investigated competitive options, but confirmed that they would "cast the net broadly" to evaluate potential alternative vendors if the combined firm attempted to raise prices after the merger. *See* Tr. at 971:16-24; Tr. at 977:15-978:1. Conclusory and unsupported statements from a handful of customers suggesting a lack of viable competitive alternatives,

undercut by their admitted lack of any meaningful investigation, cannot discredit the FTC's own

analysis and unanimous conclusion from November 2013 that, "[n]on-OSS competitors [*i.e.,*

competitors other than Staples and Office Depot] are growing in number and strength and ***have***

***demonstrated the ability to win large multi-regional and national customer contracts***."

[DX04342] Statement of the Federal Trade Commission Concerning the Proposed Merger of

Office Depot, Inc. and OfficeMax, Inc., FTC File No. 131-0104, November 1, 2013 (hereinafter

"FTC 2013 Closing Statement") at 3 (emphasis added).

## IV.    THE COURT CAN CONSIDER PROPOSED REMEDIES

52.    District courts sitting in equity have broad discretion to fashion equitable

remedies. *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 36 (D.D.C. 2014);

*Sullivan v. Murphy*, 478 F.2d 938, 966 (D.C. Cir. 1973). Further, courts have broad authority

under Section 13(b) to design and order an equitable remedy. *See Weyerhaeuser Co.*, 665 F.2d at

1083-84 (rejecting FTC's argument that "Section 13(b) presents the courts with an all or nothing

choice" and "emphasiz[ing] that 13(b) does not 'mandate' remedial rigidity"). Indeed, it is black

letter antitrust law that this Court is "clothed with 'large discretion' to fit [a] decree to the special

needs of the individual case." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972)

(internal quotation and citation omitted). The Court's guidepost is to ensure that any ordered

relief "restores competition" were it to conclude that any competition would be lost in the

relevant market alleged by the FTC, which Defendants vigorously deny. *Id.* (citing *United States

v. E.I. Du Pont De Nemours & Co.*, 366 U.S. 316, 326 (1961)).

53.    It is well-established that courts can consider proposed remedies in determining

whether a transaction is likely to lead to any anticompetitive effects, regardless of whether the

FTC has agreed to the settlement during the regulatory merger review process or at what point in

subsequent litigation it is proposed. *See, e.g.*, Mem. Opinion Denying FTC's Motion In Limine at 5, Dkt. No. 67, *FTC v. Arch Coal, Inc.*, No. 04-0534 (D.D.C. July 7, 2004) (denying the FTC's motion to exclude consideration of the proposed fix signed without the FTC's consent, and finding that the fix was "proposed as a good faith response to the Commission's investigation and concerns regarding the competitive effects"); *see also FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1298 (W.D. Mich. 1996) *aff'd sub nom. Fed. Trade Comm'n v. Butterworth Health Corp.*, 121 F.3d 708 (6th Cir. 1997) (holding that the defendants' consent decree proposal "bespeaks a serious commitment by defendants – a commitment to which they can be held accountable – to refrain from exercising market power in ways injurious to the consuming public," and the proposed commitments "undermine[d] the predictive value of the FTC's prima facie case.").

54.     It is also well-settled that federal courts have, and routinely exercise, continuing jurisdiction to protect and enforce their judgments, consent decrees, and any settlement terms made part of a court order. *See, e.g., United States v. Baroid Corp.*, 346 F. Supp. 2d 138, 142 (D.D.C. 2004) ("There is 'no doubt' that federal courts have continuing jurisdiction to protect and enforce their judgments and consent decrees."); *Roberson v. Giuliani*, 346 F.3d 75, 83 (2d Cir. 2003). In fact, the court in *Butterworth* expressly retained jurisdiction for precisely this purpose – to enforce the terms of the Consent Decree incorporating defendants' commitments. 946 F. Supp. at 1304.

## FINDINGS OF FACT

## V.     THE PARTIES AND THE MERGER

55.     Defendant Staples, Inc. ("Staples") is a publicly traded corporation headquartered in Framingham, Massachusetts. Compl. ¶ 29.

56.     Defendant Office Depot, Inc. ("Office Depot") is a publicly traded corporation headquartered in Boca Raton, Florida. Compl. ¶ 30.

57.     On February 4, 2015, Staples and Office Depot entered into an Agreement and Plan of Merger ("Merger Agreement") in which Staples would purchase Office Depot's stock for a combination of cash and Staples stock valuing Office Depot at $6.3 billion. Compl. ¶ 32.

## VI.   <u>PROCEDURAL HISTORY</u>

58.     After the merger was announced, the FTC embarked upon a nearly year-long investigation of the potential competitive effects of the merger for nearly a year and conducted extensive unilateral discovery of Defendants and third parties, including soliciting declarations from third parties in lieu of document and data productions.

59.     The Commission ultimately issued an administrative complaint before a FTC Administrative Law Judge regarding the proposed merger ("The Administrative Action"). Compl. ¶ 34. The Commission also authorized the FTC staff to seek a preliminary injunction in support of the Administrative Action. Compl. ¶ 35. The FTC, joined by the Commonwealth of Pennsylvania and the District of Columbia, filed its Complaint in this matter that same day, December 7, 2015, Dkt. 3, seeking a preliminary injunction under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). Plaintiffs alleged a relevant product market of "consumable office supplies" and alleged that "[c]onsumable office supplies consist of an assortment of office supplies, such as pens, paper clips, notepads, and copy paper, that are used and replenished frequently." Compl. ¶¶ 36-37. The Complaint further alleged that "consumable office supplies" ***do not*** include ink and toner for copiers and printers. *Id*. ¶ 39. The alleged market definition also excludes myriad other office products that businesses use and replenish frequently, including breakroom supplies and janitorial supplies. *Id.* ¶ 40. The FTC further alleged that the relevant market was limited to

sales of consumable office supplies to "[l]arge B-to-B customers," which "include, but are not limited to, those that buy at least $1 million annually of consumable office supplies for their own end-use." *Id.* ¶ 41, 45.

60.     By the end of approximately seven weeks of discovery, the Defendants had produced more than a half million pages of documents, in addition to the more than 15 million pages produced to the FTC over the course of its regulatory investigation. More than 70 depositions of parties and nonparties alike occurred, and five experts submitted expert reports.

61.     The hearing commenced on March 21, 2016, and continued through April 5, 2016. The FTC presented a total of 10 live witnesses, generating 3,063 transcript pages. Nearly 4,000 exhibits were admitted into evidence. The hearing concluded following the Plaintiffs' case-in-chief. Plaintiffs conceded that the Court can rely solely on the Plaintiffs' case-in-chief to determine Plaintiffs' likelihood of success. Tr. at 2942:23-2943:4.

## VII.   **INDUSTRY BACKGROUND**

### A.     **THE B2B OFFICE PRODUCTS MARKET**

62.     Plaintiffs do not dispute that the proposed merger will benefit, or at worst not affect, the overwhelming majority of Staples' and Office Depot's customers, including all retail customers nationwide and more than 99% of all B2B customers. Plaintiffs' alleged relevant market is comprised solely of the largest and most powerful companies in the United States, which already pay the lowest prices of any of Staples' or Office Depot's customers. Plaintiffs have made clear that they do not, and cannot, allege any harm beyond this small number of customers.

63.     The B2B office products market consists of sales of office products to businesses that purchase these products for their own internal use and not for resale. Compl. ¶¶ 5, 38.

Vendors of office products consider the B2B market to include the selling of office products to businesses, schools and universities, government entities, and other purchasers of office products for use within their organizations. *See*, *e.g.*, Tr. at 1479:18-25; 1786:19-1787:2; 1819:5-13; 1820:15-1821:19.

64.     Even the FTC has acknowledged that there are "a host of non-OSS [non-Staples and Office Depot] competitors…growing in number and strength [that] have demonstrated the ability to win large multi-regional and national customer contracts" for consumable office supplies. [DX04342] at 3. The FTC further recognized that "[i]n particular, regional office supply competitors have developed and utilized various strategies to compete successfully for large national accounts, including working with office supply wholesalers and joining cooperatives of independent office supply dealers to create a distribution network capable of meeting the needs of large multi-regional and national customers." *Id.* at 3.

65.     "Office products" sold to B2B customers include the products that businesses use to carry out daily tasks, including: general office supplies (*e.g.*, pens, pencils, staplers, notepads, paper clips, rubber bands, and post-it notes); copy paper for printers and copiers; ink and toner for printers and copiers; office furniture; technology products (*e.g.*, computers, tablets, and mobile phones); small business machines (*e.g.*, fax machines and shredders); breakroom supplies; cleaning supplies; and many other products that meet various customers' needs.

66.     Customers view office products as commodities widely available from a large assortment of vendors and do not view office supplies as a critical input to their core business requiring extensive quality control or uniformity. *See, e.g.,* **McDonald's:** Tr. at 396:10-25 (distinguishes office supplies from its direct purchases (which can only be purchased from approved food suppliers), and stated that office products are "trivial" in terms of McDonald's

24

business); **Fifth Third Bank**: Tr. at 923:9-16; 924:22-925:6; 937:16-25; 953:15-20; [DX02553] at 46:10-25; [DX00198] (considers office supplies to be commodities); **Best Buy:** Tr. at 1251:10-15 (office products are commodities that are widely available from a broad number of suppliers) and [DX04988] at 92:19-93:4; 132:8-23 (it doesn't matter where the pen comes from, just that Best Buy has pens); **HealthTrust:** Tr. at 1984:8-16 (members have not indicated that the proposed merger would affect their quality of care or their ability to continue operating); **AEP:** Tr. at 229:2-20; 250:1-11 [DX02633] at 69:5-10; 61:4-11; [DX00025] (recognizes that "office supplies" is a commodity category); **Fox** [DX04298] at 90:13-91:12 (contract with Staples is "nonstrategic" meaning it is "not relevant to [Fox's] core business.").

67.     Many other customers have expressly recognized that office products are widely available items or are otherwise not mission critical to their businesses. *See* **Bank of America ("B of A")**: [DX02560] at 171:21-172:12; **Realogy:** [PX02138] at 73:11-15; 74:4-8; 75:3-6; 78:8-14; **Weight Watchers:** [DX02452] at ¶ 5; **Windstream**: [DX02451] at ¶ 5; **Walgreens**: [DX02628] at 133:14-19; *see also* Opp. to PI Brief, Appendix D.

68.     The B2B office products market is defined by high customer bargaining power and low supplier bargaining power, with the largest customers having the most bargaining power. *See* Tr. at 404:3-16; 940:20-941:12; 953:11-14; 957:3-22; 1255:24-1256:2; [DX00198] at 17; [DX02553] at 88:15-94:25; [DX02570] at ¶¶ 196-209. As the FTC recognized in 2013, "large customers use a variety of tools to ensure that they receive competitive pricing such as ordering certain products (like ink and toner) directly from manufacturers and sourcing (or threatening to source) certain categories of office supply products from multiple firms." [DX04342] at 2-3.

69.     Contracts for the sale of office products typically lock in prices, but allow

customers to purchase office products elsewhere if they find a lower price and/or negotiate with their contracted vendor for a lower or matching price. *See, e.g.*, Tr. at 411:7-20; 412:9-12; 919:20-25; 1898:24-1900:23; 2015:19-2016:12; 2583:2-6 (Professor Shapiro acknowledging that B2B contracts are not exclusive). W.B. Mason's President and CEO succinctly described the nature of contracts in the office supplies industry as "a contract for you [the supplier], it's a license to negotiate for them [the customer]." Tr. at 1808:21-23.

70.     Other customers recognize that the B2B office products market is a low-margin and/or highly competitive business. *See, e.g.*, **McDonald's**: Tr. at 423:1-6; 424:22-425:7; 425:20-22; **AEP**: [DX0024] (noting that office supplies are "abundant and plentiful" and that "suppliers are hungry. Competition routinely solicits, asks to bid on the business."); **Fifth Third Bank:** Tr. at 957:3-22; 953:21-954:10; **Best Buy:** Tr. at 1251:10-15.

71.     Sales of general office supplies, such as pens, pencils, paper clips, and staplers, have been declining under pressure from an increasingly digital world. Tr. at 1746:23-25; 1798:6-10 (W.B. Mason recognizes that the demand for traditional office supplies is declining); [DX02522] at 13-15; *see also* [PX06100] at 12 n.37.

72.     As a result, Defendants and their competitors focus more of their sales and distribution capacity on what Staples refers to as "beyond office supplies sales," or BOSS, including sales of breakroom products, janitorial and sanitary products, and technology products. *See, e.g.*, **PDME:** Tr. at 1471:2-1472:5; **W.B. Mason:** Tr. at 1798:6-1800:12.

73.     Moreover, Defendants and their competitors have made efforts to sell a broader variety of products under a single contract to generate cost savings – and thus lower prices for customers – by increasing their sales volumes and reducing distribution costs per product sold. [PX02001] at 86:23-87:9; [PX02003] at 209:6-210:8. Thus, Staples and Office Depot and other

traditional office supplies vendors have expanded their sales of BOSS products, while competitors that traditionally focused on other products, such as Grainger, Fastenal, and McKesson, have expanded their catalogs and sales of traditional office supplies. [DX02570] Orszag Rpt., ¶¶ 17, 36; [DX02688]; [DX1232]; [DX02687]; [DDX016].

74.     These realities are reflected in the RFPs sent out by customers – which nearly always request pricing on a bundle of goods that includes far more than just office supplies. [DX02570] at ¶¶ 37-39, Ex. G; *see also* Tr. at 2641:3-9 (Professor Shapiro agreed that BOSS products are included in customer contracts and RFPs "the overwhelming majority of the time").

75.     This is consistent with the FTC's 2013 conclusion that "potential competitors in adjacent product categories, such as janitorial and industrial products, have existing contractual relationships with large office supply customers and can leverage those relationships to enter the office supply distribution market." [DX04342] at 3.

## B.     CHARACTERISTICS OF LARGE B2B CUSTOMERS

76.     Plaintiffs' Complaint first alleged that "large customers" included those that purchase at least $1 million of "consumable office supplies" per year. They then appeared to lower the threshold to $500,000 in their Motion for a Preliminary Injunction. Finally, in their Reply Brief, and again during the hearing, they implied that the threshold may be as low as $250,000. *See* Tr. at 30:4-18; *see also* PI Reply Br. at 9. Putting aside the shifting monetary thresholds on which Plaintiffs rely, they also fail to put forth evidence establishing their definition of "large" B2B customers. Rather, the characteristics Plaintiffs offer to support their definition are neither consistently held by all customers that purchase more than $1 million (or $500,000, or $250,000) of "consumable office supplies" annually, nor are those characteristics exclusively held by those purportedly "large" customers – plenty of customers that purchase

significantly lower volumes of consumable office supplies demand many of the same features from their vendors.

77.     Plaintiffs claim that large customers have specific and presumably unique requirements that justify the creation of a customer market comprised of "large B2B customers." PI Br. at 15. Yet the record shows that Plaintiffs have shifted definition of who is and who is not a "large B2B customer." This moving cut-off does not reflect commercial realities and has resulted in an ever-shifting percentage of the B2B customer base. But when applying any of the varying cut-offs, the result is a huge reduction of Defendants' customer base from the 405,000 B2B accounts that they serve. The $500,000 threshold reduces the number of Staples and Office Depot B2B customers down to roughly 1,075, or less than 1% of their total number of B2B customers. [DX02570] ¶ 8. But other than Plaintiffs' unsupported assertions that customers making purchases larger than this amount are somehow different than smaller customers, there is no evidence to support treating "large customers" as a separate relevant market.

78.     Plaintiffs argue that large customers require: nationwide distribution; next-day and/or desktop delivery; on-call sales representatives; customizable electronic product catalogs; IT integration with their procurement system; product utilization tracking; customized invoicing; flexible payment terms; and a well-known reputation. PI Br. at 5.

79.     These alleged "requirements" of large customers are in fact nothing more than preferences of *certain* customers, and are not linked to customers' purchasing volumes. These purported requirements are not consistent across customers at Plaintiffs' spending thresholds and do not support a basis for defining customers in the relevant market:

80.     For instance, numerous "large customers" do not require a single nationwide vendor, but use multiple regional vendors for their office products needs or allow local offices to

28

determine their own office products purchasing models. For example, companies like McDonald's, FedEx, Windstream, and McLane have satellite offices that use regional vendors for their office supplies needs. Other large customers, such as Ryder Trucks, use one distributor for part of the country and a second for the remainder. Tr. 1817:7-21 (Ryder uses W.B. Mason for everything east of the Rockies, and Staples for the remainder).

81.     Large customers also have explained that they do not require desktop delivery, or even local delivery of office products. Some customers, such as Pfizer and ADP, prohibit desktop delivery ██████████. **ADP**: [DX04263] at 28:2-21; **Pfizer**: [DX02642] at 107:3-108:1. Foot Locker takes deliveries of ink and toner at its own distribution center, and then provides distribution to Foot Locker locations itself. **Foot Locker**: [DX04985] at 203:15-205:18. Pep Boys similarly takes delivery of paper and ink and toner – its largest office products purchases – at its five distribution centers rather than at individual locations. **Pep Boys**: [DX02639] at 120:3-22; 122:6-124:5; 127:10-15; 171:16-20; 172:21-173:3; 174:4-175:10.

82.     Large customers further are able to use their internal IT systems to establish their own product catalogs and ordering systems. *See, e.g.*, [DX04451] at 125:10-18 (**Rite Aid** has its own ordering systems and can control catalogs if it needs to.).

