UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, COMMONWEALTH OF PENNSYLVANIA, AND THE DISTRICT OF COLUMBIA,<br><br>                    Plaintiffs,<br><br>          v.<br><br>STAPLES, INC. and OFFICE DEPOT, INC.,<br><br><br><br><br>                    Defendants. | Civil Action No.15-2115 (EGS) |

## MEMORANDUM OPINION

### I.   Introduction

Drawing an analogy to the fate of penguins whose destinies appear doomed in the face of uncertain environmental changes, Defendant Staples Inc. ("Staples") and Defendant Office Depot, Inc. ("Office Depot") (collectively "Defendants") argue they are like "penguins on a melting iceberg," struggling to survive in an increasingly digitized world and an office-supply industry soon to be revolutionized by new entrants like Amazon Business. Prelim. Inj. Hrg Tr. ("Hrg Tr.") 60:15 (Opening Statement of Diane Sullivan, Esq.). Charged with enforcing antitrust laws for the benefit of American consumers, the Federal Trade Commission ("FTC") and its co-plaintiffs, the Commonwealth of Pennsylvania

and the District of Columbia, commenced this action in an effort

to block Defendants' proposed merger and alleged that the merger

would "eliminat[e] direct competition between Staples and Office

Depot" resulting in "significant harm" to large businesses that

purchase office supplies for their own use. Compl., Docket No. 3

at ¶ 4. The survival of Staples' proposed acquisition of Office

Depot hinges on two critical issues: (1) the reliability of

Plaintiffs' market definition and market share analysis; and

(2) the likelihood that the competition resulting from new

market entrants like Amazon Business will be timely and

sufficient to restore competition lost as a result of the

merger.

Subsequent to Defendants' announcement in February 2015 of

their intent to merge, the FTC began an approximate year-long

investigation into the $6.3 billion merger and its likely

effects on competition. Defs.' Proposed Findings of Fact and

Conclusions of Law ("Defs.' FOF") ¶ 58. On December 7, 2015, by

a unanimous vote, the FTC Commissioners found reason to believe

that the proposed merger would substantially reduce competition

in violation of Section 7 of the Clayton Act and Section 5 of

the FTC Act. Compl. ¶ 34. That same day, Plaintiffs commenced

this action seeking a preliminary injunction pursuant to Section

13(b) of the FTC Act, 15 U.S.C. § 53 (b) to enjoin the proposed

merger until the FTC's administrative proceedings are complete. Pls.' Mot. Prelim. Inj., Docket No. 5 at 1.

This antitrust case involved an extraordinary amount of work. As a result of the FTC's investigation and seven weeks of discovery, more than fifteen million pages of documents were produced, more than seventy depositions around the country were taken, and five expert reports were completed. Defs.' FOF ¶ 60. The Court presided over an evidentiary hearing and heard testimony from ten witnesses from March 21, 2016 to April 5, 2016. *Id.* Nearly 4,000 exhibits were admitted into evidence. *Id.* ¶ 61. Despite onerous time constraints created by the nature of this unique litigation, lawyers for the parties and non-parties completed this work with civility and professionalism while demonstrating the highest level of sophistication and competency in their written and oral advocacy.[1] The Court commends the lawyers and the paralegals for their outstanding work.[2]

---

[1] Defendants requested an expedited decision by no later than a date certain so that financing could be secured to hold their deal together. December 17, 2015 Tr., Docket 107 at 39. The Court committed to ruling on the merits of this controversy by no later than May 10, 2016. *Id.*

[2] As the Court stated during the hearing: "Let me extend my appreciation to [the paralegals]. They're the unsung heroes and never get the credit that they deserve. I know how hard you work to make us look good, I know that. So on behalf of everyone, thank you very much." Hrg Tr. 158:8-13.

At the conclusion of Plaintiffs' case, Defendants chose not to present any fact or expert witnesses, arguing that Plaintiffs failed to establish their *prima facie* case. Hrg Tr. 2889:20-25 (Ms. Sullivan: "It's going to be the defendants' position that we're going to rest on the record as it exists, so there'll be no need for additional evidence or rebuttal."). And, although entitled to a trial on the merits before an Administrative Law Judge at the FTC, Defendants indicated that they will not proceed with the merger if Plaintiffs' motion is granted. Hrg Tr. at 3034:18-22; Defs.' FOF ¶ 17.[3]

Upon consideration of the evidence presented during the hearing, the parties' proposed findings of fact and conclusions of law, and the relevant legal authority, the Court concludes that the Plaintiffs have established their *prima facie* case by demonstrating that Defendants' proposed merger is likely to reduce competition in the Business to Business ("B-to-B") contract space for office supplies. Defendants' response relies

---

[3] As the Court expressed many times during these proceedings, the lack of meaningful appellate review on the merits is an unfortunate reality of antitrust statutes. Because the administrative process before the FTC is so time consuming, most corporations, like Defendants in this case, cannot secure financing to keep the deal together pending the administrative trial on the merits. *See, e.g. FTC v. Sysco Corporation*, 113 F. Supp. 3d 1, 15 (2015) (noting that the Defendants announced that they will not proceed with the merger if the Court grants the requested injunction.)

in large part on the prospect that Amazon Business will replace
any competition lost because of the merger. Although Amazon
Business may transform how some businesses purchase office
supplies, the evidence presented during the hearing fell short
of establishing that Amazon Business is likely to restore lost
competition in the B-to-B space in a timely and sufficient
manner. For the reasons discussed in Section IV *infra*,
Plaintiffs' Motion for Preliminary Injunction is **GRANTED**.[4]

In Section II of this Memorandum Opinion, the Court sets
forth important background information, including many critical
findings of fact underpinning the Court's analysis. Section III
establishes the relevant legal standard pursuant to the Clayton
Act. The Court's analysis in Section IV proceeds as follows:
(A) legal principles considered when defining a relevant market;
(B) application of legal principles to Plaintiffs' market
definition; (C) Defendants' arguments in opposition to
Plaintiffs' alleged market; (D) conclusions regarding the
relevant market; (E) analysis of the Plaintiffs' arguments

---

[4] The Court appreciates the tremendous amount of time, money
and effort Defendants put into this case, and understands that
they genuinely believe this merger would be best for their
companies, the industry and the public. While the Court's
decision is surely a great disappointment to Defendants, the
Court is optimistic that Defendants will find ways to innovate,
evolve and remain relevant in the rapidly changing office supply
industry.

relating to the probable effects on competition based on market share calculations; (F) Defendants' arguments in opposition to Plaintiffs' market share calculations; (G) conclusions regarding Plaintiffs' market share; (H) Plaintiffs' evidence of additional harm; (I) Defendants' response to Plaintiffs' *prima facie* case; and (J) weighing the equities. In Section V, the Court concludes that the proposed merger must be enjoined due to the likelihood of anticompetitive effects that would result were the merger to be consummated.

## II.  Background

### A. Overview

Every day millions of employees throughout the United States utilize office supplies in the course of their daily work. To sustain employees' use of pens, Post-it notes and paperclips, large companies purchase more than two billion dollars of office supplies from Defendants annually. Hrg Tr. 10:23-24, (Opening Statement of Tara Reinhart, Esq.). Companies that purchase office supplies for their own use operate in what the industry refers to as the B-to-B space. B-to-B customers prefer to work with one vendor that can meet all of the companies' office supply needs. Hrg Tr. at 204:1-20 (Gregg O'Neill, Category Manager for Workplace Services at American Electric Power ("AEP") testifying that because the company spends two million dollars on office supplies, its leverage with

one vendor is greater than it would be if it utilized twenty

vendors); *Id.* at 1617:1-1618:4 (Leo J. Meehan, III, CEO of WB

Mason testifying about the benefits of utilizing one primary

vendor, including lower prices, growth rebates, assistance with

controlling leakage, etc.).

To establish a primary vendor relationship, companies in

the B-to-B space request proposals from national suppliers like

Staples and Office Depot. *See e.g.*, Hrg Tr. (AEP) 194: 10-

195:16. The request for proposal ("RFP") process typically

results in a multi-year contract with a primary vendor that

guarantees prices for specific items, includes an upfront lump-

sum rebate, and a host of other services. Pls.' Proposed

Findings of Fact and Conclusions of Law ("Pls.' FOF") ¶¶ 41-46.

Because the office supplies consumed by large companies are

voluminous, such companies typically pay only half the price for

basic supplies as compared to the average retail consumer.

Plaintiffs' Exhibit ("PX") 06100, Pls.' Expert Dr. Carl

Shapiro's Report ("Shapiro Report") at 019.[5]

---

[5] Dr. Shapiro, Plaintiffs' expert economist, is a Professor of
Business Strategy at the Haas School of Business at the
University of California at Berkeley. Shapiro Expert Report
("Shapiro Report"), PX06100-003. In addition to teaching, Dr.
Shapiro has served in government in various capacities during
his professional career, including as a member of the
President's Council of Economic Advisers from 2011 to 2012, and
as an advisor at the Department of Justice from 1995 to 1996 and
again from 2009 to 2011. *Id.* Dr. Shapiro testifies for
Plaintiffs and Defendants in antitrust matters. *Id.*

## B. Defendants Staples and Office Depot

Established as big-box retail stores in the 1980s, Defendants are the primary B-to-B office supply vendors in the United States today. Hrg Tr. 59. Plaintiffs allege that Defendants sell and distribute upwards of seventy-nine percent of office supplies in the B-to-B space. Hrg Tr. 20-21. Since the 2013 merger of Office Depot and Office Max, Defendants consistently engage in head-to-head competition with each other for B-to-B contracts. *See, e.g.,* PX04322 Staples ("SPLS") 001 (identifying only Office Depot as "Key Competitor[]").

Staples and Office Depot are publicly traded corporations. Compl. ¶¶ 29 and 30. Staples is the largest office supplier of consumable office supplies to large B-to-B customers in the United States and operates in three business segments: (1) North American stores and online sales; (2) North American commercial; and (3) international operations. *Id.* ¶ 29. In fiscal year 2014, Staples generated $22.5 billion in sales, with more than half of all sales coming from office supplies. *Id.* In fiscal year 2013, 34.8 percent of Staples' total revenue came from the North American commercial segment. *Id.*

Office Depot is the second largest office supplier of consumable office supplies to large B-to-B customers in the Unites States. *Id.* ¶ 30. Like Staples, Office Depot operates in similar business segments: (1) North America retail; (2) North

American business solutions; and (3) an international division. *Id.* In fiscal year 2014, Office Depot made $16.1 billion in revenue, with nearly half of those sales coming from office supplies and 37.4 percent of overall sales from B-to-B business. *Id.*

Staples' "commercial" and Office Depot's "business solutions" segments focus on the B-to-B contracts at issue in this case. While both companies serve businesses of all sizes, this case focuses on large B-to-B customers, defined by Plaintiffs as those that spend $500,000 or more per year on office supplies. Hrg Tr. 30:4-6. Approximately 1200 corporations in the United States are included in this alleged relevant market. Hrg Tr. 2473:17-18.

### C. FTC Investigation

On February 4, 2015, Defendants entered into a merger agreement in which Staples would acquire Office Depot for a combination of cash and Staples' stock. Compl. ¶ 32. Shortly after the merger was announced, the FTC launched an investigation into the competitive effects of the proposed merger. Defs.' FOF ¶ 58. Ultimately, the FTC commissioners filed an administrative complaint before an FTC Administrative Law Judge ("ALJ") and also authorized the Plaintiffs to seek a preliminary injunction to prevent the Defendants from consummating the merger to maintain the status quo pending a

full hearing on the merits. Compl. ¶ 34. Plaintiffs filed this suit the same day. Pls.' Mot. Prelim. Inj.

