UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | ) |
| | ) |
| **et al.,** | ) Civil Action |
| | ) No. 15-2115 |
| **Plaintiff,** | ) |
| | ) Monday, March 21, 2016 |
| **v.** | ) 9:51 a.m. |
| | ) |
| **STAPLES INC., et al.,** | ) Washington, D.C. |
| | ) |
| **Defendants.** | ) |

**DAY 1 - MORNING SESSION**
*TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING PROCEEDINGS*
*BEFORE THE HONORABLE EMMET G. SULLIVAN,*
*UNITED STATES DISTRICT COURT JUDGE*

**APPEARANCES:**

For Plaintiff Federal      **Tara L. Reinhart, Trial Attorney**
Trade Commission:          FEDERAL TRADE COMMISSION
                           Bureau of Competition
                           400 Seventh Street, NW
                           Washington, DC 20024
                           (202) 326-2638
                           Email: Treinhart@ftc.gov

                           **Charles A. Loughlin, Trial Attorney**
                           FEDERAL TRADE COMMISSION
                           400 7th Street, SW
                           Washington, DC 20024
                           (202) 326-2114
                           Fax: (202) 326-2286
                           Email: Cloughlin@ftc.gov

                           **Peter Colwell, Trial Attorney**
                           FEDERAL TRADE COMMISSION
                           400 7th Street, SW
                           Washington, DC 20024
                           (202) 326-3362
                           Fax: (202) 326-2286
                           Email: Pcolwell@ftc.gov

APPEARANCES:  Cont.

For Plaintiff Federal        Stelios S. Xenakis, Trial Attorney
Trade Commission:            FEDERAL TRADE COMMISSION
                             400 7th Street, SW
                             Washington, DC 20024
                             (202) 326-2821
                             Fax: (202) 326-2286
                             Email: Sxenakis@ftc.gov

                             Stephanie Greco, Trial Attorney
                             FEDERAL TRADE COMMISSION
                             400 7th Street, SW
                             Washington, DC 20024
                             (202) 326-3044
                             Fax: (202) 326-2286
                             Email: Sgreco@ftc.gov

For Plaintiff                Catherine Anne Jackson, Trial
District of Columbia:        Attorney
                             OFFICE OF THE ATTORNEY GENERAL FOR
                             THE DISTRICT OF COLUMBIA
                             441 Fourth Street, NW
                             Suite 600 South
                             Washington, DC 20001
                             (202) 442-9864
                             Fax: (202) 741-0655
                             Email: Catherine.jackson@dc.gov

For Defendant                Diane P. Sullivan, Esq.
Staples, Inc.:               WEIL GOTSHAL & MANGES, LLP
                             301 Carnegie Center
                             Suite 303
                             Princeton, NJ 08540
                             (609) 986-1120
                             Email: Diane.sullivan@weil.com

                             Eric S. Hochstadt, Esq.
                             WEIL, GOTSHAL & MANGES LLP
                             767 Fifth Avenue
                             New York, NY 10153
                             (212)310-8538
                             Fax: (212)310-8007
                             Email: Eric.hochstadt@weil.com

APPEARANCES:   Cont.

For Defendant Office
Depot:

**Matthew James Reilly, Esq.**
SIMPSON, THACHER & BARTLETT LLP
900 G Street, NW
9th Floor
Washington, DC 20001
(202) 636-5566
Fax: (202) 636-5502
Email: Matt.Reilly@stblaw.com

**Andrew McHie Lacy, Esq.**
SIMPSON, THACHER & BARTLETT LLP
900 G Street, NW
9th Floor
Washington, DC 20001
(202) 636-5505
Fax: (202) 220-7702
Email: Alacy@stblaw.com

**John Lawrence Goheen III, Esq.**
SIMPSON, THACHER & BARTLETT LLP
900 G Street, NW
9th Floor
Washington, DC 20001
(202) 636-5567
Fax: (202) 636-5502
Email: John.goheen@stblaw.com

**Nathaniel Preston Miller, Esq.**
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, DC 20001
(202) 636-5576
Preston.miller@stblaw.com

For Interested Party
Amazon:

**William Leitzsey Monts, III, Esq.**
HOGAN LOVELLS, L.L.P.
555 13th Street, NW
Washington, DC 20004-1109
(202) 637-6440
Fax: (202) 637-5910
Email:
William.monts@hoganlovells.com

**APPEARANCES:  Cont.**


**Court Reporter:**               **Scott L. Wallace, RDR, CRR**
                                 **Official Court Reporter**
                                 U.S. District Court for the District
                                 of Columbia
                                 333 Constitution Avenue, NW
                                 Room 6503
                                 Washington, DC 20001
                                 (202)354-3196
                                 Email: Scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                               **Page**

OPENING STATEMENT ON BEHALF OF THE GOVERNMENT          9

OPENING STATEMENT ON BEHALF OF DEFENDANT STAPLES       57

## EXHIBITS

**DESCRIPTION**                                              **Page**

1       <u>**MORNING SESSION, MARCH 21, 2016**</u>

2  (9:51 a.m.)

3       THE COURTROOM CLERK:  Your Honor, this is civil action

4  15-2555, Federal Trade Commission, et al., versus Staples, Inc.,

5  et al.

6       Will parties please come forward to the lectern and

7  introduce yourselves for the record.

8       MS. REINHART:  Good morning, Your Honor.  Tara Reinhart

9  for the plaintiffs, Federal Trade Commission.  With me at the

10  table today, I have Chuck Loughlin, Stellios Xenakis,

11  Peter Colwell, Stephanie Greco; and for the District of Columbia,

12  Catherine Jackson.

13       THE COURT:  All right.  Good morning, Counsel.

14       MS. SULLIVAN:  Good morning, Your Honor.  Dianne Sullivan

15  for Staples, and with me today is my colleague Eric Hochstadt.

16       THE COURT:  All right.  Good morning.

17       MR. REILLY:  Good morning, Your Honor.  Matt Reilly on

18  behalf of Office Depot.  With me is my colleague Andy Lacy.

19       THE COURT:  All right.  Good morning, Counsel.

20       With respect to the videotaped deposition witnesses, I'm

21  going to direct that the parties exchange information about who

22  those people are by 5:00 today.  I want to hear something, very

23  brief argument with respect to the defendants' objection to the

24  plaintiffs' highlighting testimony in an order other than which

25  it appears in the depositions; other than chronological, I

```
1    believe.
2           MR. LACY:  Good morning, Your Honor.
3           THE COURT:  What's the problem with that?
4           Yes?
5           MR. LACY:  So, Your Honor, we think that the testimony
6    should come in as it was taken.  We don't know, for instance, if
7    our counter-designations will come after the actual designations
8    made by the plaintiffs.  If that comes in in chronological order
9    in the manner in which the testimony was actually taken, we will
10   be assured that that happens.  And otherwise, we have no idea in
11   what -- you know, what order the FTC plans on playing that
12   testimony; and, quite frankly, we think that, you know, it's a
13   manipulation of the evidence, and it ought to come in in chron
14   order.
15          THE COURT:  But you have a chance -- what do you mean
16   manipulation of the evidence?  If they're highlighting portions,
17   why shouldn't I allow either side to highlight portions that you
18   think are highly relevant?
19          MR. LACY:  Well, and we agree.  They've highlighted
20   portions they think are relevant; we've highlighted portions that
21   we think are relevant as counter-designations, but all that
22   should come in as the evidence was taken in the deposition with a
23   proposed --
24          THE COURT:  Well, Counsel, how are you prejudiced?
25          MR. LACY:  Well, we don't know the order in which they're
```

1      organizing their testimony.  We've countered-designated --

2           THE COURT:  Well, suppose I tell them to tell you before

3      they introduce it?

4           MR. LACY:  That would certainly be helpful if we had that.

5      But, you know, it would be a lot easier and more efficient from

6      our perspective if we could just play the video clips.

7           THE COURT:  It will apply to both sides.  What's the

8      problem with that, Counsel?

9           MS. REINHART:  Your Honor, actually we are providing

10     what's called a clip report of the videos.  We just had not

11     gotten to them yet, the one that has them, in the order.

12          THE COURT:  Just share it among yourselves.  That's fine.

13          MS. REINHART:  Thank you, Your Honor.

14          THE COURT:  All right.  Okay.  Do I need to set times or

15     can you work it out?

16          MS. REINHART:  I'm confident we'll work it out, Your

17     Honor.

18          THE COURT:  All right.  All right.

19          Let me just say this:  There's a lot of interest on the

20     part of the parties and nonparties to sealing, as appropriate,

21     certain confidential proprietary information, and I appreciate

22     that; I recognize that also.  I'm also aware of the Hubbard

23     factors and the Court's preference that the public has a right to

24     know information that's not confidential.

25          So if a party is seeking protection or sealing of

1    information, either a party or a nonparty, you have to deliver a
2    hard copy of whatever the exhibit is with proposed redactions so
3    that we know exactly what you're seeking to protect and the
4    reason for that.  I mean, otherwise, if you just tell us, then
5    we've got to print out a ton of paper.
6         So I'm going to put the burden on nonparties and parties
7    at the time of filing to let us know, in hard copy format in
8    addition to your electronic filing, what it is you're seeking to
9    protect and the reasons why you're seeking to protect it from the
10   public's view.  I think that's going to assist the Court in
11   properly resolving any controversies.
12        And, you know, and, again, I don't go around threatening
13   people, but, you know, we don't have a lot of time, so it should
14   be truly confidential information that a party protects.  And
15   please don't waste our time with blanket proposed protection for
16   information that the public has a right to know.
17        That's all I have to say about that.  And I recognize that
18   I think that Amazon has filed a petition with respect to certain
19   exhibits, and I'm not sure -- I guess one interpretation would be
20   that Amazon wants all the exhibits to be kept from public view.
21   I doubt that that's what the Court is going to do, but if that's
22   Amazon's position, they should be in the position to tell us the
23   reasons why there should be a blanket protection with respect to
24   the entirety of every exhibit.  This is not going to be a secret
25   trial by any stretch of the imagination, I can assure the public

1    of that.

2         All right.

3         MR. HOLT:  Your Honor, I apologize -- {unintelligible}.

4         THE COURT REPORTER:  I'm sorry, Counsel, I can't hear you.

5         THE COURT:  Not right now, Counsel.  Let's proceed with

6    the trial.  All right.

7         MS. REINHART:  Your Honor, I'm using slides this morning,

8    and I have hard copy unredacted -- hard copy unredacted versions,

9    if it would be helpful to the Court for me to pass them up.

10        THE COURT:  Sure.  And I'm going to ask for two copies of

11   anything that's filed so we don't have to make copies for my

12   staff.

13        So do you have an extra copy for my clerk?

14        MS. REINHART:  Yes, your Honor.

15        THE COURT:  All right.  Thank you.

16        **OPENING STATEMENT ON BEHALF OF THE GOVERNMENT**

17        MS. REINHART:  May it please the Court.

18        THE COURT:  Sure, Counsel, yes.

19        MS. REINHART:  Next slide, please.

20        This is why we're here today:  Combined, Staples and

21   Office Depot sell and distribute 79 percent of consumable office

22   supplies to large business customers.  They are each other's

23   closest competitors.  Large businesses buy $2 billion a year of

24   consumable office supplies.  They buy millions of units of paper

25   clips, staplers, Post-it notes, copy paper, and the like.

1    Now, you're going to hear from the defendants that there

2  are lots of competitors for this business:  Regional vendors;

3  local vendors; consortia, which are bands of vendors that get

4  together to purchase -- or to sell, pardon me; and then Amazon.

5  But all of those companies, every single one of those companies

6  is represented on this graph right here, and if all of these

7  other alternatives that the defendants are going to talk about

8  were significant competitors, then their bars would be larger and

9  Staples and Office Depot's bars would be smaller.

10    Now, we analyzed a lot of data here.  This graph shows

11  purchases of the Fortune 100; it's a proxy for large business

12  customers more broadly.  But we didn't stop there.  We analyzed

13  sales of the actual vendors, all of these alternatives that

14  defendants say can serve these large businesses.

15    THE COURT:  This chart is dated 2014.  Is this the most

16  current information you have?

17    MS. REINHART:  The data that we had from the Fortune 100

18  customers, yes, was collected in 2015.  We have other -- other

19  analyses that are from more recent periods.

20    The other analyses confirm this one right here.

21    THE COURT:  All right.

22    MS. REINHART:  And the data show that Staples and

23  Office --

24    THE COURT:  I'm sorry to interrupt you.  Do you have a

25  chart that discloses the Fortune 100 customers for 2015?

1           MS. REINHART:  I don't have a chart that shows Fortune 100

2    in 2015 with me, Your Honor.  I think the next slide you'll see

3    is Fortune 100 from a couple years ago, actually.

4           THE COURT:  Okay.

5           MS. REINHART:  But we could put something together if it

6    would be helpful.

7           THE COURT:  Well, I think it would be helpful for the

8    Court to have the most reliable current information.

9           MS. REINHART:  Okay.

10          THE COURT:  And if there is 2015 information, I think

11   that'd be extremely helpful.

12          MS. REINHART:  So the data, regardless of the test that

13   our economist runs, show that two companies have overwhelming

14   shares of sales to the large customers.  And then, as Your Honor

15   can see here, the sales by other vendors just drop off a cliff,

16   literally; and that's because Staples and Office Depot are,

17   indeed, the two best options of vendors for large business

18   customers.  Now, you're going to --

19          THE COURT:  Can I correct something I said?  Maybe I'm

20   incorrect, because maybe what the Court should be focussed on is

21   that evidence that existed at the time the merger was announced.

22   Is that your argument?  Then that would have been early 2015,

23   right?

24          MS. REINHART:  February 2015, Your Honor.

25          THE COURT:  Right.  So the best available information as

1    of that time would have been the 2014.  Should that be the focus

2    of the Court's view?

3         MS. REINHART:  Well, I think Your Honor should focus on

4    the data that all of us have access to, and a lot of that data

5    was collected during the FTC's investigation.  We've since gotten

6    supplemental data.

7         THE COURT:  All right.

8         MS. REINHART:  But even that does not run all the way

9    through 2015, it's -- it's just the vagaries of the data.

10        THE COURT:  All right.  That's fine.  All right.

11        MS. REINHART:  Okay.  So you will hear from the defendants

12   that the Federal Trade Commission made up the relevant market

13   here.  You'll hear that Staples and Office Depot do not pay

14   attention to consumable office supplies as a category because

15   they're more focused on the other categories of products that

16   they sell.  You will hear that contracts with these large

17   business customers mean nothing, that the large customers can buy

18   from whomever they like, and that they do buy from whomever they

19   like.

20        You will hear that a lot of alternative vendors can and do

21   supply the large customers, but what you will also see in the

22   evidence, Your Honor, is that it is Staples and Office Depot that

23   are the primary suppliers to large businesses.

24        Now, this is a poster.  It's a few years old.  It was made

25   for Staples' CEO Mr. Ron Sargent.  It was made for his office in

1   2013.  It was made when Office Depot and OfficeMax were in the

2   process of merging.  The employees took the trouble of breaking

3   out sales data to each and every one of the Fortune 100 by the

4   category of the products sold, including core office supplies, as

5   Staples uses that term.

6        And then they also identified the incumbent supplier.  The

7   incumbent means the supplier that serves as the primary vendor

8   for each of these companies.  And what we see in the column under

9   incumbent is Staples, Staples, and Staples, sometimes Office

10  Depot, and sometimes OfficeMax.

11       Now, this right here is the way that Staples looks at the

12  market.  They break out the categories of products.  They track

13  them separately.  They focus on their large bills customers.

14  And, yes, indeed, these business are large.  And it's not just

15  the Fortune 100.  There are at least 1,100-plus large customers

16  that fit within our definition of the relevant market, and they

17  are sophisticated, but that's because they have more

18  sophisticated and demanding needs.  They require an office supply

19  vendor that has scale and sophistication in how they can serve

20  customers, and that's what Staples and Office Depot supply.

21       And, in fact, since they announced their merger in

22  February 2015, Staples and Office Depot have warned large

23  customers, warned them that after the merger their options for

24  vendors of office supplies will dwindle to one, as is shown in

25  this Office Depot document.  Office Depot said this just when the

1    merger was announced.

2         In April '15, Office Depot again warned a large customer.

3    The offer is time sensitive.  If and when the purchases of --

4    purchase of Office Depot is approved, Staples will have no reason

5    to make this offer.

6         Here's another one from November of 2015, just before we

7    filed our complaint.  Here Staples tells a large customer that

8    the FTC is expected to approve the acquisition; the customer

9    would never get a more competitive offer than right now.  They're

10   telling them that the benefits of competition will be eliminated

11   by the deal.

12        Next, large customers reacted to the announcement of the

13   proposed merger, and that's because they consider Staples and

14   Office Depot as their two best choices of vendors.  These large

15   customers recognize that the merger would take away competition

16   and that only one national B2B would remain if Staples/Depot

17   merger is allowed.

18        This is a slide from HealthTrust, which will testify in

19   this hearing, Your Honor.

20        Next slide, please.  This large customer that you're about

21   to see reported internally only two B2B providers.  Staples and

22   Office Depot are left in the office supplies space since the

23   merger of Office Depot and OfficeMax.  This one is from June of

24   2015.

25        Next slide.  Another one from June of 2015, the large

1    customer is concerned that the single company would eliminate any

2    and all true competition in a business-to-business distribution

3    market.  Staples' primary competitor is Office Depot/Max.  These

4    customers recognize these two vendors as their two best choices.

5         One more from February 2015.  Large customer, again,

6    expresses concern about the proposed merger, because it would

7    limit the threat of RFPs.  Now, these large business customers

8    use Requests for Proposal, and they also negotiate highly

9    individualized contracts with Staples and Office Depot.  They use

10   these processes to generate head-to-head competition between

11   Staples and Office Depot.

12        Next slide.  What you'll see in the evidence, Your Honor,

13   is that Staples and Office Depot compete fiercely against each

14   other for this segment of business, and this right here is a good

15   example.  It's a little bit redacted of customer specific and

16   Staples and Office Depot specific information.  But what happened

17   here is Office Depot was in the middle of a five-year contract,

18   and then Staples apparently offered some money to the customer

19   and forced an RFP in the middle of the contract.

20        Now, Office Depot survived that particular RFP, and then

21   Staples reappeared a few months later with more money, offering

22   more benefits, more incentives to this customer; and Office Depot

23   reports here that they were unawarded the contract in the middle

24   of the contract.  This is the kind of fierce competition that is

25   going on even today, and that benefits the large business

1    customers.

2         Of course, the defendants will say that particular example

3    was from October 2013, which they will say is ancient history.

4    There are plenty of examples from 2015, Your Honor.  Here's one,

5    an Office Depot business review where Office Depot writes,

6    "Aggressive dollar-dollar offers from Staples creating losses."

7    If it's creating losses for Office Depot, that means it's

8    creating benefits for the customers.

9         And there's another one from May of 2015.  Staples drops

10   their price during an RFP process to keep the business away from

11   Office Depot.  Again, the price is being lowered for the

12   customer.

13        And another one from July 2015, Office Depot says, "We

14   took a ton of business from Staples over the last couple of

15   weeks."  That means that they had offered a better deal and

16   customers had taken it.

17        One last example, Your Honor, from February 2015:  Staples

18   drops its price to compete with Office Depot.

19        Now, all of competitive situations that I've just shown

20   you -- and there are more -- these are the real tangible benefits

21   that customers get from the competition between these two

22   companies.  And our analyses of the data confirm that Staples and

23   Office Depot overwhelmingly bid against each other head-to-head

24   for the business of these customers.

25        And so let's look at the data.  This is an analysis of

1    RFPs that were conducted over a three-year period for the data

2    that we had.  As you can see from the red bars, Staples

3    participated in every single bid and Staples won 58 percent of

4    the time.  And as you can see from the blue bars, Office Depot

5    participated in 90 percent of bids and won 39 percent of the

6    time.

7          The next most active competitor is WB Mason.  They will

8    testify in this hearing, Your Honor.  They participated in only

9    8 percent of the bids and they won zero; and that's a regional

10   vendor, WB mason is.

11         What these data indicate is that Staples and Office Depot

12   are, indeed, their closest competitors for the sale of consumable

13   office supplies to the large businesses; and they also show that

14   post-merger, the combination of the two companies would be

15   bidding against alternatives that are currently distant third

16   choices.  You don't see the names of any other vendors on this

17   chart.  The only one that shows up is WB Mason.  And under

18   standard antitrust principles, Your Honor, that implies

19   significant harm.

20         Now, the defendants --

21         THE COURT:  Excuse me, these are bidding events to obtain

22   business from which entities?

23         MS. REINHART:  These are, again, related to the Fortune

24   100 customers, Your Honor.

25         THE COURT:  Fortune 100 customers.  Okay.

1          MS. REINHART:  What we did is we surveyed the Fortune 100

2     customers as a proxy for business more broadly, and our

3     economist, who is Professor Carl Shapiro, will explain how it is

4     an appropriate proxy.  He tested it many ways.

5          And so even though we have lots more customers in the

6     relevant market, this is just one way to get at, you know, what's

7     the competition like in this industry.

8          THE COURT:  Right.  But how do you assess the other

9     customers, the other -- the other than Fortune 100 customers, or

10    is that relevant to this?

11         MS. REINHART:  We have other analyses, Your Honor, that do

12    assess.

13         THE COURT:  Okay.

14         MS. REINHART:  Yeah.

15         THE COURT:  So according to your expert, there are only

16    three business entities competing for business from the Fortune

17    100 customers now?

18         MS. REINHART:  There were only three that showed up in

19    these particular RFP events.  They were more than 50 RFP events

20    over a three-year period for these 100 customers.

21         The previous chart that we -- the chart that we showed

22    with the bars on it actually lists a number of the other vendors.

23    There are more than that, too.  They're aggregated in the

24    categories at the bottom of the page of that bar graph.

25         THE COURT:  All right.

1      MS. REINHART:  And it's not the plaintiffs' position that

2  there are no alternatives; there are lots of suppliers.  It's

3  just that those are on the fringe, and they're so small they

4  don't have the ability to compete meaningfully.  And they don't

5  have the ability to expand post-merger to take the place of the

6  competition lost.

7      Now --

8      THE COURT:  So in other words, the government's argument

9  is they're in a bad position now, and they'll be in a worse

10 position if the merger is approved then.

11     MS. REINHART:  That pretty much says it all.  Yeah.

12     So this is, again, an analysis done by our economist, but

13 Office Depot and OfficeMax did an analysis of their own two years

14 ago during the merger investigation of those two companies.  And

15 that analysis shows that -- well, let's let the slide speak for

16 itself.

17     So two years ago, Office Depot and OfficeMax went through

18 an investigation with the FTC, and they were allowed to merge.

19 And at that time, Staples was such a strong competitor that the

20 FTC did not challenge the deal.  And that is because first, and

21 most importantly, Office Depot and OfficeMax were not each

22 other's closest competitors; Staples was.  And that was the

23 representation made by Office Depot and OfficeMax to the

24 Commission right here in these two slides.  The slides were

25 titled, "Other B2B suppliers are frequently identified as winning

1    more than 1 million plus accounts from Office Depot and

2    OfficeMax."

3        In other words, these slides are intended to show that

4    Office Depot and OfficeMax were not competing head-to-head.  But

5    what they show is that Staples, Staples was the one that was

6    participating in all these RFPs and was winning more than anybody

7    else.

8        So the data then and the data now leave no doubt that

9    Office Depot today is Staples' closest competitor; and a

10   combination of those two would leave only distant competitors

11   remaining.  We saw that in the bar chart, and we see this here.

12       Your Honor, the legal standard for granting a preliminary

13   injunction under Section 13(b) is well settled in this circuit,

14   and I need not dwell on it.

15       It should be granted where such an action would be in the

16   public interest, and that's determined by weighing the equities

17   and the plaintiffs' likelihood of success on the merits under

18   Section 7 of the Clayton Act.  And we're focused here today on

19   evidence regarding plaintiffs' likelihood of success.

20       The evidence will establish a presumption --

21       THE COURT:  Does that mean a preponderance?  I know I had

22   this discussion in the *General Electric* case.  Does that mean a

23   preponderance of the evidence, the likelihood?

24       MS. REINHART:  The Court is to weigh the probabilities.

25   And if it is probably likely that we would succeed, that is the

```
1    probabilities, it's more than 50 percent.
2            THE COURT:  It's more probable than not?
3            MS. REINHART:  More probable than not, Your Honor.
4            THE COURT:  It's a preponderance of the evidence, then?
5            MS. REINHART:  It's not a high likelihood, it's not a
6    certainty, it's just a -- it's more likely than not.  And I'm
7    happy to point to an authority that gives you the exact words.
8    Sysco has good language.
9            THE COURT:  Right.  All right.
10           MS. REINHART:  Yeah.
11           But we will establish that a presumption exists, a
12   presumption that the merger would be unlawful.  And we only have
13   to show that the merger would produce an undue share -- I'm
14   sorry, a firm controlling and undue share of the market, and then
15   a significant increase in concentration in the market.
16           Now, we're going to be presenting evidence during this
17   hearing on all of the items listed under plaintiffs' prima facie
18   case.  We have extensive evidence that corroborates our
19   presumption.  We don't need to put that on, but we're going to
20   put that on so that Your Honor can see the effects of this
21   merger.  And then, of course, the defendants would have the
22   opportunity after the close of our case to rebut the presumption,
23   and we do not see how they can do that, Your Honor.
24           Let's talk about the relevant market.
25           THE COURT:  Before you start, let me ask you.  The
```

1   proceeding before the Court is *de novo*, separate and apart from

2   the FTC proceeding.  Should the Court or not -- should or should

3   not the Court read the opinion -- was there an opinion issued by

4   the FTC with respect to the proposed merger?

5         MS. REINHART:  By the commission when it voted out --

6         THE COURT:  Right.

7         MS. REINHART:  -- the proposed merger?  There is not an

8   opinion Your Honor.  It was simply a unanimous vote that the

9   merger should be challenged.

10        THE COURT:  So they all just raised their hand, and that's

11  it; that's the record?

12        MS. REINHART:  That's the record, the public record.

13        THE COURT:  Okay.  All right.  Because I didn't think I'd

14  seen anything.

15        So if there had been a written opinion, I would assume

16  there would be hearsay, and the Court shouldn't review it.  But I

17  don't need to deal with that; it was just a vote.

18        MS. REINHART:  Right.  It's a vote.  It's an authorization

19  to bring both this preliminary injunction proceeding, as well

20  as --

21        THE COURT:  So no reasons were stated or anything?

22  There's no record of --

23        MS. REINHART:  It's just the recommendation, Your Honor.

24        THE COURT:  Right.

25        MS. REINHART:  And then a public statement that's given at

1    the time that the complaint is issued.

2         THE COURT:  Right.

3         MS. REINHART:  And then the complaint speaks for the

4    commission.

5         THE COURT:  All right.  But no reasons -- who are the

6    people who voted?  They're FTC commissioners?

7         MS. REINHART:  They're the four commissioners.  They were

8    only four.

9         THE COURT:  And who are they appointed by?

10        MS. REINHART:  Pardon me?

11        THE COURT:  Who appoints them?

12        MS. REINHART:  They represent both parties, Your Honor.

13   There would normally be three from the current administration and

14   two from the other side.

15        THE COURT:  Okay.  When you say the parties, you don't

16   mean the parties in this -- you mean both political parties; is

17   that correct?

18        MS. REINHART:  And -- Your Honor, I'm sorry.

19        THE COURT:  I'm just trying to figure out who appoints

20   these commissioners.  The president?  Are they presidential

21   appointees?

22        MS. REINHART:  Your Honor --

23        THE COURT:  I'm just not familiar.

24        MS. REINHART:  Sorry.

25        And honestly, I'm not the expert on this either, Your

1    Honor, on the commissioners and how their terms run and so forth.

2         THE COURT:  All right.  All right.  And so the

3    commissioners voted.  And did they give any reasons for their

4    decision that the merger should not be approved?

5         MS. REINHART:  Not publicly, Your Honor.

6         THE COURT:  Do they privately submit a report or

7    something?

8         MS. REINHART:  They're -- the process, Your Honor,

9    internal to the Commission is part of the deliberative process.

10   It's an investigation.  And the materials and the thought

11   processes that go into that are protected.

12        THE COURT:  All right.  All right.  Okay.  All right.

13   Thank you.

14        MS. REINHART:  Okay.

15        THE COURT:  So it all leads to there's no deference that

16   the Court needs to give to any decision, especially one not

17   accompanied by public reasons.  The Court need not give any

18   deference to that decision by the FTC, correct?

19        MS. REINHART:  It's simply an agency authorizing a

20   lawsuit.  There has been no decision other than that it -- they

21   have reason to believe that the law has been violated.  That's

22   what the decision makes, but no --

23        THE COURT:  Right.  But the question is whether or not the

24   Court is under some obligation to give any deference to that

25   decision.

1       MS. REINHART:  Not in the strict sense; no, Your Honor.

2       THE COURT:  Well, in any sense.

3       MS. REINHART:  Well, the fact --

4       THE COURT:  I would be loathed to give any deference to a

5  decision for which there are no reasons associated with it, but I

6  mean --

7       MS. REINHART:  Understood, Your Honor.

8       THE COURT:  -- but if there is some circuit case or

9  Supreme Court case that says I have to give any deference at all

10  to this --

11       MS. REINHART:  No, Your Honor, not that I'm aware.  And

12  we'll take a look during the break to see if there is.

13       THE COURT:  I doubt if there's one, saying that the Court

14  has to give deference to a decision reached merely by a showing

15  of hands for which there are no reasons given.

16       But anyway, if there is, I'll certainly read it.

17       MS. REINHART:  Right.  It is the culmination of an

18  investigation, Your Honor, and it is authority to bring a lawsuit

19  not only here in Federal Court but also within the Commission's

20  process.

21       THE COURT:  All right.  Okay.

22       MS. REINHART:  Okay.

23       So back to the relevant market.  The reason that we define

24  a relevant market is to analyze the line of commerce that would

25  be affected by the merger, and that's because the ability of

1    customers to switch to other suppliers could restrain the firm

2    from raising prices above competitive levels.

3          And so the question is, are there substitutes that would

4    allow firms to move away from the firms that are planning to

5    merge so that they could avoid a price increase.

6          And here the relevant market involves a cluster of

7    products.  We call that consumable office supplies:  Pens, paper

8    clips, pads of paper.  It's a cluster of complements.  And even

9    though a pen is not a substitute for a paper clip, it is proper

10   to analyze the potential competitive effects of the merger on

11   this cluster because all of the products in the cluster are

12   subject to similar competitive conditions.  And that means that

13   the customers who buy that cluster of products pretty much have

14   the same set of choices for vendors, nothing outside that.

15         Now, this means that whether the products are analyzed

16   separately or whether they're analyzed as a cluster, the result

17   of the analysis will be the same.  And so here the large business

18   customers have the same options of vendors for the binder clips

19   that they do for the notebooks, even though those two things are

20   not functionally substitutable.

21         So you'll hear from the defendants that the market we've

22   defined is too broad, because it includes cut sheet paper for

23   copiers and printers.  But as you'll hear from Professor Shapiro,

24   the competitive options for paper are comparable to the options

25   that customers have for binder clips and notebooks.

1          Now, defendants will also say, paradoxically, that our

2   product market is too narrow because it excludes these other

3   categories of products that Staples and Office Depot sell, like

4   janitorial, sanitary cleaning products, and break room products

5   including coffee, other furniture.

6          But the large business customers have many additional

7   choices of vendors for each of those categories than they do for

8   consumable office supplies.  And Your Honor will hear testimony

9   from customers about that in this hearing.

10          Now, the economic evidence confirms the relevant market

11   here.  Professor Shapiro will explain that he conducted the

12   hypothetical monopolist test, and I do not pretend to understand

13   how to apply that myself.  But, basically, if a price increase by

14   a hypothetical monopolist could be profitable, meaning that the

15   monopolist don't lose significant business once the price

16   increase is put in place, then the products that are

17   being sold --

18          THE COURT:  The burden is on the expert to make sure the

19   Court understands this as well, all right?

20          MS. REINHART:  Understood, Your Honor.

21          THE COURT:  I've been through this.

22          MS. REINHART:  That's his job.

23          THE COURT:  All right.

24          MS. REINHART:  Yeah.

25          So the test confirms that the product market is indeed a

1    proper one in which to study the competitive affects if indeed

2    after the price increase by the hypothetical monopolist a portion

3    of customers don't fly the coop.  And here the question is, could

4    a hypothetical monopolist profitably increase prices on these

5    customers?  And the answer is, yes.  The evidence will show,

6    because these customers have nowhere else to go.  They've got

7    Staples, Office Depot, and those fringe competitors that Your

8    Honor saw on the bar chart.

9         So let's take a closer look at the large business

10   customers.

11        This is a page from an Office Depot presentation.  It has

12   some specific information redacted about customers; but,

13   otherwise, you can see the analysis.

14        Both Staples and Office Depot routinely analyze business

15   customers based on the annual spend on the products sold by

16   Staples and Office Depot.  And each of the two companies defines

17   these categories somewhat differently, but they do it for the

18   same reasons.

19        The larger the customer, the better the pricing the

20   customer will get, will demand and get, and the more services

21   that Staples and Office Depot will have to provide.

22        So as Your Honor can see in the band that's circled in

23   red, these large customers issue formal RFPs; they centralize

24   their purchasing and their approval processes; they get up-front

25   money, cash payments from Staples and Office Depot, when they

1    sign contracts.  They're sophisticated.  They negotiate

2    specialized pricing and monetary incentives routinely with these

3    companies.

4        Now, in this proceeding, the plaintiffs define large

5    customers.  We define them as a customer that spends more than

6    $500,000 annually on consumable office supplies.

7        A line has to be drawn somewhere for purposes of analysis

8    so that we can draw some conclusions about which customers are

9    likely to be harmed here.  And Professor Shapiro will explain

10   that he drew the line at $500,000 based on the evidence he saw in

11   the record about where Staples and Office Depot draw lines

12   themselves.  And he found that Staples and Office Depot dominate

13   the sales to those customers.

14       But he tested those results, too.  He wanted to see if a

15   line could be drawn somewhere else, or should be; and so he drew

16   a new line at $250,000 worth in spend annually, and he found that

17   even those slightly smaller customers were overwhelmingly served

18   by Staples and Office Depot.

19       Now, Staples and Office Depot have this position,

20   overwhelming position in the market; because they are the ones

21   that provide the range of services that these customers require,

22   and they provide them at competitive prices.

23       Now, large customers, as I said, typically issue lengthy

24   RFPs that go for months and months and ask vendors to describe

25   their capabilities on a range of services, and they negotiate

1    highly-individualized terms of service and pricing terms after

2    that process; and that's what governs their purchases year over

3    year.

4         A variety of customers are going to testify about these

5    requirements in this hearing, Your Honor.  They all do things

6    differently.  You'll hear about their negotiations, their

7    pricing, the services, and how Staples and Office Depot are their

8    two best choices.

9         I have just a few examples of the kinds of terms that are

10   negotiated, the kinds of services that are required, Your Honor.

11   This is a part of a screenshot from a Request for Proposal from a

12   large customer in 2015.  This particular provision requires that

13   the vendor have an e-commerce Website, and there are lots of

14   terms that Your Honor will hear for this.  The one that I like to

15   use is that Staples and Office Depot provide a customized online

16   catalog.

17        THE COURT:  Right.  I have the unredacted version,

18   correct?

19        MS. REINHART:  You have the unredacted version, Your

20   Honor.

21        THE COURT:  Okay.  All right.  I just wanted to make sure

22   I'm looking at the right page.  All right.  I have it.

23        MS. REINHART:  Yes.  Staples and Office Depot work with

24   their large customers to integrate the IT systems so that the

25   customers' employees, when they log into the Website to buy their

1    office products, see only the products that are available for

2    sale to them specifically.  Now, they may see more products, but

3    they're only allowed to purchase the ones that their company has

4    included in the contract with Staples and Office Depot.

5        And they do that for a reason:  To control the spend.  The

6    companies do not want their employees out there shopping online

7    all day.  They want the employees to have a small range of

8    products at their disposal to order.  They don't want the most

9    expensive Post-it notes; they want them to buy the affordable

10   Post-it notes, for example.  And this is a big process that the

11   companies go through together to make sure that there are

12   limitations.

13       And remember that these customers purchase thousands of

14   SKUs of products.  That means thousands of different products

15   made by different manufacturers at different price points,

16   different sizes, different shapes.  And so the catalogs are

17   expensive, but they're only a fraction of what Staples and Office

18   Depot offer broadly to the retail world.  They're customized so

19   that the company can control its spend.

20       They also include, as part of this, detailed utilization

21   reports, reports on precisely what is bought.  Is it an

22   eight-pack of pens that are high-level pens, or is it a two pack

23   of pens?  And what the companies do is they track the spend.

24   They track the habits of their employees to determine is there

25   something we can do to make this more affordable?  Can we change

1    the habits?  Are we spending the money in the right places, or

2    are we buying -- sorry, this isn't an office products analogy --

3    but are we buying a Cadillac when we need a Volkswagon?  That

4    sort of thing.  And Staples and Office Depot provide the services

5    they need to help them manage this spend.

6         Another example, these customers have demanding delivery

7    requirements.  Remember that the large businesses often have

8    large footprints.  They have office facilities, production

9    facilities often, research facilities, lobbying offices all over

10   the country; and they all have different needs for office

11   supplies.

12        Staples and Office Depot offer next-day and desktop

13   delivery.  This is special.  It means that they show up at the

14   business and they don't just drop a pallet of products off at the

15   loading dock.  They actually walk into the building and deliver

16   the products that were offered directly to the person who ordered

17   them, so that the customer doesn't have to spend the time doing

18   that.  Customers might have to hire more mailroom people if they

19   have to simply unload the pallets themselves and distribute the

20   products themselves.  This is an important service and one that

21   the customers demand.

