```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3   Federal Trade Commission, et   ) Civil Action
     al.,                           ) No. CA 15-2115
 4                                  )
                       Plaintiffs,  ) PRELIMINARY INJUNCTION
 5                                  )
     vs.                            ) Washington, DC
 6                                  ) March 31, 2016
     Staples, Inc., et al.,         ) Time:  1:10 p.m.
 7                                  )
                       Defendants.  )
 8   _____

 9            TRANSCRIPT OF PRELIMINARY INJUNCTION
                      AFTERNOON SESSION
10                      HELD BEFORE
            THE HONORABLE JUDGE EMMET G. SULLIVAN
11                UNITED STATES DISTRICT JUDGE
     _____

12                 A P P E A R A N C E S

13   For the Plaintiffs:      Tara L. Reinhart
        FTC                   Stelios Xenakis
14                            Krisha A. Cerilli
                              Charles A. Loughlin
15                            Peter Colwell
                              FEDERAL TRADE COMMISSION
16                            Bureau of Competition
                              400 Seventh Street, NW
17                            Washington, DC 20024
                              (202) 326-2638
18
     For the Defendants:      Diane P. Sullivan
19      Staples               WEIL GOTSHAL & MANGES, LLP
                              301 Carnegie Center
20                            Suite 303
                              Princeton, NJ 08540
21                            (609) 986-1120
                              Jeffrey H. Perry
22                            WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
23                            New York, NY 10153
                              (212)310-8538
24

25
```

1    Office Depot                 **Matthew James Reilly**
                                  **Andrew McHie Lacy**
2                                 SIMPSON, THACHER & BARTLETT LLP
                                  900 G Street, NW
3                                 9th Floor
                                  Washington, DC 20001
4    AND

5    For Commonwealth             **Norman W. Marden**
        Of Pennsylvania           Senior Deputy Attorney General
6                                 Antitrust Section
                                  Strawberry Square
7                                 14th Floor
                                  Harrisburg, PA  17120
8
     AND                          Gary Pack for Witness Allen Wright
9


10   Proceedings reported by machine shorthand, transcript
     produced by computer-aided transcription.
11   _____

12   Court Reporter:    Janice E. Dickman,  RMR, CRR
                        Official Court Reporter
13                      United States Courthouse, Room 6523
                        333 Constitution Avenue, NW
14                      Washington, DC  20001
                        202-354-3267
15

16                          INDEX

17   Allen Wright.......................................1977

18   Carl Shapiro.......................................2075

19                       *   *   *

20

21

22

23

24

25

1             AFTERNOON SESSION

2             THE COURT:  Proceed with cross-examination.

3             MR. PERRY:  Good afternoon, Your Honor, Jeff Perry

4      on behalf of Staples.

5             THE COURT:  Counsel.

6                       CROSS-EXAMINATION

7      BY MR. PERRY:

8      Q.  Good afternoon, Mr. Wright.  As you just heard, my name

9      is Jeff Perry.  We haven't met before.  I'm counsel for

10     Staples.  I have a few questions for you, okay, sir?

11     A.  Okay.

12     Q.  A few may have been a little bit of an over-promise, but

13     we'll get through it as quickly as we can.

14     A.  Okay.

15     Q.  I'm sure -- I should say, I know you've been here a few

16     days already and I know everybody here appreciates your

17     flexibility, as well.

18             Now, sir, I want to talk a little bit about HPG.

19     And you mentioned on direct examination that HPG is

20     essentially divided into two divisions; is that right, sir?

21     A.  That's correct.

22     Q.  The first division is simply called HealthTrust,

23     correct?

24     A.  Well, HealthTrust is the parent and then there is a

25     division that's called Core Trust.

1    Q.  And the HealthTrust side of the business, the members of

2    the HealthTrust side of the business are health care

3    companies, right, sir?

4    A.  That's correct.

5    Q.  Things like hospitals and hospital systems, right?

6    A.  Yes.

7    Q.  And, in fact, your parent organization, HCA is one of

8    the members of HealthTrust, right?

9    A.  That is correct.

10   Q.  And HCA is a Fortune 100 company, correct, sir?

11   A.  That is correct.

12   Q.  A for-profit institution, correct?

13   A.  Correct.

14   Q.  They do about $39 billion in revenue, right, sir?

15   A.  That is correct.

16   Q.  Okay.  So I know you mentioned the revenue constraints

17   facing some of your hospital members, but HCA, with 39 billion

18   in revenue, they're doing okay, sir?

19   A.  They are -- you know, it goes back and forth, but

20   they're financially stable.

21   Q.  And, sir, do you know, 39 billion in revenue is about

22   the size of Staples and Office Depot put together, sir?

23   A.  That is correct.

24   Q.  Okay.  Did you talk with anyone at HCA, the parent

25   entity, about your declaration, sir?

1    A.  I did not.  I spoke to the executives within HealthTrust.

2    Q.  Okay.  Did you talk to anyone at HCA about your

3    testimony today?

4    A.  I did not.

5    Q.  Have you talked to anyone at HCA about the impact,

6    positive or negative, about this merger -- from this merger?

7    A.  I did not speak to HCA, just HealthTrust.

8    Q.  Okay.  So you're not here testifying on behalf of HCA,

9    the parent entity, correct, sir?

10   A.  No, just HealthTrust.

11   Q.  Right.  They didn't authorize your testimony in this case?

12   A.  They did not.

13   Q.  Okay.  And you don't know whether HCA, the parent

14   entity, is happy or excited about the merger or concerned

15   about the merger or otherwise, you don't know?

16   A.  Well, we have representatives on our advisory board that

17   are HCA members.  And so they're informed of where we are in

18   terms of the nature of the merger and our market assessment.

19   So there are representatives within HCA on the advisory

20   board that are attuned to the matter at hand.

21   Q.  Right.  And they're attuned and they're informed about

22   where you are, but you're not testifying on their behalf,

23   fair, sir?

24   A.  I'm testifying on behalf of myself.

25   Q.  Right.  And not on behalf of HCA?

1    A.  Correct.

2    Q.  And, sir, there are, I think you said, about 1400

3    members of HealthTrust, different health care entities; is

4    that correct?

5    A.  1400 hospitals.

6    Q.  1400 hospitals.  Thank you, sir.  And have any of those

7    1400 hospitals authorized your testimony today here?

8    A.  They have not, just the executives of HealthTrust

9    themselves.  As I mentioned before, we have shared our

10   market assessment and our analysis with our advisory boards

11   within HealthTrust.

12   Q.  Right.  But you've shared information with them, but

13   none of your hospital members, these 1400 hospital members

14   have authorized you to testify on their behalf today; is

15   that fair?

16   A.  They did not.

17   Q.  Okay.  And the other division, I think you called it --

18   is called Core Trust, right, sir?

19   A.  That is correct.

20   Q.  And Core Trust is comprised of non-health care companies,

21   correct, sir?

22   A.  That is correct.

23   Q.  The members include organizations like Toys 'R' Us and

24   Hilton, correct?

25   A.  That's correct.

1    Q.  Have you spoken with anyone at the Hilton about your

2    testimony today?

3    A.  I have not.

4    Q.  Have you spoken with anyone at Hilton about this merger?

5    A.  I have not.

6    Q.  Have you spoken with anyone at Toys 'R' Us about the

7    merger or your testimony, sir?

8    A.  I have not.

9    Q.  Have you spoken with any of the 1200 Core Trust members?

10   A.  There are 1200 total Core Trust members today.

11   Q.  And have you --

12   A.  A little over 1200.

13   Q.  Sorry, sir, I didn't mean to interrupt you.

14        Have you spoken with any of those 1200 or so Core

15   Trust members about your testimony?

16   A.  I have not spoken about the details of the testimony.

17   Some of the companies that are Core Trust members or private

18   equity -- they have private equity owners, and we have

19   briefed our private -- the private equity owners of Core

20   Trust about the matter at hand, but not specifically the

21   testimony.

22   Q.  Right.  So, for example, Bain and KKR, are those

23   corporate private equity owners of your organization?

24   A.  KKR is.

25   Q.  Okay.  They're pretty financially stable, you would admit?

1   A.   They are financially stable, yes.

2          THE COURT:  You said you're testifying on behalf

3   of yourself.  You're here individually?

4          THE WITNESS:  Yes.

5          THE COURT:  You're testifying in your individual

6   capacity?

7          THE WITNESS:  In my individual capacity in my role

8   at HealthTrust.

9          THE COURT:  Okay.

10         MR. PERRY:  Thank you, Your Honor.

11  BY MR. PERRY:

12  Q.   And in terms of your Core Trust members, you're not here

13  testifying on behalf of any of those individual Core Trust

14  members, fair?

15  A.   That's fair.

16  Q.   And you mentioned that your advisory boards are

17  paramount in the contracting process, as you deal with

18  vendors, correct?

19  A.   Yeah, the advisory boards vote and approve our contract

20  award decisions.

21  Q.   Okay.  Was there an advisory board vote to approve your

22  testimony in this case?

23  A.   There was an advisory board briefing on the evaluation

24  of the market and our plans relative to the evaluation of

25  the market, but not on the actual testimony itself.

1    Q.  Right.  So you provided information to the advisory

2    board; is that correct?

3    A.  That is correct.

4    Q.  And the advisory board would have to actually vote in

5    order to approve a contract, say, with Staples, correct?

6    A.  That is correct.

7    Q.  And the advisory board -- no advisory board at HPG

8    actually voted to approve or authorize your testimony; is

9    that fair?

10   A.  That is fair.

11   Q.  Okay.  And none of your hospital members, the 1400

12   hospital members that you referenced, have told you that the

13   quality of care at their facilities will decrease if this

14   merger goes through, correct?

15   A.  We know through conversations with our advisory board

16   that if there is a nonnational player, that it creates

17   inefficiencies for our members.

18   Q.  Right.  But none of your advisory board members have

19   said that if this merger goes through, don't come to, for

20   example, an HCA hospital because the quality of care is

21   going to go down.  That conversation never happened, correct?

22   A.  Would you repeat the question, please?

23   Q.  Sure.  None of your hospital members have actually said

24   that the quality of care at their facilities would be

25   diminished depending on whether or not this merger goes

1    through, correct?

2    A.   What they have acknowledged and recognized is that there

3    would be inefficiencies created in the hospital environment

4    should the merger go through.

5    Q.   Sure.  And I appreciate that, sir, but the question I'm

6    trying to ask is about the quality of care, so if I could

7    just direct you there.

8              Have any of your hospital members indicated to you

9    that the quality of care that they offer at their hospital

10   facilities would be diminished depending on whether or not

11   this merger goes through?

12   A.   They have not.

13   Q.   Okay.  And none of your hospital members have said if

14   this Staples/Office Depot merger goes through we're going to

15   close our doors, right?  That hasn't happened, sir?

16   A.   No.

17   Q.   And none of them said if, you know, this touch-and-go

18   patient that's on the operating table, if our paperclip

19   distributors merge, something bad is going happen to that

20   patient; that's hasn't happened, right, sir?

21   A.   We have not had that specific comment.

22   Q.   Okay.  Sir, I want to talk for a few more minutes about

23   how HPG operates.  And I think your -- I don't want to put

24   words in your mouth, but your reason for being, essentially,

25   is to use the volume of your members to negotiate favorable

1    pricing in terms on their behalf.  Is that a fair way to put

2    it?

3    A.   That's fair.

4    Q.   And the primary way you do that is by negotiating

5    favorable contractual terms, right, sir?

6    A.   That is correct.

7    Q.   And in particular, that would include favorable pricing,

8    right?

9    A.   Yes.

10   Q.   And also favorable service requirements, right?

11   A.   That is correct.

12   Q.   Okay.  And HPG has a number of tools at its disposal

13   that it uses to negotiate those pricing and service terms,

14   correct, sir?

15   A.   What do you mean by -- did you say pools or tools?

16   Q.   I meant to say tools.  I don't know what I actually

17   said, sir.

18   A.   Okay.  So could you repeat the question?

19   Q.   Sure.

20          THE COURT:  The court reporter heard you say tools.

21          MR. PERRY:  Thank you, court reporter.  That's a

22   very generous interpretation.

23   BY MR. PERRY:

24   Q.   Sir, HPG has a number of tools, tools with a T --

25   A.   Okay.

1    Q.   -- that it uses to negotiate the best pricing and terms

2    for its members; is that fair?

3    A.   We have different processes depending on the situation

4    at hand.

5    Q.   And in addition to those processes, one of the tools you

6    have, really, is your procurement department, correct, sir?

7    A.   Our sourcing organization is the primary means by which

8    we negotiate contracts on behalf of our members.

9    Q.   Right.  And you're the vice president of strategic

10   sourcing for HPG, right?

11   A.   That is correct.

12   Q.   And you have a team that reports up to you, right?

13   A.   That is correct.

14   Q.   And I think you said on direct that you have about 55

15   FTEs, about 55 total people?

16   A.   Yes.

17   Q.   And that includes 33 strategic sourcing experts, right?

18   A.   That is correct.

19   Q.   And you described these strategic sourcing experts in

20   your direct examination as trained negotiators, right, sir?

21   A.   Yes.

22   Q.   And all of these 33 trained negotiators and 55 total

23   people, are they all dedicated to the nonclinical supplies

24   that you oversee?

25   A.   Yes, they are.

1    Q.  Okay.  And nonclinical, does that essentially mean that

2    the products that you're overseeing don't directly relate to

3    the care of the patients?  Is that a fair way to put it?

4    A.  They're not medical supplies and they're not implants.

5    Q.  Understood.  And office supplies fall into that

6    nonclinical category, right, sir?

7    A.  Office supplies fall into the nonclinical category.  But

8    let me add, if I may, that, you know, when patients

9    register, when patients are discharged, physician and

10   clinical orders, they're on paper.  And so there is an

11   office supply impact relative to patient care.

12   Q.  Sure.  The hospitals use office supplies, right, sir?

13   A.  They do.

14   Q.  Right.  But the office supplies don't directly relate to

15   the health outcomes of the patients, right, sir?

16   A.  They can.  So if a patient is discharged and there's

17   discharge instructions on a piece of paper that's delivered

18   by an office supply vendor, the patient's, you know,

19   adherence to those instructions that are given to them at

20   discharge is a part of patient care.

21   Q.  Okay.  And, sir, you're not testifying that whether or

22   not this merger goes through will impact whether patients

23   have discharge orders that they can follow, sir, right?

24   A.  What I'm suggesting is that there are tremendous

25   efficiencies and tremendous value associated with a national

1    office supply vendor.  And so if we were to fragment or go

2    in a different direction, relative to office supplies, there

3    would be a tremendous amount of inefficiencies introduced to

4    the hospital.

5    Q.  And that's your view, testifying on behalf of yourself

6    and HPG, right?

7    A.  That is correct.

8    Q.  You're not authorized to give that testimony on behalf

9    of any of your HealthTrust members or Core Trust members,

10   correct?

11   A.  That's correct.

12   Q.  And, sir, going back to your team, you have someone

13   who's a vice president of strategic sourcing who's

14   specifically assigned to nonclinical supplies; is that right?

15   A.  I am the vice president for nonclinical.

16   Q.  I guess you don't report to yourself then, sir?

17   A.  Well, I'm just trying to clarify your question.

18   Q.  No, I appreciate it.  I think what I meant to ask you,

19   is you have an assistant vice president who reports to you,

20   right?

21   A.  That's correct.

22   Q.  And beneath the assistant vice president you have

23   someone who is a contract manager who is specifically

24   assigned to oversee the Staples contract, correct?

25   A.  I have a contract director.

```
1    Q.  Okay.  Is that Mr. Don Colletta?

2    A.  That is correct.

3    Q.  Okay.  And one of Mr. Colletta's jobs is to make sure

4    that HPG members get the best prices and best service from

5    Staples, right, sir?

6    A.  That is true.

7    Q.  And he's good at his job, isn't he, sir?

8    A.  He's an experienced negotiator and contract manager.

9    Q.  Right.  And so are the 33 other trained negotiators you

10   have at HPG, correct?

11   A.  They're experienced professionals.

12   Q.  Right.  And in addition to the experience and the

13   training of your team, you also, I think you said on direct

14   examination, have significant leverage as a result of your

15   volume, right, sir?

16   A.  We have significant volume that we introduce to the

17   market and the market -- the competitive nature of the

18   market delivers value that an individual member can't secure

19   on their own.

20   Q.  Right.  But what you said on direct examination, sir, is

21   that vendors cherish the volume that you bring them, right,

22   sir?

23   A.  They do.

24   Q.  Right.  And the volume that you -- the volume of

25   business that you bring to vendors that they cherish, that
```

1    gives you a certain amount of leverage when you're

2    negotiating with those vendors, right, sir?

3    A.  It gives us, you know, a large amount of business to

4    bring to the vendors in exchange for more favorable pricing

5    terms.

6    Q.  Right.  And you believe that that volume of business

7    that you have, in addition to your trained negotiators and

8    your expertise, is one of the things that ensures you get

9    competitive pricing for your members, right, sir?

10   A.  That's correct.  And that's part of the value

11   proposition that's introduced to the vendor community in a

12   competitive environment.

13   Q.  Right.  And that's the primary value proposition that

14   you bring to your members, fair?

15   A.  And a compliant membership.

16   Q.  Thank you, sir.  And in addition to your team and your

17   expertise and your volume, you also have an external

18   procurement consultant, right, sir?

19   A.  We do.

20   Q.  And I think the name of the firm is EJ Advisory

21   Services; is that right?

22   A.  That is correct.

23   Q.  And the individual at EJ Advisory Services who works

24   with you is named Butch Johnson, right, sir?

25   A.  That is his name.

1   Q.  And Mr. Johnson's expertise is specifically in office

2   supplies, correct?

3   A.  That is correct.

4   Q.  And you pay him a fee in exchange for his consulting

5   services, right?

6   A.  We pay him a flat annual fee.

7   Q.  Right.  And on occasion Mr. Johnson will even go out to

8   manufacturers, like go out to a paper mill, for example, as

9   part of his work for your members to get low prices, right?

10  A.  Not in our role, no.  He simply advises us relative to

11  our sourcing process.

12  Q.  So he doesn't go out to paper mills on your behalf, sir?

13  A.  He does not.

14  Q.  Okay.  Are you aware whether or not Mr. Johnson does

15  that to form his analysis?

16  A.  He may do that as part of his consulting business, but

17  he's not directed to do that as part of the HealthTrust

18  activity.

19  Q.  Understood.  So it's not part of your direction, but

20  whatever knowledge he would gain through that process he

21  would bring to bear in helping HPG members, right?

22  A.  He does have industry knowledge.

23  Q.  Okay.  Now, sir, you talked about RFPs for quite a bit.

24  And I think you said that your advisory boards have a role

25  in that process as well, right, sir?

1   A.   Yes.

2   Q.   And part of the benefit of an RFP, isn't it, sir, that

3   you have the ability to thoroughly analyze the capabilities

4   of vendors, right, sir?

5   A.   That is correct.

6   Q.   And you would, for example, put out a questionnaire and

7   ask for very detailed, robust information from vendors to

8   allow you to compare and analyze their capabilities,

9   correct, sir?

10   A.   Correct.

11   Q.   And on top of getting that information, you would get a

12   significant amount of information about vendor pricing,

13   right, sir?

14   A.   Correct.

15   Q.   And I believe you testified that the way you do the

16   pricing analysis is that you do a detailed spreadsheet

17   analysis, right, sir?

18   A.   Yes.

19   Q.   And that looks at literally every SKU or every product

20   your members purchase, right, sir?

21   A.   Yes.

22   Q.   And the volume they purchase of each item, right, sir?

23   A.   Right.

24   Q.   And the pricing that's offered by the vendor for each

25   one of those SKUs, right, sir?

1   A.   Right.

2   Q.   And you gather that information from multiple vendors

3   and that allows you to do an all-in, apples to apples

4   analysis of vendor pricing, right?

5   A.   That information is provided to us by the contracted

6   vendor.

7   Q.   Understood.   But during an RFP process you would be able

8   to gather that information from competing members, wouldn't

9   you, sir?

10  A.   That is true if the competing vendors are willing to

11  provide that information.

12  Q.   Sure.   So, for example, if you were using Staples and

13  you went out to RFP to another company, you could find out

14  whether the 250 million that your members are spending

15  through Staples could be had for 245 million from some other

16  vendor, right, sir?

17  A.   That's part of the RFP process.

18  Q.   You could do that direct analysis to inform your price

19  negotiations, right, sir?

20  A.   Correct.

21  Q.   And that's part of the reason -- the ability to do that

22  kind of rigorous analysis, that's part of the reason you go

23  through an RFP process, right, sir?

24  A.   That is the process.

25  Q.   And you said it's a process that may take six months or

1    more at times, right?

2    A.  Yes.

3    Q.  It's not cheap, right, sir?

4    A.  What do you mean by cheap?

5    Q.  I mean, it -- you have to expend some real resources to

6    go through that RFP process, don't you?

7    A.  Well, we have a director, he's supervised by an AVP; we

8    have a finance organization, that's typically a single

9    finance person; and we also have a consultant.  So I don't

10   know if that's cheap or not, but those are the resources

11   that we bear.

12   Q.  Well, I won't ask you their salaries, but it takes a

13   significant amount of time, at least, to go through that

14   process, right?

15   A.  It does.  It does, yes.

16   Q.  And the reason it's worth it is because you get a lot of

17   value through that process, right, sir?

18   A.  That's correct.

19   Q.  And you get a lot more information, for example, than

20   you could gather, say, by going on websites or public SEC

21   filings, right?

22   A.  We have a finance organization that will look at

23   financial statements that are publicly available, so that's

24   part of the process, as well.

25   Q.  Understood.  But when you do an RFP analysis, you go a

1    lot deeper than that when you're looking at pricing, right,

2    sir?

3    A.  Correct.

4    Q.  And you go a lot deeper than that when it comes to

5    capabilities, right, sir?

6    A.  We analyze them -- I have a team that analyzes the market.

7    Q.  Right.

8    A.  Yes.

9    Q.  So if you put an RFP to an office supply vendor, you

10   wouldn't just ask them to reply with information that's

11   available in SEC filings or on their website, right, sir?

12   A.  There's all types of questions that could be in an RFP.

13   Q.  Right.  But the questions would certainly go beyond

14   what's publicly available, correct, sir?

15   A.  Correct.

16   Q.  And you might ask for references.  Do you ever do that,

17   sir?

18   A.  We do.

19   Q.  And a reference would allow you to call up a customer

20   and say, Hey, I'm not so sure if this office supply vendor

21   can meet our needs, what's your experience been, right?

22   That would be the reason?

23   A.  Yes.

24   Q.  And have you done that in the past, sir?

25   A.  We have.  I mean, we've gotten feedback from our

1    advisory board members in terms of who they think is

2    capable, who's not capable as part of the RFP process.

3    Again, they're representatives across our membership.

4    Q.  Right.  And the reason you go through the full,

5    rigorous, in-depth RFP process, sir, is that you might learn

6    something you couldn't learn just on websites and 10-Ks,

7    right, sir?

8    A.  Well, we don't limit ourselves to any one single source.

9    We try to analyze the market in a comprehensive nature.

10   Q.  Right.  And the reason you go out through a full,

11   rigorous RFP process is because you can learn information

12   that you couldn't learn through just the website and a 10-K,

13   right, sir?

14   A.  We go through the RFP process to request pricing,

15   responses to contract terms, conditions, and to learn other

16   aspects about the vendor community itself.

17   Q.  Right.  Not all that information is available on

18   websites and 10-Ks, fair?

19   A.  Well, certainly pricing and responses to contract terms

20   are not, so that's fair.

21   Q.  Okay.  Thank you, sir.

22        Now, sir, you mentioned that the contract that's

23   currently in force -- I'm not referring to the one you said

24   to the Judge was doable soon, but the one that's still in

25   force through September of this year.  Are you with me?

1    A.  Yes.

2    Q.  And that contract originally dates back to an RFP

3    process that happened around 2009, correct?

4    A.  That's correct.

5    Q.  And that contact was in force beginning August of 2010,

6    right, sir?

7    A.  It went into effect 2010, correct.

8    Q.  And it ran through September of 2013, right, sir?

9    A.  Yes.

10   Q.  And in that 2013 process, you didn't do a full RFP, is

11   that fair?

12   A.  We did not.

13   Q.  And that's because -- I'm sorry, sir?

14   A.  No, we negotiated directly with Staples.

15   Q.  That's because Staples came to you before the contract

16   expired and offered to renegotiate and give you a lower

17   deal, right, sir?

18   A.  That's correct.

19   Q.  And as part of that process, I think you said -- I hope

20   I can say it publicly, I think it came out on direct -- that

21   you saved a percentage.  Can I say that?

22              MR. PACK:  Percentage of?

23              MR. PERRY:  That you saved in 2013 relative to

24   2010.

25              THE WITNESS:  Yeah, I'm okay with that.

 1          MR. PACK:  I think it came out on direct.

 2          Thank you, sir.

 3    BY MR. PERRY:

 4    Q.  I think you said you saved about 6.2 percent, about

 5    $12 1/2 million, right, sir?

 6    A.  Yes.

 7    Q.  And you were able to save that without putting an RFP

 8    out to Office Depot, right, sir?

 9    A.  That is correct.

10    Q.  And you were able to actually save that much money

11    without putting an RFP out to any vendors, right, sir?

12    A.  We negotiated directly with Staples.  I will add that we

13    did a competitive RFP the term prior to that.  And so we had

14    vetted the market three years prior to that.

15    Q.  And the vetting of the market that you're referring to

16    was in 2009, right?

17    A.  Correct.

18    Q.  So in 2013, you never did a thorough vetting of the

19    market, correct, sir?

20    A.  We negotiated straight with Staples.

21    Q.  In 2013 you never did a thorough vetting of the market,

22    sir, right?

23    A.  Well, we didn't do a thorough RPF, if that's your

24    question.  We have consultants on contract and we do stay in

25    tune with the industry.

1    Q.  You stay in tune with the industry, but in 2013 you

2    never got information from possible vendors that wasn't

3    available publicly, did you, sir?

4    A.  We did not issue an RFP.

5    Q.  And, therefore, you didn't get information from vendors

6    that wasn't available publicly, correct?

7    A.  We didn't request information through the RFP.

8    Q.  And, sir, I believe you said that you have a contract --

9    you have an RFP process ongoing right now, right, sir?

10   A.  For what area?

11   Q.  I'm sorry, for office supplies.

12   A.  Yes.

13   Q.  I thought that would be assumed.

14   A.  We have proposals in-house.

15   Q.  And I believe in response to the Court's question you

16   said it was doable that you would sign a new contract with

17   Staples or Office Depot, right, sir?

18   A.  We said we were evaluating both proposals.  When you say

19   "doable," I think the judge had asked if it would be

20   possible to do this before, I think, May, and I said that

21   would be highly -- it would be -- it would be very hard to

22   coordinate and to wrap that up through -- so we've received

23   initial proposals, we've had the proposals for roughly two

24   weeks.  So we have to fully vet and evaluate, negotiate

25   contract terms and conditions, share the results with our

1    advisory board.  And, typically, that's a lengthy process.

2    Q.  The Judge asked you, if I recall, that it would be

3    substantially important for you to finalize this process,

4    right, sir?

5    A.  He had asked if there would be -- yes, he basically

6    stated that it would be in our interest if we could wrap

7    this up early.

8    Q.  I apologize, Your Honor, I don't want to put words in

9    the Court's mouth, so let me ask you directly.

10           It's pretty important, and as a result it's doable

11   that you could wrap up this contract in process in the next

12   month or two, right, sir?

13   A.  Possibly.

14   Q.  And the -- I'm not going to ask you the specific

15   dollars, and actually prefer you not say them out loud, but

16   there's substantial savings on the table right now, correct,

17   sir?

18   A.  There is.  As a result of the competitive environment.

19   Q.  Right.  And I should say, the savings that are on the

20   table right now relative to the contract you have in force

21   today, right, sir?

22   A.  I'm not sure that I understand your question -- yeah,

23   relative to the cost baseline that we have today.

24   Q.  In terms of the total spend, the prices that you've been

25   able to negotiate or that are on the table right now, they

```
1    are actually better than the prices that are in force on

2    your existing contract, right?

3    A.  That is correct.

4    Q.  And in the intervening time between your 2013

5    renegotiation with Staples and your current RFP process,

6    you're aware that Office Depot and Office Max merged, right

7    sir?

8    A.  Yes.

9    Q.  And actually, you talked at length in your direct

10   examination about the merger of numerous office supply

11   companies over the last eight or ten years, right, sir?

12   A.  Um-hum.

13   Q.  Right, sir?

14   A.  Yes.

15   Q.  And over the course of that same time period, HPG's

16   office supply pricing has actually gone down in every single

17   interaction with Staples, right, sir?

18   A.  Well, our price -- our price negotiations have secured

19   cost reductions with our membership.  But there's also a

20   price adjustment methodology in the contract.  So the prices

21   aren't fixed for the term of the contract, they're tied to

22   certain parameters behind which they're adjusted upward and

23   downward.  But we have reduced our members' expense each

24   time we've gone out to the market.

25   Q.  Right.  In 2013, when you renegotiated with Staples, you
```

1    were able to reduce your members' expense relative to the

2    2010 contract, right, sir?

3    A.   That is correct.

4    Q.   And the pricing that you have on the table today will

5    reduce your members' expenses yet again relative to the 2013

6    deal you reached, right, sir?

7    A.   That is correct, as a result of the competitive process.

8    Q.   That's true, notwithstanding the fact that in between

9    those two processes Office Depot and Office Max merged; you

10   know that, right, sir?

11   A.   Yes.

12   Q.   And, sir, I want to talk, if we could, about the

13   definition of consumable office supplies, if we could.

14   A.   George, I think we have a demonstrative, if you could

15   put it up, please.  That's a good start.

16            Sir, you mentioned --

17            THE COURT:  Let me ask a question.  If the concern

18   after a merger is set prices will go up, then I assume that

19   what's on the table now must be a priority, number one, for

20   your business, trying to renegotiate this contract?

21            THE WITNESS:  It is a priority, yes.  Again, it

22   was a priority last year.  We thought that we had value on

23   the table, because we were anticipating a potential merger,

24   so we felt like it was in our interest at that point in

25   time.  As we proceeded with the negotiations, the value that

1    was initially offered was removed.  So as a result we had to

2    go through the competitive process, go back out and

3    re-secure the value as a result of the competitive process.

4           THE COURT:  But there would be significant savings

5    over and above what the current contract offers now?

6           THE WITNESS:  Yes.  It would be a reduction in the

7    current cost baseline as a result of the competitive process.

8           THE COURT:  Is there any real doubt that the

9    contract won't be renegotiated within the next couple of

10   weeks or so?

11          THE WITNESS:  We have a lot of coordination that

12   we have to do with our advisory boards.  First of all, we

13   haven't even, you know, really started the negotiation.  So

14   we're trying to, you know, assemble the full details of the

15   proposal.  We've done an initial financial analysis, but

16   it's not completely vetted.  And then typically we would

17   negotiate.  We would clarify certain aspects of the

18   proposals, maybe identify deficiencies, seek to clarify,

19   eliminate the deficiencies, and then also negotiate contract

20   terms and conditions.

21          So it may sound like it's a relatively quick

22   process, but that by itself is somewhat time consuming.  And

23   then once we complete all that negotiations, we have to go

24   back out to our advisory boards and seek their recommendation

25   or approval on the contract award.

```
 1              THE COURT:  But that same advisory board, I

 2      assume, would be pretty upset if it's not renegotiated?

 3              THE WITNESS:  Yes.  Right.

 4              THE COURT:  So what's going to happen?

 5              THE WITNESS:  Well, we're going to do our best.

 6              THE COURT:  All right.  Fair enough.

 7      BY MR. PERRY:

 8      Q.  It sounds like you're pretty motivated to do that, sir?

 9      A.  We are.

10      Q.  Sir, I want to talk about consumable office supplies for

11      a minute.  And I think you testified on direct exam -- and I

12      thought the percentages might be helpful -- that consumable

13      office supplies includes general office supplies first.

14      Right, sir?

15      A.  Correct.

16      Q.  And general office supplies, in your definition, are

17      things like pens, pencils, paperclips, Post-its, file

18      folders, right, sir?

19      A.  Correct.

20      Q.  And consumable office supplies also includes ink and

21      toner, right, sir?

22      A.  It does.

23      Q.  And consumable office supplies also includes copy paper,

24      right, sir?

25      A.  That is correct.
```

1    Q.  And you mentioned on your direct examination that your

2    contract doesn't include much technology, but it does

3    include some consumer-based technology like flash drives,

4    right, sir?

5    A.  Yeah.  I mean, we don't really consider that IT, we

6    consider that consumable, kind of -- pardon the term -- but

7    it's consumable, inexpensive IT accessories.  We don't

8    really consider that to be IT hardware.

9    Q.  So your contract includes -- I'm not going to remember

10   what you said -- consumable, inexpensive IT technology?

11   A.  Yeah.  I would call it disposable types of IT related

12   products.  We really view IT as, you know, hardware; so it's

13   the laptops and the desktops and the servers that are

14   standard configured and imaged and, you know, built

15   specifically to a customer's orders and their specifications

16   and then certified and then distributed through an IT

17   reseller.  And so, hopefully, that clarifies your question.

18   Q.  It does.  So the Staples contract doesn't include big IT

19   hardware like computers and printers and things?

20   A.  Well, it may include some printers, but it doesn't

21   include laptops and desktops and servers and, you know, what

22   are considered to be IT business-related machines.

23   Q.  I see.  So you would have some printers, you would have

24   some flash drives and a few other pieces of technology; is

25   that right, sir?

```
 1    A.  That is correct.
 2    Q.  So I put some technology products on here.  I put the
 3    "some," which I thought you would like.  Are you comfortable
 4    with that, that some technology products are on your Staples
 5    contract, sir?
 6    A.  So can you share with me, what do you mean by technology?
 7    Q.  Well, what I meant to mean is things like flash drives,
 8    and now you've told me printers, right?
 9    A.  Well, there's printers, yeah, that could come through
10    the Staples channel.
11    Q.  Here we go.  Flash drives.  I'll say some printers.  You
12    can't read it, but you'll remember it, right, sir?
13    A.  I think I understood what you said.  I'm not sure that I
14    can read your writing.
15            MR. REILLY:  I'll write for you.
16            MR. PERRY:  Thank you.  Could we get a guest writer?
17    BY MR. PERRY:
18    Q.  In addition to whatever it says here, sir, you also have
19    some furniture, you mentioned some chairs and things that
20    are on part of your Staples contract, right, sir?
21    A.  Yeah, there's generally -- as I had described before,
22    there's generally what we consider to be low end,
23    off-the-shelf furniture, you know.  But the way that we view
24    furniture within our membership is there's furniture, what
25    you typically find in a professional office environment
```

1    where you have designers that are spec'ing the furniture,

2    they're selecting the fabrics.

3          That's not what we consider to be furniture from a

4    HealthTrust perspective.  The furniture that we would see

5    under a Staples relationship would just be typically

6    inexpensive, off the shelf; maybe folding chairs, folding

7    tables.

8    Q.  All right, sir.  You know, I'm not going to be able to

9    write all that.  But if I wrote some chairs, right?  There's

10   some chairs in there, sir?

11   A.  I would say inexpensive chairs.

12   Q.  I'm not going to write inexpensive chairs.  The screen

13   is only so big, sir.  All right.  So, how about we'll

14   abbreviate, sir, inexpensive.

15         Your Honor, the guidance you gave about doing

16   demonstratives as you go is really hitting home now.

17         And I think you said, Mr. Wright, on direct

18   examination that your contract also includes some snacks and

19   break room, right, sir?

20   A.  I'm sure there are some snacks sold through the -- yeah.

21   Q.  And all of those things are part of your same Staples

22   contracts, right, sir?

23   A.  I believe that -- yeah, they're under -- I'm sure

24   they're sold by the Staples office supply agreement.

25   Q.  They're all part of the same contract, right, sir?

1    A.  Yes.

2    Q.  So all of this is part of one contract, right, sir?

3    A.  They're sold through the office supply contract.  But as

4    I mentioned earlier, we don't view chairs, snacks, as really

5    major, material items under an office supply contract.

6    They're viewed as kind of ancillary.

7    Q.  They're not a big part of the contract, but they're part

8    of the same contract, right, sir?

9    A.  Correct.

10   Q.  And when you did the RFP back in 2009 and when you're

11   doing your current RFP, all of this is negotiated together,

12   right?

13   A.  That is correct.

14   Q.  Sir, this is going to get really ugly now.

15        You've never had a contract that's just general

16   office supplies and copy paper but not ink and toner or

17   snacks or break room or -- what was that, flash drives and

18   printer, or some chairs.  You never had a contract that's

19   just for that grouping of products, have you, sir?

20   A.  No, we've always held general office supplies, ink and

21   toner and copy paper under a single agreement.

22   Q.  And that's true with respect to your current RFP, right,

23   sir?

24   A.  That's correct.

25   Q.  It's not general office supplies plus paper, but not ink

```
 1    and toner and not anything else?

 2    A.   It includes all three of the bullets.

 3    Q.   Thank you, sir.

 4              George, can you take this down quickly?  It's kind

 5    of embarrassing.

 6              Actually, George, can you put it up.

 7              My writing won't be on it, I promise, Your Honor.

 8              Sir, if we just look at consumable office supplies

 9    for a minute, that 23 percent of ink and toner, that's about

10    50 or $60 million of your members' spend with Staples every

11    year, right, sir?

12    A.   Yes.

13    Q.   And if Staples, after this merger, arbitrarily tried to

14    raise your prices of paperclips, you could take your 50 or

15    $60 million in ink and toner elsewhere, couldn't you, sir?

16    A.   We wouldn't typically do that.  We feel like the best

17    value proposition is by bundling all three of the categories

18    together.  And I think the value proposition is recognized

19    by the office supply community as well, because what they're

20    trying to do, is increase their order size so that they have

21    meaningful orders coming through the truck to the delivery

22    location.

23    Q.   But you do buy things that Staples sells from other

24    people, right, sir?

25    A.   For instance?
```

1    Q.  There's other furniture-type products that you could buy

2    through your Staples contract and combine all that volume,

3    but you get them elsewhere, right, sir?

4    A.  We really have separate contract awards for separate

5    categories; as we had discussed this morning, print

6    management services, that's a separate contract category.

7    So we don't view that as office supplies.

8    Q.  So your preference is to keep ink and toner bundled with

9    general office supplies and copy paper; is that it?

10   A.  We think that's the core offering that the office supply

11   community provides to the market.

12   Q.  But if Staples tried to raise your prices of paperclips,

13   even if you didn't really want to switch your $50 million in

14   ink and toner to HP or Lexmark or Canon, you have 33 skilled

15   negotiators who could threaten to do that, right, sir, to

16   keep your paperclip prices down?

17   A.  I'm not sure under what circumstance they could do that.

18   How would they do that?

19   Q.  By "How would they do that," do you mean --

20   A.  How would they introduce a paperclip price increase?

21   Q.  Well, sir, the point you're making is that the prices

22   are locked in during the term of the contract?

23   A.  No, that's not the point I'm making.  I'm asking you how

24   would they do that?  How would they introduce a price

25   increase?

1    Q.  Let's say that during your current negotiation, your

2    RFP, Staples decided, you know what?  We're going to rise

3    our paperclip prices, HPG, because we think we got you right

4    where we want you.  Couldn't your skilled, 33 skilled

5    negotiators look them in the eye and say, You better be

6    careful, Staples, I got 50 or $60 million in ink and toner;

7    you might have heard of Lexmark or Canon, and I can make

8    this business go away.  That would be a pretty credible

9    threat; wouldn't it, sir?

10   A.  I think the general approach is we're not looking at one

11   individual specific group of categories, we're looking at

12   office supplies spend in a comprehensive manner.  So there

13   may be adjustments in the market that require certain

14   products to increase, or other products to decrease.  So

15   that's why we go out to the market to see where the market

16   is.  So the idea of a paper -- you know, a price increase on

17   paperclips, probably wouldn't necessarily yield some kind of

18   dynamic, you know, change in behavior.

19   Q.  Well, sir, for whatever reason, if you weren't happy

20   with Staples' service, one of the levers your negotiators

21   have, whether you actually want to use it or not, you can

22   take that business elsewhere, right, sir?

23   A.  Which business are you referring to?

24   Q.  The ink and toner.

25   A.  We think that we would lose the overall value

1    proposition by segmenting these categories.  We feel like we

2    create better value by aggregating these categories.

3    Q.  Your negotiators wouldn't even try to make that claim to

4    Staples, they would just say, You got us?

5    A.  We have never, ever separated ink and toner, except for

6    reman'd for minority business.  We have always bundled it

7    together.

8    Q.  Remanufactured toner, that can be separate, right, sir?

9    A.  It has for minority business reasons.

10   Q.  And MPS, when it's bundled with a service, that can be

11   different, right, sir?

12   A.  It's a service, not a supply expense.

13   Q.  But it's a service that includes toner?

14   A.  It does, right.

15              THE COURT:  What would be -- can you give me an

16   example of what might be the dramatic increase in prices

17   that might prompt you to take a hard look at competitors to

18   service ink and toner needs?  I'm certain as prices go up --

19   what prices are we talking about?

20              THE WITNESS:  Well, I'm not sure, you know, quite

21   honestly.  I'm a little confused with the questioning.

22   Typically when we go out, we have price protection under the

23   contract for the term.

24              THE COURT:  Let's make it easy.  I thought you

25   said that one concern was the increase in prices if the

 1    merger went up.

 2              THE WITNESS:  Right.

 3              THE COURT:  Prices in what categories?

 4              THE WITNESS:  In general office supplies.

 5              THE COURT:  Across the board, not just the

 6    paperclips?

 7              THE WITNESS:  Yeah.  I think comprehensively we

 8    believe that the market will be diminished and that the --

 9    there will be one dominant player.

10              THE COURT:  Less competition.  Suppose prices went

11    up in all categories but ink and toner and you have a wild

12    card of 50 to $60 million in ink and toner, the question, as

13    I understood it, is, Would you try to shop that elsewhere?

14              THE WITNESS:  It's an alternative, but we believe

15    that we lose the valve of aggregation.

16              THE COURT:  So in other words, you think you're

17    stuck with them?

18              THE WITNESS:  Well, you know, we think that we

19    could be stuck.  We think that there's value in aggregation,

20    that's kind of our overall model.

21              THE COURT:  Who would you look to to service ink

22    and toner, though, assuming that was a viable option?

23              THE WITNESS:  As you might imagine, you know,

24    there's hundreds, if not thousands of potential, you know,

25    printer machines and models and manufacturers.  And so it

```
 1    would be a very fragmented approach towards trying to

 2    contract for all of those typical -- all those machines'

 3    toners, you know, so...

 4            THE COURT:  Could Amazon service your needs in

 5    that regard?

 6            THE WITNESS:  Well, they haven't.  As I've

 7    mentioned earlier, in the earlier testimony, they, for the

 8    reasons cited before, they don't seem to be interested in

 9    our business and don't seem to be positioned or have

10    demonstrated any past performance in a business to business

11    model.

12            THE COURT:  Okay.  Speaking strictly about ink and

13    toner, though, there are other -- are there other

14    competitors that could service your needs in the event you

15    pull that 50 or 60 because of the increase in prices and

16    other categories, other than ink and toner?

17            THE WITNESS:  Not that I'm aware of.

18            THE COURT:  Okay.  All right.

19    BY MR. PERRY:

20    Q.  And, sir, the contract that you said is doable to lock

21    in soon, if that contract runs through 2019 and you find

22    yourself again on the market, you would, at least on behalf

23    of your members, revisit this situation, scenario, right, as

24    to whether you might take your ink and toner business

25    elsewhere?
```

1    A.  Well, we would have to evaluate the market, probably in

2    2018, if not before, to determine how we need to respond to

3    the market.

4    Q.  Right.  In 2018 or so you would look out at the market

5    and you would see what the reality is then, right, sir?

6    A.  That is correct.

7    Q.  And you don't know, sitting here today, whether it would

8    be viable or not in 2018 or '19 to carve that out, right, sir?

9    A.  Well, you know, we could speculate, but my gut tells me

10   that when I look at the top two, which control 80 percent of

11   the market share, and the third is what? a fifth -- or, 5

12   percent or less of the top two's volume, that my -- my best

13   guess is that in 2018 there will be no significant B2B

14   competition.

15   Q.  Right.  Sir, you don't have any nonpublic information

16   about what other competitors are planning for 2018, do you,

17   sir?

18   A.  No.

19   Q.  Okay.  Sir, I want to talk about the way your prices are

20   locked in and the terms that you have in the contract.  You

21   have something in your current Staples agreement called a

22   market competitiveness guarantee, right, sir?

23   A.  That is correct.

24   Q.  And that essentially says that Staples' contract prices

25   must remain market competitive through the life of the

1    contract, correct?

2    A.   That is correct.

3    Q.   And if you find a lower price from any source, and it's

4    apples to apples, Staples has to match it within 30 days,

5    right, sir?

6    A.   If we come across a total office supply cost solution

7    Staples has to match that solution.

8    Q.   Right.  And they have to do it within 30 days, right, sir?

9    A.   That is correct.

10   Q.   And that's required under the terms of the contract,

11   right?

12   A.   That is correct.

13   Q.   And that's a favorable term that your skill and

14   expertise and volume allowed you to get from Staples, right,

15   sir?

16   A.   It's a provision within the contract.

17   Q.   Right.  And there are other provisions in the

18   contract -- I believe you refer to them as price

19   guardrails -- that constrains Staples' behavior, right, sir?

20   A.   It allows for the adjustment of office supply pricing

21   based on market conditions.

22   Q.   And for the core products -- is that what you call the

23   list of 4200 SKUs, sir?

24   A.   Yes.  Otherwise referred to as manufacture direct products.

25   Q.   Okay.  And those manufacture direct or core products,

```
1    that accounts for a significant majority of your member

2    spend, right, sir?

3    A.  It does.

4    Q.  And those products, those 4200 products essentially are

5    locked in, the pricing is locked in through the life of the

6    contract, right, sir?

7    A.  They are not.

8    Q.  Well, sir, unless there is some manufacturer increase in

9    price, they are locked in, aren't they, sir?

10   A.  That's not correct.

11   Q.  Okay.  So your testimony is that under your Staples

12   contract the core pricing can be increased?

13   A.  The core pricing can be adjusted upward or downward.

14   Q.  There is a guardrail specifically for the core products,

15   right, sir?

16   A.  There is price protection for core or for manufactured

17   direct.

18   Q.  Right.  And that's price protection that you negotiated

19   as part of your agreement, right, sir?

20   A.  That's the terms that are in the agreement.

21   Q.  Okay.  Now, in terms of the termination, I think you

22   said on direct examination that HPG has the right to

23   terminate your Staples contract for any reason, without

24   cause, right, sir?

25   A.  There is a termination for convenience provision in the
```

1     contract.

2     Q.  Right.  And that termination for convenience provision,

3     excuse me, only applies to HPG, right, sir?

4     A.  That's correct.

5     Q.  So that's a one-way right in favor of HPG, correct?

6     A.  That is correct.

7     Q.  Staples does not have the ability, under the contract,

8     to terminate for convenience or terminate without cause,

9     right, sir?

10    A.  Well, what we learned after the Office Max situation is

11    that under a sole source agreement we really -- we can't

12    afford, ourselves, to allow the vendor to have a termination

13    for convenience provision.  It doesn't protect our members.

14    Q.  Right, sir.  And as a result of that, your contract with

15    Staples doesn't allow Staples to terminate for convenience,

16    right, sir?

17    A.  No, it's only for our convenience.

18    Q.  Right.  And the contract that you believe is doable to

19    finalize hopefully in the next few weeks or month or two,

20    will that have a similar arrangement where only HPG can

21    terminate the contract for convenience?

22    A.  We believe that it will.

23    Q.  Okay.  And if that's the case, as you believe, then

24    HPG's pricing methodology and guardrails would be locked in

25    until September of 2019, right, sir?

1    A.  For a three-year term, correct.  Now, we're still

2    negotiating, so it's uncertain in terms of what those terms,

3    conditions will ultimately end up being.  But, you know,

4    that would be our expectation.

5    Q.  Okay.  Expectation would be that you would have that --

6    those protections through September of 2019, right?

7    A.  Correct.

8    Q.  Now, sir, you talked in your direct examination about

9    how your HealthTrust members, as part of their participation

10   agreement, commit their volume to the contracts, right, sir?

11   A.  They commit to HealthTrust.  So they commit to use the

12   contracts that HealthTrust awards through the advisory board

13   process.

14   Q.  Understood.  And even though that's the case, sir, it's

15   a fact that about 5 percent of HealthTrust members actually

16   don't purchase through the Staples contract, right, sir?

17   A.  That's what we estimate.

18   Q.  Right.  So your estimate is that about 70 of your

19   members buy zero office supplies through the Staples

20   contract, right?

21   A.  Roughly.

22   Q.  Right.  So 100 percent of those members' spend is off-

23   contract, right, sir?

24   A.  It could be.

25   Q.  And with respect to your Core Trust members, it's not

1    part of the Core Trust membership agreement to commit your

2    volume to the HPG contract; is that right?

3    A.   The Core Trust members elect to commit to the agreement.

4    Q.   Okay.  Elect, meaning they have the choice?

5    A.   They have the choice.

6    Q.   It's not a condition of joining Core Trust that you

7    commit your volume to the agreement; is that right?

8    A.   That is correct.

9    Q.   And what percentage of Core Trust members purchase

10   through the Staples contract?

11   A.   It's a very high percentage.  We have over 600 members

12   on Core Trust that have committed to the office supply

13   agreement.

14   Q.   Out of 1200, sir?

15   A.   That's correct.

16   Q.   So, almost half of your Core Trust members don't buy any

17   office supplies through the Staples contract?

18   A.   They don't.  And a lot of times there's good reasons for

19   that.  So, they may have preexisting commitments.  We don't

20   necessarily prescribe to this process, but a lot of times

21   there's signing bonuses that are offered to a member in

22   exchange for a committed term.  So there are, a lot of

23   times, preexisting commitments that are in place that may

24   prevent a Core Trust member from using the HealthTrust

25   contract.

1    Q.  All right.  But those aren't one-offs, right?  They're --

2    almost half of your Core Trust members aren't buying off the

3    Staples contract, right, sir?

4    A.  That is correct.

5    Q.  So you got about 600 Core Trust members and about 70

6    HealthTrust members who don't buy any office supplies

7    through your Staples contract, correct, sir?

8    A.  Correct.

9    Q.  So for those, about 670 of your members, 100 percent of

10   their office supply spend is off-contract, right, sir?

11   A.  That could be the case, yeah.

12   Q.  And for the HealthTrust and Core Trust members who

13   purchase some, at least some portion of their office

14   supplies through the Staples contract, you know there are

15   occasions where they don't buy everything through the

16   Staples contract, right, sir?

17   A.  My understanding is that may occur.

18   Q.  Right.  And when you say "it may occur," you mean it may

19   occur that your members who purchase off the contract may

20   also purchase office supplies from some other source, right,

21   sir?

22   A.  Well, what I'm suggesting is that, as you might imagine,

23   there's a lot of administrative assistants, a lot of people

24   that consume and buy office supplies, primarily

25   administrative assistants and primarily purchasing agents.

1    And so there may be situations where other -- where there's

2    an administrative assistant that doesn't know, or other

3    situations that are in place that might negate their ability

4    to order office supplies under the agreement.

5    Q.  Right.  But for whatever reason you've got about -- even

6    your putting aside the 670 members who don't buy anything,

7    any office supplies through the contract, even your members

8    who do some portion of their office supply spend may be from

9    other sources, right, sir?

10   A.  Well, let me characterize it this way.  The -- our

11   largest members and our highest volume members are buying

12   their office supplies through the Staples agreement.

13        The Core Trust members, they elect to commit.  And

14   what we find in many cases, those Core Trust members have

15   preexisting commitments that prevent them from coming over.

16   But there is a high penetration rate on the Core Trust

17   membership side.  And as you might imagine, with tens of

18   thousands of physician offices and, you know, surgery

19   centers, you know, absolute compliance doesn't exist.

20        But what we understand and what's reaffirmed to us

21   through Staples is that we have a very compliant GPO and a

22   compliant membership.

23   Q.  Right, sir.  But you do know that some of your members,

24   even the ones who purchase from the Staples contract, may

25   also purchase office supplies from other sources; that's

1    true, isn't it?

2    A.  That may occur.

3    Q.  Okay.  And you have no means to know, for example,

4    whether any HPG member is buying office supplies through

5    Amazon, correct?

6    A.  I do not have any means to know that.

7    Q.  Right.  And that's because you don't see your members'

8    purchasing order systems, right, sir?

9    A.  That's correct.

10   Q.  So you don't promote it, but if one of your members sees

11   a blue pen on Amazon, they're perfectly free to go issue a

12   purchase order and buy that box of blue pens, right, sir?

13   A.  We don't control the purchase, so the member could

14   choose to order through Amazon.

15   Q.  Right.  And you would have no way to know about that,

16   right, sir?

17   A.  We wouldn't.  But we know that our largest members and

18   our most disciplined members, they're pushing compliance

19   towards the contract, and so they don't want off-contract

20   spend.  They can't manage what they can't control, what they

21   can't see.

22           And so, you know, as it relates to our largest

23   members, they're promoting the sole source relationship with

24   Staples.  And what we can see by looking at our member

25   reports is our largest members are buying through the

1    Staples office supply agreement.

2    Q.  Now, sir, the information you have about your member

3    spend, that comes from Staples, right?

4    A.  That is correct.

5    Q.  So you talked at length in your direct examination about

6    these usage reports, right, sir?

7    A.  Um-hum.

8    Q.  Yes?

9    A.  Yes.

10   Q.  Or, utilization reports?

11   A.  That is correct.

12   Q.  And the utilization reports are given to you by Staples

13   and they show you the spend that your members have with

14   Staples, right, sir?

15   A.  That is correct.

16   Q.  Because Staples has no way of knowing what your members

17   are spending with anyone else, correct, sir?

18   A.  Well, they have account management resources in the

19   field.  And so if they know that there's members that are

20   noncompliant, they're quick to work with our account

21   management people to identify and to change that behavior.

22   But, to your point, they don't see every office supply

23   purchase transaction that comes through the system.

24   Q.  Right.

25   A.  But they know in general whether a member is using the

1    agreement or not.

2    Q.   Okay.  Sir, I take it you're not here to speak on behalf

3    of Staples today?

4    A.   Well, no, I'm not, but what I'm trying to suggest to you

5    is that we receive feedback from several sources.  Staples,

6    as a contracted partner, is one of those mechanisms behind

7    which we receive feedback relative to compliance.

8    Q.   Right.  But the usage reports that you receive, the

9    utilization reports, they have no information about spend to

10   anyone else other than Staples, right, sir?

11   A.   That is correct.

12   Q.   Okay.  And, sir, if your members -- I know you don't

13   promote it, but if your members were to purchase that box of

14   blue pens from Amazon, not only would you not have a means

15   to know about it, you wouldn't get paid for that, right, sir?

16   A.   What do you mean by "paid"?

17   Q.   Well, your fee, sir, is 3 percent of your member spend

18   through the Staples contract, right, sir?

19   A.   There is a 3 percent administrative fee that is paid by

20   the -- that's embedded in the member's unit price and it's

21   rebated from the member -- from Staples back to HealthTrust.

22   And let me just add that that fee is transparent.  It's

23   communicated to the membership and they completely

24   understand that the HealthTrust charge is for providing that

25   service.

1   Q.  Okay.  And, sir, your fee, you said, is built into the

2   price that your members ultimately pay for the products,

3   right, sir?

4   A.  That is correct.

5   Q.  And your fee is 3 percent of your members' total spend

6   on the Staples contract, right?

7   A.  That is correct.

8   Q.  And the total spend of $250 million, you would get

9   administrative fees of $7 1/2 million, right, sir?

10  A.  Yeah.  Um-hmm.

11  Q.  And so if your members were, instead of buying through

12  the contract, were to go buy that box of blue pens from

13  Amazon or buy from W.B. Mason or set up their own account

14  with Amazon Business, not only do you not see their

15  purchasing orders to see that happening, you lose your

16  money, right, sir?

17  A.  Well, many of our members, quite frankly, they don't

18  condone that behavior.  They have protocols in place to

19  somewhat lock down the ordering mechanism.  So -- but you're

20  right, if there is an off-contract spend, we would not see

21  the transaction related to that.

22  Q.  Right.  But not only would you not see it, sir, you

23  wouldn't get your fee, right, sir?

24  A.  That is true.

25  Q.  Right.  Now, sir, you're familiar with a company called

1   Georgia Pacific, right?

2   A.  Yes.

3   Q.  And, in fact, you have a contract with Georgia Pacific;

4   is that right, sir?

5   A.  Yes, we have a direct relationship with Georgia Pacific.

6   Q.  Is that something different than having a contract?

7   A.  Well, it's a manufacturer agreement, as opposed to

8   distributor.

9   Q.  Understood.  Thank you, sir.  And as part of that

10  manufacturer agreement your members are getting paper towels

11  and tissues and toilet paper, right, sir?

12  A.  That is correct.

13  Q.  And that product is delivered to HealthTrust members

14  nationwide, right, sir?

15  A.  It is.

16  Q.  Okay.  Could we put up the slide here?

17          Now, sir, I've put on the screen here Georgia

18  Pacific's website.  Do you see it on the screen?

19  A.  I do.

20  Q.  And Georgia Pacific is the company that makes Dixie and

21  Brawny and Quilted Northern.  Do you see that, sir?

22  A.  I do.

23  Q.  Sir, you would agree with me, I hope, that toilet paper

24  is a bit more mission critical than paperclips, sir?

25  A.  Yes.

1    Q.  Okay.  If you had to run out of paperclips or toilet

2    paper, sir, which -- I won't ask you that.

3              I'll withdraw the question, Your Honor.

4              Now, sir, you trust -- your members trust Georgia

5    Pacific to deliver paper towels and toilet paper nationwide,

6    right, sir?

7    A.  Well, we trust them to furnish the product to our

8    distributors.  They're not the delivery mechanism.

9    Q.  Right.  But you have a delivery mechanism in place to

10   get Georgia Pacific products to your members nationwide,

11   right, sir?

12   A.  That is correct.

13   Q.  And Staples has no role in that, do they?

14   A.  Staples is a jan-san distributor.

15   Q.  No, my question was:  Is Staples doing the delivery of

16   the Georgia Pacific products to your members?

17   A.  They are.

18   Q.  I'm sorry?

19   A.  They are.

20   Q.  They are.  And is that the only way that Georgia Pacific

21   is able to deliver their products, sir?

22   A.  There are other jan-san distributions in place that the

23   members can choose to use as well.

24   Q.  Right.  And so if a member, through your contract, wants

25   to get Georgia Pacific products, they can get them delivered

1    nationwide through means other than Staples, right, sir?

2    A.  That is correct.

3    Q.  And, sir, you're aware that Georgia Pacific also makes

4    copy paper, right, sir?

5    A.  Yes, I am.

6    Q.  Okay.  And if Georgia Pacific is able to get paper

7    towels and toilet paper and tissues to your members

8    nationwide, they could also get paper to your members too,

9    couldn't they, sir?

10   A.  They could.  I'll add that I think that Staples, as part

11   of the value that they provide to us, they have a

12   manufacturer or a paper relationship that's greater than

13   ours.  So, as you know, Staples has their own private label

14   for paper.

15   Q.  Right.

16   A.  So, they're garnering a better price point on paper than

17   we would be able to garner through a straight relationship

18   with Georgia Pacific or any other mill, quite frankly,

19   because they have the better buying power.

20   Q.  Sir, you have done no analysis to compare the prices you

21   pay at Staples for paper to the prices that you would pay

22   Georgia Pacific for paper, correct?

23   A.  We have not.

24   Q.  Okay.  So you don't know whether or how Georgia Pacific

25   paper prices would compare to Staples, right, sir?

1    A.  What we do know is that by aggregating the three

2    categories of office supply spend, that that creates more

3    volume to a single vendor than segmenting the category.

4    Q.  Well, hold on, sir, because you also have an existing

5    contract with Georgia Pacific, right, sir?

6    A.  For paper towels and tissues and toilet paper.

7    Q.  Right.  And if you disaggregated volume on the Staples

8    contract, you would be adding volume to another existing

9    contract, right, sir?

10   A.  I'm sorry, would you repeat the question, please?

11   Q.  Sure.  You said that if you took paper out of the

12   Staples contract, you would lose, potentially, the benefits

13   of some volume, right?

14   A.  Copy paper.

15   Q.  Copy paper.  But if you took your copy paper to your

16   Georgia Pacific contract, you may get volume benefits on the

17   Georgia Pacific contract that offset whatever you lose on

18   Staples, right, sir?

19   A.  Possibly, but we believe that with 27 percent of the

20   volume coming through Staples and with Staples' purchasing

21   power, that they're going to garner a better price point.

22   Q.  Well, you believe it, sir, but you haven't done any

23   analysis; is that right, sir?

24   A.  We have not.  We have not.

25   Q.  And if for some reason -- for whatever reason in 2018 or

1    2019 you're upset with Staples, I'll bet you and your

2    negotiating experts would do that analysis, wouldn't you, sir?

3    A.  We would possibly look at that, correct.

4    Q.  Right.  And you might find out something you don't know

5    today, right?

6    A.  Possibly.

7    Q.  Okay.  Now, sir, I want to talk a little bit about

8    delivery.  Now, you mentioned that one of the things you

9    like about Staples is that Staples does its own desktop and

10   last mile delivery, right, sir?

11   A.  That's correct.

12   Q.  And when I say "last mile delivery," I'm sure you know

13   what I mean.  But I intend that to mean the last piece of

14   delivery that actually lands at the customer, right?

15   A.  Yes.

16   Q.  And you said in your direct testimony, and you actually

17   said in your deposition that you estimate that Staples does

18   probably 90 or 95 percent of that with Staples employees and

19   Staples trucks, right, sir?

20   A.  Correct.

21   Q.  And would it surprise you, sir, to know that, in fact,

22   80 percent-plus of Staples last mile delivery, including

23   desktop, is outsourced?

24   A.  To HealthTrust members?

25   Q.  Nationwide, sir.

1    A.   But to HealthTrust members?

2    Q.   HealthTrust members are no exception.  Would that

3    surprise you, sir?

4    A.   But does that 80 percent apply to Health Trust, is the

5    question?

6    Q.   Sir, I can represent to you that the vast majority --

7    A.   Well, let me suggest this:  We have a 95 percent next

8    day delivery requirement in the HealthTrust contract.  So,

9    how do you think that that's achieved by outsourcing to a

10   third party for the delivery?

11   Q.   I'll represent to you it's achieved every day by Staples

12   and Office Depot.

13   A.   I'm not sure that that's the case for HealthTrust.

14   Q.   Sir, you don't have any basis to dispute that, do you?

15   A.   I don't have any basis to agree with you or question

16   you.  I do know what's in the contract and I know what's

17   required within the contract.

18   Q.   And, sir, did you know that UPS offers desktop delivery

19   now?

20   A.   UPS is a small parcel delivery, correct.

21   Q.   No, my question was:  Did you know that UPS offers

22   desktop delivery now?

23   A.   I did not know that.

24   Q.   You didn't know that.  That's new information for you?

25   A.   So desktop, meaning to the department?

1    Q.  Meaning past the loading dock to the landing spot from

2    Staples or Office Depot?

3    A.  Yeah, I'm familiar with that, correct.

4    Q.  So you knew that?

5    A.  Yes.

6    Q.  Okay.  So you knew that Staples actually does desktop

7    delivery with UPS today?

8    A.  They deliver to the department, correct.

9    Q.  Right.  Okay.  Now, sir, you're aware that Staples has

10   said publicly this merger will generate a billion dollars a

11   year or more in efficiencies; you know that, right, sir?

12   A.  I've heard that.

13   Q.  And have you also heard that Staples has said that those

14   efficiencies will be invested in lowering prices, not just

15   for HCA and the $39 billion hospital systems, but for small

16   businesses and medium businesses and consumers online and in

17   stores?  Have you heard that, sir?

18   A.  I've heard that before, as well.

19   Q.  And, sir, that Staples members are spending -- you said

20   $250 million on -- I'm sorry, HPG members are spending

21   $250 million on the Staples contract today, sir?

22   A.  That is correct.

23   Q.  And if this merger goes through, just mathematically, if

24   Staples cut your prices by $50 million, your members would

25   save $50 million, but you would lose, HPG would lose

1    $1.5 million a year in fees, isn't that right, sir?

2    A.  Well, the fees aren't really the concern.  You know,

3    we're aligned with our members, so, you know, we're

4    motivated to reduce their prices.  Fees are secondary.

5    Q.  Sir, if Staples cuts prices by $50 million, you lose

6    $1.3 million every year --

7    A.  My --

8    Q.  -- correct?

9    A.  My take on this as it relates to the $1 billion

10   reduction, I think that $1 billion reduction, that their

11   incentives and their alignment and loyalties to their

12   shareholders, that $1 billion will go to the shareholders.

13        In a competitive environment we'll fight for the

14   $1 billion, or our portion the $1 billion, but I know that

15   the loyalty and their allegiance is to pass income on to

16   their shareholders, not to pass the savings on to us.  We

17   have to have the competitive environment in place that we

18   can take advantage of any efficiencies that come through the

19   system.

20   Q.  Sir, if Staples cuts prices by $50 million to your

21   members, you lose $1 1/2 million every year; isn't that

22   correct, sir?  Can you answer that question?

23   A.  If our prices go down, and they have gone down -- every

24   time we go back out to the market they go down, we lose

25   admin fee.

1    Q.  Sir, are you aware just in the last couple of days

2    Senator Blumenthal has indicated that he would encourage the

3    FTC to investigate whether health care GPO fees actually

4    lead to higher health care costs?  Did you know about that,

5    sir?

6    A.  I did not know about that.

7    Q.  Did you know that the same calls for investigation have

8    questioned whether health care GPOs can cause scarcity of

9    medications?

10   A.  I can share this:  Members aren't required to join a

11   GPO.  They choose to join a GPO.  And the reason they choose

12   to join a GPO is because we can deliver value to them

13   greater than they can on themselves.

14          So there's different points of view on a GPO, but

15   it's a voluntary relationship.  We don't force anybody to

16   become a member of the GPO.

17   Q.  Understood, sir.  If the member gets a better price

18   through W.B. Mason or Amazon Business or anyone else, they

19   can leave, and they may be perfectly happy, but you'd lose

20   your fees, right, sir?

21   A.  When members come on board to HealthTrust they commit to

22   use our agreements to the participation agreement -- to the

23   participation agreement they have in place with HealthTrust.

24   Q.  Sir, I want to ask you about a company called McKesson.

25   I assume you are familiar with McKesson?

1    A.  Yes.

2    Q.  They rank number 11 on the Fortune 100, sir.  Did you

3    know that?

4    A.  I understand what you're saying.

5    Q.  You follow me?

6    A.  Yes.

7    Q.  Sir, did you know McKesson had $179 billion in revenue

8    in 2015?

9    A.  I understand what you're saying.

10   Q.  You follow me?

11   A.  Yes.

12   Q.  You follow me, that's about seven times larger than

13   Staples, sir?

14   A.  I follow you.

15   Q.  And, sir, have -- you're aware that McKesson delivers

16   about one-third of all medications used in North America

17   every day?  Did you know that, sir?

18   A.  I understand they're a pharmacy distributor.  We do not

19   have a relationship with McKesson.

20   Q.  HPG doesn't have a relationship?

21   A.  No.

22   Q.  But you're aware, certainly, that they have nationwide

23   delivery capability, right?

24   A.  They have nationwide pharmaceutical delivery capabilities.

25   Q.  Did you know, sir, that McKesson sells office supplies?

1    A.  I did not.

2    Q.  Can you put up the slides?

3            Sir, in the research you talked about before going

4    to RFP this year, did you ever check McKesson's website?

5    A.  We have not.  I'm very skeptical that office supplies is

6    a core competency for McKesson.

7    Q.  Just immediately, knowing nothing, you are skeptical?

8    A.  I'm skeptical because a lot of organizations may

9    represent that they sell office supplies, but the

10   comprehensive nature can be somewhat limited.

11   Q.  Your view, sir, is that $180 billion company that

12   delivers one-third of all pharmaceuticals in North America

13   can't handle office supplies; is that it?

14   A.  My gut tells me that McKesson, that a very, very small

15   fragment of their sales is associated with office supplies.

16   And so I would also add if McKesson was a serious provider

17   of office supplies, I can assure you, for our book of

18   business, they would be knocking on our door seeking a

19   relationship.

20   Q.  Certainly, sir.  But on behalf of your members, $7

21   1/2 million a year, you don't just sit around and wait for

22   somebody to come to you, right, sir?

23   A.  Well, they do come to us.

24   Q.  Right.  But, sir, part of the reason is you've been

25   pretty happy with Staples and Office Depot, right?

1    A.  I don't view -- if the question is do I view McKesson as

2    a viable, competent office supply vendor, I do not.

3    Q.  Right.  And you didn't know that -- you literally didn't

4    know they sold office supplies two minutes ago and yet

5    you've already determined, sir, that they're not competent?

6    A.  I know what McKesson does, and office supplies is not a

7    core competency.

8    Q.  Sir, on behalf of your members, if you were upset, for

9    whatever reason, with Staples in 2018 or 2019, you would

10   look at McKesson, wouldn't you, sir?

11   A.  We would consider them.

12   Q.  You would consider them, right?

13   A.  You know, but really, they're not a legitimate B2B

14   office supply vendor.  They're not even in our market share

15   analysis.  They didn't even hit the radar.

16   Q.  Right, you haven't analyzed them at all.  You didn't

17   even know about them.

18   A.  Well, they are probably in the other segmented spend

19   category, you know, so a very small player, if any.

20   Q.  So you've never been to their website here, where on the

21   top, Product Categories, they say office supplies; you see

22   that, sir?

23   A.  I see the screen that you are showing me, yeah.

24   Q.  That is the first time you've seen this, right, sir?

25   A.  This is the first time I've seen this screen.

1    Q.  So you've never clicked through office supplies or seen

2    their product catalog online, have you?

3    A.  I have not.

4    Q.  So you didn't know, sir, if you went to -- it's a big

5    catalog, 508 pages.  If you went to page 130 you would see

6    pages on office supplies; you didn't know that, sir, right?

7    A.  I have not seen this page.

8    Q.  Okay.  First time.  And it says, "Why go anywhere else

9    for office supplies?"  Do you see that?

10   A.  Yes.

11   Q.  It says they carry more than 30,000 business supply

12   items.  Do you see that?

13   A.  I do.

14   Q.  Do you see where it says folders and paper and toner and

15   pens and even break room products, right, sir?

16   A.  I do.

17   Q.  Those are the products you buy from Staples, right?

18   A.  Those are products we buy from Staples.  But, again, I

19   do not consider McKesson to be a legitimate, primary office

20   supply vendor.

21   Q.  Based on the last three minutes of your cross-

22   examination, that's the extent of your knowledge?

23   A.  Based on my 18 years of working in office supplies.

24   Q.  At no point in 18 years did you even become aware that

25   McKesson sold office supplies, right, sir?

1   A.  My gut tells me that they do not have warehouses that

2   are dedicated, an account management that's dedicated.  Nor

3   do they, you know, consider themselves as a core office

4   supply vendor.  I don't think they position themselves in

5   the marketplace as a core office supply vendor.

6   Q.  Based on no analysis, right, sir?

7   A.  Well, based upon my years of experience in health care.

8   Q.  Sir, do you see here where it says "We carry more than

9   30,000 business supply items"?  Do you see that?

10  A.  I do.

11  Q.  And you see on the next page it says, "We serve more

12  than 50 percent of American hospitals, 20 percent of U.S.

13  physicians, and 96 percent of the top 25 health plans, and

14  we deliver one-third of all medications used every day in

15  North America."  Do you see that, sir?

16  A.  Yeah.  So that's a fairly broad statement.  So that is

17  primarily, I think, associated with their core competencies,

18  which is pharmacy distribution, and also their information,

19  software services and consulting services they have in place

20  in the health care community.

21  Q.  Sir, I would understand if you said a paperclip

22  distributor can't immediately flip a switch and become a

23  pharmaceuticals distributor.  Is your testimony, really,

24  that a $179 billion pharmaceutical distribution firm can do

25  everything, supplying critical health care products to

1    hospitals, but can't deliver paperclips?

2    A.  What I'm suggesting is that I don't view this as a core

3    competency for McKesson, and I view this as just an

4    ancillary.  And in the health care space they're not known

5    as a legitimate office supply vendor.

6    Q.  You don't know what McKesson's office supply

7    distribution plans are for 2016, 2017, 2018, correct?

8    A.  I do not.

9    Q.  I assume, because you don't even know their existing

10   operations, right, sir?

11   A.  Well, I'm familiar with McKesson.

12   Q.  You can take it down.

13           Sir, you're also familiar -- actually, leave it

14   up, George.

15           You're also familiar with a company called

16   Grainger, right, sir?

17   A.  I am.

18   Q.  Grainger is another company that HPG has a contract

19   with, right, sir?

20   A.  That is correct.

21   Q.  And your members already spend about 50 or $60 million a

22   year with Grainger; is that right?

23   A.  That's correct.

24   Q.  And have you ever been to Grainger's website?

25   A.  Yes, I have.

1    Q.  Have you ever looked at their office supply offering?

2    A.  I have.

3    Q.  Let's take a look, sir.

4          So you've seen this, right?  You've clicked

5    through on office supplies?

6    A.  I've seen that they have, basically, 8,000 line items

7    that are available for office supplies.  That's not a

8    comprehensive solution.  And I'll also add, if you don't

9    mind --

10   Q.  Please.

11   A.  -- that we've had a long-standing relationship with

12   Grainger.  They know our industry, they know our

13   organization and they know our members.  And they have

14   never, ever suggested that they can compete in the office

15   supply category.

16   Q.  They haven't come to you.  But you've never gone to

17   Grainger and said -- let me finish, sir -- you've got 50 or

18   $60 million of our business, how would you like $250 million

19   in office supplies?  Did you ever bring that to them?

20   A.  No.  Nor have they to us.

21   Q.  They haven't approached you and you haven't approach

22   them?

23   A.  I should also add that we have looked at their website;

24   very limited product offering.

25   Q.  Sir, if you were unhappy, for any reason, with Staples

1    in a year, two years, three years, you would at least take a

2    look, right, sir?

3    A.   We would assess the market.

4    Q.   Part of the assessment you would do is call Grainger and

5    say, Hey, guys, do you have any interest in doing this,

6    right?

7    A.   Possibly, yes.

8    Q.   You might find out that they are interested, right, sir?

9    A.   Maybe.

10   Q.   And so you've clicked through on office supplies very

11   quickly, sir, and you see binder clips and clip boards and

12   you click on that, sir.  And if you look at three-ring

13   binders, you click on that, sir, you see they have 630

14   three-ring binders, sir?

15   A.   Could I ask a question?  Could you flip to their home

16   page, the front page of Grainger?

17   Q.   If we had WiFi, I could.

18   A.   If you flip to the home page you'll see they have a very

19   limited office supply offering, 8000 line items.  We've

20   looked at it.  They are not a serious core office supply

21   vendor.

22   Q.   Sir, the core item list that accounts for about 80

23   percent of your member spend, that's about 4200 products,

24   right?

25   A.   That's the manufacture direct products that Staples has

1    in place under our agreement.

2    Q.  You never -- certainly not anytime recently -- have gone

3    to Grainger and said, Here's what our members buy, would you

4    be willing to sell it to us and at what price?  You haven't

5    had that conversation?

6    A.  We have not, but we have studied the Grainger catalog.

7    Q.  You do know that Grainger, for example, has a national

8    account team, right, sir?

9    A.  Yes.

10   Q.  And a national account infrastructure?

11   A.  Yes, they do.

12   Q.  And you know they have warehouses, right, sir?

13   A.  I do.

14   Q.  And you know they have utilization reporting, right, sir?

15   A.  Yes, they do.

16   Q.  I should say, with warehouses, you know, they have more

17   warehouses than Staples or Office Depot; did you know that,

18   sir?

19   A.  That would not surprise me.

20   Q.  And you know they have online E-procurement system,

21   right, sir?

22   A.  They do.

23   Q.  You know that because your members are using that today,

24   right?

25   A.  For industrial supplies.

1    Q.  Right.  For other products, right?

2    A.  For industrial supplies.

3    Q.  And you would agree that Grainger is adequately

4    positioned to service your membership today?

5    A.  For industrial supplies.

6    Q.  Sir, I want to ask you a few questions about Amazon

7    Business.  And you mentioned during your direct examination

8    that you had a meeting in 2015 with Amazon Business, right,

9    sir?

10   A.  My team had a meeting with Amazon.  Not a meeting, I

11   think it was a conference call.

12   Q.  Thank you, sir.  There was a call between HPG and Amazon

13   sometime in 2015?

14   A.  Yes.

15   Q.  And you weren't on that call?

16   A.  I was not.

17   Q.  And that was in early 2015, before the launch of Amazon

18   Business, right?

19   A.  It was, I believe, February or March of 2015.

20   Q.  Right.  You said on your direct examination that the

21   Amazon Business was in beta at the time that your people

22   talked to them, right, sir?

23   A.  What they had communicated is that they were beta, they

24   were in a beta phase for MRO.

25   Q.  And, sir, if I represent to you that Amazon Business was

 1    launched in late April of 2015, that would tell you that

 2    this conversation happened before that launch, right, sir?

 3    A.  That would tell me, yes.

 4    Q.  Okay.  And, sir --

 5    A.  But I will also suggest that my team has recently

 6    followed up with Amazon and they haven't received a response

 7    back.

 8    Q.  And you're referring to a 2015 communication?

 9    A.  A 2016.

10    Q.  2016.  And, sir, sitting here -- we'll get to that in a

11    minute -- but sitting here today, you don't personally know

12    what Amazon Business's capabilities are in 2016, do you, sir.

13    A.  We do not.  They have not responded to our calls.

14    Q.  You certainly don't know what Amazon will offer in 2017

15    or 2018, right, sir?

16    A.  They have not shared that information with us.

17    Q.  And, sir, as far as you know, has there been a meeting

18    between Amazon Business and HPG in the last month or two?

19    A.  I understood that there was a general meeting, not

20    relative to office supplies or to B2B.  But there's a

21    general meeting at the HCA corporate office between Amazon.

22    But my understanding is it was outside of any type of a

23    supply discussion.

24    Q.  And, sir, who's Ed Jones?

25    A.  He is our CEO of Health Trust.

1    Q.  Did you know, sir, that Ed Jones recently met with

2    Amazon Business?

3    A.  That's what I had heard.

4    Q.  Did you know that the subject matter of that meeting was

5    Ed Jones saying he was interested in Amazon Business

6    replacing Staples as your office supply dealer?

7    A.  I did not know that.

8    Q.  That's news to you, sir?

9    A.  Yes.

10   Q.  You haven't talked to Ed Jones about that?

11   A.  No.

12   Q.  If we wanted to get HPG's official word on Amazon

13   Business, should that come from you, sir, or from Ed Jones?

14   A.  As it relates to B2B solutions and office supplies, it

15   should come through me and my organization.

16   Q.  You outrank Mr. Jones?

17   A.  No.  I'm just suggesting that my responsibility is

18   office supplies B2B, so we are the individuals that manage

19   that relationship.  I wasn't at the meeting that Ed may have

20   had.  He's also the HCA supply team officer.  So, I wasn't

21   at that meeting.  But, my understanding, that that meeting

22   did occur, but I don't know what the topics of the details

23   were associated with that meeting.

24   Q.  How often does your CEO meet with vendors that are in

25   your product categories?

1    A.  We just had a Core Trust conference and we saw a lot of

2    vendors at the Core Trust conference last week.

3    Q.  So you're not surprised that your CEO is meeting with

4    Amazon Business, sir?

5    A.  I'm saying that in the nature of our business as a group

6    purchasing organization, there are lots of opportunities for

7    vendor and CEO meetings to occur.

8    Q.  My question is:  Were you surprised that your CEO met

9    with Amazon Business recently?

10   A.  I was not surprised to hear that, no.

11   Q.  You don't know the status of those discussions one way

12   or the other, right?

13   A.  No, no.  What I do know is that we have followed up with

14   Amazon as recently as this year and we've had prior

15   discussions with Amazon relative to their B2B capabilities.

16   And as the record reports, they did not seem to be interested.

17   Q.  Well, they were interested enough to come down and meet

18   person with your CEO, right, sir?

19   A.  A lot of times C-suite relationships or discussions

20   aren't necessarily detailed business discussions.

21   Q.  Sir, how many times did you talk to the FTC before

22   signing your declaration?  You said three or four times?

23   A.  Maybe about four or five times.

24   Q.  How many hours total, sir?

25   A.  Maybe four to five hours, maybe about an hour each call.

1    Q.  So in that four or five hours of discussion, I assume

2    the subject of Amazon came up?

3    A.  I don't recall that, no.

4    Q.  You talked to the FTC for four or five hours and you

5    don't remember if there was any discussion of Amazon?

6    A.  No.

7    Q.  So you don't know if the FTC asked you a single question

8    about Amazon, do you?

9    A.  No, I don't recall Amazon coming up.

10   Q.  And who chose the topics and questions in that

11   discussion, you or the FTC?

12   A.  It was an interview process.

13   Q.  When the FTC sent you your declaration, who chose the

14   topics in that declaration, sir?

15   A.  They were asserted by the FTC based on conversations,

16   conference calls that we had between the two parties.

17   Q.  And your declaration, which I think is about -- it's tab

18   1, I believe, sir.  It's about six pages long, single

19   spaced, 16 paragraphs.  It literally makes no mention of

20   Amazon, right, sir?

21   A.  That's correct.

22   Q.  And the word Amazon does not even appear in your

23   declaration; is that right, sir?

24   A.  That is correct.

25   Q.  Now, sir, the current bid process that you're doing with

1    Staples and Office Depot, you didn't solicit the formal bid

2    from McKesson, obviously, right, sir?

3    A.  We did not.

4    Q.  Or Amazon Business, right, sir?

5    A.  We did not.  We had follow-up conversation with Amazon

6    but did not solicit a bid.

7    Q.  You didn't send the RFP to Grainger, right, sir?

8    A.  We did not.

9    Q.  Or Georgia Pacific, right, sir?

10   A.  No.  We didn't consider any of them to be legitimate B2B

11   office supply vendors.

12   Q.  But if you had an issue in a year, two years, three

13   years, isn't it possible that between Georgia Pacific and

14   Grainger and Amazon Business and McKesson and my office

15   products, and W.B. Mason, that someone would be able to meet

16   your needs, sir?

17   A.  No.  We'll know that two to three years from now.

18   Q.  You don't know that sitting here today, right, sir?

19   A.  I don't know for certain where they'll be three years

20   from now.

21   Q.  Thank you.

22           MR. PERRY:  Your Honor, I have nothing further at

23   this time.

24           THE COURT:  All right.  I just -- I need some

25   clarity.  You asked a number of questions about fees and the

 1    impact of reduction of $50 million on fees.

 2              First of all, fees are paid to whom?

 3              THE WITNESS:  Yeah.  So there's -- in the GPO

 4    industry, under federal regulations and anti-kickback

 5    regulations, it's called a GPO fee, group purchasing

 6    organization fee.  And --

 7              THE COURT:  It's fixed by statute?

 8              THE WITNESS:  It's fixed, yeah.  Well, there's a

 9    safe harbor of 3 percent, and that's what we adhere to.

10              THE COURT:  So if there is a reduction of

11    50 million, then that would translate to a reduction of

12    1 1/2 million in fees, statutorily, I assume, right?

13              THE WITNESS:  If there -- it would be roughly --

14    it would be 3 percent of the 227 million -- or $250 million.

15    So, basically about 7 million.  So, 7 million is the total.

16    So you're right.

17              THE COURT:  So if there's a reduction of 50 million,

18    that's -- 3 percent of that is one-and-a-half?

19              THE WITNESS:  You're correct.

20              THE COURT:  What does MRO mean?

21              THE WITNESS:  It's a term that's kind of a generic

22    term, maintenance repair and operations.  But as it relates

23    to Grainger, it's industrial supplies, you know, drills,

24    motors.

25              THE COURT:  And not office supplies?

 1                 THE WITNESS:  They have some office supplies

 2     listed on their website, but when we reviewed that, it

 3     appeared to be a very limited offering.  So we didn't see

 4     them as really a legitimate B2B office supply vendor.  We

 5     believe that their core competency is really industrial

 6     supplies, and that's how they position themselves in the

 7     market.

 8                 THE COURT:  All right.  Any questions?

 9                 MR. PERRY:  No.  Thank you, Your Honor.

10                 THE COURT:  Any redirect, Counsel?

11                 MR. XENAKIS:  Yes, a little bit, Your Honor.

12                      REDIRECT EXAMINATION

13     BY MR. XENAKIS:

14     Q.  Hello again, Mr. Wright.

15     A.  Hello.

16     Q.  Just a couple of questions to follow up on.

17                 Mr. Perry asked you about any authorization from

18     your advisory boards for your testimony here today.  Did any

19     of HPG's members protest about you appearing here today to

20     express your opinions about this deal?

21     A.  No, they did not.

22     Q.  Mr. Perry asked you about a variety of tools that you

23     have to control pricing.  Is your RFP process one of those

24     tools?

25     A.  It is.

1    Q.  And to what extent does the efficiency of the RFP

2    process depend on competition?

3    A.  It's somewhat simple.  We aggregate our members' volume,

4    we go the market.  The general market understands that we

5    have a compliant membership and a membership that orders and

6    utilizes the contracts that we have in place.  And so, as

7    part of the RFP process, they really prize and cherish an

8    award.  And so what we're seeking in exchange for prices,

9    exclusivity relative to a national supply vendor.

10   Q.  I think Mr. Perry asked you about your -- the employees

11   who work under you, the experienced negotiators; is that

12   right?

13   A.  That is correct.

14   Q.  And those are one of the tools that you use to control

15   prices; is that right?

16   A.  That's correct.  They're part of the team, yep.

17   Q.  Does the merger -- can you think of any reasons why this

18   merger would increase the effectiveness of any tools that

19   you have to control pricing?

20   A.  I think the merger would decrease the effectiveness

21   because the mechanism behind which we seek price reductions

22   in exchange for exclusive award, in exchange for our volume,

23   is competition.  And my belief is that when you have 80 percent

24   of the market merging under a single corporate entity, that

25   significantly diminishes the market.

1   Q.  So Mr. Perry talked to you a little bit about the fact

2   that you're here testifying on behalf of yourself and HPG;

3   is that correct?

4   A.  That's correct.

5   Q.  And I understand that you're not here to testify on

6   behalf of any HPG members; is that correct?

7   A.  That's correct.

8   Q.  Would you say one of your primary responsibilities is

9   delivering value to HPG members?

10  A.  That's one of our primary responsibilities.

11  Q.  By "value" do you mean low prices?

12  A.  Low prices and, you know, favorable contract terms.

13  Q.  Would you say that your members rely on you to deliver

14  that value to them?

15  A.  They do.

16          THE COURT:  Did you provide the members with

17  copies of your declaration that you gave the government?

18          THE WITNESS:  I did not.

19          THE COURT:  Do you have any reason to know whether

20  they ever received copies of your declaration from any other

21  sources?

22          THE WITNESS:  Not that I'm aware of.

23  BY MR. XENAKIS:

24  Q.  Mr. Perry asked you about EJ Advisory Services.  Do you

25  recall that?

1    A.  Yes.

2    Q.  They're the consultant that you use for office supplies

3    procurement?

4    A.  Correct.

5    Q.  And do you rely on them to help you evaluate the market

6    and the options available to HPG?

7    A.  We do.

8    Q.  All right.  Have they ever come to you and said that an

9    office supplies vendor other than Staples or Office Depot

10   would be a viable option for your members?

11   A.  They have not.

12   Q.  What -- Mr. Perry asked you about the amount of time

13   involved in the RFP process, and I believe you testified

14   it's a significant amount of time?

15   A.  It takes a long time, yeah.

16   Q.  What impact, if any, would adding a vendor to the RFP,

17   among the vendors you're considering, increasing that

18   number, would that have on the amount of time necessary for

19   your RFP?

20   A.  Well, it increases the financial analysis aspects.

21   Q.  Did you invite W.B. Mason to your most recent RFP?

22   A.  We did not.

23   Q.  Why did you not?

24   A.  We did not feel they had the resources that would

25   support our membership.

1    Q.  If you had invited W.B. Mason to your RFP, would that

2    have increased the amount of time you needed to conduct that

3    RFP?

4    A.  It would.

5    Q.  So, Mr. Perry, and I believe the Court as well, asked

6    you some questions about the prospect of taking your ink and

7    toner spend under the Staples contract and moving it

8    elsewhere.  Do you recall that?

9    A.  Yes, I do.

10   Q.  I think your response was that moving your ink and toner

11   spend would effectively fragment your spend and that would

12   impose some kind of cost on you and your members?

13   A.  We feel that removing toner from the office supplies

14   spend will de-aggregate our volume and reduce the value to

15   our membership.

16   Q.  Would there be some point, though, at which, if the

17   prices of general office supplies went up enough, you would

18   consider threatening to move your ink and toner spend?

19   A.  You know, I think we look at it in a comprehensive

20   nature.  But over the last 18 years we have always bundled

21   toner with general office supplies and paper together.  We

22   understand from the vendor community that they value large

23   order sizes and large deliveries.

24   Q.  Can you think of anything about this merger that would

25   make it easier for you to threaten to move your ink and

1    toner spend to another vendor to discipline Staples' pricing?

2    A.  I cannot.

3    Q.  If your members were finding better pricing on office

4    supplies on, say, Amazon frequently, is that something you

5    would expect to hear about?

6    A.  I would.

7    Q.  Why is that?

8    A.  Well, because, you know, what it would represent to me

9    is that there's a change in the market.  But generally we

10   don't hear that type of behavior or that feedback.

11   Q.  I think you mentioned under Mr. Perry's questioning your

12   members put into place some type of controls to ensure that

13   their spend is going through the Staples contract.  Did I

14   understand that correctly?

15   A.  They do.  I mean, as part of their supply chain

16   organizations, they have systems in place and protocols in

17   place to kind of reinforce the compliance that we've -- that

18   we've established between ourselves and our members.

19   Q.  Why do members put those controls in place?

20   A.  Well, number one is they know that if the controls

21   aren't in place, we collectively can't help manage their

22   office supply spend.

23        Secondly, they understand that committed,

24   aggregated volume creates value.

25   Q.  And I think you said that -- switching gears now,

1    talking about the Georgia Pacific contract.  I think you

2    said that Staples distributes the toilet paper and other

3    paper products you source from Georgia Pacific?

4    A.   Yeah.  They perform jan-san distribution services,

5    correct.

6    Q.   Why did you select Staples to deliver those products?

7    A.   Because they have the trucks and the warehouses behind

8    which -- and they were already, basically, providing the

9    office supply deliveries to our members, so it was a natural

10   complement to their services.

11   Q.   I want to talk a little bit about how HPG's fees would

12   be impacted if the price of office supplies went down.

13   A.   Well, our fees would go down but, you know, again, we're

14   okay with that.  The value proposition that we have between

15   ourselves and our members is to reduce our price and, you

16   know, we kind of -- you know, we know that the stickiness

17   and the value that we have to deliver to our members is

18   based on reducing price.  And if we don't achieve that

19   mission day in and day out, we won't have members.

20   Q.   Is your job performance evaluated in any way?

21   A.   I'm annually evaluated based on supply expense reduction.

22   Q.   What does supply expense reduction mean?

23   A.   It means reducing expenses for supplies.

24   Q.   If HPG's fees went down as a result of a price decrease

25   on office supplies, how do you think that would impact your

1    job evaluation?

2    A.  It has no impact at all.

3    Q.  Would it impact your salary at all?

4    A.  It would not.

5    Q.  In fact, your prices have been going down on office

6    supplies over the last several years; is that correct?

7    A.  Yes.

8    Q.  And in the most recent RFP, if I understand correctly,

9    Staples initially offered you savings and then took those

10   off the table; is that right?

11   A.  In 2015, in anticipation of a possible merger, we sought

12   direct negotiations with Staples.  Staples is kind of a

13   defensive mechanism.  Initially there was value offered on

14   the table.  In August of 2015 that value was removed.

15   Q.  And at that point you didn't decide to sign the Staples

16   contract, did you?

17   A.  We did not.

18   Q.  You went to a competitive bid process?

19   A.  We issued a competitive RFP in February.

20   Q.  Why did you do that?

21   A.  Because we felt that we had to take -- well, first of

22   all, we weren't seeing value from Staples due to the volume

23   growth.  And secondly, we felt like we needed to enter the

24   competitive marketplace to secure price protection and

25   savings for our members after the contract expiration in

1    September of 2016.

2    Q.  Mr. Perry asked you about conversations that Ed Jones

3    had with Amazon Business.  Do you recall that?

4    A.  Yes, he did.

5    Q.  Has Mr. Jones ever told you that Amazon Business looks

6    like a viable option for your office supplies vendor?

7    A.  He never has.

8    Q.  Do you know whether the discussions with Amazon Business

9    that Mr. Jones had were even initiated around the topic of

10   office supplies procurement?

11   A.  I'm not aware.

12   Q.  Mr. Perry asked you some questions about what the impact

13   of an office supplies price increase or, you know, shortage

14   would be on your members; is that correct?

15   A.  That's correct.

16   Q.  Okay.  I think you said your members wouldn't close

17   their doors if office supplies went up?

18   A.  They won't close their doors, correct.

19   Q.  Has Staples or Office Depot ever described office

20   supplies to you as noncritical items?

21   A.  I'm sorry, would you repeat the question?

22   Q.  Has Staples or Office Depot ever characterized office

23   supplies to you as noncritical or unimportant items?

24   A.  No, they haven't.

25          MR. XENAKIS:  Thank you, Your Honor.  No further

1    questions.

2              THE COURT:  Sure.  Let me ask you this.  I just

3    need some understanding about the RFP process.  It sounds as

4    if you've already -- and maybe this is consistent with sound

5    business practice.  There's some organizations you don't ask

6    to submit proposals because, in your mind, your opinion, you

7    don't believe they can service your members, right?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  And W.B. Mason is one, I think there

10   was some testimony about another.  What's the downside in

11   asking an organization to submit a proposal; is it

12   investment of time and effort and resources and money?

13             THE WITNESS:  It is an investment of time, quite

14   frankly, on both sides' behalf.  And if we don't feel that

15   they have a realistic possibility of receiving award, based

16   on what we know our members need, we really don't want to

17   exercise them.

18             THE COURT:  How do you form that opinion without

19   asking what they can do?

20             THE WITNESS:  Well, we have a consultant, and we

21   did evaluate their resources, as I mentioned earlier.  We

22   know that their resources, in terms of their distribution

23   and the warehousing, is limited to three territories;

24   Illinois, Florida and the northeast.  All other national

25   coverage capabilities is a subcontracted relationship.

1          So that was the first concern that we had, is that

2     account management, the administration of a price file, the

3     second party distribution is a concern.  Their ability,

4     quite frankly, to absorb the volume business that we have is

5     also a concern.

6          And so those were kind of the primary.  And I will

7     say that this was conversations that we've had with our

8     advisory board as well.  We went through our competitive

9     analysis with the advisory board and they vetted and

10    validated our market analysis, many of which are located in

11    those same territories that W.B. Mason has a presence in.

12          THE COURT:  All right.  Any questions?

13          MR. XENAKIS:  I actually have two questions, Your

14    Honor.  I apologize.  They don't relate to what you were

15    asking about.  Just two follow-up questions.

16    BY MR. XENAKIS:

17    Q.  Mr. Wright, I want to ask two follow-up questions about

18    managed print services.  We talked about that earlier, as

19    you recall.

20          Does the bundle of services and products that

21    you're familiar with as managed print services include paper?

22    A.  It does not.

23    Q.  And if your members -- if one of your members elects to

24    use a manage print services arrangement, generally would you

25    expect that to reduce the amount of ink and toner that

 1   member would purchase through the Staples contract?

 2   A.  It would, yeah.

 3            MR. XENAKIS:  Thank you, Your Honor.

 4            THE COURT:  All right.  Counsel, any appropriate

 5   recross?

 6            MR. PERRY:  Your Honor, just a couple of

 7   questions.  Unfortunately, with the Court's indulgence, I

 8   think we need to do it at the bench with a husher.

 9                        **SEALED SESSION**







**OPEN SESSION**

THE COURT:  All right.  Let me thank the witness.
All right.  Travel safely.  You may be excused.

Did you get everything?

THE WITNESS:  I presume these are mine?

THE COURT:  I think they belong to FTC.

All right.  Who is your next witness?  We'll take
a short recess before the next witness.  Who's your next
witness?

MS. REINHART:  Our next witness is Professor Carl

1    Shapiro.

2              THE COURT:  Will that be your last witness?

3              MS. REINHART:  The last of our affirmative case,

4    yes, Your Honor.

5              THE COURT:  Let's talk about timing.  It's almost

6    three.  I'm very flexible.  How late do you want to stay

7    today?  Ten, 11, whatever?

8              MS. REINHART:  I think I'll defer to --

9              MS. SULLIVAN:  It depends, Your Honor, on how long

10   is the direct going to be, about?

11             MS. REINHART:  Five, six.

12             THE COURT:  About five hours?  What's your

13   pleasure?  I mean, there is some flexibility.

14             MS. SULLIVAN:  I'm happy to start the cross here

15   tomorrow, Your Honor, if that works, instead of staying late.

16             THE COURT:  All right.  I'm not so sure we want to

17   stay until eight.  I was actually kidding about ten, eleven.

18   How do you want to break it up?  How do you want to break it

19   up?

20             MS. REINHART:  I think we'll probably get to a

21   logical stopping place around five or a little after that.

22             THE COURT:  Let's use 6:30 as a benchmark.  Break

23   at 6:30, see where we are at that point.

24             Let's take a 15-minute recess and then we'll start

25   with the expert.

1              Will Mr. Jones testify?  Is he a witness?  He's

2     not identified by the defendants, is he?

3              MR. PERRY:  He's not, Your Honor.  This is a late-

4     produced document pursuant to the motion to compel that we

5     weren't aware of until earlier -- until recently, Your Honor.

6              THE COURT:  All right.  Okay.  All right.  We'll

7     take a 15-minute recess.

8              (Recess.)

9              THE COURT:  Yes, counsel?

10             MS. SULLIVAN:  Your Honor, may we approach briefly,

11    to talk with Your Honor briefly, with the white noise?

12             THE COURT:  Sure.

13             MS. SULLIVAN:  Thank you, Your Honor.  Actually,

14    this doesn't need to be on the record.

15             (Off-the-record discussion at the bench.)

16             THE COURT:  All right.  Let me just ask -- and

17    I'll seal that portion, counsel.

18             The last witness who testified, is the government

19    offering that witness as a witness -- well, my understanding

20    from his testimony is that he's here individually, he's

21    testifying in his individual capacity; is that correct?

22             MS. REINHART:  He's testifying in his role that he

23    has to ensure that the costs of the individual members are

24    kept low.  That's his job, is to add value in that way, yes.

25             THE COURT:  But he's not speaking on behalf of any

1    entity?

2              MS. REINHART:  That was his testimony.  That's

3    correct.

4              THE COURT:  The declaration seemed to be framed on

5    behalf of an entity.

6              MS. REINHART:  The testimony, Your Honor, we think

7    is helpful, first of all, because these group purchasing

8    organizations are -- they come into the case, you've heard

9    about them somewhat, you're going to continue to hear about

10   them.  And we wanted Your Honor to understand what role they

11   play in the market, how they function.  They have members

12   large and small.  And they do aggregate their purchases so

13   that they can take advantage of Staples --

14             THE COURT:  Right.  But if you look at the

15   declaration, especially the latter numbered paragraphs, he's

16   voicing an opinion on behalf of HPG, particularly from 12

17   on, which suggests something other than individual capacity.

18             He was clear today he's here individually.  In

19   fact, he said, in response to my question, the board didn't

20   even know, has not seen his declaration.

21             MS. REINHART:  And perhaps there's some confusion,

22   because there are two different entities.  There's

23   HealthTrust and then there's HPG.  And he was, as I

24   understand it, offered to testify on behalf of HPG.

25             MR. PERRY:  Your Honor, I don't think there's any

1    confusion.  He testified very clearly he's testifying as an

2    individual on his own behalf.  He happens to work at HPG,

3    but I thought the testimony was clear, Your Honor.

4            THE COURT:  I thought it was, too.  And I think I

5    followed up and asked him because I needed to be clear on

6    whether he was here individually, and he said individually.

7            MR. XENAKIS:  And, Your Honor, I apologize.  I

8    respectfully disagree with Mr. Perry.  I think he was

9    clear -- and I'll have to go back and look at the

10   transcript, I think he was clear that was here testifying

11   individually and on behalf of HPG.

12           I think what was clear, and think what we can --

13   we and the defendants can agree on, is that he wasn't here

14   testifying on behalf of any individual HPG member, but he

15   was here representing the group purchasing organization.

16           THE COURT:  We may have to get him back on the

17   phone.  I'm not going to make him fly back out.  He's from

18   Tennessee, right?

19           MR. XENAKIS:  Yes, Nashville.

20           THE COURT:  I thought I clarified, because I asked

21   a follow-up question, too, because I wanted to be clear that

22   he was here individually.  And I thought that's what he

23   said.  I think the transcript will bear that out.

24           MR. PERRY:  Sorry, Your Honor, that's how I heard

25   him as well.  I assume the transcript will make that clear.

1          THE COURT:  Right.  The other thing that the Court

2     is interested in is Mr. Jones.  I was wondering whether he

3     was a designated witness for the defendants.  He's not on

4     the witness list.  I assume there's no video that's going to

5     come in with his testimony on it.

6          I think I'd like to hear from him, but -- is there

7     a reason why he wasn't designated as a witness?

8          MR. PERRY:  Well, Your Honor, as you recall, I'm

9     sure, this was a document produced very late, after motions

10    to compel and a significant amount of wrangling with Amazon.

11    So, obviously, we have no --

12         THE COURT:  This came in from Amazon?

13         MR. PERRY:  This came in from Amazon very late in

14    the game, Your Honor, after the time when witness lists were

15    made and the ships were sailed, Your Honor.

16         THE COURT:  Well, I don't -- I was wrestling

17    whether there was any substantive evidence there.  I don't

18    think there is.  I mean, I think probably -- if it's

19    borderline impeachment, maybe, I don't know.  But it's not

20    substantive evidence, I don't think, that the Court can

21    consider.

22         MR. PERRY:  Your Honor, the exhibit is in evidence

23    pursuant to the CMOs.  We would submit that that document

24    itself is in evidence and it speaks for the Court.  And I

25    think the witness made clear whether or not -- I won't say

1     anything specific, but whether or not he had a basis to

2     dispute what was on the face of the document.

3               THE COURT:  Right.  But can the Court consider

4     what's on the face of the document as being -- for the truth

5     of the matter asserted?

6               MR. PERRY:  Your Honor, I submit you can.  I

7     appreciate the weight -- obviously, you'll decide what

8     weight you give that document.  But it's in evidence, it was

9     undisputed.

10              THE COURT:  Yes.

11              MR. PERRY:  And no objections from plaintiffs.  I

12    think you can consider it.

13              THE COURT:  Right.  Well, you know, this case is

14    nonjury and I don't have to spend a lot of time deciding

15    that now.  But, I mean, at some point if I rely on it, there

16    should be some hearsay exception rule that the Court can

17    point to as relying upon it for the truth of the matter

18    asserted.  I'm not so sure I can.

19              I mean, this was a document produced by Amazon

20    that reflects statements made to -- by someone else who is

21    not before the Court to cross-examine.  I have all sorts of

22    concerns about that, but I don't have to spend a lot of time

23    right now.  I mean, provisionally it's in the record.

24              MR. PERRY:  Understood, Your Honor.  We're happy

25    to follow-up.  But initially it certainly appears to be an

1    ordinary course of business record of Amazon following up in

2    an ordinary course meeting.

3          THE COURT:  Business records from Amazon that

4    reflect statements from someone else, I'm not so sure.

5          All right.  Yes, counsel.

6          MR. XENAKIS:  Yes, Your Honor.  I would submit

7    that while the document may be a business record, the

8    portion in question is not the type of evidence designed to

9    come in under the business record exception, because it is a

10   summation of what someone else said.  And if the Court

11   intends to rely on it as an accurate representation of what

12   that person said, I don't think it has reliability.

13         THE COURT:  All right.  The query whether --

14   rather than spending a lot of time on that issue, the query

15   is whether it's just easier just to hear from him, to ask

16   him to testify, because the question is whether or not there

17   are any viable alternatives out here in the real world, who

18   can compete, you know, query whether it's relevant to

19   anyone's case, or not.

20         MR. PERRY:  Understood, Your Honor.  We're happy

21   to look into it, of course.  The more evidence the better.

22   I suspect that the witness you've already heard from

23   directly at Amazon can certainly speak and has spoken more

24   directly to capabilities they have today, capabilities they

25   will have going forward.

 1             THE COURT:  All right.  All right.  Well, give it

 2     some thought and it may well be I don't need to hear from

 3     him.

 4             MR. PERRY:  Thank you, Your Honor.

 5             THE COURT:  All right.  You can call your next

 6     witness, Counsel.

 7             MS. REINHART:  Thank you, Your Honor.  The

 8     plaintiffs call Professor Carl Shapiro.

 9                         CARL SHAPIRO,

10     was called as a witness and, having been first duly sworn,

11     was examined and testified as follows:

12             THE COURT:  All right, good afternoon, sir.

13             THE WITNESS:  Good afternoon.

14             THE COURT:  How are you?

15             THE WITNESS:  Very well, thank you.

16             THE COURT:  Good.

17             MS. CERILLI:  Good afternoon, Your Honor.  I'm

18     Krisha Cerilli from the Federal Trade Commission.  I'll be

19     conducting the exam.

20             THE COURT:  All right.  Good afternoon, Counselor.

21             MS. CERILLI:  And we have a presentation that

22     we're going to be using to guide the examination.

23             THE COURT:  All right.  Thank you.

24             MS. SULLIVAN:  And, Your Honor, to the extent it

25     will speed things along, we're willing to stipulate that

1    Dr. Shapiro is an expert in the field of economics.

2             THE COURT:  I would like to hear his background;

3    it's always helpful.  I know you would, I know you would.  I

4    would like to hear it.

5             MS. CERILLI:  Thank you.  And, Your Honor, we

6    expect to be able to conduct this entire exam in public

7    forum.  There will be just certain slides that are partially

8    redacted from public view, but you will have the complete

9    un-redacted version.  And particularly towards the end there

10   might be a handful of questions that it might make sense to

11   just do in a brief sidebar and then continue on.

12            THE COURT:  That's fine.  All right.  Thank you,

13   Counsel.

14            MS. CERILLI:  Great.

15                      DIRECT EXAMINATION

16   BY MS. CERILLI:

17   Q.  Professor Shapiro, can you please state your name for

18   the record?

19   A.  Carl Shapiro.

20   Q.  And, Mr. Shapiro, what is your academic training?

21   A.  I earned my Ph.D. in 1981 from MIT.  I previously had

22   degrees in economics and mathematics at the undergraduate

23   and masters level in math.

24   Q.  Okay.  And after attaining your doctorate, where did you

25   work?

1    A.  I went to Princeton University.  And I was there during

2    the 1980s as an assistant professor and then a professor.

3    Q.  Okay.  Are where did you go after Princeton?

4    A.  In 1990 I moved to Berkeley and joined the faculty there.

5    Q.  And what is your field of academic research?

6    A.  Industrial organization, which is really the economic

7    field of which antitrust economics is one of the applied

8    branches.

9    Q.  Okay.  And have you published in this field?

10   A.  Yes.  I have, yeah.

11   Q.  And have you published articles regarding the economic

12   analysis of mergers?

13   A.  Yes, I have.  I've been working on mergers in my

14   research for about 25 years, back to about 1990, and

15   other -- many other issues related to antitrust and IO --

16   or, the industrial organization field.

17   Q.  Okay.  And have you also been involved in publication of

18   academic journals in this field?

19   A.  Yes.  I'm quite proud that I was the founding coeditor

20   and then editor of the *Journal of Economic Perspectives*,

21   which is one of the leading journals of the American

22   Economic Association.  And I was the associate editor at

23   some other journals.

24   Q.  And have you had jobs outside of academia related to

25   antitrust economics?

1      A.   Yes, I have.

2      Q.   Okay.  And what are those?

3      A.   So, I guess I would start with, in 1995, I went to join

4      the antitrust division in the Clinton administration as the

5      chief economist there, formerly the deputy assistant

6      attorney general, which is in charge of the economic shop in

7      the antitrust division.

8      Q.   And what are your responsibilities in that position?

9      A.   Well, there are around 50 or 60 Ph.D. economists there

10     who work with the attorneys in the DOJ to evaluate all --

11     basically, all the matters that the antitrust division is

12     handling.  So that would include mergers, certainly, civil

13     non-merger work, as well as competition advocacy.  And in a

14     small -- and some role in criminal cases, as well.

15              So basically supervising that group and then

16     working directly with the assistant attorney general who is

17     in charge of antitrust.

18     Q.   Okay.  And how many merger cases were you involved in

19     that you're talking about at the DOJ?

20     A.   Well, I mean, the DOJ must handle, I guess, serious

21     investigations of dozens a year.  As the chief economist

22     that would probably be a smaller number that I would really

23     dig into.  A lot of it would be done by people who are

24     working under me.  But I was there for a little over a year,

25     or about a year.  So, even that one year, it's a good number

1    of serious merger investigations.  Probably a good dozen in

2    that time.

3    Q.   Okay.  And what is the role of a chief economist in a

4    merger investigation?

5    A.   To listen carefully to the staff and learn from them.

6    The -- well, the staff economists are doing the front-line

7    work of working with the data, evaluating prices, market

8    shares, all the things we're talking about here.  And then

9    as the chief economist my job is to, you know, supervise

10   that, make sure it's high quality.  And ultimately convey

11   that and give my advice to my boss, who is the assistant

12   attorney general who will primarily make the enforcement

13   decision.  Although, of course, necessarily in some cases,

14   the bigger cases, consulting with the attorney general.

15   Q.   And were you also involved in policy work at your time

16   at the DOJ?

17   A.   Yes.  So, maybe I'll jump ahead.  I am not sure you want

18   to do this, but I actually then came back to the DOJ in

19   2009.  At the beginning of the Obama administration I served

20   in the same position for about two years.  And so that's

21   much fresher in my mind.  And we did a lot of policy work,

22   particularly since it was the early days in the

23   administration.

24            For example, the -- there was a policy regarding

25   broadband deployment and broadband build-out.  And we had

 1    views that we, being the antitrust division, on the advice

 2    to the Federal Communications Commission on competition in

 3    broadband, and so we would file -- we would call it

 4    competition advocacy.  We would file -- I want to call them

 5    reports, there's probably another word, with the FCC in this

 6    case giving them advice on how to make sure the broadband

 7    was as competitive as possible.

 8          We did other stuff involving transportation,

 9    airlines, for example.  And then we did work on the merger

10    guidelines during that period of time that you'll be hearing

11    about, Your Honor, and I was involved in that effort.

12    Q.  Okay.  And what did that work entail?

13    A.  The merger guidelines work?

14    Q.  Yeah.

15    A.  Well, we -- both agencies, that is, the FTC and the DOJ,

16    the leaders there decided it was time -- a good time to

17    update the merger guidelines, which had last been -- had a

18    real overhaul in 1992.  And so we had a process that took

19    about more than a year of soliciting input.  Just an

20    extensive process, including public comments and so forth,

21    that led to revised guidelines in August of 2010.

22    Q.  Okay.  And following that second stint at the antitrust

23    division, did you return to Berkeley?

24    A.  No, I stayed in Washington.  And this would have been,

25    now, February, March of 2011.  I was very pleased to be

```
 1    offered a position in the White House as a member of the

 2    President's Council of Economic Advisors.

 3    Q.  And what is the President's Counsel of Economic

 4    Advisors?

 5    A.  So, the CEA was set up in 1946 to give -- to have,

 6    basically, a professional economist, mostly academic

 7    economist as a group in the White House directly reporting

 8    to the President, to give the President, basically,

 9    objective, good economic advice.

10             Initially it was more for macro economics, it was

11    really not to have another great depression.  And by around

12    the '70s into the '80s it became a broader portfolio.  A lot

13    of micro economics, so industry level work, regulatory work.

14    So that's the job of the CEA; there's a chair and two

15    members.  And so in that position I was appointed by

16    President Obama and confirmed by the Senate.

17    Q.  And what were your responsibilities as a member of the

18    council?

19    A.  So we divided things up between the members.  I had a

20    kind of ridiculously large portfolio, because there's so

21    many issues.  So, basically, anything that was in a broad

22    range of economic issues where there was a policy process or

23    the President wanted advice or there were decisions to be

24    made, we would participate.  I mean, less than national

25    security, for example.  But everything from trade with
```

1    China -- housing finance I spent a lot of time on because

2    they're still trying to dig out from the great recession and

3    all the problems with Fannie and Freddie.

4           Energy, we had pipeline issues.  Natural gas, the

5    whole area of regulation was in my zone.  My fellow member,

6    who was handling the other half, Katharine Abraham, she's a

7    labor economist.  So I basically said I did the business,

8    she did the labor side, okay, and training and education.

9           So very broad range of topics.  It was quite

10   demanding.

11   Q.  And after your time on the council, what did you do?

12   A.  I returned happily to my position at UC Berkeley.

13   Q.  Okay.  And aside from your work in academics and

14   government, do you also serve as a consultant?

15   A.  Yes, I do.

16   Q.  And what role do you have in that?

17   A.  So, what I'm doing now would be in that category.  As a

18   consultant in this case, the FTC being my client.  Most of

19   the work that I do is antitrust related, not all of it.

20   Basically, whether it's for private parties or the

21   government, I do economic analysis; take mergers, where I

22   would be evaluating the likely effects of a merger and

23   either advising private clients or advising the government

24   as needed.  And if my views are aligned well enough with my

25   client, then I can testify.  I do testify.

1          MS. CERILLI:  Your Honor, at this point I would

2     like to tender Professor Shapiro as an expert in economics.

3          THE COURT:  All right.  Any voir dire, counsel?

4          MS. SULLIVAN:  No.  No objection.

5          THE COURT:  All right.  I'll let the witness

6     testify as an expert.

7          MS. CERILLI:  Thank you.

8     BY MS. CERILLI:

9     Q.  Professor Shapiro, I would like to turn to your analysis

10    of the proposed merger.  But before we talk about the

11    specifics of this merger, I think it would be helpful if you

12    could orient us to what an antitrust assessment of mergers

13    is all about.

14         So just start -- what is the purpose of an

15    antitrust assessment of a merger?

16    A.  Well, as the economist, I'll talk about antitrust

17    economists.  And I've already said it's really the applied

18    part of my field, industrial organization.  And it's

19    invariably working side by side with attorneys, since this

20    is an area of the law.

21         So we're trying to bring economics to bear to

22    answer the questions that government agencies or the Court

23    ultimately is going to be interested in, which is to predict

24    the likely effects of a merger.  In particular, will a

25    proposed merger significantly diminish competition?

1    Ultimately then that comes to a question:  Will the

2    customers, who are the customers of the merging firms, be

3    harmed because they will have fewer choices, less competition?

4         THE COURT:  Is that a relevant consideration, the

5    customers of the merging firms, or not --

6         THE WITNESS:  Absolutely.  The customers -- well --

7         THE COURT:  -- in a case like this?

8         THE WITNESS:  So in a case like this, take --

9    Mr. O'Neill spoke of AEP, they're a customer of Office

10   Depot, if I remember right.  So absolutely, the focus is on

11   the customers and their welfare, if you will.  Now, I should

12   say not just the customers of the merging firms, all the

13   customers in the relevant market.

14        THE COURT:  So individuals, John Q. Citizen?

15        THE WITNESS:  Well, here we have a market where

16   the customers are large businesses.

17        THE COURT:  Right.

18        THE WITNESS:  So, the direct -- let's call them

19   the direct customers, AEP, Best Buy, some of the companies

20   you've heard from.

21        THE COURT:  Right.  This is business, but I'm

22   concerned about the individuals also.  Is that part of what

23   the Court has to determine, the impact on those individual

24   purchases, who go in to -- well, who pick up the phone and

25   ask for the delivery of pens and office supplies and things

1     like that?

2                THE WITNESS:  Well -- so, if I, at home -- I have

3     a home office and I order stuff from Amazon, for example.  I

4     am not a customer in this market because I'm not a big

5     business.  So, we're not directly looking at, you know,

6     Shapiro Economics as a customer.

7                THE COURT:  Won't you be impacted, though, by an

8     increase in fees and prices?

9                THE WITNESS:  No, I don't think so.  No, because if --

10               THE COURT:  I say "you," you the individual.

11               THE WITNESS:  That's what I thought you meant.

12    So, no.  Let's take a small business customer or a retail

13    customer or a consumer.  If the merger has the effects that

14    the FTC alleges here, and let's say AEP has to pay more for

15    their office supplies, okay, 5 or 10 percent more, let's

16    say, that's not going to affect what a small business is

17    paying, it's not going to affect what I pay if I go to

18    Amazon.com or to Staples online or retail.  It's a different

19    set of prices.  We're already paying more -- now, me as a

20    consumer, I'm paying a lot more than AEP is paying.

21               THE COURT:  Because you don't get a discount?

22               THE WITNESS:  I don't get those discounts.  So,

23    no, it's really -- the prices are detached, if you will.

24    It's not the same prices.

25               THE COURT:  What's the relevant timeframe for the

1    prediction, the impact on the B2B customer?  It's not

2    immediate, is it, the day after?  Or is it?

3              THE WITNESS:  Well -- so, first off -- in general

4    in mergers -- it depends a lot on the case, okay.  I mean,

5    if the government is procuring jets, it might be they're not

6    going to have another procurement for eight years and we got

7    to look out eight years.  But in this case, I guess, it's

8    not like there's a certain timeframe, we close the window.

9              I think -- the way I would put it is when the deal

10   closes, if the deal goes through, okay, the deal closes,

11   some customers already have contracts, they're going to be

12   protected for a while, maybe a year because they got fixed

13   prices, okay?  Other people, though, will be coming up every

14   time -- every year -- every month there's some of these big

15   customers who are going to be in RFP process who are going

16   to be bidding.  They're going to -- they could be hurt, and

17   probably will be hurt right away.  Okay?

18             So there's going to be immediate impact.  Okay.

19   And then if Staples is right, over time they'll gain some

20   efficiencies and maybe some benefits will come to the

21   customers.  But I just view it as a motion picture, if you

22   will, what's going to happen in the first month or year and

23   then later.

24             I'm pretty confident that there will be some harm

25   right away, Your Honor.  And we're going to talk a lot about

1    entry; you know, will Amazon Business be coming in, can W.B.

2    Mason expand?  Those sort of questions, those are not going

3    to happen overnight.  So if those are going to be curative

4    to this merger, it would take some time.

5              I tend to -- what I put in my report is I tend to

6    look out one, two, three years.  I don't think I can see

7    out -- I can't claim to make much of a prediction beyond

8    that.  And so that's the timeframe I'll be talking about.

9              THE COURT:  So reasonable foreseeable period of

10   time would be that one- to three-year window?

11             THE WITNESS:  Yeah.  Yes.  Right.  And the fact

12   is, if the other firms will come in and, you know, fix the

13   problem within a year, there still might be some harm for

14   awhile, but that's usually thought of as probably fast

15   enough.  But if it's going to take two, three years and it's

16   iffy, then not so much.  And we're going to come to that.

17             THE COURT:  Sorry.  Go ahead.

18             MS. CERILLI:  No problem.

19   BY MS. CERILLI:

20   Q.  Sir, there's been references to harm to competition and

21   harm to consumers.  Can you just summarize, virtually, what

22   does it mean for a merger to harm competition?

23   A.  It means that the customers have significantly fewer

24   choices and, therefore, will end up paying a higher price,

25   or perhaps ending up with a lower quality.  But we'll just

1    talk about price for simplicity; end up paying a higher

2    price because they have less leverage, fewer choices

3    available to them due to two important suppliers merging.

4    Q.   Okay.  And how do you, as an economist, start evaluating

5    the effects of a merger between competitors?

6    A.   So what I always want to know first, whenever, you know,

7    I get brought into one of these, is where are the companies

8    competing?  Are they competing at all?  You know, in some

9    cases it's not even -- they're not competitors, it's the

10   conglomerate or something.

11          So are they competing for what products, for what

12   customers.  So that's the first -- and we'll call those --

13   we usually call those the overlaps.  You know, where are

14   they overlapping in terms of trying to serve the same

15   customers for the same products.  And that's the first

16   question, because it's there where we're most likely to be

17   worried, because it's those customers and those products

18   where there will be -- customers will lose choice or

19   leverage.  So that's the first question.

20   Q.   Okay.  Then what else do you evaluate?

21   A.   Well, then you're going to go from there and talk about

22   what are the other choices that the customers have.  Okay?

23   Because there are, a lot of times, two firms, they compete,

24   but they're two of many firms and it's not going to be a

25   problem.  So you really want to know where they overlap and

 1    then who are the -- what are other competitors or choices

 2    the customers have.

 3            So you do have to understand the customer's needs

 4    are first and foremost.  There's a lot of the customer focus

 5    in this analysis.

 6    Q.  Is there a particular framework that economists use to

 7    evaluate these issues?

 8    A.  Yes.  There's a well established, even called standard

 9    framework that's in the merger guidelines that, you know,

10    that I and many other economists like me have used and

11    follow.  We're seeing it on the screen now here.  So there's

12    five steps and, yes, there's a standard framework.

13    Q.  Can you explain the components of that framework?

14    A.  Okay.  Right.  So, you see the five -- six, okay.  We

15    have the divestiture.  I wasn't thinking about that one.

16            So, I should say, this framework is not something

17    the economists just dreamed up, it's designed to help the

18    lawyers and the courts.  So we're not blind to the case law,

19    okay?  And the case law puts a lot of weight on relevant

20    markets, so we start there.

21            THE COURT:  That's key, because if the relevant

22    market isn't defined correctly, everything else is skewed,

23    isn't it, the analysis?

24            THE WITNESS:  Yes and no.  I think any lawyer

25    would say yes, but an economist would push back a little

1     bit.  The market shares are probably going to be skewed

2     because we're defining the market -- a lot of what we're

3     doing is to figure out market shares and seeing if they're

4     high, which is the second step.  So if you don't get the

5     relevant marking right, the shares are not going to be --

6     they're going to be misinformed, they're going to be

7     misleading, they're going to be screwed up.

8               Other parts of the analysis, when we talk about

9     the bidding between these two firms, that's not so much

10    driven by the relevant market, it's really more directly

11    looking at how it's going on.  But we are going to start

12    with the relevant market.

13              So the answer is yes when it comes to market

14    shares, not necessarily for other pieces of the analysis.

15    Okay.

16              And the relevant market is, you know, kind of the

17    more formal on the way the courts and the econ -- we have a

18    formal way of doing this.  We'll talk about this.

19              What are the products and customers where we

20    have -- where the merger might alter competitive conditions,

21    and the group of products and customers we need to look at

22    where there might be a problem or there's alleged to be a

23    problem.  Then once you've defined that space, then we can

24    measure market shares.  We've got customers, we've got

25    products, we can do our best with whatever the data is to

 1    measure market shares.

 2            And you're trying to figure out who is a big

 3    player, who is successful, who is not, which is a guide to

 4    what are the customer's options.  And if the two firms sell

 5    the same thing but they're 5 percent and 7 percent, very

 6    unlikely to be a problem, because there are many other

 7    choices that are popular with customers.  So the shares are

 8    very informative and, of course, this reflects what the case

 9    law is going to say, too.

10            Then competitive effects is where we look directly

11    at, well, how do the firms compete and how might that change

12    and how would customers get hurt here?  Is the bidding going

13    to be different?  Are the prices going to be higher?  Is

14    there going to be less innovation?  What's the actual real

15    world implications of the merger, as best we can predict

16    them?  So that's what we mean by competitive effects.

17            And those first three pieces, then we're basically

18    saying let's look at the customers and the firms that are in

19    the market, that we can see them now, the way things are

20    now.  And then if we see a problem there, then we go to the

21    next stage, which is, well, maybe there's a problem if we

22    just took a snapshot.  But it's not going to be a problem if

23    we spin the clock ahead and we consider other firms will

24    enter the market, small guys will grow.  If the customers

25    are unhappy, they'll fill the gap, they'll save the day, if

1    you will.  So we look for entry and expansion, what other

2    options emerge to save the day, in this case for large

3    customers.

4            And then when we get through all that we have, I

5    would say, the primary prediction about what we think the

6    effects are going to be.  But we have to consider

7    efficiencies, because if a merger is -- looks like it's

8    going to hurt customers -- if it's good it generates

9    substantial cost savings, that makes it -- that makes the

10   companies either lower cost or in some way better, they

11   might pass some of that through to the customers.  That

12   could be an offsetting factor.  So we need to consider that.

13   But we have a screen on that, which is we're only really

14   going to want to count cost savings if they're merger

15   specific; that is, if the merger is allowing them to be

16   achieved.  Otherwise they don't get counted.

17           And here we have a possible six, basically.  If

18   when we get through step five we say it's a problem, then

19   very often companies negotiate with the DOJ or the FTC to

20   fix their problem by divesting a line of business, a

21   factory, whatever, and we have a proposal here.  So a small

22   bit of my testimony at the end will talk about the proposed

23   divestiture here.

24   BY MS. CERILLI:

25   Q.  How do you go about investigating a merger using this

1    framework?  What type of information and evidence are you

2    looking to collect?

3    A.  Well, I'm looking for a wide range of things.  You start

4    with customers, for example, and their choices, but it could

5    be -- we could have data, documents, testimony, you know,

6    it's the same range of things that the Court ultimately is

7    to consider.  Of course as an economist we will tend to

8    gravitate towards the data because our comparative

9    advantage, if you will, is to help everybody understand what

10   the date are telling us.

11   Q.  And how do you use this framework in past cases to

12   evaluate mergers?

13   A.  Yes, regularly.  It's the one to use.

14   Q.  In your past cases have you evaluated mergers that you

15   concluded would not raise competitive concerns?

16   A.  Sure.  Of course.  So, let's say at the Justice

17   Department -- I mean, the vast majority of the mergers that

18   are reported and reviewed by the Justice Department they

19   wave through, it's not a problem.

20        And when I work for private companies, there's

21   certainly, you know -- regularly I advise them that their

22   deal looks good and I support it.  This year -- last year, I

23   guess it was last year now, I worked for Intel, they

24   acquired Altera in a large merger in the semiconductor

25   space.  There were some overlaps.  I thought the deal was

1    fine and the FTC cleared it pretty quickly.  So did the

2    European Commission, actually.

3    Q.  In your past experiences, have you also evaluated

4    mergers that you have concluded would raise competitive

5    concerns?

6    A.  Yes, certainly.  I've testified over the years, I don't

7    know, maybe a handful of times in merger cases before this

8    and I think it's pretty much a split between the plaintiffs

9    and defendants, in terms of sworn testimony.

10           In the -- as an example, I mean, the DOJ, when I

11   was there, challenged the merger between H&R Block and

12   TaxAct.  I have a feeling you're going to run into this when

13   you look at the cases, Your Honor.  That case started when I

14   was at DOJ and then a complaint was filed after I had

15   already left and gone over to the White House.  But that was

16   one where there was a problem, and ultimately the Court

17   agreed with the DOJ.

18   Q.  Thank you for that background.

19           Now let's turn to your analysis of this merger.

20   Professor Shapiro, what was your assignment with regard to

21   evaluating this merger?

22   A.  Well, FTC asked me to do just the sort of thing I've

23   described, which is look at the merger and evaluate its

24   likely competitive effects.  The nature of that shifted over

25   time as I learned more and as the FTC learned more, but it

1    was pretty broad at the beginning in that respect.

2    Q.  And just to start us off, can you give us a very short

3    summary of your opinion concerning the likely effects of

4    this merger?

5    A.  Well, I don't think you'll be shocked to hear, Your

6    Honor, that I'm concerned about it.  So I think that I see

7    Staples and Office Depot as very much head-to-head, strong

8    competitors.  We're talking about the sale and distribution

9    of consumable office supplies to large customers.  And I

10   think that the merger will harm competition in that space,

11   and that's what I'm here to testify about.

12   Q.  And did you use the framework that you just outlined to

13   arrive at that conclusion?

14   A.  I sure did, yes.

15   Q.  Obviously, we're going to spend a lot of time walking

16   through the formal steps that you did defining the market,

17   calculating market shares.  But before we do that, I think

18   it would be helpful to understand your general thought

19   process in analyzing this merger and why you conclude it's

20   likely to result in harm, and why that matters to you as an

21   antitrust economist.

22          So just to get us oriented, after you were

23   retained by the FTC, what led you to focus on the sale and

24   distribution of consumable office supplies to large customers?

25   A.  So, of course I knew even right at the beginning that

1    Staples and Office Depot were large retailers.  And I'd

2    actually been aware of the merger challenge, whatever number

3    of years ago it was.  Was it '97?  '98?

4          So naturally I thought there could be some issues

5    in retail space.  I hadn't really thought as much about

6    their sales to large customers, but once we started to look

7    into it, I learned that they have very substantial sales

8    through the B2B channel, each of them.  And then the focus

9    shifted towards larger customers, once I learned more about

10   how they procure office supplies and their choices.  So it's

11   a process of learning.

12         And I think -- but again, the question, as I said

13   in general, is where did the companies compete, for what

14   customers, and are there spaces there where they really

15   dominate together and there are fewer choices?  So that

16   logical process led me eventually, working with the FTC and

17   my own staff at Charles Rivers Associates, to these large

18   customers as a group of concern.

19         Then once you get to that point, I'm like, okay,

20   what do we know about the competition for the large

21   customers?  And some of the most striking data there

22   involved the bidding between the two companies, or some of

23   the data that came across that I saw and I found, you know,

24   very much caught my attention.

25   Q.  And you mentioned retail.  Have you reached a conclusion

1     concerning the effects of the merger in retail?

2     A.  No.  I'm certainly aware that there's -- Amazon, for

3     example, is a big competitor online, it competes against

4     retail.  And there's other retailers.  So I didn't do the

5     same in-depth investigation or analysis in retail because

6     the analysis shifted towards large B2B customers, and that's

7     the scope of the complaint that the FTC filed.

8     Q.  And you mentioned noticing the presence of the parties

9     in the business space.  So what did you do to investigate

10    the sales and distribution in the business channel?

11    A.  Well, just so you understand the process, Your Honor.  I

12    work with several people.  Charles Rivers Associates is the

13    consulting firm I work with, and I have several people

14    there, a number of people there who help me.  And they work

15    and I work with the FTC staff, the lawyers and the

16    economists.  So there's a month-long period of investigation.

17            And so during that, of course, I told my staff and

18    the FTC, what -- if we're going to look at large -- sales to

19    large customers, what data do we have about the bidding, and

20    about Staples and Office Depot trying to win that business?

21    This is a standard question I would ask in many cases for

22    bidding data.  And so fairly early on we got some very

23    relevant data from Office Depot on that.  And then somewhat

24    later, data from Staples.

25    Q.  We're obviously going to walk through some of that data

1    later on, but can you give us a preview of what you saw in

2    the data?

3    A.   Absolutely.  We have a slide on that, don't we?  So

4    that's where we are going next.  So we're going to have

5    quite a few charts for the next number of hours, Your Honor.

6    So here's the first one.

7         So first off, what are these data?  This is Office

8    Depot win/loss data.  So Office Depot keeps track of, when

9    they're bidding for large customers, who they're bidding

10   against, who wins, whether they win.  That's what we mean by

11   win/loss data.  In this case, we're talking about large

12   customers.  And they have a category of enterprise customers

13   and major customers and those are included here.  You can

14   see the period is 2013 to 2015.  So this is a couple years

15   leading up to when they would have provided this data to the

16   FTC, which was around last summer, I think.

17        And we have 1,253 total opportunities or bidding

18   circumstances.  And now you see, of course, we've

19   highlighted Staples, so they're appearing -- this is just

20   appearances, we haven't yet said who's winning, just who

21   they're bidding against, as best they know.  They don't

22   always have perfect information.

23        So, they are -- Office Depot is reporting in their

24   data that Staples is appearing 833 times, so that's around

25   two-thirds of the time.  And then W.B. Mason, of course

1    you've heard from them.  It's not surprising, from what we

2    know now, they're next, because they're sort of the largest

3    regional distributor.  So they're appearing, but substantially

4    fewer appearances.

5           And then we've got -- let's call it a long tail of

6    others who appear a smaller number of times.  The third one

7    here Veritiv, they're a paper merchant.  So we got paper in

8    here as part of the consumable office supplies grouping.

9    This jumps out to me as, wow, okay, Staples is pretty

10   dominant in terms of who Office Depot is seeing when they're

11   bidding, in their bidding opportunities.

12   Q.  Did you also have data on who won in these bidding

13   opportunities?

14   A.  Yes.  So the same data said -- isn't that our next

15   slide?  Let's go to the next slide.

16          Same data, it's just we're reporting wins now

17   instead of appearances.  So before we had, you know, Staples

18   832 appearances, here they've got 240 wins.  By the way,

19   there's 1,200 here.  Where are all the other wins?  A lot of

20   the wins are Office Depot winning.  Okay.  They're going to

21   be reporting that.  So, we're again seeing Staples really

22   stands out as with far more wins than anybody else.  The

23   same pattern in the wins as in the appearances.

24   Q.  And what is the significance of seeing such prominence

25   for Staples in win/loss data like this?

1    A.  Well, this is telling me that I'm getting an early

2    sense, when I first see this at least, of okay, when Office

3    Depot is out there bidding for large customers, by far and

4    away their largest competitor, as measured by these -- by

5    these metrics, is Staples.  There are some other players,

6    and we'll need to look at them more, but this tells me that

7    if the two merge, that's going to be a pretty big event in

8    the world of these customers who have been having Staples

9    and Office Depot bid against each other so far.

10   Q.  And did you also have bidding data from Staples' files?

11   A.  Yes, we did.  That came in a bit later, as I said.  So

12   here we are, yes.  This is a smaller data set, Your Honor.

13   There's 393 bids.

14          THE COURT:  You know, it might be helpful for the

15   record to refer to the page number of the slide that -- I

16   can follow you, but the record is going to be silent.

17   A.  Absolutely.  So this is slide 6.  So the exact same

18   analysis, just a different data set.  Staples compiled this

19   in response to the FTC's request for information.  We have

20   the same pattern, it's very similar.

21          So again, here Office Depot appearing in somewhat

22   more than half of the appearances, but far more than anybody

23   else.

24   BY MS. CERELLI:

25   Q.  And did you, likewise, have data on who won in some of

1    these opportunities?

2    A.  Yeah, so that would be the next slide, slide 7, the same

3    thing, we're looking at wins here.  And again, I should say,

4    this is large customers, this includes the Fortune 100

5    customers in this case and consumable office supplies.  So

6    we're in the same space that the FTC and I was interested in

7    asking about, and this is what we got back from Staples and

8    Office Depot, the exact same pattern we're seeing in really

9    all four of these metrics.

10   Q.  Again, what is the significance of seeing Office Depot

11   have such prominence as a bidder and winner in Staples's

12   bidding data?

13   A.  Well, again, we're always thinking about this from the

14   perspective of the customer.  We can make it specific to

15   AEP, you've heard about, or McDonald's, some of the

16   witnesses from last week.  From AEP's perspective, Mr.

17   O'Neill, he's got -- he may very well be one of the data

18   points here.  I'm not actually sure.  Okay?  So let's turn

19   it from data into business reality.

20          He wants to have a good deal and he wants to

21   procure his office supplies.  He sees Office Depot and

22   Staples as the two leading choices for him.  He benefits

23   from having them bid against each other.  And we'll talk

24   about how, in various ways.

25          The fact that they're showing up so heavily here,

1    the two companies, means he's not alone in the line on the

2    two of them.  A lot of people, a lot of other big customers

3    are going to be relying on competition between these two

4    companies in order to get leverage as a buyer.  They have

5    leverage.  They are big buyers, they're not babies, okay.

6    But the way they get leverage is by threatening to go to the

7    other guy.  So this tells me that from the customers -- I

8    get pretty worried, actually, this sort of data, that the

9    customers will be harmed because of the dominance of the two

10   firms in the bidding data.

11   Q.  And can you give us an example of how a customer could

12   be harmed?

13   A.  Well, let's talk about AEP then.  Okay.  So -- I see --

14   so now -- okay.  Without referring to the numbers just yet.

15   So now we're on to slide 8.

16          So, Mr. O'Neill, I think, described how he

17   received substantial discounts.  We have some of the rows

18   here showing the nature of the discounts he received.  And

19   why did Office Depot offer those, you know, substantial

20   discounts to him?  Well, the primary thing was they were

21   under pressure from Staples.  And he knows that he can't

22   play that game anymore after the merger.  So, that's a

23   problem.  And he said it's a problem.  Okay.

24          Now, he's only one example, that's why I like to

25   look at data.  Okay.  And there are other customers who will

1    say something different, it's not going to be unanimous.

2           So -- but this gives us -- I think illustrates in

3    the real world what those bidding data translate to.  So he

4    is getting, you know, increased savings from a rebate.

5    Okay.  He's getting lower prices that are committed to him

6    by Office Depot in this RFQ process, as described here.  And

7    there's some other savings.  And those, you know, you can

8    see at the lower right-hand corner of the numbers, Your

9    Honor, it's a substantial overall, both in percentage and

10   absolute dollar amounts for him.

11          So -- and the language here talks about -- that's

12   not redacted.  Okay.  Basically, he's got counterproposals

13   with Staples and Office Depot.  It's the normal language we

14   would see many times of when a customer is using their

15   leverage of threatening to go to one guy or the other.

16          So that's a sort of thing that I'm worried that he

17   won't be able to do that.  And he and others like him, of

18   which there could be many.

19   Q.  And is Mr. O'Neill and AEP an unusual example?

20   A.  Well, what I'm saying is we don't know until we look

21   more systematically at the data, and we have different

22   individual customers.  The -- so, the data so far, and we're

23   going to look at more, suggests he's not unusual.  There are

24   a lot of customers that are going to be similarly situated

25   and potentially vulnerable to harm.

1          But then the question is, well, okay, what

2     customer group really is vulnerable here?  You know, we

3     looked at these bids, but who -- who -- what are their

4     attributes, what do they look like as a set of customers?

5     And so we need to -- that's the next step then?  Sort of

6     what are the customer demand -- like I said, the customer

7     needs.  And you learn, and you already know this, Your

8     Honor, that there are a lot of large customers who have a

9     similar procurement process and structure, they have similar

10    needs.  And there are a number of different ways we start to

11    learn that, through the company documents and through

12    information we're getting from customers, as well.

13    Q.  And so you mentioned some requirements of large

14    customers.  Is there evidence that suggests that large

15    customers have distinct needs?

16    A.  Yes.  Absolutely.  For one thing, the parties themselves

17    recognize, basically, a hierarchy of customer types in their

18    own documents.  And that's a good sense of what these

19    categories look like.  And I think we have a slide on that.

20    Yes.  So this is now slide 9.  And I don't know if you've

21    seen this yet, Your Honor.  I don't think so.  But this is

22    the private sector, so commercial customers.  And if you go

23    from -- on the left-hand side you could see the customer

24    size going from pretty small, under 24,000, all the way up

25    to more than a million.  Okay.  And they're talking about

1     their total purchases.  So they're not talking specifically

2     about consumable office supplies, we're going to narrow it

3     down to there later.

4              And we've highlighted here for you the larger

5     groups that is the focus -- that are included in the FTC

6     complaint and that are the focus of my analysis.

7              So let's look at the 500,000, to a million

8     purchases.  So they call them a major customer.  And then

9     above a million we call them an enterprise customer.

10             So these are the things that are pretty common in

11    those categories.  And Office Depot recognizes that and so

12    does Staples.  Formal RFPs, centralized purchasing, approval

13    processes, awareness and desire, up-front money, conversion

14    incentives and rebates.

15             So that's some of the forms in which these

16    customers basically are expecting and used to getting some

17    very good deals, because they're big, even in that range

18    500,000 to a million.

19             Then we go above that, we add on sophisticated

20    sourcing.  Again, formal RFPs, sensitive to cost of change.

21    That is, if there's some switching costs, they don't want to

22    -- it's not so easy for them to switch suppliers.

23    Expectation of conversation, incentives and rebates again.

24             So you don't see that in the smaller customer

25    groups, they don't have the same sophisticated needs, they

1    don't tend to run RFPs.  And we'll talk about other ways in

2    which they're different.  Okay.  But this is one of the

3    indications that large customers, you know, are a distinct

4    group and have some needs.

5            We're going to say there's not going to be a sharp

6    boundary between large and medium and small, it's the real

7    world, things are smooth, but there are differences as you

8    move up this hierarchy.

9    Q.  Okay.  And is there other documentary evidence you've

10   seen that large customers have distinct needs?

11   A.  Well, I like to look at -- not only look at the merging

12   firms here the suppliers say, but what the customers

13   themselves say.  Okay.  And so I asked pretty early on about

14   that.  We have -- that's the next slide.

15           So, we've -- so these RFPs is where the customer

16   says it's a request for proposal.  So the customers says

17   here's all the stuff I want.  What do you got?  Well,

18   that's, of course, the best place for the customer to

19   describe what's valuable to them, what their requirements

20   are.  Okay.  So here we've shown -- we've taken this -- I

21   guess we've redacted the name of the customer for open

22   court.  But this is Staples' response to an RFP by a large

23   customer, and you can see their name there, Your Honor.

24           And, you know, Staples is coming back with all

25   the, you know, why they're qualified and all the good things

1    they can do.  So we see here itemized prices on core

2    products.  So this is the set of products that the customer

3    will negotiate that are high volume products typically,

4    important to them, where they want really the most deeply

5    discounted, best prices as a commitment from the vendor.

6    And Staples is stepping up to do that.  And then there's a

7    volume rebate here.

8            So these are some of the price elements.  That's

9    the title of this slide.  Okay.  Slide 10.  So that's one

10   thing you see in this RFP and others.

11   Q.  Okay.  And are there attributes that stood out to you in

12   these customer RFPs?

13   A.  So, we have the next slide, 11.  So, again the same RFP

14   and response that we're looking at cost management.  So I

15   think you've heard about leakage, and we're going to talk

16   about leakage and off-contract spend.  So this is not at all

17   uncommon for the large customer to say I want my folks to

18   buy on the contract, you're going to give me a really good

19   price.  How are you going to help me get compliance with

20   that?  And so they're asking for, conduct a communications

21   campaign and so forth, support compliance.  So that's the

22   first grouping here.

23           We have order size.  It's clearly the case, and

24   I'm sure you'll hear this from Staples and Office Depot,

25   that, you know, it's more efficient if they can increase the

1    average order size, it's just more efficient to deliver

2    rather than small little bits.  So they want to work with

3    the customer to do that.  And that's more efficient, they're

4    good at that.  That's what the customer is asking for.

5         And then there's monitoring here.  They talk about

6    to make sure that the -- ensuring that the pricing and

7    discount structures agreed to are met.  They have a

8    consultant here, Dryden.  You know, frankly, when I do this

9    I would never have thought -- maybe I should have, but I

10   would never have thought there were specialized consultants

11   who charge six figures to help companies procure their

12   office supplies, but that's what we've got here.  Okay.

13        So, you know, it's a testament to the efficiency

14   in American business.  This might seem simple, just get the

15   pens, put them on the truck, but that's not the reality when

16   we look into it.

17   Q.  Okay.  And do you have one more set of attributes you

18   would like to talk about in relation to this RFP?

19   A.  Yes.  So this is service attributes and capabilities.

20   So this customer is asking about distribution services, who

21   is going to be servicing them.  The response here is they're

22   company owned.  They are always concerned -- often concerned

23   about accuracy and efficiency of the orders.

24        And this is something that's going to come up

25   later, Your Honor, which is reliance on wholesaler products.

1    So, Staples is touting the fact that they have -- their

2    product inventories represent more than 95 percent of the

3    items sold.  So they will talk about how they have lower

4    costs because they purchase directly from manufacturers and

5    not through wholesalers.  So the wholesaler dependence is

6    there.

7              E-procurement.  You know, as you can imagine, as

8    you probably already know, integrating with the procurement

9    systems and the reporting, that's a requirement basically

10   for large customers, not nearly the same for small

11   customers.  So that's here, too.

12   Q.  Okay.  And what is the significance of seeing large

13   customers requesting information concerning all of these

14   attributes?

15   A.  So, the reason we're walking through all of this is I'm

16   never going to be an expert on procurement, I don't want to

17   be.  But, I'm learning -- we're learning that the large

18   customers have different needs and requirements.  And this

19   is -- it's going to line up with what we're going to hear

20   later about -- such as Mr. O'Neill again, saying I really

21   can't go to the smaller guys, they don't meet my needs, the

22   smaller distributors.  Okay.  Yeah, they sell stuff, they're

23   fine.  And look, I'm not dissing them here, it's just these

24   customers with these needs, we're going to see in the

25   bidding data and other indications, that they're a

1    specialized group, and that in the end they're going to be a

2    relevant market -- the customers in a relevant market.  And

3    this is part of the understanding how their needs are

4    different, that is going to dovetail with, ultimately, the

5    relevant market, when we get to that point, and the lack of

6    choices some of these -- many of these customers will have

7    after the merger.

8    Q.  You noted the prominence that Staples and Office Depot

9    have in the bid data for large customers.  Why does that

10   prominence raise a concern for you?

11   A.  Well, we come back to loss of choice.  You know --

12   we'll -- all this indicates that, you know, this customer,

13   again, I won't say their name, they -- it sure doesn't look

14   like a small distributor like Guernsey is going to be able

15   to do it, okay, for all sorts of reasons; geographic

16   distribution, these other -- geographic scope, I mean, and

17   all these other elements.  So, we're going to need to line

18   up all these capabilities with who can meet these needs

19   besides Staples and Office Depot.

20          And, again, it's customer choices and are they --

21   we know they're losing a choice if the merger goes through,

22   the question is do they still have many?  And this is

23   pointing in the direction of a lot of these, not so much.

24   Q.  What evidence have you seen in the record concerning the

25   stature of the remaining firms?

1    A.  Well, there's a lot of stuff, and we're going to go

2    through it -- we're going to go through it soon enough.  We

3    have all sorts of evidence.  Well, first off, we saw their

4    general -- generally not appearing much in the bid data.

5    We're going to look at market shares.  We're going to look

6    at testimony from the suppliers themselves, both what you've

7    heard and then there's additional declarations, which I fear

8    I'm getting ahead of myself a little bit, if we're going to

9    go back to the whole framework.

10          But really, it's all pointing to the fact that

11   there are many small distributors, local mostly,

12   distributors of office supplies, but they're not in this

13   game.  Okay.  Mr. Morrison, P.D. Morrison, he was very clear

14   of the distinction between his traditional business, you

15   know, in -- I think it was Houston and Austin on the one

16   hand, and his Tier 1 business where he's got to partner with

17   Office Depot to make that go.

18          So it's really the lack of choices for the large

19   customers that this is all pointing to, and understanding

20   why they have few choices and are losing a big one here if

21   the merger goes through.

22   Q.  Okay.  And you've spoken a lot about the attributes of

23   large customers.  Have you reached a different conclusion

24   about whether there will be harm to small- and medium-size

25   businesses?

1    A.  It's like retail, I haven't looked at that in nearly as

2    much depth.  I think, you know, very small customers --

3    small businesses, I don't think so, because they don't

4    follow all these steps and all this process.

5           Medium-size businesses, you know, I'm not so sure.

6    We took a cutoff, which we'll talk about, $500,000 in

7    purchases, basically corresponding to these enterprise

8    customers.  And I'm quite confident of harm in that group.

9    As you go down the hierarchy of the customer sizes they have

10   more choices.  And I'm not alleging harm.  There's a range

11   where I just don't know.  And then below that I think not in

12   terms of harm.

13   Q.  Okay.  So at the end of the day you're focusing on large

14   customers.  And some would say that they're quite powerful

15   and successful companies.  So even if they face a price

16   increase, why does it matter, really?  I mean, they're not

17   going to be going out of business, right?

18   A.  Well, that is true.  And that's just not the right

19   question from my point of view as an antitrust economist.

20          You know, there's a merger the DOJ is reviewing

21   now, been reviewing for a whole year, but you may have --

22   probably read the newspapers about this, between Halliburton

23   and Baker Hughes, two huge companies in oil services.  Their

24   customers are the large oil companies.  Okay.  I'm not

25   involved in this merger in any way, but I'm pretty sure the

1    concern is the higher prices that maybe Chevron has to pay

2    for oil drilling services.  Okay.  Chevron is not going to

3    go out of business.  Okay.  But if they have to pay more,

4    that's a loss of competition, that's a problem from

5    antitrust.

6           One of the things I like about antitrust is it

7    covers the whole economy, all the markets.  So it's really --

8    whoever the customers are, merger analysis, we're seeing if

9    they're going to be harmed, whether they're big or little,

10   okay, whether it's upstream, you know, oil drilling services

11   or whether it's, you know, cable television and it's a

12   consumer.

13          So here -- look, I'm not saying -- office supplies

14   in some sense it seems kind of mundane.  Okay.  I mean, I

15   don't want to -- I'm not trying to take anything away from

16   what Staples and Office Depot do, but on the other hand, you

17   know, if you -- we've got that they're selling about -- the

18   two companies are selling about $2 billion a year of

19   consumable office supplies to large businesses.  If they

20   charge more to those businesses, 10 percent, that's a couple

21   hundred million dollars a year.  That's real money and

22   that's a concern.  No, I don't think Bank of America is

23   going to go out of business if they pay more for their pens.

24   That's not the right question.

25   Q.  So if these large customers do face a price increase,

1    will it have any impact on regular consumers?

2    A.  Well, not directly, but there's always going to be some

3    trickle down or pass through.  So -- look, take AEP again,

4    Mr. O'Neill, he talked about -- his job is to control their

5    costs.  This is one of the things he does, office supplies

6    along with other things they're procuring.  If they have to

7    pay more for office supplies, it goes into their overall

8    costs.  As an economist we normally -- I guess, I would say

9    we assume there's some pass-through when a company incurs

10   higher costs, to some extent they're going to pass it

11   through to their customers.  We don't -- without detailed

12   analysis, we don't know much.  Okay.

13          So in his case they've got ratepayers, maybe

14   they're regulated, I'm not quite sure.  The ratepayers, if

15   their costs go up there will be some pass-through, I would

16   expect, to the ratepayers, you know, who are going to be the

17   final consumers.

18          MS. SULLIVAN:  I'm going to object and move to

19   strike.  This is not in his report.  He's acknowledged he

20   hasn't done analysis.  And Your Honor asked FTC counsel,

21   point blank, in open air, are you alleging any pass-through

22   to consumers and they said no.  So I'll move to strike that.

23          THE COURT:  Counsel, what about that?

24          MS. CERILLI:  This is well within the scope of his

25   report.  I mean, I think he's just talking about general

1       economic principles.

2                 THE COURT:  That's not the government's theory,

3       though, is it?

4                 MS. CERILLI:  I mean, we believe there's,

5       obviously, harm to competition for large customers.  I think

6       it's acknowledged, even in the framework, the merger

7       guidelines that there is generally assumed to be harm to

8       any -- harm to direct customers.

9                 THE COURT:  What do you mean direct customers?

10                MS. CERILLI:  The large customers.

11                THE COURT:  Well, that's the government's theory,

12      that it's business to business harm, but no other harm.  The

13      government was very clear that it was not making a consumer

14      harm case here.

15                MS. CERILLI:  Absolutely.

16                THE COURT:  The average consumer, that's not the

17      government's theory?

18                MS. CERILLI:  No, and we're not seeking to

19      supplement our complaint.  What we're trying to explain is

20      why harm to competition -- harm to competition for large

21      customers, why it matters.

22                I mean, I think that there's been some question

23      about, you know, if a large customer is harmed, why does

24      that matter under the antitrust laws?  And I think he's just

25      seeking to explain that.

```
1              THE COURT:  All right.  And again, this is not a
2       jury, so if I hear it and ultimately determine not to
3       consider it because it's not relevant, then I'll say so.
4              MS. CERILLI:  Okay.
5              THE WITNESS:  Could I say a little more or --
6              THE COURT:  Go ahead.
7              THE WITNESS:  So, I'm not talking about whether
8       Shapiro Economics would pay more for their office supplies,
9       that sort of harm, which is outside the scope of what the
10      customer --
11             THE COURT:  Right.
12             THE WITNESS:  But all I'm saying is when the large
13      customers pay more, it raises their costs.  We can't
14      possibly track through is Bank of America going to charge
15      more for their loans, because they pay $1 million for office
16      supplies, or is AEP going to charge more for electricity.
17      That's a fool's game to go after that.
18             But there's a general principle, which we would
19      expect normally some of these costs to be passed through,
20      it's hard to know what shares.  All I'm saying, and I really
21      don't want to go beyond this, is you shouldn't think about,
22      oh, this is just a business between Bank of America and
23      Staples, it has nothing to do with anybody else.  All these
24      customers, if their costs go up, we would expect their
25      customers, whether it's people with loans or paying
```

1    electricity, to pay somewhat more.  We're not going into

2    that.  I can't analyze that, it would be crazy to try.  But,

3    the effects are not cabined in.

4         THE COURT:  You raise a good point, which is the

5    point I raised early on.  Well, what is the impact on

6    Professor Shapiro or Sullivan who calls for pens, whatever?

7    Someone is paying that freight.  The corporations aren't

8    eating it.

9         THE WITNESS:  So, again, I don't -- I'm not

10   talking about -- I'll have it be me.  I don't know how you

11   get your pens, I know how I get my pens.  I'm not talking

12   about me paying more for pens when I, let's say, go to

13   Amazon.com.  I'm talking about a ratepayer in Tennessee

14   paying more for electricity because AEP has higher costs.

15   It's a different story, but it's still a regular consumer.

16        But we can't penetrate down to that, that would

17   be -- all these customers, you know, we got Best Buy in one

18   area and Bank of America and another AEP.  It would be crazy

19   to try and look at that.

20        THE COURT:  Suffice it to say if the prices go up,

21   costs obviously go up.  But you're not speculating on who

22   those costs are passed on to?

23        THE WITNESS:  Right.  All I'm saying is we would

24   expect some pass-through to the next level down.

25        THE COURT:  What do you mean the next level down?

1          THE WITNESS:  The ratepayers.  Let's talk about

2     AEP.  AEP pays more for their office supplies.

3          THE COURT:  Let's use this case.  Staples merger

4     goes through, prices go up.

5          THE WITNESS:  To AEP.  That's what I'm trying to

6     do.  So AEP is one of big customers; again, Mr. O'Neill.  So

7     AEP, suppose they pay an extra half a million dollars a year

8     for office supplies.  Look, it's a tiny share of their

9     overall cost structure, and I believe counsel for Staples

10     made that clear in cross-examining Mr. O'Neill.  But it's

11     still a half a million dollars.

12          So the question is, is that just, oh, the AEP

13     shareholders, they're out a half million and Staples gets

14     the money?  You might think about it that way, it's just a

15     deal between those two big entities.  And I'm saying you

16     shouldn't really think about it just that way.  Okay.  The

17     way I would think about AEP is now we have a higher cost

18     structure, okay, half a million dollars.  Normally you would

19     expect them to say, Well, we're going to have to raise our

20     prices a little bit to our customers, which are electricity

21     ratepayers.

22          Now, look, it's going to be so tiny when you

23     measure it across all the electricity, I can't measure that.

24     I'm not saying anything about it.  I'm saying you should not

25     think, Your Honor, that the harm just stops at the AEP

```
 1    level.  Some of it will trickle through, but we can't
 2    measure that.
 3              THE COURT:  And it's speculative.
 4              THE WITNESS:  It's spec --
 5              THE COURT:  It's there, but it's speculative as to
 6    who the harm is passed on to, isn't it?
 7              THE WITNESS:  I would say no.  So, what we don't
 8    know -- and I know I'm not supposed to use the word
 9    "speculative," but I will.  It's speculative how much will
10    be passed through.  Okay?  But every customer -- but we can
11    ask ourselves, if AEP's cost structure goes up, we know who
12    their customers are, they're the ratepayers, I think, if I
13    understand their business.  He talked about the ratepayers.
14    He's trying to keep his costs down so they can keep their
15    rates down.
16              So, what he's telling us, and it makes good sense
17    in economics, if costs go up, they might have to raise their
18    rates a bit.  We don't know how much.  And again, it's going
19    to be small in the overall scheme of things, it's a
20    half million dollars, they're a big company.  But it's still
21    a half million dollars.  And it is going to be maybe $100
22    million when we add up all the customers.
23              So I guess, just to be blunt, I can see that, you
24    know, from the way the trial has played out, is that Staples
25    would like to say these are big customers, if they pay a
```

1    little more money, who cares?  And I don't think Bank of

2    America is warm and fuzzy, okay, I don't.  But it's not just

3    Bank of America, it's their customers, too, the people who

4    are taking out loans or bank accounts.  It's AEP's

5    customers, too.  You have to think about them, too.  And

6    when you do antitrust, you don't just stop with the big

7    customers, you have to think --

8              THE COURT:  The defendants can speak for

9    themselves.  I don't think that's their theory.  I think

10   their theory is that the prices won't go up.

11             THE WITNESS:  Sure, okay.  That's their primary

12   theory, of course.  But they're also, and I don't want to

13   put words in their mouth, I'd probably get myself in

14   trouble, but I think they've also at least insinuated or

15   hinted --

16             THE COURT:  So what.

17             THE WITNESS:  -- so what, who cares?  These are

18   big companies, they're already getting a good deal, all that

19   stuff.  And my view as an analyst economist is that's just

20   incorrect.  I don't look at it.  I think -- fine, you will

21   decide, the Court will decide, but my mode of analysis is I

22   care about any customer, depending on the harm.

23             THE COURT:  I'll float the question, I don't

24   necessarily want an answer now, but at some point I would be

25   interested in your answer to the question:  Is there any

1    evidence, any competent evidence that the defendants can

2    offer that addresses and ameliorates that harm that you

3    perceive, the increase in price?  Is there any evidence that

4    they can offer in this trial that would persuade you that a

5    harm is not as realistic as you've already articulated?  But

6    you don't have to answer that now.  But I'm interested in

7    what they can demonstrate, what they can offer in terms of

8    competent evidence.

9         Yes?

10        MS. SULLIVAN:  Again on the objection, Your Honor.

11   This was never in their complaint.  This was never part of

12   the case.  We would have had an economist address this issue

13   in our case.  This was taken off the table by the FTC and

14   reaffirmed that it was off the table in this case when Your

15   Honor asked counsel pointblank, Are you alleging trickle

16   down effects to consumer?  And they say, No, Your Honor,

17   it's not.  And now their expert's back-dooring that.

18        THE COURT:  That's absolutely true.  I'm going to

19   sustain the objection.  It's absolutely true.

20        MS. SULLIVAN:  Thank you.

21        THE WITNESS:  So I think the two main things that

22   I've given a lot of thought to, and certainly they'll put on

23   their case and make their argument, is, first, are there a

24   lot of efficiencies here that are qualified, let's just say,

25   that those would offset these concerns.  Okay?  And I

1    certainly accept in principle if they're large and meet the

2    other requirements we'll talk about, that's -- okay, and

3    particularly in this case, since they're claiming

4    efficiencies that are across many other types of customers,

5    not just large customers.  So that is a totally -- that's an

6    important question.  Okay.

7              THE COURT:  Okay.

8              THE WITNESS:  The other thing really is entry, you

9    know, whether there really is no harm because Amazon will

10   come in or something.  And that's more of a question --

11             THE COURT:  You have an opinion about that, too?

12             THE WITNESS:  I do.  I do indeed.

13             THE COURT:  We'll get to that.

14             Go ahead, Counsel.

15   BY MS. CERILLI:

16   Q.  Just to close this out.  And even just setting aside the

17   issue of pass-through, you certainly recognize, as you

18   mentioned, that office supplies are just a small fraction of

19   the costs of what it takes to run a large business.  So at

20   the end of the day why does it matter, from a competition

21   perspective, for a large customer to face a price increase

22   on what is a small component of their costs?

23   A.  Well, again, to me, I just look at the magnitude of what

24   we're talking about.  If we've got roughly $2 billion a year

25   sales, and let's say 5 percent price increase, that's a

1    hundred million dollars a year.  Okay?  And whatever we make

2    of trickle through, and I won't get into the whole pass-

3    through stuff, but even if the first cut would be, that's a

4    hundred million dollars that large customers will be paying,

5    I'll say inflated, or elevated, to Staples after the merger

6    because they don't have as much competition.  Okay.

7          Now, okay, it is what it is.  Okay.  I'm not

8    claiming -- I don't think anybody is claiming any of these

9    customers are going to go out of business because of that,

10   but they're going to be overcharged.

11   Q.  Professor Shapiro, thank you for that introduction.

12         Now, let's discuss your analysis under the

13   framework that you outlined at the beginning.  I believe the

14   first step in that framework was defining a relevant market.

15   What is your opinion concerning the relevant market in this

16   case?

17   A.  It's my opinion, the relevant market is the sale and

18   distribution of consumer office supplies to large customers

19   in the United States.

20   Q.  And what do you mean by consumable office supplies?

21   A.  These would be what you might call general office

22   supplies; core office supplies and paper, together.

23   Q.  Can you give us some examples?

24   A.  So pens, binders, Post-it notes.  I think you're

25   familiar with these now.  The standard items that both

1   companies would count as general office supplies or

2   consumable office supplies.

3            THE COURT:  Ink and toner?

4            THE WITNESS:  So, no, I'm not putting that in.

5   We're going to talk about that; I could do it now.  That is

6   not included.

7            THE COURT:  Can you tell me your opinion why it

8   should not be included in that category?

9            THE WITNESS:  I started with it in, and then as I

10  learned that competitive conditions were significantly

11  different for ink and toner --

12           THE COURT:  Can I stop you?  You kept it in at

13  first because you made an assumption it was probably in

14  there, right?

15           THE WITNESS:  Assumption or -- again, it's a

16  process.  I went through a process.  You're going to be

17  following a process, Your Honor, which was, Look -- and

18  defendants are going to love this -- the fact is most of the

19  time when the companies talk about it, when they say

20  consumable office supplies, they often mean really three

21  categories; let's call it office supplies, paper, and ink

22  and toner.  And you see that in their materials, that's a

23  pretty common usage.

24           THE COURT:  It seems fairly logical to being a

25  category.

1              THE WITNESS:  Right.  So that was the natural

2      starting point.  And a lot of the bids that are put out

3      would include these items.  And this is what these companies

4      do, they're very good at it.  It's also a big area of

5      overlap, like I said.  So that's a natural starting point.

6      The reason -- why carve it out, right?

7              So, the -- what I learned was that, I think

8      especially in the last three to five years, these managed

9      print services have come in where ink and toner is often

10     purchased by a large customer along -- from the same company

11     that's providing the printer or the copier, that's servicing

12     them, and maybe some other services.  I'm not exactly sure

13     of the scope.  And so that is a different space.  Okay?

14             And let me put it differently.  The customers have

15     additional choices for ink and toner that are important.

16     And so, like I said, you look at the overlaps and then you

17     look at the choices.  So since there are significantly

18     different choices, ultimately that did not warrant

19     aggregation into the same cluster or group with core and

20     paper.  We're going to talk about this more, but that's the

21     gist of it.

22             THE COURT:  All right.

23     BY MS. CERILLI:

24     Q.  So you defined consumable office supplies.  What do you

25     mean by large customer?

1    A.   I'm defining large customer as a customer who purchases

2    at least $500,000 of consumable office supplies in a given

3    year from -- period.  Yeah.

4    Q.   What types of distribution services are included in the

5    relevant market?

6    A.   So, basically all modes of distribution.  Okay.  Staples

7    and Office Depot have what we might call sophisticated high

8    end distribution service with all these elements we talked

9    about; next day delivery, desktop delivery, E-procurement,

10   dah, dah, dah, dah, dah.  But I've included in the market,

11   basically, any way that these companies are getting their

12   consumer office supplies.  So it's quite a broad market in

13   that sense.  Any way that these large companies are getting

14   consumable office supplies is included.

15          You could consider a narrower market that was just

16   high-end sophisticated distribution, if you will, that

17   wouldn't include some rogue spend from Amazon.  I decided to

18   go broader and just include all the modes by which large

19   customers get their office supplies.

20   Q.   And, obviously, we're going to walk through the details

21   of how you define the market, but just generally, what

22   method did you use to define the relevant market in this case?

23   A.   Well, there's a particular method called the

24   hypothetical monopolist test that economists use, and I

25   applied that method.  It's described in the merger

1    guidelines.  It's a standard tool.

2    Q.  I would like to, of course, understand how you arrived

3    at the specific conclusion regarding the market in this

4    case.  But I would think this is another area where it would

5    be helpful to first assess concept involving market

6    definition.

7            So what is the purpose of market definition?

8    A.  So, the goal is to -- and again, here is an area where

9    antitrust economists, you know, we're dovetailing with the

10   law here because we're trying to help.  I don't mean just

11   me, I mean the whole field.

12           So we're trying to identify a collection of

13   products that's broad enough, really, so that if it were

14   monopolized, controlled by one entity, that would be a

15   serious problem.  Okay.

16           If somebody just, you know, controls Corn Flakes

17   alone, probably not going to be a problem.  If they control

18   all breakfast cereals, now we are worried about that.  So

19   ready-to-eat breakfast cereals has been a relevant market, I

20   don't think Corn Flakes alone would be.

21           It's all from the customer's point of view.  What

22   are the choices the customers has?  Reasonable substitutes

23   would be the word that often gets used.  Include reasonable

24   substitutes for the products or services of the merchant firms.

25   Q.  What are the components of market definition?

1    A.  Well, there's a product, and then a geographic

2    component.

3    Q.  How do economists go about determining a relevant

4    product market?

5    A.  So we have this hypothetical monopolist test and we

6    ask -- and the courts have adopted this, too, we're not off

7    doing our own thing.  Okay.  Basically the way to think

8    about it is you take what we often call a candidate market

9    or collection of products and you ask, if one firm

10   controlled those, could it significantly raise price?  And

11   that's a test.  Would they have enough power that we would

12   be worried about that.  And if they can, then that qualifies

13   as a market.  So that's the hypothetical monopolist test.

14   Q.  Do you have an example from a past case, just to put it

15   in more concrete terms?

16   A.  Good, good.  So I mentioned the H&R Block/TaxAct case

17   the DOJ brought, and I was involved in early stages of that.

18   So you always do the same thing:  What do the merchant firms

19   sell?  In that case, H&R Block and TaxAct each sold tax

20   preparation software that people use to prepare their taxes.

21   So the natural question would be, well, maybe that's a

22   market, tax preparation software.  Turns out there's one

23   other major firm, actually the leading firm was Intuit, I

24   think is the firm with the TurboTax program, that's very

25   popular.

1           So the DOJ alleged that was the market, I think

2     they called it digital do-it-yourself.  Basically tax

3     preparation software of that sort.  The -- and the court

4     ultimately agreed with that.  Okay.  But, the -- the

5     emerging parties alleged a broader market, which would

6     include pencil and paper.  So another way to do it, to do

7     your taxes or getting a professional to prepare your taxes.

8     Okay.

9           So ultimately the court decided, the DOJ argued

10    and the court agreed, that a single firm controlling all of

11    the digital do-it-yourself software, tax prep software would

12    raise prices, would have real power and, therefore, that

13    group of products satisfied the hypothetical monopolist

14    test.  So that would be the candidate and that candidate

15    passed the test, and so we -- the additional further out

16    products, pencil and paper and professional help, were not

17    included.

18          So that's an example where the relevant market is

19    a collection of products.  Again, I try to keep it simple

20    because the test is a little bit technical.  If one firm

21    controlled all those products, would you be worried about it?

22    Q.  And is the hypothetical monopolist test well established

23    among antitrust economists?

24    A.  Very well established.  It really -- it was introduced

25    in the 1982 merger guidelines and has been really a staple

1    of antitrust work.  Not just mergers, actually, but other

2    areas, too, for over 30 years.

3    Q.  And what is really the conceptual question that the

4    hypothetical monopolist test is asking?

5    A.  Again, if a single firm controls a group of products,

6    would that be a problem?  If you wouldn't worry about that,

7    then you have to broaden the set of products; the Corn Flakes

8    example.

9         Take two gas stations that are across the street

10   from each other.  They're competitors.  If they merge, would

11   we worry about it?  If there's another gas station five

12   blocks away, probably not going to worry about it.  They

13   can't significantly raise price, people will go to the gas

14   station five blacks away.  If they're the only two gas

15   stations in town, it's another story.

16        So you ask:  Would one firm controlling both

17   products raise price?  In the case where it is an urban

18   area, the answer is no.  In the case of the only two in

19   town, the answer is yes.  You give the right answer.

20   Q.  So the central question is what are all the alternatives

21   that are outside the market, the candidate market?

22   A.  Well, you first test the products in the candidate

23   market and then -- I'm not sure I understood your question,

24   actually.

25   Q.  Sure.  So is the question whether the candidate market

1    includes the alternatives that customers might turn to in

2    the event of a price increase?

3    A.  Yes, that's a key question.  In the case of the two gas

4    stations, there's a gas station five blocks away, that's a

5    close alternative, you need to include it.  And if you

6    don't, you will find the test is not satisfied.

7    Q.  And how does the fact that emerging firms are involved

8    in sale and distribution impact product market analysis?

9    A.  Well here, so the Staples and Office Depot, they are

10   intermediators, they are not manufacturing the office

11   supplies, they are at this intermediate level, sale and

12   distribution.  So that's why the question here, it's not

13   really about which pens or clips to include, it's which

14   forms of distribution we want to include in the market,

15   because that's what they do.

16          So, here, and I think I touched on this earlier,

17   we could imagine a narrower market, just with the very

18   sophisticated high-end distribution that has all these extra

19   features, and that might potentially satisfy the

20   hypothetical monopolist test, I'm not really sure.  Since I

21   wasn't sure, I included a broader set of distribution.  That

22   would be all means by which these large customers can get

23   these consumable office supplies.

24   Q.  I'm sorry, can you explain that further, how it is that

25   your market definition is broader or conservative in favor

1    of the defendants?

2    A.  Well, let's use the Sysco/US Foods case as an example.

3    So, they're food distributors.  And the FTC alleged that the

4    market was broadline food distribution, which, as I

5    remember, includes a wide array of products and value-added

6    services, and something else I can't remember.  And that

7    excluded certain types of distribution of food; specialty

8    distributors, cash and carry, where you just go to the store

9    and buy it.  Okay.  This is, you know, special.  So there

10   you had a distribution market that did not include all forms

11   of distribution.

12           Here we've got really a broader market because it

13   includes all forms of distribution of consumable office

14   supplies.  Whatever way the customer can get the pens and

15   are doing to get the pens or other supplies, that's

16   included.  If we took a narrower market, Your Honor, and

17   just looked at the high end distribution with all the

18   features, Staples and Office Depot's share would be even

19   higher than the ones I'm going to show you.

20   Q.  And in general, are the products and services that are

21   included in a relevant market all substitutes for each

22   other?

23   A.  Yes.  Normally that would be the case, such as different

24   types of tax preparation software.  They're substitutes.

25   And that's the normal situation for when we're defining

1    relevant markets.

2    Q.  Are there instances in which economists use a different

3    approach?

4    A.  Well, here we've got what we call cluster markets, which

5    creates an additional dimension of complication, if you

6    will.  So what we're doing is -- let me talk about it from

7    the point of view, let's say AEP again.

8            They need pens delivered to their locations.  They

9    also need binder clips delivered and Post-it notes.  Getting

10   pens is not a substitute for binder clips, they need both.

11   They don't substitute each other.

12           So, you might think we could ask about the

13   distribution of pens, distribution of binder clips,

14   distribution of Post-it notes.  They need all these things.

15   There are literally thousands of items.  So what we do --

16   that's this notion of cluster market -- is we aggregate or

17   add up a whole bunch of similar items that are -- where the

18   competitive conditions are similar, and that's what we call

19   a cluster.  So pens are not substitutes for binder clips,

20   but we're going to include them all in this relevant market.

21           So it can be a little confusing because this

22   clustering is really a way to avoid having to do thousands

23   and thousands of separate analyses.

24   Q.  Can you give an example of a cluster market approach?

25   A.  Well, an area where it's been -- well, an example I like

1    to give -- still, it may be slightly abstract.  Like in

2    clothing, so let's take shoes.  A department store needs

3    shoes.  They need size 4 shoes, 5 shoes, whatever.  Size 4

4    shoes are not substitutes for size 10 shoes.  But we're not

5    going to analyze a merger between shoe manufacturers by

6    looking at the market for size 4 shoes, the market for size

7    10 shoes separately.  We're going to look at the market for

8    shoes, at least that are a similar type of shoes.  So that's

9    an example of a cluster, you know, shoes.

10   Q.  Do you also have an example of a cluster market that's

11   used in practice?

12   A.  Sure.  You didn't like the shoe example?  Okay, we can

13   do better.

14          THE COURT:  Actually, I did.  I like that.

15          THE WITNESS:  Thank you, Your Honor.

16          THE COURT:  I wrote it down, look, size 4 versus 10.

17          THE WITNESS:  Okay, okay.  I don't know if I got

18   your size right.  But okay.  So an area where this has come

19   up repeatedly, and FTC has been involved in this, is in

20   hospital mergers, where there's different types of services

21   and particular different types of surgery.  Okay.

22          So let's suppose -- you might have a hospital that

23   does cardiac surgery and they do bypass and they do valve

24   replacement and some other stuff.  Those are not

25   substitutes, you got one or the other.  It makes sense to

1    look at maybe cardiac surgery or some other types of surgery

2    that the hospital does as a grouping, so long as that's not

3    going to give misleading results.

4            And the basic principle here for the cluster

5    market is if the different products are reasonably similar

6    in terms of their competitive conditions, then we can group

7    them together.

8    BY MS. CERILLI:

9    Q.  So, from following, the items in a cluster market are

10   often not substitutes for each other?

11   A.  That's the whole idea, is we're adding up a bunch of

12   things that are not substitutes; different types of heart

13   surgery, in my example.

14   Q.  So in theory you could define separate, relevant product

15   markets for each of the different items in the cluster?

16   A.  Yes, you could.  And this is entirely a practical

17   question.  What data do you have?  How can you measure

18   things?  How many do you have to do?  Is it three?  Is it a

19   thousand?  It's just practical.  But so, yes, in principle

20   you could divide all those things up and -- but you don't

21   want to do that if they're pretty similar, ultimately, in

22   terms of the market shares you're going to get, and the

23   competitive conditions are similar.

24   Q.  And so how do you decide what items to include in a

25   cluster market?

1    A.   Again, it's mostly a matter of what's practical.   You

2    want to follow groupings that, again, where the competitive

3    conditions are similar.

4         So let's go back to the hospital example.   Suppose

5    these hospitals merge, there's two hospitals that merge, and

6    they're the only ones that do this cardiac surgery in a

7    given city.   Okay.   And it's going to be probably fine to

8    aggregate those.   Suppose they also do orthopedic surgery,

9    okay; knee surgery, shoulder, whatever, would you include

10   those too?

11        Question:   Well, suppose I learn that actually

12   there's a whole bunch of surgery centers in the same town

13   who do a lot of orthopedic surgery.   Okay.   And the

14   hospitals actually have a pretty small share of knee

15   surgery, because there's all these other people, but these

16   smaller facilities don't do cardiac.   Then you shouldn't

17   include the knee surgery, okay, because the competitive

18   conditions are very different.   And if you were to include

19   the knee surgery you would get screwy results that would be

20   misleading.

21        Suppose you added knees and hearts together and

22   there was a lot of money in knee surgery, I've had it

23   myself, if you add it all up you might say, oh, the share of

24   these two hospitals in the overall surgery market doesn't

25   look very big.   But then if you came to your senses, you'd

1    say, wait, it's a merging monopoly in cardiac surgery, I've

2    got to be worried about that.

3            So if you include some products that have very

4    different shares or competitive circumstances, it's just

5    going to lead you astray.  So you have to avoid doing that.

6    As long as you follow that principle -- I guess we have on

7    the screen here now slide 14.  If competitive conditions are

8    similar, you can take the cluster market approach.  And

9    that's the guided principle.

10           And this is very much a cluster market case, Your

11   Honor, because there are thousands and thousands of

12   individual items in the cluster grouping of consumable

13   office supplies.  And, yes, we have to decide:  Does paper

14   fit in?  Why doesn't ink and toner fit in?  We have to work

15   through that.

16           THE COURT:  You have paper, you have pens, you

17   have pencils, but not ink and toner?

18           THE WITNESS:  Correct.

19           THE COURT:  And the conclusion has to be not

20   reasonably similar?

21           THE WITNESS:  Correct.

22           THE COURT:  And not reasonably similar because of?

23           THE WITNESS:  The managed print services.

24           THE COURT:  Right.  Okay.

25           THE WITNESS:  If managed print services were

1    small, I might just cluster it anyhow.  But they're pretty

2    big, okay?  And Staples and Office Depot made that argument

3    to the FTC, that they are facing a lot of companies who are

4    carving out ink and toner as part of MPS.  I looked at that

5    and I said they have a good point, I'm less concerned about

6    ink and toner.  There might be still be some concerns, but

7    I'm less concerned.  So it's very practical.

8    BY MS. CERILLI:

9    Q.  I really would like to explore that in more depth, why

10   ink and toner weren't included and other items were.  So how

11   did you pick the cluster of items that you used to define

12   the relevant market here?

13   A.  Well, again, I think we started with what everybody in

14   the industry normally talks about, which would be the --

15   call it core office supplies, paper, and ink and toner.  And

16   then we carve out ink and toner for the reasons I talked

17   about with the judge.  Then we have to check that the other

18   remaining items are similar enough.  Paper is not -- there

19   is some differences between paper and the core items.  Okay.

20   So I think that's -- and Mr. Orszag came back in his report

21   and criticized me for lumping it together with core.  And I

22   think he made some good points there, and I responded by

23   showing what happens when we break it out, and we'll show

24   you that.

25            So I'm not staking myself to -- that you have to

1      do paper and core together.  What I'm going to say is it

2      doesn't really matter whether you aggregate them or not.

3      But the bigger thing that's come up a lot so far in this

4      hearing is all the other stuff that Staples sells, beyond

5      office supplies, you know, BOSS -- I believe Staples calls

6      it that.  And look, they make a lot of sales there.

7              So another big question is, well, should we

8      include technology products?  Should we include furniture?

9      Should we include janitorial and sanitation, jan-san.  So

10     these are other big groupings, and I did not include those.

11     And I think it's very clear that the competitive conditions

12     and suppliers in those other categories are sharply

13     different than consumable office supplies.

14             So it's very similar to the knee surgery example I

15     gave.  It would be -- give really misleading results to

16     include them.  Conditions are different.  I did not.

17     Q.  So why would it be a mistake to include these additional

18     product categories in the cluster?

19     A.  Well, okay.  So take furniture for example.  You always

20     have to remember with market definition, one of the key

21     things you're going to do is measure market shares.  I gave

22     the example with knee surgery, but let's talk about the

23     furniture in this case.

24             Suppose we included furniture?  I don't actually

25     know off the top of my head how much the total volume of

1  furniture sales are to large customers, but furniture is

2  pretty expensive, I imagine it's a lot.  And I'm quite sure

3  that Staples and Office Depot's market shares of that

4  furniture sale are significantly smaller than they are.  So

5  if you included that and lumped it all together, it would

6  pull down Staples and Office Depot's market shares for sure.

7  Okay.

8          That's a correct answer.  That's not a

9  gerrymandering.  That's the same as the heart surgeries.

10  Okay.  That tells us that that lower number would be --

11  would be, I'll say, misleading, in terms of the competitive

12  effects and what's likely going on in the consumable office

13  supplies space.  The fact that there's all these competitors

14  in furniture doesn't really solve the problem that Mr.

15  O'Neill has when he wants to procure office supplies and his

16  two main choices have merged.  Yes, he has good choices for

17  furniture, so what?  He's still behind the eight ball on

18  that.

19          So each of these BOSS categories, furniture

20  technology, etcetera, is really very different.  For

21  technology we have Dell and CDW.  For jan-san, Grainger and

22  Fastenal.  That's their home base.  That's what they

23  dominate.  And Staples and Office Depot.  Their home base is

24  the consumable office supplies.  So it would -- to me, this

25  is an easy part of the case, frankly, Your Honor, that you

1    shouldn't be including those other categories.  And I'm sure

2    there will be more questions about that, but this is

3    straightforward, as far as I'm concerned.

4    Q.  But what about ink and toner?  I mean, obviously you

5    would agree in practical terms that ink and toner is an

6    office product that is consumed, right?

7    A.  Sure.  And I even noted that it's often included in the

8    normal uses of the -- the common, what many people would

9    term consumable office supplies.  And the plain language

10   meaning, it is consumable, it is an office supply.  So

11   that's not my point.

12   Q.  And so why did you not include ink and toner in the

13   cluster here?

14   A.  Well, I think we had -- we covered this with the Judge,

15   the evidence -- I think it was pretty clear that these

16   managed print services are significant.  And they're often

17   providing the ink and toner.

18        We have evidence from Lexmark, Xerox, another

19   declarations that I've read to this effect, that they're

20   supplying ink and toner through MPS.

21        I asked, actually, well, are they also supplying

22   paper?  Because if they're supplying paper in a significant

23   way, then maybe paper is different, too.  And the answer to

24   that is no, it's not what they do.  So paper did not warrant

25   getting carved out for that reason.

1          THE COURT:  Let me ask you this:  Had you included

2     ink and toner, would your ultimate opinion be different?

3          THE WITNESS:  So, let me pause for a moment, Your

4     Honor, just to make sure.  It's a little bit of a tricky

5     answer.  If you include ink and toner in the cluster, then

6     the next step would be you calculate -- we calculate market

7     shares.  They're going to be lower.  Okay.  Ink and toner is

8     a significant volume of sales.

9          THE COURT:  Right.

10         THE WITNESS:  Okay.  So, it's going to make a real

11    difference, it's not just a small item.  So if you include

12    it, then you get -- now Staples and Office Depot, the shares

13    I'm calculating, their combined shares are around 80 percent,

14    which is very, very high.  Okay.

15         I would think -- again, this is a little bit off

16    the top of my head, but given how I know how important ink

17    and toner is, if you included it, it would pull down that

18    share.  I'm not quite sure what their share is in ink and

19    toner and how big it is, but it would pull it down -- let me

20    just real quick, purely for illustrative purposes -- suppose

21    it pulls it down to 60 percent, because that would be the

22    logical where you would go with this.  Okay.

23         Now -- so first off, I wouldn't get fooled by

24    that, so it wouldn't change my opinion, because I would say,

25    well, that's 60 percent, but that understates the problem in

1    consumable -- in core and paper, because that market share

2    is this blend.  And I don't get -- I'm not -- you know, I'm

3    not going to be blindly following the market shares.  I got

4    to look at what's going on in the market, too.

5            So I wouldn't really go off in that stray

6    direction.  But even if you wanted to grab the 60 percent

7    share instead of 80 percent share, that's still very high.

8    Again, I don't think it's the right number to look at for

9    the reason I just described.  But the answer is no, okay,

10   that the shares -- I don't know for sure, but I think they

11   would still be quite high.

12           Look, if they were much lower, then it would just

13   be like something's screwy here, right?  There's so much ink

14   and toner, so much Office Depot, it would just be a flag

15   that that was a mistake, like the knee surgery.

16           So, no, my opinion is not based on how these

17   boundaries are drawn and how this cluster is formed.  That's

18   just a way to -- we have to measure things, so we can

19   measure shares and then ultimately what's going on in the

20   market, how are the customers affected?

21           THE COURT:  So the answer is no, it would not

22   affect your opinion?

23           THE WITNESS:  That's a much better answer.  Yes,

24   you got it.  In the end it's no.  I was giving a long

25   explanation of why in the end it would not matter.

1          THE COURT:  All right.  Okay.

2     BY MS. CERILLI:

3     Q.  Is ink and toner even a substitute for any of the

4     products in the relevant market cluster here?

5     A.  No, no.  It's like a knee surgery again; it's not a

6     substitute for heart surgery, it's a different product.

7     Q.  Okay.  And it seems like when you talk about focusing on

8     consumable office supplies, it has the effect of focusing

9     just on the product items that Staples and Office Depot have

10    the most prominence in.  So isn't that, in some sense,

11    cherry-picking the items to focus on?

12    A.  No.

13    Q.  And why not?

14    A.  This is what we do in merger analysis, we look at where

15    the firms overlap and are significant and where there are

16    fewer choices.

17          As I study this, you know, it shifted away from

18    retail because there's more competition there.  It shifted

19    away from ink and toner or furniture.  So it's honing in on

20    where the problem is.  And sure, that's going to go along

21    with high shares.  Okay.  That's what we do all the time.

22          This notion that that's somehow gerrymandering or

23    rigging it, I just -- that's why -- that's just nonsense to

24    me, okay.  That is not correct.

25    Q.  You mentioned that you even think it's a mistake to

1     include these other items in.  But what really is the harm

2     of just, you know, putting ink and toner, putting furniture

3     in the relevant market?

4     A.  Again, because you're going to get -- the more of these

5     other stuff you include, it will pull down the share of

6     Staples and Office Depot, but in a misleading way.  Okay.

7     If our concern really is consumable office supplies, then

8     the share -- their share in that line of business for those

9     products is what we want to measure and look at.  We don't

10    want to blend in furniture sales.  So it would give you a

11    misleading set of shares.

12          Now, when I answered your question about ink and

13    toner, you could recover from that mistake by saying, Wait,

14    that number, not so good, got to look at the bidding.  And I

15    would recover, I would like to think.  But that's why -- it

16    takes you off track in a misleading direction to do that.

17    It's a mistake.

18          THE COURT:  I could see the -- the janitorial-

19    sanitation, I can see that, and the pens and the paper,

20    apples and oranges, right, cardiac surgery, knee surgery.

21    Office furniture, you know --

22          THE WITNESS:  Very different.

23          THE COURT:  But toner, I'm still hung up on that

24    toner and ink, you know, that's --

25          THE WITNESS:  Well, don't be.

1          THE COURT:  All right.

2          THE WITNESS:  I don't really --

3          THE COURT:  Trust you, right?

4          THE WITNESS:  Well, I guess -- look, the -- it

5     is -- look, it's -- it feels more like paper and those other

6     stuff, okay, just in terms of how it's used.

7          THE COURT:  You said it's reasonably similar and

8     that's the test.  Reasonably similar.

9          THE WITNESS:  Well, no --

10         THE COURT:  We're talking about paper and pens and

11    binders and --

12         THE WITNESS:  Okay.  Wait.  Hold on.  If I said

13    reasonably similar I need to correct --

14         THE COURT:  That's what you said.

15         THE WITNESS:  Well, so, it's not reasonably

16    similar in the sense --

17         THE COURT:  You told me earlier -- I think you

18    told me earlier it's reasonably similar.  I wrote it down.

19    If I made a mistake -- you don't recall saying that?

20         THE WITNESS:  I do not.

21         THE COURT:  All right.

22         THE WITNESS:  And it's not my view.  Okay.  So,

23    let me slow down and make sure I get it right.

24         THE COURT:  It's here.  In this little box, it's

25    here somewhere, but I'm not going to try to find it.

```
1              THE WITNESS:  Is that the final record then, in
2       the little yellow box?
3              THE COURT:  It probably is pretty good, you know.
4       But no, it's not final -- I thought you said -- I wrote it
5       down, but I normally don't put any spin on what I write down.
6              THE WITNESS:  Okay.  So let me just -- I don't
7       want a confused record here.  So -- and if I said it, maybe
8       I misspoke, I don't know.  Okay.  So --
9              THE COURT:  Tell me if I'm wrong, is that the
10      test, reasonably similar?
11      BY MS. CERILLI:
12      Q.  Well, Professor, maybe you can recap the test for why
13      you decided to include items in the market.
14      A.  Okay.
15             THE COURT:  So if it's not reasonably similar,
16      then what is it?
17             THE WITNESS:  I've been using the term reasonably
18      similar for competitive conditions are reasonably similar,
19      is the test for including different items in the cluster.
20             THE COURT:  Right.
21             THE WITNESS:  Okay.  And I'm saying that's true
22      for pens and binders and Post-it notes and so forth.
23             Now, I said it was not the case for ink and toner.
24             THE COURT:  All right.
25             THE WITNESS:  Okay.  And our discussion about --
```

1          THE COURT:  Not reasonably similar.

2          THE WITNESS:  Because of Manage Print Services

3    there's an important set of up suppliers who provide ink and

4    toner, and it's logical because they're doing copiers and

5    printers.  It's a different business.  It's very similar,

6    actually, in my view, to the janitorial/sanitation, which a

7    lot of customers get along with labor, basically, services.

8    People come and clean.  It's a whole different line of

9    business.

10         Managed Print Service is like that.  You are

11   getting some labor and other things along with ink and

12   toner.  It's fitting into a natural bundle of product.  So

13   no, I'm saying ink and toner is not reasonably similar in

14   terms of competitive conditions.  And so that's why I carve

15   it out.

16         To go back to -- while you're still hung up on it,

17   because I don't want you to be hung up on it, it feels --

18   maybe this is where we had a miscommunication.  It feels

19   closer to office supplies because, you know, it's used in

20   the office and it's ink, and it's kind of like a pen -- I

21   mean, just intuitively.  But that's not the test.  It's not

22   a functional substitute.  So when we're clustering, we're

23   clustering a lot of things that are not functional substitutes.

24         So then we're asking are competitive conditions

25   reasonably similar?  So even though it has some characteristics

1    that are similar to, let's say pens or other office

2    supplies, the competitive conditions are different, and it's

3    all about MPS.  That's the only point here.  And that's

4    significant enough that it does not belong in the cluster.

5              THE COURT:  But for MPS it would be in the cluster?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.

8    BY MS. CERILLI:

9    Q.  Just to make sure I understand it correctly.  So when

10   you're dealing with a cluster market, you're essentially

11   aggregating items that are not necessarily substitutes for

12   each other?

13   A.  Yes.

14   Q.  The criteria that you're using to decide whether to

15   include an item or not is whether those items are subject to

16   similar competitive conditions; is that right?

17   A.  Yes.

18   Q.  What does it mean for an item to be subject to similar

19   competitive conditions?

20   A.  And I've been using the term "reasonably similar

21   competitive conditions," that's the language we've had here.

22   It's really who are the suppliers, who are the main

23   suppliers?  Certainly looking at market shares is a big part

24   of that.  And that fits with the fact that we're ultimately

25   going to measure market shares, and so it dovetails.

1          You could look at other things, such as entry

2     conditions and so forth.  But I think it's usually hard --

3     in practice, it's very hard to do that.  So I would mostly

4     focus on who are the main suppliers in the market shares for

5     the purpose of clustering.

6          If there are other differences, we'll have to deal

7     with that later in the analysis.  We can't do everything

8     here in this first stage with market definition.

9     Q.  So how did you determine that the items that were

10    included in your cluster are subject to similar conditions?

11    A.  Well, there's a range of evidence from Staples and

12    Office Depot, from the customers, that these products are

13    typically -- the same firms, basically, are selling them and

14    successful in them, like I said, with the market shares and,

15    you know, often bought in a grouping together, which is

16    going to dovetail with the market shares being similar.

17         So, this is how the companies think about the

18    business, everything lines up in the direction that these

19    are similar.  Of course, I look to see whether there was

20    something that was wildly different, and I'm not aware of

21    that.

22    Q.  And so by similar competitive conditions, you're looking

23    at whether the set of competitors that sell those items is

24    roughly similar?

25    A.  Yes, and their shares, relative success.  Again, because

1    we're going to use this to measure market shares, so we

2    don't want to have very different market shares adding up.

3    That's when you can get trouble.

4    Q.  Why not examine each of the items separately?  Why not

5    examine sales of pens and sales of binders?

6    A.  Because there are thousands of them.  And that's our

7    next chart exhibit here.  I think we would all be exhausted.

8    Certainly my staff would be.  So there are thousands of

9    items and it's not practical to do that.  And again, like I

10   said, there's a lot of commonality here, tens of thousands

11   of things are sold and used, and the firms, you know.  So

12   here's the numbers, Your Honor, on consumable office supplies.

13          Again, this is average number purchased by a large

14   customer.  Okay.  So it's in the 4- to 5,000 range.  We have

15   data from each of the three companies.  Actually, we have

16   data going back to before Office Depot and OfficeMax merged.

17   It's similar, similar numbers.

18   Q.  If customers buy a certain set of products together,

19   like it's in their same contract, does that mean that all of

20   those items belong in a cluster market?

21   A.  No.  We talked about ink and toner, which is the

22   sticking point here of sorts.  I'm happy -- I totally

23   recognize that often these large companies will buy ink and

24   toner from Staples or Office Depot with these other items,

25   but often they don't.  Okay.  So the fact that they

1    sometimes do does not mean it belongs in the same cluster.

2    We have to go back to are the competitive conditions

3    similar?  It's not what's the package of products that

4    customers contract for.

5    Q.  And just to sum up before we move on.  Why is it, in

6    your view, okay to include the items that you included in

7    your cluster, but to not include ink and toner and the --

8    what they call beyond office supply products?

9    A.  Because we're going to -- well, first off, we're going

10   to satisfy the hypothetical monopolist test.  We're going to

11   check that box off.  We are going to come to that.  And

12   we're going to get market shares here that are more reliable

13   and that reflect the competitive situations and concerns in

14   the area of the greatest overlap, which is the consumable

15   office supplies, as we've defined it.

16   Q.  And you mentioned the other component of market

17   definition is the geographic component.  Just generally, how

18   do economists go about defining a geographic market?

19   A.  It's the same thing as we do for product.  We look at

20   the geographic area where the firms compete and where,

21   again, if a single firm were to control all the supply in

22   that area, then this would be a problem.

23   Q.  And what is the relevant geographic market in this

24   matter?

25   A.  Here we're looking at the entire United States, which

1    effectively means looking at large customers, wherever they

2    may be in the United States.  As far as I -- I'm pretty sure

3    that Mr. Orszag, the party's expert, has agreed with me on

4    that.  We have one thing we agree about.

5    Q.  And did you include all customers who purchase consumable

6    office supplies in your market?

7    A.  Well, just the large customers.

8    Q.  And what is your definition, again, of large customers,

9    just to reset?

10   A.  So that's the $500,000 or more purchases on an annual

11   basis of the relevant products.

12   Q.  And why is it appropriate to include in the relevant

13   market only certain customers?

14   A.  Well, this flows back from our earlier discussion about

15   the bidding and the RFPs.  This is the customer group that

16   appears vulnerable to anti-competitive effects resulting

17   from the merger.  I don't see the same concerns for

18   consumers or very small businesses.  I know that it takes a

19   little bit of shaking one's head to understand how -- you

20   know, these are really large, powerful customers, how they

21   can be the ones who are vulnerable.  But even if you're a

22   powerful customer, large customer, you need choices in order

23   to have bargaining leverage.  And that's what's going to go

24   away.  And we talked about AEP.  So these are the customers

25   whose choices are being restricted in the way that's most

1    worrisome.  That's the focus.

2    Q.  Is this approach of focusing just on specific customers

3    supported in economic -- the economic framework?

4    A.  Yes.  So we have a slide here, we're up to slide 17.

5    This is a quote from the merger guidelines.  And I know this

6    approach was adopted in the Sysco/US foods case, as well,

7    which I don't know whether I should read or not.  But

8    describing how there can be a group of customers, so-called

9    targeted customers, who are harmed by the merger even if

10   other customers are not.  And it's always going to be the

11   customers for whom the two merging firms are really

12   important choices, but they don't have that many others.

13   Okay.  Again, we have -- it's a good example of that because

14   the small businesses have more choices.  Big businesses have

15   some choices, but it's more restricted, given their needs.

16   Q.  So did you evaluate in the record to determine whether

17   the conditions for focusing on just a particular set of

18   customers are satisfied here?

19   A.  Yes.  You could see, Your Honor, the title here is

20   actually Targeted Customers and Price Discrimination.  So

21   price discrimination is the general concept of charging

22   different people different prices, like a senior discount

23   and a regular price at a movie theater.

24           Here we clearly have price discrimination.  The

25   large customers get a good deal, they get lower prices.  So

1    we know that price discrimination is feasible here, it's

2    going on.  And if the merger does lead to higher prices for

3    the large customers, that's -- well, we've got these

4    conditions are met.  In other words, the price to large

5    customers can go up while the price to other customers is

6    not because they're disconnect.  And we see that, we see

7    that in the market.

8    Q.  And because you found that prices were individually

9    negotiated, did you analyze the merger for each customer

10   separately?

11   A.  No, that wouldn't be an efficient or very informative

12   way to go, customer by customer.  We've grouped together

13   large customers because they have commonality in terms of

14   their needs, and that way we can measure market shares in an

15   intelligent way and so forth.

16   Q.  Why did you draw the line at $500,000 in consumable

17   office supplies spend?

18   A.  It's truly a practical issue.  This trying to roughly

19   correspond to what the parties -- they have a notion of

20   enterprise customers, which is more like $1 million a year

21   of spending, but that's all purchases.  We're just focusing

22   on purchases of consumable office supplies.  There's a

23   pretty good alignment between this size of customer and

24   their enterprise customers.  I think it's roughly -- it's in

25   my report, Your Honor, but something like 90 percent of

1    these customers are enterprise or 90 percent of enterprise

2    are these.  They're closely aligned.  And it goes along with

3    that table we saw, which is these are the customers who have

4    the formal RFP process or something.  Not always, but they

5    have these needs and demands and, for example, they are

6    often geographically dispersed, so they have -- that affects

7    who can do the business for them.

8            So the fact is, you have to draw the line

9    somewhere.  There's no magic place that's the right place.

10   It's just a practical thing to do.  I have some concerns

11   about customers in the next grouping down, they're a little

12   too small to be included here.  But the clearest evidence I

13   have in measurements and so forth are in this group, so

14   that's what I presume.

15   Q.  Would your opinions change if you used a somewhat

16   different cutoff?

17   A.  No, I don't think they would.  I have got some data to

18   show you, Your Honor, where we used the $250,000 cutoff, and

19   I thought actually the shares would go down, and they didn't

20   in that measure.  If you go down far enough, if you go down

21   in customer size far enough, I'm sure the shares would fall

22   for Staples and Office Depot.

23           So, like I said, there may very well be some harm

24   to customers in the next smaller grouping, but it

25   wouldn't -- but moving the boundary around somewhat would

1   not change my opinion, and inevitably there's going to be

2   customers who move from one to the other, from one year to

3   the next, there's always some messiness like that.  That's

4   not going to matter, in my opinion.

5   Q.  I believe you mentioned that the large customers in your

6   market are commercial entities?

7   A.  Yes.

8   Q.  Why did you not include government entities?

9   A.  Again, we could have included them, it would be harder

10  to measure some of these things.  Government entities are

11  different in that they often have, say, local or small

12  business preferences.  And in other words, they're

13  interested in things other than the more strict commercial

14  concerns, and so they do have somewhat different demand.  I

15  just don't know whether they will be harmed, actually, so

16  they're not in.

17  Q.  And you mentioned earlier that hypothetical monopolist

18  test is the standard economic tool for defining markets.

19  Does the relevant market you defined here satisfy that test?

20  A.  Yes.  Absolutely.

21  Q.  Can you briefly restate what the hypothetical monopolist

22  test is?

23          THE COURT:  I've got it.  I've got it.

24  BY MS. CERELLI:

25  Q.  Does finding that the hypothetical monopolist test is

1    satisfied mean that the merger is anti-competitive?

2    A.  No, no, of course not.  It's just a step to identify the

3    grouping of products that we want to look at.  You could

4    define the market and find the merging firm shares are small

5    and no problem.  So it's simply a way of defining the

6    sufficiently broad group of products so when we measure

7    shares it's meaningful.

8    Q.  In the market you defined in this case, what is it that

9    the hypothetical monopolist controls?

10   A.  All sale and distribution of consumable office supplies

11   to large customers in the United States.

12   Q.  And what evidence informed your conclusion that the

13   hypothetical monopolist test is satisfied here?

14   A.  Well, an easy way to see that it is is to note that

15   Staples and Office Depot and other firms are just offering

16   substantial discounts to win business from each other.  So

17   if we think about -- a hypothetical monopolist now gobbles

18   them all up, it's the only choice, wouldn't offer those

19   discounts.  Why would they?  The discounts are only offered

20   because the firms are competing.

21        So the hypothetical monopolist would charge a

22   significantly higher price, wouldn't face any competition.

23   That's the whole concept.  And so we know that would be

24   significantly higher.

25        THE COURT:  No doubt in your mind that would

1   happen, they would charge higher prices?

2              THE WITNESS:  No doubt in my mind.  Because we

3   see -- all the discounting we see, the hypothetical

4   monopolist, why should they?  No reason to.  It's not

5   discounting --

6              THE COURT:  Is that because of their obligation to

7   their shareholders?  Is that what it is?

8              THE WITNESS:  The hypothetical monopolist?

9              THE COURT:  Yeah.

10             THE WITNESS:  That's not a question I've ever

11  heard before.  That's a good one.  The reason I say that is

12  it's construct.  So let me just -- the assumption -- in this

13  method, the assumption is that --

14             THE COURT:  Well, I'm sorry to interrupt, but that

15  would be consistent with making more money, though, the

16  obligation to the shareholder.  That's what I meant, to

17  increase the shares of the stock.

18             THE WITNESS:  Yes.  Let me try to answer.  And I'm

19  not sure I'm with you, Your Honor, but I'm trying.

20             The assumption in this method is that this

21  hypothetical monopolist, this single firm controlling all

22  the consumable office supplies to all the large customers in

23  the United States is out to make the most money.  Okay.

24  It's a profit maximizing --

25             THE COURT:  For the shareholders, for the company,

1    right?

2              THE WITNESS:  Yes, exactly.

3              THE COURT:  You've never heard that before, making

4    more money for the shareholders?  That just seems to me to

5    just logically flow.  We're going to raise the prices

6    because people buy stock in our company, we want to give

7    them a good return on their investment.

8              THE WITNESS:  I see.  So this is going to

9    something, I would say, a fundamental aspect of my field,

10   industrial organization and antitrust economics.  So our

11   working assumption, we don't even talk about it much because

12   it's implicit, is that the firms that we're looking at are

13   out to make the most money.

14             THE COURT:  Right.

15             THE WITNESS:  And whatever -- and so this is

16   really important and fundamental because when we're trying

17   to figure out what's going to happen in the future, which

18   this whole analysis is forward looking, we're assuming all

19   the different players are out to make money; Amazon Business

20   is out to make money, are they going to make these

21   investments?  W.B. Mason is out to make money, will they

22   expand or not?  That's a fundamental thing.  Are you

23   asking -- and that applies to hypothetical monopolist, as

24   well as all the real world firms.  So, that's fundamental to

25   our craft.

1           Are you asking about questioning it or

2     wondering -- I'm not quite sure what you want to know about it.

3           THE COURT:  No, no, I was just -- no.  I started

4     off by asking you, there's no doubt in your mind that prices

5     will go up, and I tied that to the obligation of a company

6     to enhance the value of stockholders.

7           THE WITNESS:  Okay.  So, let me --

8           THE COURT:  It seems to be natural.

9           THE WITNESS:  It is.  So, yes, I'm with you there.

10    I was a little thrown off because you were asking about

11    hypothetical monopolist, this special kind of construct we

12    have.  Let me talk about Staples.

13          So when I say I think there's a reason to believe

14    Staples will raise the price after the merger, okay --

15          THE COURT:  You say there's no doubt in your mind

16    that is going to happen.

17          THE WITNESS:  I'm not as confident about that.  I

18    think that's likely.

19          THE COURT:  Okay.  Just stick with the test.  The

20    test is a reasonable prediction, right?

21          THE WITNESS:  For the merger itself.  The

22    hypothetical monopolist test, I'm very confident about that.

23    The test is satisfied.  But no, the overall predictions of

24    the merger, I don't claim to be certain about these things.

25    Okay.  But I think it will help, what you're asking about,

 1    why -- the fundamental basis for what I'm saying here is I

 2    think it will make -- Staples will make more money by

 3    raising the price than not.  Okay.

 4          Now, I'm sure you're going to be hearing from

 5    their CEO that that's not true.  Okay.  I understand that.

 6    He knows his business.  I'm not trying to mix it up with

 7    him, as it were.  But, the prediction is based on what I see

 8    as in the incentive, that Staples incentives will be,

 9    assuming that they're out to maximize their profits for

10    their shareholders.

11          Okay.  So that's, again, implicit, that's -- the

12    whole analysis is based on that.  And, look, if Staples

13    would lose a lot of business by raising the price, then it

14    wouldn't pay.  And that's what I'm sure he's going to tell

15    you, why they won't.  Okay.  And I'm arguing, well, a lot of

16    the reasons they've offered discounts is to get business

17    from Office Depot or to protect customers and not lose to

18    Office Depot.  He's not going to have to worry about that

19    anymore.  And that's why I think they'll be able to raise

20    the price.

21          And I think Mr. O'Neill from AEP is worried about

22    the same thing, and other customers are worried about the

23    same thing.  But it's because, again, Staples, assuming

24    they're going to be kind of hard-nosed about it and make

25    more money, if they can.  And, in fact, their shareholders

1    would force that upon them in our system.  Okay.  So that's

2    behind all of the analysis.

3          And I should say, though, it's not -- it's not a

4    shortsighted profit maximization.  Look, I wouldn't be -- I

5    would expect them to say -- and maybe they've already said

6    this, Look, we could raise the price, maybe we would get

7    some more customers for a little while.  But it would bring

8    Amazon in, the customers would be mad, all these horrible

9    things would happen, that won't pay.  If that were true, I

10   would say that won't raise the price.  I would agree.

11         So it's a long run, thoughtful, sharehold --

12   maximizing profits for shareholders.  Okay.  And I'm going

13   to tell you, I'm telling you that I think with that

14   perspective there will be an incentive for them to do that

15   for the foreseeable future.

16         THE COURT:  All right.  Thank you.

17   BY MS. CERILLI:

18   Q.  When I read about the hypothetical monopolist test in

19   H&R Block, I found it pretty intuitive in that context to

20   understand what was being asked and answered.  And correct

21   me if I don't get it right, but what I understood in H&R

22   Block was that there was a proposed market for digital tax

23   preparation.  And the Court was asking, and the economist in

24   that case were asking if a single firm controlled tax

25   preparation, would they be able to profitably raise prices

1    without customers switching to pencil and paper preparation.

2         Is that a fair characterization of the question at

3    H&R Block?

4    A.  Yes, that would be the implementation of the

5    hypothetical monopolist in that test.  Single firm

6    controlling -- let's just think of it, all three versions of

7    tax prep software, the H&R Block, the TaxAct and the

8    TurboTax.  Okay.  Not just the merging parties, but

9    everybody, would they raise price?  And the answer is going

10   to be, well, would it be profitable?  Yes, unless a lot of

11   people would switch to pencil and paper or maybe

12   professional preparation of taxes.

13        So that's what you need to be thinking about, how

14   many customers would you lose in this hypothetical

15   monopolist if you tried to raise the price.  And in that

16   case I think the Court -- I know the Court agreed that there

17   wouldn't be that much substitution to these other forms of

18   tax prep, they just weren't that close a substitute.  And so

19   digital, do-it-yourself was a relevant market and satisfied

20   the test.

21   Q.  And so in that case the hypothetical monopolist test

22   would have failed if the Court had found that people would

23   have switched a lot from digital tax preparation to pencil

24   and paper tax preparation, generally speaking?

25   A.  Right.  That's right.  If there were a lot of people who

1    would shift to paper, then the relevant marker would have to

2    be broader, it would have to include pencil and paper prep.

3    And the implication would have been the merging firm's

4    shares would be smaller.  And you would include a number of

5    people doing pencil and paper prep, but that wasn't the

6    case.  They kept with the DDIY, digital-do-it-yourself

7    market.

8    Q.  Okay.  But in this case here, if I understand correctly,

9    you're alleging a relevant market in which all sales of pens

10   and paper and consumable office supplies to large business

11   customers are included, correct?

12   A.  Yes.  It's really very broad in that sense, they're all

13   methods of distribution.  The market I'm putting forward is

14   very broad.  And that's why it's dead easy to satisfy the

15   hypothetical monopolist test.

16   Q.  Okay.  And so, what is it in that type of market that

17   would even discipline the hypothetical monopolist from

18   raising prices, if you're positing a single firm that

19   controls all sale and distribution of consumable office

20   supplies to large customers?

21   A.  Right.  The only discipline would be if people said

22   we're going to have to use fewer pens, we're going to

23   conserve on Post-it notes, which, of course, they're already

24   doing.  You've heard from folks about they're trying to

25   control their spend.  So the only discipline, and I'm not

1    saying it's nonexistent, would be reduced usage of

2    consumable office supplies if the price went up.  So

3    that's -- so that's a fair question.  Would there be a lot

4    of that?  It's conceivable there would be, but the evidence

5    shows that's not the case.  That's why I say it's an easy

6    call, actually, in the end, that this group -- that this

7    satisfies the hypothetical monopolist test.

8    Q.  I'm sorry, but why is it an easy call?  I mean, what is

9    it in the record that you're seeing that you think a

10   hypothetical monopolist, if we eliminated Staples, Office

11   Depot, W.B. Mason, all of that would find it profitable to

12   raise prices on consumable office supplies sold to large

13   customers?

14   A.  Well, I think the first thing we see is all of the

15   discounting that takes place, because the firms are

16   competing against each other.  They're not offering lower

17   prices to get these customers to use more pens, they're

18   offering lower prices so that they can sell the pens rather

19   than somebody else.  Okay.  I mean, that's, overall,

20   basically, all the evidence we've got, including, you know,

21   the various up-front -- the various things we saw, such as

22   an AEP slide that Staples and Office Depot are offering to

23   large customers to win that business.

24          So we see that.  That's pretty compelling right

25   there.  We also can formally do the test, which involves

1    margins and this recapture rate.  And that confirms this

2    result, if we want to do that for the Judge at such a late

3    hour.

4    Q.  Maybe very quickly, if you could just show that you -- I

5    take it that you did do the test?

6    A.  I -- look, I don't mean -- I like doing it, it's just

7    not usually the most popular part of my testimony.  So

8    there's a standard formula here that I've used, it was also

9    used -- in fact, in the -- used and accepted, I believe, by

10   the Court in the --

11          THE COURT:  In Texas Circuit Court, has accepted

12   this test.

13          THE WITNESS:  I believe so.

14          Okay.  So it involves the profit margin, one thing

15   which we've measured here.  The other -- it's a bit harder

16   to -- what takes a little more time is this recapture rate,

17   which is if one firm raises the price, they lose some

18   business, how much of that business goes to the other firms

19   in the market, versus flowing out entirely.

20          And if the recapture rate is high, then that means

21   there's a lot of competition between the firms in the

22   market, and that's going to tend to cause the test to be

23   satisfied.

24          So we've got some algebra here, it's redacted.

25   The evidence indicates to me, given the profit margins we're

1    observing, that this test, that it's easily satisfied.

2          And so those are the two pieces why I think it's --

3    this is not a tough call, the direct competition and the

4    Algebra here.

5          MS. CERILLI:  Your Honor, this would be a natural

6    breaking point, if you wanted to take --

7          THE COURT:  You know, it's your call.  I mean, if

8    you want to go a little bit later, that's fine.  If you

9    would like to stop now, that's fine.  What would the parties

10   like to do?  I mean, there's a time sensitive aspect to this

11   case.  Do you want to break now and we can start tomorrow at

12   nine?

13         MS. REINHART:  That would be great, Your Honor, if

14   we could do that.

15         THE COURT:  All right.  You want to do that?

16         MS. SULLIVAN:  That's fine.

17         THE COURT:  All right.  I'm mindful that -- I

18   would like to be able to finish the examination of the

19   expert tomorrow.  Tomorrow is Friday, is that doable?

20         MS. SULLIVAN:  It depends on how long they have.

21         THE COURT:  How much longer do you need, Counsel?

22         MS. CERILLI:  I would say about three hours.

23         THE COURT:  Another three, really?

24         MS. CERILLI:  Yeah.

25         THE COURT:  Okay.  Then I think you probably only

 1   plan for one witness tomorrow.

 2             MS. REINHART:  This is it, Your Honor.

 3             THE COURT:  Right.  Okay.

 4             THE WITNESS:  If I'm allowed to speak, I'm hoping

 5   to go back home to Berkeley after my testimony tomorrow, so...

 6             THE COURT:  You've already booked flights?

 7             THE WITNESS:  I have.

 8             THE COURT:  What time is your flight?

 9             THE WITNESS:  I have -- well, I was going to go

10   back late in the afternoon and I moved it to Saturday

11   morning.  So I'm okay tomorrow.

12             THE COURT:  Oh, okay.

13             THE WITNESS:  No, I just want to be done -- from

14   my point of view, I want to finish tomorrow, that's all I'm

15   saying, Your Honor.  Okay?

16             MS. SULLIVAN:  Your Honor, if it helps, if I get

17   him at the lunch break, I can finish tomorrow.

18             THE COURT:  All right.  That's fine.  Let's do

19   this:  Let's start at -- traffic is pretty challenging out

20   there this morning and tomorrow it will be because of

21   something going on.

22             THE WITNESS:  The Nuclear Summit.

23             THE COURT:  It's very challenging.

24             THE WITNESS:  The Nuclear Summit.

25             THE COURT:  Is that what it is?

1          THE WITNESS:  Yes.

2          THE COURT:  Let's start tomorrow at 9:30.  All

3    right.  Have a nice evening.  Enjoy your evening.

4                              *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5              I, JANICE DICKMAN, do hereby certify that the above

6       and foregoing constitutes a true and accurate transcript of

7       my stenograph notes and is a full, true and complete

8       transcript of the proceedings to the best of my ability.

9                          Dated this 31st day of March, 2016.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25

## $

**$100** [1] - 2118:21
**$12** [1] - 1998:5
**$179** [2] - 2036:7, 2040:24
**$180** [1] - 2037:11
**$250** [5] - 2026:8, 2033:20, 2033:21, 2042:18, 2051:14
**$250,000** [1] - 2155:18
**$39** [2] - 1978:14, 2033:15
**$50** [6] - 2010:13, 2033:24, 2033:25, 2034:5, 2034:20, 2051:1
**$500,000** [4] - 2111:6, 2125:2, 2152:10, 2154:16
**$60** [6] - 2009:10, 2009:15, 2011:6, 2013:12, 2041:21, 2042:18

## '

**'19** [1] - 2015:8
**'70s** [1] - 2080:12
**'80s** [1] - 2080:12
**'97** [1] - 2095:3
**'98** [1] - 2095:3
**'R'** [2] - 1980:23, 1981:6

## /

**/s** [1] - 2170:12

## 0

**08540** [1] - 1975:20

## 1

**1** [11] - 2034:9, 2034:10, 2034:12, 2034:14, 2034:21, 2049:18, 2051:12, 2110:16, 2115:15, 2154:20
**1,200** [1] - 2098:19
**1,253** [1] - 2097:17
**1.3** [1] - 2034:6
**1.5** [1] - 2034:1
**1/2** [5] - 1998:5, 2026:9, 2034:21, 2037:21, 2051:12
**10** [6] - 2084:15, 2106:9, 2112:20, 2133:4, 2133:7, 2133:16
**10-K** [1] - 1996:12
**10-Ks** [2] - 1996:6, 1996:18
**100** [5] - 1978:10, 2019:22, 2021:9, 2036:2, 2100:4
**10153** [1] - 1975:22
**11** [3] - 2036:2, 2067:7, 2106:13
**12** [1] - 2069:16
**1200** [5] - 1981:9, 1981:10, 1981:12, 1981:14, 2020:14

**130** [1] - 2039:5
**14** [1] - 2136:7
**1400** [6] - 1980:2, 1980:5, 1980:6, 1980:7, 1980:13, 1983:11
**14th** [1] - 1976:5
**15-2115** [1] - 1975:3
**15-minute** [2] - 2067:24, 2068:7
**16** [1] - 2049:19
**17** [1] - 2153:4
**17120** [1] - 1976:5
**18** [3] - 2039:23, 2039:24, 2056:20
**1946** [1] - 2080:5
**1980s** [1] - 2076:2
**1981** [1] - 2075:21
**1982** [1] - 2128:25
**1990** [2] - 2076:4, 2076:14
**1992** [1] - 2079:18
**1995** [1] - 2077:3
**1:10** [1] - 1975:6

## 2

**2** [2] - 2112:18, 2121:24
**20** [1] - 2040:12
**20001** [3] - 1976:1, 1976:10, 2170:15
**20024** [1] - 1975:14
**2009** [4] - 1997:3, 1998:16, 2008:10, 2078:19
**2010** [5] - 1997:5, 1997:7, 1997:24, 2002:2, 2079:21
**2011** [1] - 2079:25
**2013** [10] - 1997:8, 1997:10, 1997:23, 1998:18, 1998:21, 1999:1, 2001:4, 2001:25, 2002:5, 2097:14
**2015** [10] - 2036:8, 2045:8, 2045:13, 2045:17, 2045:19, 2046:1, 2046:8, 2059:11, 2059:14, 2097:14
**2016** [7] - 1975:5, 2041:7, 2046:9, 2046:10, 2046:12, 2060:1, 2170:9
**2017** [2] - 2041:7, 2046:14
**2018** [9] - 2015:2, 2015:4, 2015:8, 2015:13, 2015:16, 2030:25, 2038:9, 2041:7, 2046:15
**2019** [5] - 2014:21, 2018:25, 2019:6, 2031:1, 2038:9
**202** [1] - 1975:17
**202-354-3267** [1] - 1976:11
**212)310-8538** [1] - 1975:23
**227** [1] - 2051:14
**23** [1] - 2009:9
**24,000** [1] - 2103:24
**240** [1] - 2098:18
**245** [1] - 1993:15

**25** [2] - 2040:13, 2076:14
**250** [1] - 1993:14
**27** [1] - 2030:19

## 3

**3** [7] - 2025:17, 2025:19, 2026:5, 2051:9, 2051:14, 2051:18, 2064:19
**30** [3] - 2016:4, 2016:8, 2129:2
**30,000** [2] - 2039:11, 2040:9
**301** [1] - 1975:19
**303** [1] - 1975:19
**31** [1] - 1975:5
**326-2638** [1] - 1975:17
**33** [5] - 1986:17, 1986:22, 1989:9, 2010:14, 2011:4
**333** [2] - 1976:10, 2170:14
**39** [2] - 1978:17, 1978:21
**393** [1] - 2099:13

## 4

**4** [5] - 2133:3, 2133:6, 2133:16, 2150:14
**400** [1] - 1975:16
**4200** [3] - 2016:23, 2017:4, 2043:23

## 5

**5** [6] - 2015:11, 2019:15, 2084:15, 2090:5, 2121:25, 2133:3
**5,000** [1] - 2150:14
**50** [11] - 2009:10, 2009:14, 2011:6, 2013:12, 2014:15, 2040:12, 2041:21, 2042:17, 2051:11, 2051:17, 2077:9
**500,000** [2] - 2104:7, 2104:18
**508** [1] - 2039:5
**55** [3] - 1986:14, 1986:15, 1986:22

## 6

**6** [1] - 2099:17
**6.2** [1] - 1998:4
**60** [5] - 2014:15, 2077:9, 2141:21, 2141:25, 2142:6
**600** [2] - 2020:11, 2021:5
**609** [1] - 1975:20
**630** [1] - 2043:13
**6523** [2] - 1976:9, 2170:14
**670** [2] - 2021:9, 2022:6
**6:30** [2] - 2067:22, 2067:23

## 7

**7** [6] - 2026:9, 2037:20,

2051:15, 2090:5, 2100:2
**70** [2] - 2019:18, 2021:5
**767** [1] - 1975:22

# 8

**8** [1] - 2101:15
**8,000** [1] - 2042:6
**80** [7] - 2015:10, 2031:22, 2032:4, 2043:22, 2053:23, 2141:13, 2142:7
**8000** [1] - 2043:19
**832** [1] - 2098:18
**833** [1] - 2097:24

# 9

**9** [1] - 2103:20
**90** [3] - 2031:18, 2154:25, 2155:1
**900** [1] - 1975:25
**95** [3] - 2031:18, 2032:7, 2108:2
**96** [1] - 2040:13
**986-1120** [1] - 1975:20
**9:30** [1] - 2169:2
**9th** [1] - 1976:1

# A

**abbreviate** [1] - 2007:14
**ability** [6] - 1992:3, 1993:21, 2018:7, 2022:3, 2062:3, 2170:8
**able** [16] - 1993:7, 1998:7, 1998:10, 2000:25, 2002:1, 2007:8, 2028:21, 2029:6, 2029:17, 2050:15, 2075:6, 2102:17, 2109:14, 2161:19, 2162:25, 2167:18
**Abraham** [1] - 2081:6
**absolute** [2] - 2022:19, 2102:10
**absolutely** [9] - 2083:6, 2083:10, 2097:3, 2099:17, 2103:16, 2114:15, 2120:18, 2120:19, 2156:20
**absorb** [1] - 2062:4
**abstract** [1] - 2133:1
**academia** [1] - 2076:24
**academic** [4] - 2075:20, 2076:5, 2076:18, 2080:6
**academics** [1] - 2081:13
**accept** [1] - 2121:1
**accepted** [2] - 2166:9, 2166:11
**accessories** [1] - 2005:7
**account** [7] - 2024:18, 2024:20, 2026:13, 2040:2, 2044:8, 2044:10, 2062:2
**accounts** [3] - 2017:1, 2043:22, 2119:4
**accuracy** [1] - 2107:23
**accurate** [2] - 2073:11, 2170:6

**achieve** [1] - 2058:18
**achieved** [3] - 2032:9, 2032:11, 2091:16
**acknowledged** [3] - 1984:2, 2113:19, 2114:6
**acquired** [1] - 2092:23
**Action** [1] - 1975:2
**activity** [1] - 1991:18
**actual** [2] - 1982:25, 2090:14
**add** [12] - 1987:8, 1998:12, 2025:22, 2029:10, 2037:16, 2042:8, 2042:23, 2068:24, 2104:19, 2118:22, 2132:17, 2135:23
**added** [2] - 2131:5, 2135:21
**adding** [4] - 2030:8, 2055:16, 2134:11, 2150:2
**addition** [5] - 1986:5, 1989:12, 1990:7, 1990:16, 2006:18
**additional** [5] - 2110:7, 2124:15, 2128:15, 2132:5, 2138:17
**address** [1] - 2120:12
**addresses** [1] - 2120:2
**adequately** [1] - 2045:3
**adhere** [1] - 2051:9
**adherence** [1] - 1987:19
**adjusted** [2] - 2001:22, 2017:13
**adjustment** [2] - 2001:20, 2016:20
**adjustments** [1] - 2011:13
**admin** [1] - 2034:25
**administration** [4] - 2062:2, 2077:4, 2078:19, 2078:23
**administrative** [5] - 2021:23, 2021:25, 2022:2, 2025:19, 2026:9
**admit** [1] - 1981:25
**adopted** [2] - 2127:6, 2153:6
**advantage** [3] - 2034:18, 2069:13, 2092:8
**advice** [5] - 2078:11, 2079:1, 2079:6, 2080:9, 2080:23
**advise** [1] - 2092:20
**advises** [1] - 1991:10
**advising** [2] - 2081:23
**Advisors** [1] - 2080:2, 2080:4
**advisory** [23] - 1979:16, 1979:19, 1980:10, 1982:16, 1982:19, 1982:21, 1982:23, 1983:1, 1983:4, 1983:7, 1983:15, 1983:18, 1991:24, 1996:1, 2000:1, 2003:12, 2003:24, 2004:1, 2019:12, 2052:18, 2062:8, 2062:9
**Advisory** [3] - 1990:20, 1990:23, 2054:24
**advocacy** [2] - 2077:13, 2079:4
**AEP** [23] - 2083:9, 2083:19, 2084:14, 2084:20, 2100:15,

2101:13, 2102:19, 2113:3, 2115:16, 2116:14, 2116:18, 2117:2, 2117:5, 2117:6, 2117:7, 2117:12, 2117:17, 2117:25, 2132:7, 2152:24, 2161:21, 2165:22
**AEP's** [3] - 2100:16, 2118:11, 2119:4
**affect** [3] - 2084:16, 2084:17, 2142:22
**affected** [1] - 2142:20
**affects** [1] - 2155:6
**affirm** [1] - 2066:8
**afford** [1] - 2018:12
**AFTERNOON** [2] - 1975:9, 1977:1
**afternoon** [7] - 1977:3, 1977:8, 2074:12, 2074:13, 2074:17, 2074:20, 2168:10
**agencies** [2] - 2079:15, 2082:22
**agents** [1] - 2021:25
**aggregate** [6] - 2053:3, 2056:14, 2069:12, 2132:16, 2135:8, 2138:2
**aggregated** [1] - 2057:24
**aggregating** [3] - 2012:2, 2030:1, 2148:11
**aggregation** [3] - 2013:15, 2013:19, 2124:19
**ago** [2] - 2038:4, 2095:3
**agree** [7] - 2027:23, 2032:15, 2045:3, 2070:13, 2140:5, 2152:4, 2162:10
**agreed** [6] - 2093:16, 2107:7, 2128:4, 2128:10, 2152:3, 2163:16
**agreement** [20] - 2007:24, 2008:21, 2015:21, 2017:19, 2017:20, 2018:11, 2019:10, 2020:1, 2020:3, 2020:7, 2020:13, 2022:4, 2022:12, 2024:1, 2025:1, 2027:7, 2027:10, 2035:22, 2035:23, 2044:1
**agreements** [1] - 2035:22
**ahead** [6] - 2078:17, 2086:17, 2090:23, 2110:8, 2115:6, 2121:14
**aided** [1] - 1976:7
**air** [1] - 2113:21
**airlines** [1] - 2079:9
**al** [2] - 1975:3, 1975:6
**algebra** [2] - 2166:24
**Algebra** [1] - 2167:4
**aligned** [3] - 2034:3, 2081:24, 2155:2
**alignment** [2] - 2034:11, 2154:23
**all-in** [1] - 1993:3
**alleged** [4] - 2089:22, 2128:1,

2128:5, 2131:3
**alleges** [1] - 2084:14
**allegiance** [1] - 2034:15
**alleging** [4] - 2111:10, 2113:21, 2120:15, 2164:9
**allen** [1] - 1976:13
**allow** [4] - 1992:8, 1995:19, 2018:12, 2018:15
**allowed** [2] - 2016:14, 2168:4
**allowing** [1] - 2091:15
**allows** [2] - 1993:3, 2016:20
**almost** [3] - 2020:16, 2021:2, 2067:5
**alone** [3] - 2101:1, 2126:17, 2126:20
**alter** [1] - 2089:20
**Altera** [1] - 2092:23
**alternative** [2] - 2013:14, 2130:5
**alternatives** [3] - 2073:17, 2129:20, 2130:1
**Amazon** [71] - 2014:4, 2023:5, 2023:11, 2023:14, 2025:14, 2026:13, 2026:14, 2035:18, 2045:6, 2045:8, 2045:10, 2045:12, 2045:17, 2045:21, 2045:25, 2046:6, 2046:12, 2046:14, 2046:18, 2046:21, 2047:2, 2047:5, 2047:12, 2048:4, 2048:9, 2048:14, 2048:15, 2049:2, 2049:5, 2049:8, 2049:9, 2049:20, 2049:22, 2050:4, 2050:5, 2050:14, 2057:4, 2060:3, 2060:5, 2060:8, 2063:13, 2063:18, 2063:23, 2063:25, 2064:1, 2064:4, 2064:11, 2064:13, 2064:24, 2065:5, 2065:6, 2065:9, 2065:13, 2065:15, 2065:18, 2065:21, 2066:2, 2071:10, 2071:12, 2071:13, 2072:19, 2073:1, 2073:3, 2073:23, 2084:3, 2086:1, 2096:2, 2121:9, 2125:17, 2159:19, 2162:8
**Amazon.com** [2] - 2084:18, 2116:13
**ameliorates** [1] - 2120:2
**America** [9] - 2036:16, 2037:12, 2040:15, 2112:22, 2115:14, 2115:22, 2116:18, 2119:2, 2119:3
**American** [3] - 2040:12, 2076:21, 2107:14
**amount** [11] - 1988:3, 1990:1, 1990:3, 1992:12, 1994:13, 2055:12, 2055:14, 2055:18, 2056:2, 2062:25, 2071:10
**amounts** [1] - 2102:10
**analyses** [1] - 2132:23

**analysis** [41] - 1980:10, 1991:15, 1992:16, 1992:17, 1993:4, 1993:18, 1993:22, 1994:25, 2003:15, 2029:20, 2030:23, 2031:2, 2038:15, 2040:6, 2055:20, 2062:9, 2062:10, 2064:8, 2076:12, 2081:21, 2082:9, 2088:5, 2088:23, 2089:8, 2089:14, 2093:18, 2096:5, 2096:6, 2099:18, 2104:6, 2112:8, 2113:12, 2113:20, 2119:21, 2122:12, 2130:8, 2143:14, 2149:7, 2159:18, 2161:12, 2162:2
**analyst** [1] - 2119:19
**analyze** [7] - 1992:3, 1992:8, 1995:6, 1996:9, 2116:2, 2133:5, 2154:9
**analyzed** [1] - 2038:16
**analyzes** [1] - 1995:6
**analyzing** [1] - 2094:18
**ancillary** [2] - 2008:6, 2041:4
**AND** [1] - 1976:2
**Andrew** [1] - 1975:24
**annual** [2] - 1991:6, 2152:10
**annually** [1] - 2058:21
**answer** [17] - 2034:22, 2082:22, 2089:13, 2119:24, 2119:25, 2120:6, 2129:18, 2129:19, 2139:8, 2140:23, 2141:5, 2142:9, 2142:21, 2142:23, 2158:18, 2163:9
**answered** [2] - 2144:12, 2162:20
**anti** [3] - 2051:4, 2152:16, 2157:1
**anti-competitive** [2] - 2152:16, 2157:1
**anti-kickback** [1] - 2051:4
**anticipating** [1] - 2002:23
**anticipation** [1] - 2059:11
**Antitrust** [1] - 1976:4
**antitrust** [23] - 2076:7, 2076:15, 2076:25, 2077:4, 2077:7, 2077:11, 2077:17, 2079:1, 2079:22, 2081:19, 2082:12, 2082:15, 2082:16, 2094:20, 2111:19, 2112:5, 2112:6, 2114:24, 2119:6, 2126:9, 2128:23, 2129:1, 2159:10
**anyhow** [1] - 2137:1
**anytime** [1] - 2044:2
**apologize** [3] - 2000:8, 2062:14, 2070:7
**appear** [2] - 2049:22, 2098:6
**appearances** [6] - 2097:20, 2098:4, 2098:17, 2098:18, 2098:23, 2099:22
**appeared** [1] - 2052:3

**appearing** [6] - 2052:19, 2097:19, 2097:24, 2098:3, 2099:21, 2110:4
**apples** [5] - 1993:3, 2016:4, 2144:20
**applied** [3] - 2076:7, 2082:17, 2125:25
**applies** [2] - 2018:3, 2159:23
**apply** [1] - 2032:4
**appointed** [1] - 2080:15
**appreciate** [2] - 1984:5, 1988:18, 2072:7
**appreciates** [1] - 1977:16
**approach** [9] - 2011:10, 2014:1, 2042:21, 2068:10, 2132:3, 2132:24, 2136:8, 2153:2, 2153:6
**approached** [1] - 2042:21
**appropriate** [2] - 2063:4, 2152:12
**approval** [2] - 2003:25, 2104:12
**approve** [4] - 1982:19, 1982:21, 1983:5, 1983:8
**April** [1] - 2046:1
**arbitrarily** [1] - 2009:13
**area** [13] - 1999:10, 2081:5, 2082:20, 2116:18, 2124:4, 2126:4, 2126:8, 2129:18, 2132:25, 2133:18, 2151:14, 2151:20, 2151:22
**areas** [1] - 2129:2
**argued** [1] - 2128:9
**arguing** [1] - 2161:15
**argument** [2] - 2120:23, 2137:2
**arrangement** [2] - 2018:20, 2062:24
**array** [1] - 2131:5
**arrive** [1] - 2094:12
**arrived** [1] - 2126:2
**articles** [1] - 2076:11
**articulated** [1] - 2120:5
**aside** [3] - 2022:6, 2081:13, 2121:16
**aspect** [2] - 2159:9, 2167:10
**aspects** [3] - 1996:16, 2003:17, 2055:20
**assemble** [1] - 2003:14
**asserted** [3] - 2049:15, 2072:5, 2072:18
**assess** [2] - 2043:3, 2126:5
**assessment** [8] - 1979:18, 1980:10, 2043:4, 2064:8, 2064:9, 2066:6, 2082:12, 2082:15
**assigned** [2] - 1988:14, 1988:24
**assignment** [1] - 2093:19
**assistant** [7] - 1988:19, 1988:22, 2022:2, 2076:2, 2077:5, 2077:16, 2078:11
**assistants** [2] - 2021:23,

2021:25

**associate** [1] - 2076:22
**associated** [4] - 1987:25, 2037:15, 2040:17, 2047:23
**Associates** [2] - 2095:17, 2096:12
**Association** [1] - 2076:22
**assume** [9] - 2002:18, 2004:2, 2035:25, 2041:9, 2049:1, 2051:12, 2070:25, 2071:4, 2113:9
**assumed** [2] - 1999:13, 2114:7
**assuming** [4] - 2013:22, 2159:18, 2161:9, 2161:23
**assumption** [6] - 2123:13, 2123:15, 2158:12, 2158:13, 2158:20, 2159:11
**assure** [1] - 2037:17
**astray** [1] - 2136:5
**attaining** [1] - 2075:24
**attention** [2] - 2064:10, 2095:24
**attorney** [4] - 2077:6, 2077:16, 2078:12, 2078:14
**Attorney** [1] - 1976:3
**attorneys** [2] - 2077:10, 2082:19
**attributes** [6] - 2103:4, 2106:11, 2107:17, 2107:19, 2108:14, 2110:22
**attuned** [2] - 1979:20, 1979:21
**August** [3] - 1997:5, 2059:14, 2079:21
**Austin** [1] - 2110:15
**author** [1] - 2065:4
**authorization** [1] - 2052:17
**authorize** [2] - 1979:11, 1983:8
**authorized** [3] - 1980:7, 1980:14, 1988:8
**available** [9] - 1994:23, 1995:11, 1995:14, 1996:17, 1999:3, 1999:6, 2042:7, 2055:6, 2087:3
**Avenue** [3] - 1975:22, 1976:10, 2170:14
**average** [3] - 2107:1, 2114:16, 2150:13
**avoid** [2] - 2132:22, 2136:5
**AVP** [1] - 1994:7
**award** [5] - 1982:20, 2003:25, 2053:8, 2053:22, 2061:15
**awards** [2] - 2010:4, 2019:12
**aware** [15] - 1991:14, 2001:6, 2014:17, 2029:3, 2033:9, 2035:1, 2036:15, 2036:22, 2039:24, 2054:22, 2060:11, 2068:5, 2095:2, 2096:2, 2149:20
**awareness** [1] - 2104:13
**awhile** [1] - 2086:14

# B

**B2B** [11] - 2015:13, 2038:13, 2046:20, 2047:14, 2047:18, 2048:15, 2050:10, 2052:4, 2085:1, 2095:8, 2096:6
**babies** [1] - 2101:5
**back-dooring** [1] - 2120:17
**background** [2] - 2075:2, 2093:17
**bad** [1] - 1984:19
**Bain** [1] - 1981:22
**Baker** [1] - 2111:23
**ball** [1] - 2139:17
**bank** [1] - 2119:4
**Bank** [6] - 2112:22, 2115:14, 2115:22, 2116:18, 2119:1, 2119:3
**bargaining** [1] - 2152:23
**BARTLETT** [1] - 1975:25
**base** [2] - 2139:22, 2139:23
**based** [13] - 2005:3, 2016:21, 2039:21, 2039:23, 2040:6, 2040:7, 2049:15, 2058:18, 2058:21, 2061:15, 2142:16, 2161:7, 2161:12
**baseline** [2] - 2000:23, 2003:7
**basic** [1] - 2134:4
**basis** [7] - 2032:14, 2032:15, 2066:7, 2066:8, 2072:1, 2152:11, 2161:1
**bear** [4] - 1991:21, 1994:11, 2070:23, 2082:21
**became** [1] - 2080:12
**become** [3] - 2035:16, 2039:24, 2040:22
**BEFORE** [1] - 1975:9
**beginning** [5] - 1997:5, 2078:19, 2093:25, 2094:25, 2122:13
**behalf** [27] - 1977:4, 1979:8, 1979:22, 1979:24, 1979:25, 1980:14, 1982:2, 1982:13, 1985:1, 1986:8, 1988:5, 1988:8, 1991:12, 2014:22, 2025:2, 2037:20, 2038:8, 2054:2, 2054:6, 2061:14, 2068:25, 2069:5, 2069:16, 2069:24, 2070:2, 2070:11, 2070:14
**behavior** [5] - 2011:18, 2016:19, 2024:21, 2026:18, 2057:10
**behind** [6] - 2001:22, 2025:6, 2053:21, 2058:7, 2139:17, 2162:2
**belief** [1] - 2053:23
**belong** [3] - 2066:21, 2148:4, 2150:20
**belongs** [1] - 2151:1
**below** [1] - 2111:11

**bench** [2] - 2063:8, 2068:15
**benchmark** [1] - 2067:22
**beneath** [1] - 1988:22
**benefit** [1] - 1992:2
**benefits** [4] - 2030:12, 2030:16, 2085:20, 2100:22
**Berkeley** [4] - 2076:4, 2079:23, 2081:12, 2168:5
**Best** [2] - 2083:19, 2116:17
**best** [12] - 1986:1, 1989:4, 2004:5, 2009:16, 2015:12, 2089:25, 2090:15, 2097:21, 2105:18, 2106:5, 2170:8
**bet** [1] - 2031:1
**beta** [3] - 2045:21, 2045:23, 2045:24
**better** [5] - 2001:1, 2011:5, 2012:2, 2029:16, 2029:19, 2030:21, 2035:17, 2057:3, 2073:21, 2091:10, 2133:13, 2142:23
**between** [25] - 2001:4, 2002:8, 2045:12, 2046:18, 2046:21, 2049:16, 2050:13, 2057:18, 2058:14, 2080:19, 2087:5, 2089:9, 2093:7, 2093:10, 2095:22, 2101:3, 2105:6, 2110:14, 2111:22, 2115:22, 2117:15, 2133:5, 2137:19, 2154:23, 2166:21
**beyond** [5] - 1995:13, 2086:7, 2115:21, 2138:4, 2151:8
**bid** [8] - 2049:25, 2050:1, 2050:6, 2059:18, 2099:9, 2100:23, 2109:9, 2110:4
**bidder** [1] - 2100:11
**bidding** [21] - 2085:16, 2089:9, 2090:12, 2095:22, 2096:19, 2096:22, 2097:9, 2097:17, 2097:21, 2098:11, 2098:12, 2099:3, 2099:10, 2100:12, 2101:10, 2102:3, 2108:25, 2144:14, 2152:15
**bids** [3] - 2099:13, 2103:3, 2124:2
**big** [28] - 2005:18, 2007:13, 2008:7, 2039:4, 2084:4, 2085:14, 2090:2, 2096:3, 2099:7, 2101:2, 2101:5, 2104:17, 2110:20, 2112:9, 2117:6, 2117:15, 2118:20, 2118:25, 2119:6, 2119:18, 2124:4, 2135:25, 2137:2, 2138:7, 2138:10, 2141:19, 2148:23, 2153:14
**bigger** [2] - 2078:14, 2138:3
**billion** [15] - 1978:14, 1978:17, 1978:21, 2033:10, 2033:15, 2034:9, 2034:10, 2034:12, 2034:14, 2036:7, 2037:11,

2040:24, 2112:18, 2121:24
**binder** [5] - 2043:11, 2132:9, 2132:10, 2132:13, 2132:19
**binders** [6] - 2043:13, 2043:14, 2122:24, 2145:11, 2146:22, 2150:5
**bit** [20] - 1977:12, 1977:18, 1991:23, 2027:24, 2031:7, 2052:11, 2054:1, 2058:11, 2089:1, 2091:22, 2099:11, 2110:8, 2117:20, 2118:18, 2128:20, 2141:4, 2141:15, 2152:19, 2166:15, 2167:8
**bits** [1] - 2107:2
**blacks** [1] - 2129:14
**blank** [1] - 2113:21
**blend** [2] - 2142:2, 2144:10
**blind** [1] - 2088:18
**blindly** [1] - 2142:3
**Block** [6] - 2093:10, 2127:19, 2162:19, 2162:22, 2163:3, 2163:7
**Block/TaxAct** [1] - 2127:16
**blocks** [2] - 2129:12, 2130:4
**blue** [4] - 2023:11, 2023:12, 2025:14, 2026:12
**Blumenthal** [1] - 2035:2
**blunt** [1] - 2118:23
**board** [19] - 1979:16, 1979:20, 1982:21, 1982:23, 1983:2, 1983:4, 1983:7, 1983:15, 1983:18, 1996:1, 2000:1, 2004:1, 2013:5, 2019:12, 2035:21, 2062:8, 2062:9, 2069:19
**boards** [8] - 1980:10, 1982:16, 1982:19, 1991:24, 2003:12, 2003:24, 2043:11, 2052:18
**bonuses** [1] - 2020:21
**book** [1] - 2037:17
**booked** [1] - 2168:6
**borderline** [1] - 2071:19
**boss** [1] - 2078:11
**BOSS** [2] - 2138:5, 2139:19
**bought** [1] - 2149:15
**boundaries** [1] - 2142:17
**boundary** [2] - 2105:6, 2155:25
**box** [6] - 2023:12, 2025:13, 2026:12, 2145:24, 2146:2, 2151:11
**branches** [1] - 2076:8
**Brawny** [1] - 2027:21
**break** [9] - 2007:19, 2008:17, 2039:15, 2067:18, 2067:22, 2137:23, 2167:11, 2168:17
**breakfast** [2] - 2126:18, 2126:19
**breaking** [1] - 2167:6
**brief** [1] - 2075:11
**briefed** [1] - 1981:19

**briefing** [1] - 1982:23
**briefly** [3] - 2068:10, 2068:11, 2156:21
**bring** [8] - 1989:21, 1989:25, 1990:4, 1990:14, 1991:21, 2042:19, 2082:21, 2162:7
**broad** [9] - 2040:16, 2080:21, 2081:9, 2093:25, 2125:12, 2126:13, 2157:6, 2164:12, 2164:14
**broadband** [4] - 2078:25, 2079:3, 2079:6
**broaden** [1] - 2129:7
**broader** [7] - 2080:12, 2125:18, 2128:5, 2130:21, 2130:25, 2131:12, 2164:2
**broadline** [1] - 2131:4
**brought** [2] - 2087:7, 2127:17
**build** [1] - 2078:25
**build-out** [1] - 2078:25
**built** [2] - 2005:14, 2026:1
**bullet** [1] - 2064:22
**bullets** [1] - 2009:2
**bunch** [3] - 2132:17, 2134:11, 2135:12
**bundle** [2] - 2062:20, 2147:12
**bundled** [4] - 2010:8, 2012:6, 2012:10, 2056:20
**bundling** [1] - 2009:17
**Bureau** [1] - 1975:15
**business** [66] - 1978:1, 1978:2, 1989:25, 1990:3, 1990:6, 1991:16, 2002:20, 2005:22, 2011:8, 2011:22, 2011:23, 2012:6, 2012:9, 2014:9, 2014:10, 2014:24, 2037:18, 2039:11, 2040:9, 2042:18, 2048:5, 2048:20, 2061:5, 2062:4, 2065:22, 2073:1, 2073:3, 2073:7, 2073:9, 2081:7, 2083:21, 2084:5, 2084:12, 2084:16, 2091:20, 2096:9, 2096:10, 2096:20, 2100:19, 2107:14, 2110:14, 2110:16, 2111:17, 2112:3, 2112:23, 2114:12, 2115:22, 2118:13, 2121:19, 2122:9, 2144:8, 2147:5, 2147:9, 2149:18, 2155:7, 2156:12, 2157:16, 2161:6, 2161:13, 2161:16, 2164:10, 2165:23, 2166:18
**Business** [24] - 2026:14, 2035:18, 2045:7, 2045:8, 2045:18, 2045:21, 2045:25, 2046:18, 2047:2, 2047:5, 2047:13, 2048:4, 2048:9, 2050:4, 2050:14, 2060:3, 2060:5, 2060:8, 2063:13, 2063:18, 2063:23, 2065:13, 2086:1, 2159:19

**Business's** [1] - 2046:12
**business-related** [1] - 2005:22
**businesses** [11] - 2033:16, 2083:16, 2110:25, 2111:3, 2111:5, 2112:19, 2112:20, 2152:18, 2153:14
**Butch** [1] - 1990:24
**Buy** [2] - 2083:19, 2116:17
**buy** [19] - 2009:23, 2010:1, 2019:19, 2020:16, 2021:6, 2021:15, 2021:24, 2022:6, 2023:12, 2026:12, 2026:13, 2039:17, 2039:18, 2044:3, 2106:18, 2131:9, 2150:18, 2150:23, 2159:6
**buyer** [1] - 2101:4
**buyers** [1] - 2101:5
**buying** [6] - 2021:2, 2022:11, 2023:4, 2023:25, 2026:11, 2029:19
**BY** [24] - 1977:7, 1982:11, 1985:23, 1998:3, 2004:7, 2006:17, 2014:19, 2052:13, 2054:23, 2062:16, 2063:11, 2075:16, 2082:8, 2086:19, 2099:24, 2121:15, 2124:23, 2134:8, 2137:8, 2143:2, 2146:11, 2148:8, 2156:24, 2162:17
**bypass** [1] - 2133:23

# C

**C-suite** [1] - 2048:19
**CA** [1] - 1975:3
**cabined** [1] - 2116:3
**cable** [1] - 2112:11
**calculate** [2] - 2141:6
**calculating** [2] - 2094:16, 2141:13
**campaign** [1] - 2106:21
**candidate** [6] - 2127:8, 2128:14, 2129:21, 2129:22, 2129:25
**cannot** [1] - 2057:2
**Canon** [2] - 2010:14, 2011:7
**capabilities** [11] - 1992:3, 1992:8, 1995:5, 2036:24, 2046:12, 2048:15, 2061:25, 2073:24, 2107:19, 2109:18
**capability** [1] - 2036:23
**capable** [2] - 1996:2
**capacity** [4] - 1982:6, 1982:7, 2068:21, 2069:17
**card** [1] - 2013:12
**cardiac** [6] - 2133:23, 2134:1, 2135:6, 2135:16, 2136:1, 2144:20
**care** [19] - 1978:2, 1980:3, 1980:20, 1983:13, 1983:20,

1983:24, 1984:6, 1984:9, 1987:3, 1987:11, 1987:20, 2035:3, 2035:4, 2035:8, 2040:7, 2040:20, 2040:25, 2041:4, 2119:22
**careful** [1] - 2011:6
**carefully** [1] - 2078:5
**cares** [2] - 2119:1, 2119:17
**Carl** [4] - 1976:14, 2066:25, 2074:8, 2075:19
**CARL** [1] - 2074:9
**Carnegie** [1] - 1975:19
**carry** [3] - 2039:11, 2040:8, 2131:8
**carve** [4] - 2015:8, 2124:6, 2137:16, 2147:14
**carved** [1] - 2140:25
**carving** [1] - 2137:4
**case** [56] - 1979:11, 1982:22, 2018:23, 2019:14, 2021:11, 2032:13, 2067:3, 2069:8, 2072:13, 2073:19, 2079:6, 2081:18, 2083:7, 2083:8, 2085:4, 2085:7, 2088:18, 2088:19, 2090:8, 2091:2, 2093:12, 2097:11, 2100:5, 2106:23, 2113:13, 2114:14, 2117:3, 2120:12, 2120:13, 2120:14, 2120:23, 2121:3, 2122:16, 2125:22, 2126:4, 2127:14, 2127:16, 2127:19, 2129:17, 2129:18, 2130:3, 2131:2, 2131:23, 2136:10, 2138:23, 2139:25, 2146:23, 2153:6, 2157:8, 2162:24, 2163:16, 2163:21, 2164:6, 2164:8, 2165:5, 2167:11
**cases** [11] - 2022:14, 2077:14, 2077:18, 2078:13, 2078:14, 2087:9, 2092:10, 2092:13, 2093:6, 2093:12, 2096:21
**cash** [1] - 2131:8
**catalog** [3] - 2039:2, 2039:5, 2044:6
**categories** [17] - 2009:17, 2010:5, 2011:11, 2012:1, 2012:2, 2013:3, 2013:11, 2014:16, 2030:2, 2047:25, 2103:19, 2104:11, 2123:21, 2138:12, 2138:18, 2139:19, 2140:1
**Categories** [1] - 2038:21
**category** [10] - 1987:6, 1987:7, 2010:6, 2030:3, 2038:19, 2042:15, 2081:17, 2097:12, 2123:8, 2123:25
**caught** [1] - 2095:24
**CDW** [1] - 2139:21
**CEA** [2] - 2080:5, 2080:14
**Center** [1] - 1975:19

**centers** [2] - 2022:19, 2135:12
**central** [1] - 2129:20
**centralized** [1] - 2104:12
**CEO** [11] - 2046:25, 2047:24, 2048:3, 2048:7, 2048:8, 2048:18, 2063:18, 2064:20, 2065:21, 2066:2, 2161:5
**cereals** [2] - 2126:18, 2126:19
**CERELLI** [2] - 2099:24, 2156:24
**Cerilli** [2] - 1975:13, 2074:18
**CERILLI** [27] - 2074:17, 2074:21, 2075:5, 2075:14, 2075:16, 2082:1, 2082:7, 2082:8, 2086:18, 2086:19, 2113:24, 2114:4, 2114:10, 2114:15, 2114:18, 2115:4, 2121:15, 2124:23, 2134:8, 2137:8, 2143:2, 2146:11, 2148:8, 2162:17, 2167:5, 2167:22, 2167:24
**certain** [12] - 1990:1, 2001:22, 2003:17, 2011:13, 2012:18, 2050:19, 2075:7, 2085:8, 2131:7, 2150:18, 2152:13, 2160:24
**certainly** [17] - 1995:13, 1996:19, 2036:22, 2037:20, 2044:2, 2046:14, 2072:25, 2073:23, 2077:12, 2092:20, 2093:5, 2096:2, 2120:22, 2121:1, 2121:17, 2148:23, 2150:8
**CERTIFICATE** [1] - 2170:2
**certified** [1] - 2005:16
**certify** [1] - 2170:5
**chain** [1] - 2057:15
**chair** [1] - 2080:14
**chairs** [8] - 2006:19, 2007:6, 2007:9, 2007:10, 2007:11, 2007:12, 2008:4, 2008:18
**challenge** [1] - 2095:2
**challenged** [1] - 2093:10
**challenging** [2] - 2168:19, 2168:23
**chance** [1] - 2065:2
**change** [8] - 2011:18, 2024:21, 2057:9, 2090:11, 2104:20, 2141:24, 2155:15, 2156:1
**channel** [3] - 2006:10, 2095:8, 2096:10
**characteristics** [1] - 2147:25
**characterization** [1] - 2163:2
**characterize** [1] - 2022:10
**characterized** [1] - 2060:22
**charge** [9] - 2025:24, 2077:6, 2077:17, 2107:11, 2112:20, 2115:14, 2115:16, 2157:21, 2158:1
**charging** [1] - 2153:21
**Charles** [3] - 1975:14, 2095:17,

2096:12
**chart** [1] - 2150:7
**charts** [1] - 2097:5
**cheap** [3] - 1994:3, 1994:4, 1994:10
**check** [3] - 2037:4, 2137:17, 2151:11
**cherish** [3] - 1989:21, 1989:25, 2053:7
**cherry** [1] - 2143:11
**cherry-picking** [1] - 2143:11
**Chevron** [2] - 2112:1, 2112:2
**chief** [4] - 2077:5, 2077:21, 2078:3, 2078:9
**China** [1] - 2081:1
**choice** [6] - 2020:4, 2020:5, 2087:18, 2109:11, 2109:21, 2157:18
**choices** [27] - 2083:3, 2086:24, 2087:2, 2087:22, 2088:1, 2090:7, 2092:3, 2095:10, 2095:15, 2100:22, 2109:6, 2109:20, 2110:18, 2110:20, 2111:10, 2124:15, 2124:17, 2124:18, 2126:22, 2139:16, 2143:16, 2152:22, 2152:25, 2153:12, 2153:14, 2153:15
**choose** [4] - 2023:14, 2028:23, 2035:11
**chose** [2] - 2049:10, 2049:13
**Circuit** [1] - 2166:11
**circumstance** [1] - 2010:17
**circumstances** [2] - 2097:18, 2136:4
**cited** [1] - 2014:8
**Citizen** [1] - 2083:14
**city** [1] - 2135:7
**Civil** [1] - 1975:2
**civil** [1] - 2077:12
**claim** [3] - 2012:3, 2086:7, 2160:24
**claiming** [3] - 2121:3, 2122:8
**clarified** [1] - 2070:20
**clarifies** [1] - 2005:17
**clarify** [3] - 1988:17, 2003:17, 2003:18
**clarity** [1] - 2050:25
**clean** [1] - 2147:8
**clear** [14] - 2069:18, 2070:3, 2070:5, 2070:9, 2070:10, 2070:12, 2070:21, 2070:25, 2071:25, 2110:13, 2114:13, 2117:10, 2138:11, 2140:15
**cleared** [1] - 2092:25
**clearest** [1] - 2155:12
**clearly** [3] - 2070:1, 2106:23, 2153:24
**click** [2] - 2043:12, 2043:13
**clicked** [3] - 2039:1, 2042:4, 2043:10

**client** [2] - 2081:18, 2081:25
**clients** [1] - 2081:23
**clinical** [1] - 1987:10
**Clinton** [1] - 2077:4
**clip** [1] - 2043:11
**clips** [6] - 2043:11, 2130:13, 2132:9, 2132:10, 2132:13, 2132:19
**clock** [1] - 2090:23
**close** [7] - 1984:15, 2060:16, 2060:18, 2085:8, 2121:16, 2130:5, 2163:18
**closely** [1] - 2155:2
**closer** [1] - 2147:19
**closes** [2] - 2085:10
**clothing** [1] - 2133:2
**cluster** [29] - 2124:19, 2132:4, 2132:16, 2132:19, 2132:24, 2133:9, 2133:10, 2134:4, 2134:9, 2134:15, 2134:25, 2136:8, 2136:10, 2136:12, 2137:1, 2137:11, 2138:18, 2140:13, 2141:5, 2142:17, 2143:4, 2146:19, 2148:4, 2148:5, 2148:10, 2149:10, 2150:20, 2151:1, 2151:7
**clustering** [4] - 2132:22, 2147:22, 2147:23, 2149:5
**CMOs** [1] - 2071:23
**coeditor** [1] - 2076:19
**collect** [1] - 2092:1
**collection** [3] - 2126:12, 2127:9, 2128:19
**collectively** [1] - 2057:21
**Colletta** [1] - 1989:1
**Colletta's** [1] - 1989:3
**COLUMBIA** [1] - 1975:1
**Colwell** [1] - 1975:14
**combine** [1] - 2010:2
**combined** [1] - 2141:13
**comfortable** [1] - 2006:3
**coming** [8] - 2009:21, 2022:15, 2030:20, 2049:9, 2064:5, 2085:13, 2086:1, 2105:24
**comment** [1] - 1984:21
**comments** [1] - 2079:20
**commercial** [3] - 2103:22, 2156:6, 2156:13
**Commission** [4] - 1975:2, 2074:18, 2079:2, 2093:1
**COMMISSION** [1] - 1975:15
**commit** [8] - 2019:10, 2019:11, 2020:1, 2020:3, 2020:7, 2022:13, 2035:21
**commitment** [1] - 2106:5
**commitments** [3] - 2020:19, 2020:23, 2022:15
**committed** [4] - 2020:12, 2020:22, 2057:23, 2102:5
**common** [3] - 2104:10,

2123:23, 2140:8
**commonality** [2] - 2150:10, 2154:13
**Commonwealth** [1] - 1976:3
**communicated** [2] - 2025:23, 2045:23
**communication** [1] - 2046:8
**Communications** [1] - 2079:2
**communications** [1] - 2106:20
**community** [6] - 1990:11, 1996:16, 2009:19, 2010:11, 2040:20, 2056:22
**companies** [28] - 1978:3, 1980:20, 1981:17, 2001:11, 2083:19, 2087:7, 2091:10, 2091:19, 2092:19, 2095:13, 2095:22, 2101:1, 2101:4, 2107:11, 2111:15, 2111:23, 2111:24, 2112:18, 2119:18, 2123:1, 2123:19, 2124:3, 2125:11, 2125:13, 2137:3, 2149:17, 2150:15, 2150:23
**company** [16] - 1978:10, 1993:13, 2026:25, 2027:20, 2035:24, 2037:11, 2041:15, 2041:18, 2103:11, 2107:22, 2113:9, 2118:20, 2124:10, 2158:25, 2159:6, 2160:5
**comparative** [1] - 2092:7
**compare** [3] - 1992:8, 2029:20, 2029:25
**compel** [2] - 2068:4, 2071:10
**compelling** [1] - 2165:24
**compete** [6] - 2042:14, 2073:18, 2087:23, 2090:11, 2095:13, 2151:20
**competencies** [1] - 2040:17
**competency** [4] - 2037:6, 2038:7, 2041:3, 2052:5
**competent** [4] - 2038:2, 2038:5, 2120:1, 2120:8
**competes** [1] - 2096:3
**competing** [7] - 1993:8, 1993:10, 2087:8, 2087:11, 2157:20, 2165:16
**Competition** [1] - 1975:15
**competition** [24] - 2013:10, 2015:14, 2053:2, 2053:23, 2077:13, 2079:2, 2079:4, 2082:25, 2083:3, 2086:20, 2086:22, 2094:9, 2095:20, 2101:3, 2112:4, 2114:5, 2114:20, 2121:20, 2122:6, 2143:18, 2157:22, 2166:21, 2167:3
**competitive** [45] - 1989:17, 1990:9, 1990:12, 1998:13, 2000:18, 2002:7, 2003:2, 2003:3, 2003:7, 2015:25, 2034:13, 2034:17, 2059:18,

2059:19, 2059:24, 2062:8, 2079:7, 2089:20, 2090:10, 2090:16, 2092:14, 2093:3, 2093:23, 2123:10, 2132:18, 2134:6, 2134:23, 2135:2, 2135:17, 2136:4, 2136:7, 2138:11, 2139:11, 2146:18, 2147:14, 2147:24, 2148:2, 2148:16, 2148:19, 2148:21, 2149:22, 2151:2, 2151:13, 2152:16, 2157:1
**competitiveness** [1] - 2015:22
**competitor** [2] - 2096:3, 2099:4
**competitors** [10] - 2012:17, 2014:14, 2015:16, 2087:5, 2087:9, 2088:1, 2094:7, 2129:10, 2139:13, 2149:23
**compiled** [1] - 2099:18
**complaint** [5] - 2093:13, 2096:7, 2104:6, 2114:19, 2120:11
**complement** [1] - 2058:10
**complete** [3] - 2003:23, 2075:8, 2170:7
**completely** [2] - 2003:16, 2025:23
**compliance** [6] - 2022:19, 2023:18, 2025:7, 2057:17, 2106:19, 2106:21
**compliant** [4] - 1990:15, 2022:21, 2022:22, 2053:5
**complication** [1] - 2132:5
**component** [4] - 2121:22, 2127:2, 2151:16, 2151:17
**components** [2] - 2088:13, 2126:25
**comprehensive** [5] - 1996:9, 2011:12, 2037:10, 2042:8, 2056:19
**comprehensively** [1] - 2013:7
**comprised** [1] - 1980:20
**computer** [1] - 1976:7
**computer-aided** [1] - 1976:7
**computers** [1] - 2005:19
**conceivable** [1] - 2165:4
**concept** [3] - 2126:5, 2153:21, 2157:23
**conceptual** [1] - 2129:3
**concern** [11] - 2002:17, 2012:25, 2034:2, 2062:1, 2062:3, 2062:5, 2095:18, 2109:10, 2112:1, 2112:22, 2144:7
**concerned** [9] - 1979:14, 2064:23, 2083:22, 2094:5, 2107:22, 2137:5, 2137:7, 2140:3
**concerning** [5] - 2094:2, 2096:1, 2108:13, 2109:24, 2122:15
**concerns** [9] - 2072:22,

2092:14, 2093:4, 2120:25,
2137:6, 2151:13, 2152:17,
2155:10, 2156:14
  **conclude** [1] - 2094:18
  **concluded** [2] - 2092:14,
2093:3
  **conclusion** [6] - 2094:12,
2095:25, 2110:23, 2126:3,
2136:19, 2157:12
  **concrete** [1] - 2127:15
  **condition** [1] - 2020:6
  **conditions** [28] - 1996:15,
1999:25, 2003:20, 2016:21,
2019:3, 2089:20, 2123:10,
2132:18, 2134:6, 2134:23,
2135:3, 2135:18, 2136:7,
2138:11, 2138:16, 2146:18,
2147:14, 2147:24, 2148:2,
2148:16, 2148:19, 2148:21,
2149:2, 2149:10, 2149:22,
2151:2, 2153:17, 2154:4
  **condone** [1] - 2026:18
  **conduct** [3] - 2056:2, 2075:6,
2106:20
  **conducting** [1] - 2074:19
  **conference** [4] - 2045:11,
2048:1, 2048:2, 2049:16
  **confers** [1] - 2064:9
  **confident** [4] - 2085:24, 2111:8,
2160:17, 2160:22
  **configured** [1] - 2005:14
  **confirmed** [1] - 2080:16
  **confirms** [1] - 2166:1
  **confused** [2] - 2012:21, 2146:7
  **confusing** [1] - 2132:21
  **confusion** [2] - 2069:21, 2070:1
  **conglomerate** [1] - 2087:10
  **conservative** [1] - 2130:25
  **conserve** [1] - 2164:23
  **consider** [20] - 2005:5, 2005:6,
2005:8, 2006:22, 2007:3,
2038:11, 2038:12, 2039:19,
2040:3, 2050:10, 2056:18,
2071:21, 2072:3, 2072:12,
2090:23, 2091:6, 2091:12,
2092:6, 2115:3, 2125:15
  **consideration** [1] - 2083:4
  **considered** [1] - 2005:22
  **considering** [1] - 2055:17
  **consistent** [2] - 2061:4,
2158:15
  **constitutes** [1] - 2170:6
  **Constitution** [2] - 1976:10,
2170:14
  **constrains** [1] - 2016:19
  **constraints** [1] - 1978:16
  **construct** [2] - 2158:12,
2160:11
  **consultant** [7] - 1990:18,
1994:9, 2055:2, 2061:20,

2081:14, 2081:18, 2107:8
  **consultants** [2] - 1998:24,
2107:10
  **consulting** [5] - 1991:4,
1991:16, 2040:19, 2078:14,
2096:13
  **consumable** [43] - 2002:13,
2004:10, 2004:12, 2004:20,
2004:23, 2005:6, 2005:7,
2005:10, 2009:8, 2094:8,
2094:23, 2098:8, 2100:5,
2104:2, 2112:19, 2122:20,
2123:2, 2123:20, 2124:24,
2125:2, 2125:14, 2130:23,
2131:13, 2136:12, 2138:13,
2139:12, 2139:24, 2140:9,
2140:10, 2142:1, 2143:8,
2144:7, 2150:12, 2151:14,
2152:5, 2154:16, 2154:22,
2157:10, 2158:22, 2164:10,
2164:19, 2165:2, 2165:12
  **consume** [1] - 2021:24
  **consumed** [1] - 2140:6
  **consumer** [10] - 2005:3,
2084:13, 2084:20, 2112:12,
2114:13, 2114:16, 2116:15,
2120:16, 2122:18, 2125:12
  **consumer-based** [1] - 2005:3
  **consumers** [6] - 2033:16,
2086:21, 2113:1, 2113:17,
2113:22, 2152:18
  **consuming** [1] - 2003:22
  **contact** [1] - 1997:5
  **context** [1] - 2162:19
  **continue** [2] - 2069:9, 2075:11
  **contract** [108] - 1982:19,
1983:5, 1988:23, 1988:24,
1988:25, 1989:8, 1996:15,
1996:19, 1996:22, 1997:2,
1997:15, 1998:24, 1999:8,
1999:16, 1999:25, 2000:11,
2000:20, 2001:2, 2001:20,
2001:21, 2002:2, 2002:20,
2003:5, 2003:9, 2003:19,
2003:25, 2005:2, 2005:9,
2005:18, 2006:5, 2006:20,
2007:18, 2007:25, 2008:2,
2008:3, 2008:5, 2008:7, 2008:8,
2008:15, 2008:18, 2010:2,
2010:4, 2010:6, 2010:22,
2012:23, 2014:2, 2014:20,
2014:21, 2015:20, 2015:24,
2016:1, 2016:10, 2016:16,
2016:18, 2017:6, 2017:12,
2017:23, 2018:1, 2018:7,
2018:14, 2018:18, 2018:21,
2019:16, 2019:20, 2019:23,
2020:2, 2020:10, 2020:17,
2020:25, 2021:3, 2021:7,
2021:10, 2021:14, 2021:16,

2021:19, 2022:7, 2022:24,
2023:19, 2025:18, 2026:6,
2026:12, 2026:20, 2027:3,
2027:6, 2028:24, 2030:5,
2030:8, 2030:9, 2030:12,
2030:16, 2030:17, 2032:8,
2032:16, 2032:17, 2033:21,
2041:18, 2054:12, 2056:7,
2057:13, 2058:1, 2059:16,
2059:25, 2063:1, 2106:16,
2106:18, 2150:19, 2151:4
  **contracted** [2] - 1993:5, 2025:6
  **contracting** [1] - 1982:17
  **contracts** [6] - 1986:8, 2007:22,
2019:10, 2019:12, 2053:6,
2085:11
  **contractual** [1] - 1985:5
  **control** [10] - 2015:10, 2023:13,
2023:20, 2052:23, 2053:14,
2053:19, 2113:4, 2126:17,
2151:21, 2164:25
  **controlled** [4] - 2126:14,
2127:10, 2128:21, 2162:24
  **controlling** [4] - 2128:10,
2129:16, 2158:21, 2163:6
  **controls** [7] - 2057:12, 2057:19,
2057:20, 2126:16, 2129:5,
2157:9, 2164:19
  **convenience** [7] - 2017:25,
2018:2, 2018:8, 2018:13,
2018:15, 2018:17, 2018:21
  **conversation** [7] - 1983:21,
2044:5, 2046:2, 2050:5, 2064:1,
2066:4, 2104:23
  **conversations** [4] - 1983:15,
2049:15, 2060:2, 2062:7
  **conversion** [1] - 2104:13
  **convey** [1] - 2078:10
  **coordinate** [1] - 1999:22
  **coordination** [1] - 2003:11
  **copier** [1] - 2124:11
  **copiers** [1] - 2147:4
  **copies** [2] - 2054:17, 2054:20
  **copy** [8] - 2004:23, 2008:16,
2008:21, 2010:9, 2029:4,
2030:14, 2030:15
  **Core** [27] - 1977:25, 1980:18,
1980:20, 1981:9, 1981:10,
1981:14, 1981:17, 1981:19,
1982:12, 1982:13, 1988:9,
2019:25, 2020:1, 2020:3,
2020:6, 2020:9, 2020:12,
2020:16, 2020:24, 2021:2,
2021:5, 2021:12, 2022:13,
2022:14, 2022:16, 2048:1,
2048:2
  **core** [24] - 2010:10, 2016:22,
2016:25, 2017:12, 2017:13,
2017:14, 2017:16, 2037:6,
2038:7, 2040:3, 2040:5,

2040:17, 2041:2, 2043:20,
2043:22, 2052:5, 2106:1,
2122:22, 2124:19, 2137:15,
2137:19, 2137:21, 2138:1,
2142:1
**Corn** [3] - 2126:16, 2126:20,
2129:7
**corner** [1] - 2102:8
**corporate** [3] - 1981:23,
2046:21, 2053:24
**corporations** [1] - 2116:7
**correct** [138] - 1977:21,
1977:23, 1978:4, 1978:9,
1978:10, 1978:11, 1978:12,
1978:13, 1978:15, 1978:23,
1979:9, 1980:1, 1980:4,
1980:19, 1980:21, 1980:22,
1980:24, 1980:25, 1982:18,
1983:2, 1983:3, 1983:5, 1983:6,
1983:14, 1983:21, 1984:1,
1985:6, 1985:11, 1985:14,
1986:6, 1986:11, 1986:13,
1986:18, 1988:7, 1988:10,
1988:11, 1988:21, 1988:24,
1989:2, 1989:10, 1990:10,
1990:22, 1991:2, 1991:3,
1992:5, 1992:9, 1992:10,
1992:14, 1993:20, 1994:18,
1995:3, 1995:14, 1995:15,
1997:3, 1997:4, 1997:7,
1997:18, 1998:9, 1998:17,
1998:19, 1999:6, 2000:16,
2001:3, 2002:3, 2002:7,
2004:15, 2004:19, 2004:25,
2006:1, 2008:9, 2008:13,
2008:24, 2015:6, 2015:23,
2016:1, 2016:2, 2016:9,
2016:12, 2017:10, 2018:4,
2018:5, 2018:6, 2019:1, 2019:7,
2020:8, 2020:15, 2021:4,
2021:7, 2021:8, 2023:5, 2023:9,
2024:4, 2024:11, 2024:15,
2024:17, 2025:11, 2026:4,
2026:7, 2027:12, 2028:12,
2029:2, 2029:22, 2031:3,
2031:11, 2031:20, 2032:20,
2033:3, 2033:8, 2033:22,
2034:8, 2034:22, 2041:7,
2041:20, 2041:23, 2049:21,
2049:24, 2051:19, 2053:13,
2053:16, 2054:3, 2054:4,
2054:6, 2054:7, 2055:4, 2058:5,
2059:6, 2060:14, 2060:15,
2060:18, 2068:21, 2069:3,
2136:18, 2136:21, 2139:8,
2143:24, 2145:13, 2162:20,
2164:11
**Correct** [1] - 2065:8
**correctly** [5] - 2057:14, 2059:8,
2088:22, 2148:9, 2164:8

**correspond** [1] - 2154:19
**corresponding** [1] - 2111:7
**cost** [13] - 2000:23, 2001:19,
2003:7, 2016:6, 2056:12,
2091:9, 2091:10, 2091:14,
2104:20, 2106:14, 2117:9,
2117:17, 2118:11
**costs** [18] - 2035:4, 2068:23,
2104:21, 2108:4, 2113:5,
2113:8, 2113:10, 2113:15,
2115:13, 2115:19, 2115:24,
2116:14, 2116:21, 2116:22,
2118:14, 2118:17, 2121:19,
2121:22
**Council** [1] - 2080:2
**council** [2] - 2080:18, 2081:11
**Counsel** [8] - 1977:5, 2052:10,
2063:4, 2074:6, 2075:13,
2080:3, 2121:14, 2167:21
**counsel** [9] - 1977:9, 2068:9,
2068:17, 2073:5, 2082:3,
2113:20, 2113:23, 2117:9,
2120:15
**Counselor** [1] - 2074:20
**count** [2] - 2091:14, 2123:1
**counted** [1] - 2091:16
**counterproposals** [1] - 2102:12
**couple** [6] - 2003:9, 2035:1,
2052:16, 2063:6, 2097:14,
2112:20
**course** [18] - 2001:15, 2073:1,
2073:2, 2073:21, 2078:13,
2090:8, 2092:6, 2092:15,
2094:25, 2096:17, 2097:18,
2097:25, 2105:18, 2119:12,
2126:2, 2149:19, 2157:2,
2164:23
**Court** [23] - 1976:8, 1976:9,
2056:5, 2064:12, 2071:1,
2071:20, 2071:24, 2072:3,
2072:16, 2072:21, 2073:10,
2082:22, 2083:23, 2092:5,
2093:15, 2119:21, 2162:23,
2163:16, 2163:22, 2166:10,
2166:11, 2170:13
**court** [6] - 1985:20, 1985:21,
2105:22, 2128:3, 2128:9,
2128:10
**COURT** [171] - 1975:1, 1977:2,
1977:5, 1982:2, 1982:5, 1982:9,
1985:20, 2002:17, 2003:4,
2003:8, 2004:1, 2004:4, 2004:6,
2012:15, 2012:24, 2013:3,
2013:5, 2013:10, 2013:16,
2013:21, 2014:4, 2014:12,
2014:18, 2050:24, 2051:7,
2051:10, 2051:17, 2051:20,
2051:25, 2052:8, 2052:10,
2054:16, 2054:19, 2061:2,
2061:9, 2061:18, 2062:12,

2063:4, 2066:15, 2066:17,
2066:21, 2067:2, 2067:5,
2067:12, 2067:16, 2067:22,
2068:6, 2068:9, 2068:12,
2068:16, 2068:25, 2069:4,
2069:14, 2070:4, 2070:16,
2070:20, 2071:1, 2071:12,
2071:16, 2072:3, 2072:10,
2072:13, 2073:3, 2073:13,
2074:1, 2074:5, 2074:12,
2074:14, 2074:16, 2074:20,
2074:23, 2075:2, 2075:12,
2082:3, 2082:5, 2083:4, 2083:7,
2083:14, 2083:17, 2083:21,
2084:7, 2084:10, 2084:21,
2084:25, 2086:9, 2086:17,
2088:21, 2099:14, 2113:23,
2114:2, 2114:9, 2114:11,
2114:16, 2115:1, 2115:6,
2115:11, 2116:4, 2116:20,
2116:25, 2117:3, 2118:3,
2118:5, 2119:8, 2119:16,
2119:23, 2120:18, 2121:7,
2121:11, 2121:13, 2123:3,
2123:7, 2123:12, 2123:24,
2124:22, 2133:14, 2133:16,
2136:16, 2136:19, 2136:22,
2136:24, 2141:1, 2141:9,
2142:21, 2143:1, 2144:18,
2144:23, 2145:1, 2145:3,
2145:7, 2145:10, 2145:14,
2145:17, 2145:21, 2145:24,
2146:3, 2146:9, 2146:15,
2146:20, 2146:24, 2147:1,
2148:5, 2148:7, 2156:23,
2157:25, 2158:6, 2158:9,
2158:14, 2158:25, 2159:3,
2159:14, 2160:3, 2160:8,
2160:15, 2160:19, 2162:16,
2166:11, 2167:7, 2167:15,
2167:17, 2167:21, 2167:23,
2167:25, 2168:3, 2168:6,
2168:8, 2168:12, 2168:18,
2168:23, 2168:25, 2169:2,
2170:2
**Court's** [3] - 1999:15, 2000:9,
2063:7
**Courthouse** [1] - 1976:9
**courts** [3] - 2088:18, 2089:17,
2127:6
**coverage** [1] - 2061:25
**covered** [1] - 2140:14
**covers** [1] - 2112:7
**craft** [1] - 2159:25
**crazy** [2] - 2116:2, 2116:18
**create** [1] - 2012:2
**created** [1] - 1984:3
**creates** [4] - 1983:16, 2030:2,
2057:24, 2132:5
**credible** [1] - 2011:8

criminal [1] - 2077:14
criteria [1] - 2148:14
critical [2] - 2027:24, 2040:25
criticized [1] - 2137:21
cross [5] - 1977:2, 2039:21, 2067:14, 2072:21, 2117:10
CROSS [1] - 1977:6
cross-examination [1] - 1977:2
CROSS-EXAMINATION [1] - 1977:6
cross-examine [1] - 2072:21
cross-examining [1] - 2117:10
CRR [2] - 1976:8, 2170:13
curative [1] - 2086:3
current [8] - 2001:5, 2003:5, 2003:7, 2008:11, 2008:22, 2011:1, 2015:21, 2049:25
customer [52] - 1995:19, 2031:14, 2083:9, 2084:4, 2084:6, 2084:12, 2084:13, 2085:1, 2088:4, 2100:14, 2101:11, 2102:14, 2103:2, 2103:6, 2103:17, 2103:23, 2104:8, 2104:9, 2104:24, 2105:15, 2105:18, 2105:21, 2105:23, 2106:2, 2106:12, 2106:17, 2107:3, 2107:4, 2107:20, 2109:12, 2109:20, 2111:9, 2114:23, 2115:10, 2118:10, 2119:22, 2121:21, 2124:10, 2124:25, 2125:1, 2131:14, 2150:14, 2152:15, 2152:22, 2154:9, 2154:12, 2154:23, 2155:21
customer's [4] - 2005:15, 2088:3, 2090:4, 2126:21
Customers [1] - 2153:20
customers [153] - 2083:2, 2083:5, 2083:6, 2083:11, 2083:12, 2083:13, 2083:16, 2083:19, 2085:11, 2085:15, 2085:21, 2086:23, 2087:12, 2087:15, 2087:17, 2087:18, 2087:22, 2088:2, 2089:19, 2089:21, 2089:24, 2090:7, 2090:12, 2090:18, 2090:24, 2091:3, 2091:8, 2091:11, 2092:3, 2094:8, 2094:24, 2095:6, 2095:9, 2095:14, 2095:18, 2095:21, 2096:6, 2096:19, 2097:9, 2097:12, 2097:13, 2099:3, 2099:8, 2100:4, 2100:5, 2101:2, 2101:7, 2101:9, 2101:25, 2102:22, 2102:24, 2103:4, 2103:8, 2103:12, 2103:14, 2103:15, 2103:22, 2104:16, 2105:3, 2105:10, 2105:12, 2105:16, 2108:10, 2108:11, 2108:13, 2108:18, 2108:24, 2109:2,

2109:6, 2109:9, 2110:19, 2110:23, 2111:2, 2111:8, 2111:14, 2111:24, 2112:8, 2112:25, 2113:11, 2114:5, 2114:8, 2114:9, 2114:10, 2114:21, 2115:13, 2115:24, 2115:25, 2116:17, 2117:6, 2117:20, 2118:12, 2118:22, 2118:25, 2119:3, 2119:5, 2119:7, 2121:4, 2121:5, 2122:4, 2122:9, 2122:18, 2124:14, 2125:19, 2126:22, 2130:1, 2130:22, 2139:1, 2142:20, 2147:7, 2149:12, 2150:18, 2151:4, 2152:1, 2152:5, 2152:7, 2152:8, 2152:13, 2152:20, 2152:24, 2153:2, 2153:8, 2153:9, 2153:10, 2153:11, 2153:18, 2153:25, 2154:3, 2154:5, 2154:13, 2154:20, 2154:24, 2155:1, 2155:3, 2155:11, 2155:24, 2156:2, 2156:5, 2157:11, 2158:22, 2161:17, 2161:22, 2162:7, 2162:8, 2163:1, 2163:14, 2164:11, 2164:20, 2165:13, 2165:17, 2165:23
cut [2] - 2033:24, 2122:3
cutoff [3] - 2111:6, 2155:16, 2155:18
cuts [2] - 2034:5, 2034:20

# D

D.C [1] - 2170:15
dah [5] - 2125:10
data [41] - 2078:7, 2089:25, 2092:4, 2092:7, 2095:21, 2095:23, 2096:19, 2096:22, 2096:23, 2096:24, 2096:25, 2097:2, 2097:7, 2097:8, 2097:11, 2097:15, 2097:24, 2098:12, 2098:14, 2098:16, 2098:25, 2099:10, 2099:12, 2099:18, 2099:25, 2100:12, 2100:17, 2100:19, 2101:8, 2101:10, 2101:25, 2102:3, 2102:21, 2102:22, 2108:25, 2109:9, 2110:4, 2134:17, 2150:15, 2150:16, 2155:17
date [1] - 2092:9
Dated [1] - 2170:9
dates [1] - 1997:2
days [5] - 1977:16, 2016:4, 2016:8, 2035:1, 2078:22
DC [4] - 1975:5, 1975:16, 1976:1, 1976:10
DDIY [1] - 2164:6
de [1] - 2056:14
de-aggregate [1] - 2056:14

dead [1] - 2164:14
deal [14] - 1982:17, 1997:17, 2002:6, 2052:20, 2085:9, 2085:10, 2092:21, 2092:24, 2100:20, 2117:15, 2119:18, 2149:6, 2153:25
dealer [2] - 2047:6, 2064:5
dealing [1] - 2148:10
deals [1] - 2104:17
decide [7] - 2059:15, 2072:7, 2119:21, 2134:24, 2136:13, 2148:14
decided [5] - 2011:2, 2079:16, 2125:17, 2128:9, 2146:13
deciding [1] - 2072:14
decision [1] - 2078:13
decisions [2] - 1982:20, 2080:23
declaration [11] - 1978:25, 2048:22, 2049:13, 2049:14, 2049:17, 2049:23, 2054:17, 2054:20, 2069:4, 2069:15, 2069:20
declarations [2] - 2110:7, 2140:19
decrease [4] - 1983:13, 2011:14, 2053:20, 2058:24
dedicated [3] - 1986:23, 2040:2
deeper [1] - 1995:1, 1995:4
deeply [1] - 2106:4
defendants [8] - 2068:2, 2070:13, 2071:3, 2093:8, 2119:8, 2120:1, 2123:18, 2131:1
Defendants [2] - 1975:7, 1975:18
defensive [1] - 2059:13
defer [1] - 2067:8
deficiencies [2] - 2003:18, 2003:19
define [5] - 2125:21, 2125:22, 2134:14, 2137:11, 2157:4
defined [6] - 2088:22, 2089:23, 2124:24, 2151:15, 2156:19, 2157:8
defining [8] - 2089:2, 2094:15, 2122:14, 2125:1, 2131:25, 2151:18, 2156:18, 2157:5
definition [10] - 2002:13, 2004:16, 2126:6, 2126:7, 2126:25, 2130:25, 2138:20, 2149:8, 2151:17, 2152:8
degrees [1] - 2075:22
deliver [10] - 2028:5, 2028:21, 2033:8, 2035:12, 2040:14, 2041:1, 2054:13, 2058:6, 2058:17, 2107:1
delivered [5] - 1987:17, 2027:13, 2028:25, 2132:8, 2132:9
deliveries [2] - 2056:23, 2058:9

**delivering** [1] - 2054:9
**delivers** [3] - 1989:18, 2036:15, 2037:12
**delivery** [20] - 2009:21, 2028:8, 2028:9, 2028:15, 2031:8, 2031:10, 2031:12, 2031:14, 2031:22, 2032:8, 2032:10, 2032:18, 2032:20, 2032:22, 2033:7, 2036:23, 2036:24, 2083:25, 2125:9
**Dell** [1] - 2139:21
**demand** [2] - 2103:6, 2156:14
**demanding** [1] - 2081:10
**demands** [1] - 2155:5
**demonstrate** [1] - 2120:7
**demonstrated** [1] - 2014:10
**demonstrative** [1] - 2002:14
**demonstratives** [1] - 2007:16
**Department** [2] - 2092:16, 2092:17
**department** [4] - 1986:6, 2032:25, 2033:8, 2133:2
**dependence** [1] - 2108:5
**deployment** [1] - 2078:25
**deposition** [1] - 2031:17
**Depot** [57] - 1975:24, 1978:22, 1984:14, 1998:8, 1999:17, 2001:6, 2002:9, 2032:12, 2033:2, 2037:25, 2044:17, 2050:1, 2055:9, 2060:19, 2060:22, 2083:10, 2094:6, 2095:1, 2096:20, 2096:23, 2097:8, 2097:23, 2098:10, 2098:20, 2099:3, 2099:9, 2099:21, 2100:8, 2100:10, 2100:21, 2101:19, 2102:6, 2102:13, 2104:11, 2106:24, 2109:8, 2109:19, 2110:17, 2112:16, 2125:7, 2130:9, 2137:2, 2139:23, 2141:12, 2142:14, 2143:9, 2144:6, 2149:12, 2150:16, 2150:24, 2155:22, 2157:15, 2161:17, 2161:18, 2165:11, 2165:22
**Depot's** [3] - 2131:18, 2139:3, 2139:6
**depression** [1] - 2080:11
**depth** [4] - 1996:5, 2096:5, 2111:2, 2137:9
**Deputy** [1] - 1976:3
**deputy** [1] - 2077:5
**describe** [1] - 2105:19
**described** [8] - 1986:19, 2006:21, 2060:19, 2093:22, 2101:16, 2102:6, 2125:25, 2142:9
**describing** [2] - 2065:5, 2153:8
**designated** [2] - 2071:3, 2071:7
**designed** [2] - 2073:8, 2088:17
**designers** [1] - 2007:1

**desire** [1] - 2104:13
**desk** [1] - 2032:18
**desktop** [6] - 2031:9, 2031:23, 2032:22, 2032:25, 2033:6, 2125:9
**desktops** [2] - 2005:13, 2005:21
**detached** [1] - 2084:23
**detailed** [4] - 1992:7, 1992:16, 2048:20, 2113:11
**details** [4] - 1981:16, 2003:14, 2047:22, 2125:20
**determine** [6] - 2015:2, 2065:16, 2083:23, 2115:2, 2149:9, 2153:16
**determined** [1] - 2038:5
**determining** [1] - 2127:3
**Diane** [1] - 1975:18
**Dickman** [2] - 1976:8, 2170:13
**DICKMAN** [1] - 2170:5
**difference** [1] - 2141:11
**differences** [3] - 2105:7, 2137:19, 2149:6
**different** [49] - 1980:3, 1986:3, 1988:2, 2012:11, 2027:6, 2035:14, 2069:22, 2084:18, 2090:13, 2099:18, 2102:1, 2102:21, 2103:10, 2105:2, 2108:18, 2109:4, 2110:23, 2116:15, 2123:11, 2124:13, 2124:18, 2131:23, 2132:2, 2133:20, 2133:21, 2134:5, 2134:12, 2134:15, 2135:18, 2136:4, 2138:13, 2138:16, 2139:20, 2140:23, 2141:2, 2143:6, 2144:22, 2146:19, 2147:5, 2147:8, 2148:2, 2149:20, 2150:2, 2153:22, 2155:16, 2156:11, 2156:14, 2159:19
**differently** [1] - 2124:14
**dig** [1] - 2077:23, 2081:2
**digital** [6] - 2128:2, 2128:11, 2162:22, 2163:19, 2163:23, 2164:6
**digital-do-it-yourself** [1] - 2164:6
**dimension** [1] - 2132:5
**diminish** [1] - 2082:25
**diminished** [3] - 1983:25, 1984:10, 2013:8
**diminishes** [1] - 2053:25
**dire** [1] - 2082:3
**DIRECT** [1] - 2075:15
**direct** [34] - 1977:19, 1984:7, 1986:14, 1986:20, 1989:13, 1989:20, 1993:18, 1997:20, 1998:1, 2001:9, 2004:11, 2005:1, 2007:17, 2016:24, 2016:25, 2017:17, 2017:22,

2019:8, 2024:5, 2027:5, 2031:16, 2043:25, 2045:7, 2045:20, 2059:12, 2063:25, 2064:10, 2064:18, 2067:10, 2083:18, 2083:19, 2114:8, 2114:9, 2167:3
**directed** [1] - 1991:17
**direction** [6] - 1988:2, 1991:19, 2109:23, 2142:6, 2144:16, 2149:18
**directly** [14] - 1987:2, 1987:14, 1997:14, 1998:12, 2000:9, 2073:23, 2073:24, 2077:16, 2080:7, 2084:5, 2089:10, 2090:10, 2108:4, 2113:2
**director** [2] - 1988:25, 1994:7
**disaggregated** [1] - 2030:7
**disagree** [1] - 2070:8
**discharge** [3] - 1987:17, 1987:20, 1987:23
**discharged** [2] - 1987:9, 1987:16
**discipline** [4] - 2057:1, 2164:17, 2164:21, 2164:25
**disciplined** [1] - 2023:18
**disconnect** [1] - 2154:6
**discount** [3] - 2084:21, 2107:7, 2153:22
**discounted** [1] - 2106:5
**discounting** [3] - 2158:3, 2158:5, 2165:15
**discounts** [8] - 2084:22, 2101:17, 2101:18, 2101:20, 2157:16, 2157:19, 2161:16
**Discrimination** [1] - 2153:20
**discrimination** [3] - 2153:21, 2153:24, 2154:1
**discuss** [1] - 2122:12
**discussed** [1] - 2010:5
**discussion** [7] - 2046:23, 2049:1, 2049:5, 2049:11, 2068:15, 2146:25, 2152:14
**discussions** [5] - 2048:11, 2048:15, 2048:19, 2048:20, 2060:8
**dispersed** [1] - 2155:6
**disposable** [1] - 2005:11
**disposal** [1] - 1985:12
**dispute** [4] - 2032:14, 2066:7, 2066:8, 2072:4
**dissing** [1] - 2108:23
**distinct** [3] - 2103:15, 2105:3, 2105:10
**distinction** [1] - 2110:14
**distributed** [1] - 2005:16
**distributes** [1] - 2058:2
**distribution** [33] - 2040:18, 2040:24, 2041:7, 2058:4, 2061:22, 2062:3, 2094:7, 2094:23, 2096:10, 2107:20,

2109:16, 2122:18, 2125:4,
2125:6, 2125:8, 2125:16,
2130:8, 2130:12, 2130:14,
2130:18, 2130:21, 2131:4,
2131:7, 2131:10, 2131:11,
2131:13, 2131:17, 2132:13,
2132:14, 2157:10, 2164:13,
2164:19
   **distributions** [1] - 2028:22
   **distributor** [7] - 2027:8,
2028:14, 2036:18, 2040:22,
2040:23, 2098:3, 2109:14
   **distributors** [7] - 1984:19,
2028:8, 2108:22, 2110:11,
2110:12, 2131:3, 2131:8
   **DISTRICT** [3] - 1975:1, 1975:1,
1975:10
   **divesting** [1] - 2091:20
   **divestiture** [2] - 2088:15,
2091:23
   **divide** [1] - 2134:20
   **divided** [2] - 1977:20, 2080:19
   **division** [8] - 1977:22, 1977:25,
1980:17, 2077:4, 2077:7,
2077:11, 2079:1, 2079:23
   **divisions** [1] - 1977:20
   **Dixie** [1] - 2027:20
   **do-it-yourself** [3] - 2128:2,
2128:11, 2163:19
   **doable** [7] - 1996:24, 1999:16,
1999:19, 2000:10, 2014:20,
2018:18, 2167:19
   **dock** [1] - 2033:1
   **doctorate** [1] - 2075:24
   **document** [11] - 2064:11,
2064:19, 2065:5, 2068:4,
2071:9, 2071:23, 2072:2,
2072:4, 2072:8, 2072:19, 2073:7
   **documentary** [1] - 2105:9
   **documents** [3] - 2092:4,
2103:11, 2103:18
   **DOJ** [14] - 2077:10, 2077:19,
2077:20, 2078:16, 2078:18,
2079:15, 2091:19, 2093:9,
2093:13, 2093:16, 2111:20,
2127:17, 2128:1, 2128:9
   **dollar** [1] - 2102:10
   **dollars** [10] - 2000:15, 2033:10,
2112:21, 2117:7, 2117:11,
2117:18, 2118:20, 2118:21,
2122:1, 2122:4
   **dominance** [1] - 2101:9
   **dominant** [2] - 2013:9, 2098:10
   **dominate** [2] - 2095:15,
2139:23
   **Don** [1] - 1989:1
   **done** [7] - 1995:24, 2003:15,
2029:20, 2030:22, 2077:23,
2113:20, 2168:13
   **door** [1] - 2037:18

   **dooring** [1] - 2120:17
   **doors** [3] - 1984:15, 2060:17,
2060:18
   **doubt** [5] - 2003:8, 2157:25,
2158:2, 2160:4, 2160:15
   **dovetail** [2] - 2109:4, 2149:16
   **dovetailing** [1] - 2126:9
   **dovetails** [1] - 2148:25
   **down** [37] - 1983:21, 2001:16,
2009:4, 2010:16, 2026:19,
2034:23, 2034:24, 2041:12,
2048:17, 2058:12, 2058:13,
2058:24, 2059:5, 2104:3,
2111:9, 2113:3, 2116:16,
2116:24, 2116:25, 2118:14,
2118:15, 2120:16, 2133:16,
2139:6, 2141:17, 2141:19,
2141:21, 2144:5, 2145:18,
2145:23, 2146:5, 2155:11,
2155:19, 2155:20
   **downside** [1] - 2061:10
   **downward** [2] - 2001:23,
2017:13
   **dozen** [1] - 2078:1
   **dozens** [1] - 2077:21
   **Dr** [1] - 2075:1
   **dramatic** [1] - 2012:16
   **draw** [2] - 2154:16, 2155:8
   **drawn** [1] - 2142:17
   **dreamed** [1] - 2088:17
   **drilling** [2] - 2112:2, 2112:10
   **drills** [1] - 2051:23
   **driven** [1] - 2089:10
   **drives** [5] - 2005:3, 2005:24,
2006:7, 2006:11, 2008:17
   **Dryden** [1] - 2107:8
   **due** [2] - 2059:22, 2087:3
   **duly** [1] - 2074:10
   **during** [7] - 1993:7, 2010:22,
2011:1, 2045:7, 2076:1,
2079:10, 2096:17
   **DX5167** [1] - 2064:11
   **dynamic** [1] - 2011:18

**E**

   **e-mail** [2] - 2065:4, 2066:5
   **E-procurement** [3] - 2044:20,
2108:7, 2125:9
   **early** [8] - 2000:7, 2045:17,
2078:22, 2096:22, 2099:1,
2105:13, 2116:5, 2127:17
   **earned** [1] - 2075:21
   **easier** [2] - 2056:25, 2073:15
   **easily** [1] - 2167:1
   **easy** [7] - 2012:24, 2104:22,
2139:25, 2157:14, 2164:14,
2165:5, 2165:8
   **eat** [1] - 2126:19
   **eating** [1] - 2116:8

   **econ** [1] - 2089:17
   **economic** [10] - 2076:6,
2076:11, 2077:6, 2080:9,
2080:22, 2081:21, 2114:1,
2153:3, 2156:18
   **Economic** [4] - 2076:20,
2076:22, 2080:2, 2080:3
   **economics** [10] - 2075:1,
2075:22, 2076:7, 2076:25,
2080:10, 2080:13, 2082:2,
2082:21, 2118:17, 2159:10
   **Economics** [2] - 2084:6, 2115:8
   **economist** [17] - 2077:5,
2077:21, 2078:3, 2078:9,
2080:6, 2080:7, 2081:7,
2082:16, 2087:4, 2088:25,
2092:6, 2094:20, 2111:19,
2113:8, 2119:19, 2120:12,
2162:23
   **economists** [13] - 2077:9,
2078:6, 2082:17, 2088:6,
2088:10, 2088:17, 2096:16,
2125:24, 2126:9, 2127:3,
2128:23, 2132:2, 2151:18
   **economy** [1] - 2112:7
   **Ed** [9] - 2046:24, 2047:1,
2047:5, 2047:10, 2047:13,
2047:19, 2060:2, 2064:20,
2066:4
   **Ed's** [1] - 2066:6
   **editor** [2] - 2076:20, 2076:22
   **education** [1] - 2081:8
   **effect** [3] - 1997:7, 2140:19,
2143:8
   **effectively** [2] - 2056:11, 2152:1
   **effectiveness** [2] - 2053:18,
2053:20
   **effects** [14] - 2081:22, 2082:24,
2084:13, 2087:5, 2090:10,
2090:16, 2091:6, 2093:23,
2094:2, 2096:1, 2116:3,
2120:16, 2139:12, 2152:16
   **efficiencies** [8] - 1987:25,
2033:11, 2033:14, 2034:18,
2085:20, 2091:7, 2120:24,
2121:4
   **efficiency** [3] - 2053:1, 2107:13,
2107:23
   **efficient** [4] - 2106:25, 2107:1,
2107:3, 2154:11
   **effort** [2] - 2061:12, 2079:11
   **eight** [5] - 2001:11, 2067:17,
2085:6, 2085:7, 2139:17
   **either** [2] - 2081:23, 2091:10
   **EJ** [3] - 1990:20, 1990:23,
2054:24
   **elect** [3] - 2020:3, 2020:4,
2022:13
   **electricity** [5] - 2115:16,
2116:1, 2116:14, 2117:20,

2117:23
  elects [1] - 2062:23
  elements [3] - 2106:8, 2109:17, 2125:8
  elevated [1] - 2122:5
  eleven [1] - 2067:17
  eliminate [1] - 2003:19
  eliminated [1] - 2165:10
  elsewhere [6] - 2009:15, 2010:3, 2011:22, 2013:13, 2014:25, 2056:8
  embarrassing [1] - 2009:5
  embedded [1] - 2025:20
  emerge [1] - 2091:2
  emerging [2] - 2128:5, 2130:7
  EMMET [1] - 1975:10
  employees [2] - 2031:18, 2053:10
  encourage [1] - 2035:2
  end [16] - 2006:22, 2019:3, 2075:9, 2086:24, 2087:1, 2091:22, 2109:1, 2111:13, 2121:20, 2125:8, 2125:16, 2130:18, 2131:17, 2142:24, 2142:25, 2165:6
  ending [1] - 2086:25
  energy [1] - 2081:4
  enforcement [1] - 2078:12
  enhance [1] - 2160:6
  enjoy [1] - 2169:3
  ensure [2] - 2057:12, 2068:23
  ensures [1] - 1990:8
  ensuring [1] - 2107:6
  entail [1] - 2079:12
  enter [2] - 2059:23, 2090:24
  enterprise [7] - 2097:12, 2104:9, 2111:7, 2154:20, 2154:24, 2155:1
  entire [2] - 2075:6, 2151:25
  entirely [2] - 2134:16, 2166:19
  entities [6] - 1980:3, 2069:22, 2117:15, 2156:6, 2156:8, 2156:10
  entity [7] - 1978:25, 1979:9, 1979:14, 2053:24, 2069:1, 2069:5, 2126:14
  entry [4] - 2086:1, 2091:1, 2121:8, 2149:1
  environment [6] - 1984:3, 1990:12, 2000:18, 2006:25, 2034:13, 2034:17
  equity [4] - 1981:18, 1981:19, 1981:23
  especially [2] - 2069:15, 2124:8
  essentially [6] - 1977:20, 1984:24, 1987:1, 2015:24, 2017:4, 2148:10
  established [4] - 2057:18, 2088:8, 2128:22, 2128:24
  estimate [3] - 2019:17,

2019:18, 2031:17
  et [2] - 1975:2, 1975:6
  etcetera [1] - 2139:20
  European [1] - 2093:1
  evaluate [10] - 1999:24, 2015:1, 2055:5, 2061:21, 2077:10, 2087:20, 2088:7, 2092:11, 2093:22, 2153:16
  evaluated [4] - 2058:20, 2058:21, 2092:13, 2093:2
  evaluating [5] - 1999:18, 2078:7, 2081:22, 2087:4, 2093:20
  evaluation [3] - 1982:23, 1982:24, 2059:1
  evening [2] - 2169:3
  event [3] - 2014:14, 2099:7, 2130:2
  eventually [1] - 2095:16
  evidence [24] - 2071:17, 2071:20, 2071:22, 2071:24, 2072:8, 2073:8, 2073:21, 2091:25, 2103:14, 2105:9, 2109:24, 2110:3, 2120:1, 2120:3, 2120:8, 2140:15, 2140:18, 2149:11, 2155:12, 2157:12, 2165:4, 2165:20, 2166:25
  exact [2] - 2099:17, 2100:8
  exactly [2] - 2124:12, 2159:2
  exam [3] - 2004:11, 2074:19, 2075:6
  examination [16] - 1977:2, 1977:19, 1986:20, 1989:14, 1989:20, 2001:10, 2005:1, 2007:18, 2017:22, 2019:8, 2024:5, 2039:22, 2045:7, 2045:20, 2074:22, 2167:18
  EXAMINATION [3] - 1977:6, 2052:12, 2075:15
  EXAMINATON [1] - 2063:10
  examine [3] - 2072:21, 2150:4, 2150:5
  examined [1] - 2074:11
  examining [1] - 2117:10
  example [35] - 1981:22, 1983:20, 1991:8, 1992:6, 1993:12, 1994:19, 2012:16, 2023:3, 2044:7, 2078:24, 2079:9, 2080:25, 2084:3, 2092:3, 2093:9, 2096:3, 2101:11, 2101:24, 2102:19, 2127:14, 2128:18, 2129:8, 2131:2, 2132:24, 2132:25, 2133:9, 2133:10, 2133:12, 2134:13, 2135:4, 2138:14, 2138:19, 2138:22, 2153:13, 2155:5
  examples [1] - 2122:23
  except [2] - 2012:5, 2066:9

  exception [3] - 2032:2, 2072:16, 2073:9
  exchange [6] - 1990:4, 1991:4, 2020:22, 2053:8, 2053:22
  excited [1] - 1979:14
  excluded [1] - 2131:7
  exclusive [1] - 2053:22
  exclusivity [1] - 2053:9
  excuse [1] - 2018:3
  excused [1] - 2066:18
  executives [2] - 1979:1, 1980:8
  exercise [1] - 2061:17
  exhausted [1] - 2150:7
  exhibit [2] - 2071:22, 2150:7
  exist [1] - 2022:19
  existing [4] - 2001:2, 2030:4, 2030:8, 2041:9
  expand [2] - 2086:2, 2159:22
  expansion [1] - 2091:1
  expect [9] - 2057:5, 2062:25, 2075:6, 2113:16, 2115:19, 2115:24, 2116:24, 2117:19, 2162:5
  expectation [3] - 2019:4, 2019:5, 2104:23
  expecting [1] - 2104:16
  expend [1] - 1994:5
  expense [5] - 2001:23, 2002:1, 2012:12, 2058:21, 2058:22
  expenses [2] - 2002:5, 2058:23
  expensive [2] - 2139:2
  experience [3] - 1989:12, 1995:21, 2040:7
  experienced [3] - 1989:8, 1989:11, 2053:11
  experiences [1] - 2093:2
  expert [7] - 2067:25, 2075:1, 2082:2, 2082:6, 2108:16, 2152:3, 2167:19
  expert's [1] - 2120:17
  expertise [4] - 1990:8, 1990:17, 1991:1, 2016:14
  experts [3] - 1986:17, 1986:19, 2031:2
  expiration [1] - 2059:25
  expired [1] - 1997:16
  explain [4] - 2088:13, 2114:19, 2114:25, 2130:24
  explanation [1] - 2142:25
  explore [1] - 2137:9
  express [1] - 2052:20
  extensive [1] - 2079:20
  extent [4] - 2039:22, 2053:1, 2074:24, 2113:10
  external [1] - 1990:17
  extra [2] - 2117:7, 2130:18
  eye [1] - 2011:5

# F

fabrics [1] - 2007:2
face [6] - 2072:2, 2072:4, 2111:15, 2112:25, 2121:21, 2157:22
facilities [4] - 1983:13, 1983:24, 1984:10, 2135:16
facing [2] - 1978:17, 2137:3
fact [20] - 1978:7, 2002:8, 2019:15, 2027:3, 2031:21, 2054:1, 2059:5, 2069:19, 2086:11, 2100:25, 2108:1, 2110:10, 2123:18, 2130:7, 2139:13, 2148:24, 2150:25, 2155:8, 2161:25, 2166:9
factor [1] - 2091:12
factory [1] - 2091:21
faculty [1] - 2076:4
failed [1] - 2163:22
fair [20] - 1979:23, 1980:15, 1982:14, 1982:15, 1983:9, 1983:10, 1985:1, 1985:3, 1986:2, 1987:3, 1990:14, 1996:18, 1996:20, 1997:11, 2004:6, 2064:6, 2065:23, 2065:24, 2163:2, 2165:3
fairly [1] - 2040:16, 2096:22, 2123:24
fall [3] - 1987:5, 1987:7, 2155:21
familiar [8] - 2026:25, 2033:3, 2035:25, 2041:11, 2041:13, 2041:15, 2062:21, 2122:25
Fannie [1] - 2081:3
far [12] - 2046:17, 2066:1, 2098:22, 2099:3, 2099:9, 2099:22, 2102:22, 2138:3, 2140:3, 2152:2, 2155:20, 2155:21
fast [1] - 2086:14
Fastenal [1] - 2139:22
favor [2] - 2018:5, 2130:25
favorable [7] - 1984:25, 1985:5, 1985:7, 1985:10, 1990:4, 2016:13, 2054:12
FCC [1] - 2079:5
fear [1] - 2110:7
feasible [1] - 2154:1
features [2] - 2130:19, 2131:18
February [3] - 2045:19, 2059:19, 2079:25
Federal [3] - 1975:2, 2074:18, 2079:2
federal [1] - 2051:4
FEDERAL [1] - 1975:15
fee [11] - 1991:4, 1991:6, 2025:17, 2025:19, 2025:22, 2026:1, 2026:5, 2026:23, 2034:25, 2051:5, 2051:6

feedback [4] - 1995:25, 2025:5, 2025:7, 2057:10
fees [14] - 2026:9, 2034:1, 2034:2, 2034:4, 2035:3, 2035:20, 2050:25, 2051:1, 2051:2, 2051:12, 2058:11, 2058:13, 2058:24, 2084:8
fellow [1] - 2081:5
felt [3] - 2002:24, 2059:21, 2059:23
few [11] - 1977:10, 1977:12, 1977:15, 1984:22, 2005:24, 2018:19, 2045:6, 2064:14, 2065:15, 2097:5, 2110:20
fewer [7] - 2083:3, 2086:23, 2087:2, 2095:15, 2090:4, 2143:16, 2164:22
field [10] - 2024:19, 2075:1, 2076:5, 2076:7, 2076:9, 2076:16, 2076:18, 2082:18, 2126:11, 2159:9
fifth [1] - 2015:11
Fifth [1] - 1975:22
fight [1] - 2034:13
figure [3] - 2089:3, 2090:2, 2159:17
figures [1] - 2107:11
file [4] - 2004:17, 2062:2, 2079:3, 2079:4
filed [3] - 2093:13, 2096:7
files [1] - 2099:10
filings [2] - 1994:21, 1995:11
fill [1] - 2090:25
final [3] - 2113:17, 2146:1, 2146:4
finalize [2] - 2000:3, 2018:19
finance [4] - 1994:8, 1994:9, 1994:22, 2081:1
financial [3] - 1994:23, 2003:15, 2055:20
financially [3] - 1978:20, 1981:25, 1982:1
fine [9] - 2075:12, 2092:25, 2108:23, 2119:20, 2135:7, 2167:8, 2167:9, 2167:16, 2168:18
finish [4] - 2042:17, 2167:18, 2168:14, 2168:17
firm [18] - 1990:20, 2040:24, 2096:13, 2127:9, 2127:23, 2127:24, 2128:10, 2128:20, 2129:5, 2129:16, 2151:21, 2157:4, 2158:21, 2162:24, 2163:5, 2164:18, 2166:17
firm's [1] - 2164:3
firms [29] - 2083:2, 2083:5, 2083:12, 2086:12, 2087:23, 2087:24, 2089:9, 2090:4, 2090:11, 2090:18, 2090:23, 2101:10, 2105:12, 2109:25,

2126:24, 2127:18, 2130:7, 2143:15, 2149:13, 2150:11, 2151:20, 2153:11, 2157:15, 2157:20, 2159:12, 2159:24, 2165:15, 2166:18, 2166:21
first [34] - 1977:22, 2003:12, 2004:13, 2038:24, 2038:25, 2039:8, 2051:2, 2059:21, 2062:1, 2069:7, 2074:10, 2085:3, 2085:22, 2087:6, 2087:12, 2087:15, 2087:19, 2088:4, 2090:17, 2097:6, 2097:7, 2099:2, 2106:22, 2110:3, 2120:23, 2122:3, 2122:14, 2123:13, 2126:5, 2129:22, 2141:23, 2149:8, 2151:9, 2165:14
fit [2] - 2136:14
fits [1] - 2148:24
fitting [1] - 2147:12
five [14] - 2048:23, 2048:25, 2049:1, 2049:4, 2067:11, 2067:12, 2067:21, 2088:12, 2088:14, 2091:18, 2124:8, 2129:11, 2129:14, 2130:4
fix [2] - 2086:12, 2100:20
fixed [4] - 2001:21, 2051:7, 2051:8, 2085:12
flag [1] - 2142:14
Flakes [3] - 2126:16, 2126:20, 2129:7
flash [5] - 2005:3, 2005:24, 2006:7, 2006:11, 2008:17
flat [1] - 1991:6
flexibility [2] - 1977:17, 2067:13
flexible [1] - 2168:6
flight [1] - 2168:8
flights [1] - 2168:6
flip [3] - 2040:22, 2043:15, 2043:18
float [1] - 2119:23
Floor [2] - 1976:1, 1976:5
Florida [1] - 2061:24
flow [1] - 2159:5
flowing [1] - 2166:19
flows [1] - 2152:14
fly [1] - 2070:17
focus [9] - 2083:10, 2088:4, 2094:22, 2095:8, 2104:5, 2104:6, 2143:11, 2149:4, 2153:1
focusing [6] - 2111:13, 2143:7, 2143:8, 2153:2, 2153:17, 2154:21
folders [2] - 2004:18, 2039:14
folding [2] - 2007:6
folks [2] - 2106:17, 2164:24
follow [16] - 1987:23, 2036:5, 2036:10, 2036:12, 2036:14, 2050:5, 2052:16, 2062:15, 2062:17, 2070:21, 2072:25,

2088:11, 2099:16, 2111:4, 2135:2, 2136:6

**follow-up** [5] - 2050:5, 2062:15, 2062:17, 2070:21, 2072:25

**followed** [3] - 2046:6, 2048:13, 2070:5

**following** [5] - 2073:1, 2079:22, 2123:17, 2134:9, 2142:3

**follows** [1] - 2074:11

**food** [3] - 2131:3, 2131:4, 2131:7

**foods** [1] - 2153:6

**Foods** [1] - 2131:2

**fool's** [1] - 2115:17

**fooled** [1] - 2141:23

**FOR** [1] - 1975:1

**for-profit** [1] - 1978:12

**force** [7] - 1996:23, 1996:25, 1997:5, 2000:20, 2001:1, 2035:15, 2162:1

**foregoing** [1] - 2170:6

**foremost** [1] - 2088:4

**foreseeable** [2] - 2086:9, 2162:15

**form** [2] - 1991:15, 2061:18

**formal** [7] - 2050:1, 2089:17, 2089:18, 2094:15, 2104:12, 2104:20, 2155:4

**formally** [1] - 2165:25

**formed** [1] - 2142:17

**formerly** [1] - 2077:5

**forms** [5] - 2104:15, 2130:14, 2131:10, 2131:13, 2163:17

**formula** [1] - 2166:8

**forth** [7] - 1978:19, 2079:20, 2106:21, 2146:22, 2149:2, 2154:15, 2155:13

**Fortune** [3] - 1978:10, 2036:2, 2100:4

**forum** [1] - 2075:7

**forward** [3] - 2073:25, 2159:18, 2164:13

**founding** [1] - 2076:19

**four** [6] - 2048:22, 2048:23, 2048:25, 2049:1, 2049:4, 2100:9

**fraction** [1] - 2121:18

**fragment** [3] - 1988:1, 2037:15, 2056:11

**fragmented** [1] - 2014:1

**framed** [1] - 2069:4

**framework** [13] - 2088:6, 2088:9, 2088:12, 2088:13, 2088:16, 2091:25, 2092:10, 2094:11, 2110:9, 2114:6, 2122:13, 2122:14, 2153:3

**frankly** [6] - 2026:17, 2029:18, 2061:14, 2062:4, 2107:8, 2139:25

**Freddie** [1] - 2081:3

**free** [1] - 2023:11

**freight** [1] - 2116:7

**frequently** [1] - 2057:4

**fresher** [1] - 2078:21

**Friday** [1] - 2167:19

**front** [4] - 2043:16, 2078:6, 2104:13, 2165:21

**front-line** [1] - 2078:6

**FTC** [29] - 1975:13, 2035:3, 2048:21, 2049:4, 2049:7, 2049:11, 2049:13, 2049:15, 2066:21, 2079:15, 2081:18, 2084:14, 2091:19, 2092:25, 2093:21, 2093:24, 2094:22, 2095:16, 2096:7, 2096:15, 2096:18, 2097:16, 2100:6, 2104:5, 2113:20, 2120:13, 2131:3, 2133:19, 2137:3

**FTC's** [1] - 2099:19

**FTEs** [1] - 1986:15

**full** [5] - 1996:4, 1996:10, 1997:10, 2003:14, 2170:7

**fully** [1] - 1999:24

**function** [1] - 2069:11

**functional** [2] - 2147:22, 2147:23

**fundamental** [5] - 2159:9, 2159:16, 2159:22, 2159:24, 2161:1

**furnish** [1] - 2028:7

**furniture** [22] - 2006:19, 2006:23, 2006:24, 2007:1, 2007:3, 2007:4, 2010:1, 2138:8, 2138:19, 2138:23, 2138:24, 2139:1, 2139:4, 2139:14, 2139:17, 2139:19, 2143:19, 2144:2, 2144:10, 2144:21

**furniture-type** [1] - 2010:1

**future** [2] - 2159:17, 2162:15

**fuzzy** [1] - 2119:2

## G

**gain** [2] - 1991:20, 2085:19

**game** [4] - 2071:14, 2101:22, 2110:13, 2115:17

**gap** [1] - 2090:25

**garner** [2] - 2029:17, 2030:21

**garnering** [1] - 2029:16

**gas** [7] - 2081:4, 2129:9, 2129:11, 2129:13, 2129:14, 2130:3, 2130:4

**gather** [1] - 1993:2, 1993:8, 1994:20

**gears** [1] - 2057:25

**general** [28] - 2004:13, 2004:16, 2008:15, 2008:20, 2008:25, 2010:9, 2011:10, 2013:4, 2024:25, 2046:19, 2046:21, 2053:4, 2056:17, 2056:21, 2077:6, 2077:16, 2078:12,

2078:14, 2085:3, 2094:17, 2095:13, 2110:4, 2113:25, 2115:18, 2122:21, 2123:1, 2131:20, 2153:21

**General** [1] - 1976:3

**generally** [9] - 2006:21, 2006:22, 2057:9, 2062:24, 2110:4, 2114:7, 2125:21, 2151:17, 2163:24

**generate** [1] - 2033:10

**generates** [1] - 2091:8

**generic** [1] - 2051:21

**generous** [1] - 1985:22

**geographic** [7] - 2109:15, 2109:16, 2127:1, 2151:17, 2151:18, 2151:20, 2151:23

**geographically** [1] - 2155:6

**George** [7] - 2002:14, 2009:4, 2009:6, 2041:14

**Georgia** [22] - 2027:1, 2027:3, 2027:5, 2027:17, 2027:20, 2028:4, 2028:10, 2028:16, 2028:20, 2028:25, 2029:3, 2029:6, 2029:18, 2029:22, 2029:24, 2030:5, 2030:16, 2030:17, 2050:9, 2050:13, 2058:1, 2058:3

**gerrymandering** [2] - 2139:9, 2143:22

**gist** [1] - 2124:21

**given** [8] - 1987:19, 2024:12, 2120:22, 2125:2, 2135:7, 2141:16, 2153:15, 2166:25

**goal** [1] - 2126:8

**gobbles** [1] - 2157:17

**GOTSHAL** [2] - 1975:18, 1975:21

**government** [10] - 2054:17, 2068:18, 2081:14, 2081:21, 2081:23, 2082:22, 2085:5, 2114:13, 2156:8, 2156:10

**government's** [3] - 2114:2, 2114:11, 2114:17

**GPO** [10] - 2022:21, 2035:3, 2035:11, 2035:12, 2035:14, 2035:16, 2051:3, 2051:5, 2064:20

**GPOs** [1] - 2035:8

**grab** [1] - 2142:6

**Grainger** [15] - 2041:16, 2041:18, 2041:22, 2042:12, 2042:17, 2043:4, 2043:16, 2044:3, 2044:6, 2044:7, 2045:3, 2050:7, 2050:14, 2051:23, 2139:21

**Grainger's** [1] - 2041:24

**gravitate** [1] - 2092:7

**great** [4] - 2075:14, 2080:11, 2081:2, 2167:13

**greater** [2] - 2029:12, 2035:13

**greatest** [1] - 2151:14
**group** [22] - 2011:11, 2048:5, 2051:5, 2069:7, 2070:15, 2077:15, 2080:7, 2089:21, 2095:18, 2103:2, 2105:4, 2109:1, 2111:8, 2124:19, 2128:13, 2129:5, 2134:6, 2152:15, 2153:8, 2155:13, 2157:6, 2165:6
**grouped** [1] - 2154:12
**grouping** [9] - 2008:19, 2098:8, 2106:22, 2134:2, 2136:12, 2149:15, 2155:11, 2155:24, 2157:3
**groupings** [2] - 2135:2, 2138:10
**groups** [2] - 2104:5, 2104:25
**grow** [1] - 2090:24
**growth** [1] - 2059:23
**guarantee** [1] - 2015:22
**guardrail** [1] - 2017:14
**guardrails** [2] - 2016:19, 2018:24
**Guernsey** [1] - 2019:14
**guess** [12] - 1988:16, 2015:13, 2064:23, 2077:3, 2077:20, 2085:7, 2092:22, 2105:21, 2113:8, 2118:23, 2136:6, 2145:4
**guest** [1] - 2006:16
**guidance** [1] - 2007:15
**guide** [2] - 2074:22, 2090:3
**guided** [1] - 2136:9
**guidelines** [9] - 2079:10, 2079:13, 2079:17, 2079:21, 2088:9, 2114:7, 2126:1, 2128:25, 2153:5
**gut** [2] - 2015:9, 2037:14, 2040:1
**guy** [2] - 2101:7, 2102:15
**guys** [3] - 2043:5, 2090:24, 2108:21

# H

**H&R** [7] - 2093:10, 2127:16, 2127:19, 2162:19, 2162:21, 2163:3, 2163:7
**half** [11] - 2020:16, 2021:2, 2051:18, 2081:6, 2099:22, 2117:7, 2117:11, 2117:13, 2117:18, 2118:20, 2118:21
**Halliburton** [1] - 2111:22
**hand** [7] - 1979:20, 1981:20, 1986:4, 2102:8, 2103:23, 2110:16, 2112:16
**handful** [2] - 2075:10, 2093:6
**handle** [2] - 2037:13, 2077:20
**handling** [2] - 2077:12, 2081:6
**happily** [1] - 2081:12
**happy** [8] - 1979:14, 2011:19, 2035:19, 2037:25, 2067:14,

2072:24, 2073:20, 2150:22
**harbor** [1] - 2051:9
**hard** [6] - 1999:21, 2012:17, 2115:20, 2149:2, 2149:3, 2161:24
**hard-nosed** [1] - 2161:24
**harder** [2] - 2156:9, 2166:15
**hardware** [3] - 2005:8, 2005:12, 2005:19
**harm** [29] - 2085:24, 2086:13, 2086:20, 2086:21, 2086:22, 2094:9, 2094:19, 2102:25, 2110:24, 2111:8, 2111:10, 2111:12, 2114:5, 2114:7, 2114:8, 2114:12, 2114:14, 2114:20, 2115:9, 2117:25, 2118:6, 2119:22, 2120:2, 2120:5, 2121:9, 2144:1, 2155:23
**harmed** [7] - 2083:3, 2101:9, 2101:12, 2112:9, 2114:23, 2153:9, 2156:15
**Harrisburg** [1] - 1976:5
**HCA** [16] - 1978:7, 1978:10, 1978:17, 1978:24, 1979:2, 1979:5, 1979:7, 1979:8, 1979:13, 1979:17, 1979:19, 1979:25, 1983:20, 2033:15, 2046:21, 2047:20
**head** [5] - 2094:6, 2138:25, 2141:16, 2152:19
**head-to-head** [1] - 2094:6
**heading** [1] - 2064:20
**Health** [3] - 2032:4, 2046:25, 2065:18
**health** [12] - 1978:2, 1980:3, 1980:20, 1987:15, 2035:3, 2035:4, 2035:8, 2040:7, 2040:13, 2040:20, 2040:25, 2041:4
**HealthTrust** [35] - 1977:22, 1977:24, 1978:1, 1978:2, 1978:8, 1979:1, 1979:7, 1979:10, 1980:3, 1980:8, 1980:11, 1982:8, 1988:9, 1991:17, 2007:4, 2019:9, 2019:11, 2019:12, 2019:15, 2020:24, 2021:6, 2021:12, 2025:21, 2025:24, 2027:13, 2031:24, 2032:1, 2032:2, 2032:8, 2032:13, 2035:21, 2035:23, 2064:20, 2065:25, 2069:23
**hear** [13] - 2048:10, 2057:5, 2057:10, 2069:9, 2071:6, 2073:15, 2074:2, 2075:2, 2075:4, 2094:4, 2106:24, 2108:19, 2115:2
**heard** [22] - 1977:8, 1985:20, 2011:7, 2033:12, 2033:13, 2033:17, 2033:18, 2047:3,

2063:24, 2064:3, 2066:9, 2069:8, 2070:24, 2073:22, 2083:20, 2098:1, 2100:15, 2106:15, 2110:7, 2158:11, 2159:3, 2164:24
**hearing** [3] - 2079:10, 2138:4, 2161:4
**hearsay** [1] - 2072:16
**heart** [3] - 2134:12, 2139:9, 2143:6
**hearts** [1] - 2135:21
**heavily** [1] - 2100:25
**held** [1] - 2008:20
**HELD** [1] - 1975:9
**hello** [2] - 2052:14, 2052:15
**help** [10] - 2055:5, 2057:21, 2088:17, 2092:8, 2096:14, 2106:19, 2107:11, 2126:10, 2128:16, 2160:25
**helpful** [7] - 2004:12, 2069:7, 2075:3, 2082:11, 2094:17, 2099:14, 2126:5
**helping** [1] - 1991:21
**helps** [1] - 2168:16
**hereby** [1] - 2170:5
**hierarchy** [3] - 2103:17, 2105:8, 2111:9
**high** [14] - 2020:11, 2022:16, 2078:10, 2089:4, 2106:3, 2125:7, 2125:16, 2130:18, 2131:17, 2141:14, 2142:7, 2142:11, 2143:21, 2166:20
**high-end** [2] - 2125:16, 2130:18
**higher** [13] - 2035:4, 2086:24, 2087:1, 2090:13, 2112:1, 2113:10, 2116:14, 2117:17, 2131:19, 2154:2, 2157:22, 2157:24, 2158:1
**highest** [1] - 2022:11
**highlighted** [2] - 2097:19, 2104:4
**highly** [1] - 1999:21
**Hilton** [3] - 1980:24, 1981:1, 1981:4
**hinted** [1] - 2119:15
**hit** [1] - 2038:15
**hitting** [1] - 2007:16
**hmm** [1] - 2026:10
**hold** [2] - 2030:4, 2145:12
**home** [8] - 2007:16, 2043:15, 2043:18, 2084:2, 2084:3, 2139:22, 2139:23, 2168:5
**honestly** [1] - 2012:21
**honing** [1] - 2143:19
**Honor** [76] - 1977:3, 1982:10, 2000:8, 2007:15, 2009:7, 2028:3, 2050:22, 2052:9, 2052:11, 2060:25, 2062:14, 2063:3, 2063:6, 2066:12, 2066:14, 2067:4, 2067:9,

2067:15, 2068:3, 2068:5,
2068:10, 2068:11, 2068:13,
2069:6, 2069:10, 2069:25,
2070:3, 2070:7, 2070:24,
2071:8, 2071:14, 2071:15,
2071:22, 2072:6, 2072:24,
2073:6, 2073:20, 2074:4,
2074:7, 2074:17, 2074:24,
2075:5, 2079:11, 2082:1,
2085:25, 2093:12, 2094:5,
2096:11, 2097:6, 2099:12,
2102:9, 2103:8, 2103:21,
2105:23, 2107:25, 2113:20,
2117:25, 2120:10, 2120:15,
2120:16, 2123:17, 2131:16,
2133:15, 2136:11, 2139:25,
2141:4, 2150:12, 2153:19,
2154:25, 2155:18, 2158:19,
2167:5, 2167:13, 2168:2,
2168:15, 2168:16

**HONORABLE** [1] - 1975:10
**honored** [1] - 2064:13
**hope** [2] - 1997:19, 2027:23
**hopefully** [2] - 2005:17,
2018:19
**hoping** [1] - 2168:4
**horrible** [1] - 2162:8
**hospital** [18] - 1978:5, 1978:17,
1980:13, 1983:11, 1983:12,
1983:20, 1983:23, 1984:3,
1984:8, 1984:9, 1984:13,
1988:4, 2033:15, 2133:20,
2133:22, 2134:2, 2135:4
**hospitals** [11] - 1978:5, 1980:5,
1980:6, 1980:7, 1987:12,
2040:12, 2041:1, 2135:5,
2135:14, 2135:24
**hour** [2] - 2048:25, 2166:3
**hours** [7] - 2048:24, 2048:25,
2049:1, 2049:4, 2067:12,
2097:6, 2167:22
**house** [1] - 1999:14
**House** [3] - 2080:1, 2080:7,
2093:14
**housing** [1] - 2081:1
**Houston** [1] - 2110:15
**HP** [1] - 2010:14
**HPG** [37] - 1977:18, 1977:19,
1983:7, 1984:23, 1985:12,
1985:24, 1986:10, 1988:6,
1989:4, 1989:10, 1991:21,
2011:3, 2017:22, 2018:3,
2018:5, 2018:20, 2020:2,
2023:4, 2033:20, 2033:25,
2036:20, 2041:18, 2045:12,
2046:18, 2054:2, 2054:6,
2054:9, 2055:6, 2063:22,
2064:15, 2064:23, 2069:16,
2069:23, 2069:24, 2070:2,
2070:11, 2070:14

**HPG's** [6] - 2001:15, 2018:24,
2047:12, 2052:19, 2058:11,
2058:24
**huge** [1] - 2111:23
**Hughes** [1] - 2111:23
**hum** [2] - 2001:12, 2024:7
**hundred** [3] - 2112:21, 2122:1,
2122:4
**hundreds** [1] - 2013:24
**hung** [3] - 2144:23, 2147:16,
2147:17
**hurt** [4] - 2085:16, 2085:17,
2090:12, 2091:8
**husher** [1] - 2063:8
**hypothetical** [29] - 2125:24,
2127:5, 2127:13, 2128:13,
2128:22, 2129:4, 2130:20,
2151:10, 2156:17, 2156:21,
2156:25, 2157:9, 2157:13,
2157:17, 2157:21, 2158:3,
2158:8, 2158:21, 2159:23,
2160:11, 2160:22, 2162:18,
2163:5, 2163:14, 2163:21,
2164:15, 2164:17, 2165:7,
2165:10

# I

**idea** [2] - 2011:16, 2134:11
**identified** [1] - 2068:2
**identify** [4] - 2003:18, 2024:21,
2126:12, 2157:2
**iffy** [1] - 2086:16
**Illinois** [1] - 2061:24
**illustrates** [1] - 2102:2
**illustrative** [1] - 2141:20
**imaged** [1] - 2005:14
**imagine** [6] - 2013:23, 2021:22,
2022:17, 2108:7, 2130:17,
2139:2
**immediate** [2] - 2085:2,
2085:18
**immediately** [2] - 2037:7,
2040:22
**impact** [15] - 1979:5, 1987:11,
1987:22, 2051:1, 2055:16,
2058:25, 2059:2, 2059:3,
2060:12, 2083:23, 2085:1,
2085:18, 2113:1, 2116:5, 2130:8
**impacted** [2] - 2058:12, 2084:7
**impeachment** [1] - 2071:19
**implants** [1] - 1987:4
**implementation** [1] - 2163:4
**implication** [1] - 2164:3
**implications** [1] - 2090:15
**implicit** [2] - 2159:12, 2161:11
**important** [10] - 2000:3,
2000:10, 2087:3, 2106:4,
2121:6, 2124:15, 2141:16,
2147:3, 2153:12, 2159:16

**impose** [1] - 2056:12
**impressions** [1] - 2064:4
**IN** [1] - 1975:1
**in-depth** [2] - 1996:5, 2096:5
**in-house** [1] - 1999:14
**Inc** [1] - 1975:6
**incentive** [2] - 2161:8, 2162:14
**incentives** [4] - 2034:11,
2104:14, 2104:23, 2161:8
**include** [44] - 1980:23, 1985:7,
2005:2, 2005:3, 2005:18,
2005:20, 2005:21, 2062:21,
2077:12, 2124:3, 2125:17,
2125:18, 2126:23, 2128:6,
2130:5, 2130:13, 2130:14,
2131:10, 2132:20, 2134:24,
2135:9, 2135:17, 2135:18,
2136:3, 2138:8, 2138:9,
2138:10, 2138:16, 2138:17,
2140:12, 2141:5, 2141:11,
2144:1, 2144:5, 2146:13,
2148:15, 2151:6, 2151:7,
2152:5, 2152:12, 2156:8,
2164:2, 2164:4
**included** [22] - 2097:13, 2104:5,
2123:6, 2123:8, 2125:4,
2125:10, 2125:14, 2128:17,
2130:21, 2131:16, 2131:21,
2137:10, 2138:24, 2139:5,
2140:7, 2141:1, 2141:17,
2149:10, 2151:6, 2155:12,
2156:9, 2164:11
**includes** [12] - 1986:17,
2004:13, 2004:20, 2004:23,
2005:9, 2007:18, 2009:2,
2012:13, 2100:4, 2130:1,
2131:5, 2131:13
**including** [5] - 2031:22,
2079:20, 2140:1, 2146:19,
2165:20
**income** [1] - 2034:15
**incorrect** [1] - 2119:20
**increase** [20] - 2009:20,
2010:20, 2010:25, 2011:14,
2011:16, 2012:16, 2012:25,
2014:15, 2017:8, 2053:18,
2060:13, 2084:8, 2106:25,
2111:16, 2112:23, 2120:3,
2121:21, 2121:25, 2130:2,
2158:17
**increased** [3] - 2017:12,
2056:2, 2102:4
**increases** [1] - 2055:20
**increasing** [1] - 2055:17
**incurs** [1] - 2113:9
**indeed** [1] - 2121:12
**independently** [1] - 2065:16
**INDEX** [1] - 1976:12
**indicate** [1] - 2065:22
**indicated** [2] - 1984:8, 2035:2

**indicates** [2] - 2109:12, 2166:25
**indications** [2] - 2105:3, 2108:25
**individual** [15] - 1982:5, 1982:7, 1982:13, 1989:18, 1990:23, 2011:11, 2068:21, 2068:23, 2069:17, 2070:2, 2070:14, 2083:23, 2084:10, 2102:22, 2136:12
**individually** [8] - 1982:3, 2068:20, 2069:18, 2070:6, 2070:11, 2070:22, 2154:8
**individuals** [3] - 2047:18, 2083:14, 2083:22
**indulgence** [1] - 2063:7
**Industrial** [1] - 2076:6
**industrial** [8] - 2044:25, 2045:2, 2045:5, 2051:23, 2052:5, 2076:16, 2082:18, 2159:10
**industry** [7] - 1991:22, 1998:25, 1999:1, 2042:12, 2051:4, 2080:13, 2137:14
**inefficiencies** [3] - 1983:17, 1984:3, 1988:3
**inevitably** [1] - 2156:1
**inexpensive** [6] - 2005:7, 2005:10, 2007:6, 2007:11, 2007:12, 2007:14
**inflated** [1] - 2122:5
**inform** [1] - 1993:18
**information** [28] - 1980:12, 1983:1, 1992:7, 1992:11, 1992:12, 1993:2, 1993:5, 1993:8, 1993:11, 1994:19, 1995:10, 1996:11, 1996:17, 1999:2, 1999:5, 1999:7, 2015:15, 2024:2, 2025:9, 2032:24, 2040:18, 2046:16, 2064:2, 2091:25, 2097:22, 2099:19, 2103:12, 2108:13
**informative** [2] - 2090:8, 2154:11
**informed** [3] - 1979:17, 1979:21, 2157:12
**infrastructure** [1] - 2044:10
**initial** [2] - 1999:23, 2003:15
**initiated** [1] - 2060:9
**INJUNCTION** [2] - 1975:4, 1975:8
**ink** [59] - 2004:20, 2008:16, 2008:20, 2008:25, 2009:9, 2009:15, 2010:8, 2010:14, 2011:6, 2011:24, 2012:5, 2012:18, 2013:11, 2013:12, 2013:21, 2014:12, 2014:16, 2014:24, 2056:6, 2056:10, 2056:18, 2056:25, 2062:25, 2123:3, 2123:11, 2123:21, 2124:9, 2124:15, 2136:14,

2136:17, 2137:4, 2137:6, 2137:10, 2137:15, 2137:16, 2140:4, 2140:5, 2140:12, 2140:17, 2140:20, 2141:2, 2141:5, 2141:7, 2141:16, 2141:18, 2142:13, 2143:3, 2143:19, 2144:2, 2144:12, 2144:24, 2146:23, 2147:3, 2147:11, 2147:13, 2147:20, 2150:21, 2150:23, 2151:7
**innovation** [1] - 2090:14
**input** [1] - 2079:19
**insinuated** [1] - 2119:14
**instance** [1] - 2009:25
**instances** [1] - 2132:2
**instead** [4] - 2026:11, 2067:15, 2098:17, 2142:7
**institution** [1] - 1978:12
**instructions** [2] - 1987:17, 1987:19
**integrating** [1] - 2108:8
**Intel** [1] - 2092:22
**intelligent** [1] - 2154:15
**intend** [1] - 2031:13
**intends** [1] - 2073:11
**interaction** [1] - 2001:17
**interest** [5] - 2000:6, 2002:24, 2043:5, 2065:16, 2065:22
**interested** [11] - 2014:8, 2043:8, 2047:5, 2048:16, 2048:17, 2071:2, 2082:23, 2100:6, 2119:25, 2120:6, 2156:13
**intermediate** [1] - 2130:11
**intermediators** [1] - 2130:10
**interpretation** [1] - 1985:22
**interrupt** [2] - 1981:13, 2158:14
**intervening** [1] - 2001:4
**interview** [1] - 2049:12
**introduce** [3] - 1989:16, 2010:20, 2010:24
**introduced** [3] - 1988:3, 1990:11, 2128:24
**introduction** [1] - 2122:11
**Intuit** [1] - 2127:23
**intuitive** [1] - 2162:19
**intuitively** [1] - 2147:21
**invariably** [1] - 2082:19
**inventories** [1] - 2108:2
**invested** [1] - 2033:14
**investigate** [2] - 2035:3, 2096:9
**investigating** [1] - 2091:24
**investigation** [4] - 2035:7, 2078:4, 2096:5, 2096:16
**investigations** [2] - 2077:21, 2078:1
**investment** [3] - 2061:12, 2061:13, 2159:7
**investments** [1] - 2159:21
**invite** [1] - 2055:21

**invited** [1] - 2056:1
**involved** [10] - 2055:13, 2076:17, 2077:18, 2078:15, 2079:11, 2095:22, 2111:25, 2127:17, 2130:7, 2133:19
**involves** [2] - 2165:25, 2166:14
**involving** [2] - 2079:8, 2126:5
**IO** [1] - 2076:15
**issue** [7] - 1999:4, 2023:11, 2050:12, 2073:14, 2120:12, 2121:17, 2154:18
**issued** [1] - 2059:19
**issues** [6] - 2076:15, 2080:21, 2080:22, 2081:4, 2088:7, 2095:4
**IT** [9] - 2005:5, 2005:7, 2005:8, 2005:10, 2005:11, 2005:12, 2005:16, 2005:18, 2005:22
**item** [5] - 1992:22, 2043:22, 2141:11, 2148:15, 2148:18
**itemized** [1] - 2106:1
**items** [34] - 2008:5, 2039:12, 2040:9, 2042:6, 2043:19, 2060:20, 2060:23, 2108:3, 2122:25, 2124:3, 2132:15, 2132:17, 2134:9, 2134:15, 2134:24, 2136:12, 2137:10, 2137:11, 2137:18, 2137:19, 2143:9, 2143:11, 2144:1, 2146:13, 2146:19, 2148:11, 2148:15, 2149:9, 2149:23, 2150:4, 2150:9, 2150:20, 2150:24, 2151:6
**itself** [5] - 1982:25, 1996:16, 2003:22, 2071:24, 2160:21

## J

**James** [1] - 1975:24
**jan** [5] - 2028:14, 2028:22, 2058:4, 2138:9, 2139:21
**jan-san** [5] - 2028:14, 2028:22, 2058:4, 2138:9, 2139:21
**JANICE** [1] - 2170:5
**Janice** [2] - 1976:8, 2170:13
**janitorial** [2] - 2138:9, 2144:18
**janitorial/sanitation** [1] - 2147:6
**Jeff** [2] - 1977:3, 1977:9
**Jeffrey** [1] - 1975:21
**jets** [1] - 2085:5
**job** [7] - 1989:7, 2058:20, 2059:1, 2068:24, 2078:9, 2080:14, 2113:4
**jobs** [2] - 1989:3, 2076:24
**John** [1] - 2083:14
**Johnson** [3] - 1990:24, 1991:7, 1991:14
**Johnson's** [1] - 1991:1
**join** [4] - 2035:10, 2035:11, 2035:12, 2077:3

**joined** [1] - 2076:4
**joining** [1] - 2020:6
**Jones** [22] - 2046:24, 2047:1, 2047:5, 2047:10, 2047:13, 2047:16, 2060:2, 2060:5, 2060:9, 2063:13, 2063:18, 2063:22, 2064:1, 2064:7, 2064:20, 2065:3, 2065:9, 2065:12, 2065:17, 2065:18, 2068:1, 2071:2
**Jones'** [2] - 2063:24, 2064:4
**Journal** [1] - 2076:20
**journals** [3] - 2076:18, 2076:21, 2076:23
**Judge** [4] - 1996:24, 2000:2, 2140:14, 2166:2
**judge** [2] - 1999:19, 2137:17
**JUDGE** [2] - 1975:10, 1975:10
**jump** [1] - 2078:17
**jumps** [1] - 2098:9
**jury** [1] - 2115:2
**Justice** [2] - 2092:15, 2092:17

## K

**Katharine** [1] - 2081:6
**keep** [5] - 2010:8, 2010:16, 2118:14, 2128:19
**keeps** [1] - 2097:8
**kept** [3] - 2068:24, 2123:12, 2164:6
**key** [3] - 2088:21, 2130:3, 2138:20
**kickback** [1] - 2051:4
**kidding** [1] - 2067:17
**kind** [18] - 1993:22, 2005:6, 2008:6, 2009:4, 2011:17, 2013:20, 2051:21, 2056:12, 2057:17, 2058:16, 2059:12, 2062:6, 2080:20, 2089:16, 2112:14, 2147:20, 2160:11, 2161:24
**KKR** [2] - 1981:22, 1981:24
**knee** [10] - 2135:9, 2135:14, 2135:17, 2135:19, 2135:22, 2138:14, 2138:22, 2142:15, 2143:5, 2144:20
**knees** [1] - 2135:21
**knocking** [1] - 2037:18
**knowing** [2] - 2024:16, 2037:7
**knowledge** [5] - 1991:20, 1991:22, 2039:22, 2065:8, 2066:9
**known** [1] - 2041:4
**knows** [2] - 2101:21, 2161:6
**Krisha** [2] - 1975:13, 2074:18

## L

**label** [1] - 2029:13

**labor** [4] - 2081:7, 2081:8, 2147:7, 2147:11
**lack** [2] - 2109:5, 2110:18
**Lacy** [1] - 1975:24
**landing** [1] - 2033:1
**lands** [1] - 2031:14
**language** [4] - 2102:11, 2102:13, 2140:9, 2148:21
**laptops** [2] - 2005:13, 2005:21
**large** [75] - 1990:3, 2056:22, 2056:23, 2069:12, 2080:20, 2083:16, 2091:2, 2092:23, 2094:8, 2094:23, 2095:1, 2095:6, 2095:17, 2095:20, 2096:6, 2096:18, 2096:19, 2097:9, 2097:11, 2099:3, 2100:4, 2103:8, 2103:13, 2103:14, 2105:3, 2105:6, 2105:10, 2105:22, 2106:17, 2108:10, 2108:12, 2108:17, 2109:9, 2110:18, 2110:23, 2111:13, 2111:24, 2112:19, 2112:25, 2114:5, 2114:10, 2114:20, 2114:23, 2115:12, 2121:1, 2121:5, 2121:19, 2121:21, 2122:4, 2122:18, 2124:10, 2124:25, 2125:1, 2125:13, 2125:18, 2130:22, 2139:1, 2150:13, 2150:23, 2152:1, 2152:7, 2152:8, 2152:20, 2152:22, 2153:25, 2154:3, 2154:4, 2154:13, 2156:5, 2157:11, 2158:22, 2164:10, 2164:20, 2165:12, 2165:23
**larger** [3] - 2036:12, 2095:9, 2104:4
**largest** [6] - 2022:11, 2023:17, 2023:22, 2023:25, 2098:2, 2099:4
**last** [26] - 2001:11, 2002:22, 2031:10, 2031:12, 2031:13, 2031:22, 2035:1, 2039:21, 2046:18, 2048:2, 2056:20, 2059:6, 2063:22, 2064:22, 2065:12, 2065:15, 2066:1, 2067:2, 2067:3, 2068:18, 2079:17, 2092:21, 2092:22, 2097:16, 2100:16, 2124:8
**late** [8] - 2046:1, 2067:6, 2067:15, 2068:3, 2071:9, 2071:13, 2166:2, 2168:10
**latter** [1] - 2069:15
**launch** [2] - 2045:17, 2046:2
**launched** [1] - 2046:1
**law** [5] - 2082:20, 2088:18, 2088:19, 2090:9, 2126:10
**laws** [1] - 2114:24
**lawyer** [1] - 2088:24
**lawyers** [2] - 2088:18, 2096:15

**lead** [3] - 2035:4, 2136:5, 2154:2
**leaders** [1] - 2079:16
**leading** [4] - 2076:21, 2097:15, 2100:22, 2127:23
**leakage** [2] - 2106:15, 2106:16
**learn** [9] - 1996:5, 1996:6, 1996:11, 1996:12, 1996:15, 2078:5, 2103:7, 2103:11, 2135:11
**learned** [7] - 2018:10, 2093:24, 2095:7, 2095:9, 2123:10, 2124:7
**learning** [3] - 2095:11, 2108:17
**least** [8] - 1994:13, 2014:22, 2021:13, 2043:1, 2099:2, 2119:14, 2125:2, 2133:8
**leave** [2] - 2035:19, 2041:13
**led** [3] - 2079:21, 2094:22, 2095:16
**left** [2] - 2093:14, 2103:23
**left-hand** [1] - 2103:23
**legitimate** [5] - 2038:13, 2039:19, 2041:5, 2050:10, 2052:4
**length** [2] - 2001:9, 2024:5
**lengthy** [1] - 2000:1
**less** [8] - 2013:10, 2015:12, 2080:24, 2083:3, 2087:2, 2090:14, 2137:5, 2137:7
**level** [7] - 2065:22, 2075:23, 2080:13, 2116:24, 2116:25, 2118:1, 2130:11
**leverage** [9] - 1989:14, 1990:1, 2087:2, 2087:19, 2101:4, 2101:5, 2101:6, 2102:15, 2152:23
**levers** [1] - 2011:20
**Lexmark** [3] - 2010:14, 2011:7, 2140:18
**life** [2] - 2015:25, 2017:5
**likely** [8] - 2081:22, 2082:24, 2087:16, 2093:23, 2094:2, 2094:19, 2139:12, 2160:18
**likewise** [1] - 2099:25
**limit** [1] - 1996:8
**limited** [5] - 2037:10, 2042:24, 2043:19, 2052:3, 2061:23
**line** [11] - 2042:6, 2043:19, 2078:6, 2091:20, 2101:1, 2108:19, 2109:17, 2144:8, 2147:8, 2154:16, 2155:8
**lines** [1] - 2149:18
**list** [3] - 2016:23, 2043:22, 2071:4
**listed** [1] - 2052:2
**listen** [1] - 2078:5
**lists** [1] - 2071:14
**literally** [4] - 1992:19, 2038:3, 2049:19, 2132:15
**LLP** [3] - 1975:18, 1975:21,

1975:25
**loading** [1] - 2033:1
**loans** [3] - 2115:15, 2115:25, 2119:4
**local** [2] - 2110:11, 2156:11
**located** [1] - 2062:10
**location** [1] - 2009:22
**locations** [1] - 2132:8
**lock** [2] - 2014:20, 2026:19
**locked** [6] - 2010:22, 2015:20, 2017:5, 2017:9, 2018:24
**logical** [5] - 2067:21, 2095:16, 2123:24, 2141:22, 2147:4
**logically** [1] - 2159:5
**long-standing** [1] - 2042:11
**look** [70] - 1994:22, 2009:8, 2011:5, 2012:17, 2013:21, 2015:4, 2015:10, 2031:3, 2038:10, 2042:3, 2043:2, 2043:12, 2056:19, 2064:18, 2069:14, 2070:9, 2073:21, 2085:7, 2086:6, 2089:21, 2090:10, 2090:18, 2091:1, 2093:12, 2093:22, 2095:6, 2096:18, 2099:6, 2101:25, 2102:20, 2102:23, 2103:4, 2103:19, 2104:7, 2105:11, 2107:16, 2108:23, 2109:13, 2110:5, 2112:13, 2113:3, 2116:19, 2117:8, 2117:22, 2119:20, 2121:23, 2124:16, 2124:17, 2133:7, 2133:16, 2134:1, 2135:25, 2138:6, 2142:4, 2142:8, 2142:12, 2143:14, 2144:9, 2144:14, 2145:4, 2145:5, 2149:1, 2149:19, 2151:19, 2157:3, 2161:12, 2162:4, 2166:6
**Look** [2] - 2123:17, 2162:6
**looked** [7] - 2042:1, 2042:23, 2043:20, 2103:3, 2111:1, 2131:17, 2137:4
**looking** [17] - 1995:1, 2011:10, 2011:11, 2092:1, 2092:2, 2100:3, 2106:14, 2133:6, 2148:23, 2149:22, 2151:25, 2152:1, 2159:12, 2159:18
**looks** [4] - 1992:19, 2060:5, 2091:7, 2092:21
**lose** [16] - 2011:25, 2013:15, 2026:15, 2030:12, 2030:17, 2033:25, 2034:5, 2034:21, 2034:24, 2035:19, 2087:18, 2161:13, 2161:17, 2163:14, 2166:17
**losing** [2] - 2109:21, 2110:20
**loss** [2] - 2109:11, 2112:4
**loud** [1] - 2000:15
**Loughlin** [1] - 1975:14

**love** [1] - 2123:18
**low** [5] - 1991:9, 2006:22, 2054:11, 2054:12, 2068:24
**lower** [13] - 1997:16, 2016:3, 2086:25, 2091:10, 2102:5, 2102:8, 2108:3, 2139:10, 2141:7, 2142:12, 2153:25, 2165:16, 2165:18
**lowering** [1] - 2033:14
**loyalties** [1] - 2034:11
**loyalty** [1] - 2034:15
**lumped** [1] - 2139:5
**lumping** [1] - 2137:21
**lunch** [1] - 2168:17

## M

**machine** [1] - 1976:6
**machines** [2] - 2005:22, 2013:25
**machines'** [1] - 2014:2
**macro** [1] - 2080:10
**mad** [1] - 2162:8
**magic** [1] - 2155:9
**magnitude** [1] - 2121:23
**mail** [2] - 2065:4, 2066:5
**main** [4] - 2120:21, 2139:16, 2148:22, 2149:4
**maintenance** [1] - 2051:22
**major** [4] - 2008:5, 2097:13, 2104:8, 2127:23
**majority** [3] - 2017:1, 2032:6, 2092:16
**Manage** [1] - 2147:2
**manage** [4] - 2023:20, 2047:18, 2057:21, 2062:24
**managed** [7] - 2062:18, 2062:21, 2124:8, 2136:23, 2136:25, 2140:16, 2147:10
**management** [6] - 2010:6, 2024:18, 2024:21, 2040:2, 2062:2, 2106:14
**manager** [2] - 1988:23, 1989:8
**MANGES** [2] - 1975:18, 1975:21
**manner** [1] - 2011:12
**manufacture** [3] - 2016:24, 2016:25, 2043:25
**manufactured** [1] - 2017:16
**manufacturer** [4] - 2017:8, 2027:7, 2027:10, 2029:12
**manufacturers** [4] - 1991:8, 2013:25, 2108:4, 2133:5
**manufacturing** [1] - 2130:10
**March** [3] - 1975:5, 2045:19, 2079:25
**marden** [1] - 1976:3
**margin** [1] - 2166:14
**margins** [2] - 2166:1, 2166:25
**marker** [1] - 2164:1

**market** [154] - 1979:18, 1980:10, 1982:24, 1982:25, 1989:17, 1989:18, 1995:6, 1996:9, 1998:14, 1998:15, 1998:19, 1998:21, 2001:24, 2010:11, 2011:13, 2011:15, 2013:8, 2014:22, 2015:1, 2015:3, 2015:4, 2015:11, 2015:22, 2015:25, 2016:21, 2034:24, 2038:14, 2043:3, 2052:7, 2053:4, 2053:24, 2053:25, 2055:5, 2057:9, 2062:10, 2064:8, 2069:11, 2078:7, 2083:13, 2083:15, 2084:4, 2088:22, 2089:1, 2089:2, 2089:3, 2089:10, 2089:12, 2089:13, 2089:16, 2089:24, 2090:1, 2090:19, 2090:24, 2094:15, 2094:16, 2109:2, 2109:5, 2110:5, 2122:14, 2122:15, 2122:17, 2125:5, 2125:10, 2125:12, 2125:15, 2125:21, 2125:22, 2126:3, 2126:5, 2126:7, 2126:19, 2126:25, 2127:4, 2127:8, 2127:13, 2127:22, 2128:1, 2128:5, 2128:18, 2129:21, 2129:23, 2129:25, 2130:8, 2130:14, 2130:17, 2130:25, 2131:4, 2131:10, 2131:12, 2131:16, 2131:21, 2132:16, 2132:20, 2132:24, 2133:6, 2133:7, 2133:10, 2134:5, 2134:9, 2134:22, 2134:25, 2135:24, 2136:8, 2136:10, 2137:12, 2138:20, 2138:21, 2139:3, 2139:6, 2141:6, 2142:1, 2142:3, 2142:4, 2142:20, 2143:4, 2144:3, 2146:13, 2148:10, 2148:23, 2148:25, 2149:4, 2149:8, 2149:14, 2149:16, 2150:1, 2150:2, 2150:20, 2151:12, 2151:16, 2151:18, 2151:23, 2152:6, 2152:13, 2154:7, 2154:14, 2156:6, 2156:19, 2157:4, 2157:8, 2162:22, 2163:19, 2164:7, 2164:9, 2164:13, 2164:16, 2166:19, 2166:22
**marketplace** [2] - 2040:5, 2059:24
**markets** [6] - 2088:20, 2112:7, 2132:1, 2132:4, 2134:15, 2156:18
**marking** [1] - 2089:5
**Mason** [11] - 2026:13, 2035:18, 2050:15, 2055:21, 2056:1, 2061:9, 2062:11, 2086:2, 2097:25, 2159:21, 2165:11

**masters** [1] - 2075:23
**match** [2] - 2016:4, 2016:7
**material** [1] - 2008:5
**materials** [1] - 2123:22
**math** [1] - 2075:23
**mathematically** [1] - 2033:23
**mathematics** [1] - 2075:22
**matter** [13] - 1979:20, 1981:20, 2047:4, 2072:5, 2072:17, 2111:16, 2114:24, 2121:20, 2135:1, 2138:2, 2142:25, 2151:24, 2156:4
**matters** [3] - 2077:11, 2094:19, 2114:21
**Matthew** [1] - 1975:24
**Max** [3] - 2001:6, 2002:9, 2018:10
**maximization** [1] - 2162:4
**maximize** [1] - 2161:9
**maximizing** [2] - 2158:24, 2162:12
**McDonald's** [1] - 2100:15
**McHie** [1] - 1975:24
**McKesson** [18] - 2035:24, 2035:25, 2036:7, 2036:15, 2036:19, 2036:25, 2037:6, 2037:14, 2037:16, 2038:1, 2038:6, 2038:10, 2039:19, 2039:25, 2041:3, 2041:11, 2050:2, 2050:14
**McKesson's** [2] - 2037:4, 2041:6
**mean** [55] - 1981:13, 1985:15, 1987:1, 1994:4, 1994:5, 1995:25, 2005:5, 2006:6, 2006:7, 2010:19, 2021:18, 2025:16, 2031:13, 2051:20, 2054:11, 2057:15, 2058:22, 2067:13, 2071:18, 2072:15, 2072:19, 2072:23, 2077:20, 2080:24, 2085:4, 2086:22, 2090:16, 2092:16, 2093:9, 2097:10, 2109:16, 2111:16, 2112:14, 2113:25, 2114:4, 2114:9, 2114:22, 2116:25, 2122:20, 2123:20, 2124:25, 2126:10, 2126:11, 2140:4, 2147:21, 2148:18, 2150:19, 2151:1, 2157:1, 2165:8, 2165:19, 2166:6, 2167:7, 2167:10
**meaning** [4] - 2020:4, 2032:25, 2033:1, 2140:10
**meaningful** [2] - 2009:21, 2157:7
**means** [11] - 1986:7, 2023:3, 2023:6, 2025:14, 2029:1, 2058:23, 2086:23, 2101:1, 2130:22, 2152:1, 2166:20
**meant** [5] - 1985:16, 1988:18,

2006:7, 2084:11, 2158:16
**measure** [16] - 2089:24, 2090:1, 2117:23, 2118:2, 2134:17, 2138:21, 2142:18, 2142:19, 2144:9, 2148:25, 2150:1, 2154:14, 2155:20, 2156:10, 2157:6
**measured** [2] - 2099:4, 2166:15
**measurements** [1] - 2155:13
**mechanism** [5] - 2026:19, 2028:8, 2028:9, 2053:21, 2059:13
**mechanisms** [1] - 2025:6
**medical** [1] - 1987:4
**medications** [3] - 2035:9, 2036:16, 2040:14
**medium** [4] - 2033:16, 2105:6, 2110:24, 2111:5
**medium-size** [2] - 2110:24, 2111:5
**meet** [8] - 1995:21, 2047:24, 2048:17, 2050:15, 2065:21, 2108:21, 2109:18, 2121:1
**Meeting** [2] - 2064:20, 2065:7
**meeting** [24] - 2045:8, 2045:10, 2046:17, 2046:19, 2046:21, 2047:4, 2047:19, 2047:21, 2047:23, 2048:3, 2063:24, 2064:1, 2064:5, 2064:15, 2065:2, 2065:5, 2065:14, 2066:2, 2066:6, 2066:9, 2066:10, 2073:2
**meetings** [1] - 2048:7
**member** [20] - 1989:18, 2017:1, 2020:21, 2020:24, 2023:4, 2023:13, 2023:24, 2024:2, 2024:25, 2025:17, 2025:21, 2028:24, 2035:16, 2035:17, 2043:23, 2063:1, 2070:14, 2080:1, 2080:17, 2081:5
**member's** [1] - 2025:20
**members** [121] - 1978:1, 1978:8, 1978:17, 1979:17, 1980:3, 1980:13, 1980:23, 1981:9, 1981:10, 1981:15, 1981:17, 1982:12, 1982:14, 1983:11, 1983:12, 1983:17, 1983:18, 1983:23, 1984:8, 1984:13, 1984:25, 1986:2, 1986:8, 1988:9, 1989:4, 1990:9, 1990:14, 1991:9, 1991:21, 1992:20, 1993:8, 1993:14, 1996:1, 2014:23, 2018:13, 2019:9, 2019:15, 2019:19, 2019:25, 2020:3, 2020:9, 2020:11, 2020:16, 2021:2, 2021:5, 2021:6, 2021:9, 2021:12, 2021:19, 2022:6, 2022:7, 2022:11, 2022:13, 2022:14, 2022:23, 2023:10,

2023:17, 2023:18, 2023:23, 2023:25, 2024:13, 2024:16, 2024:19, 2025:12, 2025:13, 2026:2, 2026:11, 2026:17, 2027:10, 2027:13, 2028:4, 2028:10, 2028:16, 2028:23, 2029:7, 2029:8, 2031:24, 2032:1, 2032:2, 2033:19, 2033:20, 2033:24, 2034:3, 2034:21, 2035:10, 2035:21, 2037:20, 2038:8, 2041:21, 2042:13, 2044:3, 2044:23, 2052:19, 2054:6, 2054:9, 2054:13, 2054:16, 2055:10, 2056:12, 2057:3, 2057:12, 2057:18, 2057:19, 2058:9, 2058:15, 2058:17, 2058:19, 2059:25, 2060:14, 2060:16, 2061:7, 2061:16, 2062:23, 2068:23, 2069:11, 2080:15, 2080:19
**members'** [8] - 2001:23, 2002:1, 2002:5, 2009:10, 2019:22, 2023:7, 2026:5, 2053:3
**membership** [13] - 1990:15, 1996:3, 2001:19, 2006:24, 2020:1, 2022:17, 2022:22, 2025:23, 2045:4, 2053:5, 2055:25, 2056:15
**mention** [1] - 2049:19
**mentioned** [23] - 1977:19, 1978:16, 1980:9, 1982:16, 1996:22, 2002:16, 2005:1, 2006:19, 2008:4, 2014:7, 2031:8, 2045:7, 2057:11, 2061:21, 2095:25, 2096:8, 2103:13, 2121:18, 2127:16, 2143:25, 2151:16, 2156:5, 2156:17
**merchant** [3] - 2098:7, 2126:24, 2127:18
**merge** [5] - 1984:19, 2099:7, 2129:10, 2135:5
**merged** [4] - 2001:6, 2002:9, 2139:16, 2150:16
**merger** [85] - 1979:6, 1979:14, 1979:15, 1979:18, 1981:4, 1981:7, 1983:14, 1983:19, 1983:25, 1984:4, 1984:11, 1984:14, 1987:22, 2001:10, 2002:18, 2002:23, 2009:13, 2013:1, 2033:10, 2033:23, 2053:17, 2053:18, 2053:20, 2056:24, 2059:11, 2064:23, 2077:13, 2077:18, 2078:1, 2078:4, 2079:9, 2079:13, 2079:17, 2081:22, 2082:10, 2082:11, 2082:15, 2082:24, 2082:25, 2084:13, 2086:4, 2086:22, 2087:5, 2088:9,

2089:20, 2090:15, 2091:7, 2091:14, 2091:15, 2091:24, 2092:23, 2093:6, 2093:10, 2093:18, 2093:20, 2093:22, 2094:3, 2094:9, 2094:18, 2095:2, 2096:1, 2101:22, 2109:7, 2109:21, 2110:21, 2111:20, 2111:25, 2112:8, 2114:6, 2117:3, 2122:5, 2125:25, 2128:25, 2133:5, 2143:14, 2152:17, 2153:5, 2153:9, 2154:2, 2154:9, 2157:1, 2160:14, 2160:21, 2160:24

**mergers** [12] - 2076:12, 2076:13, 2077:12, 2081:21, 2082:12, 2085:4, 2092:11, 2092:13, 2092:16, 2093:3, 2129:1, 2133:20

**merging** [11] - 2053:24, 2083:2, 2083:5, 2083:12, 2087:3, 2105:11, 2136:1, 2153:11, 2157:4, 2163:8, 2164:3

**messiness** [1] - 2156:3

**met** [8] - 1977:9, 2047:1, 2048:8, 2065:18, 2065:20, 2065:24, 2107:7, 2154:4

**method** [5] - 2125:22, 2125:23, 2125:25, 2158:13, 2158:20

**methodology** [2] - 2001:20, 2018:24

**methods** [1] - 2164:13

**metrics** [2] - 2099:5, 2100:9

**micro** [1] - 2080:13

**might** [34] - 1995:16, 1996:5, 2004:12, 2011:7, 2012:16, 2012:17, 2013:23, 2014:24, 2021:22, 2022:3, 2022:17, 2031:4, 2043:8, 2075:10, 2085:5, 2086:13, 2089:20, 2089:22, 2090:11, 2091:11, 2099:14, 2107:14, 2117:14, 2118:17, 2122:21, 2125:7, 2130:1, 2130:19, 2132:12, 2133:22, 2135:23, 2137:1, 2137:6

**mile** [3] - 2031:10, 2031:12, 2031:22

**mill** [2] - 1991:8, 2029:18

**million** [47] - 1993:14, 1993:15, 1998:5, 2009:10, 2009:15, 2010:13, 2011:6, 2013:12, 2026:8, 2026:9, 2033:20, 2033:21, 2033:24, 2033:25, 2034:1, 2034:5, 2034:6, 2034:20, 2034:21, 2037:21, 2041:21, 2042:18, 2051:1, 2051:11, 2051:12, 2051:14, 2051:15, 2051:17, 2103:25, 2104:7, 2104:9, 2104:18, 2112:21, 2115:15, 2117:7,

2117:11, 2117:13, 2117:18, 2118:20, 2118:21, 2118:22, 2122:1, 2122:4, 2154:20

**mills** [1] - 1991:12

**mind** [7] - 2042:9, 2061:6, 2078:21, 2157:25, 2158:2, 2160:4, 2160:15

**mindful** [1] - 2167:17

**mine** [1] - 2066:20

**minority** [2] - 2012:6, 2012:9

**minute** [3] - 2004:11, 2009:9, 2046:11

**minutes** [3] - 1984:22, 2038:4, 2039:21

**miscommunication** [1] - 2147:18

**misinformed** [1] - 2089:6

**misleading** [8] - 2089:7, 2134:3, 2135:20, 2138:15, 2139:11, 2144:6, 2144:11, 2144:16

**mission** [2] - 2027:24, 2058:19

**misspoke** [1] - 2146:8

**mistake** [6] - 2138:17, 2142:15, 2143:25, 2144:13, 2144:17, 2145:19

**MIT** [1] - 2075:21

**mix** [1] - 2161:6

**mode** [1] - 2119:21

**model** [2] - 2013:20, 2014:11

**models** [1] - 2013:25

**modes** [2] - 2125:6, 2125:18

**moment** [2] - 2064:19, 2141:3

**money** [17] - 1998:10, 2026:16, 2061:12, 2104:13, 2112:21, 2117:14, 2119:1, 2135:22, 2158:15, 2158:23, 2159:4, 2159:13, 2159:19, 2159:20, 2159:21, 2161:2, 2161:25

**monitoring** [1] - 2107:5

**monopolist** [29] - 2125:24, 2127:5, 2127:13, 2128:13, 2128:22, 2129:4, 2130:20, 2151:10, 2156:17, 2156:21, 2156:25, 2157:9, 2157:13, 2157:17, 2157:21, 2158:4, 2158:8, 2158:21, 2159:23, 2160:11, 2160:22, 2162:18, 2163:5, 2163:15, 2163:21, 2164:15, 2164:17, 2165:7, 2165:10

**monopolized** [1] - 2126:14

**monopoly** [1] - 2136:1

**month** [6] - 2000:12, 2018:19, 2046:18, 2085:14, 2085:22, 2096:16

**month-long** [1] - 2096:16

**months** [1] - 1993:25

**morning** [3] - 2010:5, 2168:11, 2168:20

**Morrison** [2] - 2110:13

**most** [13] - 2023:18, 2055:21, 2059:8, 2081:18, 2087:16, 2095:21, 2106:4, 2123:18, 2143:10, 2152:25, 2158:23, 2159:13, 2166:7

**mostly** [4] - 2080:6, 2110:11, 2135:1, 2149:3

**motion** [2] - 2068:4, 2085:21

**motions** [1] - 2071:9

**motivated** [2] - 2004:8, 2034:4

**motors** [1] - 2051:24

**mouth** [3] - 1984:24, 2000:9, 2119:13

**move** [7] - 2056:18, 2056:25, 2105:8, 2113:18, 2113:22, 2151:5, 2156:2

**moved** [2] - 2076:4, 2168:10

**movie** [1] - 2153:23

**moving** [3] - 2056:7, 2056:10, 2155:25

**MPS** [5] - 2012:10, 2137:4, 2140:20, 2148:3, 2148:5

**MR** [43] - 1977:3, 1977:7, 1982:10, 1982:11, 1985:21, 1985:23, 1997:22, 1997:23, 1998:1, 1998:3, 2004:7, 2006:15, 2006:16, 2006:17, 2014:19, 2050:22, 2052:9, 2052:11, 2052:13, 2054:23, 2060:25, 2062:13, 2062:16, 2063:3, 2063:6, 2063:11, 2066:11, 2066:13, 2066:14, 2068:3, 2069:25, 2070:7, 2070:19, 2070:24, 2071:8, 2071:13, 2071:22, 2072:6, 2072:11, 2072:24, 2073:6, 2073:20, 2074:4

**MRO** [2] - 2045:24, 2051:20

**MS** [53] - 2066:25, 2067:3, 2067:8, 2067:9, 2067:11, 2067:14, 2067:20, 2068:10, 2068:13, 2068:22, 2069:2, 2069:6, 2069:21, 2074:7, 2074:17, 2074:21, 2074:24, 2075:5, 2075:14, 2075:16, 2082:1, 2082:4, 2082:7, 2082:8, 2086:18, 2086:19, 2099:24, 2113:18, 2113:24, 2114:4, 2114:10, 2114:15, 2114:18, 2115:4, 2120:10, 2120:20, 2121:15, 2124:23, 2134:8, 2137:8, 2143:2, 2146:11, 2148:8, 2156:24, 2162:17, 2167:5, 2167:13, 2167:16, 2167:20, 2167:22, 2167:24, 2168:2, 2168:16

**multiple** [1] - 1993:2

**mundane** [1] - 2112:14

**must** [3] - 2002:19, 2015:25,

2077:20

# N

**name** [7] - 1977:8, 1990:20, 1990:25, 2075:17, 2105:21, 2105:23, 2109:13
**named** [1] - 1990:24
**narrow** [1] - 2104:2
**narrower** [3] - 2125:15, 2130:17, 2131:16
**Nashville** [1] - 2070:19
**national** [6] - 1987:25, 2044:7, 2044:10, 2053:9, 2061:24, 2080:24
**nationwide** [8] - 2027:14, 2028:5, 2028:10, 2029:1, 2029:8, 2031:25, 2036:22, 2036:24
**natural** [8] - 2058:9, 2081:4, 2124:1, 2124:5, 2127:21, 2147:12, 2160:8, 2167:5
**naturally** [1] - 2095:4
**nature** [8] - 1979:18, 1989:17, 1996:9, 2037:10, 2048:5, 2056:20, 2093:23, 2101:18
**nearly** [2] - 2108:10, 2111:1
**necessarily** [7] - 2011:17, 2020:20, 2048:20, 2078:13, 2089:14, 2119:24, 2148:11
**necessary** [1] - 2055:18
**need** [22] - 2015:2, 2050:24, 2061:3, 2061:16, 2063:8, 2068:14, 2074:2, 2089:21, 2091:12, 2099:6, 2103:5, 2109:17, 2130:5, 2132:8, 2132:9, 2132:10, 2132:14, 2133:3, 2145:13, 2152:22, 2163:13, 2167:21
**needed** [4] - 2056:2, 2059:23, 2070:5, 2081:24
**needs** [21] - 1995:21, 2012:18, 2014:4, 2014:14, 2050:16, 2088:3, 2103:7, 2103:10, 2103:15, 2104:25, 2105:4, 2105:10, 2108:18, 2108:21, 2108:24, 2109:3, 2109:18, 2133:2, 2153:15, 2154:14, 2155:5
**negate** [1] - 2022:3
**negative** [1] - 1979:6
**negotiate** [10] - 1984:25, 1985:13, 1986:1, 1986:8, 1999:24, 2000:25, 2003:17, 2003:19, 2091:19, 2106:3
**negotiated** [6] - 1997:14, 1998:12, 1998:20, 2008:11, 2017:18, 2154:9
**negotiating** [4] - 1985:4, 1990:2, 2019:2, 2031:2

**negotiation** [2] - 2003:13, 2011:1
**negotiations** [5] - 1993:19, 2001:18, 2002:25, 2003:23, 2059:12
**negotiator** [1] - 1989:8
**negotiators** [9] - 1986:20, 1986:22, 1989:9, 1990:7, 2010:15, 2011:5, 2011:20, 2012:3, 2053:11
**never** [19] - 1983:21, 1998:18, 1998:21, 1999:2, 2008:15, 2008:18, 2012:5, 2038:20, 2039:1, 2042:14, 2042:16, 2044:2, 2060:7, 2107:9, 2107:10, 2108:16, 2120:11, 2159:3
**New** [1] - 1975:22
**new** [2] - 1999:16, 2032:24
**news** [1] - 2047:8
**newspapers** [1] - 2111:22
**next** [28] - 2000:11, 2003:9, 2018:19, 2032:7, 2040:11, 2066:22, 2066:23, 2066:25, 2074:5, 2090:21, 2097:4, 2097:6, 2098:2, 2098:14, 2098:15, 2100:2, 2103:5, 2105:14, 2106:13, 2116:24, 2116:25, 2125:9, 2141:6, 2150:7, 2155:11, 2155:24, 2156:3
**nice** [1] - 2169:3
**nine** [1] - 2167:12
**NJ** [1] - 1975:20
**noise** [1] - 2068:11
**non** [2] - 1980:20, 2077:13
**non-health** [1] - 1980:20
**non-merger** [1] - 2077:13
**nonclinical** [6] - 1986:23, 1987:1, 1987:6, 1987:7, 1988:14, 1988:15
**noncompliant** [1] - 2024:20
**noncritical** [2] - 2060:20, 2060:23
**none** [6] - 1980:13, 1983:11, 1983:18, 1983:23, 1984:13, 1984:17
**nonexistent** [1] - 2165:1
**nonjury** [1] - 2072:14
**nonnational** [1] - 1983:16
**nonpublic** [1] - 2015:15
**nonsense** [1] - 2143:23
**normal** [2] - 2102:13, 2131:25, 2140:8
**normally** [6] - 2113:8, 2115:19, 2117:18, 2131:23, 2137:14, 2146:5
**Norman** [1] - 1976:3
**North** [3] - 2036:16, 2037:12, 2040:15

**northeast** [1] - 2061:24
**Northern** [1] - 2027:21
**nosed** [1] - 2161:24
**note** [1] - 2157:14
**noted** [2] - 2109:8, 2140:7
**notes** [6] - 2122:24, 2132:9, 2132:14, 2146:22, 2164:23, 2170:7
**nothing** [5] - 2037:7, 2050:22, 2066:11, 2066:13, 2115:23
**noticing** [1] - 2096:8
**notion** [3] - 2132:16, 2143:22, 2154:19
**notwithstanding** [1] - 2002:8
**Nuclear** [2] - 2168:22, 2168:24
**number** [20] - 1985:12, 1985:24, 2002:19, 2036:2, 2050:25, 2055:18, 2057:20, 2077:22, 2077:25, 2095:2, 2096:14, 2097:6, 2098:6, 2099:15, 2103:10, 2139:10, 2142:8, 2144:14, 2150:13, 2164:4
**numbered** [1] - 2069:15
**numbers** [4] - 2101:14, 2102:8, 2150:12, 2150:17
**numerous** [1] - 2001:10
**NW** [4] - 1975:16, 1975:25, 1976:10, 2170:14
**NY** [1] - 1975:22

# O

**O'Neill** [10] - 2083:9, 2100:17, 2101:16, 2102:19, 2108:20, 2113:4, 2117:6, 2117:10, 2139:15, 2161:21
**Obama** [2] - 2078:19, 2080:16
**object** [1] - 2113:18
**objection** [3] - 2082:4, 2120:10, 2120:19
**objections** [1] - 2072:11
**objective** [1] - 2080:9
**obligation** [3] - 2158:6, 2158:16, 2160:5
**observing** [1] - 2167:1
**obviously** [9] - 2050:2, 2071:11, 2072:7, 2094:14, 2096:25, 2114:5, 2116:21, 2125:20, 2140:4
**occasion** [1] - 1991:7
**occasions** [1] - 2021:15
**occur** [6] - 2021:17, 2021:18, 2021:19, 2023:2, 2047:22, 2048:7
**occurred** [1] - 2066:10
**OF** [3] - 1975:1, 1975:8, 2170:2
**off-contract** [4] - 2021:10, 2023:19, 2026:20, 2106:16
**off-the-record** [1] - 2068:15

**off-the-shelf** [1] - 2006:23
   **offer** [7] - 1984:9, 2046:14,
2101:19, 2120:2, 2120:4,
2120:7, 2157:18
   **offered** [10] - 1992:24, 1997:16,
2003:1, 2020:21, 2059:9,
2059:13, 2069:24, 2080:1,
2157:19, 2161:16
   **offering** [10] - 2010:10, 2042:1,
2042:24, 2043:19, 2052:3,
2068:19, 2157:15, 2165:16,
2165:18, 2165:22
   **offers** [3] - 2003:5, 2032:18,
2032:21
   **Office** [62] - 1975:24, 1978:22,
1998:8, 1999:17, 2001:6,
2002:9, 2018:10, 2032:12,
2033:2, 2037:25, 2044:17,
2050:1, 2055:9, 2060:19,
2060:22, 2083:9, 2094:6,
2095:1, 2096:20, 2096:23,
2097:7, 2097:8, 2097:23,
2098:10, 2098:20, 2099:2,
2099:9, 2099:21, 2100:8,
2100:10, 2100:21, 2101:19,
2102:6, 2102:13, 2104:11,
2106:24, 2109:8, 2109:19,
2110:17, 2112:16, 2125:7,
2130:9, 2131:18, 2137:2,
2139:3, 2139:6, 2139:23,
2141:12, 2142:14, 2143:9,
2144:6, 2149:12, 2150:16,
2150:24, 2155:22, 2157:15,
2161:17, 2161:18, 2165:10,
2165:22
   **office** [181] - 1987:5, 1987:7,
1987:11, 1987:12, 1987:14,
1987:18, 1988:1, 1988:2,
1991:1, 1995:9, 1995:20,
1999:11, 2001:10, 2001:16,
2002:13, 2004:10, 2004:13,
2004:16, 2004:20, 2004:23,
2006:25, 2007:24, 2008:3,
2008:5, 2008:16, 2008:20,
2008:25, 2009:8, 2009:19,
2010:7, 2010:9, 2010:10,
2011:12, 2013:4, 2016:6,
2016:20, 2019:19, 2020:12,
2020:17, 2021:6, 2021:10,
2021:13, 2021:20, 2021:24,
2022:4, 2022:7, 2022:8,
2022:12, 2022:25, 2023:4,
2024:1, 2024:22, 2030:2,
2036:25, 2037:5, 2037:9,
2037:13, 2037:15, 2037:17,
2038:2, 2038:4, 2038:6,
2038:14, 2038:21, 2039:1,
2039:6, 2039:9, 2039:19,
2039:23, 2039:25, 2040:3,
2040:5, 2041:5, 2041:6, 2042:1,

2042:5, 2042:7, 2042:14,
2042:19, 2043:10, 2043:19,
2043:20, 2046:20, 2046:21,
2047:6, 2047:14, 2047:18,
2050:11, 2050:14, 2051:25,
2052:1, 2052:4, 2055:2, 2055:9,
2056:13, 2056:17, 2056:21,
2057:3, 2057:22, 2058:9,
2058:12, 2058:25, 2059:5,
2060:6, 2060:10, 2060:13,
2060:17, 2060:19, 2060:22,
2063:14, 2063:19, 2064:5,
2064:24, 2065:10, 2066:3,
2083:25, 2084:3, 2084:15,
2094:8, 2094:23, 2095:10,
2098:8, 2100:5, 2100:21,
2104:2, 2107:12, 2110:12,
2112:13, 2112:19, 2113:5,
2113:7, 2115:8, 2115:15,
2117:2, 2117:8, 2121:18,
2122:18, 2122:20, 2122:21,
2122:22, 2123:1, 2123:2,
2123:20, 2123:21, 2124:24,
2125:2, 2125:12, 2125:14,
2125:19, 2130:10, 2130:23,
2131:13, 2136:13, 2137:15,
2138:5, 2138:13, 2139:12,
2139:15, 2139:24, 2140:6,
2140:9, 2140:10, 2143:8,
2144:7, 2144:21, 2147:19,
2147:20, 2148:1, 2150:12,
2151:8, 2151:15, 2152:6,
2154:17, 2154:22, 2157:10,
2158:22, 2164:10, 2164:19,
2165:2, 2165:12
   **OfficeMax** [1] - 2150:16
   **officer** [1] - 2047:20
   **offices** [3] - 2022:18, 2065:19,
2065:25
   **Official** [2] - 1976:9, 2170:13
   **OFFICIAL** [1] - 2170:2
   **official** [1] - 2047:12
   **offs** [1] - 2021:1
   **offset** [2] - 2030:17, 2120:25
   **offsetting** [1] - 2091:12
   **often** [15] - 2047:24, 2091:19,
2107:22, 2123:20, 2124:9,
2126:23, 2127:8, 2134:10,
2140:7, 2140:16, 2149:15,
2150:23, 2150:25, 2155:6,
2156:11
   **oil** [4] - 2111:23, 2111:24,
2112:2, 2112:10
   **once** [5] - 2003:23, 2089:23,
2095:6, 2095:9, 2095:19
   **one** [69] - 1978:7, 1986:5,
1989:3, 1990:8, 1992:25,
1996:8, 1996:23, 1996:24,
2002:19, 2008:2, 2011:10,
2011:20, 2012:25, 2013:9,

2018:5, 2021:1, 2023:10,
2025:6, 2031:8, 2036:16,
2037:12, 2040:14, 2048:11,
2051:18, 2052:23, 2053:14,
2054:8, 2054:10, 2057:20,
2061:9, 2062:23, 2076:7,
2076:21, 2077:25, 2086:6,
2086:10, 2087:7, 2088:15,
2092:12, 2093:15, 2097:6,
2098:6, 2100:17, 2101:24,
2102:15, 2103:16, 2105:2,
2106:9, 2107:17, 2110:15,
2110:20, 2112:6, 2113:5,
2116:17, 2117:6, 2126:14,
2127:9, 2127:22, 2128:20,
2129:16, 2133:25, 2138:20,
2152:4, 2156:2, 2158:11,
2166:14, 2166:17, 2168:1
   **one's** [1] - 2152:19
   **one-and-a-half** [1] - 2051:18
   **one-offs** [1] - 2021:1
   **one-third** [3] - 2036:16,
2037:12, 2040:14
   **one-way** [1] - 2018:5
   **ones** [4] - 2022:24, 2131:19,
2135:6, 2152:21
   **ongoing** [1] - 1999:9
   **online** [5] - 2033:16, 2039:2,
2044:20, 2084:18, 2096:3
   **open** [2] - 2105:21, 2113:21
   **OPEN** [1] - 2066:16
   **operates** [1] - 1984:23
   **operating** [1] - 1984:18
   **operations** [2] - 2041:10,
2051:22
   **opinion** [14] - 2061:6, 2061:18,
2069:16, 2094:2, 2121:11,
2122:15, 2122:17, 2123:7,
2141:2, 2141:24, 2142:16,
2142:22, 2156:1, 2156:4
   **opinions** [2] - 2052:20, 2155:15
   **opportunities** [5] - 2048:6,
2097:17, 2098:11, 2098:13,
2100:1
   **opposed** [1] - 2027:7
   **option** [5] - 2013:22, 2055:10,
2060:6, 2063:14, 2063:19
   **options** [3] - 2055:6, 2090:4,
2091:2
   **oranges** [1] - 2144:20
   **order** [12] - 1983:5, 2009:20,
2022:4, 2023:8, 2023:12,
2023:14, 2056:23, 2084:3,
2101:4, 2106:23, 2107:1,
2152:22
   **ordering** [1] - 2026:19
   **orders** [7] - 1987:10, 1987:23,
2005:15, 2009:21, 2026:15,
2053:5, 2107:23
   **ordinary** [2] - 2073:1, 2073:2

**organization** [15] - 1978:7, 1981:23, 1986:7, 1994:8, 1994:22, 2042:13, 2047:15, 2048:6, 2051:6, 2061:11, 2070:15, 2076:6, 2076:16, 2082:18, 2159:10
**organizations** [5] - 1980:23, 2037:8, 2057:16, 2061:5, 2069:8
**orient** [1] - 2082:12
**oriented** [1] - 2094:21
**originally** [1] - 1997:2
**Orszag** [2] - 2137:20, 2152:3
**orthopedic** [2] - 2135:8, 2135:13
**otherwise** [3] - 1979:15, 2016:24, 2091:16
**ourselves** [5] - 1996:8, 2018:12, 2057:18, 2058:15, 2118:11
**outcomes** [1] - 1987:15
**outlined** [2] - 2094:11, 2122:13
**outrank** [1] - 2047:16
**outside** [4] - 2046:22, 2076:24, 2115:9, 2129:21
**outsourced** [1] - 2031:23
**outsourcing** [1] - 2032:9
**over-promise** [1] - 1977:12
**overall** [9] - 2011:25, 2013:20, 2102:9, 2113:7, 2117:9, 2118:19, 2135:24, 2160:23, 2165:19
**overcharged** [1] - 2122:10
**overhaul** [1] - 2079:18
**overlap** [4] - 2087:25, 2124:5, 2143:15, 2151:14
**overlapping** [1] - 2087:14
**overlaps** [3] - 2087:13, 2092:24, 2124:16
**overnight** [1] - 2086:3
**oversee** [2] - 1986:24, 1988:24
**overseeing** [1] - 1987:2
**own** [8] - 1989:19, 2026:13, 2029:13, 2031:9, 2070:2, 2095:17, 2103:18, 2127:7
**owned** [1] - 2107:22
**owners** [3] - 1981:18, 1981:19, 1981:23

# P

**P.D** [1] - 2110:13
**p.m** [1] - 1975:6
**PA** [1] - 1976:5
**Pacific** [21] - 2027:1, 2027:3, 2027:5, 2027:20, 2028:5, 2028:10, 2028:16, 2028:20, 2028:25, 2029:3, 2029:6, 2029:18, 2029:22, 2029:24, 2030:5, 2030:16, 2030:17, 2050:9, 2050:13, 2058:1, 2058:3

**Pacific's** [1] - 2027:18
**PACK** [2] - 1997:22, 1998:1
**package** [1] - 2151:3
**page** [8] - 2039:5, 2039:7, 2040:11, 2043:16, 2043:18, 2064:18, 2099:15
**pages** [3] - 2039:5, 2039:6, 2049:18
**paid** [4] - 2025:15, 2025:16, 2025:19, 2051:2
**paper** [65] - 1987:10, 1987:17, 1991:8, 1991:12, 2004:23, 2008:16, 2008:21, 2008:25, 2010:9, 2011:16, 2027:10, 2027:11, 2027:23, 2028:2, 2028:5, 2029:4, 2029:6, 2029:7, 2029:8, 2029:12, 2029:14, 2029:16, 2029:21, 2029:22, 2029:25, 2030:6, 2030:11, 2030:14, 2030:15, 2039:14, 2056:21, 2058:2, 2058:3, 2062:21, 2098:7, 2122:22, 2123:21, 2124:20, 2128:6, 2128:16, 2136:13, 2136:16, 2137:15, 2137:18, 2137:19, 2138:1, 2140:22, 2140:23, 2140:24, 2142:1, 2144:19, 2145:5, 2145:10, 2163:1, 2163:11, 2163:24, 2164:1, 2164:2, 2164:5, 2164:10
**paperclip** [5] - 1984:18, 2010:16, 2010:20, 2011:3, 2040:21
**paperclips** [8] - 2004:17, 2009:14, 2010:12, 2011:17, 2013:6, 2027:24, 2028:1, 2041:1
**paragraphs** [2] - 2049:19, 2069:15
**parameters** [1] - 2001:22
**paramount** [1] - 1982:17
**parcel** [1] - 2032:20
**pardon** [1] - 2005:6
**parent** [5] - 1977:24, 1978:7, 1978:24, 1979:9, 1979:13
**part** [38] - 1987:20, 1990:10, 1991:9, 1991:16, 1991:17, 1991:19, 1992:2, 1993:17, 1993:21, 1993:22, 1994:24, 1996:2, 1997:19, 2006:20, 2007:21, 2007:25, 2008:2, 2008:7, 2017:19, 2019:9, 2020:1, 2027:9, 2029:10, 2037:24, 2043:4, 2053:7, 2053:16, 2057:15, 2082:18, 2083:22, 2098:8, 2109:3, 2120:11, 2137:4, 2139:25, 2148:23, 2166:7
**partially** [1] - 2075:7
**participate** [1] - 2080:24
**participation** [3] - 2019:9,

2035:22, 2035:23
**particular** [7] - 1985:7, 2064:15, 2082:24, 2088:6, 2125:23, 2133:21, 2153:17
**particularly** [4] - 2069:16, 2075:9, 2078:22, 2121:3
**parties** [8] - 2049:16, 2081:20, 2096:8, 2103:16, 2128:5, 2154:19, 2163:8, 2167:9
**partner** [2] - 2025:6, 2110:16
**parts** [1] - 2089:8
**party** [4] - 2032:10, 2062:3, 2063:25, 2066:10
**party's** [1] - 2152:3
**pass** [11] - 2034:15, 2034:16, 2091:11, 2113:3, 2113:9, 2113:10, 2113:15, 2113:21, 2116:24, 2121:17, 2122:2
**pass-through** [5] - 2113:9, 2113:15, 2113:21, 2116:24, 2121:17
**passed** [5] - 2115:19, 2116:22, 2118:6, 2118:10, 2128:15
**past** [7] - 1995:24, 2014:10, 2033:1, 2092:10, 2092:13, 2093:2, 2127:14
**patient** [5] - 1984:18, 1984:20, 1987:11, 1987:16, 1987:20
**patient's** [1] - 1987:18
**patients** [5] - 1987:3, 1987:8, 1987:9, 1987:15, 1987:22
**pattern** [3] - 2098:23, 2099:20, 2100:8
**pause** [1] - 2141:3
**pay** [19] - 1991:4, 1991:6, 2026:2, 2029:21, 2084:14, 2084:17, 2112:1, 2112:3, 2112:23, 2113:7, 2115:8, 2115:13, 2115:15, 2116:1, 2117:7, 2118:25, 2161:14, 2162:9
**paying** [11] - 2084:17, 2084:19, 2084:20, 2086:24, 2087:1, 2115:25, 2116:7, 2116:12, 2116:14, 2122:4
**pays** [1] - 2117:2
**pen** [2] - 2023:11, 2147:20
**pencil** [7] - 2128:6, 2128:16, 2163:1, 2163:11, 2163:23, 2164:2, 2164:5
**pencils** [2] - 2004:17, 2136:17
**penetrate** [1] - 2116:16
**penetration** [1] - 2022:16
**Pennsylvania** [1] - 1976:3
**pens** [30] - 2004:17, 2023:12, 2025:14, 2026:12, 2039:15, 2083:25, 2107:15, 2112:23, 2116:6, 2116:11, 2116:12, 2122:24, 2130:13, 2131:14, 2131:15, 2132:8, 2132:10,

2132:13, 2132:19, 2136:16,
2144:19, 2145:10, 2146:22,
2148:1, 2150:5, 2164:9,
2164:22, 2165:17, 2165:18
**People** [1] - 2147:8
**people** [25] - 1986:15, 1986:23,
2009:24, 2021:23, 2024:21,
2045:21, 2077:23, 2085:13,
2096:12, 2096:13, 2096:14,
2101:2, 2115:25, 2119:3,
2127:20, 2129:13, 2135:15,
2140:8, 2153:22, 2159:6,
2163:11, 2163:22, 2163:25,
2164:5, 2164:21
**perceive** [1] - 2120:3
**percent** [36] - 1998:4, 2009:9,
2015:10, 2015:12, 2019:15,
2019:22, 2021:9, 2025:17,
2025:19, 2026:5, 2030:19,
2031:18, 2031:22, 2032:4,
2032:7, 2040:12, 2040:13,
2043:23, 2051:9, 2051:14,
2051:18, 2053:23, 2084:15,
2090:5, 2108:2, 2112:20,
2121:25, 2141:13, 2141:21,
2141:25, 2142:6, 2142:7,
2154:25, 2155:1
**percent-plus** [1] - 2031:22
**percentage** [5] - 1997:21,
1997:22, 2020:9, 2020:11,
2102:9
**percentages** [1] - 2004:12
**perfect** [1] - 2097:22
**perfectly** [2] - 2023:11, 2035:19
**perform** [1] - 2058:4
**performance** [2] - 2014:10,
2058:20
**perhaps** [2] - 2069:21, 2086:25
**period** [6] - 2001:15, 2079:10,
2086:9, 2096:16, 2097:14,
2125:3
**Perry** [13] - 1975:21, 1977:3,
1977:9, 2052:17, 2052:22,
2053:10, 2054:1, 2054:24,
2055:12, 2056:5, 2060:2,
2060:12, 2070:8
**PERRY** [29] - 1977:3, 1977:7,
1982:10, 1982:11, 1985:21,
1985:23, 1997:23, 1998:3,
2004:7, 2006:16, 2006:17,
2014:19, 2050:22, 2052:9,
2063:6, 2063:11, 2066:11,
2066:14, 2068:3, 2069:25,
2070:24, 2071:8, 2071:13,
2071:22, 2072:6, 2072:11,
2072:24, 2073:20, 2074:4
**Perry's** [1] - 2057:11
**person** [6] - 1994:9, 2048:18,
2063:22, 2065:6, 2065:12,
2073:12

**personally** [1] - 2046:11
**perspective** [5] - 2007:4,
2100:14, 2100:16, 2121:21,
2162:14
**Perspectives** [1] - 2076:20
**persuade** [1] - 2120:4
**Peter** [1] - 1975:14
**Ph.D** [2] - 2075:21, 2077:9
**pharmaceutical** [2] - 2036:24,
2040:24
**pharmaceuticals** [2] - 2037:12,
2040:23
**pharmacy** [2] - 2036:18,
2040:18
**phase** [1] - 2045:24
**phone** [2] - 2070:17, 2083:24
**physician** [2] - 1987:9, 2022:18
**physicians** [1] - 2040:13
**pick** [2] - 2083:24, 2137:11
**picking** [1] - 2143:11
**picture** [1] - 2085:21
**piece** [2] - 1987:17, 2031:13
**pieces** [4] - 2005:24, 2089:14,
2090:17, 2167:2
**pipeline** [1] - 2081:4
**place** [20] - 2020:23, 2022:3,
2026:18, 2028:9, 2028:22,
2034:17, 2035:23, 2040:19,
2044:1, 2053:6, 2057:12,
2057:16, 2057:17, 2057:19,
2057:21, 2067:21, 2105:18,
2155:9, 2165:15
**plain** [1] - 2140:9
**Plaintiffs** [2] - 1975:4, 1975:13
**plaintiffs** [3] - 2072:11, 2074:8,
2093:7
**plan** [1] - 2168:1
**planning** [1] - 2015:16
**plans** [3] - 1982:24, 2040:13,
2041:7
**play** [2] - 2069:11, 2101:22
**played** [1] - 2118:24
**player** [4] - 1983:16, 2013:9,
2038:19, 2090:3
**players** [2] - 2099:5, 2159:19
**pleased** [1] - 2079:25
**pleasure** [1] - 2067:13
**plus** [2] - 2008:25, 2031:22
**point** [30] - 2002:24, 2010:21,
2010:23, 2024:22, 2029:16,
2030:21, 2039:24, 2056:16,
2059:15, 2067:23, 2072:15,
2072:17, 2082:1, 2095:19,
2109:5, 2111:19, 2113:21,
2116:4, 2116:5, 2119:24,
2124:2, 2124:5, 2126:21,
2132:7, 2137:5, 2140:11,
2148:3, 2150:22, 2167:6,
2168:14
**pointblank** [1] - 2120:15

**pointing** [3] - 2109:23, 2110:10,
2110:19
**points** [3] - 2035:14, 2100:18,
2137:22
**policy** [4] - 2078:15, 2078:21,
2078:24, 2080:22
**pools** [1] - 1985:15
**popular** [3] - 2090:7, 2127:25,
2166:7
**portfolio** [2] - 2080:12, 2080:20
**portion** [5] - 2021:13, 2022:8,
2034:14, 2068:17, 2073:8
**portions** [1] - 2064:14
**positing** [1] - 2164:18
**position** [7] - 2040:4, 2052:6,
2077:8, 2078:20, 2080:1,
2080:15, 2081:12
**positioned** [2] - 2014:9, 2045:4
**positive** [1] - 1979:6
**possibility** [1] - 2061:15
**possible** [6] - 1999:2, 1999:20,
2050:13, 2059:11, 2079:7,
2091:17
**possibly** [6] - 2000:13, 2030:19,
2031:3, 2031:6, 2043:7, 2115:14
**Post** [6] - 2004:17, 2122:24,
2132:9, 2132:14, 2146:22,
2164:23
**Post-it** [5] - 2122:24, 2132:9,
2132:14, 2146:22, 2164:23
**Post-Its** [1] - 2004:17
**potential** [2] - 2002:23, 2013:24
**potentially** [2] - 2030:12,
2102:25, 2130:19
**power** [4] - 2029:19, 2030:21,
2127:11, 2128:12
**powerful** [3] - 2111:14,
2152:20, 2152:22
**practical** [8] - 2134:16,
2134:19, 2135:1, 2137:7,
2140:5, 2150:9, 2154:18,
2155:10
**practice** [3] - 2061:5, 2133:11,
2149:3
**predict** [2] - 2082:23, 2090:15
**prediction** [5] - 2085:1, 2086:7,
2091:5, 2160:20, 2161:7
**predictions** [1] - 2160:23
**preexisting** [3] - 2020:19,
2020:23, 2022:15
**prefer** [1] - 2000:15
**preference** [1] - 2010:8
**preferences** [1] - 2156:12
**PRELIMINARY** [1] - 1975:4,
1975:8
**prep** [5] - 2128:11, 2163:7,
2163:18, 2164:2, 2164:5
**preparation** [10] - 2127:20,
2127:22, 2128:3, 2131:24,
2162:23, 2162:25, 2163:1,

2163:12, 2163:23, 2163:24
**prepare** [2] - 2127:20, 2128:7
**prescribe** [1] - 2020:20
**presence** [2] - 2062:11, 2096:8
**present** [1] - 2064:15
**presentation** [1] - 2074:21
**President** [4] - 2080:8, 2080:16, 2080:23
**president** [5] - 1986:9, 1988:13, 1988:15, 1988:19, 1988:22
**President's** [2] - 2080:2, 2080:3
**pressure** [1] - 2101:21
**presume** [2] - 2066:20, 2155:14
**pretty** [29] - 1981:25, 2000:10, 2004:2, 2004:8, 2011:8, 2037:25, 2085:24, 2092:25, 2093:7, 2093:25, 2098:9, 2099:7, 2101:8, 2103:24, 2104:10, 2105:13, 2111:25, 2123:23, 2134:21, 2135:14, 2137:1, 2139:2, 2140:15, 2146:3, 2152:2, 2154:23, 2162:19, 2165:24, 2168:19
**prevent** [2] - 2020:24, 2022:15
**preview** [1] - 2097:1
**previously** [1] - 2075:21
**Price** [1] - 2153:20
**price** [58] - 1993:18, 2001:18, 2001:20, 2010:20, 2010:24, 2011:16, 2012:22, 2016:3, 2016:18, 2017:9, 2017:16, 2017:18, 2025:20, 2026:2, 2029:16, 2030:21, 2035:17, 2044:4, 2053:21, 2058:12, 2058:15, 2058:18, 2058:24, 2059:24, 2060:13, 2062:2, 2086:24, 2087:1, 2087:2, 2106:8, 2106:19, 2111:15, 2112:25, 2120:3, 2121:21, 2121:25, 2127:10, 2129:13, 2129:17, 2130:2, 2153:21, 2153:23, 2153:24, 2154:1, 2154:4, 2154:5, 2157:22, 2160:14, 2161:3, 2161:13, 2161:20, 2162:6, 2162:10, 2163:9, 2163:15, 2165:2, 2166:17
**prices** [63] - 1989:4, 1991:9, 2000:24, 2001:1, 2001:20, 2002:18, 2009:14, 2010:12, 2010:16, 2010:21, 2011:3, 2012:16, 2012:18, 2012:19, 2012:25, 2013:3, 2013:10, 2014:15, 2015:19, 2015:24, 2029:20, 2029:21, 2029:25, 2033:14, 2033:24, 2034:4, 2034:5, 2034:20, 2034:23, 2053:8, 2053:15, 2054:11, 2054:12, 2056:17, 2059:5, 2078:7, 2084:8, 2084:19,

2084:23, 2084:24, 2085:13, 2090:13, 2102:5, 2106:1, 2106:5, 2112:1, 2116:20, 2117:4, 2117:20, 2119:10, 2128:12, 2153:22, 2153:25, 2154:2, 2154:8, 2158:1, 2159:5, 2160:4, 2162:25, 2164:18, 2165:12, 2165:17, 2165:18
**pricing** [25] - 1985:1, 1985:7, 1985:13, 1986:1, 1990:4, 1990:9, 1992:12, 1992:16, 1992:24, 1993:4, 1995:1, 1996:14, 1996:19, 2001:16, 2002:4, 2016:20, 2017:5, 2017:12, 2017:13, 2018:24, 2052:23, 2053:19, 2057:1, 2057:3, 2107:6
**primarily** [4] - 2021:24, 2021:25, 2040:17, 2078:12
**primary** [10] - 1985:4, 1986:7, 1990:13, 2039:19, 2054:8, 2054:10, 2062:6, 2091:5, 2101:20, 2119:11
**Princeton** [3] - 1975:20, 2076:1, 2076:3
**principle** [6] - 2115:18, 2121:1, 2134:4, 2134:19, 2136:6, 2136:9
**principles** [1] - 2114:1
**Print** [2] - 2147:2, 2147:10
**print** [8] - 2010:5, 2062:18, 2062:21, 2062:24, 2124:9, 2136:23, 2136:25, 2140:16
**printer** [3] - 2008:18, 2013:25, 2124:11
**printers** [7] - 2005:19, 2005:20, 2005:23, 2006:8, 2006:9, 2006:11, 2147:5
**priority** [3] - 2002:19, 2002:21, 2002:22
**private** [10] - 1981:17, 1981:18, 1981:19, 1981:23, 2029:13, 2081:20, 2081:23, 2092:19, 2103:22
**privy** [2] - 2064:8, 2065:14
**prize** [1] - 2053:7
**problem** [24] - 2086:13, 2086:18, 2087:25, 2089:22, 2089:23, 2090:6, 2090:20, 2090:21, 2090:22, 2091:18, 2091:20, 2092:18, 2093:15, 2101:23, 2112:4, 2126:15, 2126:17, 2129:6, 2139:14, 2141:25, 2143:20, 2151:22, 2157:5
**problems** [1] - 2081:3
**proceed** [1] - 1977:2
**proceeded** [1] - 2002:25
**Proceedings** [1] - 1976:6
**proceedings** [1] - 2170:8
**process** [55] - 1982:17,

1991:11, 1991:20, 1991:25, 1993:7, 1993:17, 1993:23, 1993:24, 1993:25, 1994:6, 1994:14, 1994:17, 1994:24, 1996:2, 1996:5, 1996:11, 1996:14, 1997:3, 1997:10, 1997:19, 1999:9, 2000:1, 2000:3, 2000:11, 2001:5, 2002:7, 2003:2, 2003:3, 2003:7, 2003:22, 2019:13, 2020:20, 2049:12, 2049:25, 2052:23, 2053:2, 2053:7, 2055:13, 2059:18, 2061:3, 2079:18, 2079:20, 2080:22, 2085:15, 2094:18, 2095:11, 2095:16, 2096:11, 2102:6, 2103:9, 2111:4, 2123:16, 2123:17, 2155:4
**processes** [4] - 1986:3, 1986:5, 2002:9, 2104:13
**procure** [4] - 2095:10, 2100:21, 2107:11, 2139:15
**procurement** [11] - 1986:6, 1990:18, 2044:20, 2055:3, 2060:10, 2085:6, 2103:9, 2108:7, 2108:8, 2108:16, 2125:9
**procuring** [2] - 2085:5, 2113:6
**produced** [5] - 1976:7, 2064:11, 2068:4, 2071:9, 2072:19
**Product** [1] - 2038:21
**product** [17] - 1992:19, 2027:13, 2028:7, 2039:2, 2042:24, 2047:25, 2108:2, 2127:1, 2127:4, 2130:8, 2134:14, 2138:18, 2140:6, 2143:6, 2143:9, 2147:12, 2151:19
**products** [65] - 1987:2, 2005:12, 2006:2, 2006:4, 2008:19, 2010:1, 2011:14, 2016:22, 2016:24, 2016:25, 2017:4, 2017:14, 2026:2, 2028:10, 2028:16, 2028:21, 2028:25, 2039:15, 2039:17, 2039:18, 2040:25, 2043:23, 2043:25, 2045:1, 2050:15, 2058:3, 2058:6, 2062:20, 2087:11, 2087:15, 2087:17, 2089:19, 2089:21, 2089:25, 2106:2, 2106:3, 2107:25, 2126:13, 2126:24, 2127:9, 2128:13, 2128:16, 2128:19, 2128:21, 2129:5, 2129:7, 2129:17, 2129:22, 2131:5, 2131:20, 2134:5, 2136:3, 2138:8, 2143:4, 2144:9, 2149:12, 2150:18, 2151:3, 2151:8, 2152:11, 2157:3, 2157:6
**professional** [5] - 2006:25, 2080:6, 2128:7, 2128:16,

2163:12
**professionals** [1] - 1989:11
**Professor** [6] - 2066:25,
2074:8, 2082:2, 2116:6,
2122:11, 2146:12
**professor** [5] - 2075:17,
2076:2, 2082:9, 2093:19
**profit** [5] - 1978:12, 2158:24,
2162:4, 2166:14, 2166:25
**profitable** [2] - 2163:10,
2165:11
**profitably** [1] - 2162:25
**profits** [2] - 2161:9, 2162:12
**program** [1] - 2127:24
**prominence** [5] - 2098:24,
2100:11, 2109:8, 2109:10,
2143:10
**promise** [2] - 1977:12, 2009:7
**promote** [2] - 2023:10, 2025:13
**promoting** [1] - 2023:23
**prompt** [1] - 2012:17
**proposal** [4] - 2003:15,
2061:11, 2091:21, 2105:16
**proposals** [6] - 1999:14,
1999:18, 1999:23, 2003:18,
2061:6
**proposed** [4] - 2082:10,
2082:25, 2091:22, 2162:22
**proposition** [6] - 1990:11,
1990:13, 2009:17, 2009:18,
2012:1, 2058:14
**prospect** [1] - 2056:6
**protect** [2] - 2018:13, 2161:17
**protected** [1] - 2085:12
**protection** [4] - 2012:22,
2017:16, 2017:18, 2059:24
**protections** [1] - 2019:6
**protest** [1] - 2052:19
**protocols** [2] - 2026:18,
2057:16
**proud** [1] - 2076:19
**provide** [4] - 1993:11, 2029:11,
2054:16, 2147:3
**provided** [3] - 1983:1, 1993:5,
2097:15
**provider** [1] - 2037:16
**provides** [1] - 2010:11
**providing** [4] - 2025:24, 2058:8,
2124:11, 2140:17
**provision** [4] - 2016:16,
2017:25, 2018:2, 2018:13
**provisionally** [1] - 2072:23
**provisions** [1] - 2016:17
**public** [4] - 1994:20, 2075:6,
2075:8, 2079:20
**publication** [1] - 2076:17
**publicly** [6] - 1994:23, 1995:14,
1997:20, 1999:3, 1999:6,
2033:10
**published** [2] - 2076:9, 2076:11

**pull** [5] - 2014:15, 2139:6,
2141:17, 2141:19, 2144:5
**pulls** [1] - 2141:21
**purchase** [16] - 1992:20,
1992:22, 2019:16, 2020:9,
2021:13, 2021:19, 2021:20,
2022:24, 2022:25, 2023:12,
2023:13, 2024:23, 2025:13,
2063:1, 2108:4, 2152:5
**purchased** [2] - 2124:10,
2150:13
**purchases** [9] - 2069:12,
2083:24, 2104:1, 2104:8,
2111:7, 2125:1, 2152:10,
2154:21, 2154:22
**purchasing** [9] - 2021:25,
2023:8, 2026:15, 2030:20,
2048:6, 2051:5, 2069:7,
2070:15, 2104:12
**purely** [1] - 2141:20
**purpose** [3] - 2082:14, 2126:7,
2149:5
**purposes** [1] - 2141:20
**pursuant** [2] - 2068:4, 2071:23
**push** [1] - 2088:25
**pushing** [1] - 2023:18
**put** [25] - 1978:22, 1984:23,
1985:1, 1987:3, 1992:6, 1995:9,
2000:8, 2002:15, 2006:2,
2009:6, 2027:16, 2027:17,
2037:2, 2057:12, 2057:19,
2085:9, 2086:5, 2107:15,
2119:13, 2120:22, 2124:2,
2124:14, 2127:14, 2146:5
**puts** [1] - 2088:19
**putting** [7] - 1998:7, 1998:11,
2022:6, 2123:4, 2144:2, 2164:13

## Q

**qualified** [2] - 2105:25, 2120:24
**qualifies** [1] - 2127:12
**quality** [7] - 1983:13, 1983:20,
1983:24, 1984:6, 1984:9,
2078:10, 2086:25
**query** [3] - 2073:13, 2073:14,
2073:18
**questioned** [1] - 2035:8
**questioning** [3] - 2012:21,
2057:11, 2160:1
**questionnaire** [1] - 1992:6
**questions** [21] - 1977:10,
1995:12, 1995:13, 2045:6,
2049:10, 2050:25, 2052:8,
2052:16, 2056:6, 2060:12,
2061:1, 2062:12, 2062:13,
2062:15, 2062:17, 2063:7,
2063:12, 2075:10, 2082:22,
2086:2, 2140:2
**quick** [3] - 2003:21, 2024:20,

2141:20
**quickly** [5] - 1977:13, 2009:4,
2043:11, 2092:25, 2166:4
**Quilted** [1] - 2027:21
**quite** [17] - 1991:23, 2012:20,
2026:17, 2029:18, 2061:13,
2062:4, 2076:19, 2081:9,
2097:5, 2111:8, 2111:14,
2113:14, 2125:12, 2139:2,
2141:18, 2142:11, 2160:2
**quote** [1] - 2153:5

## R

**radar** [1] - 2038:15
**raise** [21] - 2009:14, 2010:12,
2092:14, 2093:3, 2109:10,
2116:4, 2117:19, 2118:17,
2127:10, 2128:12, 2129:13,
2129:17, 2159:5, 2160:14,
2161:19, 2162:6, 2162:10,
2162:25, 2163:9, 2163:15,
2165:12
**raised** [1] - 2116:5
**raises** [2] - 2115:13, 2166:17
**raising** [3] - 2161:3, 2161:13,
2164:18
**ran** [1] - 1997:8
**range** [8] - 2080:22, 2081:9,
2092:2, 2092:5, 2104:17,
2111:10, 2149:11, 2150:14
**rank** [1] - 2036:2
**rate** [4] - 2022:16, 2166:1,
2166:16, 2166:20
**ratepayer** [1] - 2116:13
**ratepayers** [7] - 2113:13,
2113:14, 2113:16, 2117:1,
2117:21, 2118:12, 2118:13
**rates** [2] - 2118:15, 2118:18
**rather** [3] - 2073:14, 2107:2,
2165:18
**re** [1] - 2003:3
**re-secure** [1] - 2003:3
**reached** [4] - 2002:6, 2065:15,
2095:25, 2110:23
**read** [6] - 2006:12, 2006:14,
2111:22, 2140:19, 2153:7,
2162:18
**ready** [1] - 2126:19
**ready-to-eat** [1] - 2126:19
**reaffirmed** [2] - 2022:20,
2120:14
**real** [12] - 1994:5, 2003:8,
2073:17, 2079:18, 2090:14,
2102:3, 2105:6, 2112:21,
2128:12, 2141:10, 2141:20,
2159:24
**realistic** [2] - 2061:15, 2120:5
**reality** [3] - 2015:5, 2100:19,
2107:15

**really** [67] - 1986:6, 2003:13, 2005:5, 2005:8, 2005:12, 2007:16, 2008:4, 2008:14, 2010:4, 2010:13, 2018:11, 2034:2, 2038:13, 2040:23, 2052:4, 2052:5, 2053:7, 2061:16, 2064:2, 2076:6, 2077:22, 2080:11, 2082:17, 2084:23, 2087:25, 2089:10, 2091:13, 2095:5, 2095:14, 2098:21, 2100:8, 2103:2, 2106:4, 2106:18, 2108:20, 2110:10, 2110:18, 2111:16, 2112:7, 2115:20, 2117:16, 2121:8, 2121:9, 2123:20, 2126:13, 2128:24, 2128:25, 2129:3, 2130:13, 2130:20, 2131:12, 2132:22, 2137:9, 2138:2, 2138:15, 2139:14, 2139:20, 2142:5, 2144:1, 2144:7, 2145:2, 2148:22, 2152:20, 2153:11, 2159:16, 2164:12, 2167:23
**reason** [25] - 1984:24, 1993:21, 1993:22, 1994:16, 1995:22, 1996:4, 1996:10, 2011:19, 2017:23, 2022:5, 2030:25, 2035:11, 2037:24, 2038:9, 2042:25, 2054:19, 2071:7, 2108:15, 2124:6, 2140:25, 2142:9, 2158:4, 2158:11, 2160:13
**reasonable** [4] - 2086:9, 2126:22, 2126:23, 2160:20
**reasonably** [16] - 2134:5, 2136:20, 2136:22, 2145:7, 2145:8, 2145:13, 2145:15, 2145:18, 2146:10, 2146:15, 2146:17, 2146:18, 2147:1, 2147:13, 2147:25, 2148:20
**reasons** [7] - 2012:9, 2014:8, 2020:18, 2053:17, 2109:15, 2137:16, 2161:16
**rebate** [2] - 2102:4, 2106:7
**rebated** [1] - 2025:21
**rebates** [2] - 2104:14, 2104:23
**recap** [1] - 2146:12
**recapture** [3] - 2166:1, 2166:16, 2166:20
**receive** [3] - 2025:5, 2025:7, 2025:8
**received** [5] - 1999:22, 2046:6, 2054:20, 2101:17, 2101:18
**receiving** [1] - 2061:15
**recent** [2] - 2055:21, 2059:8
**recently** [7] - 2044:2, 2046:5, 2047:1, 2048:9, 2048:14, 2065:15, 2068:5
**recess** [4] - 2066:23, 2067:24, 2068:7, 2068:8

**recession** [1] - 2081:2
**recognize** [3] - 2103:17, 2121:17, 2150:23
**recognized** [2] - 1984:2, 2009:18
**recognizes** [1] - 2104:11
**recommendation** [1] - 2003:24
**record** [15] - 2048:16, 2068:14, 2068:15, 2072:23, 2073:1, 2073:7, 2073:9, 2075:18, 2099:15, 2099:16, 2109:24, 2146:1, 2146:7, 2153:16, 2165:9
**records** [1] - 2073:3
**recover** [2] - 2144:13, 2144:15
**recross** [1] - 2063:5
**RECROSS** [1] - 2063:10
**RECROSS-EXAMINATON** [1] - 2063:10
**redacted** [5] - 2075:8, 2075:9, 2102:12, 2105:21, 2166:24
**redactions** [1] - 2064:13
**redirect** [3] - 2052:10, 2063:12, 2063:17
**REDIRECT** [1] - 2052:12
**reduce** [6] - 2002:1, 2002:5, 2034:4, 2056:14, 2058:15, 2062:25
**reduced** [2] - 2001:23, 2165:1
**reducing** [2] - 2058:18, 2058:23
**reduction** [9] - 2003:6, 2034:10, 2051:1, 2051:10, 2051:11, 2051:17, 2058:21, 2058:22
**reductions** [2] - 2001:19, 2053:21
**refer** [2] - 2016:18, 2099:15
**reference** [1] - 1995:19
**referenced** [1] - 1983:12
**references** [2] - 1995:16, 2086:20
**referred** [1] - 2016:24
**referring** [5] - 1996:23, 1998:15, 2011:23, 2046:8, 2101:14
**reflect** [2] - 2073:4, 2151:13
**reflects** [2] - 2072:20, 2090:8
**regard** [2] - 2014:5, 2093:19
**regarding** [3] - 2076:11, 2078:24, 2126:3
**regional** [1] - 2098:3
**register** [1] - 1987:9
**regular** [3] - 2113:1, 2116:15, 2153:23
**regularly** [2] - 2092:12, 2092:20
**regulated** [1] - 2113:14
**regulation** [1] - 2081:5
**regulations** [2] - 2051:4, 2051:5
**regulatory** [1] - 2080:13
**Reilly** [1] - 1975:24
**REILLY** [1] - 2006:15

**reinforce** [1] - 2057:17
**Reinhart** [1] - 1975:13
**REINHART** [12] - 2066:25, 2067:3, 2067:8, 2067:11, 2067:20, 2068:22, 2069:2, 2069:6, 2069:21, 2074:7, 2167:13, 2168:2
**relate** [4] - 1987:2, 1987:14, 2062:14, 2064:14
**related** [6] - 2005:11, 2005:22, 2026:21, 2076:15, 2076:24, 2081:19
**relates** [4] - 2023:22, 2034:9, 2047:14, 2051:22
**relation** [1] - 2107:18
**relationship** [12] - 2007:5, 2023:23, 2027:5, 2029:12, 2029:17, 2035:15, 2036:19, 2036:20, 2037:19, 2042:11, 2047:19, 2061:25
**relationships** [1] - 2048:19
**relative** [14] - 1982:24, 1987:11, 1988:2, 1991:10, 1997:23, 2000:20, 2000:23, 2002:1, 2002:5, 2025:7, 2046:20, 2048:15, 2053:9, 2149:25
**relatively** [1] - 2003:21
**relevant** [37] - 2073:18, 2083:4, 2083:13, 2084:25, 2088:19, 2088:21, 2089:5, 2089:10, 2089:12, 2089:16, 2096:23, 2109:2, 2109:5, 2115:3, 2122:14, 2122:15, 2122:17, 2125:5, 2125:22, 2126:19, 2127:3, 2128:18, 2131:21, 2132:1, 2132:20, 2134:14, 2137:12, 2143:4, 2144:3, 2151:23, 2152:11, 2152:12, 2156:19, 2163:19, 2164:1, 2164:9
**reliability** [1] - 2073:12
**reliable** [1] - 2151:12
**reliance** [1] - 2107:25
**rely** [4] - 2054:13, 2055:5, 2072:15, 2073:11
**relying** [2] - 2072:17, 2101:3
**remain** [1] - 2015:25
**remaining** [2] - 2109:25, 2137:18
**reman'd** [1] - 2012:6
**remanufactured** [1] - 2012:8
**remember** [9] - 2005:9, 2006:12, 2049:5, 2063:14, 2063:19, 2083:10, 2131:5, 2131:6, 2138:20
**removed** [2] - 2003:1, 2059:14
**removing** [1] - 2056:13
**renegotiate** [2] - 1997:16, 2002:20
**renegotiated** [3] - 2001:25,

2003:9, 2004:2
**renegotiation** [1] - 2001:5
**repair** [1] - 2051:22
**repeat** [4] - 1983:22, 1985:18, 2030:10, 2060:21
**repeatedly** [1] - 2133:19
**replacement** [1] - 2133:24
**replacing** [1] - 2047:6
**reply** [1] - 1995:10
**report** [6] - 1988:16, 2086:5, 2113:19, 2113:25, 2137:20, 2154:25
**reported** [2] - 1976:6, 2092:17
**REPORTER** [1] - 2170:2
**reporter** [2] - 1985:20, 1985:21
**Reporter** [3] - 1976:8, 1976:9, 2170:13
**reporting** [6] - 2044:14, 2080:7, 2097:23, 2098:16, 2098:21, 2108:9
**reports** [10] - 1986:12, 1988:19, 2023:25, 2024:6, 2024:10, 2024:12, 2025:8, 2025:9, 2048:16, 2079:5
**represent** [7] - 2032:6, 2032:11, 2037:9, 2045:25, 2057:8, 2064:12, 2108:2
**representation** [1] - 2073:11
**representatives** [3] - 1979:16, 1979:19, 1996:3
**representing** [1] - 2070:15
**represents** [1] - 2066:6
**request** [4] - 1996:14, 1999:7, 2099:19, 2105:16
**requesting** [1] - 2108:13
**require** [1] - 2011:13
**required** [3] - 2016:10, 2032:17, 2035:10
**requirement** [2] - 2032:8, 2108:9
**requirements** [5] - 1985:10, 2103:13, 2105:19, 2108:18, 2121:2
**research** [3] - 2037:3, 2076:5, 2076:14
**reseller** [1] - 2005:17
**reset** [1] - 2152:9
**resources** [7] - 1994:5, 1994:10, 2024:18, 2055:24, 2061:12, 2061:21, 2061:22
**respect** [3] - 2008:22, 2019:25, 2093:25
**respectfully** [1] - 2070:8
**respond** [1] - 2015:2
**responded** [3] - 2046:13, 2065:17, 2137:22
**response** [8] - 1999:15, 2046:6, 2056:10, 2069:19, 2099:19, 2105:22, 2106:14, 2107:21
**responses** [2] - 1996:15,

1996:19
**responsibilities** [4] - 2054:8, 2054:10, 2077:8, 2080:17
**responsibility** [1] - 2047:17
**restate** [1] - 2156:21
**restricted** [2] - 2152:25, 2153:15
**result** [12] - 1989:14, 2000:10, 2000:18, 2002:7, 2003:1, 2003:3, 2003:7, 2018:14, 2058:24, 2065:6, 2094:19, 2166:2
**resulting** [1] - 2152:16
**results** [4] - 1999:25, 2134:3, 2135:19, 2138:15
**retail** [9] - 2084:12, 2084:18, 2095:5, 2095:25, 2096:1, 2096:4, 2096:5, 2111:1, 2143:18
**retailers** [2] - 2095:1, 2096:4
**retained** [1] - 2094:22
**return** [2] - 2079:23, 2159:7
**returned** [1] - 2081:12
**revenue** [5] - 1978:14, 1978:16, 1978:18, 1978:21, 2036:7
**reviewed** [2] - 2052:2, 2092:17
**reviewing** [2] - 2111:20, 2111:21
**revised** [1] - 2079:21
**revisit** [1] - 2014:23
**RFP** [46] - 1992:2, 1993:7, 1993:13, 1993:17, 1993:23, 1994:6, 1994:25, 1995:9, 1995:12, 1996:2, 1996:5, 1996:11, 1996:14, 1997:2, 1997:10, 1998:7, 1998:11, 1998:13, 1999:4, 1999:7, 1999:9, 2001:5, 2008:10, 2008:11, 2008:22, 2011:2, 2037:4, 2050:7, 2052:23, 2053:1, 2053:7, 2055:13, 2055:16, 2055:19, 2055:21, 2056:1, 2056:3, 2059:8, 2059:19, 2061:3, 2085:15, 2105:22, 2106:10, 2106:13, 2107:18, 2155:4
**RFPs** [7] - 1991:23, 2104:12, 2104:20, 2105:1, 2105:15, 2106:12, 2152:15
**RFQ** [1] - 2102:6
**ridiculously** [1] - 2080:20
**rigging** [1] - 2143:23
**right-hand** [1] - 2102:8
**rigorous** [1] - 1993:22, 1996:5, 1996:11
**ring** [2] - 2043:12, 2043:14
**rise** [1] - 2011:2
**Rivers** [2] - 2095:17, 2096:12
**RMR** [2] - 1976:8, 2170:13
**robust** [1] - 1992:7
**rogue** [1] - 2125:17

**role** [9] - 1982:7, 1991:10, 1991:24, 2028:13, 2068:22, 2069:10, 2077:14, 2078:3, 2081:16
**room** [3] - 2007:19, 2008:17, 2039:15
**Room** [2] - 1976:9, 2170:14
**roughly** [7] - 1999:23, 2019:21, 2051:13, 2121:24, 2149:24, 2154:18, 2154:24
**rows** [1] - 2101:17
**RPF** [1] - 1998:23
**rule** [1] - 2072:16
**run** [5] - 2028:1, 2093:11, 2105:1, 2121:19, 2162:11
**runs** [1] - 2014:21

**S**

**safe** [1] - 2051:9
**safely** [1] - 2066:18
**sailed** [1] - 2071:15
**salaries** [1] - 1994:12
**salary** [1] - 2059:3
**sale** [8] - 2094:7, 2094:22, 2122:17, 2130:8, 2130:11, 2139:4, 2157:10, 2164:19
**sales** [13] - 2037:15, 2095:6, 2095:7, 2096:10, 2096:18, 2121:25, 2138:6, 2139:1, 2141:8, 2144:10, 2150:5, 2164:9
**san** [5] - 2028:14, 2028:22, 2058:4, 2138:9, 2139:21
**sanitation** [2] - 2138:9, 2144:19
**satisfied** [9] - 2128:13, 2130:6, 2153:18, 2157:1, 2157:13, 2160:23, 2163:19, 2166:23, 2167:1
**satisfies** [1] - 2165:7
**satisfy** [4] - 2130:19, 2151:10, 2156:19, 2164:14
**Saturday** [1] - 2168:10
**save** [5] - 1998:7, 1998:10, 2033:25, 2090:25, 2091:2
**saved** [3] - 1997:21, 1997:23, 1998:4
**savings** [10] - 2000:16, 2000:19, 2003:4, 2034:16, 2059:9, 2059:25, 2091:9, 2091:14, 2102:4, 2102:7
**saw** [6] - 2048:1, 2095:23, 2097:1, 2110:3, 2155:3, 2165:21
**scarcity** [1] - 2035:8
**scenario** [1] - 2014:23
**scheme** [1] - 2118:19
**scope** [5] - 2096:7, 2109:16, 2113:24, 2115:9, 2124:13
**screen** [4] - 2007:12, 2027:17, 2027:18, 2038:23, 2038:25, 2088:11, 2091:13, 2136:7

**screwed** [1] - 2089:7
**screwy** [2] - 2135:19, 2142:13
**seal** [1] - 2068:17
**SEALED** [1] - 2063:9
**SEC** [2] - 1994:20, 1995:11
**second** [3] - 2062:3, 2079:22, 2089:4
**secondary** [1] - 2034:4
**secondly** [2] - 2057:23, 2059:23
**Section** [1] - 1976:4
**sector** [1] - 2103:22
**secure** [3] - 1989:18, 2003:3, 2059:24
**secured** [1] - 2001:18
**security** [1] - 2080:25
**see** [67] - 2005:23, 2007:4, 2011:15, 2015:5, 2023:7, 2023:21, 2023:24, 2024:22, 2026:14, 2026:15, 2026:20, 2026:22, 2027:18, 2027:21, 2038:21, 2038:23, 2039:5, 2039:9, 2039:12, 2039:14, 2040:8, 2040:9, 2040:11, 2040:15, 2043:11, 2043:13, 2043:18, 2052:3, 2064:19, 2064:21, 2064:22, 2064:25, 2065:9, 2067:23, 2086:6, 2088:14, 2090:19, 2090:20, 2094:5, 2097:14, 2097:18, 2099:2, 2101:13, 2102:8, 2102:14, 2103:23, 2104:24, 2105:23, 2106:1, 2106:10, 2108:24, 2118:23, 2123:22, 2144:18, 2144:19, 2149:19, 2152:17, 2153:19, 2154:6, 2157:14, 2158:3, 2159:8, 2161:7, 2165:14, 2165:24
**seeing** [11] - 2059:22, 2088:11, 2089:3, 2098:10, 2098:21, 2098:24, 2100:8, 2100:10, 2108:12, 2112:8, 2165:9
**seek** [3] - 2003:18, 2003:24, 2053:21
**seeking** [4] - 2037:18, 2053:8, 2114:18, 2114:25
**seem** [5] - 2014:8, 2014:9, 2048:16, 2065:22, 2107:14
**Sees** [1] - 2064:24
**sees** [6] - 2023:10, 2063:13, 2063:18, 2065:10, 2066:3, 2100:21
**segmented** [1] - 2038:18
**segmenting** [2] - 2012:1, 2030:3
**select** [1] - 2058:6
**selecting** [1] - 2007:2
**sell** [7] - 2037:9, 2044:4, 2090:4, 2108:22, 2127:19, 2149:23, 2165:18
**selling** [3] - 2112:17, 2112:18,

2149:13
**sells** [3] - 2009:23, 2036:25, 2138:4
**semiconductor** [1] - 2092:23
**Senate** [1] - 2080:16
**Senator** [1] - 2035:2
**send** [1] - 2050:7
**senior** [1] - 2153:22
**Senior** [1] - 1976:3
**sense** [10] - 2075:10, 2099:2, 2103:18, 2112:14, 2118:16, 2125:13, 2133:25, 2143:10, 2145:16, 2164:12
**senses** [1] - 2135:25
**sensitive** [2] - 2104:20, 2167:10
**sent** [1] - 2049:13
**separate** [6] - 2010:4, 2010:6, 2012:8, 2132:23, 2134:14
**separated** [1] - 2012:5
**separately** [3] - 2133:7, 2150:4, 2154:10
**September** [5] - 1996:25, 1997:8, 2018:25, 2019:6, 2060:1
**serious** [5] - 2037:16, 2043:20, 2077:20, 2078:1, 2126:15
**serve** [3] - 2040:11, 2081:14, 2087:14
**served** [1] - 2078:19
**servers** [2] - 2005:13, 2005:21
**service** [16] - 1985:10, 1985:13, 1989:4, 2011:20, 2012:10, 2012:12, 2012:13, 2012:18, 2013:21, 2014:4, 2014:14, 2025:25, 2045:4, 2061:7, 2107:19, 2125:8
**Service** [1] - 2147:10
**Services** [4] - 1990:21, 1990:23, 2054:24, 2147:2
**services** [25] - 1991:5, 2010:6, 2040:19, 2058:4, 2058:10, 2062:18, 2062:20, 2062:21, 2062:24, 2107:20, 2111:23, 2112:2, 2112:10, 2124:9, 2124:12, 2125:4, 2126:24, 2131:6, 2131:20, 2133:20, 2136:23, 2136:25, 2140:16, 2147:7
**servicing** [2] - 2107:21, 2124:11
**SESSION** [4] - 1975:9, 1977:1, 2063:9, 2066:16
**set** [16] - 2002:18, 2026:13, 2080:5, 2084:19, 2099:12, 2099:18, 2103:4, 2106:2, 2107:17, 2129:7, 2130:21, 2144:11, 2147:3, 2149:23, 2150:18, 2153:17
**setting** [1] - 2121:16
**seven** [1] - 2036:12
**Seventh** [1] - 1975:16

**several** [4] - 2025:5, 2059:6, 2096:12, 2096:13
**shaking** [1] - 2152:19
**SHAPIRO** [1] - 2074:9
**Shapiro** [13] - 2067:1, 2074:8, 2075:1, 2075:17, 2075:19, 2075:20, 2082:2, 2082:9, 2084:6, 2093:19, 2115:8, 2116:6, 2122:11
**Shapiro**......................................
...... [1] - 1976:14
**share** [18] - 1999:25, 2006:6, 2015:11, 2035:10, 2038:14, 2064:2, 2117:8, 2131:18, 2135:14, 2135:23, 2141:18, 2142:1, 2142:7, 2144:5, 2144:8
**shared** [3] - 1980:9, 1980:12, 2046:16
**sharehold** [1] - 2162:11
**shareholder** [1] - 2158:16
**shareholders** [10] - 2034:12, 2034:16, 2117:13, 2158:7, 2158:25, 2159:4, 2161:10, 2161:25, 2162:12
**shares** [40] - 2078:8, 2089:1, 2089:3, 2089:5, 2089:14, 2089:24, 2090:1, 2090:7, 2094:16, 2110:5, 2115:20, 2134:22, 2136:4, 2138:21, 2139:3, 2139:6, 2141:7, 2141:12, 2141:13, 2142:3, 2142:10, 2142:19, 2143:21, 2144:11, 2148:23, 2148:25, 2149:4, 2149:14, 2149:16, 2149:25, 2150:1, 2150:2, 2151:12, 2154:14, 2155:19, 2155:21, 2157:4, 2157:7, 2158:17, 2164:4
**sharp** [1] - 2105:5
**sharply** [1] - 2138:12
**shelf** [2] - 2006:23, 2007:6
**shift** [1] - 2164:1
**shifted** [5] - 2093:23, 2095:9, 2096:6, 2143:17, 2143:18
**ships** [1] - 2071:15
**shocked** [1] - 2094:4
**shoe** [2] - 2133:5, 2133:12
**shoes** [11] - 2133:2, 2133:3, 2133:4, 2133:6, 2133:7, 2133:8, 2133:9
**shop** [2] - 2013:13, 2077:6
**short** [2] - 2066:23, 2094:1
**shortage** [1] - 2060:13
**shorthand** [1] - 1976:6
**shortsighted** [1] - 2162:4
**shoulder** [1] - 2135:9
**show** [5] - 2024:13, 2131:19, 2137:23, 2155:18, 2166:4
**showing** [4] - 2038:23, 2100:25, 2101:18, 2137:23

**shown** [1] - 2105:20
**shows** [1] - 2165:5
**side** [7] - 1978:1, 1978:2, 2022:17, 2081:8, 2082:19, 2103:23
**sidebar** [1] - 2075:11
**sides'** [1] - 2061:14
**sign** [2] - 1999:16, 2059:15
**significance** [3] - 2098:24, 2100:10, 2108:12
**significant** [14] - 1989:14, 1989:16, 1992:12, 1994:13, 2003:4, 2015:13, 2017:1, 2055:14, 2071:10, 2140:16, 2140:22, 2141:8, 2143:15, 2148:4
**significantly** [10] - 2053:25, 2082:25, 2086:23, 2123:10, 2124:17, 2127:10, 2129:13, 2139:4, 2157:22, 2157:24
**signing** [2] - 2020:21, 2048:22
**silent** [1] - 2099:16
**similar** [41] - 2018:20, 2099:20, 2103:9, 2132:17, 2132:18, 2133:8, 2134:5, 2134:21, 2134:23, 2135:3, 2136:8, 2136:20, 2136:22, 2137:18, 2138:14, 2145:7, 2145:8, 2145:13, 2145:16, 2145:18, 2146:10, 2146:15, 2146:18, 2147:1, 2147:5, 2147:13, 2147:25, 2148:1, 2148:16, 2148:18, 2148:20, 2149:10, 2149:16, 2149:19, 2149:22, 2149:24, 2150:17, 2151:3
**similarly** [1] - 2102:24
**simple** [3] - 2053:3, 2107:14, 2128:19
**simplicity** [1] - 2087:1
**simply** [3] - 1977:22, 1991:10, 2157:5
**SIMPSON** [1] - 1975:25
**single** [15] - 1994:8, 1996:8, 2001:16, 2008:21, 2030:3, 2049:7, 2049:18, 2053:24, 2128:10, 2129:5, 2151:21, 2158:21, 2162:24, 2163:5, 2164:18
**sit** [1] - 2037:21
**sitting** [4] - 2015:7, 2046:10, 2046:11, 2050:18
**situated** [1] - 2102:24
**situation** [4] - 1986:3, 2014:23, 2018:10, 2131:25
**situations** [3] - 2022:1, 2022:3, 2151:13
**six** [6] - 1993:25, 2049:18, 2067:11, 2088:14, 2091:17, 2107:11
**size** [16] - 1978:22, 2009:20,

2103:24, 2106:23, 2107:1, 2110:24, 2111:5, 2133:3, 2133:4, 2133:6, 2133:16, 2133:18, 2154:23, 2155:21
**sizes** [2] - 2056:23, 2111:9
**skeptical** [3] - 2037:5, 2037:7, 2037:8
**skewed** [2] - 2088:22, 2089:1
**skill** [1] - 2016:13
**skilled** [3] - 2010:14, 2011:4
**SKU** [1] - 1992:19
**SKUs** [2] - 1992:25, 2016:23
**slide** [19] - 2027:16, 2097:3, 2098:15, 2099:15, 2099:17, 2100:2, 2101:15, 2103:19, 2103:20, 2105:14, 2106:9, 2106:13, 2136:7, 2153:4, 2165:22
**slides** [2] - 2037:2, 2075:7
**slightly** [1] - 2133:1
**slow** [1] - 2145:23
**small** [30] - 2032:20, 2033:15, 2037:14, 2038:19, 2069:12, 2077:14, 2084:12, 2084:16, 2090:24, 2091:21, 2103:24, 2105:6, 2107:2, 2108:10, 2109:14, 2110:11, 2110:24, 2111:2, 2111:3, 2118:19, 2121:18, 2121:22, 2135:14, 2137:1, 2141:11, 2152:18, 2153:14, 2155:12, 2156:11, 2157:4
**smaller** [10] - 2077:22, 2098:6, 2099:12, 2104:24, 2108:21, 2108:22, 2135:16, 2139:4, 2155:24, 2164:4
**smooth** [1] - 2105:7
**snacks** [4] - 2007:18, 2007:20, 2008:4, 2008:17
**snapshot** [1] - 2090:22
**so-called** [1] - 2153:8
**so..** [2] - 2014:3, 2168:5
**software** [8] - 2040:19, 2127:20, 2127:22, 2128:3, 2128:11, 2131:24, 2163:7
**sold** [9] - 2007:20, 2007:24, 2008:3, 2038:4, 2039:25, 2108:3, 2127:19, 2150:11, 2165:12
**sole** [2] - 2018:11, 2023:23
**solicit** [2] - 2050:1, 2050:6
**soliciting** [1] - 2079:19
**solution** [6] - 2016:6, 2016:7, 2042:8, 2064:24, 2065:10, 2066:3
**solutions** [1] - 2047:14
**solve** [1] - 2139:14
**someone** [7] - 1988:12, 1988:23, 2050:15, 2072:20, 2073:4, 2073:10, 2116:7

**something's** [1] - 2142:13
**sometime** [1] - 2045:13
**sometimes** [1] - 2151:1
**somewhat** [11] - 2003:22, 2026:19, 2037:10, 2053:3, 2069:9, 2096:23, 2099:21, 2116:1, 2155:15, 2155:25, 2156:14
**somewhere** [2] - 2145:25, 2155:9
**soon** [3] - 1996:24, 2014:21, 2110:2
**sophisticated** [2] - 2104:19, 2104:25, 2125:7, 2125:16, 2130:18
**sorry** [13] - 1981:13, 1997:13, 1999:11, 2028:18, 2030:10, 2033:20, 2060:21, 2063:16, 2070:24, 2086:17, 2130:24, 2158:14, 2165:8
**sort** [8] - 2086:2, 2093:21, 2098:2, 2101:8, 2102:16, 2103:5, 2115:9, 2128:3
**sorts** [4] - 2072:21, 2109:15, 2110:3, 2150:22
**sought** [2] - 2059:11, 2064:13
**sound** [2] - 2003:21, 2061:4
**sounds** [2] - 2004:8, 2061:3
**source** [6] - 1996:8, 2016:3, 2018:11, 2021:20, 2023:23, 2058:3
**sources** [4] - 2022:9, 2022:25, 2025:5, 2054:21
**sourcing** [7] - 1986:7, 1986:10, 1986:17, 1986:19, 1988:13, 1991:11, 2104:20
**space** [9] - 2041:4, 2089:23, 2092:24, 2094:9, 2095:5, 2096:9, 2100:6, 2124:13, 2139:13
**spaced** [1] - 2049:19
**spaces** [1] - 2095:14
**speaking** [3] - 2014:12, 2068:25, 2163:24
**speaks** [1] - 2071:24
**spec** [1] - 2118:4
**spec'ing** [1] - 2007:1
**special** [2] - 2131:9, 2160:11
**specialized** [2] - 2107:10, 2109:1
**specialty** [1] - 2131:7
**specific** [8] - 1984:21, 2000:14, 2011:11, 2072:1, 2091:15, 2100:14, 2126:3, 2153:2
**specifically** [7] - 1981:20, 1988:14, 1988:23, 1991:1, 2005:15, 2017:14, 2104:1
**specifications** [1] - 2005:15
**specifics** [1] - 2082:11
**speculate** [1] - 2015:9

**speculating** [1] - 2116:21
**speculative** [4] - 2118:3, 2118:5, 2118:9
**speed** [1] - 2074:25
**spend** [34] - 2000:24, 2009:10, 2011:12, 2017:2, 2019:22, 2021:10, 2022:8, 2023:20, 2024:3, 2024:13, 2025:9, 2025:17, 2026:5, 2026:8, 2026:20, 2030:2, 2038:18, 2041:21, 2043:23, 2056:7, 2056:11, 2056:14, 2056:18, 2057:1, 2057:13, 2057:22, 2072:14, 2072:22, 2094:14, 2106:16, 2125:17, 2154:17, 2164:25
**spending** [6] - 1993:14, 2024:17, 2033:19, 2033:20, 2073:14, 2154:21
**spent** [1] - 2081:1
**spin** [2] - 2090:23, 2146:5
**split** [1] - 2093:7
**spoken** [8] - 1981:1, 1981:4, 1981:6, 1981:9, 1981:14, 1981:16, 2073:23, 2110:22
**spot** [1] - 2033:1
**spreadsheet** [1] - 1992:16
**Square** [1] - 1976:4
**stable** [3] - 1978:20, 1981:25, 1982:1
**staff** [6] - 2078:5, 2078:6, 2095:17, 2096:15, 2096:17, 2150:8
**stage** [2] - 2090:21, 2149:8
**stages** [1] - 2127:17
**staking** [1] - 2137:25
**standard** [8] - 2005:14, 2088:8, 2088:12, 2096:21, 2122:25, 2126:1, 2156:18, 2166:8
**standing** [1] - 2042:11
**stands** [1] - 2098:22
**staple** [1] - 2128:25
**Staples** [175] - 1975:6, 1975:18, 1977:4, 1977:10, 1978:22, 1983:5, 1988:24, 1989:5, 1993:12, 1993:15, 1997:14, 1997:15, 1998:12, 1998:20, 1999:17, 2001:5, 2001:17, 2001:25, 2005:18, 2006:4, 2006:10, 2006:20, 2007:5, 2007:21, 2007:24, 2009:10, 2009:13, 2009:23, 2010:2, 2010:12, 2011:2, 2011:6, 2012:4, 2015:21, 2016:4, 2016:7, 2016:14, 2017:11, 2017:23, 2018:7, 2018:15, 2019:16, 2019:19, 2020:10, 2020:17, 2021:3, 2021:7, 2021:14, 2021:16, 2022:12, 2022:21, 2022:24, 2023:24,

2024:1, 2024:3, 2024:12, 2024:14, 2024:16, 2025:3, 2025:5, 2025:10, 2025:18, 2025:21, 2026:6, 2028:13, 2028:14, 2028:15, 2029:1, 2029:10, 2029:13, 2029:21, 2029:25, 2030:7, 2030:12, 2030:18, 2030:20, 2031:1, 2031:9, 2031:17, 2031:18, 2031:19, 2031:22, 2032:11, 2033:2, 2033:6, 2033:9, 2033:13, 2033:19, 2033:21, 2033:24, 2034:5, 2034:20, 2036:13, 2037:25, 2038:9, 2039:17, 2039:18, 2042:25, 2043:25, 2044:17, 2047:6, 2050:1, 2055:9, 2056:7, 2057:13, 2058:2, 2058:6, 2059:9, 2059:12, 2059:15, 2059:22, 2060:19, 2060:22, 2063:1, 2069:13, 2084:18, 2085:19, 2094:6, 2095:1, 2096:20, 2096:24, 2097:19, 2097:24, 2098:9, 2098:17, 2098:21, 2098:25, 2099:5, 2099:8, 2099:18, 2100:7, 2100:22, 2101:21, 2102:13, 2104:12, 2105:24, 2106:6, 2106:24, 2108:1, 2109:8, 2109:19, 2112:16, 2115:23, 2117:3, 2117:9, 2117:13, 2118:24, 2122:5, 2125:6, 2130:9, 2131:18, 2137:2, 2138:4, 2138:5, 2139:3, 2139:6, 2139:23, 2141:12, 2143:9, 2144:6, 2149:11, 2150:24, 2155:22, 2157:15, 2160:12, 2160:14, 2161:2, 2161:8, 2161:12, 2161:23, 2165:10, 2165:22
**Staples'** [7] - 2011:20, 2015:24, 2016:19, 2030:20, 2057:1, 2099:10, 2105:22
**Staples's** [1] - 2100:11
**Staples/Office** [1] - 1984:14
**Staples/OfficeMax** [1] - 2064:23
**start** [14] - 2002:15, 2067:14, 2067:24, 2077:3, 2082:14, 2087:4, 2088:20, 2089:11, 2092:2, 2094:1, 2103:10, 2167:11, 2168:19, 2169:2
**started** [6] - 2003:13, 2093:12, 2095:6, 2123:9, 2137:13, 2160:3
**starting** [2] - 2124:2, 2124:5
**state** [1] - 2075:17
**statement** [1] - 2040:16
**statements** [3] - 1994:23, 2072:20, 2073:4
**States** [6] - 1976:9, 2122:19,

2151:25, 2152:2, 2157:11, 2158:23
**STATES** [2] - 1975:1, 1975:10
**stating** [1] - 2065:6
**station** [3] - 2129:11, 2129:14, 2130:4
**stations** [3] - 2129:9, 2129:15, 2130:4
**stature** [1] - 2109:25
**status** [1] - 2048:11
**statute** [1] - 2051:7
**statutorily** [1] - 2051:12
**stay** [4] - 1998:24, 1999:1, 2067:6, 2067:17
**stayed** [1] - 2079:24
**staying** [1] - 2067:15
**stenograph** [1] - 2170:7
**step** [6] - 2089:4, 2091:18, 2103:5, 2122:14, 2141:6, 2157:2
**stepping** [1] - 2106:6
**steps** [3] - 2088:12, 2094:15, 2111:4
**stick** [1] - 2160:19
**stickiness** [1] - 2058:16
**sticking** [1] - 2150:22
**still** [15] - 1996:24, 2019:1, 2081:2, 2086:13, 2109:22, 2116:15, 2117:11, 2118:20, 2133:1, 2137:6, 2139:17, 2142:7, 2142:11, 2144:23, 2147:16
**stint** [1] - 2079:22
**stipulate** [1] - 2074:25
**stock** [2] - 2158:17, 2159:6
**stockholders** [1] - 2160:6
**stood** [1] - 2106:11
**stop** [3] - 2119:6, 2123:12, 2167:9
**stopping** [1] - 2067:21
**stops** [1] - 2117:25
**store** [2] - 2131:8, 2133:2
**stores** [1] - 2033:17
**story** [2] - 2116:15, 2129:15
**straight** [2] - 1998:20, 2029:17
**straightforward** [1] - 2140:3
**strategic** [4] - 1986:9, 1986:17, 1986:19, 1988:13
**Strawberry** [1] - 1976:4
**stray** [1] - 2142:5
**street** [1] - 2129:9
**Street** [2] - 1975:16, 1975:25
**strict** [1] - 2156:13
**strictly** [1] - 2014:12
**strike** [2] - 2113:19, 2113:22
**striking** [1] - 2095:21
**strong** [1] - 2094:6
**structure** [4] - 2103:9, 2117:9, 2117:18, 2118:11
**structures** [1] - 2107:7

**stuck** [2] - 2013:17, 2013:19
**studied** [1] - 2044:6
**study** [1] - 2143:17
**stuff** [11] - 2079:8, 2084:3,
2105:17, 2108:22, 2110:1,
2119:19, 2122:3, 2133:24,
2138:4, 2144:5, 2145:6
**subcontracted** [1] - 2061:25
**subject** [5] - 2047:4, 2049:2,
2148:15, 2148:18, 2149:10
**submit** [5] - 2061:6, 2061:11,
2071:23, 2072:6, 2073:6
**substantial** [7] - 2000:16,
2091:9, 2095:7, 2101:17,
2101:19, 2102:9, 2157:16
**substantially** [2] - 2000:3,
2098:3
**substantive** [2] - 2071:17,
2071:20
**substitute** [6] - 2132:10,
2132:11, 2143:3, 2143:6,
2147:22, 2163:18
**substitutes** [11] - 2126:22,
2126:24, 2131:21, 2131:24,
2132:19, 2133:4, 2133:25,
2134:10, 2134:12, 2147:23,
2148:11
**substitution** [1] - 2163:17
**success** [1] - 2149:25
**successful** [3] - 2090:3,
2111:15, 2149:14
**suffice** [1] - 2116:20
**sufficiently** [1] - 2157:6
**suggest** [3] - 2025:4, 2032:7,
2046:5
**suggested** [1] - 2042:14
**suggesting** [4] - 1987:24,
2021:22, 2041:2, 2047:17
**suggests** [3] - 2069:17,
2102:23, 2103:14
**suite** [1] - 2048:19
**Suite** [1] - 1975:19
**SULLIVAN** [13] - 1975:10,
2067:9, 2067:14, 2068:10,
2068:13, 2074:24, 2082:4,
2113:18, 2120:10, 2120:20,
2167:16, 2167:20, 2168:16
**Sullivan** [2] - 1975:18, 2116:6
**sum** [1] - 2151:5
**summarize** [1] - 2086:21
**summary** [1] - 2094:2
**summation** [1] - 2073:10
**summer** [1] - 2097:16
**Summit** [2] - 2168:22, 2168:24
**supervise** [1] - 2078:9
**supervised** [1] - 1994:7
**supervising** [1] - 2077:15
**supplement** [1] - 2114:19
**suppliers** [9] - 2087:3, 2104:22,
2105:12, 2110:6, 2138:12,

2147:3, 2148:22, 2148:23,
2149:4
  **supplies** [145] - 1986:23,
1987:4, 1987:5, 1987:7,
1987:12, 1987:14, 1988:2,
1988:14, 1991:2, 1999:11,
2002:13, 2004:10, 2004:13,
2004:16, 2004:20, 2004:23,
2008:16, 2008:20, 2008:25,
2009:8, 2010:7, 2010:9,
2011:12, 2013:4, 2019:19,
2020:17, 2021:6, 2021:14,
2021:20, 2021:24, 2022:4,
2022:7, 2022:12, 2022:25,
2023:4, 2036:25, 2037:5,
2037:9, 2037:13, 2037:15,
2037:17, 2038:4, 2038:6,
2038:21, 2039:1, 2039:6,
2039:9, 2039:23, 2039:25,
2042:5, 2042:7, 2042:19,
2043:10, 2044:25, 2045:2,
2045:5, 2046:20, 2047:14,
2047:18, 2051:23, 2051:25,
2052:1, 2052:6, 2055:2, 2055:9,
2056:13, 2056:17, 2056:21,
2057:4, 2058:12, 2058:23,
2058:25, 2059:6, 2060:6,
2060:10, 2060:13, 2060:17,
2060:20, 2060:23, 2063:14,
2063:19, 2064:25, 2065:10,
2066:3, 2083:25, 2084:15,
2094:8, 2094:23, 2095:10,
2098:8, 2100:5, 2100:21,
2104:2, 2107:12, 2110:12,
2112:13, 2112:19, 2113:5,
2113:7, 2115:8, 2115:16,
2117:2, 2117:8, 2121:18,
2122:18, 2122:20, 2122:22,
2123:1, 2123:2, 2123:20,
2123:21, 2124:24, 2125:2,
2125:12, 2125:14, 2125:19,
2130:11, 2130:23, 2131:14,
2131:15, 2136:13, 2137:15,
2138:5, 2138:13, 2139:13,
2139:15, 2139:24, 2140:9,
2143:8, 2144:7, 2147:19,
2148:2, 2150:12, 2151:15,
2152:6, 2154:17, 2154:22,
2157:10, 2158:22, 2164:10,
2164:20, 2165:2, 2165:12
  **supply** [49] - 1987:11, 1987:18,
1988:1, 1995:9, 1995:20,
2001:10, 2001:16, 2007:24,
2008:3, 2008:5, 2009:19,
2010:10, 2012:12, 2016:6,
2016:20, 2020:12, 2021:10,
2022:8, 2024:1, 2024:22,
2030:2, 2038:2, 2038:14,
2039:11, 2039:20, 2040:4,
2040:5, 2040:9, 2041:5, 2041:6,
2042:1, 2042:15, 2043:19,

2043:20, 2046:23, 2047:6,
2047:20, 2050:11, 2052:4,
2053:9, 2057:15, 2057:22,
2058:9, 2058:21, 2058:22,
2064:5, 2140:10, 2151:8,
2151:21
  **supplying** [4] - 2040:25,
2140:20, 2140:21, 2140:22
  **support** [3] - 2055:25, 2092:21,
2106:21
  **supported** [1] - 2153:3
  **suppose** [9] - 2013:10, 2117:7,
2133:22, 2135:4, 2135:8,
2135:11, 2135:21, 2138:24,
2141:20
  **supposed** [1] - 2118:8
  **surgeries** [1] - 2139:9
  **surgery** [24] - 2022:18,
2133:21, 2133:23, 2134:1,
2134:13, 2135:6, 2135:8,
2135:9, 2135:12, 2135:13,
2135:15, 2135:17, 2135:19,
2135:22, 2135:24, 2136:1,
2138:14, 2138:22, 2142:15,
2143:5, 2143:6, 2144:20
  **surprise** [3] - 2031:21, 2032:3,
2044:19
  **surprised** [3] - 2048:3, 2048:8,
2048:10
  **surprising** [1] - 2098:1
  **suspect** [1] - 2073:22
  **sustain** [1] - 2120:19
  **switch** [4] - 2010:13, 2040:22,
2104:22, 2163:11
  **switched** [1] - 2163:23
  **switching** [3] - 2057:25,
2104:21, 2163:1
  **sworn** [2] - 2074:10, 2093:8
  **Sysco/US** [2] - 2131:2, 2153:6
  **system** [4] - 2024:23, 2034:19,
2044:20, 2162:1
  **systematically** [1] - 2102:21
  **systems** [5] - 1978:5, 2023:8,
2033:15, 2057:16, 2108:9

## T

  **tab** [1] - 2049:17
  **table** [12] - 1984:18, 2000:16,
2000:20, 2000:25, 2002:4,
2002:19, 2002:23, 2059:10,
2059:14, 2120:13, 2120:14,
2155:3
  **tables** [1] - 2007:7
  **tail** [1] - 2098:5
  **talks** [2] - 2102:11, 2137:14
  **Tara** [1] - 1975:13
  **targeted** [1] - 2153:9
  **Targeted** [1] - 2153:20
  **tax** [11] - 2127:19, 2127:22,

2128:2, 2128:11, 2131:24,
2162:22, 2162:24, 2163:7,
2163:18, 2163:23, 2163:24
  **TaxAct** [3] - 2093:11, 2127:19,
2163:7
  **taxes** [4] - 2127:20, 2128:7,
2163:12
  **team** [10] - 1986:12, 1988:12,
1989:13, 1990:16, 1995:6,
2044:8, 2045:10, 2046:5,
2047:20, 2053:16
  **technical** [1] - 2128:20
  **technology** [10] - 2005:2,
2005:3, 2005:10, 2005:24,
2006:2, 2006:4, 2006:6, 2138:8,
2139:20, 2139:21
  **television** [1] - 2112:11
  **ten** [3] - 2001:11, 2067:7,
2067:17
  **tend** [5] - 2086:5, 2092:6,
2105:1, 2166:22
  **tender** [1] - 2082:2
  **Tennessee** [2] - 2070:18,
2116:13
  **tens** [2] - 2022:17, 2150:10
  **term** [13] - 1998:13, 2001:21,
2005:6, 2010:22, 2012:23,
2016:13, 2019:1, 2020:22,
2051:21, 2051:22, 2140:9,
2146:17, 2148:20
  **terminate** [5] - 2017:23, 2018:8,
2018:15, 2018:21
  **termination** [4] - 2017:21,
2017:25, 2018:2, 2018:12
  **terms** [34] - 1979:18, 1982:12,
1985:1, 1985:5, 1985:13,
1986:1, 1990:5, 1996:1,
1996:15, 1996:19, 1999:25,
2000:24, 2003:20, 2015:20,
2016:10, 2017:20, 2017:21,
2019:2, 2054:12, 2061:22,
2087:14, 2093:8, 2098:10,
2111:12, 2120:7, 2127:15,
2134:6, 2134:22, 2139:11,
2140:5, 2145:6, 2147:14,
2154:13
  **territories** [2] - 2061:23,
2062:11
  **test** [38] - 2125:24, 2127:5,
2127:11, 2127:13, 2128:14,
2128:15, 2128:20, 2128:22,
2129:4, 2129:22, 2130:6,
2130:20, 2145:8, 2146:10,
2146:12, 2146:19, 2147:21,
2151:10, 2156:18, 2156:19,
2156:22, 2156:25, 2157:13,
2160:19, 2160:20, 2160:22,
2160:23, 2162:18, 2163:5,
2163:20, 2163:21, 2164:15,
2165:7, 2165:25, 2166:5,

2166:12, 2166:22, 2167:1
  **testament** [1] - 2107:13
  **testified** [7] - 1992:15, 2004:11,
2055:13, 2068:18, 2070:1,
2074:11, 2093:5
  **testify** [9] - 1980:14, 2054:5,
2068:1, 2069:24, 2073:16,
2081:25, 2082:6, 2094:10
  **testifying** [14] - 1979:8,
1979:22, 1979:24, 1982:2,
1982:5, 1982:13, 1987:21,
1988:5, 2054:2, 2068:21,
2068:22, 2070:1, 2070:10,
2070:14
  **testimony** [29] - 1979:3,
1979:11, 1980:7, 1981:2,
1981:7, 1981:15, 1981:16,
1981:21, 1982:22, 1982:25,
1983:8, 1988:8, 2014:7,
2017:11, 2031:16, 2040:23,
2052:18, 2061:10, 2068:20,
2069:2, 2069:6, 2070:3, 2071:5,
2091:22, 2092:4, 2093:8,
2110:6, 2166:7, 2168:5
  **Texas** [1] - 2166:11
  **THACHER** [1] - 1975:25
  **THE** [275] - 1975:1, 1975:1,
1975:10, 1977:2, 1977:5,
1982:2, 1982:4, 1982:5, 1982:7,
1982:9, 1985:20, 1997:25,
2002:17, 2002:21, 2003:4,
2003:6, 2003:8, 2003:11,
2004:1, 2004:3, 2004:4, 2004:5,
2004:6, 2012:15, 2012:20,
2012:24, 2013:2, 2013:3,
2013:4, 2013:5, 2013:7,
2013:10, 2013:14, 2013:16,
2013:18, 2013:21, 2013:23,
2014:4, 2014:6, 2014:12,
2014:17, 2014:18, 2050:24,
2051:3, 2051:7, 2051:8,
2051:10, 2051:13, 2051:17,
2051:19, 2051:20, 2051:21,
2051:25, 2052:1, 2052:8,
2052:10, 2054:16, 2054:18,
2054:19, 2054:22, 2061:2,
2061:8, 2061:9, 2061:13,
2061:18, 2061:20, 2062:12,
2063:4, 2066:15, 2066:20,
2066:21, 2067:2, 2067:5,
2067:12, 2067:16, 2067:22,
2068:6, 2068:9, 2068:12,
2068:16, 2068:25, 2069:4,
2069:14, 2070:4, 2070:16,
2070:20, 2071:1, 2071:12,
2071:16, 2072:3, 2072:10,
2072:13, 2073:3, 2073:13,
2074:1, 2074:5, 2074:12,
2074:13, 2074:14, 2074:15,
2074:16, 2074:20, 2074:23,

2075:2, 2075:12, 2082:3,
2082:5, 2083:4, 2083:6, 2083:7,
2083:8, 2083:14, 2083:15,
2083:17, 2083:18, 2083:21,
2084:2, 2084:7, 2084:9,
2084:10, 2084:11, 2084:21,
2084:22, 2084:25, 2085:3,
2086:9, 2086:11, 2086:17,
2088:21, 2088:24, 2099:14,
2113:23, 2114:2, 2114:9,
2114:11, 2114:16, 2115:1,
2115:5, 2115:6, 2115:7,
2115:11, 2115:12, 2116:4,
2116:9, 2116:20, 2116:23,
2116:25, 2117:1, 2117:3,
2117:5, 2118:3, 2118:4, 2118:5,
2118:7, 2119:8, 2119:11,
2119:16, 2119:17, 2119:23,
2120:18, 2120:21, 2121:7,
2121:8, 2121:11, 2121:12,
2121:13, 2123:3, 2123:4,
2123:7, 2123:9, 2123:12,
2123:15, 2123:24, 2124:1,
2124:22, 2133:14, 2133:15,
2133:16, 2133:17, 2136:16,
2136:18, 2136:19, 2136:21,
2136:22, 2136:23, 2136:24,
2136:25, 2141:1, 2141:3,
2141:9, 2141:10, 2142:21,
2142:23, 2143:1, 2144:18,
2144:22, 2144:23, 2144:25,
2145:1, 2145:2, 2145:3, 2145:4,
2145:7, 2145:9, 2145:10,
2145:12, 2145:14, 2145:15,
2145:17, 2145:20, 2145:21,
2145:22, 2145:24, 2146:1,
2146:3, 2146:6, 2146:9,
2146:15, 2146:17, 2146:20,
2146:21, 2146:24, 2146:25,
2147:1, 2147:2, 2148:5, 2148:6,
2148:7, 2156:23, 2157:25,
2158:2, 2158:6, 2158:8, 2158:9,
2158:10, 2158:14, 2158:18,
2158:25, 2159:2, 2159:3,
2159:8, 2159:14, 2159:15,
2160:3, 2160:7, 2160:8, 2160:9,
2160:15, 2160:17, 2160:19,
2160:21, 2162:16, 2166:11,
2166:13, 2167:7, 2167:15,
2167:17, 2167:21, 2167:23,
2167:25, 2168:3, 2168:4,
2168:6, 2168:7, 2168:8, 2168:9,
2168:12, 2168:13, 2168:18,
2168:22, 2168:23, 2168:24,
2168:25, 2169:1, 2169:2
  **theater** [1] - 2153:23
  **themselves** [9] - 1980:9,
2035:13, 2040:3, 2040:4,
2052:6, 2103:16, 2105:13,
2110:6, 2119:9
  **theory** [7] - 2114:2, 2114:11,

2114:17, 2119:9, 2119:10, 2119:12, 2134:14

**therefore** [3] - 1999:5, 2086:24, 2128:12

**they've** [5] - 2098:18, 2113:13, 2119:14, 2161:16, 2162:5

**thinking** [3] - 2088:15, 2100:13, 2163:13

**third** [8] - 2015:11, 2032:10, 2036:16, 2037:12, 2040:14, 2063:25, 2066:10, 2098:6

**third-party** [1] - 2066:10

**thirds** [1] - 2097:25

**thorough** [3] - 1998:18, 1998:21, 1998:23

**thoroughly** [1] - 1992:3

**thoughtful** [1] - 2162:11

**thousand** [1] - 2134:19

**thousands** [10] - 2013:24, 2022:18, 2132:15, 2132:22, 2132:23, 2136:11, 2150:6, 2150:8, 2150:10

**threat** [1] - 2011:9

**threaten** [2] - 2010:15, 2056:25

**threatening** [3] - 2056:18, 2101:6, 2102:15

**three** [26] - 1998:14, 2009:2, 2009:17, 2019:1, 2030:1, 2039:21, 2043:1, 2043:12, 2043:14, 2048:22, 2050:12, 2050:17, 2050:19, 2061:23, 2067:6, 2086:6, 2086:10, 2086:15, 2090:17, 2123:20, 2124:8, 2134:18, 2150:15, 2163:6, 2167:22, 2167:23

**three-ring** [2] - 2043:12, 2043:14

**three-year** [2] - 2019:1, 2086:10

**thrown** [1] - 2160:10

**tied** [2] - 2001:21, 2160:5

**Tier** [1] - 2110:16

**timeframe** [3] - 2084:25, 2085:8, 2086:8

**timing** [1] - 2067:5

**tiny** [2] - 2117:8, 2117:22

**tissues** [3] - 2027:11, 2029:7, 2030:6

**title** [2] - 2106:9, 2153:19

**today** [22] - 1979:3, 1980:7, 1980:14, 1981:2, 1981:10, 2000:21, 2000:23, 2002:4, 2015:7, 2025:3, 2031:5, 2033:7, 2033:21, 2044:23, 2045:4, 2046:11, 2050:18, 2052:18, 2052:19, 2067:7, 2069:18, 2073:24

**together** [15] - 1978:22, 2008:11, 2009:18, 2012:7, 2056:21, 2095:15, 2122:22, 2134:7, 2135:21, 2137:21,

2138:1, 2139:5, 2149:15, 2150:18, 2154:12

**toilet** [7] - 2027:11, 2027:23, 2028:1, 2028:5, 2029:7, 2030:6, 2058:2

**tomorrow** [11] - 2067:15, 2167:11, 2167:19, 2168:1, 2168:5, 2168:11, 2168:14, 2168:17, 2168:20, 2169:2

**toner** [64] - 2004:21, 2008:16, 2008:21, 2009:1, 2009:9, 2009:15, 2010:8, 2010:14, 2011:6, 2011:24, 2012:5, 2012:8, 2012:13, 2012:18, 2013:11, 2013:12, 2013:22, 2014:13, 2014:16, 2014:24, 2039:14, 2056:7, 2056:10, 2056:13, 2056:18, 2056:21, 2057:1, 2062:25, 2123:3, 2123:11, 2123:22, 2124:9, 2124:15, 2136:14, 2136:17, 2137:4, 2137:6, 2137:10, 2137:15, 2137:16, 2140:4, 2140:5, 2140:12, 2140:17, 2140:20, 2141:2, 2141:5, 2141:7, 2141:17, 2141:19, 2142:14, 2143:3, 2143:19, 2144:2, 2144:13, 2144:23, 2144:24, 2146:23, 2147:4, 2147:12, 2147:13, 2150:21, 2150:24, 2151:7

**toners** [1] - 2014:3

**took** [7] - 2030:11, 2030:15, 2059:9, 2079:18, 2090:22, 2111:6, 2131:16

**tool** [2] - 2126:1, 2156:18

**tools** [11] - 1985:12, 1985:15, 1985:16, 1985:20, 1985:24, 1986:5, 2052:22, 2052:24, 2053:14, 2053:18

**top** [8] - 1992:11, 2015:10, 2015:12, 2032:18, 2038:21, 2040:13, 2138:25, 2141:16

**topic** [1] - 2060:9

**topics** [4] - 2047:22, 2049:10, 2049:14, 2081:9

**total** [12] - 1981:10, 1986:15, 1986:22, 2000:24, 2016:6, 2026:5, 2026:8, 2048:24, 2051:15, 2097:17, 2104:1, 2138:25

**totally** [2] - 2121:5, 2150:22

**touch** [1] - 1984:17

**touch-and-go** [1] - 1984:17

**touched** [1] - 2130:16

**tough** [1] - 2167:3

**touting** [1] - 2108:1

**towards** [6] - 2014:1, 2023:19, 2075:9, 2092:7, 2095:9, 2096:6

**towels** [4] - 2027:10, 2028:5,

2029:7, 2030:6

**town** [3] - 2129:15, 2129:19, 2135:12

**Toys** [2] - 1980:23, 1981:6

**track** [3] - 2097:8, 2115:14, 2144:16

**trade** [1] - 2080:25

**Trade** [2] - 1975:2, 2074:18

**TRADE** [1] - 1975:15

**traditional** [1] - 2110:14

**traffic** [1] - 2168:19

**trained** [4] - 1986:20, 1986:22, 1989:9, 1990:7

**training** [3] - 1989:13, 2075:20, 2081:8

**transaction** [2] - 2024:23, 2026:21

**transcript** [6] - 1976:6, 2070:10, 2070:23, 2070:25, 2170:6, 2170:8

**TRANSCRIPT** [1] - 1975:8

**transcription** [1] - 1976:7

**translate** [2] - 2051:11, 2102:3

**transparent** [1] - 2025:22

**transportation** [1] - 2079:8

**travel** [1] - 2066:18

**traveled** [1] - 2065:21

**tremendous** [3] - 1987:24, 1987:25, 1988:3

**trial** [2] - 2118:24, 2120:4

**trickle** [4] - 2113:3, 2118:1, 2120:15, 2122:2

**tricky** [1] - 2141:4

**tried** [3] - 2009:13, 2010:12, 2163:15

**trouble** [2] - 2119:14, 2150:3

**truck** [2] - 2009:21, 2107:15

**trucks** [2] - 2031:19, 2058:7

**true** [14] - 1989:6, 1993:10, 2002:8, 2008:22, 2023:1, 2026:24, 2111:18, 2120:18, 2120:19, 2146:21, 2161:5, 2162:9, 2170:6, 2170:7

**truly** [1] - 2154:18

**trust** [4] - 2028:4, 2028:7, 2145:3

**Trust** [29] - 1977:25, 1980:18, 1980:20, 1981:9, 1981:10, 1981:15, 1981:17, 1981:20, 1982:12, 1982:13, 1988:9, 2019:25, 2020:1, 2020:3, 2020:6, 2020:9, 2020:12, 2020:16, 2020:24, 2021:2, 2021:5, 2021:12, 2022:13, 2022:14, 2022:16, 2032:4, 2046:25, 2048:1, 2048:2

**Trust's** [1] - 2065:18

**truth** [2] - 2072:4, 2072:17

**try** [8] - 1996:9, 2012:3, 2013:13, 2116:2, 2116:19,

2128:19, 2145:25, 2158:18
**trying** [23] - 1984:6, 1988:17, 2002:20, 2003:14, 2009:20, 2014:1, 2025:4, 2081:2, 2082:21, 2087:14, 2090:2, 2096:20, 2112:15, 2114:19, 2117:5, 2118:14, 2126:10, 2126:12, 2154:18, 2158:19, 2159:16, 2161:6, 2164:24
**tune** [2] - 1998:25, 1999:1
**TurboTax** [2] - 2127:24, 2163:8
**turn** [4] - 2082:9, 2093:18, 2100:18, 2130:1
**turns** [1] - 2127:22
**two** [46] - 1977:20, 1999:23, 2000:12, 2002:9, 2015:10, 2018:19, 2038:4, 2043:1, 2046:18, 2049:16, 2050:12, 2050:17, 2062:13, 2062:15, 2062:17, 2069:22, 2078:20, 2080:14, 2086:6, 2086:15, 2087:3, 2087:23, 2087:24, 2089:9, 2090:4, 2095:22, 2097:25, 2099:7, 2100:22, 2101:1, 2101:2, 2101:3, 2101:9, 2111:23, 2112:18, 2117:15, 2120:21, 2129:9, 2129:14, 2129:18, 2130:3, 2135:5, 2135:24, 2139:16, 2153:11, 2167:2
**two's** [1] - 2015:12
**two-thirds** [1] - 2097:25
**type** [8] - 2010:1, 2046:22, 2057:10, 2057:12, 2073:8, 2091:25, 2133:8, 2164:16
**types** [11] - 1995:12, 2005:11, 2103:17, 2121:4, 2125:4, 2131:7, 2131:24, 2133:20, 2133:21, 2134:1, 2134:12
**typical** [1] - 2014:2
**typically** [9] - 1994:8, 2000:1, 2003:16, 2006:25, 2007:5, 2009:16, 2012:22, 2106:3, 2149:13

---

## U

**U.S** [1] - 2040:12
**UC** [1] - 2081:12
**ugly** [1] - 2008:14
**ultimate** [1] - 2141:2
**ultimately** [15] - 2019:3, 2026:2, 2078:10, 2082:23, 2083:1, 2092:5, 2093:15, 2109:4, 2115:2, 2124:18, 2128:4, 2128:9, 2134:21, 2142:19, 2148:24
**um-hmm** [1] - 2026:10
**um-hum** [2] - 2001:12, 2024:7
**un-redacted** [1] - 2075:9

---

**unanimous** [1] - 2102:1
**uncertain** [1] - 2019:2
**uncommon** [1] - 2106:17
**under** [23] - 2007:5, 2007:23, 2008:5, 2008:21, 2010:17, 2012:22, 2016:10, 2017:11, 2018:7, 2018:11, 2022:4, 2044:1, 2051:4, 2053:11, 2053:24, 2056:7, 2057:11, 2073:9, 2077:24, 2101:21, 2103:24, 2114:24, 2122:12
**undergraduate** [1] - 2075:22
**understates** [1] - 2141:25
**understood** [15] - 1987:5, 1991:19, 1993:7, 1994:25, 2006:13, 2013:13, 2019:14, 2027:9, 2035:17, 2046:19, 2066:1, 2072:24, 2073:20, 2129:23, 2162:21
**undisputed** [1] - 2072:9
**unfortunately** [1] - 2063:7
**unhappy** [2] - 2042:25, 2090:25
**unimportant** [1] - 2060:23
**unit** [1] - 2025:20
**United** [6] - 1976:9, 2122:19, 2151:25, 2152:2, 2157:11, 2158:23
**UNITED** [2] - 1975:1, 1975:10
**University** [1] - 2076:1
**unless** [2] - 2017:8, 2163:10
**unlikely** [1] - 2090:6
**unredacted** [1] - 2064:14
**unusual** [2] - 2102:19, 2102:23
**up** [79] - 1986:12, 1995:19, 1999:22, 2000:7, 2000:11, 2002:15, 2002:18, 2009:6, 2012:18, 2013:1, 2013:11, 2019:3, 2026:13, 2027:16, 2037:2, 2041:14, 2046:6, 2048:13, 2049:2, 2049:9, 2050:5, 2052:16, 2056:17, 2060:17, 2062:15, 2062:17, 2067:18, 2067:19, 2070:5, 2070:21, 2072:25, 2073:1, 2080:5, 2080:19, 2083:24, 2085:13, 2086:24, 2086:25, 2087:1, 2088:17, 2089:7, 2097:15, 2100:25, 2103:24, 2104:13, 2105:8, 2106:6, 2107:24, 2108:19, 2109:18, 2113:15, 2115:24, 2116:20, 2116:21, 2117:4, 2118:11, 2118:17, 2118:22, 2119:10, 2132:17, 2133:19, 2134:11, 2134:20, 2135:23, 2138:3, 2144:23, 2147:3, 2147:16, 2147:17, 2149:18, 2150:2, 2151:5, 2153:4, 2154:5, 2157:18, 2160:5, 2161:6, 2165:2, 2165:21

---

**up-front** [2] - 2104:13, 2165:21
**update** [1] - 2079:17
**UPS** [4] - 2032:18, 2032:20, 2032:21, 2033:7
**upset** [3] - 2004:2, 2031:1, 2038:8
**upstream** [1] - 2112:10
**upward** [2] - 2001:22, 2017:13
**urban** [1] - 2129:17
**usage** [4] - 2024:6, 2025:8, 2123:23, 2165:1
**uses** [3] - 1985:13, 1986:1, 2140:8
**utilization** [4] - 2024:10, 2024:12, 2025:9, 2044:14
**utilizes** [1] - 2053:6

---

## V

**validated** [1] - 2062:10
**valuable** [1] - 2105:19
**value** [29] - 1987:25, 1989:18, 1990:10, 1990:13, 1994:17, 2002:22, 2002:25, 2003:3, 2009:17, 2009:18, 2011:25, 2012:2, 2013:19, 2029:11, 2035:12, 2054:9, 2054:11, 2054:14, 2056:14, 2056:22, 2057:24, 2058:14, 2058:17, 2059:13, 2059:14, 2059:22, 2068:24, 2131:5, 2160:6
**value-added** [1] - 2131:5
**valve** [2] - 2013:15, 2133:23
**variety** [1] - 2052:22
**various** [3] - 2100:24, 2165:21
**vast** [2] - 2032:6, 2092:16
**vendor** [29] - 1987:18, 1988:1, 1990:11, 1992:12, 1992:24, 1993:4, 1993:6, 1993:16, 1995:9, 1995:20, 1996:16, 2018:12, 2030:3, 2038:2, 2038:14, 2039:20, 2040:4, 2040:5, 2041:5, 2043:21, 2048:7, 2052:4, 2053:9, 2055:9, 2055:16, 2056:22, 2057:1, 2060:6, 2106:5
**vendors** [16] - 1982:18, 1989:21, 1989:25, 1990:2, 1990:4, 1992:4, 1992:7, 1993:2, 1993:10, 1998:11, 1999:2, 1999:5, 2047:24, 2048:2, 2050:11, 2055:17
**Veritiv** [1] - 2098:7
**version** [1] - 2075:9
**versions** [1] - 2163:6
**versus** [2] - 2133:16, 2166:19
**vet** [1] - 1999:24
**vetted** [3] - 1998:14, 2003:16, 2062:9
**vetting** [3] - 1998:15, 1998:18,

1998:21
**viable** [8] - 2013:22, 2015:8,
2038:2, 2055:10, 2060:6,
2063:14, 2063:19, 2073:17
**vice** [5] - 1986:9, 1988:13,
1988:15, 1988:19, 1988:22
**video** [1] - 2071:4
**view** [21] - 1988:5, 2005:12,
2006:23, 2008:4, 2010:7,
2035:14, 2037:11, 2038:1,
2041:2, 2041:3, 2075:8,
2085:21, 2111:19, 2119:19,
2126:21, 2132:7, 2145:22,
2147:6, 2151:6, 2168:14
**viewed** [1] - 2008:6
**views** [2] - 2079:1, 2081:24
**virtually** [1] - 2086:21
**voicing** [1] - 2069:16
**voir** [1] - 2082:3
**volume** [32] - 1984:25, 1989:15,
1989:16, 1989:21, 1989:24,
1990:6, 1990:17, 1992:22,
2010:2, 2015:12, 2016:14,
2019:10, 2020:2, 2020:7,
2022:11, 2030:3, 2030:7,
2030:8, 2030:13, 2030:16,
2030:20, 2053:3, 2053:22,
2056:14, 2057:24, 2059:22,
2062:4, 2106:3, 2106:7,
2138:25, 2141:8
**voluntary** [1] - 2035:15
**vote** [3] - 1982:19, 1982:21,
1983:4
**voted** [1] - 1983:8
**vs** [1] - 1975:5
**vulnerable** [4] - 2102:25,
2103:2, 2152:16, 2152:21

# W

**W.B** [11] - 2026:13, 2035:18,
2050:15, 2055:21, 2056:1,
2061:9, 2062:11, 2086:1,
2097:25, 2159:21, 2165:11
**Wait** [1] - 2144:13
**wait** [3] - 2037:21, 2136:1,
2145:12
**walk** [2] - 2096:25, 2125:20
**walking** [2] - 2094:14, 2108:15
**wants** [4] - 2028:24, 2100:20,
2139:15
**warehouses** [5] - 2040:1,
2044:12, 2044:16, 2044:17,
2058:7
**warehousing** [1] - 2061:23
**warm** [1] - 2119:2
**warrant** [2] - 2124:18, 2140:24
**Washington** [6] - 1975:5,
1975:16, 1976:1, 1976:10,
2079:24, 2170:15

**wave** [1] - 2092:18
**ways** [3] - 2100:24, 2103:10,
2105:1
**website** [8] - 1995:11, 1996:12,
2027:18, 2037:4, 2038:20,
2041:24, 2042:23, 2052:2
**websites** [3] - 1994:20, 1996:6,
1996:18
**week** [2] - 2048:2, 2100:16
**weeks** [4] - 1999:24, 2003:10,
2018:19, 2065:16
**weight** [3] - 2072:7, 2072:8,
2088:19
**WEIL** [2] - 1975:18, 1975:21
**welcome** [1] - 2064:17
**welfare** [1] - 2083:11
**White** [3] - 2080:1, 2080:7,
2093:14
**white** [1] - 2068:11
**whole** [13] - 2081:5, 2110:9,
2111:21, 2112:7, 2122:2,
2126:11, 2132:17, 2134:11,
2135:12, 2147:8, 2157:23,
2159:18, 2161:12
**wholesaler** [2] - 2107:25,
2108:5
**wholesalers** [1] - 2108:5
**wide** [2] - 2092:2, 2131:5
**WiFi** [1] - 2043:17
**wild** [1] - 2013:11
**wildly** [1] - 2149:20
**willing** [3] - 1993:10, 2044:4,
2074:25
**win** [4] - 2096:20, 2097:10,
2157:16, 2165:23
**win/loss** [3] - 2097:8, 2097:11,
2098:25
**window** [2] - 2085:8, 2086:10
**winner** [1] - 2100:11
**winning** [2] - 2097:20, 2098:20
**wins** [8] - 2097:10, 2098:16,
2098:18, 2098:19, 2098:20,
2098:22, 2098:23, 2100:3
**withdraw** [1] - 2028:3
**WITNESS** [104] - 1982:4,
1982:7, 1997:25, 2002:21,
2003:6, 2003:11, 2004:3,
2004:5, 2012:20, 2013:2,
2013:4, 2013:7, 2013:14,
2013:18, 2013:23, 2014:6,
2014:17, 2051:3, 2051:8,
2051:13, 2051:19, 2051:21,
2052:1, 2054:18, 2054:22,
2061:8, 2061:13, 2061:20,
2066:20, 2074:13, 2074:15,
2083:6, 2083:8, 2083:15,
2083:18, 2084:2, 2084:9,
2084:11, 2084:22, 2085:3,
2086:11, 2088:24, 2115:5,
2115:7, 2115:12, 2116:9,

2116:23, 2117:1, 2117:5,
2118:4, 2118:7, 2119:11,
2119:17, 2120:21, 2121:8,
2121:12, 2123:4, 2123:9,
2123:15, 2124:1, 2133:15,
2133:17, 2136:18, 2136:21,
2136:23, 2136:25, 2141:3,
2141:10, 2142:23, 2144:22,
2144:25, 2145:2, 2145:4,
2145:9, 2145:12, 2145:15,
2145:20, 2145:22, 2146:1,
2146:6, 2146:17, 2146:21,
2146:25, 2147:2, 2148:6,
2158:2, 2158:8, 2158:10,
2158:18, 2159:2, 2159:8,
2159:15, 2160:7, 2160:9,
2160:17, 2160:21, 2166:13,
2168:4, 2168:7, 2168:9,
2168:13, 2168:22, 2168:24,
2169:1
**witness** [21] - 2064:15,
2066:17, 2066:22, 2066:23,
2066:24, 2066:25, 2067:2,
2068:1, 2068:18, 2068:19,
2071:3, 2071:4, 2071:7,
2071:14, 2071:25, 2073:22,
2074:6, 2074:10, 2082:5, 2168:1
**witnesses** [1] - 2100:16
**won** [2] - 2098:12, 2099:25
**wondering** [2] - 2071:2, 2160:2
**word** [6] - 2047:12, 2049:22,
2066:1, 2079:5, 2118:8, 2126:23
**words** [6] - 1984:24, 2000:8,
2013:16, 2119:13, 2154:4,
2156:12
**works** [2] - 1990:23, 2067:15
**world** [6] - 2073:17, 2090:15,
2099:8, 2102:3, 2105:7, 2159:24
**worried** [9] - 2087:17, 2101:8,
2102:16, 2126:18, 2127:12,
2128:21, 2136:2, 2161:21,
2161:22
**worrisome** [1] - 2153:1
**worry** [4] - 2129:6, 2129:11,
2129:12, 2161:18
**worth** [1] - 1994:16
**wow** [1] - 2098:9
**wrangling** [1] - 2071:10
**wrap** [3] - 1999:22, 2000:6,
2000:11
**wrestling** [1] - 2071:16
**Wright** [4] - 1977:8, 2007:17,
2052:14, 2062:17
Wright.......................................
.....**1977** [1] - 1976:13
**write** [4] - 2006:15, 2007:9,
2007:12, 2146:5
**writer** [1] - 2006:16
**writing** [2] - 2006:14, 2009:7
**wrote** [4] - 2007:9, 2133:16,

2145:18, 2146:4

# X

**Xenakis** [2] - 2063:12, 2063:17
**XENAKIS** [11] - 2052:11, 2052:13, 2054:23, 2060:25, 2062:13, 2062:16, 2063:3, 2066:13, 2070:7, 2070:19, 2073:6
**Xerox** [1] - 2140:18

# Y

**year** [36] - 1996:25, 2002:22, 2009:11, 2019:1, 2033:11, 2034:1, 2034:6, 2034:21, 2037:4, 2037:21, 2041:22, 2043:1, 2048:14, 2050:12, 2077:21, 2077:24, 2077:25, 2079:19, 2085:12, 2085:14, 2085:22, 2086:10, 2086:13, 2092:21, 2092:22, 2111:21, 2112:18, 2112:21, 2117:7, 2121:24, 2122:1, 2125:3, 2154:20, 2156:2
**years** [24] - 1998:14, 2001:11, 2039:23, 2039:24, 2040:7, 2043:1, 2050:12, 2050:13, 2050:17, 2050:19, 2056:20, 2059:6, 2076:14, 2078:20, 2085:6, 2085:7, 2086:6, 2086:15, 2093:5, 2095:3, 2097:14, 2124:8, 2129:2
**yellow** [1] - 2146:2
**yield** [1] - 2011:17
**York** [1] - 1975:22
**yourself** [9] - 1982:3, 1988:5, 1988:16, 2014:22, 2054:2, 2128:2, 2128:11, 2163:19, 2164:6

# Z

**zero** [1] - 2019:19
**zone** [1] - 2081:5