1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

3    Federal Trade Commission, et    ) Civil Action
     al.,                            ) No. CA 15-2115
4                                    )
                         Plaintiffs, ) PRELIMINARY INJUNCTION
5                                    )
     vs.                             ) Washington, DC
6                                    ) April 1, 2016
     Staples, Inc., et al.,          ) Time:  2:15 p.m.
7                                    )
                         Defendants. )
8

9    _____

10             TRANSCRIPT OF PRELIMINARY INJUNCTION
                       AFTERNOON SESSION
11                      HELD BEFORE
             THE HONORABLE JUDGE EMMET G. SULLIVAN
12                UNITED STATES DISTRICT JUDGE
     _____

13

14                    A P P E A R A N C E S

15   For the Plaintiffs:      **Tara L. Reinhart**
        FTC                   **Krisha Cerilli**
16                            **Peter Colwell**
                              **David Owyang**
17                            FEDERAL TRADE COMMISSION
                              Bureau of Competition
18                            400 Seventh Street, NW
                              Washington, DC 20024
19                            (202) 326-2638

20   For the Defendants:      **Diane P. Sullivan**
        Staples               WEIL GOTSHAL & MANGES, LLP
21                            301 Carnegie Center
                              Suite 303
22                            Princeton, NJ 08540
                              (609) 986-1120
23                            **Jeffrey H. Perry**
                              WEIL, GOTSHAL & MANGES LLP
24                            767 Fifth Avenue
                              New York, NY 10153
25                            (212)310-8538

1     Office Depot          **Matthew James Reilly**

                              **Andrew McHie Lacy**

2                           SIMPSON, THACHER & BARTLETT LLP

                           900 G Street, NW

3                           9th Floor

                           Washington, DC 20001

4

5

     Proceedings reported by machine shorthand, transcript

6    produced by computer-aided transcription.

7    _____

     Court Reporter:     Janice E. Dickman, RMR, CRR

8                     Official Court Reporter

                     United States Courthouse, Room 6523

9                     333 Constitution Avenue, NW

                     Washington, DC  20001

10                   202-354-3267

11

12                         **INDEX**

13

14    Carl Shapiro.......................................2393

15                    *   *   *

16

17

18

19

20

21

22

23

24

25

1              **AFTERNOON SESSION**

2                  THE COURTROOM DEPUTY:  Resuming civil action

3       15-2115, Federal Trade Commission, et al., versus Staples

4       Inc., et al.

5                  THE COURT:  All right.  How are you?

6                  THE WITNESS:  Fine.

7                  THE COURT:  Counsel.

8                  MS. CERILLI:  Good afternoon.

9                  THE COURT:  Good afternoon.

10                 DIRECT EXAMINATION (Cont.)

11      BY MS. CERILLI:

12      Q.  Mr. Shapiro, we left off with your assessment and

13      analysis related to competitive effects.  And I believe the

14      next step in the analysis or the framework that you had

15      outlined at the beginning is to consider entry and

16      expansion, so let's turn to that.

17                 What did you mean when you referred to entry and

18      expansion?

19      A.  So now we're at the point where we're going to ask

20      whether the merger itself will induce additional

21      investments, expansion or totally new entry into the market.

22      And it's just important to distinguish that expansion

23      induced by the merger from whatever else may be going on in

24      the market anyhow, which we had already factored in.  So

25      we're really looking at what might the merger trigger?

1            And the whole frame now is, we've gotten to the

2     point where there's a lot of evidence, at least in my mind,

3     that the merger will cause a problem and will make it

4     profitable for Staples to raise the price to large

5     customers.  So now we're asking -- we've already figured the

6     customers, there's not much they can do about it, that's why

7     we think it's going to happen.  Will the supply side of the

8     market, will the other firms come in and correct for that

9     and save the day, as I put it before.

10           So this is about entry and expansion induced by --

11    let's say an assumed post merger price increase.  That's the

12    world we're in now for this next module.

13    Q.   Okay.  And did you, in fact, evaluate whether entry and

14    expansion is likely to counteract the effects that you

15    described earlier?

16    A.   So, yes, I -- I did that.  I don't think it will.

17    Q.   And --

18    A.   Surprise there, right?  I know.

19    Q.   Okay.  And we'll, obviously, go into the details, but

20    can you just sort of summarize up front why it is that you

21    think it will not?

22    A.   So, you know, we've already had a lot of hints in this

23    direction, which is you've got a very highly concentrated

24    merger, two big players, we -- we're really talking about

25    expansion here.  All these other -- everybody else we've

1    talked about is already in the market a little bit, they're

2    selling some office supplies to big customers.  They're in

3    maybe the tiniest little bit.

4            THE COURT:  What about Amazon?  And I want to be

5    careful because I think there were some projections made for

6    the next four years or so, and I think it was confidential.

7            But what about that information, coupled with a

8    freezing of prices for, say, until '18 by Office Depot and

9    Staples.

10           THE WITNESS:  Did you say raising of prices?

11           THE COURT:  No.  I'm sorry, the freezing of

12   prices.  Prices froze by those entities for three years or

13   so.  No increase in costs to their customers.

14           THE WITNESS:  And so I'm not following you, Your

15   Honor.  So, I'm trying to --

16           THE COURT:  I'm concerned as to whether you have

17   an opinion about -- whether your opinion about the

18   anticompetitive effect of this merger is impacted by

19   considering the entry of -- the increase of Amazon's share

20   based upon its confidential projections and, hypothetically,

21   the freezing of prices by Office Depot and Staples to their

22   competitors for the next three years or so.

23           THE WITNESS:  The raising of prices?

24           THE COURT:  Freezing.  Freezing.

25           THE WITNESS:  This is why I'm having trouble.

1          THE COURT:  No increase in prices.  You want me to

2     say something different, I'm not going to say that, though.

3     Prices are frozen for three years and Amazon merges, and

4     based upon its confidential projections, then if the

5     anticompetitive impact for your opinion lessens?

6          THE WITNESS:  Okay.  So let's first -- let's talk

7     about the world where there's no increases in prices.

8     That's what I think you're asking about.

9          THE COURT:  Right.

10          THE WITNESS:  So Amazon is already coming in and

11     growing -- and we're talking about Amazon Business now.  We

12     can add Amazon.com into the discussion, but I'm pretty sure

13     you mean it's Amazon Business.

14          THE COURT:  Exactly right, and projections made by

15     that entity.

16          THE WITNESS:  So they've given us projections

17     going out to 2017.  And I've got a figure for that.  I

18     didn't see those in my initial report, but I have a figure

19     for that in my reply report.  And it's confidential, so I

20     won't say it.  But just taking those projections and

21     applying it to the large customers, it's a small share -- I

22     am not sure I should say out loud in the court, but I've

23     looked at that and that's a small share.

24          So -- but they've got grand plans.  And we're

25     going to talk about -- we can go to this right now.  I mean,

1    I'd rather cut through the other stuff and get right to

2    Amazon in a lot of ways.  They are coming in, Amazon

3    Business, and I assume they're going to be pretty

4    successful, Amazon Business in general.  You know, it's not

5    about office supplies.

6                 THE COURT:  That's your expert opinion, right?

7                 THE WITNESS:  What?

8                 THE COURT:  That's your expert opinion, right?

9                 THE WITNESS:  I wouldn't put -- let's put it this

10   way --

11                THE COURT:  When you assume something, I'm going

12   to listen to you because you're an expert.

13                THE WITNESS:  I appreciate that.  Most people

14   don't tell me that.  So let me -- okay.  I just -- I didn't

15   want to say something off.  So, yes, I'm going to assume in

16   my analysis that Amazon Business overall is growing, is

17   generally growing and is going to be successful, maybe a

18   very successful line of business for Amazon.  That doesn't

19   say yet what impact it will have in the market we're talking

20   about here.

21                So, look, Amazon Business is a big play, right?

22   It's a huge range of products and it's all businesses, just

23   like Amazon.com is all consumers.  Their ambitions are

24   large.  So when I say I'm assuming they'll be successful

25   overall, I'm still reserving, if I can put it that way, the

1    question:  What impact will they have for office supplies

2    for large customers?  The fact is, assuming, and it's a

3    reasonable supposition, they'll be successful overall given

4    their track record, I don't think they're going to make that

5    big a dent in this market.

6            Now, the starting point for that is their own

7    projections.  Everything you hear about Amazon -- look, I've

8    read carefully Mr. Wilson's testimony and the documents we

9    have and all the data, okay.  And they are not focused on

10   the large business segment.  It makes sense, perfect sense.

11   They're moving up from consumer to small business.  So if I

12   take their projections and apply it to our market, their

13   projection numbers are all business.  So I have to apply it

14   to our market here.  It ends up being a small share.

15           So to answer your question, if we think of the

16   prices as flat, and Amazon, they're not looking at this

17   merger, they're doing their own thing, okay.  And his

18   projections are not based on what's going on in this

19   courtroom, as far as I can tell.  You're not sure about

20   that?  Okay.  Let me put it this way:  If projections -- I'm

21   taking those projections as what they're planning to do

22   irrespective of a merger.

23           THE COURT:  You don't think Amazon is looking at

24   this prospective merger and where its place in the market

25   would be if it goes through?

1            THE WITNESS:  You know, I hate to say what Amazon

2      is thinking because I'm not Amazon.  And Mr. Wilson was

3      here, I read his testimony pretty carefully.  I'll just say

4      this -- and I don't want to go too far, really, because it's

5      out of my scope, okay -- which is, they've got a big play,

6      generally.  What they're building out and doing is not

7      particularly about office supplies, and it's not really

8      mostly about big business, it's small and medium businesses.

9      It's their natural place for this Amazon Business.

10           They would love to sell to big business.  They

11     would like to get there.  But it's not their natural habitat

12     so much.  So, look, yes, if the price goes up from Staples,

13     that's some opportunity for them.  But I don't think it's

14     going to be a big correction for -- they have a big ship

15     that's sailing, you know, and we'll see where it's going.

16     It's not about this market.

17           So that's all I meant, that I don't think what

18     happens here is going to dramatically affect their overall

19     business strategy in Amazon Business because it's only a

20     small share.

21           So, if we take the projections as we have them,

22     and, you know, like I said, they're in my report, they're in

23     the record, that's a small share in this market.  I can --

24     you know, if there's a way to communicate the exact number,

25     I can tell you what it is.  But it's small.  So that --

1    that's my starting point and that's what I assume they would

2    do if the prices are frozen, like you said.  And now maybe

3    they could do more if the prices go up.  Okay.  It would --

4    other things equal, that clearly makes it more of an

5    opportunity for them.  So we're going to talk about that.

6    But the starting point --

7         THE COURT:  It may be more of an opportunity if

8    the prices did go up?

9         THE WITNESS:  That's what I mean.  If they are

10   frozen, they are going to come in and get this small share.

11   That's what their projections say.  Just starting with that,

12   that is not anywhere near enough to alleviate my concerns at

13   this point.  And I talked about using projected market

14   shares.  And we do have this data from them.  I didn't do

15   that with a chart, but we know from this number, from their

16   own projections, that it's small in terms of share.

17        So now we're mostly going to talk about will they

18   really grow a lot more for large customers if the prices go

19   up.  That's what we're talking about here.  We're also going

20   to talk about everybody else; will the other players be able

21   to come in and will they grow a lot more and invest?  This

22   whole section is about significant investments that other

23   firms would need to make to expand, and whether that's going

24   to happen.

25        We're going to get to the timely, likely, and

1    sufficient elements of that test.  That's where we're going

2    next.

3              THE COURT:  Thank you.

4    BY MS. CERILLI:

5    Q.  Following up on that for a moment.  What if we, at the

6    FTC, just issued an order, or maybe even the Court issued an

7    order just directing Staples, after the merger, to just

8    freeze prices?  Don't -- you know, essentially a Court order

9    prohibiting them from raising prices for the next three

10   years, and perhaps three to four years from now Amazon

11   Business will be stronger.  Would that be an adequate remedy

12   in your view?

13   A.  Well, I would feel somewhat sorry for the judge if he

14   would have to administer that order for some years to come

15   because you would be turning this into a regulated industry.

16   And I have a visceral negative reaction to that as an

17   antitrust economist.  I want to count on competition, not

18   regulation.  And even when a regulatory body does that, it's

19   very messy.  When a Court does it, that is not a substitute

20   for competition, in my view.

21   Q.  So, Professor Shapiro, what framework did you use to

22   evaluate the possibility of entry or expansion in this case?

23   A.  So what I will call the standard framework, which is in

24   the merger guidelines, and antitrust economists use as well,

25   which is to ask whether the entry induced by the merger, if

1    prices go up, will it be timely, likely, and sufficient to

2    protect consumers, customers in the market?

3    Q.  And what does that mean?

4    A.  Well, if you look at the merger guidelines, the language

5    they use is will this entry and expansion be sufficient to

6    either deter or counteract the price increase we're worried

7    about.  And I think it's useful to think about those two

8    verbs.  So it's possible, and it happens in some cases, that

9    the merged firm, even though given who they're facing right

10   now, it would be profitable to raise price, they don't want

11   to do it and they won't do it because other people will come

12   rushing into the market and they don't want that to happen.

13   That would be deterring.  The prospect of entry would deter

14   the price increase, it would never happen.

15            The other is counteract, where they go ahead, they

16   raise the price, maybe they can make some more money for a

17   while, and then other suppliers come in and it's an

18   opportunity.  And eventually over some period of time the

19   market is restored to competitive conditions.  So that would

20   be counteract.  And the counteracting, we tend to think,

21   would want to happen pretty quickly so customers weren't

22   hurt very long.  So those are the aspects of what we're

23   looking for ultimately to protect the customers from

24   significant or durable price increases.

25   Q.  And, of course, you mentioned timely, likely, and

1    sufficient.  So I think it would be helpful to unpack each

2    of those elements.  Can you describe in practical terms what

3    it means for entry and expansion to be timely?

4    A.  Well, usually this is a matter of how far out can we

5    look, given this market.  We talked about this, I think,

6    early in my testimony.  Really, fast enough so that

7    customers aren't harmed for any, you know, significant

8    period of time.  And a year or two is a common timeframe.

9    Go out a little further, perhaps, that's about it.

10   Q.  And does that mean that you only start to consider harm

11   a year or two out?

12   A.  No, no.  Any harm that occurs, including day after the

13   merger and the deal closes, that's harm to customers, we

14   care about it.  The question is whether, if the curative

15   effects of the entry are fast enough, we basically -- I

16   mean, we tolerate some short-term harm if we think it's

17   going to really be ephemeral.

18   Q.  What does it mean for entry or expansion to be likely?

19   A.  Well, this is all predictive exercises.  And this, Your

20   Honor, this is, I find, in general, a harder part of the

21   predictive exercise than the other ones.  You know, before

22   we measured the market, we looked at the shares, we see

23   who's bidding.  Now we're really trying to look out, what

24   might happen.

25            You know, it's something that hasn't happened

1    before.  These guys have been competing.  This is something

2    we haven't seen.  And we're looking out a year or two.

3    There's necessarily uncertainty in this exercise.

4              THE COURT:  That's a reasonable period of time, a

5    year or two, three?

6              THE WITNESS:  Yeah, I would say a year or two is

7    what I would like to do.  That goes with the timely.  So a

8    year or two.  Partly depends how far out can you look,

9    realistically.  In some cases you have drugs coming on the

10   market, you can see what's in trials and will be available

11   in four or five years.  Here a year or two, that's a common

12   time frame.

13             So, to me, there's uncertainty and, you know,

14   likely -- the word kind of speaks for itself.  What we're

15   trying to figure out, kind of see through that fog a little

16   bit in terms of what's likely to happen.

17             There I use the word "likely," recognizing that

18   this is -- there's uncertainty.  And one way to think about

19   it is, if entry doesn't happen, if the merger would

20   otherwise cause problems and entry doesn't happen, the risk

21   that the -- the parties who are at harm or risk there are

22   the customers.  Okay.  And so that's worth remembering as we

23   think about this uncertainty about the projections.

24   BY MS. CERILLI:

25   Q.  And what does it mean for entry or expansion to be

1    sufficient?

2    A.  Sufficient to restore competition we had before the

3    merger.  So that's going to depend on the nature of the

4    merger.  If you had a merger of firms that had maybe 20 and

5    25 percent that was worrisome, wouldn't take as much entry

6    to fix the problem or cure the problem as we have here, 40

7    and 35 percent.  So it's really to restore competition to

8    levels that customers ultimately are protected, as they were

9    before the merger.

10   Q.  And are all three prongs of the entry test equally

11   important in this case?

12   A.  No.  I mean, they all have to be met.  I guess they're

13   all necessary.  But the focus of my analysis has been on

14   whether entry will be sufficient.  Given the magnitude of

15   the shares and the bidding data we've seen, it's a pretty

16   high hurdle, in my view, for entry to be sufficient.  And so

17   I focused on that, that's one of the prongs.

18   Q.  And so let's unpack how you proceed to evaluate those

19   prongs.  So how do you attack the question of analyzing

20   whether entry is timely, likely, or sufficient?

21   A.  So I like to think about it in two buckets, if you will.

22   One is, what are the barriers to entry or obstacles to

23   expansion, would be an equally good term in this case.  Just

24   understanding what they are.  And then once we do that, then

25   move to the second part, which is let's look at different

1    firms, different categories, different competitors.  How do

2    those obstacles interact with their own capabilities and

3    their real world situation so we can figure out what might

4    happen, whether they would, in fact, expand.

5    Q.  And does it make sense to, perhaps, address the entry

6    and expansion barriers first with respect to firms other

7    than Amazon and then turn to Amazon separately?

8    A.  Yeah.  Amazon is certainly a unique creature here, so

9    that would be -- that would be good, yes.

10   Q.  Okay.  And what type of analysis or evidence are you

11   looking for to evaluate barriers to entry and expansion?

12   A.  Well, I think of this very real world exercise in the

13   sense of put yourself in the shoes of a small supplier,

14   maybe it's W.B. Mason, maybe it's HiTouch.  Imagine that

15   Staples is charging more to the big customers.  What do you

16   need to do?  What do the customers want?  Can you give it?

17   What does it take to be able to do it?  So you want to think

18   about the customer needs and then the supplier capabilities

19   from the perspective of the company we're thinking about, or

20   considering whether they would really make the necessary

21   investments.

22   Q.  Are scale economies relevant to evaluating barriers to

23   entry and expansion?

24   A.  They very often are because in merger cases where you've

25   got big companies and they're merging, there's often some

1    little companies in the market.  And they are very commonly

2    at a disadvantage because of the scale economies.  And so

3    close that gap, to grow, to become like the big guys, they

4    have to overcome.  And that's a barrier, that's an obstacle.

5              So that's often an important part of the entry and

6    expansion analysis, the nature of scale economies.  Here we

7    have two big elements of scale economies.  One is bigger

8    guys, cheaper, better prices from manufacturers.  That's a

9    scale economy.  And this economy is scale or scope,

10   sometimes called the value of being -- the necessity, even,

11   of having geographic distribution.  So those are two

12   significant obstacles that are important in this case.

