UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **et al.,** | ) | Civil Action |
| | ) | No. 15-2115 |
| **Plaintiff,** | ) | |
| | ) | Friday, April 1, 2016 |
| **v.** | ) | 9:15 a.m. |
| | ) | |
| **STAPLES INC., et al.,** | ) | Washington, D.C. |
| | ) | |
| **Defendants.** | ) | |

**DAY 8 - MORNING SESSION**
*TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING PROCEEDINGS*
*(EXCLUDING SEALED PORTIONS)*
*BEFORE THE HONORABLE EMMET G. SULLIVAN,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For Plaintiff Federal        **Tara L. Reinhart, Trial Attorney**
Trade Commission:            FEDERAL TRADE COMMISSION
                             Bureau of Competition
                             400 Seventh Street, NW
                             Washington, DC 20024
                             (202) 326-2638
                             Email: Treinhart@ftc.gov

                             **Charles A. Loughlin, Trial Attorney**
                             FEDERAL TRADE COMMISSION
                             400 7th Street, SW
                             Washington, DC 20024
                             (202) 326-2114
                             Fax: (202) 326-2286
                             Email: Cloughlin@ftc.gov

                             **David Owyang, Trial Attorney**
                             FEDERAL TRADE COMMISSION
                             400 7th Street, SW
                             Washington, DC 20024
                             (202) 326-3013
                             Fax: (202) 326-2286
                             Email: Dowyang@ftc.gov

**APPEARANCES:   Cont.**

**For Plaintiff Federal
Trade Commission:**

**Rohan Pai, Esq.**
FEDERAL TRADE COMMISSION
400 7th Street, SW
Washington, DC 20024
(202) 326-2936
Fax: (202) 326-2286
Email: Rpai@ftc.gov

**Stelios S. Xenakis, Trial Attorney**
FEDERAL TRADE COMMISSION
400 7th Street, SW
Washington, DC 20024
(202) 326-2821
Fax: (202) 326-2286
Email: Sxenakis@ftc.gov

**Krisha A. Cerilli, Trial Attorney**
FEDERAL TRADE COMMISSION
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3337
Email: Kcerilli@ftc.gov

**Stephanie Greco, Trial Attorney**
FEDERAL TRADE COMMISSION
400 7th Street, SW
Washington, DC 20024
(202) 326-3044
Fax: (202) 326-2286
Email: Sgreco@ftc.gov

**For Plaintiff District
of Columbia:**

**Catherine Anne Jackson, Trial
Attorney**
OFFICE OF THE ATTORNEY GENERAL FOR
THE DISTRICT OF COLUMBIA
441 Fourth Street, NW
Suite 600 South
Washington, DC 20001
(202) 442-9864
Fax: (202) 741-0655
Email: Catherine.jackson@dc.gov

**APPEARANCES:  Cont.**

**For Plaintiff**                    **Norman Wesley Marden, Trial Attorney**
**Commonwealth of**                  COMMONWEALTH OF PENNSYLVANIA OFFICE
**Virginia:**                        OF ATTORNEY GENERAL
                                     Strawberry Square
                                     14th Floor
                                     Harrisburg, PA 17120
                                     (717) 787-4530
                                     Email: Nmarden@attorneygeneral.gov

**For Defendant**                    **Diane P. Sullivan, Esq.**
**Staples, Inc.:**                   WEIL GOTSHAL & MANGES, LLP
                                     301 Carnegie Center
                                     Suite 303
                                     Princeton, NJ 08540
                                     (609) 986-1120
                                     Email: Diane.sullivan@weil.com

                                     **Adam S. Tolin, Esq.**
                                     WEIL, GOTSHAL & MANGES LLP
                                     17 Hulfish Street
                                     Princeton, NJ 08542
                                     (609)986-1105
                                     Email: (606)986-1199

                                     **Jeffrey H. Perry, Esq.**
                                     WEIL, GOTSHAL & MANGES LLP
                                     1300 Eye Street, NW
                                     Suite 900
                                     Washington, DC 20005
                                     (202) 682-7000
                                     Fax: (202) 857-0940
                                     Email: Jeffrey.perry@weil.com

**For Defendant Office**             **Matthew James Reilly, Esq.**
**Depot:**                           SIMPSON, THACHER & BARTLETT LLP
                                     900 G Street, NW, 9th Floor
                                     Washington, DC 20001
                                     (202) 636-5566
                                     Fax: (202) 636-5502
                                     Email: Matt.Reilly@stblaw.com

                                     **Andrew McHie Lacy, Esq.**
                                     SIMPSON, THACHER & BARTLETT LLP
                                     900 G Street, NW, 9th Floor
                                     Washington, DC 20001
                                     (202) 636-5505
                                     Fax: (202) 220-7702
                                     Email: Alacy@stblaw.com

**APPEARANCES:   Cont.**

**For Defendant Office**     **John Lawrence Goheen III, Esq.**
**Depot:**                   SIMPSON, THACHER & BARTLETT LLP
                             900 G Street, NW
                             9th Floor
                             Washington, DC 20001
                             (202) 636-5567
                             Fax: (202) 636-5502
                             Email: John.goheen@stblaw.com


**Court Reporter:**          **Scott L. Wallace, RDR, CRR**
                             **Official Court Reporter**
                             U.S. District Court for the District
                             of Columbia
                             333 Constitution Avenue, NW
                             Room 6503
                             Washington, DC 20001
                             (202)354-3196
                             Email: Scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                          **Page**

  CONTINUED DIRECT EXAMINATION OF CARL SHAPIRO          2240
  BY MS. CERILLI:

## EXHIBITS

**DESCRIPTION**                                                          **Page**

















































**MORNING SESSION, APRIL 1, 2016**

(9:20 a.m.)

* * * * *

**(Thereupon, the following proceedings were closed by order of the Court and are not included as part of the transcript production in this case.)**

* * * * *

[redacted]

1  ████████████████████████████████████

2                    *  *  *  *  *

3          (Previously designated closed proceedings concluded and

4  the following further proceedings were held in open court.)

5                    *  *  *  *  *

6          (Thereupon, a break was had from 9:50 a.m. until

7  10:00 a.m.)

8          THE COURT:  Please be seated.  Good morning.  How are you?

9          THE WITNESS:  Fine, thank you.

10         THE COURT:  Counsel, are you ready to proceed?  All right.

11         UNIDENTIFIED SPEAKER:  Your Honor, if we could have one

12  minute.

13         THE COURT:  Oh, okay.  All right.

14         UNIDENTIFIED SPEAKER:  Your Honor, they're on their way.

15         THE COURT:  That's all right.  Okay.

16         All right.  Counsel, good morning.

17         MS. CERILLI:  Good morning, Your Honor.

18         THE COURT:  All right.  Good morning, sir.  How are you

19  this morning?

20         THE WITNESS:  Fine.  Thank you.

21         THE COURT:  Good.  Go ahead, Counsel.

22         MS. CERILLI:  Okay.

23             CONTINUED DIRECT EXAMINATION OF CARL SHAPIRO

24  BY MS. CERILLI:

25  Q.    Professor Shapiro, yesterday you walked us through the

1    definition on the relevant market and your conclusion that the

2    sale and distribution of consumable office supplies to large

3    customers is a relevant market.

4         Now that you've defined the market, what is the next step

5    in the analysis?

6    **A.**    We're going to measure the market shares in that market.

7    **Q.**    And what do antitrust economists learn from market

8    shares?

9    **A.**    Well, it's, again, dovetailing with the case law.  We

10   look at the --

11        THE COURT:  You know, can I stop you?  Before we get into

12   the next category, I understand the definition of the

13   hypothetical monopolist test.  The algebraic formula, though, I

14   need you to explain that in a little more detail.

15        THE WITNESS:  Okay.

16        THE COURT:  It's slide 18, I think.

17        THE WITNESS:  All right.

18        THE COURT:  And how do you arrive at those figures that

19   are -- the ones that are not shaded?

20        THE WITNESS:  Well, okay.  The -- let me just first say --

21   so there's a standard formula.  It's in appendix -- so I have a

22   whole report here we're not going to -- that we're not -- we're

23   not going through, but Appendix D in my initial report provides

24   the formula in the algebra.

25        THE COURT:  Okay.

1          THE WITNESS:  So what we do, then, is apply that formula

2     from the literature.  And you can see here, so the main formula

3     is this recapture rate greater than 10 percent over profit margin

4     plus 10 percent.

5          THE COURT:  All right.

6          THE WITNESS:  Okay.  So the two things we need to

7     measure -- let's be clear, if that formula's satisfied, then the

8     test is met, as it says here.  Hypothetical monopolist test is

9     satisfied if this formula -- if this inequality is satisfied.  So

10    we've got to measure the recapture rate and the profit margin,

11    plug them in, and see what we get.  So the -- so that's the main

12    empirical exercise is to measure those two variables as best we

13    can, and then plug them in.

14         So do you want me to talk about how I measured them?

15         THE COURT:  Yes, please.

16         THE WITNESS:  Okay.  So -- all right.  So, again, there's

17    a lot more detail in the reports here.

18         THE COURT:  I know.

19         THE WITNESS:  So first off, the profit margin, what is

20    this margin?  There's quite different ways to talk about profits.

21    So the profit margin is how much -- let's say Staples.  We can

22    look at both companies or Office Depot.

23         THE COURT:  Right.

24         THE WITNESS:  Let's say Staples, when they track the

25    business -- the consumable office supplies business of a large

1    customer, what's the revenue they get from it, and then what are

2    the costs they incur to serve that customer?  Okay.  So this is

3    not just going to include, you know, overhead costs,

4    headquarter's cost.  This is what economists call the incremental

5    cost.  That's basically how much extra cost are they going to

6    have to incur to serve that customer.  And we're looking at the

7    difference between the two.

8         So if they take in $100 and it cost them $80 -- they take

9    in $100 in revenue from a customer, and it cost $80 to serve, we

10   would say the profit margin is $20 over the 100, or 20 percent.

11        THE COURT:  Right.

12        THE WITNESS:  The -- one of the biggest components of the

13   cost of the distributor is how much they have to pay to buy the

14   office supplies from the manufacturers.  So we've measured that

15   using their own accounting data, using their own, basically,

16   internal data from the companies.  And we get a range here that's

17   shaded, depending on exactly how we treat certain costs.

18        The main costs that are extra costs in serving the

19   customer -- while they have different categories on their own

20   accounts, but certainly the cost of goods sold -- we're going use

21   that term a lot.  So what they're paying to buy the supplies from

22   the manufacturers usually, sometimes wholesalers, and then

23   distribution costs, the cost of delivering, and the other

24   services they provide to the customer.

25        So when we do that, we get somewhat different margins for

1  the two companies.  We get somewhat different margins between

2  paper and the other core supplies as well, but this is the range

3  we get, is around -- again, it's shaded, but that's -- that's the

4  number.

5      THE COURT:  All right.  Thank you.  That's been very

6  helpful.  Thank you.

7      THE WITNESS:  Okay.  Shall we talk about the other

8  variable, then, as well, the recapture rate?

9      THE COURT:  Sure.  Absolutely, yes.

10      THE WITNESS:  Okay.  So, first, this is a less

11  straightforward concept than profit margin.  Okay.  So I first

12  have to define it.  The -- basically you have, let's call it, a

13  mental exercise.  If you imagine that Staples -- again, I'll

14  stick with them -- raises the price to large customers, they're

15  going to lose some business as a result; and some revenues will

16  be lost because customers will not be happy with the prices,

17  they'll go somewhere else.

18      THE COURT:  Well, wait a minute.  You're assuming if the

19  merger goes through?

20      THE WITNESS:  No.

21      THE COURT:  All right.

22      THE WITNESS:  Okay.  In the world today, the world that

23  we're in today, if Staples were to raise the price --

24      THE COURT:  Right.

25      THE WITNESS:  -- they would lose some business.

1          THE COURT:  I agree with you.

2          THE WITNESS:  Okay.  Now, another important part of my

3    testimony is a lot of that business we think would go to Office

4    Depot today, and that's why we're worried about the merger,

5    because they're two head-to-head competitors.  We're coming to

6    that.  At this point we're just asking if they raised the price,

7    they're going to lose some business.  How much of that business

8    is going to go to other people distributing office supplies?  If

9    every $100 they lose, how much -- what fraction of that's going

10   to go to their competitors versus maybe people that just won't

11   use office supplies so much.  That would be another way that they

12   could lose business.  People would say, "Fine, I'm not going

13   to -- I'm going to use half as many pens or, you know, conserve

14   on Post-it notes."

15         So the recapture rate is if they lose some business, how

16   much of it goes to their competitors?  All of the ones we've

17   included in the market, which is all the other forms of

18   distribution, Office Depot, anybody else, Amazon, leakage, all

19   those things, and that's the recapture rate, the percentage that

20   goes to the competitors.

21         And if you think about it -- so I think that's very high,

22   and that was -- we covered that quickly yesterday.  I think

23   that's very high because just from everything we know about this

24   business.  And what this formula does is we plug in that number

25   and what -- the calculations here, if you look at the last row

```
 1    here, Your Honor.

 2            THE COURT:  Right.

 3            THE WITNESS:  The blue numbers on my printout, at least,

 4    that are shaded.

 5            THE COURT:  Right.

 6            THE WITNESS:  So long as the recapture rate is at least

 7    that high, then the test is satisfied.  And what I'm saying is I

 8    think all the other evidence indicates the recapture rate is well

 9    above that.

10            Again, if Staples raises their price, the lion's share of

11    the lost sales would go to their competitors, and so that number

12    is well above these shaded numbers.

13            Now, I have not been able to empirically estimate that

14    using -- using data, doing some econometric -- I just -- I

15    don't -- I would love to be able to do that.  In some cases

16    people can do that.  I can't measure that, so what I'm doing here

17    is telling you I have other evidence on that point, I believe

18    it's well north of the numbers here, so I'm confident the test is

19    satisfied.  And that's why I said it was kind of an easy call,

20    actually, because I don't think it's close.

21            THE COURT:  Really?  All right.

22            THE WITNESS:  Okay.

23            THE COURT:  Thank you.

24            THE WITNESS:  All right.

25            THE COURT:  Counsel.
```

1    BY MS. CERILLI:

2    Q.    Thank you.

3    A.    So we're back to what slide now?

4    Q.    To market shares.

5    A.    Okay.

6    Q.    I think you were just introducing, you know, what is that

7    antitrust economists learn from market shares.

8    A.    So high market shares -- well, we mostly look at the

9    market shares of the merging firms, and if they're very high,

10   that is a signal that we're much more likely to have an

11   anticompetitive concern from -- in the merger of two large firms

12   in the market.

13   Q.    And since market shares are based on historical data,

14   aren't they inherently backward looking?

15   A.    Well, yes and no in the sense that, of course, historical

16   data, that's the real world, it's backward looking.  But we can

17   do things with the data to make -- because our whole exercise

18   here is forward looking, so there's really two things we can do,

19   and I will do that, and have done that in other cases.

20         For one thing we could do is we could look at

21   projections.  The data can include projections, and we're going

22   to have projections, such as Amazon Business is going to be the

23   most important element here.  So we can look at projections, and

24   more generally we can look at trends.

25         So in other cases, for example, let's say -- well, when I

```
1    worked on the Whirlpool/Maytag merger --
2         THE WITNESS:  Which is related to your previous deal,
3    Your Honor.
4         -- and in that case that involved washers and dryers that
5    both Whirlpool and Maytag were selling, and LG and Samsung had
6    at that time -- this was ten years ago, 2006, had -- were coming
7    into the U.S. with some high-end washers and dryers.
8         THE COURT:  Right.
9         THE WITNESS:  And one of the questions was, "Well, their
10   shares are growing.  Are they important competitors so we don't
11   have to worry about Whirlpool and Maytag merging?"  Okay.  Now,
12   the shares were very small but they were growing.  So I did a
13   projection looking out a couple years, if their shares grew the
14   way they had been growing, what would the concentration in the
15   market shares look like.
16        So if you have reliable data for making these
17   projections, then you should use it so we can be as
18   forward-looking as possible with data that, again, is reliable.
19        And I'm going to do that here.
20        THE COURT:  All right.
21   BY MS. CERILLI:
22   Q.   And we'll obviously talk about the additional steps in
23   the analysis, but can you just briefly reset us here?
24        How do market shares fit into the overall structure of
25   the merger analysis?
```

1    **A.**    Well, we had the very steps, market definition, market

2    share, that then we're going to get to competitive effects.

3         They're an important piece of data to economists, and I

4    note in the case law, and really -- but it's one piece of

5    information.  When I see high market shares, then you want to go

6    to the next stage of the analysis and see, well, will there be

7    competitive effects, am I missing something, are there other

8    players who have small shares who are going to be a discipline

9    entry?

10        So it's one step along the analysis; but it's, again,

11   like any one piece, it doesn't give -- it doesn't dictate the

12   result.

13   **Q.**    Okay.  And Professor Shapiro, what is your opinion

14   regarding market shares in this matter?

15   **A.**    I believe the combined market share of Staples and Office

16   Depot, our best estimate is 79 percent combined.  And that's the

17   next slide, which is, I guess, not redacted?  Okay.

18        So this is the primary historical -- I'll call it

19   historical, this is 2014 data, market shares:  47 and 32 percent

20   for the two companies for a combined share of 79 percent.

21   That's my primary conclusion regarding market shares.

22   **Q.**    And we're going to go through the details, but can you

23   just briefly explain how you generated these shares and what

24   this is showing?

25   **A.**    So we are going to talk about this.  So if you see on

1   this -- we're still at slide 20 -- it says Fortune 100 customers

2   and then 2014.

3        So this -- these pie charts, these shares are generated

4   based on I'll say extremely detailed analysis of the data and

5   responses from the Fortune 100 companies in response to, I

6   guess, CIDs and back and forth generally between FTC going to

7   all of these hundred companies and trying to get information

8   about their purchases -- excuse me -- of consumable office

9   supplies.

10       So that's the basis for these numbers.

11  Q.   Okay.  And did you look at other data sources to confirm

12  these findings from the Fortune 100?

13  A.   So yes, I have another measure, which I call primary

14  vendor shares, which is based on data from the suppliers.

15       So the Fortune 100 data, that's customers, a particular

16  set of customers, and then we have another data set from the

17  suppliers which has some advantages and disadvantages.  All in

18  all for the purposes of measuring market shares, these are the

19  better data, in my opinion, the ones here with the Fortune 100,

20  but they're very much corroborated by the other data set from

21  the suppliers.  And we have many other pieces of evidence that

22  line up with this, the bidding data that we've talked about and

23  will return to, for example.

24  Q.   Okay.  So let's first take a more in-depth look at the

25  Fortune 100 market shares, which you said is your best estimate

1  of market shares here.

2       How did you calculate market shares using the Fortune 100

3  data?

4  **A.**   So I already made -- said that was a pretty extensive bit

5  of work.

6       So each Fortune 100 company was asked by the FTC -- and

7  there were multiple rounds of going back for more information --

8  about their purchases.  And so all that information came in.

9  This is over a period of months.  And my staff was participating

10  in that exercise, and looking at the information, and asking

11  more questions, and so forth.

12       And then when we did that, the -- the tricky part really

13  was to do two things:  Break out consumable office supplies from

14  other purchases that these companies made, to the best we could,

15  and then to allocate -- figure out which vendors, which

16  suppliers they bought from so we could attribute shares.  Okay.

17       And each of these is quite a -- I'll say messy.  It is

18  messy, you know, because each company has a different accounting

19  system and different records, and they responded in terms --

20  rather incompletely and we couldn't use them; others more

21  completely.  So it's very much a hand-crafted work, okay.

22       When I say that -- well, I don't know.  I guess I'm very

23  thankful to my staff.  Okay.  So you know it's not cookie-cutter

24  stuff.  Okay.

25       THE WITNESS:  And, again, you can see that, Your Honor,

1    it's a plus or minus; and, you know, I'm happy to go into any

2    level of detail about how we did it.  We'll talk a little bit

3    about how we, in my view, when we -- when things were ambiguous,

4    we attributed more sales to the smaller competitors -- the

5    smaller firms so that our share -- if anything, we've juiced up

6    their shares, if you will, by just -- because of ambiguities in

7    the data.

8         If I can direct your attention -- Your Honor, I think you

9    have the binder with my reports in it as well.

10        THE COURT:  I'm sure I do.

11        THE WITNESS:  Okay.  So --

12        THE COURT:  In fact, I do.

13        THE WITNESS:  Yeah.  So I'm not necessarily encouraging

14   you to turn to it right now, but there's a -- there are a good

15   number of exhibits on market shares there that have a lot more

16   detail than we're displaying for you here in court.

17        Then there are appendices.  So in the first report,

18   there's an appendix on how we process the customer data from the

19   Fortune 100.  There's another appendix, G, on how we -- the first

20   one is E.  And Appendix G, on how we process the data from the

21   competitors.  And then in the appendix responding to certain

22   criticisms, there's another appendix, Appendix C, on how we --

23   we're essentially defending our approach to processing the

24   Fortune 100 data.

25        So there's a lot of detail there in terms of exhibits and

1    text about what we did.

2         But the main thing is, basically, our best efforts to

3    figure out which purchases were involved, consumable office

4    supplies, and from whom, so we could calculate these numbers.

5    BY MS. CERILLI:

6    **Q.**    Okay.  Dr. Shapiro, did you receive data from all of the

7    Fortune 100?

8    **A.**    Well, not usable data, okay.  So we ended up determining

9    that 81 of the hundred companies we felt that was accurate

10   enough and detailed enough the way we could break things out.

11   So some companies, large companies, only gave us a part of their

12   company information.  Others didn't disaggregate things at all.

13        THE COURT:  What about Amazon?

14        THE WITNESS:  Amazon is one of the ones we could not use.

15   I know they -- either the -- their primary vendor is either

16   Staples or Office Depot, I can't remember which one; they buy a

17   lot.  We have an exhibit on that.  They buy -- I don't know the

18   number, but a large volume of office supplies from one of the two

19   companies.

20        They did not provide data about their own -- other

21   purchases from other sources.  Again, this is their own

22   purchases, right, we're talking about as a customer.

23        THE COURT:  Right, right.

24        THE WITNESS:  Okay.  We'll get to them as a supplier

25   before.  They are in the Fortune 100 so we asked them.

1          THE COURT:  Right.

2          THE WITNESS:  They are one of the 19 that we couldn't use,

3     but we did -- I know, and we have -- I won't turn to it now.

4          THE COURT:  You can if you want to.

5          THE WITNESS:  Okay.  Give me one moment then.

6          (Brief pause in proceedings.)

7          THE WITNESS:  I will find it, I promise.

8          THE COURT:  Take your time.

9     BY MS. CERILLI:

10    Q.    I believe it's R1A.

11    A.    Which one?

12    Q.    R1A.

13    A.    No, no. That's not it.  There's an exhibit -- okay.  I'm

14    still looking for it.  I'm going to find it.  We have an exhibit

15    of all the companies whose data we couldn't use, the 19.  And it

16    shows how much they buy from Office Depot and Staples; and

17    that's the one I'm having trouble with.

18         THE COURT:  Take your time.

19    BY MS. CERILLI:

20    Q.    I'm sorry, it's slide 30.

21    A.    We have it as a slide?

22    Q.    Yes.

23    A.    Uh, even better.

24    Q.    And I'm sorry, we just have to be a little careful

25    because the names of these are confidential.

1   **A.**      Okay.  Thank you.

2          All right.

3          THE WITNESS:  So do you have slide 30 for -- okay.

4          And you see the -- so these are the names -- you see the

5   redacted part of the 19 names.  You'll see down there, fourth

6   one lists -- I shouldn't say -- okay.  One of the ones list -- I

7   already said it.

8          So Amazon is listed there with a corresponding number,

9   okay.  So what we did -- so in one of my appendices, Your Honor,

10  it describes for each of the 19 companies why we felt that

11  company's response was not detailed enough to use for the data

12  set.  So there's that.

13         And then what we figure, well, let's go back, because I

14  was criticized by Mr. Orszag, these 19, you know, that was

15  biased and, you know, maybe we -- they should have been included

16  or it's a problem.

17         So one thing we were able to do is go back for each of

18  those companies, and Amazon is one of those, and see how much

19  did they buy from Staples and Office Depot; because we have the

20  Staples and Office Depot data on their sales that we can find

21  it.  And you see the number here, and let's just say that's a

22  big number.

23         THE COURT:  Right.

24         THE WITNESS:  Even for Amazon.  So -- in general among

25  the large customers, that's a big number.  So that gave me some

1    comfort that it wasn't as though we were, you know, excluding

2    companies.  The companies that didn't give us sufficient

3    responses, they're also shown here, large customers, Amazon and

4    a number of others.

5         THE COURT:  Thank you.

6         THE WITNESS:  Okay.

7    BY MS. CERILLI:

8    **Q.**    Okay.  And Professor Shapiro, you alluded to the fact

9    that these were a hundred data sets that took months to process,

10   and I think we -- we'd probably be here until May 10th if we

11   were to go through all of the nuances in them, so I appreciate

12   that you referred the Court to some of the detailed backup.  And

13   I'd like to still go through kind of some of the conceptual

14   issues for the Court's understanding.

15        So what is it, just getting us started, that you and your

16   team did when you received these data sets?

17   **A.**    Okay.  Well, can we -- we just tried to segregate out --

18   first, was the response sufficient to work with and

19   disaggregate; and then break out basically product, the

20   consumable office supplies; and then vendors.  The whole point

21   of this is it's not going to be useful unless we can figure out

22   who the supplier is and attribute shares to that.

23        So that's the basic step.

24        Also -- but for Staples and for Office Depot, we have

25   their data on what they're selling to each of these Fortune 100

1    companies.  So we used Staples and Office Depot data to measure

2    their sales to the Fortune 100; and then we used the customers'

3    responses to measure sales for everybody else, all the other

4    suppliers.

5        Now you might think, wait a moment that's kind of mixing

6    two sources, is that okay?  And it is.  Because what we've done

7    for all the other suppliers is overestimate their sales because

8    we don't have as accurate detailed information.

9        So when it was ambiguous, what -- let's say, W.B. Mason

10   sold -- let's take W.B. Mason.  We show them selling to some of

11   these large customers.  The customer might say, "I bought a lot

12   of stuff from W.B. Mason, it -- and they lumped together ink and

13   toner and other stuff.  So we would just take that number and

14   say we'll include it.  So we've actually included W.B. Mason's

15   ink and toner sales in here, which is more than they've sold of

16   the products we're measuring for Staples and Office Depot,

17   because we're not including Staples' and Office Depot's ink and

18   toner.

19       Another company, Veritiv, shows up here as a paper

20   manu- -- as a paper vendor, a large one.  They have a bunch of

21   sales to one very large customer -- I won't name them -- that

22   involve a lot of other shipping supplies and things, other sort

23   of packaging and shipping, that they -- that this customer, this

24   Fortune 100 customer, reported here's what we bought in this

25   area from Veritiv.  We didn't get a breakout from cut sheet

1   paper and all sorts of other packaging materials, so we took the

2   whole number and just treated that as though it was paper.  So

3   we overstated their Veritiv sales to this customer.

4       That's happening a lot, and so all I can say is the -- in

5   the end, the sales of the other firms are overstated so the

6   shares of Staples and Office Depot are understated.  Even so,

7   we're getting shares of 47 and 32 percent here.

8   Q.   And now, you assembled data for the Fortune 100.

9       Why didn't you measure market shares for all large

10  customers?

11  A.   Well, it wouldn't be practical to go to 1,000 or so

12  customers and do this, so we picked the Fortune 100 as a, you

13  know, well-defined set of companies, as our sample, our proxy

14  for the overall set of customers.  You could not do this for

15  1,000 customers and have a hearing in this decade.

16  Q.   Okay.  And why did you pick the Fortune 100 as the

17  companies to use as a proxy?

18  A.   Well, it's a set of companies that I didn't pick.  If I

19  pick companies, then how am I going to pick them, which was I

20  going to pick?  So it's a preset sample, if you will, so

21  that's -- and it's kind of a lot.  Actually, 100 was a lot to

22  work with, so we did that.  So it's a pre-given set of

23  companies, is the main point.

24  Q.   Okay.  And is using a proxy group a common way to measure

25  market shares in merger cases?

**A.**     Often.  It depends on, you know, what the data

availability is here.  The big issue is:  Is it representative?

You know, that's going to be the big issue:  Is it biased in

some way or another?  So I think, you know, it's highly

informative, and we -- we need to consider whether it somehow

overstates or understates the company's share because it's not

the whole set of customers.

**Q.**     Okay.  And why do you think that the Fortune 100 are a

good proxy for all large customers?

**A.**     Okay.

     THE WITNESS:  So first I would emphasize, Your Honor, that

while these are the -- first of all, what is a Fortune 100?  It's

measurement of companies by their revenues.  Okay.  These are the

largest companies in America by their revenues, but they're not

the largest companies in terms of their purchases of consumable

office supplies.  Okay.  So they're not actually the largest

customers in our market.  They tend to be larger than average,

but they're not the very largest.

     So we -- you know, if we think in terms of -- remember,

large customers in our market are the ones who buy at least

500,000.

     THE COURT:  Right.

     THE WITNESS:  So we've -- in fact, not every single

Fortune 100 company buys more than 500,000.  A couple of them

fall below that threshold.  I could have taken them out.  I

1    decided to just include them all.  It wouldn't matter very much

2    because their sales aren't -- their purchases aren't very much.

3         But we've got a good range of sizes, and we're going to

4    see that up ahead -- maybe -- well, anyhow, we'll show you that,

5    I think.  So that's -- that's useful, I think, in terms of

6    there's some distribution.

7         The other thing we did was a standard method, which is we

8    said, well, let's -- let's split the sample into half -- we had

9    81 to work with, so we split it basically top 40, bottom 40 --

10   and see what the shares look like for Staples and Office Depot.

11   Now, I mean, the ones who buy the most office supplies and then

12   the second half.  And to see -- I thought that Staples' and

13   Office Depot's market share would drop off in the second half

14   because they're a bit smaller.  You know, I still have in mind

15   this continuum from very large enterprise, you know, down to

16   small business.  In fact, it didn't drop off at all.

17        I think I'm probably out of order here, in terms of the

18   slides, Your Honor, so maybe we'll come back to that, but -- so

19   that's a good check that we're not getting some, you know,

20   distorted figure here, that this is a good proxy.  So we've done

21   a number of things that give me confidence.

22   BY MS. CERILLI:

23   Q.    Okay.  And I notice looking at the shares here that there

24   are a number of smaller distributors that don't appear at all.

25   Why is that?

1    **A.**    Well, back to slide 20, Your Honor, I actually had W.B.

2    Mason displayed here.  They come in at 0.2 percent, you know,

3    which is small, right?  The other larger companies are showing

4    up are all paper manufacturers or paper vendors.

5        So the reason the other -- some of the smaller companies

6    you've heard about, HiTouch or Guernsey, are not here, they're

7    just so small they're lumped together in the all other suppliers

8    category.  Otherwise we'd have too many slivers in this pie.

9    But they were counted, and a number of them did appear, but very

10   small quantities.

11   **Q.**    Okay.  And I believe you referenced that you were using

12   2014 data here.

13        Why did you not use a more recent time period?

14   **A.**    So, again, this is practical.  The CIDs went out, I

15   think, in the summer of last year, middle, maybe into the fall.

16   The process certainly continued in the fall.  So this collection

17   effort is going on for a period of months, and so it's natural

18   to ask companies to give us your most recent years' worth of

19   data, which was 2014, so that's what we have.

20   **Q.**    Okay.  And are you concerned that the data is out of

21   date?

22   **A.**    Well, no.  It's reliable data for 2014.  The question is:

23   Are things very different for 2016 or '17?  So I thought about

24   that.  Okay.  And we do have a way to project.  So you ask

25   yourself:  What's significantly changing in this space from one

1    year to the next?  And the only big thing that's happening or

2    even potentially big thing, is Amazon Business that we've heard

3    about.  Okay.

4         And now you've heard, Your Honor, from, you know, W.B.

5    Mason who's the next largest here and others.  It's not like

6    they're expanding.  There's no big thing happening, other than

7    Amazon that we've heard about.  So I'm not concerned that the

8    data's out of date, but I want to do a projection if I can to

9    account for this -- the one element that is potentially a big

10   changer, and that's Amazon Business.

11   BY MS. CERILLI:

12   Q.    Okay.  And did you do adjustments for Amazon Business?

13   A.    So yes, that's our --

14   Q.    And I think --

15   A.    That's our next slide.

16   Q.    Okay.

17   A.    Okay.

18         MS. CERILLI:  Now, this slide will have to be confidential

19   because it involves Amazon Business confidential information.

20   BY MS. CERILLI:

21   Q.    But certainly if the -- you can describe it in general

22   terms, and the Court will be able to see.

23   A.    Right, okay.

24         THE WITNESS:  So -- and, Your Honor, given what I've seen

25   in the trial transcript, I think this is, you know, pretty

1    important and responsive to some of your questions, so I

2    certainly attempted to do that.

3         MS. SULLIVAN:  Your Honor, I'm just going to object

4    because this analysis and slide are not in his report at all.

5    This expert witness's analysis was undisclosed to us in this

6    case.

7         THE COURT:  This particular slide?

8         MS. SULLIVAN:  And this whole analysis about Amazon and

9    the future is not in his report.

10        MS. CERILLI:  Absolutely not.  I mean, he's a professor --

11   Mr. Orszag argued in his report that Professor Shapiro did not

12   account for future competitive significance of Amazon Business.

13   Professor Shapiro responded in his reply that nothing about

14   Amazon Business' projections unsettled his results.  It was an

15   opinion directly expressed in Professor Shapiro's reply report.

16   This is a visual representation of that opinion.  It's not new.

17        THE COURT:  Well, it wasn't disclosed in the expert's

18   report, though, so it is -- it is new.  I mean, I query whether

19   it'd be appropriate for rebuttal, I guess, to rebut any evidence

20   that the defendants' expert produces is query.

21        MS. SULLIVAN:  Even rebuttal, Your Honor, should have been

22   disclosed.

23        THE COURT:  Well, I'm not so sure rebuttal has to be

24   disclosed.  I'm not sure.

25        MS. SULLIVAN:  It's no secret that Amazon was going to be

1    a huge part of this case, where Amazon was going to be in two to

2    three years; so he's got one line in his report, and now they

3    want to enter his whole analysis.  He was deposed, and this did

4    not come up in his deposition.  And, Your Honor, I would object

5    to it.

6            THE COURT:  Ms. Reinhart.

7            MS. REINHART:  Yes, Your Honor.  He did address the

8    criticism by Mr. Orszag in his rebuttal report.  He addressed it.

9    If it didn't come up in his deposition, it's because they didn't

10   ask about it.

11           THE COURT:  All right.  So it is in the rebuttal report;

12   is that correct?

13           MS. SULLIVAN:  No, no.

14           THE COURT:  It's not?

15           MS. SULLIVAN:  There's a line in his rebuttal report that

16   says that Amazon's not going to be here in two or three years,

17   but there's no analysis.  This whole analysis was not disclosed.

18   He had a reply report.  They could have put the analysis in if

19   they wanted to talk about it at trial.  They did not do it, and

20   now it's -- so here's a new analysis that --

21           THE COURT:  Is this disclosed anywhere, this slide, in the

22   analysis of Amazon?

23           MS. REINHART:  It's just a depiction, Your Honor.  It's a

24   depiction that did not include --

25           THE COURT:  Is the analysis, though -- is the analysis set

1    forth anywhere?

2         MS. SULLIVAN:  No, it's not.

3         THE COURT:  It either is or it's not.  I mean, if it's

4    not, then, I think this is new.  And I'm going to sustain the

5    objection.

6         MS. CERILLI:  I would say it's not a new analysis, though,

7    is what we're saying.

8         THE COURT:  But it was not disclosed at all, is it?  Is it

9    disclosed?  And let me make it easy:  Where is it disclosed?

10         MS. CERILLI:  In his rebuttal report he describes how the

11    Amazon Business projections do not unsettle --

12         THE COURT:  Show me the chapter and verse there.  I mean,

13    it's either there or it's not there.

14         MS. SULLIVAN:  Your Honor, I have the final report.

15    There's one line about it, one sentence, page 26.

16         MS. CERILLI:  Well, I don't know if some of this is

17    confidential.  It's page 26 of his reply report.

18         THE COURT:  Is the analysis of Amazon disclosed?  It

19    either is or it's not, Counsel.

20         MS. CERILLI:  This representation of the shares are not in

21    there.

22         MS. SULLIVAN:  It's at the top of the page, Your Honor.

23    One sentence, there's no analysis, no discussion.

24         MS. REINHART:  Could you direct the judge to the

25    appropriate paragraphs to look at?

```
 1          MS. SULLIVAN:  Yes.

 2          MS. CERILLI:  Yeah.  It starts at the top of the page.

 3          THE COURT:  What page, Counsel?

 4          MS. CERILLI:  Page 26, basically the first three

 5  paragraphs.

 6          THE COURT:  Is that where you're reading from?

 7          MS. CERILLI:  Yes, the first three paragraphs.

 8          MS. SULLIVAN:  Yes, Your Honor, the discussion for

 9  purposes of Amazon in the future, there's one line on top:  "I

10  concluded it was unlikely that Amazon Business would replace

11  Office Depot as a strong competitor to Staples in the relevant

12  market in the foreseeable future, by which I mean the next two to

13  three years."

14          The analysis they're about to discuss is not in his report

15  at all.

16          THE COURT:  Right.

17          MS. SULLIVAN:  It is not attached.

18          THE COURT:  There's a difference between citing a

19  conclusion and an analysis leading up to the conclusion.  The

20  conclusion's there, but the question is whether or not the

21  analysis was set forth anywhere.

22          MS. CERILLI:  Yeah.  And I guess we would just say we did

23  not think of this as new analysis, it's just a --

24          THE COURT:  Well, it's new if it's not set forth anywhere.

25  I mean, you have to give their experts a chance to take a look at
```

1        what was analyzed.  I'm going to sustain the objection.

2                MS. SULLIVAN:  Thank you, Your Honor.

3                THE COURT:  Let's move on.

4                (Brief pause in proceedings.)

5                MS. SULLIVAN:  And, Your Honor, I'm going to move to

6        strike.  There are apparently a bunch of slides in this deck.

7                THE COURT:  Yeah.  I mean, look, it's nonjury.  I'm not

8        going to give -- I'm not going to give any consideration to them.

9        So you're referring to slide 21?

10               MS. SULLIVAN:  Yeah.  There's a couple, Your Honor.  We

11       can put it up right here.

12               THE COURT:  All right.  Just give me the number.  I know

13       21 is among them.  All right.

14               MS. REINHART:  Just generally, Your Honor, this witness is

15       testifying and is giving opinions about -- you know, about

16       Amazon, and what they are and where they're going.

17               THE COURT:  Right, but the point that counsel's raising,

18       though, is that the analysis that supports the conclusion was not

19       set forth in the report -- and it doesn't appear that it was --

20       so, therefore, I query whether it's fair to allow examination in

21       open court now on an analysis that's not previously been shared

22       with defendants; and I don't think it is.

23               MS. REINHART:  Your Honor, I -- as Your Honor said, this

24       is a bench trial.

25               THE COURT:  Right.

```
 1          MS. REINHART:  We want to have as full a record as

 2     possible.  There are other opportunities we could have to do

 3     this, give them an opportunity to respond to it, and then he

 4     could --

 5          THE COURT:  Well, why should he respond to something that

 6     was not previously disclosed in discovery?

 7          MS. REINHART:  Well, and one of the issues we have here,

 8     Your Honor, is there was recently produced new data from Amazon.

 9     And I think perhaps some of the slides that counsel's referencing

10     later in his report relate to that new data.  Your Honor

11     understands that just came in after you requested it.  There are

12     plenty of opportunities for the parties to --

13          THE COURT:  Yeah, but there would have been a motion filed

14     to supplement the expert's report, a fair opportunity to depose

15     the expert, a lot of other things.  Counsel's just claiming --

16     you know, she's claiming fundamental unfairness, and I'm inclined

17     to agree with her.

18          I think that -- I mean, if the government is going to rely

19     upon this analysis that supports the conclusion, the conclusion

20     is in the rebuttal report, but the analysis leading up to it is

21     not; and I don't think that's fair.

22          So I'll sustain the objection.

23          MS. CERILLI:  Okay.

24          THE COURT:  It would have been very helpful, very

25     interesting.
```

```
1        MS. CERILLI:  Your Honor, we would request then to be able

2   to disclose it today.  We're happy to provide the backup data and

3   reserve the right to call Professor Shapiro as a rebuttal.

4        THE COURT:  How would you feel if someone sprung that on

5   you at trial?  You know, seriously.  I think it's

6   fundamentally -- you know, as I've said time and time again,

7   there's wealth of talent in the well of the court, and I think

8   it's just fundamentally unfair, and we're in trial now.  You

9   know, there was extensive discovery.  There was discovery

10  disputes.  I know it firsthand.  And the parties fought very

11  fairly but vigorously about, you know, trying to obtain all the

12  discoverable information they can.

13       This is a big issue here, the analysis leading up to

14  conclusions that address the impact of projected market shares

15  for Amazon.  It's a huge issue.

16       MS. SULLIVAN:  And what makes it doubly-unfair, Your

17  Honor, is that the FTC purposely didn't seek this data themselves

18  as part of their investigation.  We had to make motions, and Your

19  Honor was good enough as part of the fairness to let us see this

20  data, and now data they could have had for a year they want to

21  all of a sudden do a magical analysis in the middle of trial

22  without disclosure.

23       It's unfair, Your Honor.

24       THE COURT:  And I've sustained the objection.  Your

25  objection is noted, and I've sustained it.
```

 1          MS. REINHART:  And, Your Honor, we take exception to that

 2   characterization.  We collected data from Amazon during the

 3   investigation.  And we don't need to get into a dispute right now

 4   about what we asked for and what we didn't ask for.  I'm only

 5   saying --

 6          THE COURT:  No, I'm not assigning any sinister motive to

 7   anyone.  I just think that it's just fundamentally unfair to

 8   allow testimony about an analysis that has not been previously

 9   shared with defendants.

10          MS. REINHART:  Your Honor, we, of course, are happy to

11   give the other side whatever time they need.  It is not unusual

12   for experts in these situations to supplement their responses, to

13   bring things to their --

14          THE COURT:  I agree.

15          MS. REINHART:  -- to their testimony even if they are in

16   the courtroom.

17          THE COURT:  When did you learn about this?

18          MS. REINHART:  When did we learn about the...

19          THE COURT:  Yeah, the slide and the analysis, right.

20   Before trial?

21          MS. REINHART:  Before trial?  I'm not quite sure how to

22   answer Your Honor's question based on the --

23          THE COURT:  Well, truthfully would help.

24          FROM THE FLOOR:  (Laughter.)

25          MS. REINHART:  Your Honor, of course.  Your Honor, of

1    course --

2          THE COURT:  Yeah, I just want --

3          MS. REINHART:  -- we're answering truthfully.

4          THE COURT:  No, seriously though.  If you learned about

5    this before trial, you could have filed a motion to supplement,

6    then I would have given them time to take a deposition.  Well, I

7    probably would have granted that.  I probably would have granted

8    it had I known about it.  And then I probably would have told

9    defendants, I would have said, "Look, fair is fair.  If you want

10   to take his deposition at the government's expense, bring the

11   expert here, and we'll do it that way."

12         I probably would have -- because, you know -- I mean, the

13   trial lawyer in me would have allowed -- would have suggested to

14   me to do that, but -- but no motion was made.

15         MS. REINHART:  In response to your question, Your Honor,

16   Mr. Wilson from Amazon gave testimony in this trial.  Professor

17   Shapiro has been accumulating knowledge based on testimony;

18   including that testimony, has been continuing to do analyses.

19   There's no effort to keep anything from the other side.  Perhaps

20   we could have done it a day sooner or something like that but --

21         THE COURT:  Well, let me ask you this, let me ask you

22   this:  When did the government learn about the analytical

23   underpinnings that support this conclusion?

24         MS. CERILLI:  Okay.

25         THE COURT:  All right.  I have to rely on the expert?  I

1    mean, I can.

2           MS. CERILLI:  No, no.

3           THE COURT:  Is that your answer, to ask the witness?

4           MS. CERILLI:  It was informed by Mr. Wilson's testimony

5    about Amazon's projected sales.

6           THE COURT:  What's your answer?  I'm just -- I don't want

7    to put you on the spot.  I'm asking the attorney.  I mean --

8    they're looking at you for the answer, so I'll ask you.

9           When did you give the government your analysis that

10   supports that conclusion?

11          THE WITNESS:  So all I was going to say, and I realize

12   this is a delicate situation --

13          THE COURT:  Yeah, I'm not trying to put you on the spot.

14          THE WITNESS:  No, and I raised my hand.  So -- there's two

15   sources of --

16          THE COURT:  But the government should answer this.  It's a

17   question directed to the government.  I don't want to put you on

18   the --

19          THE WITNESS:  Okay, I'm sorry.  I apologize then.

20          THE COURT:  No, no, I just -- I'm just shielding you.  I

21   don't -- I think I should get an answer from the government, from

22   the attorneys.

23          MS. SULLIVAN:  And, Your Honor, at least the slides --

24          THE COURT:  No one is suggesting you've done anything

25   wrong.  But, you know, I'm just asking the government:  When did

1    you learn of it?  I'm just trying to figure out what could have

2    been done.

3         MS. SULLIVAN:  Your Honor, looking at their dec, the

4    projection cites to Mr. Wilson's deposition, which was many

5    months ago.

6         MS. REINHART:  It's to an exhibit from the deposition,

7    Your Honor, which he then, again, described here in his

8    testimony.

9         THE COURT:  So is that actually an exhibit that was used

10   during the deposition?

11        MS. SULLIVAN:  Yes, Your Honor.

12        MS. REINHART:  It's an exhibit that was used in the

13   deposition as well as in his testimony here.

14        THE COURT:  So he was deposed about this area then.

15        MS. SULLIVAN:  No, Your Honor.  They're taking a

16   deposition exhibit and doing a whole new analysis based on it.

17   So the point is that they had --

18        THE COURT:  Oh.  Well, let me ask you this:  So he was not

19   deposed -- the expert was not deposed about this exhibit during

20   his deposition?

21        MS. SULLIVAN:  No, no -- yeah, Your Honor.  Just so it's

22   clear, the data -- this analysis is taken -- they took a

23   deposition of Mr. Wilson many months ago, that's the vice

24   president of Amazon who testified here, and what it looks like

25   Dr. Shapiro has done is taken an exhibit from that deposition

1   and --

2          THE COURT:  Oh, I see.

3          MS. SULLIVAN:  -- and did a whole new analysis.

4          THE COURT:  I'm sorry, I see.  I thought you were

5   referring to your deposition of this expert; you're referring to

6   the deposition of Mr. Wilson.

7          MS. SULLIVAN:  And so it's clear, that the government had

8   the basis for this analysis many months ago.  There are -- and,

9   Your Honor, there are rules for a reason, and basic fairness is

10  one of them, and unfair surprise in the middle of a hearing is

11  significantly prejudicial.  They had the -- if they wanted to do

12  this analysis, they had the deposition many months ago.

13         MS. CERILLI:  And, again, as you can see, this slide is

14  actually citing Professor Shapiro's reply report; and, again, it

15  was our perspective that --

16         THE COURT:  That's the conclusion, though.  I mean,

17  that -- the analysis is not in the reply report.  I didn't see it

18  there.  I didn't see the analysis.

19         All right.  I've sustained the objection.

20  BY MS. CERILLI:

21  Q.   Okay.  So, Dr. Shapiro, putting aside the specific data

22  or any specific calculations, as you articulated in your reply

23  report, you were aware that Amazon Business had certain

24  projections concerning their sale of consumable office supplies,

25  correct?

1  A.    Yes.

2  Q.    And as expressed in your reply report, do those future

3  projections of Amazon Business unsettle your conclusions that

4  Staples and Office Depot have a substantial share --

5       MS. SULLIVAN:  Objection, Your Honor, it's the same issue.

6       THE COURT:  Well, the conclusion is there, but it's not

7  supported by any underpinnings.  So I'll take it and give it

8  whatever weight, if any, it's entitled to.

9       THE WITNESS:  Um, that was based on -- my conclusion was

10 based on the data I had available at the time of the reply

11 report, which was from Mr. -- which we've been talking about

12 here, the projections that were in the exhibit to Mr. Wilson's

13 deposition, which I should say was not available to me in time to

14 include in my initial report.

15 BY MS. CERILLI:

16 Q.    Okay.  So going back to the initial market share chart --

17      THE COURT:  What slide, Counsel?

18      MS. CERILLI:  Slide 20.

19      THE COURT:  All right.

20 BY MS. CERILLI:

21 Q.    -- I noticed that the -- some of the next largest

22 suppliers here are focused on paper.  Did you break out market

23 shares for paper as distinct from other types of consumable

24 office supplies?

25 A.    Yes, I did.

1    Q.    Okay.  And what did you find?

2          THE WITNESS:  So this would now be slide 23, Your Honor.

3    Isn't that right?  I think so.

4          So as we would have expected -- so first off, we did the

5    same thing with the Fortune 100 companies; we just had to try to

6    pry apart the paper and the other, what's called core office

7    supplies, which is an imperfect exercise again.

8          We know as a matter of arithmetic that when we break it

9    out, one side's going to end up with higher shares for the

10   merging companies; the other side's share -- piece is going to

11   be lower.

12         THE COURT:  Right.

13         THE WITNESS:  We're pretty sure going in, the core office

14   supplies is going to be higher, and the paper is lower because

15   we see these paper manufacturers.  And that's what this chart

16   shows you.

17         I would emphasize the bottom row, that the core would get

18   a share of about 87 percent combined between the two companies.

19   It is lower in paper, 71; and then the 79 over there on the

20   left, that's the number we had before, when we -- before we

21   broke them out.

22         So actually the total amount of money for the two

23   companies, it's a little bit more than half its core and a

24   little bit less than half its paper; I think 46 percent is

25   paper.  So that's all adding up.

```
 1          So this is one of the reasons, by the way, originally --
 2     so I did this in my prior -- my rebuttal report, or prior
 3     report.  I had looked at this originally and not done the break
 4     out; Mr. Orszag criticized that, and we did some extra work.
 5     There's some additional, you know, like I said, allocations or
 6     attributes that have to be made.
 7          And this is the result, so we've done that now.
 8     BY MS. CERILLI:
 9     Q.    Okay.  And so is your takeaway from this is that even if
10     you had not included paper in your cluster and you separately
11     defined a paper market, you still would have found substantial
12     shares for the parties in paper?
13     A.    Well, I think -- so I think this is actually instructive
14     regarding how cluster markets work.  So if you look at the
15     79 percent for the core and the paper together, you say, "Well,
16     I'm not sure they're exactly the same.  Let's try to break them
17     out."  It's hard to do, you break them out, you start with 79,
18     you get one number that's higher, the other number that's lower.
19          It is worth checking that the 71 percent -- well, okay,
20     that's still pretty high.  If that number were 20 percent, then
21     I go like, wait a moment.  Something else is going on in paper.
22     Maybe there's not a problem in paper.  And then the clustering
23     would be dubious.
24          THE WITNESS:  We could have put ink and toner as another
25     column here, Your Honor, and, again, it would take a lot more
```

1    work to measure.  But if you put ink and toner in, we have every

2    reason to believe that we would end up with a considerably lower

3    share; and that's why we haven't done it.  Okay.  But the same

4    sort of arithmetic would apply.  We stuck here.

5         So I think the main message here is the paper shares are

6    still very high.  I guess if you look at 46 and 25, for the two

7    companies, and that is what it is in terms of concentration --

8         THE COURT:  If you put ink and toner in, you would come up

9    with lower share such as, what, I mean, what percentage?

10        THE WITNESS:  Well, we don't know.  You see, the

11   trouble -- and the trouble is a lot of these -- again, we're

12   talking about Fortune 100 customer responses.  So I mentioned

13   W.B. Mason, they didn't break out -- many large customers would

14   say, "Here's what we bought from W.B. Mason in the office

15   supplies category generally."

16        THE COURT:  And everyone interprets it differently; do

17   they?  Is that --

18        THE WITNESS:  There's some of that, yes.  But then the FTC

19   went back and said, "Well, what do you include in this?"  And

20   some companies had more detail, other companies didn't.  But a

21   lot of those times after that back and forth, the company would

22   say, "Look, this is what our records show.  We buy from W.B.

23   Mason" --

24        THE COURT:  You figured it out, right?

25        THE WITNESS:  Yeah, "We don't know how to break it out."

1          THE COURT:  More often than not, though, would it be fair

2     to say that most companies include ink and toner as an office --

3     under the category of office supplies/office products?

4          THE WITNESS:  I'd have to double-check the underlying

5     records.  I wouldn't be surprised.  But I'm not, as a factual

6     matter, sure, if we went through those, you know, 81 responses we

7     worked with.

8          There's a lot of, you know, variety here; everybody has

9     their own accounting system and so forth.  But -- and, again, the

10    dis- --

11         THE COURT:  But you wouldn't be surprised if that were the

12    case.

13         THE WITNESS:  Sorry, I didn't answer clearly.

14         I wouldn't be surprised if a number of the large Fortune

15    100 companies had a category --

16         THE COURT:  Or the majority.

17         THE WITNESS:  Or the majority.  No, I wouldn't be

18    surprised at all.

19         THE COURT:  So you think ink and toner is office

20    supplies/office products?

21         THE WITNESS:  Yes, and the -- and that's why in many -- if

22    we kept it in the market shares, that goes back to my example

23    with W.B. Mason.  So we would say, "All right, you're not

24    breaking it out" --

25         THE COURT:  Yeah.

 1          THE WITNESS:  -- "we'll just include the whole number,"

 2   even though they've told us it includes some ink and toner.

 3          THE COURT:  Right, right.

 4          THE WITNESS:  So my purposes, that inflates W.B. Mason's

 5   share here because we've -- because I'm trying to measure core

 6   and paper.

 7          THE COURT:  Right.

 8          THE WITNESS:  But I understand, I think, where you're

 9   coming from:  Well, don't people think of it together in a group?

10          THE COURT:  Exactly, right.

11          THE WITNESS:  And I there's some -- look, I think that's

12   pretty common.  I can't give you numbers.  I'm not -- I'm not

13   quibbling about --

14          THE COURT:  It is usual for a Fortune 100 not to include

15   ink and toner under the category of office supplies/office

16   products, and -- well, do you have an expert opinion about that?

17          THE WITNESS:  Well, it -- I don't want to say right now.

18   I could ask one of staff members, you know, Matt Johnson, who

19   looked at this very carefully and knows all the details.  I do

20   not know, sitting here, how many.  And, again they're all

21   different so it's idiosyncratic.  I just don't know as a factual

22   matter, Your Honor.

23   BY MS. CERILLI:

24   Q.    But does the fact that a particular customer buys

25   products together mean that they belong in the same cluster?

1    **A.**    No, no, not at all.  I mean, if you go back to my example

2    with the cardiac surgery and the knee surgery, same insurance

3    companies contracting with the hospital for a range of things,

4    that doesn't mean you lump it together.

5         THE COURT:  Right.

6    BY MS. CERILLI:

7    **Q.**    And, again, Professor Shapiro, I believe when we were

8    looking at the original market share graph, it included some

9    manufacturing of paper; is that correct?

10   **A.**    Yes, that's right.

11   **Q.**    So did your -- do your market shares include sales of

12   manufacturers to the Fortune 100?

13   **A.**    Yes, absolutely.  If any Fortune 100 company is buying

14   paper directly from the manufacturer, I would include that.  We

15   see some of that in the data.  In fact, is it shown here?  Yeah,

16   Georgia-Pacific is showing up as one of the paper manufacturers.

17   That actually -- all of that is a very large order by one very

18   large company of paper that that company reported to us, one of

19   the Fortune 100 companies, so it's included here.  And this is

20   part of the method of asking them:  Tell us wherever you got

21   your office supplies from, manufacturer, distributor, somebody

22   going to the store to buy it; tell us wherever they came from.

23        And so the manufacturers are included.  Georgia-Pacific

24   shows up here and Domtar.

25   **Q.**    And what about manufacturers of office supplies other

1    than paper?

2    A.     Well, they're also included.  It's minuscule in the

3    overall scheme of things.  That's just not something these

4    companies want to be doing, ordering those smaller items

5    directly from manufacturers; very, very tiny shares.

6    Q.     Okay.  And what conclusions did you draw from these

7    market share figures?

8    A.     I'm sorry, I spaced out.  What did I conclude?  Okay.

9    Q.     Sort of what is your assessment of the market

10   concentration in light of these shares?

11   A.     So, look, that is highly-concentrated market, 47 plus 32

12   are very large shares in a merger context.  I would call this

13   market a duopoly with a fringe, just in terms of the way the

14   literature would describe this.  And the fringe is not a

15   derogatory term.  It just means a lot of smaller players, which

16   there are a large number here.  And, of course, the merger would

17   then turn it into what we would call a dominant firm plus a

18   fringe, rather than duopoly.  So highly-concentrated with a, you

19   know, dramatic increase in concentration that would result from

20   the merger.

21   Q.     Okay.  And can you show us your formal assessment of the

22   market concentration figures?

23   A.     So that's slide 24.

24          THE WITNESS:  I think Your Honor has already heard about

25   the Herfindahl index, the HHI, the sum of the squared shares, so

1    I'm going to skip through that, I think.  It's purely an

2    arithmetic calculation, but a standard one.  And you can see here

3    the post of the -- the HHI in the upper half, the 3,274, that's

4    the concentration today, as best we measure it using these data.

5    And then after the merger, combining the two firms, it would go

6    up again from 3,200-something to 6,200-some.  So I've highlighted

7    the increase, which is what I give a lot of weight to, the

8    increase in the Herfindahl, because that's what's really

9    changing.  And that's 3,000.  It happens to be a round number.

10   That's a -- that's what the, you know, Herfindahl concentration

11   arithmetic tells us here.

12   Q.    Okay.  And does this increase in market concentration

13   have implications for the likelihood of anticompetitive

14   conditions?

15   A.    Well, yes.  I mean, following the normal methods of what

16   we do with the Herfindahl index, this is well into the zone.

17   For example, under the merger guidelines, it's, you know, well

18   above the zone where there would be -- whatever the guidelines'

19   language is actually something to the effect -- the presumption

20   of significant harm to competition, which is, you know, in the

21   case law type of language.

22   Q.    Okay.  And you understand that the defendants claim that

23   the HHI comparisons and Office Depot/OfficeMax would have also

24   been above the threshold.

25         Does that weaken your confidence in -- of the

1    significance of the high concentration here?

2    **A.**    No, not here.  I mean, I don't view this as the end of

3    the analysis anyhow.  It's informative.  So one thing, we need

4    to go on to look at competitive facts.

5           The other thing is, in shorthand, if that merger was 3 to

6    2, this is 2 to 1, again with the fringe.  So that's just a

7    whole different matter.  And there's reason to believe that the

8    3 to 2 -- if I can use that language again -- didn't have, as

9    far as we can discern, anticompetitive effects, because after

10   that merger Office Depot and Staples have been competing very

11   vigorously since then.

12          So two -- two strong players looks like it was a -- very

13   valuable for customers.  The drop from 3 to 2, I can't find any

14   big effect that occurred from that.  So the Herfindahl is

15   one piece of that, but we're going to look at the bidding

16   analysis; and that's going to be, in a way, more informative to

17   me about tracing through the actual effects.

18   **Q.**    Okay.  And we'll skip the next slide in light of the

19   objection that the Court sustained, but consistent with

20   your opinion --

21          THE COURT:  Which one is that, 25?

22          MS. CERILLI:  Yes.

23          THE COURT:  All right.

24   BY MS. CERILLI:

25   **Q.**    But consistent with the opinion you expressed in your

1    reply report, does your understanding of Amazon Business'

2    projections unsettle your conclusion that this merger would

3    result in a highly-concentrated market?

4           MS. SULLIVAN:  Objection, Your Honor, again, undisclosed

5    expert opinion.

6           THE COURT:  I'll sustain that.

7    BY MS. CERILLI:

8    Q.    So, Professor Shapiro, you mentioned that you sought to

9    corroborate the conclusions in the Fortune 100 shares in other

10   ways, and I believe one of the other ways you mentioned was the

11   primary vendor relationship shares.

12          So can you explain what those are and elaborate on how

13   you think it corroborates the F100 shares?

14   A.    Yes.  So we might as well look at slide 26 to do this.

15   So this is the other main data set and data analysis I did for

16   market shares, for measuring shares.  So the main starting point

17   here is, first off, the data.  It's a completely different set

18   of data.  These are data coming from suppliers.  Okay.  The

19   other was customers, Fortune 100.  These are the suppliers.  And

20   I think it's mostly redacted, but you can see the long list --

21   well, the list of suppliers here, there's about 35 of them I

22   think, that provided information.

23          THE COURT:  All right.

24          THE WITNESS:  They were contacted and provided

25   information.  And then what did we do with each of those

1    suppliers?  Again, this is the same process:  The FTC seeking

2    information, back and forth, my staff involved, period of months,

3    detailed analysis.  It's all similar in that sense, but it's a

4    different set of sources of data.

5         So the -- we tried to determine -- first off, let me

6    define a primary vendor relationship.  Okay.  We asked -- tried

7    to find out -- asked these companies:  "Can you identify -- can

8    you identify customers to whom you sell at least $500,000 of

9    consumable office supplies during a given year?"  And, again,

10   they would have mostly be talking about 2014, the previous year.

11   So that's what we're trying to measure.

12        The idea is to measure how are these -- how's everybody --

13   all these large -- all these distributors, how are they doing --

14   how successful are they in establishing a primary vendor

15   relationship and selling office supplies in that relationship.

16   And that's what we're trying to do here, and -- actually, if we

17   could jump to the next slide.

18        We'll go back and forth between 27 and 26.  27 shows a

19   little more detail that I think is instructive in terms of what

20   we get from these data.  So, for example, the first two are

21   Office Depot and Staples, and you can see their sales.  That's

22   not redacted, right?  So between the two of them, each have

23   around 900 million of sales to these -- in -- to customers in

24   this category.  And you can see they each have 500-some customers

25   that they sell at least $500,000 worth of consumable office

1     supplies.  So that we're getting, of course, right from their own

2     data, Staples and Office Depot.

3           Everybody else, the data is from these other suppliers,

4     and their names have been blocked out for the open court.  And so

5     a number of things here are relevant, and they're also reflected

6     in the previous bar chart.  So, actually, if you flip back to 26,

7     you can see the sales have been turned into percentage terms.

8     Office Depot and Staples have 45 and 43 percent of all these

9     sales go to them.  And then the next couple of companies are at

10    the, you know, 3 or 2 or 3 percent range.  And you can see, Your

11    Honor, on slide 27 -- although it's redacted -- who they are, and

12    then on down the line.  Okay.

13          So we've got -- that's -- so this is the main additional

14    measure of shares.  I want to be very careful.  I'm not -- I

15    don't want to call these market shares, okay, and we can talk

16    about exactly why.  I want to call the Fortune 100 data market

17    shares.  I'm calling these primary vendor relationship shares

18    because they're measuring something different but something very

19    valuable for the merger analysis, in my view.

20    BY MS. CERILLI:

21    Q.    Okay.  And did you have data also on how important the

22    primary vendor is to large customers?

23    A.    Yes.  So we do know that -- so from the Fortune 100 data,

24    we know that on average -- if I remember this right --

25    78 percent of the purchases are from their number one vendor.

1    Okay.  See, those customers we can ask them -- we know, who did

2    they buy from?  We could say the top dog in terms of who they

3    buy from was 78 percent on average.  And so that's consistent

4    with other evidence that this -- the primary vendor's playing a

5    big role.  It's not the only role.  It's not 100 percent, but

6    it's a big role.  So that strengthens the informative value of

7    these primary relationship shares that we're looking at here.

8    Q.    Okay.  And I understand that these shares are based on

9    collection of data from several dozen different distributors of

10   office supplies, and similar to the Fortune 100, we won't have

11   time to go through all of the detailed analysis that you did to

12   assemble and process that data.

13       Can you refer the Court to where that is in your report

14   in the event that he -- the Court has specific

15   detailed information -- more detailed information he's

16   interested in?

17   A.    Yes, I can.  So Appendix G to my first report is called,

18   "Competitor Data Compilation and Processing," and that goes

19   through in, you know, a fair bit of detail how this was done,

20   including how the firms were selected to be contacted.

21       And I believe in the end we got -- we, the FTC, got

22   something like 35 usable responses out of 39 companies that were

23   contacted, something like that.

24   Q.    Okay.  And similar to the F100 shares, when you were

25   processing the data that you got from competitors, did the

1    method that you took, was it over conclusive or under inclusive

2    with respect to counting shares to the competitors?

3    **A.**      So, again, there's a lot of -- so, for example, Fastenal

4    is an adjacent supplier.  Okay.  So we might get data that they

5    sold -- actually, I'm not sure that they apply here.  I should

6    back off on that.

7         Let me make the general point:  We often had trouble

8    breaking out whether this company that supported the data,

9    between their sales of consumable office supplies and other

10   items, including our favorite ink and toner in some cases.  So

11   what we did is, if the -- we basically said, look, if they can't

12   break it out between the products we're trying to count and

13   other products, we'll just include -- we'll include the sales

14   that are ambiguous as well.  So we're overstating their sales.

15        And I think -- again, I'm not certain of this one, I'm

16   sorry.  But I think with Fastenal, you know, they sell a lot of

17   other stuff; so we would, I think in some cases at least,

18   include some of their sales.  I'm sorry, I shouldn't have said

19   that.  I -- the general principle -- I apologize.

20        So we're overinclusive where we can't break things out.

21   I'd have to go back and check for particular examples, but

22   that's what's going on.  Grainger, that's going to happen for.

23   Grainger is in here.  I won't say where, but they're on the

24   list, listed on slide 26.

25   **Q.**      Okay.  And did you also consider breaking out paper as

1   well from other consumable office supplies in relation to when

2   you were looking at the primary vendor relationships?

3   **A.**     So yes, we did the same breakout, same type of

4   breakout -- that is now going to be slide 28 here -- as best we

5   could again, doing the split.  And we get, as you can see

6   there -- well, the share we were -- we started with for the two

7   combined categories was 88 percent, 87.6 shown here, and that

8   broke out into 94 and 81.

9        Again, the key question, I think, in doing this is:  Is

10  paper still -- share high enough that you would still, you know,

11  have some strong concern about paper?

12       And here we say yes, because it's 42 plus 39.

13  **Q.**     Okay.  And we're seeing here that Staples and Office

14  Depot have a very, very large share, a primary vendor share,

15  using what I believe you're using here, the $500,000 spend

16  cutoff.

17       Did you test the sensitivity of going down to a lower

18  spend threshold to see if their share -- their shares drop at

19  all?

20  **A.**     Yes, we did.  So I -- that's the next slide.  That'll be

21  slide 29.  Fortunately, because of the information that was

22  obtained by the FTC here, we were able to look at a broader set

23  of customers with the $250,000 threshold.

24       THE WITNESS:  And, actually, it's shown there on the

25  slide, Your Honor.  There were 1,249 primary vendor relationships

1   at the 500,000 cutoff.  By lowering the cutoff to 250,000, we

2   roughly doubled the number of data points here to 2,490.

3        And I -- again, I thought the shares, Staples' and Office

4   Depot's shares, would fall a little bit or maybe a moderate

5   amount.  I wasn't sure.  I think more or less by coincidence

6   they're almost exactly the same.  They didn't fall at all.

7   Which, you know, looking at this alone, actually made me worry

8   about somewhat low -- the next range of customers and harm to

9   them.  Now, they're not included in the relevant market; but it

10  gives me, you know, that much more confidence that by using the

11  500,000 threshold we're not, you know, missing something

12  important, some other supplier's a big deal who's serving smaller

13  customers.  That's not the case.

14  **Q.**   Okay.  And, generally, just to sort of sum up, what

15  significance do you draw from seeing such large primary vendor

16  shares for Staples and Office Depot?

17  **A.**   Well, I think these shares -- and look, these are higher

18  than the market shares.  And the reason they're higher is

19  because we're not including leakage and a bunch of other things.

20  This is just establishing a primary vendor relationship often by

21  winning an RFP, you know, or getting a renewal on a major

22  contract.  These are the basic, I'll say, relationships that

23  large companies want to have with their vendors here, and so

24  this is a measure of success.  And it's going to dovetail with

25  the bidding data we look at, too.

1          So this may -- this, I guess, further increases my

2    concern about the deal at the stage where we're still measuring

3    shares before we get to bidding analysis as such.

4    Q.    Okay.  And Professor, I'd like to turn now to address

5    some of the criticisms that defendants have made against your

6    market shares based on the Fortune 100 data.

7          So you testified that the shares are not based on the

8    full Fortune 100 but instead that you only had usable data for

9    81 of the companies.

10         Do you believe that leads to bias in your results?

11   A.    No, I don't.  We talked about that before.  I maybe got

12   ahead of myself on that.  And we had this Exhibit 30 that we had

13   already covered.

14         So it doesn't -- it doesn't lead to bias, in my view.

15   This particular exhibit was showing that the 19 companies that

16   we couldn't -- that didn't have enough -- good enough data from,

17   are, you know, generally very large, also using Staples and

18   Office Depot as their primary vendors; they're certainly large

19   customers of Staples and Office Depot.

20         But more generally, I have no reason to think this sample

21   is biased, and I've done a number of things to check it.  And it

22   fits with all the other evidence, so I'm not concerned about

23   that, no.

24   Q.    Okay.  And you did also touch on this next question

25   before, but just to sum up:  You know, the Fortune 100 are the

1   largest companies in America.  Why are you comfortable using

2   that as far as a larger or different set of companies?

3   **A.**     Well, again, they are not the largest customers of

4   consumable office supplies.  We actually -- you know, I'm going

5   to take this opportunity.

6          THE WITNESS:  Judge, if you could look -- turn to in my

7   reply report, Exhibit R1A.  Do you mind?

8          THE COURT:  I'm not sure I have that, but I'll make a note

9   of that.

10         Go ahead.

11         THE WITNESS:  Okay.

12         THE COURT:  What's the exhibit number?  R1A?

13         THE WITNESS:  It's R1A in the reply report.

14         So this lists -- this lists the 81 companies we've been

15  talking about, how much they buy in consumable office supplies,

16  and it's listed out between by Staples and Office Depot.

17         So, you know, you want to see who are these companies, how

18  much are they actually buying, and it lists their total

19  purchases.  So -- and I guess the individual items.

20         But you can see that when we get down to the lower part of

21  this list, the last -- the lower half, say -- and we saw this on

22  the other exhibit, too -- they're buying -- they're buying one or

23  two million of consumable office supplies.  And that's, you know,

24  in the range of other -- of many other large customers, okay.

25         So there's nothing -- you know, I don't think this is some

1    distorted or -- sample that's not reliable.

2    BY MS. CERILLI:

3    **Q.**    Okay.  Now, did the Fortune 100 shares you calculated --

4    I believe you said it included sales not only on contract --

5    through a contract but also any purchases that the companies

6    were making off-contract; is that correct?

7    **A.**    Correct.

8    **Q.**    Okay.  And how specifically did you account for any

9    off-contract spend?

10   **A.**    So at the risk of repetition, these Fortune 100 responses

11   from the customers, we asked them -- again, "we" being FTC with

12   all of the intermediaries, between me and them -- "Please tell

13   us all the ways in which you get your consumable office

14   supplies."  Okay.  "Not just your primary vendor, other

15   off-contract spend, how you get your paper," and we asked them

16   about what you've heard about already, leakage, okay, which

17   there are different definitions of the term, but we just said,

18   "Include it all, everything."

19        And so the shared numbers do include that.

20        There were -- of course, a number of companies said,

21   "Well, here's everything we track, but there's some stuff we

22   can't track, we don't track."  So, you know, we could -- I tend

23   to call that discretionary leakage or unreported leakage.

24        THE WITNESS:  And if you see in slide 31, let's say,

25   that's about where we are now, Your Honor, there's an unreported

1    leakage adjustment, I don't -- that's not redacted.

2         So we took information about what -- a number of

3    companies responded and said, "Well, look, there's a bunch of

4    stuff we can't track.  Leakage, we're not sure how big it is,

5    but it's small," and we used that.

6         And slide 32 lists all the companies that gave specific

7    answer about that in this back and forth with the FTC.  So, you

8    know, a number of them said de minimis when asked about, you

9    know, everything -- "Everything you told us and specified, is

10   there some stuff you're missing?"  And they'd say, "De minimis,"

11   or "Less than 3 percent," whatever.

12        So we took all those numbers, we -- I made the decision

13   to count de minimis as 1 percent, then I added it all up and

14   then that's what leads to this 2.2 percent unreported leakage

15   adjustment.

16        So it's my best shot at using the data I have to include

17   leakage and, therefore, all sources by which companies get their

18   office supplies in my market share table.

19        So that's the goal, and I think we've done a good job of

20   it, is to be inclusive.

21   BY MS. CERILLI:

22   Q.   Okay.  And do you have other data analysis that you used

23   that added confidence to your belief that these estimates were

24   reliable?

25   A.   Well -- so just in terms of these data, I'm still

1    thinking -- I had seen a lot of -- as part of this process

2    again, over a period of months, the Staples and Office Depot

3    were saying, "There's a lot of leakage, there's a great deal of

4    leakage as a form of competition that we have to worry about."

5    And so -- and some of the leakage would be people going and

6    buying at retail or online.

7         So I said, "Well, okay, how can we study that?"  And so

8    we looked at the price difference between what the big customers

9    pay on their contract and what they have to pay if they would go

10   online.  We know they're getting a good deal, but how good is

11   it?

12        So we looked at that price gap.  The idea is, look, if

13   when you go online, if you have to pay 50 percent more, that's

14   not going to be very attractive.  If it's the same price, that's

15   more interesting where I'd have to worry about leakage more.

16        So we measured this price gap between the contract price

17   and the online or in-store prices.

18   Q.   And did you also see evidence from the customers

19   themselves that they prefer that customers -- prefer that their

20   employees purchase on contract?

21   A.   Well, yes, and I think you've heard testimony about that

22   from some of the procurement officers.  Look, it makes sense:

23   They get a really good deal from Office Depot or Staples.

24   It's -- well, we're going to show the numbers here.  It's a lot

25   better than if people just go buy on their own.  And, of course,

1    they want to save money.  They want to control that rogue spend

2    or discretionary spend.  They want to control it.

3         And, of course, it's an interesting situation:  If

4    Staples is the primary vendor, they and the customer, they both

5    want to control that spend.  So they're really teaming up to do

6    this.

7         And we see that the in the RFPs, we see that in other

8    materials that it's a combined effort.  It makes perfect sense

9    to me.  So that also -- and customers talk about how they're,

10   you know, controlling leakage and generally successful at it, I

11   would say, although it's an ongoing issue.

12        MS. CERILLI:  Okay.  Before we turn to the next slide,

13   Your Honor, I just wanted to address what the next slide is

14   showing.

15        So Your Honor recalled that you requested that Amazon

16   produce data from Amazon.com.  That data was produced basically

17   midnight last Friday.  We assumed Your Honor would have

18   questions on it and whether unsettled Professor Shapiro's

19   analysis.  And so in the next slide he seeks to just explain

20   that it does not.

21        We are happy to proceed however you'd like.  We would be

22   happy to produce the backup of that today so that their expert

23   can address it.  We would even go so far as to make him

24   available --

25        THE COURT:  Just so the record is clear, what slide are

1    you referring to?

2          MS. CERILLI:  We are referring to slide 34.

3          THE WITNESS:  Thirty-four.

4          MS. CERILLI:  And, obviously, there is no attempt at

5    holding anything back, it's just that this data did not come in

6    until midnight last Friday, and we were literally processing it

7    within the last 48 hours.

8          MS. SULLIVAN:  And, Your Honor, two things:  One, again,

9    we object to an undisclosed expert analysis and expert report;

10   and two, it didn't come in until last night because we pressed

11   for this, Your Honor, and Your Honor granted our request.  The

12   FTC could have gotten this data a year ago.  They purposely put

13   blinders on when it came to Amazon.  So it's doubly unfair:  One,

14   undisclosed expert testimony; and two, data that they purposely

15   didn't pursue in this case because they didn't want anybody to

16   know what was going on in terms of sales from Amazon.

17         MS. CERILLI:  Let me clarify.  We had data from the

18   Fortune 100.  The Fortune 100 were asked to report all of their

19   purchases, as Professor Shapiro has been explaining, including

20   from Amazon -- and you can see on slide 34 this is not new data.

21   This is directly from the Fortune 100 market shares.  This is the

22   reported data directly from the customers.  So we're not putting

23   blinders on; we are going directly to the customers and asking

24   them to produce their Amazon.com spend.

25         THE COURT:  So wait a minute.  So you did not get this

```
 1   information until when?  Last Friday?

 2         MS. CERILLI:  Yes.  And so from the customer side, we

 3   have --

 4         THE COURT:  Did you share it with defendants then?

 5         MS. CERILLI:  So what came in last Friday was Your Honor

 6   had asked Amazon.com to produce data.

 7         MS. SULLIVAN:  At our request.

 8         MS. CERILLI:  That was what was produced last Friday.

 9         We did not pursue that data because we were pursuing it

10   from the customers.  And as you can see here, you can see

11   Amazon.com's share in our F100 shares.  We just thought that Your

12   Honor might have the natural question of whether the data coming

13   from the other side, from Amazon.com, was inconsistent with the

14   data that we had from the customer side.

15         Professor Shapiro analyzed it and concluded it did not.

16   That's all we're seeking to show here.  But we're happy to do

17   it to alleviate any concern; we will produce the backup to this.

18   We -- their expert will have a chance to --

19         THE COURT:  I'm sorry, I'm sorry.  So you have the backup,

20   you have the analysis --

21         MS. CERILLI:  We have the backup to the Amazon.com data

22   that came in last --

23         THE COURT:  How long have you had that?

24         MS. CERILLI:  Within the last 48 hours, because the data

25   itself only came in at midnight last Friday.
```

1          MS. SULLIVAN:  And here's the problem, Your Honor.  They

2     only pursued for their market share analysis data from Staples

3     and Office Depot.  They purposely didn't look for the Amazon.com

4     data.  It was only at our request, Your Honor, that it was

5     produced.  And they've had a year to put this case together, they

6     purposely didn't receive this data.  They never disclosed any

7     opinions from this expert about this data.  It's an unfair

8     surprise at this point, Your Honor.

9          MS. REINHART:  Your Honor, regarding Amazon data, there

10    was data that we collected during the investigation.  And that

11    data was used as the basis for the numbers, the projections that

12    were in the declaration.  Mr. Wilson testified about that

13    methodology in his deposition.

14         There never was another request from the other side

15    forthcoming for any additional data.

16         He then testified again here in this courtroom and had a

17    slightly different spin on things.  That caused Your Honor to

18    make the request for the data.

19         We're very comfortable with the data as it was, but it was

20    given to us, and now this supplemental data has just put a slight

21    twist on things.  And that's what -- that's what --

22         THE COURT:  That's what I want to know, though, that the

23    defendants' experts have not had an opportunity to consider,

24    right?

25         MS. REINHART:  We just -- Judge --

1          THE COURT:  I understand that, but you -- all right.  And

2     I accept what you're saying, but you received it two days ago.

3     Why didn't you let me know two days ago?  Maybe I could have done

4     something then.  I don't know.

5          MS. REINHART:  So the data came in that Your Honor had

6     requested them to produce.  We received it, transmitted it to our

7     expert, they began working with it.  They just finished their

8     work on it, the backup has just been created.  We're happy to

9     give it to the other side.

10          THE COURT:  And what are they supposed to do with it now?

11          MS. REINHART:  Well, their expert will be testifying

12     sometime next week.  They have plenty of time to work with it.

13          THE COURT:  Okay.  I'm not going to allow it.  The

14     objection's sustained.

15     BY MS. CERILLI:

16     Q.   Professor, I think we --

17          THE COURT:  Let me ask a question:  Could not that data

18     have been obtained by the government at any time during the last

19     year?

20          MS. REINHART:  It could have, Your Honor, and I think -- I

21     think the only reason it wasn't is that we were comfortable with

22     the data we received, the forecasting information that they gave

23     us and the description that came with it.  And, again, Mr. Wilson

24     testified about all of that in his deposition.  We were

25     comfortable with that testimony.  Apparently the other side was

1  too because they did not ask him for anything additional.  It was

2  only when he testified here last week that there was a request.

3          MS. SULLIVAN:  Your Honor, they purposely sought data only

4  from Amazon Business, not from Amazon.com.

5          THE COURT:  All right.  I sustained the objection.

6          MS. SULLIVAN:  Thank you.

7  BY MS. CERILLI:

8  Q.    Mr. Shapiro, I still would like to address the top half

9  of this slide, which is data from --

10         THE COURT:  Which one are you referring to now?

11         MS. CERILLI:  To slide 34.

12         THE COURT:  All right.

13  BY MS. CERILLI:

14  Q.    We've heard -- defendants have been making arguments that

15  off-contract spend goes to Amazon.com.  Did you assess purchases

16  by the Fortune 100 on Amazon.com in your shares?

17  A.    Yes, I did.  And that's what's shown on the top of the

18  slide here.

19  Q.    And can you explain what the top half of the slide is

20  showing?

21  A.    Certainly.

22         THE WITNESS:  So let me go back again, Your Honor.

23  The -- so all the Fortune 100 companies, we get their

24  information --

25         MS. SULLIVAN:  Your Honor, I'm sorry.  This was -- if we

1    could take this down.  This is what was just objected to and

2    sustained, and now they put the slide back up.

3         MS. CERILLI:  Well, the top half of the slide is the

4    analysis from his report.  That's all I'm asking him to address.

5         MS. SULLIVAN:  You just published it.

6         THE WITNESS:  Slide 34, slide 34.

7         THE COURT:  That's not the one I have here, slide 34.

8         THE WITNESS:  It's titled --

9         THE COURT:  I see it.  Right.  All right.

10        THE WITNESS:  Are we okay now?

11        THE COURT:  Counsel, what's your objection?

12        MS. SULLIVAN:  Your Honor, I have no problem with the top

13   half.

14        THE COURT:  Right.

15        MS. SULLIVAN:  It's the bottom half that --

16        THE COURT:  All right.  That's what I thought.

17        All right.  You can proceed, Counsel.

18        THE WITNESS:  Okay.  So the highlighted parts there in the

19   circle, that's directly from probably -- let me actually look at

20   it and make sure I'm right here -- R1D as indicated.

21        Okay.  So that's from the exhibit in my reply report where

22   I broke out the sales to the Fortune 100 companies.  And one of

23   the suppliers, not surprising, is Amazon.  And you can see their

24   purchases shown there.  That is the Fortune 100 purchases from

25   Amazon.  Whatever they said, where they mention Amazon, which

1    would include Amazon.com, that's there.

2          There were a couple of other places where Amazon --

3    important places where Amazon, I'm sure, are appearing in those

4    data but not by name.  Those are the next two rows, which are,

5    you know, between them, nearly 20 million, $19 million, which

6    is -- and you can see in terms of the shares of the overall --

7    about 4-1/2 percent.  And if you went back to the pie chart you'd

8    see those.  They're there, too.  Okay.

9          So what are those?  So that is two things:  Other supplier

10   not specified -- so a lot of times the Fortune 100 company says,

11   "I don't know who this is bought from," so it's not specified.  I

12   assume some of that's Amazon.com.  I don't know how much, but

13   they're going to be in there to some degree.

14         And then we have this unreported leakage adjustment that I

15   talked about before, so this is, again, where the corporate

16   procurement officers are not -- they're not tracking it.  And I

17   assume some of that, maybe a lot of that is Amazon.com.

18         So there's about, if you look at it together, you know,

19   about 20 million here.  And this is what the slide is showing, in

20   this -- which is about 4-1/2 percent of total purchases in this

21   universe here from Fortune 100 companies that is either specified

22   as Amazon or could well be Amazon without their name attached to

23   it.

24         So that's my -- that's how I've measured and tracked

25   Fortune 100 company purchases from Amazon.com using the data from

1    the customers.  Okay.  And -- okay.  So that -- that's what's

2    shown here.

3    BY MS. CERILLI:

4    Q.    Okay.  And Professor Shapiro, defendants have asserted

5    that many other suppliers will enter the market and expand if

6    Staples raises prices after the merger.

7         How do your market shares account for entering and

8    expansion?

9    A.    So the market shares -- the historical market shares do

10   not account for entry and expansion that would arise as a result

11   of the merger.  Okay.  That is going to come in a subsequent

12   analysis.  We're trying to measure, as best we can, what are

13   people actually buying and selling right now.

14        This question about the future and what might happen,

15   we're not including that, so that's coming.

16   Q.    Okay.  And you understand that some large customers

17   negotiate pricing of paper directly with manufacturers; and you,

18   I understand, attributed those sales to Staples.

19        Why is that appropriate?

20   A.    In my market share calculations, when Staples sells and

21   distributes paper to a customer, I attribute that, those sales,

22   to Staples.  In some cases, such as -- well, maybe -- I'm not

23   sure what I'm supposed to say, so I'll just leave it at that.

24        The customer may talk directly with the paper

25   manufacturer, such as Domar [sic] -- Domtar, excuse me, and get

1    a -- get a lower price.  And I am -- but Staples is still

2    actually making the sale at that price; and, more importantly,

3    doing the distribution services, and booking the sale, and so

4    forth.

5         I'm attributing those sales to Staples.  That's something

6    that the defendants have objected to or criticized, their

7    expert.  I stand by it.  I think it's the right way to do it;

8    and it's the normal way to do these things; because we're really

9    looking at who's providing the distribution services, and it's

10   not the paper manufacturer.

11        In cases where the paper manufacturer directly sells and

12   delivers the paper to the customer, then I attribute the sales

13   to the paper manufacturer.

14        THE COURT:  Let's do this, Counsel, I'm going -- let's

15   take a ten-minute recess and I think we'll keep it at ten

16   minutes, and we'll start back at 20 to the hour.

17        MS. CERILLI:  Sure.

18        THE COURT:  You can step down.

19        (Thereupon, a break was had from 11:28 a.m. until

20   11:44 a.m.)

21        THE COURT:  Let me ask a question about -- I want to

22   separate out the Amazon supplemental material received pretrial

23   and the Amazon supplemental material received after trial

24   commenced.

25        Let me ask defense counsel:  Does your expert intend to

1     factor that newly-produced information into his opinion?

2          MS. SULLIVAN:  Your Honor, it's pretty self-evident so

3     we're happy to put it in the proposed Findings of Fact.  The

4     number is absolutely clear, and so I don't think it needs expert

5     opinion.  I mean, it is what it is in terms of their forecast and

6     the fact that they're grown by 50 percent every year.  I mean,

7     it's incredible.

8          MS. CERILLI:  We disagree.  I mean, I think -- the data

9     that was produced was not specific to large customers; it was not

10    specific to consumable office supplies.  If Your Honor is

11    interested in the implications of that data --

12         THE COURT:  No, I was just concerned as to whether or

13    not -- I was just interested in whether or not, since it was

14    produced after the trial started and produced to both sides,

15    whether or not the defendants plan to factor that information --

16         MS. REINHART:  Your Honor, might I make --

17         THE COURT:  -- into its position.

18         MS. REINHART:  Might I make a suggestion based on

19    Ms. Sullivan's colloquy just here, is that we step back and talk

20    a little bit afterward and decide whether it's actually going to

21    be used.  It may be useful to the Court to see some --

22         THE COURT:  That's my whole point.  I don't want to spite

23    myself, you know.

24         MS. REINHART:  Exactly.

25         THE COURT:  I mean, this is a nonjury, and I can let it in

```
 1   and if there are objections --

 2         MS. SULLIVAN:  So --

 3         MS. REINHART:  If might suggest, Your Honor, if we can

 4   consult with the other side and decide if it's worth arguing

 5   about and perhaps making a proffer.

 6         THE COURT:  That's fine.

 7         MS. SULLIVAN:  That's fine, Your Honor.

 8         THE COURT:  You can do that over lunch.

 9         MS. SULLIVAN:  We will, Your Honor.

10         THE COURT:  Because I was concerned -- yeah.  And why am I

11   doing this to myself, because it could be extremely helpful

12   information to inform the Court's decision, so --

13         MS. SULLIVAN:  And part of the issue, Your Honor, is if

14   the government for their own reasons made a conscious decision

15   not to get vendor data from Amazon.com or we wouldn't be here.

16   It's been a year and they made a decision:  We don't want to look

17   at that.

18         THE COURT:  Right.  And now, I had anticipated one of two

19   answers.  One answer would be, "We have the information, and no,

20   Judge, you know, our expert did not plan to opine on it," and

21   then that informs the Court's decision to leave it out.

22         But if you're going to use it, then query whether or not

23   the expert should be allowed --

24         MS. SULLIVAN:  Well, we'll take a look at that, Your

25   Honor, and decide.
```

1          THE COURT:  All right.

2          MS. SULLIVAN:  Well, we hadn't intended to use it with our

3     expert.  The numbers are what they are.  And whether or not it's

4     significant enough to put in our findings of fact, we can do

5     that.

6          THE COURT:  All right.  Fair enough.  All right.

7     BY MS. CERILLI:

8     **Q.**    Okay.  Professor Shapiro, I believe we left off and you

9     were addressing how you accounted for sales by paper

10    manufacturers.

11         I noticed also in your Fortune 100 shares that you did

12    not generally have shares for diversity suppliers.  Why is that?

13    **A.**    So when a diversity supplier works with, let's say,

14    Office Depot and serves a large customer, I've attributed those

15    revenues to Staples in that -- excuse me, Office Depot in that

16    case, rather than the diversity supplier as such.  I think

17    that's the right approach under the competition normal methods.

18         The point really is, if you think about what the shares

19    are trying to do, you're trying to measure how significant are

20    different firms as competitors.  And, you know, Mr. Morrison

21    from P.D. Morrison made it clear, he couldn't serve these

22    customers alone, no way.  He's a valuable partner with Office

23    Depot, and it seems like they have a very good relationship.

24    But if I were to attribute those sales that Office Depot makes

25    to his company, it would make it look like he's a big competitor

1    independent of them.  And that would not be -- that would be a

2    misleading approach in terms of shares.

3         There is a slightly -- one could say, well, his -- the

4    diversity suppliers do get a small piece -- you know, they get a

5    small piece of the revenue, a few percentage.  He mentioned

6    single digits; you know, it's small.

7         THE COURT:  Right.

8         THE WITNESS:  One could attribute a little bit of it to

9    him and his -- and the other Tier 1 suppliers.  It wouldn't

10   matter in the numbers.  I'm not doing that.  I'm really trying

11   to measure who's providing the basic services, who's capable of

12   doing it independently, and that's Staples and Office Depot.

13   And not Mr. Morrison, as valuable as he is in the relationship

14   with Office Depot.

15        THE COURT:  I understand.

16        THE WITNESS:  Okay.

17   BY MS. CERILLI:

18   Q.   And, Professor Shapiro, I would just like to wrap up on

19   market shares, and I do want to actually return to the topic of

20   ink and toner and whether the -- the question of whether ink and

21   toner is or is not out unsettled anything that we just talked

22   about.

23        So I understand from our discussion yesterday you did not

24   include ink and toner in your cluster, correct?

25   A.   Correct.

1    **Q.**    Did you calculate shares for ink and toner?

2    **A.**    So no, and I think we had a little bit of back and forth

3    with the Court about why it would be quite hard to do that with

4    my data from the Fortune 100 companies, to break it out; that

5    is, from the core and paper.

6    **Q.**    Okay.  And does the absence of ink and toner bias your

7    market share results that you're showing here?

8    **A.**    Well, no.  These are the correct measures for the

9    relevant market that we've defined, let's call it core and

10   paper, because we've kept out ink and toner.  So no, it doesn't

11   bias these results; it's just we're looking at a narrower

12   cluster.

13   **Q.**    Okay.  And I understand that you did not include ink and

14   toner in the cluster because you felt that there was significant

15   sales coming from MPS providers.

16       What if you're wrong about that and, in fact, MPS sale of

17   ink and toner is fairly small?

18   **A.**    Right.  So if MPS sales are small, then the competitive

19   conditions for ink and toner might look a lot like paper and

20   core.

21       THE COURT:  Do you have -- did you factor in reliable data

22   about MPS sales from the Fortune 100 companies?

23       THE WITNESS:  Right.  So we have some data from them, and

24   the trouble is the data -- let's take Xerox or Lexmark.  They're

25   going to -- a customer will say, "I bought all this stuff from

1   Xerox.  It's a lot of printers.  It's maintenance on the printers

2   and ink and toner."  So you get a big number.  But the customer

3   is not able to break out how much of that was ink and toner.

4        THE COURT:  Right.

5        THE WITNESS:  So I don't have reliable data on ink and

6   toner apart from the bundle of services that they purchase it

7   with, which is the --

8        THE COURT:  But somebody can break it out, couldn't you?

9        THE WITNESS:  Well -- okay.  So the Fortune 100 is based

10  on the customers.

11       THE COURT:  Right, right.

12       THE WITNESS:  So that's, you know, one of my two main data

13  sets so I can't do it there.

14       THE COURT:  Right.

15       THE WITNESS:  Sellers -- so then you would have to -- then

16  you would have to go to a whole collection of who are the MPS

17  providers and the printers and you could --

18       THE COURT:  Right.  It's a big factor, though, because

19  you're excluding ink and toner based on an understanding, a

20  factor that the print services overly compensates for ink and

21  toner --

22       THE WITNESS:  -- okay --

23       THE COURT:  -- or adequately compensates for ink and

24  toner.  I mean, that's why you're not including ink and toner.

25  It's covered by the managed print services.

1          Does that sound right?

2          THE WITNESS:  Yes, but let me back up.

3          THE COURT:  It seems to me you would have to have reliable

4     data about the service contracts separate and apart from

5     computers and maintenance, right?

6          THE WITNESS:  That's what we could not break out with the

7     Fortune 100 companies; that's exactly right, for Fortune 100.

8          But let me back up a half step, Your Honor.  I hope this

9     is helpful, which is, look, I have evidence that --

10         THE COURT:  Let me back up a second.  Let me just explain

11    to you.

12         THE WITNESS:  I was backing up first.

13         FROM THE FLOOR:  (Laughter.)

14         THE COURT:  All right.  Your objection is sustained.

15         FROM THE FLOOR:  (Laughter.)

16         THE COURT:  Go ahead.  Go ahead.

17         THE WITNESS:  No, really.  All right.  I had my backup

18    lights on, I think.

19         So, I have evidence that the ink and toners often sold as

20    package with the other stuff.

21         THE COURT:  Right, right, right.

22         THE WITNESS:  And I think there's quite a bit of that.

23    There's evidence that's growing, and I think Staples and Office

24    Depot would agree.  Okay.  So if that's right -- if I'm right, if

25    that's correct, then it really is a different competitive

1    situation over there.  And, you know, I shouldn't put that in the

2    same cluster.  It just doesn't look the same.  Like I said, ink

3    and toner is a consumable office supply by a reasonable -- you

4    know, just common sense, common usage; but the competitive

5    conditions are different.  So if I'm right about that, it really

6    shouldn't be in the cluster, any more than furniture should be.

7         THE COURT:  Or jan/san.

8         THE WITNESS:  Yeah, or jan/san, exactly.  What if I'm

9    wrong about it?  Okay.  What if I'm wrong and actually those MPS

10   guys, you know, they don't sell very much of ink and toner.

11        THE COURT:  Right.

12        THE WITNESS:  Okay.  It's kind of small.  Then maybe it

13   would be similar competitive conditions.  Okay.

14        THE COURT:  Right.  And then it should be in the category

15   of office products and supplies.

16        THE WITNESS:  Okay.  So then if we included it -- let's

17   trace that through, though.  Okay.  So then I should have

18   included it.  Okay.  If I should have included it -- because

19   actually that's telling me Staples and Office Depot shares of ink

20   and toner are probably going to be -- I have every reason to

21   think they'll be just like similar to what they are in core and

22   paper.  Similar, that's why we put it in the same cluster.  So

23   they're going to be 80 percent.

24        So if I'm wrong about the MPS guys, and they're small,

25   then I make made a mistake and this case should be broader.  We

1    should be worried about harm in ink and toner.  We'd have a

2    bigger case.  Ink and toner is, you know, a significant

3    additional bunch of money.  So the mistake would be -- whether

4    you attribute it to the FTC or me -- bringing a case to you that

5    was too narrow and didn't include some more products.  I don't

6    think we've made that mistake, I've made that mistake, because I

7    think the MPS guys are big; but that's the nature of the possible

8    error.  It's not that we fabricated a problem in core and paper

9    or fabri- --

10           THE COURT:  No, I'm not saying that, right.

11           THE WITNESS:  You know, it's not that we've given you

12   inflated shares in core and paper that makes it look like there's

13   a problem when there's not.  It's we might have left out another

14   problem area.  Okay.

15           THE COURT:  All right.

16           THE WITNESS:  I don't think we're doing that.  But even if

17   we are, it doesn't change the fact we've got the problem in the

18   area we're focusing on.  That's where we've shined the spotlight.

19   There's some stuff around the edges.  I don't think we need to

20   look at that.

21           So -- so that's why I'm highly confident that these

22   shares -- and we can see bidding data in this core and paper area

23   is, you know, a legitimate problem.  And I think -- I don't think

24   we've -- you know, I think -- I think ink and toner is different.

25   It is different than MPS, but whatever we -- even if we're wrong

1    about that, it doesn't undermine what we're presenting to you.

2          THE COURT:  All right.  Thank you.

3          THE WITNESS:  Okay.

4          MS. CERILLI:  Thank you.

5    BY MS. CERILLI:

6    Q.    So just to sum up, we covered a lot of data,

7    Professor Shapiro.

8          Can you just sum up your opinions about the market shares

9    and what the significance is to you?

10   A.    Okay.  So once we have the market defined -- obviously

11   we're going to have arguments about that -- then we measure the

12   shares.  I think it's crystal clear that the shares of the two

13   merging firms are very large.  Okay.  I've got 79 percent, 47

14   and 32.  We've got some different measures.  It's very large.

15   It's a little bit lower for paper.  So just that piece of the

16   analysis, I think, is clearly raising a flag.  And we can do the

17   Herfindahl on the shares.

18         Now, I don't stop there, but we -- it means we need to

19   keep going onto the next step, which is to try to trace through

20   the effects.

21   Q.    Okay.  Great.  So, Professor Shapiro, you mentioned that

22   the next element is competitive effects.

23         What are the ways in which a merger can result in a loss

24   of competition?

25   A.    Well, the normal analysis -- and this is in the merger

1    guidelines -- talks about two general categories of competitive

2    effects.  They're called coordinated effects and unilateral

3    effects.  And to put it simply, coordinated effects is the fear

4    that the merger will make it easier for the merged firm and its

5    competitors to coordinate, collude, in an extreme sense, after

6    the merger.  You know, more concentrated market, more of a

7    danger of collusion, section 1 type of stuff; or just tacit

8    coordination that wouldn't be a section 1 violation.

9         The unilateral effects is quite different -- and that's

10   what we're going to talk about here -- which is simply the

11   merged firm by no one having to compete -- the two firms by no

12   longer having to compete, the merged firm will have more market

13   power on its own, no coordination with anybody else, just on its

14   own, and that's why it's unilateral.  On their own they're going

15   to have more power and raise price, and that's what we're

16   talking about in this case.

17   Q.   Okay.  So let's consider unilateral effects in more

18   depth.

19        Can you provide a further explanation of what a

20   unilateral effect is?

21   A.   So really it's anything that's going to -- where the

22   merged firm -- because it no longer faces the company it just

23   acquired as a competitor -- will harm consumers -- where

24   customers will be harmed as a result.  Typically a higher price,

25   but it could be, you know, not being pushed to innovate quickly.

1   Okay.  In the tech industry that's often the concern, rather

2   than prices.

3        Here we're going to focus on prices as an effect, as

4   unilateral -- so I might use the word "unilateral price

5   effects."

6   Q.    Okay.  How does the analysis of unilateral effects relate

7   to the market shares we just reviewed?

8   A.    Well, it's -- it smoothly is the next step, which is if

9   you have high market shares, that's certainly an indication that

10  you're likely to have these unilateral effects.  That is to say,

11  if the firms are competing directly against each other a lot,

12  then that's when you're going to be worried.  So the market

13  shares are one -- actually one simple way of getting an estimate

14  of how often are the firms really going head to head?  How often

15  do they compete against each other?  The market shares are an

16  indication of that.

17       But we want to go beyond that and look in more detail at

18  how they actually do compete, and that's what's going to bring

19  us to the bidding data.

20  Q.    And you're starting along those lines, but how do

21  economists determine whether an adverse unilateral effect may

22  occur?

23  A.    Well, the -- the first thing we're looking for is

24  diversion between the two companies.  Okay.  That word comes up

25  a lot.  Or head-to-head competition and looking for the

1    frequency of that.

2         And then we're also going to be looking to see if these

3    two companies stop competing -- as they will if they merge --

4    are there other companies that can just step right in and will

5    be just about as good?  So there's really two elements to this

6    analysis, the economics:  One is diversion, how often are they

7    going head to head; and I'll call it gap, I'll just use the word

8    "gap," which is how far behind is the next guy.

9         You know, in this case, you know, whether it's W.B.

10   Mason, or HiTouch, or whoever -- maybe it'll be Amazon, you

11   know, in another year or two -- how far behind in terms of their

12   ability to compete effectively?  And if that gap is large,

13   that's when you're worried.  If you have high diversion and a

14   high gap, that's -- those are -- that's -- that's the most

15   worrisome situation.

16   Q.    Okay.  And so what types of evidence do economists draw

17   on to measure diversion and the gap issue that you've flagged?

18   A.    Well, we love to look at the bidding data, as you already

19   heard.  But, you know, I'm looking at what the customers say

20   about their choices -- you know, sort of stuff you've heard

21   about from McDonald's and so forth -- and, of course, what the

22   suppliers themselves say about who are we going up against, who

23   are we bidding against, and how good are they.

24        You know, and we're going to get into competitive

25   advantage and disadvantage, you know, so we can talk about this

1    gap.  So any information that I find that speaks to the strength

2    or the competitive advantage or disadvantage of the different

3    firms, that's going to start to come in here in this phase of

4    the analysis that wouldn't necessarily get picked up just with

5    measuring market shares.

6    Q.    Okay.  And that was -- you mentioned bidding already a

7    lot.  So how does the fact that that is a market that involves

8    bidding play into assessing unilateral effects?

9    A.    Well, the way -- I think the way I like to think about it

10   is, in the real world, what's going to -- we see Office Depot

11   and Staples bidding directly against each other.  You know, I

12   think the only -- the AEP example is a very good one, not the

13   only one -- and the benefits, we talked about that yesterday

14   afternoon.

15        And so we want to see how the customers benefit from the

16   bidding, and that's -- and then see who's going to be -- who

17   else is going to be able to bid in terms of come in, who does

18   bid, do they win very often.  So that's the real, you know, here

19   and now, if you will, of how competition takes place.  You know,

20   it's not an abstract concept.  Okay.  To Mr. O'Neill it's not an

21   abstract concept.  It's having these guys sweat it out a little

22   bit about who's going to win his business and get something out

23   of them as a result.

24   Q.    Okay.  And now, do all customers in the market have to

25   view the merging parties as their two best options for there to

1    be unilateral anticompetitive effects?

2    **A.**    No.  I mean, of course not.  The -- there are going to be

3    some customers who don't pick Staples or Office Depot.  This

4    is -- anything short of a total merger and monopoly, you're

5    going to always have that.  There are other suppliers.  The fact

6    that there are some other suppliers does not -- does not mean a

7    deal is okay.  I mean, that's -- that makes -- doesn't make

8    sense in terms of economics.  So that's why we'll look -- we've

9    looked at the shares of those suppliers, and we're going to look

10   at their presence in the bidding data, and their competitive

11   disadvantages.

12          So, no, the fact that there are other firms who serve

13   large customers -- you know, W.B. Mason absolutely does sell,

14   particularly in his region -- that does not somehow give a --

15   give a free pass, if you will, or -- to the deal or imply that

16   there's no unilateral effects, not at all.

17   **Q.**    Okay.  And so let's turn to your analysis effects and

18   your conclusions here.

19          What are your conclusions concerning the likely

20   competitive effects of the merger on large customers?

21          THE WITNESS:  So this is really some of what you've

22   already heard, Your Honor, which I think the -- there will be a

23   significant reduction in bidding competition for the large

24   customers, as a result of the merger.  And the other suppliers --

25   and right now we're talking about the suppliers who are in the

```
1    market now.  We're going to get -- when we get to entry and
2    expansion, we'll talk about who might come in more.  Okay.
3           But the suppliers who we see now, they're just not enough
4    strong ones who are comparable to replace Office Depot.
5           THE COURT:  How strong would Mason have to be,
6    hypothetically, to be a competitor?
7           THE WITNESS:  Right.  So I would think of that in three
8    differently ways.  One is, what's the market share?  Okay.  So
9    it's pretty -- it's very small, actually, and --
10          THE COURT:  They'd have to increase its market share by a
11   significant percentage, right?
12          THE WITNESS:  Well, we would -- I mean, we had 0.2 percent
13   in there in the Fortune 100 numbers.
14          THE COURT:  Right.
15          THE WITNESS:  Even if we underestimated a little bit, give
16   them five times that much, 1 percent, you know, this is the --
17   Office Depot, the smaller of the two firms in the market share,
18   32 percent.  So it would be a huge chasm for them to clear to
19   get to be anywhere near that big, just in terms of size.
20          THE COURT:  What if they increased the market share to,
21   say, 25 percent?
22          THE WITNESS:  What would it take for them?
23          THE COURT:  Yeah.
24          THE WITNESS:  Okay.  So let me come around to that.  So
25   first off, there's a big gap.  It would take -- they'd have to
```

1     expand enormously, okay, in this market.

2          THE COURT:  Right.  And they can do that by acquisition of

3     business, right?

4          THE WITNESS:  Okay.  Right.  So, look, the reality is they

5     couldn't -- just to -- even to start doing that, they'd have to

6     build out nationally.

7          THE COURT:  Right.

8          THE WITNESS:  Okay.  And I know you've thought about this.

9          THE COURT:  They couldn't stay in Masonville?

10         THE WITNESS:  Well, they could -- look, they could grow a

11    fair bit in Masonville.

12         THE COURT:  Right.

13         THE WITNESS:  Okay.  But not so much with these customers

14    because most of these large customers, we have data on -- they're

15    national -- they don't want to pick somebody for this contract --

16    main contract who can only serve part of their needs.

17         THE COURT:  Right.

18         THE WITNESS:  It's awkward.  You know, it's not really

19    what they want in a distributor.  So -- and I think he -- I think

20    Mr. Meehan said as much.  Okay.

21         So -- so first of all, they've got a huge gap in terms

22    what -- the way I -- I think -- quantitatively I think, okay,

23    you've got a 47 and a 32 percent.

24         THE COURT:  Right.

25         THE WITNESS:  If you had somebody who was 10 percent, you

1    might say, well, maybe they could double and that would do a lot

2    to fill the gap.  We don't have anybody like that here, so it

3    makes me more worried.

4         So we're looking at W.B. Mason because they're the next

5    one down.  The paper guys we could talk about, too, but they're

6    not coming in on this core -- these core supplies, okay, core

7    office supplies.

8         So -- and then I look at bidding data.  Who else -- is

9    there somebody else who's bidding a lot and, like, seems like

10   they're putting competitive pressure on?  Maybe they could turn

11   up the dial.  And we're not seeing -- you already saw the preview

12   on the bidding data.  We're not seeing anybody close.  Okay.  So

13   we've got a big gap there.

14        So then you're into building out significant expansion,

15   and that's going to be in the -- well, at least -- I'll do

16   whatever you want, but in my way of thinking, that's entry and

17   expansion.  That's not -- unilateral effects we're looking at

18   what's going on with the bidding?  What are people's capabilities

19   now?  Okay.  And they're -- look, you'll see -- I mean, they're

20   definitely number three here in terms of the core office

21   supplies, but they're way behind Staples and Office Depot.  So --

22   so they would have to build out nationally.  And we could talk

23   about -- let's talk about that, if you don't mind, when we get to

24   entry and expansion.

25        THE COURT:  Sure.

1    BY MS. CERILLI:

2    **Q.**    Okay.  Professor Shapiro, you mentioned that your views

3    on your -- your conclusions about competitive effects were

4    informed by the bid data as well as other evidence in the

5    record, including documentary evidence and testimonial evidence.

6          Obviously, I want to go through the bid data in detail,

7    but before we do that, can you talk us through the other

8    evidence you saw on the record that informed your conclusions

9    about unilateral effects?

10   **A.**    Okay.  So we can ask -- we can see what customers think.

11   We can see what the suppliers think.  We have a slide here next,

12   that'd be slide 36.

13   **Q.**    And we'll have the -- these are documents from customer

14   files, and so we've redacted the names of the customers.

15   **A.**    So these are from -- so these are customers' statements

16   about -- and you heard it directly from Mr. O'Neill, you know,

17   in court here and others who -- some of the, not all of them,

18   say, "These are the only two guys who really can serve my needs

19   right now."  Okay.  That's a pretty strong statement.

20         THE WITNESS:  Just so you understand, Your Honor, the --

21   so what happens -- during the whole process, the FTC gathers, as

22   you well know -- I guess, gets declarations and other

23   information.  That comes to me -- I basically have a standing

24   request:  I want to know what the customers think; I want to

25   know what the suppliers think.  You know, some broad categories,

1    and I have my staff working with the FTC.  So in my report, it's

2    sprinkled with various cites to declarations; you know, all the

3    material that one could have at that time from discovery.

4         So here are a few, okay.  And I should say, you know, I

5    don't -- this isn't the basis of my opinion because I'm sure

6    there are other customers that say the opposite.  I get that.

7    But in this area I think generally there's a good number who

8    feel this way and, you know, it fits with the other things we

9    see.  Either these are the only two companies that can serve

10   their needs or -- or something close to that.  This is the

11   customer side.

12   **Q.**     And did you also see documentary evidence from Staples

13   and Office Depot's own files?

14   **A.**     So yes, that's the next slide we have for you.  Again,

15   I -- you'll get this directly from other sources, I imagine, but

16   it's consistent.

17        You know, they recognize each other as, you know,

18   critical direct competitors.  Look, they also identify other

19   competitors.  I'm not saying they don't.  Okay.  They're looking

20   broadly.  Some of what they're doing, of course, is trying to

21   expand into other product areas, so they're seeing competitors

22   there.  That's not as directly relevant for our case here.

23   Okay.  But, you know, there's certainly some indications that

24   they, you know, see this as now a duopoly that has gone from

25   three to two.

1   **Q.**    And, of course, Professor Shapiro, did you also perform

2   an empirical analysis in order to assess unilateral effects?

3   **A.**    I thought you'd never get to the bid data.  Here we are.

4   **Q.**    Okay.  So let's turn to your bid data analysis then.

5   Before we dive into the results, can you explain why bid data is

6   relevant in the case?

7   **A.**    Well, I think we did that in intro.  It's really the best

8   way to measure the head-to-head competition that's going on.

9       Again, with the firms, what we've actually seen

10  historically, you know, as close as we can get to it today, and

11  that's, you know, that's the reality of competition, for --

12  again, the focus here is on large customers, and these contracts

13  they sign and the primary vendor relationships.  That's the

14  heart of what we're looking at here now, and that's what the bid

15  data is going to speak to.

16  **Q.**    Okay.  And if we can move to slide 38, can you provide an

17  overview of what type of analysis you attempted to -- you

18  performed with respect to the bid data?

19  **A.**    Okay.

20      THE WITNESS:  So we're just laying out for you, Your

21  Honor, types of analysis, and these are all pretty standard.

22      Frequencies, basically, who do we see bidding and

23  appearing as a bidder; who, the different competitors; how often

24  is W.B. Mason in the bid, you know, and so forth.  And then who

25  wins in the bidding.  That's the first part.

1          And then the other thing we can look at is when customers

2     switch from one supplier to another, what's going on?  And in

3     particular when Staples loses a customer, who are they losing it

4     to and vice versa, and where do their big wins come from.

5          And so we can do both of those types of analysis here.

6     Q.   Okay.  And what data did you have available to you to

7     conduct that analysis?

8     A.   So we had -- the first two -- I'm on slide 39 now, we had

9     the win-loss data from the companies that we already talked

10    about in the intro section of the testimony.  That's the first

11    two.

12         Then we have data they provided, both of the companies,

13    that is, on their top wins and losses in response to the FTC's

14    request for information.  So this would be top wins and losses

15    based on sales of consumable office supplies.

16         And then we have data from the Fortune 100 companies.

17    Part of the back and forth with those companies was, have you

18    done a bidding, who bid, who won, what can you tell us about

19    your RFPs.

20         So that's our fifth data set.

21    Q.   Okay.  And can you just explain a little bit further,

22    what is the top wins-losses data set?

23    A.   So these are basically when -- let's take losses.  Okay.

24    So Office Depot would say, when we've lost a customer in terms

25    of how much revenue we lost, that customer was spending with us

1    and we lost in consumable office supplies, who is that customer?

2    And then we can try to find out where they went.  Okay.  That's

3    what we're measuring there and then likewise for wins.

4    Q.    Okay.  And then, obviously, we talked about the Fortune

5    100 market share data.  So as -- but is what you're saying that

6    the Fortune 100 also submitted their bid files as well?

7    A.    Yes, about half of them had responsive information on

8    that, not all of them.

9    Q.    Okay.  Let's turn to the results of your analysis.

10   I think -- why don't we start out with customer

11   switching.  Did you analyze how frequently large customers

12   switched between office supply vendors?

13   A.    So yes, I did.  And that's going to be on slide 40.

14   So one of the features of this market is that the large

15   customers very typically year to year stay with the same vendor,

16   and you can see all these numbers are very high in this table.

17   And Staples and Office Depot have documents that indicate the

18   same thing, that their customers tend to be sticky.

19   THE COURT:  That's because of the evergreen contracts, I

20   assume?

21   THE WITNESS:  I don't think about it as an evergreen

22   contract so much.  So I think there are two things going on:  One

23   is, if you sign a three-year contract, yeah, people could

24   terminate it but why did you sign a three-year contract?  You

25   know, stick around for a few years.  They don't want to do it

1  every year.  So that would --

2      But more importantly from my analysis, even when a company

3  has decided, all right, the contract's term is ending, should we

4  renew it or should we go somewhere else, they want to

5  renegotiate.  That's when the competition is going to happen,

6  okay, usually.  I mean, people don't do it every month for fun,

7  right?

8      So at this point -- and whether they do it through a

9  formal RFP or just, you know, turn to their incumbent supplier

10 and say, "Look, you want to just give us a good deal and we won't

11 bother with that," we find that these very high retention rates,

12 part -- I think there's an advantage for the incumbent,

13 basically.  They have a business relationship, of course, and

14 their switching costs, okay.  So -- and we've seen some evidence

15 on that; that you have to integrate with the new vendor with your

16 systems and so forth.

17     So it's a combination of customers don't want to have

18 think about this every year, sign a multi-year contract, but also

19 there's -- they have switching costs.

20     The main point here, we're going to come back to this

21 later, actually, but the main point here simply is when we look

22 at the data on switching.  The numbers are going to be much

23 smaller, on the small side, because there aren't that many

24 switches.  You can see, you know, what small percentage of

25 customers are actually switching.  And that's -- this is kind of

```
 1   a prelude to the switching data to indicate to you why the

 2   numbers are on the small side.

 3   BY MS. CERILLI:

 4   Q.     Okay.

 5          Now, Professor Shapiro, you said you did analysis of bid

 6   frequencies.  Can you explain what that is and why that's

 7   important?

 8   A.     So bid frequencies basically measure how often do

 9   different bidders show up in our data, and that's an indication

10   of their competitive significance.  In the end I'll probably go

11   more with who wins, but showing up in bidding is worth tracking

12   so we track both.

13   Q.     Okay.  And can you explain for the Court the results that

14   you saw with respect to bid frequency and all of the different

15   data sets that you had access to and analyzed?

16   A.     Okay.  So slide 41 shows the Fortune 100 data, so you can

17   see it's RFP data appearances.  So when the companies reported

18   they had an RFP, then they indicated who bid.  And you see --

19   oh, this is not redacted, okay.  So there are 52 responses.

20          As it turned out, Staples was in there on every one as

21   one of the bidders and Office Depot on almost all of them.  And

22   then we see a number of other -- the other suppliers who

23   appeared at least twice.

24          It's noted at the bottom in the smaller print, 45

25   suppliers are mentioned.  So if you look at all this data,
```

```
1   you're going to see a bunch of other companies, but they're
2   hardly ever -- but they're bidding rarely.  Okay.
3       The other thing I have to say is, some of these other
4   companies -- I mean, Fastenal here is a good example.  Sometimes
5   we have a bid that includes consumable office supplies but it
6   includes a lot of other stuff, and they would appear but they're
7   not winning -- we're going to see that on the next chart or some
8   other chart -- they're not going to win the consumable office
9   supplies' bid but they're appearing.
10      So some of these appearances are actually people who are
11  bidding on other things, so -- but, anyhow, Staples and Office
12  Depot, you know, obviously dominate the appearances --
13  Q.   Okay.
14  A.   -- in bidding Fortune 100.
15  Q.   Okay.  And so slide 41 is the Fortune 100 bid data.
16  A.   Yep.
17  Q.   In how many of the Fortune 100 bid data files that you
18  looked at were Staples and Office Depot actually the only
19  bidders?
20  A.   Right.  So about 30 of those 50 or 60 percent.  The
21  only Fortune 100 company reported there were two bidders,
22  Staples and Office Depot.  That's who we -- so Mr. O'Neill's
23  testimony is not unusual, that they were the two who could serve
24  APD's needs in his case.
25  Q.   And did you also examine the bid frequencies using the
```

1    Office Depot bid data?

2    **A.**      Yes, so that's slide 42, which is I think the very first

3    slide we showed you at the beginning of my testimony.  So as the

4    title said, "Staples dominates in appearances in the Office

5    Depot data with 833 appearances," you know, far more than

6    anybody else.

7    **Q.**      And did you examine bid frequencies using the Staples

8    data?

9    **A.**      So that's the next slide, 43, which we also presented in

10   the opening part, same pattern.

11   **Q.**      Okay.

12   **A.**      With Office Depot appearing in the Staples data.

13   **Q.**      Okay.  And what do you conclude from this bid frequency

14   analysis seeing Staples and Office Depot so prominent and their

15   smaller rivals --

16   **A.**      Well --

17   **Q.**      -- small?

18   **A.**      -- and we're looking to the extent of head-to-head

19   competition and gap with somebody else.  We got a lot of

20   head-to-head competition and a big gap.  So that's what we're

21   seeing.

22   **Q.**      All right.  I want to turn now to your analysis of who

23   wins in bidding situations.  And we can turn to 544.  I believe

24   this is based on the Fortune 100 RFP data.

25           Can you explain the results of that analysis?

1   **A.**     Yes.

2          So I already mentioned that there were 52 Fortune 100

3   responses involving these bids, so now we can see who won.

4   Okay.  So, you know, almost all of them were Staples and Office

5   Depot.  Runco I happened -- they showed me a bid.  I happen to

6   know they got part of that contract in one case, and so they're

7   showing up here.

8          And Veritiv is a paper, a paper merchant, and they're

9   showing up here.

10  **Q.**     And did you examine win frequencies using the Office

11  Depot data?

12  **A.**     Yes.

13         So now we're back to the slide 45 which we showed Your

14  Honor at the beginning, and I do put more weight on the wins

15  than the appearances because I think they're both informative.

16  So we've got Staples dominating in who wins from the data we got

17  from Office Depot.

18  **Q.**     Okay.  And did you examine win frequencies using the

19  Staples data?

20  **A.**     So that's slide 46; same idea.  Office Depot dominating

21  in what we see in the Staples data.

22         THE WITNESS:  We also showed that to you, Your Honor,

23  yesterday.

24  BY MS. CERILLI:

25  **Q.**     Okay.  And what do you conclude from this analysis of who

1   wins in these bidding situations?

2   **A.**     So it's -- it's a pretty dominant picture for the two

3   merging firms.

4   **Q.**     Okay.  And I want to turn now to your analysis of who

5   wins when Staples and Office Depot loses a large customer.  Why

6   is looking at Staples and Office Depot's losses of large

7   customers important?

8   **A.**     I'm sorry, I was having a drink of water.

9          Could you say that again?

10  **Q.**     I want to turn to your analysis of who actually picks up

11  the customer in the event that a Staples or Office Depot loses a

12  large customer.

13  **A.**     Okay.

14  **Q.**     So just to introduce that analysis, why is it important

15  to look at who's winning in occasions when Staples and Office --

16  or Office Depot loses a large customer?

17  **A.**     Well, in a sense it's a particular direct way of

18  measuring the companies competing.  You know, in business,

19  people come in and say, "They stole my customer," you know.  And

20  so this is what we're talking about when the customers actually

21  switch.

22         The earlier discussion was to alert you that this is a

23  small number here because customers don't switch very much.  But

24  it's one of the most direct and tangible ways of seeing

25  head-to-head competition between the two firms.

1        So we're on slide 47 now, I think.

2   **Q.**     And does that switching, does that link back to the

3   diversion term that you referred to earlier?

4   **A.**     Yes.  So that would be -- when the customer doesn't get a

5   good enough deal from one company, from, let's say, Office

6   Depot, who's an incumbent, where do they go?  We're seeing here

7   that in the seven cases where -- excuse me.

8        Let me start with the upper -- take somebody who's

9   incumbent is Office Depot, that's the upper row.  There are

10  seven cases where Office Depot lost to a competitor and all

11  seven of these those happen to be to Staples.

12       Oh, I should say, this is Fortune 100 data.  Okay.

13  We've -- previously we were talking about the company's data,

14  this is -- so it's a relatively small sample, but you've got

15  only 50 or so companies and they don't move all the time.  So --

16  but, you know, it's meaningful to me.  So every single one that

17  Office Depot lost in this group was to Staples, seven out of

18  seven.

19       The second row shows that almost all of the losses that

20  Staples had were to Office Depot.  It may look odd that we have

21  a half there, but that was a customer.  Staples only lost half

22  of the business, so it's a half a loss to another supplier.

23       But, again, the -- overwhelmingly when they lose a large

24  customer here in the Fortune 100, it's to Office Depot, the

25  other --

1   **Q.**    And just to be sure it's clear on the record, you are

2   describing slide 47, which is showing in the Fortune 100 bid

3   data who wins in instances when Staples and Office Depot loses;

4   is that correct?

5   **A.**    Yes, I hope that's there.  Yes.

6   **Q.**    Okay.  And who wins in the bid lost by Office Depot in

7   the Office Depot data?

8   **A.**    So this is slide 48, and so you see here there's -- at

9   the bottom actually seven- -- and equals 78, so there were 78

10  instances where Staples lost -- excuse me, back up -- where

11  Office Depot lost, and about three-quarters of those were to

12  Staples.

13         Notice, this number 78.  It's on the small side compared

14  to the other data sets because they don't lose that much.  They

15  tend to keep their customers.  But when they do -- when Office

16  Depot loses in their own data, about three-quarters of the time

17  it's to Staples.

18  **Q.**    Okay.  And then moving to 549, what about the Staples

19  data?

20  **A.**    Exact same thing going in the other direction.  When

21  Staples loses, it's showing 80 percent of the time it's to

22  Office Depot.

23  **Q.**    Okay.  And then you mentioned early that you had analysis

24  specifically about the top 50 losses that Staples and Office

25  Depot had in the last several years.

1        Can you describe how you used that data and what the

2   results were?

3   **A.**      Right.  So now we're into slide 50.  So this is just

4   another -- again, one of the other data sets that I have because

5   of response to FTC's request for information.

6        And top losses, so the left side here is Staples' top 50

7   losses that they report, 80 percent went to Office Depot.  The

8   other direction, almost as high.  It's the same pattern.  You

9   know, we're seeing the same thing.

10       And let's just flip to 51.  Those are the wins.  When

11  they get their big wins, most of the time it's from the other

12  company.  Okay.

13       So this is, you know, I don't know, very -- I guess I'll

14  say nicely consistent from my point of view as an data analysis.

15  I'm not seeing anomalies here.  I'm not seeing anything coming

16  up.  Look, what I really am -- I'm looking for how they're

17  competing, and is there somebody else -- I'm -- had the high

18  market shares.  So I'm like, well, it sure looks like there's a

19  problem based on that, but maybe I'm missing something.  How --

20  you know, what's going on?

21       I'm looking.  Is there some other player who's -- maybe

22  their market share was small, but they're in here bidding a lot,

23  they're winning some of these, you know, and I'm not seeing

24  that.  I don't think -- I think that would be a phantom.

25  Basically that firm does not exist.  That's what I'm getting

1    from these data.

2    Q.    Okay.  So obviously we passed through a lot of detailed

3    data.  Just taking a step back, what are the implications of

4    this data to your conclusion about unilateral effects?

5    A.    Okay.  So -- so what we're looking for here in,

6    unilateral effects of bidding, is extensive bidding against each

7    other, head-to-head competition, especially winning, stealing

8    customers from each other, if I can use that term.  And these

9    are very high numbers.  Okay.  This -- I'm not shocked, given

10   the market shares, but just -- it's all consistent.  And so, it

11   leaves me, you know, no doubt that this is a very big red flag.

12          I still want to check, are these other smaller firms, why

13   are they not winning more?  You know, it suggests to me they're

14   at some significant disadvantage.  So I want to check that

15   that's true, that's part of the -- you know, what the

16   disadvantage is.  But at this point, you know, they're not

17   bidding that much, they're not winning that much, these smaller

18   players, and this is making me pretty concerned.

19   Q.    Okay.  And that's definitely something I want to talk

20   about in depth.

21          Before we leave the data, in particular, do you have any

22   concerns about the reliability of this data?

23   A.    Well, generally the bid data -- so there's -- I've done a

24   fair number of cases with bid data.  I did just good a big one

25   with GE, for General Electric buying Alstom, where they're

1    bidding to sell huge turbines to electric power plants.

2         And I like working with bid data a lot.   There's always

3    imperfections.   So, for example, the suppliers -- when Office

4    Depot and Staples provide the bid data, they write down who they

5    know about who's bidding, but they may not know -- they may not

6    be right.   They may not be exactly accurate.   There may be a

7    bidder they didn't hear about.   Okay.   They may think somebody's

8    bidding and they're not.   Okay.   So it's basically what any

9    company knows.   That's all they can do.   I'm not worried about

10   that here.   I don't see any reason that creates a bias in what

11   I've got.

12        The other thing is, they don't necessarily report every

13   single bid.   You know, this is coming -- in Office Depot's case,

14   this is coming from their normal course of business.   They keep

15   track of these things.   So you're always worried, you now, is

16   there something wrong with this sample?   I looked as best I can.

17   I don't see a problem.   And the numbers are so overwhelming and

18   consistent with everything else, that I'm okay on that.

19   Basically I think -- I think we're safe.

20        The Fortune 100 company data, that's the other -- the

21   data source that doesn't come from the merging companies here.

22   That, in some ways, I like that better because, look, the

23   customer knows who's bidding.   You know, they're going to be the

24   most accurate on that.   And they will even know -- you know,

25   they could even say things like, "Only these two guys really do

1    what this third guy bid, but he wasn't, like, get out of here,"

2    right?  So you get -- the customer's view is very important, and

3    it's quite consistent here.

4        But this is a smaller data set, so I don't want to just

5    look at that one.  But altogether it's so consistent and so

6    unambiguous that -- that I'm, you know, very comfortable

7    recognizing the data's imperfect.

8    Q.    Okay.  And in your bid analysis, you would acknowledge

9    that often the bids cover items other than consumable office

10   supplies, correct?

11   A.    Very often, and Mr. Orszag has made that point

12   effectively, I think, in his report.

13   Q.    Okay.  And does that bias your results?

14   A.    Well, no, but let clarify.  Some of the bids we see -- I

15   mentioned Fastenal in there -- are bids -- so what we counted

16   here are bids that include consumable office supplies.

17   Sometimes people are bidding, and they're going to end up -- the

18   bidding for or winning another part of the business.  I'm

19   including all those, wherever they appear.  I'm not ruling them

20   out.

21       Okay.  I happen to know Fastenal, a very tiny share of

22   their business is in consumable office supplies.  You know, very

23   tiny.  I'm not sure if I'm allowed to say it not, but tiny.

24   Okay.  So when I look at the bidding here, like, probably

25   they're not bidding for this part of the business, but I'm going

1    to include them because I don't know for sure, and I just -- so

2    by including those other suppliers, I have decreased the

3    dominance of Staples and Office Depot because I'm showing other

4    people bidding.  So this complication that the RFPs often

5    include other products does not bias my results, although it

6    may -- may lead me to understate the importance of Staples and

7    Office Depot when it comes to bidding for the products that

8    we're actually worried about here.

9    Q.    Okay.  And so we've seen a bunch of data indicating that

10   Staples and Office Depot are prominent winners and prominent in

11   bidding for large customers.

12         What's the next step that you would look at to assess the

13   unilateral effects?

14   A.    Well, so then we want to look at the gap.  As I said,

15   you've got a lot of head-to-head competition.  What about the

16   gap versus the other players?  And the larger that gap is the

17   more worried we are.

18   Q.    Okay.  And how did you pursue that inquiry?

19   A.    Well, I guess we get into starting to look at these other

20   players -- you know, W.B. Mason stands out, actually -- and

21   there's a number of elements to it.  What -- what are their

22   competitive -- do they have significant competitive

23   disadvantages relative to Staples and Office Depot and what are

24   they?  I'm pretty sure they do have significant competitive

25   disadvantages.  That's why they're not getting the

1   market-to-market share.  That's why they're not winning very

2   much.  But I'd like to understand what they are, and if we

3   possibly can, to quantify that, which is hard.

4       So that's where I'm going next.  Competitive advantages

5   that Staples and Office Depot have, or same thing, competitive

6   disadvantages the other guys have who are much smaller.

7   Q.    Okay.  And based on your assessment of the record, what

8   competitive advantage do you find that Staples and Office Depot

9   have over these other firms?

10  A.    Well, two of them stand out, and we're going to come back

11  to this when we get to entry expansion.  The same question's

12  going to be very relevant there, too.

13      But at this point I would just say, two, which is the

14  smaller firms such as W.B. Mason or even much smaller ones like

15  Guernsey, they have a much smaller -- they have a higher cost of

16  goods sold.  They basically are purchasing at a much smaller

17  volume, and through wholesalers much more, rather than directly

18  from manufacturers, and it's a disadvantage for them, and it's a

19  significant one.

20      The other is geographic scope.  And you heard this from

21  Mr. Meehan very clearly.  They're, you know, either really not

22  able to bid or have a huge disadvantage with a company -- with a

23  customer who wants nationwide, you know, scope, delivery from a

24  single vendor.  So those are the two:  Cost of goods sold; and

25  geographic scope, which I think are pretty compelling in -- at

1    this part of the analysis, as explaining what the smaller

2    players are not -- not really in -- not in this game very

3    effectively.  Again, W.B. Mason appears, but much smaller.

4    **Q.**    Okay.  And as you mentioned, we are going to discuss some

5    of this in the entry and expansion section, but I would like to

6    just briefly have you explain the purchasing scale issue and the

7    distribution disadvantage issue here.

8          So let's start with purchasing scale.  What evidence have

9    you seen in the record explaining that scale gap, and what is it

10   and why does it exist?

11   **A.**    So first off, if you start to think about -- let's use

12   W.B. Mason as our example because they're the next guy.  What is

13   the purchasing scale that we're going to look at?  We're

14   thinking if they're going to a manufacturer to buy a bunch of

15   pens or Post-its, whatever, so we want to look at how much are

16   they buying in total?  Okay.  So now for this purpose we've got

17   to look at their total purchases, not -- we can't just look at

18   large customers anymore, because they're buying for all their

19   customers.  So it's total purchases.  So that's the thing we

20   want to measure.  And we can measure that, basically see how big

21   they are compared to Staples and Office Depot.

22         Now, we're not going to measure their purchases of all

23   this stuff.  We're going to measure how much they sell in all

24   channels because, of course, they have to buy all that stuff in

25   order to sell it.  So we're now going to measure their total

1    sales in all channels, retail, small business, everything, and

2    compare that to Staples and Office Depot, all channels.  Okay.

3         So this is perfectly consistent with the relevant market

4    we've got in the case, Your Honor, because we're still just

5    concerned about harm to large customers.  But for assessing this

6    competitive disadvantage, it's driven by sales more broadly, so

7    we're looking at a broader measure of sales, and that's what

8    we're going to do on slide 52.

9    Q.    Turn to slide 52, yeah.

10   A.    Yeah.

11   Q.    And unfortunately we have to keep the numbers

12   confidential, but obviously you and the Court can see them.

13   A.    Okay.  So here the -- as it says, Exhibit R9, it's a

14   reply report, so there's, you know, more detail there on what

15   was done, but this is based on the suppliers' responses

16   themselves.

17        One of the things it was pretty easy to get from all the

18   suppliers is, how much do you sell in consumable office

19   supplies?  You know, what's your revenues?  So you can see

20   here -- and, you know, I think it's good to focus on W.B. Mason

21   because they're actually -- you know, they're clearly number

22   three in this sense, and -- I guess I shouldn't say the number,

23   but there's a very large multiple between their size or scale,

24   let's call it, and either of the merging parties, and that will

25   predictively put them at a significant disadvantage when it

1    comes to cost to goods sold.

2         Now, that's one metric I can present to you, but we also

3    have two other things that come up here:  One is -- well,

4    Mr. Meehan himself described this is a problem for him in going

5    up against the big guys; and second, we have other evidence that

6    a distributor who has to purchase more of their products from a

7    wholesaler, rather than directly from the manufacturer, is at a

8    cost disadvantage as well.  And I think we're going to come back

9    to that in entry, so I'll -- I won't say more now.

10   Q.   Okay.  And, basically, the reason for looking at this is

11   because the more a distributor buys, they're able to obtain, in

12   general, lower product costs from manufacturers?

13   A.   Yes.  I -- I hope that was implicit.  Basically, the more

14   you buy from a manufacturer or a wholesaler, as a distributor,

15   the lower the cost you will get on average.

16   Q.   And then you also mentioned a distribution network

17   advantage that Staples and Office Depot have.  And, again, we'll

18   cover it in more depth in the next section, but can you briefly

19   describe what you were referring to here?

20   A.   So basically nobody else is national like they are, none

21   of these other players, and -- but then, of course, the next

22   question is, well, W.B. Mason, can't they deliver to customers

23   outside of Masonville?  You know, can't very handle that?  And

24   we've learned pretty clearly from them that they do that some --

25   not much, actually, a very tiny amount.  But one reason they

1    don't do it much is it's a lot more costly.

2         So this is -- and, I mean, now I'm talking about cost of

3    the distribution function, not the buying of the goods.  So

4    that's another significant disadvantage that the regional

5    players would have in trying to go after a big customer who had

6    a lot of locations outside their -- their home zone.

7    Q.    Okay.  And why is having higher product costs or higher

8    distribution costs competitively significant?

9    A.    Well, we're all talking -- we're talking about this gap.

10   Okay.  How strong are the other guys, can they fill the gap and

11   replace the competition that's lost after the merger.

12        To the extent they have -- again, W.B. Mason or others

13   have significant cost disadvantages; it's going to be much

14   harder for them to do that and ultimately to apply competitive

15   pressure to Staples, which is what, of course, the customers

16   want.

17   Q.    Okay.  And have you been able to measure the gap or the

18   magnitude of the unilateral -- the likely unilateral effects?

19   A.    So I have one measurement that we've got here on slide

20   53, which we have estimates -- so we have to ask ourselves:  How

21   much does scale matter in terms of purchasing costs?  Getting

22   bigger, how much better deal do you get?  And then, what's the

23   scale gap?

24        So the first question, if you double in size, if we look

25   at what Office Depot is saying from its merger with OfficeMax,

1    they roughly doubled in size, and then we can see here what they

2    have, I guess, experienced, or claimed, or asserted regarding

3    their cost of goods sold; how much that's gone down because of

4    the doubling in size, and that's the number that's redacted.

5         You're on slide 53, I hope.

6         So a doubling -- if we take that number, a doubling leads

7    to that amount of a cost reduction, a cost of goods sold.

8         And then we look at W.B. Mason and they would have to

9    more than double; they'd have to double some number of times to

10   get to be the size of Office Depot.  So if we apply the same

11   number, we get a cost of goods sold gap between W.B. Mason and

12   Office Depot.

13        So that's one measurement of the gap.

14   **Q.**   And, actually, I should say here, you can say that the

15   total gap from your analysis is 6 percent.  We will -- that is

16   public.  And we will unredact it from this slide, just the total

17   number.  Some of the other numbers that --

18   **A.**   The 6 percent.

19        I want to say two things about that.  So I stand by that

20   analysis.  I think it's sound.

21        But I want to say two things:  First, the testimony of

22   Mr. Meehan, actually, and Mr. Morrison as well, both point to a

23   significantly large number in terms of the cost disadvantage

24   they face.  I don't have a way to quantify that; I couldn't do

25   that, but that is what they have said.  Okay.  That's one.

1        The other thing is, this is simply -- we're measuring one

2   aspect of the disadvantage that W.B. Mason faces, cost of goods

3   sold.  But the distribution network is probably, you know, at

4   least as important in terms of national scope, which is actually

5   being able to bid today for a national customer, you know, a

6   geographically disbursed customer.

7        So this gap, as it exists today, is quite large, and

8   that -- you know, the 6 percent number is surely too low but

9   it's the piece I can quantify in this way.  We can put in a

10  significantly higher number based on their testimony, but I

11  don't know how general that is.  I mean, W.B. Mason, that's

12  pretty important to me what he said.

13       This is the part I'm able to quantify with -- with as

14  shown.  As shown, yeah.

15  Q.    And so is the 6 percent figure your estimate of a

16  post-merger price increase?

17  A.    So no, I think the number I used in my report was, as I

18  said, it could be a guide.  And I've explained now to the Court

19  how it's -- I think of it as a lower bound because it's only

20  measuring one aspect of the disadvantage, and because we have

21  some other evidence that the actual cost gap -- COGS gap alone

22  is bigger than this estimate.

23  Q.    Okay.  And have you considered how Staples could

24  profitably raise prices following the merger?

25  A.    So yes.  I think I have, and this is an important part of

1   unilateral effects analysis, yes.

2   **Q.**     Okay.  And what different ways could Staples utilize to

3   raise prices after the merger?

4   **A.**     So here's how we do this:  What I do is I look at how

5   Staples actually prices to the large customers.  Okay.  And it's

6   a bit complicated --

7         THE WITNESS:  But you've seen it already, Your Honor.  So

8   I would flag -- first they have a list of core items that are

9   high-volume items the customer wants a particularly good

10  discount on; we talked about this a little bit.  Then they've

11  got noncore items that they get another discount on.

12        And then the part I actually want to highlight at this

13  moment, they have sign-on bonuses and then they have rebates

14  based on volume purchasing, so they have some other elements

15  where they -- of pricing to try to win these large customers.

16        Now, the sign-on bonuses, on average, those are about

17  5 percent of the total that they're getting.  So that's a

18  significant number.  And one of the most -- again, with my

19  methodology, assuming the company threw out the profit

20  maximized, if they want to raise price, they can, but of course

21  they don't want to lose business when they do so.  It's quite

22  natural, I'm thinking, first, that they would trim or eliminate

23  these sign-up bonuses, okay.  And like I said, there's quite a

24  bit of money there.

25        Now, why don't they do that now?  Why do they offer these

1    sign-up bonuses?  Well, you've heard about it:  They do it in

2    order not to lose the business to the other guy, okay.

3         THE COURT:  Right.

4         THE WITNESS:  And, of course, the customers are savvy,

5    and they're trying to play that as best they can.

6         So this is the motive analysis and they say -- well, take

7    a customer six months from now if the merger goes through,

8    they're negotiating, that pressure to do the sign-up bonus is

9    really not there.  Who else is the customer going to turn to?

10   Are they really going to credibly turn to, you know -- name

11   that -- we don't have -- we've got a gap.

12        So it's -- the advantage for Staples after the merger of

13   using this tactic is they're not raising the price -- this

14   element alone -- they're not raising the price of any of their

15   core items.  Okay.  They're not encouraging any leakage.  You

16   know, the only way a customer -- what's a customer going to do?

17   Okay.

18        So they haven't -- so that's the first step, is they

19   could eliminate or significantly reduce these sign-up bonuses.

20   And because those are large, I see that as really the

21   low-hanging fruit for them after the merger because the

22   customers won't have the same leverage.

23        So that's a natural mechanism, and that fits with what we

24   see in the bidding data.  This is one of the key ways in which

25   they compete.

1          And then we've got volume discounts and other elements,

2     too.  I'm not saying they won't change those prices.  But the

3     starting point, I would think, would be, I'm not giving you as

4     much of sign-up bonus; why should I?

5     BY MS. CERILLI:

6     Q.     Okay.  And are there any other ways in which it would be

7     advantageous for Staples to implement the price increase?

8     A.     Well, they could increase any of the elements we talked

9     about.  The one other way that might not be obvious, I guess, or

10    it's a little tricky, would be they could raise the price of,

11    let's say the core items, and then also raise the volume

12    discounts so that there wouldn't be any -- so they would

13    discourage leakage and still get an average price that's higher.

14    Okay.  Basically they can say, "Look, you're going to have to

15    pay this amount to do business with us, but if you grow your

16    business a little bit more, we'll give you a good deal on the

17    extra stuff; but not a good deal on the first million or two

18    that you're buying because we know you don't really have a good

19    choice for that."  Okay.  "The extra stuff, we'll" -- they're

20    sort of competing for that leakage or extra sales.

21          So they have a price structure they can twist, I don't

22    mean that in a bad way, they can adjust as well.

23          The key point -- this is --

24          THE WITNESS:  I know this may seem a little intricate,

25    maybe, Your Honor, but I'm not adding any bells and whistles to

1    the pricing structure they already have; I'm just looking at it.

2    And it's not just a flat price.  It's got these elements.  And

3    there's some ways that would be more or less profitable for them

4    to take advantage of their enhanced market power after the

5    merger, and I've identified a couple where I think it would be

6    most advantageous.

7    BY MS. CERILLI:

8    Q.    Okay.  Now, you've talked about ways in which customers

9    can be harmed.  I do want to ask you about whether you think

10   there are ways that customers can protect themselves.

11        First, you'd acknowledge that there are large customers

12   that don't even use Staples or Office Depot today.  So if they

13   can get by without Staples and Office Depot today, why is there

14   any reasons for concerns here?

15   A.    Well, there are other competitors.  The fact that this is

16   not a total monopoly situation doesn't mean that there's no

17   problem.  This is why we look at market shares, and frequencies

18   of bidding, and winning.

19        So I'm not saying every single customer in the relevant

20   market will be harmed.  Some of them are not using these

21   companies and have their reasons for that.  But we're talking

22   about a predominant situation.

23   Q.    Okay.  And why can't large customers protect themselves

24   by buying at retail?

25   A.    Um, well, we talked before about how --

1          THE WITNESS:  I think we showed you the data there, Your

2     Honor, how the retail -- I'm not allowed to say that.

3          How the retail prices are far, far above the contract

4     prices, so that's just not an attractive option.  There's a

5     little bit of it that takes place.  We've measured that.  But

6     that's not what any of these big companies want to do to shift to

7     more retail purchases.  That would totally go against their

8     attempts at cost control.

9     Q.    Okay.  But -- and then defendants say they're concerned

10    about off-contract spend.  So will that concern about

11    off-contract spend constrain a likely price increase?

12    A.    Well, we've measured that; it's small.  And I don't see

13    any reason to think it would grow dramatically, particularly

14    with the type of pricing structure changes I described a moment

15    ago.

16    Q.    Okay.  But you've heard defendants argue that leakage is

17    significant.  Have you seen any evidence in the record of that?

18    A.    Well -- so we have quite a bit of evidence about the

19    leakage or the absence of it.  So first off, I've measured that

20    in my market shares.  We talked about that before.  And we have

21    customers testifying about how they want to control it and do

22    control it; and, of course, their primary vendor helps them do

23    that, and that will be true after the merger as well.

24    Q.    I believe defendants' expert put forth some analysis of

25    potential leakage.  Does that unsettle your conclusions at all?

1    **A.**    No.   I responded to that in my reply report.   It does

2    not, and so it's not been part of my affirmative presentation

3    here.

4    **Q.**    Okay.   Now, you said a moment ago that retail prices are

5    generally higher than the prices that large customers pay.

6         But doesn't that show that large customers are getting a

7    better deal anyway; so what's the concern here, even if they

8    face a price increase?

9    **A.**    Large customers are getting very good deals here.   And

10   the issue is whether that will, to some degree, go away.   That's

11   the concern.   That's the customer harm from a loss of

12   competition.   That's what I'm focusing on.

13        I don't know what else to say.   That's a real antitrust

14   harm.   I mean, I don't mean that as a legal thing.   It's just as

15   an economist, I'm concerned about that.   Even though they're big

16   customers and even though they'll still -- look, given the gaps,

17   even if the price went up 10 or 20 percent, they'd still be

18   getting better than retail; but it would be a big hit.

19   **Q.**    Okay.   But you've acknowledged that Staples and Office

20   Depot often sell more than just consumable office supplies to

21   large customers:   Ink and toner, maybe some of the BOSS

22   products.

23        So can a large customer simply threaten to take those

24   BOSS products away from Staples and Office Depot in order to,

25   you know, forestall a price increase on the consumable office

 1    supplies after the merger?

 2    **A.**    Well, I -- large customers are going to use whatever

 3    bargaining tools they have at their disposal, which could

 4    include that tactic, to threaten, you know, I won't buy

 5    furniture or whatever.  They're doing that today; they're going

 6    to do that after the merger, I assume.  That's not changing.

 7    They're losing leverage, fundamental leverage, because of the

 8    deal.  The fact that they have some leverage in some areas is

 9    not relevant because it's unchanging.

10    **Q.**    Okay.  Can you give us an example, kind of a practical

11    example, to help understand that?

12            THE WITNESS:  Well, I made this up, Your Honor.  We'll

13    see if it helps you or not.

14            I'm a big national parks buff and I go to the Grand

15    Canyon sometimes.  I was down in Utah recently.

16            So imagine there's two hotels at the Grand Canyon, two

17    lodges to stay; there's only two, and I really want to go there.

18    And maybe it's off season and they have some extra space;

19    they've got some discounts.

20            They offer a package with air and ground transportation,

21    too, and I'm buying the package.  Okay.  Some people buy the

22    package, some people don't.

23            Now they merge.  There's only one company that controls

24    both lodges, the Grand Canyon.

25            They know there's a lot of people who really want to come

1   to the Grand Canyon.  Let's imagine they -- you know, it would

2   be tempting to raise the price.  I'm a customer.  I say, "Gee, I

3   really don't like that."  I say, "You know, if you raise the

4   price, I'm not going to take your airfare and ground

5   transportation package."

6          Is that going to protect me from the monopoly, it's not.

7   Okay.  I'm already getting -- whatever they're charging for that

8   piece of it, the air and the ground, they've got to compete with

9   other people already.  That's true now; that's going to be true

10  after they merge.  Now they've got control over the lodges.  I'm

11  going in a weak position.

12         So it's just -- it's a bogus economic argument that that

13  somehow gives customers leverage to offset what the merger's

14  causing.

15         I don't doubt for a moment a lot of customers will use

16  that leverage as part of a negotiation and they get volume

17  discounts over broad -- all that's true, okay, and Staples and

18  Office Depot have emphasized that.  I'm not disputing that.  I'm

19  just saying the effect of the merger is, I only got one place I

20  can go to the Grand Canyon, and no matter what's going on with

21  air and ground transportation, that's market power.

22  BY MS. CERILLI:

23  Q.     Okay.  But we've also heard throughout the hearing that

24  these are large, sophisticated companies.  A lot of them have

25  procurement staff.  A lot of them bring in consultants

1    specifically to help them negotiate.  Why won't there -- all of

2    those tools and sophistication help them in preventing a price

3    increase?

4    A.    It comes back to the fundamental economics.  These

5    customers -- as I said, they're not particularly lovable.

6    They're large.  They're powerful.  Done.  But they are losing

7    leverage, and they can be a sophisticated -- they are

8    sophisticated.  They can bring all the consultants they want.

9    If they don't have good choices, they're going to pay more.

10   Q.    Okay.  And defendants have also argued that the -- that

11   the consumable office supplies are a commodity product.

12         Does that mean there won't be harm here?

13   A.    Well, I think that strikes me as a somewhat confusing

14   statement to talk about the commodities product.

15         What the companies offer are sales and distribution

16   service, and I've called them kind of high-end sophisticated

17   distribution services.  What they offer is not a commodity

18   product, right?  It's the IT system, it's the integration, it's

19   the nationwide delivery, it's desktop, it's all these other

20   things.  That's what they offer.

21         I'm assuming that any distributor can get the same pens,

22   can get the same Post-its, those items -- okay, now they may

23   have to pay more, but -- no.  What the issue in the case is what

24   the companies' services are, and that is by no means commodity.

25   Okay.  That's -- that's just -- it's a red herring, really.

1  **Q.**    Okay.  And we've also heard that large customers often

2  have contracts that run for several years.

3      Won't the length of the contract prevent these customers

4  from harm?

5  **A.**    Well, I think this came up a bit yesterday in terms of

6  the contracts, so let me try to be very precise here.

7      The -- a customer who has a contract now -- first off,

8  they may have -- typically, say, for the first year -- the core

9  prices locked in.  Okay.  So that's some protection.  Other

10  prices typically wouldn't be locked in, and after the first year

11  they can float anyhow.  So I think there's some short-term

12  protection for some customers, and it's going to depend customer

13  by customer.

14      The -- and then, of course, renewals are coming in all

15  the time.  So, I guess, I'll just say as a general matter, I

16  think it's a really bad idea to allow mergers to go through that

17  are anticompetitive because some customers are protected for

18  some period of time.  Because you're basically -- I don't mean

19  you, but one is then allowing a market structure to be put into

20  place that is less competitive, and even if the harm's a bit

21  delayed, that still should be worrisome.  Okay.

22      Now, in a balancing, it's a fair question, some customers

23  are protected.  But, you know, it -- and it depends customer by

24  customer.  It's not that long, and it's not on all the items for

25  sure; so I don't view that as, you know, something that

1    alleviates my concerns, the presence of the contracts.

2         MS. CERILLI:  Okay.  And, Your Honor, I want to just note,

3    we have about five minutes more material on this section.  I'll

4    follow your lead, but I'm happy to finish this section and then

5    maybe a time for a break for lunch?

6         THE COURT:  Sure.

7         MS. CERILLI:  Okay.

8    BY MS. CERILLI:

9    Q.    Now, Professor Shapiro, have you evaluated whether there

10   were any anticompetitive effects from the Office Depot/OfficeMax

11   merger?

12   A.    I did look that, yes.  It's a natural thing to look at.

13   Q.    Okay.  And what did you find?

14   A.    As best I can discern with the data I have available, I

15   have not found any such effects.

16   Q.    Okay.  And in that case, why would you expect harm here?

17   A.    Well, the -- first off, I'd say it -- it's irresistible

18   to look at this recent merger and see what it's effects were, so

19   I did that.  The -- so I would think of it, there's a three --

20   think of that as, again, in the shorthand.  That was the three

21   to two, and now we've got a two to one, you know, in the

22   shorthand language we sometimes use.  So it's a whole different

23   creature, you know, from a customer whose choices have been --

24   gone from three to two versus now down to one.  So it's

25   really -- we're in a different range here, substantially

1    different range in terms of market shares, bidding, competitive

2    effects.   So this is very different than what we saw before, and

3    I think that's why we're here.

4    **Q.**    Okay.  And did you evaluate bid data in the Office

5    Depot/OfficeMax merger?

6    **A.**    Well, no, I was not involved in that merger.  But I did

7    have available the data that Office Depot presented to the FTC

8    at the time -- so this would be 2013 -- where they did a bid

9    analysis very similar to the sort of thing I presented here for

10   this merger.  And I -- I -- so I'm aware of that.  We have -- we

11   have access to that.  We have slides on that.

12   **Q.**    Okay.  And so what did the data that Office Depot and

13   OfficeMax presented to the commission in 2013 show?

14   **A.**    So we'll have three slides in four minutes, I hope.

15        Basically, as I -- I was not present at these meetings.

16   But as I read these charts, they're showing -- they were

17   basically going in -- I'll characterize it, but I think it's

18   right -- going in to say, "Don't worry about our merger because

19   Staples is a big guy, we have to compete against them."  Okay.

20        So the data here shows, they -- these data -- that were

21   presented to the FTC, is showing in each of these bid charts,

22   Staples is a bigger factor than here Office Depot.  So this

23   first chart on slide 55, OfficeMax's losses.  So when they

24   lost -- same sort of thing we did here, right?  They're showing

25   when OfficeMax lost, who did they lose to.  And they're showing,

1    gee, most of the time they lost to Staples, not so much to

2    Office Depot, would be their point here.  The left-hand side is

3    somewhat smaller accounts, over 150,000; the right-hand side is

4    the larger accounts, over a million.  And I'm pretty sure that's

5    all office supplies, so -- or maybe all sales, so I would look

6    at the right-hand side as for most relevant for our customer set

7    here if you wanted to compare.

8         Okay.  So they're finding when OfficeMax loses, a lot of

9    it's to Staples.  And then if we flip ahead -- I'm trying to get

10   us to lunch here -- the first one was when OfficeMax loses.  The

11   second one is when Office Depot loses.  Okay.  And they've got a

12   couple of different data sets and different sizes of customers.

13   The reds are Staples again, appearing a lot, same point.

14        And then they have runner-up data on slide 57, which I

15   generally haven't had here, but that's something we often look

16   at, who won, who was the runner up, okay, who's applying the

17   pressure.  And they're showing Staples as the runner-up

18   two-thirds of the time in the largest customer set here.  That's

19   slide 57.

20        So it's really very similar type of bidding analysis that

21   I'm doing.  And they were arguing that Staples was a huge

22   factor, and that's why the Depot/Max merger should be allowed,

23   and it was.

24   Q.   And so, is this -- given the prominence of Staples in

25   this data, is this data suggesting that Office Depot and

1    OfficeMax were not each other's closest competitors?

2    **A.**    Well, as measured by these frequencies, Staples was a

3    bigger, you know, more -- a bigger competitor, if you will, to

4    either of them than they were to each other.

5              THE COURT:  Were the products in the office supply

6    category defined the same way as they are now by the FTC?

7              THE WITNESS:  No, I'm pretty sure they -- no.  They

8    included ink and toner.

9              THE COURT:  All right.

10             THE WITNESS:  They certainly did in --

11             THE COURT:  Is that significant, then?

12             THE WITNESS:  Um, well, maybe -- I'm not sure what

13   significant -- in term of interpreting the data?

14             THE COURT:  Yeah.  Well, we're making comparisons and

15   judgments --

16             THE WITNESS:  Right.

17             THE COURT:  -- but it's apples and oranges, though, right?

18             THE WITNESS:  No, I wouldn't --

19             THE COURT:  The categories were not defined the same way.

20             THE WITNESS:  Fair point, but --

21             THE COURT:  I mean, it's getting back to the cardiac

22   surgery or the knee surgery, isn't it?

23             THE WITNESS:  Well, my knee's hurting when you say that.

24   The -- it's a fair point.  I don't think it's so different that

25   we can't make the comparison.  Okay.  So they're including -- so

1    let's think it through.  They've included ink and toner here.

2         THE COURT:  Right.

3         THE WITNESS:  So they may have some --

4         THE COURT:  When you say "here," you mean 2013?

5         THE WITNESS:  Well, yeah, in their category -- yeah, the

6    slides we just looked at.  Okay.  So I don't know all the details

7    about their data there, but the concern that you're raising, I

8    think, would be -- right, they've got a bunch of bids.  They

9    include ink and toner, so some of these bids might be ink --

10   might be MPS bids.

11        THE COURT:  Right.

12        THE WITNESS:  Okay.  I don't know how much that's true in

13   their data; but if it's true, then if you took out ink and toner,

14   Staples would look even bigger.

15        THE COURT:  Right, right.

16        THE WITNESS:  Okay.  Which would reinforce the point they

17   were making then and that I'm making now.

18        THE COURT:  Right.

19   BY MS. CERILLI:

20   Q.   Okay.  And so --

21        THE COURT:  Do you have an opinion as to why the

22   government defined the product category differently in 2013 as

23   opposed to now?

24        THE WITNESS:  Um, I don't know why they did it.  What -- I

25   don't know -- have insight to what they did exactly then, but I

1    can tell you now that -- I said I started by including ink and

2    toner.

3              THE COURT:  Right.

4              THE WITNESS:  I assume some of the people at FTC did, too,

5    probably some of the same people who did this a few years ago.

6    And, again, speaking for myself, as I learned about MPS, I carved

7    it out for the reasons we've talked about.  I -- so that -- fine.

8    That's my guess.

9              THE COURT:  Did the government say, "Exclude ink and toner

10   from your calculations"?

11             THE WITNESS:  No, no.  They didn't tell me what to do, if

12   that's what you mean.  There's a dialogue, you know, working

13   together, for sure.  It was more, "We learned about ink and

14   toner.  My staff tells me, you know, these MPS are showing up,

15   they're selling a lot of stuff.  It looks different."

16             THE COURT:  Right.

17             THE WITNESS:  I'm like, "Well, gee, if it's really

18   different, we should carve it out.  Can we do that with the data?

19   Is it practicable?"

20             And we found a way to do it.  So -- and at the same time

21   the FTC's saying the same thing, so we're -- you know, we're in a

22   conversation together, and that's how it happened.

23             MS. CERILLI:  And certainly, Your Honor, we'd be happy to

24   address that question in our summation as well.

25             THE COURT:  All right.  Sure.

1          MS. CERILLI:  Okay.

2    BY MS. CERILLI:

3    Q.    So if we're looking at -- what we're looking at here in

4    the Office Depot/OfficeMax merger, who was the next option

5    available to customers, large customers?

6    A.    Well, it was clearly Staples, as the obvious option, to

7    go against the now-merged firm, Office Depot after they acquire

8    OfficeMax.  That's what they were projecting, and that's what

9    happened.

10   Q.    And I take it, you had no reason to believe that Staples

11   is at any competitive disadvantage in the way that we're seeing

12   the remaining firms here?

13   A.    Right.  So if you go back to what I was saying about

14   bidding analysis, you look at the gap.  So in the previous

15   merger there was no gap.  Okay.  Once they merged they had this

16   other guy just as big to go against, so the gap was tiny.  And

17   in the end that's what -- that's my view of what happened, is we

18   went from three to two.  Staples was plenty powerful enough to

19   go head -- toe to toe, against Office Depot.  They compete quite

20   aggressively against each other, and prices didn't go up.

21   That's what I think happened.

22   Q.    Okay.  And just to sum up for us -- we've covered a lot

23   of evidence related to competitive effects -- taking that all

24   into account, what is your opinion concerning the likely

25   competitive effects of the merger on large customers?

1    **A.**      So now we've got -- it's clear from the bidding data;

2    it's all lining up.  This just reinforces what we have from the

3    market shares stage.  You know, two critical competitors going

4    up against each other all the time.  The others -- compet- --

5    the other bidders or competitors are significantly weaker or

6    smaller.  So, you know, we get to this point, like, okay, I've

7    got some serious concerns here.  And then we're going to ask:

8    Is entry going to save the day?

9         MS. CERILLI:  It sounds like a good time for lunch.

10        THE WITNESS:  Wait, we don't get to do it now?  It's so

11   exciting.

12        FROM THE FLOOR:  (Laughter.)

13        THE COURT:  Objection overruled.

14        FROM THE FLOOR:  (Laughter.)

15        THE COURT:  We'll break until 2:15.  Enjoy your lunch.

16        THE WITNESS:  You, too.

17        (Thereupon, a luncheon recess was had beginning at

18   1:05 p.m.)

19

20

21

22

23

24

25

1

2                    **C E R T I F I C A T E**

3

4                    I, Scott L. Wallace, RDR-CRR, certify that
    the foregoing is a correct transcript from the record of
    proceedings in the above-entitled matter.

5

6    /s/ Scott L. Wallace                    4/1/16
     -----------------------------        ----------------
7    **Scott L. Wallace, RDR, CRR**            **Date**
        **Official Court Reporter**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [3] - 2243:8; 2245:9
**$19** [1] - 2304:5
**$20** [1] - 2243:10
**$250,000** [1] - 2290:23
**$500,000** [3] - 2286:8, 25; 2290:15
**$80** [2] - 2243:8

## '

**'17** [1] - 2261:23

## /

**/s** [1] - 2368:6

## 0

**0.2** [2] - 2261:2; 2322:12
**08540** [1] - 2212:8
**08542** [1] - 2212:12

## 1

**1** [8] - 2210:5; 2215:1; 2284:6; 2295:13; 2310:9; 2317:7; 2322:16
**1,000** [2] - 2258:11, 15
**1,249** [1] - 2290:25
**10** [4] - 2242:3; 2323:25; 2355:17
**100** [72] - 2243:10; 2250:1, 5, 12, 15, 19, 25; 2251:2, 6; 2252:19, 24; 2253:7, 25; 2256:25; 2257:2, 24; 2258:8, 12, 16, 21; 2259:8, 12, 24; 2276:5; 2278:12; 2279:15; 2280:14; 2281:12, 19; 2285:9, 19; 2287:16, 23; 2288:5, 10; 2292:6, 8, 25; 2294:3, 10; 2298:18, 21; 2302:16, 23; 2303:22, 24; 2304:10, 21, 25; 2309:11; 2311:4, 22; 2312:9; 2313:7; 2322:13; 2328:16; 2329:5; 2331:16; 2332:14, 17, 21; 2333:24; 2334:2; 2336:12, 24; 2337:2; 2340:20
**10:00** [1] - 2240:7
**10th** [1] - 2256:10
**11:28** [1] - 2306:19
**11:44** [1] - 2306:20
**1300** [1] - 2212:15
**14th** [1] - 2212:4
**15-2115** [1] - 2210:4
**150,000** [1] - 2362:3
**17** [1] - 2212:11
**17120** [1] - 2212:4
**18** [1] - 2241:16
**19** [6] - 2254:2, 15; 2255:5, 10, 14; 2292:15
**1:05** [1] - 2367:18

## 2

**2** [5] - 2284:6, 8, 13; 2287:10
**2,490** [1] - 2291:2
**2.2** [1] - 2295:14
**20** [9] - 2243:10; 2250:1; 2261:1; 2275:18; 2277:20; 2304:5, 19; 2306:16; 2355:17
**20001** [5] - 2211:22; 2212:20, 24; 2213:4, 11
**20005** [1] - 2212:16
**20024** [6] - 2210:15, 19, 23; 2211:4, 8, 16
**2006** [1] - 2248:6
**2013** [4] - 2361:8, 13; 2364:4, 22
**2014** [6] - 2249:19; 2250:2; 2261:12, 19, 22; 2286:10
**2016** [3] - 2210:5; 2215:1; 2261:23
**202** [22] - 2210:16, 19-20, 23-24; 2211:5, 9, 13, 17, 22-23; 2212:16, 20-21, 24-25; 2213:5
**202)354-3196** [1] - 2213:12
**20580** [1] - 2211:13
**21** [2] - 2267:9, 13
**220-7702** [1] - 2212:25
**2240** [1] - 2214:4
**23** [1] - 2276:2
**24** [1] - 2282:23
**25** [3] - 2278:6; 2284:21; 2322:21
**250,000** [1] - 2291:1
**26** [7] - 2265:15, 17; 2266:4; 2285:14; 2286:18; 2287:6; 2289:24
**27** [3] - 2286:18; 2287:11
**28** [1] - 2290:4
**29** [1] - 2290:21
**2:15** [1] - 2367:15

## 3

**3** [6] - 2284:5, 8, 13; 2287:10; 2295:11
**3,000** [1] - 2283:9
**3,200-something** [1] - 2283:6
**3,274** [1] - 2283:3
**30** [4] - 2254:20; 2255:3; 2292:12; 2332:20
**301** [1] - 2212:7
**303** [1] - 2212:8
**31** [1] - 2294:24
**32** [7] - 2249:19; 2258:7; 2282:11; 2295:6; 2316:14; 2322:18; 2323:23
**326-2114** [1] - 2210:19
**326-2286** [5] - 2210:20, 24; 2211:5, 9, 17
**326-2638** [1] - 2210:16
**326-2821** [1] - 2211:9
**326-2936** [1] - 2211:5
**326-3013** [1] - 2210:23
**326-3044** [1] - 2211:17

**326-3337** [1] - 2211:13
**333** [1] - 2213:10
**34** [6] - 2298:2, 20; 2302:11; 2303:6
**35** [2] - 2285:21; 2288:22
**36** [1] - 2325:12
**38** [1] - 2327:16
**39** [3] - 2288:22; 2290:12; 2328:8

## 4

**4-1/2** [2] - 2304:7, 20
**4/1/16** [1] - 2368:6
**40** [3] - 2260:9; 2329:13
**400** [6] - 2210:15, 18, 22; 2211:4, 8, 16
**41** [2] - 2331:16; 2332:15
**42** [1] - 2290:12; 2333:2
**43** [2] - 2287:8; 2333:9
**441** [1] - 2211:21
**442-9864** [1] - 2211:22
**45** [3] - 2288:7; 2331:24; 2334:13
**46** [3] - 2276:24; 2278:6; 2334:20
**47** [7] - 2249:19; 2258:7; 2282:11; 2316:13; 2323:23; 2336:1; 2337:2
**48** [3] - 2298:7; 2299:24; 2337:8

## 5

**5** [1] - 2350:17
**50** [7] - 2296:13; 2307:6; 2332:20; 2336:15; 2337:24; 2338:3, 6
**500,000** [4] - 2259:21, 24; 2291:1, 11
**500-some** [1] - 2286:24
**51** [1] - 2338:10
**52** [4] - 2331:19; 2334:2; 2345:8
**53** [2] - 2347:20; 2348:5
**544** [1] - 2333:23
**549** [1] - 2337:18
**55** [1] - 2361:23
**57** [2] - 2362:14, 19

## 6

**6** [4] - 2348:15, 18; 2349:8, 15
**6,200-some** [1] - 2283:6
**60** [1] - 2332:20
**600** [2] - 2211:12, 21
**606)986-1199** [1] - 2212:13
**609** [1] - 2212:9
**609)986-1105** [1] - 2212:12
**636-5502** [2] - 2212:21; 2213:5
**636-5505** [1] - 2212:24
**636-5566** [1] - 2212:20
**636-5567** [1] - 2213:5
**6503** [1] - 2213:11
**682-7000** [1] - 2212:16

## 7

**71** [2] - 2276:19; 2277:19
**717** [1] - 2212:5
**741-0655** [1] - 2211:23
**78** [5] - 2287:25; 2288:3; 2337:9, 13
**787-4530** [1] - 2212:5
**79** [6] - 2249:16, 20; 2276:19; 2277:15, 17; 2316:13
**7th** [5] - 2210:18, 22; 2211:4, 8, 16

## 8

**8** [1] - 2210:9
**80** [3] - 2314:23; 2337:21; 2338:7
**81** [6] - 2253:9; 2260:9; 2279:6; 2290:8; 2292:9; 2293:14
**833** [1] - 2333:5
**857-0940** [1] - 2212:17
**87** [1] - 2276:18
**87.6** [1] - 2290:7
**88** [1] - 2290:7

## 9

**900** [5] - 2212:15, 19, 23; 2213:3; 2286:23
**94** [1] - 2290:8
**986-1120** [1] - 2212:9
**9:15** [1] - 2210:6
**9:20** [1] - 2215:2
**9:50** [1] - 2240:6
**9th** [3] - 2212:19, 23; 2213:4

## A

**a.m** [6] - 2210:6; 2215:2; 2240:6; 2306:19
**ability** [1] - 2319:12
**able** [13] - 2246:13, 15; 2255:17; 2262:22; 2269:1; 2290:22; 2312:3; 2320:17; 2343:22; 2346:11; 2347:17; 2349:5, 13
**above-entitled** [1] - 2368:4
**absence** [2] - 2311:6; 2354:19
**absolutely** [5] - 2244:9; 2263:10; 2281:13; 2307:4; 2321:13
**abstract** [2] - 2320:20
**accept** [1] - 2301:2
**access** [2] - 2331:15; 2361:11
**account** [6] - 2262:9; 2263:12; 2294:8; 2305:7, 10; 2366:24
**accounted** [1] - 2309:9
**accounting** [3] - 2243:15; 2251:18; 2279:9
**accounts** [3] - 2243:20; 2362:3
**accumulating** [1] - 2271:17

**accurate** [4] - 2253:9; 2257:8; 2340:6, 24
**acknowledge** [2] - 2341:8; 2353:11
**acknowledged** [1] - 2355:19
**acquire** [1] - 2366:7
**acquired** [1] - 2317:23
**acquisition** [1] - 2323:2
**Action** [1] - 2210:4
**actual** [2] - 2284:17; 2349:21
**Adam** [1] - 2212:10
**added** [2] - 2295:13, 23
**adding** [2] - 2276:25; 2352:25
**additional** [6] - 2248:22; 2277:5; 2287:13; 2300:15; 2302:1; 2315:3
**address** [8] - 2264:7; 2269:14; 2292:4; 2297:13, 23; 2302:8; 2303:4; 2365:24
**addressed** [2] - 2264:8
**addressing** [1] - 2309:9
**adequately** [1] - 2312:23
**adjacent** [1] - 2289:4
**adjust** [1] - 2352:22
**adjustment** [2] - 2295:1, 15; 2304:14
**adjustments** [1] - 2262:12
**advantage** [7] - 2319:25; 2320:2; 2330:12; 2343:8; 2346:17; 2351:12; 2353:4
**advantageous** [2] - 2352:7; 2353:6
**advantages** [2] - 2250:17; 2343:4
**adverse** [1] - 2318:21
**AEP** [1] - 2320:12
**afternoon** [1] - 2320:14
**aggressively** [1] - 2366:20
**ago** [11] - 2248:6; 2273:5, 23; 2274:8, 12; 2298:12; 2301:2; 2354:15; 2355:4; 2365:5
**agree** [4] - 2245:1; 2268:17; 2270:14; 2313:24
**ahead** [7] - 2240:21; 2260:4; 2292:12; 2293:10; 2313:16; 2362:9
**aided** [1] - 2213:14
**air** [3] - 2356:20; 2357:8, 21
**airfare** [1] - 2357:4
**al** [2] - 2210:4, 7
**alacy@stblaw.com** [1] - 2212:25
**alert** [1] - 2335:22
**algebra** [1] - 2241:24
**algebraic** [1] - 2241:13
**alleviate** [1] - 2299:17
**alleviates** [1] - 2360:1
**allocate** [1] - 2251:15
**allocations** [1] - 2277:5
**allow** [4] - 2267:20; 2270:8; 2301:13; 2359:16
**allowed** [5] - 2271:13; 2308:23; 2341:23; 2354:2; 2362:22
**allowing** [1] - 2359:19
**alluded** [1] - 2256:8
**almost** [5] - 2291:6; 2331:21; 2334:4; 2336:19; 2338:8

**alone** [4] - 2291:7; 2309:22; 2349:21; 2351:14
**Alstom** [1] - 2339:25
**altogether** [1] - 2341:5
**Amazon** [48] - 2245:18; 2247:22; 2253:13; 2255:8, 18, 24; 2256:3; 2262:2, 7, 10, 12, 19; 2263:8, 12, 14, 25; 2264:1, 22; 2265:11, 18; 2266:9; 2267:16; 2268:8; 2269:15; 2270:2; 2271:16; 2273:24; 2274:23; 2275:3; 2285:1; 2297:15; 2298:13, 16, 20; 2300:9; 2302:4; 2303:23, 25; 2304:2, 22; 2306:22; 2319:10
**Amazon's** [2] - 2264:16; 2272:5
**Amazon.com** [14] - 2297:16; 2298:24; 2299:6, 13, 21; 2300:3; 2302:4, 15-16; 2304:1, 12, 17, 25; 2308:15
**Amazon.com's** [1] - 2299:11
**ambiguities** [1] - 2252:6
**ambiguous** [3] - 2252:3; 2257:9; 2289:14
**America** [2] - 2259:14; 2293:1
**amount** [5] - 2276:22; 2291:5; 2346:25; 2348:7; 2352:15
**analyses** [1] - 2271:18
**analysis** [88] - 2241:5; 2248:23, 25; 2249:6, 10; 2250:4; 2263:4, 8; 2264:3, 17-18, 20, 22, 25; 2265:6, 18, 23; 2266:14, 19, 21, 23; 2267:18, 21; 2268:19; 2269:13, 21; 2270:8, 19; 2272:9; 2273:16, 22; 2274:3, 8, 12, 17-18; 2284:3, 16; 2285:15; 2286:3; 2287:19; 2288:11; 2292:3; 2295:22; 2297:19; 2298:9; 2299:20; 2300:2; 2303:4; 2305:12; 2316:16, 25; 2318:6; 2319:6; 2320:4; 2321:17; 2327:2, 4, 17, 21; 2328:5, 7; 2329:9; 2330:2; 2331:5; 2333:14, 22, 25; 2334:25; 2335:4, 10, 14; 2337:23; 2338:14; 2341:8; 2344:1; 2348:15, 20; 2350:1; 2351:6; 2354:24; 2361:9; 2362:20; 2366:14
**analytical** [1] - 2271:22
**analyze** [1] - 2329:11
**analyzed** [3] - 2267:1; 2299:15; 2331:15
**Andrew** [1] - 2212:22
**Anne** [1] - 2211:19
**anomalies** [1] - 2338:15
**answer** [9] - 2270:22; 2272:3, 6, 8, 16, 21; 2279:13; 2295:7; 2308:19
**answering** [1] - 2271:3
**answers** [1] - 2308:19
**anticipated** [1] - 2308:18
**anticompetitive** [6] - 2247:11; 2283:13; 2284:9; 2321:1; 2359:17; 2360:10
**antitrust** [3] - 2241:7; 2247:7; 2355:13
**anyhow** [4] - 2260:4; 2284:3; 2332:11; 2359:11
**anyway** [1] - 2355:7

**apart** [3] - 2276:6; 2312:6; 2313:4
**APD's** [1] - 2332:24
**apologize** [2] - 2272:19; 2289:19
**appear** [5] - 2260:24; 2261:9; 2267:19; 2332:6; 2341:19
**APPEARANCES** [4] - 2210:12; 2211:2; 2212:1; 2213:1
**appearances** [6] - 2331:17; 2332:10, 12; 2333:4; 2334:15
**appeared** [1] - 2331:23
**appearing** [5] - 2304:3; 2327:23; 2332:9; 2333:12; 2362:13
**appendices** [2] - 2252:17; 2255:9
**appendix** [3] - 2241:21; 2252:18, 21
**Appendix** [4] - 2241:23; 2252:20, 22; 2288:17
**apples** [1] - 2363:17
**apply** [5] - 2242:1; 2278:4; 2289:5; 2347:14; 2348:10
**applying** [1] - 2362:16
**appreciate** [1] - 2256:11
**approach** [3] - 2252:23; 2309:17; 2310:2
**appropriate** [3] - 2263:19; 2265:25; 2305:19
**APRIL** [1] - 2215:1
**April** [1] - 2210:5
**area** [6] - 2257:25; 2273:14; 2315:14, 18, 22; 2326:7
**areas** [2] - 2326:21; 2356:8
**argue** [1] - 2354:16
**argued** [2] - 2263:11; 2358:10
**arguing** [2] - 2308:4; 2362:21
**argument** [1] - 2357:12
**arguments** [2] - 2302:14; 2316:11
**arise** [1] - 2305:10
**arithmetic** [4] - 2276:8; 2278:4; 2283:2, 11
**arrive** [1] - 2241:18
**articulated** [1] - 2274:22
**aside** [1] - 2274:21
**aspect** [2] - 2349:2, 20
**assemble** [1] - 2288:12
**assembled** [1] - 2258:8
**asserted** [2] - 2305:4; 2348:2
**assess** [3] - 2302:15; 2327:2; 2342:12
**assessing** [2] - 2320:8; 2345:5
**assessment** [3] - 2282:9, 21; 2343:7
**assigning** [1] - 2270:6
**assume** [5] - 2304:12, 17; 2329:20; 2356:6; 2365:4
**assumed** [1] - 2297:17
**assuming** [3] - 2244:18; 2350:19; 2358:21
**attached** [2] - 2266:17; 2304:22
**attempt** [1] - 2298:4
**attempted** [2] - 2263:2; 2327:17
**attempts** [1] - 2354:8
**attention** [1] - 2252:8

**attorney** [1] - 2272:7
**ATTORNEY** [2] - 2211:20; 2212:3
**Attorney** [8] - 2210:13, 17, 21; 2211:7, 11, 15, 19; 2212:2
**attorneys** [1] - 2272:22
**attractive** [1] - 2296:14; 2354:4
**attribute** [7] - 2251:16; 2256:22; 2305:21; 2306:12; 2309:24; 2310:8; 2315:4
**attributed** [3] - 2252:4; 2305:18; 2309:14
**attributes** [1] - 2277:6
**attributing** [1] - 2306:5
**availability** [1] - 2259:2
**available** [7] - 2275:10, 13; 2297:24; 2328:6; 2360:14; 2361:7; 2366:5
**Avenue** [2] - 2211:12; 2213:10
**average** [6] - 2259:17; 2287:24; 2288:3; 2346:15; 2350:16; 2352:13
**aware** [2] - 2274:23; 2361:10
**awkward** [1] - 2323:18

## B

**backing** [1] - 2313:12
**backup** [8] - 2256:12; 2269:2; 2297:22; 2299:17, 19, 21; 2301:8; 2313:17
**backward** [2] - 2247:14, 16
**bad** [2] - 2352:22; 2359:16
**balancing** [1] - 2359:22
**bar** [1] - 2287:6
**bargaining** [1] - 2356:3
**BARTLETT** [3] - 2212:19, 23; 2213:3
**based** [21] - 2247:13; 2250:4, 14; 2270:22; 2271:17; 2273:16; 2275:9; 2288:8; 2292:6; 2307:18; 2312:9, 19; 2328:15; 2333:24; 2338:19; 2343:7; 2345:15; 2349:10; 2350:14
**basic** [4] - 2256:23; 2274:9; 2291:22; 2310:11
**basis** [4] - 2250:10; 2274:8; 2300:11; 2326:5
**BEFORE** [1] - 2210:10
**began** [1] - 2301:7
**beginning** [3] - 2333:3; 2334:14; 2367:17
**behind** [3] - 2319:8, 11; 2324:21
**belief** [1] - 2295:23
**bells** [1] - 2352:25
**belong** [1] - 2280:25
**below** [1] - 2259:25
**bench** [1] - 2267:24
**benefit** [1] - 2320:15
**benefits** [1] - 2320:13
**best** [14] - 2242:12; 2249:16; 2250:25; 2251:14; 2253:2; 2283:4; 2290:4; 2295:16; 2305:12; 2320:25; 2327:7; 2340:16; 2351:5; 2360:14

**better** [7] - 2250:19; 2254:23; 2296:25; 2340:22; 2347:22; 2355:7, 18
**between** [19] - 2243:7; 2244:1; 2250:6; 2266:18; 2276:18; 2286:18, 22; 2289:9, 12; 2293:16; 2294:12; 2296:8, 16; 2304:5; 2318:24; 2329:12; 2335:25; 2345:23; 2348:11
**beyond** [1] - 2318:17
**bias** [7] - 2292:10, 14; 2311:6, 11; 2340:10; 2341:13; 2342:5
**biased** [3] - 2255:15; 2259:3; 2292:21
**bid** [39] - 2320:17; 2325:4, 6; 2327:3-5, 14, 18, 24; 2328:18; 2329:6; 2331:5, 8, 14, 18; 2332:5, 9, 15, 17, 25; 2333:1, 7, 13; 2334:5; 2337:2, 6; 2339:23; 2340:2, 4, 13; 2341:1, 8; 2343:22; 2349:5; 2361:4, 8, 21
**bidder** [2] - 2327:23; 2340:7
**bidders** [3] - 2331:9, 21; 2332:19, 21; 2367:5
**bidding** [48] - 2250:22; 2284:15; 2291:25; 2292:3; 2315:22; 2318:19; 2319:18, 23; 2320:6, 8, 11, 16; 2321:10, 23; 2324:8, 12, 18; 2327:22, 25; 2328:18; 2331:11; 2332:2, 11, 14; 2333:23; 2335:1; 2338:22; 2339:6, 17; 2340:1, 5, 8, 23; 2341:17, 24-25; 2342:4, 7, 11; 2351:24; 2353:18; 2361:1; 2362:20; 2366:14; 2367:1
**bids** [8] - 2334:3; 2341:9, 14-16; 2364:8
**big** [36] - 2255:22, 25; 2259:2; 2262:1, 6, 9; 2269:13; 2284:14; 2288:5; 2291:12; 2295:4; 2296:8; 2309:25; 2312:2, 18; 2317:5, 25; 2324:13; 2328:4; 2333:20; 2338:11; 2339:11, 24; 2344:20; 2346:5; 2347:5; 2354:6; 2355:15, 18; 2356:14; 2361:19; 2366:16
**bigger** [7] - 2315:2; 2347:22; 2349:22; 2361:22; 2363:3; 2364:14
**biggest** [1] - 2243:12
**binder** [1] - 2252:9
**bit** [24] - 2251:4; 2252:2; 2260:14; 2276:23; 2288:19; 2291:4; 2307:20; 2310:8; 2311:2; 2313:22; 2316:15; 2320:22; 2322:15; 2323:11; 2328:21; 2350:6, 10, 24; 2352:16; 2354:5, 18; 2359:5, 20
**blinders** [2] - 2298:13, 23
**blocked** [1] - 2287:4
**blue** [1] - 2246:3
**bogus** [1] - 2357:12
**bonus** [2] - 2351:8; 2352:4
**bonuses** [5] - 2350:13, 16, 23; 2351:1, 19
**booking** [1] - 2306:3
**BOSS** [2] - 2355:21, 24
**bother** [1] - 2330:11
**bottom** [5] - 2260:9; 2276:17; 2303:15;

2331:24; 2337:9
  **bought** [6] - 2251:16; 2257:11, 24; 2278:14; 2304:11; 2311:25
  **bound** [1] - 2349:19
  **break** [20] - 2240:6; 2251:13; 2253:10; 2256:19; 2275:22; 2276:8; 2277:3, 16-17; 2278:13, 25; 2289:12, 20; 2306:19; 2311:4; 2312:3, 8; 2313:6; 2360:5; 2367:15
  **breaking** [3] - 2279:24; 2289:8, 25
  **breakout** [3] - 2257:25; 2290:3
  **Brief** [2] - 2254:6; 2267:4
  **briefly** [4] - 2248:23; 2249:23; 2344:6; 2346:18
  **bring** [5] - 2270:13; 2271:10; 2318:18; 2357:25; 2358:8
  **bringing** [1] - 2315:4
  **broad** [2] - 2325:25; 2357:17
  **broader** [3] - 2290:22; 2314:25; 2345:7
  **broadly** [2] - 2326:20; 2345:6
  **broke** [3] - 2276:21; 2290:8; 2303:22
  **buff** [1] - 2356:14
  **build** [2] - 2323:6; 2324:22
  **building** [1] - 2324:14
  **bunch** [9] - 2257:20; 2267:6; 2291:19; 2295:3; 2315:3; 2332:1; 2342:9; 2344:14; 2364:8
  **bundle** [1] - 2312:6
  **Bureau** [2] - 2210:14; 2211:12
  **Business** [11] - 2247:22; 2262:2, 10, 12, 19; 2263:12; 2265:11; 2266:10; 2274:23; 2275:3; 2302:4
  **business** [25] - 2242:25; 2244:15, 25; 2245:3, 7, 12, 15, 24; 2260:16; 2320:22; 2323:3; 2330:13; 2335:18; 2336:22; 2340:14; 2341:18, 22, 25; 2345:1; 2350:21; 2351:2; 2352:15
  **Business'** [2] - 2263:14; 2285:1
  **buy** [19] - 2243:13, 21; 2253:16; 2254:16; 2255:19; 2259:20; 2260:11; 2278:22; 2281:22; 2288:2; 2293:15; 2296:25; 2344:14, 24; 2346:14; 2356:4, 21
  **buying** [13] - 2281:13; 2293:18, 22; 2296:6; 2305:13; 2339:25; 2344:16, 18; 2347:3; 2352:18; 2353:24; 2356:21
  **buys** [3] - 2259:24; 2280:24; 2346:11
  **BY** [38] - 2214:5; 2240:24; 2247:1; 2248:21; 2253:5; 2254:9, 19; 2256:7; 2260:22; 2262:11, 20; 2274:20; 2275:15, 20; 2277:8; 2280:23; 2281:6; 2284:24; 2285:7; 2287:20; 2294:2; 2295:21; 2301:15; 2302:7, 13; 2305:3; 2309:7; 2310:17; 2316:5; 2325:1; 2331:3; 2334:24; 2352:5; 2353:7; 2357:22; 2360:8; 2364:19; 2366:2

**C**

  **calculate** [3] - 2251:2; 2253:4; 2311:1
  **calculated** [1] - 2294:3
  **calculation** [1] - 2283:2
  **calculations** [4] - 2245:25; 2274:22; 2305:20; 2365:10
  **Canyon** [5] - 2356:15, 24; 2357:1, 20
  **capabilities** [1] - 2324:18
  **capable** [1] - 2310:11
  **cardiac** [2] - 2281:2; 2363:21
  **careful** [2] - 2254:24; 2287:14
  **carefully** [1] - 2280:19
  **CARL** [2] - 2214:4; 2240:23
  **Carnegie** [1] - 2212:7
  **carve** [1] - 2365:18
  **carved** [1] - 2365:6
  **case** [25] - 2215:6; 2241:9; 2248:4; 2249:4; 2263:6; 2264:1; 2279:12; 2283:21; 2291:13; 2298:15; 2300:5; 2309:16; 2314:25; 2315:2, 4; 2317:16; 2319:9; 2326:22; 2327:6; 2332:24; 2334:6; 2340:13; 2345:4; 2358:23; 2360:16
  **cases** [11] - 2246:15; 2247:19, 25; 2258:25; 2289:10, 17; 2305:22; 2306:11; 2336:7, 10; 2339:24
  **categories** [5] - 2243:19; 2290:7; 2317:1; 2325:25; 2363:19
  **category** [5] - 2241:12; 2261:8; 2278:15; 2279:3, 15; 2280:15; 2286:24; 2314:14; 2363:6; 2364:5, 22
  **Catherine** [1] - 2211:19
  **catherine.jackson@dc.gov** [1] - 2211:23
  **caused** [1] - 2300:17
  **causing** [1] - 2357:14
  **Center** [1] - 2212:7
  **Cerilli** [1] - 2211:11
  **CERILLI** [77] - 2214:5; 2240:17, 22, 24; 2247:1; 2248:21; 2253:5; 2254:9, 19; 2256:7; 2260:22; 2262:11, 18, 20; 2263:10; 2265:6, 10, 16, 20; 2266:2, 4, 7, 22; 2268:23; 2269:1; 2271:24; 2272:2, 4; 2274:13, 20; 2275:15, 18, 20; 2277:8; 2280:23; 2281:6; 2284:22, 24; 2285:7; 2287:20; 2294:2; 2295:21; 2297:12; 2298:2, 4, 17; 2299:2, 5, 8, 21, 24; 2301:15; 2302:7, 11, 13; 2303:3; 2305:3; 2306:17; 2307:8; 2309:7; 2310:17; 2316:4; 2325:1; 2331:3; 2334:24; 2352:5; 2353:7; 2357:22; 2360:2, 7-8; 2364:19; 2365:23; 2366:1; 2367:9
  **certain** [4] - 2243:17; 2252:21; 2274:23; 2289:15
  **certainly** [10] - 2243:20; 2261:16; 2262:21; 2263:2; 2292:18; 2302:21; 2318:9; 2326:23; 2363:10; 2365:23

  **certify** [1] - 2368:3
  **chance** [2] - 2266:25; 2299:18
  **change** [2] - 2315:17; 2352:2
  **changer** [1] - 2262:10
  **changes** [1] - 2354:14
  **changing** [3] - 2261:25; 2283:9; 2356:6
  **channels** [2] - 2344:24; 2345:1
  **chapter** [1] - 2265:12
  **characterization** [1] - 2270:2
  **characterize** [1] - 2261:17
  **charging** [1] - 2357:7
  **Charles** [1] - 2210:17
  **chart** [7] - 2275:16; 2276:15; 2287:6; 2304:7; 2332:7; 2361:23
  **charts** [3] - 2250:3; 2361:16, 21
  **chasm** [1] - 2322:18
  **check** [6] - 2260:19; 2279:4; 2289:21; 2292:21; 2339:12, 14
  **checking** [1] - 2277:19
  **choice** [1] - 2352:19
  **choices** [3] - 2319:20; 2358:9; 2360:23
  **CIDs** [2] - 2250:6; 2261:14
  **circle** [1] - 2303:19
  **cites** [2] - 2273:4; 2326:2
  **citing** [2] - 2266:18; 2274:14
  **Civil** [1] - 2210:4
  **claim** [1] - 2283:22
  **claimed** [1] - 2348:2
  **claiming** [2] - 2268:15
  **clarify** [2] - 2298:17; 2341:14
  **clear** [10] - 2242:7; 2273:22; 2274:7; 2297:25; 2307:4; 2309:21; 2316:12; 2322:18; 2337:1; 2367:1
  **clearly** [6] - 2279:13; 2316:16; 2343:21; 2345:21; 2346:24; 2366:6
  **close** [4] - 2246:20; 2324:12; 2326:10; 2327:10
  **closed** [2] - 2215:4; 2240:3
  **closest** [1] - 2363:1
  **cloughlin@ftc.gov** [1] - 2210:20
  **cluster** [9] - 2277:10, 14; 2280:25; 2310:24; 2311:12, 14; 2314:2, 6, 22
  **clustering** [1] - 2277:22
  **COGS** [1] - 2349:21
  **coincidence** [1] - 2291:5
  **collected** [2] - 2270:2; 2300:10
  **collection** [3] - 2261:16; 2288:9; 2312:16
  **colloquy** [1] - 2307:19
  **collude** [1] - 2317:5
  **collusion** [1] - 2317:7
  **Columbia** [2] - 2211:19; 2213:10
  **COLUMBIA** [2] - 2210:1; 2211:20
  **column** [1] - 2277:25
  **combination** [1] - 2330:17
  **combined** [6] - 2249:15, 20; 2276:18; 2290:7; 2297:8
  **combining** [1] - 2283:5

comfort [1] - 2256:1
comfortable [5] - 2293:1; 2300:19;
2301:21, 25; 2341:6
coming [12] - 2245:5; 2248:6; 2280:9;
2285:18; 2299:12; 2305:15; 2311:15;
2324:6; 2338:15; 2340:13; 2359:14
commenced [1] - 2306:24
commission [1] - 2361:13
COMMISSION [8] - 2210:3, 14, 18, 22;
2211:3, 7, 11, 15
Commission [2] - 2210:14; 2211:3
commodities [1] - 2358:14
commodity [3] - 2358:11, 17, 24
common [4] - 2258:24; 2280:12;
2314:4
Commonwealth [1] - 2212:2
COMMONWEALTH [1] - 2212:2
companies [79] - 2242:22; 2243:16;
2244:1; 2249:20; 2250:5, 7; 2251:14;
2253:9, 11, 19; 2254:15; 2255:10, 18;
2256:2; 2257:1; 2258:13, 17-19, 23;
2259:13-15; 2261:3, 5, 18; 2276:5, 10,
18, 23; 2278:7, 20; 2279:2, 15; 2281:3,
19; 2282:4; 2286:7; 2287:9; 2288:22;
2291:23; 2292:9, 15; 2293:1, 14, 17;
2294:5, 20; 2295:3, 6, 17; 2302:23;
2303:22; 2304:21; 2311:4, 22; 2313:7;
2318:24; 2319:3; 2326:9; 2328:9, 12,
16-17; 2331:17; 2332:1, 4; 2335:18;
2336:15; 2340:21; 2353:21; 2354:6;
2357:24; 2358:15
companies' [1] - 2358:24
company [23] - 2251:6, 18; 2253:12;
2257:19; 2259:24; 2278:21; 2281:13,
18; 2289:8; 2304:10, 25; 2309:25;
2317:22; 2330:2; 2332:21; 2336:5;
2338:12; 2340:9, 20; 2343:22; 2350:19;
2356:23
company's [3] - 2255:11; 2259:6;
2336:13
comparable [1] - 2322:4
compare [2] - 2345:2; 2362:7
compared [2] - 2337:13; 2344:21
comparison [1] - 2363:25
comparisons [2] - 2283:23; 2363:14
compelling [1] - 2343:25
compensates [2] - 2312:20, 23
compet [1] - 2367:4
compete [9] - 2317:11; 2318:15, 18;
2319:12; 2351:25; 2357:8; 2361:19;
2366:19
competing [6] - 2284:10; 2318:11;
2319:3; 2335:18; 2338:17; 2352:20
Competition [2] - 2210:14; 2211:12
competition [17] - 2283:20; 2296:4;
2309:17; 2316:24; 2318:25; 2320:19;
2321:23; 2327:8, 11; 2330:5; 2333:19;
2335:25; 2339:7; 2342:15; 2347:11;
2355:12
competitive [30] - 2249:2, 7; 2263:12;

2284:4; 2311:18; 2313:25; 2314:4, 13;
2316:22; 2317:1; 2319:24; 2320:2;
2321:10, 20; 2324:10; 2325:3; 2331:10;
2342:22, 24; 2343:4, 8; 2345:6;
2347:14; 2359:20; 2361:1; 2366:11, 23,
25
competitively [1] - 2347:8
competitor [6] - 2266:11; 2309:25;
2317:23; 2322:6; 2336:10; 2363:3
Competitor [1] - 2288:18
competitors [20] - 2245:5, 10, 16, 20;
2246:11; 2248:10; 2252:4, 21; 2288:25;
2289:2; 2309:20; 2317:5; 2326:18, 21;
2327:23; 2353:15; 2363:1; 2367:3, 5
Compilation [1] - 2288:18
completely [2] - 2251:21; 2285:17
complicated [1] - 2350:6
complication [1] - 2342:4
components [1] - 2243:12
computer [1] - 2213:14
computer-aided [1] - 2213:14
computers [1] - 2313:5
concentrated [4] - 2282:11, 18;
2285:3; 2317:6
concentration [9] - 2248:14; 2278:7;
2282:10, 19, 22; 2283:4, 10, 12; 2284:1
concept [3] - 2244:11; 2320:20
conceptual [1] - 2256:13
concern [9] - 2247:11; 2290:11;
2292:2; 2299:17; 2318:1; 2354:10;
2355:7, 11; 2364:7
concerned [2] - 2261:20; 2262:7;
2292:22; 2307:12; 2308:10; 2339:18;
2345:5; 2354:9; 2355:15
concerning [3] - 2274:24; 2321:19;
2366:24
concerns [4] - 2339:22; 2353:14;
2360:1; 2367:7
conclude [3] - 2282:8; 2333:13;
2334:25
concluded [3] - 2240:3; 2266:10;
2299:15
conclusion [14] - 2241:1; 2249:21;
2266:19; 2267:18; 2268:19; 2271:23;
2272:10; 2274:16; 2275:6, 9; 2285:2;
2339:4
conclusion's [1] - 2266:20
conclusions [9] - 2269:14; 2275:3;
2282:6; 2285:9; 2321:18; 2325:3, 8;
2354:25
conclusive [1] - 2289:1
conditions [4] - 2283:14; 2311:19;
2314:5, 13
conduct [1] - 2328:7
confidence [4] - 2260:21; 2283:25;
2291:10; 2295:23
confident [2] - 2246:18; 2315:21
confidential [5] - 2254:25; 2262:18;
2265:17; 2345:12
confirm [1] - 2250:11

confusing [1] - 2358:13
conscious [1] - 2308:14
conserve [1] - 2245:13
consider [2] - 2259:5; 2289:25;
2300:23; 2317:17
considerably [1] - 2278:2
consideration [1] - 2267:8
considered [2] - 2349:23
consistent [10] - 2284:19, 25; 2288:3;
2326:16; 2338:14; 2339:10; 2340:18;
2341:3, 5; 2345:3
Constitution [1] - 2213:10
constrain [1] - 2354:11
consult [1] - 2308:4
consultants [2] - 2357:25; 2358:8
consumable [30] - 2241:2; 2242:25;
2250:8; 2251:13; 2253:3; 2256:20;
2259:15; 2274:24; 2275:23; 2286:9, 25;
2289:9; 2290:1; 2293:4, 15, 23;
2294:13; 2307:10; 2314:3; 2328:15;
2329:1; 2332:5, 8; 2341:9, 16, 22;
2345:18; 2355:20, 25; 2358:11
consumers [1] - 2317:23
Cont [1] - 2211:2
cont [2] - 2212:1; 2213:1
contacted [2] - 2285:24; 2288:20, 23
context [1] - 2282:12
CONTINUED [2] - 2214:4; 2240:23
continued [1] - 2261:16
continuing [1] - 2271:18
continuum [1] - 2260:15
contract [22] - 2291:22; 2294:4-6, 9,
15; 2296:9, 16, 20; 2302:15; 2323:15;
2329:22-24; 2330:18; 2334:6; 2354:3,
10-11; 2359:3, 7
contract's [1] - 2330:3
contracting [1] - 2281:3
contracts [6] - 2313:4; 2327:12;
2329:19; 2359:2, 6; 2360:1
control [7] - 2297:1, 5; 2354:8, 21-22;
2357:10
controlling [1] - 2297:10
controls [1] - 2356:23
conversation [1] - 2365:22
cookie [1] - 2251:23
cookie-cutter [1] - 2251:23
coordinate [1] - 2317:5
coordinated [2] - 2317:2
coordination [2] - 2317:8, 13
core [22] - 2244:2; 2276:6, 13, 17, 23;
2277:15; 2280:5; 2311:5, 9, 20;
2314:21; 2315:8, 12, 22; 2324:6, 20;
2350:8; 2351:15; 2352:11; 2359:8
corporate [1] - 2304:15
correct [12] - 2264:12; 2274:25;
2281:9; 2294:6; 2310:24; 2311:8;
2313:25; 2337:4; 2341:10; 2368:4
corresponding [1] - 2255:8
corroborate [1] - 2285:9

**corroborated** [1] - 2250:20
**corroborates** [1] - 2285:13
**cost** [23] - 2243:4, 8-9, 13, 20, 23; 2343:15, 24; 2346:1, 8, 15; 2347:2, 13; 2348:3, 7, 11, 23; 2349:2, 21; 2354:8
**costly** [1] - 2347:1
**costs** [12] - 2243:2, 17-18, 23; 2330:14, 19; 2346:12; 2347:7, 21
**Counsel** [7] - 2240:16, 21; 2265:19; 2266:3; 2275:17; 2303:17; 2306:14
**counsel** [4] - 2240:10; 2246:25; 2303:11; 2306:25
**counsel's** [3] - 2267:17; 2268:9, 15
**count** [2] - 2289:12; 2295:13
**counted** [2] - 2261:9; 2341:15
**counting** [1] - 2289:2
**couple** [7] - 2248:13; 2259:24; 2267:10; 2287:9; 2304:2; 2353:5; 2362:12
**course** [22] - 2247:15; 2270:10, 25; 2271:1; 2282:16; 2287:1; 2294:20; 2296:25; 2297:3; 2319:21; 2321:2; 2326:20; 2327:1; 2330:13; 2340:14; 2344:24; 2346:21; 2347:15; 2350:20; 2351:4; 2354:22; 2359:14
**court** [6] - 2240:4; 2252:16; 2267:21; 2269:7; 2287:4; 2325:17
**Court** [15] - 2213:8; 2215:5; 2256:12; 2262:22; 2284:19; 2288:13; 2307:21; 2311:3; 2331:13; 2345:12; 2349:18; 2368:7
**Court's** [3] - 2256:14; 2308:12, 21
**courtroom** [1] - 2270:16; 2300:16
**cover** [2] - 2341:9; 2346:18
**covered** [5] - 2245:22; 2292:13; 2312:25; 2316:6; 2366:22
**crafted** [1] - 2251:21
**created** [1] - 2301:8
**creates** [1] - 2340:10
**creature** [1] - 2360:23
**credibly** [1] - 2351:10
**critical** [2] - 2326:18; 2367:3
**criticism** [1] - 2264:8
**criticisms** [2] - 2252:22; 2292:5
**criticized** [3] - 2255:14; 2277:4; 2306:6
**CRR** [3] - 2213:8; 2368:3, 7
**crystal** [1] - 2316:12
**customer** [61] - 2243:1, 6, 9, 19, 24; 2252:18; 2253:22; 2257:11, 21, 23-24; 2258:3; 2278:12; 2280:24; 2297:4; 2299:2, 14; 2305:21, 24; 2306:12; 2309:14; 2311:25; 2312:2; 2325:13; 2326:11; 2328:3, 24-25; 2329:1, 10; 2335:5, 11-12, 16, 19; 2336:4, 21, 24; 2340:23; 2343:23; 2347:5; 2349:5; 2350:9; 2351:7, 9, 16; 2353:19; 2355:11, 23; 2357:2; 2359:7, 12-13, 23-24; 2360:23; 2362:6, 18
**customer's** [1] - 2341:2

**customers** [103] - 2241:3; 2244:14, 16; 2250:1, 15-16; 2255:25; 2256:3; 2257:11; 2258:10, 12, 14-15; 2259:7, 9, 17, 20; 2278:13; 2284:13; 2285:19; 2286:8, 23-24; 2287:22; 2288:1; 2290:23; 2291:8, 13; 2292:19; 2293:3, 24; 2294:11; 2296:8, 18-19; 2297:9; 2298:22; 2299:10; 2305:1, 16; 2307:9; 2309:22; 2312:10; 2317:24; 2319:19; 2320:15, 24; 2321:3, 13, 20, 24; 2323:13; 2325:10, 14, 24; 2326:6; 2327:12; 2328:1; 2329:11, 15, 18; 2330:17, 25; 2335:7, 20, 23; 2337:15; 2339:8; 2342:11; 2344:18; 2345:5; 2346:22; 2347:15; 2350:5, 15; 2351:4, 22; 2353:8, 10-11, 23; 2354:21; 2355:5, 9, 16, 21; 2356:2; 2357:13, 15; 2358:5; 2359:1, 3, 12, 17, 22; 2362:12; 2366:5, 25
**customers'** [2] - 2257:2; 2325:15
**cut** [1] - 2257:25
**cutoff** [3] - 2290:16; 2291:1
**cutter** [1] - 2251:23

# D

**D.C** [1] - 2210:7
**danger** [1] - 2317:7
**data** [199] - 2243:15; 2246:14; 2247:13, 16-17, 21; 2248:16, 18; 2249:3, 19; 2250:4, 11, 14-16, 19-20, 22; 2251:3; 2252:7, 18, 20, 24; 2253:6, 8, 20; 2254:15; 2255:11, 20; 2256:9, 16, 25; 2257:1; 2258:8; 2259:1; 2261:12, 19-20, 22; 2268:8, 10; 2269:2, 17, 20; 2270:2; 2273:22; 2274:21; 2275:10; 2281:15; 2283:4; 2285:15, 17-18; 2286:4, 20; 2287:2, 16, 21, 23; 2288:9, 12, 25; 2289:4, 8; 2291:2, 25; 2292:6, 8, 16; 2295:16, 22, 25; 2297:16; 2298:5, 12, 14, 17, 20, 22; 2299:6, 9, 12, 14, 21, 24; 2300:2, 4, 6-7, 9-11, 15, 18-20; 2301:5, 17, 22; 2302:3, 9; 2304:4, 25; 2307:8, 11; 2308:15; 2311:4, 21, 23-24; 2312:5, 12; 2313:4; 2315:22; 2316:6; 2318:19; 2319:18; 2321:10; 2323:14; 2324:8, 12; 2325:4, 6; 2327:3-5, 15, 18; 2328:6, 9, 12, 16, 20, 22; 2329:5; 2330:22; 2331:1, 9, 15-17, 25; 2332:15, 17; 2333:1, 5, 8, 12, 24; 2334:11, 16, 19, 21; 2336:12; 2337:3, 7, 14, 16, 19; 2338:1, 4, 14; 2339:1, 3-4, 21-24; 2340:2, 4, 20-21; 2341:4; 2342:9; 2351:24; 2354:1; 2360:14; 2361:4, 7, 12, 20; 2362:12, 14, 25; 2363:13; 2364:7, 13; 2365:18; 2367:1
**Data** [1] - 2288:18
**data's** [2] - 2262:8; 2341:7
**Date** [1] - 2368:7

**date** [2] - 2261:21; 2262:8
**David** [1] - 2210:21
**DAY** [1] - 2210:9
**days** [2] - 2301:2
**DC** [13] - 2210:15, 19, 23; 2211:4, 8, 13, 16, 22; 2212:16, 20, 24; 2213:4, 11
**de** [2] - 2295:8, 13
**De** [1] - 2295:10
**deal** [15] - 2248:2; 2291:12; 2292:2; 2296:3, 10, 23; 2321:7, 15; 2330:10; 2336:5; 2347:22; 2352:16; 2355:7; 2356:8
**deals** [1] - 2355:9
**dec** [1] - 2273:3
**decade** [1] - 2258:15
**decide** [3] - 2307:20; 2308:4, 25
**decided** [2] - 2260:1; 2330:3
**decision** [5] - 2295:12; 2308:12, 14, 16, 21
**deck** [1] - 2267:6
**declaration** [1] - 2300:12
**declarations** [2] - 2325:22; 2326:2
**decreased** [1] - 2342:2
**Defendant** [2] - 2212:6, 18; 2213:2
**Defendants** [1] - 2210:8
**defendants** [13] - 2267:22; 2270:9; 2271:9; 2283:22; 2292:5; 2299:4; 2302:14; 2305:4; 2306:6; 2307:15; 2354:9, 16; 2358:10
**defendants'** [3] - 2263:20; 2300:23; 2354:24
**defending** [1] - 2252:23
**defense** [1] - 2306:25
**define** [2] - 2244:12; 2286:6
**defined** [8] - 2241:4; 2258:13; 2277:11; 2311:9; 2316:10; 2363:6, 19; 2364:22
**definitely** [2] - 2324:20; 2339:19
**definition** [3] - 2241:1, 12; 2249:1
**definitions** [1] - 2294:17
**degree** [2] - 2304:13; 2355:10
**delayed** [1] - 2359:21
**delicate** [1] - 2272:12
**deliver** [1] - 2346:22
**delivering** [1] - 2243:23
**delivers** [1] - 2306:12
**delivery** [2] - 2343:23; 2358:19
**depiction** [1] - 2264:23
**depose** [1] - 2268:14
**deposed** [4] - 2264:3; 2273:14, 19
**deposition** [18] - 2264:4, 9; 2271:6, 10; 2273:4, 6, 10, 13, 16, 20, 23, 25; 2274:5, 12; 2275:13; 2300:13; 2301:24
**Depot** [99] - 2212:19; 2213:3; 2242:22; 2245:4, 18; 2249:16; 2253:16; 2254:16; 2255:19; 2256:24; 2257:1, 16; 2258:6; 2260:10; 2266:11; 2275:4; 2284:10; 2286:21; 2287:2, 8; 2290:14; 2291:16; 2292:18; 2293:16; 2296:2, 23; 2300:3;

2309:14, 23-24; 2310:12, 14; 2313:24;
2314:19; 2320:10; 2321:3; 2322:4, 17;
2324:21; 2328:24; 2329:17; 2331:21;
2332:12, 18, 22; 2333:1, 5, 12, 14;
2334:5, 11, 17, 20; 2335:5, 11, 16;
2336:6, 9-10, 17, 20, 24; 2337:3, 6-7,
11, 16, 22, 25; 2338:7; 2340:4; 2342:3,
7, 10, 23; 2343:5, 8; 2344:21; 2345:2;
2346:17; 2347:25; 2348:10, 12;
2353:12; 2355:20, 24; 2357:18; 2361:7,
12, 22; 2362:2, 11, 25; 2366:7, 19
  **Depot's** [6] - 2257:17; 2260:13;
2291:4; 2326:13; 2335:6; 2340:13
  **Depot/Max** [1] - 2362:22
  **Depot/OfficeMax** [4] - 2283:23;
2360:10; 2361:5; 2366:4
  **depth** [4] - 2250:24; 2317:18; 2339:20;
2346:18
  **derogatory** [1] - 2282:15
  **describe** [4] - 2262:21; 2282:14;
2338:1; 2346:19
  **described** [3] - 2273:7; 2346:4;
2354:14
  **describes** [2] - 2255:10; 2265:10
  **describing** [1] - 2337:2
  **description** [1] - 2301:23
  **DESCRIPTION** [1] - 2214:7
  **designated** [1] - 2240:3
  **desktop** [1] - 2358:19
  **detail** [11] - 2241:14; 2242:17; 2252:2,
16, 25; 2278:20; 2286:19; 2288:19;
2318:17; 2325:6; 2345:14
  **detailed** [10] - 2250:4; 2253:10;
2255:11; 2256:12; 2257:8; 2286:3;
2288:11, 15; 2339:2
  **details** [3] - 2249:22; 2280:19; 2364:6
  **determine** [2] - 2286:5; 2318:21
  **determining** [1] - 2253:8
  **dial** [1] - 2324:11
  **dialogue** [1] - 2365:12
  **Diane** [1] - 2212:6
  **diane.sullivan@weil.com** [1] - 2212:9
  **dictate** [1] - 2249:11
  **difference** [3] - 2243:7; 2266:18;
2296:8
  **different** [37] - 2242:20; 2243:19, 25;
2244:1; 2251:18; 2261:23; 2280:21;
2284:7; 2285:17; 2286:4; 2287:18;
2288:9; 2293:2; 2294:17; 2300:17;
2309:20; 2313:25; 2314:5; 2315:24;
2316:14; 2317:9; 2320:2; 2327:23;
2331:9, 14; 2350:2; 2360:22, 25;
2361:1; 2362:12; 2363:24; 2365:15, 18
  **differently** [3] - 2278:16; 2322:8;
2364:22
  **digits** [1] - 2310:6
  **DIRECT** [2] - 2214:4; 2240:23
  **direct** [5] - 2252:8; 2265:24; 2326:18;
2335:17, 24
  **directed** [1] - 2272:17

  **direction** [2] - 2337:20; 2338:8
  **directly** [17] - 2263:15; 2281:14;
2282:5; 2298:21-23; 2303:19; 2305:17,
24; 2306:11; 2318:11; 2320:11;
2325:16; 2326:15, 22; 2343:17; 2346:7
  **dis** [1] - 2279:10
  **disadvantage** [15] - 2319:25; 2320:2;
2339:14, 16; 2343:18, 22; 2344:7;
2345:6, 25; 2346:8; 2347:4; 2348:23;
2349:2, 20; 2366:11
  **disadvantages** [6] - 2250:17; 2321:11;
2342:23, 25; 2343:6; 2347:13
  **disaggregate** [2] - 2253:12; 2256:19
  **disagree** [1] - 2307:8
  **disbursed** [1] - 2349:6
  **discern** [2] - 2284:9; 2360:14
  **discipline** [1] - 2249:8
  **disclose** [1] - 2269:2
  **disclosed** [11] - 2263:17, 22, 24;
2264:17, 21; 2265:8, 18; 2268:6;
2300:6
  **disclosure** [1] - 2269:22
  **discount** [1] - 2350:10
  **discounts** [4] - 2352:1, 12; 2356:19;
2357:17
  **discourage** [1] - 2352:13
  **discoverable** [1] - 2269:12
  **discovery** [4] - 2268:6; 2269:9; 2326:3
  **discretionary** [2] - 2294:23; 2297:2
  **discuss** [2] - 2266:14; 2344:4
  **discussion** [4] - 2265:23; 2266:8;
2310:23; 2335:22
  **displayed** [1] - 2261:2
  **displaying** [1] - 2252:16
  **disposal** [1] - 2356:3
  **dispute** [1] - 2270:3
  **disputes** [1] - 2269:10
  **disputing** [1] - 2357:18
  **distinct** [1] - 2275:23
  **distorted** [2] - 2260:20; 2294:1
  **distributes** [1] - 2305:21
  **distributing** [1] - 2245:8
  **distribution** [13] - 2241:2; 2243:23;
2245:18; 2260:6; 2306:3, 9; 2344:7;
2346:16; 2347:3, 8; 2349:3; 2358:15,
17
  **distributor** [7] - 2243:13; 2281:21;
2323:19; 2346:6, 11, 14; 2358:21
  **distributors** [3] - 2260:24; 2286:13;
2288:9
  **DISTRICT** [4] - 2210:1, 11; 2211:20
  **District** [3] - 2211:19; 2213:9
  **dive** [1] - 2327:5
  **diversion** [5] - 2318:24; 2319:6, 13,
17; 2336:3
  **diversity** [4] - 2309:12, 16; 2310:4
  **documentary** [2] - 2325:5; 2326:12
  **documents** [2] - 2325:13; 2329:17
  **dog** [1] - 2288:2

  **Domar** [1] - 2305:25
  **dominance** [1] - 2342:3
  **dominant** [2] - 2282:17; 2335:2
  **dominate** [1] - 2332:12
  **dominates** [1] - 2333:4
  **dominating** [2] - 2334:16, 20
  **Domtar** [2] - 2281:24; 2305:25
  **done** [18] - 2247:19; 2257:6; 2260:20;
2271:20; 2272:24; 2273:2, 25; 2277:3,
7; 2278:3; 2288:19; 2292:21; 2295:19;
2301:3; 2328:18; 2339:23; 2345:15;
2358:6
  **double** [5] - 2279:4; 2324:1; 2347:24;
2348:9
  **double-check** [1] - 2279:4
  **doubled** [2] - 2291:2; 2348:1
  **doubling** [3] - 2348:4, 6
  **doubly** [2] - 2269:16; 2298:13
  **doubly-unfair** [1] - 2269:16
  **doubt** [2] - 2339:11; 2357:15
  **dovetail** [1] - 2291:24
  **dovetailing** [1] - 2241:9
  **down** [12] - 2255:5; 2260:15; 2287:12;
2290:17; 2293:20; 2303:1; 2306:18;
2324:5; 2340:4; 2348:3; 2356:15;
2360:24
  **dowyang@ftc.gov** [1] - 2210:24
  **dozen** [1] - 2288:9
  **Dr** [3] - 2253:6; 2273:25; 2274:21
  **dramatic** [1] - 2282:19
  **dramatically** [1] - 2354:13
  **draw** [3] - 2282:6; 2291:15; 2319:16
  **drink** [1] - 2335:8
  **driven** [1] - 2345:6
  **drop** [4] - 2260:13, 16; 2284:13;
2290:18
  **dryers** [2] - 2248:4, 7
  **dubious** [1] - 2277:23
  **duopoly** [3] - 2282:13, 18; 2326:24
  **during** [7] - 2270:2; 2273:10, 19;
2286:9; 2300:10; 2301:18; 2325:21

## E

  **early** [1] - 2337:23
  **easier** [1] - 2317:4
  **easy** [3] - 2246:19; 2265:9; 2345:17
  **econometric** [1] - 2246:14
  **economic** [1] - 2357:12
  **economics** [3] - 2319:6; 2321:8;
2358:4
  **economist** [1] - 2355:15
  **economists** [6] - 2241:7; 2243:4;
2247:7; 2249:3; 2318:21; 2319:16
  **edges** [1] - 2315:19
  **effect** [6] - 2283:19; 2284:14; 2317:20;
2318:3, 21; 2357:19
  **effectively** [3] - 2319:12; 2341:12;
2344:3

2376

**effects** [35] - 2249:2, 7; 2284:9, 17; 2316:20, 22; 2317:2, 9, 17; 2318:5, 10; 2320:8; 2321:1, 16-17, 20; 2324:17; 2325:3, 9; 2327:2; 2339:4, 6; 2342:13; 2347:18; 2350:1; 2360:10, 15, 18; 2361:2; 2366:23, 25
**effort** [3] - 2261:17; 2271:19; 2297:8
**efforts** [1] - 2253:2
**either** [10] - 2253:15; 2265:3, 13, 19; 2304:21; 2326:9; 2343:21; 2345:24; 2363:4
**elaborate** [1] - 2285:12
**Electric** [1] - 2339:25
**electric** [1] - 2340:1
**element** [4] - 2247:23; 2262:9; 2316:22; 2351:14
**elements** [6] - 2319:5; 2342:21; 2350:14; 2352:1, 8; 2353:2
**eliminate** [1] - 2350:22; 2351:19
**Email** [16] - 2210:16, 20, 24; 2211:6, 10, 14, 18, 23; 2212:5, 9, 13, 17, 21, 25; 2213:6, 12
**EMMET** [1] - 2210:10
**emphasize** [2] - 2259:11; 2276:17
**emphasized** [1] - 2357:18
**empirical** [2] - 2242:12; 2327:2
**empirically** [1] - 2246:13
**employees** [2] - 2252:13; 2351:15
**encouraging** [2] - 2252:13; 2351:15
**end** [10] - 2248:7; 2258:5; 2276:9; 2278:2; 2284:2; 2288:21; 2331:10; 2341:17; 2358:16; 2366:17
**ended** [1] - 2253:8
**ending** [1] - 2330:3
**enhanced** [1] - 2353:4
**enjoy** [1] - 2367:15
**enormously** [1] - 2323:1
**enter** [2] - 2264:3; 2305:5
**entering** [1] - 2305:7
**enterprise** [1] - 2260:15
**entitled** [2] - 2275:8; 2368:4
**entry** [9] - 2249:9; 2305:10; 2322:1; 2324:16, 24; 2343:11; 2344:5; 2346:9; 2367:8
**equals** [1] - 2337:9
**error** [1] - 2315:8
**especially** [1] - 2339:7
**Esq** [7] - 2211:3; 2212:6, 10, 14, 18, 22; 2213:2
**essentially** [1] - 2252:23
**establishing** [2] - 2286:14; 2291:20
**estimate** [6] - 2246:13; 2249:16; 2250:25; 2318:13; 2349:15, 22
**estimates** [2] - 2295:23; 2347:20
**et** [2] - 2210:4, 7
**evaluate** [1] - 2361:4
**evaluated** [1] - 2360:9
**event** [2] - 2288:14; 2335:11
**evergreen** [2] - 2329:19, 21

**evidence** [23] - 2246:8, 17; 2250:21; 2263:19; 2288:4; 2292:22; 2296:18; 2313:9, 19, 23; 2319:16; 2325:4, 8; 2326:12; 2330:14; 2344:8; 2346:5; 2349:21; 2354:17; 2366:23
**evident** [1] - 2307:2
**exact** [1] - 2337:20
**exactly** [10] - 2243:17; 2277:16; 2280:10; 2287:16; 2291:6; 2307:24; 2313:7; 2314:8; 2340:6; 2364:25
**examination** [1] - 2267:20
**EXAMINATION** [2] - 2214:4; 2240:23
**EXAMINATIONS** [1] - 2214:3
**examine** [4] - 2332:25; 2333:7; 2334:10, 18
**example** [13] - 2247:25; 2250:23; 2279:22; 2281:1; 2283:17; 2286:20; 2289:3; 2320:12; 2332:4; 2340:3; 2344:12; 2356:10
**examples** [1] - 2289:21
**exception** [1] - 2270:1
**exciting** [1] - 2367:11
**Exclude** [1] - 2365:9
**excluding** [2] - 2256:1; 2312:19
**EXCLUDING** [1] - 2210:10
**excuse** [5] - 2250:8; 2305:25; 2309:15; 2336:7; 2337:10
**exercise** [5] - 2242:12; 2244:13; 2247:17; 2251:10; 2276:7
**Exhibit** [3] - 2292:12; 2293:7; 2345:13
**exhibit** [14] - 2253:17; 2254:13; 2273:6, 9, 12, 16, 19, 25; 2275:12; 2292:15; 2293:12, 22; 2303:21
**EXHIBITS** [1] - 2214:6
**exhibits** [2] - 2252:15, 25
**exist** [2] - 2338:25; 2344:10
**exists** [1] - 2349:7
**expand** [3] - 2305:5; 2323:1; 2326:21
**expanding** [1] - 2262:6
**expansion** [8] - 2305:8, 10; 2322:2; 2324:14, 17, 24; 2343:11; 2344:5
**expect** [1] - 2360:16
**expected** [1] - 2276:4
**expense** [1] - 2271:10
**experienced** [1] - 2348:2
**expert** [24] - 2263:5, 20; 2268:15; 2271:11, 25; 2273:19; 2274:5; 2280:16; 2285:5; 2297:22; 2298:9, 14; 2299:18; 2300:7; 2301:7, 11; 2306:7, 25; 2307:4; 2308:20, 23; 2309:3; 2354:24
**expert's** [2] - 2263:17; 2268:14
**experts** [3] - 2266:25; 2270:12; 2300:23
**explain** [12] - 2241:14; 2249:23; 2285:12; 2297:19; 2302:19; 2313:10; 2327:5; 2328:21; 2331:6, 13; 2333:25; 2344:6
**explained** [1] - 2349:18
**explaining** [3] - 2298:19; 2344:1, 9
**explanation** [1] - 2317:19

**expressed** [3] - 2263:15; 2275:2; 2284:25
**extensive** [3] - 2251:4; 2269:9; 2339:6
**extent** [2] - 2333:18; 2347:12
**extra** [7] - 2243:5, 18; 2277:4; 2352:17, 19-20; 2356:18
**extreme** [1] - 2317:5
**extremely** [2] - 2250:4; 2308:11
**Eye** [1] - 2212:15

## F

**F100** [3] - 2285:13; 2288:24; 2299:11
**fabri** [1] - 2315:9
**fabricated** [1] - 2315:8
**face** [2] - 2348:24; 2355:8
**faces** [2] - 2317:22; 2349:2
**fact** [15] - 2252:12; 2256:8; 2259:23; 2260:16; 2280:24; 2281:15; 2307:6; 2309:4; 2311:16; 2315:17; 2320:7; 2321:5, 12; 2353:15; 2356:8
**Fact** [1] - 2307:3
**factor** [7] - 2307:1, 15; 2311:21; 2312:18, 20; 2361:22; 2362:22
**facts** [1] - 2284:4
**factual** [2] - 2279:5; 2280:21
**fair** [13] - 2267:20; 2268:14, 21; 2271:9; 2279:1; 2288:19; 2309:6; 2323:11; 2339:24; 2359:22; 2363:20, 24
**fairly** [2] - 2269:11; 2311:17
**fairness** [2] - 2269:19; 2274:9
**fall** [5] - 2259:25; 2261:15; 2291:4, 6
**far** [8] - 2284:9; 2293:2; 2297:23; 2319:8, 11; 2333:5; 2354:3
**Fastenal** [5] - 2289:3, 16; 2332:4; 2341:15, 21
**favorite** [1] - 2289:10
**Fax** [10] - 2210:20, 24; 2211:5, 9, 17, 23; 2212:17, 21, 25; 2213:5
**fear** [1] - 2317:3
**features** [1] - 2329:14
**FEDERAL** [8] - 2210:3, 14, 18, 22; 2211:3, 7, 11, 15
**Federal** [2] - 2210:13; 2211:3
**felt** [3] - 2253:9; 2255:10; 2311:14
**few** [4] - 2310:5; 2326:4; 2329:25; 2365:5
**fifth** [1] - 2328:20
**figure** [7] - 2251:15; 2253:3; 2255:13; 2256:21; 2260:20; 2273:1; 2349:15
**figured** [1] - 2278:24
**figures** [3] - 2241:18; 2282:7, 22
**filed** [2] - 2268:13; 2271:5
**files** [4] - 2313:24; 2326:13; 2329:6; 2332:17
**fill** [2] - 2324:2; 2347:10
**final** [1] - 2265:14
**Findings** [1] - 2307:3

**findings** [2] - 2250:12; 2309:4
**Fine** [1] - 2245:12
**fine** [5] - 2240:9, 20; 2308:6; 2365:7
**finish** [1] - 2360:4
**finished** [1] - 2301:7
**firm** [7] - 2282:17; 2317:4, 11-12, 22; 2338:25; 2366:7
**firms** [21] - 2247:9, 11; 2252:5; 2258:5; 2283:5; 2288:20; 2309:20; 2316:13; 2317:11; 2318:11, 14; 2320:3; 2321:12; 2322:17; 2327:9; 2335:3, 25; 2339:12; 2343:9, 14; 2366:12
**first** [40] - 2241:20; 2242:19; 2244:10; 2250:24; 2252:17, 19; 2256:18; 2259:11; 2266:4, 7; 2276:4; 2285:17; 2286:5, 20; 2288:17; 2313:12; 2318:23; 2322:25; 2323:21; 2327:25; 2328:8, 10; 2333:2; 2344:11; 2347:24; 2348:21; 2350:8, 22; 2351:18; 2352:17; 2353:11; 2354:19; 2359:7, 10; 2360:17; 2361:23; 2362:10
**firsthand** [1] - 2269:10
**fit** [1] - 2248:24
**fits** [3] - 2292:22; 2326:8; 2351:23
**five** [2] - 2322:16; 2360:3
**flag** [3] - 2316:16; 2339:11; 2350:8
**flagged** [1] - 2319:17
**flat** [1] - 2353:2
**flip** [3] - 2287:6; 2338:10; 2362:9
**float** [1] - 2359:11
**Floor** [4] - 2212:4, 19, 23; 2213:4
**FLOOR** [5] - 2270:24; 2313:13, 15; 2367:12, 14
**focus** [3] - 2318:3; 2327:12; 2345:20
**focused** [1] - 2275:22
**focusing** [2] - 2315:18; 2355:12
**follow** [1] - 2360:4
**following** [4] - 2215:4; 2240:4; 2283:15; 2349:24
**FOR** [2] - 2210:1; 2211:20
**forecast** [1] - 2307:5
**forecasting** [1] - 2301:22
**foregoing** [1] - 2368:4
**foreseeable** [1] - 2266:12
**forestall** [1] - 2355:25
**form** [1] - 2296:4
**formal** [2] - 2282:21; 2330:9
**forms** [1] - 2245:24
**formula** [7] - 2241:13, 21, 24; 2242:1, 9; 2245:24
**formula's** [1] - 2242:7
**forth** [18] - 2250:6; 2251:11; 2265:1; 2266:21, 24; 2267:19; 2278:21; 2279:9; 2286:2, 18; 2295:7; 2306:4; 2311:2; 2319:21; 2327:24; 2328:17; 2330:16; 2354:24
**forthcoming** [1] - 2300:15
**fortunately** [1] - 2290:21
**Fortune** [69] - 2250:1, 5, 12, 15, 19, 25; 2251:2, 6; 2252:19, 24; 2253:7, 25;

2256:25; 2257:2, 24; 2258:8, 12, 16; 2259:8, 12, 24; 2276:5; 2278:12; 2279:14; 2280:14; 2281:12, 19; 2285:9, 19; 2287:16, 23; 2288:10; 2292:6, 8, 25; 2294:3, 10; 2298:18, 21; 2302:16, 23; 2303:22, 24; 2304:10, 21, 25; 2309:11; 2311:4, 22; 2312:9; 2313:7; 2322:13; 2328:16; 2329:4, 6; 2331:16; 2332:14, 17, 21; 2333:24; 2334:2; 2336:12, 24; 2337:2; 2340:20
**forward** [2] - 2247:18; 2248:18
**forward-looking** [1] - 2248:18
**fought** [1] - 2269:10
**four** [2] - 2298:3; 2361:14
**Fourth** [1] - 2211:21
**fourth** [1] - 2255:5
**fraction** [1] - 2245:9
**free** [1] - 2321:15
**frequencies** [9] - 2327:22; 2331:6, 8; 2332:25; 2333:7; 2334:10, 18; 2353:17; 2363:2
**frequency** [3] - 2319:1; 2331:14; 2333:13
**frequently** [1] - 2329:11
**Friday** [7] - 2210:5; 2297:17; 2298:6; 2299:1, 5, 8, 25
**fringe** [4] - 2282:13, 18; 2284:6
**FROM** [5] - 2270:24; 2313:13, 15; 2367:12, 14
**fruit** [1] - 2351:21
**FTC** [17] - 2250:6; 2251:6; 2269:17; 2278:18; 2286:1; 2288:21; 2290:22; 2294:11; 2295:7; 2298:12; 2315:4; 2325:21; 2326:1; 2361:7, 21; 2363:6; 2365:4
**FTC's** [3] - 2328:13; 2338:5; 2365:21
**full** [2] - 2268:1; 2292:8
**fun** [1] - 2330:6
**function** [1] - 2347:3
**fundamental** [3] - 2268:16; 2356:7; 2358:4
**fundamentally** [3] - 2269:6, 8; 2270:7
**furniture** [2] - 2314:6; 2356:5
**future** [6] - 2263:9, 12; 2266:9, 12; 2275:2; 2305:14

## G

**game** [1] - 2344:2
**gap** [32] - 2296:12, 16; 2319:7, 12, 14, 17; 2320:1; 2322:25; 2323:21; 2324:2, 13; 2333:19; 2342:14, 16; 2344:9; 2347:9, 17, 23; 2348:11, 13, 15; 2349:7, 21; 2351:11; 2366:14
**gaps** [1] - 2355:16
**gathers** [1] - 2325:21
**GE** [1] - 2339:25
**gee** [2] - 2362:1; 2365:17
**Gee** [1] - 2357:2

**GENERAL** [2] - 2211:20; 2212:3
**General** [1] - 2339:25
**general** [8] - 2255:24; 2262:21; 2289:7, 19; 2317:1; 2346:12; 2349:11; 2359:15
**generally** [13] - 2247:24; 2250:6; 2267:14; 2278:15; 2291:14; 2292:17, 20; 2297:10; 2309:12; 2326:7; 2339:23; 2355:5; 2362:15
**generated** [2] - 2249:23; 2250:3
**geographic** [2] - 2343:20, 25
**geographically** [1] - 2349:6
**Georgia** [2] - 2281:16, 23
**Georgia-Pacific** [2] - 2281:16, 23
**given** [9] - 2258:22; 2262:24; 2271:6; 2286:9; 2300:20; 2315:11; 2339:9; 2355:16; 2362:24
**goal** [1] - 2295:19
**Goheen** [1] - 2213:2
**goods** [9] - 2243:20; 2343:16, 24; 2346:1; 2347:3; 2348:3, 7, 11; 2349:2
**GOTSHAL** [3] - 2212:7, 11, 14
**government** [12] - 2268:18; 2271:22; 2272:9, 16-17, 21, 25; 2274:7; 2301:18; 2308:14; 2364:22; 2365:9
**government's** [1] - 2271:10
**Grainger** [1] - 2289:22
**Grand** [5] - 2356:14, 16, 24; 2357:1, 20
**granted** [3] - 2271:7; 2298:11
**graph** [1] - 2281:8
**great** [2] - 2296:3; 2316:21
**greater** [1] - 2242:3
**Greco** [1] - 2211:15
**grew** [1] - 2248:13
**ground** [4] - 2356:20; 2357:4, 8, 21
**group** [5] - 2258:24; 2280:9; 2336:17
**grow** [3] - 2323:10; 2352:15; 2354:13
**growing** [4] - 2248:10, 12, 14; 2313:23
**grown** [1] - 2307:6
**Guernsey** [2] - 2261:6; 2343:15
**guess** [16] - 2249:17; 2250:6; 2251:22; 2263:19; 2266:22; 2278:6; 2292:1; 2293:19; 2325:22; 2338:13; 2342:19; 2345:22; 2348:2; 2352:9; 2359:15; 2365:8
**guide** [1] - 2349:18
**guidelines** [2] - 2283:17; 2317:1
**guidelines'** [1] - 2283:18
**guy** [6] - 2319:8; 2341:1; 2344:12; 2351:2; 2361:19; 2366:16
**guys** [10] - 2314:10, 24; 2315:7; 2320:21; 2324:5; 2325:18; 2340:25; 2343:6; 2346:5; 2347:10

## H

**half** [18] - 2245:13; 2260:8, 12-13; 2276:23; 2283:3; 2293:21; 2302:8, 19;

2303:3, 13, 15; 2313:8; 2329:7;
2336:21
**hand** [5] - 2251:21; 2272:14; 2362:2, 6
**hand-crafted** [1] - 2251:21
**handle** [1] - 2346:23
**hanging** [1] - 2351:21
**happy** [11] - 2244:16; 2252:1; 2269:2;
2270:10; 2297:21; 2299:16; 2301:8;
2307:3; 2360:4; 2365:23
**hard** [3] - 2277:17; 2311:3; 2343:3
**harder** [1] - 2347:14
**hardly** [1] - 2332:2
**harm** [10] - 2283:20; 2291:8; 2315:1;
2317:23; 2345:5; 2355:11, 14; 2358:12;
2359:4; 2360:16
**harm's** [1] - 2359:20
**harmed** [3] - 2317:24; 2353:9, 20
**Harrisburg** [1] - 2212:4
**head** [21] - 2245:5; 2318:14, 25;
2319:7; 2327:8; 2333:18, 20; 2335:25;
2339:7; 2342:15; 2366:19
**head-to-head** [8] - 2245:5; 2318:25;
2327:8; 2333:18, 20; 2335:25; 2339:7;
2342:15
**headquarter's** [1] - 2243:4
**hear** [1] - 2340:7
**heard** [17] - 2261:6; 2262:2, 4, 7;
2282:24; 2294:16; 2296:21; 2302:14;
2319:19; 2321:22; 2325:16; 2343:20;
2351:1; 2354:16; 2357:23; 2359:1
**hearing** [3] - 2258:15; 2274:10;
2357:23
**HEARING** [1] - 2210:9
**heart** [1] - 2327:14
**held** [1] - 2240:4
**help** [4] - 2270:23; 2356:11; 2358:1
**helpful** [4] - 2244:6; 2268:24; 2308:11;
2313:9
**helps** [2] - 2354:22; 2356:13
**Herfindahl** [6] - 2282:25; 2283:8, 10,
16; 2284:14; 2316:17
**herring** [1] - 2358:25
**HHI** [3] - 2282:25; 2283:3, 23
**high** [21] - 2245:21, 23; 2246:7;
2247:8; 2248:7; 2249:5; 2277:20;
2278:6; 2284:1; 2290:10; 2318:9, 17;
2319:13; 2329:16; 2330:11; 2338:8, 17;
2339:9; 2350:9; 2358:16
**high-end** [2] - 2248:7; 2358:16
**high-volume** [1] - 2350:9
**higher** [12] - 2276:9, 14; 2277:18;
2291:17; 2317:24; 2343:15; 2347:7;
2349:10; 2352:13; 2355:5
**highlight** [1] - 2350:12
**highlighted** [2] - 2283:6; 2303:18
**highly** [5] - 2259:4; 2282:11, 18;
2285:3; 2315:21
**highly-concentrated** [3] - 2282:11, 18;
2285:3
**himself** [1] - 2346:4

**historical** [5] - 2247:13, 15; 2249:18;
2305:9
**historically** [1] - 2327:10
**hit** [1] - 2355:18
**HiTouch** [2] - 2261:6; 2319:10
**holding** [1] - 2298:5
**home** [1] - 2347:6
**Honor** [94] - 2240:11, 14, 17; 2246:1;
2248:3; 2251:25; 2252:8; 2255:9;
2259:11; 2260:18; 2261:1; 2262:4, 24;
2263:3, 21; 2264:4, 7, 23; 2265:14, 22;
2266:8; 2267:2, 5, 10, 14, 23; 2268:8,
10; 2269:1, 17, 19, 23; 2270:1, 10, 25;
2271:15; 2272:23; 2273:3, 7, 11, 15,
21; 2274:9; 2275:5; 2276:2; 2277:25;
2280:22; 2282:24; 2285:4; 2287:11;
2290:25; 2294:25; 2297:13, 15, 17;
2298:8, 11; 2299:5, 12; 2300:1, 4, 8-9,
17; 2301:5, 20; 2302:3, 22, 25;
2303:12; 2307:2, 10, 16; 2308:3, 7, 9,
13, 25; 2313:8; 2321:22; 2325:20;
2327:21; 2334:14, 22; 2345:4; 2350:7;
2352:25; 2354:2; 2356:12; 2360:2;
2365:23
**Honor's** [1] - 2270:22
**HONORABLE** [1] - 2210:10
**hope** [5] - 2313:8; 2337:5; 2346:13;
2348:5; 2361:14
**hospital** [1] - 2281:3
**hotels** [1] - 2356:16
**hour** [1] - 2306:16
**hours** [2] - 2298:7; 2299:24
**huge** [7] - 2264:1; 2269:15; 2322:18;
2323:21; 2340:1; 2343:22; 2362:21
**Hulfish** [1] - 2212:11
**hundred** [3] - 2250:7; 2253:9; 2256:9
**hurting** [1] - 2363:23
**hypothetical** [2] - 2241:13; 2242:8
**hypothetically** [1] - 2322:6

# I

**idea** [4] - 2286:12; 2296:12; 2334:20;
2359:16
**identified** [1] - 2353:5
**identify** [3] - 2286:7; 2326:18
**idiosyncratic** [1] - 2280:21
**Ill** [1] - 2213:2
**imagine** [4] - 2244:13; 2326:15;
2356:16; 2357:1
**impact** [1] - 2269:14
**imperfect** [2] - 2276:7; 2341:7
**imperfections** [1] - 2340:3
**implement** [1] - 2352:7
**implications** [3] - 2283:13; 2307:11;
2339:3
**implicit** [1] - 2346:13
**imply** [1] - 2321:15
**importance** [1] - 2342:6

**important** [15] - 2245:2; 2247:23;
2248:10; 2249:3; 2263:1; 2287:21;
2291:12; 2304:3; 2331:7; 2335:7, 14;
2341:2; 2349:4, 12, 25
**importantly** [2] - 2306:2; 2330:2
**in-depth** [1] - 2250:24
**in-store** [1] - 2296:17
**Inc** [1] - 2212:7
**INC** [1] - 2210:7
**inclined** [1] - 2268:16
**Include** [1] - 2294:18
**include** [26] - 2243:3; 2247:21;
2257:14; 2260:1; 2264:24; 2275:14;
2278:19; 2279:2; 2280:1, 14; 2281:11,
14; 2289:13, 18; 2294:19; 2295:16;
2304:1; 2310:24; 2311:13; 2315:5;
2341:16; 2342:1, 5; 2356:4; 2364:9
**included** [16] - 2215:5; 2245:17;
2255:15; 2257:14; 2277:10; 2281:8, 19,
23; 2282:2; 2291:9; 2294:4; 2314:16,
18; 2363:8; 2364:1
**includes** [3] - 2280:2; 2332:5
**including** [13] - 2257:17; 2271:18;
2288:20; 2289:10; 2291:19; 2298:19;
2305:15; 2312:24; 2325:5; 2341:19;
2342:2; 2363:25; 2365:1
**inclusive** [2] - 2289:1; 2295:20
**incompletely** [1] - 2251:20
**inconsistent** [1] - 2299:13
**increase** [12] - 2282:19; 2283:7, 12;
2322:10; 2349:16; 2352:7; 2354:11;
2355:8, 25; 2358:3
**increased** [1] - 2322:20
**increases** [1] - 2292:1
**incredible** [1] - 2307:7
**incremental** [1] - 2243:4
**incumbent** [4] - 2330:9, 12; 2336:6, 9
**incur** [2] - 2243:2, 6
**independent** [1] - 2310:1
**independently** [1] - 2310:12
**index** [2] - 2282:25; 2283:16
**indicate** [2] - 2329:17; 2331:1
**indicated** [2] - 2303:20; 2331:18
**indicates** [1] - 2246:8
**indicating** [1] - 2342:9
**indication** [3] - 2318:9, 16; 2331:9
**indications** [1] - 2326:23
**individual** [1] - 2293:19
**industry** [1] - 2318:1
**inequality** [1] - 2242:9
**inflated** [1] - 2315:12
**inflates** [1] - 2280:4
**inform** [1] - 2308:12
**information** [28] - 2249:5; 2250:7;
2251:7, 10; 2253:12; 2257:8; 2262:19;
2269:12; 2285:22, 25; 2286:2; 2288:15;
2290:21; 2295:2; 2299:1; 2301:22;
2302:24; 2307:1, 15; 2308:12, 19;
2320:1; 2325:23; 2328:14; 2329:7;
2338:5

2379

**informative** [5] - 2259:5; 2284:3, 16; 2288:6; 2334:15
**informed** [3] - 2272:4; 2325:4, 8
**informs** [1] - 2308:21
**inherently** [1] - 2247:14
**initial** [3] - 2241:23; 2275:14, 16
**INJUNCTION** [1] - 2210:9
**ink** [43] - 2257:12, 15, 17; 2277:24; 2278:1, 8; 2279:2, 19; 2280:2, 15; 2289:10; 2310:20, 24; 2311:1, 6, 10, 13, 17, 19; 2312:2, 5, 19-20, 23-24; 2313:19; 2314:2, 10, 19; 2315:1, 24; 2355:21; 2363:8; 2364:1, 9, 13; 2365:1, 9, 13
**innovate** [1] - 2317:25
**inquiry** [1] - 2342:18
**insight** [1] - 2364:25
**instances** [2] - 2337:3, 10
**instead** [1] - 2292:8
**instructive** [2] - 2277:13; 2286:19
**insurance** [1] - 2243:16
**integrate** [1] - 2330:15
**integration** [1] - 2358:18
**intend** [1] - 2306:25
**intended** [1] - 2309:2
**interested** [2] - 2288:16; 2307:11, 13
**interesting** [3] - 2268:25; 2296:15; 2297:3
**intermediaries** [1] - 2294:12
**internal** [1] - 2243:16
**interpreting** [1] - 2363:13
**interprets** [1] - 2278:16
**intricate** [1] - 2352:24
**intro** [2] - 2327:7; 2328:10
**introduce** [1] - 2335:14
**introducing** [1] - 2247:6
**investigation** [3] - 2269:18; 2270:3; 2300:10
**involve** [1] - 2257:22
**involved** [4] - 2248:4; 2253:3; 2286:2; 2361:6
**involves** [2] - 2262:19; 2320:7
**involving** [1] - 2334:3
**irresistible** [1] - 2360:17
**issue** [12] - 2259:2; 2269:13, 15; 2275:5; 2297:11; 2308:13; 2319:17; 2344:6; 2355:10; 2358:23
**issues** [2] - 2256:14; 2268:7
**IT** [1] - 2358:18
**it'd** [1] - 2263:19
**it'll** [1] - 2319:10
**items** [11] - 2282:4; 2289:10; 2293:19; 2341:9; 2350:8, 11; 2351:15; 2352:11; 2358:22; 2359:24
**itself** [1] - 2299:25

## J

**Jackson** [1] - 2211:19

**James** [1] - 2212:18
**jan/san** [2] - 2314:7
**Jeffrey** [1] - 2212:14
**jeffrey.perry@weil.com** [1] - 2212:17
**job** [1] - 2295:19
**John** [1] - 2213:2
**john.goheen@stblaw.com** [1] - 2213:6
**Johnson** [1] - 2280:18
**JUDGE** [1] - 2210:11
**Judge** [2] - 2300:25; 2308:20
**judge** [2] - 2265:24; 2293:6
**judgments** [1] - 2363:15
**juiced** [1] - 2252:5
**jump** [1] - 2286:17

## K

**kcerilli@ftc.gov** [1] - 2211:14
**keep** [6] - 2271:19; 2306:15; 2316:19; 2337:15; 2340:14; 2345:11
**kept** [2] - 2279:22; 2311:10
**key** [3] - 2290:9; 2351:24; 2352:23
**kind** [8] - 2246:19; 2256:13; 2257:5; 2258:21; 2314:12; 2330:25; 2356:10; 2358:16
**knee** [2] - 2281:2; 2363:22
**knee's** [1] - 2363:23
**knowledge** [1] - 2271:17
**known** [1] - 2271:8
**knows** [3] - 2280:19; 2340:9, 23
**Krisha** [1] - 2211:11

## L

**Lacy** [1] - 2212:22
**language** [4] - 2283:19, 21; 2284:8; 2360:22
**large** [69] - 2241:2; 2242:25; 2244:14; 2247:11; 2253:11, 18; 2255:25; 2256:3; 2257:11, 20-21; 2258:9; 2259:9, 20; 2260:15; 2278:13; 2279:14; 2281:17; 2282:12, 16; 2286:13; 2287:22; 2290:14; 2291:15, 23; 2292:17; 2293:24; 2305:16; 2307:9; 2309:14; 2316:13; 2319:12; 2321:13, 20, 23; 2323:14; 2327:12; 2329:11, 14; 2335:5, 12, 16; 2336:23; 2342:11; 2344:18; 2345:5, 23; 2348:23; 2349:7; 2350:5, 15; 2351:20; 2353:11, 23; 2355:5, 9, 21, 23; 2356:2; 2357:24; 2358:6; 2359:1; 2366:5, 25
**larger** [5] - 2259:17; 2261:3; 2293:2; 2342:16; 2362:4
**largest** [9] - 2259:14-16, 18; 2262:5; 2275:21; 2293:1, 3; 2362:18
**last** [16] - 2245:25; 2261:15; 2293:21; 2297:17; 2298:6, 10; 2299:1, 5, 8, 22,

24-25; 2301:18; 2302:2; 2337:25
**Laughter** [5] - 2270:24; 2313:13, 15; 2367:12, 14
**law** [3] - 2241:9; 2249:4; 2283:21
**Lawrence** [1] - 2213:2
**lawyer** [1] - 2271:13
**laying** [1] - 2327:20
**lead** [3] - 2292:14; 2342:6; 2360:4
**leading** [3] - 2266:19; 2268:20; 2269:13
**leads** [3] - 2292:10; 2295:14; 2348:6
**leakage** [21] - 2245:18; 2291:19; 2294:16, 23; 2295:1, 4, 14, 17; 2296:3-5, 15; 2297:10; 2304:14; 2351:15; 2352:13, 20; 2354:16, 19, 25
**learn** [6] - 2241:7; 2247:7; 2270:17; 2271:22; 2273:1
**learned** [4] - 2271:4; 2346:24; 2365:6, 13
**least** [10] - 2246:3, 6; 2259:20; 2272:23; 2288:8, 25; 2289:17; 2324:15; 2331:23; 2349:4
**leave** [2] - 2305:23; 2308:21; 2339:21
**leaves** [1] - 2339:11
**left** [5] - 2276:20; 2309:8; 2315:13; 2338:6; 2362:2
**left-hand** [1] - 2362:2
**legal** [1] - 2355:14
**legitimate** [1] - 2315:23
**length** [1] - 2359:3
**Less** [2] - 2295:11
**less** [5] - 2244:10; 2276:24; 2291:5; 2353:3; 2359:20
**level** [1] - 2252:2
**leverage** [7] - 2351:22; 2356:7; 2357:13, 16; 2358:7
**Lexmark** [1] - 2311:24
**LG** [1] - 2248:5
**light** [2] - 2282:10; 2284:18
**lights** [1] - 2313:18
**likelihood** [1] - 2283:13
**likely** [6] - 2247:10; 2318:10; 2321:19; 2347:18; 2354:11; 2366:24
**likewise** [1] - 2329:3
**line** [6] - 2250:22; 2264:2, 15; 2265:15; 2266:9; 2287:12
**lines** [1] - 2318:20
**lining** [1] - 2367:2
**link** [1] - 2336:2
**lion's** [1] - 2246:10
**list** [6] - 2255:6; 2285:20; 2289:24; 2293:21; 2350:8
**listed** [3] - 2255:8; 2289:24; 2293:16
**lists** [5] - 2255:6; 2293:14, 18; 2295:6
**literally** [1] - 2298:6
**literature** [2] - 2242:2; 2282:14
**LLP** [6] - 2212:7, 11, 14, 19, 23; 2213:3
**locations** [1] - 2347:6

**locked** [2] - 2359:9
**lodges** [3] - 2356:17, 24; 2357:10
**look** [77] - 2241:10; 2242:22; 2245:25; 2247:8, 20, 23-24; 2248:15; 2250:11, 24; 2260:10; 2265:25; 2266:25; 2267:7; 2277:14; 2278:6; 2280:11; 2282:11; 2284:4, 15; 2285:14; 2289:11; 2290:22; 2291:17, 25; 2293:6; 2295:3; 2296:12, 22; 2300:3; 2303:19; 2304:18; 2308:16, 24; 2309:25; 2311:19; 2313:9; 2314:2; 2315:12, 20; 2318:17; 2319:18; 2321:8; 2323:4, 10; 2324:8, 19; 2326:18; 2328:1; 2330:21; 2331:25; 2335:15; 2336:20; 2338:16; 2340:22; 2341:5, 24; 2342:12, 14, 19; 2344:13, 15, 17; 2347:24; 2348:8; 2350:4; 2353:17; 2355:16; 2360:12, 18; 2362:5, 15; 2364:14; 2366:14
**Look** [4] - 2271:9; 2278:22; 2330:10; 2352:14
**looked** [8] - 2277:3; 2280:19; 2296:8, 12; 2321:9; 2332:18; 2340:16; 2364:6
**looking** [35] - 2243:6; 2247:14, 16, 18; 2248:13, 18; 2251:10; 2254:14; 2260:23; 2272:8; 2273:3; 2281:8; 2288:7; 2290:2; 2291:7; 2306:9; 2311:11; 2318:23, 25; 2319:2, 19; 2324:4, 17; 2326:19; 2327:14; 2333:18; 2335:6; 2338:16, 21; 2339:5; 2345:7; 2346:10; 2353:1; 2366:3
**looks** [4] - 2273:24; 2284:12; 2338:18; 2365:15
**lose** [11] - 2244:15, 25; 2245:7, 9, 12, 15; 2336:23; 2337:14; 2350:21; 2351:2; 2361:25
**loses** [10] - 2328:3; 2335:5, 11, 16; 2337:3, 16, 21; 2362:8, 10
**losing** [3] - 2328:3; 2356:7; 2358:6
**loss** [4] - 2316:23; 2328:9; 2336:22; 2355:11
**losses** [10] - 2328:13, 22-23; 2335:6; 2336:19; 2337:24; 2338:6; 2361:23
**lost** [159] - 2244:16; 2246:11; 2328:24; 2329:1; 2336:10, 17, 21; 2337:6, 10-11; 2347:11; 2361:24; 2362:1
**Loughlin** [1] - 2210:17
**lovable** [1] - 2358:5
**love** [2] - 2246:15; 2319:18
**low** [3] - 2291:8; 2349:8; 2351:21
**low-hanging** [1] - 2351:21
**lower** [14] - 2276:11, 14, 19; 2277:18; 2278:2, 9; 2290:17; 2293:20; 2306:1; 2316:15; 2346:12, 15; 2349:19
**lowering** [1] - 2291:1
**lump** [1] - 2281:4
**lumped** [2] - 2257:12; 2261:7
**lunch** [5] - 2308:8; 2360:5; 2362:10; 2367:9, 15
**luncheon** [1] - 2367:17

# M

**machine** [1] - 2213:13
**magical** [1] - 2269:21
**magnitude** [1] - 2347:18
**main** [13] - 2242:2, 11; 2243:18; 2253:2; 2258:23; 2278:5; 2285:15; 2287:13; 2312:12; 2323:16; 2330:20
**maintenance** [2] - 2312:1; 2313:5
**major** [1] - 2291:21
**majority** [2] - 2279:16
**managed** [1] - 2312:25
**MANGES** [3] - 2212:7, 11, 14
**manu** [1] - 2257:20
**manufacturer** [9] - 2281:14, 21; 2305:25; 2306:10, 13; 2344:14; 2346:7, 14
**manufacturers** [13] - 2243:14, 22; 2261:4; 2276:15; 2281:12, 16, 23, 25; 2282:5; 2305:17; 2309:10; 2343:18; 2346:12
**manufacturing** [1] - 2281:9
**Marden** [1] - 2212:2
**margin** [7] - 2242:3, 10, 19-21; 2243:10; 2244:11
**margins** [2] - 2243:25; 2244:1
**market** [97] - 2241:1, 3-4, 6-7; 2245:17; 2247:4, 7-9, 12-13; 2248:15, 24; 2249:1, 5, 14-15, 19, 21; 2250:18, 25; 2251:1; 2252:15; 2258:9, 25; 2259:17, 20; 2260:13; 2266:12; 2269:14; 2275:16, 22; 2277:11; 2279:22; 2281:8, 11; 2282:7, 9, 11, 13, 22; 2283:12; 2285:3, 16; 2287:15; 2291:9, 18; 2292:6; 2295:18; 2298:21; 2300:2; 2305:5, 7, 9, 20; 2310:19; 2311:7, 9; 2316:8, 10; 2317:6, 12; 2318:7, 9, 12, 15; 2320:5, 7, 24; 2322:1, 8, 10, 17, 20; 2323:1; 2329:5, 14; 2338:18, 22; 2339:10; 2343:1; 2345:3; 2353:4, 17, 20; 2354:20; 2357:21; 2359:19; 2361:1; 2367:3
**market-to-market** [1] - 2343:1
**markets** [1] - 2277:14
**Mason** [25] - 2257:9, 12; 2261:2; 2262:5; 2278:13, 23; 2279:23; 2319:10; 2321:13; 2322:5; 2324:4; 2327:24; 2342:20; 2343:14; 2344:3, 12; 2345:20; 2346:22; 2347:12; 2348:8, 11; 2349:2, 11
**Mason's** [2] - 2257:14; 2280:4
**Masonville** [3] - 2323:9, 11; 2346:23
**material** [4] - 2306:22; 2326:3; 2360:3
**materials** [2] - 2258:1; 2297:8
**Matt** [1] - 2280:18
**Matt.Reilly@stblaw.com** [1] - 2212:21
**matter** [11] - 2249:14; 2260:1; 2276:8; 2279:6; 2280:22; 2284:7; 2310:10; 2347:21; 2357:20; 2359:15; 2368:4

**Matthew** [1] - 2212:18
**maximized** [1] - 2350:20
**Maytag** [2] - 2248:5, 11
**McDonald's** [1] - 2319:21
**McHie** [1] - 2212:22
**mean** [42] - 2260:11; 2263:10, 18; 2265:3, 12; 2266:12, 25; 2267:7; 2268:18; 2271:12; 2272:1, 7; 2274:16; 2278:9; 2280:25; 2281:1, 4; 2283:15; 2284:2; 2307:5, 8, 25; 2312:24; 2321:2, 6-7; 2322:12; 2324:19; 2330:6; 2332:4; 2347:2; 2349:11; 2352:22; 2353:16; 2355:14; 2358:12; 2359:18; 2363:21; 2364:4; 2365:12
**meaningful** [1] - 2336:16
**means** [3] - 2282:15; 2316:18; 2358:24
**measure** [31] - 2241:6; 2242:7, 10, 12; 2246:16; 2250:13; 2257:1, 3; 2258:9, 24; 2278:1; 2280:5; 2283:4; 2286:11; 2287:14; 2291:24; 2305:12; 2309:19; 2310:11; 2316:11; 2319:17; 2327:8; 2331:8; 2344:20, 22-23, 25; 2345:7; 2347:17
**measured** [8] - 2242:14; 2243:14; 2296:16; 2304:24; 2354:5, 12, 19; 2363:2
**measurement** [3] - 2259:13; 2347:19; 2348:13
**measures** [2] - 2311:8; 2316:14
**measuring** [10] - 2250:18; 2257:16; 2285:16; 2287:18; 2292:2; 2320:5; 2329:3; 2335:18; 2349:1, 20
**mechanism** [1] - 2351:23
**Meehan** [4] - 2323:20; 2343:21; 2346:4; 2348:22
**meetings** [1] - 2361:15
**members** [1] - 2280:18
**mental** [1] - 2244:13
**mention** [1] - 2303:25
**mentioned** [13] - 2278:12; 2285:8, 10; 2310:5; 2316:21; 2320:6; 2325:2; 2331:25; 2334:2; 2337:23; 2341:15; 2344:4; 2346:16
**merchant** [1] - 2334:8
**merge** [3] - 2319:3; 2356:23; 2357:10
**merged** [6] - 2317:4, 11-12, 22; 2366:7, 15
**merger** [47] - 2244:19; 2245:4; 2247:11; 2248:1, 25; 2258:25; 2282:12, 16, 20; 2283:5, 17; 2284:5, 10; 2285:2; 2287:19; 2305:6, 11; 2316:23, 25; 2317:4, 6; 2321:4, 20, 24; 2347:11, 25; 2349:16, 24; 2350:3; 2351:7, 12, 21; 2353:5; 2354:23; 2356:1, 6; 2357:19; 2360:11, 18; 2361:5, 10, 18; 2362:22; 2366:4, 15, 25
**merger's** [1] - 2357:13
**mergers** [1] - 2359:16
**merging** [8] - 2247:9; 2248:11; 2276:10; 2316:13; 2320:25; 2335:3;

2340:21; 2345:24
**message** [1] - 2278:5
**messy** [2] - 2251:17
**met** [1] - 2242:8
**method** [3] - 2260:7; 2281:20; 2289:1
**methodology** [2] - 2300:13; 2350:19
**methods** [2] - 2283:15; 2309:17
**metric** - 2346:2
**middle** [3] - 2261:15; 2269:21; 2274:10
**midnight** [3] - 2297:17; 2298:6; 2299:25
**might** [17] - 2257:5, 11; 2285:14; 2289:4; 2299:12; 2305:14; 2307:16, 18; 2308:3; 2311:19; 2315:13; 2318:4; 2322:2; 2324:1; 2352:9; 2364:9
**million** [7] - 2286:23; 2293:23; 2304:5, 19; 2352:17; 2362:4
**mind** [3] - 2260:14; 2293:7; 2324:23
**minimis** [3] - 2295:8, 10, 13
**minus** [1] - 2252:1
**minuscule** [1] - 2282:2
**minute** [4] - 2240:12; 2244:18; 2298:25; 2306:15
**minutes** [3] - 2306:16; 2360:3; 2361:14
**misleading** [1] - 2310:2
**missing** [4] - 2249:7; 2291:11; 2295:10; 2338:19
**mistake** [4] - 2314:25; 2315:3, 6
**mixing** [1] - 2257:5
**moderate** [1] - 2291:4
**moment** [7] - 2254:5; 2257:5; 2277:21; 2350:13; 2354:14; 2355:4; 2357:15
**money** [4] - 2276:22; 2297:1; 2315:3; 2350:24
**monopolist** [2] - 2241:13; 2242:8
**monopoly** [2] - 2321:4; 2353:16; 2357:6
**month** [1] - 2330:6
**months** [10] - 2251:9; 2256:9; 2261:17; 2273:5, 23; 2274:8, 12; 2286:2; 2296:2; 2351:7
**morning** [5] - 2240:8, 16
**MORNING** [2] - 2210:9; 2215:1
**Morrison** [4] - 2309:20; 2310:13; 2348:22
**most** [13] - 2247:23; 2260:11; 2261:18; 2279:2; 2319:14; 2323:14; 2335:24; 2338:11; 2340:24; 2350:18; 2353:6; 2362:1, 6
**mostly** [3] - 2247:8; 2285:20; 2286:10
**motion** [3] - 2268:13; 2271:5, 14
**motions** [1] - 2269:18
**motive** [2] - 2270:6; 2351:6
**move** [4] - 2267:3, 5; 2327:16; 2336:15
**moving** [2] - 2337:18
**MPS** [12] - 2311:15, 18, 22; 2312:16; 2314:9, 24; 2315:7, 25; 2364:10; 2365:6, 14

**MS** [144] - 2214:5; 2240:17, 22, 24; 2247:1; 2248:21; 2253:5; 2254:9, 19; 2256:7; 2260:22; 2262:11, 18, 20; 2263:3, 8, 10, 21, 25; 2264:7, 13, 15, 23; 2265:2, 6, 10, 14, 16, 20, 22, 24; 2266:1, 4, 7-8, 17, 22; 2267:2, 5, 10, 14, 23; 2268:1, 7, 23; 2269:1, 16; 2270:1, 10, 15, 18, 21, 25; 2271:3, 15, 24; 2272:2, 4, 23; 2273:3, 6, 11-12, 15, 21; 2274:3, 7, 13, 20; 2275:5, 15, 18, 20; 2277:8; 2280:23; 2281:6; 2284:22, 24; 2285:4, 7; 2287:20; 2294:2; 2295:21; 2297:12; 2298:2, 4, 8, 17; 2299:2, 5, 7-8, 21, 24; 2300:1, 9, 25; 2301:5, 11, 15, 20; 2302:3, 6-7, 11, 13, 25; 2303:3, 5, 12, 15; 2305:3; 2306:17; 2307:2, 8, 16, 18, 24; 2308:2, 7, 9, 13, 24; 2309:2, 7; 2310:17; 2316:4; 2325:1; 2331:3; 2334:24; 2352:5; 2353:7; 2357:22; 2360:2, 7-8; 2364:19; 2365:23; 2366:1; 2367:9
**multi** [1] - 2330:18
**multi-year** [1] - 2330:18
**multiple** [2] - 2251:7; 2345:23

# N

**name** [4] - 2257:21; 2304:4, 22; 2351:10
**names** [5] - 2254:25; 2255:4; 2287:4; 2325:14
**narrow** [2] - 2315:5
**narrower** [1] - 2311:11
**national** [5] - 2323:6; 2346:20; 2349:4; 2356:14
**nationally** [2] - 2323:6; 2324:22
**nationwide** [2] - 2343:23; 2358:19
**natural** [5] - 2261:17; 2299:12; 2350:22; 2351:23; 2360:12
**nature** [1] - 2315:7
**near** [1] - 2322:19
**nearly** [1] - 2304:5
**necessarily** [3] - 2252:13; 2320:4; 2340:12
**need** [8] - 2241:14; 2242:6; 2259:5; 2270:3, 11; 2284:3; 2315:19; 2316:18
**needs** [5] - 2307:4; 2323:16; 2325:18; 2326:10; 2332:24
**negotiate** [2] - 2305:17; 2358:1
**negotiating** [2] - 2351:8
**negotiation** [2] - 2357:16
**network** [2] - 2346:16; 2349:3
**never** [3] - 2300:6, 14; 2327:3
**new** [13] - 2263:16, 18; 2264:20; 2265:4, 6; 2266:23; 2268:8, 10; 2273:16; 2274:3; 2298:20; 2330:15
**newly** [1] - 2307:1
**newly-produced** [1] - 2307:1
**next** [35] - 2241:4, 12; 2249:6, 17;

2262:1, 5, 15; 2266:12; 2275:21; 2284:18; 2286:17; 2287:9; 2290:20; 2291:8; 2292:24; 2297:12, 19; 2301:12; 2304:4; 2316:19, 22; 2318:8; 2319:8; 2324:4; 2325:11; 2326:14; 2332:7; 2333:9; 2342:12; 2343:4; 2344:12; 2346:18, 21; 2366:4
**nicely** [1] - 2338:14
**night** [1] - 2298:10
**NJ** [2] - 2212:8, 12
**nmarden@attorneygeneral.gov** [1] - 2212:5
**nobody** [1] - 2346:20
**noncore** [1] - 2350:11
**none** [2] - 2346:20
**nonjury** [2] - 2267:7; 2307:25
**normal** [5] - 2283:15; 2306:8; 2309:17; 2316:25; 2340:14
**Norman** [1] - 2212:2
**north** [1] - 2246:18
**note** [3] - 2249:4; 2293:8; 2360:2
**noted** [2] - 2269:25; 2331:24
**notes** [1] - 2245:14
**nothing** [2] - 2263:13; 2293:25
**notice** [2] - 2260:23; 2337:13
**noticed** [2] - 2275:21; 2309:11
**now-merged** [1] - 2366:7
**nuances** [1] - 2256:11
**number** [53] - 2244:4; 2245:24; 2246:11; 2252:15; 2253:18; 2255:8, 21-22, 25; 2256:4; 2257:13; 2258:2; 2260:21, 24; 2261:9; 2267:12; 2276:20; 2277:18, 20; 2279:14; 2280:1; 2282:16; 2283:9; 2287:5, 25; 2291:2; 2292:21; 2293:12; 2294:20; 2295:2, 8; 2307:4; 2312:2; 2324:20; 2326:7; 2331:22; 2335:23; 2337:13; 2339:24; 2342:21; 2345:21; 2348:4, 6, 9, 11, 17, 23; 2349:8, 10, 17; 2350:18
**numbers** [20] - 2246:3, 12, 18; 2250:10; 2253:4; 2280:12; 2294:19; 2295:10; 2296:24; 2300:11; 2309:3; 2310:10; 2322:13; 2329:16; 2330:22; 2331:2; 2339:9; 2340:17; 2345:11; 2348:17
**NW** [8] - 2210:15; 2211:12, 21; 2212:15, 19, 23; 2213:3, 10

# O

**O'Neill** [2] - 2320:20; 2325:16
**O'Neill's** [1] - 2332:22
**object** [3] - 2263:3; 2264:4; 2298:9
**objected** [2] - 2303:1; 2306:6
**objection** [13] - 2265:5; 2267:1; 2268:22; 2269:24; 2274:19; 2275:5; 2284:19; 2285:4; 2302:5; 2303:11; 2313:14; 2367:13
**objection's** [1] - 2301:14

**objections** [1] - 2308:1
**obtain** [2] - 2269:11; 2346:11
**obtained** [2] - 2290:22; 2301:18
**obvious** [2] - 2352:9; 2366:6
**obviously** [8] - 2248:22; 2298:4;
2316:10; 2325:6; 2329:4; 2332:12;
2339:2; 2345:12
**occasions** [1] - 2335:15
**occur** [1] - 2318:22
**occurred** [1] - 2284:14
**odd** [1] - 2336:20
**OF** [8] - 2210:1, 9; 2211:20; 2212:2;
2214:4; 2240:23
**off-contract** [6] - 2294:6, 9, 15;
2302:15; 2354:10
**offer** [5] - 2350:25; 2356:20; 2358:15,
17, 20
**OFFICE** [2] - 2211:20; 2212:2
**office** [53] - 2241:2; 2242:25; 2243:14;
2245:8, 11; 2250:8; 2251:13; 2253:3,
18; 2256:20; 2259:16; 2260:11;
2274:24; 2275:24; 2276:6, 13; 2278:14;
2279:2, 19; 2280:15; 2281:21, 25;
2286:9, 15, 25; 2288:10; 2289:9;
2290:1; 2293:4, 15, 23; 2294:13;
2295:18; 2307:10; 2314:3, 15; 2324:7,
20; 2328:15; 2329:1, 12; 2332:5, 8;
2341:9, 16, 22; 2345:18; 2355:20, 25;
2358:11; 2362:5; 2363:5
**Office** [110] - 2212:18; 2213:2;
2242:22; 2245:3, 18; 2249:15; 2253:16;
2254:16; 2255:19; 2256:24; 2257:1,
16-17; 2258:6; 2260:10, 13; 2266:11;
2275:4; 2283:23; 2284:10; 2286:21;
2287:2, 8; 2290:13; 2291:3, 16;
2292:18; 2293:16; 2296:2, 23; 2300:3;
2309:14, 22, 24; 2310:12, 14; 2313:23;
2314:19; 2320:10; 2321:3; 2322:4, 17;
2324:21; 2326:13; 2328:24; 2329:17;
2331:21; 2332:11, 18, 22; 2333:1, 4,
12, 14; 2334:4, 10, 17, 20; 2335:5, 11,
15-16; 2336:5, 9-10, 17, 20, 24; 2337:3,
6-7, 11, 15, 22, 24; 2338:7; 2340:3, 13;
2342:3, 7, 10, 23; 2343:5, 8; 2344:21;
2345:2; 2346:17; 2347:25; 2348:10, 12;
2353:12; 2355:19, 24; 2357:18;
2360:10; 2361:4, 7, 12, 22; 2362:2, 11,
25; 2366:4, 7, 19
**OfficeMax** [7] - 2347:25; 2361:13, 25;
2362:8, 10; 2363:1; 2366:8
**OfficeMax's** [1] - 2361:23
**officers** [2] - 2296:22; 2304:16
**Official** [2] - 2213:9; 2368:7
**offset** [1] - 2357:13
**often** [18] - 2259:1; 2279:1; 2289:7;
2291:20; 2313:19; 2318:1, 14; 2319:6;
2320:18; 2327:23; 2331:8; 2341:9, 11;
2342:4; 2355:20; 2359:1; 2362:15
**once** [2] - 2316:10; 2366:15
**one** [98] - 2240:11; 2243:12; 2247:20;

2248:9; 2249:4, 10-11; 2252:20;
2253:14, 16, 18; 2254:2, 5, 11, 17;
2255:6, 9, 17-18; 2257:20; 2261:25;
2262:9; 2264:2; 2265:15, 23; 2266:9;
2268:7; 2272:24; 2274:10; 2276:9;
2277:1, 18; 2280:18; 2281:16-18;
2283:2; 2284:3, 15, 21; 2285:10;
2287:25; 2289:15; 2293:22; 2298:8, 13;
2302:10; 2303:7, 22; 2308:18; 2310:3,
8; 2312:12; 2317:11; 2318:13; 2319:6;
2320:12; 2322:8; 2324:5; 2326:3;
2328:2; 2329:14, 22; 2331:20; 2334:6;
2335:24; 2336:5, 16; 2338:4; 2339:24;
2341:5; 2343:19; 2345:17; 2346:2, 25;
2347:19; 2348:13, 25; 2349:1, 20;
2350:18; 2351:24; 2352:9; 2356:23;
2357:19; 2359:19; 2360:21, 24;
2362:10
**ones** [9] - 2241:19; 2245:16; 2250:19;
2253:14; 2255:6; 2259:20; 2260:11;
2322:4; 2343:14
**ongoing** [1] - 2297:11
**online** [4] - 2296:6, 10, 13, 17
**open** [3] - 2240:4; 2267:21; 2287:4
**opening** [1] - 2333:10
**opine** [1] - 2308:20
**opinion** [13] - 2249:13; 2250:19;
2263:15; 2280:16; 2284:20, 25; 2285:5;
2307:1, 5; 2326:5; 2364:21; 2366:24
**opinions** [3] - 2267:15; 2300:7; 2316:8
**opportunities** [2] - 2268:2, 12
**opportunity** [4] - 2268:3, 14; 2293:5;
2300:23
**opposed** [1] - 2364:23
**opposite** [1] - 2326:6
**option** [3] - 2354:4; 2366:4, 6
**options** [1] - 2320:25
**oranges** [1] - 2363:17
**order** [7] - 2215:4; 2260:17; 2281:17;
2327:2; 2344:25; 2351:2; 2355:24
**ordering** [1] - 2282:4
**original** [1] - 2281:8
**originally** [2] - 2277:1, 3
**Orszag** [5] - 2255:14; 2263:11; 2264:8;
2277:4; 2341:11
**otherwise** [1] - 2261:8
**ourselves** [1] - 2347:20
**outside** [2] - 2346:23; 2347:6
**overall** [4] - 2248:24; 2258:14; 2282:3;
2304:6
**overestimate** [1] - 2257:7
**overhead** [1] - 2243:3
**overinclusive** [1] - 2289:20
**overly** [1] - 2312:20
**overruled** [1] - 2367:13
**overstated** [2] - 2258:3, 5
**overstates** [1] - 2259:6
**overstating** [1] - 2289:14
**overview** [1] - 2327:17
**overwhelming** [1] - 2340:17

**overwhelmingly** [1] - 2336:23
**own** [14] - 2243:15, 19; 2253:20;
2279:9; 2287:1; 2296:25; 2308:14;
2317:13; 2326:13; 2337:16
**Owyang** [1] - 2210:21

## P

**P.D** [1] - 2309:21
**p.m** [1] - 2367:18
**PA** [1] - 2212:4
**Pacific** [2] - 2281:16, 23
**package** [5] - 2313:20; 2356:20-22;
2357:5
**packaging** [2] - 2257:23; 2258:1
**Page** [2] - 2214:3, 7
**page** [6] - 2265:15, 17, 22; 2266:2
**Pai** [1] - 2211:3
**paper** [51] - 2244:2; 2257:19; 2258:1;
2261:4; 2275:22; 2276:6, 14-15, 19,
24-25; 2277:10-12, 15, 21-22; 2278:5;
2280:6; 2281:9, 14, 16, 18; 2282:1;
2289:25; 2290:10; 2294:15; 2305:17,
21, 24; 2306:10-13; 2309:9; 2311:5, 10,
19; 2314:22; 2315:8, 12, 22; 2316:15;
2324:5; 2334:8
**paragraphs** [3] - 2265:25; 2266:5, 7
**parks** [1] - 2356:14
**part** [27] - 2215:5; 2245:2; 2251:12;
2253:11; 2255:5; 2264:1; 2269:18;
2281:20; 2293:20; 2296:1; 2308:13;
2323:16; 2327:25; 2328:17; 2330:12;
2333:10; 2334:6; 2339:15; 2341:18, 25;
2344:1; 2343:13, 25; 2350:12; 2355:2;
2357:16
**participating** [1] - 2251:9
**particular** [8] - 2250:15; 2263:7;
2280:24; 2289:21; 2292:15; 2328:3;
2335:17; 2339:21
**particularly** [4] - 2321:14; 2350:9;
2354:13; 2358:5
**parties** [5] - 2268:12; 2269:10;
2277:12; 2320:25; 2345:24
**partner** [1] - 2309:22
**parts** [1] - 2303:18
**pass** [1] - 2321:15
**passed** [1] - 2339:2
**pattern** [2] - 2333:10; 2338:8
**pause** [2] - 2254:6; 2267:4
**pay** [8] - 2243:13; 2296:9, 13; 2352:15;
2355:5; 2358:9, 23
**paying** [1] - 2243:21
**Pennsylvania** [1] - 2211:12
**PENNSYLVANIA** [1] - 2212:2
**pens** [3] - 2245:13; 2344:15; 2358:21
**people** [20] - 2245:8, 10, 12; 2246:16;
2280:9; 2296:5, 20; 2305:13; 2329:23;
2330:6; 2332:10; 2335:19; 2341:17;
2342:4; 2356:21, 25; 2357:9; 2365:4

**people's** [1] - 2324:18
**percent** [43] - 2242:3; 2243:10; 2249:16, 19-20; 2258:7; 2261:2; 2276:18, 24; 2277:15, 19-20; 2287:8, 10, 25; 2288:3, 5; 2290:7; 2295:11, 13-14; 2296:13; 2304:7, 20; 2307:6; 2314:23; 2316:13; 2322:12, 16, 18, 21; 2323:23, 25; 2332:20; 2337:21; 2338:7; 2348:15, 18; 2349:8, 15; 2350:17; 2355:17
**percentage** [6] - 2245:19; 2278:9; 2287:7; 2310:5; 2322:11; 2330:24
**perfect** [1] - 2297:8
**perfectly** [1] - 2345:3
**perform** [1] - 2327:1
**performed** [1] - 2327:18
**perhaps** [3] - 2268:9; 2271:19; 2308:5
**period** [6] - 2251:9; 2261:13, 17; 2286:2; 2296:2; 2359:18
**Perry** [1] - 2212:14
**perspective** [1] - 2274:15
**phantom** [1] - 2338:24
**phase** [1] - 2320:3
**pick** [2] - 2258:16, 18-20; 2321:3; 2323:15
**picked** [2] - 2258:12; 2320:4
**picks** [1] - 2335:10
**picture** [1] - 2335:2
**pie** [3] - 2250:3; 2261:8; 2304:7
**piece** [10] - 2249:3, 11; 2276:10; 2284:15; 2310:4; 2316:15; 2349:9; 2357:8
**pieces** [1] - 2250:21
**place** [4] - 2320:19; 2354:5; 2357:19; 2359:20
**places** [2] - 2304:2
**Plaintiff** [5] - 2210:5, 13; 2211:3, 19; 2212:2
**plan** [2] - 2307:15; 2308:20
**plants** [1] - 2340:1
**play** [2] - 2320:8; 2351:5
**player** [1] - 2338:21
**players** [9] - 2249:8; 2282:15; 2284:12; 2339:18; 2342:16, 20; 2344:2; 2346:21; 2347:5
**playing** [1] - 2288:4
**plenty** [3] - 2268:12; 2301:12; 2366:18
**plug** [1] - 2242:11, 13; 2245:24
**plus** [5] - 2242:4; 2252:1; 2282:11, 17; 2290:12
**point** [27] - 2245:6; 2246:17; 2256:20; 2258:23; 2267:17; 2273:17; 2285:16; 2289:7; 2300:8; 2307:22; 2309:18; 2330:8, 20-21; 2338:14; 2339:16; 2341:11; 2343:13; 2348:22; 2352:3, 23; 2362:2, 13; 2363:20, 24; 2364:16; 2367:6
**points** [1] - 2291:2
**PORTIONS** [1] - 2210:10
**position** [2] - 2307:17; 2357:11

**possible** [3] - 2248:18; 2268:2; 2315:7
**possibly** [1] - 2343:3
**Post** [3] - 2245:14; 2344:15; 2358:22
**post** [2] - 2283:3; 2349:16
**Post-it** [1] - 2245:14
**Post-its** [2] - 2344:15; 2358:22
**post-merger** [1] - 2349:16
**potential** [1] - 2354:25
**potentially** [2] - 2262:2, 9
**power** [5] - 2317:13, 15; 2340:1; 2353:4; 2357:21
**powerful** [2] - 2358:6; 2366:18
**practicable** [1] - 2365:19
**practical** [3] - 2258:11; 2261:14; 2356:10
**pre** [1] - 2258:22
**pre-given** [1] - 2258:22
**precise** [1] - 2359:6
**predictively** [1] - 2345:25
**predominant** [1] - 2353:22
**prefer** [2] - 2296:19
**prejudicial** [1] - 2274:11
**PRELIMINARY** [1] - 2210:9
**prelude** [1] - 2331:1
**presence** [2] - 2321:10; 2360:1
**present** [2] - 2346:2; 2361:15
**presentation** [1] - 2355:2
**presented** [5] - 2333:9; 2361:7, 9, 13, 21
**presenting** [1] - 2316:1
**preset** [1] - 2258:20
**president** [1] - 2273:24
**pressed** [1] - 2298:10
**pressure** [4] - 2324:10; 2347:15; 2351:8; 2362:17
**presumption** [1] - 2283:19
**pretrial** [1] - 2306:22
**pretty** [18] - 2251:4; 2262:25; 2276:13; 2277:20; 2280:12; 2307:2; 2322:9; 2325:19; 2327:21; 2335:2; 2339:18; 2342:24; 2343:25; 2345:17; 2346:24; 2349:12; 2362:4; 2363:7
**prevent** [1] - 2359:3
**preventing** [1] - 2358:2
**preview** [1] - 2324:11
**previous** [4] - 2248:2; 2286:10; 2287:6; 2366:14
**Previously** [1] - 2240:3
**previously** [4] - 2267:21; 2268:6; 2270:8; 2336:13
**price** [30] - 2244:14, 23; 2245:6; 2246:10; 2296:8, 12, 14, 16; 2306:1; 2317:15, 24; 2318:4; 2349:16; 2350:20; 2351:13; 2352:7, 10, 13, 21; 2353:2; 2354:11; 2355:8, 17, 25; 2357:2, 4; 2358:2
**prices** [16] - 2244:16; 2296:17; 2305:6; 2318:2; 2349:24; 2350:3, 5; 2352:2; 2354:3; 2355:4; 2359:9; 2366:20

**pricing** [4] - 2305:17; 2350:15; 2353:1; 2354:14
**primary** [21] - 2249:18, 21; 2250:13; 2253:15; 2285:11; 2286:6, 14; 2287:17, 22; 2288:4, 7; 2290:2, 14, 25; 2291:15, 20; 2292:18; 2294:14; 2297:4; 2327:13; 2354:22
**Princeton** [2] - 2212:8, 12
**principle** [1] - 2289:19
**print** [3] - 2312:20, 25; 2331:24
**printers** [3] - 2312:1, 17
**printout** [1] - 2246:3
**problem** [13] - 2255:16; 2277:22; 2300:1; 2303:12; 2315:8, 13-14, 17, 23; 2338:19; 2340:17; 2346:4; 2353:17
**proceed** [3] - 2240:10; 2297:21; 2303:17
**PROCEEDINGS** [1] - 2210:9
**Proceedings** [1] - 2213:13
**proceedings** [6] - 2215:4; 2240:3; 2254:6; 2267:4; 2368:4
**process** [5] - 2252:18, 20; 2256:9; 2261:16; 2286:1; 2288:12; 2296:1; 2325:21
**Processing** [1] - 2288:18
**processing** [3] - 2252:23; 2288:25; 2298:6
**procurement** [3] - 2296:22; 2304:16; 2357:25
**produce** [6] - 2297:16, 22; 2298:24; 2299:6, 17; 2301:6
**produced** [6] - 2213:13; 2268:8; 2297:16; 2299:8; 2300:5; 2307:1, 9, 14
**produces** [1] - 2263:20
**product** [8] - 2256:19; 2326:21; 2346:12; 2347:7; 2358:11, 14, 18; 2364:22
**production** [1] - 2215:6
**products** [15] - 2257:16; 2279:3, 20; 2280:16, 25; 2289:12; 2314:15; 2315:5; 2342:5, 7; 2346:6; 2355:22, 24; 2363:5
**Professor** [24] - 2249:13; 2256:8; 2263:11, 13, 15; 2269:3; 2271:16; 2274:14; 2281:7; 2285:8; 2292:4; 2297:18; 2298:19; 2299:15; 2301:16; 2305:4; 2309:8; 2310:18; 2316:7, 21; 2325:2; 2327:1; 2331:5; 2360:9
**professor** [2] - 2240:25; 2263:10
**proffer** [1] - 2308:5
**profit** [7] - 2242:3, 10, 19, 21; 2243:10; 2244:11; 2350:19
**profitable** [1] - 2353:3
**profitably** [1] - 2349:24
**profits** [1] - 2242:20
**project** [1] - 2261:24
**projected** [2] - 2269:14; 2272:5
**projecting** [1] - 2366:8
**projection** [3] - 2248:13; 2262:8; 2273:4
**projections** [12] - 2247:21-23;

2248:17; 2263:14; 2265:11; 2274:24;
2275:3, 12; 2285:2; 2300:11
**prominence** [1] - 2362:24
**prominent** [3] - 2333:14; 2342:10
**promise** [1] - 2254:7
**proposed** [1] - 2307:3
**protect** [3] - 2353:10, 23; 2357:6
**protected** [2] - 2359:17, 23
**protection** [2] - 2359:9, 12
**provide** [6] - 2243:24; 2253:20;
2269:2; 2317:19; 2327:16; 2340:4
**provided** [3] - 2285:22, 24; 2328:12
**providers** [2] - 2311:15; 2312:17
**provides** [1] - 2241:23
**providing** [2] - 2306:9; 2310:11
**proxy** [5] - 2258:13, 17, 24; 2259:9;
2260:20
**pry** [1] - 2276:6
**public** [1] - 2348:16
**published** [1] - 2303:5
**purchase** [3] - 2296:20; 2312:6;
2346:6
**purchases** [20] - 2250:8; 2251:8, 14;
2253:3, 21-22; 2259:15; 2260:2;
2287:25; 2293:19; 2294:5; 2298:19;
2302:15; 2303:24; 2304:20, 25;
2344:17, 19, 22; 2354:7
**purchasing** [6] - 2343:16; 2344:6, 8,
13; 2347:21; 2350:14
**purely** [1] - 2283:1
**purpose** [1] - 2344:16
**purposely** [6] - 2269:17; 2298:12, 14;
2300:3, 6; 2302:3
**purposes** [3] - 2250:18; 2266:9;
2280:4
**pursue** [3] - 2298:15; 2299:9; 2342:18
**pursued** [1] - 2300:2
**pursuing** [1] - 2299:9
**pushed** [1] - 2317:25
**put** [22] - 2264:18; 2267:11; 2272:7,
13, 17; 2277:24; 2278:1, 8; 2298:12;
2300:5, 20; 2303:2; 2307:3; 2309:4;
2314:1, 22; 2317:3; 2334:14; 2345:25;
2349:9; 2354:24; 2359:19
**putting** [3] - 2274:21; 2298:22;
2324:10

**Q**

**quantify** [4] - 2343:3; 2348:24; 2349:9,
13
**quantitatively** [1] - 2323:22
**quantities** [1] - 2261:10
**quarters** [2] - 2337:11, 16
**query** [4] - 2263:18, 20; 2267:20;
2308:22
**question's** [1] - 2343:11
**questions** [4] - 2248:9; 2251:11;
2263:1; 2297:18

**quibbling** [1] - 2280:13
**quickly** [2] - 2245:22; 2317:25
**quite** [12] - 2242:20; 2251:17; 2270:21;
2311:3; 2313:22; 2317:9; 2341:3;
2349:7; 2350:21, 23; 2354:18; 2366:19

**R**

**R1A** [5] - 2254:10, 12; 2293:7, 12
**R1D** [1] - 2303:20
**R9** [1] - 2345:13
**raise** [9] - 2244:23; 2317:15; 2349:24;
2350:3, 20; 2352:10; 2357:2
**raised** [2] - 2245:6; 2272:14
**raises** [3] - 2244:14; 2246:10; 2305:6
**raising** [5] - 2267:17; 2316:16;
2351:13; 2364:7
**range** [9] - 2243:16; 2244:2; 2260:3;
2281:3; 2287:10; 2291:8; 2293:24;
2360:25; 2361:1
**rarely** [1] - 2332:2
**rate** [7] - 2242:3, 10; 2244:8; 2245:15,
19; 2246:6, 8
**rates** [1] - 2330:11
**rather** [6] - 2251:20; 2282:18; 2309:16;
2318:1; 2343:17; 2346:7
**RDR** [3] - 2213:8; 2368:3, 7
**RDR-CRR** [1] - 2368:3
**read** [1] - 2361:16
**reading** [1] - 2266:6
**ready** [1] - 2240:10
**real** [4] - 2247:16; 2320:10, 18;
2355:13
**reality** [2] - 2323:4; 2327:11
**realize** [1] - 2272:11
**really** [36] - 2246:21; 2247:18; 2249:4;
2251:12; 2283:8; 2296:23; 2297:5;
2306:8; 2309:18; 2310:10; 2313:17, 25;
2314:5; 2317:21; 2318:14; 2319:5;
2321:21; 2323:18; 2325:18; 2327:7;
2338:16; 2340:25; 2343:21; 2344:2;
2351:9, 20; 2352:18; 2356:17, 25;
2357:3; 2358:25; 2359:16; 2360:25;
2362:20; 2365:17
**reason** [13] - 2261:5; 2274:9; 2278:2;
2284:7; 2291:18; 2292:20; 2301:21;
2314:20; 2340:10; 2346:10, 25;
2354:13; 2366:10
**reasonable** [1] - 2314:3
**reasons** [5] - 2277:1; 2308:14;
2353:14, 21; 2365:7
**rebates** [1] - 2350:13
**rebut** [1] - 2263:19
**rebuttal** [10] - 2263:19, 21, 23; 2264:8,
11, 15; 2265:10; 2268:20; 2269:3;
2277:2
**recalled** [1] - 2297:15
**recapture** [7] - 2242:3, 10; 2244:8;
2245:15, 19; 2246:6, 8

**receive** [2] - 2253:6; 2300:6
**received** [6] - 2256:16; 2301:2, 6, 22;
2306:22
**recent** [2] - 2261:13, 18; 2360:18
**recently** [2] - 2268:8; 2356:15
**recess** [2] - 2306:15; 2367:17
**recognize** [1] - 2326:17
**recognizing** [1] - 2341:7
**record** [9] - 2268:1; 2297:25; 2325:5,
8; 2337:1; 2343:7; 2344:9; 2354:17;
2368:4
**records** [3] - 2251:19; 2278:22; 2279:5
**red** [2] - 2339:11; 2358:25
**redacted** [7] - 2249:17; 2255:5;
2285:20; 2286:22; 2287:11; 2295:1;
2325:14; 2331:19; 2348:4
**reds** [1] - 2362:13
**reduce** [1] - 2351:19
**reduction** [2] - 2321:23; 2348:7
**refer** [1] - 2288:13
**referenced** [1] - 2261:11
**referencing** [1] - 2268:9
**referred** [2] - 2256:12; 2336:3
**referring** [7] - 2267:9; 2274:5; 2298:1;
2302:10; 2346:19
**reflected** [1] - 2287:5
**regarding** [5] - 2249:14, 21; 2277:14;
2300:9; 2348:2
**region** [1] - 2321:14
**regional** [1] - 2347:4
**Reilly** [1] - 2212:18
**reinforce** [1] - 2364:16
**reinforces** [1] - 2367:2
**Reinhart** [2] - 2210:13; 2264:6
**REINHART** [26] - 2264:7, 23; 2265:24;
2267:14, 23; 2268:1, 7; 2270:1, 10, 15,
18, 21, 25; 2271:3, 15; 2273:6, 12;
2300:9, 25; 2301:5, 11, 20; 2307:16,
18, 24; 2308:3
**relate** [2] - 2268:10; 2318:6
**related** [2] - 2248:2; 2366:23
**relation** [1] - 2290:1
**relationship** [10] - 2285:11; 2286:6,
15; 2287:17; 2288:7; 2291:20; 2309:23;
2310:13; 2330:13
**relationships** [4] - 2290:2, 25;
2291:22; 2327:13
**relative** [1] - 2342:23
**relatively** [1] - 2336:14
**relevant** [13] - 2241:1, 3; 2266:11;
2287:5; 2291:9; 2311:9; 2326:22;
2327:6; 2343:12; 2345:3; 2353:19;
2356:9; 2362:6
**reliability** [1] - 2339:22
**reliable** [8] - 2248:16, 18; 2261:22;
2294:1; 2295:24; 2311:21; 2312:5;
2313:3
**rely** [2] - 2268:18; 2271:25
**remaining** [1] - 2366:12

**remember** [3] - 2253:16; 2259:19; 2287:24

**renegotiate** [1] - 2330:5

**renew** [1] - 2330:4

**renewal** [1] - 2291:21

**renewals** [1] - 2359:14

**repetition** [1] - 2294:10

**replace** [3] - 2266:10; 2322:4; 2347:11

**reply** [15] - 2263:13, 15; 2264:18; 2265:17; 2274:14, 17, 22; 2275:2, 10; 2285:1; 2293:7, 13; 2303:21; 2345:14; 2355:1

**report** [45] - 2241:22; 2252:17; 2263:4, 9, 11, 15, 18; 2264:2, 8, 11, 15, 18; 2265:10, 14, 17; 2266:14; 2267:19; 2268:10, 14, 20; 2274:14, 17, 23; 2275:2, 11, 14; 2277:2; 2285:1; 2288:13, 17; 2293:7, 13; 2298:9, 18; 2303:4, 21; 2326:1; 2338:7; 2340:12; 2341:12; 2345:14; 2349:17; 2355:1

**reported** [6] - 2213:13; 2257:24; 2281:18; 2298:22; 2331:17; 2332:21

**Reporter** [1] - 2368:7

**reports** [2] - 2242:17; 2252:9

**representation** [2] - 2263:16; 2265:20

**representative** [1] - 2259:2

**request** [10] - 2269:1; 2298:11; 2299:7; 2300:4, 14, 18; 2302:2; 2325:24; 2328:14; 2338:5

**requested** [3] - 2268:11; 2297:15; 2301:6

**reserve** [1] - 2269:3

**reset** [1] - 2248:23

**respect** [3] - 2289:2; 2327:18; 2331:14

**respond** [2] - 2268:3, 5

**responded** [4] - 2251:19; 2263:13; 2295:3; 2355:1

**responding** [1] - 2252:21

**response** [6] - 2250:5; 2255:11; 2256:18; 2271:15; 2328:13; 2338:5

**responses** [11] - 2250:5; 2256:3; 2257:3; 2270:12; 2278:12; 2279:6; 2288:22; 2294:10; 2331:19; 2334:3; 2345:15

**responsive** [2] - 2263:1; 2329:7

**result** [10] - 2244:15; 2249:12; 2277:7; 2282:19; 2285:3; 2305:10; 2316:23; 2317:24; 2320:23; 2321:24

**results** [11] - 2263:14; 2292:10; 2311:7, 11; 2327:5; 2329:9; 2331:13; 2333:25; 2338:2; 2341:13; 2342:5

**retail** [8] - 2296:6; 2345:1; 2353:24; 2354:2, 7; 2355:14, 18

**retention** [1] - 2330:11

**return** [2] - 2250:23; 2310:19

**revenue** [4] - 2243:1, 9; 2310:5; 2328:25

**revenues** [3] - 2244:15; 2259:13; 2309:15; 2345:19

**reviewed** [1] - 2318:7

**RFP** [5] - 2291:21; 2330:9; 2331:17; 2333:24

**RFPs** [3] - 2297:7; 2328:19; 2342:4

**right-hand** [2] - 2362:3, 6

**risk** [1] - 2294:10

**rivals** [1] - 2333:15

**rogue** [1] - 2297:1

**Rohan** [1] - 2211:3

**role** [3] - 2288:5

**Room** [1] - 2213:11

**roughly** [2] - 2291:2; 2348:1

**round** [1] - 2283:9

**rounds** [1] - 2251:7

**row** [4] - 2245:25; 2276:17; 2336:9, 19

**rows** [1] - 2304:4

**rpai@ftc.gov** [1] - 2211:6

**rules** [1] - 2274:9

**ruling** [1] - 2341:19

**run** [1] - 2359:2

**Runco** [1] - 2334:5

**runner** [3] - 2362:14, 16

**runner-up** [2] - 2362:14, 17

## S

**safe** [1] - 2340:19

**sale** [3] - 2241:2; 2274:24; 2306:2; 2311:16

**sales** [40] - 2246:11; 2252:4; 2255:20; 2257:2, 7, 15, 21; 2258:3, 5; 2260:2; 2272:5; 2281:11; 2286:21, 23; 2287:7, 9; 2289:9, 13-14, 18; 2294:4; 2298:16; 2303:22; 2305:18, 21; 2306:5, 12; 2309:9, 24; 2311:15, 18, 22; 2328:15; 2345:1, 6-7; 2352:20; 2358:15; 2362:5

**sample** [7] - 2258:13, 20; 2260:8; 2292:20; 2294:1; 2336:14; 2340:16

**Samsung** [1] - 2248:5

**satisfied** [5] - 2242:7, 9; 2246:7, 19

**save** [2] - 2297:1; 2367:8

**savvy** [1] - 2351:4

**saw** [5] - 2293:21; 2324:11; 2325:8; 2331:14; 2361:2

**scale** [7] - 2344:6, 8-9, 13; 2345:23; 2347:21, 23

**scheme** [1] - 2282:3

**scope** [4] - 2343:20, 23, 25; 2349:4

**Scott** [4] - 2213:8; 2368:3, 6

**scottlyn01@aol.com** [1] - 2213:12

**SEALED** [1] - 2210:10

**season** [1] - 2356:18

**seated** [1] - 2240:8

**second** [5] - 2260:12; 2313:10; 2336:19; 2346:5; 2362:11

**secret** [1] - 2263:25

**section** [2] - 2317:7; 2328:10; 2344:5; 2346:18; 2360:3

**see** [82] - 2242:2, 11; 2249:5, 25; 2251:25; 2255:4, 18, 21; 2260:4, 10, 12; 2262:22; 2269:19; 2274:2, 4, 13, 17-18; 2276:15; 2278:10; 2281:15; 2283:2; 2285:20; 2286:21, 24; 2287:7, 10; 2288:1; 2290:5, 18; 2293:17, 20; 2294:24; 2296:18; 2297:7; 2298:20; 2299:10; 2303:9, 23; 2304:6, 8; 2307:21; 2315:22; 2319:2; 2320:10, 15-16; 2322:3; 2324:19; 2325:10; 2326:9, 12, 24; 2327:22; 2329:16; 2330:24; 2331:17, 22; 2332:1, 7; 2334:3, 21; 2337:8; 2340:10, 17; 2341:14; 2344:20; 2345:12, 19; 2348:1; 2351:20, 24; 2354:12; 2356:13; 2360:18

**seeing** [14] - 2290:13; 2291:15; 2324:11; 2326:21; 2333:14, 21; 2335:24; 2336:6; 2338:9, 15, 23; 2366:11

**seek** [1] - 2269:17

**seeking** [2] - 2286:1; 2299:16

**seeks** [1] - 2297:19

**seem** [1] - 2352:24

**segregate** [1] - 2256:17

**selected** [1] - 2288:20

**self** [1] - 2307:2

**self-evident** [1] - 2307:2

**sell** [10] - 2286:8, 25; 2289:16; 2314:10; 2321:13; 2340:1; 2344:23, 25; 2345:18; 2355:20

**sellers** [1] - 2312:15

**selling** [6] - 2248:5; 2256:25; 2257:10; 2286:15; 2305:13; 2365:15

**sells** [2] - 2335:20; 2306:11

**sense** [9] - 2247:15; 2286:3; 2296:22; 2297:8; 2314:4; 2317:5; 2321:8; 2335:17; 2345:22

**sensitivity** [1] - 2290:17

**sentence** [2] - 2265:15, 23

**separate** [2] - 2306:22; 2313:4

**separately** [1] - 2277:10

**serious** [1] - 2367:7

**seriously** [2] - 2269:5; 2271:4

**serve** [9] - 2243:2, 6, 9; 2309:21; 2321:12; 2323:16; 2325:18; 2326:9; 2332:23

**serves** [1] - 2309:14

**service** [2] - 2313:4; 2358:16

**services** [9] - 2243:24; 2306:3, 9; 2310:11; 2312:6, 20, 25; 2358:17, 24

**serving** [2] - 2243:18; 2291:12

**SESSION** [2] - 2210:9; 2215:1

**set** [23] - 2250:16, 20; 2255:12; 2258:13, 18, 22; 2259:7; 2264:25; 2266:21, 24; 2267:19; 2285:15, 17; 2286:4; 2290:22; 2293:2; 2328:20, 22; 2341:4; 2362:6, 18

**sets** [7] - 2256:9, 16; 2312:13; 2331:15; 2337:14; 2338:4; 2362:12

**seven** [6] - 2336:7, 10-11, 17-18; 2337:9

**Seventh** [1] - 2210:15
**several** [3] - 2288:9; 2337:25; 2359:2
**sgreco@ftc.gov** [1] - 2211:18
**shaded** [5] - 2241:19; 2243:17; 2244:3; 2246:4, 12
**shall** [1] - 2244:7
**SHAPIRO** [2] - 2214:4; 2240:23
**Shapiro** [24] - 2240:25; 2249:13; 2253:6; 2256:8; 2263:11, 13; 2269:3; 2271:17; 2273:25; 2274:21; 2281:7; 2285:8; 2298:19; 2299:15; 2302:8; 2305:4; 2309:8; 2310:18; 2316:7, 21; 2325:2; 2327:1; 2331:5; 2360:9
**Shapiro's** [3] - 2263:15; 2274:14; 2297:18
**share** [35] - 2246:10; 2249:2, 15, 20; 2252:5; 2259:6; 2260:13; 2275:4, 16; 2276:10, 18; 2278:3, 9; 2280:5; 2281:8; 2282:7; 2290:6, 10, 14, 18; 2295:18; 2299:4, 11; 2300:2; 2305:20; 2311:7; 2322:8, 10, 17, 20; 2329:5; 2338:22; 2341:21; 2343:1
**shared** [3] - 2267:21; 2270:9; 2294:19
**shares** [101] - 2241:6, 8; 2247:4, 7-9, 13; 2248:10, 12-13, 15, 24; 2249:5, 8, 14, 19, 21, 23; 2250:3, 14, 18, 25; 2251:1, 16; 2252:6, 15; 2256:22; 2258:6, 9, 25; 2260:10, 23; 2265:20; 2269:14; 2275:23; 2276:9; 2277:12; 2278:5; 2279:22; 2281:11; 2282:5, 10, 12, 25; 2285:9, 11, 13, 16; 2287:14, 17; 2288:7, 24; 2289:2; 2290:18; 2291:3, 16-18; 2292:3, 6-7; 2294:3; 2298:21; 2299:11; 2302:16; 2304:6; 2305:7, 9; 2309:11, 18; 2310:2, 19; 2311:1; 2314:19; 2315:12, 22; 2316:8, 12, 17; 2318:7, 9, 13, 15; 2320:5; 2321:9; 2338:18; 2339:10; 2353:17; 2354:20; 2361:1; 2367:3
**sheet** [1] - 2257:25
**shielding** [1] - 2272:20
**shift** [1] - 2354:6
**shined** [1] - 2315:18
**shipping** [2] - 2257:22
**shocked** [1] - 2339:9
**short** [2] - 2321:4; 2359:11
**short-term** [1] - 2359:11
**shorthand** [4] - 2213:13; 2284:5; 2360:20, 22
**shot** [1] - 2295:16
**show** [10] - 2257:10; 2260:4; 2265:12; 2278:22; 2282:21; 2296:24; 2299:16; 2331:9; 2355:6; 2361:13
**showed** [5] - 2333:3; 2334:5, 13, 22; 2354:1
**showing** [20] - 2249:24; 2261:3; 2281:16; 2292:15; 2297:14; 2302:20; 2304:19; 2311:7; 2331:11; 2334:7, 9; 2337:2, 21; 2342:3; 2361:16, 21, 24-25; 2362:17; 2365:14

**shown** [9] - 2256:3; 2281:15; 2290:7, 24; 2302:17; 2303:24; 2305:2; 2349:14
**shows** [8] - 2254:16; 2257:19; 2276:16; 2281:24; 2286:18; 2331:16; 2336:19; 2361:20
**sic** [1] - 2305:25
**side** [17] - 2270:11; 2271:19; 2299:2, 13-14; 2300:14; 2301:9, 25; 2308:4; 2326:11; 2330:23; 2331:2; 2337:13; 2338:6; 2362:2, 6
**side's** [2] - 2276:9
**sides** [1] - 2307:14
**sign** [11] - 2327:13; 2329:23; 2330:18; 2350:13, 16, 23; 2351:1, 8, 19; 2352:4
**sign-on** [2] - 2350:13, 16
**sign-up** [5] - 2350:23; 2351:1, 8, 19; 2352:4
**signal** [1] - 2247:10
**significance** [5] - 2263:12; 2284:1; 2291:15; 2316:9; 2331:10
**significant** [20] - 2283:20; 2309:4, 19; 2311:14; 2315:2; 2321:23; 2322:11; 2324:14; 2339:14; 2342:22, 24; 2343:19; 2345:25; 2347:4, 8, 13; 2350:18; 2354:17; 2363:11, 13
**significantly** [6] - 2261:25; 2274:11; 2348:23; 2349:10; 2351:19; 2367:5
**similar** [8] - 2286:3; 2288:10, 24; 2314:13, 21-22; 2361:9; 2362:20
**simple** [1] - 2318:13
**simply** [5] - 2317:3, 10; 2330:21; 2349:1; 2355:23
**SIMPSON** [3] - 2212:19, 23; 2213:3
**single** [6] - 2259:23; 2310:6; 2336:16; 2340:13; 2343:24; 2353:19
**sinister** [1] - 2270:6
**sitting** [1] - 2280:20
**situation** [6] - 2272:12; 2297:3; 2314:1; 2319:15; 2353:16, 22
**situations** [3] - 2270:12; 2333:23; 2335:1
**six** [1] - 2351:7
**size** [6] - 2322:19; 2345:23; 2347:24; 2348:1, 4, 10
**sizes** [2] - 2260:3; 2362:12
**skip** [2] - 2283:1; 2284:18
**slide** [72] - 2241:16; 2247:3; 2249:17; 2250:1; 2254:20; 2255:3; 2261:1; 2262:15, 18; 2263:4, 7; 2264:21; 2267:9; 2270:19; 2274:13; 2275:17; 2276:2; 2282:23; 2284:18; 2285:14; 2286:17; 2287:11; 2289:24; 2290:4, 20-21, 25; 2294:24; 2295:6; 2297:12, 19, 25; 2298:2, 20; 2302:9, 11, 18-19; 2303:2, 6-7; 2304:19; 2325:11; 2326:14; 2327:16; 2328:8; 2329:13; 2331:16; 2332:15; 2333:2, 9; 2334:13, 20; 2336:1; 2337:2, 8; 2338:3; 2345:8; 2347:19; 2348:5, 16; 2361:23; 2362:14, 19

**slides** [7] - 2260:18; 2267:6; 2268:9; 2272:23; 2361:11, 14; 2364:6
**slight** [1] - 2300:20
**slightly** [2] - 2300:17; 2310:3
**slivers** [1] - 2261:8
**small** [25] - 2248:12; 2249:8; 2260:16; 2261:3, 7, 10; 2295:5; 2310:4-6; 2311:17; 2314:12, 24; 2322:9; 2330:23; 2331:2; 2333:17; 2335:23; 2336:14; 2337:13; 2338:22; 2345:1; 2354:12
**smaller** [24] - 2252:4; 2260:14, 24; 2261:5; 2282:4, 15; 2291:12; 2322:17; 2330:23; 2331:24; 2333:15; 2339:12, 17; 2341:4; 2343:6, 14-16; 2344:1, 3; 2362:3; 2367:6
**smoothly** [1] - 2318:8
**sold** [12] - 2243:20; 2257:10, 15; 2289:5; 2313:19; 2343:16, 24; 2346:1; 2348:3, 7, 11; 2349:3
**someone** [1] - 2269:4
**sometime** [1] - 2301:12
**sometimes** [5] - 2243:22; 2332:4; 2341:17; 2356:15; 2360:22
**somewhat** [5] - 2243:25; 2244:1; 2291:8; 2358:13; 2362:3
**somewhere** [2] - 2244:17; 2330:4
**sooner** [1] - 2271:20
**sophisticated** [4] - 2357:24; 2358:7, 16
**sophistication** [1] - 2358:2
**sorry** [12] - 2254:20, 24; 2272:19; 2274:4; 2279:13; 2282:8; 2289:16, 18; 2299:19; 2302:25; 2335:8
**sort** [8] - 2257:22; 2278:4; 2282:9; 2291:14; 2319:20; 2352:20; 2361:9, 24
**sorts** [1] - 2258:1
**sought** [2] - 2285:8; 2302:3
**sound** [2] - 2313:1; 2348:20
**sounds** [1] - 2367:9
**source** [1] - 2340:21
**sources** [7] - 2250:11; 2253:21; 2257:6; 2272:15; 2286:4; 2295:17; 2326:15
**South** [1] - 2211:21
**space** [2] - 2261:25; 2356:18
**spaced** [1] - 2282:8
**SPEAKER** [2] - 2240:11, 14
**speaking** [1] - 2365:6
**speaks** [1] - 2320:1
**specific** [6] - 2274:21; 2288:14; 2295:6; 2307:9
**specifically** [3] - 2294:8; 2337:24; 2358:1
**specified** [4] - 2295:9; 2304:10, 11
**spend** [11] - 2290:15, 18; 2294:9, 15; 2297:1, 5; 2298:24; 2302:15; 2354:10
**spending** [1] - 2328:25
**spin** [1] - 2300:17
**spite** [1] - 2307:22
**split** [3] - 2260:8; 2290:5

2387

**spot** [2] - 2272:7, 13
**spotlight** [1] - 2315:18
**sprinkled** [1] - 2326:2
**sprung** [1] - 2269:4
**Square** [1] - 2212:3
**squared** [1] - 2282:25
**staff** [7] - 2251:9, 23; 2280:18; 2286:2; 2326:1; 2357:25; 2365:14
**stage** [3] - 2249:6; 2292:2; 2367:3
**stand** [3] - 2306:7; 2343:10; 2348:19
**standard** [4] - 2241:21; 2260:7; 2283:2; 2327:21
**standing** [1] - 2325:23
**stands** [1] - 2342:20
**STAPLES** [1] - 2210:7
**Staples** [108] - 2212:7; 2242:21, 24; 2244:13, 23; 2246:10; 2249:15; 2253:16; 2254:16; 2255:19; 2256:24; 2257:1, 16; 2258:6; 2260:10; 2266:11; 2275:4; 2284:10; 2286:21; 2287:2, 8; 2290:13; 2291:16; 2292:17, 19; 2293:16; 2296:2, 23; 2297:4; 2300:2; 2305:6, 18, 20, 22; 2306:1, 5; 2309:15; 2310:12; 2313:23; 2314:19; 2320:11; 2321:3; 2324:21; 2326:12; 2328:3; 2329:17; 2331:20; 2332:11, 18, 22; 2333:4, 7, 12, 14; 2334:4, 16, 19, 21; 2335:5, 11, 15; 2336:11, 17, 20-21; 2337:3, 10, 12, 17-18, 21, 24; 2340:4; 2342:3, 6, 10, 23; 2343:5, 8; 2344:21; 2345:2; 2346:17; 2347:15; 2349:23; 2350:2, 5; 2351:12; 2352:7; 2353:12; 2355:19, 24; 2357:17; 2361:19, 22; 2362:1, 9, 13, 17, 21, 24; 2363:2; 2364:14; 2366:6, 10, 18
**Staples'** [4] - 2257:17; 2260:12; 2291:3; 2338:6
**start** [8] - 2277:17; 2306:16; 2320:3; 2323:5; 2329:10; 2336:8; 2344:8, 11
**started** [4] - 2256:15; 2290:6; 2307:14; 2365:1
**starting** [4] - 2285:16; 2318:20; 2342:19; 2352:3
**starts** [1] - 2266:2
**statement** [2] - 2325:19; 2358:14
**statements** [1] - 2325:15
**STATES** [2] - 2210:1, 11
**stay** [3] - 2323:9; 2329:15; 2356:17
**stealing** [1] - 2339:7
**Stelios** [1] - 2211:7
**step** [12] - 2241:4; 2249:10; 2256:23; 2306:18; 2307:19; 2313:8; 2316:19; 2318:8; 2319:4; 2339:3; 2342:12; 2351:18
**Stephanie** [1] - 2211:15
**steps** [2] - 2248:22; 2249:1
**stick** [2] - 2244:14; 2329:25
**sticky** [1] - 2329:18
**still** [19] - 2250:1; 2254:14; 2256:13; 2260:14; 2277:11, 20; 2278:6; 2290:10;

2292:2; 2295:25; 2302:8; 2306:1; 2339:12; 2345:4; 2352:13; 2355:16; 2359:21
**stole** [1] - 2335:19
**stop** [3] - 2241:11; 2316:18; 2319:3
**store** [2] - 2281:22; 2296:17
**straightforward** [1] - 2244:11
**Strawberry** [1] - 2212:3
**Street** [12] - 2210:15, 18, 22; 2211:4, 8, 16, 21; 2212:11, 15, 19, 23; 2213:3
**strength** [1] - 2320:1
**strengthens** [1] - 2288:6
**strike** [1] - 2267:6
**strikes** [1] - 2358:13
**strong** [7] - 2266:11; 2284:12; 2290:11; 2322:4; 2325:19; 2347:10
**structure** [5] - 2248:24; 2352:21; 2353:1; 2354:14; 2359:19
**stuck** [1] - 2278:4
**study** [1] - 2296:7
**stuff** [18] - 2251:24; 2257:12; 2289:17; 2294:21; 2295:4, 10; 2311:25; 2313:20; 2315:19; 2317:7; 2319:20; 2332:6; 2344:23; 2352:17, 19; 2365:15
**submitted** [1] - 2329:6
**subsequent** [1] - 2305:11
**substantial** [2] - 2275:4; 2277:11
**substantially** [1] - 2360:25
**success** [1] - 2291:24
**successful** [2] - 2286:14; 2297:10
**sudden** [1] - 2269:21
**sufficient** [2] - 2256:2, 18
**suggest** [1] - 2308:3
**suggested** [1] - 2271:13
**suggesting** [2] - 2272:24; 2362:25
**suggestion** [1] - 2307:18
**suggests** [1] - 2339:13
**Suite** [3] - 2211:21; 2212:8, 15
**SULLIVAN** [42] - 2210:10; 2263:3, 8, 21, 25; 2264:13, 15; 2265:2, 14, 22; 2266:1, 8, 17; 2267:2, 5, 10; 2269:16; 2272:23; 2273:3, 11, 15, 21; 2274:3, 7; 2275:5; 2285:4; 2298:8; 2299:7; 2300:1; 2302:3, 6, 25; 2303:5, 12, 15; 2307:2; 2308:2, 7, 9, 13, 24; 2309:2
**Sullivan** [1] - 2212:6
**Sullivan's** [1] - 2307:19
**sum** [6] - 2282:25; 2291:14; 2292:25; 2316:6, 8; 2366:22
**summation** [1] - 2365:24
**summer** [1] - 2261:15
**supplement** [3] - 2268:14; 2270:12; 2271:5
**supplemental** [3] - 2300:20; 2306:22
**supplier** [9] - 2253:24; 2256:22; 2289:4; 2304:9; 2309:13, 16; 2328:2; 2330:9; 2336:22
**supplier's** [1] - 2291:12
**suppliers** [32] - 2250:14, 17, 21; 2251:16; 2257:4, 7; 2261:7; 2275:22;

2285:18, 21; 2286:1; 2287:3; 2303:23; 2305:5; 2309:12; 2310:4, 9; 2319:22; 2321:5, 9, 24-25; 2322:3; 2325:11, 25; 2331:22, 25; 2340:3; 2342:2; 2345:18
**suppliers'** [1] - 2345:15
**supplies** [49] - 2241:2; 2242:25; 2243:14, 21; 2244:2; 2245:8, 11; 2250:9; 2251:13; 2253:4, 18; 2256:20; 2257:22; 2259:16; 2260:11; 2274:24; 2275:24; 2276:7, 14; 2278:15; 2281:21, 25; 2286:9, 15; 2287:1; 2288:10; 2289:9; 2290:1; 2293:4, 15, 23; 2294:14; 2295:18; 2307:10; 2314:15; 2324:6, 21; 2328:15; 2329:1; 2332:5; 2341:10, 16, 22; 2345:19; 2355:20; 2356:1; 2358:11; 2362:5
**supplies'** [1] - 2332:9
**supplies/office** [3] - 2279:3, 20; 2280:15
**supply** [3] - 2314:3; 2329:12; 2363:5
**support** [1] - 2271:23
**supported** [2] - 2275:7; 2289:8
**supports** [2] - 2267:18; 2268:19; 2272:10
**supposed** [2] - 2301:10; 2305:23
**surely** [1] - 2349:8
**surgery** [4] - 2281:2; 2363:22
**surprise** [2] - 2274:10; 2300:8
**surprised** [4] - 2279:5, 11, 14, 18
**surprising** [1] - 2303:23
**sustain** [4] - 2265:4; 2267:1; 2268:22; 2285:6
**sustained** [8] - 2269:24; 2274:19; 2284:19; 2301:14; 2302:5; 2303:2; 2313:14
**SW** [5] - 2210:18, 22; 2211:4, 8, 16
**sweat** [1] - 2320:21
**switch** [3] - 2328:2; 2335:21, 23
**switched** [1] - 2329:12
**switches** [1] - 2330:24
**switching** [7] - 2329:11; 2330:14, 19, 22, 25; 2331:1; 2336:2
**sxenakis@ftc.gov** [1] - 2211:10
**system** [3] - 2251:19; 2279:9; 2358:18
**systems** [1] - 2330:16

# T

**table** [2] - 2295:18; 2329:16
**tacit** [1] - 2317:7
**tactic** [2] - 2351:13; 2356:4
**takeaway** [1] - 2277:9
**talent** [1] - 2269:7
**talks** [1] - 2317:1
**tangible** [1] - 2335:24
**Tara** [1] - 2210:13
**team** [1] - 2256:16
**teaming** [1] - 2297:5
**tech** [1] - 2318:1

**tempting** [1] - 2357:2
**ten** [3] - 2248:6; 2306:15
**ten-minute** [1] - 2306:15
**tend** [4] - 2259:17; 2294:22; 2329:18; 2337:15
**term** [8] - 2243:21; 2282:15; 2294:17; 2330:3; 2336:3; 2339:8; 2359:11; 2363:13
**terminate** [1] - 2329:24
**terms** [29] - 2251:19; 2252:25; 2259:15, 19; 2260:5, 17; 2262:22; 2278:7; 2282:13; 2286:19; 2287:7; 2288:2; 2295:25; 2298:16; 2304:6; 2307:5; 2310:2; 2319:11; 2320:17; 2321:8; 2322:19; 2323:21; 2324:20; 2328:24; 2347:21; 2348:23; 2349:4; 2359:5; 2361:1
**test** [6] - 2241:13; 2242:8; 2246:7, 18; 2290:17
**testified** [6] - 2273:24; 2292:7; 2300:12, 16; 2301:24; 2302:2
**testifying** [3] - 2267:15; 2301:11; 2354:21
**testimonial** [1] - 2325:5
**testimony** [17] - 2245:3; 2270:8, 15; 2271:16-18; 2272:4; 2273:8, 13; 2296:21; 2298:14; 2301:25; 2328:10; 2332:23; 2333:3; 2348:21; 2349:10
**text** [1] - 2253:1
**THACHER** [3] - 2212:19, 23; 2213:3
**thankful** [1] - 2251:23
**that'd** [1] - 2325:12
**that'll** [1] - 2290:20
**the..** [1] - 2270:18
**themselves** [6] - 2269:17; 2296:19; 2319:22; 2345:16; 2353:10, 23
**therefore** [2] - 2267:20; 2295:17
**Thereupon** [4] - 2215:4; 2240:6; 2306:19; 2367:17
**they've** [11] - 2257:15; 2280:2; 2300:5; 2323:21; 2350:10; 2356:19; 2357:8, 10; 2362:11; 2364:1, 8
**thinking** [4] - 2296:1; 2324:16; 2344:14; 2350:22
**third** [1] - 2341:1
**thirds** [1] - 2362:18
**thirty** [1] - 2298:3
**thirty-four** [1] - 2298:3
**threaten** [2] - 2355:23; 2356:4
**three** [18] - 2264:2, 16; 2266:4, 7, 13; 2322:7; 2324:20; 2326:25; 2329:23; 2337:11, 16; 2345:22; 2360:19, 24; 2361:14; 2366:18
**three-quarters** [2] - 2337:11, 16
**three-year** [1] - 2329:23
**threshold** [5] - 2259:25; 2283:24; 2290:18, 23; 2291:11
**threw** [1] - 2350:19
**throughout** [1] - 2357:23
**Tier** [1] - 2310:9

**tiny** [6] - 2282:5; 2341:21, 23; 2346:25; 2366:16
**title** [1] - 2333:4
**titled** [1] - 2303:8
**today** [12] - 2244:22; 2245:4; 2269:2; 2283:4; 2297:22; 2327:10; 2349:5, 7; 2353:12; 2356:5
**toe** [2] - 2366:19
**together** [10] - 2257:12; 2261:7; 2277:15; 2280:9, 25; 2281:4; 2300:5; 2304:18; 2365:13, 22
**Tolin** [1] - 2212:10
**toner** [41] - 2257:13, 15, 18; 2277:24; 2278:1, 8; 2279:2, 19; 2280:2, 15; 2289:10; 2310:20, 24; 2311:1, 6, 10, 14, 17, 19; 2312:2, 6, 19, 21, 24; 2314:3, 10, 20; 2315:1, 24; 2355:21; 2363:8; 2364:1, 9, 13; 2365:2, 9, 14
**toners** [1] - 2313:19
**took** [7] - 2256:9; 2258:1; 2273:22; 2289:1; 2295:2, 12; 2364:13
**tools** [2] - 2356:3; 2358:2
**top** [14] - 2260:9; 2265:22; 2266:2, 9; 2288:2; 2302:8, 17, 19; 2303:3, 12; 2328:13, 22; 2337:24; 2338:6
**topic** [1] - 2310:19
**total** [12] - 2276:22; 2293:18; 2304:20; 2321:4; 2344:16, 19, 25; 2348:15; 2350:17; 2353:16
**totally** [1] - 2354:7
**touch** [1] - 2292:24
**trace** [2] - 2314:17; 2316:19
**tracing** [1] - 2284:17
**track** [7] - 2242:24; 2294:21; 2295:4; 2331:12; 2340:15
**tracked** [1] - 2304:24
**tracking** [2] - 2304:16; 2331:11
**TRADE** [8] - 2210:3, 14, 18, 22; 2211:3, 7, 11, 15
**Trade** [2] - 2210:14; 2211:3
**transcript** [4] - 2213:13; 2215:5; 2262:25; 2368:4
**TRANSCRIPT** [1] - 2210:9
**transcription** [1] - 2213:14
**transmitted** [1] - 2301:6
**transportation** [3] - 2356:20; 2357:5, 21
**treat** [1] - 2243:17
**treated** [1] - 2258:2
**treinhart@ftc.gov** [1] - 2210:16
**trends** [1] - 2247:24
**Trial** [8] - 2210:13, 17, 21; 2211:7, 11, 15, 19; 2212:2
**trial** [13] - 2262:25; 2264:19; 2267:24; 2269:5, 8, 21; 2270:20; 2271:5, 13, 16; 2306:23; 2307:14
**tricky** [2] - 2251:12; 2352:10
**tried** [3] - 2256:17; 2286:5
**trim** [1] - 2350:22
**trouble** [5] - 2254:17; 2278:11; 2289:7;

2311:24
**true** [7] - 2339:15; 2354:23; 2357:9, 17; 2364:12
**truthfully** [2] - 2270:23; 2271:3
**try** [6] - 2276:5; 2277:16; 2316:19; 2329:2; 2350:15; 2359:6
**trying** [16] - 2250:7; 2269:11; 2272:13; 2273:1; 2280:5; 2286:11, 16; 2289:12; 2305:12; 2309:19; 2310:10; 2326:20; 2347:5; 2351:5; 2362:9
**turbines** [1] - 2340:1
**turn** [18] - 2252:14; 2254:3; 2282:17; 2292:4; 2293:6; 2297:12; 2321:17; 2324:10; 2327:4; 2329:9; 2330:9; 2333:22; 2335:4, 10; 2345:9; 2351:9
**turned** [2] - 2287:7; 2331:20
**twice** [1] - 2331:23
**twist** [2] - 2300:21; 2352:21
**two** [70] - 2242:6, 12; 2243:7; 2244:1; 2245:5; 2247:11, 18; 2249:20; 2251:13; 2253:18; 2257:6; 2264:1, 16; 2266:12; 2272:14; 2276:18, 22; 2278:6; 2283:5; 2284:12; 2286:20, 22; 2290:6; 2293:23; 2298:8, 10, 14; 2301:2; 2304:4, 9; 2308:18; 2312:12; 2316:12; 2317:1, 11; 2318:24; 2319:3, 5, 11; 2320:25; 2322:17; 2325:18; 2326:9, 25; 2328:8, 11; 2329:22; 2332:21, 23; 2335:2, 25; 2340:25; 2343:10, 13, 24; 2346:3; 2348:19, 21; 2352:17; 2356:16; 2360:21, 24; 2362:18; 2366:18; 2367:3
**two-thirds** [1] - 2362:18
**type** [6] - 2283:21; 2290:3; 2317:7; 2327:17; 2354:14; 2362:20
**types** [4] - 2275:23; 2319:16; 2327:21; 2328:5
**typically** [4] - 2317:24; 2329:15; 2359:8, 10

# U

**U.S** [2] - 2213:9; 2248:7
**ultimately** [1] - 2347:14
**unambiguous** [1] - 2341:6
**unchanging** [1] - 2356:9
**under** [5] - 2279:3; 2280:15; 2283:17; 2289:1; 2309:17
**underestimated** [1] - 2322:15
**underlying** [1] - 2279:4
**undermine** [1] - 2316:1
**underpinnings** [2] - 2271:23; 2275:7
**understate** [1] - 2342:6
**understated** [1] - 2258:6
**understates** [1] - 2259:6
**undisclosed** [4] - 2263:5; 2285:4; 2298:9, 14
**unfair** [7] - 2269:8, 16, 23; 2270:7; 2274:10; 2298:13; 2300:7
**unfairness** [1] - 2268:16

**unfortunately** [1] - 2345:11
**UNIDENTIFIED** [2] - 2240:11, 14
**unilateral** [22] - 2317:2, 9, 14, 17, 20; 2318:4, 6, 10, 21; 2320:8; 2321:1, 16; 2324:17; 2325:9; 2327:2; 2339:4, 6; 2342:13; 2347:18; 2350:1
**UNITED** [2] - 2210:1, 11
**universe** [1] - 2304:21
**unless** [1] - 2256:21
**unlikely** [1] - 2266:10
**unredact** [1] - 2348:16
**unreported** [4] - 2294:23, 25; 2295:14; 2304:14
**unsettle** [4] - 2265:11; 2275:3; 2285:2; 2354:25
**unsettled** [3] - 2263:14; 2297:18; 2310:21
**unusual** [2] - 2270:11; 2332:23
**up** [61] - 2250:22; 2252:5; 2253:8; 2257:19; 2260:4; 2261:4; 2264:4, 9; 2266:19; 2267:11; 2268:20; 2269:13; 2276:9, 25; 2278:2, 8; 2281:16, 24; 2283:6; 2291:14; 2292:25; 2295:13; 2297:5; 2303:2; 2310:18; 2313:2, 8, 10, 12; 2316:6, 8; 2318:24; 2319:22; 2320:4; 2324:11; 2331:9, 11; 2334:7, 9; 2335:10; 2337:10; 2338:16; 2341:17; 2346:3, 5; 2350:23; 2351:1, 8, 19; 2352:4; 2355:17; 2356:12; 2359:5; 2362:14, 16-17; 2365:14; 2366:20, 22; 2367:2, 4
**upper** [3] - 2283:3; 2336:8
**usable** [3] - 2253:8; 2288:22; 2292:8
**usage** [1] - 2314:4
**useful** [3] - 2256:21; 2260:5; 2307:21
**usual** [1] - 2280:14
**Utah** [1] - 2356:15
**utilize** [1] - 2350:2

## V

**valuable** [4] - 2284:13; 2287:19; 2309:22; 2310:13
**value** [1] - 2288:6
**variable** [1] - 2244:8
**variables** [1] - 2242:12
**variety** [1] - 2279:8
**various** [1] - 2326:2
**vendor** [22] - 2250:14; 2253:15; 2257:20; 2285:11; 2286:6, 14; 2287:17, 22, 25; 2290:2, 14, 25; 2291:15, 20; 2294:14; 2297:4; 2308:15; 2327:13; 2329:15; 2330:15; 2343:24; 2354:22
**vendor's** [1] - 2288:4
**vendors** [6] - 2251:15; 2256:20; 2261:4; 2291:23; 2292:18; 2329:12
**Veritiv** [4] - 2257:19, 25; 2258:3; 2334:8
**versa** [1] - 2328:4

**verse** [1] - 2265:12
**versus** [3] - 2245:10; 2342:16; 2360:24
**vice** [2] - 2273:23; 2328:4
**view** [9] - 2252:3; 2284:2; 2287:19; 2292:14; 2320:25; 2338:14; 2341:2; 2359:25; 2366:17
**views** [1] - 2325:2
**vigorously** [2] - 2269:11; 2284:11
**violation** [1] - 2317:8
**Virginia** [1] - 2212:3
**visual** [1] - 2263:16
**volume** [7] - 2253:18; 2343:17; 2350:9, 14; 2352:1, 11; 2357:16

## W

**W.B** [26] - 2257:9, 12, 14; 2261:1; 2262:4; 2278:13, 22; 2279:23; 2280:4; 2319:9; 2321:13; 2324:4; 2327:24; 2342:20; 2343:14; 2344:3, 12; 2345:20; 2346:22; 2347:12; 2348:8, 11; 2349:2, 11
**wait** [5] - 2244:18; 2257:5; 2277:21; 2298:25; 2367:10
**walked** [1] - 2240:25
**Wallace** [4] - 2213:8; 2368:3, 6
**wants** [2] - 2343:23; 2350:9
**washers** [2] - 2248:4, 7
**Washington** [14] - 2210:7, 15, 19, 23; 2211:4, 8, 13, 16, 22; 2212:16, 20, 24; 2213:4, 11
**water** [1] - 2335:8
**ways** [14] - 2242:20; 2285:10; 2294:13; 2316:23; 2322:8; 2335:24; 2340:22; 2350:2; 2351:24; 2352:6; 2353:3, 8, 10
**weak** [1] - 2357:11
**weaken** [1] - 2283:25
**weaker** [1] - 2367:5
**wealth** [1] - 2269:7
**week** [2] - 2301:12; 2302:2
**weight** [3] - 2275:8; 2283:7; 2334:14
**WEIL** [3] - 2212:7, 11, 14
**well-defined** [1] - 2258:13
**Wesley** [1] - 2212:2
**Whirlpool** [2] - 2248:5, 11
**Whirlpool/Maytag** [1] - 2248:1
**whistles** [1] - 2352:25
**whole** [16] - 2241:22; 2247:17; 2256:20; 2258:2; 2259:7; 2263:8; 2264:3, 17; 2273:16; 2274:3; 2280:1; 2284:7; 2307:22; 2312:16; 2325:21; 2360:22
**wholesaler** [2] - 2346:7, 14
**wholesalers** [2] - 2243:22; 2343:17
**Wilson** [5] - 2271:16; 2273:23; 2274:6; 2300:12; 2301:23
**Wilson's** [3] - 2272:4; 2273:4; 2275:12
**win** [7] - 2320:18, 22; 2328:9; 2332:8; 2334:10, 18; 2350:15

**win-loss** [1] - 2328:9
**winners** [1] - 2342:10
**winning** [10] - 2291:21; 2332:7; 2335:15; 2338:23; 2339:7, 13, 17; 2341:18; 2343:1; 2353:18
**wins** [16] - 2327:25; 2328:4, 13-14, 22; 2329:3; 2331:11; 2333:23; 2334:14, 16; 2335:1, 5; 2337:3, 6; 2338:10
**wins-losses** [2] - 2328:22
**witness** [2] - 2267:14; 2272:3
**WITNESS** [126] - 2240:9, 20; 2241:15, 17, 20; 2242:1, 6, 16, 19, 24; 2243:12; 2244:7, 10, 20, 22, 25; 2245:2; 2246:3, 6, 22, 24; 2248:2, 9; 2251:25; 2252:11, 13; 2253:14, 24; 2254:2, 5, 7; 2255:3, 24; 2256:6; 2259:11, 23; 2262:24; 2272:11, 14, 19; 2275:9; 2276:2, 13; 2277:24; 2278:10, 18, 25; 2279:4, 13, 17, 21; 2280:1, 4, 8, 11, 17; 2282:24; 2285:24; 2290:24; 2293:6, 11, 13; 2294:24; 2298:3; 2302:22; 2303:6, 8, 10, 18; 2310:8, 16; 2311:23; 2312:5, 9, 12, 15, 22; 2313:2, 6, 12, 17, 22; 2314:8, 12, 16; 2315:11, 16; 2316:3; 2321:21; 2322:7, 12, 15, 22, 24; 2323:4, 8, 10, 13, 18, 25; 2325:20; 2327:20; 2329:21; 2334:22; 2350:7; 2351:4; 2352:24; 2354:1; 2356:12; 2363:7, 10, 12, 16, 18, 20, 23; 2364:3, 5, 12, 16, 24; 2365:4, 11, 17; 2367:10, 16
**witness's** [1] - 2263:5
**won** [3] - 2328:18; 2334:3; 2362:16
**word** [3] - 2318:4, 24; 2319:7
**works** [1] - 2309:13
**world** [4] - 2244:22; 2247:16; 2320:10
**worried** [9] - 2245:4; 2315:1; 2318:12; 2319:13; 2324:3; 2340:9, 15; 2342:8, 17
**worrisome** [2] - 2319:15; 2359:21
**worry** [5] - 2248:11; 2291:7; 2296:4, 15; 2361:18
**worth** [5] - 2261:18; 2277:19; 2286:25; 2308:4; 2331:11
**wrap** [1] - 2310:18
**write** [1] - 2340:4

## X

**Xenakis** [1] - 2211:7
**Xerox** [2] - 2311:24; 2312:1

## Y

**year** [20] - 2261:15; 2262:1; 2269:20; 2286:9; 2298:12; 2300:5; 2301:19; 2307:6; 2308:16; 2319:11; 2329:15, 23-24; 2330:1, 18; 2359:8, 10
**years** [9] - 2248:6, 13; 2264:2, 16;

2266:13; 2329:25; 2337:25; 2359:2;
2365:5
  **years'** [1] - 2261:18
  **yesterday** [6] - 2240:25; 2245:22;
2310:23; 2320:13; 2334:23; 2359:5
  **yourself** [1] - 2261:25

## Z

  **zone** [3] - 2283:16, 18; 2347:6