83.     Large customers also have or are developing usage reporting out of their own internal IT systems. For instance, **Best Buy**'s senior director of procurement and sustainability, Timothy Meester, testified that Best Buy is currently implementing systems that will allow it to receive usage reporting, and that such usage reporting is a preference, but Best Buy can "get by without it." Tr. at 1238:5-14. Best Buy also prefers, but does not require, quarterly business reviews with suppliers. Tr. at 1241:19-1242:7. **ADP** also finds centralized usage capabilities from vendors less important as what it "used to rely on our vendors to give us reporting for we

can now do through our Ariba system." [DX04263] at 23: 14-22

84.  ████████████████████████████████████████████

████████████████████████████████████████; 415:1-6; 417:14-

21; 472:12-25; [DX04981] at 236:5-11 (McDonald's negotiated with Office Depot and did not

send an RFP or mention Staples); **Lockheed Martin**: [DX04406] at 3; **Bunzl**: [DX02967] at

144:5-144:14 (Bunzl "basically handed [Guernsey] the agreement"); **INTL FCStone**:

[DX04182] at 2 ("…our office supply purchase decisions are made at the local office level and

are not part of a larger national purchasing program or a RFI, RFP or bid process").

85.  Further, the evidence also shows that many of these so-called requirements are

not exclusive to "large customers," but are also requested by smaller purchasers. For example,

Plaintiffs offer no evidence to explain why only large customers might care whether their office

supplies vendor has a "well-known reputation" or "demonstrated financial stability." PI Br. at 15.

The size of the customer has little bearing on their requirements from a B2B vendor. [PX02109]

at 104:20–105:1 ("A customer may have a lot of spend with a very simple document with very

simple requirements. Or a customer could have very little spend with a lot of complexity and

different requirements.").

### C.   LARGE B2B CUSTOMERS USE MANY TOOLS TO PURCHASE OFFICE PRODUCTS AT LOW PRICES AND WITH NECESSARY SERVICES

86.  The B2B office products market is defined by "high" purchaser bargaining power

and "low" supplier bargaining power. *See* Tr. at 957:3-22; [DX00198] at 17; [DX02553] at

88:15-94:25; *see also* **McDonald's:** Tr. at 404:3-16.

87.  The largest B2B customers in the country, such as those in the Fortune 1000, have

a number of tools that they can use to obtain the lowest prices and highest levels of service. For

example, these customers often have dedicated procurement employees or departments, whose

function is to secure the lowest prices for that customer. *See*, *e.g.*, **AEP:** Tr. at 243:13-16; 245:4-14; 249:1-15; **McDonald's:** Tr. at 409:18-410:1; **Fifth Third Bank:** Tr. at 948:12-20; **Best Buy:** Tr. at 1257:24-1258:7; 1326:2-17; **Healthtrust:** Tr. at 1986:5-8; **Select Medical:** Tr. at 1091:180-20; **Autozone**: [DX03900] at 1; *see also* Opp. to PI Br., Appendix C.

88.    Many large customers also use consultants with purchasing expertise to obtain low prices. *See*, *e.g.*, **AEP:** 243:24-244:8; 245:4-14; 249:1-15; **Best Buy**: Tr. 1257:4-7; **B of A**: [DX02560] at 21:7-22:24; **ADP**: [DX04263] 22:13-21; **AEP**: [DX02633] at 53:10-22; **Mondelez**: [DX04418] ¶ 9; **Fifth Third Bank**: [DX02553] at 58:3-21; 59:4-19; *see also* Opp. to PI Br., Appendix C.

89.    Large customers also negotiate lower prices by buying both in higher volumes and across multiple product lines, such as including BOSS products in addition to other office products. *See*, *e.g.*, **McDonald's**: Tr. at 404:3-16 (agreeing that "McDonald's is able to take advantage of its size to have some negotiating power with suppliers"); **Fifth Third**: Tr. at 940:20-941:12; 951:7-25 (Fifth Third leverages its buying power and expanded categories of products it purchases from Office Depot, which helps Fifth Third get the best price and best service, and makes it hard for a vendor to raise prices on office supplies if they want to earn the breakroom supplies business); **Best Buy**: Tr. at 1254:14-20 ("**Q**. And what gives you that leverage, sir? **A**. It's the scale, the value that we're buying."); **HealthTrust**: Tr. at 1989:12-23 (agreeing that "vendors cherish the volume that" HealthTrust brings); **Walgreens:** [PX02121] at 81:20-82:7; 83:12-84:16; **MGM**: [DX02969] at 97:5-22 █████████████████ ████████████████████████████████████; *see also* **W.B. Mason**: [DX02637] at 228:11-229:6 (customers can get lower prices for consumable office supplies in exchange for also purchasing jan/san products from W.B. Mason).

31

90.     Large customers use price monitoring to ensure they get the lowest possible prices: *See*, *e.g.*, **McDonald's**: Tr. at 411:7-21; 412:9-12; 414:5-20; 453:22-454:2; 454:20-455:9; **Fifth Third**: Tr. at 910:24-911:17; 956:14-20; **Best Buy:** Tr. at 1222:19-1223:1; 1297:2-5; **HealthTrust**: Tr. at 2015:19-2016:12 (HealthTrust's contract with Staples requires Staples to match lower prices within 30 days); **B of A**: [DX02560] at 26:20-27:9; 27:13-23; 28:13-29:8; 29:23-30:12 (uses "market basket exercises" to use market prices to seek better pricing from its contract); **Walgreens:** [PX02121] at 144:14-157:15; **Realogy:** [PX02138] at 148:13-149:9; **Cigna**: [DX04286] ¶ 7; **Bright Horizons**: [DX02447] ¶ 11; **Edward Jones**: [DX 02964] at 58:18-25 56:18-57:15; 70:23-71:11 (agreeing that, under the negotiated contract, Staples.com pricing is a ceiling on the prices charged); *see also* Opp. to PI Br. Appendix C.

91.     Large customers use sophisticated software and usage reporting to secure the best prices for office products: *See*, *e.g.*, **Best Buy**: Tr. at 1256:3-15 (Best Buy uses CombineNet to analyze bids); **ADP** [DX04263] at 23:5-24:3; **Nationwide**: [DX03917] at 3; *see also* Opp. to PI Br. Appendix C.

92.     Large customers also search for new suppliers that are capable of meeting their needs and that can be used to secure lower prices or compare against current suppliers to ensure they have low prices: *See*, *e.g.*, **Fifth Third**: Tr. at 924:8-11; 946:2-8; 977:11-978:9; 979:2-5; **McDonald's**: Tr. at 407:14-20; 460:8-14; 485:8-14; **Select Medical:** Tr. at 1115:18-1116:6; **Healthtrust:** Tr. at 2014:20-2015:6; 2030:25-2031:6; 2038:8-112042:25-2043:9; **B of A**: [DX02560] at 26:20-27:9; 27:13-20; 221:18-23; *See also* Opp. to PI Br. Appendix C.

93.     The RFP process also allows customers to secure low prices and high levels of service due to the ability to compare competitors and negotiate for lower prices, and can allow customers to learn significantly more information than is available publicly. *See*, *e.g.*,

**HealthTrust**: Tr. at 1992:2-1993:1; 1994:16-1995:15; 1996:10-20 (RFP process used to learn non-public "pricing, responses to contract terms, conditions, and to learn other aspects about the vendor community itself"); *see also* Opp. to PI Br. Appendix C.

94.     As a result, large customers pay the lowest prices for office products. Plaintiffs' own expert found that retail prices were approximately 46% higher than the prices that large customers paid for the same products under their contracts. [PX06100] at 17.

95.     Customers use these tools to secure lower prices from their office supplies vendors even without a competitive RFP. *See*, *e.g.*, **Citizens Bank**: Tr. at 1808:5-12 (renewed contract and received lower prices from W.B. Mason); **Coca-Cola**: [DX02973] at 71:10-20 (negotiated and renewed its contract with Staples to achieve cost savings).

96.     Plaintiffs also argue that customers value having a single office supplies vendor for consumable office supplies because that "allows these customers to consolidate their purchases and leverage the bigger purchasing volume to negotiate lower prices and higher discounts, rebates, or other pricing concessions." Compl. ¶ 8. The evidence shows that these large, sophisticated customers have the ability to deal with hundreds or thousands of vendors across their purchasing needs, and that they can – and do – manage multiple vendors for office products. For example: **Best Buy** purchases ink and toner from Office Depot, as well as from two MPS sources. Tr. at 1270:11-14; **Fifth Third** sources janitorial supplies from cleaning service provider. [DX02553] at 68:3-9; **B of A** purchases paper from a number of paper suppliers, including Domtar, Sappi, International Paper, Finch Paper, and Appleton Coated. *See* [PX03002-001] ¶ 8; [DX02560] at 85:4-14; 86:1-8; 86:20-23; 87:14-17; **McDonald's** has fifty vendors on its internal "marketplace," a number of which can provide office products, including office supplies and works with more than a thousand vendors overall. Tr. at 457:10-24; 405:21–

406:8; **Select Medical** has between 10,000 and 15,000 total vendors. Tr. at 1091:21-1092:4.

## VIII.   THE FTC HAS NOT DEFINED A RELEVANT PRODUCT MARKET

97.     Both the FTC's administrative complaint and Plaintiffs' Complaint in this Court allege that the product market consists of "the sale and distribution of consumable office supplies to large B-to-B customers in the United States." Compl. ¶ 36; Admin. Compl. ¶ 25. The uncontroverted evidence from every fact witness who testified for Plaintiffs and the extensive discovery record in this case plainly contradicts Plaintiffs' alleged product market.

98.     Plaintiffs' market definition is based on an arbitrary bundle of products neither recognized by industry participants nor reflected in actual contracts or purchases by large B2B customers. Not one fact witness at trial agreed that the Plaintiffs' alleged relevant market was how they viewed or purchased office supplies. Instead, B2B purchasers of office supplies and office supplies vendors buy and sell many different bundles of office supplies, tailored to each customer's needs, but that ***almost never*** include only general office supplies and paper. The FTC itself used a different market definition when it analyzed the retail office products market in 1997, and again in late 2013, when it considered ink and toner to be part of a "consumable office supplies" relevant market.

99.     Plaintiffs' inability to define a proper relevant market, relying on a product market that does not reflect commercial reality, is fatal to their claim. Moreover, the evidence uniformly shows that Staples' and Office Depot's customers can, and do, purchase or threaten to purchase some or all of these office products from those alternative suppliers in order to secure better prices from Staples and Office Depot on their office products contracts.

### A.     CUSTOMERS' AND COMPETITORS' DOCUMENTS AND TESTIMONY OVERWHELMINGLY SHOW THAT INDUSTRY PARTICIPANTS DO NOT RECOGNIZE PLAINTIFFS' ALLEGED PRODUCT MARKET

100.    Companies providing office supplies "recognize that to compete effectively, they

34

must offer all or nearly all types of" office products, beyond those contained in the FTC's limited "product market." *Grinnell*, 384 U.S. at 572. As the *Grinnell* Court stated, "[w]e see no barrier to combining in a single market a number of different products or services when that combination reflects commercial realities." *Id*.

###### 1.    Plaintiffs Identify An Arbitrary Assortment Of Products

101.    Every one of Plaintiffs' fact witnesses at the hearing agreed that ink and toner (among other items) were included in their definitions of "consumable office supplies." Plaintiffs' witnesses at the hearing defined "consumable office supplies." *See, e.g.,* **AEP**: Tr. at 235:19-236:25; 342:13-343:1; 351:10-13; 353:8-14. ("Office supplies" includes pens, pencils, paper, binder clips, folders, ink and toner, jan/san materials, break room, furniture, and technology);**McDonald's**: Tr. at 397:11-398:22. ("Office supplies" includes traditional office supplies, toner, and copy paper, as well as break room supplies and some technology items); **Amazon Business**: Tr. at 524:21-25; 808:7-11 ("Office supplies" or the "core office category" includes paper, pens, and ink and toner); **B of A**: [DX02560] at 73:11-13 ("Office supplies" includes toner); **Fifth Third Bank**: Tr. at 930:10-931:3; 936:2-937:12 ("Office supplies" includes ink and toner, paper, "office essentials" including pens, paper clips and other general office supplies, small office equipment, and breakroom supplies); **Select Medical**: Tr. at 1097:1-1099:1 ("Office supplies" includes 12 categories: computers and accessories; furniture; office supplies; business machines; paper; janitorial; filing and books; forms, labels and shipping; pads, memos and post-it notes; food and break room; retail supplies; and ink and toner.); **Best Buy**: Tr. at 1262:14-20; 1263:5-11 (Best Buy considers "consumable office supplies" to include general office supplies, copy paper, and ink and toner, as well as furniture, jan/san, breakroom supplies, and technology accessories) **P.D. Morrison Enterprises ("PDME")**: Tr. at 1471:2-1472:10; 1473:8-25 ("Office supplies" includes pens, pencils and paper clips, copy paper, ink and toner,

and some jan/san products); **W.B. Mason**: Tr. at 1799:24-1800:3 ("Consumable office supplies"

includes general office supplies, paper, and ink and toner); **HealthTrust**: Tr. at 2004:16-25;

2008:15-2009:2; 2010:8-11 ("Consumable office supplies" includes general office supplies, ink

and toner, and copy paper).

102.    The record is replete with both customers and competitors that included at least

ink and toner among "consumable office supplies," and industry participants commonly include

other products such as breakroom supplies, janitorial and sanitary supplies, technology supplies,

and furniture as those products that they consider together in their procurement strategies.

103.    Plaintiffs also secured declarations from third parties that did not testify at the

hearing that similarly define "consumable office supplies" more broadly than Plaintiffs. *See*, *e.g.*,

[PX03016-001] ¶ 3 ("**Pep Boys** currently contracts with Office Depot for consumable office

supplies, which is comprised of general office supplies, copy paper, and some ink and toner.");

**Detroit Regional Chamber**: [PX03023-002] ¶ 5 ("The primary product category is consumable

office supplies, which includes office essentials like paper clips, scissors, file folders, binders,

and staplers, as well as copy paper, ink, and toner."); **Windfall**: [PX03024-001] ¶ 2 ("Such

office products include consumable office supplies: paper, ink, toner, general office supplies

(pens, pencils, note pads, paper clips, post-its, among other things).").

104.    Market realities of other B2B customers similarly refute Plaintiffs' "market." *See*,

*e.g.*, **Lowe's**: "the overall 'office supplies' category includes copying and printing related items

such as paper, toner, ink, and occasionally, business cards." [DX04243] at 2; **Sherwin Williams**:

office product categories include: a. General office supplies (i.e. pens, paper clips, paper, ink,

and toners), break room supplies, and office furniture. b. Paper and Stationary. c. Office

equipment (i.e. computers, smart phones, and tablets). d. Cleaning supplies and janitorial

supplies. e. Office support services, copy and print services, and managed print services.
[DX00335] at 12; **GSA**: "office supplies includes things like pens, pencils, markers . . . paper . . . toner products . . . office furnishings . . . CD-ROMs, optical disks, and certain office appliances." [DX04984] at 48:5-49:3; **INTL FCStone**: "office supplies" includes items such as printer cartridges, kitchen equipment under $2500 per item, food vending supplies, kitchen supplies for the break room, drinking water, cleaning supplies, check stock, coffee, miscellaneous parts for office repairs, and small computer components. [DX04182] at 1; **Harvard**: "Office Products" include: "Ink/toner; Paper; Writing Instruments; and General Office Supplies (*i.e.*, staples, notepads, post-it notes, and similar products)." [DX02433] ¶ 3; **GEICO**: "general office supplies" includes pens, pencils, notepads, staplers, paper clips, post-it notes, ink and toner, and other sundry items. [DX04989] at 55:6-13; *see also* Opp. to PI Br., Appendix B.

105.　Defendants' competitors likewise reject Plaintiffs' market definition:

a. **PDME** includes ink and toner, some janitorial/sanitation products, and some break room products in the category of office supplies. Tr. at 1471:2-15; 1473:8-25.

b. **Guernsey's** use of "the term 'consumable office products' includes general office products, copy paper and ink and toner." [DX02967] at 80:23-81:2.

c. 　"**Capital [Office Products**] is not aware of any RFP for only consumable office supplies including paper but excluding ink and toner, office furniture, and janitorial and breakroom supplies. Capital's customers almost always request pricing for ink and toner and/or janitorial and breakroom supplies in addition to pricing for office supplies." [DX03890] at ¶ 10.

d. **S.P. Richards'** core office supplies include ink and toner. [PX03007] at ¶ 4.

e. "**Guy Brown**…specializes in the sale and distribution of general office supplies

(e.g., pens, notebooks, highlighters, paper clips, staplers), copy paper, ink and toner, office furniture, print solutions, promotional materials, and facility and breakroom supplies (collectively referred to as "office products" hereinafter)." [PX03043] ¶ 2.

f. **Fastenal** agreed that "general office supplies, copy paper, ink and toner, sales of office furniture all are categorized as office supplies in Fastenal's business." [DX02965] at 190:16-20.

g. **HiTouch** agreed that the office supply category includes consumable office supplies (e.g., pens), paper, ink and toner, janitorial supplies / breakroom (e.g., Windex and toilet paper but not chemicals) and coffee and beverage. [DX02968] at 22:7-23:17.

106.    W.B. Mason's CEO stated plainly that "[t]ypically if you have the paper business, you have the ink and toner business. That's – they go hand in hand. So it's very rare to have a situation where all you have is the paper and not the ink and paper." [DX02637] at 228:17-229:6; *see also* Tr. at 1599:10-13.

### 2.    Large Customers' Actual Purchases Contradict Plaintiffs' Alleged Relevant Market

107.    None of the customers identified by the FTC simply buy core office supplies and paper from Staples or Office Depot. And nearly every single RFP submitted to Staples and Office Depot included not only ink and toner, but other products as well.