### D. Regional and local vendors

Regional and local office supply vendors exist throughout the country. Hrg Tr. 84:2. However, they typically do not bid for large B-to-B contracts. Hrg Tr. 907:7-14 (James Moise, Senior Vice President and Chief Sourcing Officer for Fifth Third Bank testifying that regional suppliers Office Essentials and WB Mason declined to bid on their RFP); Hrg Tr. 1941:18-20 (Leonard Allen Wright, Vice President of Strategic Sourcing for Health Trust Purchasing Group ("HPG") noting that neither WB Mason nor MyOfficeProducts could meet HPG's needs nationwide). When regional office supply vendors compete for large RFPs, they are rarely awarded the contract. PX02138 (Sears (Realogy) Dep. 156: 15-21, 191:6-17) (". . . I was concerned about [WB Mason's] ability to service the entire country . . . .").

WB Mason is a regional supplier that targets its business to thirteen northeastern states plus the District of Columbia (known in the industry as "Masonville"). *Id.* WB Mason "ranks a distant third" behind Staples and Office Depot. PX03021-002, Meehan Decl. ¶ 6. In fiscal year 2015, WB Mason generated approximately $1.4 billion in total revenue. *Id.* WB Mason has no customers in the Fortune 100 and only nine in the Fortune 1000. Hrg Tr. 1611:21-1611:24. According to WB Mason's CEO, Leo

Meehan, "Staples and Office Depot are the only consumable office supplies vendors that meet the needs of most large B2B customer[s] across the entire country, or even most of it." Meehan Decl. ¶ 19.

WB Mason recently abandoned a plan to expand nationwide. Hrg Tr. 1672 (Mr. Meehan: "And then I just got cold feet about it ███████████████████████████████████████████ ███████████████████████████████████.") When asked during the hearing if WB Mason would accept a divestiture of cash assets from the Defendants to cover the expenses of nationwide expansion, Mr. Meehan would not commit to accepting such a proposal. *Id.* 1790 (Mr. Meehan: "I don't know if I would. That's a big challenge.").

### E. Amazon Business

Amazon.com Inc.'s ("Amazon") effort to compete in the office supply industry, including the B-to-B space, is Amazon Business. Amazon began exploring how to target companies' procurement of office supplies more than fourteen years ago. PX02166, Mendelson Dep. 178:24-179:7; Hrg Tr. 525:10-526:10. In 2002, Amazon launched an "office product store at Amazon.com," a cooperative effort with Office Depot. Mendelson Dep. 178:24-179:7. In 2007, Amazon launched the All Business Center. *Id.* 175:18-176:21. In April 2012, Amazon launched Amazon Supply, a

marketplace for selling a variety of products, including office

supplies to business customers. Hrg Tr. 524:3-4.

Amazon Business was launched just over one year ago, in

April 2015. Amazon Business is a "top priority" for Amazon, Hrg

Tr. 659:17-20, and a "must win" opportunity. Id. 660:8-14. In

2016, Amazon Business forecasts making $██████████ profit.

Defendants' Exhibit ("DX") 05038. By 2020, Amazon Business's

forecasts estimate $█████████ revenue, ████████ percent

($███████████) coming from the sale of basic office

supplies. Hrg Tr. 719:25 - 720:3, 856: 5-16. ████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████ Hrg Tr. 573:3-574:24.

Although in its infancy, Amazon's vision is for Amazon

Business to be the "preferred marketplace for all professional,

business and institutional customers worldwide." DX00030 at 1.

Amazon Business has several undisputed strengths: tremendous

brand recognition, a user-friendly marketplace, cutting edge

technological innovation, and global reach.[6] Hrg Tr. 663:13 (Vice

President of Amazon Business, Prentis Wilson: "We actually don't

---

[6] Amazon's marketplace is an online shopping experience where
customers can browse for items and make online purchases. Hrg
Tr. 552. Amazon makes approximately half of all sales through
the marketplace. Id. Millions of other companies—"third-party
sellers,"—make the remaining sales through the marketplace. Id.

worry a lot about our competitors. Our focus has been on serving our customers."). Amazon Business also has several weaknesses with regard to its entry into the B-to-B space. One weakness is that Amazon Business is inexperienced in the RFP process. Amazon Business has not bid on many RFPs and has yet to win a primary vendor contract. Hrg Tr. 551:11-13 ("Q: Has Amazon Business ever won an RFP for the role as primary supplier of office supplies? A: No."). Amazon Business' marketplace model is also at odds with the B-to-B industry because half of the sales made through the marketplace are from independent third-party sellers over whom Amazon Business has no control. Hrg Tr. 843: 7-9 ("Q: You have no plans to force the third parties to offer particular prices? A: No, we'll never do that. No.").

## III. Legal Standards

### A. The Clayton Act

Section 7 of the Clayton Act prohibits mergers or acquisitions "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly," in any "line of commerce or in any activity affecting commerce in any section of the country." 15 U.S.C. § 18. When the FTC has "reason to believe that a corporation is violating, or is about to violate, Section 7 of the Clayton Act," it may seek a preliminary injunction under Section 13(b) of the FTC Act to "prevent a merger pending the Commission's administrative

adjudication of the merger's legality." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1070 (D.D.C. 1997) (citing 15 U.S.C. § 53(b)); *see also Brown Shoe v. U.S.*, 370 U.S. 294, 317 (1962) ("Congress saw the process of concentration in American business as a dynamic force; it sought to ensure the Federal Trade Commission and the courts the power to brake this force . . . before it gathered momentum.") "Section 13(b) provides for the grant of a preliminary injunction where such action would be in the public interest—as determined by a weighing of the equities and a consideration of the Commission's likelihood of success on the merits." *FTC v. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (citing 15 U.S.C. § 53(b)).

### B. Section 13(b) Standard for Preliminary Injunction

The standard for a preliminary injunction under Section 13(b) requires plaintiffs to show: (1) a likelihood of success on the merits; and (2) that the equities tip in favor of injunctive relief. *FTC v. Cardinal Health*, 12 F. Supp. 2d 34, 44 (D.D.C. 1998).[7] To establish a likelihood of success on the merits, the government must show that "there is a reasonable probability that the challenged transaction will substantially impair

---

[7] In contrast, the typical preliminary injunction standard requires a plaintiff to show: (1) irreparable harm; (2) probability of success on the merits; and (3) a balance of equities favoring the plaintiff. *FTC v. Sysco Corporation*, 113 F. Supp. 3d 1, 22 (2015) (citing *Heinz*, 246 F.3d at 714)).

competition." *Staples*, 970 F. Supp. at 1072 (citation omitted) (internal quotation marks omitted). "Proof of actual anticompetitive effects is not required; instead, the FTC must show an appreciable danger of future coordinated interaction based on predictive judgment." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004) (internal quotations omitted).

The Court's task, therefore, is to "measure the probability that, after an administrative hearing on the merits, the Commission will succeed in proving that the effect of the [proposed] merger 'may be substantially to lessen competition, or tend to create a monopoly' in violation of Section 7 of the Clayton Act.'" *Heinz*, 246 F.3d at 714 (quoting 15 U.S.C. § 18). This standard is satisfied if the FTC raises questions going to the merits "so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Id.* at 714-15 (citations omitted) (internal quotation marks omitted). As reflected by this standard, Congress' concern regarding potentially anticompetitive mergers was with "probabilities, not certainties." *Brown Shoe Co.*, 370 U.S. at 323 (other citations omitted).

In sum, the Court "must balance the likelihood of the FTC's success against the equities, under a sliding scale." *F.T.C. v.*

*Whole Foods Market, Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008).
The equities or "public interest" in the antitrust context
include: "(1) the public interest in effectively enforcing
antitrust laws, and (2) the public interest in ensuring that the
FTC has the ability to order effective relief if it succeeds at
the merits trial." *Sysco*, 113 F. Supp. 3d at 86.

Nevertheless, "[t]he issuance of a preliminary injunction
prior to a full trial on the merits is an extraordinary and
drastic remedy." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C.
Cir. 1980)(citations omitted) (internal quotation marks
omitted). The government must come forward with rigorous proof
to block a proposed merger because "the issuance of a
preliminary injunction blocking an acquisition or merger may
prevent the transaction from ever being consummated." *Id.*

### C. *Baker Hughes* Burden-Shifting Framework

In *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83
(D.C. Cir. 1990), the U.S. Court of Appeals for the D.C. Circuit
established a burden-shifting framework for evaluating the FTC's
likelihood of success on the merits. *See Heinz*, 246 F.3d at 715.
The government bears the initial burden of showing the merger
would result in "undue concentration in the market for a
particular product in a particular geographic area." *Baker
Hughes*, 908 F.2d at 982. Showing that the merger would result in
a single entity controlling such a large percentage of the

relevant market so as to significantly increase the concentration of firms in that market entitles the government to a presumption that the merger will substantially lessen competition. *Id.*

The burden then shifts to the defendants to rebut the presumption by offering proof that "the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition in the relevant market." *Heinz*, 246 F.3d at 715 (quoting *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86 (1975) (alterations in original)). "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *Baker Hughes*, 908 F.2d at 991. "A defendant can make the required showing by affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor." *Id.*

"If the defendant successfully rebuts the presumption, the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Id.* at 983. "[A] failure of proof in any respect will mean the transaction should not be enjoined." *Arch Coal*, 329 F. Supp. 2d at 116. The court must also weigh the equities, but if

the FTC is unable to demonstrate a likelihood of success on the merits, the equities alone cannot justify an injunction. *Id.*

## IV.  Discussion

The Court's analysis proceeds as follows: (A) legal principles considered when defining a relevant market; (B) application of legal principles to Plaintiffs' market definition; (C) Defendants' arguments in opposition to Plaintiffs' alleged market; (D) conclusions regarding the relevant market; (E) analysis of the Plaintiffs' arguments relating to the probable effects on competition based on market share calculations; (F) Defendants' arguments in opposition to Plaintiffs' market share calculations; (G) conclusions regarding Plaintiffs' market share; (H) Plaintiffs' evidence of additional harm; (I) Defendants' response to Plaintiffs' *prima facie* case; and (J) weighing the equities.

### A. Legal principles considered when defining a relevant market

As discussed *supra*, the burden is on the Plaintiffs to show that the merger would result in a single entity controlling such a large percentage of the relevant market that concentration is significantly increased and competition is lessened. *See e.g. Baker Hughes*, 908 F.2d at 982. To consider whether the proposed merger may have anticompetitive effects, the Court must first define the relevant market based on evidence proffered at the evidentiary hearing. *See United States v. Marine Bancorp.*, 418

U.S. 602, 618 (1974) (Market definition is a "'necessary predicate' to deciding whether a merger contravenes the Clayton Act."). Examination of the particular market, including its structure, history and probable future, is necessary to "provide the appropriate setting for judging the probable anticompetitive effects of the merger." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d at 116 (quoting *Brown Shoe* at 322 n. 28); *see also United States v. General Dynamic*, 415 U.S. 486, 498 (1974). "Defining the relevant market is critical in an antitrust case because the legality of the proposed merger [] in question almost always depends on the market power of the parties involved." *Cardinal Health, Inc.*, 12 F. Supp. 2d at 45.