22        There are a lot of these types of terms, Your Honor, that

23   the companies negotiate for; and we have RFPs, we have contracts

24   that show the results.

25        I just have one more example in the interest of time,

1    which is this individualized pricing and incentives that I've

2    been talking about.  This is, again, just one example from an RFP

3    where the customer is demanding large online order credit, prompt

4    payment discounts, annual purchase volume rebates.  Pricing is

5    highly individualized.  There is no boilerplate.  The customers

6    negotiate all kinds of terms.  One that we see frequently is

7    something called a prebate.  A prebate gives the customer

8    basically a discount on volumes that it's expected to buy under

9    the contract.  So Staples or Office Depot will actually pay them

10   money upfront, and then if the customer doesn't meet the volume

11   threshold that's in the contract, they might have to pay some of

12   that money back.

13        They also provide what's called upfront money, which is

14   simply a cash payment.  It's a signing bonus, if you will.  There

15   are all kinds of pricing provisions in these contracts.

16        So these customers benefit from this individualized

17   pricing now, but post-merger Staples and Office Depot will not

18   have the incentive to go through this process.  They'll be a

19   combined entity at that point.  There will be no head-to-head

20   competition for all these RFP and these individualized

21   negotiations.  There won't be interruptions in the middle of a

22   contract to put out an RFP so that Staples can pay more money and

23   take a contract away from Office Depot, and then customers will

24   lose the benefits of all of this competition that we see here.

25        We've seen some of the data, Your Honor, and

1   Professor Shapiro will testify about all of the different

2   analyses that he's done.  We've also seen documents that show

3   that the customers consider Staples and Office Depot to be their

4   two best choices.  The data will show that currently the two

5   companies control 79 percent of this relevant market.  And the

6   market after the merger would be even more highly concentrated,

7   and the level of concentration is presumptively unlawful.

8           Just one illustrative chart to show you, Your Honor.  This

9   case, compared to other recent cases in Washington, D.C.; this is

10  a comparison of the increase in concentration using the

11  Herfindahl-Hirschman Index, which is a measure of concentration.

12  And, again, I don't pretend to understand how to apply that, Your

13  Honor, but Professor Shapiro will explain it very well.  And what

14  we see here is that the increase in concentration is higher than

15  any of the other cases reported here.  The combined share is

16  close to a couple of them; but, otherwise, much higher than any

17  of these other cases, and these are all cases that were enjoined.

18          Now, as I said, this evidence that I've shown you right

19  now, this establishes our presumption; but we also won't stop

20  there.  We're going to add a little evidence during this hearing

21  to show the potential effects on the customers and corroborates

22  the presumption.  We've already provided quite a few examples

23  today.

24          THE COURT:  Were there any cases in which the combined

25  share equals the percentages in any of these cases in which the

1    government did not prevail?

2         MS. REINHART:  I am not aware of any, Your Honor, but I'm

3    happy to get a firm answer for you.  It's a good question.

4         THE COURT:  Well, the standard cannot be just because the

5    government has won all these cases, then it should win this one,

6    right?

7         MS. REINHART:  No, it's not.  It's not.  I think this

8    chart shows, illustrates actually very well that the combined

9    share can actually be quite low, but because of --

10        THE COURT:  30 percent up to 70.

11        MS. REINHART:  30 percent, yeah; but because of the

12   increase in concentration, it's unlawful.

13        THE COURT:  You know what's really troubling, though --

14   and both sides have agreed that whatever the decision is, it's

15   probably going to be the final decision.  That's very troubling,

16   and I think Congress really needs to take a hard look at that

17   standard.  I think that our system of justice works best if

18   people have a meaningful opportunity to appeal whatever the

19   judgment is of the District Court.  I mean, we're going to strive

20   to do our best in every case, but there's something lacking here

21   if people don't have -- if entities and the government don't have

22   an opportunity to, in a meaningful way, you know, challenge what

23   a District Court does on an expedited basis or something; but

24   there's no -- well, there is an opportunity to file an appeal,

25   but in reality, investors aren't going to wait around; people

1    move on.

2         MS. REINHART:  Well, Your Honor, the defendants could have

3    stipulated to this proceeding and then actually had a full trial

4    as part of the administrative process.  They chose to do this

5    process instead.

6         THE COURT:  That's interesting.  So they had an

7    opportunity to stipulate to the entry of an injunction?

8         MS. REINHART:  I'm not aware of anything that would

9    prevent that, and they'll correct me if I'm wrong.

10        THE COURT:  And then proceed to an evidentiary hearing; is

11   that right?

12        MS. REINHART:  And proceed to a full trial on the merits.

13   That's the process in front of the Commission.

14        THE COURT:  Yeah, but how many months would that have

15   taken?

16        MS. REINHART:  The start date is May 10th.

17        THE COURT:  No, I mean, how -- how long would that trial

18   have taken?

19        MS. REINHART:  It can take up to 210 hours total.  That's

20   the maximum time to be split between the parties, that's four

21   weeks.

22        THE COURT:  And who says it takes up to 210?

23        MS. REINHART:  It's just in the rules, Your Honor.  We

24   don't have to take that much time.

25        THE COURT:  I mean, what rules?  Rules where?

 1    MS. REINHART:  The rules of the Commission.

 2    THE COURT:  Is that binding on the Court?  I mean, if they

 3 had opted for an evidentiary trial, it'd be binding on the Court?

 4    MS. REINHART:  I'm not sure I understand the question,

 5 Your Honor.

 6    THE COURT:  The hour limitation, would that -- I can't

 7 imagine that it'd be binding on the Court; is that right?

 8    MS. REINHART:  I don't think there's anything that would

 9 prevent the Court from expanding that time if he thought it was

10 just to do so, maybe there is.

11    THE COURT:  So you're saying there could have been an

12 option, full evidentiary hearing, but then so what?  I mean,

13 there's still no basis for an appeal, though, is there?

14    MS. REINHART:  There's an appeal process, Your Honor.  It

15 goes to the Commission first, and then it goes to the circuit of

16 the choice of the defendants.

17    THE COURT:  All right.  So in other words, in a few years

18 someone will figure out whether the District Court got it right

19 or not?

20    MS. REINHART:  Well, I think in merger cases the Courts

21 tend to work very quickly.  They understand the urgency.

22    THE COURT:  Okay.  All right.

23    MS. REINHART:  So we're turning now to what we expect to

24 see from the defendants in this hearing.  First of all, just a

25 reminder, as this Court knows well, the defendants bear the

1    burden of rebutting the presumption here; and the evidence will

2    show they cannot do so.  We expect them to make at least the

3    following --

4         THE COURT:  What's the standard for rebutting the

5    presumption?  If the government has by a preponderance to prove

6    its case-in-chief, what's the standard to rebut that?  By equal

7    evidence, or what standard?

8         MS. REINHART:  Different courts have stated it

9    differently, Your Honor.

10        THE COURT:  I understand that, but what's the prevailing

11   Supreme Court view on that?

12        MS. REINHART:  The Supreme Court view, I think there are a

13   couple of different ways that it's formulated.  And, actually,

14   what I have in mind, Your Honor, is how it's laid out in *Sysco*

15   referring to *H&R Block* and *Heinz*, which is -- there's basically a

16   sliding scale.  The stronger the presumption, the more evidence

17   that the other side has to put up.  So it could be clear in one

18   instance; it could be some evidence in others.  It's a range.

19        Let's turn to leakage.  You will hear from the defendants

20   that after this merger they would be constrained in their ability

21   to increase prices by a phenomenon that's called leakage.

22   Leakage, sometimes you'll hear it as off-contract spend, or

23   maverick spend, or rogue spend.  Basically it refers to a

24   customer's purchase of office supplies from a vendor that is not

25   its primary vendor.  In other words, the customer has a supply

1   agreement with Staples or Office Depot; but it's buying some

2   quantities of office products from a competitor, from someone

3   else.  That's called leakage.

4        Now, defendants will argue that leakage is a real thing;

5   it's a phenomenon that occurs.  And because of it, the contracts

6   that they entered, the ones that we've just spent time looking at

7   and take months to arrive at, they just don't matter and that

8   these customers actually were free to buy from anywhere; and that

9   they do.

10       But the evidence will show that both the customers, and

11  Staples, and Office Depot spend an awful lot of time on contracts

12  and the RFP process.  And if the contracts really didn't matter,

13  if they really weren't used, and leakage was so prevalent, they

14  wouldn't spend time on this process.  They wouldn't be worried

15  when Staples comes in the middle of an Office Depot contract and

16  tries to take it away.

17       And as I mentioned, the contracts include monetary

18  incentive to make sure that the customers are buying on their

19  contracts.  If they don't meet a threshold, they have to spend --

20  pay money back to Staples and Office Depot sometimes; and there

21  are other types of incentives as well.

22       But even assuming that there is some leakage in here,

23  Professor Shapiro has studied it, and it doesn't affect his

24  analysis.  In other words, no matter how you slice it, Staples

25  and Office Depot currently are the overwhelming suppliers to

1    these businesses.  It just belies the notion that there is

2    meaningful leakage that affects competition now or that would

3    affect it in the future.

4         So we have a slide that we need to black out.

5         So, Your Honor, this is an Office Depot document that

6    is -- I should turn it away -- that is tracking on a weekly basis

7    information that comes from customers about their spend.  And

8    what happens is the customers will talk to Staples and Office

9    Depot and say, my spend is going down because I had a round of

10   layoffs so we're not buying as much as we used to buy; or that

11   they have a new green initiative so they're buying less paper

12   than they used to buy.  There are all kinds of reasons.  And the

13   companies do keep track of them.  Leakage may be one of them, but

14   you're not going to see that much of this in the evidence.

15        And, in fact, many of the instances that I think we will

16   see that the defendants call leakage are actually competition

17   between these two companies.  You can see examples of that on

18   this page, at the very top of the page.  It's not leakage if

19   Office Depot loses business to Staples or if Staples loses

20   business to Office Depot.

21        You're also going to hear from the defendants that

22   customers that buy a lot of categories of products from Staples

23   or Office Depot, in addition to office supplies, can threaten to

24   move their purchases of these categories if Staples and Office

25   Depot were to raise prices on office supplies.  That's their

1     argument.  They can use it as a lever to get better pricing on

2     office supplies.

3          But as Professor Shapiro will explain, even if it's used

4     as a lever now, post-merger these customers would not get

5     satisfaction by threatening to move other categories of products

6     to a competing supplier.

7          First of all, Staples and Office Depot already considered

8     the risk that customers can move categories in the prices that

9     they offer today, and the threat doesn't become greater just

10    because the parties have merged.  What does change is that

11    post-merger the customers lose their -- the biggest threat they

12    have with these two companies, which is to move their office

13    supplies purchases somewhere because they have nowhere else to

14    go.  They have Staples, and Office Depot, and the list of fringe

15    vendors that we've seen in the beginning.

16         I think we can go back to the next screen.

17         You will hear from the defendants that the Commission's

18    decision in 2013 not to challenge the Office Depot/OfficeMax

19    merger is support for their notion that they should be able to

20    merge here today; Staples and Office Depot should be able to

21    merge.

22         Now, we already reviewed a presentation that Office Depot

23    and OfficeMax made to the FTC in 2013, and it showed that the two

24    companies were not each other's closest competitors; Staples was.

25    Office Depot and OfficeMax were the second and third largest

1     suppliers at that time.   Staples was number 1.

2         There are two other primary reasons reported in the

3     Commission's closing statement why the FTC did not challenge the

4     merger in 2013, and you'll see that closing statement from the

5     defendants.   We have some quotes from it here.

6         First, in 2013, large business customers were neutral or

7     even in favor of the combination of Office Depot and OfficeMax.

8     That's not true today.   Customers are quite concerned about the

9     number 1 and the number 2 suppliers coming together.   And you

10    will hear from a representative sample of those customers in this

11    hearing.

12        And second, the Commission never considered the deal that

13    is before us today.   It was considering the merger of the number

14    2 and Number 3.   And at that point the Commission decided that

15    there were viable alternatives that would compete against the

16    combined entity, starting with Staples, the number 1 at the time.

17    Other vendors existed to be able to compete adequately against

18    that new combined Office Depot/OfficeMax.

19        That's not the merger that's before us today.   Today we

20    have to ask the question:   Do the existing competitors have the

21    capability to expand to replace the competition that will be lost

22    if Staples and Office Depot combine, the number 1 and number 2,

23    overwhelmingly.

24        So I want to go back to the bar chart that I started with

25    this morning.

1          THE COURT:  What page, Counsel?

2          MS. REINHART:  Oh, I'm sorry.  Your Honor, it's the next

3     slide.  It's in there twice.

4          So this is the picture today, and defendants will not be

5     able to muster the evidence to show that this picture will

6     change; and that entry by new competitors or expansion by

7     existing ones would be timely, likely, and sufficient to replace

8     the competition lost.

9          The defendants bear the burden of proof on this, although

10    argue that entry is easy; because, purportedly, there are no

11    specialized assets like patents that are necessary to get into

12    this industry.  But it's not enough to show that a player may

13    enter or wants to enter, the defendants have to show that the new

14    entry would actually replace the competition lost as a result of

15    this merger.

16         Another fringe player is not going to do the trick.  A

17    slight increase in market share of a fringe player is not going

18    to be enough.  The entry has to be of a magnitude, and character,

19    and scope to be able to deter the combined entity from increasing

20    their prices to anticompetitive levels.

21         Now, entry here would require significant investment to

22    develop all the capabilities that large customers require.  These

23    capabilities include the few examples I gave and then a lot more.

24    There are a lot of -- a lot of capabilities that these two

25    companies have developed over the years to satisfy the needs of

1     the large businesses.

2          These investments would be expensive, and you will hear

3     from W.B. Mason on this topic.

4          These things also would take time.  You'll hear about that

5     as well.  And defendants also will say that the manufacturers of

6     the products that are sold, such as the Mead makes notebooks and

7     3M makes Post-It notes, the manufacturers themselves will

8     actually become direct suppliers to these large customers if the

9     combined Staples increases prices too much.  But currently, most

10    manufacturers do not sell their products direct to customers, and

11    there's no evidence that we've seen that that will change.

12         Now, Your Honor, you've heard a lot about Amazon before

13    the hearing even started.  We all know Amazon.com.  Amazon

14    Business is an entity that was created in 2015.  It's the

15    successor of a site called Amazon Supply, and that's a successor

16    of a site called SmallParts.com.  That one has been around since

17    2005.  Amazon has been selling to businesses since 2005.  Amazon

18    has been selling office supplies for even longer than that.

19         But you might not have even noticed them on the bar chart

20    that we've been looking at.  They're there, they're very small,

21    and they don't serve the needs of the large businesses.

22         Now, Amazon Business looks a lot, and acts a lot,

23    functions a lot like Amazon.com.  And Amazon.com is a

24    marketplace.  It's a place where consumers can shop from among --

25    shop for products that are offered for sale by a lot of different

1    suppliers, not just Amazon.

2         A significant portion of Amazon's products, and this is

3    true for Amazon Business as well, are offered for sale by

4    independent, third-party vendors.  And what that means is that

5    Amazon doesn't control the pricing that's set by those companies.

6    It doesn't control the quantities that are made available.

7    Instead, what Amazon Business is set up to do is to allow

8    individuals to sign in and shop, shop for products sold by lots

9    of different vendors at lots of different prices, click on the

10   shopping cart, get their free two-day shipping of orders over

11   $49, and then exit.

12        This is a screenshot that we're looking at now from a

13   promotional video from Amazon Business.  It looks a lot like the

14   consumer site Amazon.com.

15        Now, Amazon will testify, and we'll hear about their

16   capabilities, but what we know for sure is Amazon does not do a

17   lot of the things that we've been talking about that the large

18   business customers require.  So, for example, they do not offer

19   online customized catalogs for large businesses.

20        In fact, it's kind of the opposite of what Amazon is all

21   about.  They don't want to restrict employees' abilities to shop.

22   They want employees to shop among products in all different

23   prices supplied by all different kinds of vendors.  That's the

24   business model of Amazon.  They don't provide next-day desktop

25   delivery.  You see they provide here free two-day shipping on

1    orders over $49.  Those are small purchases.

2         Amazon Business recently started delivering on pallets,

3    what we've talked about, the difference between pallet delivery

4    and desktop delivery.

5         Amazon also does not offer the pre-bates we've been

6    talking about, the upfront money, and other creative types of

7    discounts.  And that's because they don't control the price of a

8    lot of the products that are sold on the site.  In fact, if a

9    customer wanted to purchase its requirements -- and again, these

10   large customers purchase maybe thousands of SKUs of products --

11   they would have to negotiate separately with these individual

12   suppliers.

13        I'm not quite sure how that will work, but you'll hear

14   about it.

15        Entry or expansion by Amazon, simply as the evidence will

16   show, would not be timely, it's not likely enough; and by that I

17   mean for Amazon to become the primary supplier to the large

18   business customers.

19        Now, you will hear from Amazon and you'll hear from some

20   of the large customers that large business customers have been

21   looking into Amazon Business as an option.  You'll hear this from

22   Fifth Third Bank this week.  But so far, not a single large

23   business customer has taken on Amazon as its primary vendor of

24   office supplies.

25        Two more quick topics, Your Honor.

1          The defendants here have proposed a so-called fix.  It's a

2     deal they have proposed to address the antitrust concerns.  I'll

3     just spend a few moments on it.  That are lot of flaws to this

4     deal, but there are two major flaws that come to my mind.  First

5     is that --

6          THE COURT:  Can I stop you for a second?

7          MS. REINHART:  Sure.

8          THE COURT:  Normally the Court would not be concerned

9     about efforts to resolve a legal controversy.  Is this an

10    exception?

11         MS. REINHART:  I'm not sure I understand the question,

12    Your Honor.

13         THE COURT:  In other words, if this were a nonjury trial,

14    Federal Tort Claim Act, let's say, intersectional collision,

15    significant personal injuries, the Court would not view as

16    competent evidence efforts to settle the case.  That wouldn't be

17    competent evidence for the trier of fact, so is this an

18    exception?

19         MS. REINHART:  Yes, Your Honor, it is an exception.  The

20    cases do show that courts consider proposed divestitures.

21         THE COURT:  All right.

22         MS. REINHART:  There are criteria for that, and at this

23    point I don't think we're contesting that criteria.  We're simply

24    evaluating the proposal on its merits, and that's what we will be

25    asking the Court to do as well.

1          THE COURT:  Is this an issue that the Court should be

2     required to address in its decision as to whether or not the

3     proposed fix is sufficient as a remedy or not?

4          MS. REINHART:  I think the defendants certainly would take

5     that position.  I -- based on the evidence, Your Honor, it's not

6     going to take much time.

7          THE COURT:  Would that be -- is there a Supreme Court

8     precedent or a circuit precedent?

9          MS. REINHART:  And I can get -- I can get you some

10    examples of cases in DC, Your Honor.

11         THE COURT:  All right.

12         MS. REINHART:  Yes, yes.

13         So first of all, parties, when they offer a fix like this,

14    they tend to be offering up a divestiture of a going concern, an

15    actual business that can from day one, after the business has

16    been spun off, can compete in the way that the parties are

17    currently competing.  And that's not what this proposal's all

18    about.  The proposal here is that contracts related to large

19    customer purchases will be assigned to this company called

20    Essendant, which is one of the two major wholesalers in this

21    industry.  So it's not a divestiture.  It's temporary.  These

22    contracts will run out at some point in time, maybe tomorrow,

23    maybe next year; and if the customers are not satisfied with the

24    service that they're getting through this Essendant mechanism

25    that's being set up, they'll go back to the combined Staples.

```
 1        THE COURT:  Right, but this obviously is an issue that
 2   their respective experts are going to opine on, obviously.  I
 3   mean, the Court is ill-equipped to determine whether or not it's
 4   a matter of applying the law to these facts if it's sufficient or
 5   not.  It's going to depend upon expert testimony, I assume?
 6        MS. REINHART:  There will be expert testimony at least
 7   from our side, Your Honor.
 8        THE COURT:  Okay.
 9        MS. REINHART:  The second big concern we have about this,
10   Your Honor, is that Essendant on day one will not be ready to
11   step into the shoes of Office Depot that's merging with Staples.
12   In fact, it will be dependent upon Staples -- by the terms of the
13   contract between the parties -- for several years to provide the
14   needs that Staples and Office Depot currently provide these
15   customers.
16        And this chart right here shows that.  This is a slide
17   from a presentation that was made to the FTC that shows in the
18   first column that Essendant is lacking in several current
19   capabilities, and that those capabilities will be enhanced by the
20   transaction.  They can't do it alone, in other words.
21        Now, the theory here is that Essendant is not going to
22   sell direct to these large customers itself, it's going to be
23   selling through vendors -- tier one diversity vendors that
24   currently are partnering with Staples and Office Depot -- to
25   serve business customers.
```

1    You will hear from P.D. Morrison who owns a tier one

2  diverse company.  And he's been bound up in this deal, and his

3  contract is being signed as part of this proposal.  And you will

4  hear his concerns about his future as a result of this.

5    Next slide.  Again, this next slide is simply a timeline

6  of the transition.  And what's very clear, by the terms of this

7  agreement, is that Essendant will not be able to replace the

8  competition lost from this merger on day one, or even in two

9  years, potentially three years.

10    And finally, Your Honor, the defendants here are claiming

11  that efficiencies, cost savings that they say are resulting from

12  this deal will outweigh whatever harm we prove up.  Well, first

13  and foremost, given the strength of our structural case, the

14  presumption, extraordinary efficiencies would be required to

15  salvage this deal.  No court has ever salvaged a deal that was

16  found to be anticompetitive using efficiencies.

17    You'll hear a lot about this, and I'll just say a few

18  words.  The defendants' claimed deficiencies are derived from

19  their experience in prior deals; and they assert that the savings

20  that they have been making in those prior deals can be

21  extrapolated and applied to this one, and that the combined

22  Staples will generate the same savings.

23    But the problem is, is that a significant part of the

24  so-called savings from the prior deals has simply not been

25  realized yet; in other words, it's a projection.  So basically

```
 1    the efficiencies that are being claimed today are a projection of
 2    a projection.  And we do have an expert who will be addressing
 3    this, Your Honor.
 4         Even Mr. Ron Sargent, who's the CEO of Staples, has called
 5    the efficiencies estimate in this case a guesstimate.  You can
 6    see the quote here from his testimony.
 7         THE COURT:  What was the remainder of that sentence?  I
 8    see the ellipses.  What else did he say?
 9         MS. REINHART:  I'll have to look at the transcript, Your
10    Honor.  I'm happy to provide that.
11         THE COURT:  I'm always suspicious when I see ellipses, you
12    know.
13         MS. REINHART:  I suppose I can understand that; but that's
14    unfortunate, Your Honor.
15         THE COURT:  All right.  All right.  I'm not accusing you
16    of anything, but I'm just -- I'd like to know what the remainder
17    of that sentence is.
18         MS. REINHART:  We'll get that for you as soon as we can.
19         THE COURT:  All right.
20         MS. REINHART:  Okay.  So this is a preview of what Your
21    Honor is going to see and hear.  In this hearing over the next
22    week or so, we're going to have a variety of --
23         THE COURT:  Over the next what?
24         MS. REINHART:  Week or so, week or so meaning the four
25    days from this week and perhaps a day into the following week,
```

1    yeah.

2         We're going to have a variety of customers testify so that

3    Your Honor gets a complete picture of the types of controls these

4    customers want to put in place to control the millions of dollars

5    of spend, and how Staples and Office Depot negotiate with them,

6    their fears about this merger.  You'll hear from two competitors,

7    Amazon and WB Mason.  You'll hear about their capabilities;

8    you'll hear about their plans.  And then you'll hear from

9    PD Morrison, who's the tier one diversity vendor, and he's going

10   to explain his concerns about this proposed fix.

11        And then, of course, after all of that, you will hear from

12   Professor Shapiro.  He will explain how the economic evidence

13   supports this case.  He'll explain a lot better than I could, and

14   he'll explain why the plaintiffs have satisfied our presumption.

15   He'll also take a look at the corroborating evidence.

16        So I've shown just a small portion of what our evidence

17   will be here today; and I have one more document for you to see,

18   Your Honor, which pretty much sums up the situation.

19        This is a Staples document.  There are only two real

20   choices for customers:  Us or them.  This one is from 2013, Your

21   Honor.

22        And if there are no further questions, that concludes my

23   presentation.

24        THE COURT:  All right.  Let me ask you this.  Thank you

25   for your presentation.  I really appreciate you walking me

1    through this.  It's interesting.

2         One of the recurring issues in the *General Electric* case

3    was the impact -- had to do with the impact of the merger on the

4    ability of the hypothetical, Ms. Smith, I think her name was, or

5    Brown or something, to purchase products after a merger.  And the

6    government made a very strong showing that the hypothetical

7    Ms. Smith, who was on a fixed income, may have to spend another

8    hundred dollars or so to purchase certain appliances.  And that

9    was a -- that was a significant issue, the impact on the average

10   consumer.

11        I've not heard any references to the average consumer, and

12   I'm not sure -- well, certainly the Court's not going to require

13   to just assume that a merger will result in a certain impact on

14   the average consumer, but is there some expert that's going to

15   opine about what the impact on the average consumer will be as a

16   result of this merger versus the big business consumer?

17        MS. REINHART:  Well, Your Honor, the big business

18   consumers are the ones we're concerned about here.  We are not

19   alleging harm to the Ms. Smith who buys the appliances.  We're

20   alleging harm to the thousands of companies that spend millions

21   of dollars.

22        THE COURT:  But the individual consumers are going to be

23   impacted, won't they?

24        MS. REINHART:  We've not alleged that, Your Honor.  This

25   is not a retail case.  This is about -- this is about this

```
1   important segment of Staples and Office Depot --

2         THE COURT:  Well, I'm not minimizing the importance of it,

3   but --

4         MS. REINHART:  Yeah.

5         THE COURT:  So I'm not going to hear any evidence about

6   the impact on the average, every-day consumer who also buys pens,

7   and paper, and ink supply, and things like that?

8         MS. REINHART:  That's not our case, Your Honor.  You'll

9   certainly hear about the impact on the employees, thousands and

10  thousands of employees of the companies that would be impacted by

11  this deal.

12        THE COURT:  Right.  And my question in no way should --

13  should not be interpreted to mean it's not is significant, what

14  you're alleging.  I was just curious because I've not heard any

15  reference to the impact on the average consumer.  I mean,

16  certainly there must be an impact.

17        MS. REINHART:  We're not alleging it, Your Honor; and I

18  think it's fair game for Your Honor to ask Professor Shapiro

19  about that, but I'm not qualified to talk about the how the

20  impacts work.  What we do see is --

21        THE COURT:  So it's not an issue that the Court's going to

22  have to -- that seems odd, but --

23        MS. REINHART:  No, Your Honor, it's not odd at all.  The

24  antitrust laws do not require -- and, in fact, it'd be foolish

25  for them to require some sort of consumer harm at the level of
```

1    Ms. Smith.  There's an impact in this market.  There will be.  It

2    could be significant.

3        THE COURT:  I'm not minimizing that.  It's just that it

4    just seems logically -- it just doesn't seem to logically flow.

5    If there's an impact -- the government alleges significant

6    adverse circumstances due to a merger vis-à-vis big business.

7    There has to be a trickle-down effect somewhere, wouldn't you

8    expect?

9        MS. REINHART:  There may be.  We're not alleging that.

10   There may be, Your Honor.  We're not alleging that, but this is

11   $2 billion a year in commerce.  It's significant.  And I think

12   when you hear from these customers, these are customers out there

13   trying to keep their bottom line under control, and they feel

14   like they have two choices to do that.

15       THE COURT:  Well, suppose the evidence shows that the

16   hypothetical Ms. Smith is not going to be adversely impacted, is

17   that something the Court should consider?

18       MS. REINHART:  So they may present an argument about that.

19   I've not seen any evidence of it.

20       THE COURT:  No, no, no, I said evidence.  I said evidence.

21       MS. REINHART:  I've not seen any evidence of that, Your

22   Honor.  They may present argument on that, but there is

23   absolutely the weighing process that goes on.  And what you would

24   expect them to argue is that through the efficiencies, through

25   the efficiencies consumers would benefit.  And consumers, in

```
 1    terms of the Ms. Smith that you're talking about, Your Honor, we

 2    absolutely think that that is just not true.  We have an

 3    efficiencies expert who will testify about how there will be no

 4    trickle-down in savings from this deal to those consumers.

 5         THE COURT:  So you do have evidence, then?

 6         MS. REINHART:  Well, it's not -- it's not the consumer

 7    harm.  It's their side of the argument.  We have evidence to

 8    rebut their argument that there will be benefits.

 9         THE COURT:  To the average consumer.

10         MS. REINHART:  That's correct, Your Honor.

11         THE COURT:  But the government's saying that's not really

12    an issue the Court needs to focus on because this is not a

13    consumer -- well, actually it is a consumer case because it's a

14    big business consumer case.

15         MS. REINHART:  That's correct, they are the consumers with

16    all their thousands of employees.

17         So we're alleging that they're harmed, and I think you

18    will hear from the other side that despite that harm this merger

19    should be allowed to go through; and we hardly disagree with

20    that.  We don't see the evidence that supports that.

21         Case law, you have to be careful on the cases when we're

22    doing the balancing.  Efficiencies should not be able to save

23    this deal here.  It's definitely in dispute, Your Honor.

24         THE COURT:  All right.  Another fascinating trial.

25         Let's do this.  The morning is going to be devoted to
```

1    opening statements.  It's 11:15.  Let's just take a break until

2    11:30, and I'll hear from defense counsel.

3            All right.  Thank you very much, Counsel.  I really

4    appreciate it.  Thank you.

5            (Thereupon, a break was had from 11:10 a.m. until

6    11:33 a.m.)

7            THE COURT:  All right, Counsel.

8            MS. SULLIVAN:  Thank you, Your Honor.

9            THE COURT:  Good morning.

10           MS. SULLIVAN:  Good morning.

11        **OPENING STATEMENT ON BEHALF OF DEFENDANT STAPLES**

12           MS. SULLIVAN:  Your Honor, I thought it might be helpful

13   to the Court if I briefly gave some background on the companies:

14   Where they've been, where they are, and why they're here.

15           THE COURT:  Sure.

16           MS. SULLIVAN:  And so, Your Honor, Staples and Office

17   Depot are two iconic American companies.

18           THE COURT:  Do you have hard copies?

19           MS. SULLIVAN:  Oh, I apologize, Your Honor.

20           THE COURT:  If you do, Counsel.  I don't want to take

21   yours.  All right.  Do you have another one for my clerk, or do

22   you have one?  Okay.  Great.  Thank you.

23           MS. SULLIVAN:  Sure, I apologize, Judge.

24           THE COURT:  All right.  It's very helpful.

25           MS. SULLIVAN:  So Judge, Staples and Office Depot are two

1    iconic American companies who first opened their doors for

2    business in the 1980s, focused on the sale of office supplies at

3    the retail level.  And soon their stores began dotting the

4    American landscape, opening in local communities around the

5    country, providing a place for parents, moms or dads to go and

6    buy school supplies for their kids, and a place for local

7    businesses to go to these retail stores and buy products for

8    their businesses, pens, paper, binder clips, folders, et cetera.

9         And for some of us in this courtroom, the 1980s seem like

10   only yesterday, Judge, but in many ways it's a long time ago.

11   It's a time before the Internet, before companies like Amazon and

12   Google even existed, before iPads and iPhones, before the

13   transformation of the American economy by digitization, and

14   before the transformation of the American office place.  We now

15   have paperless offices, largely paperless courtrooms in many

16   places.  People are editing documents on screens instead of on

17   hard copy.  If you take out a pen and a notepad in a meeting now

18   like I still do, people look at you like you're a sad old

19   dinosaur, as the young folks are typing on their MAC computers or

20   using their iPads.

21        And this change in the way people operate in their

22   offices, this digitization of the American office place, has hit

23   these two companies hard.  That, and the combination of the

24   growth of online retailers like Amazon, and like all brick and

25   mortar stores, they have been battered by online competition.

1    And for the last decade or more, they have been facing a

2    disappearing market for their core products, the pens, papers,

3    folders.  People store things in iCloud now instead of in

4    cabinets.

5         And their stock price has taken beating, and they have

6    tried to reinvent their companies to offer other kinds of

7    products to their business customers -- furniture, break room

8    supplies -- to try to combat the decline in their traditional

9    office supply market, offering coffee and janitorial products as

10   well.

11        They've also tried to reinvent their presence and

12   strengthen their presence online to try to combat competition

13   like Amazon, the behemoth on the retail side.

14        But, Your Honor, notwithstanding their best efforts, these

15   companies, like penguins on a melting iceberg, have not been able

16   to stem the tide of declining stock price, declining profit, and

17   declining sales, as the market for traditional --

18        THE COURT:  You're tugging at my heartstrings now,

19   penguins on a melting iceberg.

20        MS. SULLIVAN:  Well, Judge, the truth is, they're --

21   notwithstanding the analogy, the truth is their core market has

22   been declining; people aren't using these kinds of products the

23   way they did before the digitization, and they're struggling to

24   try to compete, these 1980s companies, in this new digital age.

25   And so faced with that problem -- and, in fact, Judge, it's such

1    a huge problem, the closings of hundreds of their retail stores,

2    600 or more over the last two years, has not been enough to

3    reverse the tide.  And so their boards of directors, their

4    executives, their CEOs have determined their best chance to stay

5    competitive in this transformed marketplace is to merge, to shed

6    their legacy costs, and to take the savings from this merger and

7    reinvest those savings in lower prices to customers.

8           You asked, Your Honor, a very good question, in fact, a

9    critical question:  How is this going to affect regular

10   consumers?  Well, the market has been -- the market

11   analysts that -- there's banks and investment people that track

12   this market and advise about whether people should buy or sell

13   stock.  They have uniformly applauded this deal as good for

14   customers, good for the companies, and good for competition; and

15   there is no --

16          THE COURT:  The government says this is not a consumer

17   case.

18          MS. SULLIVAN:  Yes.

19          THE COURT:  I ask a lot of questions, and people shouldn't

20   read too much into my questions, but it's a big -- it's a

21   business case.

22          MS. SULLIVAN:  It's a business case, Your Honor, but it's

23   much more than that.  One of the things that these companies are

24   facing, they're getting killed on the retail side because they

25   can't compete with Amazon on the retail side on prices.  And so

1    one of the things that they're going to do -- and you're going to

2    hear -- Ms. Reinhart was, I think, careful in her response to the

3    Court.  But the fact is, you're going to hear evidence from our

4    experts and our executives that the synergies and the savings

5    from this merger estimated at between 1 billion and

6    $2-1/2 billion.  The companies have a conservative estimate.  The

7    analysts are saying 2-1/2 billion.  Those savings are going to be

8    reinvested, in part, for lower prices for all customers.  And,

9    Your Honor, that's a public interest component to this case that

10   Your Honor, under the case law, must consider.  And this merger

11   is not only in the companies' interest in the interest of

12   competition, but it's in the public's interest.

13        And the government stood here, Judge, and said, "We have

14   79 percent of the market, we're the government, look at all these

15   cases, we win."  And we are happy for the opportunity that your

16   court -- that in this court you're the decision-maker, Your

17   Honor.  You get to decide using your independent judgment, no

18   deference to the FTC under the case law, whether they have met

19   their burden.  And what you're going to see, Judge, is that the

20   79 percent number they come up with is based on a narrowed,

21   rigged, artificially inflated view of the world that has nothing

22   to do with business realities.  And so we submit when you hear

23   the evidence, you will find that they have not come close to

24   meeting their presumption.

25        And I'll show you -- Mr. Coates, if you would be good

1    enough to -- thank you.

2         I don't know if Your Honor can see this, but this is a

3    rendering of their customer -- their relevant customer market by

4    percentages, Judge; and in this case, here's what the government

5    has done to get up to their 79 percent.  They have eliminated --

6    they've all but conceded that this merger is good, or at least

7    neutral, to all retail customers, no problem.  They have no

8    problem with any anticompetitive effect of this merger for people

9    off the street.  And so they've eliminated those customers, and

10   that includes mom and dads off the streets, small business owners

11   who buy on retail, they've eliminated that from the relevant

12   market.

13        Then there are 400,000 business customers between these

14   two companies, they have decided to strike 99 percent of those

15   out of the relevant market.  And their expert, instead, has

16   focused on 6 percent of revenue for large business customers,

17   which makes up about 1 percent of all business customers, forget

18   all other customers.

19        But then they did something else to gin up market shares.

20   They didn't calculate market share based on even their 6 percent;

21   they used the Fortune 100.  And then he ignored -- their expert

22   Dr. Shapiro ignored or didn't look at data for 19 of them

23   originally, so we're calling it the Fortune 81.  So they

24   calculated their market share based on the Fortune 81.

25        Now, Your Honor, if I stood in the corner of that

1    courtroom (indicating), I'd be the prettiest girl in the corner.

2    But as everybody can see, that's not much of a market.  If you

3    add a few more girls in here, your market share -- my market

4    share would go way, way down, Judge.  And that's kind of what the

5    government has done here.  I mean, if you slice, and dice, and

6    narrow the relevant market that much, you get an artificial

7    79 percent.

8         And, Your Honor, you're going to hear the evidence that

9    that is a way to slice and dice this market that has nothing to

10   do with reality or business realities here.

11        You're also going to hear -- I'm sorry, Mark.  Thank you.

12        And, Your Honor, an example of one of many of the business

13   analysis who say that this merger is going to be good, it's going

14   to have savings to customers.