13   Q.  And have you identified any other barriers to entry or

14   expansion that are relevant to this case?

15   A.  Well, one of the other barriers sometimes comes up is

16   customer stickiness.  Again, if you're thinking about it

17   from a small guy thinking of investing, if you're going to

18   invest that money, how many customers are you going to be

19   able to get to earn revenue and get a recoupment on your

20   investment if it's very hard to pry the customers away from

21   the incumbent firms?  That is a problem.  And in this case

22   we do have customer stickiness and switching costs, the high

23   retention rates we talked about.  That's an obstacle.  I

24   mean, that's a real world concern.

25             Look, and even if Staples raised the price,

1    they're trying to raise the price, if you make all those

2    investments to come in, they're not going to sit still for

3    it, they're not going to give up their customers easily.  So

4    you've got a lot of risks there and it's hard to get those

5    customers.  So, I think it was -- was it Mr. Meehan? said,

6    you know, I can have warehouses, but until I get the

7    customers, I'm not getting revenue.  It's exactly that sort

8    of thing.  He has to convince big customers to switch.  And

9    we know that's very hard, they don't do it very much.

10   Q.  I want to unpack each of those barriers to entry and

11   expansion that you identified, but before we do, can you

12   just describe, how do those barriers interact with one

13   another, from your perspective?

14   A.  You need to view them cumulatively, because as a

15   business split, if you've got a bunch of obstacles, you've

16   got to clear all those hurdles to get revenues, they all

17   basically add up.  So you want to look at them as a group or

18   cumulatively.

19   Q.  So let's unpack the barrier that you mentioned related

20   to retention rates.  And I think we're looking at slide 60

21   now.  The numbers are redacted, but you and the Court can

22   certainly see and describe them directionally.

23          Can you please explain what you found regarding

24   retention rates and why that's meaningful to you?

25   A.  So, Your Honor, I think this is slide 60 now.  So we

1    talked about this before, very high annual retention rates.

2    We talked about why.  Again, nothing wrong about that, it's

3    just a problem for an entrant, how many customers can you

4    get, how soon?  Again, we're talking about large customers,

5    so these are very high and it's an obstacle.

6    Q.  Turning to slide 61, have you seen other evidence about

7    why there are very high retention rates?  Slide 61.

8    A.  Right.  So this is a Staples document.

9         First, I should say, Staples at least, I think

10   both companies, they meant -- they themselves have reported

11   and stated they have very high retention rates.  They're

12   proud of it, I think, and I don't think it's disputed.  And

13   this is one document where they're mentioning these high

14   retention rates due to our integration into their business

15   and IT systems.  So that gives me a little more sense of

16   why.  I've heard it from the customers, too.  You heard it

17   from McDonald's, for example.  So this is consistent and

18   gives us a little understanding of why they're so high, the

19   retention rates.

20   Q.  Then why are very high retention rates a barrier to

21   entry and expansion?

22   A.  So, again, if Mr. Meehan wants to expand, he's got to

23   make a bunch of investments.  There's scale economies in

24   this business.  If he makes more investments and doesn't get

25   to scale anywhere, say, Office Depot's scale now, he's

1   probably going to lose money or -- let me change that

2   slightly.  Whatever investment he makes, he has to figure --

3   he's got to get enough customers to recoup it.  And if he's

4   still at a competitive disadvantage, vis-à-vis Staples,

5   because he's small, it's an uphill battle, that's all.

6   Q.  And then the other -- another barrier that you mentioned

7   was economies of scale in purchasing.  So let's turn to that

8   factor.

9           What evidence in the record have you seen showing

10  that purchasing costs are related to volume?

11  A.  Well, there's a lot of different sources.  We have a

12  number of slides here, Your Honor, which I think we've

13  covered this, so we can kind of go through.  Slide 62,

14  there's testimony by -- I guess some of them are redacted

15  here -- by some of the smaller participants indicating they

16  have higher costs of goods sold.

17          And we heard that -- you know, I have to say what

18  Mr. Morrison said, this isn't here, but he said -- he said

19  when he works with Office Depot, he sees the prices they set

20  and their prices are less than what he pays for the goods

21  because he -- for his own business through Essendant, I

22  think it is.  That tells you that's a significant gap.  And

23  so that's another piece of this.  So, there's testimony by

24  the other market participants that the smaller players have

25  much higher costs of goods sold.

1          Slide 63, then, is part of an explanation for why

2     that is, which is the more -- Staples and Office Depot buy

3     the lion's share of their products directly from

4     manufacturers; smaller players much less so.  And that is --

5     causes a higher cost for the littler players, because they

6     do go through the wholesalers instead of manufacturers.

7     Q.  And why is it that going through a wholesaler would add

8     to purchasing costs?

9     A.  Well, the wholesaler is going to have their own fees.

10    And when you work it all out, it turns out to be a more

11    expensive way to get things.

12         And we can see on slide 64, this is a Staples

13    document, I believe it's a response to an RFP.  Anyhow,

14    they're talking about how they have advantage because

15    they're buying directly.  Staples bypasses one stop in the

16    supply chain, translates to one less markup, ultimately

17    savings to our customers, minimize wholesale independence.

18         So they're mentioning that as an advantage they

19    face.  So both -- they see it as an advantage, the other guy

20    sees it as a disadvantage.  It's real.

21    Q.  And why do these higher purchasing costs represent a

22    barrier to entry and expansion?

23    A.  Again, Mr. Meehan, it's going to be hard for him to go

24    toe-to-toe and really recoup his investments, given this

25    cost disadvantage.  And all the more so for even smaller

1        players, it's more pronounced.

2        Q.   Okay.  And you also mention a barrier to entry related

3        to economies of scale and distribution.  Can you explain

4        what you meant by that?

5        A.   Yeah.  So this is a very common thing in distribution

6        markets, sometimes it's called economies of density, which

7        it's more efficient to have a distribution system that has a

8        denser network of customers you're delivering to.

9             Again, Mr. Meehan, he said a lot about density.

10       And so -- so there's two aspects here.  One thing, he needs

11       to build out his distribution network outside of Masonville

12       to be competitive.  And then in order to do that in an

13       efficient way, he needs density or scale in the new region.

14            THE COURT:  He needs to fill those trucks, right?

15            THE WITNESS:  Yeah, exactly.  Fill the trucks.  I

16       love the saying about you're making money when the trucks --

17       not when the truck is moving, driving, you're making money

18       when the truck's stopped and delivering stuff.

19            So that's a scale economy.  And, you know, it

20       relates to this need for geographic scope.  Look, a lot of

21       the customers -- not everyone, but a lot of the customers in

22       our relevant market here, they have widely geographically

23       distributed locations.  And this is one reason why the

24       smaller players find it very hard to play in that game, they

25       don't have the scope.

1          So, slide 65 is going to go to that, dispersion of

2     locations.  So, this is -- let me pause a moment.  So let's

3     just take the Staples row, which will make the point.  If

4     you look at all their customers -- we measure all the B2B

5     customers.  On average, customers in five zip codes in two

6     states.  A lot of those are small customers.  But the large

7     customers, on average, are in 552 zip codes and 29 states.

8     And the same is true for Office Depot and OfficeMax, it's

9     the same idea.

10          So, these large customers, and I said this at the

11    beginning, this is one way in which they're really different

12    from the small and medium size customers, they've got all

13    this geographic dispersion.  And so that's what the customer

14    needs, that's what Mr. Meehan needs to be able to deliver,

15    to expand.  And that's quite a gap, quite an obstacle for him.

16    BY MS. CERILLI:

17    Q.   And I had mentioned economies of scale, is there also an

18    economy of scope?  Can you explain what that means?

19    A.   Well, I would say the scope here would be you want to be

20    present in many different locations.  It's not simply being

21    big, you have to be widespread.  And that's what this

22    diagram emphasizes.

23    Q.   Okay.  And, of course, you've been able to reference

24    Mr. Meehan, W.B. Mason's testimony.  Is there other evidence

25    in the record concerning the costs of that smaller

1    distributive space as a result of not having distribution

2    centers nationwide?

3    A.  Yes, that slide 66 has several other firms who are

4    saying this.  And in my report there's a number of

5    declarations along these lines that are cited regarding this

6    issue of expansion, obstacles to expansion.  It's quite

7    consistent among the -- in the evidence here that this is an

8    issue that the smaller players face as a distribution cost,

9    network cost disadvantage.

10   Q.  Okay.  And have you also seen evidence in the record

11   concerning the time and expense of building distribution

12   centers?

13   A.  Yes, and that's what we've got, some summaries on slide

14   67.  You know, Mr. Meehan was talking about how long will it

15   take to build out and how much money it would take.

16          Another thing, somebody could try to roll -- do a

17   bunch of acquisitions, you could try to merge -- called a

18   roll-up, basically a merger, bunch of different local

19   players.  And the second company has done that to a limited

20   degree, locally, you know, but to do that on a national

21   basis is a -- you know, it would be much harder.  And nobody

22   is saying they're close to doing that.  And we have a third

23   quote here, too.

24          So either through organic growth or acquisition,

25   this is not something that would be timely.

1    Q.  Okay.  And so we've talked about retention rates,

2    purchasing costs, distribution network.  Are there any other

3    barriers to entry in this case?

4    A.  There are others.  So, the need to develop information

5    technology, it depends on the company.  Like Mr. Morrison, I

6    got the impression he was pretty proud of his IT systems, so

7    he may not need to do as much.  Some of the other players

8    would have to do more.  Even he would have to do a lot, I

9    think, to serve a big customer on his own.

10          So that's the sort of thing -- look, it's not

11   insurmountable, you can hire people, it's an investment, it

12   takes some time.  But it is -- it needs to be factored into

13   the mix of business reality, would companies do this?  And

14   this is one where -- these are investments that would need

15   to be specific to the large customers who have, you know,

16   especially demanding in the sense -- in terms of

17   E-procurement and integration.  And there's even customer-

18   specific IT build-out that needs to be done.

19          So this is -- even I think -- my sense is even the

20   more capable smaller firms, there's still a decent amount

21   they would need to do in IT to get -- to be able to satisfy

22   some of the larger customers.

23   Q.  Okay.  And are there any other barriers to entry and

24   expansion you identified in assessing the record?

25   A.  Those are the major ones.  I mean, you do hear about

1    reputation is an issue, you know, the need to prove you can

2    serve large customers.  The need to have financial stability

3    and financial backing to play at this scale.  I think those

4    seem real, people are talking about them.  They're not the

5    highest ones on my list, but they belong on the list.

6    Q.  Now, defendant's economic expert, Mr. Orszag, has argued

7    that there are no barriers to entry here because -- I think

8    he says there's no special sauce to selling office supplies.

9         What is your reaction to that argument?

10   A.  Well, I'm a little nonplussed by it, actually.  I

11   think -- I guess, at a general level there are many things

12   that are entry barriers that I listed; the need to build out

13   nationally, the need to get scale, all the things I listed,

14   which they're not -- maybe they're not secret sauce, they're

15   not patented, but they're still entry barriers, they're real

16   world obstacles that firms face.

17        So I sense -- he will speak for himself, but my

18   sense is he has a much narrower notion of entry barrier than

19   I do, Your Honor.  So I think that's part of why you're

20   seeing a rather different opinion from the two of us.  I

21   would say that that's one reaction.  Yeah.

22   Q.  Have you looked at whether there has been entry and

23   expansion by distributors in the past several years?

24   A.  Yes.  So one of the natural -- one of the natural things

25   to look at as part of any entry analysis is what entry is

1    actually taking place?  What does it take to enter, to grow,

2    to expand?  Who has done it?  How long did it take?  All

3    those things.

4            And so I've looked at that.  That's a pretty easy,

5    quick look in this case, because if you go back to our

6    market shares, we see that none of these other distributors

7    have gotten much of a market share in the overall large

8    customer market.  W.B. Mason was quite small, they're the

9    biggest one.  We're still holding aside Amazon, just -- you

10   know, I'm not going to forget about them.

11           The paper manufacturers have picked up some larger

12   shares, and paper is a little different there.  But in terms

13   of, let's say now, what we've primarily been talking about,

14   which is distribution, you know, core office supplies as

15   well as paper, nobody's really grown up and become anything

16   like Office Depot, Staples or OfficeMax for years, for the

17   past several years.

18           So we don't really have a record of actual entry

19   to look at and see, oh, it's proven, you can do it.

20           Now, I should say I know what Staples is going to

21   tell you about that, they're going to say it's a highly

22   competitive market, it doesn't pay better.  But if we raise

23   the price, people will come in.  Okay.  So we are doing that

24   exercise about the raising of the price, but part of that is

25   to look and see the history.  And I'm just saying it hasn't

1   happened.  Okay?  You know, there's some small -- you know,

2   the fringe players, you know, some come, it's a little bit

3   fluid.  But when I talk about entry and expansion here, I'm

4   looking for anybody who has entered or expanded to get a

5   sizeable market share, which is what we would need in order

6   to offset the loss of Office Depot, and that just hasn't

7   happened.

8   Q.  Okay.  Now, you've kind of walked us through the

9   barriers to entry and expansion.  I think it would be

10  helpful if you discussed the -- your assessment of the

11  likelihood of entry for particular supplier types.

12          So, let's first address the local and regional

13  suppliers like W.B. Mason.  What have you concluded

14  concerning whether W.B. Mason and similar regional vendors

15  are likely to provide timely and sufficient entry for large

16  customers?

17          MS. SULLIVAN:  Your Honor, I'm just going to

18  object.  I think we've been through this twice so far.

19  Cumulative.

20          THE COURT:  I think we have as well.

21          MS. CERILLI:  Your Honor, what we're seeking to do

22  here is address by type.  I mean, basically, Professor

23  Shapiro just outlined the conceptual issues, the barriers to

24  entry.  And we're kind of going to describe how each of

25  those barriers apply to particular suppliers.  So, regional

```
 1    manufacturers, the adjacencies that you've heard about,

 2    Grainger and so on.

 3              THE COURT:  All right.  I think we've been over a

 4    lot of this stuff.  If you want to supplement any previous

 5    responses, you can with respect to Mason.

 6              MS. CERILLI:  Okay.

 7    BY MS. CERILLI:

 8    Q.  So I think we've -- we've addressed the regionals a lot,

 9    and so we can skip ahead on the regional.

10    A.  Your Honor, we have -- slide 72 had some more quotes on

11    that, it's in the record.

12              Let me just -- slide 73 talks about consortia.  We

13    haven't explicitly talked about AOPD, Trimega.  Look,

14    they've tried to get together a bunch of little guys to see

15    if they can go after the big customers, it's been a failure.

16    Okay, they tried.

17              THE COURT:  AOPD?

18              THE WITNESS:  Yeah, AOPD, Trimega, Independent

19    Stationers are the ones -- you know, the quotes here are

20    redirect, but we know those are the three major.  So that's --

21    we looked at that.  And they've tried, you know, they just

22    haven't had much success at this end of the market, that's

23    all.  So -- so, we got that.

24              The other category we got adjacent suppliers -- I

25    don't think we have a slide on that -- they're basically --
```

1    this is Grainger and Fastenal, they're focused on other

2    stuff.  You know, it would be a big shift for them to get

3    into consumable office supplies.

4           Can I swear to you they absolutely won't do it in

5    the next three years?  No.  But I don't see any indication

6    they're doing it.  They're not saying they're doing it.  It

7    would be -- they're just really focused somewhere else.

8    Okay.

9           And then we have manufacturers who -- you know, we

10   talked about paper.  And then the other stuff, slide 75

11   shows -- it's just a tiny, tiny sales of manufacturers

12   directly.  That's not going to come in, you know, just based

13   on how much they're selling and it doesn't appeal to the

14   customers.

15          So, those are the different categories.  You know,

16   we've just got a number of slides here to walk through that.

17          MS. CERILLI:  And, Your Honor, I don't think we

18   did get a chance to talk about the adjacencies and the

19   manufacturer, so I would ask if we can --

20          THE COURT:  All right.  Sure.  Go ahead.

21          MS. CERILLI:  Okay.

22   BY MS. CERILLI:

23   Q.  So just for context, and I think you laid it out, but

24   can you just describe where these adjacent suppliers stand

25   in the market today, slide 74?

1    A.  So 74 we've got for you here.  All right.  So, Fastenal

2    is in here.  Okay.  First off, this is the primary vendor

3    relationship shares, so this is -- and you can see Fastenal

4    is -- I won't say where they are --

5              THE COURT:  I see it.

6              THE WITNESS:  You know that.  And Grainger is

7    bigger than them, they're above them.  But those shares are

8    tiny.  Okay.

9              THE COURT:  Right.

10             THE WITNESS:  Those shares are tiny.  And then --

11   so that's where they are now.  So the sort of expansion we

12   would be talking about would have to be quite dramatic.

13   And, like I said, it's just not their core line of business.

14   They'll peck around the edges.  I mean, they'll be happy to

15   take some opportunistic sales.  I think they talk about

16   selling these things for convenience to the large customer.

17   I view that as quite different than seriously making the

18   investments necessary, to try to get the skill necessary to

19   compete head to head against Staples; that's a different

20   business.

21   BY MS. CERILLI:

22   Q.  Okay.  And then just to put in context, as well, what

23   are we looking at regarding the current status of

24   manufacturers and selling to large customers.

25   A.  So that's slide 75.  So after -- it's redacted, though.

1    So the first three here are paper companies.  And, you know,

2    the manufacturers do have a small piece there, we saw that

3    in the market shares, but the other -- the paper

4    manufacturers.  But other than that, these are the largest

5    vendors of manufactures to Staples and Office Depot, which

6    gives you a sense of how big a share of the consumable

7    office supplies cluster or package these other manufacturers

8    represent.  And this is in Fortune 100 here -- excuse me.

9    Okay.  So they're really tiny.  Okay.  Avery Dennison, at

10   the top of the list, that's a tiny share, and down from

11   there.

12   Q.  Okay.  And just to sum it up, what do these small shares

13   imply to you regarding the possibility of sufficient entry

14   and expansion?

15   A.  Well, the very small shares tell us already this is not

16   really what customers want to buy, they don't want a lot of

17   their stuff this way.  And I just don't see any indication

18   that a price increase would substantially change what the

19   manufacturer is going to do in that respect, or what the

20   customer is going to want to do.  Even if they expand some

21   of these categories -- some of these sales, it's still going

22   to be tiny.

23   Q.  Okay.  So, Mr. Shapiro, perhaps at this point we should

24   turn to Amazon.

25              MS. CERILLI:  And, Your Honor, we expected to be

1  able to do most of this in public, but I think there may be

2  certain questions that it makes sense to do at sidebar.

3          THE COURT:  All right.

4          MS. CERILLI:  And I'll also note that there are a

5  couple of slides in the PowerPoint that after consulting

6  with defense counsel, we are not going to address them here.