108.    A review of the bid data described in Professor Shapiro's Exhibit R8B to his Reply Report demonstrates that customers purchase ink and toner in the same bundle as they do "core office supplies" and paper. [PX06300] at R8B; *see also* Tr. 2631:10-2634:25. Ink and toner is included in virtually every single "description of products included." *Id.* Staples' bid data shows that, of 942 bids in 2014 on large B2B contracts, only 11 bids (1.2%) included only paper and office supplies. [DX02570] at ¶ 38, Ex. G. It is undisputed that Fortune 100 customers of

Staples and Office Depot purchase a wide and diverse mix of office products from Defendants.
[DX02570] at ¶ 55; *id.* at Ex. J. None of them purchased a bundle of products consisting of
"office supplies and paper, but not ink and toner or other products" from Defendants. *Id.*

109.    Of the 529 large B2B customers that purchased offices supplies and paper from
Staples in fiscal year 2014, ***every single one*** also purchased significant amounts of products from
Staples in other categories. [DX02570] at Ex. H.

110.    Plaintiffs' hearing witnesses consistently testified that they not only include ink
and toner in their definition of "consumable office supplies" but also purchase ink and toner,
furniture, janitorial and breakroom supplies, and technology products in the same bundle as they
purchase core office supplies and paper:

a. **Fifth Third's** purchases of office products include ink and toner, paper, "office
   essentials" including pens, paper clips and other general office supplies, and small
   office equipment. Tr. at 930:10-931:3; 936:2-17. Fifth Third's purchases also
   include breakroom products. Tr. at 936:2-937:12.

b. **Best Buy's** purchasing from Office Depot includes general office supplies, copy
   paper, ink and toner, furniture, janitorial and sanitary, breakroom supplies and
   technology accessories. Tr. at 1263:12-20.

c. **HealthTrust** has "always had general office supplies, ink and toner, and copy paper
   under a single agreement," and that is true with respect to HealthTrust's current
   RFP. Tr. at 2008:15-2009:2; *see also* Tr. at 1894:10-25 (HealthTrust's current office
   supplies contract includes general office supplies, copy paper, and ink and toner).

d. **McDonald's** Office Depot contract includes general office supplies, break room
   supplies, technology, and toner. Tr. at 398:4-22.

39

e. **Select Medical's** purchases of "office supplies" from Office Depot/OfficeMax include "computers and accessories, furniture, office supplies, business machines, paper, janitorial, filing, and books, forms, labels and shipping, pads, memos, and Post-it notes, food and break room and retail supplies." Tr. at 1098:4-1099:1.

f. **B of A** Purchases janitorial and sanitary supplies, technology products, ink and toner, and furniture from Staples. [DX02560] at 49:9-13; 50:21-51:17; 56:15-57:15; 75:4-8.

111.    In addition to the hearing witnesses, numerous other customers similarly confirmed that they include ink and toner as part of their bundle when purchasing "office supplies." *See, e.g.*, **Walgreens**: ink and toner "fall within the office supply purchases." ([PX02121] at 49:15-19; **ExxonMobil**: "ExxonMobil purchases office products from Lee and Tejas in a number of different categories, including but not limited to office supplies, ink and toner, paper, facilities, furniture, technology, print, breakroom supplies, cleaning supplies, and copy and print depot." [DX02453] ¶ 3; **Merck**: Staples is Merck's "primary supplier for all categories" including furniture, products, paper, tech, toner and other/misc. [DX3912] at 3-4; **Oracle**: "Oracle's three main categories of office supplies include: i) General Office Supplies, ii) Paper and iii) Toner & Ink. These are the only three categories of products which Oracle purchases primarily from generalized office supply vendors." [DX04010] at 4; **Boeing**: Boeing's "Product categories indicated in the RFP include: (1) furniture; (2) general office products; (3) paper; (4) technology; and (6) Miscellaneous/other." [DX00367]; **Caterpillar**: Caterpillar's 2006 OfficeMax contract and 2011 extension of the contract include pricing for ink and toner, paper, and office supplies. [DX00092] at 12-30; [DX00090] at 3-18; **Chevron**: Chevron had $7.2 million spend on office supplies in the following categories: 28% toner, 22% paper, 20% general

office supplies, 16% office essentials supplies, 12% tech essentials, 1% cleaning and break room, .5% furniture, .5% miscellaneous. [DX00302]; **Cigna**: "Cigna spends approximately ███████ on office products through Staples: toner ██████████, paper █████████████, general office supplies █████████████, and information technology products ██████████." [DX04286] ¶¶ 5-6; *see also* Opp. to PI Br., Appendix B.

112.     Further, Defendants' bid data and customer purchases undermine the FTC's market definition. Plaintiffs argue that the Court should disregard the business realities entirely and exclude ink and toner solely because some customers purchase ink and toner directly from MPS vendors or other suppliers. However, the evidence shows that ink and toner is often among customers' largest spend with Defendants and their competitors. [DX02570] at Ex. J; *see also* Tr. at 932:6-15 (ink and toner comprises 41% of **Fifth Third's** purchases from Office Depot); [DX04286] ¶ 5 (in 2014, **Cigna** spent ███████████ with Staples on ink of its ██████████ total Staples spend); [PX03033] ¶ 3 (in 2014, 41% of **GEICO's** spend with Office Depot was on ink and toner); **Kindred Healthcare**: [PX03017] ¶ 3 (In 2014, 49% of Kindred's spend with Office Depot was on ink and toner); [PX03029] ¶ 4 (in 2014, 66% of **McDonald's** spend with Office Depot was on ink and toner); [PX03019] ¶ 4 (in 2014, $19.8 million of **Walgreens** $34 million in spend with Office Depot was spent on ink and toner, compared with $6 million on copy paper and $2.1 million on traditional office supplies); [DX02420] ¶ 5 ("In 2015, **BioReference** spent approximately $6.4 million on office products with W.B. Mason. Specifically, BioReference spent nearly $385,000 on traditional office supplies, $377,000 on paper, $3.5 million on ink and toner, $602,000 on printers, $59,000 on coffee, $54,000 on other break room supplies, $1.4 million on furniture, and $69,000 on janitorial/sanitation products.").

    **B.**    **PLAINTIFFS' CURRENT DEFINITION OF "CONSUMABLE OFFICE SUPPLIES" IS INCONSISTENT WITH THE FTC'S PAST POSITIONS AND ITS OWN PURCHASING**

EXPERIENCE

113.     In 1997, in its challenge of Staples' previous proposed acquisition of Office

Depot, the FTC defined "consumable office supplies" to include toner cartridges. *FTC v. Staples*,

970 F. Supp. at 1073. On November 1, 2013, in announcing that it would not challenge the

merger of Office Depot and OfficeMax, the FTC again defined "consumable office supplies" to

include ink and toner. [DX04342] at 1, n. 3 ("'Consumable office supplies' refers to non-durable

products that consumers use up, discard, and purchase on a recurrent basis. Examples included

pens, paper, file folders, Post-it notes, and ink and toner cartridges." (citing *FTC v. Staples*, 970

F. Supp. at 1080)). Nearly identical language – products that "consumers use up, discard, and

repurchase on a recurrent basis" – is used by the FTC's expert in this case. [PX06100] at 4.

114.     Even the FTC's Chief Financial Officer, who oversees its procurement activities,

includes toner among "consumable office supplies." [DX02988] at 40:5-16; 81:14-82:10.

115.     Plaintiffs offer this Court no explanation for why their 1997 or 2013 definitions of

the relevant market were wrong. At most, they assert that the "competitive conditions" for ink

and toner have changed such that ink and toner are now available from Managed Print Services

("MPS") vendors, in addition to traditional office supplies vendors. PI Br. at 14 n. 37.

116.     But Plaintiffs presented no evidence whatsoever that the "competitive conditions"

are different in any way from November 2013 when the FTC included ink and toner in the

product market *and* recognized that large customers were "ordering certain products (like ink

and toner) directly from manufacturers". [DX04342] at 2. Plaintiffs did not provide to its expert

any data or analysis from the in the Office Depot/OfficeMax case. Nor did Plaintiffs or Professor

Shapiro collect MPS data to conduct any meaningful analysis of that segment. Tr. at 2622:15-

2623:24; 2629:7-2630:13; 2817:7-12. MPS vendors have been options in the market for more

than a decade. *See* [PX03037] ¶ 2 ("Xerox's MPS program dates to before 2000 and was the first

large-scale program of its kind. Starting around 2005, large enterprise customers adopted MPS at an accelerated rate…").

117.     Further, certain general office supplies, such as Sharpies or labels, can be purchased directly from manufacturers. [PX02001] at 229:22-230:7; [DX02570] ¶ 134. Others can be purchased from a "host" of competitors, including competitors better known as vendors of adjacent products, but which have expanded their sales of office supplies. [DX04342] at 3.

118.     Paper can be purchased direct from manufacturers, or from specialized vendors. *See*, *e.g.*, **Fifth Third Bank**: [DX02553] at 97:24-98:24 (Fifth Third separately negotiates a contract for paper (Domtar)); **ADP**: [DX4263] at 44:11-21; 99:14-22 (ADP separately negotiates contracts for paper with Lindenmeyr and CDS); **Enterprise Product Partners**: [DX00152] (internal email stating that "[i]f necessary we can order paper from a paper company and not through office supplies" after having machine issues with Staples); **B of A**: [PX03002] ¶ 8 (separate contract from Staples contract with Domtar for paper), [DX02560] at 85:6-14, 86:20-23, 87:14-17 (B of A also purchases from other paper mills, including Sappi, Finch Paper, and Appleton Coated); **California State Universities**: [DX05031] (off contract paper purchases from manufacturers); **Cisco**: [DX04287] at 2 ("Cisco purchases ink, toner, and paper from Xerox" under an agreement).

119.     Likewise, breakroom supplies, which are regularly included among office products contracts, can be purchased from specialized food vendors such as Aramark. *See* [DX02629] at 103:15-104:17. And janitorial supplies are often also included among sales of office products, but can be purchased from specialized vendors or outsourced to third-party janitorial companies that purchase those supplies as part of their janitorial service contracts. *See*, *e.g.*, Tr. at 944:1-14 (Fifth Third's maintenance vendor purchases its own cleaning supplies).

120.   The record does not support Plaintiffs' alleged "market" or their purported justification for reversing course on whether ink and toner are "consumable office supplies." Customers simply do not purchase Plaintiffs' alleged bundle of products, and Plaintiffs have put forth no evidence to support their conclusory assertions that general office supplies and paper are sold under different competitive conditions than other products.

C.   **PROFESSOR SHAPIRO'S TESTIMONY CANNOT SALVAGE PLAINTIFFS' CASE**[1]

1.   **Professor Shapiro's Conclusions Rely On a Fatally Flawed Definition of the Relevant Market**

121.   Plaintiffs' expert Professor Shapiro admitted that he initially *included* ink and toner in the relevant market because that is "what everybody in the industry normally talks about, which would be the – call it core office supplies, paper, and ink and toner." Tr. at 2137:9-15.

122.   Professor Shapiro was forced to acknowledge that the FTC told him as part of their pre-complaint "collaborative" effort that ink and toner was being excluded from the product market in the complaint, and he simply followed their instruction. Tr. at 2617:18-2618:4; 2831:4-2832:6; 2815:24-2817:12 ("the FTC made a decision not to include ink and toner and then I've been working with that ever since."); *see also* Motion to Strike Certain Opinions of Plaintiffs' Expert, Dkt. 371. Professor Shapiro also conceded that his opinion regarding the exclusion of ink and toner from the relevant market is based on no data whatsoever. Tr. 2818:19-21.

123.   After Plaintiffs' made the decision to exclude ink and toner from the relevant product market, Professor Shapiro *never* calculated market shares with ink and toner included in the relevant market. Tr. at 2778:17-20.

124.   Upon cross examination, Professor Shapiro ultimately acknowledged that he

---

[1] Defendants have separately filed a motion to strike certain opinions expressed by Professor Shapiro regarding the relevant market definition and Amazon Business, which they incorporate herein. *See* Motion to Strike Certain Opinions of Plaintiffs' Expert, Dkt. 371.

"might have made a mistake" by excluding ink and toner from the relevant market. Tr. at 2623:18-24 (Shapiro). He further conceded that when "you don't get the relevant market right, the shares are not going to be – they're going to be misinformed, they're going to be misleading, they're going to be screwed up." Tr. at 2088:21-2089:7. Professor Shapiro also admitted that "if one were to calculate market shares for ink and toner, which I have not done, that Staples and Office Depot's share would be significantly smaller." Tr. at 2817:13-2818:16. Remarkably, Professor Shapiro acknowledged that when customers and competitors use the term "consumable office supplies" they actually mean to include ink and toner, Tr. 2606:6-2607:14, and further acknowledged that the overwhelming majority of RFPs called for far more products than are in the FTC's relevant market. Tr. at 2636:10-24. Yet he calculated market shares according only the market Plaintiffs defined in their complaint.

125.    Significantly, the 19 companies he excluded are those most likely to purchase supplies from vendors other than Staples and Office Depot. [DX02570] ¶¶ 156-158. For example, Costco does not have a contract with either Staples or Office Depot, but instead leaves each department / office in charge of its own office supplies purchases for internal use. [DX03893] at ¶¶ 5, 7. "Office products procured by Costco, that are not purchased from a Costco warehouse or Costco.com, are purchased using a variety of payment methods from numerous suppliers and retailers across the country." *Id.* at ¶ 8.

126.    While Professor Shapiro asserts that the Fortune 81 are a representative (and reasonable) "sample" for the approximately 1,200 customers in the FTC's proposed market, he did not even bother to investigate or sample any of the remaining 1,100 customers, a significant failure, given Professor Shapiro's admission that the likelihood of alleged harm diminishes as customer size decreases. Tr. at 2480:21:25; [PX06100] at 6 n.13. By focusing on only those

companies that allegedly have the fewest options, Professor Shapiro presents dramatically

inflated market shares.

127.    Professor Shapiro then misattributed the sales by Tier 1 diversity suppliers and by

paper manufacturers selling directly to Fortune 100 customers as sales by Defendants, simply

because Staples or Office Depot provide certain delivery support to these entities. Tr. at 2571:10-

2573:15; 2576:20-25; [DX02570] at ¶¶ 160, 166-167. Thirty-two of the 81 Fortune 100 suppliers

that Professor Shapiro analyzed made purchases from diversity suppliers. [DX02570] at ¶ 166.

For example, even though B of A negotiates its paper prices directly with Domtar and Staples

just distributes the paper, Professor Shapiro allocates 100% of the sales to Staples, instead of

allocating proportionally the purchase between Domtar and Staples. [DX02570] at ¶ 160;

[PX06300] at 103-104. *See* [DX02576] at Example 8. Such misattribution dramatically increases

Defendants' market shares despite the fact that they do not make these sales, nor do they

negotiate the contracts for these sales. Tr. at 2571:10-2573:15; 2576:20-25; [DX02570] at ¶¶

160, 166-167; *see also* Tr. at 1384:6-13; 1392:6-17.

128.    Professor Shapiro's opinions also ignore the substantial impact of Defendants'

competitors in the market. For instance, Professor Shapiro did not cite to a single Amazon

document in his initial report, nor has he ever even visited the Amazon Business website. Tr. at

2667:6-22; 2669:3-12; 2669:19-2670:4. But Professor Shapiro agreed that Amazon Business can

"do a lot in a year or two if it's profitable to do so." [DX05240] at 328:24-329:25. Indeed,

Professor Shapiro had to acknowledge that Amazon Business is part of an "awesome" company.

Tr. at 2663:3-7. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

129.    Finally, while Professor Shapiro attempted to account for what he refers to as

"unreported leakage," his efforts to do so are woefully incomplete. As an initial matter, Professor

Shapiro only relied on statements from 26 of the 81 Fortune 100 companies that he includes in

his market share analysis. For the remaining 55 companies, he had no information whatsoever.

Tr. at 2583:16-2586:4. Moreover, even for the 26 companies for which Professor Shapiro had

information on "unreported leakage," that information is of dubious quality. By way of example,

12 of the 26 companies for which Professor Shapiro had some information provided a

qualitative, rather than quantitative response, such as that their unreported leakage is "de

minimis" or "immaterial." [PX06300] at Ex. RC-2. In such cases, Professor Shapiro just

assumed that the unreported leakage was 1% of total spend. Tr. 2592:21-2593:21; [PX06100] at

E-12. Recognizing the frailties of this analysis, Professor Shapiro ultimately conceded that it was

"conceivable" that the amount of unreported leakage could be "substantially higher" than what

he reported. Tr. 2593:25-2594:23.

130.    In an effort to prop up Professor Shapiro's market share calculations, the FTC will

undoubtedly claim that these market share calculations are somehow supported by Professor

Shapiro's primary vendor relationship calculations. But as Professor Shapiro freely admitted, his

"primary vendor relationship" numbers are not market shares. Tr. 2503:5-10; [DX05240] at

266:1-267:19. And that is for good reason – the primary vendor relationship numbers do not

account for any leakage and do not properly account for circumstances in which a customer

splits their spend between two or more office supply vendors. [PX06100] at 19. As a simple

example, if a customer purchased $500,000 worth of "consumable" office supplies from Staples,

and also spent $499,999 with W.B. Mason, the Staples and W.B. Mason market shares for this

customer would be about equal – 50% to each. Professor Shapiro's primary vendor relationship

numbers would include only the $500,000 spent with Staples, and entirely ignore the sales made

by W.B. Mason because those sales did not reach Professor Shapiro's arbitrary $500,000 cutoff.
[PX06100] at 18.

131.    As a result, Plaintiffs' analysis of the relevant market, and the "presumption" of
harm to competition as a result of their Herfindahl Hirschman Index calculations, is irredeemably
negated by their inherently flawed market definition.