Two components are considered when defining a relevant market: (1) the geographic area where Defendants compete; and (2) the products and services with which the defendants' products compete. *Arch Coal, Inc.*, 329 F. Supp. 2d. at 119. The parties agree that the United States is the relevant geographic market. Hrg Tr. (Shapiro) 2151:23-2152:4; *see also* Orszag Dep. 155:15-19.[8] The parties vigorously disagree, however, about how the relevant product market should be defined.

---

[8] Defendants' economic expert, Johnathan Orszag, produced several expert reports for Defendants but was not called to testify.

The Supreme Court in *Brown Shoe* established the basic rule for defining a product market: "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. In other words, a product market includes all goods that are reasonable substitutes, even where the products are not entirely the same. Two factors contribute to an analysis of whether goods are "reasonable substitutes": (1) functional interchangeability; and (2) cross-elasticity of demand. *See e.g.*, *Sysco*, 113 F. Supp. 3d at 25-26.

As the following discussion demonstrates, the concepts of cluster and targeted markets are critical to defining the market in this case.

### a. Consumable office supplies as cluster market

Cluster markets allow items that are not substitutes for each other to be clustered together in one antitrust market for analytical convenience. Shapiro Report at 007 (noting that cluster markets are "commonly used by antitrust economists.") The Supreme Court has made clear that "[w]e see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).

Here, Plaintiffs allege that items such as pens, file folders, Post-it notes, binder clips, and paper for copiers and printers are included in this cluster market. Compl. ¶¶ 36-37. Although a pen is not a functional substitute for a paperclip, it is possible to cluster consumable office supplies into one market for analytical convenience. *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565-68 (6th Cir. 2014). Defining the market as a cluster market is justified in this case because "market shares and competitive conditions are likely to be similar for the distribution of pens to large customers and the distribution of binder clips to large customers." Shapiro Report at 007; *see also* PX02167 (Orszag Dep. 91:11-15) ("So, for example, pens may not often be substitutes for notebooks in the context of this case, but a cluster market would be the aggregation of those two and then the analysis of those together for, as we talked about earlier, analytical simplicity.").

### b. Large B-to-B customers as target market

Another legal principle relevant to market definition in this case is the concept of a "targeted" or "price discrimination" market. According to the Merger Guidelines:

> When examining possible adverse competitive effects from a merger, the Agencies consider whether those effects vary significantly for different customers purchasing the same or similar products. Such differential impacts are possible when sellers can discriminate, e.g., by profitably raising price to certain targeted customers but not to others. […]

> When price discrimination is feasible, adverse
> competitive effects on targeted customers can arise,
> even if such effects will not arise for other customers.
> A price increase for targeted customers may be
> profitable even if a price increase for all customers
> would not be profitable because too many other customers
> would substitute away.

U.S. Dep't of Justice & FTC Horizontal Merger Guidelines

§3 (2010) (hereinafter Merger Guidelines).[9]

Defining a market around a targeted consumer, therefore, requires finding that sellers could "profitably target a subset of customers for price increases . . ." *See Sysco*, 113 F. Supp. 3d at 38 (citing Merger Guidelines Section 4.1.4.). This means that there must be differentiated pricing and limited arbitrage. Dr. Shapiro concluded that arbitrage is limited here because "it is not practical or attractive for a large customer to purchase indirectly from or through smaller customers." *Id.*

### B. Application of relevant legal principles to Plaintiffs' market definition

The concepts of cluster and targeted markets inform the Court's critical consideration when defining the market in this case: the products and services with which the Defendants' products compete. *Arch Coal, Inc.*, 329 F. Supp. 2d. at 119. The

---

[9] Although the Merger Guidelines are not binding on this Court, the D.C. Circuit has relied on them for guidance in other merger cases. *Sysco*, 113 F. Supp. 3d at 38 (citing *Heinz*, 246 F.3d at 716 n.9).

parties vigorously disagree on how the market should be defined.
As noted *supra*, Plaintiffs argue that the relevant market is a
cluster market of "consumable office supplies" which consists of
"an assortment of office supplies, such as pens, paper clips,
notepads and copy paper, that are used and replenished
frequently." Compl. ¶¶ 36-37. Plaintiffs' alleged relevant
market is also a targeted market, limited to B-to-B customers,
specifically large B-to-B customers who spend $500,000 or more
on office supplies annually. Hrg Tr. 30:4-6.[10]

Defendants, on the other hand, argue that Plaintiffs'
alleged market definition is wrong because it is a
"gerrymandered and artificially narrow product market limited to
*some*, but not all, consumable office supplies sold to only the
most powerful companies in the world." Defs.' FOF ¶ 4 (emphasis
in original). In particular, Defendants insist that ink and
toner must be included in a proper definition of the relevant
product market. *Id.* ¶ 101. Defendants also argue that no

---

[10] In Plaintiffs' complaint, they alleged that the relevant
market was limited to large B-to-B customers, including, but not
limited to "those that buy $1 million annually of consumable
office supplies for their own use." Id. ¶¶ 41, 45. For
analytical purposes, Dr. Shapiro drew the line at large B-to-B's
that spend $500,000 or more on office supplies. Hrg Tr. 2154:16-
2155:14(Dr. Shapiro noting that 90 percent of Enterprise
customers spend at least $500,000 on office supplies and that
there is no "magic place that's the right place" to draw the
line, but necessary for practical analytical purposes).

evidence supports finding sales to large B-to-B customers as a distinct market. *Id.* ¶ 77.

### 1. *Brown Shoe* "Practical Indicia"

The *Brown Shoe* practical indicia support Plaintiffs' definition of the relevant product market. The *Brown Shoe* "practical indicia" include: (1) industry or public recognition of the market as a separate economic entity; (2) the product's peculiar characteristics and uses; (3) unique production facilities; (4) distinct customers; (5) distinct prices; (6) sensitivity to price changes; and (7) specialized vendors. *Brown Shoe*, 370 U.S. at 325. Courts routinely rely on the *Brown Shoe* factors to define the relevant product market. *See, e.g. Staples*, 970 F. Supp. at 1075-80; *Cardinal Health*, 12 F. Supp. 2d at 46-48; *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 159-64 (D.D.C. 2000); *FTC v. CCC Holdings*, 605 F. Supp. 2d 26, 39-44 (D.D.C. 2009); *United States v. H & R Block*, 833 F. Supp. 2d 36, 51-60 (D.D.C. 2011).[11]

---

[11] The Court is aware of the academic observation that "the rationale for market definition in *Brown Shoe* was very different from and at odds with the rationale for market definition in horizontal merger cases today." Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application at 237 (CCH, Inc. 2015).

> Today the concern is that the post-merger firm might be able to raise prices without causing too much output to be lost to its rivals. In contrast, the *Brown Shoe* concern was that by reducing its price (or improving quality at the same price), the post-merger firm could

The most relevant *Brown Shoe* indicia in this case are:
(a) industry or public recognition of the market as a separate
economic entity; (b) distinct prices and sensitivity to price
changes; and (c) distinct customers that require specialized
vendors that offer value-added services, including:
(i) sophisticated information technology (IT) services;
(ii) high quality customer service; and (iii) expedited
delivery.

### a. Industry or public recognition of the alleged market as a separate economic entity

Vendors in the office supply industry identify customers
according to how much they spend annually and recognize B-to-B
customers as a distinct group. Shapiro Report 006-008. For
example, Staples defines "Enterprise" customers as those who
spend over $1 million per year, "Commercial" customers as those
who spend between $100,000 and $1 million per year, and "mid-
market" customers as those who spend between $6,000 and $100,000
per year. PX04062 (SPLS) at 009; PX04088 (SPLS) at 23. Office
Depot maintains similar categories. PX02002 (Calkins, Office
Depot ("ODP") IH 85:16-86:7). According to Staples, the $500,000

---

deprive rivals of output, thus forcing them out
altogether or relegating them to niche markets.

*Id.* at 240. Nevertheless, the Court finds the *Brown Shoe* factors
a useful analytical tool, and as Judge Amit P. Mehta recognized
in *Sysco*, "*Brown Shoe* remains the law, and this court cannot
ignore its dictates." *Sysco*, 113 F. Supp. 3d at n 2.

spend mark is a "threshold" that requires "closer attention" be paid to the customer. PX02153 (Mutschler (SPLS) Dep. 56:11-20).

These examples demonstrate that the industry recognizes large B-to-B customers as a separate economic entity.

### b. Distinct prices and a high sensitivity to price changes

Large B-to-B customers solicit RFPs, requests for information ("RFI"), requests for quote ("RFQ"), or similar processes to select their primary office supply vendor. *See e.g.*, Hrg Tr. (AEP) 194:10-195:16; Hrg Tr. (HPG) 1883, 1915:13-1916:18. Through these competitive processes, large B-to-B customers enter into multi-year contracts that typically last for three to five years. Hrg Tr. at 70, 92. Large B-to-B customers generally request prices for all items on their core list of office supplies, particularly those purchased in high volume. Hrg Tr. (AEP) 207:19-208:10; (Select Medical) 1012:18-25; 1112:14-18. The volume of consumable office supplies purchased by large B-to-B customers allows them to purchase office supplies for half the price paid by the average retail consumer. Shapiro Report at 019.

Multi-year contracts with a primary office supply vendor allow large B-to-B customers to avoid regional price differences and to lock in prices on core items for several years. Hrg Tr. (Select Medical) 1023:3-7; (HPG) 1929:8-1931:19. B-to-B

26

contracts are not exclusive, which means that B-to-B customers can buy office supplies off contract at any time without penalty. *See e.g.* Hrg Tr. at 411:7-20; 412:9-12; 919:20-25; 1898:24-1900:23. B-to-B customers may seek to amend the items on their core list and re-negotiate the price for those items. PX02100 (Heisroth (SPLS) Dep. 92:1-16). B-to-B customers typically receive a flat percentage discount off published prices for non-core items. Pls.' FOF ¶ 52. Upfront payments and volume discounts also reduce costs for large B-to-B customers. Hrg Tr. (AEP) 173:1-23; (Meester (Best Buy)) 1320:4-10.

In addition to price, other services are also evaluated, including delivery and information technology capabilities, customer service, and more. Hrg Tr. (AEP) 208:12-22; (HPG) 1914:15-1915:10. After evaluating all proposals and selecting finalists, intense competition between the top two or three bidders ensues. Hrg Tr. (AEP) 209:17-210:3. Vendors naturally seek to charge B-to-B customers the highest price possible, while the B-to-B customers' interest in obtaining the lowest possible price is served by the head-to-head competition among vendors. PX02002 (Calkins (ODP) IH 305:7-306:8). Large B-to-B customers possess a tremendous amount of bargaining power. *See e.g.* Hrg Tr. 404:3-16; 940:20-941:12.

The bargaining power of large B-to-B customers is enhanced by their ability to pit Defendants against each other. For

27

example, in 2015, Staples was in "a dog fight" with Office Depot

for ▮▮▮▮'s business, so it offered an additional 1.5 percent

volume rebate. PX04064. In November 2014, Staples offered a

$▮▮▮▮▮▮▮ upfront payment to win a contract with ▮▮▮▮

▮▮▮▮▮▮▮▮, beating Office Depot's offer of $▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮. PX04034 (SPLS) at 001. In 2014,

Office Depot offered ▮▮▮▮▮ a retention incentive of $▮▮▮▮

per year for three years. PX05266 (ODP) at 001. These examples

demonstrate that large B-to-B customers are extremely price

sensitive.