15        But instead of focusing on -- and we submit, Your Honor,

16   the FTC has lost their way; that the antitrust laws were intended

17   to protect customers, consumers, and particularly small

18   consumers.  But instead the FTC here focused on a litigation win,

19   has sued to protect the largest, most powerful, richest companies

20   on earth.  And you know what the most telling thing about their

21   lawsuit here is?  The most powerful companies on earth don't

22   think they need protection.  And they're going to get, I think,

23   one of the Fortune 100 to come in here live to testify.  And you

24   know why they don't think they need protection?  I think Ms. --

25   let me see if I can clear this here.

1       I think Ms. Reinhart said that the Fortune 100, they have

2   it bad, Judge; because there are only two suppliers, and it's

3   going to get much worse.  Well, we should all wish we have it as

4   bad as the Fortune 100.  They pay 46 percent less for office

5   products than moms off the street buying school supplies for

6   their kids, the same notepad, the same pens.  Exxon, Goldman

7   Sachs, Comcast, Pfizer pay almost 50 percent less; and that's

8   according to their expert.

9       They are wonderful, these large sophisticated companies,

10  about squeezing the best prices out of all their vendors.  They

11  have procurement officers.  They have armies, in some cases, of

12  procurement officers who have sophisticated metrics on how to

13  squeeze the best prices out of all their vendors.  They have

14  RFPs, reverse auctions, they buy -- leakage is going to be a

15  big -- leakage is when you have a contract with a vendor, and the

16  company employees don't buy on contract.  They go and buy off of

17  Amazon, they go and buy off the street, they go off and buy from

18  another vendor.  And Your Honor's going to hear that one of the

19  flaws in the government's case is they haven't measured that

20  real -- very real and substantial off-contract spend in

21  calculating market share.

22      And one of the other ways that these companies keep prices

23  down is cross-category retaliation.  And so companies like

24  Staples and Office Depot are trying to sell more office products

25  beyond the tradition, beyond pens and papers.  They want to sell

1    furniture, and break room supplies, and janitorial -- I hear

2    Purell is a really big seller because that market is not going

3    down in the same way.

4           And so one of the ways these big companies have -- even if

5    this merger goes through, and hopefully it does -- to keep down

6    prices, they say, if you raise my price on pens, I'm not going to

7    buy Purell and break room supplies from you.  And so they have

8    all kinds of ways to make sure they get the best prices from

9    their vendors.

10          And even their expert Dr. Shapiro, who Ms. Reinhart talked

11   a lot about, concedes after this merger the -- these big

12   companies will continue to pay substantially less than retail

13   customers because they're that powerful.

14          And as I mentioned, Your Honor, the Fortune 100 are not

15   real concerned about this merger.  They have gotten a total of

16   six -- and the FTC for the last year has been dialing for

17   affidavits, dialing for declarations.  They've called hundreds of

18   companies, including the Fortune 100, and they got a grand total

19   of six who expressed any concern at all about the merger.

20          Well, two of them are competitors of Staples and Office

21   Depot:  Walgreen's and Best Buy.  One of them, Pfizer, and also

22   Walgreen's, has huge mergers pending before the FTC.  So I

23   submit, Your Honor, they'd basically cooperate with the FTC any

24   way they could.  And Bank of America, whose video they're

25   playing -- apparently the witness can't testify live -- her

1   position as procurement person is completely inconsistent with

2   the company's public position to the investor community where

3   Bank of America has concluded -- and you'll see the evidence,

4   Your Honor -- that this deal is good for customers, it's good for

5   competition, and it will result in $2.5 billion in savings.

6       The Fortune 100 does not believe they will have any

7   problem handling their paper clip supplier in terms of pricing

8   after this merger.  Their silence is stunning and telling in

9   terms of the lack of any concern about this merger.

10      And Best Buy will come live, Your Honor, the only Fortune

11  100 company that you'll hear from live.  And they are an arch

12  competitor of Staples on the technology side on iPads, and

13  laptops, and things like that.

14      In addition, Your Honor, although they didn't calculate

15  market share based on the 400,000 business customers that Staples

16  and Office Depot have, they got affidavits from some of them; and

17  they got a total of 19, which is -- I think that's 100th of

18  1 percent of all the business customers who have expressed

19  concern.  It's even less than 2 percent of the FTC's market.  And

20  those overwhelmingly who expressed concern were Office Depot's

21  customers.  And you can understand if you have a vendor, you

22  don't want to be bothered with having to replace that vendor, but

23  that doesn't make the merger anticompetitive; a lot of people

24  just don't like change or disruption.  That doesn't mean the

25  merger is anticompetitive.

1          And some of the affidavits that they have include

2    customers who aren't even in their target market.  Detroit

3    Regional only buys 50,000 a year.  They're not even in the FTC's

4    market of concern.  Corporate United, a witness that they

5    submitted a declaration for before the Court, who expressed

6    concern about the merger, is a competitor of Staples.  And, Your

7    Honor, here is the quality, the kind of quality of evidence the

8    FTC has in this case.  The gentleman from Corporate United who

9    submitted the affidavit, Mr. Arslanian, said, "If this gets

10   blocked, this merger, they should make a statue of me in front of

11   Corporate United.  My testimony was a work of art mixed with

12   B.S."  That's the kind of evidence that the FTC has submitted to

13   this Court in opposition to the merger.

14         And, Your Honor, just going back to their target customer

15   market.  So as I mentioned, they struck out retailers, all retail

16   customers; they struck out almost all of the business contract

17   customers in analyzing market share.  They said their target

18   market is this green, this five -- their target market, Your

19   Honor, is large companies who buy $500,000 or more in office

20   supplies.  But then they don't calculate at market share based on

21   those, they just look at the Fortune 81.

22         And that is, I submit, Your Honor, when you hear the

23   evidence, that is gerrymandering as its worse.

24         In addition -- and the reality is their expert concedes

25   that the business contract market is about -- as between these

1    two companies, it's about 400,000 customers.

2          THE COURT:  Is this person going to testify, Arslanian?

3    Is he scheduled to testify?

4          MS. SULLIVAN:  He's not, Your Honor, but they submitted

5    his declaration in support of their brief.

6          THE COURT:  Okay.

7          MS. SULLIVAN:  And so, Your Honor, they have carved out

8    about 1100 customers, a 1,085 out of the 400,000 business

9    customers between these companies, to try to protect in this

10   case; and that's about a third of a percent --

11         THE COURT:  Well, if they want me -- if the government

12   wants me to give credit to his declaration, then the government

13   is going to have to give me another declaration from him signed

14   under oath about what he meant when he made this statement.

15         Go ahead.

16         MS. SULLIVAN:  And so, Your Honor, in calculating their

17   target customer market, in trying to, we submit, gin up this

18   79 percent, they've cleaved out or chopped out 99 percent of the

19   business customers that Staples and Office Depot serve, even

20   though you will hear that, at least in the real world, any

21   customer who buys over a hundred thousand dollars, which is

22   hundreds of thousands of these customers, they treat the same

23   way:  Contracts, customer service, delivery requirements,

24   technology requirements -- that there's no business reality

25   reason to cleave out hundreds of thousands of customers unless

1    you want to artificially inflate the market share.

2         In addition, and for reasons -- well, reasons, Your Honor,

3    I'll submit are clear, they've also cleaved out all of the

4    government customers, even though -- even when they meet their

5    own threshold of 500,000 and above.  And that's about 15 percent

6    of the market.  And the reason they've done that, they say, is

7    because the government has a mandate to use diversity; disabled

8    and state governments, in many cases local vendors.

9         Well, that's kind of the point, Judge.  If the federal

10   government and huge state governments can get by just fine with

11   office suppliers other than Staples or Office Depot, it actually

12   puts the lie to their argument.  They're saying no one can

13   service these huge customers except Staples and Office Depot.

14   Well, the federal government and all these states' governments do

15   it just fine with local, regional, and other alternatives.

16        These are some of the witnesses they will bring, Your

17   Honor.  You're going to hear, I think, from AEP today,

18   Mr. O'Neil; and they will acknowledge that they haven't

19   investigated alternative suppliers in many cases.  In part

20   because many of them are locked into multi-year contracts.  In

21   Mr. O'Neil's case you're going to hear they've had Office Depot

22   as their vendor for about 15 years or so, and the business wanted

23   to continue with Office Depot.  And so -- and they acknowledge

24   they have haven't investigated what Amazon is up to recently; and

25   you'll hear that evidence.

1           Another mistake, I submit, Your Honor, that the FTC has

2     made in this case is that they have focused on the bid, what they

3     call the bid data, what's called the bid data as companies

4     compete for these big office supply contracts with Fortune 100,

5     Fortune 500.  They try to get the companies to sign a contract.

6     And the FTC argues, well, you, you guys have, you know,

7     79 percent of those contracts.

8           The problem is those contracts are a lousy surrogate for

9     market share because they're not binding.  These big companies,

10    to their credit, with their lawyers and their buying power, make

11    their vendors agree that they can buy from anybody.  You sign a

12    contract with Staples or Office Depot for office supplies,

13    Staples and Office Depot guaranty a price, but then these big

14    companies can go and buy from anybody else.

15          If these contracts had a name, Judge, it would be "One

16    Way," because the companies can say, I'll take your price; or if

17    I see a lower price, I'm not going to buy even if I have a

18    contract from you; I'm going to go buy from someone else.

19    They're a terrible surrogate for market share.  They're

20    nonexclusive; the companies can and do buy off contract.

21          The other problem with the government's case, Your Honor,

22    I submit, and another way they've tried to gin up market share is

23    to artificially narrow the relevant product market.  And so this

24    is the FTC's definition of the relevant product market:

25    Consumable office supplies.  "Office" -- is their term -- "Office

1    supplies that customers use up, discard, and repurchase on a

2    recurrent basis."  That's how they want to define the market.

3         The problem is, then they cleave out ink and toner, even

4    though ink and toner is a consumable office supply that people

5    discard, repurchase on a recurrent basis; even if it was on the

6    paper that's included in their relevant market.

7         And why do they do that?  Because that's about a third of

8    our sales.  And so you cleave that out, your market shares are

9    artificially inflated.

10        In addition, Your Honor, and more importantly, you're

11   going to hear that for Staples, about 50 percent, and for Office

12   Depot, lower, but a significant percent, about 50 percent of

13   their product sales now are these BOSS products, beyond -- and I

14   learned in this case, Judge, BOSS is Beyond Office Supply Sales.

15   And that's things like -- it -- faced with declining market in

16   pens and paper, et cetera, these companies have said we've got to

17   sell more.  And over the last ten years or so they have

18   increasingly sold these customers break room, janitorial

19   supplies, Bounty, Purell; and that core part of the office supply

20   market has also been cleaved out by the government in calculating

21   a relevant market share.  And so they've taken out ink and toner;

22   and they've taken out all of these Beyond Office Supply products

23   for the obvious reason that if you include them, the market share

24   calculations are nowhere near what the FTC suggested.  In fact,

25   we're a very small player in the Beyond Office Supply product

1   market.

2         In addition, in order to, I submit to Your Honor, win a

3   lawsuit, the FTC has flip-flopped on its own definition of office

4   supplies based on the 2013 case conclusion statement they issued

5   after the OfficeMax and Office Depot merger -- when first in 1997

6   in connection with the Staples and Office Depot initial try to

7   merge that was blocked by the FTC -- the FTC defined consumable

8   office supplies as including ink and toner.  And, again, in 2013,

9   consumable office supplies the FTC said included ink and toner.

10  They have flip-flopped, Your Honor.

11        And, again, they issue these case guidances so that

12  industry -- these case conclusions so that industry would have

13  some guidance when they decide whether to merge or not as to

14  whether there's going to be regulatory issues, and here they

15  define consumable office supplies to include about a third of our

16  sales, and in this case they've cleaved that out to gin up market

17  share.

18        Another problem with their definition of the product

19  market is, the Court was good enough to permit us to take the

20  deposition of the FTC's own procurement person, and that person

21  disagrees with the FTC lawyers.  The FTC procurement person

22  includes ink and toner in the definition of consumable office

23  supplies, so the FTC's own witness disagrees with them.  In fact,

24  the expert in procurement there disagrees with them on the

25  definition of the relevant market.

1         In addition, the Commonwealth of Pennsylvania is a

2    plaintiff here.  They've recently submitted an RFP for office

3    supplies.  Ink and toner is in the mix.  Again, their product

4    definition defies market realities and defies the testimony of

5    their own witnesses.  And, in fact, the relevant produce market

6    is beyond traditional office supplies, beyond ink and toner, and

7    for the last ten years or so has included these Beyond Office

8    Supply products.  And that market is growing, fortunately, for

9    the company.  The Beyond Office Supply market is really the place

10   to be now with business contract partners because of the decline

11   in traditional pen/paper sales and the low margins on the pens.

12   These are higher margins, these Beyond Office Supply products,

13   the coffee and the janitorial supplies; and so the companies

14   really want to try to sell more of these kinds of products.

15        And so the FTC -- and these products come, Your Honor,

16   you'll see, on the same contracts.  They're part of the same

17   RFPs, these Beyond Office Supply products.  So when there is a

18   Request for Proposal from these big companies and everyone bids

19   on them, these companies are looking for the same -- Beyond

20   Office Supply product, they want stuff for their break room, they

21   want janitorial supplies, they want ink and toner in many cases,

22   and they want traditional.  And they come on the same trucks

23   under the same contract.

24        And the FTC says, "No, we're just going to gin up market

25   share."  You'll hear the evidence, Your Honor, delete or

1   disregard half or more than half -- actually more than half of

2   the relevant product market, and I submit to you, chop off more

3   than half of the relevant product market, you can get artificial

4   market shares.

5        And here -- and, Your Honor, I submit that in defining the

6   relevant product market, the best evidence is how the customers

7   define it.  And these contracts from these business customers, in

8   these contracts, the customers are defining the market much more

9   broadly than the FTC.

10        If we -- our expert Dr. Orszag, who the Court will hear

11   from in this case, our economist, they did an analysis -- he did

12   an analysis of Request for Proposals and contracts to see what

13   the customers are calling for on these contracts, and only about

14   1 percent of all of the RFPs or contracts match the FTC's

15   definition.  Almost all of them, close to 99 percent, were much

16   broader than the FTC's definition, including ink and toner,

17   including these Beyond Office Supply products.

18        And so, again, not only does their target customer market

19   defy business realities, but the customers define the product

20   market much more broadly than does the FTC.

21        THE COURT:  What weight -- what weight should the Court

22   give to the statements of business customers to an expert which

23   helped to define that expert's opinion?  What weight, if any?

24        MS. SULLIVAN:  And, Your Honor, these weren't statements;

25   these were contracts.  And so experts can typically analyze data,

1    and these are data that the expert relied on.  These are -- so

2    they are relevant and rely -- I would submit, Your Honor, the

3    best data, the contracts are what the FTC -- what the customers

4    are calling for in terms of the product market, and I submit

5    that -- forget the FTC, forget Staples and Office Depot.  What

6    did the customer -- how are they defining the product market?

7    And they are defining it substantially more broadly than does the

8    FTC here.

9        THE COURT:  All right.

10       MS. SULLIVAN:  And, in fact, their own witnesses, Your

11   Honor, many of them whom you'll hear from, define the relevant

12   product market -- and here are some of their witnesses -- much

13   more broadly than does the FTC, so their own witnesses won't

14   agree with them on this narrow definition of the relevant product

15   market, and you'll hear that --

16       THE COURT:  Have they all been -- they've all been

17   deposed, and this is consistent with their deposition testimony?

18       MS. SULLIVAN:  Yes, Your Honor.  Yes, Your Honor.

19   Either -- I believe they've all been deposed; but if not, it's

20   either from their deposition or the declaration; and they're

21   coming live so Your Honor will hear that.

22       THE COURT:  All right.

23       MS. SULLIVAN:  And, Your Honor, the competitors of Staples

24   and Office Depot, WB Mason, a national wholesaler who distributes

25   office supplies across the country; a buying group, there are

1    several in the country, buying groups that get together and

2    solicit hospitals and companies to join them to get more

3    purchasing power.  You'll hear something about those.  All of

4    these experts in the field define the product market much more

5    broadly than the FTC.

6         Mason, you'll hear from.  They define it as break room,

7    coffee supplies, in addition to office products; and Essendant

8    and Trimega, the same.

9         The other issue, Your Honor, in terms of the robustness of

10   the competitive landscape and how -- post-merger, how strong or

11   good Staples' ability will be to raise prices, is the fact that

12   these are low-impact commodity products.  This is not -- these

13   are not products that companies are willing to pay a lot of money

14   for, and we don't -- and all of their witnesses will agree that

15   they're nonstrategic.  A pen is a pen is a pen.  It's a commodity

16   category.  Low margins, the fact that the pricing that these

17   companies get that you'll hear about is so good, is it's a

18   commodity low-margin product.  And there is no special -- we're

19   not selling computer chips.  We're not selling operating systems.

20   We're selling pens, and pencils, and erasers.  There's no special

21   intellectual property.  We're middle men.  We're intermediaries.

22   We're not manufacturers.  There's lower barriers to entry here,

23   Your Honor.

24        Essendant is a national wholesaler.  If I wanted to open

25   up a store, a business, to sell office supplies to other

1  businesses, you sign a contract with a Essendant.  They provide

2  more product selection than Staples or Office Depot have.  They

3  provide national delivery.  They can do desktop delivery.  And

4  you'll hear a lot about the wholesalers who support a lot of

5  independent dealers and support national accounts.

6         And they're -- the company that their witness -- the

7  video that they're going play from Bank of America, her company

8  talks about how good this merger is; Bank of America,

9  $2.5 billion in savings in synergies.  And they talk about how

10  competitive the market is.  We think the market is

11  underestimating how fragmented the commercial office supply

12  market is across wholesalers, manufacturers, regional players,

13  and national players like Staples and Office Depot due to the

14  low barriers to entry.  And if there are, as a price -- if there

15  is any price increase post-merger, because the barriers to entry

16  are so low, others will get in or others will expand because

17  it's easy to do.  There's no IP there.  There's no

18  manufacturing.  It's -- we're middlemen.

19         And other analyst consistent that there is robust

20  competition in this space, Your Honor, that -- and you'll hear

21  that executives at the company review and rely on these

22  analysts' reports in making decisions, including pursuing

23  mergers and things like that.  And these analysts are saying the

24  same thing that we are, that there is robust competition, even

25  post-merger, in the office supply market.

```
 1          And one of the reasons that there's robust competition,
 2    and one of the reasons that these powerful companies get such
 3    good prices, is they threaten to buy direct from manufacturers.
 4    Staples, if you're not going to give me a lower price for paper,
 5    I'm going to go and buy it direct from Domtar -- the paper
 6    manufacturer that many of these companies buy direct from -- or
 7    Veritiv.  Starbucks buys Sharpies direct.  So there are other
 8    options for these companies beyond the middlemen, Staples and
 9    Office Depot.  And that's one of the ways that these big
10    companies constrain prices, by threatening to buy direct if our
11    prices aren't satisfactory to them.  And you'll hear evidence
12    that that can and does often happen.
13          There's also many competitors across the landscape, and
14    Your Honor will hear about that in this case.  WB Mason is --
15    their only business is serving business contract customers.
16    They are expanding nationally, and they have a -- they've been
17    growing at an alarming, to Staples', rate; and you'll hear about
18    them.  These national wholesalers, Essendant, manu- -- Grainger
19    is a company you'll hear about, Your Honor.  They sell -- they
20    have a bunch of retail stores for janitorial supplies, but they
21    also offer office supplies.  They're a much bigger company than
22    Staples or Office Depot, and they have -- they offer office
23    supplies to the same customers.
24          And another -- in terms of equities, Your Honor, another
25    thing that the FTC did in 2013 when it approved the Office
```

1    Depot/OfficeMax merger, was credit the robust competition in

2    this marketplace.  So in addition -- in the -- and specifically,

3    in the business contract marketplace.  And specifically, in

4    addition to Staples, they said, "And a host" -- that the parties

5    will continue to face strong competition for such customers --

6    talking about the business customers -- from Staples and a host

7    of nonoffice supply superstore competitors, such as WB Mason.  I

8    think Ms. Reinhart stood up and said, well, Mason's not a strong

9    competitor.  Well, in 2013 they said they were.  And Mason's

10   gotten so much stronger since then.  And you'll see they've

11   grown by 15, 16 percent every year since then.

12          Nonoffice supply competitors are growing in number and

13   strength and have demonstrated the ability to win large,

14   multi-regional national customer contracts.

15          In the interest of winning a litigation, the FTC is

16   saying exactly the opposite thing three years later.  And,

17   again, companies rely, executives rely on these case conclusion

18   statements for guidance in determining whether to pursue a

19   merger or not.

20          Mason, their Website, Your Honor, here's a fierce

21   competitor of Staples.  They are a business-to-business vendor.

22   They have -- their Website says, "We're a national provider.  We

23   serve customers in all 50 states.  We have 30,000 items that we

24   can ship next day.  We have 500 trucks.  We have warehouses."

25   And they are growing.  As you can see from the revenue chart

1   below, they are growing every day.  Unlike Staples and Office

2   Depot, they were faster to get into this Beyond Office Supply

3   category, and they have been going gangbusters.  And certainly

4   any price increase by Staples post-merger could easily be

5   constrained by Mason coming in to take more of that market.

6         And I think the FTC has argued that Mason is only --

7   they've conceded, Judge -- and this is important.  The FTC has

8   conceded that WB Mason is a strong competitor to Staples and

9   Office Depot in the Northeast.  That's conceded.  Well, 28 of

10   their target market is in the -- is headquartered in the

11   Northeast; 28 of the Fortune 100 is in the Northeast, but beyond

12   that, Your Honor, the evidence will show that Mason serves

13   customers in all 50 states.  They have warehouse, cross docks,

14   sales customer service across the country; and they certainly

15   would expand that if there was any price increase post-merger by

16   Staples.

17         They're coming in, Your Honor, to testify.  You should

18   know that Staples and Mason are arch competitors.  They're both

19   headquartered in Massachusetts.  The last thing WB Mason wants

20   is a stronger, more efficient, more price competitive Staples;

21   and so their arch competitor, no surprise, is going to come in

22   and testify against the merger for the FTC.

23         And Your Honor's been around a long time, and I suspect

24   this judge can sniff out bias better than most.

25         And, Your Honor, when asked at his deposition, the CEO of

1    WB Mason was asked:

2         "What can Mason do better than Staples?"

3         "Answer:  Everything."

4         I mean, they think they are a fierce competitor; and they

5    are.

6         As I mentioned, Your Honor, often these Fortune 100

7    companies buy direct from manufacturers to get better pricing or

8    to constrain pricing.

9         And the FTC, again, in 2013, noted that fact as the

10   reason there was robust competition, and they weren't worried

11   about a post-merger price increase after the OfficeMax/Office

12   Depot merger.  They said, "Large customers use a variety of

13   tools to ensure that they receive competitive pricing such as

14   ordering certain products like ink and toner directly from

15   manufacturing" -- "manufacturers and sourcing, or threatening to

16   source, certain categories of office supply products from

17   multiple firms."

18        The FTC said exactly then exactly what we're saying here.

19   And, again, Your Honor, they flip-flopped on that as well to

20   pursue a litigation win here.

21        And as I mentioned, Your Honor, these national

22   wholesalers can support any independent dealer that wants to be

23   a national player.  They've got technology platforms.  They've

24   got a wide assortment of product.  They've got trucks.  They've

25   got warehouses.  They've got distribution centers, and they

1    are -- in fact, they support Staples, and they support Office

2    Depot, and they support Mason in various areas as well.  About

3    8 percent of Staples' business is supported by Essendant.  In

4    cases where they don't have the product, Essendant might, or in

5    hard-to-reach places, Essendant may have more distribution

6    capabilities.

7          These buying groups, I mentioned, Your Honor, also a

8    competitor for national accounts, and they are.  There has been

9    a new alliance, Trimega, an independent station, where it has

10   recently announced an alliance to even get more buying power

11   from wholesalers and manufacturers and to support large national

12   accounts.  And they can do everything that the FTC claims only

13   Staples and Office Depot:  Customized billing, customized

14   catalog, and they can and do compete with us for national

15   contracts.

16         And in 2013, once again, the FTC said the same thing

17   we're saying here:  That "These regional office supply

18   competitors have developed and utilized various strategies to

19   compete successfully for large national accounts, including

20   working with office supply wholesalers and joining cooperatives

21   of independent office supply dealers to create a distribution

22   network capable of meeting the needs of large multi-regional and

23   national customers."

24         They've only gotten stronger since 2013, Your Honor, and

25   they are part, as the FTC acknowledged back then, they are part

1    of the robust competition faced by office supply customers like

2    Staples.  They are regional suppliers, and many companies carve

3    out certain regions because pricing is better or they want to do

4    business with local vendors for office supplies.  So companies

5    like Office Depot and Staples face competition all around,

6    including from these local vendors.  And they're there's going

7    to be examples of that in this trial as well, Your Honor.

8           And, again, the FTC, in 2013, recognized something very

9    important that they've also flip-flopped on here, Judge; and

10   that is that these adjacent suppliers, these people -- these big

11   companies that offer janitorial/industrial products have

12   contracts with the same Fortune 100/Fortune 500 customers; and

13   they can easily, as part of their offering, supply office

14   supplies to these customers to ensure robust competition

15   post-merger.

16          Grainger is one example, a bigger company than either

17   Staples or Office Depot.  They're in with the same customers

18   that we are.  They've got contracts with the same customers, and

19   they offer office supplies.  And so one thing the Grainger could

20   do easily post-merger is expand their operation and office

21   supplies.  Frankly, they haven't been that big into it yet

22   because the margins are terrible.  They're making more money on

23   janitorial supplies; but certainly, if prices increase, they

24   could easily expand their offerings there because they're there;

25   they're in the same customers, delivering trucks to the same

1    places as we are.

2          And you'll see that the companies recognize that

3    Grainger, this adjacent janitorial supplier who is now into the

4    office supply space, is a significant competitor; that

5    Staples -- here's internal Staples documents, Your Honor, before

6    the merger was announced, before the merger was discussed:

7    "Staples should closely monitor Grainger's assortment expansion

8    strategy, potential direct threat as they expand direct core

9    office supplies.  Grainger, we will increasingly bump up against

10   this player, one enabled by a robust e-commerce business and

11   over 700 retail locations.  They are emerging as a major

12   competitor."

13         And they are ahead of us, they say, in reinvention.  They

14   don't have the pressure of secular decline.

15         And so, again, another constrain on any price increase

16   post-merger is adjacent suppliers like Grainger, and which the

17   FTC credited in 2013 in approving the Office Depot/OfficeMax

18   merger.

19         Now, there are also -- there's also competition from

20   diversity suppliers.  And so many companies have made a

21   commitment to use suppliers who are diverse or disabled, and

22   companies then insist that their supplier be diverse.  And, Your

23   Honor, the Fortune 100 has many companies; but last time I

24   looked, number 1 on the Fortune 100 is Wal-Mart.  And Wal-Mart

25   is serviced by a diversity supplier.  And they're able to do

 1    it -- they're able to do it without Staples or Office Depot.

 2         And so this notion that big companies can't operate, they

 3    can't get their office supplies in a cost-competitive way,

 4    everybody knows Wal-Mart is good at getting their vendors to get

 5    lower prices.  Wal-Mart is able to operate just fine across the

 6    country using a diversity supplier.  And that's one example of

 7    many on the diversity side.

 8         Now, I want to talk a little bit about the fix.  And,

 9    Your Honor, we don't believe -- we believe that based on the

10    2013 -- the FTC's own admissions in 2013, and based on the

11    evidence, the robust competition in this marketplace, that the

12    divestiture remedy is not necessary here; but we will litigate

13    it here, Your Honor, in case the Court has any doubt that this

14    merger is anticompetitive.

15         And so one of the things that the companies have signed

16    an agreement to do with Essendant, this national wholesaler, is

17    to divest a half a billion -- more than a half a billion -- and

18    that's a lot of money for these companies at this time -- a half

19    a billion in revenue to Essendant, give this wholesaler these

20    diversity contracts; so if these diversity suppliers have a

21    contract with a Fortune 100 or Fortune 500 company, Essendant

22    will, instead of Staples or Office Depot backing them as the

23    wholesaler, Essendant will back them.

24         And that deal has been signed.  And, Your Honor, it's --

25    it's important for a couple of reasons.  One, it's important --

1    Your Honor asked a really good question when Ms. Reinhart was

2    going through the slides:  But isn't that old data?  Why aren't

3    we looking at new data?

4         And one of the things that the Court has honed in on is

5    the fact that the Court has looked -- even their merger

6    guidelines talks about two years, their expert says two or three

7    years out, you look forward not back.  And I think their second

8    slide was this poster that was in the CEO from Staples' office

9    leaning against the wall, and it's of the Fortune 100 as it

10   existed then.

11        And like many companies or many people, I mean, law

12   firms, you know, you represent big companies, you like to put it

13   on your Website, oh, we represent GE or Pfizer, to make you feel

14   good or make you look good.  So he put a list -- or somebody at

15   the company put a list of the Fortune 100 companies that Staples

16   had contracts with.

17        Well, two issues:  One, it's 2012 data.  It's four years

18   ago.

19        The second is, these contracts, as I mentioned, Your

20   Honor, they're nonexclusive.  It doesn't mean that they're

21   buying product or all their product from Staples or Office

22   Depot.  There's lots -- they're buying -- because it's --

23   because it's nonexclusive, they're buying from other vendors as

24   well.  And the divestiture -- if you look at this chart, Judge,

25   it shows, first of all, Wal-Mart and Costco weren't being

```
 1    supported by Staples or Office Depots; and all of the pink on

 2    the chart was the diversity suppliers were fronting that company

 3    backed by either Staples, Depot, or Essendant, were funding that

 4    company; but part of the divestiture remedy is to take the

 5    contracts with these pink companies and sell them to Essendant.

 6    About 30 percent of the Fortune 100 divested as part of the

 7    proposed fix, Your Honor.  To the extent the Court thinks we

 8    need a fix, we'll get rid of 30 percent of those contracts that

 9    Office Depot and Staples has, we'll divest it to Essendant.  And

10    that does a couple of things.

11        THE COURT:  And this is evidence that your expert is going

12    opine on, correct?

13        MS. SULLIVAN:  Yes, we're going to have the CEO from

14    Essendant here talking about the contracts and the divestiture;

15    and our expert will discuss it as well, Your Honor.  And I

16    submit, Your Honor --

17        THE COURT:  And it's appropriate for the Court to consider

18    remedies?

19        MS. SULLIVAN:  Yes, Your Honor.  Well, we submit, Your

20    Honor, the divestitures in this case is not -- given the robust

21    competition, given their statement, given the way they

22    gerrymandered the customer and the product market, that they have

23    not met their burden in any way, or met their presumption; but if

24    there's any doubt in the Court's mind, we will propose a

25    divestiture, and the Court can consider that in rendering Your
```

```
 1   Honor's opinion here.
 2        And the reason why the divestiture is good for the --
 3        THE COURT:  And there's circuit precedent with respect to
 4   consideration of that type of evidence, or Supreme Court
 5   precedent?
 6        MS. SULLIVAN:  Yes, Your Honor.
 7        THE COURT:  All right.
 8        MS. SULLIVAN:  And we can submit some cases for the Court.
 9        And so the reason why the divestiture is -- would even
10   enhance competition even more than it already is, is it makes
11   Essendant, this national wholesaler, a lot stronger; and that's
12   important because Essendant supports W.B. Mason, which is an arch
13   competitor of Staples, so it makes Staples stronger -- I mean,
14   makes Mason stronger because their wholesaler's stronger, more
15   resources.
16        As part of the divestiture, Staples is giving -- or
17   transferring hundreds of employees with knowledge of these
18   customers, so the ones who are servicing these customers will go
19   to Essendant to make sure the contracts stick.  And the contracts
20   will also stick because these companies are committed to using
21   diversity suppliers.  So it's not like, oh -- and they run for 18
22   months anyway.  But even after 18 months, these are companies who
23   have made a commitment publicly to use diversity suppliers.  So
24   these are contracts that will stick long term.  We're giving them
25   to Essendant.
```

1          And it makes -- because Essendant supports their --

2    they're huge.  They're a multibillion-dollar company.  Their

3    reach is national, and they support many other competitors of

4    Staples.  So we are making a wholesaler who supports many of our

5    competitors even stronger in this fix; which we will we submit,

6    Your Honor, enhance competition even more than it already exists

7    for this business contract market.

8          Now, I saw on the FTC's slide chart today -- and we've

9    seen it a lot in their briefing, Your Honor, and I submit perhaps

10   one of the reasons they're pursuing this case -- is they think

11   it's like the *Sysco* case.  There's two national distributors.

12   They say it's the same thing, and the results should be the same,

13   that the merger should be enjoined.

14         But, Your Honor, this case is nothing like *Sysco*.  It's

15   like comparing, not apples to oranges, apples to pens.  Because

16   in *Sysco*, food was mission critical to the restaurants and the

17   food companies, the food distributors that -- or foodservice

18   companies that deal with colleges and hospitals.  Food is

19   critical.  This is about pens.  So they have -- *Sysco* had

20   leverage over these customers, customers that needed quality

21   food, who needed -- who had to satisfy regulations, who needed

22   storage capability, and refrigeration trucks.

23         Here we have pens.  It's like if you go to a restaurant,

24   you go to Olive Garden or something; and you order the chicken

25   parm, and it's terrible; and you're afraid it might make you

1   sick, and you'll never go back there.  And that's a real problem.

2        But if somebody gives you your check in one of those vinyl

3   wallets and the pen doesn't work, well, you just say, oh, can I

4   have another pen.  Most people aren't going to say, oh, you gave

5   me a Bic, not a Paper Mate; I'm never coming back here.  It's a

6   completely different kind of case than *Sysco* where food was

7   mission critical for these companies; and pens, papers, erasers

8   are commodity products.

9        In addition, the market here, the evidence will show, is

10  much more fragmented.  There's not two national distributors,

11  there's many that can service national customers.

12       And Amazon, there was no Internet competition for these

13  B2B customers, and there certainly is now; and Your Honor will

14  hear that evidence.

15       And as I mentioned, the remedy litigated in *Sysco* didn't

16  involve contracts that will stick like the commitment to

17  diversity suppliers here.

18       And, Your Honor, as you look at what the -- if the FTC

19  meets their presumption, and I submit, Your Honor, the way they

20  have gerrymandered these markets, when you see the evidence, I

21  submit they won't come close.  But if they do, Your Honor, the

22  way that we rebut the presumption is the competition over the

23  horizon.  What's the -- what's going to -- what's the market

24  going to look like over the next two years?

25       And in this case, we submit -- although we don't have to,

1    or I think in two years it's going to be even more robust, but

2    these -- many of these contracts or most of them are frozen for

3    multiple years.  In other words, these contracts, their expert

4    acknowledges, is on average three years; it's actually on average

5    three to five years.  So the Staple and Depot prices are locked

6    in for years to come in these contracts.

7           And so the horizon is much more -- is much longer than it

8    might usually be.  But, you know, in two years, Your Honor,

9    hopefully even after this merger, Staples will be able to remain

10   competitive.  But something happened on April 28th, 2015, that

11   sent shockwaves across the business supply marketplace for

12   business customers, and that was the launch of Amazon Business.

13          And, Your Honor, we had some fun.  My fine graphics guy

14   had some fun with that slide.  But the reality is, it was like an

15   earthquake.  They took a full-page ad in the *Wall Street Journal*.

16   I mean, you're targeting big customers, full-page ad in the *Wall*

17   *Street Journal* from "Paper clips, we're coming for you."  Paper

18   clips to particle counters, Amazon Business, and they launch with

19   a splash; and everybody knows that Amazon is a behemoth.  They

20   are a seller of goods like the world has never seen.  And they

21   have targeted Staples and Office Depot, their market in a huge

22   way.  And if anyone thinks that they're not going to be -- never

23   mind viable -- dominant in two years' time, they haven't been

24   watching what's been going on over the last couple of years.

25          And, Your Honor, just -- I think the FTC's arguing that

```
 1   Amazon -- if you could hold off, George, for a minute -- that
 2   Amazon is only targeting small customers, well, that's not --
 3   small business customers, well, that's not going to be the
 4   evidence, and that's not going to be the truth, Your Honor.
 5          And with the Court's permission, I'd like to play a short
 6   video from the an Amazon Website.
 7          THE COURT:  Sure.
 8          (Videotape played.)
 9          MS. SULLIVAN:  Judge, they're advertising and collecting
10   customers small and large, from the small bakery to the Fortune
11   100; and you'll hear that evidence.  And Amazon, compared to
12   Staples and Office Depot, is mammoth.  I mean, they have
13   5.9 million product assortments on their Website that customers,
14   business customers, can choose from.  We have together 80,000.
15   They have 5.9 million.  They have more pen selections than we
16   have products altogether.
17          SKU is shopping something units; but it's products,
18   individual products.  They have more distribution centers.  And
19   by square foot, theirs dwarf ours by like 100 times, massive.
20   They have delivery capabilities like the world has never seen,
21   maybe soon drones.  They signed a lease for 20 Boeing 727s.  I
22   mean, this company is for real, and they know how to process
23   orders and deliver goods like no company in history ever had.
24   Their market cap dwarfs ours.  Their stock price, obviously,
25   dwarfs ours.
```

1           And it took Staples and Office Depot years, about a

2    decade, to sign up the customers Amazon has done just in a couple

3    of months.  This is a press release from January 2016, and they

4    launched in April, 200,000 businesses already, ranging from small

5    to the Fortune 500.  Any doubt that they're going to service the

6    Fortune 100 or are servicing the Fortune 100, Fortune 500?

7    They're telling the world they are, and they're signing up

8    business customers right and left.