7  We will just set them aside for now.

8          THE COURT:  All right.

9  BY MS. CERILLI:

10 Q.  Professor Shapiro, do you consider Amazon Business to

11 have a significant competitive presence today in the

12 relevant market?

13 A.  Currently, right now, no.  Or put differently, not yet.

14 Q.  Okay.  And have you been able to quantify their current

15 competitive position in the market?

16 A.  So, we have -- I think the most up-to-date data or

17 information on that comes from Mr. Wilson's testimony where

18 he said, basically, they've participated in some RFPs,

19 they've not won any except one sort of small one or part of

20 a customer.

21          So, they have not -- so if we were to update the

22 bidding and winning analysis, we would know that he's still

23 not going to appear so far.  We're just talking about as of

24 today, as best we can as we sit here, they are still not a

25 significant competitor to Staples and Office Depot in this

1    market.

2    Q.   Okay.  And are you aware of any customers who recently

3    considered Amazon Business?

4    A.   Yes.  Was it -- I think Fifth Third Bank was the one who

5    said they considered them most recently and did not view

6    them as, I guess, really viable.  I don't know exactly what

7    the word was, but that's what's in my head.

8    Q.   Okay.  And let's turn now to the future competitive

9    significance of Amazon.  First, do you see Amazon facing all

10   of the barriers to entry that you just described?

11   A.   No.  They don't face all of these barriers.  So, if you

12   look at the barriers, Your Honor, one of the barriers is

13   building out a nationwide distribution network; they've got it.

14            THE COURT:  I get it.

15            THE WITNESS:  No question.  The other barrier --

16   and IT, look, they're good at IT, they have to build stuff

17   and it's certain things that are going to take time, and

18   you've heard of what gets funded.  But I don't think that's

19   a barrier they can't surmount, if they want to.  I would

20   really kind of put those aside.  Let me put it this way.

21   The IT, they need to do a bunch of work for a year or two to

22   really build the capabilities the customers want, and

23   there's a question about timing and whether it would be

24   funded, but they can do it if they want.  Let's put it that

25   way.

```
 1              The other barrier that I think is --
 2              THE COURT:  You said they can do it if they want to?
 3              THE WITNESS:  If they want to.
 4              THE COURT:  Money is no object?
 5              THE WITNESS:  Well, you know, an economist, I'm
 6    sorry, we can never say that.  We can say they are well
 7    funded if they find that this is worth investing in.  If Mr.
 8    Bezos decides to give Mr. Wilson approvals, they can do it.
 9    But he'll have to make that judgment.
10              So, I was going to talk about cost of goods sold.
11    If you -- or maybe -- not yet?
12    BY MS. CERILLI:
13    Q.  Yes, absolutely.  So what is your view related to the
14    purchasing costs barrier?
15    A.  So I think this is compelling evidence that the small
16    distributors we've been talking about, they have a real
17    disadvantage in costs of goods sold.  So now we turn to
18    Amazon.  You would think, oh, they're huge, they're not
19    going to have any disadvantage.  Actually, I don't think
20    that's true.  Okay.
21              So, first off, even with all the data we
22    collectively have been able to finally extract out of
23    Amazon, or what little data, we're still not sure what their
24    overall scale is.  I mean, there's -- I don't know exactly
25    what their scale is for purchasing.  Okay.
```

 1                    MS. SULLIVAN:  Your Honor, I'm going to object.

 2          Calls for speculation.

 3                    THE COURT:  He said he doesn't know.  He doesn't

 4          know.

 5                    THE WITNESS:  I --

 6                    THE COURT:  So we don't want you to speculate.

 7                    THE WITNESS:  I wasn't going to.  Okay.  Fair

 8          enough.  No, I'm saying I don't know that.  But here's what

 9          I do know:  About half of what Amazon Business sells now is

10          sold by third-party sellers.  They have this model where

11          there's third-party sellers who put a bunch of stuff up on

12          their marketplace, customers can buy it.  And then they have

13          their own, what's called their own, items which they buy

14          from vendors and then they make available.  So there's a

15          split.  And, Mr. Bezos -- that's an important part of their

16          business model, that split.

17                    And the share that is going to be third-party

18          sellers is growing.  We have some forecasts on that that are

19          confidential, but it's growing.  So why is that relevant?

20          Why am I bringing that up now?  Think about a third-party

21          seller.  A lot of these are smaller businesses themselves,

22          so I guess they're using Amazon's marketplace to sell.

23          They're not going to have scale economies in buying.  Those

24          are basically small businesses.  They're not all small

25          businesses, there's all variety, but they're not going to

1    have the scale of an Amazon itself or an Office Depot or

2    Staples or, probably, W.B. Mason.

3         So I think the reasonable inference from what we

4    know about their business model and how it works is that

5    that significant chunk of their sales made by third-party

6    sellers will be, with the cost of goods sold, that is

7    substantially higher than Staples and Office Depot have

8    today.  So that large part of Amazon, even though we're

9    calling it Amazon and the sales will be made through Amazon,

10   it's not like corporate Amazon is buying the other part.

11        So when we talk about Amazon here, they are going

12   to have, from everything I can tell, a significant cost of

13   goods sold disadvantage vis-à-vis Staples, even if the other

14   part that Amazon buys and sells, you know, takes possession

15   of, and even if they're on parity, if Amazon is on parity

16   with Staples there, they still have the majority, which is a

17   disadvantage.  This is inherent to their business model.

18        Generally, what I'm trying to do with Amazon is --

19   this is what I said:  I assume it's generally going to be

20   successful business, Amazon Business, I figure they're

21   technically capable.  I'm looking at the underlying

22   structure of their business and capabilities and trying to

23   see how it will mesh with the market we're concerned for

24   here.  So this competitive disadvantages, I don't see a way

25   for Amazon to get around it easily.  Okay.  Because the very

1    nature of their business strategy and model is third-party

2    sellers.  And they're very clearly not changing that.  If

3    anything, they're going -- in fact, they're going more in

4    that direction.  Okay.

5          So, I just think, you know, Amazon, they have a

6    lot of advantages because they're really pretty awesome in a

7    lot of ways, but they also have disadvantages, and this is

8    one of them.

9    BY MS. CERILLI:

10   Q.  I mean, defendants argue that Amazon Business is going

11   to be a disrupter, I think they even analogize it to an

12   earthquake.  Have you seen the evidence to suggest that

13   that's true?

14   A.  Well, we have a lot of little tremblers out in Berkeley,

15   so an earthquake could be pretty minor.  If they mean a

16   major earthquake, let me put it this way:  I don't want to

17   say anything to -- I think Amazon is a great company, you

18   know, so -- but we're talking about a particular market

19   here, large businesses, consumable office supplies.  I don't

20   see that at all.  It's -- look, their own projections don't

21   show that.  Their own projections show the share in this

22   market will be single digits, low single digits, even by

23   their own projections.

24         THE COURT:  Adaptability was a word I think was

25   used by Mr. Wilson.  They're able to make the changes they

1    need to make.  Is that the change -- the barrier you

2    identified, the fact they rely upon third-party sellers, why

3    wouldn't they be able to adapt and make whatever change is

4    necessary?

5              THE WITNESS:  I thought about that.  I think

6    that's a very important question.  Remember, I said earlier

7    their business model is not focused on consumable office

8    supplies.  It's a small percentage.  Again, I don't know

9    quite what I'm able to say in open court here, but it's

10   small.  So they -- everything I've heard from Mr. Wilson,

11   you know, trying to play close attention to this, he's not

12   building this whole business model for consumable office

13   supplies, he's building it more generally, and the

14   third-party sellers is a very important -- it's a lot of

15   what they're about.

16             Their technology platform, a marketplace platform,

17   where they are trying to bring in people.  Ebay did that

18   very successfully, Amazon has done it increasingly here.  So

19   they're adaptable.  But there's nothing I've seen in the

20   record that would indicate that they would depart sharply

21   from their basic business model for one vertical, from their

22   point of view, for one set of products.

23             THE COURT:  Depart from something that's proven to

24   be extremely successful to what?  The unknown?

25             THE WITNESS:  Well, first off, it might seem risky

1    to them.  Second off -- again, I don't want to speculate,

2    certainly, but I think there's a reason -- they want a

3    uniformity, I guess.  If somebody comes and buys stuff, they

4    want to offer a whole range of stuff in a similar way with

5    these third-party sellers.  If nothing else, I think it

6    would be awkward, and I don't think it would work, really,

7    but it's for them to say, to have a different business model

8    where there are no third-party sellers and we have different

9    arrangements for consumable office supplies to large

10   businesses.  It's not the way they talk about their business.

11          Adaptable, yes, but I don't see any evidence

12   they're going to shift their fundamental business strategy

13   based on this slice.  Again, we're talking about here what

14   business strategies will change as a result of a 5 or

15   10 percent increase by Staples.  Whatever else they're doing

16   with that giant ship of theirs, wherever it's sailing, are

17   they going to change direction?  There's no indication of

18   that in the record.  Are they adaptable?  Yes, sure.  But

19   this doesn't seem to be the sort of tailored modification

20   that fits with how they want to do things.

21   BY MS. CERILLI:

22   Q.  Professor Shapiro, you mentioned having actual projected

23   sales from Amazon Business through 2017.  And I'll try to do

24   this in public by having you both refer to page 26 of your

25   report, both you and the Court, if the Court has it handy.

```
 1   A.  Yes.

 2   Q.  Sorry.  The reply report?

 3   A.  Oh, the reply report.  Okay.  I've got that.

 4   Q.  Okay.  And you'll see the third paragraph down that

 5   starts with "However"?

 6   A.  Okay.

 7   Q.  And I'll read the sentence, but I won't say the number.

 8   "A more recent document shows an estimated" blank "million

 9   in sales of consumable office supplies in 2017."

10          And that's for Amazon Business?

11   A.  Yes.  Correct.  And this is citing to the exhibit from

12   the Wilson deposition that we -- yes, that's correct.

13   Q.  And is the figure that we're looking at there -- I'll

14   wait for the Court.

15          THE COURT:  Go ahead.

16          MS. CERILLI:  Okay.

17   Q.  Is the figure that we're looking at on page 26 of your

18   reply report, are those sales of consumable office supplies

19   just to large customers?

20   A.  No, this is -- you could see the previous sentence says

21   "all products --"  well, "consumable office supplies to all

22   B2B customers."  Okay.  This is all B2B customers.

23   Q.  And do you have a sense of how much of those sales would

24   be in our market, in the market for large customers?

25   A.  Yes.  I've got a conversion factor there, the 38 percent
```

1    that we use in other parts.

2              MS. SULLIVAN:  Objection, Your Honor.  This is

3    exactly what they've tried about 30 times to circumvent this

4    Court's ruling.  This is what was undisclosed in the report,

5    the forecast.

6              THE COURT:  Why don't you come to the microphone?

7              MS. SULLIVAN:  This is the same issue, Your Honor.

8    I object as undisclosed, expert testimony extrapolating from

9    undisclosed opinion.

10   BY MS. CERILLI:

11   Q.  We're not seeking to do any new analysis, and so I'm not

12   going to even ask you to do a calculation.

13             My question is:  In light of Amazon Business's own

14   projected sales to 2017, is it your understanding that

15   Staples and Office Depot would still have a large share of

16   the relevant market?

17   A.  So we could take the ███ -- the number here, I'm sorry,

18   and in the relevant market it would correspond to a small

19   share.

20   Q.  Do these projected sales from Amazon Business through

21   2017 reflect adjustments in response to the merger?

22   A.  No.  So this is what their projections are, which I take

23   to be their --

24             THE COURT:  Just going forward?

25             THE WITNESS:  Going forward business plan, not

1    responding --

2            THE COURT:  Without a merger, right?

3            THE WITNESS:  Correct.

4            MS. CERILLI:  Your Honor, if we could go into

5    sidebar, just to speak in more detail.

6            THE COURT:  All right.  Sure.

7                        **CLOSED SESSION**

8    ████████████

9    █  ████████████████████████████████

10   ██████████████████████████████████

11   ███████████████████

12   █  ████████████████████████████████

13   ████████████████████████

14       ██████████████████████████████

15   █████████████████████████████████

16   █████████████████████████████

17   ████████████████████████████████████

18   █████████████████████████████████████

19   ████████████████████████████████████

20   ███████████████████████████

21   █  ████████████████████████████████

22   ██████████████████

23   █  █████████████████████████

24       ████████████████████████████████████████

25   ████████████████████████████



















1

2

3

4

5

6

7

8

9          **OPEN COURT**

10     BY MS. CERILLI:

11     Q.  Professor Shapiro, just to summarize for the public

12     session, what is your opinion concerning whether entry and

13     expansion by Amazon Business will be sufficient to replace

14     the competition loss from this merger?

15     A.  So, my summary is Amazon is an awesome company, but

16     they're not focused on this market.  And even if they grow

17     quite a bit in the relevant market, they're still going to

18     be very small compared with -- we have Office Depot today.

19     Q.  And Mr. Orszag has submitted a report coming to a

20     different conclusion, obviously, concerning Amazon and

21     Amazon Business.  Why do you think he reached a different

22     conclusion?

23     A.  Well, I generally think his analysis of entry is -- it's

24     more in the order of, well, they could do it, there's

25     nothing absolutely preventing them from doing it, so that --

1    again, I hate to put words in people's mouths, but I guess

2    I'm forced to here, that he seems to be thinking that that's --

3            THE COURT:  Well, just tell me why his expert

4    opinion is -- should not be persuasive.

5            THE WITNESS:  Okay.  I don't think he's looking

6    at -- he didn't tie together the projections here and relate

7    that to market share in the relevant market and to see, you

8    know, is that anywhere near the size of Office Depot?

9            And I don't think he or Professor Mendelson,

10   actually, who is the other expert on this point, really

11   confronted the fact that Amazon Business's -- their business

12   model is much more geared and their focus is much more

13   geared to small and medium businesses.  And there are real

14   problems for them, obstacles, anyhow, to serve large

15   businesses.

16           So I think, to go back to summarize, Mr. Orszag

17   has a -- is willing to take more of a chance that they might

18   do this, and that's good enough for him, and I don't think

19   addressed the reasons why Amazon is very successful in other

20   areas, it does not mean they will be successful in this

21   market.  And they face disadvantages in this market,

22   notwithstanding their awesomeness.

23   BY MS. CERILLI:

24   Q.  And, Professor Shapiro, defendants have also submitted

25   an expert report from Professor Mendelson that's specifically

1   focused on Amazon Business.  How do your views differ from

2   Professor Mendelson?

3   A.  Well, one of the things I put in my reply report, Your

4   Honor, was I looked at Mr. -- excuse me, Professor

5   Mendelson's summaries about Amazon's success in the past and

6   their capabilities.  And I said, you know, I pretty much

7   agree with these at a high level.  But it's not addressing

8   timely, likely, sufficient.  And it's not addressing impact

9   in the relevant market.

10          So I thought it was interesting, I learned

11  something from his report, but I didn't view it as really on

12  point for the type of entry analysis that is called for

13  under the standard framework in the merger guidelines.

14  Q.  Okay.  And what is it about Professor Mendelson's

15  analysis that you felt led him to a different conclusion?

16  A.  Well, I just think he was talking generally about

17  Amazon's capabilities and not drilling down on the issues we

18  talked about in the closed session, and more generally about

19  the -- Amazon's likely presence and likely success or

20  obstacles for serving large B2B customers without a

21  significant change in the business strategy.  Being

22  adaptable is one thing, but imagining a departure that is at

23  odds with what they've described that they're doing is quite

24  another.

25  Q.  So, Professor Shapiro, just to close the loop on entry

1     and expansion, can you just briefly summarize your views?

2     A.   Not enough.

3     Q.   Okay.

4            MS. CERILLI:  Your Honor, the last section that

5     we're going to be dealing with is efficiencies and the

6     proposed divestiture.  I'd expect this to be about 20, 25

7     minutes, if you'd like to continue proceeding.

8            THE COURT:  It's up to the court reporter.

9     BY MS. CERILLI:

10    Q.   Turning to efficiencies.  Professor Shapiro, can you

11    explain what role efficiencies play in evaluating a merger?

12    A.   If there are significant -- efficiencies hold out the

13    prospect of benefits to customers.  And since we're

14    interested in the customer's welfare, if there are large

15    efficiencies that qualify, that can -- that's a big plus for

16    the merger.

17    Q.   Okay.  And we're looking at the merger guidelines

18    framework for efficiencies.  Can you summarize what that

19    framework is?

20    A.   Yes.  And let me step back just for a moment, Your

21    Honor.  So once we finish the entry section, so now we said,

22    all right, we thought the merger was a problem and then we

23    looked, entry might help a bit, but not sufficient to

24    alleviate the problem.  Now we say, well, maybe there will

25    be enough efficiencies that the customers will benefit

1     anyhow.  Then there would be kind of a balancing; there's

2     some harm that we've identified, but then some benefits,

3     potentially, to the customers from the efficiencies, and we

4     have to do the balancing of a very nice scale there, so we

5     do the balancing.

6            But we only count certain types of efficiencies.

7     I think we are following the merger guidelines, which, as

8     usual, are meant to be keyed into case law, but I'm doing

9     this as an economist, of course.  So, there's some language

10    here.

11           And the main thing is merger specific -- there's

12    three items, and I highlight these in my report, three

13    hurdles or requirements that efficiencies have to meet in

14    order to properly be counted for this balancing purpose.

15    One is merger specific, verified, and then pass through to

16    customers.

17    Q.  Okay.  And what does it mean for an efficiency to be

18    merger specific?

19    A.  It means that the -- there's no way to achieve the

20    efficiencies, or most of them, in a manner, other than the

21    merger, that would not cause the harm -- the problems with

22    competition that we, at least so far, concluded in the

23    analysis that the merger would cause.

24           So you -- that is to say merger-specific means

25    there's efficiencies created by the merger and there's

1    really no other way to get them.

2    Q.   Okay.  And what does it mean for efficiencies to be

3    verifiable?

4    A.   This is a very practical standard.  The fact is,

5    companies -- it's hard for us to know, for me as an analyst,

6    for you as the Court to know which efficiencies will be

7    actually achieved in one year, two years, three years.  And

8    even companies that, you know, hope to achieve efficiencies,

9    they may not succeed.

10          So, it really means well documented, convincing in

11   the sense that they're not just wished for, they're not

12   speculative, that they're well documented and can be

13   checked, that it's not just, you know, a bare allegation or,

14   you know, a hope on the part of the companies.  So it's

15   really a matter of documentation and proof.

16   Q.   Okay.  And what does it mean for an efficiency to result

17   from an anti-competitive effect?

18   A.   Oh, so some efficiencies don't count.  If you have two

19   stores and you're competing and you close one and you save

20   some money, but that's not going to count because that's

21   part and parcel of the lack of competition.  So -- but to

22   that we would tend to set those aside as not counting, not

23   in this framework.