## IX.    THE MERGER WILL NOT RESULT IN ANTICOMPETITIVE EFFECTS

132.    The evidence shows that competition from non-Staples and Office Depot
competitors in the market for B2B office supplies – which the FTC described as "strong" and
"growing in number and strength" in 2013 – has continued to grow since 2013, and in fact has
grown even stronger with the entry and rapid expansion of Amazon Business, a unit of one of the
largest companies in the United States and a notoriously ferocious and capable competitor.
Amazon Business's extensive corporate testimony confirmed that it views the B2B office
products market as a "must win" for the company and that Amazon Business intends to become
the *primary* source for all B2B customers, large and small, for office products and anything else
that they need. Amazon's history of disrupting markets – particularly distribution markets, which
play to its strengths – confirms its competitive threat and ability to continually drive prices down.

### A.    THE ENTRY AND RAPID EXPANSION OF AMAZON BUSINESS AS A DISRUPTIVE COMPETITOR HAS FUNDAMENTALLY CHANGED THE NATURE OF COMPETITION

133.    By 2014, Amazon had identified B2B sales as a point of focus for the company.
Tr. at 736:6-12; [DX00030] at 1 ████████████████████████████
████████████████████████████████████████████████████ Amazon
saw a great opportunity to exploit because businesses – including Fortune 100 customers – were
already spending billions of dollars purchasing through Amazon.com. [DX00033-OUTCNSL] at
13 ████████████████████████████████████████████████

████████████████████████████████████████████; *see also* **AEP**: [DX0014] (showing increasing

spend through Amazon from 2012-2014); [DX05284] at 6 ("In just 11 months over 300,000

business accounts have been created…Almost every one of these companies found that their

employees were already shopping on Amazon."); [DX01090] ("Millions of business customers

purchased billions worth of products on Amazon in the past 12 months."); Tr. at 1681:12-

1682:13 (W.B. Mason is "aware of orders that we've lost [to Amazon]. They underprice us on

really highly used commodities, like Keurig, Keurig K-Cups and Hewlett Packard toners.").

134.   Amazon has time and again set its sights on a wide variety of industries, and has

transformed them all, routinely becoming the dominant player. *See, e.g.*, Tr. 2662:9-14. The B2B

marketplace is Amazon's next target where it will bring "innovation" to the purchase of business

products, including office supplies. Tr. at 662:15-663:2.

135.   On April 28, 2015, Amazon announced the launch of Amazon Business.

[DX01090]; [DX05193] at 1. On the day of its launch, Amazon took out a full-page ad in the

Wall Street Journal, which was chosen because it would target business customers. [DX05196];

*see also* Tr. at 653:23-654:24. Amazon Business's launch was a "success," [DX00030-

OUTCNSL] at 1-2, ████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████. *See also*

[DX00037] at 7 (a "positive surprise" for Amazon Business within six months of launch was the

"ability to address enterprise customers").

136.   Amazon Business is a "top priority" for Amazon, Tr. at 659:17-20, and a "must-

win" opportunity. Tr. at 660:8-14; 736:22-737:5; 718:22-24; [DX00030] at 1. ████████████

██████████████████████████████████████████████████████████████

████████████████████.

137.     ███████████████████████████████████████████

██████████████████████████████████████. Amazon

Business intends to be a one-stop source for "anything that a business could possibly need,"

including office supplies. Tr. at 655:5-21.

138.     In fact, as part of the "Amazon" process of "working backwards" from the

customer, Amazon Business has begun drafting future press releases to announce further

competitive enhancements and offerings. [DX05235] at 182:8-183:14. ██████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████

139.     ████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████



140. ██████████████████████████████████

142.     By being part of the Amazon family, Amazon Business comes to the playing field with substantial brand recognition, a depth of resources (including the ability to leverage Amazon Web Services ("AWS"), a $9 billion business which sells cloud and data storage to enterprise customers), a massive customer base to leverage from at Amazon.com that includes millions of businesses, world class IT capabilities and engineering innovation, superior fulfillment centers (with robots) and larger distribution networks (50+) than Staples and Office Depot combined, as well as a marketplace platform offering hundreds of millions of products. *See* Tr. at 634:15-635:1, 637:4-19, 638:19-23, 639:9-15, 639:22-640:2, 645:24-646:6, 656:2-23, 687:18-23; *see also* [DX02841] (stating that AWS customers include "large enterprises like

Shell, BP, J&J, Philips, Comcast, Netflix, Adobe, Newscorp, The New York Times and Major

League Baseball."). Large customers have already identified Amazon Business as a supplier that

they have begun to work with, or as a supplier that they expect to use. They include: **Chevron**:

[PX07010] at 7 ("Need more choices. Some procure through Amazon and/or Staples if Office

Depot can't meet their needs"); **Weyerhaeuser**: [DX05041] at 3, 5 (Weyerhaeuser signed up for

Amazon Business in July 2015; projected annual spend of $774,000); **Edward Jones**:

[DX02964] at 169:17-170:9 (Edward Jones is looking at Amazon Business for its office supply

needs); █████████████████████████████████████████

███████████████; *see also* [DX05036] at 3 ("The team continued discussions from Q4

with the ████████, and AB was selected as the preferred tail-spend provider for all ██████

█████████████████████████████████████. . . and ██████ short-

listed Amazon as the top finalist for an additional ██████ GMS per year opportunity that will be

awarded in Q3 2016 and operational in 2017."); **Pep Boys**: Pep Boys has begun to evaluate

Amazon Business ([DX02639] at 322:3-18); ████████████████ will move $600K of annual

spend to AB to source product for their northern California sales team's employee incentive

program, and intends to deploy across the US when successful[.]" [DX05035-OUTCNSL] at 3;

**University of Illinois**: *see* [DX00037] at 4 ("[T]he University of Illinois on-boarded 1,196 users

and grew their monthly spend from $3K to $154K in three months."); ████████: 40 buyers

making purchases of office supplies and tools. Tr. at 758:19-759:11; *see also* [DX05035] at 3. In

addition, Amazon Business has established and is seeking to establish partnerships with entities

that can bring Amazon Business large customers. ██████**:** [DX05039] at 3 ("We are negotiating

agreements with other e-procurement providers such as ██████.… These partners are expected to

████████████████████████████████████████████████████

████████████████████████████**:** [DX05036] at 3 ("We continue to pursue a partnership

with ████ and access to their ████ commercial card accounts to embed AB line-item detail

directly on the customer's card statement.").

143.    As a result of its early success, Amazon is "bullish" about Amazon Business. Tr.

at 828:16-23.

**1.    Amazon Business Is Rapidly Expanding Its Capabilities and
        Targeting Large Customers**

144.    Amazon Business already provides utilization reporting to customers, including

"spend per user, spend per group, spend in different categories, spend with certain sellers with

certain types of credentials." Tr. at 549:19-550:2; *see also* 852:18-853:12 ; 742:10-12; 743:12-

14; 752:17-18; [DX05284] at 40.

145.    Amazon Business also provides its customers with invoicing, ████████████

████████████████████████████. Tr. at 581:5-10; 650:24-

651:11. Specifically, Amazon Business offers customers the ability to "pay in 30 days, 60 days,

or 90 days as part of [Amazon's] invoice solution." Tr. at 652:7-15. ██████████████



146.    In addition, Amazon Business provides business analytics, to "enable a company

to have visibility into their spend." Tr. at 649:20-650:3; 650:16-23. Large enterprise customers

that use this tool have expressed positive feedback. For instance, ████████████, one of the

world's largest private owners of ████████, has praised the Amazon Business analytics

system. *See* [DX05036-OUTCNSL] at 4 ("Launched v1 of Amazon Business Analytics. …

████████████████████████████████████████████

████████████████████████████████████████████).

Amazon Business also has begun responding to RFPs and RFQs from large customers. Tr. at 829:13-22. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████ Amazon Business at that point had already won an RFP for office supplies. Tr. at 552:9-13. Amazon expects to continue to improve its ability to respond to RFPs and to build the capability it needs to be successful in 2016. Tr. at 553:4-17; 751:8-13; 816:12-818:7; 830:6-14. *See also* [DX05036-OUTCNSL] at 1 (by "[u]tilizing lessons learned from initial RFP/RFQs", such as the ██████ RFP, Amazon Business is "developing a plan to ██████████████ ███████████████████████████████ in 2016.").

147.   ██████████████████████████████████████████████████

███████████████████████████████████. ████████████████████████████

████████████████████████████████. This feature will be automated technologically and allow different companies to have specific pricing for certain products. Tr. at 754:19-22; [DX05235] at 58:13-21; 106:19-107:5; 107:23-108:4 ████████████████████████████████

███████████████████████████████████████████████████████████████████

For example, "customer-specific pricing will enable" a feature "[i]f Exxon wanted to have their head pricing set for a full year." Tr. at 849:1-3. ██████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████



148. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮. Amazon Business launched a pilot of pallet delivery in late 2015 ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮. Tr. at 744:1-23; 752:19-25. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

149. Amazon Business is also working on, or has already developed additional features requested by its customers, including: ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮; quantity pricing and discounts (Tr. at 647:12-648:5; 656:10-657:1; 680:10-15); IT integration with 30 different procurement platforms (Tr. at 748:19-23; 749:20-23; 750:23-751:4; [DX02883]); high levels of customer service (Tr. at 745:21-746:1; 753:1-4); and advanced infrastructure supporting nationwide delivery, including same-day delivery, one-day delivery, and two-day delivery (Tr. at 638:19-23; 639:9-18; 645:24-646:6; 646:25-647:3).

150. As of January 1, 2016, Amazon had signed up 248,000 business accounts, with a ▮▮▮▮▮▮▮▮▮▮▮▮ Tr. at 677:2-16. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮. Amazon Business also forecasts having ▮▮▮ in profit in 2016. [DX05038] at 1. Amazon Business has added "about 30" features since its launch and has "plans to continue innovating on behalf of business customers." Tr. at 665:23-666:14; *see also* 680:16-21; 682:9-

17. Amazon Business expects to release "80-plus" features in 2016. Tr. at 684:7-17; *see also* [DX05036-OUTCNSL] at 8-11.

151.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████. Amazon Business is developing with the goal of serving the needs of all of its customers, including "mega-companies" such as Fortune 100 or Fortune 500 companies. Tr. at 640:9-641:2; 653:12-15 ("Q. you are targeting all-sized customers: Huge ones, small ones, medium-sized, that's your plan? A. That's correct.").

152.     As part of its expansion efforts, Amazon Business has sent emails to Staples employees about job opportunities at Amazon Business, noting that Amazon Business is "revolutionizing the way businesses procure." Tr. at 754:23-756:7; [DX05212].

153.     ████████████████████████████████████████████████

███████████████████████████████████████████   ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

154.     Amazon has followed through with its plans to hire dedicated Amazon Business employees, including adding nearly ██ new dedicated employees between its launch and the end of 2015, and funding for an additional ██ employees for external teams to support Amazon Business. Tr. at 683:4-13.

155.     Amazon Business offers dedicated account representatives for enterprise customers, [DX02643] at 88:16-89:11; 89:12-24; [DX05235] at 19:10-23:5 Tr. at 745:21-746:1; 753:1-4, as well as sales representatives for specific industries (*i.e.*, "industry vertical teams") like education and healthcare. [DX05235] at 22:6-10.

156.    Amazon Business continues to recruit Adoption Evangelists who "identify leads for potential [Amazon Business] partnerships and clients and assist with presales support." [DX02783]; *see also* [DX02643] at 89:25-91:3 ███████████████████████████ ████████████████████████████████. Additionally, Amazon Business hires Software Development Engineers who "want to disrupt the way businesses purchase their supplies" as Amazon Business works to automate the RFP response process. [DX05223].

157.    Amazon Business also continues publicly to tout its existing capabilities and robust enhancements at numerous industry conferences. As keynote speaker at a March 2016 conference, Prentis Wilson presented slides titled "The Future of Procurement" and stated "[i]t's still Day One" at Amazon Business and that they plan to "continue to improve with: more selection; an increasing number of products and business products [sic]; better personalization; a purchasing experience even better tailored for businesses." [DX05284] at 43. Despite claiming it was only "Day One" for Amazon Business, Wilson also highlighted that "[i]n just 11 months" since its launch, Amazon Business has "over 300,000" business customers (*id.* at 6) and has already developed a pay-by-invoice solution (*id.* at 42) and an automated customer specific pricing (*id.* at 36).

### 2.    Large Customers Are Considering Amazon Business Now and Will Increasingly Look To Amazon Business In the Future

158.    Large customers in Plaintiffs' alleged relevant market have already identified Amazon Business as a primary alternative to Staples or Office Depot. Even before Amazon announced the launch of Amazon Business, it was fielding inquiries from customers looking at Amazon as either a supplement or a replacement to Staples or Office Depot as a primary supplier of office supplies. *See*, *e.g.*: ████████████████████████████████████ ████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

159.   [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

160.    Fifth Third's Chief Sourcing Officer testified that Fifth Third would consider

Amazon Business in the future, particularly if Staples raised prices.

- "**THE COURT**: If you learned that the distribution capabilities have changed for the

  better, would you consider Amazon going forward? **THE WITNESS**: Yeah, I think, you

  know, if we had issues in the new contract we signed, as we discussed before, or when

  that contract is up, I'd definitely put them back on the docket and, again, do the

  investigation.") (Tr. at 974:19-975:9);

---

[2] 

- "**Q.** And so, Mr. Moise, just following up on the judge's question, Amazon Business could be an option for Fifth Third in the future, fair? **A.** Yeah, I think that's fair. **Q.** And certainly if Staples were to raise prices after the merger, you could explore Amazon Business as an option, right, sir? **A.** Exactly. I mean, we would -- I think we would, again, if we got into a bind, we would -- **THE COURT**: You could be casting that net again, wouldn't you? **THE WITNESS**: We would be casting that net again.") (Tr. at 977:11- 978:9).

### 3.    Defendants Perceive Amazon Business As an Existential Competitive Threat

161.    Defendants perceive Amazon Business as a massive threat like they have never faced before:

a. "Next week at our quarterly strategy meeting we will be discussing how to win against Amazon Business… [I]t may be worth reading … this excerpt from Malcolm Gladwell's book, David and Goliath." [DX01770].

b. "How will we compete with Amazon now that they are frontally assaulting our business … Amazon is a competitor the world has never seen. Jeff [Bezos] isn't thinking about 2016. He's already planning the death of Staples." [DX01685] at 3; *id.* at 6.

c. "Here we go! Amazon Prime for business. This is going to unfold very quickly and remains a major threat." [DX01671];

d. "Scary! This is big-time competition and threat.... This is a shot across our bow..." [DX01733];

e. "We knew it was coming and here it is. Ups the urgency for our business dramatically… We have to change our game." [DX01684];

    f.  "Check out the Amazon business video … gulp ... Amazon is out aggressively marketing its business." [DX04510];

    g.  "They are replacing Amazon Supply with Amazon Business … Scary prospects for OD." [DX04847].

162.    Plaintiffs dramatically claim that Defendants' own documents demonstrate there will be no competition in the office supply market if the merger is consummated, leading to higher prices. *See*, *e.g.*, PI Br. at 1-2, 6, 19, and 26. But these documents reflect nothing more than one-off sales tactics by individuals pushing to make a deal. Moreover, far from creating a sense of worry and dread, the recipients of these tactics were hardly moved and saw the statements for what they were: sales pitches. *See*, *e.g.*, [PX05393] (responding that company was satisfied with current agreement and would revisit post-merger) and [PX04357] (responding that "I am sure the merger will drive down costs").

163.    Defendants' fears of the competitive threat posed by Amazon have only been confirmed by Amazon's focus on the B2B office products industry and its stated goal of being a one-stop source for "anything that a business could possibly need," including office supplies. Amazon's Prentis Wilson clearly stated that Amazon Business competes directly against Staples and Office Depot *today*. Tr. at 771:16-772:7. Amazon's counsel confirmed that Amazon Business is competing fiercely against Staples and Office Depot today. Tr. at 1178:25-1179:2. That is precisely why Amazon has fought so hard to cloak its documents and testimony in confidentiality. *See*, *e.g.*, Tr. 1180:3-18.

164.    Tellingly, Staples appears numerous times throughout Amazon Business' ordinary course business documents. Amazon Business monitors Staples' pricing and selection, benchmarks its competitors, including Staples, monitors this proposed acquisition by Staples of

Office Depot, ██████████████████████████████████████████████████

██████████████████████. *See, e.g.,* [DX05036-OUTCNSL] at 1; [DX05192] at 1;

[DX05167-OUTCNSL] at 3; and [DX05226] at 1. *See also* Tr. at 635:14-636:2; 727:16-728:5;

728:11-20.

165.   ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

166.   Nevertheless, Amazon Business primarily focuses on its customers, and does not

spend a lot of time worrying about its competitors. Rather, Amazon Business wants to ensure

that its customers are happy, and if so, "it doesn't really matter" what its competitors do. Tr. at

725:11-726:11. As a result, Amazon Business is not concerned that Staples may be able to lower

prices after the merger because Amazon will continue to "focus on the customer and we'll offer

the value we can. The customers can make a choice." Tr. at 772:8-17.