### c. Large B-to-B customers are distinct

In addition to wanting the best price, large B-to-B

customers also want the best service. PX02003 (Ringel (SPLS) IH

127:9-11) ("It's not always about the company wanting the lowest

price, they want the best service, they want the best services,

they want a competitive price, and they want good

representation."). This includes sophisticated IT capabilities,

personalized customer service, and expedited delivery

capabilities. See e.g. Hrg Tr. (HPG) 1914:15-1915:10; PX02119

(O'Neill (AEP) Dep.) 262:16-263:5; PX 07006 (▮▮▮▮) at 012.

### i. Sophisticated IT capabilities

Sophisticated IT capabilities include customizable product

catalogs, electronic procurement systems, and punch-out sites.

See e.g., Hrg Tr. (McDonalds) 375:25-376:13; (PDME) 1391:7-23.

Customized catalogs allow large B-to-B customers to limit the products their employees can purchase in accordance with the specific high-volume items for which they have negotiated the lowest price from their vendor. *See e.g.*, Hrg Tr. (Select Medical) 1067:16-25; 1069:3-1070:4. The "punch out" IT interface enables companies to control ordering, approval, payment and invoicing. Hrg Tr. (WB Mason) 1624:3-1625:20. Such IT capabilities are expensive and are therefore offered by only a select few nationwide vendors. PX03032 (Pfizer Decl. ¶ 9). These capabilities are critical, however, to invoicing in such a way that reduces the administrative burden of processing a high volume of invoices. Hrg Tr. 1624.

In addition to detailed invoicing, large B-to-B customers require utilization reports. *See e.g.*, Hrg Tr. (AEP) 182:1-9; (McDonalds) 376:14-377:9. These reports include data on the products ordered by employees (whether they are core or non-core), the quantity, unit price and delivery location. *Id.* (Best Buy) 1237:7-1238:4. The reports also identify the product purchased by employees at the stock keeping unit ("SKU") level. *Id.* This detailed reporting allows B-to-B customers to track spending and make necessary adjustments in order to decrease off-contract spend and save money. *Id.*

### ii.   Personalized, high quality customer service

Dedicated customer service experts are another unique feature demanded by large B-to-B contract customers. *See e.g.*, (WB Mason) 1631:18-1633:9. Large B-to-B customers demand an office supply vendor that provides a dedicated account manager. *Id.* (BestBuy) Hrg 1241:14-18; (HPG) 1938:7-13. Account managers for large B-to-B customers are expected to understand the customers' office supply needs. *Id.* (AEP) 187:19-18:14. According to Staples' CEO Ron Sargent, large B-to-B customers require "more high-touch hand holding" from dedicated sales experts. PX02012.

### iii.   Next day and desktop delivery

The sale and distribution of consumable office supplies to large B-to-B customers, many of whom have locations nationwide, requires the warehousing, sale, and distribution of a wide range of office supplies. Hrg Tr. (HPG) 1907:24-25. Nationwide delivery to dispersed geographic locations is critical for large B-to-B customers. *See e.g.,* Hrg Tr. (Fifth Third Bank) 895:24-896:13. Large B-to-B customers require reliable next-day delivery because they have limited storage space for office supplies. *Id.* (Select Medical) 1082:1-1083:24. Large B-to-B customers also prefer a vendor with the ability to make desktop deliveries because such a service eliminates the need to hire employees to make internal deliveries. Hrg Tr. (Fifth Third

Bank) 982:25-983:10, 983:17-984:12. Defendants are the only two office supply vendors that provide nation-wide desktop delivery. *Id.* (WB Mason) 1695:25-1696:5. Defendants tout their nationwide distribution capabilities to differentiate themselves among other office supply vendors. PX 02002 (Calkins (ODP) IH 118:21 - 119:2); PX04321 (SPLS) at 001; PX04469 (SPLS) at 014; PX05380 (ODP) at 044; PX04320 (SPLS) at 001; PX04338 (SPLS) at 004.

In sum, the evidence shows that the *Brown Shoe* factors support Plaintiffs' alleged market definition because there is: (a) industry or public recognition of the market as a separate economic entity; (b) B-to-B customers demand distinct prices and demonstrate a high sensitivity to price changes; and (c) B-to-B customers require specialized vendors that offer value-added services, including: (i) sophisticated information technology (IT) services; (ii) high quality customer service; and (iii) expedited delivery. These factors support viewing large B-to-B customers as a target market.

2. **Expert testimony of Dr. Carl Shapiro and the Hypothetical Monopolist Test**

In addition to the *Brown Shoe* factors, the Court must consider the expert testimony offered by Plaintiffs in this case. The parties agree that the main test used by economists to determine a product market is the hypothetical monopolist test. ("HMT"). Shapiro Report at 014; *see* Orszag Dep. at 89:6-8. This

31

test queries whether a hypothetical monopolist who has control over the products in an alleged market could profitably raise prices on those products. Defs.' FOF ¶ 31 ("The key question is whether a hypothetical monopolist in the alleged market profitably could impose a small but significant and non-transitory increase in price ("SSNIP")") (citing *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 at 1111-12 (N.D. Cal. 2004). If so, the products may comprise a relevant product market. *See H & R Block*, 833 F. Supp. 2d at 51-52. The HMT is explained in the Merger Guidelines.

> [T]he test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products … likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market, including at least one product sold by one of the merging firms.

Merger Guidelines § 4.1.1 The SSNIP is generally assumed to be "five percent of the price paid by customers for the products or services to which the merging firms contribute value." Merger Guidelines § 4.1.2.

Dr. Shapiro's HMT analysis emphasizes that the proposed or "candidate" market consisting of the sale and distribution of consumable office supplies includes *all* methods of procuring office supplies by large companies, i.e. procurement through a primary vendor relationship, off contract purchases, online and retail buys. Shapiro Report at 014. "Since the hypothetical

32

monopolist, by definition, controls all sources of supply to large customers, it would not have to worry that raising prices would cause large customers to switch to other suppliers of consumable office supplies: by definition, there are none." *Id.*

Dr. Shapiro also points out that Staples and Office Depot's head-to-head competition "tells us that a *monopoly* provider of consumable office supplies would charge significantly more to large customers than Staples and Office Depot today charge these same customers." *Id.* Dr. Shapiro also highlights the record evidence that demonstrates Defendants compete "fiercely" for business in the large B-to-B space. *Id.* Dr. Shapiro concludes that such competition implies that "the elimination of competition would lead to a significant price increase to large customers, which in turn implies that the HMT is satisfied." *Id.*

Dr. Shapiro's conclusions are supported by the testimony presented during the hearing. For example, Mr. O'Neill, who testified on behalf of AEP, noted that the company was able to get a lower price because of competition between Staples and Office Depot. Hrg Tr. 340. Mr. Jason Cervone, Sourcing Manager of indirect procurement at McDonalds, acknowledged the same. *Id.* at 492 ("So in our definition of what we need in terms of vendor in this space [with Staples and Office Depot] you have more chance of lowering prices or maintaining pricing than you would with just one player there."); *see also* Hrg Tr. 1890:15-24 (Mr.

Wright for HPG: "Without competition, we can't secure best-in-
class price and best-in-class terms for our members and that's
really part of our operating model.").

In sum, Dr. Shapiro's expert report and testimony, as well
as the testimony of the corporate representatives, supports
Plaintiffs' definition of the relevant market as the sale and
distribution of consumable office supplies to large B-to-B
customers.

### C. Defendants' arguments in opposition to Plaintiffs' alleged market

Defendants make two primary arguments in response to
Plaintiffs' alleged market. First, although Defendants do not
explicitly discuss the *Brown Shoe* practical indicia, they argue
that exclusion of ink and toner, as well as "beyond office
supplies" or "BOSS" products from the alleged market, is error.
Defs.' FOF ¶¶ 6 and 72. Second, Defendants argue that no
evidence supports Plaintiffs' contention that large B-to-B
customers should be treated as a separate market. Defs.' FOF ¶
77.

### 1. Exclusion of ink, toner and BOSS from alleged market is proper

Defendants' principal challenge to Plaintiffs' alleged
market centers on the exclusion of ink, toner and BOSS from the
alleged relevant market. Defendants advance three arguments,
none of which are persuasive. First, Defendants argue that

exclusion of these products from the alleged market is a "made for litigation market," that is inconsistent with commercial realties. Defs.' FOF ¶ 6. Second, Defendants argue that Plaintiffs' market definition is inconsistent with the one used by the FTC in 1997 and 2013. *Id.* Finally, Defendants seize on Dr. Shapiro's admission that the FTC made the decision to exclude ink and toner from the proposed market prior to his independent determination that doing so was proper. *Id.* These arguments are addressed in turn.

### a. Defendants' argument for inclusion of ink and toner fails because they are not subject to the same competitive conditions as general office supplies

Defendants' fundamental legal argument for inclusion of ink, toner and BOSS products in the alleged market is that "a well-defined product market must correspond to the commercial realties of the industry and be economically significant." Defs.' FOF ¶ 32 (citing *Brown Shoe*, 370 U.S. at 336-37). Defendants argue that the dispositive "commercial reality" is that many large B-to-B customers include ink, toner and other BOSS products in the bundle of goods they contract for with their primary vendor. Defs.' FOF ¶ 74. Many large businesses include these adjacent items in their primary vendor bundle. Hrg Tr. 2641:3-9 (Professor Shapiro agreed that BOSS products are included in customer contracts and RFPs "the overwhelming majority of the time."); *see also id.* at 235:19-236:25; 342:13-

343:1; 351:10-13; 353:8-14 (AEP testifying that "office
supplies" includes pens, pencils, paper, binder clips, folders,
ink and toner, [janitorial and sanitation "jan/san"] materials,
break room supplies, furniture, and technology); *see also id*, at
397:11-398:22 (McDonald's testifying that "office supplies"
includes traditional office supplies, toner, and copy paper, as
well as break room supplies and some technology items). However,
Defendants do not address the critical question that must be
answered when determining whether a particular product should be
included in a cluster market: are the items subject to the same
competitive conditions? *ProMedica Health*, 749 F.3d at 566
(holding that "the competitive conditions across the markets for
primary and secondary services are similar enough to justify
clustering of those markets when analyzing the merger's
competitive effects."); *see also* Hrg Tr. (Shapiro) 2123:3-
2124:21, 2313:19-2314:8.

Competition for the sale of ink and toner has increased due
to the "recent and rapid" rise of Managed Print Services
("MPS"). Pls.' FOF ¶ 26. MPS vendors like Xerox, Hewlett-
Packard, Lexmark, and Ricoh provide a bundle of services that
includes sale of ink and toner in addition to service and
maintenance of printers and copiers. *See e.g.*, Hrg Tr. (Select
Medical) 1018:18-1019:3; (WB Mason) 1604:14-20. There is ample
record evidence to show that ink, toner, and other adjacent BOSS

items are properly excluded from the relevant market because
they are subject to distinct competitive conditions. For
example, some large companies are shifting all of their ink and
toner business to an MPS. *See e.g.*, Hrg Tr. 357-358; 503
(McDonalds noting that in November 2015 it changed from Office
Depot to an MPS to procure its ink and toner and that the number
of companies capable of providing ink and toner is larger than
those that provide office supplies). Other large companies are
disaggregating ink and toner purchases between their primary
vendor and an MPS. *Id.* (AEP) 236 (noting that AEP buys some ink
and toner from Office Depot and some from Xerox). Many companies
hold separate sourcing events for ink and toner. *See e.g.,* Hrg
Tr. 166-170 (AEP confirming that it runs a separate sourcing
event for office furniture, jan/san and ink and toner); *id.* at
1019:13-1020:3 (Select Medical noting five vendors submitted
bids during its 2013 RFP for MPS. Select Medical ultimately
contracted with MPS Total Print); *id.* at 1316-18 (Best Buy
confirming purchases of BOSS items from Kimberly-Clark and ink
and toner through MPS contract with Hewlett-Packard). The same
is true of other BOSS items. Hrg Tr. 168 (AEP: ". . . most of
our commercial, if not all of our commercial jan san is part of
a janitorial contract that also provides labor.").