9           This is a -- an internal Amazon document.  They have

10   monthly meetings about this business-to-business Amazon Business

11   launch.  And this was before they launched.  At the highest

12   levels of the companies, Your Honor, you're going to see from the

13   CEO Jeff Bezos, down to their senior leadership, this is where

14   the money is.  They focused on this -- we consider the next three

15   to four years in 2014 as a land grab to get business from

16   competitors like Staples and Office Depot.  Amazon Business is a

17   must-win initiative for Amazon.  It's a top priority for Amazon.

18          THE COURT:  What's the relevant time frame for the Court

19   to focus on, the ensuing three to four years if the merger's

20   approved or what happens the day after the day the merger is

21   approved?

22          MS. SULLIVAN:  That's a very good question, Your Honor,

23   and the case law and their merger guidelines say two years.

24   Their expert says two to three years.  But it's a -- it's a

25   pretty significant horizon.  And we submit Amazon's competing

1    now, never mind two years.  They've got advertisements about

2    48 --

3           THE COURT:  All of this is a forward-looking process.  The

4    Court has to try to consider --

5           MS. SULLIVAN:  Absolutely.

6           THE COURT:  -- what will be the impact of the merger going

7    forward, not necessarily the day after -- and I thought that was

8    the government's position:  The day after the merger is approved.

9    Right?

10          MS. SULLIVAN:  They would like that to be the law in this

11   case, Your Honor, but the law is clear.  And even the guidelines

12   talk about two years.  Our expert talks about two to three years.

13          And Your Honor asked right off the bat the exact right

14   question:  What's the horizon here?

15          And the problem -- the fatal flaw with the FTC's case:  It

16   all looks backwards.  They started with 2013 data, 2014 data.

17          Ama- -- they did -- and in fairness to the FTC, Amazon

18   launched during their investigation.  And so maybe they had

19   tunnel vision, you know, we're going to get here, we're going to

20   block this, or get to court; but they haven't been watching

21   what's going on in the world.  And you're going to hear the

22   evidence of what's going to happen over the next -- forget two

23   years, over the next six months with Amazon Business at the rate

24   they're going.

25          THE COURT:  But you want me to look back also to 2013 and

1    2014 for the favorable evidence and the --

2        MS. SULLIVAN:  Fair point, Your Honor, fair point.  But,

3    Your Honor, that is fair because -- they say the market

4    was ro- -- the competitive market was robust then.  We'll show

5    it's even more robust now.  There's even more competition.  So

6    the fact that they said 2013, this was their robust competitive

7    market, is telling because three years later even they

8    acknowledge there's more competitors.  We have Amazon Business

9    and we didn't have there.  I mean, I think the evidence is

10   overwhelming on the robust nature and all of the players now in

11   this easy-to-enter, low-commodity market -- low-margin market.

12       And, again, just an idea about how many products Amazon

13   has available for these customers.  They're targeting -- and,

14   look, the top ten business customer type:  Industrial,

15   manufacturing, technology, business, {unintelligible},

16   healthcare.  That's not bakeries; that's not the pizza place.

17   They want big Fortune 100, Fortune 500 large business customers.

18       And if there's any doubt they've been trying -- that

19   they're coming in to take over our market, their internal

20   documents show they've been tracking Staples.  And you'll see

21   that, Your Honor, that they've been tracking Staples and other

22   competitors to make sure they have product parity for business

23   customers, to make sure they have item-line parity.  They are a

24   real competitor in this market, and they're coming after --

25   unfortunately for Staples, they're coming after us and our

1    customers.

2         And, Your Honor, this has been redacted, and I'm not

3    sure -- I don't believe the Court -- I apologize, Your Honor.  I

4    don't believe you have the unredacted version, but we'll get it

5    to you.  But here is -- this is an e-mail dated February 2017

6    [sic].  It's an internal Amazon e-mail, and it's before they even

7    launched Amazon Business launch.  It's before that, but they had

8    done a pilot.  Like Amazon, they're very careful about

9    everything.  They had done a pilot program for about three or

10   four years called AmazonSupply where they tried out offering

11   things to businesses to perfect it, and to fine-tune it, and to

12   figure out what customers needed before they actually launched.

13   So, in February, a Fortune 15 customer -- and Your Honor will

14   recognize the name -- a mammoth company, contacts Amazon, and

15   they say, "We're looking to supplement or replace Staples or

16   OfficeMax as the primary supplier of office supplies to this big

17   company's employees."  And what does Amazon say?  Do they say

18   what the FTC is arguing here, "Oh, no, we can't do it.  We're not

19   ready."  They say, "No, we'll put you in touch with our

20   salesperson.  We'll sign you up."  And then they say, "We have

21   been getting more and more interest in Amazon as a replacement

22   for Staples and OfficeMax, given the merger, and we anticipate

23   getting more of these."

24        They are poaching our people.  What better evidence that

25   they're robust competitors.  Here's an example, Your Honor.  This

1    is an e-mail that went to a salesperson at Staples, Greg Garza

2    from Amazon.  "We're going to revolutionize the business

3    procurement.  Come work with us."

4         And that's the point.  You know, it's sort of like --

5    thinking about this case -- these car service companies that

6    fight over the contracts for the big companies, we want to

7    shuttle the employees around to the airport or their meetings,

8    and they're like, "Oh, we've got good market share.  We've got,

9    you know, 50 percent of the contracts in this city."  Meanwhile,

10   all the employees on the street are using Uber.  The executives

11   are on the street.  The employees are on the street using Uber,

12   making this contract market almost obsolete.  So you're talking

13   about RFPs and bidding for contracts, and what Amazon is doing is

14   transforming the way people order business supplies.  And they

15   are bidding for these contracts while saying, "You know, we're

16   going to do this old-school thing for now, but we're going to

17   transform the way people do business."

18        And so while the FTC is looking at bid data and who's got

19   contracts, that's again, looking backwards because this company's

20   going to transform the way -- like they did on online retail,

21   transform the way business is -- and they say it, revolutionize

22   the way businesses procure.

23        And, Your Honor, I have this as a reminder to myself to

24   not violate Your Honor's protective order.  Mister -- it'll be

25   very expense, as I understand it.  Mr. Coates, thank you.

 1          He's got it for Court and counsel, and so I will show it

 2     for court and counsel.  This is an internal Amazon document.

 3     Again, their monthly business meeting.  It's October 2015, so

 4     several months ago.  Look at those forecasts, Judge.  Look at

 5     those revenue forecasts for Amazon Business.  Staples and Office

 6     Depot could only dream of having revenue forecasts like that.

 7     They are in this.  And, you know, they're making business

 8     forecasts that they think are legitimate, real, to their bosses,

 9     right?

10          Another Amazon confidential, Your Honor.  One of the

11     things they do is they have anticipatory press releases; because

12     Amazon's pretty confident, and they should be.  So they work

13     backwards.  So they say by April 2017, we're going to have this,

14     and so they get the press release ready.  And what they have is

15     something, as the Court can see in point four, it's going to

16     target the very customers that the FTC's defined as their market.

17     They've already targeted them, but they're going to have a new

18     offering that's primarily relevant for these large enterprise

19     customers.  And you see the financial benefits on the bottom,

20     Your Honor.  Again, revenue projections that we could only dream

21     about for the very customers that we are servicing now.

22          And the people who work in this business who have been

23     experts in this business for many years, know -- they know for

24     real what the launch of Amazon Business means to them.  And this

25     is a June 2014 Staples document, written by the president of

1    their entire North America operation.  And this was before any

2    talk of merger, before the merger, while Amazon's doing their

3    pilot program still on Amazon Business, even before the launch.

4    She's writing to the CEO.  If anyone doesn't think that Staples

5    believes that Amazon is a legitimate threat before any merger

6    discussion, she writes to the CEO, "Bankruptcy may not be

7    imminent, but we are on a road to increasing financial distress,

8    declining cash flows, and irrelevancy.  The noose is tightening.

9    We are still far from dead, but the noose is tightening.  There

10   is not a business out there that is not being impacted by

11   digitization; but in our case it is a double whammy, impacting

12   what we sell and how we sell."

13        Amazon and others, new players are much more formidable

14   threats to us.  Amazon plays by different rules, and it's setting

15   customer expectations and pricing levels based on their

16   negligible profitability model.  They knew that Amazon was going

17   to be a competitive threat like they had never seen before in the

18   business-to-business market.  They immediately after launch --

19   this is within weeks of Amazon Business launch -- have a big

20   business meeting at Staples.  How are we going to compete with

21   this Goliath?  How are we going to compete?

22        And there's no -- the FTC during this trial, Your Honor,

23   I'd like to submit, would like to show a couple of e-mails about,

24   you know, Staples and Office Depot calling it a two-player

25   market.  And part of that is because these e-mails are written

1   right on the heels of the OfficeMax/Office Depot merger, so it

2   was kind of tunnel vision.  And also, these e-mails, as you see,

3   Your Honor, are dated two or three years ago.  But one thing that

4   the Court will see:  There's no more talk about any two-player

5   market after Amazon Business launches.  Instead, the evidence is

6   going to show this is what the companies are saying internally

7   after Amazon Business launches.

8           This is an e-mail from a gentleman -- and Your Honor may

9   hear from him in this case -- a Staples employee Faisal Masud.

10  He worked at Amazon for 11 years, and he now works at Staples.

11  And after -- right after, this is two days after the launch of

12  Amazon Business, he writes, "Amazon is a competitor the world has

13  never seen.  Jeff isn't thinking about 2016.  He's already

14  planning the death of Staples, like he did for Circuit City, Best

15  Buy, Sears, RadioShack, and many, many more.  Scary.  This is

16  big-time competition and threat.  This is a shot across our bow.

17  We knew it was coming, and here it is.  We have to up the urgency

18  for our business dramatically.  We have to change our game

19  today."

20          Office Depot e-mail, same thing.  "Scary prospects.  If

21  the people who are working in the trenches who know this market

22  better than anyone, they know that this is going to be a

23  competitive threat like they've never seen before."

24          In fact, if you ask -- I submit, Your Honor, if you ask

25  the executives at Staples to a person today whether they'd rather

1    compete with Office Depot today or Amazon, even Amazon Business

2    as the fledgling, to a person they'd say Office Depot because

3    Amazon is transformational.  And they've got product SKUs and

4    delivery capability like nobody can compete with.  And their

5    e-mails reflect that.

6        Another confidential Amazon document.  You know, Staples,

7    as you saw, Your Honor, Amazon views as a competitor, and so

8    they'd like this merger not to happen, I submit; there's some

9    bias there.  They'd like Staples not to be able to lower their

10   prices to compete with Amazon.  They'd like Staples not to have

11   the resources they'll have with Office Depot sales and marketing

12   team.  And so they have provided the FTC with an affidavit, and

13   they're going to come in here live to testify.

14       But interestingly, they didn't object outright to the

15   merger.  And why is that telling?  New entrant into the market.

16   If they believe Staples was going to be such a dominant

17   competitor that they couldn't compete, they're the best --

18   they're in the best position to assess that.  They're a new entry

19   right on the heels of this merger, and they have no objection to

20   the merger.  You know why?  They know they've got this.  They

21   know they're not going to have any problems competing with

22   Staples.

23       In fact, the Court was good enough to give us discovery

24   from Amazon.  There is no Amazon -- and we asked to give us

25   documents that reference Staples or the merger.  There's not a

1    single Amazon document worried about it.  There's nothing --

2    there's nothing like when you see in Staples worried about

3    Amazon.  There's nothing in Amazon saying, oh, we're worried

4    about this Staples merger.  We're worried about competing with

5    Staples.  No, they have revenue forecasts off the charts.

6    They're not worried about competing with Staples post-merger.

7         And the FTC, Your Honor will see evidence, tried to get

8    Amazon to say certain things to support their case in some

9    affidavits.  They tried to get Amazon to say that Amazon would

10   not be in a position to respond to large office supplies,

11   customers' RFPs; that Amazon couldn't request to these request

12   for proposals until 2017.  They tried to get Amazon to say that.

13   And Amazon's like, nah, we can't say that.  Because they're

14   responding to RFPs now.

15        They also -- the FTC tried to get Amazon to say in its

16   affidavit that Amazon didn't have certain capabilities, that --

17   because of the confidential nature of this document, I won't say

18   in open court -- but they wanted Amazon to say that they couldn't

19   do certain things to service big, large national customers.  And,

20   in fact, the FTC said --

21        THE COURT:  I'm sorry, should something not be on the

22   screen?

23        MR. HOCHSTADT:  Yes, that should be taken down.

24        THE COURT:  All right.  Go ahead.

25        MS. SULLIVAN:  I apologize, Judge.

```
1          THE COURT:  I'm going to have to rely on the attorneys to

2    monitor, because I don't --

3          MS. SULLIVAN:  Yeah, I apologize, Your Honor.  I thought

4    we still had court and counsel.  My fault, Mark.

5          And so, Your Honor, that is comment by Amazon to the draft

6    FTC -- the FTC sent Amazon an affidavit.  They called Amazon, and

7    they said to Amazon, "This is the FTC's highest priority item."

8    Like Amazon, we really want you to say this.  And, Your Honor,

9    they're the government.  Should they be putting words in

10   witnesses' mouths?  Shouldn't they be trying to get to the truth?

11         But they said this is a high priority, and we want you to

12   say, Amazon, we can't do any of these things to service big

13   customers.  And look what Amazon says?  We push back.  We can't

14   say that.  Because they are.  They have all of these

15   capabilities, or they will in the next couple of months.

16         And companies, big companies, recognize, and you'll hear

17   some of that evidence, they're already talking with Amazon.

18   They're doing business with Amazon.  They recognize Amazon as a

19   potential alternative to Staples now, never mind two years from

20   now.

21         Again, Your Honor, we submit the FTC's case wrongly, under

22   the law, looks backwards, not forwards.

23         And the FTC made a mistake once before, at least once

24   before, when it involved a new innovative company in terms of

25   assessing the competitive threat, and they opposed the
```

1    Hollywood/Blockbuster merger; and so those two parties abandoned

2    the merger in the face of the FTC's opposition.  And the FTC, to

3    their credit, did a retrospective analysis of things that they

4    had done in the past and what they could do better, and they

5    underestimated the new innovative companies like Netflix, the new

6    videostreaming service.

7         And here's what the FTC said about that:  That "The

8    Blockbuster/Hollywood video" -- this is the FTC Commissioner

9    Maureen Ohlhausen.  She issued this statement as part of a

10   retrospective, and what she said was, basically, we got it wrong

11   in the Blockbuster/Hollywood video merger.  We shouldn't have

12   opposed it.  We underestimated this new videostreaming

13   technology.  The Blockbuster/Hollywood merger, which was

14   ultimately abandoned in the face of FTC opposition.  But even

15   then, in 2005, the industry was moving towards streaming.  And I

16   don't know if we, as an agency, really understood the magnitude

17   of that change in video distribution during the investigation."

18        "These are the kinds of things that we need to do to

19   evaluate fast-changing industries, really understand what's

20   happening in terms of changing business models and consumer

21   preferences."

22        They acknowledge they didn't understand the magnitude of

23   the change in the video distribution business during the

24   investigation.  And I submit, Your Honor, they don't understand

25   or they're not looking at the magnitude of the change in the

```
 1   office supply distribution business here with the launch of
 2   Amazon Business.
 3          And, Your Honor, here today with the Court's permission,
 4   we have the CEO of Staples Mr. Ron Sargent, and we have the chief
 5   financial officer of Staples Ms. Christine Komola, and we have
 6   the general counsel of Staples, Mr. Mike Williams.
 7          THE COURT:  Good afternoon.
 8          You know, they're your clients; they're corporate
 9   officers.  They can sit at the table, if they want to.  They can
10   sit at counsel table, if they want to.
11          MS. SULLIVAN:  Thank you, Your Honor.  Well, I wasn't
12   sure.  Thank you, Your Honor.  They might want to stay away from
13   me, Judge.  I'm not sure.
14          But, Your Honor, they are here -- and it's expensive to
15   fight with the government over trying to get a merger approved.
16   But they're here fighting to get this deal done because they know
17   that it's really, really important to stay competitive in this
18   transformational digital age, and they know that the landscape of
19   history is littered with companies who have been killed or
20   bankrupt by Amazon and other digital new-age companies.
21          And they don't want to be one of those.  So they're here
22   fighting to merge, fighting to stay relevant, fighting to
23   reinvent themselves to try to compete with the existing threats
24   that are growing and the new Amazon threat that they tout as
25   transformational.
```

 1          And we appreciate the Court giving these companies the

 2    opportunity to prevent -- to present the evidence in this case.

 3    And we submit after Your Honor hears the evidence, you will

 4    conclude that this evidence is not anticompetitive.  If anything,

 5    it will increase competition with somebody like Amazon who is

 6    poised to dominate this market.

 7          And in addition, Your Honor, it's strongly in the public

 8    interest.  Consumers will benefit from this merger.

 9          And we thank the Court for the time.

10          THE COURT:  Let me ask you this:  Do the defendants plan

11    to introduce evidence that inclusion of ink and toner in the

12    relevant market will be more reliable, HHI numbers?

13          MS. SULLIVAN:  Our experts will -- and because it's the

14    FTC's burden and because we only had two months, they haven't

15    done -- or they haven't gathered from all these 400,000 customers

16    the sales data, but it's clear because there's these companies

17    like Xerox and Hewlett-Packard and others that compete, that we

18    have a much smaller share of that piece of the market shares, and

19    we can show some of that evidence.  The market shares will go

20    considerably down.

21          And that's why, I submit, Your Honor, that's why they

22    ripped it out to gin up the market shares.

23          THE COURT:  All right.  Thank you, Counsel.

24          MS. SULLIVAN:  Thank you, Your Honor.

25          THE COURT:  Let me ask government counsel one question

1    about that declaration.  It's really disturbing if that -- you

2    know, I'm going to assume in good faith the statement was

3    attributed to him, but what is the declaration that that

4    person -- what is the declaration associated with this case?  He

5    gave a declaration, I assume.  What's the government asking me to

6    do with respect to that declaration?  Because in view of that

7    statement, I'm not inclined to give it any credit at all if

8    that's what he said.

9         MS. REINHART:  Sure, sure.  He'll testify about it, Your

10   Honor --

11        THE COURT:  He's going to be a witness?

12        MS. REINHART:  This is the Amazon witness, yes, Your

13   Honor.

14        THE COURT:  This is Mr. Arslanian.

15        MS. REINHART:  Oh, I'm sorry.  You're talking about

16   Corporate United.

17        THE COURT:  Right.

18        MS. REINHART:  He testified in a deposition, and he

19   explained himself there, which was that this was a big joke.  He

20   was taking in by the --

21        THE COURT:  Well, he's testifying under oath, though,

22   right?

23        MS. REINHART:  He testified under oath, yes --

24        THE COURT:  He's not going to testify here; is that right?

25        MS. REINHART:  He's not testifying here, Your Honor.

1      THE COURT:  What weight is the government asking me to

2   give his declaration?

3      MS. REINHART:  We have not actually made that decision,

4   Your Honor.  I don't think he's necessary to our case.  We have

5   lots of declarations.  We have a lot of declarations.

6      THE COURT:  Because based on that statement, I'm not

7   inclined to give it any weight at all.  I mean, he can come in

8   here and testify under oath what he meant, what he said his

9   testimony was a work of art mixed with B.S., and good luck to

10  him.

11     MS. REINHART:  Certainly, Your Honor.  We'd happy to put

12  the deposition transcript in front of you as well.

13     THE COURT:  I mean, that's pretty disturbing.  If he was

14  testifying -- this came in a proceeding before the Federal Trade

15  Commission?

16     MS. REINHART:  I'm sorry.  No, Your Honor.  So this was --

17  what counsel showed you, I believe --

18     THE COURT:  The statement is made September 22nd.  What

19  testimony is he talking about?  Was it testimony before the FTC?

20     MS. REINHART:  No.  I think he was referencing his

21  declaration is what he's talking about.

22     THE COURT:  Well, he said "My testimony was a work of art

23  mixed with B.S."  that's what he says.  What testimony --

24     MS. REINHART:  He's talking about his statement.  He had

25  not given testimony, Your Honor.  He gave testimony afterward.

1    THE COURT:  Well, what he talking about then?  What's he

2  talking about?

3    MS. REINHART:  The declaration.

4    THE COURT:  So was there a declaration submitted to the

5  FTC that the FTC relied upon in reaching its decision in this

6  case?

7    MS. REINHART:  It -- Your Honor, I can't say we relied on

8  him specifically; but, yes, we did give a declaration --

9    THE COURT:  Well, all right.  I'll give you two choices:

10  If you're going to withdraw his declaration, that's fine.

11    But if you're asking me to credit it, I am going to need

12  answers to those questions I had, because I'm very disturbed

13  about this.  I mean, these folks have spent a lot of money, the

14  Court has spent, you know, a ton of time and effort and will

15  spend the time; but I don't have time to deal with declarations

16  that, you know, that are very disturbing, to say the least.

17    So I'll give you a choice:  Either just withdraw it or

18  bring him in here and let him testify under oath as to what he

19  meant.  But, you know, he should probably bring his lawyer with

20  him, too.

21    MS. REINHART:  Yes, certainly, Your Honor.

22    THE COURT:  All right.  We're going break for lunch.

23    Yes, Counsel.

24    MR. REILLY:  Your Honor, Matt Reilly from Office Depot.  I

25  have about 20 minutes of remarks, if Your Honor --

```
 1          THE COURT:  All right.  We'll do it after lunch.  I'm
 2     sorry, I have a conference call scheduled in something totally
 3     unrelated to this, involving another case; and I will be happy to
 4     give you that time.
 5          MR. REILLY:  Okay.  Thank you.
 6          THE COURT:  We'll do that at 2:15.
 7          The Amazon attorney wanted to say something; I kind of cut
 8     him off early because I wanted to focus on that.
 9          How much time do you need to say whatever you wish to say,
10     Counsel?  I may take it after lunch.
11          MR. HULSE:  I can say it less than a minute, Your Honor.
12     I was just correcting --
13          THE COURT:  Why don't you come forward then, Counsel.
14     Sure.  I'm sorry I didn't give you a chance earlier, but I wanted
15     to hear the opening statements.  And I cut you off knowing I
16     would give you time.  All right.
17          Good afternoon.  How are you?
18          MR. HULSE:  Good afternoon.  Benjamin Hulse, Your Honor,
19     on behalf of Amazon.  I entered an appearance this morning.
20          I just wondered, Your Honor was speculating as to -- or
21     questioning whether Amazon had requested that all of its exhibits
22     be under seal.  That is absolutely not correct.  We are not doing
23     that at all.  We've made a good faith effort to follow the
24     Hubbard factors, mindful of your comments and your directions in
25     your order.
```

1          So I just wanted to clear that up.

2          THE COURT:  All right.  And do we have hard copies that

3    show the redactions?  If not, we should have hard copies in

4    chambers so it is clear to us what you're redacting.

5          MR. HULSE:  Those should have been delivered to you this

6    morning.  Because we had to file the motion last night, we

7    couldn't get you the hard copy last night; but they should have

8    been delivered this morning.

9          THE COURT:  All right.

10         MR. HULSE:  And it's just two documents at issue in the

11   motion.

12         THE COURT:  All right.  Thank you very much.

13         MR. HULSE:  Thank you, Your Honor, I appreciate the time.

14         THE COURT:  Sure.

15         Yes, sir.

16         MR. HOCHSTADT:  Your Honor, if I may be heard for the

17   defendants on an issue.

18         THE COURT:  Sure.

19         MR. HOCHSTADT:  Your Honor, just with the Court's brief

20   indulgence, my name is Eric Hochstadt for Staples.

21         Your Honor, there's two documents at issue that Amazon has

22   asked for blanket confidentiality that we appreciate the Court's

23   indulgence, and we have submitted our briefing on that in

24   response.

25         But part of the reason we raised the issue in the joint

1   status report is that Mr. Wilson is coming here to testify

2   tomorrow.  And as it stands right now, we've endeavored to work

3   with Amazon on redactions across a number of their documents.

4   And the majority of the exam right now is likely going to have to

5   be under seal with the courtroom cleared, which we understand the

6   Court's preference not to have this be a secret trial.  And given

7   the public interest in this case, and it being a government

8   merger proceeding, we're asking the Court's guidance on how best

9   to proceed without having to shut down the Court for most of the

10  exam.

11      THE COURT:  Well, you know, if we have to close the doors,

12  we have to close the doors.  I mean, sometimes it's appropriate,

13  and everyone's able to talk around issues.  I don't know if

14  that's appropriate or not, or easy to do.

15      If you can, we'll keep the doors open; that's fine.  If

16  not, then if we seal it, then I would hope that any direct

17  testimony followed immediately by cross-examination with respect

18  to the sealed material would take place so we don't have to keep

19  opening doors, and closing doors, and inviting people in, and

20  asking them to leave.

21      MR. HOCHSTADT:  We'll do the best we can, Your Honor.  But

22  part of the issue which is late breaking for us, but as Your

23  Honor may recall, Mr. Wilson came to Baltimore last week to give

24  a presentation.  He's coming tomorrow.  We just received his

25  presentation that he gave to the public last week, and a number

1    of the topics that Amazon is claiming redactions over that we've

2    been trying to meet and confer on were publicly disclosed in

3    slides that Amazon itself has produced highly confidential --

4        THE COURT:  Well, a hint to the wise:  If they're out

5    there on the Internet or in some public statement, then I'm not

6    going to seal it.  So I leave it up to the good faith of the

7    attorneys to work it out.  But -- and I'm sure you will.  All

8    right?

9        MR. HOCHSTADT:  Thank you, Your Honor.

10       THE COURT:  And I appreciate it.  And that's the kind of

11   things that -- I mean, because we're all fighting time here, we

12   don't want to spend time on something that's already out there

13   already in the public domain, Counsel.  So thank you very much

14   for a good faith effort for this.

15       MR. HOCHSTADT:  Thank you, Your Honor.

16       THE COURT:  So everyone enjoy -- I'm sorry.  Counsel,

17   anything further from government counsel?

18       MS. REINHART:  No, Your Honor.

19       THE COURT:  All right.  So we'll start promptly at 2:15.

20   All right.  Thank you.

21       (Proceedings adjourned at 12:57 p.m.)

22

23

24

25

1

## **C E R T I F I C A T E**

2

3                     I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of
4    proceedings in the above-entitled matter.

5

6    /s/ Scott L. Wallace
     ---------------------------          ----------------
7    **Scott L. Wallace, RDR, CRR                 Date**
     **Official Court Reporter**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$250,000** [1] - 30:16
**$49** [2] - 46:11; 47:1
**$500,000** [3] - 30:6, 10; 68:19

## '

**'15** [1] - 15:2

## /

**/s** [1] - 115:5

## 0

**08540** [1] - 2:14

## 1

**1** [11] - 1:9; 21:1; 43:1, 9, 16, 22; 62:5;
63:17; 67:18; 75:14; 85:24
**1,085** [1] - 69:8
**1,100-plus** [1] - 14:15
**100** [35] - 11:11, 17, 25; 12:1, 3; 14:3,
15; 18:24; 19:1, 9, 17, 20; 63:21; 64:23;
65:1, 4; 66:14, 18; 67:6, 11; 71:4;
81:11; 82:6; 85:23; 86:21; 87:9, 15;
88:6; 93:11, 19; 94:6; 96:17
**100/Fortune** [1] - 84:12
**100th** [1] - 67:17
**10153** [1] - 2:17
**10th** [1] - 37:16
**11** [1] - 101:10
**1100** [1] - 69:8
**11:10** [1] - 58:5
**11:15** [1] - 58:1
**11:30** [1] - 58:2
**11:33** [1] - 58:6
**12:57** [1] - 114:21
**13(b** [1] - 21:13
**13th** [1] - 3:20
**15** [4] - 70:5, 22; 80:11; 97:13
**15-2115** [1] - 1:4
**15-2555** [1] - 6:4
**16** [1] - 80:11
**18** [2] - 89:21
**19** [2] - 63:22; 67:17
**1980s** [3] - 59:2, 9; 60:24
**1997** [1] - 73:5

## 2

**2** [6] - 10:23; 43:9, 14, 22; 56:11; 67:19
**2-1/2** [2] - 62:6

**2.5** [2] - 67:5; 78:9
**20** [2] - 93:21; 110:25
**200,000** [1] - 94:4
**20001** [6] - 2:9; 3:4, 8, 13, 17; 4:6
**20004-1109** [1] - 3:20
**20024** [5] - 1:15, 18, 22; 2:4, 21
**2005** [3] - 45:17; 105:15
**2012** [1] - 87:17
**2013** [21] - 14:1; 17:3; 42:18, 23; 43:4,
6; 53:20; 73:4, 8; 79:25; 80:9; 82:9;
83:16, 24; 84:8; 85:17; 86:10; 95:16,
25; 96:6
**2014** [6] - 11:15; 13:1; 94:15; 95:16;
96:1; 99:25
**2015** [20] - 11:18, 25; 12:2, 10, 22, 24;
13:9; 14:22; 15:6, 24-25; 16:5; 17:4, 9,
13, 17; 31:12; 45:14; 92:10; 99:3
**2016** [4] - 1:5; 6:1; 94:3; 101:13
**2017** [3] - 97:5; 99:13; 103:12
**202** [20] - 1:15, 19, 23; 2:4, 10, 22; 3:4,
9, 13-14, 17, 21
**202)354-3196** [1] - 4:7
**21** [2] - 1:5; 6:1
**210** [2] - 37:19, 22
**212)310-8007** [1] - 2:18
**212)310-8538** [1] - 2:18
**220-7702** [1] - 3:9
**22nd** [1] - 109:18
**28** [2] - 8:9, 11
**28th** [1] - 92:10
**2:15** [2] - 111:6; 114:19

## 3

**3** [1] - 43:14
**30** [4] - 36:10; 88:6, 8
**30,000** [1] - 80:23
**301** [1] - 2:13
**303** [1] - 2:13
**326-2114** [1] - 1:19
**326-2286** [4] - 1:19, 23; 2:5, 22
**326-2638** [1] - 1:15
**326-2821** [1] - 2:4
**326-3044** [1] - 2:22
**326-3362** [1] - 1:23
**333** [1] - 4:5
**39** [1] - 18:5
**3M** [1] - 45:7

## 4

**400** [5] - 1:14, 18, 22; 2:3, 21
**400,000** [5] - 63:13; 67:15; 69:1, 8;
107:15
**441** [1] - 2:8
**442-9864** [1] - 2:10
**46** [1] - 65:4
**48** [1] - 95:2

## 5

**5.9** [2] - 93:13, 15
**50** [8] - 19:19; 22:1; 65:7; 72:11; 80:23;
81:13; 98:9
**50,000** [1] - 68:3
**500** [7] - 71:5; 80:24; 84:12; 86:21;
94:5; 96:17
**500,000** [1] - 70:5
**555** [1] - 3:20
**57** [1] - 5:5
**58** [1] - 18:3
**5:00** [1] - 6:22

## 6

**6** [2] - 63:16, 20
**600** [2] - 2:9; 61:2
**609** [1] - 2:14
**636-5502** [2] - 3:5, 14
**636-5505** [1] - 3:9
**636-5566** [1] - 3:4
**636-5567** [1] - 3:13
**636-5576** [1] - 3:17
**637-5910** [1] - 3:21
**637-6440** [1] - 3:21
**6503** [1] - 4:6

## 7

**7** [1] - 21:18
**70** [1] - 36:10
**700** [1] - 85:11
**727s** [1] - 93:21
**741-0655** [1] - 2:10
**767** [1] - 2:17
**79** [8] - 10:21; 35:5; 62:14, 20; 63:5;
64:7; 69:18; 71:7
**7th** [4] - 1:18, 22; 2:3, 21

## 8

**8** [2] - 18:9; 83:3
**80,000** [1] - 93:14
**81** [3] - 63:23; 68:21

## 9

**9** [1] - 5:4
**90** [1] - 18:5
**900** [4] - 3:3, 7, 12, 16
**986-1120** [1] - 2:14
**99** [3] - 63:14; 69:18; 75:15
**9:51** [2] - 1:6; 6:2
**9th** [3] - 3:3, 8, 12

# A

**a.m** [4] - 1:6; 6:2; 58:5
**abandoned** [2] - 105:1, 14
**abilities** [1] - 46:21
**ability** [7] - 20:4; 26:25; 39:20; 54:4; 77:11; 80:13
**able** [14] - 42:19; 43:17; 44:5, 19; 51:7; 57:22; 60:15; 85:25; 86:1, 5; 92:9; 102:9; 113:13
**above-entitled** [1] - 115:4
**absolutely** [4] - 56:23; 57:2; 95:5; 111:22
**access** [1] - 13:4
**accompanied** [1] - 25:17
**according** [2] - 19:15; 65:8
**accounts** [5] - 21:1; 78:5; 83:8, 12, 19
**accusing** [1] - 52:15
**acknowledge** [4] - 70:18, 23; 96:8; 105:22
**acknowledged** [1] - 83:25
**acknowledges** [1] - 92:4
**acquisition** [1] - 15:8
**Act** [2] - 21:18; 48:14
**action** [2] - 6:3; 21:15
**Action** [1] - 1:4
**active** [1] - 18:7
**acts** [1] - 45:22
**actual** [3] - 7:7; 11:13; 49:15
**ad** [2] - 92:15
**add** [2] - 35:20; 64:3
**addition** [13] - 9:8; 41:23; 67:14; 68:24; 70:2; 72:10; 73:2; 74:1; 77:7; 80:2, 4; 91:9; 107:7
**additional** [1] - 28:6
**address** [2] - 48:2; 49:2
**addressing** [1] - 52:2
**adequately** [1] - 43:17
**adjacent** [3] - 84:10; 85:3, 16
**adjourned** [1] - 114:21
**administration** [1] - 24:13
**administrative** [1] - 37:4
**admissions** [1] - 86:10
**adverse** [1] - 56:6
**adversely** [1] - 56:16
**advertisements** [1] - 95:1
**advertising** [1] - 93:9
**advise** [1] - 61:12
**AEP** [1] - 70:17
**affect** [3] - 40:23; 41:3; 61:9
**affected** [1] - 26:25
**affects** [1] - 29:1; 41:2
**affidavit** [4] - 68:9; 102:12; 103:16; 104:6
**affidavits** [4] - 66:17; 67:16; 68:1; 103:9
**affordable** [2] - 32:9, 25
**afraid** [1] - 90:25

**afternoon** [3] - 106:7; 111:17
**age** [3] - 60:24; 106:18, 20
**agency** [2] - 25:19; 105:16
**aggregated** [1] - 19:23
**Aggressive** [1] - 17:6
**ago** [7] - 12:3; 20:14, 17; 59:10; 87:18; 99:4; 101:3
**agree** [4] - 7:19; 71:11; 76:14; 77:14
**agreed** [1] - 36:14
**agreement** [3] - 40:1; 51:7; 86:16
**ahead** [3] - 69:15; 85:13; 103:24
**aided** [1] - 4:9
**airport** [1] - 98:7
**al** [4] - 1:4, 7; 6:4
**alacy@stblaw.com** [1] - 3:10
**alarming** [1] - 16:8
**alleged** [1] - 54:24
**alleges** [1] - 56:5
**alleging** [7] - 54:19; 55:14, 17; 56:9; 57:17
**alliance** [2] - 83:9
**allow** [3] - 7:17; 27:4; 46:7
**allowed** [4] - 15:17; 20:18; 32:3; 57:19
**almost** [4] - 65:7; 68:16; 75:15; 98:12
**alone** [1] - 50:20
**alternative** [3] - 13:20; 70:19; 104:19
**alternatives** [6] - 11:7, 13; 18:15; 20:2; 43:15; 70:15
**altogether** [1] - 93:16
**Ama** [1] - 95:17
**Amazon** [24] - 3:19; 9:18, 20; 11:4; 45:12, 15, 17, 22; 46:1, 3, 5, 7, 13, 15-16, 20, 24; 47:5, 15, 17, 19, 21, 23; 53:7; 59:11, 24; 60:13; 61:25; 65:17; 70:24; 91:12; 92:12, 18-19; 93:1, 6, 11; 94:2, 9-10, 16-17; 95:17, 23; 96:8, 12; 97:6-8, 14, 17, 21; 98:2, 13; 99:2, 5, 10, 24; 100:3, 5, 13-14, 16, 19; 101:5, 7, 10, 12; 102:1, 3, 6-7, 10, 24; 103:1, 3, 8-9, 11-12, 15-16, 18; 104:5-8, 12-13, 17-18; 106:2, 20, 24; 107:5; 108:12; 111:7, 19, 21; 112:21; 113:3; 114:1, 3
**amazon** [1] - 47:2
**Amazon's** [6] - 9:22; 46:2; 94:25; 99:12; 100:2; 103:13
**Amazon.com** [4] - 45:13, 23; 46:14
**AmazonSupply** [1] - 97:10
**America** [3] - 66:24; 67:3; 78:7; 100:1
**American** [6] - 58:17; 59:1, 4, 13-14, 22
**analogy** [2] - 33:2; 60:21
**analyses** [5] - 11:19; 17:22; 19:11; 35:2
**analysis** [12] - 17:25; 20:12, 15; 27:17; 29:13; 30:7; 40:24; 64:13; 75:11; 105:3
**analyst** [1] - 78:19
**analysts** [3] - 61:11; 62:7; 78:23
**analysts'** [1] - 78:22
**analyze** [4] - 26:24; 27:10; 29:14;