24   Q.   Okay.  And what is your understanding of whether

25   defendants' claimed efficiencies are merger specific and

1    verifiable?

2    A.  Well, defendants are certainly claiming they are, and

3    substantially so.  The FTC's expert has looked at that and

4    disagrees, so we've got a -- you know, experts on both

5    sides.  I'm not wading into that, I've got enough to do.

6           So, I understand defense -- Staples and Office

7    Depot are claiming significant merger-specific efficiencies,

8    but it's disputed.

9    Q.  Okay.  And even assuming that defendants' claimed

10   efficiencies were merger specific and verifiable, did you

11   analyze the likelihood of those claimed efficiencies being

12   passed through to large customers?

13   A.  I did look at that.  And I talked about that, I think,

14   in, certainly, my first report.  I'm skeptical that the

15   efficiencies -- let's assume now they achieve these and

16   they're merger specific and they otherwise qualify.  The

17   piece that still needs to be dealt with is would they get

18   passed through to customers?  Because ultimately we're

19   interested in the customers, here the large customers.

20          And I'm not really seeing why there would be much

21   pass through, that is to say, why would Staples want to

22   lower prices to their large customers when they're not

23   facing competition from Office Depot?  Even if they're --

24   let's say the costs of goods sold were a bit lower because

25   of further scale increases, the only reason to lower a price

1    would be to sell more stuff to these customers.  And they're

2    going to have almost all these customers already after the

3    merger and they're not going to have the same incentive to

4    give them these up-front payments.  So I don't see why they

5    would do much pass through.  I'm skeptical of that, that

6    there will be much pass through.  So, I -- that's my answer,

7    yeah.

8    Q.  I mean, what -- can you explain a little bit further?

9    Why wouldn't they be -- why wouldn't competitors give them

10   the incentive to pass through those efficiencies to large

11   customers?

12   A.  So, look, generally economists think -- this came up

13   yesterday, actually.  A lot of the times we think if firms

14   have lower costs, they'll pass them through to some degree.

15   I was talking about how AEP, if they have higher costs, they

16   might pass it through, in office supplies, they might pass

17   it through electricity prices.  Okay.

18        So we generally think there's some pass through,

19   but it can be very low -- the percentage that gets passed

20   through varies a lot from one market to another, one company

21   to another.

22        The reason the companies pass through their costs

23   when they have lower costs is to sell more stuff, to get

24   more customers.  And here I'm not seeing a lot of incentive

25   for Staples to do that.

1          MS. SULLIVAN:  Your Honor, I'm going to object and

2    move to strike.  This is the issue that Your Honor struck

3    yesterday because it's not in your complaint.  And the FTC

4    told the Court that they were not going to pursue this

5    theory at all.  This is the third time they tried to get it

6    from the expert.  And I move to strike.

7          MS. CERILLI:  I think there's a fundamental

8    misunderstanding here.  The discussion yesterday was about

9    whether the large customers would pass through any price

10   increase they receive from the merged firm to their

11   customers.  What we're talking about here is whether the

12   merged Staples, even if it achieves efficiencies, is going

13   to pass those savings on to large customers, the large

14   customers that we say are going to be harmed here.  That is

15   directly addressed in the efficiency section of Mr. -- of

16   Professor Shapiro's report.

17         MS. SULLIVAN:  I object, Your Honor.  This trickle

18   down issue has been -- by the FTC has been taken off the

19   table in this case.

20         THE COURT:  Right.  All right.  The objection is

21   noted.  I'm interested in the answer.  Whether I rely on it

22   or not is -- I'll resolve that later.  And if I rely on it,

23   I'll give you reasons why I rely on it.  But I'm interested

24   in it, it's non-jury.  And at some point I'm going to rely

25   upon only the competent, appropriate evidence in the case.

1          Over objection, I want to hear the answers.

2          THE WITNESS:  So, just to set the stage where

3     we're at.  The question in this part of efficiency analysis

4     is if Staples and Office Depot -- let's suppose they can buy

5     pens more cheaply because they're now even bigger, and

6     Mr. Anderson, their efficiency expert, says they will be

7     able to do that.  Will they charge Bank of America less for

8     pens?  That's what we're asking one of our customer.  And

9     this is absolutely addressed on page 52 of my first report.

10          The -- what I'm saying -- I said generally some

11    costs get passed through, some costs they don't, just as a

12    general principle.  Here I don't expect there to be much

13    pass through from what I've seen because Staples will -- the

14    reason to pass through the lower pen cost to Bank of America

15    is if they think they can sell more pens to Bank of America,

16    otherwise why? there's no good reason to do it.

17          One reason might be that they would fear that they

18    would lose Bank of America as a customer if they don't do

19    that.  That seems much less of a concern after the merger

20    for the very reason we talked about.

21          Another would be maybe Bank of America will use

22    more pens if they give them a little bit lower price.  And

23    again, the evidence -- there's no evidence that that sort

24    off elasticity or response is very significant here in

25    driving prices.  So I don't think -- I'm not saying zero

1    pass through, it just seems to be there's reasons to believe

2    it's low.  So even if they achieve the efficiencies they

3    claim, will customers really see much of that?  I'm skeptical.

4    BY MS. CERILLI:

5    Q.  Just so the record is clear, the pass through that you

6    were referring to in your answer right there is whether

7    defendants will pass through their claimed efficiencies to

8    their customers, correct?

9    A.  Yes, whether Staples, if they pay less for pens because

10   they're even bigger after the merger, will lower the price

11   of pens to Bank of America or McDonald's and other large

12   customers.

13   Q.  Okay.  Now, are you aware that defendants have put forth

14   an efficiencies expert?

15   A.  Yes, I mentioned him a moment ago.

16   Q.  And I believe defendant's expert, Mr. Anderson, has

17   claimed that in his opinion approximately 415 million of the

18   defendant's claimed efficiencies are merger specific

19   variable cost savings; is that correct?

20   A.  Yes, that sounds right.

21   Q.  Okay.  And even if you accepted Mr. Anderson's

22   conclusions, would that change your view that the merger is

23   likely to be anti-competitive?

24   A.  So, no, not based on that number as -- alone.

25            So, the -- if we figure out which of those would

1    apply to large customers and then apply a 15 percent pass

2    through, that is something that Mr. Orszag mentions in his

3    report as a number to use, if we apply that pass through

4    rate to this efficiency rate for large customers, that's

5    still less than the harm estimate that I -- or, actually,

6    the lower bound of harm that I -- remember I talked about a

7    6 percent price increase?  And that would be on the roughly

8    $1.8 billion that Staples and Office Depot are charging or

9    selling to large customers now.

10          So if you do the balancing with a 6 percent, which

11   I think -- the harm side would be 6 percent, 100 millionish,

12   that's more than the pass through of these efficiencies,

13   using the defendant's numbers, their expert's numbers.

14          Frankly, I think the whole thing is a little bit

15   rough and ready, both sides, you know.  But that's what we

16   can do.  And that's what I can do with the record.  So, no,

17   it would not tip the balance if you use their numbers.

18   Q.  And so to sum up, you had talked about competitive

19   effects, entry and expansion and efficiencies.  So taking

20   into account efficiencies, what is your view concerning the

21   effects of the merger?

22   A.  So, you can see where this is going.  So when you finish

23   that step, finally, the efficiencies are -- even if proven,

24   don't seem to be enough to offset anti-competitive harm.  So

25   we're going to see -- expect to see customer harm as a

1    result, which is where this inquiry has been going.  So

2    that -- on that basis the merger, you know, is problematic.

3    Q.  Okay.  Professor Shapiro, I believe efficiencies were

4    kind of the last step in the formal merger guidelines

5    analysis.  But, as you know, defendants have put forth a

6    proposed divestiture here.  Are you familiar with

7    defendant's proposed divestiture, proposed remedy in this

8    case?

9    A.  Yes, I am.

10   Q.  Can you briefly describe it?

11   A.  Well, this involves a divestiture of a significant

12   volume of sales revenues that are tier 1 suppliers to

13   Essendant, along with -- so there's an asset purchase

14   agreement and then some transition services that would be

15   worked out so that Essendant would be backing up these tier

16   1 suppliers.  And then the concept, the idea is that could

17   they then again compete against Staples after the merger in

18   that new structure?

19   Q.  Do you have an opinion whether that proposed remedy

20   would address the competitive concerns you've been outlining?

21   A.  Well, I find it quite unconvincing.  I think my view is

22   quite strongly negative, but perhaps not quite as strong as

23   Mr. Morrison's.  The -- when I think about remedies, and

24   I've worked with companies on fashioning these things, of

25   course we've dealt with it at DOJ, you're looking to replace

1    the competition that's lost.  So, you know, that's the goal.

2    And in every other case I can think of that involved a

3    divestiture -- well, a horizontal merger, let's talk about,

4    okay.  A divestiture either to create a spinoff or

5    significant entity that would be a competitor or to beef up

6    some other company that's already in the market.

7          In the GE/Alstom merger, those big gas turbines,

8    GE agreed to divest a significant part of the business to

9    the third and fourth firm in the industry so they would be

10   stronger, with more technology and so forth.  So they took a

11   smaller player, sold them a lot of assets, they could

12   replace the lost competition.

13         Here Essendant is not even going to be a

14   participant in the open market, they're going to be upstream

15   as a wholesaler.  I am not seeing this.  It does not work

16   for me.

17   Q.  Okay.  Can you talk us through the -- why you think it

18   does not work to replace the lost competition from Office

19   Depot?

20   A.  Well, I guess we have to ask ourselves:  After the

21   merger closes, Staples is in there bidding for a large

22   customer, Fifth Third Bank, AP, you name it, what's going to

23   happen?  Who's going to step up and really compete against

24   them?  The diversity suppliers, they -- I'm relying on Mr.

25   Morrison and others here, you know, they can't do that alone.

```
1              The fact that they have Essendant backing them up
2     doesn't mean they can look anything like Office Depot in
3     terms of their ability to compete independent -- you know,
4     without the help they've had from Staples or Office Depot.
5              I just -- and then Essendant is going to be very
6     heavily reliant on Staples for a long time to come; partly
7     their financial entanglement, you know, and Staples is a big
8     customer of theirs.  But more so, just for all these
9     technical services.  And that is not clean at all in terms
10    of divestiture, not at all.
11    Q.  I'm sorry, can you elaborate?  What do you mean by
12    saying Essendant is going to be dependent on Staples?
13    A.  Well, my understanding is they would put in place or are
14    working on, perhaps, a long-term transition services
15    agreement.  There are a lot of capabilities that Essendant
16    just does not have.  Again, Mr. Morrison was crystal clear
17    on this.  He seems to know them pretty well, Essendant.
18    And, as I understand the concept behind the divestiture,
19    Staples will be providing a lot of assistance, support, so
20    that Essendant does have more capabilities to back up the
21    tier 1 suppliers.
22             But that generally makes me very uneasy because
23    now the firm that's supposed to step in and compete,
24    Essendant, you know, partnered with a distributor is heavily
25    reliant on Staples.  And that's unhealthy from a point of
```

1    view of competition.

2    Q.  How so?

3    A.  Well, you know, it's one of these things where if

4    Staples is -- as far as I can tell -- again, I don't --

5    look, they don't welcome this competition.  So they've got a

6    competitor who is supposedly going to be a critical

7    competitor replacing Office Depot who is going to need to be

8    coming to them for all sorts of things.  How cooperative are

9    they going to be?  Okay.  They can write a contract, they

10   can put a lot of stuff in there, but I -- you know, it goes

11   to my view about regulating the industry.  I -- I don't

12   think we should be counting on a contract here to enable a

13   competitor -- I want competitors to have their own assets

14   and capabilities so they can really go after each other the

15   way Office Depot and Staples do today.

16          So, look, I'm not going to be an expert on those

17   business arrangements.  I'm sure they'll run circles around

18   me on it.  But structurally I consider that a dubious

19   arrangement.

20   Q.  Okay.  And you also mentioned Staples is a large

21   customer of Essendant.  Why does that matter?

22   A.  Well, it raises the question whether -- you know, if

23   they're going to compete and win business against Staples,

24   they might be disinclined to do that because of the other

25   business relationship.  That's secondary, in my view.  I

1    mean, the primary thing is they're not -- we're not creating

2    an independent competitor.  Then we got these additional

3    entanglements, which could cause an additional problem.

4    Q.  Okay.  And I believe you covered them all, but we had a

5    slide summarizing, slide 81.  Is there anything else you

6    wanted to address?  And, if not, would you like to just

7    summarize your views on whether the proposed remedy to

8    Essendant is likely to remedy the harm?

9    A.  No.  I think we've covered it.  So slide 81 lists those,

10   but we've covered it.

11   Q.  Great.  Awesome.  Professor Shapiro, I think we've

12   reached the conclusion.  So, in closing, can you summarize

13   your opinion concerning the proposed transaction?

14   A.  Slide 82 goes through the summary of the steps, I think

15   the Judge gets it.  And it might be more useful to have a

16   break than have me repeat it.

17            THE COURT:  We'll take a ten-minute recess.

18            Let's talk about planning for the evening.  And

19   again, I'm not trying to curtail your examination.  How much

20   time do you need?  And will we need the witness to come back

21   on Monday?

22            MS. SULLIVAN:  Yes, Your Honor.  I was hoping to

23   get him earlier than this.  But I think he'll have to come

24   back on Monday.

25            THE COURT:  What's -- what time?  What's an

1     appropriate time to break?  I mean, you know, you've

2     structured your examination, what's an appropriate time?

3          MS. SULLIVAN:  There's sections, Your Honor, so

4     it's certainly up to Your Honor, but I --

5          THE COURT:  There's flexibility.  I recognize the

6     time sensitivity of this case, so whatever you want to do

7     that's reasonable will be fine.

8          MS. SULLIVAN:  Okay, Your Honor.  I'll work

9     through and then I'll check in with the Court after I finish

10    the first section and see where we are.

11         THE COURT:  Let's take a ten-minute recess.

12         MS. SULLIVAN:  Thank you.

13         (Recess.)

14         THE COURT:  All right, Counsel.

15         MS. SULLIVAN:  Thank you, Your Honor.  And, Your

16    Honor, I hope it's okay with the Court that we propped some

17    things up.

18         THE COURT:  Sure.

19                    CROSS-EXAMINATION

20    BY MS. SULLIVAN:

21    Q.  Good afternoon, Dr. Shapiro.

22         Dr. Shapiro, you talked a bunch about your

23    credentials and background yesterday, and it sounds like

24    you've been involved in some significant cases and matters,

25    but you haven't been involved, before this case, in the

1    office supply business, true?

2    A.  True.

3    Q.  And in fact, you have never worked on a case or

4    investigation or matter involving the sale of office

5    supplies before this case, true?

6    A.  That's correct.

7    Q.  And you don't hold yourself out as an expert in the area

8    of office supply industry?

9    A.  I'm an expert on economics and I analyzed the office

10   supply merger here.

11   Q.  My question, sir, is:  You don't hold yourself out as an

12   expert in the office supply industry?

13   A.  I have the same answer.  I'm an expert in analyzing the

14   industry.  I'm not a participant in the industry, if that's

15   what you mean.

16   Q.  One of the things before you issued your expert report

17   and opinions in this case that you did not do is interview

18   any participants in the office supply business.  You didn't

19   interview any customers, any competitors, etcetera, right?

20   A.  I relied on declarations and extensive other materials

21   that are described in a long list of relied-upon materials,

22   but no interviews, that's correct.

23   Q.  And, Dr. Shapiro, you relied on, for the basis of your

24   opinions and analysis, on what the FTC gave you?

25   A.  Well, I guess that's correct, in the sense that that was

1    my source of information.  All the discovery materials that

2    were obtained and investigative materials prior to

3    litigation I did get through FTC's counsel, that's correct.

4    Q.  But you didn't do any independent investigation of your

5    own?  You would rely on what the FTC gave you?

6    A.  No, that's not correct.

7    Q.  Well, you didn't interview any customers, any

8    businesses, didn't talk to Amazon Business, didn't talk to

9    Mason, didn't talk to any individual business-to-business

10   customers?  You didn't even talk to your own procurement

11   department, right?

12   A.  Well, I already explained that I'm relying on extensive

13   documentary evidence.  I already indicated I didn't

14   interview people.  But your previous suggestion that I just

15   took what the FTC gave me is incorrect.

16   Q.  And, Dr. Shapiro, you would agree that sometimes what

17   you are not given, what you don't see is as important or

18   more important than what you do, right?

19   A.  Since I used to have teenage kids, I would have to agree

20   with that, but --

21   Q.  I understand.  Believe me, I understand, sir.

22   A.  I -- this is always the case in my line of work as a

23   consultant.  I indicate what I'm interested in.  There's

24   quite an impressive, in many ways, discovery process to get

25   confidential information.  And sometimes you don't get

1    everything you want because companies don't give it.  But I

2    was very clear with my staff and then, indirectly then --

3    directly with the FTC attorneys and economists, what lines

4    of inquiry I was interested in pursuing.  And we got plenty

5    of information to support my opinion, as far as I'm concerned.

6    Q.  And, Dr. Shapiro, you mentioned on a couple of occasions

7    in your testimony and your report a buying group, a purchasing

8    group called Trimega, right, sir?

9    A.  Yes, I'm aware of Trimega.

10   Q.  You mentioned that you reviewed Trimega's declaration in

11   this case?

12   A.  That's one of the materials I relied upon, I believe

13   that's correct.

14   Q.  One of the things that the government lawyers did not

15   provide to you were draft declarations of the business

16   customers in this case before you issued your report, correct?

17   A.  I don't think I saw draft declarations, no.  I saw the

18   final ones, that's correct.

19   Q.  They didn't give you those, right?

20   A.  That's correct.

21   Q.  They also didn't give you, sir, e-mail communications

22   between customers and the FTC about those draft declarations,

23   did they, sir?

24   A.  I'm a little unclear on what might be privileged here,

25   so I'm not sure.

1      Q.  Well, did you see -- for example, did you see -- you

2      didn't cite in your report, did you see the e-mail

3      communication between the FTC and Trimega about their draft

4      declaration?

5      A.  That's not the sort of material I generally looked at.

6      I was looking at evidence in the record and other things

7      that I could glean from data and so forth; not drafts, no.

8      Q.  You weren't provided those, correct?

9      A.  I think I already answered that.  That's correct.

10     Q.  And you testified, Dr. Shapiro, that in your view

11     Trimega's efforts to be a competitor with Staples and Office

12     Depot has been, quote, an utter failure, right?  Those were

13     your words?

14     A.  Did I say utter failure?  I think they were a failure.

15     Q.  You based that on the declaration that you were provided

16     by the FTC, correct?

17     A.  In part.  I'm also looking at market shares.  I'm

18     looking at a whole range of evidence, and they're not

19     appearing in the market shares to any significant extent.

20     So I'm relying on a number of sources, including the

21     declaration, yes.