167.   ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████

**B.   SUBSTANTIAL EVIDENCE CONFIRMS THAT COMPETITION EXISTS NOW AND WILL EXIST IN THE FUTURE**

168.   Customer experience shows that competition is intense and is likely to remain so after the merger, and customers have stated that they are not concerned about the proposed merger. *See, e.g.,* **Lowe's**: [DX04242] at 3 ("Price competition for many of the product categories is intense, and the merger is not likely to substantially decrease such competition."); **Autozone**: [DX03902] (American Paper & Twine providing favorable prices over Staples in the copy paper and janitorial/sanitary categories); **Fox Entertainment**: [DX04298] at 174:12-18 ("Q. If Staples were to acquire Office Depot, would that stop you from searching for better prices elsewhere? A. No. Q. Fox has shown a willingness to do that over time; correct? A. Correct."); **GEICO**: [DX04989] at 170:6-15 ("We are always going to pursue better terms so . . . we are not beholden to what happens in the merger."); **Guernsey**: [DX02967] at 106:9-106:16 (testifying that Bunzl had been purchasing office supplies from Office Depot, but came to Guernsey and asked if they could handle the business instead "on a national account basis, in other words, service all of their locations. And – and we said we could."); **ADM**: [DX04125] ¶ 8 ("Based on my experience, I am not at all concerned about the proposed merger because ADM would have plenty of competitive options for traditional office products if Staples attempted to raise prices above competitive levels. I also do not believe the proposed merger will have any impact at all on ADM. Overall, I am satisfied with competition for office supplies."); **Pep Boys**: [DX02639] at 293:14-294:18; 295:21-297:2 (Pep Boys is "preparing right now" and has the tools to identify alternatives if necessary after the merger); **ADP**: [DX04263] at 87:7-88:9 (ADP has a contract in place for catalog items and could purchase non-catalog items elsewhere); **Walt Disney**: [PX02430] ¶ 10 ("If Office Depot raised its prices after merging with Staples, Disney could

conduct an RFP inviting other companies, such as Amazon, we expect could meet our office

supplier needs . . . although Disney has not conducted an investigation at this time**.**")

### 1. Large National Customers Can and Do Choose Suppliers Other Than Staples and Office Depot

169.    Many "national" customers use regional office supply vendors for each office,

rather than insist on a national procurement contract. For example, the FTC's own witness,

McDonald's testified that the majority of its locations do not utilize McDonald's Office Depot

contract for their office products needs. Tr. at 458:21-459:11; 460:8-14. HealthTrust, another

FTC witness, testified that half of its CoreTrust members – about 600 companies – purchase

100% of their office supplies outside of the Staples contract. Tr. at 2021: 5 – 11.

170.    Several Fortune 100 companies choose not to have a national office supplies

vendor. *See* e.g., **INTL FCStone** [DX04182] at 2 ("…our office supply purchase decisions are

made at the local office level and are not part of a larger national purchasing program or a RFI,

RFP or bid process."); **CHS** [DX04186] at 7 (CHS noted in its response to the FTC's CID, that

despite selecting Staples as the "Preferred Supplier" in a sourcing event, they "did not mandate

to all of the business units and divisions in the enterprise that all future Office Supplies/Janitorial

Supplies orders were to be placed with Staples."); **FedEx** [DX02442] ¶ 7) (FedEx and its

operating companies purchase office supplies from Guy Brown, S.P. Richards, U-Line Corp.,

Staples, American Business Solutions, Inc., En Pointe Technologies, Anders Group, Inc., Vulcan

Information Packaging, DSI-Data Source, Inc., Toner Express Officetech, Corporate Graphics,

International, and Midwest Fixture Group, Inc.)

171.    Similarly, "McLane utilizes a decentralized procurement strategy for office

products. In general, McLane's distribution centers are individually responsible for their office

product purchasing decisions and each distribution center is empowered to acquire office

products from the suppliers of its choice, including online suppliers. Often the distribution center selects a supplier that has operations or a facility in or near the city in which the distribution center is located." [DX02432] ¶ 6.

172.    In 2015, approximately 30% of Windstream's office supplies purchases were off-contract spend with other office product vendors, including Amazon. Windstream also purchases office supplies from other local and regional vendors. [DX02451] ¶ 12.

173.    Rite Aid currently uses more than a dozen different suppliers to fulfill its office products, and the business reasons for doing so outweigh any benefits to purchasing this range of products from Staples as a single supplier. [DX04451] at 78:19-79:15.

### 2.    Alternative Suppliers Already Can Provide National Coverage to Customers

174.    W.B. Mason confirmed that it can provide national coverage to any company that is headquartered in "Masonville," or the area which W.B. Mason considers to be its home territory. Tr. at 1757:8-12; 1744:19-22. Masonville consists of an area in the Northeastern United States covering 13 states and Washington, D.C. Tr. at 1565:4-9.

175.    W.B. Mason confirmed to this Court that it was the primary office supplies vendor for a number of such companies headquartered in Masonville but with national locations: **BioReference Laboratories** (Tr. at 1806:1-14), **Citizens Bank** (Tr. at 1806:15-11), **Bright Horizons** (Tr. at 1811:16-1813:1), **Talbots** (Tr. at 1814:3-1816:1), **The Hartford** (Tr. at 1816:2-1817:4), **Burlington Coat Factory** (Tr. at 1813:2-7). W.B. Mason also provides nationwide coverage to a number of other customers that were not discussed in its testimony, including: ████████████ [DX05026]; and **Whiting Turner** [DX02963].

176.    Yet W.B. Mason can also provide nationwide coverage to customers that are headquartered *outside* of Masonville – it currently provides coverage for Ryder's headquarters in

Florida, as well as satellite locations in 42 states. Tr. at 1817:7-1818:9. And while Bright
Horizons is headquartered in Massachusetts, the majority of its purchases are at locations outside
of Masonville. Tr. at 1703:8-1704:5.

177.   In fact, up until the day that W.B. Mason's CEO, testified at the hearing in this
case, W.B. Mason's website touted that it had warehouses across the United States which would
allow it to service customers in all 50 states, referring to both its own warehouses and
distribution network, and Essendant's network that distributed products through a partnership
with W.B. Mason. Tr. at 1753:18-1755:8; 1755:17-1756:5; 1756:22-1757:20; [DX00600].

178.   Its website also touted that "W.B. Mason has a workforce of over 2,300 people,
spread over 40 locations throughout the nation. We also have warehouses across the United
States which allow us to service customers in all 50 states." Tr. at 1730:3-1731:1; [DX00600].

179.   Those statements had been on its website for six years, and remain true today. Tr.
at 1754:3-15; 1752:16-23; 1818:25-1819:4. Yet, incredibly, the night before Mr. Meehan's
testimony, the national map was removed from the W.B. Mason website and was replaced with a
map of Masonville – the very same map attached to W.B. Mason's declaration for the FTC in
this case. Tr. at 1753:20-1757:20. Mr. Meehan had no explanation for why the national map had
been removed, despite the fact that it remained accurate. Furthermore, the evidence clearly
demonstrates that W.B. Mason capably wins RFPs and serves customers with nationwide
requirements, whether or not they are headquartered in "Masonville." *See, e.g.,* Tr. at 1739:17-
25; 1744:2-1745:10; 1759:7-15; 1818:10-24.

180.   Notwithstanding Mason's proven ability to provide nationwide coverage to
customers headquartered both within and outside of Masonville, Mr. Meehan also testified that
W.B. Mason would be able to expand to provide truly nationwide coverage with a further

investment of ████████. Tr. at 1720:23-1721:6; 1789:25-1790:15; 1791:23-1793:5; 1794:20-

1795:6. The FTC conceded in a bench memo that W.B. Mason could receive this investment

from a bank. Plaintiffs' Bench Memorandum Regarding the Court's Authority to Consider

Remedial Proposals (Dkt. No. 347) at 3.

181.    In addition to the statements on its website, W.B. Mason repeatedly touted its

nationwide distribution capabilities in responses to RFPs or other inquiries from customers. Tr.

at 1735:1-1736:11; 1737:7-1739:25; 1744:2-1745:10; 1750:18-1751:24 (W.B. Mason's response

to the GSA stated that W.B. Mason's strategic partnership with United Stationers (now

Essendant) allowed it to deliver nationwide, including to Alaska, Hawaii, and Puerto Rico).

182.    Many other independent suppliers provide office products to large national

accounts. For example:

   a. **American Product Distributors ("APD"),** an independent supplier, provides office

      products for Wal-Mart, the Fortune #1 company. [DX04487] ¶5.

   b. **Guernsey** provides Office Products for Bunzl. [DX02967] at 106:9-106:16) (Bunzl

      decided to switch vendors from Office Depot and Guernsey was able to provide

      national service to all of Bunzl's locations).

   c. **HiTouch** provides office products for ████████████████████

      

      ████████. [DX02968] at 46:25-48:19 (There are actually █████ major accounts, not

      two as stated in the declaration: ██████████████████████

      ████████████████████████████████████████

      ████████████████████████████████████. HiTouch

      delivers to all of their U.S. locations, "[e]ither on our own trucks or through FedEx

      or . . . our other LTL carriers.").

    d. **Greenville Office Supply** works with Essendant to provide nationwide distribution to Windstream. [DX05234] at 165:24-166:14; 169:7-21; 178:16-20.

### 3. Alternative Suppliers Can Provide the Features That Large B2B Customers Allegedly Require

183.     To the extent that "Large B2B Customers" actually share distinct "requirements," rather than merely preferences that only certain members of Plaintiffs' alleged relevant market have, the record shows that Defendants' competitors can meet those requirements.

184.     Defendants' competitors can provide desktop delivery. *See*, *e.g.*, **AOPD**: [DX03888] ¶ 5; **Complete Office**: [DX02414] ¶ 5; **W.B. Mason**: Tr. at 1727:6-13; [DX03998] at 2; **HiTouch**: [DX02968] at 84:21-85:21; **Greenville Office Supply**: [DX05234] at 191:16-24. Further, desktop delivery is primarily provided by couriers or other vendors for Staples and Office Depot, rather than by Defendants themselves. *See*, *e.g.*, Tr. at 994:10-22; 1515:4-10. These services are as readily available to Defendants' competitors as they are to Defendants.

185.     Defendants' competitors can provide customizable catalogs to customers. *See*, *e.g.*, **W.B. Mason:** Tr. at 1623:8-23; **Other Suppliers**: [DX04985] at 176:-177:25; **Independent Stationers/EPIC**: [DX02966] at 100:5-21.

186.     Defendants' competitors can provide IT integration for customers. *See*, *e.g.*, **Weeks-Lerman**: [DX02452] ¶ 7; **W.B. Mason**: Tr. at 1623:24-1624:24; [DX02411] ¶ 11; **Independent Stationers/EPIC**: [DX02966] at 89:5-90:6; **Grainger**: Tr. at 1111:10-16.

187.     Defendants' competitors can provide product utilization tracking and reporting to customers. *See*, *e.g.*, **W.B. Mason:** Tr. at 1627:25-1628:19; **Other Suppliers**: [DX04985] at 177:18-178:15; **S.P. Richards**: [DX02971]; **AOPD**: [DX03888] at ¶ 7; **Grainger**: Tr. at 1111:10-22.

188.     Defendants' competitors can provide volume rebates and prebates to customers.

*See*, *e.g.*, **AOPD**: AOPD offers tiered volume rebates [DX05027] at "Spec 6" Tab; **United Imaging**: United Imaging offered a prebate of $50K, and there was no minimum spend associated with that. It also provided volume based incentives starting at $750K. Office Depot's volume rebates did not kick in until $2 million, whereas United Imaging offered rebates anywhere from 1 to 2 percent that kicked in at a spend rate of $350K for ink and toner. [DX02629] at 243:19-245:1.

189.    In fact W.B. Mason has offered rebates in the millions of dollars in bids for customers' business. W.B. Mason offered a $3 million rebate in an unsuccessful bid for business, and offered "significant" signing bonuses to Steward Health Care and Pittsburgh Medical Center in successful bids that beat out Staples and Office Depot. Tr. at 1801:4-1802:11.

### 4.    Independent Office Supply Vendors Are Growing and Expanding Their Coverage and Capabilities

190.    W.B. Mason has been expanding steadily and competing more strongly for national accounts, as the FTC recognized in 2013. ██████████████████████

████████████████████████████████████████████████████

██████████████. Over the past five years, Mason has made 104 acquisitions. Tr. at 1738:12-14. In 2015 alone, W.B. Mason completed thirteen acquisitions and added 500 new trucks, two new warehouses, and 245 new sales people ([DX02681]); and W.B. Mason reported 12.5% growth in 2015 and expects a 33% sales growth by 2018 (*id.*).

191.    W.B. Mason is participating in national account bids more frequently. Tr. at 1818:22-24; [DX02637] at 43:5-44:2. W.B. Mason reported to a customer that "[t]he past decade has been one of constant expansion; whether measured by company size, breadth of product, geographical footprint, or account base. With rising sales approaching the largest in the industry, W.B. Mason continues to differentiate itself from other industry giants as the only national

68

supplier solely focused on corporate account management and b2b sales." [DX01021] at 3.

192.    W.B. Mason has ████████ customers with more than $1 million in annual
purchases, including national customers. [DX02637] at 146:18-147:22; Tr. at 1806:15-21;
1814:3-6; 1812:24-1813:1.

193.    A number of other independent vendors have confirmed that they are growing and
expanding the coverage and capabilities:

a.  **Guy Brown**: "I believe that the competitive landscape has and will continue to
change in the office products industry due to technological advancements.
Irrespective of a potential Staples/Office Depot merger, customers of all sizes will
see increased penetration by historically cloud-based providers, and traditional office
products will continue to be replaced and/or decline in usage." [DX02449] ¶ 11.

b.  **AOPD**: "AOPD's contract sales have recently grown at double-digit rates. From
2013 to 2014, we added 55 contracts, increasing sales by 22%. From 2014 to 2015,
we added 56 contracts, increasing sales by 13%. Similarly, AOPD's national
contract with Premier Purchasing Partners ('Premier') grew by 27% and its national
contract with the National Cooperative Purchasing Alliance (NCPA) grew by 71%
from 2014 to 2015." [DX03888] ¶ 8.

c.  **HiTouch**: In 2010, MYOP had one warehouse and HiTouch had a small warehouse
in northern New Jersey. Now, HiTouch has five distribution centers and
"approximately 30-some-odd cross-docks" in approximately 20 states. HiTouch's
"greatest strength is in the Northeast," but also has infrastructure on the West Coast,
the South, and the Midwest ([DX02968] at 31:12-33:10.

d.  **TriMega and Independent Stationers**: "Effective January 1, 2016, TriMega

69

entered a joint venture with Independent Stationers, called EPIC Business Essentials ('EPIC'), to provide a platform that allows our member dealers to potentially service large commercial accounts including national accounts… [TriMega's] member-dealers already successfully compete to supply large customers with multi-regional ship-to locations." [DX03881] ¶ 6.

194.    In fact, dealer cooperative TriMega stated in its declaration for Plaintiffs that its members' national coverage *exceeded* that of Staples and Office Depot. [DX03881] ¶ 5 ("As I stated in my October 7, 2015 declaration, TriMega's member-dealers collectively have national coverage that exceeds that of Staples and Office Depot").

195.    Further, vendors of "adjacent" products such as Fastenal are expanding their sales of office supplies and competing against Staples and Office Depot. [DX02965] at 80:20-81:11; 144:16-145:6 (Fastenal considers Staples and Office Depot to be among its competitors for the sale and distribution of office supplies).

### 5.    Wholesalers Such as Essendant and S.P. Richards Partner with Office Supply Vendors to Expand Their Footprints

196.    W. B. Mason has a "strategic partnership" with Essendant (formerly United Stationers) that "allows us to ship over 30,000 items next day for national accounts." Tr. at 1740:6-19. Their long-time partnership has allowed Mason to take advantage of Essendant's distribution centers in parts of the country outside of Masonville, and tout its nationwide distribution abilities to national customers. Tr. at 1740:20-1741:20; 1750:18-1751:24.

197.    A number of other independent dealers use wholesalers to expand their coverage. PDME utilizes Essendant to ship to customers outside of its traditional service area. Tr. at 1376:4-19. Weeks-Lerman uses Essendant as one method of shipping products to each of its top 25 customers. [DX00541] *see* Shipment Means tab. S.P. Richards' distribution network allows

70

independent dealers to provide nationwide coverage. *See* [PX03007] ¶ 2; [DX02971] at 89:23-90:5 ("Q. And does SPR's network of distribution facilities give independent dealers nationwide reach? A. Yes"). Greenville Office Supply uses Essendant to provide nationwide coverage. *See* [DX05234] at 165:24-166:14; 169:7-21. Guernsey can serve nationwide customers through Pinnacle, AOPD and Essendant**.** [DX02967] at 177:21-178:2.

### C. DEFENDANTS WOULD LOSE SALES OF ADJACENT "BEYOND OFFICE SUPPLIES" PRODUCTS IF THEY RAISED PRICES OF OFFICE SUPPLIES

198.    Staples and Office Depot have recently attempted to expand their focus on BOSS sales, such as break room products, facilities products, technology, furniture, and print and promotional, to capture more of those markets, in particular because general office supplies, including ink, toner, paper, and general office supplies, are facing a secular decline due to increasing use of digital solutions, while other categories continue to grow. *See* Tr. at 2638: 11-16; 2640:4-17; [PX02003] at 44:11-18; [PX04033] ("…      plans to recommend ODP… Will you approve dropping initial CPE to    AP as a final shot? We'll apply it to the upfront $ to see if we can change their mind. ***We'll have future BOS opportunity*** and can improve AP if we can get the deal. Thoughts – OK?") (emphasis added); [PX04032] ("Are you still ok with me taking    benchmark exercise     basis points or do you want me to go to Deal Council? They are having Depot price out the benchmark ***… We will get the coffee business as well.***") (emphasis added); [PX04295] ("It's not an ideal circumstance but it's our foot in the door with      and will provide a marquee    customer for us. ***The VP Procurement has promised additional BOS opportunities once we are set-up on their 3rd party platform*** and I'm confident we can make this more profitable over time…") (emphasis added); [PX04371] ("***That being said, we are already filling the sales gap***. An incremental $500k coffee and break room program will be implemented and added to their base of business once the contract is signed.