Moreover, the authority relied on by Defendants is readily
distinguished. Defendants rely on *Brown Shoe* to support a focus

on the "commercial realities of the industry." However,
Defendants rely on *Brown Shoe's* discussion of the proper
geographic boundaries of a market, which is distinct from *Brown
Shoe's* discussion of the relevant product market. *Brown Shoe* 370
U.S. at 336-37 ("The geographic market selected must, therefore
both 'correspond to the commercial realities of the industry'
and be economically significant."). To the extent that the
"commercial realities of the industry" are important in this
case, the Court agrees with Plaintiffs that the commercial
realities are "that Defendants are the largest and second-
largest office supplies vendors in the country; they are each
other's closest competitor for large business customers; bid
data show that they lose bids most often to each other; and
large customers currently benefit greatly from their head-to-
head competition." Pls.' FOF ¶ 288.

Defendants also rely on *PepsiCo, Inc. v. Coca Cola Co.*, a
case brought by PepsiCo under Section 2 of the Sherman Act
alleging that Coca Cola had monopolized, or attempted to
monopolize, the market of fountain syrup distributed by
independent food service entities. 114 F. Supp. 2d 243 (S.D.N.Y.
2000). *PepsiCo* is distinguishable for a number of reasons.
First, the critical question before the Court in *PepsiCo* was
whether the evidence supported a finding that the distribution
channel of fountain syrup through independent foodservice

distributors should be recognized as a relevant market. *Id.* at 249-50. The Court rejected *PepsiCo*'s proposed relevant market because the evidence showed that "while customers view fountain syrup delivered through independent foodservice distributors as preferential and advantageous, they view fountain syrup delivered through other means as acceptable." *Id.*

Here, the record evidence shows that large B-to-B customers do not view any alternative sources for bulk procurement of basic office supplies that would retain the current competitive conditions of the market. Hrg Tr. 349 (AEP) ("I think our team would be very good at finding alternatives to provide pens and pencils; however, they cannot create competition."); *Id.* 486 (McDonalds)("We would attempt to look for alternatives. We find ourselves, though, back to a situation where we don't have another national player that has a retail footprint nationwide that stocks everything we need . . .") In contrast, large B-to-B customers not only view alternative vendors for ink, toner and BOSS as adequate, they increasingly contract with MPS, furniture, and janitorial companies for their primary purchase of these distinct products. *See e.g.*, Hrg Tr. 1019 (Select Medial) (after considering MPS bids in 2013 from Office Depot, OfficeMax, Staples, Total Print and Weaver, Select Medical entered into a contract with Total Print for its MPS needs). In

light of these distinctions, *PepsiCo* does not support a finding that Plaintiffs' alleged market is in error.

In sum, inclusion of ink, toner and BOSS items by large companies in the bundle of goods they want to have the **option** of purchasing through their primary vendor does not mean that those goods are subject to the same competitive conditions.

### b. Consideration of ink and toner during 1997 and 2013 investigations

Next, Defendants argue that the Plaintiffs' alleged market is inconsistent with how the FTC defined the market during its investigation of the Staples and Office Depot proposed merger in 1997 and the Office Depot and Office Max merger in 2013. Defs.' FOF ¶ 113-116.

In 1997, the proposed merger between Staples and Office Depot was enjoined by this Court. *FTC v. Staples*, 970 F. Supp. 1066, 1070 (D.D.C. 1997) (J. Hogan). At that time, FTC included ink and toner in its definition of consumable office supplies. *Id.* at 1080. However, scant precedential value can be gleaned from comparing the defined market in that case and the Plaintiffs' alleged market in this case. The 1997 case is nearly twenty years old, and the office supply market has changed dramatically since that time. For example, as discussed in Section IV.B.1.a. *supra*, the rise of MPS services as a competitive force has occurred in the last several years.

Moreover, the 1997 Staples case was a retail case that focused on how the proposed merger would affect the average consumer. The case before the Court today is a contract channel case focused on large B-to-B customers.

In 2013, after a seven month investigation, the FTC did not challenge Office Depot's proposed acquisition of Office Max. *See* FTC's Closing Statement ("2013 Closing Statement"), https://www.ftc.gov/system/files/documents/public_statements/statement-commission/131101officedepotofficemaxstatement.pdf. Because the Commission cited to the definition of consumable office supplies from *Staples* in its Closing Statement, Defendants argue that ink and toner should be included in the relevant market because Plaintiffs "presented no evidence whatsoever that the 'competitive conditions' are different in any way from November 2013." Defs.' FOF ¶ 116.

The Court rejects this argument. In the 2013 Closing Statement, one of the rationales for allowing the proposed merger to proceed was because:

> large customers use a variety of tools to ensure that they receive competitive pricing such as ordering certain products (like ink and toner) directly from manufacturers and sourcing (or threatening to source) certain categories of office supply products from multiple firms.

2013 Closing Statement at 3. The FTC's decision recognized that "yesterday's market dynamics may be very different

41

from market dynamics of today." *Id.* Plaintiffs' decision to

not include ink and toner in their proposed relevant market

in this case is therefore entirely consistent with the 2013

decision to not challenge the Office Depot and Office Max

merger. *See also*, Hrg Tr. 3593 (Plaintiffs' closing

argument noting that the 2013 decision is "wholly

consistent with what we're doing here. It's exactly the

same thing. We did not see a reason to challenge ink and

toner based on the evidence that was developed in the

investigation.").

### c. Dr. Shapiro and the FTC worked collaboratively to determine that ink and toner should be excluded

Finally, Defendants challenge the propriety of excluding

ink and toner from the alleged cluster market based on Dr.

Shapiro's testimony indicating that the decision to exclude ink

and toner resulted from a collaborative process with the FTC and

that he did not perform a market share analysis including ink

and toner. Defs.' FOF ¶ 121-124. The Court is not persuaded by

Defendants' argument. First, the fact that the FTC works

collaboratively with its experts to determine what products

should be included in an antitrust market is not problematic.

The FTC's own economists contribute to the FTC's decision

regarding the relevant market prior to the time the expert

witness for trial is retained. *See e.g.* Hrg Tr. 2907 (Ms.

42

Reinhart: "The amount of work that went into this investigation is huge. And these staff attorneys, they're experts themselves. They know the antitrust laws, they know the antitrust economics . . . .").

Further, Defendants take Dr. Shapiro's testimony regarding market shares of Defendants for ink and toner out of context. Defs.' FOF ¶ 124. Defendants' highlight Dr. Shapiro's statement that if one were to calculate market shares for ink and toner, Defendants' share would be significantly smaller. *Id.* Defendants seek to imply that Dr. Shapiro agrees that Defendants' market shares in the alleged market would be smaller if ink and toner were included. However, Dr. Shapiro's comment was referring to his earlier statement that:

> I think that both the FTC and Staples and Office Depot agree, as far as I can tell, that if you took Staples and Office Depot's market share in ink and toner, it would be significantly lower than it is in core office supplies and paper. To me that is confirmation that it's correct not to include ink and toner in the cluster.

Hrg Tr. 2783. In other words, because there are more companies that sell ink and toner, Defendants' market share in an ink and toner market would be lower than they are in the alleged market.

All of the above arguments are advanced by Defendants to bolster their assertion that the Plaintiffs have "gerrymandered the market" to inflate Defendants' market

43

share. Defs.' FOF ¶ 4. As discussed *supra*, voluminous

record evidence supports excluding ink, toner and BOSS

products from the relevant cluster market. To the extent

Defendants sought to show that exclusion of ink and toner

radically altered Defendants' market share, Defendants

could have presented expert testimony to support that

proposition.

### 2. Antitrust laws exist to protect competition, not a particular set of consumers

Defendants' second primary argument in opposition to

Plaintiffs' proposed relevant market is that "there is no

evidence to support Plaintiffs' claim that large B-to-Bs should

be treated as a separate market." Defs' FOF ¶ 77. Defendants

maintain that Plaintiffs' attempt to protect "mega companies" is

misplaced because the merger "indisputably will benefit all

retail customers, and more than 99 percent of business

customers." Defs.' FOF ¶ 1.

Antitrust laws exist to protect competition, even for a

targeted group that represents a relatively small part of an

overall market. *See* Merger Guidelines § 3 ("When price

discrimination is feasible, adverse competitive effects on

targeted customers can arise, even if such effects will not

arise for other customers."). Indeed, the Supreme Court has

recognized that within a broad market, "well-defined submarkets

44

may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co.*, 370 U.S. at 325, (1962); *Cardinal Health, Inc.*, 12 F. Supp. 2d at 47 (concluding that "the services provided by wholesalers in fact comprise a distinct submarket within the larger market of drug delivery."); *See e.g. Sysco*, 113 F. Supp. 3d at 40 (holding that "the ordinary factors that courts consider in defining a market—the Brown Shoe practical indicia and the Merger Guidelines' SSNIP test—support a finding that broadline distribution to national customers is a relevant product market."); *see also United States v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 360 (1970) ("[I]t is the cluster of products and services ... that as a matter of trade reality makes commercial banking a distinct" market).

As discussed in Section IV.A.2.a-c *supra*, the nature of how large B-to-B customers operate, including the services they demand, supports a finding that they are a targeted customer market for procurement of consumable office supplies. There is overwhelming evidence in this case that large B-to-B customers constitute a market that Defendants could target for price increases if they are allowed to merge. Significantly, Defendants themselves used the proposed merger to pressure B-to-B customers to lock in prices based on the expectation that they would lose negotiating leverage if the merger were approved. *See*

45

*e.g.*, PX05236 (ODP) at 001 ("This offer is time sensitive. If and when the purchase of Office Depot is approved, Staples will have no reason to make this offer."); PX05249 (ODP) at 001 ("[The merger] will remove your ability to evaluate your program with two competitors. There will only be one."); PX05514 (ODP) at 003 ("Today, the FTC announced 45 days for its final decision. You still have time! You would be able to leverage the competition, gain an agreement that is grandfathered in and drive down expenses!").

### D. Conclusions regarding the definition of the relevant market

The "practical indicia" set forth by the Supreme Court in *Brown Shoe* and Dr. Shapiro's expert testimony support the conclusion that Plaintiffs' alleged market of consumable office supplies (a cluster market) sold and distributed by Defendants to large B-to-B customers (a targeted market) is a relevant market for antitrust purposes. The *Brown Shoe* factors support Plaintiffs' argument that the sale and distribution of consumable office supplies to large B-to-B customers is a proper antitrust market because the evidence supports the conclusion that: (1) there is industry or public recognition of the market as a separate economic entity; (2) B-to-B customers demand distinct prices and demonstrate a high sensitivity to price changes; and (3) B-to-B customers require specialized vendors that offer value-added services. Dr. Shapiro's unrebutted

testimony also supports Plaintiffs' alleged market definition
because, in his opinion, "the elimination of competition would
lead to a significant price increase to large customers," which
implies the HMT is satisfied. Finally, for the reasons discussed
in detail in Section IV.C *supra*, Defendants arguments against
Plaintiffs' market definition fail.