75:25
**analyzed** [4] - 11:10, 12; 27:15
**analyzing** [1] - 68:17
**ancient** [1] - 17:3
**Andrew** [1] - 3:6
**Andy** [1] - 6:18
**Anne** [1] - 2:6
**announced** [5] - 12:21; 14:21; 15:1; 83:10; 85:6
**announcement** [1] - 15:12
**annual** [2] - 29:15; 34:4
**annually** [2] - 30:6, 16
**answer** [3] - 29:5; 36:3; 82:3
**answers** [1] - 110:12
**anticipate** [1] - 97:22
**anticipatory** [1] - 99:11
**anticompetitive** [7] - 44:20; 51:16; 63:8; 67:23, 25; 86:14; 107:4
**antitrust** [4] - 18:18; 48:2; 55:24; 64:16
**anyway** [2] - 26:16; 89:22
**apart** [1] - 23:1
**apologize** [6] - 10:3; 58:19, 23; 97:3; 103:25; 104:3
**appeal** [4] - 36:18, 24; 38:13
**appearance** [1] - 111:19
**APPEARANCES** [4] - 1:12; 2:1; 3:1; 4:1
**applauded** [1] - 61:13
**apples** [2] - 90:15
**appliances** [2] - 54:8, 19
**applied** [1] - 51:21
**apply** [3] - 8:7; 28:13; 35:12
**applying** [1] - 50:4
**appointed** [1] - 24:9
**appointees** [1] - 24:21
**appoints** [2] - 24:11, 19
**appreciate** [7] - 8:21; 53:25; 58:4; 107:1; 112:13, 22; 114:10
**appropriate** [5] - 8:20; 19:4; 88:17; 113:12, 14
**approval** [1] - 29:24
**approve** [1] - 15:8
**approved** [8] - 15:4; 20:10; 25:4; 79:25; 94:20; 95:8; 106:15
**approving** [1] - 85:17
**April** [4] - 15:2; 92:10; 94:4; 99:13
**arch** [4] - 67:11; 81:18, 21; 89:12
**areas** [1] - 83:2
**argue** [3] - 40:4; 44:10; 56:24
**argued** [1] - 81:6
**argues** [1] - 71:6
**arguing** [2] - 92:25; 97:18
**argument** [9] - 6:23; 12:22; 20:8; 42:1; 56:18, 22; 57:7; 70:12
**armies** [1] - 65:11
**arrive** [1] - 40:7
**Arslanian** [3] - 68:9; 69:2; 108:14
**art** [3] - 68:11; 109:9, 22
**artificial** [2] - 64:6; 75:3

**artificially** [4] - 62:21; 70:1; 71:23; 72:9
**assert** [1] - 51:19
**assess** [3] - 19:8, 12; 102:18
**assessing** [1] - 104:25
**assets** [1] - 44:11
**assigned** [1] - 49:19
**assist** [1] - 9:10
**associated** [2] - 26:5; 108:4
**assortment** [2] - 82:24; 85:7
**assortments** [1] - 93:13
**assume** [5] - 23:15; 50:5; 54:13; 108:2, 5
**assuming** [1] - 40:22
**assure** [1] - 9:25
**assured** [1] - 7:10
**attention** [1] - 13:14
**attorney** [1] - 111:7
**Attorney** [6] - 1:13, 17, 21; 2:2, 7, 20
**ATTORNEY** [1] - 2:7
**attorneys** [2] - 104:1; 114:7
**attributed** [1] - 108:3
**auctions** [1] - 65:14
**authority** [2] - 22:7; 26:18
**authorization** [1] - 23:18
**authorizing** [1] - 25:19
**available** [4] - 12:25; 32:1; 46:6; 96:13
**Avenue** [2] - 2:17; 4:5
**average** [9] - 54:9, 11, 14-15; 55:6, 15; 57:9; 92:4
**avoid** [1] - 27:5
**aware** [4] - 8:22; 26:11; 36:2; 37:8
**awful** [1] - 40:11

## B

**B.S** [3] - 68:12; 109:9, 23
**B2B** [4] - 15:16, 21; 20:25; 91:13
**backed** [1] - 88:3
**background** [1] - 58:13
**backing** [1] - 86:22
**backwards** [4] - 95:16; 98:19; 99:13; 104:22
**bad** [3] - 20:9; 65:2, 4
**bakeries** [1] - 96:16
**bakery** [1] - 93:10
**balancing** [1] - 57:22
**Baltimore** [1] - 113:23
**band** [1] - 29:22
**bands** [1] - 11:3
**Bank** [5] - 47:22; 66:24; 67:3; 78:7
**bankrupt** [1] - 106:20
**Bankruptcy** [1] - 100:6
**banks** [1] - 61:11
**bar** [5] - 19:24; 21:11; 29:8; 43:24; 45:19
**barriers** [3] - 77:22; 78:14
**bars** [5] - 11:8; 18:2, 4; 19:22
**BARTLETT** [4] - 3:2, 7, 11, 16

**based** [13] - 29:15; 30:10; 49:5; 62:20; 63:20, 24; 67:15; 68:20; 73:4; 86:9; 100:15; 109:6
**basis** [5] - 36:23; 38:13; 41:6; 72:2, 5
**bat** [1] - 95:13
**bates** [1] - 47:5
**battered** [1] - 59:25
**bear** [2] - 38:25; 44:9
**beating** [1] - 60:5
**become** [3] - 42:9; 45:8; 47:17
**BEFORE** [1] - 1:10
**began** [1] - 59:3
**beginning** [1] - 42:15
**BEHALF** [4] - 5:4; 10:16; 58:11
**behalf** [2] - 6:18; 111:19
**behemoth** [2] - 60:13; 92:19
**belies** [1] - 41:1
**believes** [1] - 100:5
**below** [1] - 81:1
**benefit** [3] - 34:16; 56:25; 107:8
**benefits** [8] - 15:10; 16:22, 25; 17:8, 20; 34:24; 57:8; 99:19
**Benjamin** [1] - 111:18
**Best** [3] - 66:21; 67:10; 101:14
**best** [19] - 12:17, 25; 15:14; 16:4; 31:8; 35:4; 36:17, 20; 60:14; 61:4; 65:10, 13; 66:8; 75:6; 76:3; 102:17; 113:8, 21
**better** [11] - 17:15; 29:19; 42:1; 53:13; 81:24; 82:2, 7; 84:3; 97:24; 101:22; 105:4
**between** [10] - 16:10; 17:21; 37:20; 41:17; 47:3; 50:13; 62:5; 63:13; 68:25; 69:9
**beyond** [7] - 65:25; 72:13; 74:6; 79:8; 81:11
**Beyond** [10] - 72:14, 22, 25; 74:7, 9, 12, 17, 19; 75:17; 81:2
**Bezos** [1] - 94:13
**bias** [2] - 81:24; 102:9
**Bic** [1] - 91:5
**bid** [6] - 17:23; 18:3; 71:2; 98:18
**bidding** [4] - 18:15, 21; 98:13, 15
**bids** [3] - 18:5, 9; 74:18
**big** [30] - 32:10; 50:9; 54:16; 56:6; 57:14; 61:20; 65:15; 66:2, 4, 11; 71:4, 9, 13; 74:18; 79:9; 84:10, 21; 86:2; 87:12; 92:16; 96:17; 97:16; 98:6; 100:19; 101:16; 103:19; 104:12, 16; 108:19
**big-time** [1] - 101:16
**bigger** [2] - 79:21; 84:16
**biggest** [2] - 42:11
**billing** [1] - 83:13
**billion** [10] - 10:23; 56:11; 62:5-7; 67:5; 78:9; 86:17, 19
**bills** [1] - 14:13
**binder** [3] - 27:18, 25; 59:8
**binding** [4] - 38:2, 7; 71:9
**bit** [2] - 16:15; 86:8

**black** [1] - 41:4
**blanket** [3] - 9:15, 23; 112:22
**Block** [1] - 39:15
**block** [1] - 95:20
**Blockbuster/Hollywood** [3] - 105:8, 11, 13
**blocked** [2] - 68:10; 73:7
**blue** [1] - 18:4
**boards** [1] - 61:3
**Boeing** [1] - 93:21
**boilerplate** [1] - 34:5
**bonus** [1] - 34:14
**BOSS** [2] - 72:13
**bosses** [1] - 99:8
**bothered** [1] - 67:22
**bottom** [3] - 19:24; 56:13; 99:19
**bought** [1] - 32:21
**bound** [1] - 51:2
**Bounty** [1] - 72:19
**bow** [1] - 101:16
**break** [14] - 14:12; 26:12; 28:4; 58:1, 5; 60:7; 66:1, 7; 72:18; 74:20; 77:6; 110:22
**breaking** [2] - 14:2; 113:22
**brick** [1] - 59:24
**brief** [3] - 6:23; 69:5; 112:19
**briefing** [2] - 90:9; 112:23
**briefly** [1] - 58:13
**bring** [5] - 23:19; 26:18; 70:16; 110:18
**broad** [1] - 27:22
**broader** [1] - 75:16
**broadly** [8] - 11:12; 19:2; 32:18; 75:9, 20; 76:7, 13; 77:5
**Brown** [1] - 54:5
**building** [1] - 33:15
**bump** [1] - 85:9
**bunch** [1] - 79:20
**burden** [7] - 9:6; 28:18; 39:1; 44:9; 62:19; 88:23; 107:14
**Bureau** [1] - 1:14
**Business** [23] - 45:14, 22; 46:3, 7, 13; 47:2, 21; 92:12, 18; 94:10, 16; 95:23; 96:8; 97:7; 99:5, 24; 100:3, 19; 101:5, 7, 12; 102:1; 106:2
**business** [103] - 10:22; 11:2, 11; 12:17; 13:17; 14:14; 16:2, 7, 14, 25; 17:5, 10, 14, 24; 18:22; 19:2, 16; 27:17; 28:6, 15; 29:9, 14; 33:14; 41:19; 43:6; 46:18, 24; 47:18, 20, 23; 49:15; 50:25; 54:16; 56:6; 57:14; 59:2; 60:7; 61:21; 62:22; 63:10, 13, 16-17; 64:10, 12; 67:15, 18; 68:16, 25; 69:8, 19, 24; 70:22; 74:10; 75:7, 19, 22; 77:25; 79:15; 80:3, 6, 21; 83:3; 84:4; 85:10; 90:7; 92:11; 93:3, 14; 94:8, 10, 15; 96:14, 17, 22; 98:2, 14, 17, 21; 99:3, 7, 22-23; 100:10, 18, 20; 101:18; 104:18; 105:20, 23; 106:1
**business-to-business** [4] - 16:2; 80:21; 94:10; 100:18

**businesses** [16] - 10:23; 11:14; 13:23; 18:13; 33:7; 41:1; 45:1, 17, 21; 46:19; 59:7; 78:1; 94:4; 97:11; 98:22
**Buy** [3] - 66:21; 67:10; 101:15
**buy** [33] - 10:23; 13:17; 27:13; 31:25; 32:9; 34:8; 40:8; 41:10, 12, 22; 59:6; 61:12; 63:11; 65:14, 16-17; 66:7; 68:19; 71:11, 14, 17-18, 20; 79:3, 5-6, 10; 82:7
**buying** [15] - 33:2; 40:1, 18; 41:10; 65:5; 71:10; 76:25; 77:1; 83:7, 10; 87:21
**buys** [5] - 54:19; 55:6; 68:3; 69:21; 79:7

## C

**cabinets** [1] - 60:4
**Cadillac** [1] - 33:3
**calculate** [3] - 63:20; 67:14; 68:20
**calculated** [1] - 63:24
**calculating** [3] - 65:21; 69:16; 72:20
**calculations** [1] - 72:24
**cannot** [2] - 36:4; 39:2
**cap** [1] - 93:24
**capabilities** [12] - 30:25; 44:22-24; 46:16; 50:19; 53:7; 83:6; 93:20; 103:16; 104:15
**capability** [3] - 43:21; 90:22; 102:4
**capable** [1] - 83:22
**car** [1] - 98:5
**careful** [3] - 57:21; 62:2; 97:8
**Carl** [1] - 19:3
**Carnegie** [1] - 2:13
**cart** [1] - 46:10
**carve** [1] - 84:2
**carved** [1] - 69:7
**case** [60] - 21:22; 22:18, 22; 26:8; 35:9; 36:20; 39:6; 48:16; 51:13; 52:5; 53:13; 54:2, 25; 55:8; 57:13, 21; 61:17, 21-22; 62:9, 18; 63:4; 65:19; 68:8; 69:10; 70:21; 71:2, 21; 72:14; 73:4, 11-12, 16; 75:11; 79:14; 80:17; 86:13; 88:20; 90:10, 14; 91:6, 25; 94:23; 95:11, 15; 98:5; 100:11; 101:9; 103:8; 104:21; 107:2; 108:4; 109:4; 110:6; 111:3; 113:7
**case-in-chief** [1] - 39:6
**cases** [18] - 35:9, 15, 17, 24-25; 36:5; 38:20; 48:20; 49:10; 57:21; 62:15; 65:11; 70:8, 19; 74:21; 83:4; 89:8
**cash** [3] - 29:25; 34:14; 100:8
**catalog** [2] - 31:16; 83:14
**catalogs** [2] - 32:16; 46:19
**categories** [11] - 13:15; 14:12; 19:24; 28:3, 7; 29:17; 41:22, 24; 42:5, 8; 82:16
**category** [5] - 13:14; 14:4; 65:23; 77:16; 81:3
**Catherine** [2] - 2:6; 6:12
**catherine.jackson@dc.gov** [1] - 2:11

**Center** [1] - 2:13
**centers** [2] - 82:25; 93:18
**centralize** [1] - 29:23
**CEO** [9] - 13:25; 52:4; 81:25; 87:8; 88:13; 94:13; 100:4, 6; 106:4
**CEOs** [1] - 61:4
**certain** [10] - 8:21; 9:18; 54:8, 13; 82:14, 16; 84:3; 103:8, 16, 19
**certainly** [12] - 8:4; 26:16; 49:4; 54:12; 55:9, 16; 81:3, 14; 84:23; 91:13; 109:11; 110:21
**certainty** [1] - 22:6
**certify** [1] - 115:3
**cetera** [2] - 59:8; 72:16
**challenge** [4] - 20:20; 36:22; 42:18; 43:3
**challenged** [1] - 23:9
**chambers** [1] - 112:4
**chance** [3] - 7:15; 61:4; 111:14
**change** [10] - 32:25; 42:10; 44:6; 45:11; 59:21; 67:24; 101:18; 105:17, 23, 25
**changing** [2] - 105:19
**character** [1] - 44:18
**Charles** [1] - 1:17
**chart** [17] - 11:15, 25; 12:1; 18:17; 19:21; 21:11; 29:8; 35:8; 36:8; 43:24; 45:19; 50:16; 80:25; 87:24; 88:2; 90:8
**charts** [1] - 103:5
**check** [1] - 91:2
**chicken** [1] - 90:24
**chief** [2] - 39:6; 106:4
**chips** [1] - 77:19
**choice** [2] - 38:16; 110:17
**choices** [10] - 15:14; 16:4; 18:16; 27:14; 28:7; 31:8; 35:4; 53:20; 56:14; 110:9
**choose** [1] - 93:14
**chop** [1] - 75:2
**chopped** [1] - 69:18
**chose** [1] - 37:4
**Christine** [1] - 106:5
**chron** [1] - 7:13
**chronological** [2] - 6:25; 7:8
**Chuck** [1] - 6:10
**circled** [1] - 29:22
**circuit** [5] - 21:13; 26:8; 38:15; 49:8; 89:3
**Circuit** [1] - 101:14
**circumstances** [1] - 56:6
**City** [1] - 101:14
**city** [1] - 98:9
**Civil** [1] - 1:4
**civil** [1] - 6:3
**Claim** [1] - 48:14
**claimed** [2] - 51:18; 52:1
**claiming** [2] - 51:10; 114:1
**claims** [1] - 83:12
**Clayton** [1] - 21:18

**cleaning** [1] - 28:4
**clear** [8] - 39:17; 51:6; 64:25; 70:3; 95:11; 107:16; 112:1, 4
**cleared** [1] - 113:5
**cleave** [3] - 69:25; 72:3, 8
**cleaved** [4] - 69:18; 70:3; 72:20; 73:16
**clerk** [2] - 10:13; 58:21
**CLERK** [1] - 6:3
**click** [1] - 46:9
**clients** [1] - 106:8
**cliff** [1] - 12:15
**clip** [3] - 8:10; 27:9; 67:7
**clips** [8] - 8:6; 10:25; 27:8, 18, 25; 59:8; 92:17
**close** [7] - 22:22; 35:16; 62:23; 75:15; 91:21; 113:11
**closely** [1] - 85:7
**closer** [1] - 29:9
**closest** [5] - 12:10; 38:12; 20:22; 21:9; 42:24
**closing** [2] - 43:3; 113:19
**closings** [1] - 61:1
**cloughlin@ftc.gov** [1] - 1:20
**cluster** [6] - 27:6, 8, 11, 13, 16
**Coates** [2] - 62:25; 98:25
**coffee** [4] - 28:5; 60:9; 74:13; 77:7
**colleague** [2] - 6:15, 18
**collected** [2] - 11:18; 13:5
**collecting** [1] - 93:9
**colleges** [1] - 90:18
**collision** [1] - 48:14
**COLUMBIA** [2] - 1:1; 2:8
**Columbia** [3] - 2:7; 4:5; 6:11
**column** [2] - 14:8; 50:18
**Colwell** [2] - 1:21; 6:11
**combat** [2] - 60:8, 12
**combination** [4] - 18:14; 21:10; 43:7; 59:23
**combine** [1] - 43:22
**combined** [11] - 10:20; 34:19; 35:15, 24; 36:8; 43:16, 18; 44:19; 45:9; 49:25; 51:21
**Comcast** [1] - 65:7
**coming** [12] - 43:9; 76:21; 81:5, 17; 91:5; 92:17; 96:19, 24-25; 101:17; 113:1, 24
**comment** [1] - 104:5
**comments** [1] - 111:24
**commerce** [4] - 26:24; 31:13; 56:11; 85:10
**commercial** [1] - 78:11
**commission** [2] - 23:5; 24:4
**COMMISSION** [6] - 1:3, 13, 17, 21; 2:3, 20
**Commission** [13] - 1:13; 2:3; 6:4, 9; 13:12; 20:24; 25:9; 37:13; 38:1, 15; 43:12, 14; 109:15
**Commission's** [3] - 26:19; 42:17; 43:3
**Commissioner** [1] - 105:8

**commissioners** [5] - 24:6, 20; 25:1, 3
**commitment** [3] - 85:21; 89:23; 91:16
**committed** [1] - 89:20
**commodity** [5] - 77:12, 15, 18; 91:8; 96:11
**Commonwealth** [1] - 74:1
**communities** [1] - 59:4
**community** [1] - 67:2
**companies** [94] - 11:5; 12:13; 14:8; 17:22; 18:14; 20:14; 29:16; 30:3; 32:6, 11, 23; 33:23; 35:5; 41:13, 17; 42:12, 24; 44:25; 46:5; 54:20; 55:10; 58:13, 17; 59:1, 11, 23; 60:6, 15, 24; 61:14, 23; 62:6; 63:14; 64:19, 21; 65:9, 22-23; 66:4, 12, 18; 68:19; 69:1, 9; 71:3, 5, 9, 14, 16, 20; 72:16; 74:13, 18-19; 77:2, 13, 17; 79:2, 6, 8, 10; 80:17; 82:7; 84:2, 4, 11; 85:2, 20, 23-23; 86:2, 15, 18; 87:11, 15; 88:5; 89:20, 22; 90:17; 91:7; 94:12; 98:5; 101:6; 104:16; 105:5; 106:19; 107:1, 16
**companies'** [1] - 62:11
**company** [23] - 16:1; 32:3, 19; 49:19; 51:2; 65:16; 67:11; 74:9; 78:6, 21; 79:19, 21; 84:16; 86:21; 87:15; 88:2, 4; 90:2; 93:22; 97:14; 104:24
**company's** [3] - 67:2; 97:17; 98:19
**comparable** [1] - 27:24
**compared** [2] - 35:9; 93:11
**comparing** [1] - 90:15
**comparison** [1] - 35:10
**compete** [19] - 16:13; 17:18; 20:4; 43:15, 17; 49:16; 60:24; 61:25; 71:4; 83:14, 19; 100:20; 102:1, 4, 10, 17; 106:23; 107:17
**competent** [2] - 48:16
**competing** [8] - 19:16; 21:4; 42:6; 49:17; 94:25; 102:21; 103:4, 6
**Competition** [1] - 1:14
**competition** [40] - 15:10, 15; 16:2, 10, 24; 17:21; 19:7; 20:6; 34:20, 24; 41:2, 16; 43:21; 44:8, 14; 51:8; 59:25; 60:12; 61:14; 62:12; 67:5; 78:20, 24; 79:1; 80:1, 5; 82:10; 84:1, 5, 14; 85:19; 86:11; 88:21; 89:10; 90:6; 91:12, 22; 96:5; 101:16; 107:5
**competitive** [21] - 15:9; 17:19; 27:2, 10, 12, 24; 29:1; 30:22; 61:5; 77:10; 78:10; 81:20; 82:13; 86:3; 92:10; 96:4, 6; 100:17; 101:23; 104:25; 106:17
**competitor** [20] - 16:3; 18:7; 20:19; 21:9; 40:2; 67:12; 68:6; 80:9, 21; 81:8, 21; 82:4; 83:8; 85:4, 12; 89:13; 96:24; 101:12; 102:7, 17
**competitors** [24] - 10:23; 11:2, 8; 18:12; 20:22; 21:10; 29:7; 42:24; 43:20; 44:6; 53:6; 66:20; 76:23; 79:13; 80:7, 12; 81:18; 83:18; 90:3, 5; 94:16; 96:8, 22; 97:25
**complaint** [3] - 15:7; 24:1, 3

**complements** [1] - 27:8
**complete** [1] - 53:3
**completely** [2] - 67:1; 91:6
**component** [1] - 62:9
**computer** [2] - 4:9; 77:19
**computer-aided** [1] - 4:9
**computers** [1] - 59:19
**conceded** [4] - 63:6; 81:7
**concedes** [2] - 66:11; 68:24
**concentrated** [1] - 35:6
**concentration** [6] - 22:15; 35:7, 10-11, 14; 36:12
**concern** [9] - 16:6; 49:14; 50:9; 66:19; 67:9, 19-20; 68:4, 6
**concerned** [5] - 16:1; 43:8; 48:8; 54:18; 66:15
**concerns** [3] - 48:2; 51:4; 53:10
**conclude** [1] - 107:4
**concluded** [1] - 67:3
**concludes** [1] - 53:22
**conclusion** [2] - 73:4; 80:17
**conclusions** [2] - 30:8; 73:12
**conditions** [1] - 27:12
**conducted** [2] - 18:1; 28:11
**confer** [1] - 114:2
**conference** [1] - 111:2
**confident** [2] - 8:16; 99:12
**confidential** [7] - 8:21, 24; 9:14; 99:10; 102:6; 103:17; 114:3
**confidentiality** [1] - 112:22
**confirm** [2] - 11:20; 17:22
**confirms** [2] - 28:10, 25
**Congress** [1] - 36:16
**connection** [1] - 73:6
**conservative** [1] - 62:6
**consider** [9] - 15:13; 35:3; 48:20; 56:17; 62:10; 88:17, 25; 94:14; 95:4
**considerably** [1] - 107:20
**consideration** [1] - 89:4
**considered** [2] - 42:7; 43:12
**considering** [1] - 43:13
**consistent** [2] - 76:17; 78:19
**consortia** [1] - 11:3
**Constitution** [1] - 4:5
**constrain** [3] - 79:10; 82:8; 85:15
**constrained** [2] - 39:20; 81:5
**consumable** [13] - 10:21, 24; 13:14; 18:12; 27:7; 28:8; 30:6; 71:25; 72:4; 73:7, 9, 15, 22
**consumer** [16] - 46:14; 54:10, 14-16; 55:6, 15, 25; 57:6, 9, 13-14; 61:16; 105:20
**consumers** [11] - 45:24; 54:18, 22; 56:25; 57:4, 15; 61:10; 64:17; 107:8
**cont** [2] - 3:1; 4:1
**Cont** [1] - 2:1
**contacts** [1] - 97:14
**contesting** [1] - 48:23
**continue** [3] - 66:12; 70:23; 80:5

**contract** [30] - 16:17, 19, 23-24; 32:4; 34:9, 11, 22-23; 39:22; 40:15; 50:13; 51:3; 65:15, 20; 68:16, 25; 71:5, 12, 18, 20; 74:10, 23; 78:1; 79:15; 80:3; 86:21; 90:7; 98:12
**contracts** [48] - 13:16; 16:9; 30:1; 33:23; 34:15; 40:5, 11-12, 17, 19; 49:18, 22; 69:23; 70:20; 71:4, 7-8, 15; 74:16; 75:7, 12-14, 25; 76:3; 80:14; 83:15; 84:12, 18; 86:20; 87:16, 19; 88:5, 8, 14; 89:19, 24; 91:16; 92:2, 6; 98:6, 9, 13, 15, 19
**control** [22] - 32:5, 19; 35:5; 46:5; 47:7; 53:4; 56:13
**controlling** [1] - 22:14
**controls** [1] - 53:3
**controversies** [1] - 9:11
**controversy** [1] - 48:9
**coop** [1] - 29:3
**cooperate** [1] - 66:23
**cooperatives** [1] - 83:20
**copiers** [1] - 27:23
**copies** [5] - 10:10; 58:18; 112:2
**copy** [8] - 9:2, 7; 10:8, 13, 25; 59:17; 112:7
**core** [5] - 14:4; 60:2, 21; 72:19; 85:8
**corner** [2] - 63:25; 64:1
**corporate** [1] - 106:8
**Corporate** [4] - 68:4, 8, 11; 108:16
**correct** [10] - 12:19; 24:17; 25:18; 31:18; 37:9; 57:10, 15; 88:12; 111:22; 115:3
**correcting** [1] - 111:12
**corroborates** [2] - 22:18; 35:21
**corroborating** [1] - 53:15
**cost** [2] - 51:11; 86:3
**cost-competitive** [1] - 86:3
**Costco** [1] - 87:25
**costs** [1] - 61:6
**Counsel** [17] - 6:13, 19; 7:24; 8:8; 10:4, 18; 44:1; 58:3, 7, 20; 107:23; 110:23; 111:10, 13; 114:13, 16
**counsel** [9] - 58:2; 99:1; 104:4; 106:6, 10; 107:25; 109:17; 114:17
**counter** [2] - 7:7, 21
**counter-designations** [2] - 7:7, 21
**countered** [1] - 8:1
**countered-designated** [1] - 8:1
**counters** [1] - 92:18
**country** [6] - 33:10; 59:5; 76:25; 77:1; 81:14; 86:6
**couple** [10] - 12:3; 17:14; 35:16; 39:13; 86:25; 88:10; 92:24; 94:2; 100:23; 104:15
**course** [3] - 17:2; 22:21; 53:11
**Court** [66] - 4:3; 9:10, 21; 10:9, 17; 12:8, 20; 21:24; 23:1-3, 16; 25:16, 24; 26:9, 13, 19; 28:19; 36:19, 23; 38:2, 7, 9, 18, 25; 39:11; 48:8, 15, 25; 49:1, 7; 50:3; 56:17; 57:12; 58:13; 62:3; 68:5,

13; 73:19; 75:10, 21; 86:13; 87:4; 88:7, 17, 25; 89:4, 8; 94:18; 95:4; 97:3; 99:1, 15; 101:4; 102:23; 107:1, 9; 110:14; 113:9; 115:7
  **court** [7] - 51:15; 62:16; 95:20; 99:2; 103:18; 104:4
  **Court's** [11] - 8:23; 13:2; 54:12; 55:21; 88:24; 93:5; 106:3; 112:19, 22; 113:6, 8
  **COURTROOM** [1] - 6:3
  **courtroom** [3] - 59:9; 64:1; 113:5
  **courtrooms** [1] - 59:15
  **Courts** [1] - 38:20
  **courts** [2] - 39:8; 48:20
  **create** [1] - 83:21
  **created** [1] - 45:14
  **creating** [3] - 17:6
  **creative** [1] - 47:6
  **credit** [7] - 34:3; 69:12; 71:10; 80:1; 105:3; 108:7; 110:11
  **credited** [1] - 85:17
  **criteria** [2] - 48:22
  **critical** [4] - 61:9; 90:16, 19; 91:7
  **cross** [3] - 65:23; 81:13; 113:17
  **cross-category** [1] - 65:23
  **cross-examination** [1] - 113:17
  **CRR** [3] - 4:3; 115:3, 6
  **culmination** [1] - 26:17
  **curious** [1] - 55:14
  **current** [4] - 11:16; 12:8; 24:13; 50:18
  **customer** [36] - 15:2, 7-8, 20; 16:1, 5, 15, 18, 22; 17:12; 29:19; 30:5; 31:12; 33:17; 34:3, 7, 10; 39:25; 47:9, 23; 49:19; 63:3; 68:14; 69:17, 21, 23; 75:18; 76:6; 80:14; 81:14; 88:22; 96:14; 97:13; 100:15
  **customer's** [1] - 39:24
  **customers** [166] - 10:22; 11:12, 18, 25; 12:14, 18; 13:17, 21; 14:13, 15, 20, 23; 15:12, 15; 16:4, 7; 17:1, 8, 16, 21, 24; 18:24; 19:2, 5, 9, 17, 20; 27:1, 13, 18, 25; 28:6, 9; 29:3, 5-6, 10, 12, 15, 23; 30:5, 8, 13, 17, 21, 23; 31:4, 24; 32:13; 33:6, 18, 21; 34:5, 16, 23; 35:3, 21; 40:8, 10, 18; 41:7, 22; 42:4, 8, 11; 43:6, 8, 10; 44:22; 45:8, 10; 46:18; 47:10, 18, 20; 49:23; 50:15, 22, 25; 53:2, 4, 20; 56:12; 60:7; 61:7, 14; 62:8; 63:7, 9, 13, 16-18; 64:14, 17; 66:13; 67:4, 15, 18, 21; 68:2, 16-17; 69:1, 8-9, 19, 22, 25; 70:4, 13; 72:1, 18; 75:6-8, 13, 19, 22; 76:3; 79:15, 23; 80:5, 23; 81:13; 82:12; 83:23; 84:1, 12, 14, 17-18, 25; 89:18; 90:20; 91:11, 13; 92:12, 16; 93:2, 10, 13-14; 94:2, 8; 96:13, 17, 23; 97:1, 12; 99:16, 19, 21; 103:19; 104:13; 107:15
  **customers'** [2] - 31:25; 103:11
  **customized** [5] - 31:15; 32:18; 46:19; 83:13
  **cut** [3] - 27:22; 111:7, 15

# D

  **D.C** [2] - 1:7; 35:9
  **dads** [2] - 59:5; 63:10
  **data** [30] - 11:10, 17, 22; 12:12; 13:4, 6, 9; 14:3; 17:22, 25; 18:1, 11; 21:8; 34:25; 35:4; 63:22; 71:3; 75:25; 76:1, 3; 87:2, 17; 95:16; 98:18; 107:16
  **Date** [1] - 115:6
  **date** [1] - 37:16
  **dated** [3] - 11:15; 97:5; 101:3
  **DAY** [1] - 1:9
  **days** [2] - 52:25; 101:11
  **DC** [13] - 1:15, 18, 22; 2:4, 9, 21; 3:4, 8, 13, 17, 20; 4:6; 49:10
  **de** [1] - 23:1
  **dead** [1] - 100:9
  **deal** [20] - 15:11; 17:15; 20:20; 23:17; 43:12; 48:2, 4; 51:2, 12, 15; 55:11; 57:4, 23; 61:13; 67:4; 86:24; 90:18; 106:16; 110:15
  **dealer** [1] - 82:22
  **dealers** [2] - 78:5; 83:21
  **deals** [3] - 51:19, 24
  **death** [1] - 101:14
  **decade** [2] - 60:1; 94:2
  **decide** [2] - 62:17; 73:13
  **decided** [2] - 43:14; 63:14
  **decision** [15] - 25:4, 16, 18, 20, 22, 25; 26:5, 14; 36:14; 42:18; 49:2; 62:16; 109:3; 110:5
  **decision-maker** [1] - 62:16
  **decisions** [1] - 78:22
  **declaration** [16] - 68:5; 69:5, 12-13; 76:20; 108:1, 3-6; 109:2, 21; 110:3, 8, 10
  **declarations** [4] - 66:17; 109:5; 110:15
  **decline** [3] - 60:8; 74:10; 85:14
  **declining** [6] - 60:16, 22; 72:15; 100:8
  **DEFENDANT** [2] - 5:5; 58:11
  **Defendant** [2] - 2:12; 3:2
  **defendants** [28] - 11:1, 7, 14; 13:11; 17:2; 18:20; 22:21; 27:21; 28:1; 37:2; 38:16, 24-25; 39:19; 40:4; 41:16, 21; 42:17; 43:5; 44:4, 9, 13; 45:5; 48:1; 49:4; 51:10; 107:10; 112:17
  **Defendants** [1] - 1:8
  **defendants'** [2] - 6:23; 51:18
  **defense** [1] - 58:2
  **deference** [7] - 25:15, 18, 24; 26:4, 9, 14; 62:18
  **deficiencies** [1] - 51:18
  **defies** [1] - 74:4
  **define** [11] - 26:23; 30:4; 72:2; 73:15; 75:7, 19, 23; 76:11; 77:4, 6
  **defined** [2] - 27:22; 73:7; 99:16
  **defines** [1] - 29:16
  **defining** [4] - 75:5, 8; 76:6
  **definitely** [1] - 57:23

  **definition** [10] - 14:16; 71:24; 73:3, 18, 22, 25; 74:4; 75:15; 76:14
  **defy** [1] - 75:19
  **delete** [1] - 74:25
  **deliberative** [1] - 25:9
  **deliver** [3] - 9:1; 33:15; 93:23
  **delivered** [2] - 112:5, 8
  **delivering** [1] - 47:2; 84:25
  **delivery** [10] - 33:6, 13; 46:25; 47:3; 69:23; 78:3; 93:20; 102:4
  **demand** [2] - 29:20; 33:21
  **demanding** [3] - 14:18; 33:6; 34:3
  **demonstrated** [1] - 80:13
  **dependent** [1] - 50:12
  **deposed** [2] - 76:17, 19
  **deposition** [8] - 6:20; 7:22; 73:20; 76:17, 20; 81:25; 108:18; 109:12
  **depositions** [1] - 6:25
  **Depot** [131] - 3:2; 6:18; 10:21; 12:16; 13:13, 22; 14:1, 10, 20, 22, 25; 15:2, 4, 14, 22-23; 16:9, 11, 13, 16-17, 20, 22; 17:5, 7, 11, 13, 18, 23; 18:4, 11; 20:13, 17, 21, 23; 21:1, 4, 9; 28:3; 29:7, 11, 14, 16, 21, 25; 30:11, 18-19; 31:7, 15, 23; 32:4, 18; 33:4, 12; 34:9, 17, 23; 35:3; 40:1, 11, 15, 20, 25; 41:5, 9, 19-20, 23, 25; 42:7, 14, 20, 22; 43:7, 22; 50:11, 14, 24; 53:5; 55:1; 58:17, 25; 65:24; 66:21; 67:16; 69:19; 70:11, 13, 21, 23; 71:12; 72:12; 73:5; 76:5, 24; 78:2, 13; 79:9, 22; 81:2, 9; 82:12; 83:2, 13; 84:5, 17; 86:1, 22; 87:22; 88:3, 9; 92:5, 21; 93:12; 94:1, 16; 99:6; 100:24; 101:1, 20; 102:1, 11; 110:24
  **Depot's** [2] - 11:9; 67:20
  **Depot/Max** [1] - 16:3
  **Depot/OfficeMax** [4] - 42:18; 43:18; 80:1; 85:17
  **Depots** [1] - 88:1
  **derived** [1] - 51:18
  **describe** [1] - 30:24
  **DESCRIPTION** [1] - 5:8
  **designated** [1] - 8:1
  **designations** [3] - 7:7, 21
  **desktop** [4] - 33:12; 46:24; 47:4; 78:3
  **despite** [1] - 57:18
  **detailed** [1] - 32:20
  **deter** [1] - 44:19
  **determine** [2] - 32:24; 50:3
  **determined** [2] - 21:16; 61:4
  **determining** [1] - 80:18
  **Detroit** [1] - 68:2
  **develop** [1] - 44:22
  **developed** [2] - 44:25; 83:18
  **devoted** [1] - 57:25
  **dialing** [2] - 66:16
  **Diane** [1] - 2:12
  **diane.sullivan@weil.com** [1] - 2:15
  **Dianne** [1] - 6:14