22     Q.  Let's take a look at Defense Exhibit 4171, and that is,

23     I believe, tab 98 of the binder, the two binders that you've

24     been provided, Dr. Shapiro.

25              MS. SULLIVAN:  And, Mark, if I could have the Elmo?

```
 1              THE COURTROOM DEPUTY:  Sure.

 2   A.  What tab did you say this is?

 3   BY MS. SULLIVAN:

 4   Q.  98, sir.

 5   A.  Okay.  Okay, I've got it.  I'm there.

 6   Q.  Do you see at the bottom, this is a document from the

 7   FTC, the FTC production number?

 8   A.  I see the FTC production number at the bottom.

 9   Q.  And do you see, sir, that this is an e-mail from Mike

10   Maggio at Trimega to the FTC, a lawyer at the FTC; do you

11   see that?

12   A.  I do.

13   Q.  And it's dated October 4, 2015?

14   A.  Yes, I see that.

15   Q.  Do you see that the Trimega gentleman tells the FTC,

16   speaking about the draft declaration that the FTC wrote,

17   "Well, reading it certainly gives a different perspective

18   than having it read to you.  While these are my words, you

19   left out quite a bit of my comments that indicate we are not

20   as hapless as this narrative makes us appear.  This makes us

21   seem totally ineffective against Staples, which, if you

22   include all that I said, I think clearly states that we are

23   not.

24              "A few things I would like included:  Our official

25   position is that the acquisition is good for independent
```

1    dealers, based on our belief that one less competitor is a

2    good thing."  Do you see that, sir?

3    A.  I do.  That's interesting.

4    Q.  Do you see the second -- I see you brought your

5    audience, that's good, Dr. Shapiro.

6          Do you see the second bullet, sir, where it says

7    "We have national coverage that surpasses Staples, but we

8    have not collaborated effectively enough to date," and he

9    underlines to date, "to leverage it."

10         Do you see that, sir?

11   A.  I do.

12   Q.  So you see the third bullet "Our largest challenges when

13   competing with Staples are pre-bates, perception, and

14   experience."  And then he goes on to say "And that while

15   price is an issue, it is one that we overcome daily when

16   competing with Staples on a local and regional level."

17         Do you see that, sir?

18   A.  I do.

19   Q.  And that was information that you were not provided by

20   the FTC, correct, sir?

21   A.  So this is not familiar to me to look at it.  We can

22   check to see whether it's the documents relied upon.  It's

23   perfectly consistent with what I've seen.  I'm not surprised

24   by anything here.  But I can't tell you that I've seen it or

25   it was provided to me until I -- without going back and look --

 1    excuse me -- going back and checking my documents-relied-upon

 2    list.

 3    Q.  Mr. Maggio at Trimega told the FTC that they were making

 4    him seem totally ineffective and that that was not the

 5    truth, right?

 6    A.  Well, the words speak for themselves.

 7    Q.  Fair enough.

 8    A.  I'm not sure what you want me to say.  For example,

 9    national coverage.  This is a good example, I think.

10    National coverage, they've got members all around the

11    country.  But that is not something that the large customers

12    have indicated that they're interested in, and that's why

13    they don't appear at all or in any significant way in my

14    primary vendor relationship chart, for example.

15    Q.  Dr. Shapiro, Mr. Maggio at Trimega tells the FTC that

16    their draft affidavit, the words they wanted him to say, in

17    effect, that Trimega was ineffective, totally ineffective

18    against Staples, was not the truth.  That's what he tells

19    him, right?

20    A.  I don't think it's my expertise to interpret his words.

21    This has nothing to do with me, so far as I know.

22    Q.  But in any event, sir, we know they gave you their

23    declaration, but they didn't give you Mr. Maggio's e-mail,

24    did they, sir, the FTC?

25    A.  Again, I would have to look at my list of documents

1   relied upon.

2   Q.  It's not there, sir.

3   A.  We can go look at it, if you want.  As a general

4   practice, I would say I asked for -- I mean, this type of

5   situation, declarations, often it takes a while for

6   declarations to be developed, and I don't insert myself in

7   that process except to generally let my staff or the FTC

8   know what questions I'm interested in, what market

9   participants I would like to hear from.  And then once it's

10  actually a signed declaration, that's something I can rely

11  on.  I don't generally insert myself at this stage.

12          You're correct, your representation is correct,

13  that this was not given to me, so I'm agreeing with you.

14  Q.  Wouldn't you like to have known that Trimega themselves

15  thinks that they can compete against Staples, and they do it

16  daily?

17  A.  I would like to know what Trimega thinks and that's why

18  I look at the declaration.  Why don't we look at the

19  declaration?

20  Q.  Let's turn to the one that was written by the FTC.

21  A.  I usually attribute a declaration to the person who

22  signs it, but if you have a different approach, then we can

23  talk about it.

24  Q.  We can move on.  But, Dr. Shapiro, they didn't give you

25  any of the draft declarations, they didn't give you any of

1    the e-mails from the customers, they just gave you what they

2    wanted to give you, true?

3    A.   No, that's false.   They did not give me just what they

4    wanted to give me because --

5              THE COURT:   I don't think he can answer that

6    question, what they wanted.   I mean, I think it's clear.

7              You didn't see an e-mail, right?

8              THE WITNESS:   I didn't see the e-mail.   I guess,

9    partly protecting my integrity, frankly, I don't have any

10   clients that can feed me what they want to pick.   I tell

11   them what I'm interested in.   And I've never had a client

12   hide stuff from me, that I'm aware of, okay.   And I don't

13   think that happened here.   But the notion that I am --

14             THE COURT:   That document, had you known that

15   document existed, though, I assume you would have wanted to

16   see the document.   Or not?   Maybe not, I don't know.

17             THE WITNESS:   You know, not much, really.   Look,

18   the fact is there's a lot of back and forth.   People say no,

19   that's not right in the declaration; oh, I don't like the

20   way it came out.   In the end I want to see what their sworn

21   testimony is, really.   And other -- no -- I mean, I often

22   want to see the ordinary course of business documents

23   because people tilt things, depending how it suits them.

24   You might know that as a judge.   But this sort of thing is

25   not really my style, no.

 1    BY MS. SULLIVAN:

 2    Q.  Dr. Shapiro, when were you first contacted by the FTC

 3    about this case?

 4    A.  I believe it was February, perhaps March of 2015.

 5    Q.  2015.  Were you involved in the investigation then, sir?

 6    A.  Well, yes, I had been retained so I was -- my staff and

 7    I were involved in that sense, yes.

 8    Q.  So you assisted the FTC as part of the investigation of

 9    the merger here?

10    A.  I don't use that word.  I guess -- let me use my own

11    words.  I may not be disagreeing.  I was retained, I was

12    asked to look at this, and I -- Charles River Associates, we

13    got involved as well.  We were retained as a company, that's

14    how we often do these things.  And then I basically waited

15    to know -- to see when the FTC feels they were ready to ask

16    me questions.  I had feedback.  It was kind of a slow

17    process initially.

18         I don't -- anyhow, that's my description of it.  I

19    guess I wouldn't say I assisted them so much as they wanted

20    me to begin developing an opinion, so I did so.  Let me put

21    it that way.

22    Q.  And, Dr. Shapiro, I want to talk a little bit -- so you

23    talked some on your direct exam about your target customers

24    that you're concerned about and the relevant product market.

25    And I want to talk to you about both those things, if I

1    could.

2              First, I want to show a demonstrative, with the

3    Court's permission, Defense Exhibit -- Demonstrative Exhibit

4    100, and it's an excerpt of your report, Dr. Shapiro.

5              Do you see it, sir, on the screen?

6    A.  It's flashing still.

7    Q.  It's also in your binder, if you want, in the beginning

8    of Volume 1, under the exhibit number?

9    A.  I'm sorry, it's from what document?

10   Q.  This is from your expert report.

11   A.  Okay.  I have that separately anyhow.  Go ahead.

12   Q.  And, Doctor, you wrote in your report that the adverse

13   competitive effect of concern -- here, I can give you a copy.

14             MS. CERILLI:  I would just ask that you refer to

15   him -- refer him to where this sentence in this report is.

16             MS. SULLIVAN:  On page 10.

17             MS. CERILLI:  Thank you.

18             THE COURT:  Just a minute, Counsel.  We're trying

19   to accommodate the witness.

20             THE WITNESS:  Thank you.

21             I can read hers, rather than hold everybody up, if

22   you want.

23             THE COURTROOM DEPUTY:  I think I got it.

24             THE WITNESS:  I'm just going to read hers.

25   BY MS. SULLIVAN:

1   Q.  Doctor, it's on page 10 of your original report, if

2   that's easier.

3   A.  Okay.

4   Q.  Doctor, looking at your report, you wrote that "The

5   adverse competitive effects of concern is that the merger

6   will cause prices paid by large customers to rise, even if

7   the merger does not cause prices paid by small businesses

8   and retail customers to rise."

9           That's your concern, right, sir?

10  A.  That's correct.  That quote is correct.

11  Q.  And, Doctor, we can talk about these numbers, but some

12  of these numbers we took from your report, some from Dr.

13  Orszag, and, at least according to your deposition, you're

14  in rough agreement that this represents all of the retail

15  customers of Office Depot and Staples and you have no

16  concerns, and have expressed none in your report, about the

17  merger's effect on this group of customers, right, sir?

18  A.  That's correct.

19  Q.  And I understand your report and the FTC's case here.

20  You've also expressed no concern about the effects of the

21  merger on the large majority of business-to-business

22  customers of these companies, correct?

23  A.  No, that's not correct.

24  Q.  Okay.  You have done -- so let's start with the retail

25  customers.  There was some discussion about trickle down

1    effects and impact.  The truth is, you've done no analysis

2    of the merger's effect on retail customers, correct?

3    A.  Trickle down did not have anything to do with retail

4    customers, it was about the indirect customers, which is to

5    say, the customers of Staples, large customers.

6    Q.  But can you answer my question, sir, it's true you have

7    done no analysis about the impact of the merger on the

8    retail customers?

9    A.  Well, your question was about trickle down, so that's

10   why I was answering about it.  I find it confusing.

11   Q.  My apologies.  You have done no analysis about the

12   merger's effect on the broad majority of the company's

13   customers, the retail customers, right?

14   A.  No, that's false as well.

15   Q.  Okay.  You have -- the area that you're concerned about,

16   you've done no efficiencies analysis, correct?

17   A.  Oh, there's a separate expert who's handling efficiencies.

18   Q.  Yeah, yeah.  So on the issue of whether or not this

19   merger is going to be good for retail customers, you have

20   not done that analysis?

21   A.  That's correct.

22   Q.  Okay.  And, in fact, in your direct exam you acknowledge

23   they very well may benefit from this merger if Staples makes

24   good on its promise to reduce prices because of the

25   synergies, correct?

1    A.  Well, if Staples lowers prices to retail customers, I

2    would -- I would assume that's a benefit to them.  I don't

3    know if that's going to happen.

4    Q.  Yes.  But in your view and the FTC's view -- and just to

5    step back, we've got an army of government lawyers, a lot of

6    money, we've got a high-priced expert.  And it's the

7    government's position and your position that even if the

8    merger is really good for all of these retail customers,

9    this Court should block it because of the effects on the

10   very small top companies in the world, right?

11   A.  No, that's incorrect as well.

12   Q.  Your statement in your report, Doctor, is that the

13   adverse competitive effect of concern is that the merger

14   will cause prices paid by large customers to rise.  That's

15   the target customer base you're concerned about here?

16   A.  Correct.

17   Q.  Okay.  And that makes up, according to you, approximately

18   1100 or 1200 large business customers, right?

19   A.  Yes, that's right.

20   Q.  Okay.  So, and you know -- but even though you know that

21   Staples and Office Depot have about 400,000 business-to-

22   business customers, right?

23   A.  I don't know that number as I sit here.  I'm much more

24   focused on the revenue measures, rather than counting by

25   number of customers.  So I would tend to look at the

1    $1.8 billion figure you have up there, which I believe is

2    Office Depot and Staples sales of consumer office --

3    consumable office supplies to large customers in the target

4    market.

5    Q.   Yeah, that's your number, that 6.4 percent, right?  It's

6    in your report?

7    A.   That's correct.

8    Q.   Yeah.  And so just so we get orientated in terms of

9    customer numbers, you did a market share calculation based

10   on only the Fortune 100, correct?

11   A.   Well, that's the -- there's two calculations I did, the

12   Fortune 100 and the primary vendor shares.  The Fortune 100

13   number, which is my -- what I'm putting forward to the Court

14   as my market share is based on the Fortune 100 sample, or

15   proxy, with 81 of the 100 -- based on data from 81 that I

16   talked about.

17   Q.   Yes.  And you mention a primary vendor, but when

18   government counsel was talking with you about it, you said

19   we shouldn't call the primary vendor analysis a market share

20   calculation, correct?

21   A.   Yes, that's what I said.

22   Q.   Because it's not?

23   A.   I mean, it could be, but I have a better measure.

24   Q.   Yeah.  Okay.  So just sticking about -- you know, talk a

25   lot about shares and market share, just sticking with the

1    issue of market share, the only real market share analysis

2    you did was on the Fortune 100, correct?

3    A.   No, you're not -- let me make myself clear.  I have two

4    measures of share.  I put forward one as superior to the

5    Court, which is the Fortune 100, and I explained why.

6         I have another measure of share -- the fact is,

7    there was a point in time where I didn't know which one I

8    was going to use, because the Fortune 100 was a huge amount

9    of work.  I didn't know if it would come home, we'd get

10   enough responses.  I'm saying I have two measures of share,

11   one is better than the other in the end, so that's the one I

12   put forward to the Court.  The other is also very informative.

13   Q.   It's informative, but you said we shouldn't call that

14   one a market share.  Those are your words.

15   A.   Right, because we have something that's better.

16   Q.   Fair enough.  Fair enough.

17   A.   But you're suggesting it's unusable and doesn't give us

18   information about shares, and I'm just saying that's not my

19   opinion.

20   Q.   And I don't mean to quibble, but just to use your words,

21   the one you're relying on, the one you put forward to the

22   Court to rely on in this case is your market share analysis

23   for the Fortune 100?

24   A.   Correct.

25   Q.   Okay.  And then, actually, we know that that market

1   share analysis isn't really the Fortune 100, right, it's the

2   Fortune 81?

3   A.  Well, there are 81 companies whose data we are able to

4   use.  And then we talked about the other 19.

5   Q.  Okay.

6   A.  But the survey, if you want to call it that, is of 100

7   companies.

8   Q.  Yeah, but you only included 81 in your market share

9   calculation, correct?

10  A.  That's correct.

11  Q.  Okay.  And we're going to talk about the 19 you threw

12  out and the reasons why, but let's stick to this.

13          And then in terms of large business-to-business

14  customers, your 6.4 percent of revenue, approximately 1100

15  or 1200, according to you and Dr. Orszag, right, customers?

16  A.  Large customers in the target market, that's correct.

17  Q.  So 1100 or 12 -- I think you said 12, so let me use 12.

18  So we have -- so that's -- this is your target market,

19  right, these 1200 customers?

20  A.  Yes, that's right.

21  Q.  And -- but you didn't -- and just so we're clear, there

22  are a lot more business-to-business customers for Staples,

23  Office Depot, Mason and others than these 1200, there's

24  hundreds of thousands of them, right?

25  A.  There are many more small and medium businesses,

1    absolutely.

2    Q.  And large that didn't meet your 500,000 threshold,

3    right?

4    A.  Well, you want to bring in a different definition of

5    large, then we can talk about that.  This is the definition

6    of large I'm using and that's the count.

7    Q.  I don't mean to quibble.

8    A.  Really?

9    Q.  The truth is, Dr. Shapiro, that there are hundreds of

10   thousands of business-to-business customers serviced by

11   Staples, Office Depot and Mason that make up about 37 percent

12   of these companies' combined revenue?

13   A.  I agree, the B2B channel makes up -- my calculation I

14   think was 38 percent, very close to what you've got there,

15   38 percent of their overall revenue.  I don't know -- have a

16   count of how many B2B customers there are.  Those are going

17   to be a lot of very small businesses, of course.  But if

18   you're telling me it's 400,000, I'll accept that.

19   Q.  Well, it's 400,000 between Staples and Office Depot.

20   And if you read Mr. Meester's testimony, he said Mason has

21   about 200,000, right?

22   A.  I don't remember that part of it.

23   Q.  But we can agree that business-to-business customer base

24   is 400,000-plus, you don't dispute that?

25   A.  Again, we could check it in the documentation.

1    Q.  Yes.

2    A.  But if you want to represent it, I'm following you.

3    Q.  You have no basis -- you saw that in Dr. Orszag's

4    report.  You have no basis to dispute it, sir?

5    A.  I'm just telling you I don't have that number in my head.

6    Q.  Okay.  Fair enough.

7    A.  So we can go either one of two ways --

8    Q.  Fair enough.

9    A.  -- either, you know, I take your representation or we go

10   look somewhere to see it.  I'll do whichever one you want.

11   Q.  Fair enough.  But the point is, sir, that you did a

12   market share calculation based on 81 of these business-to-

13   business customers, right?  81 of these 37 percent, hundreds

14   of thousands of customers, you did a market share calculation

15   based on 81, right?

16   A.  Well, the hundreds of thousands is, you know, a separate

17   universe.  Within the relevant market we've got 81 of the

18   100, that's correct, out of about 1200.  So that's what

19   we're looking at in terms of the data I used for the market

20   share calculation, correct.

21   Q.  And you have no problem with this merger as it relates

22   to 399, or 99 percent of these hundreds of thousands of

23   business customers, right?

24   A.  No, that's not correct.

25   Q.  You have not done any analysis or -- as to -- or alleged

1    any anticompetitive effects as it relates to these customers,

2    correct?

3    A.  No, that's not correct.

4    Q.  And, Dr. Shapiro, even if the merger proves to be

5    beneficial for all of these customers (indicating), below

6    this 1100 or 1200 you would urge the Court to block the

7    merger?

8    A.  That doesn't follow.

9    Q.  Okay.  So if the -- so you're saying, Dr. Shapiro, if

10   the merger is beneficial to these 600,000 or so business

11   customers, it should go through, even if, in your view, it's

12   not great for the top 1200?

13   A.  No, I don't think I said that.  Maybe I didn't hear you

14   right.  I'm sorry.

15   Q.  Maybe we're missing each other.  You have not done an

16   analysis in terms of market share or anticompetitive impact

17   of this merger on the 600,000 or so business-to-business

18   customers not in your target market, right?

19   A.  Wait.  I thought we were working with 400,000.  Did

20   another 200,000 crop up?

21   Q.  Well, I didn't include Mason, so maybe -- it's 400

22   between Staples and Office Depot, right?

23   A.  Well, again, we've been through that, that's what you're

24   telling me.

25   Q.  Okay.  But you focused, in terms of your market share

1    calculations, on this group (indicating)?  You didn't do any

2    market share calculations for this overwhelming majority of

3    the business-to-business customers?