Other **new BO$$ deals** include a $300k Headsets/Unified Communications program and a

Kindle $l00K order last week. ▪ is growing BO$$ and that is reflected in the 16% YoY overall

growth of the acct and 45% BO$$ penetration (Facilities+31%, Furn. +16%, and Tech +31%).")

(emphasis added).

199.    Other competitors have similarly seen growth in BOSS categories. Tr. at 1748:24-

1749:18 (W.B. Mason's growth for break room sales are 30%, while office supplies is 10%).

200.    Further, as noted above, many customers seek to purchase a broad range of

products, including BOSS products, together with traditional office supplies, paper, and ink and

toner, to secure lower prices and/or greater volume discounts and rebates.

201.    As a result, Staples and Office Depot have sought to increase sales of those

products to customers, and to include a wider range of products in their contracts. *See*, *e.g.*,

[PX02009] at 188:10-190:22; **B of A**: [DX02560] at 63:6-64:4.

202.    Customers recognize that they can use their "bundling" leverage, combined with

the presence of alternative suppliers, to police Defendants' pricing. ***See, e.g.,* Best Buy:** Tr. at

1326:2-17 (would use leverage from its purchasing of cleaning and breakroom supplies to

prevent overcharges on commodity office supplies, such as paper clips); **Fifth Third Bank:** Tr.

at 951:15-25 (acknowledged that it is beneficial to expand the categories of products in buys

from Office Depot, because, for instance, it would be difficult for Office Depot to raise the price

of paper clips while hoping to maintain Fifth Third Bank's break room business); **Walgreens:**

[DX02628] at 81:9-82:16; 83:12-84:16 (has sourced or threatened to source certain categories of

office supply products from multiple firms to obtain more favorable pricing from Office Depot

and would most likely do that on any categories of office supply products if prices increased);

**Albany Medical Center**: [DX00041] (in reaction to 2013 price increases by Staples - "I think

we should RFP it, as we did in 2009."

203.    Other office supply vendors believe such a price increase would be an opportunity

for them to gain customers. *See*, *e.g.*, ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████ ; Tr. at 1729:6-22 (if Staples tried to raise prices in Masonville, "we would try

to take those accounts"); Tr. at 1767:13-1768:3 ("**Q.** And if they raise prices and you could come

in at a lower price with better service and better features, you would try and take that business,

right? **A.** Without a doubt."); **Midway**: [DX02421] ¶ 14; **Xerox**: [DX02413] ¶ 8 ("If Staples

raised its prices on paper, Xerox has the capabilities to fulfill customers' paper needs, including

the needs of large customers, and offer competitive pricing.").

### D. COMPETING SUPPLIERS ARE POSITIONED TO GAIN MARKET SHARE IF A POST-MERGER STAPLES ATTEMPTED TO RAISE PRICES

204.    If Staples were to try to raise prices post-merger, there is ample evidence that

large B2B customers would be able to turn to other suppliers to purchase their office supplies

off-contract. Some customers have even shown a willingness to disaggregate purchases and

purchase paper directly from manufacturers or other specialty suppliers, ink and toner from

manufacturers or MPS services, office supplies from other vendors, and BOSS products from

competing suppliers.

205.    Competitors already gain market share through "Leakage". *See, e.g.,* **AIG:**

[DX00369]; [DX00370] (AIG has a main contract with Office Depot, but also purchases from

W.B. Mason outside of Office Depot contract); **Windstream**: [DX02451] at ¶ 12 (in 2015,

approximately 30% of **Windstream's** office supplies purchases were off-contract spend with

other office product vendors, including Amazon, local and regional vendors); **B of A:**

[DX02560] at 47:10-48:15 (acknowledges employees purchase office products from sources other than Staples, including products that could be purchased through Staples, or when they need specific products that may not be available at Staples).

206.    Office Depot's sales tool, Prism, routinely shows steep declines in customer purchases, reflecting leakage to competitors. [DX03378].

207.    Many customers acknowledge leakage but cannot reliably track it. *See*, *e.g.*, **Sherwin-Williams**: [DX00335] at 15 (it has "limited visibility" in terms of tracking leakage); **Foot Locker**: [DX04985] at 165:12-17 (Foot Locker does not have any way of checking how much was spent off-contract on office supplies across Foot Locker); **Fox Entertainment**: [DX04298] at 150:24-151:1 (Fox does not have a way of tracking off-contract spending); **McDonald's**: Tr. at 390:8-391:1; 391:21-392:5; 464:9-12; [DX04981] at 106:9-107:11 (McDonald's does not know how or from where 65% of its franchises purchase their office products); **HealthTrust**: Tr. at 2022:23-2023:9 (HealthTrust has no means to know whether any HPG member is buying office supplies through Amazon, because it cannot see members' purchasing order systems); 2025:8-11 (usage reports do not have information about spend anywhere other than Staples).

208.    McDonald's indirect spend (which includes office supplies as a small portion) includes up to a thousand vendors, and McDonald's "marketplace" alone includes approximately 50 vendors, a number of which can provide office products, including office supplies. Tr. at 405:5-406:8; 457:10-24. McDonald's works with more than a thousand vendors overall. Tr. at 405:21- 406:8.

209.    Select Medical swore in its declaration that it "strongly prefers purchasing from a single vendor with nationwide distribution capabilities because it allows us to receive the most

competitive prices by funneling our entire volume through one vendor." [PX03013] ¶ 14. But the
evidence shows that Select Medical purchases a number of products from other suppliers, even
though they are offered by Office Depot. For example, Select Medical has two primary vendors
for jan-san. Tr. at 1101:10-12. Select Medical also purchases technology products from Dell,
SHI, and CDW, even though these products are also sold by Office Depot. Tr. at 1102:5-16.
Select Medical has between 10,000 and 15,000 total vendors. Tr. at 1091:21-1092:4.

210.   ADP purchases millions of dollars' worth of products that it could purchase
through Staples from other vendors. [DX04263] at 71:11-72:4. For example, ADP purchases
copy paper from CDS and Lindenmeyr Munroe because it gets better value. (*Id.* at 99:14-100:2).
ADP also purchased hundreds of thousands of dollars' worth of other products from each of
Office Depot, Xerox, Standard Register Company, Software House, and other companies, and in
each case those products were available through Staples. *See id.* at 13:13-24; 53:12-56:10; 56:16-
57:16; 71:11-72:4; 79:3-18. Further, ADP testified that "[g]iven our overall capacity," ADP does
not believe that consolidating spend of consumable office supplies results in savings. *Id.* at
115:14-20.

211.   The administrative burden from buying furniture, janitorial and sanitation, and
technology products from multiple companies is also manageable for Walgreens. [DX02628] at
101:19-102:13; 103:7-14.

212.   HealthTrust has 70 HealthTrust members and 600 Core Trust members that do not
purchase office supplies through the Staples contract. Tr. at 2019:14-24; 2021:5-11.

213.   "The total number of suppliers used by McLane nationwide for the products
identified in paragraph 5 is likely in the hundreds." [DX02432] at ¶ 7.

214.   Rite Aid currently uses more than a dozen different suppliers to fulfill its office

products needs. [DX04451] at 78:19-24.

215.    Sherwin-Williams sources some of its products (e.g., janitorial supplies, paper and stationery products, end-user equipment, etc.), from multiple suppliers, including Grainger, Fastenal, and Pomeroy. [DX00335] at 16-17.

216.    43% of CHS's total YTD fiscal year 2015 Spend on Office Supplies/Janitorial Services went to 1,742 different suppliers. [DX04186] at 2.

217.    MGM has approximately 120 different procurement contracts, spanning "200 or more" different categories, and sources products from an estimated 10,000 different vendors. In addition, MGM's spend data shows that MGM's various locations procure supplies from multiple and different vendors. [DX02969] at 19:6-18; 85:16-22; [DX04029].

218.    In 2014, Express Scripts purchased office supplies from 100 different suppliers, including Alpha Office Supplies, Office Essentials Inc., OfficeMax, Staples, Unisource, Professional Office Environments, Domtar, Fisher Group, Grainger, Xpedx, HP, Uline, Shaughnessy, Canon, Nishida, and others. [DX00304].

219.    AmerisourceBergen has a contract with OfficeMax, but also has spend with Staples, Southern Office Supply, W.B. Mason, and Grainger [DX00366]; [DX00301]; [DX00002]; [DX05032]. Its Lash Group location stopped purchasing on contract because of service issues ([DX00004]; its Charlotte location uses a local supplier named SOS. [DX00006].

220.    McKesson purchased "Paper Products" from Spicers Canada Ltd, Avalon Papers LLC, and from International Paper Co. [DX00418].

221.    Though MetLife's contract with HP is described as an MPS contract, MetLife spent millions of dollars on "Shipping & Mailing supplies" with Xerox in 2013. [DX03913].

222.    Target sources categories from multiple suppliers. Janitorial supplies used at

distribution centers and stores are purchased from Rubbermaid. [DX02424] ¶9. Janitorial

supplies used at HQ facilities are purchased from Unisource. *Id.* at ¶9. All cleaning chemicals are

purchased from Sealed Air/Diversey. *Id.* at ¶10. Furniture is sourced from numerous vendors

including Target Commercial. *Id.* at ¶11. Paper is purchased from Domtar. *Id.* at ¶ 5.

223.    Each Disney office or office complex purchases ink and toner in a manner most

efficient for the operations at that location." [DX02430] ¶ 7.

224.    Prior to 2013, CHS had "approximately 600-700 locations that were all

purchasing 'relevant products'…involv[ing] several hundreds of vendors all over the US (from

local hardware stores and local convenience stores to Wal-Mart, Target and the like)…"

[DX04185] at 3.

225.    The FTC itself chooses to purchase its office supplies separately and from

different suppliers for its Washington, D.C. headquarters and its eight satellite offices.

[DX05090]; [DX05091]; [DX02988] at 39:4-7.

## X.    THE EVIDENCE SHOWS THAT PLAINTIFFS IMPROPERLY BEGAN WITH A PRESUMPTION THAT THE MERGER WAS ANTICOMPETITIVE AND WORKED BACKWARD TO FIND EVIDENCE SUPPORTING THEIR CONCLUSION

226.    The evidence shows that Plaintiffs aggressively sought statements from witnesses

to support Plaintiffs' case, even when those statements did not accurately reflect the facts, or

when those statements pushed beyond the witnesses' actual industry knowledge.

227.    For example, the FTC sought to convince Amazon to sign a declaration

containing a number of statements that were not true and not reflective of Amazon Business's

capabilities. They sought statements from Amazon that Amazon did not maintain control over

the third-party sellers in its marketplace, when, in fact Amazon "maintain[s] substantial control

over your – over the performance of your third-party sellers." Tr. at 819:6-820:22; *see also*

670:14-19 ("**Q.** So half of your product offerings are from Amazon vendors, and I take it Amazon has quality control checks in terms of products it sells on its marketplace from its vendors? **A.** [Y]eah, we work hard to make sure that the products … we sell meet the expectations of our customers."). And despite Amazon's documented ability to respond to RFPs, the FTC sought to include language in Amazon's declaration that Amazon Business would not be in position to respond to RFPs until early 2017, but Amazon struck that language from the draft declaration. Tr. at 816:15-818:7.

228. The FTC either did not believe or chose not to acknowledge that Amazon Business already had or was developing the features needed to serve large B2B customers. In fact, it was the FTC's "highest priority item" to get a statement from Amazon Business that it would not be ready to compete for large customers in two years. Tr. at 827:14-21. But Mr. Wilson, from Amazon Business, could not agree, testifying as follows: "**Q.** But when the FTC, as their highest priority item for your affidavit in this case, asked you to say, we're not going to have these things ready in two years, if at all; you said, we can't say that? **A.** Correct. Yeah. **Q.** Okay. Because the truth is, as we went through, some of these features, utilization reporting, IT interfacing, flexible payment terms, you already have. And others, you're in development and you've got launch dates, right? **A.** We're – we're working to get these out and some are – we have early versions and others we're working towards." Tr. at 822:11-21. Mr. Wilson further testified that the statements the FTC sought were not true, and that "[t]hat's why we were unwilling to say that, because we weren't sure if that was going to be true or not." Tr. at 824:24-826:6 ("**THE COURT:** And that wasn't true, was it? **A.** That's why we were unwilling to say that, because we weren't sure if that was going to be true or not because we were actually working to deliver most of the – … **THE COURT:** Were you surprised that the government was

telling you what to say and not say? **A.** Yes. **THE COURT:** Why? **A.** Well, we should say what we think is – is – **THE COURT:** Is true? **A.** Is true."). Ultimately, Amazon told the FTC that it could not "commit to not having [B2B features] available in two years." Tr. at 826:13-16.

229.    Other declarants similarly objected to the FTC's efforts to obtain statements far removed from the facts. For example FTC declarant Michael Maggio of TriMega wrote to Stephanie Greco of the FTC about the declaration the FTC had drafted for him, stating that "[w]hile these are my words, you left out quite a bit of my comments that indicate we are not has [sic] helpless as this narrative makes us appear. This makes us seem totally ineffective against Staples, which if you include all that I said, I think clearly states that we are not." [DX04171]. Maggio then asked Greco to add to his declaration: "[W]hile price is an issue, it is one that we overcome daily when competing with Staples on a local and regional level." *Id.*; *See also* [PX03008] ¶ 15.

230.    Fifth Third's Chief Sourcing Officer, James Moise testified that the FTC drafted the declaration that he signed. Tr. at 958:9-13. His declaration stated that "I am familiar with W.B. Mason, but I am not sure that it could adequately serve as a substitute for Staples or Office Depot" and discussed W.B. Mason's footprint, its potential need to partner with a wholesaler, its purchasing power and financial resources, and its ability to compete on price. [PX03012] at ¶ 10. However, Mr. Moise admitted that at the time he signed the declaration the FTC drafted for him, he had not reached out to W.B. Mason and had not solicited any information from W.B. Mason. Indeed, he had not even visited W.B. Mason's website or discussed its capabilities with them. Tr. at 961:17-962:18; 963:21-25; 966:20-22.

231.    Mr. Moise's declaration also stated that Fifth Third was concerned that Amazon Business could not provide the key attributes that Fifth Third required. [PX03012] at ¶ 15. But at

that time, Fifth Third "had only taken a shallow look at Amazon Business" and had not asked

them to respond to an RFP. Tr. at 969:8-22.

232.    Similarly, McDonald's witness, Mr. Jason Cervone, testified that the FTC drafted

his declaration and that he deleted two sentences because he did not believe them to be accurate.

Tr. at 483:4-13. McDonald's deleted from its declaration the FTC's proposed statement "While

McDonald's would explore any other sourcing options, it is likely that Staples could significantly

increase our prices or decrease its service offerings before we could take our business elsewhere.

In the absence of competition from Office Depot, it is hard to envision the marketplace

exercising any pricing or service discipline on Staples." [PX03029]; [DX05261].

233.    Along the same lines, ▮▮▮▮▮▮▮▮ deleted from its declaration the FTC's

proposed statement "Because ▮▮▮▮ would ultimately be forced to choose between the

combined Staples/Office Depot and a less attractive option, ▮▮▮▮ could be vulnerable to

price increases." [PX03035]; [DX05327].

234.    The evidence, and in particular the language in the declarations written by the

FTC that was repeatedly rejected by a number of declarants, plainly demonstrates that Plaintiffs

began this case with the assumption that the merger was anticompetitive, and worked backward

to establish the evidence to prove their case.

### A.    SOME OF THE "CONCERNED" CUSTOMERS HAVE EXPLICITLY IDENTIFIED BIAS AGAINST THE MERGER AND THE DEFENDANTS

235.    Further, the evidence shows that most, if not all, of the few customers that have

objected to the merger have biases against the Defendants or against the merger unrelated to its

competitive effects. Best Buy's representative, who submitted a declaration in opposition to the

merger, and who testified at the hearing, acknowledged that his company is a competitor of

Staples and Office Depot for retail customers, and a combined Staples would be a stronger

competitor. Tr. at 1301:5-9; 1301:24-1302:4. Additionally, for reasons unrelated to the competitive effects of the merger, Best Buy stated that it would never purchase from Amazon, even if it meant saving millions of dollars, because Amazon is a primary, "formidable" competitor. Tr. at 1229:2-11; 1248:12-1249:17; 1298:3-15; 1302:10-11.

236.    A declarant from Corporate United, a competitor of Staples and Office Depot, stated that "If this gets blocked they should make a statue in front of CU offices for me. My testimony was a work of art (mixed with BS)." [DX00098] at 2.

237.    A declarant from Fifth Third Bank admitted that Office Depot is a long-standing customer of Fifth Third Bank. Tr. at 927:17-22 ("**Q.** But you certainly understand there's a long-standing relationship between Fifth Third and Office Depot, right? **A.** Yes. **Q.** And, in fact, Office Depot is actually a customer of Fifth Third, right? **A.** That is correct."); 928:21-929:2 ("**Q.** Sure. A part of what your concern is, is that you don't have any familiarity with Staples, right? **A.** I would say it's a small part of it. **Q.** You have a 40- -- almost a 40-year relationship with Office Depot, right? **A.** Fifth Third has been using them for quite a long time.").

### B. SOME OF THE "CONCERNED" CUSTOMERS HAVE UNIQUE AND/OR IRRELEVANT CONCERNS THAT DO NOT RELATE TO THE COMPETITIVENESS OF THE ALLEGED RELEVANT MARKET

238.    The customers who have objected to the merger are almost uniformly long-term Office Depot customers worried about supply disruptions: **Fifth Third** (38 years with Office Depot). Tr. at 927:9-16; **McDonald's** (13 years with Office Depot). [PX03029] ¶ 10; **AEP** (15+ years with Office Depot). [PX07136]; **Best Buy** (7 years with Office Depot). [PX03009] ¶ 7.