### E. Analysis of the Plaintiffs' arguments relating to probable effects on competition based on market share calculations

Having concluded that Plaintiffs have carried their burden
of establishing that the sale and distribution of consumable
office supplies to large B-to-B customers in the United States
is the relevant market, the Court now turns to an analysis of
the likely effects of the proposed merger on competition within
the relevant market. "If the FTC can make a *prima facie* showing
that the acquisition in this case will result in a significant
market share and an undue increase in concentration" in the
relevant market, then "a presumption is established that [the
merger] will substantially lessen competition." *Swedish Match,*
131 F. Supp. 2d at 166. The burden is on the government to show
that the merger would "produce a firm controlling an undue
percentage share of the relevant market" that would result in a
"significant increase in the concentration of firms in that
market." *Heinz,* 246 F.3d at 715.

The Plaintiffs can establish their *prima facie* case by showing that the merger will result in an increase in market concentration above certain levels. *Id.* "Market concentration is a function of the number of firms in a market and their respective market shares." *Arch Coal*, 329 F. Supp. 2d at 123. The Herfindahl-Hirschmann Index ("HHI") is a tool used by economists to measure changes in market concentration. Merger Guidelines § 5.3. HHI is calculated by "summing the squares of the individual firms' market shares," a calculation that "gives proportionately greater weight to the larger market shares." *Id.* An HHI above 2,500 is considered "highly concentrated"; a market with an HHI between 1,500 and 2,500 is considered "moderately concentrated"; and a market with an HHI below 1,500 is considered "unconcentrated". *Id.* A merger that results in a highly concentrated market that involves an increase of 200 points will be presumed to be likely to enhance market power." *Id.; see also Heinz*, 246 F.3d at 716-17.

### 1. Concentration in the sale and distribution of consumable office supplies to large B-to-B customers

Dr. Shapiro estimated Defendants' market shares by using data collected from Fortune 100 companies ("Fortune 100 sample" or "Fortune 100"). Shapiro Report at 017. During the data collecting process, 81 of the Fortune 100 companies responded with enough detail to be used in Dr. Shapiro's sample. *Id.; see*

*also* Hrg Tr. 2294:3-19. The critical data provided by the companies was fiscal year 2014 information on: (1) their overall spend on consumable office supplies; (2) the amount spent on consumable office supplies from Staples; and (3) the amount spent on consumable office supplies from Office Depot. Shapiro Report, Exhibit 5A. Some Fortune 100 companies have an established primary vendor relationship with Staples or Office Depot. *Id.* For example, Staples has 100 percent of the market share relating to ████████.'s spend on consumable office supplies and Office Depot has 100 percent of the market share relating to ████████████'s spend on consumable office supplies. *Id.* Other Fortune 100 customers purchase office supplies from a mix of vendors. For example, Staples accounted for twenty-seven percent of ████████████████'s spend on consumable office supplies in 2014 and Office Depot accounted for twenty-one percent. *Id.*

Defendants' market share of the Fortune 100 sample as a whole is striking: Staples captures 47.3 percent and Office Depot captures 31.6 percent, for a total of 79 percent market share. Shapiro Report at 017 and Ex. 5B. The pre-merger HHI is already highly concentrated in this market, resting at 3,270. *Id.* at 021. Put another way, Staples and Office Depot currently operate in the relevant market as a "duopoly with a competitive fringe." *Id.* If allowed to merge, the HHI would increase nearly

49

3,000 points, from 3,270 to 6,265. *Id.* This market structure would constitute one dominant firm with a competitive fringe. *Id.* Staples' proposed acquisition of Office Depot is therefore presumptively illegal because the HHI increases more than 200 points and the post-merger HHI is greater than 2,500. Shapiro Report at 021; *see also Heinz*, 246 F.3d at 716 (noting that the pre-merger HHI for baby food was 4775, "indicative of a highly concentrated industry" and the 500 point post-merger HHI increase "creates, by a wide margin, a presumption that the merger will lessen competition in the domestic jarred baby food market.")

### F. Defendants' arguments in opposition to Plaintiffs' Market Share Calculations

Defendants make several arguments in opposition to Dr. Shapiro's market share methodology and calculation. *See* Defs.' FOF ¶¶ 125-131. Defendants argue that: (1) the Fortune 100 sample overstates Defendants' actual market share; (2) treatment of Tier 1 diversity suppliers and paper manufacturers was error;[12] and (3) Dr. Shapiro underestimates leakage, inflating Defendants' market shares. *Id.* However, despite significant time spent cross-examining Dr. Shapiro with regard to his

---

[12] Tier 1 diversity suppliers are minority or veteran owned businesses that are regional in nature and generally rely on large nationwide office supply companies like Staples and Office Depot to service their customers. Hrg Tr. 1379 (PDME).

methodology, Defendants produced no expert evidence during the hearing to rebut that methodology. Moreover, it is significant that Defendants' final 100-page brief devotes only seven paragraphs to challenging Dr. Shapiro's market share calculations. *Id.*

### 1. The Fortune 100 is a trustworthy sample to calculate Defendants' market shares

Defendants' first argument in opposition to Dr. Shapiro's focus on the Fortune 100 is that his failure to take a sample of the other approximate 1100 companies in the relevant market is error because it results in "dramatically inflated market shares." *Id.* ¶ 126. Dr. Shapiro conceded that the data he analyzed is imperfect because it does not include all large B-to-B customers. Shapiro Report at 017. However, Dr. Shapiro was confident that "there is no reason to believe [the market shares] are biased when it comes to estimating the market shares of Staples and Office Depot." *Id.* To test whether his analysis of the Fortune 100 might have overstated Defendants' market shares because the Fortune 100 companies are especially large, Dr. Shapiro measured the market share of the top half of his sample separate from the bottom half. *Id.* at 018. The range of spending on consumable office supplies among the companies analyzed in Dr. Shapiro's analysis is vast: from less than $200,000 per year on the low end, to more than $33 million per

year on the high end. *Id.*, Ex. 5A. The combined market share for
Defendants is seventy-nine percent among the top half of the
Fortune 100 and eighty-nine percent among the bottom half. *Id.*
at 018. Thus, Dr. Shapiro states that he is "confiden[t] that
the market shares for Staple[s] and Office Depot reported in
Exhibit 5B are not overstated." *Id.*

Defendants' second challenge relating to the Fortune 100
sample focuses on the fact that only eighty-one of the 100
companies responded with enough data to be included in Dr.
Shapiro's analysis. Defendants argue that the nineteen omitted
"are the most likely to purchase supplies from vendors other
than Staples and Office Depot." *Id.* ¶ 125. Defendants highlight
Costco as an example, a company that charges each department
with procuring its own office supplies, whether from Costco or
other vendors. *Id.* The fact that Costco is able to purchase
office supplies from Costco itself makes that company's
procurement of office supplies an anomaly. Because Defendants
did not present a case, they do not provide the Court with an
analysis of the nineteen Fortune 100 companies excluded from Dr.
Shapiro's analysis to show that their exclusion skewed
Defendants' market shares in a way favorable to Plaintiffs.
Antitrust economists rely on data from third parties through
surveys, and therefore the measure of market shares is "normally
imperfect." *Id.*, fn 43. Perhaps Judge Mehta said it best: "The

FTC need not present market shares and HHI estimates with the precision of a NASA scientist." *Sysco*, 113 F. Supp. 3d at 54; *see also H & R Block*, 833 F. Supp. 2d at 72 (stating that a "reliable, reasonable, close approximation of relevant market share data is sufficient."). For all of these reasons, and in view of the absence of expert testimony offered by the Defendants, the Court is persuaded that Dr. Shapiro's analysis of the Fortune 100 represents a reasonable and reliable approximation of the Defendants' market share.

### 2. Dr. Shapiro's treatment of Tier 1 diversity suppliers and paper manufacturers who rely on Defendants is consistent with commercial realities

Next, Defendants challenge the manner in which Dr. Shapiro dealt with Tier 1 diversity suppliers and paper manufacturers. Defs.' FOF ¶ 127. Defendants contend that the sales made by Tier 1 diversity suppliers and paper manufacturers are improperly attributed to Defendants. *Id.*

In the normal course, Defendants treat accounts served by Tier 1 diversity partners toward their own revenue. Pls.' FOF 102. Moreover, Tier 1 diversity suppliers cannot serve large B-to-B customers without partnering with Defendants. *Id.* For these reasons, Dr. Shapiro attributed Tier 1 revenues to Defendants. Hrg Tr. 2309:11-2310:6; 2795:2-2796:3; *See also* Hrg Tr. 379 (McDonalds) ("Our understanding is that Tier 1s are generally

regional players and may not have the size or scale to handle large geographically-distributed business.")

With regard to paper manufacturers, some large companies purchase paper through Defendants and others purchase directly from a manufacturer. *Id.* 2305-06. Dr. Shapiro included sales of paper that are made through Defendants toward Defendants' revenue. *Id.* In these situations, Staples or Office Depot distributes the paper. *Id.* at 2306. "In cases where the paper manufacturer directly sells and delivers the paper to the customer," Dr. Shapiro "attribute[d] the sales to the paper manufacturer." *Id.* Thus, the Court is satisfied that Dr. Shapiro's treatment of Tier 1 diversity suppliers and some paper manufacturer's revenue is consistent with commercial realities and does not overstate Defendants' market shares.

### 3. Dr. Shapiro accounted for leakage in his analysis

Finally, Defendants contend that Dr. Shapiro did not adequately account for "leakage" in his market share analysis. *Id.* ¶ 129. Leakage refers to unreported discretionary employee purchases of office supplies. Shapiro Report at 018. Dr. Shapiro requested an estimate of leakage from the Fortune 100. Shapiro Report at 019. Of the eighty-one companies included in his market-share analysis, twenty-six reported on leakage. *Id.* Appendix E. Twelve of the twenty-six indicated that leakage spend was "*de minimis*" or "immaterial". PX06300, Ex. RC2. In

these cases, Dr. Shapiro assumed that one percent of the companies' spend on office supplies was leakage. Defs.' FOF ¶ 129.

Testimony from fact witnesses during the hearing made it clear that even the largest companies in the world are either not concerned enough about leakage to track it or do not have a reliable way of tracking it. *See e.g.* Hrg Tr. 344:2-4 (AEP: "We have a methodology [to track leakage] which is an audit process which is ran [sic] on a monthly basis. We choose not to include office supplies every month."); 464-65 (McDonalds became aware of how to track leakage through "P-card" spend during communications with the FTC in this case; and "data for the P-cards really wasn't available to procurement, at least we weren't aware of that.").[13] These same companies have tremendous incentive to ensure that their employees spend on contract. Purchases made by employees online or from a brick and mortar store are ███████ to ██████ percent higher than the contract price paid by large companies. Shapiro Report at 019. Most companies with a primary-vendor contract have an official policy that requires employees to purchase office supplies

---

[13] "P-Cards" or "procurement cards" are the equivalent of company credit cards that allow goods to be purchased without using a traditional purchasing process.

through the contract. *See e.g.*, Hrg Tr. 464-65 (McDonalds'
policy is that corporate stores must purchase on contract
through Office Depot). Best Buy produced a video to educate
employees about the benefits of buying on contract. *Id.* 1212-
1214.

For all of these reasons, the Court is confident that Dr.
Shapiro accounted for any impact leakage has on Defendants'
market shares in this case.