**dice** [2] - 64:5, 9
**difference** [1] - 47:3
**different** [16] - 32:14-16; 33:10; 35:1; 39:8, 13; 45:25; 46:9, 22-23; 91:6; 100:14
**differently** [3] - 29:17; 31:6; 39:9
**digital** [3] - 60:24; 106:18, 20
**digitization** [4] - 59:13, 22; 60:23; 100:11
**dinosaur** [1] - 59:19
**direct** [13] - 6:21; 45:8, 10; 50:22; 79:3, 5-7, 10; 82:7; 85:8; 113:16
**directions** [1] - 111:24
**directly** [2] - 33:16; 82:14
**directors** [1] - 61:3
**disabled** [2] - 70:7; 85:21
**disagree** [1] - 57:19
**disagrees** [3] - 73:21, 23
**disappearing** [1] - 60:2
**discard** [2] - 72:1, 5
**disclosed** [1] - 114:2
**discloses** [1] - 11:25
**discount** [1] - 34:8
**discounts** [2] - 34:4; 47:7
**discovery** [1] - 102:23
**discuss** [1] - 88:15
**discussed** [1] - 85:6
**discussion** [2] - 21:22; 100:6
**disposal** [1] - 32:8
**dispute** [1] - 57:23
**disregard** [1] - 75:1
**disruption** [1] - 67:24
**distant** [2] - 18:15; 21:10
**distress** [1] - 100:7
**distribute** [2] - 10:21; 33:19
**distributes** [1] - 76:24
**distribution** [8] - 16:2; 82:25; 83:5, 21; 93:18; 105:17, 23; 106:1
**distributors** [3] - 90:11, 17; 91:10
**District** [7] - 2:7; 4:4; 6:11; 36:19, 23; 38:18
**DISTRICT** [4] - 1:1, 10; 2:8
**disturbed** [1] - 110:12
**disturbing** [3] - 108:1; 109:13; 110:16
**diverse** [3] - 51:2; 85:21
**diversity** [13] - 50:23; 53:9; 70:7; 85:20, 25; 86:6, 20; 88:2; 89:21, 23; 91:17
**divest** [2] - 86:17; 88:9
**divested** [1] - 88:6
**divestiture** [10] - 49:14, 21; 86:12; 87:24; 88:4, 14, 25; 89:2, 9, 16
**divestitures** [2] - 48:20; 88:20
**dock** [1] - 33:15
**docks** [1] - 81:13
**document** [10] - 14:25; 41:5; 53:17, 19; 94:9; 99:2, 25; 102:6; 103:1, 17
**documents** [8] - 35:2; 59:16; 85:5; 96:20; 102:25; 112:10, 21; 113:3

**dollar** [3] - 17:6; 90:2
**dollar-dollar** [1] - 17:6
**dollars** [4] - 53:4; 54:8, 21; 69:21
**domain** [1] - 114:13
**dominant** [2] - 92:23; 102:16
**dominate** [2] - 30:12; 107:6
**Domtar** [1] - 79:5
**done** [11] - 20:12; 35:2; 63:5; 64:5; 70:6; 94:2; 97:8; 105:4; 106:16; 107:15
**doors** [6] - 59:1; 113:11, 15, 19
**dotting** [1] - 59:3
**double** [1] - 100:11
**doubt** [7] - 9:21; 21:8; 26:13; 86:13; 88:24; 94:5; 96:18
**down** [11] - 41:9; 56:7; 57:4; 64:4; 65:23; 66:3, 5; 94:13; 103:23; 107:20; 113:9
**Dr** [3] - 63:22; 66:10; 75:10
**draft** [1] - 104:5
**dramatically** [1] - 101:18
**draw** [1] - 30:8, 11
**drawn** [2] - 30:7, 15
**dream** [2] - 99:6, 20
**drew** [2] - 30:10, 15
**drones** [1] - 93:21
**drop** [2] - 12:15; 33:14
**drops** [1] - 17:9, 18
**due** [2] - 56:6; 78:13
**during** [10] - 13:5; 17:10; 20:14; 22:16; 26:12; 35:20; 95:18; 100:22; 105:17, 23
**dwarf** [1] - 93:19
**dwarfs** [1] - 93:24
**dwell** [1] - 21:14
**dwindle** [1] - 14:24

## E

**e-commerce** [2] - 31:13; 85:10
**e-mail** [5] - 97:5; 98:1; 101:8, 20
**e-mails** [4] - 100:23, 25; 101:2; 102:5
**early** [2] - 12:22; 111:8
**earth** [2] - 64:20
**earthquake** [1] - 92:15
**easier** [1] - 8:5
**easily** [4] - 81:4; 84:13, 20, 24
**easy** [4] - 44:10; 78:17; 96:11; 113:14
**easy-to-enter** [1] - 96:11
**economic** [2] - 28:10; 53:12
**economist** [4] - 12:13; 19:3; 20:12; 75:11
**economy** [1] - 59:13
**editing** [1] - 59:16
**effect** [2] - 56:7; 63:8
**effects** [3] - 22:20; 27:10; 35:21
**efficiencies** [9] - 51:11, 14, 16; 52:1, 5; 56:24; 57:3, 22
**efficient** [2] - 8:5; 81:20
**effort** [3] - 110:14; 111:23; 114:14
**efforts** [3] - 48:9, 16; 60:14

**eight** [1] - 32:22
**eight-pack** [1] - 32:22
**either** [8] - 7:17; 9:1; 24:25; 76:19; 84:16; 88:3; 110:17
**Electric** [2] - 21:22; 54:2
**electronic** [1] - 9:8
**eliminate** [1] - 16:1
**eliminated** [4] - 15:10; 63:5, 9, 11
**ellipses** [2] - 52:8, 11
**Email** [13] - 1:16, 20, 24; 2:5, 11, 15, 19, 23; 3:5, 10, 14, 22; 4:7
**emerging** [1] - 85:11
**EMMET** [1] - 1:10
**employee** [1] - 101:9
**employees** [15] - 14:2; 31:25; 32:6, 24; 46:22; 55:9; 57:16; 65:16; 89:17; 97:17; 98:7, 10
**employees'** [1] - 46:21
**enabled** [1] - 85:10
**endeavored** [1] - 113:2
**enhance** [2] - 89:10; 90:6
**enhanced** [1] - 50:19
**enjoined** [2] - 35:17; 90:13
**enjoy** [1] - 114:16
**ensuing** [1] - 94:19
**ensure** [2] - 82:13; 84:14
**enter** [3] - 44:13; 96:11
**entered** [2] - 40:6; 111:19
**enterprise** [1] - 99:18
**entire** [1] - 100:1
**entirety** [1] - 9:24
**entities** [3] - 18:22; 19:16; 36:21
**entitled** [1] - 115:4
**entity** [4] - 34:19; 43:16; 44:19; 45:14
**entrant** [1] - 102:15
**entry** [11] - 37:7; 44:6, 10, 14, 18, 21; 47:15; 77:22; 78:14; 102:18
**equal** [1] - 39:6
**equals** [1] - 35:25
**equipped** [1] - 50:3
**equities** [2] - 21:16; 79:24
**erasers** [2] - 77:20; 91:7
**Eric** [3] - 2:16; 6:15; 112:20
**eric.hochstadt@weil.com** [1] - 2:19
**especially** [1] - 25:16
**Esq** [7] - 2:12, 16; 3:2, 6, 11, 15, 19
**Essandant** [26] - 49:20, 24; 50:10, 18, 21; 51:7; 77:7, 24; 78:1; 79:18; 83:3-5; 86:16, 19, 21, 23; 88:3, 5, 9, 14; 89:11, 19, 25; 90:1
**establish** [2] - 21:20; 22:11
**establishes** [1] - 35:19
**estimate** [2] - 52:5; 62:6
**estimated** [1] - 62:5
**et** [6] - 1:4, 7; 6:4; 59:8; 72:16
**evaluate** [1] - 105:19
**evaluating** [1] - 48:24
**events** [3] - 18:21; 19:19
**every-day** [1] - 55:6

**evidence** [73] - 7:13, 16, 22; 12:21;
13:22; 16:12; 21:19, 23; 22:4, 16, 18;
28:10; 29:5; 30:10; 35:18, 20; 39:1, 7,
16, 18; 40:10; 41:14; 44:5; 45:11;
47:15; 48:16; 49:5; 53:12, 15-16; 55:5;
56:15, 19-21; 57:5, 7, 20; 62:3, 23;
64:8; 67:3; 68:7, 12, 23; 70:25; 74:25;
75:6; 79:11; 81:12; 86:11; 88:11; 89:4;
91:9, 14, 20; 93:4, 11; 95:22; 96:1, 9;
97:24; 101:5; 103:7; 104:17; 107:2-4,
11, 19
**evidentiary** [3] - 37:10; 38:3, 12
**exact** [2] - 22:7; 95:13
**exactly** [4] - 9:3; 80:16; 82:18
**exam** [2] - 113:4, 10
**examination** [1] - 113:17
**EXAMINATIONS** [1] - 5:3
**example** [12] - 16:15; 17:2, 17; 32:10;
33:6, 25; 34:2; 46:18; 64:12; 84:16;
86:6; 97:25
**examples** [7] - 17:4; 31:9; 35:22;
41:17; 44:23; 49:10; 84:7
**except** [1] - 70:13
**exception** [3] - 48:10, 18
**exchange** [1] - 6:21
**excludes** [1] - 28:2
**excuse** [1] - 18:21
**executives** [6] - 61:4; 62:4; 78:21;
80:17; 98:10; 101:25
**exhibit** [2] - 9:2, 24
**EXHIBITS** [1] - 5:7
**exhibits** [3] - 9:19; 111:21
**existed** [4] - 12:21; 43:17; 59:12; 87:10
**existing** [3] - 43:20; 44:7; 106:23
**exists** [2] - 22:11; 90:6
**exit** [1] - 46:11
**expand** [7] - 20:5; 43:21; 78:16; 81:15;
84:20, 24; 85:8
**expanding** [2] - 38:9; 79:16
**expansion** [3] - 44:6; 47:15; 85:7
**expect** [4] - 38:23; 39:2; 56:8, 24
**expectations** [1] - 100:15
**expected** [2] - 15:8; 34:8
**expedited** [1] - 36:23
**expense** [1] - 98:25
**expensive** [4] - 32:9, 17; 45:2; 106:14
**experience** [1] - 51:19
**expert** [23] - 19:15; 24:25; 28:18; 50:5;
52:2; 54:14; 57:3; 63:15, 21; 65:8;
66:10; 68:24; 73:24; 75:10, 22; 76:1;
87:6; 88:11, 15; 92:3; 94:24; 95:12
**expert's** [1] - 75:23
**experts** [6] - 50:2; 62:4; 75:25; 77:4;
99:23; 107:13
**explain** [9] - 19:3; 28:11; 30:9; 35:13;
42:3; 53:10, 12
**explained** [1] - 108:19
**expressed** [4] - 66:19; 67:18, 20; 68:5
**expresses** [1] - 16:6
**extensive** [1] - 22:18

**extent** [1] - 88:7
**extra** [1] - 10:13
**extraordinary** [1] - 51:14
**extrapolated** [1] - 51:21
**extremely** [1] - 12:11
**Exxon** [1] - 65:6

# F

**face** [4] - 80:5; 84:5; 105:2, 14
**faced** [3] - 60:25; 72:15; 84:1
**facie** [1] - 22:17
**facilities** [3] - 33:8
**facing** [2] - 60:1; 61:24
**fact** [24] - 14:21; 26:3; 41:15; 46:20;
47:8; 48:17; 50:12; 55:24; 60:25; 61:8;
62:3; 72:24; 73:23; 74:5; 76:10; 77:11,
16; 82:9; 83:1; 87:5; 96:6; 101:24;
102:23; 103:20
**factors** [2] - 8:23; 111:24
**facts** [1] - 50:4
**fair** [4] - 55:18; 96:2
**fairness** [1] - 95:17
**Faisal** [1] - 101:9
**faith** [4] - 108:2; 111:23; 114:6, 14
**familiar** [1] - 24:23
**far** [2] - 47:22; 100:9
**fascinating** [1] - 57:24
**fast** [1] - 105:19
**fast-changing** [1] - 105:19
**faster** [1] - 81:2
**fatal** [1] - 95:15
**fault** [1] - 104:4
**favor** [1] - 43:7
**favorable** [1] - 96:1
**Fax** [10] - 1:19, 23; 2:5, 10, 18, 22; 3:5,
9, 14, 21
**fears** [1] - 53:6
**February** [6] - 12:24; 14:22; 16:5;
17:17; 97:5, 13
**FEDERAL** [6] - 1:3, 13, 17, 21; 2:3, 20
**federal** [2] - 70:9, 14
**Federal** [8] - 1:13; 2:2; 6:4, 9; 13:12;
26:19; 48:14; 109:14
**few** [9] - 13:24; 16:21; 31:9; 35:22;
38:17; 44:23; 48:3; 51:17; 64:3
**field** [1] - 77:4
**fierce** [3] - 16:24; 80:20; 82:4
**fiercely** [1] - 16:13
**Fifth** [2] - 2:17; 47:22
**fight** [2] - 98:6; 106:15
**fighting** [5] - 106:16, 22; 114:11
**figure** [3] - 24:19; 38:18; 97:12
**file** [2] - 36:24; 112:6
**filed** [3] - 9:18; 10:11; 15:7
**filing** [2] - 9:7
**final** [1] - 36:15
**finally** [1] - 51:10
**financial** [3] - 99:19; 100:7; 106:5

**fine** [9] - 8:12; 13:10; 70:10, 15; 86:5;
92:13; 97:11; 110:10; 113:15
**fine-tune** [1] - 97:11
**firm** [3] - 22:14; 27:1; 36:3
**firms** [4] - 27:4; 82:17; 87:12
**First** [1] - 42:7
**first** [11] - 20:20; 38:15, 24; 43:6; 48:4;
49:13; 50:18; 51:12; 59:1; 73:5; 87:25
**fit** [1] - 14:16
**five** [3] - 16:17; 68:18; 92:5
**five-year** [1] - 16:17
**fix** [8] - 48:1; 49:3, 13; 53:10; 86:8;
88:7; 90:5
**fixed** [1] - 54:7
**flaw** [1] - 95:15
**flaws** [3] - 48:3; 65:19
**fledgling** [1] - 102:2
**flip** [4] - 73:3, 10; 82:19; 84:9
**flip-flopped** [4] - 73:3, 10; 82:19; 84:9
**Floor** [3] - 3:3, 8, 12
**flopped** [4] - 73:3, 10; 82:19; 84:9
**flow** [1] - 56:4
**flows** [1] - 100:8
**fly** [1] - 29:3
**focus** [6] - 13:1, 3; 14:13; 57:12;
94:19; 111:8
**focused** [7] - 13:15; 21:18; 59:2;
63:16; 64:18; 71:2; 94:14
**focusing** [1] - 64:15
**focussed** [1] - 12:20
**folders** [2] - 59:8; 60:3
**folks** [2] - 59:19; 110:13
**follow** [1] - 111:23
**followed** [1] - 113:17
**following** [2] - 39:3; 52:25
**food** [6] - 90:16-18, 21; 91:6
**foodservice** [1] - 90:17
**foolish** [1] - 55:24
**foot** [1] - 93:19
**footprints** [1] - 33:8
**FOR** [2] - 1:1; 2:7
**forced** [1] - 16:19
**forecasts** [5] - 99:4-6, 8; 103:5
**foregoing** [1] - 115:3
**foremost** [1] - 51:13
**forget** [4] - 63:17; 76:5; 95:22
**formal** [1] - 29:23
**format** [1] - 9:7
**formidable** [1] - 100:13
**formulated** [1] - 39:13
**forth** [1] - 25:1
**fortunately** [1] - 74:8
**Fortune** [43] - 11:11, 17, 25; 12:1, 3;
14:3, 15; 18:23, 25; 19:1, 9, 16; 63:21,
23-24; 64:23; 65:1, 4; 66:14, 18; 67:6,
10; 68:21; 71:4; 81:11; 82:6; 84:12;
85:23; 86:21; 87:9, 15; 88:6; 93:10;
94:5; 96:17; 97:13
**forward** [5] - 6:6; 87:7; 95:3, 7; 111:13

forward-looking [1] - 95:3
forwards [1] - 104:22
four [9] - 24:7; 37:20; 52:24; 87:17; 94:15, 19; 97:10; 99:15
Fourth [1] - 2:8
fraction [1] - 32:17
fragmented [2] - 78:11; 91:10
frame [1] - 94:18
frankly [2] - 7:12; 84:21
free [3] - 40:8; 46:10, 25
frequently [2] - 20:25; 34:6
fringe [5] - 20:3; 29:7; 42:14; 44:16
front [4] - 29:24; 37:13; 68:10; 109:12
fronting [1] - 88:2
frozen [1] - 92:2
FTC [68] - 7:11; 15:8; 20:18, 20; 23:2, 4; 24:6; 25:18; 42:23; 43:3; 50:17; 62:18; 64:16, 18; 66:16, 22-23; 68:8, 12; 71:1, 6; 72:24; 73:3, 7, 9, 21; 74:15, 24; 75:9, 20; 76:3, 5, 8, 13; 77:5; 79:25; 80:15; 81:6, 22; 82:9, 18; 83:12, 16, 25; 84:8; 85:17; 91:18; 95:17; 97:18; 98:18; 100:22; 102:12; 103:7, 15, 20; 104:6, 23; 105:2, 7-8, 14; 109:19; 110:5
FTC's [17] - 13:5; 67:19; 68:3; 71:24; 73:20, 23; 75:14, 16; 86:10; 90:8; 92:25; 95:15; 99:16; 104:7, 21; 105:2; 107:14
full [5] - 37:3, 12; 38:12; 92:15
full-page [2] - 92:15
fun [2] - 92:13
functionally [1] - 27:20
functions [1] - 45:23
funding [1] - 88:3
furniture [3] - 28:5; 60:7; 66:1
future [2] - 41:3; 51:4

## G

game [2] - 55:18; 101:18
gangbusters [1] - 81:3
Garden [1] - 90:24
Garza [1] - 98:1
gathered [1] - 107:15
GE [1] - 87:13
GENERAL [1] - 2:7
General [2] - 21:22; 54:2
general [1] - 106:6
generate [2] - 16:10; 51:22
gentleman [2] - 68:8; 101:8
George [1] - 93:1
gerrymandered [2] - 88:22; 91:20
gerrymandering [1] - 68:23
gin [6] - 63:19; 69:17; 71:22; 73:16; 74:24; 107:22
girl [1] - 64:1
girls [1] - 64:3
given [9] - 23:25; 26:15; 51:13; 88:20; 97:22; 109:25; 113:6

Goheen [1] - 3:11
Goldman [1] - 65:6
Goliath [1] - 100:21
goods [2] - 92:20; 93:23
Google [1] - 59:12
GOTSHAL [2] - 2:12, 16
GOVERNMENT [2] - 5:4; 10:16
government [25] - 36:1, 5, 21; 39:5; 54:6; 56:5; 61:16; 62:13; 63:4; 64:5; 69:11; 70:4, 7, 10, 14; 72:20; 104:9; 106:15; 107:25; 108:5; 109:1; 113:7; 114:17
government's [5] - 20:8; 57:11; 65:19; 71:21; 95:8
governments [3] - 70:8, 10, 14
governs [1] - 31:2
grab [1] - 94:15
Grainger [6] - 79:18; 84:16, 19; 85:3, 9, 16
Grainger's [1] - 85:7
grand [1] - 66:18
granted [1] - 21:15
granting [1] - 21:12
graph [3] - 11:6, 10; 19:24
graphics [1] - 92:13
great [1] - 58:22
greater [1] - 42:9
Greco [2] - 2:20; 6:11
green [2] - 41:11; 68:18
Greg [1] - 98:1
group [1] - 76:25
groups [2] - 77:1; 83:7
growing [6] - 74:8; 79:17; 80:12, 25; 81:1; 106:24
grown [1] - 80:11
growth [1] - 59:24
guaranty [1] - 71:13
guess [1] - 9:19
guesstimate [1] - 52:5
guidance [3] - 73:13; 80:18; 113:8
guidances [1] - 73:11
guidelines [3] - 87:6; 94:23; 95:11
guy [1] - 92:13
guys [1] - 71:6

## H

H&R [1] - 39:15
habits [2] - 32:24; 33:1
half [7] - 75:1, 3; 86:17
hand [1] - 23:10
handling [1] - 67:7
hands [1] - 26:15
happy [6] - 22:7; 36:3; 52:10; 62:15; 109:11; 111:3
hard [12] - 9:2, 7; 10:8; 36:16; 58:18; 59:17, 23; 83:5; 112:2, 7
hard-to-reach [1] - 83:5
hardly [1] - 57:19

harm [7] - 18:19; 51:12; 54:19; 55:25; 57:7, 18
harmed [2] - 30:9; 57:17
head [8] - 16:10; 17:23; 21:4; 34:19
head-to-head [4] - 16:10; 17:23; 21:4; 34:19
headquartered [2] - 81:10, 19
healthcare [1] - 96:16
HealthTrust [1] - 15:18
hear [72] - 6:22; 10:4; 11:1; 13:11, 13, 16, 20; 27:21, 23; 28:8; 31:6, 14; 39:19, 22; 41:21; 42:17; 43:10; 45:2, 4; 46:15; 47:13, 19, 21; 51:1, 4, 17; 52:21; 53:6-8, 11; 55:5, 9; 56:12; 57:18; 58:2; 62:2, 22; 64:8, 11; 65:18; 66:1; 67:11; 68:22; 69:20; 70:17, 21, 25; 72:11; 74:25; 75:10; 76:11, 15, 21; 77:3, 6, 17; 78:4, 20; 79:11, 14, 17, 19; 91:14; 93:11; 95:21; 101:9; 104:16; 111:15
heard [4] - 45:12; 54:11; 55:14; 112:16
hearing [1] - 15:19; 18:8; 22:17; 28:9; 31:5; 35:20; 37:10; 38:12, 24; 43:11; 45:13; 52:21
HEARING [1] - 1:9
hears [1] - 107:3
hearsay [1] - 23:16
heartstrings [1] - 60:18
heels [2] - 101:1; 102:19
Heinz [1] - 39:15
help [1] - 33:5
helped [1] - 75:23
helpful [7] - 8:4; 10:9; 12:6, 11; 58:12, 24
Herfindahl [1] - 35:11
Herfindahl-Hirschman [1] - 35:11
Hewlett [1] - 107:17
Hewlett-Packard [1] - 107:17
HHI [1] - 107:12
high [3] - 22:5; 32:22; 104:11
high-level [1] - 32:22
higher [3] - 35:14, 16; 74:12
highest [1] - 94:11; 104:7
highlight [1] - 7:17
highlighted [2] - 7:19
highlighting [2] - 6:24; 7:16
highly [6] - 7:18; 16:8; 31:1; 34:5; 35:6; 114:3
highly-individualized [1] - 31:1
himself [1] - 108:19
hint [1] - 114:4
hire [1] - 33:18
Hirschman [1] - 35:11
history [3] - 17:3; 93:23; 106:19
hit [1] - 59:22
Hochstadt [3] - 2:16; 6:15; 112:20
HOCHSTADT [6] - 103:23; 112:16, 19; 113:21; 114:9, 15
HOGAN [1] - 3:19
hold [1] - 93:1

**Hollywood/Blockbuster** [1] - 105:1
**HOLT** [1] - 10:3
**honed** [1] - 87:4
**honestly** [1] - 24:25
**Honor** [229] - 6:3, 8, 14, 17; 7:2, 5; 8:9, 13, 17; 10:3, 7, 14; 12:2, 14, 24; 13:3, 22; 15:19; 16:12; 17:4, 17; 18:8, 18, 24; 19:11; 21:12; 22:3, 20, 23; 23:8, 23; 24:12, 18, 22; 25:1, 5, 8; 26:1, 7, 11, 18; 28:8, 20; 29:8, 22; 31:5, 10, 14, 20; 33:22; 34:25; 35:8, 13; 36:2; 37:2, 23; 38:5, 14; 39:9, 14; 41:5; 44:2; 45:12; 47:25; 48:12, 19; 49:5, 10; 50:7, 10; 51:10; 52:3, 10, 14, 21; 53:3, 18, 21; 54:17, 24; 55:8, 17-18, 23; 56:10, 22; 57:1, 10, 23; 58:8, 12, 16, 19; 60:14; 61:8, 22; 62:9, 17; 63:2, 25; 64:8, 12, 15; 66:14, 23; 67:4, 10, 14; 68:7, 14, 19, 22; 69:4, 7, 16; 70:2, 17; 71:1, 21; 72:10; 73:2, 10; 74:15, 25; 75:5, 24; 76:2, 11, 18, 21, 23; 77:9, 23; 78:20; 79:14, 19, 24; 80:20; 81:12, 17, 25; 82:6, 19, 21; 83:7, 24; 84:7; 85:5, 23; 86:9, 13, 24; 87:1, 20; 88:7, 15-16, 19-20; 89:6; 90:6, 9, 14; 91:13, 18-19, 21; 92:8, 13, 25; 93:4; 94:12, 22; 95:11, 13; 96:2, 21; 97:2, 13, 25; 98:23; 99:10, 20; 100:22; 101:3, 8, 24; 102:7; 103:7; 104:3, 5, 8, 21; 105:24; 106:3, 11-12, 14; 107:3, 7, 21, 24; 108:10, 13, 25; 109:4, 11, 16, 25; 110:7, 21, 24-25; 111:11, 18, 20; 112:13, 16, 19, 21; 113:21, 23; 114:9, 15, 18
**Honor's** [4] - 65:18; 81:23; 89:1; 98:24
**HONORABLE** [1] - 1:10
**hope** [1] - 113:16
**hopefully** [2] - 66:5; 92:9
**horizon** [4] - 91:23; 92:7; 94:25; 95:14
**hospitals** [1] - 77:2; 90:18
**host** [2] - 80:4, 6
**hour** [1] - 38:6
**hours** [1] - 37:19
**Hubbard** [2] - 8:22; 111:24
**huge** [6] - 61:1; 66:22; 70:10, 13; 90:2; 92:21
**HULSE** [5] - 111:11, 18; 112:5, 10, 13
**Hulse** [1] - 111:18
**hundred** [2] - 54:8; 69:21
**hundreds** [5] - 61:1; 66:17; 69:22, 25; 89:17
**hypothetical** [7] - 28:12, 14; 29:2, 4; 54:4, 6; 56:16

**I**

**iceberg** [2] - 60:15, 19
**iCloud** [1] - 60:3
**iconic** [2] - 58:17; 59:1
**idea** [2] - 7:10; 96:12

**identified** [2] - 14:6; 20:25
**ignored** [2] - 63:21
**III** [2] - 3:11, 19
**ill** [1] - 50:3
**ill-equipped** [1] - 50:3
**illustrates** [1] - 36:8
**illustrative** [1] - 35:8
**imagination** [1] - 9:25
**imagine** [1] - 38:7
**immediately** [2] - 100:18; 113:17
**imminent** [1] - 100:7
**impact** [13] - 54:3, 9, 13, 15; 55:6, 9, 15-16; 56:1, 5; 77:12; 95:6
**impacted** [4] - 54:23; 55:10; 56:16; 100:10
**impacting** [1] - 100:11
**impacts** [1] - 55:20
**implies** [1] - 18:18
**importance** [1] - 55:2
**important** [8] - 33:20; 55:1; 81:7; 84:9; 86:25; 89:12; 106:17
**importantly** [2] - 20:21; 72:10
**INC** [1] - 1:7
**Inc** [2] - 2:12; 6:4
**incentive** [2] - 34:18; 40:18
**incentives** [4] - 16:22; 30:2; 34:1; 40:21
**inclined** [2] - 108:7; 109:7
**include** [6] - 32:20; 40:17; 44:23; 68:1; 72:23; 73:15
**included** [4] - 32:4; 72:6; 73:9; 74:7
**includes** [3] - 27:22; 63:10; 73:22
**including** [9] - 14:4; 28:5; 66:18; 73:8; 75:16; 78:22; 83:19; 84:6
**inclusion** [1] - 107:11
**income** [1] - 54:7
**inconsistent** [1] - 67:1
**incorrect** [1] - 12:20
**increase** [18] - 22:15; 27:5; 28:13, 16; 29:2, 4; 35:10, 14; 36:12; 39:21; 44:17; 78:15; 81:4, 15; 82:11; 84:23; 85:15; 107:5
**increases** [1] - 45:9
**increasing** [2] - 44:19; 100:7
**increasingly** [2] - 72:18; 85:9
**incumbent** [2] - 14:6, 9
**indeed** [5] - 12:17; 14:14; 18:12; 28:25; 29:1
**independent** [6] - 46:4; 62:17; 78:5; 82:22; 83:9, 21
**Index** [1] - 35:11
**indicate** [1] - 18:11
**indicating** [1] - 64:1
**individual** [3] - 47:11; 54:22; 93:18
**individualized** [6] - 16:9; 31:1; 34:1, 5, 16, 20
**individuals** [1] - 46:8
**indulgence** [2] - 112:20, 23
**industrial** [1] - 96:14

**industries** [1] - 105:19
**industry** [6] - 19:7; 44:12; 49:21; 73:12; 105:15
**inflate** [1] - 70:1
**inflated** [2] - 62:21; 72:9
**information** [13] - 6:21; 8:21, 24; 9:1, 14, 16; 11:16; 12:8, 10, 25; 16:16; 29:12; 41:7
**initial** [1] - 73:6
**initiative** [2] - 41:11; 94:17
**injunction** [3] - 21:13; 23:19; 37:7
**injuries** [1] - 48:15
**ink** [13] - 55:7; 72:3, 21; 73:8, 22; 74:3, 6, 21; 75:16; 82:14; 107:11
**innovative** [2] - 104:24; 105:5
**insist** [1] - 85:22
**instance** [2] - 7:6; 39:18
**instances** [1] - 41:15
**insofar** [9] - 37:5; 46:7; 59:16; 60:3; 63:15; 64:15, 18; 86:22; 101:5
**integrate** [1] - 31:24
**intellectual** [1] - 77:21
**intended** [2] - 21:3; 64:16
**interest** [11] - 8:19; 21:16; 33:25; 62:9, 11-12; 80:15; 97:21; 107:8; 113:7
**Interested** [1] - 3:19
**interesting** [2] - 37:6; 54:1
**interestingly** [1] - 102:14
**intermediaries** [1] - 77:21
**internal** [6] - 25:9; 85:5; 94:9; 96:19; 97:6; 99:2
**internally** [2] - 15:21; 101:6
**internet** [1] - 114:5
**Internet** [2] - 59:11; 91:12
**interpretation** [1] - 9:19
**interpreted** [1] - 55:13
**interrupt** [1] - 11:24
**interruptions** [1] - 34:21
**intersectional** [1] - 48:14
**introduce** [3] - 6:7; 8:3; 107:11
**investigated** [2] - 70:19, 24
**investigation** [8] - 13:5; 20:14, 18; 25:10; 26:18; 95:18; 105:17, 24
**investment** [2] - 44:21; 61:11
**investments** [1] - 45:2
**investor** [1] - 67:2
**investors** [1] - 36:25
**inviting** [1] - 113:19
**involve** [1] - 91:16
**involved** [1] - 104:24
**involves** [1] - 27:6
**involving** [1] - 111:3
**IP** [1] - 78:17
**iPads** [3] - 59:12, 20; 67:12
**iPhones** [1] - 59:12
**irrelevancy** [1] - 100:8
**issue** [14] - 29:23; 30:23; 49:1; 50:1; 54:9; 55:21; 57:12; 73:11; 77:9; 112:10, 17, 21, 25; 113:22

**issued** [4] - 23:3; 24:1; 73:4; 105:9
**issues** [4] - 54:2; 73:14; 87:17; 113:13
**IT** [1] - 31:24
**it'd** [3] - 38:3, 7; 55:24
**it'll** [1] - 98:24
**item** [2] - 96:23; 104:7
**item-line** [1] - 96:23
**items** [2] - 22:17; 80:23
**itself** [3] - 20:16; 50:22; 114:3

## J

**Jackson** [2] - 2:6; 6:12
**James** [1] - 3:2
**janitorial** [9] - 28:4; 60:9; 66:1; 72:18; 74:13, 21; 79:20; 84:23; 85:3
**janitorial/industrial** [1] - 84:11
**January** [1] - 94:3
**Jeff** [2] - 94:13; 101:13
**job** [1] - 28:22
**John** [1] - 3:11
**john.goheen@stblaw.com** [1] - 3:14
**join** [1] - 77:2
**joining** [1] - 83:20
**joint** [1] - 112:25
**joke** [1] - 108:19
**Journal** [2] - 92:15, 17
**Judge** [19] - 58:23, 25; 59:10; 60:20, 25; 62:13, 19; 63:4; 64:4; 65:2; 70:9; 71:15; 72:14; 81:7; 84:9; 87:24; 99:4; 103:25; 106:13
**JUDGE** [1] - 1:10
**judge** [2] - 81:24; 93:9
**judgment** [2] - 36:19; 62:17
**July** [1] - 17:13
**June** [3] - 15:23, 25; 99:25
**justice** [1] - 36:17

## K

**keep** [7] - 17:10; 41:13; 56:13; 65:22; 66:5; 113:15, 18
**kept** [1] - 9:20
**kids** [2] - 59:6; 65:6
**killed** [2] - 61:24; 106:19
**kind** [10] - 16:24; 46:20; 64:4; 68:7, 12; 70:9; 91:6; 101:2; 111:7; 114:10
**kinds** [11] - 31:9; 34:6, 15; 41:12; 46:23; 60:6, 22; 66:8; 74:14; 105:18
**knowing** [1] - 111:15
**knowledge** [1] - 89:17
**knows** [3] - 38:25; 86:4; 92:19
**Komola** [1] - 106:5

## L

**L.L.P** [1] - 3:19

**lack** [1] - 67:9
**lacking** [2] - 36:20; 50:18
**LACY** [5] - 7:2, 5, 19, 25; 8:4
**Lacy** [2] - 3:6; 6:18
**laid** [1] - 39:14
**land** [1] - 94:15
**landscape** [4] - 59:4; 77:10; 79:13; 106:18
**language** [1] - 22:8
**laptops** [1] - 67:13
**large** [61] - 10:22; 11:11, 14; 12:14, 17; 13:16, 21, 23; 14:13-15, 22; 15:2, 7, 12, 14, 20, 25; 16:5, 7, 25; 18:13; 27:17; 28:6; 29:9, 23; 30:4, 23; 31:12, 24; 33:7; 34:3; 43:6; 44:22; 45:1, 8, 21; 46:17, 19; 47:10, 17, 20, 22; 49:18; 50:22; 63:16; 65:9; 68:19; 80:13; 83:11, 19, 22; 93:10; 96:17; 99:18; 103:10, 19
**Large** [1] - 82:12
**largely** [1] - 59:15
**larger** [2] - 11:8; 29:19
**largest** [2] - 42:25; 64:19
**last** [14] - 17:14, 17; 60:1; 61:2; 66:16; 72:17; 74:7; 81:19; 85:23; 92:24; 112:6; 113:23, 25
**late** [1] - 113:22
**launch** [10] - 92:12, 18; 94:11; 97:7; 99:24; 100:3, 18-19; 101:11; 106:1
**launched** [5] - 94:4, 11; 95:18; 97:7, 12
**launches** [2] - 101:5, 7
**law** [10] - 25:21; 50:4; 57:21; 62:10, 18; 87:11; 94:23; 95:10; 104:22
**Lawrence** [1] - 3:11
**laws** [2] - 55:24; 64:16
**lawsuit** [4] - 25:20; 26:18; 64:21; 73:3
**lawyer** [1] - 110:19
**lawyers** [2] - 71:10; 73:21
**layoffs** [1] - 41:10
**leadership** [1] - 94:13
**leads** [1] - 25:15
**leakage** [13] - 39:19, 21-22; 40:3, 13, 22; 41:2, 13, 16, 18; 65:14
**leaning** [1] - 87:9
**learned** [1] - 72:14
**lease** [1] - 93:21
**least** [7] - 14:15; 39:2; 50:6; 63:6; 69:20; 104:23; 110:16
**leave** [4] - 21:8, 10; 113:20; 114:6
**lectern** [1] - 6:6
**left** [2] - 15:22; 94:8
**legacy** [1] - 61:6
**legal** [2] - 21:12; 48:9
**legitimate** [2] - 99:8; 100:5
**Leitzsey** [1] - 3:19
**lengthy** [1] - 30:23
**less** [6] - 41:11; 65:4, 7; 66:12; 67:19; 111:11
**level** [4] - 32:22; 35:7; 55:25; 59:3

**levels** [4] - 27:2; 44:20; 94:12; 100:15
**lever** [2] - 42:1, 4
**leverage** [1] - 90:20
**lie** [1] - 70:12
**likelihood** [4] - 21:17, 19, 23; 22:5
**likely** [6] - 21:25; 22:6; 30:9; 44:7; 47:16; 113:4
**limit** [1] - 16:7
**limitation** [1] - 38:6
**limitations** [1] - 32:12
**line** [7] - 26:24; 30:7, 10, 15-16; 56:13; 96:23
**lines** [1] - 30:11
**list** [3] - 42:14; 87:14
**listed** [1] - 22:17
**lists** [1] - 19:22
**literally** [1] - 12:16
**litigate** [1] - 86:12
**litigated** [1] - 91:15
**litigation** [3] - 64:18; 80:15; 82:20
**littered** [1] - 106:19
**live** [6] - 64:23; 66:25; 67:10; 76:21; 102:13
**LLP** [6] - 2:12, 16; 3:2, 7, 11, 16
**loading** [1] - 33:15
**loathed** [1] - 26:4
**lobbying** [1] - 33:9
**local** [7] - 11:3; 59:4, 6; 70:8, 15; 84:4, 6
**locations** [1] - 85:11
**locked** [2] - 70:20; 92:5
**log** [1] - 31:25
**logically** [2] - 56:4
**look** [20] - 17:25; 26:12; 29:9; 36:16; 52:9; 53:15; 59:18; 62:14; 63:22; 68:21; 87:7, 14, 24; 91:18, 24; 95:25; 96:14; 99:4; 104:13
**looked** [2] - 85:24; 87:5
**looking** [12] - 31:22; 40:6; 45:20; 46:12; 47:21; 74:19; 87:3; 95:3; 97:15; 98:18; 105:25
**looks** [5] - 14:11; 45:22; 46:13; 95:16; 104:22
**lose** [3] - 28:15; 34:24; 42:11
**loses** [2] - 41:19
**losses** [2] - 17:6
**lost** [6] - 20:6; 43:21; 44:8, 14; 51:8; 64:16
**Loughlin** [2] - 1:17; 6:10
**lousy** [1] - 71:8
**LOVELLS** [1] - 3:19
**low** [6] - 36:9; 74:11; 77:12, 16, 18; 78:14, 16; 96:11
**low-commodity** [1] - 96:11
**low-impact** [1] - 77:12
**low-margin** [2] - 77:18; 96:11
**lower** [8] - 61:7; 62:8; 71:17; 72:12; 77:22; 79:4; 86:5; 102:9
**lowered** [1] - 17:11