4    A.  Well, they're not in the relevant market.  So I

5    calculated market shares -- oh, I got the right answer,

6    you're happy with that one?  Is that what you're looking for?

7    Q.  I think we're missing each other, sir.

8         So, okay, let's look at it this way:  If you have

9    a car and there's a bus -- so we agree there's a car and bus

10   in my example?

11   A.  It's your example, go for it.

12   Q.  Okay.  And if you want to know -- if you want to know

13   what's going on in the bus, looking at the car doesn't help

14   you, does it?

15   A.  This is a little abstract for me.  I'm not quite seeing

16   the connection here.

17   Q.  Let's talk to the Court -- let's go -- we'll stick with

18   that example, but let's talk to the Court about what you did

19   and didn't do to calculate market share.

20   A.  Okay.

21   Q.  What you didn't do, sir, is do a market share analysis

22   for your target group of customers, for these 1200, right?

23   You didn't do that?

24   A.  I used the Fortune 100, and then 81 of them as my proxy

25   for the 1200 for practical reasons, that's correct.

1    Q.  Okay.  So the answer to my question is, No, I did not do

2    an analysis for my target customer market in terms of market

3    share?  You didn't do that?

4    A.  I just explained.  Do you want me to give the same

5    answer again?

6    Q.  I didn't think it was clear.  So you're asking this

7    Court, with the government, to stop this merger, even if

8    it's good for all of these customers (indicating), because

9    you think it's going to hurt these 1200, but you didn't do a

10   market share analysis for your target customer base, did

11   you, sir?

12   A.  I'm not asking the Court to stop the merger.

13   Q.  Well, good.  We can go home.

14   A.  The FTC is asking the Court to stop the merger.

15   Q.  Okay.

16   A.  I'm here to give economic analysis to the Court.

17   Q.  Fair enough.  And the FTC is arguing this Court should

18   block the merger because of concerns about these 1200

19   customers.  But you, the expert for the FTC, have not done a

20   market share analysis for this core -- this core customer

21   group, have you?

22   A.  Yes, I have.  I've presented it, I have a market share,

23   they add up to 79 percent.  I've done a market share analysis.

24   Q.  You did it for the car, though.  You did it for 81, not

25   the 1200?  You ignored the bus --

1    A.  What we did is we talked to a bunch of people on the bus

2    and found out how much the bus fare cost.  And we didn't ask

3    everybody on the bus, that was our sample.  We got a pretty

4    good, accurate indication of how much the bus fare was by

5    talking to --

6    Q.  81?

7    A.  -- by talking to a fraction of the people on the bus.

8    Q.  Fraction, 81.

9    A.  81 is the number we -- you know the answer to that.

10   Q.  And one of the ways that you try to determine whether

11   your 81 was representative of the 1200 is you looked at the

12   top 40 and the bottom 41 in the 81, right?

13   A.  I did.  This is Exhibit R1A to my reply report.

14   Q.  So again, you looked at the people in the car, the top

15   40 and the bottom 41, and nobody on the bus to see if your

16   market share calculation was valid?

17   A.  No, we looked at some people in the front of the bus,

18   some people in the back of the bus, because we were

19   concerned that they might be a different group.  And we

20   found, in fact, in the lower half, it's right here in

21   Exhibit R1A, that actually the combined share of Office

22   Depot and Staples was 89 percent in the lower half and --

23   which was significantly higher than in the upper half.  So

24   yeah, we talked to people on the front and back of the bus.

25   Q.  Only the car, only the 81?

1    A.   No, I'm in the bus.

2    Q.   Okay.  But you -- but you didn't look at market share

3    analysis for anybody other than the 81?

4    A.   That's my sample.

5    Q.   That's your sample.  And you didn't even do a -- you

6    didn't even say, well, these are Fortune 81 companies, maybe

7    they're different than the next 1100 or so companies,

8    let's -- even if you didn't have time, in a year, to do a

9    market share for 1200 -- and by the way, Charles River

10   Associates is huge, right?  You're traded on the stock

11   exchange, you're one of the leading, hugest consulting firms

12   in the world, right?

13   A.   I don't think that's true, no.

14   Q.   Pretty big?

15   A.   It's big enough for my needs.

16   Q.   Yeah.

17   A.   The Oakland office is wonderful, I got great people

18   there.  That's the part that I really work with.

19   Q.   And traded on the stock exchange?

20   A.   Yes, they're publicly traded.  That's correct.

21   Q.   And you had an army of helpers on this case?

22   A.   We had a platoon.

23   Q.   A platoon.  Very good.  And you didn't say --

24   Dr. Shapiro, you didn't say to your platoon, you know, we

25   can't just look at this 81 if we want to convince the Court

1    that this target market 1200 is going to have anticompetitive

2    effects, we have to at least do a random sample of market

3    share data for these 1200.  But you didn't do that, did you,

4    sir?

5    A.  Well, we -- we thought a lot about how to best measure

6    this.  So, the problem is we don't have a complete list of

7    large customers to sample from to begin with.  So that's a

8    problem.  The -- and if we went to Office Depot and Staples'

9    records, we would be biased towards their customers rather

10   than somebody else's.  Ultimately went to the suppliers to

11   do the best we could with that.  But, of course, then we're

12   missing leakage and some other stuff, so we're back to this.

13            So the Fortune 100 -- so you could pick a

14   different sample, but I think picking a random sample of

15   large customers was not workable and would, of course, be

16   subject to the criticism, oh, you picked them in some way

17   that was -- that juiced up the shares.  That is not even a

18   conceivable criticism for the Fortune 100s, since that's a

19   well-defined set.  It has nothing to do with this case.

20   Q.  So you and your platoon, Dr. Shapiro, if I understand

21   your testimony, didn't look at any of the companies below

22   the Fortune 81 in terms of a market share analysis, right?

23   A.  Well, again, we looked at a lot of them in terms of our

24   overall primary vendor shares, but in terms of the -- this

25   measure, it's -- I think we've covered this, but, you know,

1   it is -- this is the sample.  And so things outside the

2   sample are not included in the sample.

3   Q.  And so the government is asking this Court:  Stop the

4   merger, market share is too high for these 1200 customers.

5   But the fact is you didn't look at 1120 of them, right, in

6   terms of market share?  Didn't look?

7   A.  You know, any sample, you're not going to look at every --

8   that's the whole nature of a sample.

9   Q.  But, sir, you didn't look at any of the 1200 except the 81?

10  A.  You can keep asking it again, you're going to get the

11  same answer.

12  Q.  No.  The answer is no, right?

13  A.  The answer is the sample is the 81 companies.

14  Q.  Fair enough.

15  A.  And that's a good sample and it's a proxy.  You know,

16  there's a long answer, I don't really want to give long,

17  repetitive answers, but --

18  Q.  Fair enough.

19  A.  -- if that's what we're supposed to do, I'll do that.

20  Q.  One of the things that you told us yesterday was based

21  on your analysis, as you went down in spend the competitive

22  effects were reduced.

23  A.  Well, in a way that was --

24  Q.  I can pull it out.

25  A.  That was -- that's been my supposition from looking

1    at -- for example, the Trimega document you talked about, it

2    says we compete with Staples on a local and regional basis.

3    That's examples -- there are many materials like that that

4    indicate small and medium businesses have other choices.

5    That's how the small vendors make a living.  So I knew that.

6           I also found that at very high end, what's called

7    the very high end, the large customers that are focused

8    here, Office Depot, Staples dominate.  In between, you know,

9    it's not so clear.  And it took me a while to sort that out.

10   The best visibility I have into that is by going down to the

11   250,000 threshold.  Remember, we looked at that, we cut the

12   threshold in half.  And yeah, I expected Office Depot and

13   Staples' share to go down when I broaden that out from like

14   1,000 to 2,000, it didn't.  I assume it would go down if I

15   went -- you know, went down from 250,000 to 20,000.  But

16   have I measured that?  No.  That's far away from the

17   boundaries of the target customers here that -- where the

18   concern is addressed.

19   Q.  And so, Dr. Shapiro, we have -- this green, in terms of

20   a demonstrative, is the 1200 customers, and that's your 6.4

21   percent revenue, right?

22   A.  Yes.  And I'm just -- the scale in here, you know, one

23   of the things -- the information visualization is one of the

24   things that I do.  And it seems to me the scaling is not

25   right at all, so it's misleading.

1   Q.  This should be even smaller, right?  If it's 81 out of

2   600,000, this top Fortune 81 should be even smaller, right,

3   sir?

4   A.  Let me put it this way:  I'm not disputing your numbers

5   there, okay?  I'm just pointing out -- because trying to do

6   this, it's a highly misleading diagram because the green

7   part, as indicated, is 6.4 percent.  I don't have a

8   protractor with me, but I'm quite sure that that area that

9   you're showing in green is a lot less than 6.4 percent of

10  that huge triangle.

11  Q.  But the yellow is a lot bigger than the 81?

12  A.  I'm sorry, you threw me off.  This is a --

13  Q.  If we're talking about a Fortune 81, this --

14  A.  Okay.  Fine.  I just couldn't help myself.  The diagram

15  is misleading, the numbers are fine.  What's the question?

16  Q.  But your market share calculations aren't misleading?

17  A.  They're not misleading, no.

18  Q.  Okay.  Even though you didn't look at any of the

19  customers in this target market, the target market you're

20  urging the Court to consider, you didn't look at any of them

21  except for the Fortune 81 for calculating market share?

22  A.  I don't have anything more to say about this.

23  Q.  Dr. Shapiro, you also said yesterday and today it's

24  important to hear from the customers, the customer's view is

25  critical, right?

1    A.   The customer's view is critical regarding their needs,

2    their options, who they considered capable in the past.

3    Basically, what they have visibility into, I put a lot of

4    weight on that.  And of course there's going to be

5    heterogeneity.  We have a lot of heterogeneity here, too.

6    But with those clarifications or qualifications, yes,

7    absolutely.

8    Q.   Your concern is that these poor Fortune 81 companies are

9    going to be at the mercy of Staples if the merger goes

10   through, in terms of a price increase, right?

11   A.   Did you say "poor"?

12   Q.   Yes.  These vulnerable Fortune 81 are going to be at the

13   mercy of Staples after the merger because we'll raise the

14   price on paperclips and erasers, right?

15   A.   I think I was pretty clear.  These are large, powerful

16   companies who are going to lose leverage.  I didn't say they

17   were poor or helpless.

18   Q.   And although you acknowledge that the voice of the

19   customer is important, the truth is, sir, that these

20   customers that you seek to protect, the Fortune 100,

21   overwhelmingly are not complaining about this merger, are

22   they, sir?

23   A.   I think there are a lot that are complaining.  I don't

24   know what you mean.

25   Q.   You received the declarations in this case, Dr. Shapiro?

1    A.  Yes.

2    Q.  Did you count up how many expressed concerns about the

3    merger?

4    A.  I don't have a number.  We cite a number in my report.

5    But I guess my mode of analysis is not to count declarations.

6    Often you have a declaration battle in these cases, the

7    company's going to the government, the declaration, the

8    government has to get declarations.  I'm never part of that.

9    Like I said, I don't want to see the drafts or anything.

10   But that's interesting.

11        I mostly figure out what are the customer's

12   choices, what are they telling me about that, not their

13   overall view of the deal.  Like I said, that's not what I

14   would go to the customers for.

15        If I want an overall figure of what the customers

16   are doing, I want to look at data in the market shares.  I

17   must have looked through declarations.  The customer says I

18   want desktop delivery.  I want one vender to serve me all

19   around the country.  I need integration.  And here, these

20   guys were good in my last bid and those guys weren't.

21   That's what I'm looking for, the part they live and breathe

22   day-to-day.  I'm not counting up declarations.  That's not

23   my method.

24   Q.  Is it not important to you, Dr. Shapiro, that the

25   customers you seek to protect, that 95 percent of them have

1    no concerns about this merger?

2    A.  I don't think that's true.

3    Q.  Did you notice how many expressed any -- well, let me

4    ask you this:  Wouldn't it be important to you to know

5    whether the Fortune 100 or these 1200 customers expressed

6    concerns about this merger?  Is that not important to you?

7    A.  Well, you know, take the TaxAct case.  The government is

8    not going to go -- or, either side is not going to go to

9    millions of individuals and ask them, What do you think

10   about this tax software?  That's crazy.  Here you can have

11   more of a shot at it because you have a thousand companies.

12   But this is not a matter of taking a poll.  I need enough

13   evidence to figure out what's going on, what do these

14   customers need, and what are their choices, and then I want

15   to go to data.

16           THE COURT:  What's enough evidence?  What's enough

17   evidence for you to form an expert opinion?

18           THE WITNESS:  So the part here, Your Honor, that

19   I'm taking away from the customers is when they indicate the

20   needs -- what they need from a vendor, and who is providing it.

21           THE COURT:  What's enough?  What's enough of a

22   customer base to be able for you to formulate an expert

23   witness?

24           THE WITNESS:  It's not a matter of counting.  It's

25   a matter of is there a consistency story.

1            THE COURT:  Among how many, though?  Among more

2     than 50 percent, random sampling?  Sometimes during

3     discovery disputes we'll take every tenth document because

4     it's a pain in the neck to go through every page.  There are

5     ways to get a fairly reliable sampling of objections or

6     opinions.  So I don't know what's -- how do you approach that?

7            THE WITNESS:  So when I can, I want to go to the

8     data so I don't have to deal with this, and I have some very

9     clear data here.  Again, it's not like I want to know what

10    fraction of the customers like the deal or don't like the

11    deal.  Very often they may not know.  They're not going to

12    know about Amazon Business's future plans.

13           THE COURT:  Let me ask you this:  Suppose you had

14    the capability in that year to talk to everyone in that

15    group, and everyone, with the exception of the 81, said fine

16    with me.  Would that have impacted your opinion?

17           THE WITNESS:  Oh, sure.  Yeah, absolutely.  But,

18    presumably --

19           THE COURT:  Would your opinion have been drastically

20    different if that was the case?

21           THE WITNESS:  Probably.  But let me just -- look,

22    if they say no problem, I go, That's interesting, who was

23    bid for your business last time?  They would say something,

24    I think we're going to find it's Staples and Office Depot.

25    Suppose they said it's Staples and Office Depot and then

 1    they had W.B. Mason was in there.  I go, All right, what's

 2    the deal here, you're not worried about it?  Do you think

 3    W.B. Mason will be good or you don't care or, like, what's

 4    going on?  And I would want to know why.  So I wouldn't just

 5    stop there.

 6            THE COURT:  Suppose they just told you, Fine with

 7    us, and hung up on you and didn't give you the answers to

 8    the other questions that you needed, then what?

 9            THE WITNESS:  Now we're almost into sort of

10    sampling, which if you talk to a bunch of customers and say,

11    look, this is the deal, here's what I need, you guys are

12    good, and that's the picture I've seen.

13            The fact there's a bunch of other customers, look,

14    I'm too busy, don't bother me, don't talk to me.  I'm, like,

15    I have no reason to think they have some other view,

16    necessarily.  Am I getting a biased sample?  So I would

17    worry about that.  But -- and also, look, look, I'm looking

18    for Staples to put forward the evidence and their experts to

19    say here's the evidence that a bunch of customers say

20    something else.  They say, I don't care, no big deal, you

21    know, I'll just go to Amazon.com or I will string together a

22    bunch of little guys.  And I did that last time and that was

23    fine.  I'm not really seeing that.  There's always going to

24    be some here and there.  It's not really a count.

25            THE COURT:  Okay.

1    BY MS. SULLIVAN:

2    Q.  Dr. Shapiro, you know that the FTC lawyers have been

3    dialing for declarations for over the last several months or

4    year, trying to get declarations to this case, including

5    from the Fortune 100, right?

6    A.  I haven't heard the term "dialing for declarations."

7    That's nice.  I was aware, certainly, that it's typical in

8    these cases, whichever side I'm on, whether I'm working for

9    merging parties or the government.  The government is

10   looking to learn what's going on, and if they think they

11   might go to court, to get sworn testimony.  And that's

12   normal and it goes on over a period of months.  Yes, I was

13   aware of that.

14   Q.  You have the declarations that they got, they provided

15   them to you?

16   A.  Yes.

17   Q.  You know, sir, that hardly any of the Fortune 100

18   expressed concerns about this merger, notwithstanding the

19   FTC dialing them all up, right?

20   A.  Well, we haven't -- I don't know exactly how many.  I

21   said I'm not doing a count.  We have a certain number of

22   declarations.  If we had ten more -- like I said, I'm seeing

23   a consistent picture.  I'm not reading these declarations

24   primarily for are they concerned about the merger, I'm

25   reading them to what are their needs, who are their choices.

```
1        And we're getting a very clear picture on all fronts.

2               If you want to show me a large number of customers

3    who say, Oh, no problem, I've got plenty of other choices,

4    I'm a big customer.  I'm like, really?  Who is that customer

5    and what are those choices?  I haven't seen them.  I've been

6    looking.  I've been asking.

7    Q.  Not compelling to you, Dr. Shapiro, that 95 percent of

8    the Fortune 100 have absolutely no concern, have expressed

9    no concerns about this merger; not compelling to you?

10   A.  I don't know why you would say that's true.

11   Q.  Well, you've got the declarations.  Wasn't that

12   important to you?  Didn't you say to the FTC, Wow a lot of

13   money, lot of time suing to protect these big companies, do

14   they care, do they need protection?  They're saying no,

15   right?

16   A.  I don't think they're saying no.  I understand how

17   you're trying to paint the lack of statements by a number of

18   companies as though they have no problem.  There are a lot

19   of other reasons companies, in my experience, don't want to

20   get involved.  It's time, it's a hassle, they don't want to

21   piss off one of their suppliers.  Okay.  Maybe some cases, I

22   don't know if it's true in Staples.  I've seen cases where

23   the companies offer really good deals.  Tell you what, sign

24   a five-year contract, we'll give a good deal and then you'll

25   be happy.  Maybe they won't promise not to testify, but if
```

1    they do testify, they won't be harmed.

2    Q.  Dr. Shapiro, it's rank speculation.

3    A.  No, it's not at all.  I've seen this happen.

4    Q.  No evidence in this case that that's going on.

5    A.  I said I don't know if that's happening here.  I wasn't

6    alleging it's happening here, absolutely.  I'm telling you

7    I've seen it in other cases.  I've seen clients try to do

8    it.  Okay.  So, I think this inference that every customer

9    who didn't file a declaration is fine with this deal or

10   feels they have other choices is completely unjustified.

11   Q.  So it's not compelling to you that the FTC called these

12   customers and they say, No, we don't have a concern, we're

13   not going to give you a declaration?

14   A.  I don't know who they called and who they did not call.

15   I was not involved in that stage of the process.

16   Q.  You didn't count up the number of Fortune 100 companies

17   that expressed concern in the declarations?  Even though you

18   were provided with those declarations, you didn't count?