239.    Further, a number of the objections to the merger on which the FTC relies come from competitors of Staples and Office Depot. *See*, *e.g.*, **Best Buy**: Tr. at 1300:18-23 (Staples is a competitor to Best Buy); Tr. at 1301:5-16 (a combined Staples would be a stronger competitor to Best Buy at retail); 1301:24-1302:4 (Staples lowering prices post-merger would not be good

for Best Buy); **PDME**: Tr. at 1413:11-25 (a combined Staples and office Depot would have

significantly less net costs and "probably beat [PDME] all day long"); Tr. at 1498:22-1499:2;

1500:17-1502:17.

240.    These objections should be considered by the Court "with great skepticism,"

especially in light of the remaining record showing significant competition from Amazon, and

the dearth of objections to the merger from non-competitors of the Defendants.

### C.   FTC WITNESSES ASSERTING THAT ONLY STAPLES AND OFFICE DEPOT COULD SERVE THEM HAVE DONE NOTHING TO INVESTIGATE ALTERNATIVE SUPPLIERS

241.    The FTC pushed their declarants to swear to conclusions that they had no basis to

reach. Many customers – including some on which the FTC relies to claim that large customers

do not have alternatives to Staples and Office Depot – have admitted that they have not even

investigated whether alternatives exist that can meet their requirements. **AEP**: Tr. at 311:3-312:4

(AEP did not investigate W.B. Mason until after it had concluded its RFP); 345:7-346:14 (stating

that AEP has not done an analysis of Amazon Business, and that it is fair to say that AEP hasn't

had "a reason to analyze Amazon Business' current capabilities in any depth because [AEP has]

a contract with Office Depot"); 310:6-23 (AEP wanted to keep Office Depot but looked at

Staples as a benchmark); [DX02633] at 128:20-132:25; **B of A**: [DX02560] at 167:18-168:5;

178:24-179:6; 179:11-23; 187:19-190:6; 192:17-22; 193:2-9 (B of A has not analyzed the IT

capabilities of office supply vendors other than Defendants since 2012, has not analyzed the

customer service or IT capabilities of any consortium, and has not investigated the capabilities or

expansion plans of Amazon Business other than visiting its website); **Fifth Third**: Tr. at 949:13-

17; 997:18-998:18; 953:3-10; 954:18-21; 969:23-970:5; 972:4-15; **Foot Locker**: [DX04985] at

62:1-15; 188:4-24; ███████: [DX02627] at 48:22-49:7; **Lennar**: [DX02629] at 249:19-250:21;

**AAA**: [DX00218] ("we simply don't know what else might be out there and for such a

large/complex area we owe it to the clubs/organizations to explore it further…."); **Pep Boys**: [DX02639] at 95:8-15; 157:17-20; 321:16-322:2; 322:3-18 (Pep Boys has not had the opportunity to evaluate W.B. Mason, Amazon Business, and the hundreds of independent dealers backed by Essendant, but should Staples raise prices post-merger, Pep Boys would do that investigation); **Walgreens:** [DX02628] at 113:8-14 (Walgreens has not evaluated W.B. Mason).

242.    McDonald's likewise has not analyzed or evaluated the pricing or ability of Defendants' competitors. *See* Tr. at 371:15-21 ("We have not done any benchmarking with Amazon Business in its current reincarnation"); 393:15-23; 474:24-475:6 (McDonald's has not had the need or opportunity to fully evaluate Amazon Business's capabilities because its current contract locks in prices until December 2017); 475:7-23 (McDonald's is not aware whether Amazon Business is capable of meeting McDonald's requirements, and statements in McDonald's declaration regarding Amazon Business were based on earlier evaluations of Amazon Supply); 473:15-474:12 (McDonald's has not investigated W.B. Mason's pricing or capabilities); 486:5-10 (McDonald's has not looked at independent dealers backed by Essendant); 492:15-493:15 (in colloquy with the Court, discussing whether McDonald's has anything more than an "educated speculation" as to the ability of Defendants' competitors to meet its requirements); [DX04981] at 246:23-248:20; 257:5-258:9; 265:14- 267:1.

243.    Best Buy has not conducted an RFP or other analysis of the office products market since 2012. Tr. at 1262:4-13. Even in its 2012 RFP, Best Buy did not investigate W.B. Mason's distribution network, capabilities, or pricing. Tr. at 1282:19-25; 1283:9-11; 1284:25-1285:8. The only research that Best Buy did for its statements in its declaration regarding W.B. Mason was to review its website, including the map of its locations and coverage. *See*, *e.g.*, Tr. at 1282:6-14; 1293:11-13; 1283:16-19; 1284:20-1285:21; 1293:11-13. Likewise, Best Buy did not

evaluate any other vendors' abilities to meet Best Buy's requirements. Tr. at 1286:1-1290:21;

1291:12-16. Best Buy also was not familiar with Amazon Business's capabilities when it

executed its declaration, and does not know if Amazon could match or beat all of the prices in its

current contract. Tr. at 1294:23-25; 1296:24-1297:1.

244.    HealthTrust's purchasing group has not examined Georgia-Pacific's paper prices

against Staples's prices. Tr. at 2029:20-23. It also has not examined the ability for McKesson,

Amazon Business, Grainger, or W.B. Mason to serve HealthTrust's needs. Tr. at 2036:25-

2037:13; 2038:16-2039:7; 2040:11-2041:8; 2046:10-18; 2049:25-2050:21.

245.    Likewise, Select Medical has not looked into W.B. Mason's capabilities since

2013, and even then, it did not reach out to W.B. Mason and performed no analysis of its pricing

or procurement capabilities. Tr. at 1108:22-1109:6. He further admitted that he was unfamiliar

with Amazon Business's capabilities and knew nothing about Amazon Business's plans or what

capabilities it will have when his contract with Office Depot expires in 2018. Tr. at 1115:18-22.

Indeed, during the hearing, the Select Medical witness declined to speculate about any vendor

other than Staples and Office Depot. Tr. at 1109:23-1110:1.

## XI.    THE B2B OFFICE PRODUCTS MARKET IS AND WILL REMAIN COMPETITIVE POST-MERGER

### A.    MANY VENDORS COMPETE TO SELL OFFICE SUPPLIES TO LARGE B2B CUSTOMERS

246.    W.B. Mason and other independent vendors are increasingly competing for, and

winning, "national" accounts.

247.    W.B. Mason has gone head-to-head against Staples, Office Depot, and OfficeMax

and won a number of large contracts. **Citizen's Bank**: Tr. at 1806:15-1808:4; [DX02637] at

152:5-20 (W.B. Mason bid against the incumbent, Office Depot, and believes Staples and

OfficeMax were also involved in the RFP); **Bright Horizons**: Tr. at 1811:6-1813:1 (W.B. Mason

84

has served Bright Horizons since 1988, and won when Bright Horizons put the contract out to bid in 2013); **Talbot's**: [DX02637] at 174:20-175:13 (W.B. Mason won Talbot's business from OfficeMax); **Pittsburgh Medical Center**: Tr. at 1802:4-11; [DX02637] at 211:10-16 (W.B. Mason beat Staples in RFP); **Steward**: [DX02637] at 210:13-19 (W.B. Mason beat Staples in RFP); **The Hartford**: Tr. at 1816:2-1817:6; [DX02418] at ¶ 4 (W.B. Mason beat Guy Brown and Office Depot in RFP "because it was able to meet all of our requirements and provided the best overall value.").

248.    Other independent vendors have proven that they can compete for large B2B customers with locations nationwide: **Weeks-Lerman**: [DX00541] at 1 (Spreadsheet of top 25 customers by revenue) (Weeks-Lerman customers with spending over $1 million in 2015 and delivery locations in more than 40 states include: ████████████████████████

████████; **Complete Office**: [DX02414] at ¶ 13; **Guernsey**: [DX04296] at ¶¶ 1, 3; **MyOfficeProducts**: [DX02417] at ¶ 6; **CDS**: [DX04263] at 106:7-10 (CDS is price competitive – "I wouldn't buy from them if they were more expensive."); **Greenville**: [DX02451] at ¶ 8; **Office Essentials**: [DX02409] at ¶ 6.

249.    Even when Staples or Office Depot wins a contract competing against independent competitors, they must continually fight for that customer's business and lower their prices to beat those competitors. **Best Buy**: Tr. at 1222:19-1223:1; 1276:2-17; 1277:16-21; **Windfall**: [DX04993] at 27:18-28:12 (Windfall relies on competitive pricing from entities other than Staples, including My Office Supplies, W.B. Mason, Corporate Product Supplies, and others.); **Valero**: [DX02408] at ¶ 18.

### B. INDEPENDENT VENDORS WORKING WITH WHOLESALERS COMPETE FOR LARGE B2B CUSTOMERS

250.    Tier 1 suppliers currently serve at least thirty-two Fortune 100 companies and

many other large B2B customers with national locations. [DX02570] at ¶ 166. Contrary to

Plaintiffs' and Professor Shapiro's position that Tier 1 suppliers' sales can be attributed to

Defendants, PDME testified that Tier 1 vendors (such as PDME) manage contractual

relationships with customers, provide all customer service, provide invoicing or credit card

processing, lead IT implementation, and provide reporting. Tr. at 1392:6-24.

251.    Wholesalers such as Essendant and S.P. Richards work with independent dealers

and Tier 1 suppliers to provide nationwide reach: **Essendant**: [DX00541] (Weeks Lerman uses

Essendant as one method of shipping products to each of its top 25 customers (see Shipment

Means tab)); **S.P. Richards**: [PX03007] at ¶ 2; [DX02971] at 89:23-90:5 ("Q. And does SPR's

network of distribution facilities give independent dealers nationwide reach? A. Yes");

**TriMega**: [DX03881] at ¶ 5.

### C.   MANUFACTURERS OF OFFICE SUPPLIES SELL DIRECTLY TO NATIONAL CUSTOMERS

252.    Although Professor Shapiro failed to fully account for direct purchases from

manufacturers, many customers can and do purchase high-use office supplies, such as paper,

Sharpie markers or mailing labels, directly from manufacturers. [DX02570] at ¶ 134.

253.    Customers often negotiate directly with manufacturers for paper purchases. **Fifth

Third Bank**: Tr. at 944:16-21 ("Q: But one of the options that Fifth Third has when it comes to

procurement is to purchase directly from the manufacturer in some instances, right, sir? A. It is

one of the options, but, again, you have to look at all the circumstances to say whether you

would actually want to do that.").

254.    And there are other supplier arrangements, such as outsourcing office supplies

purchasing to third parties. [DX04451] at 127:23-128:6 (Rite Aid could outsource its indirect

procurement of office supplies to a third party and have them manage multiple providers so that

if Rite Aid had issues it could just call that outside third party who would then have to contact

the numerous vendors).

### D.   THE COMMODITIZED NATURE OF OFFICE SUPPLIES ALLOWS LARGE B2B CUSTOMERS TO CONTINUOUSLY SEEK OUT BETTER TERMS

255.   Large companies do not care who sells them pens or binders or whether the

delivery box bears a particular label. What they care about is price. *See*, *e.g.*, **Foot Locker**:

[DX04985] at 203:19-205:15; **B of A**: [DX02560] at 26:20-27:9 (B of A conducts audits to

ensure it gets the best prices).

256.   Further, Defendants' contracts are non-exclusive, allowing competitors to sell

office products to Defendants' customers at any time. *See*, *e.g.*, **Fifth Third**: Tr. at 990:2-13 ("**Q.**

And what it says is that: 'Nothing shall obligate the customer to purchase goods from the seller,

nor shall the seller be customer's exclusive provider of goods,' right? **A.** That is correct. **Q.**

Right. And so that gives Fifth Third -- that is a favorable contract position -- provision for Fifth

Third, right, sir? **A.** Yes, I would say so. **Q.** Because if you find something cheaper off-contract,

you have the ability to purchase it, right? **A.** If we so chose, given all the other headaches that

could bring about, yes."); **Best Buy**: Tr. at 1274:4-16 (Best Buy's office products contract is

non-exclusive and allows Best Buy to purchase from other vendors or enter contracts with other

vendors); **AEP**: Tr. at 253:19-254:9 (AEP would not be violating its contract with Office Depot

by purchasing supplies from other vendors); **McDonald's**: Tr. at 411:7-18 (McDonald's contract

with Office Depot is non-exclusive).

257.   Defendants' contracts are also freely terminable by their customers on short

notice, and many of their contracts allow customers to cancel the contracts much more freely

than Defendants could. *See*, *e.g.*, **B of A**: [DX02560] at 33:7-34:10 (B of A can freely cancel

contract on 45 days' notice at its convenience, while Staples must provide 180 days' notice);

**HealthTrust**: Tr. at 1898:24-1900:23; 1999:15-2000:13 (HealthTrust negotiates a one-way termination-at-will clause).

258.    Where Defendants' contracts allow for price increases during the term of a contract, they typically require Defendants to justify the increases before customers agree to them. *See*, *e.g.*, **B of A**: [DX02560] at 41:7-22 (any price change during the term of the contract must be tied to increases in Staples' costs, and B of A "will evaluate the total cost impact for justification of price changes"); **Fifth Third**: Tr. at 991:19-25 (prices for core items cannot increase unless the increase is "documented, reviewed, and mutually agreed upon by both parties"); **Best Buy**: Tr. at 1275:13-1276:1 (Best Buy's prices from Office Depot are fixed, and there are limits as to how much Office Depot can raise prices of certain product categories, but there is no floor and prices can drop); Tr. at 1277:16-21 (when Best Buy gets price drops from Office Depot, they become permanent through the life of the contract); **Select Medical**: Tr. at 1113:16-1114:4 (contract does not allow Office Depot to unilaterally increase prices, increases are only permitted if Office Depot's prices go up, and Select Medical has "capitation on what those increases should be").

259.    Further, many customers maintain multiple overlapping contracts and purchase from multiple office products vendors as a general practice. *See*, *e.g.*, **AEP**: Tr. at 236:1-4 (AEP purchases ink and toner from both Office Depot and Xerox); **Fox Entertainment**: [DX04298] at 32:10-13; 33:1-3 (Fox contracts directly with manufacturers and will multi-source some of those contracts (OEM contracts); **Oracle**: [DX04013] ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████; **B of A**: [DX02560] at 105:17-23 ("[i]f it meets our strategic objectives at the time", B of A may dual or multisource for particular goods); *id*. at

104:15-105:15) (from 2009-2012, B of A triple sourced its office supplies from Pitney Bowes (ink/toner), Staples (general), and OfficeMax (paper)); **Rite Aid**: [DX04451] at 78:19-24 (Rite Aid currently uses more than a dozen different suppliers to fulfill its office products needs).

260.    Thus, competition for sales of office products continues even after a contract is signed. **HealthTrust**: Tr. at 2019:14-24, 2021:5-11 (approximately 70 HealthTrust members do not purchase through the Staples contract at all); **McDonald's**: Tr. at 390:16-391:1 (despite a corporate contract with Office Depot, 65% of McDonald's 13,000 franchise restaurants purchase their office supplies elsewhere); **Best Buy**: Tr. at 1274:20-1275:3 (contract contains no minimum spend requirement, so Best Buy is not obligated to buy any office supplies from Office Depot); **AEP**: [DX02633] at 47:3-15; 187:8-19 (off-contract spend with Staples, Quill, Wal-Mart, and Target); **Windstream**: [DX02451] ¶12 ("Windstream purchases office supplies from many other vendors. In 2015, approximately 30% of Windstream's office supplies purchases were off-contract spend with other office product vendors. A non-exclusive list of these other vendors includes Amazon, Office Depot, OfficeMax, Office Solutions, Standard Register, Staples, Target, Walmart and Walgreens. Windstream also purchases office supplies from other local and regional vendors."); **State Farm**: [DX02412] ¶ 14 ("State Farm is not required to purchase any minimum quantity of products under its contract with OfficeMax/Office Depot"); **Corporate United**: [DX00097] at 4 (Prospective CU member Cars.com had purchased 81.54% of its office supplies "off contract"); ███████ : [DX02627] at 60:21-61:1 ("**Q**. Would you characterize the amount of off-contract spending for office supplies as significant? **THE WITNESS**: I would say it's pretty high").

261.    Further, Defendants' customers routinely demand lower prices, based on competitive offerings by other companies such as Amazon and W.B. Mason, after the award of a

contract. *See*, *e.g.*, [DX02967] at 202:16-203:22; **B of A**: [DX02560] at 26:2-27:9; 27:13-23;

28:13-29:8; 29:23-30:12 (B of A uses "market basket exercises" to use market prices to seek

better pricing from its vendors); [DX02707] (citing, *e.g.*, [DX01167]; [DX01169]; [DX01175];

[DX01177]; [DX01179]; [DX01182]; [DX01201]; [DX01205])).

262.    Customers also seek out pricing from competitors such as Amazon, and use that

to get lower prices from their contract vendors. *See*, *e.g.*, **McDonald's:** Tr. at 412:9-12; 415:1-6;

453:22-454:2; 454:20-455:9; **Fifth Third Bank:** Tr. at 956:14-20; **Best Buy**: Tr. at 1222:19-

1223:1; 1276:2-17 (Best Buy uses prices on Amazon.com to secure lower prices under its

contract with Office Depot) 1297:2-5; *see also* [DX02637] at 284:1-12.

263.    In response, Staples frequently cuts prices during the duration of a contract

despite the presence of negotiated contract prices. [DX02570] Orszag Rpt. at ¶¶ 151-152.