## G. Conclusion regarding Plaintiffs' market share analysis

Plaintiffs have met their burden of showing that the merger
would result in "undue concentration" in the relevant market of
the sale and distribution of consumable office supplies to large
B-to-B customers in the United States. The relevant HHI would
increase nearly 3,000 points, from 3270 to 6265. These HHI
numbers far exceed the 200 point increase and post-merger
concentration level of 2500 necessary to entitle Plaintiffs to a
presumption that the merger is illegal. The Court rejects
Defendants' arguments in opposition to Dr. Shapiro's market
analysis for the reasons discussed in detail in Section IV.F
*supra*. Nevertheless, to strengthen their *prima facie* case,
Plaintiffs presented additional evidence of harm, which the
Court analyzes next.

## H. Plaintiffs' evidence of additional harm

Sole reliance on HHI calculations cannot guarantee litigation

victories. *Baker Hughes*, 908 F.2d at 992. Plaintiffs therefore highlight additional evidence, including bidding data ("bid data"), ordinary course documents, and fact-witness testimony. This additional evidence substantiates Plaintiffs' claim that this merger, if consummated, would result in a lessening of competition.

Mergers that eliminate head-to-head competition between close competitors often result in a lessening of competition. *See* Merger Guidelines § 6 ("The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition."); *see also Heinz*, 246 F.3d at 717-19; *Swedish Match*, 131 F. Supp. 2d at 169; *Staples*, 970 F. Supp. at 1083. Plaintiffs' evidence supports the conclusion that Defendants compete head-to-head for large B-to-B customers.

### 1. Bidding Data

Dr. Shapiro analyzed five sets of bid data including: (1) Defendants' win-loss data; (2) data on Defendants' top wins and top losses; and (3) Fortune 100 bid data. Pls.' FOF ¶ 109. Defendants often bid against each other for large B-to-B contracts. *See, e.g.*, PX05028 (ODP) at 001 (of five bids for ███████'s RFP, Staples and Office Depot had the best bids); PX05255 (ODP) at 001 ("It is down to OD and Staples"); PX02167 (Orszag Dep. 173:11-18, 194:23-195:10) ("We do observe in the

data that [Staples and Office Depot] are often the last two bidding against each other for the - for large customers as well.").

The bid data also shows that Defendants win large B-to-B customer bids more frequently than other bidders. Hrg Tr. 2334:10-21. The B-to-B contract market accounts for approximately thirty-five percent of Defendants' sales. Compl. ¶¶ 29 and 30. According to Dr. Shapiro, the sale of consumable office supplies accounts for about ███████ percent of Defendants' B-to-B customer revenues. Shapiro Report at 006. Staples CEO Mr. Sargent describes the B-to-B contract business as a "cornerstone" of Staples' business. PX04023 (SPLS) at 005 ("This year, [B-to-B sales] will account for almost 40% of company sales . . ."); PX 04630 (SPLS) at 007 (for B-to-B, Staples is the "clear industry leader and gaining share") (emphasis in original). In fact, seventy-eight percent of Office Depot bid losses are to Staples. PX06500 (Shapiro Demonstrative) at 048. Similarly, eighty-one percent of Staples' bid losses were to Office Depot. *Id.* at 049. Defendants compete aggressively for the others' business, exemplified by Staples' 2014 "Operation Take Share," a campaign that sought to capture some of Office Depot's market share. PX04432 (SPLS) at 003.

## 2. Ordinary Course Documents

Defendants' own documents created in the ordinary course of their business show that Defendants view themselves as the most viable office supply vendors for large businesses in the United States. *See, e.g.* PX04082 (SPLS) at 029 ("[T]here are only two real choices for them. Us or Them."); PX04042 (SPLS) at 024; PX05311 (ODP) at 001. Not surprisingly, Defendants view themselves as each other's fiercest competition. *See, e.g.,* PX04322 (SPLS) at 001 (identifying only Office Depot as "Key Competitor[]"); PX04414 (SPLS) at 008 ("For core office supplies we often compare ourselves to our most direct competitor, ODP"); PX05229 (ODP) at 149 (stating that Staples is Office Depot's "[t]oughest and most aggressively priced national competitor.").

Defendants consistently compete head-to-head with each other to win large B-to-B contracts. For example, in early 2015, HPG began negotiations with Staples. Hrg Tr. 1896:9-1898:14, 1901:2-16. Staples' initial price reduction was retracted until Office Depot was invited to bid. *Id.* Pitting Defendants against each other, HPG received substantial price concessions from both. *Id.* In November 2014, Staples increased its up-front payment to ███████████████████ to $██████████ to prevent ████ from switching to Office Depot. PX04034 (SPLS) at 001. In March 2014, ███████ engaged the Defendants in multiple rounds of bidding. PX05234 (ODP) at 001). Ultimately, Office

Depot could not meet the six percent core list savings necessary to win the contract from Staples. *Id.*

### 3. Fact Witness Testimony

Large B-to-B customers view Defendants as their best option for nationwide sale and delivery of consumable office supplies. *See e.g.* Hrg Tr. 225:25-226:5 (AEP: "Q: And after Office Depot and Staples, what's the -- what's the next best option after that? A: Then we're in trouble. We don't have a good - I don't think we have a good option after that."); 1205:17-20 (Best Buy "Q: So today Best Buy has a contract with Office Depot. Who does Best Buy consider to be its next best option for general office supplies and copy paper? A: Staples."); 1938:14-1939:18 (HPG "There's two nationally capable office supply vendors, from our perspective. One is Staples and one is Depot. And they control, roughly -- when I say control, they own 80 percent of the market in terms of revenue."); 361:2-21, 373:9-15; 492:3-7 (McDonalds' noting its consideration of Staples and Office Depot, but ultimately did not invite Staples to submit an RFP because the company was able to "recognize immediate savings" by not going through an expensive bid process.); 1018:1-13 (Select Medical, a company that contracts with Office Depot, testified that it has concerns about the merger going through because "I believe it's important to have that competition to be able to properly service our national footprint, our national presence, and to

60

also be able to provide the best possible pricing."). This testimony shows that absent Office Depot, large B-to-B customers would lose tremendous leverage and likely have to pay higher prices for consumable office supplies. Shapiro Report at 009-10.

This additional evidence strengthens Plaintiffs' claim that harm will result in the form of loss of competition if Staples is permitted to acquire Office Depot.

## I. Defendants' response to Plaintiffs' *prima facie* case

Defendants' sole argument in response to Plaintiffs' *prima facie* case is that the merger will not have anti-competitive effects because Amazon Business, as well as the existing patchwork of local and regional office supply companies, will expand and provide large B-to-B customers with competitive alternatives to the merged entity. Defs.' FOF ¶¶ 132-203. Plaintiffs argue that there is no evidence that Amazon or existing regional players will expand in a timely and sufficient manner so as to eliminate the anticompetitive harm that will result from the merger. Pls.' FOF ¶¶ 152-207. For the reasons discussed below, Defendants' argument that Amazon Business and other local and regional office supply companies will restore the competition lost from Office Depot is inadequate as a matter of law.

"The prospect of entry into the relevant market will alleviate concerns about adverse competitive effects only if

such entry will deter or counteract any competitive effects of concern so the merger will not substantially harm customers." Merger Guidelines § 9. Even in highly concentrated markets, Plaintiffs' *prima facie* case may be rebutted if there is ease of entry or expansion such that other firms would be able to counter any discriminatory pricing practices. *Cardinal Health*, 12 F. Supp. 2d at 54-55. Defendants carry the burden of showing that the entry or expansion of competitors will be "timely, likely and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern." *H&R Block*, 833 F. Supp. 2d at 73. The relevant time frame for consideration in this forward looking exercise is two to three years. Hrg Tr. 2660-2662 (Dr. Shapiro confirming that two to three years is the relevant temporal scope for the Court to consider the effects of new entrants or expansion of existing competitors).

### 1. Amazon Business

Defendants seize on Amazon's lofty vision for Amazon Business to be the "preferred marketplace for all professional, business and institutional customers worldwide" to support their contention that Amazon not only wants to take over the office supply industry, but desires to "take over the world." Hrg Tr. 3010 (Ms. Sullivan's Closing Argument). Amazon Business may eventually transform the B-to-B office supply space. *See e.g.*

DX05284 at 43 (Mr. Wilson's 2016 presentation in Baltimore:
"It's still Day One." Amazon Business plans to "improve with:
more selection; an increasing number of produce and business
products [sic]; better personalization; a purchasing experience
even better tailored for businesses."); Hrg Tr. 2662: 9-14. The
Court's unenviable task is to assess the likelihood that Amazon
Business will, within the next three years, replace the
competition lost from Office Depot in the B-to-B space as a
result of the proposed merger.

Amazon Business has a number of impressive strengths. For
example, Amazon Business already enjoys great brand recognition
and its consumer marketplace has a reputation as user-friendly,
innovative and reliable. Amazon Business' strategy documents
also reveal a number of priorities that, if successful, may
revolutionize office supply procurement for large companies. For
example,



DX05033 at 4.

Hrg Tr. 710:22-23. Amazon is also working

████████████████████, among other innovative technologies. Hrg Tr. 567:23-568:2; 724:11-25; 744:1-23.

However, several significant institutional and structural challenges face Amazon Business. Plaintiffs point to a long list of what they view as Amazon Business' deficiencies, including, but not limited to: (1) lack of RFP experience; (2) no commitment to guaranteed pricing ████████████████████; (3) lack of ability to control third-party price and delivery; (4) inability to provide customer-specific pricing; (5) a lack of dedicated customer service agents dedicated to the B-to-B space; (6) no desktop delivery; (7) no proven ability to provide detailed utilization and invoice reports; and (8) lack of product variety and breadth. Pls.' FOF ¶ 191. Although Amazon Business may successfully address some of these alleged weaknesses in the short term, the evidence produced during the evidentiary hearing does not support the conclusion that Amazon Business will be in a position to restore competition lost by the proposed merger within three years.

First, despite entering the office supply business fourteen years ago, large B-to-B customers still do not view Amazon Business as a viable alternative to Staples and Office Depot. PX07518 (Amazon) at 001 ("Our customers tell us that ██████ ████████████████████████████████████████ ████████████████████████████.") . Moreover, Amazon

Business' participation in RFPs has been "limited." Hrg Tr.
546:18-547:4; *see also* 1943:14-1947:9 (HPG)(noting that HPG's
membership and advisory board would require proof of Amazon
Business' demonstrated success in serving large B-to-B customers
before considering Amazon Business as a primary vendor).
Signficantly, Amazon Business also has yet to successfully bid
to be a large B-to-B customer's primary vendor. Hrg Tr. 551:11-
13; *see also* Hrg Tr. 206-207 (AEP)(testifying that Amazon
Business did not have all services required to be its primary
vendor when it was considered by AEP in 2015). When Amazon
Business has participated in RFPs, ███████████████████
███████████. *Id.* 551:11-552:5; 851:21-852:8; McDevitt Dep.
186:6-16 (Amazon's prices to █████ were █% higher than lowest
bid).