**luck** [1] - 109:9
**lunch** [3] - 110:22; 111:1, 10

# M

**MAC** [1] - 59:19
**machine** [1] - 4:8
**magnitude** [4] - 44:18; 105:16, 22, 25
**mail** [5] - 97:5; 98:1; 101:8, 20
**mailroom** [1] - 33:18
**mails** [4] - 100:23, 25; 101:2; 102:5
**major** [3] - 48:4; 49:20; 85:11
**majority** [1] - 113:4
**maker** [1] - 62:16
**mammoth** [2] - 93:12; 97:14
**manage** [1] - 33:5
**mandate** [1] - 70:7
**MANGES** [2] - 2:12, 16
**manipulation** [2] - 7:13, 16
**manner** [1] - 7:9
**manu** [1] - 79:18
**manufacturer** [1] - 79:6
**manufacturers** [10] - 32:15; 45:5, 7, 10; 77:22; 78:12; 79:3; 82:7, 15; 83:11
**manufacturing** [3] - 78:18; 82:15; 96:15
**March** [1] - 1:5
**MARCH** [1] - 6:1
**margin** [2] - 77:18; 96:11
**margins** [4] - 74:11; 77:16; 84:22
**Mark** [2] - 64:11; 104:4
**market** [119] - 13:12; 14:12, 16; 16:3; 19:6; 22:14, 24; 26:23; 27:6, 21; 28:2, 10, 25; 30:20; 35:5; 44:17; 56:1; 60:2, 9, 17, 21; 61:10, 12; 62:14; 63:3, 12, 15, 19-20, 24; 64:2, 6, 9; 65:21; 66:2; 67:15, 19; 68:2, 4, 15, 17-18, 20, 25; 69:17; 70:1, 6; 71:9, 19, 22-24; 72:2, 6, 8, 15, 20-21, 23; 73:1, 16, 19, 25; 74:4, 8-9, 24; 75:2-4, 6, 8, 18, 20; 76:4, 6, 12, 15; 77:4; 78:10, 12, 25; 81:5, 10; 88:22; 90:7; 91:9, 23; 92:21; 93:24; 96:3, 7, 11, 19, 24; 98:8, 12; 99:16; 100:18, 25; 101:5, 21; 102:15; 107:6, 12, 18-19, 22
**marketing** [1] - 102:11
**marketplace** [6] - 45:24; 61:5; 80:2; 86:11; 92:11
**markets** [1] - 91:20
**Mart** [5] - 85:24; 86:4; 87:25
**Mason** [18] - 18:7, 17; 45:3; 53:7; 76:24; 79:14; 80:7; 81:5, 8, 12, 18-19; 82:1; 83:2; 89:12, 14
**mason** [3] - 18:10; 77:6; 80:20
**Mason's** [2] - 80:8
**Massachusetts** [1] - 81:19
**massive** [1] - 93:19
**Masud** [1] - 101:9
**match** [1] - 75:14
**Mate** [1] - 91:5

**material** [1] - 113:18
**materials** [1] - 25:10
**Matt** [2] - 6:17; 110:24
**Matt.Reilly@stblaw.com** [1] - 3:5
**matter** [5] - 40:7, 12, 24; 50:4; 115:4
**Matthew** [1] - 3:2
**Maureen** [1] - 105:9
**maverick** [1] - 39:23
**maximum** [1] - 37:20
**McHie** [1] - 3:6
**Mead** [1] - 45:6
**mean** [32] - 7:15; 9:4; 13:17; 21:21; 24:16; 26:6; 36:19; 37:17, 25; 38:2, 12; 47:17; 50:3; 55:13, 15; 64:5; 67:24; 82:4; 87:11, 20; 89:13; 92:16; 93:12, 22; 96:9; 109:7, 13; 110:13; 113:12; 114:11
**meaning** [1] - 28:14; 52:24
**meaningful** [3] - 36:18, 22; 41:2
**meaningfully** [1] - 20:4
**means** [9] - 14:7; 17:7, 15; 27:12, 15; 32:14; 33:13; 46:4; 99:24
**meant** [3] - 69:14; 109:8; 110:19
**meanwhile** [1] - 98:9
**measure** [1] - 35:11
**measured** [1] - 65:19
**mechanism** [1] - 49:24
**meet** [4] - 34:10; 40:19; 70:4; 114:2
**meeting** [5] - 59:17; 62:24; 83:22; 99:3; 100:20
**meetings** [2] - 94:10; 98:7
**meets** [1] - 91:19
**melting** [1] - 60:15, 19
**men** [1] - 77:21
**mentioned** [8] - 40:17; 66:14; 68:15; 82:6, 21; 83:7; 87:19; 91:15
**merely** [1] - 26:14
**merge** [8] - 20:18; 27:5; 42:20; 61:5; 73:7, 13; 106:22
**merged** [1] - 42:10
**merger** [103] - 12:21; 14:21, 23; 15:1, 13, 15, 17, 23; 16:6; 18:14; 20:5, 10, 14; 22:12, 21; 23:4, 7, 9; 25:4; 26:25; 27:10; 34:17; 35:6; 38:20; 39:20; 42:4, 11, 19; 43:4, 13, 19; 44:15; 51:8; 53:6; 54:3, 5, 13, 16; 56:6; 57:18; 61:6; 62:5, 10; 63:6, 8; 64:13; 66:5, 11, 15, 19; 67:8, 23, 25; 68:6, 10, 13; 73:5; 77:10; 78:8, 15, 25; 80:1, 19; 81:4, 15, 22; 82:11; 84:15, 20; 85:6, 16, 18; 86:14; 87:5; 90:13; 92:9; 94:20, 23; 95:6, 8; 97:22; 100:2, 5; 101:1; 102:8, 15, 19-20, 25; 103:4, 6; 105:1, 11, 13; 106:15; 107:8; 113:8
**merger's** [1] - 94:19
**mergers** [2] - 66:22; 78:23
**merging** [2] - 14:2; 50:11
**merits** [3] - 21:17; 37:12; 48:24
**met** [2] - 62:18; 88:23
**metrics** [1] - 65:12

**middle** [6] - 16:17, 19, 23; 34:21; 40:15; 77:21
**middlemen** [2] - 78:18; 79:8
**might** [8] - 33:18; 34:11; 45:19; 58:12; 83:4; 90:25; 92:8; 106:12
**Mike** [1] - 106:6
**Miller** [1] - 3:15
**million** [3] - 21:1; 93:13, 15
**millions** [3] - 10:24; 53:4; 54:20
**mind** [6] - 39:14; 48:4; 88:24; 92:23; 95:1; 104:19
**mindful** [1] - 111:24
**minimizing** [2] - 55:2; 56:3
**minute** [2] - 93:1; 111:11
**minutes** [1] - 110:25
**mission** [2] - 90:16; 91:7
**mistake** [2] - 71:1; 104:23
**Mister** [1] - 98:24
**mix** [1] - 74:3
**mixed** [3] - 68:11; 109:9, 23
**model** [2] - 46:24; 100:16
**models** [1] - 105:20
**mom** [1] - 63:10
**moments** [1] - 48:3
**moms** [2] - 59:5; 65:5
**Monday** [1] - 1:5
**monetary** [2] - 30:2; 40:17
**money** [15] - 16:18, 21; 29:25; 33:1; 34:10, 12-13, 22; 40:20; 47:6; 77:13; 84:22; 86:18; 94:14; 110:13
**monitor** [2] - 85:7; 104:2
**monopolist** [5] - 28:12, 14-15; 29:2, 4
**monthly** [2] - 94:10; 99:3
**months** [12] - 16:21; 30:24; 37:14; 40:7; 89:22; 94:3; 95:23; 99:4; 104:15; 107:14
**Monts** [1] - 3:19
**morning** [15] - 6:8, 13-14, 16-17, 19; 7:2; 10:7; 43:25; 57:25; 58:9; 111:19; 112:6, 8
**MORNING** [2] - 1:9; 6:1
**Morrison** [2] - 51:1; 53:9
**mortar** [1] - 59:25
**most** [13] - 11:15; 12:8; 18:7; 20:21; 32:8; 45:9; 64:19-21; 81:24; 91:4; 92:2; 113:9
**motion** [2] - 112:6, 11
**mouths** [1] - 104:10
**move** [6] - 27:4; 37:1; 41:24; 42:5, 8, 12
**moving** [1] - 105:15
**MR** [19] - 6:17; 7:2, 5, 19, 25; 8:4; 10:3; 110:24; 111:5, 11, 18; 112:5, 10, 13, 16, 19; 113:21; 114:9, 15
**MS** [148] - 6:8, 14; 8:9, 13, 16; 10:7, 14, 17, 19; 11:17, 22; 12:1, 5, 9, 12, 24; 13:3, 8, 11; 18:23; 19:1, 11, 14, 18; 20:1, 11; 21:24; 22:3, 5, 10; 23:5, 7, 12, 18, 23, 25; 24:3, 7, 10, 12, 18, 22, 24;

25:5, 8, 14, 19; 26:1, 3, 7, 11, 17, 22;
28:20, 22, 24; 31:19, 23; 36:2, 7, 11;
37:2, 8, 12, 16, 19, 23; 38:1, 4, 8, 14,
20, 23; 39:8, 12; 44:2; 48:7, 11, 19, 22;
49:4, 9, 12; 50:6, 9; 52:9, 13, 18, 20,
24; 54:17, 24; 55:4, 8, 17, 23; 56:9, 18,
21; 57:6, 10, 15; 58:8, 10, 12, 16, 19,
23, 25; 60:20; 61:18, 22; 69:4, 7, 16;
75:24; 76:10, 18, 23; 88:13, 19; 89:6, 8;
93:9; 94:22; 95:5, 10; 96:2; 103:25;
104:3; 106:11; 107:13, 24; 108:9, 12,
15, 18, 23, 25; 109:3, 11, 16, 20, 24;
110:3, 7, 21; 114:18
  **multi** [3] - 70:20; 80:14; 83:22
  **multi-regional** [2] - 80:14; 83:22
  **multi-year** [1] - 70:20
  **multibillion** [1] - 90:2
  **multibillion-dollar** [1] - 90:2
  **multiple** [2] - 82:17; 92:3
  **must** [3] - 55:16; 62:10; 94:17
  **must-win** [1] - 94:17
  **muster** [1] - 44:5

## N

  **nah** [1] - 103:13
  **name** [4] - 54:4; 71:15; 97:14; 112:20
  **names** [1] - 18:16
  **narrow** [4] - 28:2; 64:6; 71:23; 76:14
  **narrowed** [1] - 62:20
  **Nathaniel** [1] - 3:15
  **national** [23] - 15:16; 76:24; 77:24;
78:3, 5, 13; 79:18; 80:14, 22; 82:21, 23;
83:8, 11, 14, 19, 23; 86:16; 89:11; 90:3,
11; 91:10; 103:19
  **nationally** [1] - 79:16
  **nature** [2] - 96:10; 103:17
  **near** [1] - 72:24
  **necessarily** [1] - 95:7
  **necessary** [3] - 44:11; 86:12; 109:4
  **need** [14] - 8:14; 21:14; 22:19; 23:17;
25:17; 33:3, 5; 41:4; 64:22, 24; 88:8;
105:18; 110:11; 111:9
  **needed** [4] - 90:20; 97:12
  **needs** [9] - 14:18; 25:16; 33:10; 36:16;
44:25; 45:21; 50:14; 57:12; 83:22
  **negligible** [1] - 100:16
  **negotiate** [7] - 16:8; 30:1, 25; 33:23;
34:6; 47:11; 53:5
  **negotiated** [1] - 31:10
  **negotiations** [2] - 31:6; 34:21
  **Netflix** [1] - 105:5
  **network** [1] - 83:22
  **neutral** [2] - 43:6; 63:7
  **never** [12] - 15:9; 43:12; 91:1, 5; 92:20,
22; 93:20; 95:1; 100:17; 101:13, 23;
104:19
  **New** [1] - 2:17
  **new** [18] - 30:16; 41:11; 43:18; 44:6,

13; 60:24; 83:9; 87:3; 99:17; 100:13;
102:15, 18; 104:24; 105:5, 12; 106:20,
24
  **new-age** [1] - 106:20
  **next** [22] - 10:19; 12:2; 15:12, 20, 25;
16:12; 18:7; 33:12; 42:16; 44:2; 46:24;
49:23; 51:5; 52:21, 23; 80:24; 91:24;
94:14; 95:22; 104:15
  **next-day** [2] - 33:12; 46:24
  **night** [2] - 112:6
  **NJ** [1] - 2:14
  **nobody** [1] - 102:4
  **nonexclusive** [1] - 71:20; 87:20, 23
  **nonjury** [1] - 48:13
  **nonoffice** [2] - 80:7, 12
  **nonparties** [2] - 8:20; 9:6
  **nonparty** [1] - 9:1
  **nonstrategic** [1] - 77:15
  **noose** [2] - 100:8
  **normally** [2] - 24:13; 48:8
  **North** [1] - 100:1
  **Northeast** [3] - 81:9, 11
  **notebooks** [3] - 27:19, 25; 45:6
  **noted** [1] - 82:9
  **notepad** [2] - 59:17; 65:6
  **notes** [4] - 10:25; 32:9; 45:7
  **nothing** [8] - 13:17; 27:14; 62:21; 64:9;
90:14; 103:1
  **noticed** [1] - 45:19
  **notion** [3] - 41:1; 42:19; 86:2
  **notwithstanding** [2] - 60:14, 21
  **November** [1] - 15:6
  **novo** [1] - 23:1
  **nowhere** [3] - 29:6; 42:13; 72:24
  **Number** [1] - 43:14
  **number** [13] - 19:22; 43:1, 9, 13, 16,
22; 62:20; 80:12; 85:24; 113:3, 25
  **numbers** [1] - 107:12
  **NW** [8] - 1:14; 2:8; 3:3, 7, 12, 16, 20;
4:5
  **NY** [1] - 2:17

## O

  **O'Neil** [1] - 70:18
  **O'Neil's** [1] - 70:21
  **oath** [5] - 69:14; 108:21, 23; 109:8;
110:18
  **object** [1] - 102:14
  **objection** [2] - 6:23; 102:19
  **obligation** [1] - 25:24
  **obsolete** [1] - 98:12
  **obtain** [1] - 18:21
  **obvious** [1] - 72:23
  **obviously** [3] - 50:1; 93:24
  **occurs** [1] - 40:5
  **October** [2] - 17:3; 99:3
  **odd** [2] - 55:22
  **OF** [8] - 1:1, 9; 2:7; 5:4; 10:16; 58:11

  **off-contract** [2] - 39:22; 65:20
  **offer** [14] - 15:3, 5, 9; 32:18; 33:12;
42:9; 46:18; 47:5; 49:13; 60:6; 79:21;
84:11, 19
  **offered** [5] - 16:18; 17:15; 33:16;
45:25; 46:3
  **offering** [6] - 16:21; 49:14; 60:9; 84:13;
97:10; 99:18
  **offerings** [1] - 84:24
  **offers** [1] - 17:6
  **OFFICE** [1] - 2:7
  **office** [68] - 10:21, 24; 13:14, 25; 14:4,
18, 24; 15:22; 18:13; 27:7; 28:8; 30:6;
32:1; 33:2, 8, 10; 39:24; 40:2; 41:23,
25; 42:2, 12; 45:18; 47:24; 59:2, 14, 22;
60:9; 65:4, 24; 68:19; 70:11; 71:4, 12,
25; 72:4, 19; 73:3, 8-9, 15, 22; 74:2, 6;
76:25; 77:7, 25; 78:11, 25; 79:21;
82:16; 83:17, 20-21; 84:1, 4, 13, 19-20;
85:4, 9; 86:3; 87:8; 97:16; 103:10;
106:1
  **Office** [147] - 3:2; 6:18; 10:21; 11:9, 23;
12:16; 13:13, 22; 14:1, 9, 20, 22, 25;
15:2, 4, 14, 22-23; 16:3, 9, 11, 13,
16-17, 20, 22; 17:5, 7, 11, 13, 18, 23;
18:4, 11; 20:13, 17, 23; 32:4, 17; 33:4, 12;
34:9, 17, 23; 35:3; 40:1, 11, 15, 20, 25;
41:5, 8, 19-20, 23-24; 42:7, 14, 18, 20,
22, 25; 43:7, 18, 22; 50:11, 14, 24;
53:5; 55:1; 58:16, 25; 65:24; 66:20;
67:16, 20; 69:19; 70:11, 13, 21, 23;
71:12, 25; 72:11, 14, 22, 25; 73:5; 74:7,
9, 12, 17, 20; 75:17; 76:5, 24; 78:2, 13;
79:9, 22, 25; 81:1, 9; 83:1, 13; 84:5, 17;
85:17; 86:1, 22; 87:21; 88:1, 9; 92:21;
93:12; 94:1, 16; 99:5; 100:24; 101:20;
102:1, 11; 110:24
  **OfficeMax** [15] - 14:1, 10; 15:23;
20:13, 17, 21, 23; 21:2, 4; 42:23, 25;
43:7; 73:5; 97:16, 22
  **OfficeMax/Office** [2] - 82:11; 101:1
  **officer** [1] - 106:5
  **officers** [2] - 65:11; 106:9
  **offices** [3] - 33:9; 59:15, 22
  **Official** [2] - 4:4; 115:7
  **often** [4] - 33:7, 9; 79:12; 82:6
  **Ohlhausen** [1] - 105:9
  **old** [4] - 13:24; 59:18; 87:2; 98:16
  **old-school** [1] - 98:16
  **Olive** [1] - 90:24
  **ON** [4] - 5:4; 10:16; 58:11
  **once** [4] - 28:15; 83:16; 104:23
  **one** [70] - 8:11; 9:19; 11:5, 20; 14:3,
24; 15:6, 16, 23, 25; 16:5; 17:4, 9, 13,
17; 18:17; 19:6; 21:5; 25:16; 26:13;
29:1; 31:14; 33:20, 25; 34:2, 6; 35:8;
36:5; 39:17; 41:13; 45:16; 49:15, 20;
50:10, 23; 51:1, 8, 21; 53:9, 17, 20;

54:2; 58:21; 61:23; 62:1; 64:12, 23; 65:18, 22; 66:4, 21; 70:12; 79:1, 9; 84:16, 19; 85:10; 86:6, 15, 25; 87:4, 17; 90:10; 91:2; 99:10; 101:3; 106:21; 107:25

**One** [1] - 71:15

**ones** [6] - 30:20; 32:3; 40:6; 44:7; 54:18; 89:18

**online** [8] - 31:15; 32:6; 34:3; 46:19; 59:24; 60:12; 98:20

**open** [3] - 77:24; 103:18; 113:15

**opened** [1] - 59:1

**OPENING** [4] - 5:4; 10:16; 58:11

**opening** [4] - 58:1; 59:4; 111:15; 113:19

**operate** [3] - 59:21; 86:2, 5

**operating** [1] - 77:19

**operation** [2] - 84:20; 100:1

**opine** [3] - 50:2; 54:15; 88:12

**opinion** [6] - 23:3, 8, 15; 75:23; 89:1

**opportunity** [7] - 22:22; 36:18, 22, 24; 37:7; 62:15; 107:2

**opposed** [2] - 104:25; 105:12

**opposite** [2] - 46:20; 80:16

**opposition** [3] - 68:13; 105:2, 14

**opted** [1] - 38:3

**option** [2] - 38:12; 47:21

**options** [6] - 12:17; 14:23; 27:18, 24; 79:8

**oranges** [1] - 90:15

**order** [13] - 6:24; 7:8, 11, 14, 25; 8:11; 32:8; 34:3; 73:2; 90:24; 98:14, 24; 111:25

**ordered** [1] - 33:16

**ordering** [1] - 82:14

**orders** [3] - 46:10; 47:1; 93:23

**organizing** [1] - 8:1

**originally** [1] - 63:23

**Orszag** [1] - 75:10

**otherwise** [4] - 7:10; 9:4; 29:13; 35:16

**ought** [1] - 7:13

**outright** [1] - 102:14

**outside** [1] - 27:14

**outweigh** [1] - 51:12

**overwhelming** [4] - 12:13; 30:20; 40:25; 96:10

**overwhelmingly** [4] - 17:23; 30:17; 43:23; 67:20

**own** [9] - 20:13; 70:5; 73:3, 20, 23; 74:5; 76:10, 13; 86:10

**owners** [1] - 63:10

**owns** [1] - 51:1

---

## P

**P.D** [1] - 51:1

**p.m** [1] - 114:21

**pack** [2] - 32:22

**Packard** [1] - 107:17

---

**pads** [1] - 27:8

**page** [8] - 19:24; 29:11; 31:22; 41:18; 44:1; 92:15

**Page** [2] - 5:3, 8

**pallet** [2] - 33:14; 47:3

**pallets** [2] - 33:19; 47:2

**Paper** [2] - 91:5; 92:17

**paper** [17] - 9:5; 10:24; 27:7-9, 22, 24; 41:11; 55:7; 59:8; 67:7; 72:6, 16; 79:4; 92:17

**paperless** [1] - 59:15

**papers** [3] - 60:2; 65:25; 91:7

**paradoxically** [1] - 28:1

**pardon** [2] - 11:4; 24:10

**parents** [1] - 59:5

**parity** [2] - 96:22

**parm** [1] - 90:25

**part** [21] - 8:20; 25:9; 31:11; 32:20; 37:4; 51:3, 23; 62:8; 70:19; 72:19; 74:16; 83:25; 84:13; 88:4, 6; 89:16; 100:25; 105:9; 112:25; 113:22

**participated** [3] - 18:3, 5, 8

**participating** [1] - 21:6

**particle** [1] - 92:18

**particular** [4] - 16:20; 17:2; 19:19; 31:12

**particularly** [1] - 64:17

**parties** [15] - 6:6, 21; 8:20; 9:6; 24:12, 15-16; 37:20; 42:10; 49:13, 16; 50:13; 80:4; 105:1

**partnering** [1] - 50:24

**partners** [1] - 74:10

**Party** [1] - 3:19

**party** [4] - 8:25; 9:1, 14; 46:4

**pass** [1] - 10:9

**past** [1] - 105:4

**patents** [1] - 44:11

**pay** [9] - 13:13; 34:9, 11, 22; 40:20; 65:4, 7; 66:12; 77:13

**payment** [2] - 34:4, 14

**payments** [1] - 29:25

**pcolwell@ftc.gov** [1] - 1:24

**PD** [1] - 53:9

**pen** [8] - 27:9; 59:17; 77:15; 91:3; 93:15

**pen/paper** [1] - 74:11

**pencils** [1] - 77:20

**pending** [1] - 66:22

**penguins** [2] - 60:15, 19

**Pennsylvania** [1] - 74:1

**pens** [17] - 27:7; 32:22; 55:6; 59:8; 60:2; 65:6, 25; 66:6; 72:16; 74:11; 77:20; 90:15, 19, 23; 91:7

**people** [27] - 6:22; 9:13; 24:6; 33:18; 36:18, 21, 25; 59:16, 18, 21; 60:3, 22; 61:11, 19; 63:8; 67:23; 72:4; 84:10; 87:11; 91:4; 97:24; 98:14, 17; 99:22; 101:21; 113:19

**percent** [36] - 10:21; 18:3, 5, 9; 22:1;

---

35:5; 36:10; 62:14, 20; 63:5, 14, 16-17, 20; 64:7; 65:4, 7; 67:18; 69:10, 18; 70:5; 71:7; 72:11; 75:14; 80:11; 83:3; 88:6, 8; 98:9

**percentages** [2] - 35:25; 63:4

**perfect** [1] - 97:11

**perhaps** [5] - 52:25; 90:9

**period** [2] - 18:1; 19:20

**periods** [1] - 11:19

**permission** [2] - 93:5; 106:3

**permit** [1] - 73:19

**person** [9] - 33:16; 67:1; 69:2; 73:20; 101:25; 102:2; 108:4

**personal** [1] - 48:15

**perspective** [1] - 8:6

**Peter** [2] - 1:21; 6:11

**petition** [1] - 9:18

**Pfizer** [3] - 65:7; 66:21; 87:13

**phenomenon** [2] - 39:21; 40:5

**picture** [3] - 44:4; 53:3

**piece** [1] - 107:18

**pilot** [3] - 97:8; 100:3

**pink** [2] - 88:1, 5

**pizza** [1] - 96:16

**place** [11] - 20:5; 28:16; 45:24; 53:4; 59:5, 14, 22; 74:9; 96:16; 113:18

**places** [4] - 33:1; 59:16; 83:5; 85:1

**plaintiff** [1] - 74:2

**Plaintiff** [4] - 1:5, 13; 2:2, 6

**plaintiffs** [4] - 6:9; 7:8; 30:4; 53:14

**plaintiffs'** [5] - 6:24; 20:1; 21:17, 19; 22:17

**plan** [1] - 107:10

**planning** [2] - 27:4; 101:14

**plans** [2] - 7:11; 53:8

**platforms** [1] - 82:23

**play** [3] - 8:6; 78:7; 93:5

**played** [1] - 93:8

**player** [8] - 44:12, 16-17; 72:25; 82:23; 85:10; 100:24; 101:4

**players** [4] - 78:12; 96:10; 100:13

**playing** [2] - 7:11; 66:25

**plays** [1] - 100:14

**plenty** [1] - 17:4

**plus** [1] - 21:1

**poaching** [1] - 97:24

**point** [10] - 22:7; 34:19; 43:14; 48:23; 49:22; 70:9; 96:2; 98:4; 99:15

**points** [1] - 32:15

**poised** [1] - 107:6

**political** [1] - 24:16

**portion** [3] - 29:2; 46:2; 53:16

**portions** [4] - 7:16, 20

**position** [13] - 9:22; 20:1, 9-10; 30:19; 49:5; 67:1; 95:8; 102:18; 103:10

**post** [15] - 18:14; 20:5; 34:17; 42:4, 11; 77:10; 78:15, 25; 81:4, 15; 82:11; 84:15, 20; 85:16; 103:6

**Post** [4] - 10:25; 32:9; 45:7

---

**Post-it** [4] - 10:25; 32:9; 45:7
**post-merger** [15] - 18:14; 20:5; 34:17; 42:4, 11; 77:10; 78:15, 25; 81:4, 15; 82:11; 84:15, 20; 85:16; 103:6
**poster** [2] - 13:24; 87:8
**potential** [4] - 27:10; 35:21; 85:8; 104:19
**potentially** [1] - 51:9
**power** [3] - 71:10; 77:3; 83:10
**powerful** [4] - 64:19, 21; 66:13; 79:2
**pre** [1] - 47:5
**pre-bates** [1] - 47:5
**prebate** [2] - 34:7
**precedent** [4] - 49:8; 89:3, 5
**precisely** [1] - 32:21
**preference** [2] - 8:23; 113:6
**preferences** [1] - 105:21
**prejudiced** [1] - 7:24
**preliminary** [2] - 21:12; 23:19
**preponderance** [4] - 21:21, 23; 22:4; 39:5
**presence** [2] - 60:11
**present** [3] - 56:18, 22; 107:2
**presentation** [7] - 29:11; 42:22; 50:17; 53:23, 25; 113:24
**presenting** [1] - 22:16
**president** [2] - 24:20; 99:25
**presidential** [1] - 24:20
**press** [3] - 94:3; 99:11, 14
**pressure** [1] - 85:14
**Preston** [1] - 3:15
**preston.miller@stblaw.com** [1] - 3:18
**presumption** [16] - 21:20; 22:11, 19, 22; 35:19, 22; 39:1, 5, 16; 51:14; 53:14; 62:24; 88:23; 91:19, 22
**presumptively** [1] - 35:7
**pretend** [2] - 28:12; 35:12
**PRETRIAL** [1] - 1:9
**prettiest** [1] - 64:1
**pretty** [6] - 20:11; 27:13; 53:18; 94:25; 99:12; 109:13
**prevail** [1] - 36:1
**prevailing** [1] - 39:10
**prevalent** [1] - 40:13
**prevent** [3] - 37:9; 38:9; 107:2
**preview** [1] - 52:20
**previous** [1] - 19:21
**price** [24] - 17:10, 18; 27:5; 28:13, 15; 29:2; 32:15; 47:7; 60:5, 16; 66:6; 71:13, 16-17; 78:14; 79:4; 81:4, 15, 20; 82:11; 85:15; 93:24
**prices** [26] - 27:2; 29:4; 30:22; 39:21; 41:25; 42:8; 44:20; 45:9; 46:9, 23; 61:7, 25; 62:8; 65:10, 13, 22; 66:6, 8; 77:11; 79:3, 10-11; 84:23; 86:5; 92:5; 102:10
**pricing** [17] - 29:19; 30:2; 31:1, 7; 34:1, 4, 15, 17; 42:1; 46:5; 67:7; 77:16; 82:7, 13; 84:3; 100:15
**prima** [1] - 22:17

**primarily** [1] - 99:18
**primary** [8] - 13:23; 14:7; 16:3; 39:25; 43:2; 47:17, 23; 97:16
**Princeton** [1] - 2:14
**principles** [1] - 18:18
**print** [1] - 9:5
**printers** [1] - 27:23
**priority** [3] - 94:17; 104:7, 11
**privately** [1] - 25:6
**probabilities** [2] - 21:24; 22:1
**probable** [2] - 22:2
**problem** [14] - 7:3; 8:8; 51:23; 60:25; 61:1; 63:7; 67:7; 71:8, 21; 72:3; 73:18; 91:1; 95:15
**problems** [1] - 102:21
**proceed** [4] - 10:5; 37:10, 12; 113:9
**proceeding** [2] - 23:1, 19; 30:4; 37:3; 109:14; 113:8
**PROCEEDINGS** [1] - 1:9
**proceedings** [1] - 115:4
**Proceedings** [2] - 4:8; 114:21
**process** [17] - 14:2; 17:10; 25:8; 26:20; 31:2; 32:10; 34:18; 37:4, 13; 38:14; 40:12, 14; 56:23; 93:22; 95:3
**processes** [3] - 16:10; 25:11; 29:24
**procure** [1] - 98:22
**procurement** [7] - 65:11; 67:1; 73:20, 24; 98:3
**produce** [2] - 22:13; 74:5
**produced** [2] - 4:8; 114:3
**product** [28] - 28:2, 25; 71:23; 72:13, 25; 73:18; 74:3, 20; 75:2, 6, 19; 76:4, 6, 12, 14; 77:4, 18; 78:2; 82:24; 83:4; 87:21; 88:22; 93:13; 96:22; 102:3
**production** [1] - 33:8
**products** [60] - 13:15; 14:4, 12; 27:7, 11, 13, 15; 28:3, 16; 29:15; 32:1, 8, 14; 33:2, 14, 16, 20; 40:2; 41:22; 42:5; 45:6, 10, 25; 46:2, 8, 22; 47:8, 10; 54:5; 59:7; 60:2, 7, 9, 22; 65:5, 24; 72:13, 22; 74:8, 12, 14-15, 17; 75:17; 77:7, 12-13; 82:14, 16; 84:11; 91:8; 93:16-18; 96:12
**Professor** [10] - 19:3; 27:23; 28:11; 30:9; 35:1, 13; 40:23; 42:3; 53:12; 55:18
**profit** [1] - 60:16
**profitability** [1] - 100:16
**profitable** [1] - 28:14
**profitably** [1] - 29:4
**program** [2] - 97:9; 100:3
**projection** [3] - 51:25; 52:1
**projections** [1] - 99:20
**promotional** [1] - 46:13
**prompt** [1] - 34:3
**promptly** [1] - 114:19
**proof** [1] - 44:9
**proper** [2] - 27:9; 29:1
**properly** [1] - 9:11
**property** [1] - 77:21

**proposal** [3] - 48:24; 49:18; 51:3
**Proposal** [3] - 16:8; 31:11; 74:18
**proposal's** [1] - 49:17
**proposals** [1] - 103:12
**Proposals** [1] - 75:12
**propose** [1] - 88:24
**proposed** [13] - 7:23; 9:2, 15; 15:13; 16:6; 23:4, 7; 48:1, 20; 49:3; 53:10; 88:7
**proprietary** [1] - 8:21
**prospects** [1] - 101:20
**protect** [6] - 9:3, 9; 64:17, 19; 69:9
**protected** [1] - 25:11
**protection** [5] - 8:25; 9:15, 23; 64:22, 24
**protective** [1] - 98:24
**protects** [1] - 9:14
**prove** [2] - 39:5; 51:12
**provide** [9] - 29:21; 30:21; 31:15; 33:4; 34:13; 46:24; 50:13; 52:10; 78:1, 3
**provided** [2] - 35:22; 102:12
**provider** [1] - 80:22
**providers** [1] - 15:21
**providing** [2] - 8:9; 59:5
**provision** [1] - 31:12
**provisions** [1] - 34:15
**proxy** [3] - 11:11; 19:2, 4
**public** [15] - 8:23; 9:16, 20, 25; 21:16; 23:12, 25; 25:17; 62:9; 67:2; 107:7; 113:7, 25; 114:5, 13
**public's** [2] - 9:10; 62:12
**publicly** [3] - 25:5; 89:23; 114:2
**purchase** [10] - 11:4; 15:4; 32:3, 13; 34:4; 39:24; 47:9; 54:5, 8
**purchases** [7] - 11:11; 15:3; 31:2; 41:24; 42:13; 47:1; 49:19
**purchasing** [2] - 29:24; 77:3
**Purell** [2] - 66:2, 7; 72:19
**purportedly** [1] - 44:10
**purposes** [1] - 30:7
**pursue** [2] - 80:18; 82:20
**pursuing** [1] - 78:22; 90:10
**push** [1] - 104:13
**put** [13] - 9:6; 12:5; 22:19; 28:16; 34:22; 39:17; 53:4; 87:12, 14-15; 97:19; 109:11
**puts** [1] - 70:12
**putting** [1] - 104:9

---

# Q

**qualified** [1] - 55:19
**quality** [3] - 68:7; 90:20
**quantities** [2] - 40:2; 46:6
**questioning** [1] - 111:21
**questions** [4] - 53:22; 61:19; 110:12
**quick** [1] - 47:25
**quickly** [1] - 38:21

**quite** [5] - 7:12; 35:22; 36:9; 43:8; 47:13
**quote** [1] - 52:6
**quotes** [1] - 43:5

# R

**RadioShack** [1] - 101:15
**raise** [3] - 41:25; 66:6; 77:11
**raised** [2] - 23:10; 112:25
**raising** [1] - 27:2
**range** [4] - 30:21, 25; 32:7; 39:18
**ranging** [1] - 94:4
**rate** [2] - 79:17; 95:23
**rather** [1] - 101:25
**RDR** [3] - 4:3; 115:3, 6
**RDR-CRR** [1] - 115:3
**reach** [2] - 83:5; 90:3
**reached** [1] - 26:14
**reaching** [1] - 110:5
**reacted** [1] - 15:12
**read** [3] - 23:3; 26:16; 61:20
**ready** [3] - 50:10; 97:19; 99:14
**real** [12] - 17:20; 40:4; 53:19; 65:20; 66:15; 69:20; 91:1; 93:22; 96:24; 99:8, 24
**realities** [4] - 62:22; 64:10; 74:4; 75:19
**reality** [5] - 36:25; 64:10; 68:24; 69:24; 92:14
**realized** [1] - 51:25
**really** [17] - 36:13, 16; 40:12; 53:25; 57:11; 58:3; 66:2; 74:9, 14; 87:1; 104:8; 105:16, 19; 106:17; 108:1
**reappeared** [1] - 16:21
**reason** [12] - 9:4; 15:4; 25:21; 26:23; 32:5; 69:25; 70:6; 72:23; 82:10; 89:2, 9; 112:25
**reasons** [17] - 9:9, 23; 23:21; 24:5; 25:3, 17; 26:5, 15; 29:18; 41:12; 43:2; 70:2; 79:1; 86:25; 90:10
**rebates** [1] - 34:4
**rebut** [4] - 22:22; 39:6; 57:8; 91:22
**rebutting** [2] - 39:1, 4
**receive** [1] - 82:13
**received** [1] - 113:24
**recent** [2] - 11:19; 35:9
**recently** [4] - 47:2; 70:24; 74:2; 83:10
**recognize** [8] - 8:22; 9:17; 15:15; 16:4; 85:2; 97:14; 104:16, 18
**recognized** [1] - 84:8
**recommendation** [1] - 23:23
**record** [7] - 6:7; 23:11, 22; 30:11; 115:3
**recurrent** [2] - 72:2, 5
**recurring** [1] - 54:2
**red** [2] - 18:2; 29:23
**redacted** [3] - 16:15; 29:12; 97:2
**redacting** [1] - 112:4
**redactions** [4] - 9:2; 112:3; 113:3;