19   You didn't say, Let's see if these companies are even

20   concerned about this?

21   A.  The declarations the FTC -- I know there's going to be

22   declarations on both sides.  Of course during the

23   investigative stage I'm seeing a lot of declarations the FTC

24   is developing, and then once we go to litigation I'm seeing

25   more discovery.  But, no, my method is absolutely not to

1     count the declarations or to count the number of people who

2     don't file declarations.  That's not my method in this case

3     or other cases, I don't think it's the way to go.  And the

4     inference that people that don't complain are fine is wrong.

5     Q.  That's fair, Doctor.  And it doesn't matter to you that

6     the Fortune 500, Fortune 100 have largely not expressed any

7     concerns with the merger?  That doesn't matter to you?

8     A.  I did not say that.  You are mischaracterizing what I said.

9     Q.  Doctor, you haven't counted up how many of these large

10    customers have actually expressed any concerns?

11    A.  I have cited a number of the declarations here and I --

12    do I have a count in my head?  Again, that's not how I do my

13    analysis, by counting declarations.

14    Q.  And, Doctor, in terms of the data you looked at to come

15    up with your market share calculation for the Fortune 81,

16    that was old data, right?  That was looking-back data?

17    A.  So the data on the Fortune 100, they were all queried

18    for the previous calendar year, which was 2014.  If you want

19    to call that old, then that's old.

20    Q.  It's -- that data was a year-and-a-half or more old,

21    correct?

22    A.  No, that's not correct.

23    Q.  Two years, actually.  Where am I?  2014 data is two

24    years old.

25    A.  Well, first off, depends on when you're counting.  Okay.

1    As of -- of course, life goes on, right.  These are set out

2    in the summer and back and forth into the fall.  So the data

3    from the previous year, so let's call that a year old, let's

4    say, 2014, when the inquiry was going on in the middle of

5    2015, because it's the most recent calendar year.  So, yes,

6    so one year old, which is, of course, almost -- which is

7    typically normal with calendar year data or annual data.

8    Q.  But now we're in April of 2016 and you're asking the

9    Court to make a decision where His Honor has to look forward

10   based on 2014 data, true?

11   A.  Well, I'm not -- I have done projections going forward

12   from that and I've shown, for example, Amazon Business

13   won't -- their own projections won't significantly change

14   this year.

15   Q.  We're going to talk about Amazon Business, but I'm

16   asking you about you.  The data you relied on in this case

17   was 2014 data for your market share calculation?

18   A.  But that wasn't your previous question.  The question

19   was whether I was asking the Court to just rely on that, and

20   I said no.  I'm also looking forward on the most recent data

21   from Amazon Business, and Amazon.com, for that matter, and I

22   am highly confident that the market shares don't change

23   significantly, even with that projection.

24        So no, I'm not just relying on 2014 data in what

25   I'm presenting to the Court.

1    Q.  My question was very specific, Dr. Shapiro.

2         For your market share calculations you relied on

3    2014 data, correct?

4    A.  Well, this particular exhibit, and that's not --

5    Q.  It's the basis of your opinion.

6    A.  No, that's certainly not true.  That's not true at all.

7    Q.  Your market share calculation was based on 2014 data, true?

8    A.  This exhibit here, but that -- so, fine.  This exhibit,

9    and I've also explained to the Court how one can project

10   forward.  Look, the other thing I would say is, when you

11   want to project, it's when things are changing rapidly.  So

12   it's fair to ask is 2016 significantly different than 2014,

13   since you're focusing on this point.  And I think basically

14   the answer is, there's no reason to think it is.  The only

15   question mark being the Amazon Business, and that's why I

16   responded that I have included their projections as well.

17   Q.  Dr. Shapiro, you said, and I wrote it down, you said

18   that historical market shares do not account for entry and

19   expansion, true?

20   A.  That's correct.

21   Q.  And you will agree that some significant things happened

22   in the market over the last two years; Amazon Business

23   launched, for example?

24   A.  That's certainly the biggest one, and we've all been

25   talking about that.

1    Q.  So since 2014, since the market share data was generated

2    that you relied on, Amazon Business launched, right?  Mason

3    has gotten bigger and stronger, correct?

4    A.  I don't know how much stronger they've been.  I don't

5    think in a way that will significantly affect these market

6    shares, no.

7    Q.  Did you review Mr. Meehan's testimony?

8    A.  I did.

9    Q.  Did you hear him talk about the expansion he's undergone

10   over the last several years, in terms of buying up other

11   dealers, expanding to different states?  Did you see that

12   testimony?

13   A.  Well, when there's an acquisition --

14   Q.  Sir, I would like to get you out of here, if I can.

15   Could you just try to answer my question?  Did you see that

16   testimony?

17   A.  I read -- I'm sorry, you're talking about -- maybe I'm

18   confused.  This is Mr. Meehan?

19   Q.  Yes, Mr. Meehan's testimony.

20   A.  Right, I did.

21   Q.  Did you see his testimony over the last couple of years

22   they have expanded to different cities?

23   A.  I know there's been some expansion.  I thought there was

24   also pullback from some possible expansion.  I would want to

25   look at the testimony to get that just right.

1    Q.  Did you see he spoke about the fact that over the last

2    ten years or so they had grown 15 percent in revenue each

3    and every year?

4    A.  Again, if you want to cite particular numbers, either

5    you represent it to me or we look at the record.

6    Q.  I'm asking you, did you see it?  If you don't recall,

7    that's fine.  Did you see that testimony?

8    A.  Well, I did see it, but I don't recall the number.

9    That's what I'm saying.  There's a distinction there.  I do

10   know their market share is 0.2 percent, so --

11   Q.  I'm sorry?

12   A.  Their market share is 0.2 percent, so growing 15 percent

13   is not going to do much to that at all.

14   Q.  The market share in your 81?

15   A.  The market share in the relevant market.

16   Q.  Which is your 81.  You didn't calculate Mr. Meehan's

17   market share in the 1200, and you didn't calculate Mason's

18   market share in the 400,000-plus business customers, did

19   you, sir?

20   A.  I calculated it as market share --

21   Q.  In the 81?

22   A.  -- in the relevant market using my proxy group, the

23   Fortune 100 companies.

24   Q.  Which means that you didn't look at Mason's market share

25   in this target group or in this target group (indicating),

1    correct, sir?

2    A.  Again, we -- we looked at their presence in the larger

3    group through the primary vendor relationship.

4            THE COURT:  You have to give her an answer.

5    BY MS. SULLIVAN:

6    Q.  You didn't look at Mr. Mason's market share beyond the

7    Fortune 81, true, sir?

8    A.  Well, the answer is I did through the primary vendor

9    relationship share.

10   Q.  Which you've already acknowledged is not a market share

11   calculation?

12   A.  No.  I think you're twisting what I said.  And we've

13   been through this.  I said, I am putting forward to the

14   Court what I think is -- there is two market share

15   calculations; one is Fortune 100 and the other a primary

16   vendor relationship.  I am putting forward the Fortune 100

17   as what I think is the better measure.  And, fine, I was

18   trying to be helpful by saying let's use the word "market

19   share" for that.  But the other one is also very informative

20   about shares of who's winning business.

21           So when you ask questions about you haven't done

22   anything with this broader group regarding shares, I want to

23   say no, because I think it's misleading.

24   Q.  Well, Doctor -- Mark, if we could have --

25           Dr. Shapiro, when FTC's counsel talked to you

1    about the primary vendor relationship, you made very clear,

2    sir, you said we shouldn't call that a market share

3    calculation, right; that's what you said?

4    A.  Look, I know I said that and I stand by it, it's fine,

5    if you want to parse the words that way.  I also said --

6    Q.  I'm just using your words.  Sir, you said we shouldn't

7    call this a market share calculation because it's not,

8    right, it's not?

9              MS. CERILLI:  Objection, Your Honor.  I would just

10   ask that Professor Shapiro be allowed to complete his answer.

11             THE COURT:  There's some need for clarity, so I

12   would like to know what your answer is.

13             THE WITNESS:  Thank you.  So, my preferred market

14   share is based on the Fortune 80 -- Fortune 100, or 81 of

15   them, and that is why I said that -- that's what I meant

16   when I said the primary vendor shares.  I didn't want to

17   confuse things, so I was reserving the word "market share"

18   for the Fortune 100 sample.  But I also -- so, my opinion

19   that for -- exactly for this sort of question, the other

20   measure is important.  Okay.

21             The primary vendor relationships, we see W.B.

22   Mason, in Exhibit R2, has 0.9 percent.  I hope this is

23   redacted, anyhow.  That is informative to me, that maybe I

24   have underestimated the share of the Fortune 100.  It is

25   possible.  Okay.  But it's not -- there's no indication that

1    it's a significant error, that there's something significantly

2    different about that sample than all large customers.

3    That's my opinion.

4    BY MS. SULLIVAN:

5    Q.  And, Dr. Shapiro, just to get this straight, and we can

6    pull out your testimony from today and from your deposition,

7    you have said at least twice that this is not a market share

8    calculation, true?

9    A.  As explained in my previous answer I have said that,

10   that is correct.

11   Q.  Your words "not market share" --

12               THE COURT:  Just for the record, Counsel, what's

13   the slide number on there?

14               MS. SULLIVAN:  This is slide 29.

15   BY MS. SULLIVAN:

16   Q.  "Calculation."  Those were your words, correct?  Under

17   oath, your words, "not a market share calculation."  You

18   said it, twice?

19   A.  I'm not going to repeat a long answer, so I will refer

20   to my previous answer.

21   Q.  But this was your market share calculation (indicating)?

22   A.  That's the one I put forward with the Court.

23               THE COURT:  The record should reflect you were

24   pointing to 81.

25               MS. SULLIVAN:  Yes, Your Honor.  Thank you.

1    BY MS. SULLIVAN:

2    Q.  And so, Dr. Shapiro, going back to my question, sticking

3    with a market share calculation, you did not look at W.B.

4    Mason's market share in terms of a market share calculation

5    in this target 1200, correct?

6    A.  That's correct.  In Exhibit -- in Exhibit R1A and R1B,

7    based on the Fortune 100, the market share shown for W.B.

8    Mason, the 0.2 percent, did not include these other

9    customers outside the Fortune 100.

10   Q.  Fair enough.  Fair enough.  So in determining W.B.

11   Mason's market share in the large B2B market, which you

12   agree is about 1200 customers, you only looked at 81?

13   A.  For this calculation, that is correct.

14   Q.  And that would be true for all other competitors as

15   well?  In other words, in determining the market share of

16   the competitors in this -- your target market, you only

17   looked at market share calculations for 81?

18          MS. CERILLI:  Objection.  Asked and answered and

19   mischaracterizes his testimony.

20          THE COURT:  I think it has.  I think it's fair.  I

21   think it's fair.

22          MS. SULLIVAN:  I'll move on.

23          THE WITNESS:  Thank you.

24   BY MS. SULLIVAN:

25   Q.  And the truth is, Dr. Shapiro, that your market share

1    calculations exclude the vast majority of business-to-

2    business customers, true?

3              MS. CERILLI:  Objection.  Again, asked and

4    answered and mischaracterizes his testimony.

5              THE COURT:  I think it's clear.  I think it's clear.

6    BY MS. SULLIVAN:

7    Q.  You also --

8              THE COURT:  That's correct, though, right?

9              THE WITNESS:  Well, there are a large number of

10   B2B customers who are not in the relevant market, so I'm not

11   counting them in the calculation.

12             THE COURT:  All right.

13   BY MS. SULLIVAN:

14   Q.  But you also didn't include a large number who were in

15   the relevant market, about 1120?  But you also didn't count

16   about 1120 who are in the relevant market?

17   A.  Well, we've talked about the sample I used to measure

18   the share, but it's a completely different question whether --

19   how my sample applies to the customers in the relevant

20   market versus not counting people who are not in the

21   relevant market, which I'm not trying to do.

22   Q.  And the other thing you did, Dr. Shapiro, when

23   calculating market shares, is you threw out all government

24   customers, right?

25   A.  They're not in the relevant market.

1    Q.  Yeah.  Even if they met the 500,000-or-over spend -- and

2    many of them did, right?

3    A.  I don't know how many would meet that.

4    Q.  And, you know, sir -- or do you know, sir, that's about

5    15 percent or so of this market (indicating), right, of

6    large 500,000 or more --

7    A.  I don't know what you're measuring, so could you show me

8    some documents?

9    Q.  Well, fair enough.  Do you know the percentage of large

10   B2B customers who are government customers?

11   A.  Sorry, the term as defined in my report and my testimony,

12   large B2B customers are commercial customers.

13   Q.  Do you know how many -- what percentage of the large

14   customers who spend 500,000 or more are government entities?

15   A.  No, I do not.

16   Q.  Okay.  But you threw them out as part of your market

17   share, you didn't include them as part of your market share

18   calculations?

19   A.  No, they're not in the relevant market -- it's not a

20   matter of throwing things out, it's a matter of counting

21   what's in the relevant market and not counting things

22   outside the relevant market.

23           THE COURT:  Let me interject.  I think, Counsel,

24   you prefaced your question, you're saying 15 percent of

25   "this figure."  And that figure is not going to be reflected

1    in the transcript.

2              MS. SULLIVAN:  I apologize.

3              THE COURT:  You're referring to 15 percent of

4    1200, right?

5              MS. SULLIVAN:  Fair.  Fair.  Yes, Your Honor.

6    BY MS. SULLIVAN:

7    Q.  And, Dr. Shapiro, if you had included government

8    customers, market shares go down?

9    A.  Well, there's two possibilities, either they -- well,

10   let's say up or down, we'll ignore constant.  If they go up,

11   then I would have possibly missed the problem in selling to

12   government customers.

13             If they go down, then that would be consistent

14   with the view that there's less of a problem in government

15   for the reasons given.  Either way it doesn't undermine or

16   really call into question the analysis I did do.

17   Q.  And whose idea was is it to exclude all the government

18   customers?  Was that yours or the FTC's?

19   A.  Well, I think this is part of figuring out what

20   customers' needs are and whether they're different.

21   Q.  Sir, can you answer my question?  Whose idea was it?

22   A.  I'm getting there.  Maybe not as quickly as you would

23   like.  So, I don't remember the back and forth.  It's a

24   collaborative process.  But in the end it's my decision

25   about what -- well, I -- it's my -- what I'm offering is an

1     analysis of the hypothetical monopolist test and the

2     economics behind the market that the FTC included in its

3     complaint.

4     Q.  Can you answer my question, sir?  Who first raised the

5     issue of throwing the government customers out of your

6     analysis?

7     A.  Well, this throwing out, it's not --

8     Q.  Excluding them from your analysis.

9     A.  I just --

10    Q.  Can you answer, sir, whose --

11    A.  No, I cannot because the presumption of the question is

12    that they were included and thrown out, or excluded rather

13    than -- you look at the large business customers and then

14    look at other groups and see whether they're similar, which

15    is more my way of thinking.  But look, no, I can't remember

16    exactly how it -- how that process played out.

17    Q.  Did you or anyone else do a market share analysis which

18    included the government customers?

19    A.  No.  Not comparable to what I presented to the Court, no.

20    Q.  Did you do some market share analysis, even if it wasn't

21    comparable, of -- on the government customers, that included

22    the government customers?

23    A.  No, I don't -- not that it comes to mind.  I mean,

24    the -- let's just see.  The Fortune -- so the business

25    customers -- the advantage of the Fortune 100, it's a well

1    defined set, and all the reason we've given.  That seems

2    less likely to be a good proxy for government customers,

3    because the government is not in the Fortune 100.

4            So, no, I don't think there was ever a way to do

5    that that I can remember.

6    Q.  Well, Dr. Shapiro, if you wanted to say let's look at

7    large business customers who spend 500,000 or more, the

8    government -- many government customers would have been

9    included using that definition?

10   A.  Well, I don't know how many.  The data we would have

11   that you could work with would be the Staples and Office

12   Depot data in terms of who they sell at least 500,000 of

13   office supplies to, but that's not going to be a good --

14   that's not going to answer for --

15   Q.  I'm sorry, I didn't mean --

16           MS. CERILLI:  Objection, Your Honor.  I ask --

17           MS. SULLIVAN:  I'm sorry.

18           THE WITNESS:  But that's --

19           THE COURT:  Wait a minute.  Sorry.  Objection --

20           MS. CERILLI:  I just ask that he be allowed to

21   complete his answer.

22           THE COURT:  Yes.

23           MS. SULLIVAN:  My apologies.

24           THE WITNESS:  I pause sometimes, so it's

25   understandable.  So -- I lost the thread, actually.

1            THE COURT:  Re-ask that question, Counsel.

2            THE WITNESS:  I think I can finish it.

3            THE COURT:  All right.

4            THE WITNESS:  So we could look at how much --

5    which customers, including government customers, Office

6    Depot and Staples sell a large volume to.  But to look at --

7    to calculate the market shares you need either to contact

8    the customers in a sample or, again, to go to suppliers, one

9    or the other, I think.  I didn't do either of those things

10   for this other group you're asking about.

11   BY MS. SULLIVAN:

12   Q.  Yeah.  In other words, you could have gotten data from

13   Mason and the other vendors, like you did for some other

14   things, and said how many government customers do they have

15   and Staples has and Office Depot has that spend 500,000 or

16   more and included them in your market share analysis?  You

17   could have done that?

18   A.  Well, again, it wouldn't make sense in the market share

19   analysis in this relevant market.  So the only way that

20   would make sense as an analytic step would be as if one were

21   looking at a market for, let's say, large government

22   customers, might be another customer set.  That is not in

23   the FTC complaint and I have not analyzed that in detail.

24            Same thing, maybe we missed a problem there, too,

25   but that doesn't -- if so, it doesn't change the fact that

1    there's a problem in the relevant market that I have

2    analyzed.

3    Q.  Or maybe the market shares go dramatically down if you

4    had included them, you just don't know because you didn't

5    look at it?

6    A.  Again, if they went down, then that would actually

7    confirm the view that we -- that the FTC, I'll say, was

8    properly not including the government because they have a

9    bunch of other suppliers for other -- have other needs.

10   And, you know, I do discuss this in my report, small

11   business preferences and so forth, local preferences in many

12   cases, depending on what government entities we're talking

13   about.

14          So again, if the shares are the same or higher for

15   Office Depot and Staples, then the FTC and, I guess I,

16   missed a problem area.  If they're lower, as you're

17   suggesting, then that confirms the decision to carve them

18   out and focus on the business customers that we did.

19   Q.  It makes sense to exclude them, even if the market

20   shares go down?  Sounds like it was the FTC's idea to

21   exclude the government customers, based on your answer?

22   A.  No, at that point I was just referring to what was in

23   the complaint.  Which then, of course, you know, I took off

24   from that in terms of my report, once we're in the

25   litigation phase of my work.

1    Q.  As I understand your report, Dr. Shapiro, you excluded

2    government customers even if they spent 500,000 or more

3    because they have some noncommercial interests?  Those are

4    your words.