264.    Further, large customers' contracts are typically multi-year contracts that lock in

their current prices for multiple years. *See*, *e.g.*, **McDonald's:** Tr. at 474:10-475:6 (prices are

"locked in until 2017"); 501:17-23; **Fifth Third**: Tr. at 919:20-25; 920:6-14; 941:16-942:8;

980:20-22 (agreeing that prices can't increase for core items unless mutually agreed upon). In

that time, these customers will be protected from any potential price increases by their

contractually agreed prices; **HealthTrust**: Tr. at 1898:24-1900:23; 1999:15-2000:13

(HealthTrust could complete a three-year contract to lock in prices before the merger closes, and

negotiates a one-way termination-at-will clause).

### E.    THE CHARACTERISTICS OF THE ALLEGED RELEVANT MARKET DIFFER SUBSTANTIALLY FROM THOSE IN SYSCO

265.    Plaintiffs' reliance on the recent decision in *Sysco*, 113 F. Supp. 3d 1, to argue

that Defendants' merger will be anticompetitive, is misplaced. The office products industry

presents significantly different competitive conditions than in the "broadline food distribution"

industry at issue in *Sysco*. Specifically, unlike in *Sysco*, the products at issue here are considered indirect and not mission critical across the board by customers of all sizes. *See* [DX02699] at 8; *see also*, *e.g.*, **AEP:** Tr. at 229:2-20; 250:1-11; **McDonald's:** Tr. at 396:10-25; **Best Buy:** Tr. at 1251:10-15. Customers do not require consistency of office products across office locations, there is no special handling requirement for office products, office products are clearly non-perishable, and office products are readily available commodities – in other words, customers do not need a particular supplier or branded product, and barriers to entry and expansion are far lower, meaning any attempted price increase would risk a massive and nearly instantaneous influx of new competition. [DX02699] at 9-10. Additionally, unlike in *Sysco,* the Internet plays a major role in both ordering and price-checking in the office products industry, and nothing even remotely akin to Amazon exists as an option for broadline food service customers. *Id.* at 10.

266.    Further, unlike *Sysco*, this market is also characterized by huge national wholesalers – Essendant and S.P. Richards – that have at least as many distribution centers as Defendants and enable national delivery of office supplies for *any* supplier. This simply did not exist in *Sysco*.

267.    Put simply, these large companies understandably do not care who sells them pens or binders or whether the delivery box bears a "Staples" or "Office Depot" sticker. What they care about is price. Large customers' businesses are simply not harmed by purchasing office supplies off-contract.

268.    Further, *United States v. H&R Block*, 833 F. Supp. 2d 36 (D.D.C. 2011), is of limited utility in determining the product market here. DDIY tax preparation was a discrete product – that is it was not divisible such that "combinations of other" products "may be substitute." *SunGard* 172 F. Supp. 2d at 190 n.20. By contrast, here the products are diverse and

differentiated: customers purchase office products in different bundles that may include any or all of general office supplies, paper, ink and toner, breakroom supplies, furniture, janitorial supplies, and other products.

### F. THE COURT HAS REVIEWED PROPOSED REMEDIES THAT WOULD ELIMINATE ANY POTENTIAL ANTICOMPETITIVE EFFECTS

269.    During its regulatory investigation of the proposed merger, the FTC expressed concerns to Defendants about potential anticompetitive effects on Fortune 100 and Fortune 500 customers. In an effort to address the FTC's professed concerns (and notwithstanding Defendants' belief that these concerns were unfounded), Defendants proposed a remedy consisting of a divestiture to Essendant, Co. ("Essendant") of at least $550 million worth of B2B customer contracts, including 27 Fortune 100 customers and dozens of Fortune 500 accounts.[3] *See* [DX00156]; *see also* [DX02703] at 7-8. The Asset Purchase Agreement also provides that Essendant will obtain additional assets, including those that the FTC alleges are required by customers: information technology assets; human resources, including dedicated customer service representatives; access to the courier agreements that can provide desktop delivery; and transition services to provide an orderly transfer of the business. *See id.*; [DX00157]; [DX05082]. This agreement obligates Staples to divest at least $550 million of Business-to-Business ("B2B") contracts and related assets that will allow Essendant to effectively transition those contracts, as well as continue to effectively compete for and serve customers. [DX04994].

270.    Essendant is the leading office products wholesaler in the U.S. with over $5 billion in revenue [DX04994] at 3. Essendant has more than 70 distribution centers, more than either Staples or Office Depot. *Id.* at -006; [DX02707] at 21.

---

[3] In addition to this proposed remedy, as the Court is aware, Defendants made two additional proposals to the Plaintiffs during the course of the hearings, both of which were rejected by the FTC.

271.    Essendant already partners with independent dealers and competes effectively against Staples and Office Depot. [DX04994] at 8-9.

272.    The proposed remedy would reduce Essendant's costs and incentivize Essendant to make further investments. [DX04994] at 37.

273.    In determining the accounts to be divested to Essendant,[4] Defendants focused primarily on accounts that are currently serviced by Tier 1 diversity suppliers, with Defendants acting in a wholesaler role. Staples focused on these accounts because (a) the Tier 1 diversity resellers already have direct relationships with the customers, which would make the transition easier for the customers and more likely to succeed; (b) Essendant already has expertise as a wholesaler and is well-position to assume Defendants' role in providing wholesaler support to these accounts; (c) Tier 1 resellers have a high percentage of large B2B accounts, including Fortune 100 and Fortune 500 accounts, which were the focus of the FTC's professed concern; and (d) in light of their strong diversity commitments, these customers were viewed as most likely to keep their business with the Tier 1 resellers and Essendant on a long-term basis. *See* [PX02108] at 128:14-129:2; [PX02162] at 13:23-14:9.

274.    In partnership with Tier 1 diversity resellers, Essendant already serves large national accounts including Honeywell, PetSmart, Schwan's Foods, Finish Line, and Stuart Companies. [DX04994] at 13.

275.    The FTC credited the wholesaler plus dealer sales model in the 2013 FTC Statement. [DX01078] at 3.

---

[4] Although Defendants would of course prefer to retain all of their Tier 1 diversity reseller accounts, the proposed divestiture to Essendant constitutes part of the evidentiary record in this case and, as Plaintiffs have acknowledged, *see* Tr. At 48:8-49:12, this Court has the discretion to consider the proposed divestiture and incorporate it into its final order if necessary to resolve any anticompetitive concerns. This Court need not consider the proposed divestiture, however, if it determines that the FTC has not met its burden of showing a likely anticompetitive effect.

276.    During the preliminary injunction hearing, based on testimony that the Court elicited from Plaintiffs' witnesses, Defendants also made a separate proposal for the Court's consideration: that, if necessary to resolve any anticompetitive concerns, Defendants would agree "to extend the term and all terms and conditions of the identified large B2B customer contracts for three (3) years or until May 1, 2019, whichever comes first, subject to termination by Staples only for reasons of non-payment or material breach by the customer of the terms and conditions of the contract."[5] Exhibit D, [Proposed] Order Denying Plaintiffs' Motion For Preliminary Injunction; *see also* Tr. at 1359:21-1361:9; 2891:7-14; Defendants' Bench Mem., April 1, 2016 (Dkt. 337). ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ .

## XII.   THE MERGER WILL CREATE ENORMOUS VERIFIABLE EFFICIENCIES THAT WILL BE PASSED ON TO CUSTOMERS

277.    The evidence demonstrates that the proposed transaction will result in lower prices, better service, and increased potential for innovation that will benefit all customers, including those in the FTC's alleged relevant market, as well as the more than 99% of Staples' and Office Depot's customers that do not fall within the FTC's relevant market definition.

### A.   CALCULATION AND METHODOLOGY

278.    When announcing the proposed transaction, Staples reported that it expected the merger to result in annual cost savings efficiencies of "*at least*" $1 billion (net of investments to provide increased value to customers), to be achieved within three years of closing. [DX01049] Office Depot Press Release, "Staples, Inc. Announces Acquisition of Office Depot, Inc."

---

[5] Even if the Court finds that Plaintiffs have not met their burden of showing a likely anticompetitive effect, Defendants have no objection to the Court's incorporating this contract extension proposal into its final order in an abundance of caution.

February 4, 2015 (emphasis added); [DX02400] at 6.

279.    In developing this estimate, Staples relied in part on information it obtained regarding the Office Depot business during due diligence and its experience from its 2008 acquisition of Corporate Express and the savings achieved through that integration. [DX02561] ¶ 11; [PX02146] at 69:6-15; [PX02005] at 186:5-187:22. The cost savings estimate of at least $1 billion was relied upon by Staples' Board of Directors in determining whether to proceed with the proposed transaction. [PX02005] at 179:12-180:24.

280.    Following the signing of the merger agreement, Staples obtained additional information from Office Depot which demonstrated that the rate of savings expected from the Office Depot/OfficeMax transaction exceeded the savings realized during the Staples/Corporate Express transaction, ███████████████████████████████████████████████ ███████████████████████████████████████████. [DX02561] ¶ 12; [PX04155].

281.    These targets were informed significantly by the magnitude of savings ***already*** realized through the merger of Office Depot and OfficeMax, as well as Office Depot's outlook regarding the realization of additional savings expected through the completion of the OfficeMax integration. [PX02005] at 185:10-186:24; [PX02127] at 82:12-84:19.

282.    As Roland Smith, Office Depot's CEO has noted, "in the first year [following the closing of the Office Depot/OfficeMax merger] we were able to deliver just under $300 million of synergies and efficiencies. We started 2015 with a run rate of right at $500 million of synergies and efficiencies, and we have publicly stated and I'm confident that we will be able to deliver synergies and efficiencies by the end of 2016 on a run rate of at least $750 million in total." [PX02009] at 238:3-11.

283.     In fact, Office Depot continues to "over-achiev[e]" on its cost savings estimate, as Office Depot now projects a run rate of ███████ in savings as a result of the Office Depot/OfficeMax merger. [PX02148] at 120:12-17.

284.     Moreover, the Office Depot/OfficeMax integration experience provides a proven "playbook" that Staples can follow in order to ensure a successful integration. [PX02009] at 260:11-24; [PX02149] at 81:3-8.

285.     For these reasons, Staples executives are confident that they will achieve the ███ ███ savings target. *See, e.g.*, [PX02146] at 135:16-23; 185:1-20; 187:14-17; 187:22-23; 188:3-7; [PX02127] at 119:20-120:11.

## B.     MERGER-SPECIFIC, VARIABLE COST SAVINGS

286.     The HMG require merging parties to demonstrate their claimed efficiencies are "likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects," such that "the Agencies can verify by reasonable means the likelihood and magnitude of each asserted efficiency; how and when each would be achieved (and any costs of doing so), how each would enhance the merged firm's ability and incentive to compete, and why each would be merger-specific." [DX02576] at § 10.

287.     The HMG further state: "efficiency claims substantiated by analogous past experience are those most likely to be credited." [DX02576] at § 10.

288.     Mr. Anderson concluded that the Staples/Corporate Express and Office Depot/OfficeMax transactions provided – not one but two – analogous past experiences that substantiated Staples' efficiencies estimate. [DX02561] ¶ 18.

289.     In particular, in analyzing Staples' conservative, publicly-announced efficiencies

estimate of $1 billion, Mr. Anderson found that Staples' cost of goods sold ("COGS") and supply chain ("SC") savings estimates (collectively, "COGS-SC"), totaling $415 million, were both merger-specific and verifiable. [DX02561] ¶¶ 8; 39; 28, 65.

290.    Mr. Anderson also found that, in addition to COGS-SC savings, "there is no doubt that the Proposed Transaction will result in significant opportunities to reduce the Parties' combined fixed costs that are not available on a standalone basis." *Id.* ¶ 100.

291.    For example, "a merger of companies with similar operations virtually always results in opportunities to reduce the fixed cost infrastructure of the combined organization through the elimination of duplicative costs in redundant organizations, functions, and activities. Additionally, these savings opportunities are generally easy to identify and achieve as they are often associated with readily apparent redundancies in personnel, facilities, and other redundant services." [DX02561] at ¶ 99.

292.    Additional evidence of merger-specific efficiencies comes from Professor Shapiro himself. His entire analysis of competitive effects of the proposed merger is predicated on COGS efficiencies of 1.9%. [PX06100] 39-40. Thus, the entire theory of harm from the Plaintiffs *assumes* that the merger will generate COGS efficiencies alone totaling around $500 million.

### C.    EFFICIENCIES WILL PASS ON TO CUSTOMERS

293.    Staples needs these cost savings to reinvest in its business and lower its prices "across the board," to compete more effectively against other companies in the office products marketplace. Staples' CEO, Ron Sargent, testified that the Office Depot transaction will enable Staples to "improv[e the] customer experience and lower[] prices," which in turn will "allow [Staples] to be much more competitively priced against some of the largest competitors." [PX02147] at 150:14-151:12. *See also* [PX02127] at 80:12-16 ("███████  ████████

███████ which we will go after with the expectation that a majority of that would be reinvested back into lowering prices and improving customer experience").

294.     This is consistent with Office Depot's actions following the Office Depot/OfficeMax transaction. The FTC's own fact witnesses testified that they received better prices and service from Office Depot following the Office Depot/Office Max merger. Tr. at 348:20-349:6 (**AEP** received a "significant discount" on its contract prices); Tr. at 508: 4-13 (**McDonald's** renegotiated for lower prices); Tr. at 929:16-19 (**Fifth Third Bank** obtained better price and service as a result of its post-merger renegotiation); Tr. at 1272:21-1273:6 (**Best Buy**) (same); *see also* Tr. at 1301:24-1302: 4 (efficiencies generated from the transaction would be used to lower prices to consumers in competition with Best Buy, which would "not [be] a good thing for Best Buy.")

295.     Indeed, as Professor Shapiro admitted, he found no anticompetitive effects from the Office Depot/OfficeMax merger. Tr.at 2360:9-15; Tr. at 2748:3-8.

## XIII.   THE EQUITIES WEIGH IN FAVOR OF THE PROPOSED MERGER

296.     Even if Plaintiffs had demonstrated a likelihood of success on the merits, which the evidence overwhelmingly shows they have not, they must also demonstrate that the balance of the equities supports an injunction.

297.     Here, the equities weigh strongly in Defendants' favor. Critically, it is undisputed that the overwhelming majority (more than 99%) of B2B customers and *all* retail customers will benefit – or at least not be harmed – from this merger. Even if, for the sake of argument, the Court were to accept Plaintiffs' gerrymandered product market, defective market shares, and unreliable expert analysis and conclude that the merger would harm the customers in their alleged market, the likely benefits to hundreds of thousands of B2B and millions of retail

customers would *still* far outweigh any potential harm.

298.     The FTC also issued the 2013 statement, endorsing this market as highly competitive. As the FTC has admitted, closing statements are intended to provide guidance to the market, and induce reliance on them for future mergers. Defendants indeed relied on that statement as consistent with their view of the office products industry before proceeding with this merger, and the FTC should be held to the facts in that statement now.

299.     Moreover, Plaintiffs have forced Defendants to aim at a moving target during their investigation and this litigation, repeatedly shifting course, changing the definition of the relevant market, and altering the definition of which customers lie within the relevant market. Most alarmingly, Plaintiffs have repeatedly sought to overreach in sworn statements from third-party witnesses.

300.     Moreover, despite Plaintiffs' considerable head start in discovery, they have presented only a handful of witnesses objecting to the proposed merger, and the evidence shows that those witnesses are biased, lack sufficient personal knowledge to testify competently, and are unreliable.

## XIV.  <u>DISPOSITION</u>

301.     Based on the applicable law and the foregoing facts, the Court should find that Plaintiffs have failed to meet their burden of defining a relevant market in which the proposed transaction would result in undue concentration levels. Therefore, Plaintiffs have failed to establish any presumption of illegality. Further, pervasive and robust evidence of competition from current competitors, some, like Amazon Business, which are strongly positioned for explosive and industry-altering growth in the near future, far outweighs any weak presumption on which Plaintiffs seek to rely. Finally, any potential harm would be fully addressed by the

proposed remedies and far outweighed by the equities favoring denial of the motion, and

allowing this merger to proceed to the benefit of the vast majority of customers. Accordingly,

Defendants respectfully request the Court deny Plaintiffs' motion for a preliminary injunction.


April 13, 2016                                    Respectfully submitted,

                                                 */s/ Carrie Mahan*
                                                 Carrie Mahan
                                                 Jeffrey H. Perry
                                                 WEIL, GOTSHAL & MANGES LLP
                                                 1300 Eye Street, NW
                                                 Washington, DC 20005
                                                 Telephone: (202) 682-7000
                                                 Facsimile: (202) 857-0940
                                                 jeffrey.perry@weil.com
                                                 carrie.mahan@weil.com

                                                 Diane Sullivan
                                                 Eric S. Hochstadt
                                                 WEIL, GOTSHAL & MANGES LLP
                                                 767 Fifth Avenue
                                                 New York, NY 10153
                                                 Telephone: (212) 310-8000
                                                 Facsimile: (212) 310-8007
                                                 diane.sullivan@weil.com
                                                 eric.hochstadt@weil.com

                                                 *Counsel for Staples, Inc.*

                                                 Matthew Reilly
                                                 Andrew Lacy
                                                 Peter C. Herrick
                                                 Simpson Thacher & Bartlett LLP
                                                 900 G Street, N.W.
                                                 Washington, D.C. 20001
                                                 202-636-5566
                                                 matt.reilly@stblaw.com
                                                 peter.herrick@stblaw.com
                                                 alacy@stblaw.com

                                                 *Counsel for Office Depot, Inc.*

100