   The Court has considered whether Amazon Business' newly
energized focus on the B-to-B space could transform the office
supply industry for B-to-B customers in such a dramatic way that
the RFP process may be "what dinosaurs do" in the future. Hrg
Tr. 2693:19-2694:9 (Ms. Sullivan's cross of Dr. Shapiro: "You
know Dr. Shapiro, [Amazon Business] intends to make the RFP
process obsolete.). However, during Mr. Wilson's deposition, he
testified that Amazon Business does not seek to change the RFP
process. PX02125 (Wilson Dep. 193:10-194:1). During cross-

examination, Defendants addressed this point with Mr. Wilson

directly:

> **Ms. Sullivan:** And anybody that's been watching what's
> been going on in the world understands that the way
> the old companies are doing things, running around,
> trying to get RFPs and a contract is kind of the old
> world. The new world is going to be procurement
> officers sitting at their desks using platforms like
> the one you're developing?
>
> **Mr. Wilson:** I don't know -- I mean, that's maybe one
> vision of what may happen. We'll see how the
> technology sort of evolves and where things land.
>
> **Ms. Sullivan:** But that's your plan, that that's going
> to be the new world?
>
> **Mr. Wilson:** Well, our plan is to bring Amazon Business
> shopping experience to customers. And we would like
> for them to be able to -- to leverage it, and we would
> like to create a solution that they like.

Hrg Tr. 692:11-25. Mr. Wilson's testimony does not support

the conclusion that Amazon Business seeks to make the RFP

process obsolete. Defendants did not offer testimony from

other industry experts or offer any other credible evidence

that the RFP process will become obsolete within the next

three years. The evidence before the Court simply does not

support a finding that Amazon Business will, within the

next three years, either compete for large RFPs in the same

way that Office Depot does now, or so transform the

industry as to make the RFP process obsolete.

Second, Amazon Business' marketplace model is at odds with

the large B-to-B industry. Similar to Amazon's consumer

marketplace, half of all sales on Amazon Business are serviced
by Amazon directly, while the other half are serviced by third-
party sellers. Hrg Tr. 552. Amazon does not control the price or
delivery offered by third-party sellers. *Id.* 842:14. Mr. Wilson
confirmed that this will not change. *Id.* 843: 7-9 ("Q: You have
no plans to force the third parties to offer particular prices?
A: No, we'll never do that. No."). Amazon Business' lack of
control over the price offered by third-party sellers
contributes to Amazon Business' inability to offer guaranteed
pricing. Mr. Wilson also testified that Amazon Business will not



. Hrg Tr. 849:9-12

). The evidence thus shows that Amazon Business'

, guaranteed pricing is

not feasible at this time, and

. Absent

these features, which are fundamental to the current office
supply industry for large B-to-B customers, the record is devoid
of evidence to support the proposition that large business would
shift their entire office supply spend to Amazon Business in the
next three years.

Finally, although Amazon Business' 2020 revenue projection
is an impressive $            , only            percent of that

is forecast to come from the sale of office supplies. Hrg Tr.
856:5-16; PX 06300 (Shapiro Reply) at 028. This level of revenue
for office supplies would give Amazon Business only a very small
share in the relevant market. Shapiro Hrg Tr. 2432:11-19;
2436:15-19 (Dr. Shapiro: "So, in the end, no, I don't think over
the next two years or so that they will - are likely to step in
and provide sufficient additional competition to protect large
customers . . . ."). Further, Amazon Business' 2020 forecast ██

████████████████████████████████████████████████████ ,

in part because ███████████████████████████████████████

██████████    Hrg Tr. 579:15-581:4; 719:25-720:3; 720:22-721:24,
856:5-13. Even the launch of ████████████████ is uncertain
due to ███████████████████ . Park Dep. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ ; Hrg
731:17-732:1 (testifying that ████████████████████████████

██████████ ).

At the conclusion of Mr. Wilson's testimony, the Court
asked whether, ███████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████ Hrg Tr.
859:10-16. Mr. Wilson answered "████████████████████████

████████████████ " Id. at 859:22-23. Similarly, during

Mr. Wilson's testimony about Amazon Business' ability to compete for RFPs, the Court engaged in this exchange:

> **THE COURT:** So, if one were to predict -- if a vice president were to predict five years from now, you'd be in a much better position to respond, just predicting?
>
> **THE WITNESS:** That's our point, yes.
>
> **THE COURT:** Right. And that -- the strength of that prediction is based upon what?
>
> **THE WITNESS:** Investment in resources.
>
> **THE COURT:** Right. And that's something that, I guess from a business point of view, you plan to do?
>
> **THE WITNESS:** I plan to request the resources.
>
> **THE COURT:** Right. Because you want to be as successful as you possibly can and compete, right?
>
> **THE WITNESS:** Absolutely.

Hrg Tr. 553:1-17.

Critically, however, when the Court asked whether Mr. Wilson █████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ *Id.* at 860 1-3. This answer, considered in light of Amazon Business' lack of demonstrated ability to compete for RFPs and the structural and institutional challenges of its marketplace model, leads the Court to conclude that Amazon Business will not be in a position to compete in the B-to-B space on par with the proposed merged entity within three years. Just as it would be "pure

speculation" for an Amazon Business employee to give a date certain for ███████████████████████████, it would be sheer speculation, based on the evidence, for the Court to conclude otherwise. If Amazon Business was more developed and Mr. Wilson ████████████████████████████████ ██████████████████████████████████████ █████████████████████, the outcome of this case very well may have been different.[14]

### 2. WB Mason and other competitors

Brief discussion is necessary with regard to the ability of existing competitors to fill the competition gap that would be left in the wake of this merger. WB Mason is the third largest office supply company in the U.S., but is a distant third behind Defendants, retaining less than one percent market share in the relevant market. PX03021 (WB Mason Decl.) ¶ 6. WB Mason has nine customers in the Fortune 1000. Hrg Tr. 1611:21-1611:24. WB Mason and other regional and local office supply vendors are at a

---

[14] Throughout the hearing Defendants argued that the FTC's declaration drafting process, especially as it pertained to Mr. Wilson, was "wrong." Hrg Tr. 3016:11-14. As is routine in antitrust cases, the FTC began drafting declarations based on the interviews that were conducted. The companies and the FTC then engaged in a back-and-forth process of edits. Some companies found the FTC's drafts to be accurate, others, like Amazon, sought significant edits. Although the Court expressed its concern about this process at various times during the hearing, no evidence of an improper motive on the part of the FTC was ever presented. Hrg Tr. 3016-3018.

competitive disadvantage because they do not have the resources to serve large customers nationwide. *Id.* at 1601: 3-8, 1687:13-22, 1697:2-8. Although WB Mason is confident in its ability to compete with Staples in Masonville, it does not bid on large RFPs outside of Masonville. Hrg Tr. (Meehan "We'll respond to RFPs that are inside of Masonville, that are headquartered in Masonville, that the majority of the business is inside of Masonville.").

It is significant that WB Mason does not have the desire or the ability to compete with the merged entity outside of Masonville. Pls.' FOF ¶ 44. As WB Mason's CEO Mr. Meehan testified, "we don't have any plans to expand [outside of Masonville] . . . We're going to focus on Masonville." Hrg Tr. Meehan, 1671. After establishing that it would take ████████ for WB Mason to expand nationwide, the Court asked Mr. Meehan "If [Defendants] gave you $██████, would you accept it to be competitive with them?" He answered "I don't know if I would. That's a big challenge. I mean, that's if I even want to do this, right? Become this. I - no, I would definitely think about it, Your Honor." *Id.* 1790.

Like WB Mason, other regional and local office supply companies also face the structural disadvantage of purchasing from wholesalers instead of manufacturers. *Id.* Hrg Tr. 1584:23-1585:2. This means their costs are higher than those of

Defendants. Further, because their overall volumes are lower, they cannot offer the deep discounts that Defendants are able to offer. Pls.' FOF ¶ 168. There was simply no other evidence presented during the hearing that supports Defendants' assertion that utilizing a collection of regional or local office supply companies would meet the needs of large B-to-B customers.

## J. Weighing the Equities

Although Plaintiffs are entitled to a presumption in favor of injunctive relief for the reasons discussed, Section 13(b)'s "public interest" standard still requires the Court to weigh the public and private equities of enjoining the merger. *Heinz*, 246 F. 3d at 726. The public interests to be considered include: (1) the public interest in effectively enforcing antitrust laws; and (2) the public interest in ensuring that the FTC has the ability to order effective relief if it succeeds at the merits trial. *See e.g. Sysco*, 113 F. Supp. 3d at 86. Both factors weigh in favor of granting Plaintiffs' Motion for Preliminary Injunction.

First, the "principle public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in the effective enforcement of the antitrust laws." *Swedish Match*, 131 F. Supp. 2d at 173. Because the law is clear that this merger is likely to lessen competition in the relevant market, it is in the public's interest for the merger to be enjoined. Second, preserving the FTC's ability to order

effective relief after the administrative hearing also weighs in favor of enjoining the proposed merger. As discussed at some length during the parties' summations, it is "impossible to recreate pre-merger competition" if the parties are allowed to merge pending the administrative hearing. *Sysco*, 113 F. Supp. 3d at 87 (quoting *Swedish Match*, 131 F. Supp. 2d at 173); *see also* Hrg Tr. (Ms. Reinhart: "There's no doubt about it, the eggs would be scrambled. Once that happens, it's very difficult to get the companies apart."). Thus, the second public interest consideration also weighs in favor of enjoining the merger.

Defendants argue that the equities favor allowing the merger to proceed because "it is undisputed that the overwhelming majority (more than 99%) of B2B customers and *all* retail customers will benefit—or at least not be harmed—from this merger." Defs.' FOF ¶ 297. This argument is the same as Defendants' argument in opposition to Plaintiffs' alleged relevant market, for which Defendants cite no persuasive authority. The Court rejects the argument for the same reasons discussed in Section IV.C.2. *supra*.

Because Defendants have not made a showing of public equities that favor allowing the merger to proceed immediately, the Court should go no further because "[w]hen the Commission demonstrates a likelihood of ultimate success, a counter showing of private equities alone [does] not suffice to justify denial

of a preliminary injunction barring the merger." *F.T.C. v. Whole Foods Mkt., Inc.,* 548 F.3d 1028, 1050 (D.C. Cir. 2008) (quoting FTC v. *Weyerhaeuser,* 665 F. 2d 1071, 1083 (D.C. Cir. 1981).[15]

## V. Conclusion

As Judge Mehta observed in *Sysco,* "There can be little doubt that the acquisition of the second largest firm in the market by the largest firm in the market will tend to harm competition in that market." 113 F. Supp. 3d at 88 (quoting J. Tatel in *Whole Foods,* 548 F.3d at 1043). The Court concludes that Plaintiffs have met their burden of showing by a "reasonable probability" that Staples' acquisition of Office Depot would lessen competition in the sale and distribution of consumable office supplies in the large B-to-B market in the United States. The evidence offered by Defendants to rebut Plaintiffs' showing of likely harm was inadequate as a matter of law. Plaintiffs have therefore carried their ultimate burden of showing that they are likely to succeed in proving, after a full administrative hearing on the merits, that the proposed merger "may be

---

[15] Defendants bear the burden of showing that any proposed remedy would negate any anticompetitive effects of the merger and that their claimed efficiencies are: (1) merger specific; and (2) reasonably verifiable by an independent party. *H&R Block,* 833 F. Supp. 2d at 89. Because Defendants rested at the close of Plaintiffs' case-in-chief and called no witnesses to support their arguments related to remedies or efficiencies, they have not met their burden.

substantially to lessen competition, or to tend to create a monopoly" in violation of Section 7 of the Clayton Act.

For the reasons discussed herein, Plaintiffs' Motion for Preliminary Injunction is GRANTED. A separate order accompanies this Memorandum Opinion.

SO ORDERED.

Signed: **Emmet G. Sullivan**
        **United States District Judge**
        **May 10, 2016**