114:1
**reference** [2] - 55:15; 102:25
**references** [1] - 54:11
**referencing** [1] - 109:20
**referring** [1] - 39:15
**refers** [1] - 39:23
**reflect** [1] - 102:5
**refrigeration** [1] - 90:22
**regarding** [1] - 21:19
**regardless** [1] - 12:12
**regional** [8] - 11:2; 18:9; 70:15; 78:12; 80:14; 83:17, 22; 84:2
**Regional** [1] - 68:3
**regions** [1] - 84:3
**regular** [1] - 61:9
**regulations** [1] - 90:21
**regulatory** [1] - 73:14
**Reilly** [3] - 3:2; 6:17; 110:24
**REILLY** [3] - 6:17; 110:24; 111:5
**Reinhart** [7] - 1:13; 6:8; 62:2; 65:1; 66:10; 80:8; 87:1
**REINHART** [116] - 6:8; 8:9, 13, 16; 10:7, 14, 17, 19; 11:17, 22; 12:1, 5, 9, 12, 24; 13:3, 8, 11; 18:23; 19:1, 11, 14, 18; 20:1, 11; 21:24; 22:3, 5, 10; 23:5, 7, 12, 18, 23, 25; 24:3, 7, 10, 12, 18, 22, 24; 25:5, 8, 14, 19; 26:1, 3, 7, 11, 17, 22; 28:20, 22, 24; 31:19, 23; 36:2, 7, 11; 37:2, 8, 12, 16, 19, 23; 38:1, 4, 8, 14, 20, 23; 39:8, 12; 44:2; 48:7, 11, 19, 22; 49:4, 9, 12; 50:6, 9; 52:9, 13, 18, 20, 24; 54:17, 24; 55:4, 8, 17, 23; 56:9, 18, 21; 57:6, 10, 15; 108:9, 12, 15, 18, 23, 25; 109:3, 11, 16, 20, 24; 110:3, 7, 21; 114:18
**reinvent** [3] - 60:6, 11; 106:23
**reinvention** [1] - 85:13
**reinvest** [1] - 61:7
**reinvested** [1] - 62:8
**related** [2] - 18:23; 49:18
**release** [2] - 94:3; 99:14
**releases** [1] - 99:11
**relevant** [13] - 7:18, 20-21; 13:12; 14:16; 19:6, 10; 22:24; 26:23; 27:6; 28:10; 35:5; 63:3, 11, 15; 64:6; 71:23; 72:6, 21; 73:25; 74:5; 75:2, 6; 76:2, 11, 14; 94:18; 99:18; 106:22; 107:12
**reliable** [2] - 12:8; 107:12
**relied** [3] - 76:1; 110:5, 7
**rely** [5] - 76:2; 78:21; 80:17; 104:1
**remain** [2] - 15:16; 92:9
**remainder** [2] - 52:7, 16
**remaining** [1] - 21:11
**remarks** [1] - 110:25
**remedies** [1] - 88:18
**remedy** [4] - 49:3; 86:12; 88:4; 91:15
**remember** [2] - 32:13; 33:7
**reminder** [2] - 38:25; 98:23
**rendering** [2] - 63:3; 88:25
**replace** [6] - 43:21; 44:7, 14; 51:7;

67:22; 97:15
**replacement** [1] - 97:21
**report** [3] - 8:10; 25:6; 113:1
**reported** [4] - 4:8; 15:21; 35:15; 43:2
**REPORTER** [1] - 10:4
**Reporter** [2] - 4:3; 115:7
**reports** [4] - 16:23; 32:21; 78:22
**represent** [3] - 24:12; 87:12
**representation** [1] - 20:23
**representative** [1] - 43:10
**represented** [1] - 11:6
**repurchase** [2] - 72:1, 5
**request** [2] - 103:11
**Request** [3] - 31:11; 74:18; 75:12
**requested** [1] - 111:21
**Requests** [1] - 16:8
**require** [8] - 14:18; 30:21; 44:21; 46:18; 54:12; 55:24
**required** [3] - 31:10; 49:2; 51:14
**requirements** [5] - 31:5; 33:7; 47:9; 69:23
**requires** [1] - 31:12
**research** [1] - 33:9
**resolve** [1] - 48:9
**resolving** [1] - 9:11
**resources** [2] - 89:15; 102:11
**respect** [8] - 6:20, 23; 9:18, 23; 23:4; 89:3; 108:6; 113:17
**respective** [1] - 50:2
**respond** [1] - 103:10
**responding** [1] - 103:14
**response** [2] - 62:2; 112:24
**restaurant** [1] - 90:23
**restaurants** [1] - 90:16
**restrain** [1] - 27:1
**restrict** [1] - 46:21
**result** [6] - 27:16; 44:14; 51:4; 54:13, 16; 67:5
**resulting** [1] - 51:11
**results** [3] - 30:14; 33:24; 90:12
**retail** [15] - 32:18; 54:25; 59:3, 7; 60:13; 61:1, 24-25; 63:7, 11; 66:12; 68:15; 79:20; 85:11; 98:20
**retailers** [2] - 59:24; 68:15
**retaliation** [1] - 65:23
**retrospective** [2] - 105:3, 10
**revenue** [7] - 63:16; 80:25; 86:19; 99:5, 20; 103:5
**reverse** [2] - 61:3; 65:14
**review** [3] - 17:5; 23:16; 78:21
**reviewed** [1] - 42:22
**revolutionize** [2] - 98:2, 21
**RFP** [10] - 16:19; 17:10; 19:19; 34:2, 20, 22; 40:12; 74:2
**RFPs** [12] - 16:7; 18:1; 21:6; 29:23; 30:24; 33:23; 65:14; 74:17; 75:14; 98:13; 103:11, 14
**richest** [1] - 64:19
**rid** [1] - 88:8

rigged [1] - 62:21
ripped [1] - 107:22
risk [1] - 42:8
ro [1] - 96:4
road [1] - 100:7
robust [16] - 78:19, 24; 79:1; 80:1;
82:10; 84:1, 14; 85:10; 86:11; 88:20;
92:1; 96:4-6, 10; 97:25
robustness [1] - 77:9
rogue [1] - 39:23
Ron [3] - 13:25; 52:4; 106:4
Room [1] - 4:6
room [7] - 28:4; 60:7; 66:1, 7; 72:18;
74:20; 77:6
round [1] - 41:9
routinely [2] - 29:14; 30:2
rules [5] - 37:23, 25; 38:1; 100:14
run [4] - 13:8; 25:1; 49:22; 89:21
runs [1] - 12:13

**S**

Sachs [1] - 65:7
sad [1] - 59:18
sale [5] - 18:12; 32:2; 45:25; 46:3; 59:2
Sales [1] - 72:14
sales [13] - 11:13; 12:14; 14:3; 30:13;
60:17; 72:8, 13; 73:16; 74:11; 81:14;
102:11; 107:16
salesperson [2] - 97:20; 98:1
salvage [1] - 51:15
salvaged [1] - 51:15
sample [1] - 43:10
sanitary [1] - 28:4
Sargent [3] - 13:25; 52:4; 106:4
satisfaction [1] - 42:5
satisfactory [1] - 79:11
satisfied [2] - 49:23; 53:14
satisfy [1] - 44:25; 90:21
save [1] - 57:22
savings [12] - 51:11, 19, 22, 24; 57:4;
61:6; 62:4, 7; 64:14; 67:5; 78:9
saw [5] - 21:11; 29:8; 30:10; 90:8;
102:7
scale [2] - 14:19; 39:16
scary [2] - 101:15, 20
scheduled [2] - 69:3; 111:2
school [3] - 59:6; 65:5; 98:16
scope [1] - 44:19
Scott [4] - 4:3; 115:3, 5
scottlyn01@aol.com [1] - 4:7
screen [2] - 42:16; 103:22
screens [1] - 59:16
screenshot [2] - 31:11; 46:12
seal [4] - 111:22; 113:5, 16; 114:6
sealed [1] - 113:18
sealing [2] - 8:20, 25
Sears [1] - 101:15
second [6] - 42:25; 43:12; 48:6; 50:9;

87:7, 19
secret [2] - 9:24; 113:6
Section [2] - 21:13, 18
secular [1] - 85:14
see [54] - 12:2, 15; 13:21; 14:8; 15:21;
16:12; 18:2, 4, 16; 21:11; 22:20, 23;
26:12; 29:13, 22; 30:14; 32:1; 34:6, 24;
35:14; 38:24; 41:14, 16-17; 43:4; 46:25;
52:6, 8, 11, 21; 53:17; 55:20; 57:20;
62:19; 63:2; 64:2, 25; 67:3; 71:17;
74:16; 75:12; 80:10, 25; 85:2; 91:20;
94:12; 96:20; 99:15, 19; 101:2, 4;
103:2, 7
seeking [4] - 8:25; 9:3, 8
seem [2] - 56:4; 59:9
segment [2] - 16:14; 55:1
selection [1] - 78:2
selections [1] - 93:15
sell [16] - 10:21; 11:4; 13:16; 28:3;
45:10; 50:22; 61:12; 65:24; 72:17;
74:14; 77:25; 79:19; 88:5; 100:12
seller [2] - 66:2; 92:20
selling [6] - 45:17; 50:23; 77:19
senior [1] - 94:13
sense [2] - 26:1
sensitive [1] - 15:3
sent [2] - 92:11; 104:6
sentence [2] - 52:7, 17
separate [1] - 23:1
separately [3] - 14:13; 27:16; 47:11
September [1] - 109:18
serve [6] - 11:14; 14:19; 45:21; 50:25;
69:19; 80:23
served [1] - 30:17
serves [2] - 14:7; 81:12
service [12] - 31:1; 33:20; 49:24;
69:23; 70:13; 81:14; 91:11; 94:5; 98:5;
103:19; 104:12; 105:6
serviced [1] - 85:25
services [6] - 29:20; 30:21, 25; 31:7,
10; 33:4
servicing [3] - 89:18; 94:6; 99:21
serving [1] - 79:15
SESSION [2] - 1:9; 6:1
set [5] - 8:14; 27:14; 46:5, 7; 49:25
setting [1] - 100:14
settle [1] - 48:16
settled [1] - 21:13
Seventh [1] - 1:14
several [4] - 50:13, 18; 77:1; 99:4
sgreco@ftc.gov [1] - 2:23
shapes [1] - 32:16
Shapiro [12] - 19:3; 27:23; 28:11; 30:9;
35:1, 13; 40:23; 42:3; 53:12; 55:18;
63:22; 66:10
share [25] - 8:12; 22:13; 35:15, 25;
36:9; 44:17; 63:20, 24; 64:3; 65:21;
67:15; 68:17, 20; 70:1; 71:9, 19, 22;
72:21, 23; 73:17; 74:25; 98:8; 107:18
shares [7] - 12:14; 63:19; 72:8; 75:4;

107:18, 22
Sharpies [1] - 79:7
shed [1] - 61:5
sheet [1] - 27:22
ship [1] - 80:24
shipping [2] - 46:10, 25
shockwaves [1] - 92:11
shoes [1] - 50:11
shop [6] - 45:24; 46:8, 21
shopping [3] - 32:6; 46:10; 93:17
short [1] - 93:5
shorthand [1] - 4:8
shot [1] - 101:16
show [30] - 11:22; 12:13; 18:13; 21:3,
5; 22:13; 29:5; 33:13, 24; 35:2, 4, 8, 21;
39:2; 40:10; 44:5, 12-13; 47:16; 48:20;
62:25; 81:12; 91:9; 96:4, 20; 99:1;
100:23; 101:6; 107:19; 112:3
showed [4] - 19:18, 21; 42:23; 109:17
showing [2] - 26:14; 54:6
shown [4] - 14:24; 17:19; 35:18; 53:16
shows [9] - 11:10; 12:1; 18:17; 20:15;
36:8; 50:16; 56:15; 87:25
shut [1] - 113:9
shuttle [1] - 98:7
sic] [1] - 97:6
sick [1] - 91:1
side [11] - 7:17; 24:14; 39:17; 50:7;
57:7, 18; 60:13; 61:24; 67:12; 86:7
sides [2] - 8:7; 36:14
sign [12] - 30:1; 46:8; 71:5, 11; 78:1;
94:2; 97:20
signed [5] - 51:3; 69:13; 86:15, 24;
93:21
significant [16] - 11:8; 18:19; 22:15;
28:15; 44:21; 46:2; 48:15; 51:23; 54:9;
55:13; 56:2, 5, 11; 72:12; 85:4; 94:25
signing [2] - 34:14; 94:7
silence [1] - 67:8
similar [1] - 27:12
simply [6] - 23:8; 25:19; 33:19; 34:14;
47:15; 48:23; 51:5, 24
SIMPSON [4] - 3:2, 7, 11, 16
single [5] - 11:5; 16:1; 18:3; 47:22;
103:1
sit [2] - 106:9
site [4] - 45:15; 46:14; 47:8
situation [1] - 53:18
situations [1] - 17:19
six [3] - 66:16, 19; 95:23
sizes [1] - 32:16
SKU [1] - 93:17
SKUs [3] - 32:14; 47:10; 102:3
slice [5] - 40:24; 64:5, 9
slide [15] - 10:19; 12:2; 15:18, 20, 25;
16:12; 20:15; 41:4; 44:3; 50:16; 51:5;
87:8; 90:8; 92:14
slides [6] - 10:7; 20:24; 21:3; 87:2;
114:3

**sliding** [1] - 39:16
**slight** [1] - 44:17
**slightly** [1] - 30:17
**small** [13] - 20:3; 32:7; 45:20; 47:1;
53:16; 63:10; 64:17; 72:25; 93:2, 10;
94:4
**smaller** [3] - 11:9; 30:17; 107:18
**SmallParts.com** [1] - 45:16
**Smith** [6] - 54:4, 7, 19; 56:1, 16; 57:1
**sniff** [1] - 81:24
**so-called** [2] - 48:1; 51:24
**sold** [7] - 14:4; 28:17; 29:15; 45:6;
46:8; 47:8; 72:18
**solicit** [1] - 77:2
**someone** [3] - 38:18; 40:2; 71:18
**sometimes** [5] - 14:9; 39:22; 40:20;
113:12
**somewhat** [1] - 29:17
**somewhere** [4] - 30:7, 15; 42:13; 56:7
**soon** [3] - 52:18; 59:3; 93:21
**sophisticated** [5] - 14:17; 30:1; 65:9,
12
**sophistication** [1] - 14:19
**sorry** [13] - 10:4; 11:24; 22:14; 24:18;
33:2; 44:2; 64:11; 103:21; 108:15;
109:16; 111:2, 14; 114:16
**Sorry** [1] - 24:24
**sort** [3] - 33:4; 55:25; 98:4
**source** [1] - 82:16
**sourcing** [1] - 82:15
**South** [1] - 2:9
**space** [3] - 15:22; 78:20; 85:4
**speaks** [1] - 24:3
**special** [3] - 33:13; 77:18, 20
**specialized** [2] - 30:2; 44:11
**specific** [3] - 16:15; 29:12
**specifically** [4] - 32:2; 80:2; 110:8
**speculating** [1] - 111:20
**spend** [22] - 29:15; 30:16; 32:5, 19, 23;
33:5, 17; 39:22; 40:11, 14, 19; 41:7, 9;
48:3; 53:5; 54:7, 20; 65:20; 110:15;
114:12
**spending** [1] - 33:1
**spends** [1] - 30:5
**spent** [3] - 40:6; 110:13
**splash** [1] - 92:19
**split** [1] - 37:20
**spun** [1] - 49:16
**square** [1] - 93:19
**squeeze** [1] - 65:13
**squeezing** [1] - 65:10
**staff** [1] - 10:12
**standard** [7] - 18:18; 21:12; 36:4, 17;
39:4, 6
**stands** [1] - 113:2
**Staple** [1] - 92:5
**staplers** [1] - 10:25
**Staples** [170] - 2:12; 6:4, 15; 10:20;
11:9, 22; 12:16; 13:13, 22; 14:5, 9, 11,

20, 22; 15:4, 7, 13, 21; 16:9, 11, 13, 16,
18, 21; 17:6, 9, 14, 17, 22; 18:2, 11;
20:19, 22; 21:5; 28:3; 29:7, 14, 16, 21,
25; 30:11, 18-19; 31:7, 15, 23; 32:4, 17;
33:4, 12; 34:9, 17, 22; 35:3; 40:1, 11,
15, 20, 24; 41:8, 19, 22, 24; 42:7, 14,
20, 24; 43:1, 16, 22; 45:9; 49:25; 50:11,
14, 24; 51:22; 52:4; 53:5, 19; 55:1;
58:16, 25; 65:24; 66:20; 67:12, 15;
68:6; 69:19; 70:11, 13; 71:12; 72:11;
73:6; 76:5, 23; 78:2, 13; 79:8, 22; 80:4,
6, 21; 81:1, 4, 8, 16, 18, 20; 82:2; 83:1,
13; 84:2, 5, 17; 85:5, 7; 86:1, 22; 87:15,
21; 88:1, 3, 9; 89:13, 16; 90:4; 92:9, 21;
93:12; 94:1, 16; 96:20, 25; 97:15, 22;
98:1; 99:25; 100:4, 20, 24; 101:9, 14,
25; 102:6, 9-10, 16, 22, 25; 103:2, 4-6;
104:19; 106:4-6; 112:20
**STAPLES** [3] - 1:7; 5:5; 58:11
**staples** [2] - 79:4; 99:5
**Staples'** [7] - 13:25; 16:3; 21:9; 77:11;
79:17; 83:3; 87:8
**Staples/Depot** [1] - 15:16
**Starbucks** [1] - 79:7
**start** [3] - 22:25; 37:16; 114:19
**started** [4] - 43:24; 45:13; 47:2; 95:16
**starting** [1] - 43:16
**state** [2] - 70:8, 10
**STATEMENT** [4] - 5:4; 10:16; 58:11
**statement** [13] - 23:25; 43:3; 69:14;
73:4; 88:21; 105:9; 108:2, 7; 109:6, 18,
24; 114:5
**statements** [5] - 58:1; 75:22, 24;
80:18; 111:15
**states** [2] - 80:23; 81:13
**STATES** [2] - 1:1, 10
**states'** [1] - 70:14
**station** [1] - 83:9
**statue** [1] - 68:10
**status** [1] - 113:1
**stay** [4] - 61:4; 106:12, 17, 22
**Stelios** [1] - 2:2
**Stella** [1] - 6:10
**stem** [1] - 60:16
**step** [1] - 50:11
**Stephanie** [2] - 2:20; 6:11
**stick** [4] - 89:19, 24; 91:16
**still** [5] - 38:13; 59:18; 100:3, 9; 104:4
**stipulate** [1] - 37:7
**stipulated** [1] - 37:3
**stock** [4] - 60:5, 16; 61:13; 93:24
**stood** [3] - 62:13; 63:25; 80:8
**stop** [3] - 11:12; 35:19; 48:6
**storage** [1] - 90:22
**store** [2] - 60:3; 77:25
**stores** [5] - 59:3, 7, 25; 61:1; 79:20
**strategies** [1] - 83:18
**strategy** [1] - 85:8
**streaming** [1] - 105:15
**street** [6] - 63:9; 65:5, 17; 98:10

**Street** [13] - 1:14, 18, 22; 2:3, 8, 21;
3:3, 7, 12, 16, 20; 92:15, 17
**streets** [1] - 63:10
**strength** [2] - 51:13; 80:13
**strengthen** [1] - 60:12
**stretch** [1] - 9:25
**strict** [1] - 26:1
**strike** [1] - 63:14
**strive** [1] - 36:19
**strong** [6] - 20:19; 54:6; 77:10; 80:5, 8;
81:8
**stronger** [9] - 39:16; 80:10; 81:20;
83:24; 89:11, 13-14; 90:5
**strongly** [1] - 107:7
**struck** [2] - 68:15
**structural** [1] - 51:13
**struggling** [1] - 60:23
**studied** [1] - 40:23
**study** [1] - 29:1
**stuff** [1] - 74:20
**stunning** [1] - 67:8
**subject** [1] - 27:12
**submit** [30] - 25:6; 62:22; 64:15; 66:23;
68:22; 69:17; 70:3; 71:1, 22; 73:2; 75:2,
5; 76:2, 4; 88:16, 19; 89:8; 90:5, 9;
91:19, 21, 25; 94:25; 100:23; 101:24;
102:8; 104:21; 105:24; 107:3, 21
**submitted** [7] - 68:5, 9, 12; 69:4; 74:2;
110:4; 112:23
**substantial** [1] - 65:20
**substantially** [2] - 66:12; 76:7
**substitutable** [1] - 27:20
**substitute** [1] - 27:9
**substitutes** [1] - 27:3
**succeed** [1] - 21:25
**success** [2] - 21:17, 19
**successfully** [1] - 83:19
**successor** [2] - 45:15
**sued** [1] - 64:19
**sufficient** [3] - 44:7; 49:3; 50:4
**suggested** [1] - 72:24
**Suite** [2] - 2:9, 13
**SULLIVAN** [33] - 1:10; 6:14; 58:8, 10,
12, 16, 19, 23, 25; 60:20; 61:18, 22;
69:4, 7, 16; 75:24; 76:10, 18, 23; 88:13,
19; 89:6, 8; 93:9; 94:22; 95:5, 10; 96:2;
103:25; 104:3; 106:11; 107:13, 24
**Sullivan** [2] - 2:12; 6:14
**sums** [1] - 53:18
**superstore** [1] - 80:7
**supplement** [1] - 97:15
**supplemental** [1] - 13:6
**supplied** [1] - 46:23
**supplier** [10] - 14:6; 42:6; 47:17; 67:7;
85:3, 22, 25; 86:6; 97:16
**suppliers** [23] - 13:23; 20:2, 25; 27:1;
40:25; 43:1, 9; 45:8; 46:1; 47:12; 65:2;
70:11, 19; 84:2, 10; 85:16, 20-21;
86:20; 88:2; 89:21, 23; 91:17

**supplies** [54] - 10:22, 24; 13:14; 14:4, 24; 15:22; 18:13; 27:7; 28:8; 30:6; 33:11; 39:24; 41:23, 25; 42:2, 13; 45:18; 47:24; 59:2, 6; 60:8; 65:5; 66:1, 7; 68:20; 71:12, 25; 72:1, 19; 73:4, 8-9, 15, 23; 74:3, 6, 13, 21; 76:25; 77:7, 25; 79:20, 23; 84:4, 14, 19, 21, 23; 85:9; 86:3; 97:16; 98:14; 103:10

**supply** [22] - 13:21; 14:18, 20; 39:25; 55:7; 60:9; 71:4; 72:4, 19; 78:11, 25; 80:7, 12; 82:16; 83:17, 20-21; 84:1, 13; 85:4; 92:11; 106:1

**Supply** [11] - 45:15; 72:14, 22, 25; 74:8, 12, 17, 20; 75:17; 81:2

**support** [11] - 42:19; 69:5; 78:4; 82:22; 83:1, 11; 90:3; 103:8

**supported** [2] - 83:3; 88:1

**supports** [5] - 53:13; 57:20; 89:12; 90:1, 4

**suppose** [3] - 8:2; 52:13; 56:15

**Supreme** [5] - 26:9; 39:11; 49:7; 89:4

**surprise** [1] - 81:21

**surrogate** [2] - 71:8, 19

**surveyed** [1] - 19:1

**survived** [1] - 16:20

**suspect** [1] - 81:23

**suspicious** [1] - 52:11

**SW** [4] - 1:18, 22; 2:3, 21

**switch** [1] - 27:1

**sxenakis@ftc.gov** [1] - 2:5

**synergies** [2] - 62:4; 78:9

**Sysco** [8] - 22:8; 39:14; 90:11, 14, 16, 19; 91:6, 15

**system** [1] - 36:17

**systems** [2] - 31:24; 77:19

---

**T**

**table** [3] - 6:10; 106:9

**talks** [3] - 78:8; 87:6; 95:12

**tangible** [1] - 17:20

**Tara** [2] - 1:13; 6:8

**target** [8] - 68:2, 14, 17-18; 69:17; 75:18; 81:10; 99:16

**targeted** [2] - 92:21; 99:17

**targeting** [3] - 92:16; 93:2; 96:13

**team** [1] - 102:12

**technology** [5] - 67:12; 69:24; 82:23; 96:15; 105:13

**temporary** [1] - 49:21

**ten** [3] - 72:17; 74:7; 96:14

**tend** [2] - 38:21; 49:14

**term** [3] - 14:5; 71:25; 89:24

**terms** [17] - 25:1; 31:1, 9, 14; 33:22; 34:6; 50:12; 51:6; 57:1; 67:7, 9; 76:4; 77:9; 79:24; 104:24; 105:20

**terrible** [3] - 71:19; 84:22; 90:25

**test** [3] - 12:12; 28:12, 25

**tested** [2] - 19:4; 30:14

---

**testified** [2] - 108:18, 23

**testify** [19] - 15:18; 18:8; 31:4; 35:1; 46:15; 53:2; 57:3; 64:23; 66:25; 69:2; 81:17, 22; 102:13; 108:9, 24; 109:8; 110:18; 113:1

**testifying** [3] - 108:21, 25; 109:14

**testimony** [20] - 6:24; 7:5, 9, 12; 8:1; 28:8; 50:5; 52:6; 68:11; 74:4; 76:17; 109:9, 19, 22-23, 25; 113:17

**THACHER** [4] - 3:2, 7, 11, 16

**that'd** [1] - 12:11

**theirs** [1] - 93:19

**themselves** [5] - 30:12; 33:19; 45:7; 106:23

**theory** [1] - 50:21

**Thereupon** [1] - 58:5

**they've** [38] - 7:19; 29:6; 58:14; 60:11; 63:6, 9, 11; 66:17; 69:18; 70:3, 6, 21; 71:22; 72:21; 73:16; 74:2; 76:16, 19; 79:16; 80:10; 81:7; 82:23-25; 83:24; 84:9, 18; 95:1; 96:18, 20-21; 99:17; 101:23; 102:3, 20

**thinking** [2] - 98:5; 101:13

**thinks** [2] - 88:7; 92:22

**Third** [1] - 47:22

**third** [6] - 18:15; 42:25; 46:4; 69:10; 72:7; 73:15

**third-party** [1] - 46:4

**thousand** [1] - 69:21

**thousands** [9] - 32:13; 47:10; 54:20; 55:9; 57:16; 69:22, 25

**threat** [10] - 16:7; 42:9, 11; 85:8; 100:5, 17; 101:16, 23; 104:25; 106:24

**threaten** [2] - 41:23; 79:3

**threatening** [4] - 9:12; 42:5; 79:10; 82:15

**threats** [2] - 100:14; 106:23

**three** [17] - 18:1; 19:16, 18, 20; 24:13; 51:9; 80:16; 87:6; 92:4; 94:14, 19, 24; 95:12; 96:7; 97:9; 101:3

**three-year** [2] - 18:1; 19:20

**threshold** [3] - 34:11; 40:19; 70:5

**tide** [2] - 60:16; 61:3

**tier** [3] - 50:23; 51:1; 53:9

**tightening** [1] - 100:8

**timeline** [1] - 51:5

**timely** [2] - 44:7; 47:16

**titled** [1] - 20:25

**today** [23] - 6:10, 15, 22; 10:20; 16:25; 21:9, 18; 35:23; 42:9, 20; 43:8, 13, 19; 44:4; 52:1; 53:17; 70:17; 90:8; 101:19, 25; 102:1; 106:3

**together** [6] - 11:4; 12:5; 32:11; 43:9; 77:1; 93:14

**tomorrow** [3] - 49:22; 113:2, 24

**ton** [3] - 9:5; 17:14; 110:14

**toner** [12] - 72:3, 21; 73:8, 22; 74:3, 6, 21; 75:16; 82:14; 107:11

**took** [4] - 14:2; 17:14; 92:15; 94:1

**tools** [1] - 82:13

---

**top** [3] - 41:18; 94:17; 96:14

**topic** [1] - 45:3

**topics** [2] - 47:25; 114:1

**Tort** [1] - 48:14

**total** [4] - 37:19; 66:15, 18; 67:17

**totally** [1] - 111:2

**touch** [1] - 97:19

**tout** [1] - 106:24

**towards** [1] - 105:15

**track** [5] - 14:12; 32:23; 41:13; 61:11

**tracking** [1] - 41:6; 96:20

**TRADE** [6] - 1:3, 13, 17, 21; 2:3, 20

**Trade** [6] - 1:13; 2:3; 6:4, 9; 13:12; 109:14

**tradition** [1] - 65:25

**traditional** [3] - 60:8, 17; 74:6, 11, 22

**transaction** [1] - 50:20

**TRANSCRIPT** [1] - 1:9

**transcript** [4] - 4:8; 52:9; 109:12; 115:3

**transcription** [1] - 4:9

**transferring** [1] - 89:17

**transform** [3] - 98:17, 20

**transformation** [2] - 59:13

**transformational** [3] - 102:3; 106:18, 25

**transformed** [1] - 61:5

**transforming** [1] - 98:14

**transition** [1] - 51:6

**treat** [1] - 69:22

**treinhart@ftc.gov** [1] - 1:16

**trenches** [1] - 101:21

**trial** [11] - 9:25; 10:6; 37:3, 12, 17; 38:3; 48:13; 57:24; 84:7; 100:22; 113:6

**Trial** [6] - 1:13, 17, 21; 2:2, 6, 20

**trick** [1] - 44:16

**trickle** [2] - 56:7; 57:4

**trickle-down** [2] - 56:7; 57:4

**tried** [8] - 60:6, 11; 71:22; 97:10; 103:7, 9, 12, 15

**trier** [1] - 48:17

**tries** [1] - 40:16

**Trimega** [2] - 77:8; 83:9

**trouble** [1] - 14:2

**troubling** [2] - 36:13, 15

**trucks** [5] - 74:22; 80:24; 82:24; 84:25; 90:22

**true** [4] - 16:2; 43:8; 46:3; 57:2

**truly** [1] - 9:14

**truth** [4] - 60:20; 93:4; 104:10

**try** [9] - 60:8, 12, 24; 69:9; 71:5; 73:6; 74:14; 95:4; 106:23

**trying** [8] - 24:19; 56:13; 65:24; 69:17; 96:18; 104:10; 106:15; 114:2

**tugging** [1] - 60:18

**tune** [1] - 97:11

**tunnel** [2] - 95:19; 101:2

**turn** [2] - 39:19; 41:6

**turning** [1] - 38:23

twice [1] - 44:3
two [68] - 10:10; 12:13, 17; 15:14, 21; 16:4; 17:21; 18:14; 20:13, 17, 24; 21:10; 24:14; 27:19; 29:16; 31:8; 32:22; 35:4; 41:17; 42:12, 23; 43:2; 44:24; 46:10, 25; 47:25; 48:4; 49:20; 51:8; 53:6, 19; 56:14; 58:17, 25; 59:23; 61:2; 63:14; 65:2; 66:20; 69:1; 87:6, 17; 90:11; 91:10, 24; 92:1, 8, 23; 94:23; 95:1, 12, 22; 100:24; 101:3, 11; 104:19; 105:1; 107:14; 110:9; 112:10, 21
two-day [2] - 46:10, 25
two-player [2] - 100:24; 101:4
type [2] - 89:4; 96:14
types [4] - 33:22; 40:21; 47:6; 53:3
typically [2] - 30:23; 75:25
typing [1] - 59:19

## U

U.S [1] - 4:4
Uber [2] - 98:10
ultimately [1] - 105:14
unanimous [1] - 23:8
unawarded [1] - 16:23
under [19] - 14:8; 18:17; 21:13, 17; 22:17; 25:24; 34:8; 56:13; 62:10, 18; 69:14; 74:23; 104:21; 108:21, 23; 109:8; 110:18; 111:22; 113:5
underestimated [2] - 105:5, 12
underestimating [1] - 78:11
understood [3] - 26:7; 28:20; 105:16
undue [1] - 22:13
unfortunate [1] - 52:14
unfortunately [1] - 96:25
uniformly [1] - 61:13
unintelligible [1] - 96:15
unintelligible} [1] - 10:3
UNITED [2] - 1:1, 10
United [4] - 68:4, 8, 11; 108:16
units [2] - 10:24; 93:17
unlawful [3] - 22:12; 35:7; 36:12
unless [1] - 69:25
unlike [1] - 81:1
unload [1] - 33:19
unredacted [5] - 10:8; 31:17, 19; 97:4
unrelated [1] - 111:3
up [36] - 10:9; 13:12; 18:17; 19:18; 29:24; 33:13; 36:10; 37:19, 22; 39:17; 46:7; 49:14, 25; 51:2, 12; 53:18; 62:20; 63:5, 17, 19; 69:17; 70:24; 71:22; 72:1; 73:16; 74:24; 77:25; 80:8; 85:9; 94:2, 7; 97:20; 101:17; 107:22; 112:1; 114:6
up-front [1] - 29:24
upfront [3] - 34:10, 13; 47:6
urgency [2] - 38:21; 101:17
uses [1] - 14:5
utilization [1] - 32:20
utilized [1] - 83:18

## V

vagaries [1] - 13:9
variety [4] - 31:4; 52:22; 53:2; 82:12
various [2] - 83:2, 18
vendor [14] - 14:7, 19; 18:10; 31:13; 39:24; 47:23; 53:9; 65:15, 18; 67:21; 70:22; 80:21
vendors [32] - 11:2, 13; 12:15, 17; 13:20; 14:24; 15:14; 16:4; 18:16; 19:22; 27:14, 18; 28:7; 30:24; 42:15; 43:17; 46:4, 9, 23; 50:23; 65:10, 13; 66:9; 70:8; 71:11; 84:4, 6; 86:4; 87:23
Veritiv [1] - 79:7
version [3] - 31:17, 19; 97:4
versions [1] - 10:8
versus [2] - 6:4; 54:16
viable [2] - 43:15; 92:23
video [9] - 8:6; 46:13; 66:24; 78:7; 93:6; 105:8, 11, 17, 23
videos [1] - 8:10
videostreaming [2] - 105:6, 12
Videotape [1] - 93:8
videotaped [1] - 6:20
view [8] - 9:10, 20; 13:2; 39:11; 48:15; 62:21; 108:6
views [1] - 102:7
vinyl [1] - 91:2
violate [1] - 98:24
violated [1] - 25:21
vis-à-vis [1] - 56:6
vision [2] - 95:19; 101:2
Volkswagon [1] - 33:3
volume [2] - 34:4, 10
volumes [1] - 34:8
vote [3] - 23:8, 17
voted [3] - 23:5; 24:6; 25:3

## W

W.B [2] - 45:3; 89:12
wait [1] - 36:25
Wal [5] - 85:24; 86:4; 87:25
Wal-Mart [5] - 85:24; 86:4; 87:25
Walgreen's [2] - 66:21
walk [1] - 33:15
walking [1] - 53:25
wall [1] - 87:9
Wall [2] - 92:15
Wallace [4] - 4:3; 115:3, 5
wallets [1] - 91:3
wants [5] - 9:20; 44:13; 69:12; 81:19; 82:22
warehouse [1] - 81:13
warehouses [2] - 80:24; 82:25
warned [1] - 14:22; 15:2
Washington [14] - 1:7, 15, 18, 22; 2:4, 9, 21; 3:4, 8, 13, 17, 20; 4:6; 35:9

waste [1] - 9:15
watching [2] - 92:24; 95:20
ways [7] - 19:4; 39:13; 59:10; 65:22; 66:4, 8; 79:9
WB [10] - 18:7, 10, 17; 53:7; 76:24; 79:14; 80:7; 81:8, 19; 82:1
Website [7] - 31:13, 25; 80:20, 22; 87:13; 93:6, 13
week [8] - 47:22; 52:22, 24-25; 113:23, 25
weekly [1] - 41:6
weeks [3] - 17:15; 37:21; 100:19
weigh [1] - 21:24
weighing [2] - 21:16; 56:23
weight [5] - 75:21, 23; 109:1, 7
WEIL [2] - 2:12, 16
whammy [1] - 100:11
wholesaler [7] - 76:24; 77:24; 86:16, 19, 23; 89:11; 90:4
wholesaler's [1] - 89:14
wholesalers [7] - 49:20; 78:4, 12; 79:18; 82:22; 83:11, 20
wide [1] - 82:24
William [1] - 3:19
william.monts@hoganlovells.com [1] - 3:22
Williams [1] - 106:6
willing [1] - 77:13
Wilson [2] - 113:1, 23
win [7] - 36:5; 62:15; 64:18; 73:2; 80:13; 82:20; 94:17
winning [3] - 20:25; 21:6; 80:15
wise [1] - 114:4
wish [2] - 65:3; 111:9
withdraw [2] - 110:10, 17
witness [6] - 66:25; 68:4; 73:23; 78:6; 108:11
witnesses [7] - 6:20; 70:16; 74:5; 76:10, 12-13; 77:14
witnesses' [1] - 104:10
won [4] - 18:3, 5, 9; 36:5
wondered [1] - 111:20
wonderful [1] - 65:9
words [12] - 20:8; 21:3; 22:7; 38:17; 39:25; 40:24; 48:13; 50:20; 51:18, 25; 92:3; 104:9
works [2] - 36:17; 101:10
world [8] - 32:18; 62:21; 69:20; 92:20; 93:20; 94:7; 95:21; 101:12
worried [7] - 40:14; 82:10; 103:1-4, 6
worse [3] - 20:9; 65:3; 68:23
worth [1] - 30:16
writes [3] - 17:5; 100:6; 101:12
writing [1] - 100:4
written [3] - 23:15; 99:25; 100:25
wrongly [1] - 104:21

| **X** |
| --- |
| **Xenakis** [2] - 2:2; 6:10<br>**Xerox** [1] - 107:17 |

| **Y** |
| --- |
| **year** [12] - 10:23; 16:17; 18:1; 19:20;<br>31:2; 49:23; 56:11; 66:16; 68:3; 70:20;<br>80:11<br>**years** [40] - 12:3; 13:24; 20:13, 17;<br>38:17; 44:25; 50:13; 51:9; 61:2; 70:22;<br>72:17; 74:7; 80:16; 87:6, 17; 91:24;<br>92:1, 3-6, 8, 24; 94:1, 15, 19, 23-24;<br>95:1, 12, 23; 96:7; 97:10; 99:23; 101:3,<br>10; 104:19<br>**years'** [1] - 92:23<br>**yesterday** [1] - 59:10<br>**York** [1] - 2:17<br>**young** [1] - 59:19<br>**yourselves** [2] - 6:7; 8:12 |

| **Z** |
| --- |
| **zero** [1] - 18:9 |