5    A.  No, they're not excluded.  You keep saying that and I

6    keep having to correct it.  There might be another market

7    for government, large government customers, and maybe they

8    would be vulnerable here, too.  Same thing came up with

9    GPOs, actually.  I hope for their sake the FTC hasn't missed

10   anything.  But again, the problem would be the case is too

11   narrow, not there's something wrong with the case that was

12   brought.

13   Q.  So you looked at the Fortune 81, not at all customers

14   who spent 500,000 or more?

15   A.  Well, for the purpose of Exhibit R1A and R1B and the

16   market share calculations, that's based on the Fortune 100

17   and the 81 who gave responses we were able to work with.

18   Q.  And you didn't include in your market share calculation

19   other customers, government entities or anyone else who

20   spent 500,000 or more if they weren't in the Fortune 100?

21   A.  Well, again, we -- so the answer is no, we did not.  I

22   think we've covered that.  But I would make a pretty

23   significant distinction between customers in the relevant

24   market where the Fortune 100 is the proxy and customers

25   outside the relevant market that one would not even want to

 1    try to measure and who are different.

 2    Q.  So in viewing your market share calculations, Dr. Shapiro,

 3    you excluded all of these customers (indicating), of the

 4    1200 in the target market, the 400,000-plus B2B customers,

 5    and government customers, and only looked at the Fortune 81?

 6         MS. CERILLI:  Objection.  Asked and answered.

 7    Mischaracterizes his testimony.

 8         THE COURT:  It think it has been asked and answered.

 9    And I think his answer is yes, right?

10         THE WITNESS:  Well, I hate to disagree with you.

11         THE COURT:  Well, what is your answer then?  I

12    need a clear answer.  You focused only on the 81, that's it?

13         THE WITNESS:  That's what I used to measure the

14    market shares.  I thought that's been clear.  Well, to the

15    extent there's back and forth here, I think it's -- I don't

16    like the characterization "you excluded, you threw stuff

17    out."  That's not what I did.  I took a sample --

18         THE COURT:  All right.  It's fair to say you

19    considered all the 81 companies?

20         THE WITNESS:  That's my sample.

21         MS. SULLIVAN:  That's a better way to say it.

22    Thank you, Your Honor.

23    BY MS. SULLIVAN:

24    Q.  Okay.  And you also, Dr. Shapiro, excluded 19 of the

25    Fortune 100 in calculating market share?

1   A.   You know I don't like that word excluded.

2   Q.   They're not in your -- 19 -- so you said, Let me just

3   look at the Fortune 100 as a proxy for my 1200 customer

4   market, right?

5   A.   Yes, that is the proxy, the 81 Fortune 100 companies

6   from whom we got data that we felt we could work with in a

7   reliable manner.

8   Q.   And then when you got to the Fortune 100 you decided to

9   not include 19 of those companies in your market share

10  calculation?

11  A.   Well, 19 we judged the answers -- the responses were

12  not, you know, detailed enough in order to do that.  Look,

13  let me show you what we did, okay, since you're pressing on

14  this.  Okay, so if we look here, in the Exhibit Appendix E

15  to my initial report, page E-12 has a section called

16  insufficient or unreliable Fortune 100 responses.

17             THE COURT:  I recall your testimony.

18             THE WITNESS:  Okay.  And it gives three -- four

19  reasons why certain responses were excluded, in general.

20  That's on page E-12 to E-13.  And then each of the 19

21  companies -- and this takes the next three pages or so, it

22  explains what the sentence or paragraph, what the deficiency

23  was in that --

24  BY MS. SULLIVAN:

25  Q.   I'm sorry.  What exhibit are you looking at, Dr. Shapiro?

1    A.   I'm looking at appendix E to my initial report, pages

2    E-12 to E-13.  So, I'm not clear on whether -- I don't see

3    why this would be -- I don't know what's confidential, but

4    you can read this, Your Honor, and see how -- why we did it.

5              So we wanted to explain what our reasoning was.

6    We, I'm saying "we" because, you know, I work with my staff

7    and they did a lot of the work, with my supervision.  So --

8    so this is why the notion that I just -- I threw them out, I

9    excluded them is just not an accurate characterization of

10   the process.  We actually worked for quite a long time to

11   get more usable responses.  Okay.

12             And I know Matt Johnson was very proud that we got

13   it up to 81, actually, because -- and that required some

14   back and forth with the companies to get more information.

15   Q.   Well, let's look at examples of some of the companies

16   you excluded, if we could, briefly.  And one company that

17   you -- oh, I guess I can't say the name, but we'll put it up

18   for Court and counsel.

19             If we could, Mr. Coates.

20             And this would be your report at E-13.

21             And, Kim, it's Bates No. 2591.210.

22             One of the companies --

23             MS. SULLIVAN:  Can I say the name of the company,

24   Your Honor, or --

25             THE WITNESS:  You can tell me, us, the number

1    that's listed, if you want, that way we could identify it.

2              MS. SULLIVAN:  Well, I guess the name is not

3    confidential.

4              THE COURT:  I don't think it's confidential, is it?

5              MS. SULLIVAN:  I'm not going to share the data,

6    I'm just going to say the name of the company.

7    BY MS. SULLIVAN:

8    Q.  So, for example, you excluded --

9              THE COURT:  Wait just a minute.  Is it on the

10   screen?

11             MS. SULLIVAN:  And, Your Honor, it's no secret

12   that they're a member of the Fortune 100, so I'm going to --

13   BY MS. SULLIVAN:

14   Q.  So you excluded ████████████████████, correct?

15   A.  Correct.

16   Q.  And you excluded them because they didn't buy from

17   Staples or Office Depot, right, they weren't -- that Staples

18   or Office Depot was not a primary vendor --

19             MS. CERILLI:  Objection.

20             THE COURT:  Just a minute, counsel.  Is there an

21   objection?

22             MS. CERILLI:  Yes, on confidentiality issues.

23   You're naming the company.  It was a confidential CID

24   submission.  We would necessarily be disclosing information

25   about their procurement practices that were -- that are

1    still under seal.

2              THE COURT:  All right.

3              MS. SULLIVAN:  Well, why don't we do it this way,

4    I'll put it up for Court and counsel.

5              THE COURT:  That's fine.

6              MS. SULLIVAN:  And if we could put up the

7    declaration.

8              MS. CERILLI:  I mean, I ask at this point you

9    actually discuss another company.

10             THE COURT:  Well, we can talk -- can you about at

11   the bench?  Would you do that?

12             MS. SULLIVAN:  Sure, sure.

13             THE COURT:  All right.  Why don't we do that?

14   BY MS. SULLIVAN:

15   Q.  And, Dr. Shapiro, can you turn to tab --

16             THE COURT:  Wait just a minute, Counsel.

17             MS. SULLIVAN:  I'm sorry.

18             THE COURT:  Okay.  If you want to talk at the

19   bench, Counsel --

20             MS. CERILLI:  Sure.

21             THE COURT:  -- around the confidential material,

22   that's fine.

23             MS. CERILLI:  Sure.

24                     **CLOSED SESSION** ▮

25                 ████████████████████████████████



2519





1  ████████████████████████████████

2  ██████████████████████████████████

3  █████████████████████████████████

4  ████████████████████

5  █  ████████████████████████████████

6  ██████████████████████████████

7  ████████████

8  █  ████████████

9        ███████████████████

10       █████████████████████████████

11       █████████████████████████████

12 ██████████████████

13              **OPEN SESSION**

14 BY MS. SULLIVAN:

15 Q.  And, Dr. Shapiro, you also excluded other companies in

16 the Fortune 100 from your market share calculation,

17 including some like ██████ -- yeah, including some like

18 ██████, correct?

19 A.  Well, the list of companies that did not give adequate

20 responses to calculate market share is based on -- includes

21 ██████.  It's on page E-14 of my initial report.

22        MS. CERILLI:  Objection.  I will just note again,

23 on confidentiality reasons, to the extent that we want to

24 have conversations about any customer data, it is still

25 under seal.

1            THE COURT:  This information is under seal,

2      Counsel.  We put it under seal.

3            MS. SULLIVAN:  I'm not going to publish any data,

4      Your Honor.

5      BY MS. SULLIVAN:

6      Q.  And some of the companies you excluded, Dr. Shapiro,

7      even in your analysis, talk about purchases from other

8      vendors, correct, like Amazon?

9      A.  I'm sorry, "talk about," what are you referring to?

10     Q.  In other words, you go, through in your report, an

11     analysis of the 19 you excluded, and some say they only

12     provided primary vendor data for Amazon?

13     A.  Is there one you have in mind that you're referring to?

14     Q.  I can't say it, I don't think, in open court, but I

15     can -- what's the page?

16     A.  Well, anyhow, the details here and -- this is not

17     something I memorized, that's one reason I directed

18     everybody's attention to this appendix to my report.  But I

19     am just looking this over now.  I see one example where a

20     company mentions, does mention that they -- I won't say who --

21     buys from Amazon.  And they also mention Office Depot,

22     OfficeMax and Staples that they buy from.

23            So, yes, you get a lot of different things here.

24     There are a number of companies that mention Staples, for

25     example, but we just didn't have sufficient data to do the

1    calculations.

2    Q.  So you excluded 19 of the Fortune 100 in your proxy,

3    even some of whom, as we looked at, who purchased from other

4    vendors?

5    A.  Well, certainly.  I mean, these large companies are

6    often purchasing from other vendors, even the ones who have

7    Office Depot and Staples as their primary vendor.  That's

8    not the basis for excluding or including in the sample.

9    It's all about the quality of the response.

10   Q.  But, sir, you included some of the 19 whose primary

11   vendor was somebody other than Staples or Office Depot,

12   right?

13   A.  I got confused.  I didn't get -- could you say that again?

14   Q.  So, included in the 19 you excluded -- included in the

15   19 excluded -- in the 81 companies that you included, you

16   excluded 19, among those 19 were companies who purchased, as

17   a primary vendor relationship, from companies who weren't

18   Staples or Office Depot, right?

19   A.  Well, whatever the responses were, if they were usable

20   we included them, completely without respect to who they

21   were getting it from.  It's just a matter of the quality of

22   response.  So the way we have -- we have an exhibit on that,

23   right?  So I think it's relevant here.  I'll just point

24   people to it.  We have --

25   Q.  Can you give us the Bates number, Dr. --

1    A.  Well, it's Exhibit R1A from my reply report.

2         So one of the things that's useful -- I'm pretty

3    sure this is responsive, Counselor -- in that exhibit, which

4    is the basis for the market share calculations, the far

5    right-hand column shows the share of that company's

6    purchases that are coming from Staples and Office Depot.

7    And there's a lot of variety, you know.  So whatever your

8    question was, there's going to be examples in there; were

9    the shares high?  Were the shares low?  That's all been

10   included.

11   Q.  And in the Fortune -- in your Fortune 81, you also

12   included three or four companies whose spend was lower than

13   500,000, right?

14   A.  Yes, I think I mentioned it on direct, that I could --

15   there were a few that fell below and I decided to include

16   them just to -- out of, basically, the integrity of the

17   sample, even though they're not technically large customers.

18   It would be -- because their spending is so low, removing

19   them would make a very small difference because they're not

20   accounting to much of the overall spend.

21   Q.  So you included in your market share calculations four

22   companies whose spend wasn't even in your target market, right?

23   A.  Let's see.  I see three here in my Exhibit R1A.

24   Q.  Three?

25   A.  I see three.

1    Q.  You included three companies whose spend wasn't in your

2    target market, but you excluded 1120 whose spend was, right?

3    A.  Well, again, I did not exclude anybody.  I have a

4    sample.  I work with a sample.  I use very reliable methods

5    to do so.  And yes, the sample -- because it was a

6    previously given sample, Fortune 100, what do I know going

7    in how much they're going to buy, exactly, of consumable

8    office supplies?  A few fell below the threshold, so, yes, I

9    included them.  And, yes, there are, we've been through

10   this, a large number of large customers who are not in this

11   sample.

12   Q.  But you included at least three who are not even in your

13   target market in your market share calculation?

14   A.  The same answer I just gave.

15   Q.  The answer is yes?

16   A.  The answer is the same one I just gave.

17   Q.  Which is yes?

18   A.  Which is, following this procedure, for the reasons I

19   gave, the answer is yes.

20   Q.  So even though 1120 of the companies here you didn't

21   include had 500,000 or more spend, you included three who

22   didn't in your market share?  In other words, you ignored

23   all these companies who met your magic line threshold, the

24   500,000 spend, but you included three who didn't (indicating)?

25   A.  There's no magic line here.  The line I set doesn't

1    matter that much.  There's no magic to it.

2              THE COURT:  Is that yes?  Do you agree with

3    counsel?

4              THE WITNESS:  I've answered this so many times

5    that I -- probably, yes.  I don't know what's different

6    about this than the one I answered before.  But I'm not

7    going to buy into there's a magic line in my analysis.

8    That's not correct.

9    BY MS. SULLIVAN:

10   Q.  In fairness, you said there's no magic, but it's your

11   line, you drew the line at 500,000 in terms of your target

12   market, 500,000 spend, right?

13   A.  That's the threshold, yes.

14   Q.  That's the line you drew, that's the test that you

15   determined in figuring out what's the target customer who is

16   at risk for a price increase, right?  That was your line,

17   500,000; not ours, yours?

18   A.  Correct.

19   Q.  In doing your market share calculation, you didn't even

20   follow your own line.  You included three companies who fell

21   below that spend, right?

22   A.  Yes.  As I said, because they were good in the sample, I

23   made the call to include them here.  It's a small amount of

24   spend.  As I look at the shares of those three companies,

25   one of them, if you look at this, the third from the bottom,

1    has a very small share in Office Depot and Staples.  So

2    throwing those three out would probably raise Office Depot

3    and Staples' share, if I'd gone in the other direction.

4            So it's a small amount, it's at the bottom of the

5    table.  I have a good reason for what I did.  If I had done

6    what you are suggesting and applied a 500,000 threshold,

7    Office Depot and Staples' market shares would be very

8    slightly higher than what I calculated.

9    Q.  And, Dr. Shapiro, you didn't -- even though all of these

10   customers meet the 500,000 and above spend, you didn't even

11   do a random sample for that group, correct (indicating)?

12   A.  I stuck with the Fortune 100 sample, did not do a random

13   sample of a larger group, that's correct.

14           MS. SULLIVAN:  Your Honor, I'm moving on to

15   another topic.  At the Court's pleasure, we can break.

16           THE COURT:  I'm sensitive.  If you want to go a

17   little bit longer, that's fine.  If everyone wants to break,

18   that's fine with me as well.  What's your pleasure?  If you

19   want to break, that's fine.

20           MS. SULLIVAN:  Yeah, we can pick it up on --

21           Thank you, Your Honor.

22           THE COURT:  All right.  All right.  So let me

23   inquire.  Doctor, you're going to have to come back on

24   Monday.

25           THE WITNESS:  I figured that out.

 1              THE COURT:  So how much longer do you have,

 2    Counsel, approximately?

 3              MS. SULLIVAN:  About two hours, Your Honor.

 4              THE COURT:  All right.  And how many witnesses for

 5    the defendants?

 6              MS. SULLIVAN:  In total, Your Honor?  We are

 7    slashing our list as we speak.  We have about ten, ten or

 8    11, Your Honor.

 9              THE COURT:  That includes one expert or two?

10              MS. SULLIVAN:  It includes two, and maybe one.

11    But right now two, Your Honor.

12              THE COURT:  All right.  All right.  Okay.  So what

13    do you think in terms of your case-in-chief?

14              MS. SULLIVAN:  I wasn't expecting -- I was hoping

15    that we would be done with Dr. Shapiro.  So I was hopeful

16    that we would be done by the end of next week.  It looks

17    like we might slip over to Monday, Your Honor.

18              THE COURT:  Yes?

19              MS. REINHART:  Just one follow-up to counsel's

20    representation.  We do understand that they are still

21    considering slashing more witnesses from their list, and we

22    would just ask to be given that information as soon as

23    possible.  We're trying to prepare ourselves.  And also

24    because, Your Honor, as I said, this is our last witness

25    that we plan to call, but we do have some witnesses on our

1     witness list that are their employees, Staples and Office

2     Depot employees.  If they're not going to call them, we

3     might have to ourselves.  That's another reason to know who

4     exactly they are going to call.

5                    THE COURT:  This in your case-in-chief?

6                    MS. REINHART:  We had advised them, at their

7     request, that we had planned to examine them.

8                    THE COURT:  Is this something counsel can work out

9     over the weekend?

10                    MS. SULLIVAN:  Hopefully, Your Honor.  But it is

11    the FTC's burden, and Your Honor was very generous with both

12    sides with time.  They had two weeks to put on their

13    affirmative case.

14                    THE COURT:  I didn't limit anyone's time.

15                    MS. SULLIVAN:  No, I understand.  But if the FTC

16    thought they needed somebody from Staples to meet their

17    burden, they could have put them on.  Miss Reinhart told the

18    Court that they are done with their affirmative case after

19    this witness.

20                    MS. REINHART:  Your Honor, at their insistence we

21    told them that we would examine the employees who are on

22    their list and our list at the same time, during their case,

23    if they put them on -- if they put them on -- and that

24    otherwise we might have to call them ourselves.  That's all

25    I'm saying.  I don't think it's going to be a problem

```
 1    because I suspect that if they're slashing witnesses, the

 2    ones we have in mind are not going to be the ones that are

 3    slashed.  But I wanted to put a placeholder down just in

 4    case.

 5              THE COURT:  I encourage counsel to work it out.

 6    I'm not going to be unfair to either side, and everyone

 7    should know that.  Try to work it out.  All right?

 8              We'll start at 9:30 on Monday.  Have a nice

 9    weekend.

10              I have to ask you not to discuss your testimony.

11              THE WITNESS:  Can I speak with my CRA staff?

12              THE COURT:  With your staff?

13              THE WITNESS:  Yes.

14              THE COURT:  Do you have any objection?

15              MS. MAHAN:  No.  No.  We object.

16              THE COURT:  I thought there might be.  Yeah.

17    During cross-examination it would be inappropriate.  So I

18    have to ask you not to.

19              THE WITNESS:  Even my own staff, you're saying?

20              THE COURT:  Yes.

21              THE WITNESS:  I will do what you say.  That's why

22    I asked.  All right.

23              THE COURT:  Thank you very much.  Everyone have a

24    nice weekend.

25                               *   *   *
```

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5          I, JANICE DICKMAN, do hereby certify that the above

6    and foregoing constitutes a true and accurate transcript of

7    my stenograph notes and is a full, true and complete

8    transcript of the proceedings to the best of my ability.

9                        Dated this 2nd day of April, 2016.

10

11

12                        /s/_____

13                        Janice E. Dickman, CRR, RMR
                          Official Court Reporter
14                        Room 6523
                          333 Constitution Avenue NW
15                        Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25